*Reference Manual on Scientific Evidence*

1.  The expert should state clearly the objectives of the study, as well as the time frame to which it applies and the statistical population to which the results are being projected.
2.  The expert should report the units of observation (e.g., consumers, businesses, or employees).
3.  The expert should clearly define each variable.
4.  The expert should clearly identify the sample for which data are being studied,[67] as well as the method by which the sample was obtained.
5.  The expert should reveal if there are missing data, whether caused by a lack of availability (e.g., in business data) or nonresponse (e.g., in survey data), and the method used to handle the missing data (e.g., deletion of observations).
6.  The expert should report investigations into errors associated with the choice of variables and assumptions underlying the regression model.
7.  If samples were chosen randomly from a population (i.e., probability sampling procedures were used),[68] the expert should make a good-faith effort to provide an estimate of a sampling error, the measure of the difference between the sample estimate of a parameter (such as the mean of a dependent variable under study), and the (unknown) population parameter (the population mean of the variable).[69]
8.  If probability sampling procedures were not used, the expert should report the set of procedures that was used to minimize sampling errors.

Standards on Disclosure of Procedures Used for Statistical Studies to Collect Data Submitted in Evidence in Legal Cases).

67. The sample information is important because it allows the expert to make inferences about the underlying population.

68. In probability sampling, each representative of the population has a known probability of being in the sample. Probability sampling is ideal because it is highly structured, and in principle, it can be replicated by others. Nonprobability sampling is less desirable because it is often subjective, relying to a large extent on the judgment of the expert.

69. Sampling error is often reported in terms of standard errors or confidence intervals. *See* Appendix, *infra,* for details.

332

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

potentially exposed populations and provide estimates of the cumulative exposure over specified periods.

Perhaps the most widely used models are those that track the fate and transport pathways followed by substances emitted into the air. Knowledge of the amounts emitted per unit of time (usually obtainable by measurement) from a given location (a stack of a certain height, for example) provides the basic model input. Information on wind directions and velocities, the nature of the physical terrain surrounding the source, and other factors needs to be incorporated into the modeling. Some substances will remain in the vapor phase after emission, but chemical degradation (e.g., because of the action of sunlight) could affect media concentrations. Some models provide for estimating the distributions of soil concentrations for those substances (particulates of a certain size) that may fall during dispersion. Much effort has been put into developing and validating air dispersion models.[68] Similar models are available to track the movement of contaminants in both surface and ground waters.

The fate and transport modeling issue becomes more complex when attempts are made to follow a chemical's movement from air, water, and soils into the food chain and to estimate concentrations in the edible portions of plants and animals.[69] Most of the effort in this area involves the use of empirical data (e.g., What does the scientific literature tell us about the quantitative relationships between the concentration of cadmium in soil and its concentration in the edible portions of plants grown in that soil?). This type of empirical information, together with general data on chemical absorption into, distribution in, and excretion from living systems, is the usual approach to ascertain concentrations in these food media.[70]

Many models for environmental fate and transport analysis are available. It is not possible to specify easily which models have established validity and which have not; rather, some are preferred for some purposes and others are preferred for different purposes.

Perhaps the best that can be done to scrutinize the work of an expert in this area is to

- Require that the expert describe in full the basis for model selection;
- Ask the expert to describe the standing of the model with authoritative bodies such as EPA;
- Require the expert to state why other possible models are not suitable;

v. ConocoPhillips Co., 605 F. Supp. 2d 1142, 1164 (E.D. Wash. 2009) (expert calculated plaintiff's benzene exposure by adjusting study results to account for plaintiff's activities); Junk v. Terminix Int'l Co., 2008 WL 6808423 (S.D. Iowa 2008) (study measured chlorpyrifos exposure of inhabitants of houses sprayed indoors); *In re* W.R. Grace & Co., 355 B.R. 462 (Bankr. D. Del. 2006) (asbestos in attic insulation released by normal activity).

68. National Research Council, Models in Environmental Regulatory Decision Making (2007).

69. Ecologists also use modeling results to evaluate risks to wildlife, plants, and ecosystems.

70. National Research Council, *supra* note 68.

EXHIBIT C

*Reference Guide on Exposure Science*

- Require that the expert describe the scientific basis and underlying assumptions of the model, and the ways in which the model has been verified;[71] and
- Require the expert to describe the likely size of error associated with model results.

Other issues pertaining to the sources and reliability of the data used in the application of a model can be similarly pursued.

Results from modeling are concentrations in media of concern over time. If sampling and analysis data are available for the same media, they can be compared with the modeling result, and efforts can be made to reconcile the two and arrive at the most likely values (or range of likely values).

## E. Integrated Exposure/Dose Assessment

We have shown the various methods used to determine the concentrations of chemicals in products and in various environmental media and also the methods used to determine doses from each of the relevant media. Dose estimation as described in Section VI.A applies to each of the relevant routes of exposure.

In many cases, the dose issue concerns one chemical in one product and only one route of exposure. But numerous variations on this basic scenario are possible: one chemical in several products or environmental media, many chemicals in one product or environmental medium, or many chemicals in many environmental media. Even though some exposure situations can be complex and involve multiple chemicals through both direct and indirect pathways, the exposure assessment methods and principles described here can be applied. Exposures occurring by different routes can be added together, or they can be reported separately. The decisions on the final dose estimates and their form of presentation can be made only after discussions with the users of that information—typically the toxicologists and epidemiologists involved in the risk assessment.[72] The dose metrics emerging from the exposure assessment need to match the dose metrics that are used to describe toxicity risks.

One additional point should be highlighted. The principle that exposure to chemicals through foods and consumer products typically focuses on high-end consumers of those foods or products also applies in environmental settings. Thus,

71. This point is to ensure that the expert truly understands the model and its limits and that he or she is not simply using some "black box" computer software.

72. *See, e.g.,* American Farm Bureau Fed'n v. EPA, 559 F.3d 512 (D.C. Cir. 2009) (challenging EPA's risk assessment for fine PM); Miami-Dade County v. EPA, 529 F.3d 1049 (11th Cir. 2008) (assessment of risk of wastewater disposal methods to drinking water); Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin., 476 F.3d 946 (D.C. Cir. 2007) (risk assessment of diesel particulate matter to miners); Rowe v. E.I. du Pont de Nemours & Co., 2008 WL 5412912, 12 (D.N.J 2008) (risk assessment for proposed class).

EXHIBIT C

for example, it is possible to assert with relatively high confidence that almost no one consumes more than 3.5 L of water a day and that almost everyone consumes less. If the dose calculation assumes a water consumption rate of 3.5 L/day, then the risk estimated for that dose is almost certainly an upper limit on the population risk, and regulatory actions based on that risk will almost certainly be highly protective. For regulatory and public health decisionmaking, such a precautionary approach has a great deal of precedent, although care must be taken to ensure adherence to scientific data and principles.[73]

This approach becomes problematic, however, if applied to assessments of exposures that may have been incurred in the past by individuals claiming to have been harmed by them. In such cases, it would seem that there is no basis for a precautionary approach; an approach based on attempts to accurately describe the individual's exposure would seem to be necessary. Whatever the case, the exposure scientist must be careful to ensure accurate description of the exposure concentration (and resulting dose), so that the users of the information can understand whether upper limits or more typical exposures and doses have been provided.

# VII. Into the Body

## *A. Body Burdens*

Section V described how chemicals in the environment contact the three major portals of entry into the body—the respiratory tract, the GI tract, and the skin. For some chemicals, the dose contacting one or more of those portals may be sufficient to cause harm before those chemicals are absorbed into the body; that is, they may cause one or more forms of toxicity to the respiratory system, to the GI tract, or to the skin. Although these forms of *contact* toxicity can be important, it is also important to consider the many forms of systemic toxicity. The latter refers to a large number of toxic manifestations that can affect any of the organs or organ systems of the body after a chemical is absorbed into the bloodstream and distributed within the body. Recall also that most chemicals are acted upon by certain large protein molecules, called enzymes, contained in cells, particularly those of the liver, the skin, and the lungs, and are converted to new compounds, called metabolites (the process leading to these changes is called metabolism). Metabolite formation

---

73. National Research Council, *Evolution and Use of Risk Assessment in the Environmental Protection Agency: Current Practice and Future Prospects, in* Science and Decisions: Advancing Risk Assessment (2008). Those who must comply with regulations that were developed based on a high degree of caution often protest that more accurate assessments should be used as their basis. For several reasons, truly accurate prediction of risk is difficult to achieve (*see* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, in this manual), while predicting an upper bound on the risk is not. At the same time, unless carefully done and described, upper-bound estimates may be so remote from reality that decisions based on them should be avoided.

EXHIBIT C

*Reference Guide on Exposure Science*

is one of the body's mechanisms for creating compounds that are easily removed from the body by one or more excretion processes. Unfortunately, metabolism sometimes creates new compounds that are more toxic than the original (so-called parent) molecule, and, if the internal dose of toxic metabolite exceeds a so-called threshold, toxic harm may occur. Of course, not all toxicity is produced by metabolites; in some cases harm may be caused directly by the parent compound.[74]

As in the other areas of exposure science that have been discussed, it usually becomes important to move from description to quantification. Exposure scientists seek to understand the amount of chemical absorbed into the body after contact (i.e., the fraction of the dose that is absorbed), the amount of chemical reaching and distributed within the body (the blood concentration being the most easily measurable), and the rate of loss of the chemical from the body. The science devoted to understanding these important phenomena is called pharmacokinetics (drug rates). That name came to be used because most of the developmental work in this area related to the behavior of pharmaceuticals in the body, but the tools of pharmacokinetics have been extended to study all types of chemicals.

Pharmacokinetics is important because it reveals where in the body a chemical is most likely to cause harm (where the greatest concentrations, or target site doses, are reached for the longest period of time) and also the concentration—duration level necessary to cause harm. To understand these relationships, pharmacokinetic studies typically are carried out in conjunction with toxicity studies in animals, and their results are used to assess possible toxic risk in humans.[75]

Pharmacokineticists do not ordinarily characterize themselves as exposure scientists; more often they are toxicologists or pharmacologists. But they are in fact extending the usual work of exposure scientists into the body, and it is here that we see the interface between exposure science and toxicology and epidemiology.

## B. Monitoring the Body (Biomonitoring)

As long as we live in a world of chemicals, we will be exposed to them. If analytical chemists developed sufficiently sensitive measuring techniques, it would not be far-fetched to say that we could find within the human body, at some level and for some period, virtually any of the tens of thousands of chemicals, natural and synthetic, with which it comes into contact. Some would be found only occasionally, some continuously; some would be found to persist for days, weeks,

---

74. J.V. Rodricks, *From Exposure to Dose, in* Calculated Risks: The Toxicity and Human Health Risks of Chemicals in Our Environment (2d ed. 2007)

75. See Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, in this manual. *See also, e.g., In re* Fosamax Prod. Liab. Litig., 645 F. Supp. 2d 164, 186 (S.D.N.Y. 2009) (rat and dog studies showing a bisphosphonate caused jaw necrosis relevant to whether Fosamax, another type of bisphosphonate, could cause jaw necrosis in humans); Rose v. Matrixx Initiatives, Inc., 2009 WL 902311, at ★14 (W.D. Tenn. 2009) (studies in animals of nasal spray effects could not be extrapolated to humans because olfactory physiology was too different).

EXHIBIT C

*Reference Manual on Scientific Evidence*

or even longer, whereas others would persist for only minutes or hours. The concentrations in blood would likely vary over many orders of magnitude. Currently, we can measure only a few thousand chemicals in the body, a large share of them pharmaceuticals, nutrients, and substances of abuse. Some standards for occupational exposures are expressed as allowable blood or urine concentrations, and their measurement is a useful supplement to air monitoring.[76]

The environmental chemical that has perhaps received the most attention in this area of exposure science is lead (chemical symbol Pb). Indeed, lead may be the most studied of all environmental substances. After it was learned in the 1950s that the concentration of lead in blood could be easily measured, it became common to sample and test the blood level of lead (BPb) in individuals who had suffered one or more forms of this metal's toxicity. Some epidemiological studies of lead began to include BPb as the measure of exposure, and since the 1970s, hundreds of such studies involving lead have reported results using this measure.[77]

BPb is particularly useful for substances such as lead that have (or did have) a relatively large number of environmental sources.[78] The simple measure of BPb provides a single, integrated measure of exposures through multiple sources, pathways, and routes (although this measure reflects relatively recent and not long-term exposure).[79] This is perhaps the best example of the use of target site dose in risk assessment.

The Centers for Disease Control and Prevention (CDC) began, in the late 1970s, to take blood samples from a relatively large number of children as part of its National Health and Nutrition Examination Survey (NHANES). Children were selected because it was known that they take up more lead from their envi–

---

76. *See, e.g.,* Haas v. Peake, 525 F.3d 1168, 1177 (Fed. Cir. 2008) (presumption of dioxin exposure instituted because of the difficulty of measuring dioxin in the body); Young v. Burton, 567 F. Supp. 2d 121 (D.D.C. 2008) (hormone and enzyme levels allegedly altered by exposure to biotoxins in mold); Hazlehurst v. Sec'y of Dep't of Health & Human Servs., 2009 WL 332306, at ⋆62 (Fed. Cl. 2009) (study measuring porphyrin in urine as a marker for mercury in the body); United States v. Bentham, 414 F. Supp. 2d 472 (S.D.N.Y. 2006) (cocaine use monitored by a "sweatpatch" on the skin).

77. National Center for Environmental Health, Centers for Disease Control and Prevention, Fourth National Report on Human Exposure to Environmental Chemicals (2009), *available at* http://www.cdc.gov/exposurereport/pdf/FourthReport.pdf (last visited July 1, 2010).

78. *See, e.g.,* Potter v. EnerSys, Inc., 2009 WL 3764031 (E.D. Ky. 2009) (alleged lead exposure from working on battery manufacturing site); City of North Chicago v. Hanovnikian, 2006 WL 1519578 (N.D. Ill. 2006) (alleged lead contamination of soil); Perry *ex rel.* Perry v. Frederick Inv. Corp., 509 F. Supp. 2d 11 (D.D.C. 2007) (residential lead paint exposure); Goodstein v. Continental Cas. Co., 509 F.3d 1042 (9th Cir. 2007) (environmental contamination from lead waste site); Evansville Greenway & Remediation Trust v. Southern Indiana Gas & Elec., 661 F. Supp. 2d 989 (S.D. Ind. 2009) (contamination of battery recycling site).

79. BPb usually is reported in units of micrograms (1 one-millionth of 1 gram) in each deciliter (one-tenth of a liter) of blood (μg/dL). More recently, noninvasive methods to measure lead levels in teeth and bones have become available; such measures reflect cumulative exposures over long periods, but their relationships to health are less clear than those based on BPb.

**EXHIBIT C**

*Reference Guide on Exposure Science*

ronments (air,[80] water, food, paint, soils and dusts, emissions from lead and other metal smelters, consumer products, and more) than do adults; they are also, especially during early periods of development, more vulnerable to the adverse effects of lead than are adults. Nationwide, childhood BPb levels averaged 15–20 µg/dL during the 1970s, with substantial numbers of children having BPb levels well in excess of what was at the time thought to be the minimum BPb associated with adverse health effects (40 µg/dL). The most recent NHANES surveys reveal that average childhood levels are in the range of 2 µg/dL, although there remain substantial numbers of children with levels greater than the current CDC health guideline of 10 µg/dL.[81]

Lead is not the only chemical now being studied under the NHANES biomonitoring program. The most recent surveys involve nationwide sampling of blood and urine from close to 8000 children and adults for more than 100 different chemicals.[82] The program focuses on commonly used pesticides and consumer products and certain ubiquitous environmental contaminants, particularly those that persist in the body for long periods. Not surprisingly, most of these chemicals have been detected in some individuals. The NHANES program will continue, and similar programs are under way in government and research centers around the world.

The presence of a chemical in the body is not evidence that it is causing harm. And in some cases—those that involve chemicals, such as the metals and some organic compounds that occur naturally—the NHANES findings may simply reflect natural background levels.[83] In any case, data such as these provide far more direct measures of dose (often referred to as body burden), and in those cases (which are increasing in number) in which epidemiologists and toxicologists are able to relate disease rates to body burdens (instead of to external dose, as is the usual case), far more accurate measures of human risk should become available.

# VIII. Evaluating the Scientific Quality of an Exposure Assessment

Exposure scientists may offer expert testimony regarding exposures to chemicals incurred by individuals or populations. Their assessments typically will include

---

80. At the time of the first NHANES lead survey, leaded gasoline, which emitted lead to air and to soil, was in wide use. That use, at least in the United States, came to an end in the 1980s. For a discussion of the routes of exposure to toxic substances, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, Section III.A, in this manual.

81. There is developing evidence of IQ deficits in children at levels below 10 µg/dL.

82. National Center for Environmental Health, *supra* note 77.

83. Natural background levels of certain metals may, in some geological regions, be quite high and may even be associated with excess disease.

EXHIBIT C

*Reference Manual on Scientific Evidence*

a description of how and when exposures have or could occur, the identities of the chemicals involved, the routes of exposure, the doses incurred, and the durations of exposure. In some cases, testimony will include a description and quantification of body burdens. If the exposure scientist is also an epidemiologist or toxicologist,[84] he or she may offer additional testimony on the health risks associated with those exposures or even regarding the question of whether such exposures have actually caused disease.

For purposes of this reference guide, it is assumed that questions regarding disease risk and causation are beyond the bounds of exposure science. Below is offered a set of questions that exposure scientists should be able to answer, with appropriate documentation and scientific reasoning, to support any given exposure assessment:

- Is the purpose of the assessment clear? Is the exposed population specified?
- What is the source(s) of exposure?
- When did the exposures occur: past? present? If they are occurring now, will they continue to occur?
- What is the assumed duration of exposure, and what is its basis?
- What are the pathways from the source to the exposed individuals? How has it been established that those pathways exist (past? present? future?).
- What is the concentration of the chemical in the media with which the exposed population comes into contact (past? present? future?). What is the basis for this answer: direct measurement? modeling?
- If the concentration is based on direct measurement, what procedures were followed in obtaining that measurement? Was media sampling suf-ficient to ensure that it was representative? If not, why is representativeness not important? Were validated analytical methods used by an accredited laboratory? If not, how can one be assured that the analytical results are reliable?
- If models were used, what is their reliability (see Section VI.D)? What is the variability over time in concentrations in the media of concern? How has the variability been determined?
- What is the variability among members of the population in their exposure to the chemical of concern? How is this known?
- What is known or assumed about the nature and extent of media contact by members of the exposed population? How has this been ascertained?
- What dose, over what period of time, by which routes, has been incurred? What calculations support this determination?

---

84. See Section IX, which deals with the question of the qualifications of exposure scientists. In many cases, the work of exposure experts is turned over to the health experts to incorporate into their evaluation of risk and disease causation. In some cases, usually filed less complex ones, exposure assessments may be undertaken by the health experts.

**EXHIBIT C**

*Reference Guide on Exposure Science*

- What is the likely error in the exposure estimates?
- What uncertainties are associated with the dose/duration findings? Is it a "most likely" estimate, or is it an "upper limit"? To what fraction of the population is the "upper limit" likely to apply?
- What has been omitted from the exposure assessment, and why?

These questions are perhaps the minimum that an expert should be able to address when offering testimony. Obviously, most such questions can be answered fully only if the expert can support the answers with documentation.

As noted in Section III.D, the evaluation of whether a current medical condition is causally related to exposures occurring in the past (prior to the onset or diagnosis of the medical condition) requires a retrospective examination of the conditions that led to those exposures. Thus, for example, a plaintiff suffering from leukemia and who alleges that benzene exposure in his or her workplace caused the disease may easily demonstrate the fact of benzene exposure. But ordinarily an estimation of the quantitative magnitude and duration of the incurred benzene exposure is necessary to evaluate the plausibility of the causation claim.[85] The methodological tools necessary to "reconstruct" the plaintiff's past exposure are identical to those used to estimate current exposures, but the availability of the data necessary to apply those methods may be limited or, in some cases, nonexistent.

Reconstruction of occupational exposures has been a relatively successful pursuit, because often historical industrial hygiene data are available involving the measurement of workplace air levels of chemicals. If it is possible, through the examination of employment records, to reconstruct an individual's job history, it may be possible to ascertain that individual's exposure history.[86] Guidelines for occupational exposure reconstruction have been published by the American Industrial Hygiene Association.[87] Clearly, experts presenting testimony regarding exposure reconstruction must be queried heavily on the sources of data used in their applications of exposure methods.

# IX. Qualifications of Exposure Scientists

Exposure science is not yet a true academic discipline. Rather, scientists and engineers from diverse backgrounds have, over the past several decades, come together to give shape and substance and scientific rigor to what is clearly a criti-

---

85. *See* Michael D. Green et al., Reference Guide on Epidemiology, Section VII, in this manual.

86. T.W. Armstrong, *Exposure Reconstruction, in* Mathematical Models for Estimating Occupational Exposures to Chemicals (Charles B. Keil et al. eds., 2d ed. 2009).

87. American Industrial Hygiene Association, Guideline on Occupational Exposure Reconstruction (S.M. Viet et al. eds., 2008).

EXHIBIT C

*Reference Manual on Scientific Evidence*

cal element in understanding toxicity risks and disease causation. Typically, those who have contributed to this developing field have come from backgrounds in industrial hygiene, environmental and analytical chemistry, chemical engineering, hydrogeology, and even behavioral sciences (pertaining to those aspects of human behavior that affect exposures).[88] Most toxicologists and epidemiologists have considerable experience in exposure science, as do pharmacologists who study drug kinetics and disposition. Many exposure assessments involve collaborative efforts among members of these various disciplines.

There are currently no certification programs available for exposure scientists, but increasingly exposure science research appears in publications such as *Environmental Health Perspectives*, *Risk Analysis*, and the *Journal of Exposure Science and Environmental Epidemiology*.

Certification programs do exist in occupational exposure science. Qualified industrial hygienists will almost always be certified (CIH). The *American Industrial Hygiene Association Journal* includes much scholarly work related to exposure science.

---

88. *See, e.g.,* Allen v. Martin Surfacing, 2009 WL 3461145, 2008 U.S. Dist. LEXIS 111658, 263 F.R.D. 47 (D. Mass. 2008) (industrial hygienist qualified to testify regarding concentration and duration of plaintiffs' decedent's exposure to toluene and other chemicals); Buzzerd v. Flagship Carwash of Port St. Lucie, Inc., 669 F. Supp. 2d 514 (M.D. Pa. 2009) (industrial hygienist qualified to opine on carbon monoxide exposure, but his conclusions were not based on reliable methodology).

EXHIBIT C

*Reference Guide on Exposure Science*

# Appendix A: Presentation of Data— Concentration Units

Choosing the proper units to express concentrations of chemicals in environmental media is crucial for precisely defining exposure. Chemical concentrations in environmental media usually are reported in one of two forms: as numeric ratios, such as parts per million or billion (ppm and ppb, respectively), or as unit weight of the chemical per weight or volume of environmental media, such as milligrams per kilogram (mg/kg) or milligrams per cubic meter (mg/m$^3$). Although concentrations expressed as parts per million or parts per billion are easier for some people to conceptualize, their use assumes that media are always sampled at standard temperature and pressure (25°C and 760 torr, respectively). Consequently, scientists prefer to express chemical concentrations as weight of chemical per unit weight or volume of media. This method also makes conversions to dose equivalents, usually expressed in terms of weight of chemical per unit body weight (mg/kg bw), more convenient.

To permit the presentation of results without excessive zeroes before or after the decimal point, appropriate units are needed. The choice of units depends on both the medium in which the chemical resides and the amount of chemical measured. For example, if 50 nanograms of chemical were found in 1 L of water, the appropriate units would be ng/L, rather than 0.00005 mg/L. If 50 grams were found instead, the appropriate units would be 50,000 mg/L, because milligrams are generally the largest units used to express the mass of a chemical in media (Table 1).

Table 1. Weight of Chemical per Unit Weight of Medium

| Preferred Unit | Alternative Unit |
| --- | --- |
| mg/kg | ppm (parts per million) |
| µg/kg | ppb (parts per billion) |
| ng/kg | ppt (parts per trillion) |
| pg/kg | ppq (parts per quadrillion) |

In water or food, concentration expressed by the preferred unit equals concentration expressed by alternative unit; thus, 2 mg/kg = 2 ppm. One mg ($10^{-3}$ g) per kg ($10^3$ g) equals 1 part per million ($10^{-3}/10^3 = 10^{-6}$). Similarly, 1 µg ($10^{-6}$ g) per kilogram ($10^3$ g) equals 1 part per billion ($10^{-6}/10^3 = 10^{-9}$), and so on (Table 2).

Note that in air, parts per million and parts per billion have different meanings than they do in water or food; to avoid confusion, it is always preferrable to express air concentrations in weight of chemical per unit volume (rather than weight) of air (usually cubic meters, m$^3$).

EXHIBIT C

*Reference Manual on Scientific Evidence*

Table 2. Weight of Chemical per Unit Volume of Medium

| Water | Air |
|---|---|
| mg/L = ppm | $mg/m^3 \neq ppm$ |
| µg/L = ppb | $mg/m^3 \neq ppb$ |
| ng/L = ppt | $ng/m^3 \neq ppt$ |

542

**EXHIBIT C**

*Reference Guide on Exposure Science*

# Appendix B: Hazardous Waste Site Exposure Assessment

Several principles of exposure assessment can be illustrated by examining the steps taken to evaluate a hazardous waste disposal site. From 1964 to 1972, more than 300,000 55-gallon drums of solid and liquid pesticide production wastes were buried in shallow trenches at a hazardous waste disposal site in Hardeman County, Tennessee. As early as 1965, county engineers had raised concerns that these operations might have affected the aquifer supplying drinking water to the City of Memphis, Tennessee. The State of Tennessee ordered the landfill to stop accepting hazardous waste in 1972; all operations were reported to have ceased by 1975. Testing in 1978 confirmed the presence of toxic chemicals in domestic wells, and by January 1979 all uses of the contaminated well water had been discontinued.

Among the chemicals of concern detected in the ground water were benzene, carbon tetrachloride, chlordane, chlorobenzene, chloroform, and several other pesticides or chemicals associated with pesticide production. As is often the case for ground water polluted by landfills, the observed concentrations fluctuated over a relatively wide range. For example, in a domestic well approximately 1500 feet north of the landfill, carbon tetrachloride concentrations ranged from 10 ppm to 20 ppm between November 1978 and November 1979; from May 1981 to June 1982, carbon tetrachloride levels varied from 18 ppm to 164 ppm.

The chemicals of greatest concern detected during ground-water monitoring near the Hardeman site included carbon tetrachloride, chloroform, and tetrachloroethylene. For each of these three chemicals, the concentrations detected in well water were significantly elevated over levels typically found in potable water. Health surveys conducted in 1978 and 1982 suggested that these chemicals might be causing a variety of health problems in nearby residents.

To confirm the cause-and-effect relationship suggested by the health surveys, an exposure assessment was conducted so that the findings of the health surveys could be compared to adverse health impacts predicted from exposure estimates and toxicological data from laboratory experiments. The exposure assessment for the Hardeman site focused on carbon tetrachloride, because of the high concentrations of this chemical found in the ground water and the severity of the potential health effects associated with exposure to it.

To estimate the range of possible exposures, the Hardeman site assessment considered exposures of both an adult and an infant. The exposure assessor then needed to identify the pathways of exposure that might be important. For the infant, the following exposure pathways were examined:

- Consumption of formula made using well water,
- Dermal absorption during bathing in contaminated water, and

543

EXHIBIT C

*Reference Manual on Scientific Evidence*

- In-utero exposure of the fetus through exposure of the mother during pregnancy.

Adult exposures were evaluated for two pathways:

- Consumption of contaminated drinking water and
- Inhalation of carbon tetrachloride emanating from water during showers.

Because measurements of concentrations of carbon tetrachloride in the ground water were scant before 1978, estimates were modeled for these years; measured concentrations were used for 1978, the last year residents utilized ground water for drinking. Standard assumptions regarding the ingestion of water by adults (2 L/day) were used; water consumption by a child was assumed to be 0.5 L/day for 3 months following birth. Dermal absorption by infants was estimated by assuming that the child bathed in 30 L/day of well water, that 50% of this volume contacted the skin, and that 10% of the contaminant was absorbed through the skin. Three baths per week were assumed for the first 3 months after birth. In-utero exposure was estimated assuming equal concentrations of carbon tetrachloride in fetal and maternal blood. The concentration of carbon tetrachloride in air during showering was calculated assuming that it would quickly reach equilibrium with carbon tetrachloride in the shower water.

In Table 3, carbon tetrachloride exposure estimates for the infant and adult are compared with the minimum daily exposure producing liver damage in guinea pigs and the lifetime cumulative exposure producing liver cancer in mice. Daily exposure rates were based on a predicted yearly average exposure during the highest year of exposure. Monitoring data indicate that the concentration of carbon tetrachloride in the ground water may have varied by a factor of 10 around the mean. The maximum daily exposure rate may have been considerably higher than the estimates presented in the table, whereas the long-term averages may have been lower.

Table 3. Carbon Tetrachloride Exposure Estimates for Infants and Adults Compared with Minimum Daily Exposure Producing Liver Damage in Guinea Pigs and Lifetime Cumulative Exposure Producing Liver Cancer in Mice

|  | Daily Dose Rate (mg/kg/day) |
| --- | --- |
| Liver damage in guinea pigs | 1.5 |
| Estimated infant exposure | 1.8 |
| Estimated adult exposure | 0.3 |
|  | Cumulative Dose (mg/kg) |
| 40% Liver tumors in mice | 1200 |
| Estimated adult exposure | 284 |

544

EXHIBIT C

*Reference Guide on Exposure Science*

# Glossary of Terms

**absorbed dose.** The amount of a substance that actually enters the body following absorption.

**absorption.** The penetration of a substance through a barrier (e.g., the skin, the gut, or the lungs).

**acute exposure.** An exposure of short duration and/or rapid onset. An acute toxic effect is one that develops during or shortly after an acute exposure to a toxic substance.

**average daily dose (ADD).** The average dose received on any given day during a period of exposure, expressed in mg/kg body weight per day. Ordinarily used in assessing noncancer risks.

**bioavailability.** The rate and extent to which a chemical or chemical breakdown product enters the general circulation, thereby permitting access to the site of toxic action.

**body burden.** The total amount of a chemical present or stored in the body. In humans, body burden is an important measure of exposure to chemicals that tend to accumulate in fat cells, such as DDT, PCBs, or dioxins.

**chronic exposure.** A persistent, recurring, or long-term exposure, as distinguished from an acute exposure. Chronic exposure may result in health effects (such as cancer) that are delayed in onset, occurring long after exposure has ceased.

**direct exposure.** Exposure of a subject who comes into contact with a chemical via the medium in which it was initially released to the environment. Examples include exposures mediated by cosmetics, other consumer products, some food and beverage additives, medical devices, over-the-counter drugs, and single-medium environmental exposures.

**dose.** The amount of a substance entering a person, usually expressed for chemicals in the form of weight of the substance (generally in milligrams (mg) or micrograms ($\mu$g)) per unit of body weight (generally in kilograms (kg)). It is necessary to specify whether the dose referred to is applied or absorbed. The time over which it is received must also be specified. The time of interest is typically 1 day. If the duration of exposure is specified, dose is actually a dose rate and is expressed as mg or $\mu$g/kg per day.

**dose–response assessment.** An analysis of the relationship between the dose administered to a group and the frequency or magnitude of the biological effect (response).

**duration of exposure.** Toxicologically, there are three categories describing duration of exposure: acute (one time), subchronic (repeated, for a fraction of a lifetime), and chronic (repeated, for nearly a lifetime).

545

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**environmental media.** Air, water, soils, and food; consumer products may also be considered media. Chemicals may be directly and intentionally introduced into certain media. Others may move from their sources through one or more media before they reach the media with which people have contact.

**exposure.** The opportunity to receive a dose through direct contact with a chemical or medium containing a chemical. See also direct esposure; indirect exposure.

**exposure assessment.** The process of describing, for a population at risk, the amounts of chemicals to which individuals are exposed, or the distribution of exposures within a population, or the average exposure over an entire population.

**frequency of exposure.** The number of times an exposure occurs in a given period; exposure may be continuous, discontinuous but regular (e.g., once daily), or intermittent (e.g., less than daily, with no standard quantitative definition).

**indirect exposure.** Often defined as an exposure involving multimedia transport of chemicals from source to exposed individual. Examples include exposures to chemicals deposited onto soils from the air, chemicals released into the ground water beneath a hazardous waste site, or consumption of fruits or vegetables with pesticide residues.

**intake.** The amount of contact with a medium containing a chemical; used for estimating the dose received from a particular medium.

**levels.** An alternative term for expressing chemical concentration in environmental media. Usually expressed as mass per unit volume or unit weight in the medium of interest.

**lifetime average daily dose (LADD).** Total dose received over a lifetime multiplied by the fraction of lifetime during which exposure occurs, expressed in mg/kg body weight per day. Ordinarily used for assessing cancer risk.

**models.** Idealized mathematical expressions of the relationship between two or more factors (variables).

**pathway.** The connected media that transport a chemical from source to populations.

**point–of–contact exposures.** Exposure expressed as the product of the concentration of the chemical in the medium of exposure and the duration and surface area of contact with the body surface, for example, $mg/cm^2$-hours. Some chemicals do not need to be absorbed into the body but rather produce toxicity directly at the point of contact, for example, the skin, mouth, GI tract, nose, bronchial tubes, or lungs. In such cases, the absorbed dose is not the relevant measure of exposure; rather, it is the amount of toxic chemical coming directly into contact with the body surface.

EXHIBIT C

*Reference Guide on Exposure Science*

**population at risk.** A group of subjects with the opportunity to be exposed to a chemical.

**risk.** The nature and probability of occurrence of an unwanted, adverse effect on human life or health or on the environment.

**risk assessment.** Characterization of the potential adverse effects on human life or health or on the environment. According to the National Research Council's Committee on the Institutional Means for Assessment of Health Risk, human health risk assessment includes the following: description of the potential adverse health effects based on an evaluation of results of epidemiologic, clinical, toxicological, and environmental research (hazard identification); extrapolation from those results to predict the type and estimate the extent of health effects in humans under given conditions of exposure (dose–response assessment); judgments regarding the number and characteristics of persons exposed at various intensities and durations (exposure assessment); summary judgments on the existence and overall magnitude of the public-health problem; and characterization of the uncertainties inherent in the process of inferring risk (risk characterization).

**route of exposure.** The way a chemical enters the body after exposure, that is, by ingestion, inhalation, or dermal absorption.

**setting.** The place or situation in which a person is exposed to the chemical. Setting is often modified by the activity a person is undertaking, for example, occupational or in-home exposures.

**source.** The activity or entity from which the chemical is released for potential human exposure.

**subchronic exposure.** An exposure of intermediate duration between acute and chronic.

**subject.** An exposed individual, whether a human or an exposed animal or organism in the environment. An exposed individual is sometimes also called a receptor.

**systemic dose.** A dose of a chemical within the body—that is, not localized at the point of contact. Thus, skin irritation caused by contact with a chemical is not a systemic effect, but liver damage due to absorption of the chemical through the skin is. Often referred to as target site dose.

**total dose.** The doses received by more than one route of exposure are added to yield the total dose.

EXHIBIT C

*Reference Manual on Scientific Evidence*

# References on Exposure

D.B. Barr, *Expanding the Role of Exposure Science in Environmental Health,* 16 J. Exposure Sci. Envtl. Epidemiol. 473 (2006).

Exposure Assessment in Occupational and Environmental Epidemiology (M.J. Nieuwenhuiysen ed., 2003).

S. Gad, Regulatory Toxicology (2d ed. 2001). Includes much discussion of pharmaceuticals, food ingredients, and other consumer products.

P. Lioy, *Exposure Science: A View of the Past and Milestones for the Future*, 118 Envtl. Health Persp. 1081–90 (2010).

U.S. Environmental Protection Agency, Guidelines for Exposure Assessment, Doc. No. EPA/600/Z-92/001 (1992), *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=15263.

EXHIBIT C

# Reference Guide on Epidemiology

MICHAEL D. GREEN, D. MICHAL FREEDMAN, AND
LEON GORDIS

*Michael D. Green, J.D., is Bess & Walter Williams Chair in Law, Wake Forest University School of Law, Winston-Salem, North Carolina.*

*D. Michal Freedman, J.D., Ph.D., M.P.H., is Epidemiologist, Division of Cancer Epidemiology and Genetics, National Cancer Institute, Bethesda, Maryland.*

*Leon Gordis, M.D., M.P.H., Dr.P.H., is Professor Emeritus of Epidemiology, Johns Hopkins Bloomberg School of Public Health, and Professor Emeritus of Pediatrics, Johns Hopkins School of Medicine, Baltimore, Maryland.*

CONTENTS

  I.  Introduction, 551
 II.  What Different Kinds of Epidemiologic Studies Exist? 555
       A.  Experimental and Observational Studies of Suspected Toxic
           Agents, 555
       B.  Types of Observational Study Design, 556
           1.  Cohort studies, 557
           2.  Case–control studies, 559
           3.  Cross–sectional studies, 560
           4.  Ecological studies, 561
       C.  Epidemiologic and Toxicologic Studies, 563
III.  How Should Results of an Epidemiologic Study Be Interpreted? 566
       A.  Relative Risk, 566
       B.  Odds Ratio, 568
       C.  Attributable Risk, 570
       D.  Adjustment for Study Groups That Are Not Comparable, 571
 IV.  What Sources of Error Might Have Produced a False Result? 572
       A.  What Statistical Methods Exist to Evaluate the Possibility of
           Sampling Error? 574
           1.  False positives and statistical significance, 575
           2.  False negatives, 581
           3.  Power, 582

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

B.  What Biases May Have Contributed to an Erroneous Association? 583
    1.  Selection bias, 583
    2.  Information bias, 585
    3.  Other conceptual problems, 590
C.  Could a Confounding Factor Be Responsible for the Study Result? 591
    1.  What techniques can be used to prevent or limit confounding? 595
    2.  What techniques can be used to identify confounding factors? 595
    3.  What techniques can be used to control for confounding factors? 596
V.  General Causation: Is an Exposure a Cause of the Disease? 597
A.  Is There a Temporal Relationship? 601
B.  How Strong Is the Association Between the Exposure and Disease? 602
C.  Is There a Dose–Response Relationship? 603
D.  Have the Results Been Replicated? 604
E.  Is the Association Biologically Plausible (Consistent with Existing Knowledge)? 604
F.  Have Alternative Explanations Been Considered? 605
G.  What Is the Effect of Ceasing Exposure? 605
H.  Does the Association Exhibit Specificity? 605
I.  Are the Findings Consistent with Other Relevant Knowledge? 606
VI.  What Methods Exist for Combining the Results of Multiple Studies? 606
VII.  What Role Does Epidemiology Play in Proving Specific Causation? 608
VIII. Acknowledgments, 618
Glossary of Terms, 619
References on Epidemiology, 630
References on Law and Epidemiology, 630

**EXHIBIT C**

*Reference Guide on Epidemiology*

# I. Introduction

Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations. The purpose of epidemiology is to better understand disease causation and to prevent disease in groups of individuals. Epidemiology assumes that disease is not distributed randomly in a group of individuals and that identifiable subgroups, including those exposed to certain agents, are at increased risk of contracting particular diseases.[1]

Judges and juries are regularly presented with epidemiologic evidence as the basis of an expert's opinion on causation.[2] In the courtroom, epidemiologic research findings are offered to establish or dispute whether exposure to an agent[3]

---

1. Although epidemiologists may conduct studies of beneficial agents that prevent or cure disease or other medical conditions, this reference guide refers exclusively to outcomes as diseases, because they are the relevant outcomes in most judicial proceedings in which epidemiology is involved.

2. Epidemiologic studies have been well received by courts deciding cases involving toxic substances. *See, e.g.,* Siharath v. Sandoz Pharms. Corp., 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001) ("The existence of relevant epidemiologic studies can be a significant factor in proving general causation in toxic tort cases. Indeed, epidemiologic studies provide 'the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease.'" (quoting Conde v. Velsicol Chem. Corp., 804 F. Supp. 972, 1025–26 (S.D. Ohio 1992))), *aff'd,* 295 F.3d 1194 (11th Cir. 2002); Berry v. CSX Transp., Inc., 709 So. 2d 552, 569 (Fla. Dist. Ct. App. 1998). Well-conducted studies are uniformly admitted. 3 Modern Scientific Evidence: The Law and Science of Expert Testimony § 23.1, at 187 (David L. Faigman et al. eds., 2007–08) [hereinafter Modern Scientific Evidence]. Since *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), the predominant use of epidemiologic studies is in connection with motions to exclude the testimony of expert witnesses. Cases deciding such motions routinely address epidemiology and its implications for the admissibility of expert testimony on causation. Often it is not the investigator who conducted the study who is serving as an expert witness in a case in which the study bears on causation. *See, e.g.,* Kennedy v. Collagen Corp., 161 F.3d 1226 (9th Cir. 1998) (physician is permitted to testify about causation); DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 953 (3d Cir. 1990) (a pediatric pharmacologist expert's credentials are sufficient pursuant to Fed. R. Evid. 702 to interpret epidemiologic studies and render an opinion based thereon); Medalen v. Tiger Drylac U.S.A., Inc., 269 F. Supp. 2d 1118, 1129 (D. Minn. 2003) (holding toxicologist could testify to general causation but not specific causation); Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256, 1267 (D. Kan. 2002) (a vascular surgeon was permitted to testify to general causation); Landrigan v. Celotex Corp., 605 A.2d 1079, 1088 (N.J. 1992) (an epidemiologist was permitted to testify to both general causation and specific causation); Trach v. Fellin, 817 A.2d 1102, 1117–18 (Pa. Super. Ct. 2003) (an expert who was a toxicologist and pathologist was permitted to testify to general and specific causation).

3. We use the term "agent" to refer to any substance external to the human body that potentially causes disease or other health effects. Thus, drugs, devices, chemicals, radiation, and minerals (e.g., asbestos) are all agents whose toxicity an epidemiologist might explore. A single agent or a number of independent agents may cause disease, or the combined presence of two or more agents may be necessary for the development of the disease. Epidemiologists also conduct studies of individual characteristics, such as blood pressure and diet, which might pose risks, but those studies are rarely of interest in judicial proceedings. Epidemiologists also may conduct studies of drugs and other pharmaceutical products to assess their efficacy and safety.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

caused a harmful effect or disease.[4] Epidemiologic evidence identifies agents that are associated with an increased risk of disease in groups of individuals, quantifies the amount of excess disease that is associated with an agent, and provides a profile of the type of individual who is likely to contract a disease after being exposed to an agent. Epidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?).[5] For example, in the 1950s, Doll and Hill and others published articles about the increased risk of lung cancer in cigarette smokers. Doll and Hill's studies showed that smokers who smoked 10 to 20 cigarettes a day had a lung cancer mortality rate that was about 10 times higher than that for nonsmokers.[6] These studies identified an association between smoking cigarettes and death from lung cancer that contributed to the determination that smoking causes lung cancer.

However, it should be emphasized that *an association is not equivalent to causation*.[7] An association identified in an epidemiologic study may or may not be

4. *E.g.,* Bonner v. ISP Techs., Inc., 259 F.3d 924 (8th Cir. 2001) (a worker exposed to organic solvents allegedly suffered organic brain dysfunction); Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256 (D. Kan. 2002) (cigarette smoking was alleged to have caused peripheral vascular disease); *In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166 (N.D. Cal. 2007) (multidistrict litigation over drugs for arthritic pain that caused heart disease); Ruff v. Ensign-Bickford Indus., Inc., 168 F. Supp. 2d 1271 (D. Utah 2001) (chemicals that escaped from an explosives manufacturing site allegedly caused non-Hodgkin's lymphoma in nearby residents); Castillo v. E.I. du Pont De Nemours & Co., 854 So. 2d 1264 (Fla. 2003) (a child born with a birth defect allegedly resulting from mother's exposure to a fungicide).

5. This terminology and the distinction between general causation and specific causation are widely recognized in court opinions. *See, e.g.,* Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005); *In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1129 (9th Cir. 2002) ("'Generic causation' has typically been understood to mean the capacity of a toxic agent . . . to cause the illnesses complained of by plaintiffs. If such capacity is established, 'individual causation' answers whether that toxic agent actually caused a particular plaintiff's illness."); *In re* Rezulin Prods. Liab. Litig., 369 F. Supp. 2d 398, 402 (S.D.N.Y. 2005); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 524–25 (W.D. Pa. 2003); Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256, 1266–67 (D. Kan. 2002). For a discussion of specific causation, see *infra* Section VII.

6. Richard Doll & A. Bradford Hill, *Lung Cancer and Other Causes of Death in Relation to Smoking: A Second Report on the Mortality of British Doctors,* 2 Brit. Med. J. 1071 (1956).

7. *See* Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 461 (W.D. Pa. 2003) (Hill criteria [see *infra* Section V] developed to assess whether an association is causal); Miller v. Pfizer, Inc., 196 F. Supp. 2d 1062, 1079–80 (D. Kan. 2002); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 591 (D.N.J. 2002) ("[A]n association is not equivalent to causation." (quoting the second edition of this reference guide)); Zandi v. Wyeth a/k/a Wyeth, Inc., No. 27-CV-06-6744, 2007 WL 3224242, at *11 (D. Minn. Oct. 15, 2007).

Association is more fully discussed *infra* Section III. The term is used to describe the relationship between two events (e.g., exposure to a chemical agent and development of disease) that occur more frequently together than one would expect by chance. Association does not necessarily imply a causal effect. Causation is used to describe the association between two events when one event is a necessary link in a chain of events that results in the effect. Of course, alternative causal chains may exist that do not include the agent but that result in the same effect. For general treatment of causation in tort law

**EXHIBIT C**

*Reference Guide on Epidemiology*

causal.[8] Assessing whether an association is causal requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge. It is important to emphasize that all studies have "flaws" in the sense of limitations that add uncertainty about the proper interpretation of the results.[9] Some flaws are inevitable given the limits of technology, resources, the ability and willingness of persons to participate in a study, and ethical constraints. In evaluating epidemiologic evidence, the key questions, then, are the extent to which a study's limitations compromise its findings and permit inferences about causation.

A final caveat is that employing the results of group-based studies of risk to make a causal determination for an individual plaintiff is beyond the limits of epidemiology. Nevertheless, a substantial body of legal precedent has developed that addresses the use of epidemiologic evidence to prove causation for an individual litigant through probabilistic means, and the law developed in these cases is discussed later in this reference guide.[10]

The following sections of this reference guide address a number of critical issues that arise in considering the admissibility of, and weight to be accorded to, epidemiologic research findings. Over the past several decades, courts frequently have confronted the use of epidemiologic studies as evidence and have recognized their utility in proving causation. As the Third Circuit observed in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*: "The reliability of expert testimony founded on reasoning from epidemiologic data is generally a fit subject for judicial notice; epidemiology is a well-established branch of science and medicine, and epidemiologic evidence has been accepted in numerous cases."[11] Indeed,

---

and that for factual causation to exist an agent must be a necessary link in a causal chain sufficient for the outcome, see Restatement (Third) of Torts: Liability for Physical Harm § 26 (2010). Epidemiologic methods cannot deductively prove causation; indeed, all empirically based science cannot affirmatively prove a causal relation. *See, e.g.,* Stephan F. Lanes, *The Logic of Causal Inference in Medicine,* in Causal Inference 59 (Kenneth J. Rothman ed., 1988). However, epidemiologic evidence can justify an inference that an agent causes a disease. See *infra* Section V.

8. *See infra* Section IV.

9. *See In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 289 F. Supp. 2d 1230, 1240 (W.D. Wash. 2003) (quoting this reference guide and criticizing defendant's "ex post facto dissection" of a study); *In re* Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1997 U.S. Dist. LEXIS 6441, at ⋆26–⋆27 (E.D. Pa. May 5, 1997) (holding that despite potential for several biases in a study that "may . . . render its conclusions inaccurate," the study was sufficiently reliable to be admissible); Joseph L. Gastwirth, *Reference Guide on Survey Research,* 36 Jurimetrics J. 181, 185 (1996) (review essay) ("One can always point to a potential flaw in a statistical analysis.").

10. *See infra* Section VII.

11. 911 F.2d 941, 954 (3d Cir. 1990); *see also* Norris v. Baxter Healthcare Corp., 397 F.3d 878, 882 (10th Cir. 2005) (an extensive body of exonerative epidemiologic evidence must be confronted and the plaintiff must provide scientifically reliable contrary evidence); *In re* Meridia Prods. Liab. Litig., 328 F. Supp. 2d 791, 800 (N.D. Ohio 2004) ("Epidemiologic studies are the primary generally accepted methodology for demonstrating a causal relation between the chemical compound and a set of symptoms or a disease. . . ." (quoting Conde v. Velsicol Chem. Corp., 804 F. Supp. 972,

553

EXHIBIT C

*Reference Manual on Scientific Evidence*

much more difficult problems arise for courts when there is a paucity of epidemiologic evidence.[12]

Three basic issues arise when epidemiology is used in legal disputes, and the methodological soundness of a study and its implications for resolution of the question of causation must be assessed:

1. Do the results of an epidemiologic study or studies reveal an association between an agent and disease?
2. Could this association have resulted from limitations of the study (bias, confounding, or sampling error), and, if so, from which?
3. Based on the analysis of limitations in Item 2, above, and on other evidence, how plausible is a causal interpretation of the association?

Section II explains the different kinds of epidemiologic studies, and Section III addresses the meaning of their outcomes. Section IV examines concerns about the methodological validity of a study, including the problem of sampling error.[13] Section V discusses general causation, considering whether an agent is capable of causing disease. Section VI deals with methods for combining the results of multiple epidemiologic studies and the difficulties entailed in extracting a single global measure of risk from multiple studies. Additional legal questions that arise in most toxic substances cases are whether population-based epidemiologic evidence can be used to infer specific causation, and, if so, how. Section VII addresses specific causation—the matter of whether a specific agent caused the disease in a given plaintiff.

1025–26 (S.D. Ohio 1992))); Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1296 (N.D. Ala. 2001) ("Unquestionably, epidemiologic studies provide the best proof of the general association of a particular substance with particular effects, but it is not the only scientific basis on which those effects can be predicted.").

12. *See infra* note 181.

13. For a more in-depth discussion of the statistical basis of epidemiology, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section II.A, in this manual, and two case studies: Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life Cycle of Mass Torts,* 43 Hastings L.J. 301 (1992); Devra L. Davis et al., *Assessing the Power and Quality of Epidemiologic Studies of Asbestos-Exposed Populations,* 1 Toxicological & Indus. Health 93 (1985). *See also* References on Epidemiology and References on Law and Epidemiology at the end of this reference guide.

**EXHIBIT C**

*Reference Guide on Epidemiology*

# II. What Different Kinds of Epidemiologic Studies Exist?

## A. Experimental and Observational Studies of Suspected Toxic Agents

To determine whether an agent is related to the risk of developing a certain disease or an adverse health outcome, we might ideally want to conduct an experimental study in which the subjects would be randomly assigned to one of two groups: one group exposed to the agent of interest and the other not exposed. After a period of time, the study participants in both groups would be evaluated for the development of the disease. This type of study, called a randomized trial, clinical trial, or true experiment, is considered the gold standard for determining the relationship of an agent to a health outcome or adverse side effect. Such a study design is often used to evaluate new drugs or medical treatments and is the best way to ensure that any observed difference in outcome between the two groups is likely to be the result of exposure to the drug or medical treatment.

Randomization minimizes the likelihood that there are differences in relevant characteristics between those exposed to the agent and those not exposed. Researchers conducting clinical trials attempt to use study designs that are placebo controlled, which means that the group not receiving the active agent or treatment is given an inactive ingredient that appears similar to the active agent under study. They also use double blinding where possible, which means that neither the participants nor those conducting the study know which group is receiving the agent or treatment and which group is given the placebo. However, ethical and practical constraints limit the use of such experimental methodologies to assess the value of agents that are thought to be beneficial to human beings.[14]

When an agent's effects are suspected to be harmful, researchers cannot knowingly expose people to the agent.[15] Instead epidemiologic studies typically

---

14. Although experimental human studies cannot intentionally expose subjects to toxins, they can provide evidence that a new drug or other beneficial intervention also has adverse effects. *See In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2007) (the court relied on a clinical study of Celebrex that revealed increased cardiovascular risk to conclude that the plaintiff's experts' testimony on causation was admissible); McDarby v. Merck & Co., 949 A.2d 223 (N.J. Super. Ct. App. Div. 2008) (explaining how clinical trials of Vioxx revealed an association with heart disease).

15. Experimental studies in which human beings are exposed to agents known or thought to be toxic are ethically proscribed. *See* Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 992 (8th Cir. 2001); Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1297 (N.D. Ala. 2001). Experimental studies can be used where the agent under investigation is believed to be beneficial, as is the case in the development and testing of new pharmaceutical drugs. *See, e.g.,* McDarby v. Merck & Co., 949 A.2d 223, 270 (N.J. Super. Ct. App. Div. 2008) (an expert witness relied on a clinical trial of a new drug to find the adjusted risk for the plaintiff); *see also* Gordon H. Guyatt, *Using Randomized Trials in*

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

"observe"[16] a group of individuals who have been exposed to an agent of interest, such as cigarette smoke or an industrial chemical and compare them with another group of individuals who have not been exposed. Thus, the investigator identifies a group of subjects who have been exposed[17] and compares their rate of disease or death with that of an unexposed group. In contrast to clinical studies in which potential risk factors can be controlled, epidemiologic investigations generally focus on individuals living in the community, for whom characteristics other than the one of interest, such as diet, exercise, exposure to other environmental agents, and genetic background, may distort a study's results. Because these characteristics cannot be controlled directly by the investigator, the investigator addresses their possible role in the relationship being studied by considering them in the design of the study and in the analysis and interpretation of the study results (see *infra* Section IV).[18] We emphasize that the Achilles' heel of observational studies is the possibility of differences in the two populations being studied with regard to risk factors other than exposure to the agent.[19] By contrast, experimental studies, in which subjects are randomized, generally avoid this problem.

## *B. Types of Observational Study Design*

Several different types of observational epidemiologic studies can be conducted.[20] Study designs may be chosen because of suitability for investigating the question of interest, timing constraints, resource limitations, or other considerations.

Most observational studies collect data about both exposure and health outcome in every individual in the study. The two main types of observational studies are cohort studies and case–control studies. A third type of observational study is a cross–sectional study, although cross–sectional studies are rarely useful in identifying toxic agents.[21] A final type of observational study, one in which data about

*Pharmacoepidemiology, in* Drug Epidemiology and Post–Marketing Surveillance 59 (Brian L. Strom & Giampaolo Velo eds., 1992). Experimental studies also may be conducted that entail the discontinuation of exposure to a harmful agent, such as studies in which smokers are randomly assigned to a variety of smoking cessation programs or have no cessation.

16. Classifying these studies as observational in contrast to randomized trials can be misleading to those who are unfamiliar with the area, because subjects in a randomized trial are observed as well. Nevertheless, the use of the term "observational studies" to distinguish them from experimental studies is widely employed.

17. The subjects may have voluntarily exposed themselves to the agent of interest, as is the case, for example, for those who smoke cigarettes, or subjects may have been exposed involuntarily or even without knowledge to an agent, such as in the case of employees who are exposed to chemical fumes at work.

18. *See* David A. Freedman, *Oasis or Mirage?* 21 Chance 59, 59–61 (Mar. 2008).

19. Both experimental and observational studies are subject to random error. See *infra* Section IV.A.

20. Other epidemiologic studies collect data about the group as a whole, rather than about each individual in the group. These group studies are discussed *infra* Section II.B.4.

21. See *infra* Section II.B.3.

556

**EXHIBIT C**

*Reference Guide on Epidemiology*

individuals are not gathered, but rather population data about exposure and disease are used, is an ecological study.[22]

The difference between cohort studies and case-control studies is that cohort studies measure and compare the incidence of disease in the exposed and unexposed ("control") groups, while case-control studies measure and compare the frequency of exposure in the group with the disease (the "cases") and the group without the disease (the "controls"). In a case-control study, the rates of exposure in the cases and the rates in the controls are compared, and the odds of having the disease when exposed to a suspected agent can be compared with the odds when not exposed. The critical difference between cohort studies and case-control studies is that cohort studies begin with exposed people and unexposed people, while case-control studies begin with individuals who are selected based on whether they have the disease or do not have the disease and their exposure to the agent in question is measured. The goal of both types of studies is to determine if there is an association between exposure to an agent and a disease and the strength (magnitude) of that association.

## 1. Cohort studies

In cohort studies,[23] researchers define a study population without regard to the participants' disease status. The cohort may be defined in the present and followed forward into the future (prospectively) or it may be constructed retrospectively as of sometime in the past and followed over historical time toward the present. In either case, the researchers classify the study participants into groups based on whether they were exposed to the agent of interest (see Figure 1).[24] In a prospective study, the exposed and unexposed groups are followed for a specified length of time, and the proportions of individuals in each group who develop the disease of interest are compared. In a retrospective study, the researcher will determine the proportion of individuals in the exposed group who developed the disease from available records or evidence and compare that proportion with the proportion of another group that was not exposed.[25] Thus, as illustrated in Table 1,

---

22. For thumbnail sketches on all types of epidemiologic study designs, see Brian L. Strom, *Study Designs Available for Pharmacoepidemiology Studies, in* Pharmacoepidemiology 17, 21–26 (Brian L. Strom ed., 4th ed. 2005).

23. Cohort studies also are referred to as prospective studies and followup studies.

24. In some studies, there may be several groups, each with a different magnitude of exposure to the agent being studied. Thus, a study of cigarette smokers might include heavy smokers (>3 packs a day), moderate smokers (1 to 2 packs a day), and light smokers (<1 pack a day). *See, e.g.,* Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment,* 316 New Eng. J. Med. 1044 (1987).

25. Sometimes in retrospective cohort studies the researcher gathers historical data about exposure and disease outcome of a cohort. Harold A. Kahn, An Introduction to Epidemiologic Methods 39–41 (1983). Irving Selikoff, in his seminal study of asbestotic disease in insulation workers, included several hundred workers who had died before he began the study. Selikoff was able to obtain information about exposure from union records and information about disease from hospital and autopsy

EXHIBIT C

*Reference Manual on Scientific Evidence*

Figure 1. Design of a cohort study.



Table 1. Cross-Tabulation of Exposure by Disease Status

|             | No Disease | Disease | Totals  | Incidence Rates of Disease |
|-------------|------------|---------|---------|----------------------------|
| Not exposed | $a$        | $c$     | $a + c$ | $c/(a + c)$                |
| Exposed     | $b$        | $d$     | $b + d$ | $d/(b + d)$                |

a researcher would compare the proportion of unexposed individuals with the disease, $c/(a + c)$, with the proportion of exposed individuals with the disease, $d/(b + d)$. If the exposure causes the disease, the researcher would expect a greater proportion of the exposed individuals to develop the disease than the unexposed individuals.[26]

One advantage of the cohort study design is that the temporal relationship between exposure and disease can often be established more readily than in other study designs, especially a case–control design, discussed below. By tracking people who are initially not affected by the disease, the researcher can determine the time of disease onset and its relation to exposure. This temporal relationship is critical to the question of causation, because exposure must precede disease onset if exposure caused the disease.

As an example, in 1950 a cohort study was begun to determine whether uranium miners exposed to radon were at increased risk for lung cancer as com-

records. Irving J. Selikoff et al., *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 132 Ann. N.Y. Acad. Sci. 139, 143 (1965).

26. Researchers often examine the rate of disease or death in the exposed and control groups. The rate of disease or death entails consideration of the number developing disease within a specified period. All smokers and nonsmokers will, if followed for 100 years, die. Smokers will die at a greater rate than nonsmokers in the earlier years.

**EXHIBIT C**

*Reference Guide on Epidemiology*

pared with nonminers. The study group (also referred to as the exposed cohort) consisted of 3400 white, underground miners. The control group (which need not be the same size as the exposed cohort) comprised white nonminers from the same geographic area. Members of the exposed cohort were examined every 3 years, and the degree of this cohort's exposure to radon was measured from samples taken in the mines. Ongoing testing for radioactivity and periodic medical monitoring of lungs permitted the researchers to examine whether disease was linked to prior work exposure to radiation and allowed them to discern the relationship between exposure to radiation and disease. Exposure to radiation was associated with the development of lung cancer in uranium miners.[27]

The cohort design is used often in occupational studies such as the one just discussed. Because the design is not experimental, and the investigator has no control over what other exposures a subject in the study may have had, an increased risk of disease among the exposed group may be caused by agents other than the exposure of interest. A cohort study of workers in a certain industry that pays below-average wages might find a higher risk of cancer in those workers. This may be because they work in that industry, or, among other reasons, because low-wage groups are exposed to other harmful agents, such as environmental toxins present in higher concentrations in their neighborhoods. In the study design, the researcher must attempt to identify factors other than the exposure that may be responsible for the increased risk of disease. If data are gathered on other possible etiologic factors, the researcher generally uses statistical methods[28] to assess whether a true association exists between working in the industry and cancer. Evaluating whether the association is causal involves additional analysis, as discussed in Section V.

## 2. Case-control studies

In case-control studies,[29] the researcher begins with a group of individuals who have a disease (cases) and then selects a similar group of individuals who do not have the disease (controls). (Ideally, controls should come from the same source population as the cases.) The researcher then compares the groups in terms of past exposures. If a certain exposure is associated with or caused the disease, a higher proportion of past exposure among the cases than among the controls would be expected (see Figure 2).

---

27. This example is based on a study description in Abraham M. Lilienfeld & David E. Lilienfeld, Foundations of Epidemiology 237–39 (2d ed. 1980). The original study is Joseph K. Wagoner et al., *Radiation as the Cause of Lung Cancer Among Uranium Miners,* 273 New Eng. J. Med. 181 (1965).

28. *See* Daniel L. Rubinfeld, Reference Guide on Multiple Regression, Section II.B, in this manual; David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section V.D, in this manual.

29. Case-control studies are also referred to as retrospective studies, because researchers gather historical information about rates of exposure to an agent in the case and control groups.

EXHIBIT C

*Reference Manual on Scientific Evidence*

Figure 2. Design of a case-control study.



Thus, for example, in the late 1960s, doctors in Boston were confronted with an unusual number of young female patients with vaginal adenocarcinoma. Those patients became the "cases" in a case-control study (because they had the disease in question) and were matched with "controls," who did not have the disease. Controls were selected based on their being born in the same hospitals and at the same time as the cases. The cases and controls were compared for exposure to agents that might be responsible, and researchers found maternal ingestion of DES (diethylstilbestrol) in all but one of the cases but none of the controls.[30]

An advantage of the case-control study is that it usually can be completed in less time and with less expense than a cohort study. Case-control studies are also particularly useful in the study of rare diseases, because if a cohort study were conducted, an extremely large group would have to be studied in order to observe the development of a sufficient number of cases for analysis.[31] A number of potential problems with case-control studies are discussed in Section IV.B.

## 3. Cross-sectional studies

A third type of observational study is a cross-sectional study. In this type of study, individuals are interviewed or examined, and the presence of both the exposure of interest and the disease of interest is determined in each individual at a single point in time. Cross-sectional studies determine the presence (prevalence) of both exposure and disease in the subjects and do not determine the development of disease or risk of disease (incidence). Moreover, because both exposure and disease are determined in an individual at the same point in time, it is not possible to establish the temporal relation between exposure and disease—that is, that the

30. *See* Arthur L. Herbst et al., *Adenocarcinoma of the Vagina: Association of Maternal Stilbestrol Therapy with Tumor Appearance,* 284 New Eng. J. Med. 878 (1971).

31. Thus, for example, to detect a doubling of disease caused by exposure to an agent where the incidence of disease is 1 in 100 in the unexposed population would require sample sizes of 3100 for the exposed and nonexposed groups for a cohort study, but only 177 for the case and control groups in a case-control study. Harold A. Kahn & Christopher T. Sempos, Statistical Methods in Epidemiology 66 (1989).

**EXHIBIT C**

exposure preceded the disease, which would be necessary for drawing any causal inference. Thus, a researcher may use a cross-sectional study to determine the connection between a personal characteristic that does not change over time, such as blood type, and existence of a disease, such as aplastic anemia, by examining individuals and determining their blood types and whether they suffer from aplastic anemia. Cross-sectional studies are infrequently used when the exposure of interest is an environmental toxic agent (current smoking status is a poor measure of an individual's history of smoking), but these studies can provide valuable leads to further directions for research.[32]

## 4. Ecological studies

Up to now, we have discussed studies in which data on both exposure and health outcome are obtained for each individual included in the study.[33] In contrast, studies that collect data only about the group as a whole are called ecological studies.[34] In ecological studies, information about individuals is generally not gathered; instead, overall rates of disease or death for different groups are obtained and compared. The objective is to identify some difference between the two groups, such as diet, genetic makeup, or alcohol consumption, that might explain differences in the risk of disease observed in the two groups.[35] Such studies may be useful for identifying associations, but they rarely provide definitive causal answers.[36] The difficulty is illustrated below with an ecological study of the relationship between dietary fat and cancer.

32. For more information (and references) about cross-sectional studies, see Leon Gordis, Epidemiology 195–98 (4th ed. 2009).

33. Some individual studies may be conducted in which all members of a group or community are treated as exposed to an agent of interest (e.g., a contaminated water system) and disease status is determined individually. These studies should be distinguished from ecological studies.

34. In *Cook v. Rockwell International Corp.,* 580 F. Supp. 2d 1071, 1095–96 (D. Colo. 2006), the plaintiffs' expert conducted an ecological study in which he compared the incidence of two cancers among those living in a specified area adjacent to the Rocky Flats Nuclear Weapons Plant with other areas more distant. (The likely explanation for relying on this type of study is the time and expense of a study that gathered information about each individual in the affected area.) The court recognized that ecological studies are less probative than studies in which data are based on individuals but nevertheless held that limitation went to the weight of the study. Plaintiff's expert was permitted to testify to causation, relying on the ecological study he performed.

In *Renaud v. Martin Marietta Corp.,* 749 F. Supp. 1545, 1551 (D. Colo. 1990), *aff'd,* 972 F.2d 304 (10th Cir. 1992), the plaintiffs attempted to rely on an excess incidence of cancers in their neighborhood to prove causation. Unfortunately, the court confused the role of epidemiology in proving causation with the issue of the plaintiffs' exposure to the alleged carcinogen and never addressed the evidentiary value of the plaintiffs' evidence of a disease cluster (i.e., an unusually high incidence of a particular disease in a neighborhood or community). *Id.* at 1554.

35. David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology 12 (3d ed. 1994).

36. Thus, the emergence of a cluster of adverse events associated with use of heparin, a longtime and widely-prescribed anticoagulent, led to suspicions that some specific lot of heparin was responsible. These concerns led the Centers for Disease Control to conduct a case control study that concluded

EXHIBIT C

*Reference Manual on Scientific Evidence*

If a researcher were interested in determining whether a high dietary fat intake is associated with breast cancer, he or she could compare different countries in terms of their average fat intakes and their average rates of breast cancer. If a country with a high average fat intake also tends to have a high rate of breast cancer, the finding would suggest an association between dietary fat and breast cancer. However, such a finding would be far from conclusive, because it lacks particularized information about an individual's exposure and disease status (i.e., whether an individual with high fat intake is more likely to have breast cancer).[37] In addition to the lack of information about an individual's intake of fat, the researcher does not know about the individual's exposures to other agents (or other factors, such as a mother's age at first birth) that may also be responsible for the increased risk of breast cancer. This lack of information about each individual's exposure to an agent and disease status detracts from the usefulness of the study and can lead to an erroneous inference about the relationship between fat intake and breast cancer, a problem known as an ecological fallacy. The fallacy is assuming that, on average, the individuals in the study who have suffered from breast cancer consumed more dietary fat than those who have not suffered from the disease. This assumption may not be true. Nevertheless, the study is useful in that it identifies an area for further research: the fat intake of individuals who have breast cancer as compared with the fat intake of those who do not. Researchers who identify a difference in disease or death in an ecological study may follow up with a study based on gathering data about individuals.

Another epidemiologic approach is to compare disease rates over time and focus on disease rates before and after a point in time when some event of interest took place.[38] For example, thalidomide's teratogenicity (capacity to cause birth defects) was discovered after Dr. Widukind Lenz found a dramatic increase in the incidence of limb reduction birth defects in Germany beginning in 1960. Yet, other than with such powerful agents as thalidomide, which increased the incidence of limb reduction defects by several orders of magnitude, these secular-trend studies (also known as time-line studies) are less reliable and less able to

that contaminated heparin manufactured by Baxter was responsible for the outbreak of adverse events. See David B. Blossom et al., *Outbreak of Adverse Event Reactions Associated with Contaminated Heparin,* 359 New Eng. J. Med. 2674 (2008); *In re* Heparin Prods. Liab. Litig. 2011 WL 2971918 (N.D. Ohio July 21, 2011).

37. For a discussion of the data on this question and what they might mean, see David Freedman et al., Statistics (4th ed. 2007).

38. In *Wilson v. Merrell Dow Pharmaceuticals, Inc.,* 893 F.2d 1149, 1152–53 (10th Cir. 1990), the defendant introduced evidence showing total sales of Bendectin and the incidence of birth defects during the 1970–1984 period. In 1983, Bendectin was removed from the market, but the rate of birth defects did not change. The Tenth Circuit affirmed the lower court's ruling that the time-line data were admissible and that the defendant's expert witnesses could rely on them in rendering their opinions. Similar evidence was relied on in cases involving cell phones and the drug Parlodel, which was alleged to cause postpartum strokes in women who took the drug to suppress lactation. *See* Newman v. Motorola, Inc., 218 F. Supp. 2d 769, 778 (D. Md. 2002); Siharath v. Sandoz Pharms. Corp., 131 F. Supp. 2d 1347, 1358 (N.D. Ga. 2001).

EXHIBIT C

*Reference Guide on Epidemiology*

detect modest causal effects than the observational studies described above. Other factors that affect the measurement or existence of the disease, such as improved diagnostic techniques and changes in lifestyle or age demographics, may change over time. If those factors can be identified and measured, it may be possible to control for them with statistical methods. Of course, unknown factors cannot be controlled for in these or any other kind of epidemiologic studies.

## C. Epidemiologic and Toxicologic Studies

In addition to observational epidemiology, toxicology models based on live animal studies (in vivo) may be used to determine toxicity in humans.[39] Animal studies have a number of advantages. They can be conducted as true experiments, and researchers control all aspects of the animals' lives. Thus, they can avoid the problem of confounding,[40] which epidemiology often confronts. Exposure can be carefully controlled and measured. Refusals to participate in a study are not an issue, and loss to followup very often is minimal. Ethical limitations are diminished, and animals can be sacrificed and their tissues examined, which may improve the accuracy of disease assessment. Animal studies often provide useful information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies.

Animal studies have two significant disadvantages, however. First, animal study results must be extrapolated to another species—human beings—and differences in absorption, metabolism, and other factors may result in interspecies variation in responses. For example, one powerful human teratogen, thalidomide, does not cause birth defects in most rodent species.[41] Similarly, some known teratogens in animals are not believed to be human teratogens. In general, it is often difficult to confirm that an agent known to be toxic in animals is safe for human beings.[42] The second difficulty with inferring human causation from animal studies is that the high doses customarily used in animal studies require consideration of the dose–response relationship and whether a threshold no–effect dose exists.[43] Those matters are almost always fraught with considerable, and currently unresolvable, uncertainty.[44]

---

39. For an in-depth discussion of toxicology, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, in this manual.

40. *See infra* Section IV.C.

41. Phillip Knightley et al., Suffer the Children: The Story of Thalidomide 271–72 (1979).

42. *See* Ian C.T. Nesbit & Nathan J. Karch, Chemical Hazards to Human Reproduction 98–106 (1983); Int'l Agency for Research on Cancer (IARC), Interpretation of Negative Epidemiologic Evidence for Carcinogenicity (N.J. Wald & Richard Doll eds., 1985) [hereafter IARC].

43. *See infra* Section V.C & note 119.

44. *See* Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 466 (W.D. Pa. 2003) (quoting this reference guide in the first edition of the Reference Manual); *see also* General Elec. Co. v. Joiner, 522 U.S. 136, 143–45 (1997) (holding that the district court did not abuse its discretion in exclud-

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Toxicologists also use in vitro methods, in which human or animal tissue or cells are grown in laboratories and are exposed to certain substances. The problem with this approach is also extrapolation—whether one can generalize the findings from the artificial setting of tissues in laboratories to whole human beings.[45]

Often toxicologic studies are the only or best available evidence of toxicity.[46] Epidemiologic studies are difficult, time-consuming, expensive, and sometimes, because of limited exposure or the infrequency of disease, virtually impossible to perform.[47] Consequently, they do not exist for a large array of environmental agents. Where both animal toxicologic and epidemiologic studies are available, no universal rules exist for how to interpret or reconcile them.[48] Careful assess-

ing expert testimony on causation based on expert's failure to explain how animal studies supported expert's opinion that agent caused disease in humans).

45. For a further discussion of these issues, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, Section III.A, in this manual.

46. IARC, a well-regarded international public health agency, evaluates the human carcinogenicity of various agents. In doing so, IARC obtains all of the relevant evidence, including animal studies as well as any human studies. On the basis of a synthesis and evaluation of that evidence, IARC publishes a monograph containing that evidence and its analysis of the evidence and provides a categorical assessment of the likelihood the agent is carcinogenic. In a preamble to each of its monographs, IARC explains what each of the categorical assessments means. Solely on the basis of the strength of animal studies, IARC may classify a substance as "probably carcinogenic to humans." International Agency for Research on Cancer, *Human Papillomaviruses,* 90 Monographs on the Evaluation of Carcinogenic Risks to Humans 9–10 (2007), *available at* http://monographs.iarc.fr/ENG/Monographs/vol90/index.php; *see also* Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 600 n.18 (D.N.J. 2002). When IARC monographs are available, they are generally recognized as authoritative. Unfortunately, IARC has conducted evaluations of only a fraction of potentially carcinogenic agents, and many suspected toxic agents cause effects other than cancer.

47. Thus, in a series of cases involving Parlodel, a lactation suppressant for mothers of newborns, efforts to conduct an epidemiologic study of its effect on causing strokes were stymied by the infrequency of such strokes in women of child-bearing age. *See, e.g.,* Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1297 (N.D. Ala. 2001). In other cases, a plaintiff's exposure to an overdose of a drug may be unique or nearly so. *See* Zuchowicz v. United States, 140 F.3d 381 (2d Cir. 1998).

48. *See* IARC, *supra* note 41 (identifying a number of substances and comparing animal toxicology evidence with epidemiologic evidence); Michele Carbone et al., *Modern Criteria to Establish Human Cancer Etiology,* 64 Cancer Res. 5518, 5522 (2004) (National Cancer Institute symposium concluding that "There should be no hierarchy [among different types of scientific methods to determine cancer causation]. Epidemiology, animal, tissue culture and molecular pathology should be seen as integrating evidences in the determination of human carcinogenicity.")

A number of courts have grappled with the role of animal studies in proving causation in a toxic substance case. One line of cases takes a very dim view of their probative value. For example, in *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 313 (5th Cir. 1989), the court noted the "very limited usefulness of animal studies when confronted with questions of toxicity." A similar view is reflected in *Richardson v. Richardson-Merrell, Inc.,* 857 F.2d 823, 830 (D.C. Cir. 1988), Bell v. Swift Adhesives, Inc., 804 F. Supp. 1577, 1579–80 (S.D. Ga. 1992), and *Cadarian v. Merrell Dow Pharmaceuticals, Inc.,* 745 F. Supp. 409, 412 (E.D. Mich. 1989).

Other courts have been more amenable to the use of animal toxicology in proving causation. Thus, in *Marder v. G.D. Searle & Co.,* 630 F. Supp. 1087, 1094 (D. Md. 1986), *aff'd sub nom. Wheelahan v. G.D. Searle & Co.,* 814 F.2d 655 (4th Cir. 1987), the court observed: "There is a range of scientific

EXHIBIT C

*Reference Guide on Epidemiology*

ment of the methodological validity and power[49] of the epidemiologic evidence must be undertaken, and the quality of the toxicologic studies and the questions of interspecies extrapolation and dose–response relationship must be considered.[50]

---

methods for investigating questions of causation—for example, toxicology and animal studies, clinical research, and epidemiology—which all have distinct advantages and disadvantages." In *Milward v. Acuity Specialty Products Group, Inc.,* 639 F.3d 11, 17-19 (1st Cir. 2011), the court endorsed an expert's use of a "weight-of-the-evidence" methodology, holding that the district court abused its discretion in ruling inadmissible an expert's testimony about causation based on that methodology. As a corollary to recognizing weight of the evidence as a valid scientific technique, the court also noted the role of judgment in making an appropriate inference from the evidence. While recognizing the legitimacy of the methodology, the court also acknowledged that, as with any scientific technique, it can be improperly applied. *See also* Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 842 (9th Cir. 2001) (holding that the lower court erred in per se dismissing animal studies, which must be examined to determine whether they are appropriate as a basis for causation determination); *In re* Heparin Prods. Liab. Litig. 2011 WL 2971918 (N.D. Ohio July 21, 2011) (holding that animal toxicology in conjunction with other non-epidemiologic evidence can be sufficient to prove causation); Ruff v. Ensign-Bickford Indus., Inc., 168 F. Supp. 2d 1271, 1281 (D. Utah 2001) (affirming animal studies as sufficient basis for opinion on general causation.); *cf. In re* Paoli R.R. Yard PCB Litig., 916 F.2d 829, 853–54 (3d Cir. 1990) (questioning the exclusion of animal studies by the lower court). The Third Circuit in a subsequent opinion in *Paoli* observed:

> [I]n order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves. Thus, the requirement of reliability, or "good grounds," extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.

*In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994); *see also* Cavallo v. Star Enter., 892 F. Supp. 756, 761–63 (E.D. Va. 1995) (courts must examine each of the steps that lead to an expert's opinion), *aff'd in part and rev'd in part,* 100 F.3d 1150 (4th Cir. 1996).

One explanation for these conflicting lines of cases may be that when there is a substantial body of epidemiologic evidence that addresses the causal issue, animal toxicology has much less probative value. That was the case, for example, in the Bendectin cases of *Richardson, Brock,* and *Cadarian.* Where epidemiologic evidence is not available, animal toxicology may be thought to play a more prominent role in resolving a causal dispute. *See* Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation,* 86 Nw. U. L. Rev. 643, 680–82 (1992) (arguing that plaintiffs should be required to prove causation by a preponderance of the available evidence); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1359 (6th Cir. 1992); *In re* Paoli R.R. Yard PCB Litig., No. 86-2229, 1992 U.S. Dist. LEXIS 16287, at *16 (E.D. Pa. 1992). For another explanation of these cases, see Gerald W. Boston, *A Mass-Exposure Model of Toxic Causation: The Control of Scientific Proof and the Regulatory Experience,* 18 Colum. J. Envtl. L. 181 (1993) (arguing that epidemiologic evidence should be required in mass-exposure cases but not in isolated-exposure cases); *see also* IARC, *supra* note 41; Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, Section I.F, in this manual. The Supreme Court, in *General Electric Co. v. Joiner,* 522 U.S. 136, 144–45 (1997), suggested that there is no categorical rule for toxicologic studies, observing, "[W]hether animal studies can ever be a proper foundation for an expert's opinion [is] not the issue. . . . The [animal] studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them."

49. *See infra* Section IV.A.3.

50. *See* Ellen F. Heineman & Shelia Hoar Zahm, *The Role of Epidemiology in Hazard Evaluation,* 9 Toxic Substances J. 255, 258–62 (1989).

565

**EXHIBIT C**

# III. How Should Results of an Epidemiologic Study Be Interpreted?

Epidemiologists are ultimately interested in whether a causal relationship exists between an agent and a disease. However, the first question an epidemiologist addresses is whether an association exists between exposure to the agent and disease. An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance.[51] Although a causal relationship is one possible explanation for an observed association between an exposure and a disease, an association does not necessarily mean that there is a cause–effect relationship. Interpreting the meaning of an observed association is discussed below.

This section begins by describing the ways of expressing the existence and strength of an association between exposure and disease. It reviews ways in which an incorrect result can be produced because of the sampling methods used in all observational epidemiologic studies and then examines statistical methods for evaluating whether an association is real or the result of a sampling error.

The strength of an association between exposure and disease can be stated in various ways,[52] including as a relative risk, an odds ratio, or an attributable risk.[53] Each of these measurements of association examines the degree to which the risk of disease increases when individuals are exposed to an agent.

## A. Relative Risk

A commonly used approach for expressing the association between an agent and disease is relative risk ("RR"). It is defined as the ratio of the incidence rate (often referred to as incidence) of disease in exposed individuals to the incidence rate in unexposed individuals:

$$RR = \frac{\text{(Incidence rate in the exposed)}}{\text{(Incidence rate in the unexposed)}}$$

51. A negative association implies that the agent has a protective or curative effect. Because the concern in toxic substances litigation is whether an agent caused disease, this reference guide focuses on positive associations.

52. Another outcome measure is a risk difference. A risk difference is the difference between the proportion of disease in those exposed to the agent and the proportion of disease in those who were unexposed. Thus, in the example of relative risk in the text below discussing relative risk, the proportion of disease in those exposed is 40/100 and the proportion of disease in the unexposed is 20/100. The risk difference is 20/100.

53. Numerous courts have employed these measures of the strength of an association. *See, e.g., In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1172–74 (N.D. Cal. 2007); Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1095 (D. Colo. 2006) (citing the second edition of this reference guide); *In re* W.R. Grace & Co., 355 B.R. 462, 482–83 (Bankr. D. Del. 2006).

EXHIBIT C

*Reference Guide on Epidemiology*

The incidence rate of disease is defined as the number of cases of disease that develop during a specified period of time divided by the number of persons in the cohort under study.[54] Thus, the incidence rate expresses the risk that a member of the population will develop the disease within a specified period of time.

For example, a researcher studies 100 individuals who are exposed to an agent and 200 who are not exposed. After 1 year, 40 of the exposed individuals are diagnosed as having a disease, and 20 of the unexposed individuals also are diagnosed as having the disease. The relative risk of contracting the disease is calculated as follows:

- The incidence rate of disease in the exposed individuals is 40 cases per year per 100 persons (40/100), or 0.4.
- The incidence rate of disease in the unexposed individuals is 20 cases per year per 200 persons (20/200), or 0.1.
- The relative risk is calculated as the incidence rate in the exposed group (0.4) divided by the incidence rate in the unexposed group (0.1), or 4.0.

A relative risk of 4.0 indicates that the risk of disease in the exposed group is four times as high as the risk of disease in the unexposed group.[55]

In general, the relative risk can be interpreted as follows:

- If the relative risk equals 1.0, the risk in exposed individuals is the same as the risk in unexposed individuals.[56] There is no association between exposure to the agent and disease.
- If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals. There is a positive association between exposure to the agent and the disease, which could be causal.
- If the relative risk is less than 1.0, the risk in exposed individuals is less than the risk in unexposed individuals. There is a negative association, which could reflect a protective or curative effect of the agent on risk of disease. For example, immunizations lower the risk of disease. The results suggest that immunization is associated with a decrease in disease and may have a protective effect on the risk of disease.

Although relative risk is a straightforward concept, care must be taken in interpreting it. Whenever an association is uncovered, further analysis should be

---

54. Epidemiologists also use the concept of prevalence, which measures the existence of disease in a population at a given point in time, regardless of when the disease developed. Prevalence is expressed as the proportion of the population with the disease at the chosen time. *See* Gordis, *supra* note 32, at 43–47.

55. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 591 (D.N.J. 2002).

56. *See Magistrini*, 180 F. Supp. 2d at 591.

EXHIBIT C

*Reference Manual on Scientific Evidence*

conducted to assess whether the association is real or a result of sampling error, confounding, or bias.[57] These same sources of error may mask a true association, resulting in a study that erroneously finds no association.

## B. Odds Ratio

The odds ratio ("OR") is similar to a relative risk in that it expresses in quantitative terms the association between exposure to an agent and a disease.[58] It is a convenient way to estimate the relative risk in a case-control study when the disease under investigation is rare.[59] The odds ratio approximates the relative risk when the disease is rare.[60]

In a case-control study, the odds ratio is the ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed. In a cohort study, the odds ratio is the ratio of the odds of developing a disease when exposed to a suspected agent to the odds of developing the disease when not exposed.

Consider a case-control study, with results as shown schematically in a 2 × 2 table (Table 2):

Table 2. Cross-tabulation of cases and controls by exposure status

|  | Cases (with disease) | Controls (no disease) |
|---|---|---|
| Exposed | *a* | *b* |
| Not exposed | *c* | *d* |

In a case-control study,

$$\text{OR} = \frac{\text{(Odds that a case was exposed)}}{\text{(Odds that a control was exposed)}}.$$

57. *See infra* Sections IV.B–C.

58. A relative risk cannot be calculated for a case-control study, because a case-control study begins by examining a group of persons who already have the disease. That aspect of the study design prevents a researcher from determining the rate at which individuals develop the disease. Without a rate or incidence of disease, a researcher cannot calculate a relative risk.

59. If the disease is not rare, the odds ratio is still valid to determine whether an association exists, but interpretation of its magnitude is less intuitive.

60. *See* Marcello Pagano & Kimberlee Gauvreau, Principles of Biostatistics 354 (2d ed. 2000). For further detail about the odds ratio and its calculation, see Kahn & Sempos, *supra* note 31, at 47–56.

**EXHIBIT C**

*Reference Guide on Epidemiology*

Looking at Table 2, this ratio can be calculated as

$$\frac{(a/c)}{(b/d).}$$

This works out to *ad/bc*. Because we are multiplying two diagonal cells in the table and dividing by the product of the other two diagonal cells, the odds ratio is also called the cross–products ratio.

Consider the following hypothetical study: A researcher identifies 100 individuals with a disease who serve as "cases" and 100 people without the disease who serve as "controls" for her case-control study. Forty of the 100 cases were exposed to the agent and 60 were not. Among the control group, 20 people were exposed and 80 were not. The data can be presented in a 2 × 2 table (Table 3):

Table 3. Case-Control Study Outcome

|  | Cases (with disease) | Controls (no disease) |
|---|---|---|
| Exposed | 40 | 20 |
| Not exposed | 60 | 80 |

The calculation of the odds ratio would be:

$$\text{OR} = \frac{(40/60)}{(20/80)} = 2.67.$$

If the disease is relatively rare in the general population (about 5% or less), the odds ratio is a good approximation of the relative risk, which means that there is almost a tripling of the disease in those exposed to the agent.[61]

---

61. The odds ratio is usually marginally greater than the relative risk. As the disease in question becomes more common, the difference between the odds ratio and the relative risk grows.

The reason why the odds ratio approximates the relative risk when the incidence of disease is small can be demonstrated by referring to Table 2. The odds ratio, as stated in the text, is *ad/bc*. The relative risk for such a study would compare the incidence of disease in the exposed group, or *a/(a + b),* with the incidence of disease in the unexposed group or *c/(c + d).* The relative risk would be:

$$\frac{a/(a+b)}{c/(c+d)} = \frac{a/(c+d)}{c/(a+b)}$$

When the incidence of disease is low, *a* and *c* will be small in relation to *b* and *d*, and the relative risk will then approximate the odds ratio of *ad/bc*. *See* Leon Gordis, Epidemiology 208–09 (4th ed. 2009).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## C. *Attributable Risk*

A frequently used measurement of risk is the attributable risk ("AR"). The attributable risk represents the amount of disease among exposed individuals that can be attributed to the exposure. It also can be expressed as the proportion of the disease among exposed individuals that is associated with the exposure (also called the "attributable proportion of risk," the "etiologic fraction," or the "attributable risk percent"). The attributable risk reflects the maximum proportion of the disease that can be attributed to exposure to an agent and consequently the maximum proportion of disease that could be potentially prevented by blocking the effect of the exposure or by eliminating the exposure.[62] In other words, if the association is causal, the attributable risk is the proportion of disease in an exposed population that might be caused by the agent and that might be prevented by eliminating exposure to that agent (see Figure 3).[63]

Figure 3. Risks in exposed and unexposed groups.



To determine the proportion of a disease that is attributable to an exposure, a researcher would need to know the incidence of the disease in the exposed group and the incidence of disease in the unexposed group. The attributable risk is

$$AR = \frac{(\text{incidence in the exposed}) - (\text{incidence in the unexposed})}{\text{incidence in the exposed}}$$

62. Kenneth J. Rothman et al., Modern Epidemiology 297 (3d ed. 2008); *see also* Landrigan v. Celotex Corp., 605 A.2d 1079, 1086 (N.J. 1992) (illustrating that a relative risk of 1.55 conforms to an attributable risk of 35%, that is, $(1.55 - 1.0)/1.55 = .35$, or 35%).

63. Risk is not zero for the control group (those not exposed) when there are other causal chains that cause the disease that do not require exposure to the agent. For example, some birth defects are the result of genetic sources, which do not require the presence of any environmental agent. Also, some degree of risk in the control group may be the result of background exposure to the agent being studied. For example, nonsmokers in a control group may have been exposed to passive cigarette smoke, which is responsible for some cases of lung cancer and other diseases. *See also* Ethyl Corp. v. EPA, 541 F.2d 1, 25 (D.C. Cir. 1976). There are some diseases that do not occur without exposure to an agent; these are known as signature diseases. *See infra* note 177.

EXHIBIT C

*Reference Guide on Epidemiology*

The attributable risk can be calculated using the example described in Section III.A. Suppose a researcher studies 100 individuals who are exposed to a substance and 200 who are not exposed. After 1 year, 40 of the exposed individuals are diagnosed as having a disease, and 20 of the unexposed individuals are also diagnosed as having the disease.

- The incidence of disease in the exposed group is 40 persons out of 100 who contract the disease in a year.
- The incidence of disease in the unexposed group is 20 persons out of 200 (or 10 out of 100) who contract the disease in a year.
- The proportion of disease that is attributable to the exposure is 30 persons out of 40, or 75%.

This means that 75% of the disease in the exposed group is attributable to the exposure. We should emphasize here that "attributable" does not necessarily mean "caused by." Up to this point, we have only addressed associations. Inferring causation from an association is addressed in Section V.

## D. *Adjustment for Study Groups That Are Not Comparable*

Populations often differ in characteristics that relate to disease risk, such as age, sex, and race. Those who live in Florida have a much higher death rate than those who live in Alaska.[64] Is sunshine dangerous? Perhaps, but the Florida population is much older than the Alaska population, and some adjustment must be made for the differences in age distribution in the two states in order to compare disease or death rates between populations. The technique used to accomplish this is called adjustment, and two types of adjustment are used—direct and indirect. In direct adjustment (e.g., when based on age), overall disease/death rates are calculated for each population as though each had the age distribution of another standard, or reference, population, using the age-specific disease/death rates for each study population. We can then compare these overall rates, called age-adjusted rates, knowing that any difference between these rates cannot be attributed to differences in age, since both age-adjusted rates were generated using the same standard population.

Indirect adjustment is used when the age-specific rates for a study population are not known. In that case, the overall disease/death rate for the standard/reference population is recalculated based on the age distribution of the population of interest using the age-specific rates of the standard population. Then, the actual number of disease cases/deaths in the population of interest can be compared with

---

64. *See* Lilienfeld & Stolley, *supra* note 35, at 68–70 (the mortality rate in Florida is approximately three times what it is in Alaska).

**EXHIBIT C**

the number in the reference population that would be expected if the reference population had the age distribution of the population of interest.

This ratio is called the standardized mortality ratio (SMR). When the outcome of interest is disease rather than death, it is called the standardized morbidity ratio.[65] If the ratio equals 1.0, the observed number of deaths equals the expected number of deaths, and the mortality rate of the population of interest is no different from that of the reference population. If the SMR is greater than 1.0, the population of interest has a higher mortality risk than that of the reference population, and if the SMR is less than 1.0, the population of interest has a lower mortality rate than that of the reference population.

Thus, age adjustment provides a way to compare populations while in effect holding age constant. Adjustment is used not only for comparing mortality rates in different populations but also for comparing rates in different groups of subjects selected for study in epidemiologic investigations. Although this discussion has focused on adjusting for age, it is also possible to adjust for any number of other variables, such as gender, race, occupation, and socioeconomic status. It is also possible to adjust for several factors simultaneously.[66]

# IV. What Sources of Error Might Have Produced a False Result?

Incorrect study results occur in a variety of ways. A study may find a positive association (relative risk greater than 1.0) when there is no true association. Or a study may erroneously result in finding that that there is no association when in reality there is. A study may also find an association when one truly exists, but the association found may be greater or less than the real association.

Three general categories of phenomena can result in an association found in a study to be erroneous: chance, bias, and confounding. Before any inferences about causation are drawn from a study, the possibility of these phenomena must be examined.[67]

65. *See* Taylor v. Airco, Inc., 494 F. Supp. 2d 21, 25 n.4 (D. Mass. 2007) (explaining SMR and its relationship with relative risk). For an example of adjustment used to calculate an SMR for workers exposed to benzene, see Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment,* 316 New Eng. J. Med. 1044 (1987).

66. For further elaboration on adjustment, see Gordis, *supra* note 32, at 73–78; Philip Cole, *Causality in Epidemiology, Health Policy, and Law,* 27 Envtl. L. Rep. 10,279, 10,281 (1997).

67. *See* Cole, *supra* note 65, at 10,285. In *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 955 (3d Cir. 1990), the court recognized and discussed random sampling error. It then went on to refer to other errors (e.g., systematic bias) that create as much or more error in the outcome of a study. For a similar description of error in study procedure and random sampling, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV, in this manual.

EXHIBIT C

*Reference Guide on Epidemiology*

The findings of a study may be the result of chance (or random error). In designing a study, the size of the sample can be increased to reduce (but not eliminate) the likelihood of random error. Once a study has been completed, statistical methods (discussed in Section IV.A) permit an assessment of the extent to which the results of a study may be due to random error.

The two main techniques for assessing random error are statistical significance and confidence intervals. A study that is statistically significant has results that are unlikely to be the result of random error, although any criterion for "significance" is somewhat arbitrary. A confidence interval provides both the relative risk (or other risk measure) found in the study and a range (interval) within which the risk likely would fall if the study were repeated numerous times. These two techniques (which are closely related) are explained in Section IV.A.

We should emphasize a matter that those unfamiliar with statistical methodology frequently find confusing: That a study's results are statistically significant says nothing about the importance of the magnitude of any association (i.e., the relative risk or odds ratio) found in a study or about the biological or clinical importance of the finding.[68] "Significant," as used with the adjective "statistically," does not mean important. A study may find a statistically significant relationship that is quite modest—perhaps it increases the risk only by 5%, which is equivalent to a relative risk of 1.05.[69] An association may be quite large—the exposed cohort might be 10 times more likely to develop disease than the control group—but the association is not statistically significant because of the potential for random error given a small sample size. In short, *statistical significance is not about the size of the risk found in a study*.

Bias (or systematic error) also can produce error in the outcome of a study. Epidemiologists attempt to minimize bias through their study design, including data collection protocols. Study designs are developed before they begin gathering data. However, even the best designed and conducted studies have biases, which may be subtle. Consequently, after data collection is completed, analytical tools are often used to evaluate potential sources of bias. Sometimes, after bias is identified, the epidemiologist can determine whether the bias would tend to inflate or dilute any association that may exist. Identification of the bias may permit the

---

68. *See* Modern Scientific Evidence, *supra* note 2, § 6.36 at 358 ("Statisticians distinguish between 'statistical' and 'practical' significance. . . ."); Cole, *supra* note 65, at 10,282. Understandably, some courts have been confused about the relationship between statistical significance and the magnitude of the association. *See* Hyman & Armstrong, P.S.C. v. Gunderson, 279 S.W.3d 93, 102 (Ky. 2008) (describing a small increased risk as being considered statistically insignificant and a somewhat larger risk as being considered statistically significant.); *In re* Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 634–35 (S.D.N.Y. 2008) (confusing the magnitude of the effect with whether the effect was statistically significant); *In re* Joint E. & S. Dist. Asbestos Litig., 827 F. Supp. 1014, 1041 (S.D.N.Y. 1993) (concluding that any relative risk less than 1.50 is statistically insignificant), *rev'd on other grounds,* 52 F.3d 1124 (2d Cir. 1995).

69. In general, small effects that are statistically significant require larger sample sizes. When effects are larger, generally fewer subjects are required to produce statistically significant findings.

EXHIBIT C

*Reference Manual on Scientific Evidence*

epidemiologist to make an assessment of whether the study's conclusions are valid. Epidemiologists may reanalyze a study's data to correct for a bias identified in a completed study or to validate the analytical methods used.[70] Common biases and how they may produce invalid results are described in Section IV.B.

Finally, a study may reach incorrect conclusions about causation because, although the agent and disease are associated, the agent is not a true causal factor. Rather, the agent may be associated with another agent that is the true causal factor, and this latter factor confounds the relationship being examined in the study. Confounding is explained in Section IV.C.

## A. What Statistical Methods Exist to Evaluate the Possibility of Sampling Error?[71]

Before detailing the statistical methods used to assess random error (which we use as synonymous with sampling error), two concepts are explained that are central to epidemiology and statistical analysis. Understanding these concepts should facilitate comprehension of the statistical methods.

Epidemiologists often refer to the true association (also called "real association"), which is the association that really exists between an agent and a disease and that might be found by a perfect (but nonexistent) study. The true association is a concept that is used in evaluating the results of a given study even though its value is unknown. By contrast, a study's outcome will produce an observed association, which is known.

Formal procedures for statistical testing begin with the null hypothesis, which posits that there is no true association (i.e., a relative risk of 1.0) between the agent and disease under study. Data are gathered and analyzed to see whether they disprove[72] the null hypothesis. The data are subjected to statistical testing to assess the plausibility that any association found is a result of random error or whether it supports rejection of the null hypothesis. The use of the null hypothesis for this testing should not be understood as the a priori belief of the investigator. When epidemiologists investigate an agent, it is usually because they hypothesize that the agent is a cause of some outcome. Nevertheless, epidemiologists prepare their

70. *E.g.,* Richard A. Kronmal et al., *The Intrauterine Device and Pelvic Inflammatory Disease: The Women's Health Study Reanalyzed,* 44 J. Clin. Epidemiol. 109 (1991) (a reanalysis of a study that found an association between the use of IUDs and pelvic inflammatory disease concluded that IUDs do not increase the risk of pelvic inflammatory disease).

71. For a bibliography on the role of statistical significance in legal proceedings, see Sanders, *supra* note 13, at 329 n.138.

72. *See, e.g.,* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993) (scientific methodology involves generating and testing hypotheses).

**EXHIBIT C**

*Reference Guide on Epidemiology*

study designs and test the plausibility that any association found in a study was the result of random error by using the null hypothesis.[73]

## 1. False positives and statistical significance

When a study results in a positive association (i.e., a relative risk greater than 1.0), epidemiologists try to determine whether that outcome represents a true association or is the result of random error.[74] Random error is illustrated by a fair coin (i.e., not modified to produce more heads than tails [or vice versa]). On average, for example, we would expect that coin tosses would yield half heads and half tails. But sometimes, a set of coin tosses might yield an unusual result, for example, six heads out of six tosses,[75] an occurrence that would result, purely by chance, in less than 2% of a series of six tosses. In the world of epidemiology, sometimes the study findings, merely by chance, do not reflect the true relationships between an agent and outcome. Any single study—even a clinical trial—is in some ways analogous to a set of coin tosses, being subject to the play of chance. Thus, for example, even though the true relative risk (in the total population) is 1.0, an epidemiologic study of a particular study population may find a relative risk greater than (or less

---

73. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945 (3d Cir. 1990); United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 706 n.29 (D.D.C. 2006); Stephen E. Fienberg et al., *Understanding and Evaluating Statistical Evidence in Litigation,* 36 Jurimetrics J. 1, 21–24 (1995).

74. Hypothesis testing is one of the most counterintuitive techniques in statistics. Given a set of epidemiologic data, one wants to ask the straightforward, obvious question: What is the probability that the difference between two samples reflects a real difference between the populations from which they were taken? Unfortunately, there is no way to answer this question directly or to calculate the probability. Instead, statisticians—and epidemiologists—address a related but very different question: If there really is no difference between the populations, how probable is it that one would find a difference at least as large as the observed difference between the samples? *See* Modern Scientific Evidence, *supra* note 2, § 6:36, at 359 ("it is easy to mistake the *p*-value for the probability that there is no difference"); Expert Evidence: A Practitioner's Guide to Law, Science, and the FJC Manual 91 (Bert Black & Patrick W. Lee eds., 1997). Thus, the *p*-value for a given study does not provide a rate of error or even a probability of error for an epidemiologic study. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593 (1993), the Court stated that "the known or potential rate of error" should ordinarily be considered in assessing scientific reliability. Epidemiology, however, unlike some other methodologies—fingerprint identification, for example—does not permit an assessment of its accuracy by testing with a known reference standard. A *p*-value provides information only about the plausibility of random error given the study result, but the true relationship between agent and outcome remains unknown. Moreover, a *p*-value provides no information about whether other sources of error—bias and confounding—exist and, if so, their magnitude. In short, for epidemiology, there is no way to determine a rate of error. *See* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151 (1999) (recognizing that for different scientific and technical inquiries, different considerations will be appropriate for assessing reliability); Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1100 (D. Colo. 2006) ("Defendants have not argued or presented evidence that . . . a method by which an overall 'rate of error' can be calculated for an epidemiologic study.")

75. *DeLuca*, 911 F.2d at 946–47.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

than) 1.0 because of random error or chance.[76] An erroneous conclusion that the null hypothesis is false (i.e., a conclusion that there is a difference in risk when no difference actually exists) owing to random error is called a false-positive error (also Type I error or alpha error).

Common sense leads one to believe that a large enough sample of individuals must be studied if the study is to identify a relationship between exposure to an agent and disease that truly exists. Common sense also suggests that by enlarging the sample size (the size of the study group), researchers can form a more accurate conclusion and reduce the chance of random error in their results. Both statements are correct and can be illustrated by a test to determine if a coin is fair. A test in which a fair coin is tossed 1000 times is more likely to produce close to 50% heads than a test in which the coin is tossed only 10 times. It is far more likely that a test of a fair coin with 10 tosses will come up, for example, with 80% heads than will a test with 1000 tosses. With large numbers, the outcome of the test is less likely to be influenced by random error, and the researcher would have greater confidence in the inferences drawn from the data.[77]

One means for evaluating the possibility that an observed association could have occurred as a result of random error is by calculating a *p*-value.[78] A *p*-value represents the probability that an observed positive association could result from random error even if no association were in fact present. Thus, a *p*-value of .1 means that there is a 10% chance that values at least as large as the observed relative risk could have occurred by random error, with no association actually present in the population.[79]

To minimize false positives, epidemiologists use a convention that the *p*-value must fall below some selected level known as alpha or significance level for the results of the study to be statistically significant.[80] Thus, an outcome is statistically significant when the observed *p*-value for the study falls below the preselected

76. *See* Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 592 (D.N.J. 2002) (citing the second edition of this reference guide).

77. This explanation of numerical stability was drawn from Brief for Professor Alvan R. Feinstein as Amicus Curiae Supporting Respondents at 12–13, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) (No. 92-102). *See also* Allen v. United States, 588 F. Supp. 247, 417–18 (D. Utah 1984), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987). The *Allen* court observed that although "[s]mall communities or groups of people are deemed 'statistically unstable'" and "data from small populations must be handled with care [, it] does not mean that [the data] cannot provide substantial evidence in aid of our effort to describe and understand events."

78. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.B, in this manual (the *p*-value reflects the implausibility of the null hypothesis).

79. Technically, a *p*-value of .1 means that if in fact there is no association, 10% of all similar studies would be expected to yield an association the same as, or greater than, the one found in the study due to random error.

80. Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1100–01 (D. Colo. 2006) (discussing *p*-values and their relationship with statistical significance); *Allen*, 588 F. Supp. at 416–17 (discussing statistical significance and selection of a level of alpha); *see also* Sanders, *supra* note 13, at 343–44 (explaining alpha, beta, and their relationship to sample size); *Developments in the Law—Confronting*

**EXHIBIT C**

*Reference Guide on Epidemiology*

significance level. The most common significance level, or alpha, used in science is .05.[81] A .05 value means that the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association.[82] Although .05 is often the significance level selected, other levels can and have been used.[83] Thus, in its study of the effects of second-hand smoke, the U.S.

*the New Challenges of Scientific Evidence,* 108 Harv. L. Rev. 1481, 1535–36, 1540–46 (1995) [hereafter *Developments in the Law*].

81. A common error made by lawyers, judges, and academics is to equate the level of alpha with the legal burden of proof. Thus, one will often see a statement that using an alpha of .05 for statistical significance imposes a burden of proof on the plaintiff far higher than the civil burden of a preponderance of the evidence (i.e., greater than 50%). *See, e.g., In re* Ephedra Prods. Liab. Litig., 393 F. Supp. 2d 181, 193 (S.D.N.Y. 2005); Marmo v. IBP, Inc., 360 F. Supp. 2d 1019, 1021 n.2 (D. Neb. 2005) (an expert toxicologist who stated that science requires proof with 95% certainty while expressing his understanding that the legal standard merely required more probable than not). *But see* Giles v. Wyeth, Inc., 500 F. Supp. 2d 1048, 1056–57 (S.D. Ill. 2007) (quoting the second edition of this reference guide).

Comparing a selected *p*-value with the legal burden of proof is mistaken, although the reasons are a bit complex and a full explanation would require more space and detail than is feasible here. Nevertheless, we sketch out a brief explanation: First, alpha does not address the likelihood that a plaintiff's disease was caused by exposure to the agent; the magnitude of the association bears on that question. *See infra* Section VII. Second, significance testing only bears on whether the observed magnitude of association arose as a result of random chance, not on whether the null hypothesis is true. Third, using stringent significance testing to avoid false-positive error comes at a complementary cost of inducing false-negative error. Fourth, using an alpha of .5 would not be equivalent to saying that the probability the association found is real is 50%, and the probability that it is a result of random error is 50%. Statistical methodology does not permit assessments of those probabilities. *See* Green, *supra* note 47, at 686; Michael D. Green, *Science Is to Law as the Burden of Proof Is to Significance Testing,* 37 Jurimetrics J. 205 (1997) (book review); *see also* David H. Kaye, *Apples and Oranges: Confidence Coefficients and the Burden of Persuasion,* 73 Cornell L. Rev. 54, 66 (1987); David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.B.2, in this manual; Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1357 n.2 (6th Cir. 1992), *cert. denied,* 506 U.S. 826 (1992); *cf. DeLuca,* 911 F.2d at 959 n.24 ("The relationship between confidence levels and the more likely than not standard of proof is a very complex one . . . and in the absence of more education than can be found in this record, we decline to comment further on it.").

82. This means that if one conducted an examination of a large number of associations in which the true RR equals 1, on average 1 in 20 associations found to be statistically significant at a .05 level would be spurious. When researchers examine many possible associations that might exist in their data—known as data dredging—we should expect that even if there are no true causal relationships, those researchers will find statistically significant associations in 1 of every 20 associations examined. *See* Rachel Nowak, *Problems in Clinical Trials Go Far Beyond Misconduct,* 264 Sci. 1538, 1539 (1994).

83. A significance test can be either one-tailed or two-tailed, depending on the null hypothesis selected by the researcher. Because most investigators of toxic substances are only interested in whether the agent increases the incidence of disease (as distinguished from providing protection from the disease), a one-tailed test is often viewed as appropriate. *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 289 F. Supp. 2d 1230, 1241 (W.D. Wash. 2003) (accepting the propriety of a one-tailed test for statistical significance in a toxic substance case); United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 701 (D.D.C. 2006) (explaining the basis for EPA's decision to use one-tailed test in assessing whether second-hand smoke was a carcinogen). *But see* Good v. Fluor Daniel Corp., 222 F. Supp. 2d 1236, 1243 (E.D. Wash. 2002). For an explanation of the difference

EXHIBIT C

*Reference Manual on Scientific Evidence*

Environmental Protection Agency (EPA) used a .10 standard for significance testing.[84]

There is some controversy among epidemiologists and biostatisticians about the appropriate role of significance testing.[85] To the strictest significance testers,

between one-tailed and two-tailed tests, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.C.2, in this manual.

84. U.S. Environmental Protection Agency, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders (1992); *see also Turpin,* 959 F.2d at 1353–54 n.1 (confidence level frequently set at 95%, although 90% (which corresponds to an alpha of .10) is also used; selection of the value is "somewhat arbitrary").

85. Similar controversy exists among the courts that have confronted the issue of whether statistically significant studies are required to satisfy the burden of production. The leading case advocating statistically significant studies is *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 312 (5th Cir. 1989), *amended,* 884 F.2d 167 (5th Cir.), *cert. denied,* 494 U.S. 1046 (1990). Overturning a jury verdict for the plaintiff in a Bendectin case, the court observed that no statistically significant study had been published that found an increased relative risk for birth defects in children whose mothers had taken Bendectin. The court concluded: "[W]e do not wish this case to stand as a bar to future Bendectin cases in the event that new and statistically significant studies emerge which would give a jury a firmer basis on which to determine the issue of causation." *Brock,* 884 F.2d at 167.

A number of courts have followed the *Brock* decision or have indicated strong support for significance testing as a screening device. *See* Good v. Fluor Daniel Corp., 222 F. Supp. 2d 1236, 1243 (E.D. Wash. 2002) ("In the absence of a statistically significant difference upon which to opine, Dr. Au's opinion must be excluded under *Daubert.*"); Miller v. Pfizer, Inc., 196 F. Supp. 2d 1062, 1080 (D. Kan. 2002) (the expert must have statistically significant studies to serve as basis of opinion on causation); Kelley v. Am. Heyer-Schulte Corp., 957 F. Supp. 873, 878 (W.D. Tex. 1997) (the lower end of the confidence interval must be above 1.0—equivalent to requiring that a study be statistically significant—before a study may be relied upon by an expert), *appeal dismissed,* 139 F.3d 899 (5th Cir. 1998); Renaud v. Martin Marietta Corp., 749 F. Supp. 1545, 1555 (D. Colo. 1990) (quoting *Brock* approvingly), *aff'd,* 972 F.2d 304 (10th Cir. 1992).

By contrast, a number of courts are more cautious about or reject using significance testing as a necessary condition, instead recognizing that assessing the likelihood of random error is important in determining the probative value of a study. In *Allen v. United States,* 588 F. Supp. 247, 417 (D. Utah 1984), the court stated, "The cold statement that a given relationship is not 'statistically significant' cannot be read to mean there is no probability of a relationship." The Third Circuit described confidence intervals (i.e., the range of values that would be found in similar studies due to chance, with a specified level of confidence) and their use as an alternative to statistical significance in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 948–49 (3d Cir. 1990). *See also* Milward v. Acuity Specialty Products Group, Inc., 639 F.3d 11, 24-25 (1st Cir. 2011) (recognizing the difficulty of obtaining statistically significant results when the disease under investigation occurs rarely and concluding that district court erred in imposing a statistical significance threshold); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1357 (6th Cir. 1992) ("The defendant's claim overstates the persuasive power of these statistical studies. An analysis of this evidence demonstrates that it is possible that Bendectin causes birth defects even though these studies do not detect a significant association."); *In re* Viagra Prods. Liab. Litig., 572 F. Supp. 2d 1071, 1090 (D. Minn. 2008) (holding that, for purposes of supporting an opinion on general causation, a study does not have to find results with statistical significance); United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 706 n.29 (D.D.C. 2006) (rejecting the position of an expert who denied that the causal connection between smoking and lung cancer had been established, in part, on the ground that any study that found an association that was not statistically significant must be excluded from consideration); Cook v. Rockwell Int'l Corp., 580 F. Supp.

EXHIBIT C

*Reference Guide on Epidemiology*

any study whose *p*-value is not less than the level chosen for statistical significance should be rejected as inadequate to disprove the null hypothesis. Others are critical of using strict significance testing, which rejects all studies with an observed *p*-value below that specified level. Epidemiologists have become increasingly sophisticated in addressing the issue of random error and examining the data from a study to ascertain what information they may provide about the relationship between an agent and a disease, without the necessity of rejecting all studies that are not statistically significant.[86] Meta-analysis, as well, a method for pooling the results of multiple studies, sometimes can ameliorate concerns about random error.[87]

Calculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiologic study.[88]

---

2d 1071, 1103 (D. Colo. 2006) ("The statistical significance or insignificance of Dr. Clapp's results may affect the weight given to his testimony, but does not determine its admissibility under Rule 702."); *In re* Ephedra Prods. Liab. Litig., 393 F. Supp. 2d 181, 186 (S.D.N.Y. 2005) ("[T]he absence of epidemiologic studies establishing an increased risk from ephedra of sufficient statistical significance to meet scientific standards of causality does not mean that the causality opinions of the PCC's experts must be excluded entirely.").

Although the trial court had relied in part on the absence of statistically significant epidemiologic studies, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), did not explicitly address the matter. The Court did, however, refer to "the known or potential rate of error" in identifying factors relevant to the scientific validity of an expert's methodology. *Id.* at 594. The Court did not address any specific rate of error, although two cases that it cited affirmed the admissibility of voice spectrograph results that the courts reported were subject to a 2%–6% chance of error owing to either false matches or false eliminations. One commentator has concluded, "*Daubert* did not set a threshold level of statistical significance either for admissibility or for sufficiency of scientific evidence." *Developments in the Law, supra* note 79, at 1535–36, 1540–46. The Supreme Court in *General Electric Co. v. Joiner,* 522 U.S. 136, 145–47 (1997), adverted to the lack of statistical significance in one study relied on by an expert as a ground for ruling that the district court had not abused its discretion in excluding the expert's testimony.

In *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309 (2011), the Supreme Court was confronted with a question somewhat different from the relationship between statistically significant study results and causation. *Matrixx* was a securities fraud case in which the defendant argued that unless adverse event reports from use of a drug are statistically significant, the information about them is not material, as a matter of law (materiality is required as an element of a fraud claim). Defendant's claim was premised on the idea that only statistically significant results can be a basis for an inference of causation. The Court, unanimously, rejected that claim, citing cases in which courts had permitted expert witnesses to testify to toxic causation in the absence of any statistically significant studies.

For a hypercritical assessment of statistical significance testing that nevertheless identifies much inappropriate overreliance on it, see Stephen T. Ziliak & Deidre N. McCloskey, The Cult of Statistical Significance (2008).

86. *See* Sanders, *supra* note 13, at 342 (describing the improved handling and reporting of statistical analysis in studies of Bendectin after 1980).

87. *See infra* Section VI.

88. Kenneth Rothman, Professor of Public Health at Boston University and Adjunct Professor of Epidemiology at the Harvard School of Public Health, is one of the leaders in advocating the use of confidence intervals and rejecting strict significance testing. In *DeLuca*, 911 F.2d at 947, the Third Circuit discussed Rothman's views on the appropriate level of alpha and the use of con-

EXHIBIT C

*Reference Manual on Scientific Evidence*

A confidence interval is a range of possible values calculated from the results of a study. If a 95% confidence interval is specified, the range encompasses the results we would expect 95% of the time if samples for new studies were repeatedly drawn from the same population. Thus, the width of the interval reflects random error.

The narrower the confidence interval, the more statistically stable the results of the study. The advantage of a confidence interval is that it displays more information than significance testing. "Statistically significant" does not convey the magnitude of the association found in the study or indicate how statistically stable that association is. A confidence interval shows the boundaries of the relative risk based on selected levels of alpha or statistical significance. Just as the *p*-value does not provide the probability that the risk estimate found in a study is correct, the confidence interval does not provide the range within which the true risk must lie. Rather, the confidence interval reveals the likely range of risk estimates consistent with random error. An example of two confidence intervals that might be calculated for a given relative risk is displayed in Figure 4.

Figure 4. Confidence intervals.



The confidence intervals shown in Figure 4 are for a study that found a relative risk of 1.5, with boundaries of 0.8 to 3.4 when the alpha is set to .05 (equivalently, a confidence level of .95), and with boundaries of 1.1 to 2.2 when alpha is set to .10 (equivalently, a confidence level of .90). The confidence interval for alpha equal to .10 is narrower because it encompasses only 90% of the expected test results. By contrast, the confidence interval for alpha equal to .05 includes the expected outcomes for 95% of the tests. To generalize this point, the lower the alpha chosen (and therefore the more stringent the exclusion of possible random error) the wider the confidence interval. At a given alpha, the width of the confidence interval is

fidence intervals. In *Turpin*, 959 F.2d at 1353–54 n.1, the court discussed the relationship among confidence intervals, alpha, and power. *See also* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1100–01 (D. Colo. 2006) (discussing confidence intervals, alpha, and significance testing). The use of confidence intervals in evaluating sampling error more generally than in the epidemiologic context is discussed in David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.A, in this manual.

EXHIBIT C

determined by sample size. All other things being equal, the larger the sample size, the narrower the confidence boundaries (indicating greater numerical stability). For a given risk estimate, a narrower confidence interval reflects a decreased likelihood that the association found in the study would occur by chance if the true association is 1.0.[89]

For the example in Figure 4, the boundaries of the confidence interval with alpha set at .05 encompass a relative risk of 1.0, and the result would be said to be not statistically significant at the .05 level. Alternatively, if the confidence boundaries are defined as an alpha equal to .10, then the confidence interval no longer includes a relative risk of 1.0, and the result would be characterized as statistically significant at the .10 level.

## 2. False negatives

As Figure 4 illustrates, false positives can be reduced by adopting more stringent values for alpha. Using an alpha of .05 will result in fewer false positives than using an alpha of .10, and an alpha of .01 or .001 would produce even fewer false positives.[90] The tradeoff for reducing false positives is an increase in false-negative errors (also called beta errors or Type II errors). This concept reflects the possibility that a study will be interpreted as "negative" (not disproving the null

---

89. Where multiple epidemiologic studies are available, a technique known as meta-analysis (*see infra* Section VI) may be used to combine the results of the studies to reduce the numerical instability of all the studies. *See generally* Diana B. Petitti, Meta-analysis, Decision Analysis, and Cost-Effectiveness Analysis: Methods for Quantitative Synthesis in Medicine (2d ed. 2000). Meta-analysis is better suited to combining results from randomly controlled experimental studies, but if carefully performed it may also be helpful for observational studies, such as those in the epidemiologic field. *See* Zachary B. Gerbarg & Ralph I. Horwitz, *Resolving Conflicting Clinical Trials: Guidelines for Meta-Analysis,* 41 J. Clin. Epidemiol. 503 (1988). In *In re Bextra & Celebrex Marketing Sales Practices & Products Liability Litigation,* 524 F. Supp. 2d 1166 (N.D. Cal. 2007), the court relied on several meta-analyses of Celebrex at a 200-mg dose to conclude that the plaintiffs' experts who proposed to testify to toxicity at that dosage failed to meet the requirements of *Daubert*. The court criticized those experts for the wholesale rejection of meta-analyses of observational studies.

In *In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829, 856–57 (3d Cir. 1990), the court discussed the use and admissibility of meta-analysis as a scientific technique. Overturning the district court's exclusion of a report using meta-analysis, the Third Circuit observed that meta-analysis is a regularly used scientific technique. The court recognized that the technique might be poorly performed, and it required the district court to reconsider the validity of the expert's work in performing the meta-analysis. *See also* E.R. Squibb & Sons, Inc. v. Stuart Pharms., No. 90-1178, 1990 U.S. Dist. LEXIS 15788, at *41 (D.N.J. Oct. 16, 1990) (acknowledging the utility of meta-analysis but rejecting its use in that case because one of the two studies included was poorly performed); Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528, 538–39 (6th Cir. 1992) (identifying an error in the performance of a meta-analysis, in which the Food and Drug Administration pooled data from control groups in different studies in which some gave the controls a placebo and others gave the controls an alternative treatment).

90. It is not uncommon in genome-wide association studies to set the alpha at .00001 or even lower because of the large number of associations tested in such studies. Reducing alpha is designed to limit the number of false-positive findings.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

hypothesis), when in fact there is a true association of a specified magnitude.[91] The beta for any study can be calculated only based on a specific alternative hypothesis about a given positive relative risk and a specific level of alpha selected.[92]

## 3. Power

When a study fails to find a statistically significant association, an important question is whether the result tends to exonerate the agent's toxicity or is essentially inconclusive with regard to toxicity.[93] The concept of power can be helpful in evaluating whether a study's outcome is exonerative or inconclusive.[94]

The power of a study is the probability of finding a statistically significant association of a given magnitude (if it exists) in light of the sample sizes used in the study. The power of a study depends on several factors: the sample size; the level of alpha (or statistical significance) specified; the background incidence of disease; and the specified relative risk that the researcher would like to detect.[95] Power curves can be constructed that show the likelihood of finding any given relative risk in light of these factors. Often, power curves are used in the design of a study to determine what size the study populations should be.[96]

The power of a study is the complement of beta $(1 - \beta)$. Thus, a study with a likelihood of .25 of failing to detect a true relative risk of $2.0$[97] or greater has a power of .75. This means the study has a 75% chance of detecting a true relative risk of 2.0. If the power of a negative study to find a relative risk of 2.0 or greater

---

91.  *See also* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990).

92.  *See* Green, *supra* note 47, at 684–89.

93.  Even when a study or body of studies tends to exonerate an agent, that does not establish that the agent is absolutely safe. *See* Cooley v. Lincoln Elec. Co., 693 F. Supp. 2d 767 (N.D. Ohio 2010). Epidemiology is not able to provide such evidence.

94.  *See* Fienberg et al., *supra* note 72, at 22–23. Thus, in *Smith v. Wyeth-Ayerst Labs. Co.,* 278 F. Supp. 2d 684, 693 (W.D.N.C. 2003) and *Cooley v. Lincoln Electric Co.,* 693 F. Supp. 2d 767, 773 (N.D. Ohio 2010), the courts recognized that the power of a study was critical to assessing whether the failure of the study to find a statistically significant association was exonerative of the agent or inconclusive. *See also* Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc., No. 06 Civ. 0034(PAC), 2006 WL 2588002, at *32 n.16 (S.D.N.Y. Sept. 6, 2006) (discussing power curves and quoting the second edition of this reference guide); *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 289 F. Supp. 2d 1230, 1243–44 (W.D. Wash. 2003) (explaining expert's testimony that "statistical reassurance as to lack of an effect would require an upper bound of a reasonable confidence interval close to the null value"); Ruff v. Ensign-Bickford Indus., Inc., 168 F. Supp. 2d 1271, 1281 (D. Utah 2001) (explaining why a study should be treated as inconclusive rather than exonerative based on small number of subjects in study).

95.  *See* Malcolm Gladwell, *How Safe Are Your Breasts?* New Republic, Oct. 24, 1994, at 22, 26.

96.  For examples of power curves, see Kenneth J. Rothman, Modern Epidemiology 80 (1986); Pagano & Gauvreau, *supra* note 59, at 245.

97.  We use a relative risk of 2.0 for illustrative purposes because of the legal significance courts have attributed to this magnitude of association. *See infra* Section VII.

582

**EXHIBIT C**

is low, it has substantially less probative value than a study with similar results but a higher power.[98]

## B. What Biases May Have Contributed to an Erroneous Association?

The second major reason for an invalid outcome in epidemiologic studies is systematic error or bias. Bias may arise in the design or conduct of a study, data collection, or data analysis. The meaning of scientific bias differs from conventional (and legal) usage, in which bias refers to a partisan point of view.[99] When scientists use the term *bias,* they refer to anything that results in a systematic (nonrandom) error in a study result and thereby compromises its validity. Two important categories of bias are selection bias (inappropriate methodology for selection of study subjects) and information bias (a flaw in measuring exposure or disease in the study groups).

Most epidemiologic studies have some degree of bias that may affect the outcome. If major bias is present, it may invalidate the study results. Finding the bias, however, can be difficult, if not impossible. In reviewing the validity of an epidemiologic study, the epidemiologist must identify potential biases and analyze the amount or kind of error that might have been induced by the bias. Often, the direction of error can be determined; depending on the specific type of bias, it may exaggerate the real association, dilute it, or even completely mask it.

### 1. Selection bias

Selection bias refers to the error in an observed association that results from the method of selection of cases and controls (in a case-control study) or exposed and unexposed individuals (in a cohort study).[100] The selection of an appropriate

---

98. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.C.1, in this manual.

99. A Dictionary of Epidemiology 15 (John M. Last ed., 3d ed. 1995); Edmond A. Murphy, The Logic of Medicine 239–62 (1976).

100. Selection bias is defined as "[e]rror due to systematic differences in characteristics between those who are selected for study and those who are not." A Dictionary of Epidemiology, *supra* note 98, at 153. In *In re "Agent Orange" Product Liability Litigation,* 597 F. Supp. 740, 783 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 145 (2d Cir. 1987), the court expressed concern about selection bias. The exposed cohort consisted of young, healthy men who served in Vietnam. Comparing the mortality rate of the exposed cohort and that of a control group made up of civilians might have resulted in error that was a result of selection bias. Failing to account for health status as an independent variable tends to understate any association between exposure and disease in studies in which the exposed cohort is healthier. *See also In re* Baycol Prods. Litig., 532 F. Supp. 2d 1029, 1043 (D. Minn. 2007) (upholding admissibility of testimony by expert witness who criticized study based on selection bias).

EXHIBIT C

*Reference Manual on Scientific Evidence*

control group has been described as the Achilles' heel of a case-control study.[101] Ideally, controls should be drawn from the same population that produced the cases. Selecting control participants becomes problematic if the control participants are selected for reasons that are related to their having the exposure being studied. For example, a study of the effect of smoking on heart disease will suffer selection bias if subjects of the study are volunteers and the decision to volunteer is affected by both being a smoker and having a family history of heart disease. The association will be biased upward because of the additional disease among the exposed smokers caused by genetics.

Hospital-based studies, which are relatively common among researchers located in medical centers, illustrate the problem. Suppose an association is found between coffee drinking and coronary heart disease in a study using hospital patients as controls. The problem is that the hospitalized control group may include individuals who had been advised against drinking coffee for medical reasons, such as to prevent the aggravation of a peptic ulcer. In other words, the controls may become eligible for the study because of their medical condition, which is in turn related to their exposure status—their likelihood of avoiding coffee. If this is true, the amount of coffee drinking in the control group would understate the extent of coffee drinking expected in people who do not have the disease, and thus bias upwardly (i.e., exaggerate) any odds ratio observed.[102] Bias in hospital studies may also understate the true odds ratio when the exposures at issue led to the cases' hospitalizations and also contributed to the controls' chances of hospitalization.

Just as cases and controls in case-control studies should be selected independently of their exposure status, so the exposed and unexposed participants in cohort studies should be selected independently of their disease risk.[103] For example, if women with hysterectomies are overrepresented among exposed women in a cohort study of cervical cancer, this could overstate the association between the exposure and the disease.

A further source of selection bias occurs when those selected to participate decline to participate or drop out before the study is completed. Many studies have shown that individuals who participate in studies differ significantly from those who do not. If a significant portion of either study group declines to participate, the researcher should investigate whether those who declined are different from those who agreed. The researcher can compare relevant characteristics of those who

101. William B. Kannel & Thomas R. Dawber, *Coffee and Coronary Disease,* 289 New Eng. J. Med. 100 (1973) (editorial).

102. Hershel Jick et al., *Coffee and Myocardial Infarction,* 289 New Eng. J. Med. 63 (1973).

103. When unexposed controls may differ from the exposed cohort because exposure is associated with other risk (or protective factors), investigators can attempt to measure and adjust for those differences, as explained in Section IV.C.3, *infra. See also* Martha J. Radford & JoAnne M. Foody, *How Do Observational Studies Expand the Evidence Base for Therapy?* 286 JAMA 1228 (2001) (discussing the use of propensity analysis to adjust for potential confounding and selection biases that may occur from nonrandomization).

EXHIBIT C

*Reference Guide on Epidemiology*

participate with those who do not to show the extent to which the two groups are comparable. Similarly, if a significant number of subjects drop out of a study before completion, the remaining subjects may not be representative of the original study populations. The researcher should examine whether that is the case.

The fact that a study may suffer from selection bias does not necessarily invalidate its results. A number of factors may suggest that a bias, if present, had only limited effect. If the association is particularly strong, for example, bias is less likely to account for all of it. In addition, a consistent association across different control groups suggests that possible biases applicable to a particular control group are not invalidating. Similarly, a dose–response relationship (*see* Section V.C, *infra)* found among multiple groups exposed to different doses of the agent would provide additional evidence that biases applicable to the exposed group are not a major problem.

## *2. Information bias*

Information bias is a result of inaccurate information about either the disease or the exposure status of the study participants or a result of confounding. In a case-control study, potential information bias is an important consideration because the researcher depends on information from the past to determine exposure and disease and their temporal relationship.[104] In some situations, the researcher is required to interview the subjects about past exposures, thus relying on the subjects' memories. Research has shown that individuals with disease (cases) tend to recall past exposures more readily than individuals with no disease (controls);[105] this creates a potential for bias called recall bias.

For example, consider a case-control study conducted to examine the cause of congenital malformations. The epidemiologist is interested in whether the malformations were caused by an infection during the mother's pregnancy.[106] A group of mothers of malformed infants (cases) and a group of mothers of infants with no

104. Information bias can be a problem in cohort studies as well. When exposure is determined retrospectively, there can be a variety of impediments to obtaining accurate information. Similarly, when disease status is determined retrospectively, bias is a concern. The determination that asbestos is a cause of mesothelioma was hampered by inaccurate death certificates that identified lung cancer rather than mesothelioma, a rare form of cancer, as the cause of death. *See* I.J. Selikoff et al., *Mortality Experience of Insulation Workers in the United States and Canada,* 220 Ann. N.Y. Acad. Sci. 91, 110–11 (1979).

105. Steven S. Coughlin, *Recall Bias in Epidemiological Studies,* 43 J. Clinical Epidemiology 87 (1990).

106. *See* Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 311–12 (5th Cir. 1989) (discussion of recall bias among women who bear children with birth defects). We note that the court was mistaken in its assertion that a confidence interval could correct for recall bias, or for any bias for that matter. Confidence intervals are a statistical device for analyzing error that may result from random sampling. Systematic errors (bias) in the design or data collection are not addressed by statistical methods, such as confidence intervals or statistical significance. *See* Green, *supra* note 47, at 667–68; Vincent M. Brannigan et al., *Risk, Statistical Inference, and the Law of Evidence: The Use of Epidemiological Data in Toxic Tort Cases,* 12 Risk Analysis 343, 344–45 (1992).

EXHIBIT C

*Reference Manual on Scientific Evidence*

malformation (controls) are interviewed regarding infections during pregnancy. Mothers of children with malformations may recall an inconsequential fever or runny nose during pregnancy that readily would be forgotten by a mother who had a normal infant. Even if in reality the infection rate in mothers of malformed children is no different from the rate in mothers of normal children, the result in this study would be an apparently higher rate of infection in the mothers of the children with the malformations solely on the basis of recall differences between the two groups.[107] The issue of recall bias can sometimes be evaluated by finding an alternative source of data to validate the subject's response (e.g., blood test results from prenatal visits or medical records that document symptoms of infection).[108] Alternatively, the mothers' responses to questions about other exposures may shed light on the presence of a bias affecting the recall of the relevant exposures. Thus, if mothers of cases do not recall greater exposure than controls' mothers to pesticides, children with German measles, and so forth, then one can have greater confidence in their recall of illnesses.

Bias may also result from reliance on interviews with surrogates who are individuals other than the study subjects. This is often necessary when, for example, a subject (in a case–control study) has died of the disease under investigation or may be too ill to be interviewed.

There are many sources of information bias that affect the measure of exposure, including its intensity and duration. Exposure to the agent can be measured directly or indirectly.[109] Sometimes researchers use a biological marker as a direct measure of exposure to an agent—an alteration in tissue or body fluids that occurs as a result of an exposure and that can be detected in the laboratory. Biological markers, however, are only available for a small number of toxins and usually only reveal whether a person was exposed.[110] Biological markers rarely help determine the intensity or duration of exposure.[111]

107. Thus, in *Newman v. Motorola, Inc.,* 218 F. Supp. 2d 769, 778 (D. Md. 2002), the court considered a study of the effect of cell phone use on brain cancer and concluded that there was good reason to suspect that recall bias affected the results of the study, which found an association between cell phone use and cancers on the side of the head where the cell phone was used but no association between cell phone use and overall brain tumors.

108. Two researchers who used a case-control study to examine the association between congenital heart disease and the mother's use of drugs during pregnancy corroborated interview data with the mother's medical records. *See* Sally Zierler & Kenneth J. Rothman, *Congenital Heart Disease in Relation to Maternal Use of Bendectin and Other Drugs in Early Pregnancy,* 313 New Eng. J. Med. 347, 347–48 (1985).

109. *See In re* Paoli R.R. Yard PCB Litig., No. 86-2229, 1992 U.S. Dist LEXIS 18430, at ⋆9–⋆11 (E.D. Pa. Oct. 21, 1992) (discussing valid methods of determining exposure to chemicals).

110. *See* Gary E. Marchant, *Genetic Susceptibility and Biomarkers in Toxic Injury Litigation,* 41 Jurimetrics J. 67, 68, 73–74, 95–97 (2000) (explaining concept of biomarkers, how they might be used to provide evidence of exposure or dose, discussing cases in which biomarkers were invoked in an effort to prove exposure, and concluding, "biomarkers are likely to be increasingly relied on to demonstrate exposure").

111. There are different definitions of dose, but dose often refers to the intensity or magnitude of exposure multiplied by the time exposed. *See* Sparks v. Owens-Illinois, Inc., 38 Cal. Rptr. 2d 739,

EXHIBIT C

*Reference Guide on Epidemiology*

Monitoring devices also can be used to measure exposure directly but often are not available for exposures that have occurred in the past. For past exposures, epidemiologists often use indirect measures of exposure, such as interviewing workers and reviewing employment records. Thus, all those employed to install asbestos insulation may be treated as having been exposed to asbestos during the period that they were employed. However, there may be a wide variation of exposure within any job, and these measures may have limited applicability to a given individual.[112] If the agent of interest is a drug, medical or hospital records can be used to determine past exposure. Thus, retrospective studies, which are often used for occupational or environmental investigations, entail measurements of exposure that are usually less accurate than prospective studies or followup studies, including ones in which a drug or medical intervention is the independent variable being measured.

742 (Ct. App. 1995). Other definitions of dose may be more appropriate in light of the biological mechanism of the disease.

For a discussion of the difficulties of determining dose from atomic fallout, see Allen v. United States, 588 F. Supp. 247, 425–26 (D. Utah 1984), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987). The timing of exposure may also be critical, especially if the disease of interest is a birth defect. In *Smith v. Ortho Pharmaceutical Corp.,* 770 F. Supp. 1561, 1577 (N.D. Ga. 1991), the court criticized a study for its inadequate measure of exposure to spermicides. The researchers had defined exposure as receipt of a prescription for spermicide within 600 days of delivery, but this definition of exposure is too broad because environmental agents are likely to cause birth defects only during a narrow band of time.

A different, but related, problem often arises in court. Determining the plaintiff's exposure to the alleged toxic substance always involves a retrospective determination and may involve difficulties similar to those faced by an epidemiologist planning a study. Thus, in *John's Heating Service v. Lamb,* 46 P.3d 1024 (Alaska 2002), plaintiffs were exposed to carbon monoxide because of defendants' negligence with respect to a home furnace. The court observed: "[W]hile precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation." *Id.* at 1035 (quoting Westberry v. Gislaved Gummi AB, 178 F.3d 257, 264 (4th Cir. 1999)); *see also* Alder v. Bayer Corp., AGFA Div., 61 P.3d 1068, 1086–88 (Utah 2002) (summarizing other decisions on the precision with which plaintiffs must establish the dosage to which they were exposed). *See generally* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c(2) & rptrs. note (2010).

In asbestos litigation, a number of courts have adopted a requirement that the plaintiff demonstrate (1) regular use by an employer of the defendant's asbestos-containing product, (2) the plaintiff's proximity to that product, and (3) exposure over an extended period of time. *See, e.g.,* Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162–64 (4th Cir. 1986); Gregg v. V-J Auto Parts, Inc., 943 A.2d 216, 226 (Pa. 2007).

112. Frequently, occupational epidemiologists employ study designs that consider all agents to which those who work in a particular occupation are exposed because they are trying to determine the hazards associated with that occupation. Isolating one of the agents for examination would be difficult if not impossible. These studies, then, present difficulties when employed in court in support of a claim by a plaintiff who was exposed to only one or fewer than all of the agents present at the worksite that was the subject of the study. *See, e.g.,* Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 352–53 (5th Cir. 2007) (concluding that case-control studies of cancer that entailed exposure to a variety of organic solvents at job sites did not support claims of plaintiffs who claimed exposure to benzene caused their cancers).

587

EXHIBIT C

*Reference Manual on Scientific Evidence*

The route (e.g., inhalation or absorption), duration, and intensity of exposure are important factors in assessing disease causation. Even with environmental monitoring, the dose measured in the environment generally is not the same as the dose that reaches internal target organs. If the researcher has calculated the internal dose of exposure, the scientific basis for this calculation should be examined for soundness.[113]

In assessing whether the data may reflect inaccurate information, one must assess whether the data were collected from objective and reliable sources. Medical records, government documents, employment records, death certificates, and interviews are examples of data sources that are used by epidemiologists to measure both exposure and disease status.[114] The accuracy of a particular source may affect the validity of a research finding. If different data sources are used to collect information about a study group, differences in the accuracy of those sources may affect the validity of the findings. For example, using employment records to gather information about exposure to narcotics probably would lead to inaccurate results, because employees tend to keep such information private. If the researcher uses an unreliable source of data, the study may not be useful.

The kinds of quality control procedures used may affect the accuracy of the data. For data collected by interview, quality control procedures should probe the reliability of the individual and whether the information is verified by other sources. For data collected and analyzed in the laboratory, quality control procedures should probe the validity and reliability of the laboratory test.

Information bias may also result from inaccurate measurement of disease status. The quality and sophistication of the diagnostic methods used to detect a disease should be assessed.[115] The proportion of subjects who were examined also should be questioned. If, for example, many of the subjects refused to be tested, the fact that the test used was of high quality would be of relatively little value.

113. *See also* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, Section I.D, in this manual.

114. Even these sources may produce unanticipated error. Identifying the causal connection between asbestos and mesothelioma, a rare form of cancer, was complicated and delayed because doctors who were unfamiliar with mesothelioma erroneously identified other causes of death in death certificates. *See* David E. Lilienfeld & Paul D. Gunderson, *The "Missing Cases" of Pleural Malignant Mesothelioma in Minnesota, 1979–81: Preliminary Report,* 101 Pub. Health Rep. 395, 397–98 (1986).

115. The hazards of adversarial review of epidemiologic studies to determine bias is highlighted by *O'Neill v. Novartis Consumer Health, Inc.,* 55 Cal. Rptr. 3d 551, 558–60 (Ct. App. 2007). Defendant's experts criticized a case-control study relied on by plaintiff on the ground that there was misclassification of exposure status among the cases. Plaintiff objected to this criticism because defendant's experts had only examined the cases for exposure misclassification, which would tend to exaggerate any association by providing an inaccurately inflated measure of exposure in the cases. The experts failed to examine whether there was misclassification in the controls, which, if it existed, would tend to incorrectly diminish any association.

**EXHIBIT C**

*Reference Guide on Epidemiology*

The scientific validity of the research findings is influenced by the reliability of the diagnosis of disease or health status under study.[116] The disease must be one that is recognized and defined to enable accurate diagnoses.[117] Subjects' health status may be essential to the hypothesis under investigation. For example, a researcher interested in studying spontaneous abortion in the first trimester must determine that study subjects are pregnant. Diagnostic criteria that are accepted by the medical community should be used to make the diagnosis. If a diagnosis had been made at a time when home pregnancy kits were known to have a high rate of false-positive results (indicating pregnancy when the woman is not pregnant), the study will overestimate the number of spontaneous abortions.

Misclassification bias is a consequence of information bias in which, because of problems with the information available, individuals in the study may be misclassified with regard to exposure status or disease status. Bias due to exposure misclassification can be differential or nondifferential. In nondifferential misclassification, the inaccuracies in determining exposure are independent of disease status, or the inaccuracies in diagnoses are independent of exposure status—in other words, the data are crude, with a great deal of random error. This is a common problem. Generally, nondifferential misclassification bias leads to a shift in the odds ratio toward one, or, in other words, toward a finding of no effect. Thus, if the errors are nondifferential, it is generally misguided to criticize an apparent association between an exposure and disease on the ground that data were inaccurately classified. Instead, nondifferential misclassification generally underestimates the true size of the association.

Differential misclassification is systematic error in determining exposure in cases as compared with controls, or disease status in unexposed cohorts relative to exposed cohorts. In a case-control study this would occur, for example, if, in the

---

116. In *In re Swine Flu Immunization Products Liability Litigation,* 508 F. Supp. 897, 903 (D. Colo. 1981), *aff'd sub nom. Lima v. United States,* 708 F.2d 502 (10th Cir. 1983), the court critically evaluated a study relied on by an expert whose testimony was stricken. In that study, determination of whether a patient had Guillain-Barré syndrome was made by medical clerks, not physicians who were familiar with diagnostic criteria.

117. The difficulty of ill-defined diseases arose in some of the silicone gel breast implant cases. Thus, in *Grant v. Bristol-Myers Squibb,* 97 F. Supp. 2d 986 (D. Ariz. 2000), in the face of a substantial body of exonerative epidemiologic evidence, the female plaintiff alleged she suffered from an atypical systemic joint disease. The court concluded:

> As a whole, the Court finds that the evidence regarding systemic disease as proposed by Plaintiffs' experts is not scientifically valid and therefore will not assist the trier of fact. As for the atypical syndrome that is suggested, where experts propose that breast implants cause a disease but cannot specify the criteria for diagnosing the disease, it is incapable of epidemiologic testing. This renders the experts' methods insufficiently reliable to help the jury.

*Id.* at 992; *see also* Burton v. Wyeth-Ayerst Labs., 513 F. Supp. 2d 719, 722–24 (N.D. Tex. 2007) (parties disputed whether cardiology problem involved two separate diseases or only one; court concluded that all experts in the case reflected a view that there was but a single disease); *In re* Breast Implant Cases, 942 F. Supp. 958, 961 (E.D.N.Y. & S.D.N.Y. 1996).

589

EXHIBIT C

*Reference Manual on Scientific Evidence*

process of anguishing over the possible causes of the disease, parents of ill children recalled more exposures to a particular agent than actually occurred, or if parents of the controls, for whom the issue was less emotionally charged, recalled fewer. This can also occur in a cohort study in which, for example, birth control users (the exposed cohort) are monitored more closely for potential side effects, leading to a higher rate of disease identification in that cohort than in the unexposed cohort. Depending on how the misclassification occurs, a differential bias can produce an error in either direction—the exaggeration or understatement of a true association.

## 3. Other conceptual problems

There are dozens of other potential biases that can occur in observational studies, which is an important reason why clinical studies (when ethical) are often preferable. Sometimes studies are limited by flawed definitions or premises. For example, if the researcher defines the disease of interest as all birth defects, rather than a specific birth defect, there should be a scientific basis to hypothesize that the effects of the agent being investigated could be so broad. If the effect is in fact more limited, the result of this conceptualization error could be to dilute or mask any real effect that the agent might have on a specific type of birth defect.[118]

Some biases go beyond errors in individual studies and affect the overall body of available evidence in a way that skews what appears to be the universe of evidence. Publication bias is the tendency for medical journals to prefer studies that find an effect.[119] If negative studies are never published, the published literature will be biased. Financial conflicts of interest by researchers and the source of funding of studies have been shown to have an effect on the outcomes of such studies.[120]

---

118. In *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 312 (5th Cir. 1989), the court discussed a reanalysis of a study in which the effect was narrowed from all congenital malformations to limb reduction defects. The magnitude of the association changed by 50% when the effect was defined in this narrower fashion. *See* Rothman et al. *supra* note 61, at 144 ("Unwarranted assurances of a lack of any effect can easily emerge from studies in which a wide range of etiologically unrelated outcomes are grouped.").

119. Investigators may contribute to this effect by neglecting to submit negative studies for publication.

120. *See* Jerome P. Kassirer, On the Take: How Medicine's Complicity with Big Business Can Endanger Your Health 79–84 (2005); J.E. Bekelman et al., *Scope and Impact of Financial Conflicts of Interest in Biomedical Research: A Systematic Review,* 289 JAMA 454 (2003). Richard Smith, the editor in chief of the British Medical Journal, wrote on this subject:

> The major determinant of whether reviews of passive smoking concluded it was harmful was whether the authors had financial ties with tobacco manufacturers. In the disputed topic of whether third-generation contraceptive pills cause an increase in thromboembolic disease, studies funded by the pharmaceutical industry find that they don't and studies funded by public money find that they do.

Richard Smith, *Making Progress with Competing Interests,* 325 Brit. Med. J. 1375, 1376 (2002).

EXHIBIT C

*Reference Guide on Epidemiology*

Examining a study for potential sources of bias is an important task that helps determine the accuracy of a study's conclusions. In addition, when a source of bias is identified, it may be possible to determine whether the error tended to exaggerate or understate the true association. Thus, bias may exist in a study that nevertheless has probative value.

Even if one concludes that the findings of a study are statistically stable and that biases have not created significant error, additional considerations remain. As repeatedly noted, an association does not necessarily mean a causal relationship exists. To make a judgment about causation, a knowledgeable expert[121] must consider the possibility of confounding factors. The expert must also evaluate several criteria to determine whether an inference of causation is appropriate.[122] These matters are discussed below.

## C. Could a Confounding Factor Be Responsible for the Study Result?[123]

The third major reason for error in epidemiologic studies is confounding. Confounding occurs when another causal factor (the confounder) confuses the relationship between the agent of interest and outcome of interest.[124] (Confounding and selection bias (Section IV.B.1, *supra*) can, depending on terminology, overlap.) Thus, one instance of confounding is when a confounder is both a risk factor for the disease and a factor associated with the exposure of interest. For example, researchers may conduct a study that finds individuals with gray hair have a higher rate of death than those with hair of another color. Instead of hair color having an impact on death, the results might be explained by the confounding factor of age. If old age is associated differentially with the gray-haired group (those with gray hair tend to be older), old age may be responsible for the association found between hair color and death.[125] Researchers must separate the relationship between gray hair and risk of death from that of old age and risk of death. When researchers find an association between an agent and a disease, it is critical to determine whether the association is causal or the result of confounding.[126] Some

---

121. In a lawsuit, this would be done by an expert. In science, the effort is usually conducted by a panel of experts.

122. For an excellent example of the authors of a study analyzing whether an inference of causation is appropriate in a case-control study examining whether bromocriptine (Parlodel)—a lactation suppressant—causes seizures in postpartum women, see Kenneth J. Rothman et al., *Bromocriptine and Puerpal Seizures,* 1 Epidemiology 232, 236–38 (1990).

123. *See* Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1991) (discussing the possibility that confounders may lead to an erroneous inference of a causal relationship).

124. *See* Rothman et al., *supra* note 61, at 129.

125. This example is drawn from Kahn & Sempos, *supra* note 31, at 63.

126. Confounding can bias a study result by either exaggerating or diluting any true association. One example of a confounding factor that may result in a study's outcome understating an

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

epidemiologists classify confounding as a form of bias. However, confounding is a reality—that is, the observed association of a factor and a disease is actually the result of an association with a third, confounding factor.[127]

Confounding can be illustrated by a hypothetical prospective cohort study of the role of alcohol consumption and emphysema. The study is designed to investigate whether drinking alcohol is associated with emphysema. Participants are followed for a period of 20 years and the incidence of emphysema in the "exposed" (participants who consume more than 15 drinks per week) and the unexposed is compared. At the conclusion of the study, the relative risk of emphysema in the drinking group is found to be 2.0, an association that suggests a possible effect). But does this association reflect a true causal relationship or might it be the product of confounding?

One possibility for a confounding factor is smoking, a known causal risk factor for emphysema. If those who drink alcohol are more likely to be smokers than those who do not drink, then smoking may be responsible for some or all of the higher level of emphysema among those who do not drink.

A serious problem in observational studies such as this hypothetical study is that the individuals are not assigned randomly to the groups being compared.[128] As discussed above, randomization maximizes the possibility that exposures other than the one under study are evenly distributed between the exposed and the control cohorts.[129] In observational studies, by contrast, other forces, including self-selection, determine who is exposed to other (possibly causal) factors. The lack of randomization leads to the potential problem of confounding. Thus, for example, the exposed cohort might consist of those who are exposed at work to an agent suspected of being an industrial toxin. The members of this cohort may, however, differ from unexposed controls by residence, socioeconomic or health status, age, or other extraneous factors.[130] These other factors may be causing (or

association is vaccination. Thus, if a group exposed to an agent has a higher rate of vaccination for the disease under study than the unexposed group, the vaccination may reduce the rate of disease in the exposed group, thereby producing an association that is less than the true association without the confounding of vaccination.

127. Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1199–1200 (E.D.N.Y. 2006), *rev'd on other grounds,* 522 F.3d 215 (2d Cir. 2008), describes confounding that led to premature conclusions that low-tar cigarettes were safer than regular cigarettes. Smokers who chose to switch to low-tar cigarettes were different from other smokers in that they were more health conscious in other aspects of their lifestyles. Failure to account for that confounding—and measuring a healthy lifestyle is difficult even if it is identified as a potential confounder—biased the results of those studies.

128. Randomization attempts to ensure that the presence of a characteristic, such as coffee drinking, is governed by chance, as opposed to being determined by the presence of an underlying medical condition.

129. *See* Rothman et al., *supra* note 61, at 129; *see also supra* Section II.A.

130. *See, e.g., In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 783 (E.D.N.Y. 1984) (discussing the problem of confounding that might result in a study of the effect of exposure to Agent Orange on Vietnam servicemen), *aff'd,* 818 F.2d 145 (2d Cir. 1987).

EXHIBIT C

*Reference Guide on Epidemiology*

protecting against) the disease, but because of potential confounding, an apparent (yet false) association of the disease with exposure to the agent may appear. Confounders, like smoking in the alcohol drinking study, do not reflect an error made by the investigators; rather, they reflect the inherently "uncontrolled" nature of exposure designations in observational studies. When they can be identified, confounders should be taken into account. Unanticipated confounding factors that are suspected after data collection can sometimes be controlled during data analysis, if data have been gathered about them.

To evaluate whether smoking is a confounding factor, the researcher would stratify each of the exposed and control groups into smoking and nonsmoking subgroups to examine whether subjects' smoking status affects the study results. If the relationship between alcohol drinking and emphysema in the smoking subgroups is the same as that in the all-subjects group, smoking is not a confounding factor. If the subjects' smoking status affects the relationship between drinking and emphysema, then smoking is a confounder, for which adjustment is required. If the association between drinking and emphysema completely disappears when the subjects' smoking status is considered, then smoking is a confounder that fully accounts for the association with drinking observed. Table 4 reveals our hypothetical study's results, with smoking being a confounding factor, which, when accounted for, eliminates the association. Thus, in the full cohort, drinkers have twice the risk of emphysema compared with nondrinkers. When the relationship between drinking and emphysema is examined separately in smokers and in nonsmokers, the risk of emphysema in drinkers compared with nondrinkers is not elevated in smokers or in nonsmokers. This is because smokers are disproportionately drinkers and have a higher rate of emphysema than nonsmokers. Thus, the relationship between drinking and emphysema in the full cohort is distorted by failing to take into account the relationship between being a drinker and a smoker.

Even after accounting for the effect of smoking, there is always a risk that an undiscovered or unrecognized confounding factor may contribute to a study's findings, by either magnifying or reducing the observed association.[131] It is, however, necessary to keep that risk in perspective. Often the mere possibility of uncontrolled confounding is used to call into question the results of a study. This was certainly the strategy of some seeking, or unwittingly helping, to undermine the implications of the studies persuasively linking cigarette smoking to lung cancer. The critical question is whether it is plausible that the findings of a given study could indeed be due to unrecognized confounders.

In designing a study, researchers sometimes make assumptions that cannot be validated or evaluated empirically. Thus, researchers may assume that a missing potential confounder is not needed for the analysis or that a variable used was adequately classified. Researchers employ a sensitivity analysis to assess the effect of those assumptions should they be incorrect. Conducting a sensitivity analysis

131. Rothman et al., *supra* note 61, at 129; *see also supra* Section II.A.

593

EXHIBIT C

594

Table 4. Hypothetical Emphysema Study Data[a]

| Drinking Status | Total Cohort | | | | Smokers | | | | Nonsmokers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Cases | Incidence | RR | Total | Cases | Incidence | RR | Total | Cases | Incidence | RR |
| Nondrinkers | 471 | 16 | 0.034 | 1.0[b] | 111 | 9 | 0.081 | 1.0[b] | 360 | 7 | 0.019 | 1.0[b] |
| Drinkers | 739 | 41 | 0.069 | 2.0 | 592 | 48 | 0.081 | 1.0 | 147 | 3 | 0.020 | 1.0 |

[a] The incidence of disease is not normally presented in an epidemiologic study, but we include it here to aid in comprehension of the ideas discussed in the text.
[b] RR = relative risk. The relative risk for each of the cohorts is determined based on reference to the risk among nondrinkers; that is, the incidence of disease among drinkers is compared with nondrinkers for each of the three cohorts separately.

EXHIBIT C

*Reference Guide on Epidemiology*

entails repeating the analysis using different assumptions (e.g., alternative correc‑tions for missing data or for classifying data) to see if the results are sensitive to the varying assumptions. Such analyses can show that the assumptions are not likely to affect the findings or that alternative explanations cannot be ruled out.[132]

## 1. What techniques can be used to prevent or limit confounding?

Choices in the design of a research project (e.g., methods for selecting the sub‑jects) can prevent or limit confounding. In designing a study, the researcher must determine other risk factors for the disease under study. When a factor or factors, such as age, sex, or even smoking status, are risk factors and potential confounders in a study, investigators can limit the differential distribution of these factors in the study groups by selecting controls to "match" cases (or the exposed group) in terms of these variables. If the two groups are matched, for example, by age, then any association observed in the study cannot be due to age, the matched variable.[133]

Restricting the persons who are permitted as subjects in a study is another method to control for confounders. If age or sex is suspected as a confounder, then the subjects enrolled in a study can be limited to those of one sex and those who are within a specified age range. When there is no variance among subjects in a study with regard to a potential confounder, confounding as a result of that variable is eliminated.

## 2. What techniques can be used to identify confounding factors?

Once the study data are ready to be analyzed, the researcher must assess a range of factors that could influence risk. In the hypothetical study, the researcher would evaluate whether smoking is a confounding factor by comparing the incidence of emphysema in smoking alcohol drinkers with the incidence in nonsmoking alcohol drinkers. If the incidence is substantially the same, smoking is not a confounding factor (e.g., smoking does not distort the relationship between alcohol drinking and the development of emphysema). If the incidence is substantially different, but still exists in the nonsmoking group, then smoking is a confounder, but does not wholly account for the association with alcohol drinking. If the association disappears, then smoking is a confounder that fully accounts for the association observed.

---

132. Kenneth Rothman & Sander Greenland, Modern Epidemiology (2d ed. 1998).

133. Selecting a control population based on matched variables necessarily affects the representa‑tiveness of the selected controls and may affect how generalizable the study results are to the population at large. However, for a study to have merit, it must first be internally valid; that is, it must not be subject to unreasonable sources of bias or confounding. Only after a study has been shown to meet this standard does its universal applicability or generalizability to the population at large become an issue. When a study population is not representative of the general or target population, existing scientific knowledge may permit reasonable inferences about the study's broader applicability, or additional confirmatory studies of other populations may be necessary.

EXHIBIT C

*Reference Manual on Scientific Evidence*

### 3. What techniques can be used to control for confounding factors?

A good study design will consider potential confounders and obtain data about them if possible. If researchers have good data on potential confounders, they can control for those confounders in the data analysis. There are several analytic approaches to account for the distorting effects of a confounder, including stratification or multivariate analysis. Stratification permits an investigator to evaluate the effect of a suspected confounder by subdividing the study groups based on a confounding factor. Thus, in Table 4, drinkers have been stratified based on whether they smoke (the suspected confounder). To take another example that entails a continuous rather than dichotomous potential confounder, let us say we are interested in the relationship between smoking and lung cancer but suspect that air pollution or urbanization may confound the relationship. Thus, an observed relationship between smoking and lung cancer could theoretically be due in part to pollution, if smoking were more common in polluted areas. We could address this issue by stratifying our data by degree of urbanization and look at the relationship between smoking and lung cancer in each urbanization stratum. Figure 5 shows actual age–adjusted lung cancer mortality rates per 100,000 person–years by urban or rural classification and smoking category.[134]

Figure 5: Age–adjusted lung cancer mortality rates per 100,000 person–years by urban or rural classification and smoking category.



*Source:* Adapted from E. Cuyler Hammond & Daniel Horn, *Smoking and Death Rates—Report on Forty-Four Months of Follow-Up of 187,783 Men: II, Death Rates by Cause*, 166 JAMA 1294 (1958).

134. This example and Figure 4 are from Leon Gordis, Epidemiology 254 (4th ed. 2009).

EXHIBIT C

*Reference Guide on Epidemiology*

For each degree of urbanization, lung cancer mortality rates in smokers are shown by the dark gray bars, and nonsmoker mortality rates are indicated by light gray bars. From these data we see that in every level (or stratum) of urbanization, lung cancer mortality is higher in smokers than in nonsmokers. Therefore, the observed association of smoking and lung cancer cannot be attributed to level of urbanization. By examining each stratum separately, we, in effect, hold urbanization constant, and still find much higher lung cancer mortality in smokers than in nonsmokers.

For each degree of urbanization, lung cancer mortality rates and smokers are shown by the dark-colored bars, and nonsmoker mortality rates are indicated by light-colored bars. For these data we see that in every level (or stratum) of urbanization, lung cancer mortality is higher in smokers than in nonsmokers. Therefore, the observed association of lung cancer cannot be attributed to level of urbanization. By examining each stratum separately, we are, in effect, holding urbanization constant, and we still find much higher lung cancer mortality in smokers than in nonsmokers.

Multivariate analysis controls for the confounding factor through mathematical modeling. Models are developed to describe the simultaneous effect of exposure and confounding factors on the increase in risk.[135]

Both of these methods allow for adjustment of the effect of confounders. They both modify an observed association to take into account the effect of risk factors that are not the subject of the study and that may distort the association between the exposure being studied and the disease outcomes. If the association between exposure and disease remains after the researcher completes the assessment and adjustment for confounding factors, the researcher must then assess whether an inference of causation is justified. This entails consideration of the Hill factors explained in Section V, *infra.*

# V. General Causation: Is an Exposure a Cause of the Disease?

Once an association has been found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause–effect relationship. When epidemiologists evaluate whether a cause–effect relationship exists between an agent and disease, they are using the term causation in a way similar to, but not identical to, the way that the familiar "but for," or sine qua non, test is used in law for cause in fact. "Conduct is a factual cause of

---

135. For a more complete discussion of multivariate analysis, see Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in this manual.

EXHIBIT C

*Reference Manual on Scientific Evidence*

[harm] when the harm would not have occurred absent the conduct."[136] This is equivalent to describing the conduct as a necessary link in a chain of events that results in the particular event.[137] Epidemiologists use causation to mean that an increase in the incidence of disease among the exposed subjects would not have occurred had they not been exposed to the agent.[138] Thus, exposure is a necessary condition for the increase in the incidence of disease among those exposed.[139] The relationship between the epidemiologic concept of cause and the legal question of whether exposure to an agent caused an individual's disease is addressed in Section VII.

As mentioned in Section I, epidemiology cannot prove causation; rather, causation is a judgment for epidemiologists and others interpreting the epidemiologic data.[140] Moreover, scientific determinations of causation are inherently tentative. The scientific enterprise must always remain open to reassessing the validity of past judgments as new evidence develops.

In assessing causation, researchers first look for alternative explanations for the association, such as bias or confounding factors, which are discussed in Section IV, *supra*. Once this process is completed, researchers consider how guidelines for inferring causation from an association apply to the available evidence. We emphasize that these guidelines are employed only *after* a study finds an association

136. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (2010); *see also* Dan B. Dobbs, The Law of Torts § 168, at 409–11 (2000). When multiple causes are each operating and capable of causing an event, the but-for, or necessary–condition, concept for causation is problematic. This is the familiar "two-fires" scenario in which two independent fires simultaneously burn down a house and is sometimes referred to as overdetermined outcomes. Neither fire is a but-for, or necessary condition, for the destruction of the house, because either fire would have destroyed the house. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 (2010). This two-fires situation is analogous to an individual being exposed to two agents, each of which is capable of causing the disease contracted by the individual. *See* Basko v. Sterling Drug, Inc., 416 F.2d 417 (2d Cir. 1969). A difference between the disease scenario and the fire scenario is that, in the former, one will have no more than a probabilistic assessment of whether each of the exposures would have caused the disease in the individual.

137. *See supra* note 7; *see also* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 cmt. c (2010) (employing a "causal set" model to explain multiple elements, each of which is required for an outcome).

138. "The imputed causal association is at the group level, and does not indicate the cause of disease in individual subjects." Bruce G. Charlton, *Attribution of Causation in Epidemiology: Chain or Mosaic?* 49 J. Clin. Epidemiology 105, 105 (1999).

139. *See* Rothman et al., *supra* note 61, at 8 ("We can define a cause of a specific disease event as an antecedent event, condition, or characteristic that was necessary for the occurrence of the disease at the moment it occurred, given that other conditions are fixed."); Allen v. United States, 588 F. Supp. 247, 405 (D. Utah 1984) (quoting a physician on the meaning of the statement that radiation causes cancer), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987).

140. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c (2010) ("[A]n evaluation of data and scientific evidence to determine whether an inference of causation is appropriate requires judgment and interpretation.").

EXHIBIT C

*Reference Guide on Epidemiology*

to determine whether that association reflects a true causal relationship.[141] These guidelines consist of several key inquiries that assist researchers in making a judgment about causation.[142] Generally, researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn.[143]

The factors that guide epidemiologists in making judgments about causation (and there is no threshold number that must exist) are[144]

141. In a number of cases, experts attempted to use these guidelines to support the existence of causation in the absence of any epidemiologic studies finding an association. *See, e.g.,* Rains v. PPG Indus., Inc., 361 F. Supp. 2d 829, 836–37 (S.D. Ill. 2004) (explaining Hill criteria and proceeding to apply them even though there was no epidemiologic study that found an association); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 460–61 (W.D. Pa. 2003). There may be some logic to that effort, but it does not reflect accepted epidemiologic methodology. *See In re* Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 187–88 (S.D.N.Y. 2009); Dunn v. Sandoz Pharms. Corp., 275 F. Supp. 2d 672, 678–79 (M.D.N.C. 2003) ("The greater weight of authority supports Sandoz' assertion that [use of] the Bradford Hill criteria is a method for determining whether the results of an epidemiologic study can be said to demonstrate causation and not a method for testing an unproven hypothesis."); *Soldo*, 244 F. Supp. 2d at 514 (the Hill criteria "were developed as a mean[s] of interpreting an established association based on a body of epidemiologic research for the purpose of trying to judge whether the observed association reflects a causal relation between an exposure and disease." (quoting report of court-appointed expert)).

142. *See* Mervyn Susser, Causal Thinking in the Health Sciences: Concepts and Strategies in Epidemiology (1973); Gannon v. United States, 571 F. Supp. 2d 615, 624 (E.D. Pa. 2007) (quoting expert who testified that the Hill criteria are "'well-recognized' and widely used in the science community to assess general causation"); Chapin v. A & L Parts, Inc., 732 N.W.2d 578, 584 (Mich. Ct. App. 2007) (expert testified that Hill criteria are the most well-utilized method for determining if an association is causal).

143. Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 n.12 (Fla. Dist. Ct. App. 1998) ("Almost all genres of research articles in the medical and behavioral sciences conclude their discussion with qualifying statements such as 'there is still much to be learned.' This is not, as might be assumed, an expression of ignorance, but rather an expression that all scientific fields are open-ended and can progress from their present state. . . ."); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 app. B. at 1446–51 (D. Or. 1996) (report of Merwyn R. Greenlick, court-appointed epidemiologist). In *Cadarian v. Merrell Dow Pharmaceuticals, Inc.,* 745 F. Supp. 409 (E.D. Mich. 1989), the court refused to permit an expert to rely on a study that the authors had concluded should not be used to support an inference of causation in the absence of independent confirmatory studies. The court did not address the question whether the degree of certainty used by epidemiologists before making a conclusion of cause was consistent with the legal standard. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 957 (3d Cir. 1990) (standard of proof for scientific community is not necessarily appropriate standard for expert opinion in civil litigation); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745 (11th Cir. 1986).

144. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) ("Defendants cite no authority, scientific or legal, that compliance with all, or even one, of these factors is required. . . . The scientific consensus is, in fact, to the contrary. It identifies Defendants' list of factors as some of the nine factors or lenses that guide epidemiologists in making judgments about causation. . . . These factors are not tests for determining the reliability of any study or the causal inferences drawn from it.").

EXHIBIT C

*Reference Manual on Scientific Evidence*

1. Temporal relationship,
2. Strength of the association,
3. Dose–response relationship,
4. Replication of the findings,
5. Biological plausibility (coherence with existing knowledge),
6. Consideration of alternative explanations,
7. Cessation of exposure,
8. Specificity of the association, and
9. Consistency with other knowledge.

There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines.[145] One or more factors may be absent even when a true causal relationship exists.[146] Similarly, the existence of some factors does not ensure that a causal relationship exists. Drawing causal inferences after finding an association and considering these factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship, and vice versa. Although the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using an objective or algorithmic methodology.

These guidelines reflect criteria proposed by the U.S. Surgeon General in 1964[147] in assessing the relationship between smoking and lung cancer and expanded upon by Sir Austin Bradford Hill in 1965[148] and are often referred to as the Hill criteria or Hill factors.

145. *See* Douglas L. Weed, *Epidemiologic Evidence and Causal Inference,* 14 Hematology/Oncology Clinics N. Am. 797 (2000).

146. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) (rejecting argument that plaintiff failed to provide sufficient evidence of causation based on failing to meet four of the Hill factors).

147. Public Health Serv., U.S. Dep't of Health, Educ., & Welfare, Smoking and Health: Report of the Advisory Committee to the Surgeon General (1964); *see also* Centers for Disease Control and Prevention, U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking: A Report of the Surgeon General (2004).

148. *See* Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc. Royal Soc'y Med. 295 (1965) (Hill acknowledged that his factors could only serve to assist in the inferential process: "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*."). For discussion of these criteria and their respective strengths in informing a causal inference, see Gordis, *supra* note 32, at 236–39; David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology 263–66 (3d ed. 1994); Weed, *supra* note 144.

**EXHIBIT C**

*Reference Guide on Epidemiology*

## A. Is There a Temporal Relationship?

A temporal, or chronological, relationship must exist for causation to exist. If an exposure causes disease, the exposure must occur before the disease develops.[149] If the exposure occurs after the disease develops, it cannot have caused the disease. Although temporal relationship is often listed as one of many factors in assessing whether an inference of causation is justified, this aspect of a temporal relationship is a necessary factor: Without exposure before the disease, causation cannot exist.[150]

With regard to specific causation, a subject dealt with in detail in Section VII, *infra*, there may be circumstances in which a temporal relationship supports the existence of a causal relationship. If the latency period between exposure and outcome is known,[151] then exposure consistent with that information may lend credence to a causal relationship. This is particularly true when the latency period is short and competing causes are known and can be ruled out. Thus, if an individual suffers an acute respiratory response shortly after exposure to a suspected agent and other causes of that respiratory problem are known and can be ruled out, the temporal relationship involved supports the conclusion that a causal relationship exists.[152] Similarly, exposure outside a known latency period constitutes evidence, perhaps conclusive evidence, against the existence of causation.[153] On the other hand, when latency periods are lengthy, variable, or not known and a

149. *See* Carroll v. Litton Sys., Inc., No. B-C-88-253, 1990 U.S. Dist. LEXIS 16833, at *29 (W.D.N.C. 1990) ("[I]t is essential for . . . [the plaintiffs' medical experts opining on causation] to know that exposure preceded plaintiffs' alleged symptoms in order for the exposure to be considered as a possible cause of those symptoms. . . .").

150. Exposure during the disease initiation process may cause the disease to be more severe than it otherwise would have been without the additional dose.

151. When the latency period is known—or is known to be limited to a specific range of time— as is the case with the adverse effects of some vaccines, the time frame from exposure to manifestation of disease can be critical to determining causation.

152. For courts that have relied on temporal relationships of the sort described, see Bonner v. ISP Technologies, Inc., 259 F.3d 924, 930–31 (8th Cir. 2001) (giving more credence to the expert's opinion on causation for acute response based on temporal relationship than for chronic disease that plaintiff also developed); Heller v. Shaw Industries, Inc. 167 F.3d 146 (3d Cir. 1999); Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999); Zuchowicz v. United States, 140 F.3d 381 (2d Cir. 1998); Creanga v. Jardal, 886 A.2d 633, 641 (N.J. 2005); Alder v. Bayer Corp., AGFA Div., 61 P.3d 1068, 1090 (Utah 2002) ("If a bicyclist falls and breaks his arm, causation is assumed without argument because of the temporal relationship between the accident and the injury [and, the court might have added, the absence of any plausible competing causes that might instead be responsible for the broken arm].").

153. *See In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 289 F. Supp. 2d 1230, 1238 (W.D. Wash. 2003) (determining expert testimony on causation for plaintiffs whose exposure was beyond known latency period was inadmissible).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

substantial proportion of the disease is due to unknown causes, temporal relationship provides little beyond satisfying the requirement that cause precede effect.[154]

## B. *How Strong Is the Association Between the Exposure and Disease?*[155]

The relative risk is one of the cornerstones for causal inferences.[156] Relative risk measures the strength of the association. The higher the relative risk, the greater the likelihood that the relationship is causal.[157] For cigarette smoking, for example, the estimated relative risk for lung cancer is very high, about 10.[158] That is, the risk of lung cancer in smokers is approximately 10 times the risk in nonsmokers.

A relative risk of 10, as seen with smoking and lung cancer, is so high that it is extremely difficult to imagine any bias or confounding factor that might account for it. The higher the relative risk, the stronger the association and the lower the chance that the effect is spurious. Although lower relative risks can reflect causality, the epidemiologist will scrutinize such associations more closely because there is a greater chance that they are the result of uncontrolled confounding or biases.

154. These distinctions provide a framework for distinguishing between cases that are largely dismissive of temporal relationships as supporting causation and others that find it of significant persuasiveness. *Compare* cases cited in note 151, *supra*, *with* Moore v. Ashland Chem. Inc., 151 F.3d 269, 278 (5th Cir. 1998) (giving little weight to temporal relationship in a case in which there were several plausible competing causes that may have been responsible for the plaintiff's disease), *and* Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 990 (8th Cir. 2001) (giving little weight to temporal relationship in case studies involving drug and stroke).

155. Assuming that an association is determined to be causal, the strength of the association plays an important role legally in determining the specific causation question—whether the agent caused an individual plaintiff's injury. *See infra* Section VII.

156. *See supra* Section III.A.

157. *See* Miller v. Pfizer, Inc., 196 F. Supp. 2d 1062, 1079 (D. Kan. 2002) (citing this reference guide); Landrigan v. Celotex Corp., 605 A.2d 1079, 1085 (N.J. 1992). The use of the strength of the association as a factor does not reflect a belief that weaker effects occur less frequently than stronger effects. *See* Green, *supra* note 47, at 652–53 n.39. Indeed, the apparent strength of a given agent is dependent on the prevalence of the other necessary elements that must occur with the agent to produce the disease, rather than on some inherent characteristic of the agent itself. *See* Rothman et al., *supra* note 61, at 9–11.

158. *See* Doll & Hill, *supra* note 6. The relative risk of lung cancer from smoking is a function of intensity and duration of dose (and perhaps other factors). *See* Karen Leffondré et al., *Modeling Smoking History: A Comparison of Different Approaches,* 156 Am. J. Epidemiology 813 (2002). The relative risk provided in the text is based on a specified magnitude of cigarette exposure.

EXHIBIT C

*Reference Guide on Epidemiology*

## *C. Is There a Dose–Response Relationship?*

A dose–response relationship means that the greater the exposure, the greater the risk of disease. Generally, higher exposures should increase the incidence (or severity) of disease.[159] However, some causal agents do not exhibit a dose–response relationship when, for example, there is a threshold phenomenon (i.e., an exposure may not cause disease until the exposure exceeds a certain dose).[160] Thus, a dose–response relationship is strong, but not essential, evidence that the relationship between an agent and disease is causal.[161]

159. *See* Newman v. Motorola, Inc., 218 F. Supp. 2d 769, 778 (D. Md. 2002) (recognizing importance of dose–response relationship in assessing causation).

160. The question whether there is a no-effect threshold dose is a controversial one in a variety of toxic substances areas. *See, e.g.,* Irving J. Selikoff, Disability Compensation for Asbestos-Associated Disease in the United States: Report to the U.S. Department of Labor 181–220 (1981); Paul Kotin, *Dose–Response Relationships and Threshold Concepts,* 271 Ann. N.Y. Acad. Sci. 22 (1976); K. Robock, *Based on Available Data, Can We Project an Acceptable Standard for Industrial Use of Asbestos? Absolutely,* 330 Ann. N.Y. Acad. Sci. 205 (1979); Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1536 (D.C. Cir. 1984) (dose–response relationship for low doses is "one of the most sharply contested questions currently being debated in the medical community"); *In re* TMI Litig. Consol. Proc., 927 F. Supp. 834, 844–45 (M.D. Pa. 1996) (discussing low-dose extrapolation and no-dose effects for radiation exposure).

Moreover, good evidence to support or refute the threshold-dose hypothesis is exceedingly unlikely because of the inability of epidemiology or animal toxicology to ascertain very small effects. *Cf.* Arnold L. Brown, *The Meaning of Risk Assessment,* 37 Oncology 302, 303 (1980). Even the shape of the dose–response curve—whether linear or curvilinear, and if the latter, the shape of the curve—is a matter of hypothesis and speculation. *See* Allen v. United States, 588 F. Supp. 247, 419–24 (D. Utah 1984), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987); *In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1180 (N.D. Cal. 2007) (criticizing expert for "primitive" extrapolation of risk based on assumption of linear relationship of risk to dose); Troyen A. Brennan & Robert F. Carter, *Legal and Scientific Probability of Causation for Cancer and Other Environmental Disease in Individuals,* 10 J. Health Pol'y & L. 33, 43–44 (1985).

The idea that the "dose makes the poison" is a central tenet of toxicology and attributed to Paracelsus, in the sixteenth century. *See* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, Section I.A, in this manual. It does not mean that any agent is capable of causing any disease if an individual is exposed to a sufficient dose. Agents tend to have specific effects, *see infra* Section V.H., and this dictum reflects only the idea that there is a safe dose below which an agent does not cause any toxic effect. *See* Michael A Gallo, *History and Scope of Toxicology,* in Casarett and Doull's Toxicology: The Basic Science of Poisons 1, 4–5 (Curtis D. Klaassen ed., 7th ed. 2008). For a case in which a party made such a mistaken interpretation of Paracelsus, see Alder v. Bayer Corp., AGFA Div., 61 P.3d 1068, 1088 (Utah 2002). Paracelsus was also responsible for the initial articulation of the specificity tenet. *See infra* Section V.H.

161. Evidence of a dose–response relationship as bearing on whether an inference of general causation is justified is analytically distinct from determining whether evidence of the dose to which a plaintiff was exposed is required in order to establish specific causation. On the latter matter, see *infra* Section VII; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c(2) & rptrs. note (2010).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## D. Have the Results Been Replicated?

Rarely, if ever, does a single study persuasively demonstrate a cause–effect relationship.[162] It is important that a study be replicated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists.[163]

The need to replicate research findings permeates most fields of science. In epidemiology, research findings often are replicated in different populations.[164] Consistency in these findings is an important factor in making a judgment about causation. Different studies that examine the same exposure–disease relationship generally should yield similar results. Although inconsistent results do not necessarily rule out a causal nexus, any inconsistencies signal a need to explore whether different results can be reconciled with causality.

## E. Is the Association Biologically Plausible (Consistent with Existing Knowledge)?[165]

Biological plausibility is not an easy criterion to use and depends upon existing knowledge about the mechanisms by which the disease develops. When biological plausibility exists, it lends credence to an inference of causality. For example, the conclusion that high cholesterol is a cause of coronary heart disease is plausible because cholesterol is found in atherosclerotic plaques. However, observations have been made in epidemiologic studies that were not biologically plausible at the time but subsequently were shown to be correct.[166] When an observation is inconsistent with current biological knowledge, it should not be discarded, but

---

162. In *Kehm v. Procter & Gamble Co.,* 580 F. Supp. 890, 901 (N.D. Iowa 1982), *aff'd,* 724 F.2d 613 (8th Cir. 1983), the court remarked on the persuasive power of multiple independent studies, each of which reached the same finding of an association between toxic shock syndrome and tampon use.

163. This may not be the legal standard, however. *Cf.* Smith v. Wyeth-Ayerst Labs. Co., 278 F. Supp. 2d 684, 710 n.55 (W.D.N.C. 2003) (observing that replication is difficult to establish when there is only one study that has been performed at the time of trial).

164. *See* Cadarian v. Merrell Dow Pharms., Inc., 745 F. Supp. 409, 412 (E.D. Mich. 1989) (holding a study on Bendectin insufficient to support an expert's opinion, because "the study's authors themselves concluded that the results could not be interpreted without independent confirmatory evidence").

165. A number of courts have adverted to this criterion in the course of their discussions of causation in toxic substances cases. *E.g., In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 289 F. Supp. 2d 1230, 1247–48 (W.D. Wash. 2003); Cook v. United States, 545 F. Supp. 306, 314–15 (N.D. Cal. 1982) (discussing biological implausibility of a two-peak increase of disease when plotted against time); Landrigan v. Celotex Corp., 605 A.2d 1079, 1085–86 (N.J. 1992) (discussing the existence vel non of biological plausibility); *see also* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, Section III.E, in this manual.

166. *See In re* Rezulin Prods. Liab. Litig., 369 F. Supp. 2d 398, 405 (S.D.N.Y. 2005); *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003).

604

**EXHIBIT C**

*Reference Guide on Epidemiology*

the observation should be confirmed before significance is attached to it. The saliency of this factor varies depending on the extent of scientific knowledge about the cellular and subcellular mechanisms through which the disease process works. The mechanisms of some diseases are understood quite well based on the available evidence, including from toxicologic research, whereas other mechanism explanations are merely hypothesized—although hypotheses are sometimes accepted under this factor.[167]

## F. Have Alternative Explanations Been Considered?

The importance of considering the possibility of bias and confounding and ruling out the possibilities is discussed above.[168]

## G. What Is the Effect of Ceasing Exposure?

If an agent is a cause of a disease, then one would expect that cessation of exposure to that agent ordinarily would reduce the risk of the disease. This has been the case, for example, with cigarette smoking and lung cancer. In many situations, however, relevant data are simply not available regarding the possible effects of ending the exposure. But when such data are available and eliminating exposure reduces the incidence of disease, this factor strongly supports a causal relationship.

## H. Does the Association Exhibit Specificity?

An association exhibits specificity if the exposure is associated only with a single disease or type of disease.[169] The vast majority of agents do not cause a wide vari-

---

167. *See* Douglas L. Weed & Stephen D. Hursting, *Biologic Plausibility in Causal Inference: Current Methods and Practice,* 147 Am. J. Epidemiology 415 (1998) (examining use of this criterion in contemporary epidemiologic research and distinguishing between alternative explanations of what constitutes biological plausibility, ranging from mere hypotheses to "sufficient evidence to show how the factor influences a known disease mechanism").

168. *See supra* Sections IV.B–C.

169. This criterion reflects the fact that although an agent causes one disease, it does not necessarily cause other diseases. *See, e.g.,* Nelson v. Am. Sterilizer Co., 566 N.W.2d 671, 676–77 (Mich. Ct. App. 1997) (affirming dismissal of plaintiff's claims that chemical exposure caused her liver disorder, but recognizing that evidence supported claims for neuropathy and other illnesses); Sanderson v. Int'l Flavors & Fragrances, Inc., 950 F. Supp. 981, 996–98 (C.D. Cal. 1996); *see also* Taylor v. Airco, Inc., 494 F. Supp. 2d 21, 27 (D. Mass. 2007) (holding that plaintiff's expert could testify to causal relationship between vinyl chloride and one type of liver cancer for which there was only modest support given strong causal evidence for vinyl chloride and another type of liver cancer).

When a party claims that evidence of a causal relationship between an agent and one disease is relevant to whether the agent caused another disease, courts have required the party to show that

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ety of effects. For example, asbestos causes mesothelioma and lung cancer and may cause one or two other cancers, but there is no evidence that it causes any other types of cancers. Thus, a study that finds that an agent is associated with many different diseases should be examined skeptically. Nevertheless, there may be causal relationships in which this guideline is not satisfied. Cigarette manufacturers have long claimed that because cigarettes have been linked to lung cancer, emphysema, bladder cancer, heart disease, pancreatic cancer, and other conditions, there is no specificity and the relationships are not causal. There is, however, at least one good reason why inferences about the health consequences of tobacco do not require specificity: Because tobacco and cigarette smoke are not in fact single agents but consist of numerous harmful agents, smoking represents exposure to multiple agents, with multiple possible effects. Thus, whereas evidence of specificity may strengthen the case for causation, lack of specificity does not necessarily undermine it where there is a good biological explanation for its absence.

## I. Are the Findings Consistent with Other Relevant Knowledge?

In addressing the causal relationship of lung cancer to cigarette smoking, researchers examined trends over time for lung cancer and for cigarette sales in the United States. A marked increase in lung cancer death rates in men was observed, which appeared to follow the increase in sales of cigarettes. Had the increase in lung cancer deaths followed a decrease in cigarette sales, it might have given researchers pause. It would not have precluded a causal inference, but the inconsistency of the trends in cigarette sales and lung cancer mortality would have had to be explained.

# VI. What Methods Exist for Combining the Results of Multiple Studies?

Not infrequently, the scientific record may include a number of epidemiologic studies whose findings differ. These may be studies in which one shows an association and the other does not, or studies that report associations, but of different

---

the mechanisms involved in development of the disease are similar. Thus, in *Austin v. Kerr-McGee Refining Corp.,* 25 S.W.3d 280 (Tex. App. 2000), the plaintiff suffered from a specific form of chronic leukemia. Studies demonstrated a causal relationship between benzene and all leukemias, but there was a paucity of evidence on the relationship between benzene and the specific form of leukemia from which plaintiff suffered. The court required that plaintiff's expert demonstrate the similarity of the biological mechanism among leukemias as a condition for the admissibility of his causation testimony, a requirement the court concluded had not been satisfied. *Accord In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1183 (N.D. Cal. 2007); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 603 (D.N.J. 2002).

**EXHIBIT C**

*Reference Guide on Epidemiology*

magnitude.[170] In view of the fact that studies may disagree and that often many of the studies are small and lack the statistical power needed for definitive conclusions, the technique of meta-analysis was developed, initially for clinical trials.[171] Meta-analysis is a method of pooling study results to arrive at a single figure to represent the totality of the studies reviewed.[172] It is a way of systematizing the time-honored approach of reviewing the literature, which is characteristic of science, and placing it in a standardized framework with quantitative methods for estimating risk. In a meta-analysis, studies are given different weights in proportion to the sizes of their study populations and other characteristics.[173]

Meta-analysis is most appropriate when used in pooling randomized experimental trials, because the studies included in the meta-analysis share the most significant methodological characteristics, in particular, use of randomized assignment of subjects to different exposure groups. However, often one is confronted with nonrandomized observational studies of the effects of possible toxic substances or agents. A method for summarizing such studies is greatly needed, but when meta-analysis is applied to observational studies—either case-control or cohort—it becomes more controversial.[174] The reason for this is that often methodological differences among studies are much more pronounced than they are in randomized trials. Hence, the justification for pooling the results and deriving a single estimate of risk, for example, is problematic.[175]

170. *See, e.g.,* Zandi v. Wyeth a/k/a Wyeth, Inc., No. 27-CV-06-6744, 2007 WL 3224242 (Minn. Dist. Ct. Oct. 15, 2007) (plaintiff's expert cited 40 studies in support of a causal relationship between hormone therapy and breast cancer; many studies found different magnitudes of increased risk).

171. *See In re* Paoli R.R. Yard PCB Litig., 916 F.2d 829, 856 (3d Cir. 1990), *cert. denied,* 499 U.S. 961 (1991); Hines v. Consol. Rail Corp., 926 F.2d 262, 273 (3d Cir. 1991); Allen v. Int'l Bus. Mach. Corp., No. 94-264-LON, 1997 U.S. Dist. LEXIS 8016, at ★71–★74 (meta-analysis of observational studies is a controversial subject among epidemiologists). Thus, contrary to the suggestion by at least one court, multiple studies with small numbers of subjects may be pooled to reduce the possibility of sampling error. *See In re* Joint E. & S. Dist. Asbestos Litig., 827 F. Supp. 1014, 1042 (S.D.N.Y. 1993) ("[N]o matter how many studies yield a positive but statistically insignificant SMR for colorectal cancer, the results remain statistically insignificant. Just as adding a series of zeros together yields yet another zero as the product, adding a series of positive but statistically insignificant SMRs together does not produce a statistically significant pattern."), rev'd, 52 F.3d 1124 (2d Cir. 1995); *see also supra* note 76.

172. For a nontechnical explanation of meta-analysis, along with case studies of a variety of scientific areas in which it has been employed, see Morton Hunt, How Science Takes Stock: The Story of Meta-Analysis (1997).

173. Petitti, *supra* note 88.

174. *See* Donna F. Stroup et al., *Meta-analysis of Observational Studies in Epidemiology: A Proposal for Reporting,* 283 JAMA 2008, 2009 (2000); Jesse A. Berlin & Carin J. Kim, *The Use of Meta-Analysis in Pharmacoepidemiology, in* Pharmacoepidemiology 681, 683–84 (Brian L. Strom ed., 4th ed. 2005).

175. On rare occasions, meta-analyses of both clinical and observational studies are available. *See, e.g., In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1175 (N.D. Cal. 2007) (referring to clinical and observational meta-analyses of low dose of a drug; both analyses failed to find any effect).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

A number of problems and issues arise in meta-analysis. Should only published papers be included in the meta-analysis, or should any available studies be used, even if they have not been peer reviewed? Can the results of the meta-analysis itself be reproduced by other analysts? When there are several meta-analyses of a given relationship, why do the results of different meta-analyses often disagree? The appeal of a meta-analysis is that it generates a single estimate of risk (along with an associated confidence interval), but this strength can also be a weakness, and may lead to a false sense of security regarding the certainty of the estimate. A key issue is the matter of heterogeneity of results among the studies being summarized. If there is more variance among study results than one would expect by chance, this creates further uncertainty about the summary measure from the meta-analysis. Such differences can arise from variations in study quality, or in study populations or in study designs. Such differences in results make it harder to trust a single estimate of effect; the reasons for such differences need at least to be acknowledged and, if possible, explained.[176] People often tend to have an inordinate belief in the validity of the findings when a single number is attached to them, and many of the difficulties that may arise in conducting a meta-analysis, especially of observational studies such as epidemiologic ones, may consequently be overlooked.[177]

# VII. What Role Does Epidemiology Play in Proving Specific Causation?

Epidemiology is concerned with the incidence of disease in populations, and epidemiologic studies do not address the question of the cause of an individual's disease.[178] This question, often referred to as specific causation, is beyond the

---

176.  *See* Stroup et al., *supra* note 173 (recommending methodology for meta-analysis of observational studies).

177.  Much has been written about meta-analysis recently and some experts consider the problems of meta-analysis to outweigh the benefits at the present time. For example, John Bailar has observed:

> [P]roblems have been so frequent and so deep, and overstatements of the strength of conclusions so extreme, that one might well conclude there is something seriously and fundamentally wrong with the method. For the present . . . I still prefer the thoughtful, old-fashioned review of the literature by a knowledgeable expert who explains and defends the judgments that are presented. We have not yet reached a stage where these judgments can be passed on, even in part, to a formalized process such as meta-analysis.

John C. Bailar III, *Assessing Assessments,* 277 Science 528, 529 (1997) (reviewing Morton Hunt, How Science Takes Stock (1997)); *see also Point/Counterpoint: Meta-analysis of Observational Studies,* 140 Am. J. Epidemiology 770 (1994).

178.  *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945 & n.6 (3d Cir. 1990) ("Epidemiological studies do not provide direct evidence that a particular plaintiff was injured by exposure to a substance."); *In re* Viagra Prods. Liab. Litig., 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) ("Epi-

**EXHIBIT C**

*Reference Guide on Epidemiology*

domain of the science of epidemiology. Epidemiology has its limits at the point where an inference is made that the relationship between an agent and a disease is causal (general causation) and where the magnitude of excess risk attributed to the agent has been determined; that is, epidemiologists investigate whether an agent can cause a disease, not whether an agent did cause a specific plaintiff's disease.[179]

Nevertheless, the specific causation issue is a necessary legal element in a toxic substance case. The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did cause the plaintiff's disease. Thus, numerous cases have confronted the legal question of what is acceptable proof of specific causation and the role that epidemiologic evidence plays in answering that question.[180] This question is not a question that is addressed by epidemiology.[181] Rather, it is a legal question with which numerous courts

demiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause a disease in a particular individual?)" (quoting the second edition of this reference guide)); *In re* Asbestos Litig,, 900 A.2d 120, 133 (Del. Super. Ct. 2006); Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact,* 7 Harv. Envtl. L. Rev. 429, 436 (1983).

There are some diseases that do not occur without exposure to a given toxic agent. This is the same as saying that the toxic agent is a necessary cause for the disease, and the disease is sometimes referred to as a signature disease (also, the agent is pathognomonic), because the existence of the disease necessarily implies the causal role of the agent. *See* Kenneth S. Abraham & Richard A. Merrill, *Scientific Uncertainty in the Courts,* Issues Sci. & Tech. 93, 101 (1986). Asbestosis is a signature disease for asbestos, and vaginal adenocarcinoma (in young adult women) is a signature disease for in utero DES exposure.

179. *Cf. In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 780 (E.D.N.Y. 1984) (Agent Orange allegedly caused a wide variety of diseases in Vietnam veterans and their offspring), *aff'd,* 818 F.2d 145 (2d Cir. 1987).

180. In many instances, causation can be established without epidemiologic evidence. When the mechanism of causation is well understood, the causal relationship is well established, or the timing between cause and effect is close, scientific evidence of causation may not be required. This is frequently the situation when the plaintiff suffers traumatic injury rather than disease. This section addresses only those situations in which causation is not evident, and scientific evidence is required.

181. Nevertheless, an epidemiologist may be helpful to the factfinder in answering this question. Some courts have permitted epidemiologists (or those who use epidemiologic methods) to testify about specific causation. *See* Ambrosini v. Labarraque, 101 F.3d 129, 137–41 (D.C. Cir. 1996); Zuchowicz v. United States, 870 F. Supp. 15 (D. Conn. 1994); Landrigan v. Celotex Corp., 605 A.2d 1079, 1088–89 (N.J. 1992). In general, courts seem more concerned with the basis of an expert's opinion than with whether the expert is an epidemiologist or clinical physician. *See* Porter v. Whitehall, 9 F.3d 607, 614 (7th Cir. 1992) ("curb side" opinion from clinician not admissible); Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256, 1266–67 (D. Kan. 2002) (vascular surgeon permitted to testify to general causation over objection based on fact he was not an epidemiologist); Wade–Greaux v. Whitehall Labs., 874 F. Supp. 1441, 1469–72 (D.V.I.) (clinician's multiple bases for opinion inadequate to support causation opinion), *aff'd,* 46 F.3d 1120 (3d Cir. 1994); *Landrigan,* 605 A.2d at 1083–89 (permitting both clinicians and epidemiologists to testify to specific causation provided the methodology used is sound); Trach v. Fellin, 817 A.2d 1102, 1118–19 (Pa. Super. Ct. 2003) (toxicologist and pathologist permitted to testify to specific causation).

EXHIBIT C

*Reference Manual on Scientific Evidence*

have grappled.[182] The remainder of this section is predominantly an explanation of judicial opinions. It is, in addition, in its discussion of the reasoning behind applying the risk estimates of an epidemiologic body of evidence to an individual, informed by epidemiologic principles and methodological research.

Before proceeding, one more caveat is in order. This section assumes that epidemiologic evidence has been used as proof of causation for a given plaintiff. The discussion does not address whether a plaintiff must use epidemiologic evidence to prove causation.[183]

Two legal issues arise with regard to the role of epidemiology in proving individual causation: admissibility and sufficiency of evidence to meet the burden of production. The first issue tends to receive less attention by the courts but nevertheless deserves mention. An epidemiologic study that is sufficiently rigorous to justify a conclusion that it is scientifically valid should be admissible,[184] as it tends to make an issue in dispute more or less likely.[185]

---

182. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c(3) (2010) ("Scientists who conduct group studies do not examine specific causation in their research. No scientific methodology exists for assessing specific causation for an individual based on group studies. Nevertheless, courts have reasoned from the preponderance-of-the-evidence standard to determine the sufficiency of scientific evidence on specific causation when group-based studies are involved").

183. *See id*. § 28 cmt. c(3) & rptrs. note ("most courts have appropriately declined to impose a threshold requirement that a plaintiff always must prove causation with epidemiologic evidence"); *see also* Westberry v. Gislaved Gummi AB, 178 F.2d 257 (4th Cir. 1999) (acute response, differential diagnosis ruled out other known causes of disease, dechallenge, rechallenge tests by expert that were consistent with exposure to defendant's agent causing disease, and absence of epidemiologic or toxicologic studies; holding that expert's testimony on causation was properly admitted); Zuchowicz v. United States, 140 F.3d 381 (2d Cir. 1998); *In re* Heparin Prods. Liab. Litig. 2011 WL 2971918, at ★7-10 (N.D. Ohio July 21, 2011).

184. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 958 (3d Cir. 1990); *cf*. Kehm v. Procter & Gamble Co., 580 F. Supp. 890, 902 (N.D. Iowa 1982) ("These [epidemiologic] studies were highly probative on the issue of causation—they all concluded that an association between tampon use and menstrually related TSS [toxic shock syndrome] cases exists."), *aff'd,* 724 F.2d 613 (8th Cir. 1984).

Hearsay concerns may limit the independent admissibility of the study, but the study could be relied on by an expert in forming an opinion and may be admissible pursuant to Fed. R. Evid. 703 as part of the underlying facts or data relied on by the expert.

In *Ellis v. International Playtex, Inc.,* 745 F.2d 292, 303 (4th Cir. 1984), the court concluded that certain epidemiologic studies were admissible despite criticism of the methodology used in the studies. The court held that the claims of bias went to the studies' weight rather than their admissibility. *Cf*. Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1109 (5th Cir. 1991) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility. . . . ").

185. Even if evidence is relevant, it may be excluded if its probative value is substantially outweighed by prejudice, confusion, or inefficiency. Fed. R. Evid. 403. However, exclusion of an otherwise relevant epidemiologic study on Rule 403 grounds is unlikely.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591 (1993), the Court invoked the concept of "fit," which addresses the relationship of an expert's scientific opinion to the facts of the case and the issues in dispute. In a toxic substance case in which cause in fact is disputed, an epi-

EXHIBIT C

*Reference Guide on Epidemiology*

Far more courts have confronted the role that epidemiology plays with regard to the sufficiency of the evidence and the burden of production.[186] The civil burden of proof is described most often as requiring belief by the factfinder "that what is sought to be proved is more likely true than not true."[187] The relative risk from epidemiologic studies can be adapted to this 50%-plus standard to yield a probability or likelihood that an agent caused an individual's disease.[188] An important caveat is necessary, however. The discussion below speaks in terms of the magnitude of the relative risk or association found in a study. However, before an association or relative risk is used to make a statement about the probability of individual causation, the inferential judgment, described in Section V, that the association is truly causal rather than spurious, is required: "[A]n agent cannot be considered to cause the illness of a specific person unless it is recognized as a cause of that disease in general."[189] The following discussion should be read with this caveat in mind.[190]

demiologic study of the same agent to which the plaintiff was exposed that examined the association with the same disease from which the plaintiff suffers would undoubtedly have sufficient "fit" to be a part of the basis of an expert's opinion. The Court's concept of "fit," borrowed from *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985), appears equivalent to the more familiar evidentiary concept of probative value, albeit one requiring assessment of the scientific reasoning the expert used in drawing inferences from methodology or data to opinion.

186. We reiterate a point made at the outset of this section: This discussion of the use of a threshold relative risk for specific causation is not epidemiology or an inquiry an epidemiologist would undertake. This is an effort by courts and commentators to adapt the legal standard of proof to the available scientific evidence. See *supra* text accompanying notes 175–179. While strength of association is a guideline for drawing an inference of causation from an association, *see supra* Section V, there is no specified threshold required.

187. Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 104.01 (5th ed. 2000); *see also* United States v. Fatico, 458 F. Supp. 388, 403 (E.D.N.Y. 1978) ("Quantified, the preponderance standard would be 50%+ probable."), *aff'd,* 603 F.2d 1053 (2d Cir. 1979).

188. An adherent of the frequentist school of statistics would resist this adaptation, which may explain why many epidemiologists and toxicologists also resist it. To take the step identified in the text of using an epidemiologic study outcome to determine the probability of specific causation requires a shift from a frequentist approach, which involves sampling or frequency data from an empirical test, to a subjective probability about a discrete event. Thus, a frequentist might assert, after conducting a sampling test, that 60% of the balls in an opaque container are blue. The same frequentist would resist the statement, "The probability that a single ball removed from the box and hidden behind a screen is blue is 60%." The ball is either blue or not, and no frequentist data would permit the latter statement. "[T]here is no logically rigorous definition of what a statement of probability means with reference to an individual instance. . . ." Lee Loevinger, *On Logic and Sociology,* 32 Jurimetrics J. 527, 530 (1992); *see also* Steve Gold, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion and Statistical Evidence,* 96 Yale L.J. 376, 382–92 (1986). Subjective probabilities about unique events are employed by those using Bayesian methodology. *See* Kaye, *supra* note 80, at 54–62; David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.D, in this manual.

189. Cole, *supra* note 65, at 10,284.

190. We emphasize this caveat, both because it is not intuitive and because some courts have failed to appreciate the difference between an association and a causal relationship. *See, e.g.,* Forsyth v. Eli Lilly & Co., Civ. No. 95-00185 ACK, 1998 U.S. Dist. LEXIS 541, at ⋆26–⋆31 (D. Haw. Jan. 5, 1998). *But see*

611

EXHIBIT C

Some courts have reasoned that when epidemiologic studies find that exposure to the agent causes an incidence in the exposed group that is more than twice the incidence in the unexposed group (i.e., a relative risk greater than 2.0), the probability that exposure to the agent caused a similarly situated individual's disease is greater than 50%.[191] These courts, accordingly, hold that when there is group-based evidence finding that exposure to an agent causes an incidence of disease in the exposed group that is more than twice the incidence in the unexposed group, the evidence is sufficient to satisfy the plaintiff's burden of production and permit submission of specific causation to a jury. In such a case, the factfinder may find that it is more likely than not that the substance caused the particular plaintiff's disease. Courts, thus, have permitted expert witnesses to testify to specific causation based on the logic of the effect of a doubling of the risk.[192]

While this reasoning has a certain logic as far as it goes, there are a number of significant assumptions and important caveats that require explication:

1. *A valid study and risk estimate*. The propriety of this "doubling" reasoning depends on group studies identifying a genuine causal relationship and a reasonably reliable measure of the increased risk.[193] This requires attention

Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 (Fla. Dist. Ct. App. 1998) ("From epidemiologic studies demonstrating an association, an epidemiologist may or may not infer that a causal relationship exists.").

191. An alternative, yet similar, means to address probabilities in individual cases is use of the attributable fraction parameter, also known as the attributable risk. *See supra* Section III.C. The attributable fraction is that portion of the excess risk that can be attributed to an agent, above and beyond the background risk that is due to other causes. Thus, when the relative risk is greater than 2.0, the attributable fraction exceeds 50%.

192. For a comprehensive list of cases that support proof of causation based on group studies, see Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c(4) rptrs. note (2010). The Restatement catalogues those courts that require a relative risk in excess of 2.0 as a threshold for sufficient proof of specific causation and those courts that recognize that a lower relative risk than 2.0 can support specific causation, as explained below. Despite considerable disagreement on whether a relative risk of 2.0 is required or merely a taking-off point for determining the sufficiency of the evidence on specific causation, two commentators who surveyed the cases observed that "[t]here were no clear differences in outcomes as between federal and state courts." Russellyn S. Carruth & Bernard D. Goldstein, *Relative Risk Greater than Two in Proof of Causation in Toxic Tort Litigation,* 41 Jurimetrics J. 195, 199 (2001).

193. Indeed, one commentator contends that, because epidemiology is sufficiently imprecise to accurately measure small increases in risk, in general, studies that find a relative risk less than 2.0 should not be sufficient for causation. The concern is not with specific causation but with general causation and the likelihood that an association less than 2.0 is noise rather than reflecting a true causal relationship. *See* Michael D. Green, *The Future of Proportional Liability, in* Exploring Tort Law (Stuart Madden ed., 2005); *see also* Samuel M. Lesko & Allen A. Mitchell, *The Use of Randomized Controlled Trials for Pharmacoepidemiology Studies, in* Pharmacoepidemiology 599, 601 (Brian L. Strom ed., 4th ed. 2005) ("it is advisable to use extreme caution in making causal inferences from small relative risks derived from observational studies"); Gary Taubes, *Epidemiology Faces Its Limits,* 269 Science 164 (1995) (explaining views of several epidemiologists about a threshold relative risk of 3.0 to seriously consider a causal relationship); N.E. Breslow & N.E. Day, *Statistical Methods in Cancer Research, in* The Analysis

EXHIBIT C

*Reference Guide on Epidemiology*

to the possibility of random error, bias, or confounding being the source of the association rather than a true causal relationship as explained in Sections IV and V, *supra*.[194]

2. *Similarity among study subjects and plaintiff.* Only if the study subjects and the plaintiff are similar with respect to other risk factors will a risk estimate from a study or studies be valid when applied to an individual.[195] Thus, if those exposed in a study of the risk of lung cancer from smoking smoked half a pack of cigarettes a day for 20 years, the degree of increased incidence of lung cancer among them cannot be extrapolated to someone who smoked two packs of cigarettes for 30 years without strong (and questionable) assumptions about the dose–response relationship.[196] This is also applicable to risk factors for competing causes. Thus, if all of the subjects in a study are participating because they were identified as having a family history of heart disease, the magnitude of risk found in a study of smok-

---

of Case-Control Studies 36 (IARC Pub. No. 32, 1980) ("[r]elative risks of less than 2.0 may readily reflect some unperceived bias or confounding factor"); David A. Freedman & Philip B. Stark, *The Swine Flu Vaccine and Guillain-Barré Syndrome: A Case Study in Relative Risk and Specific Causation,* 64 Law & Contemp. Probs. 49, 61 (2001) ("If the relative risk is near 2.0, problems of bias and confounding in the underlying epidemiologic studies may be serious, perhaps intractable.").

194. An excellent explanation for why differential diagnoses generally are inadequate without further proof of general causation was provided in *Cavallo v. Star Enterprises,* 892 F. Supp. 756 (E.D. Va. 1995), *aff'd in relevant part,* 100 F.3d 1150 (4th Cir. 1996):

> The process of differential diagnosis is undoubtedly important to the question of "specific causation". If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be capable of causing the injury. That is, the expert must "rule in" the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation" must be derived from a scientifically valid methodology.

*Id.* at 771 (footnote omitted); *see also* Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 254 (2d Cir. 2005); Norris v. Baxter Healthcare Corp., 397 F.3d 878, 885 (10th Cir. 2005); Meister v. Med. Eng'g Corp., 267 F.3d 1123, 1128–29 (D.C. Cir. 2001); Bickel v. Pfizer, Inc., 431 F. Supp. 2d 918, 923–24 (N.D. Ind. 2006); *In re* Rezulin Prods. Liab. Litig., 369 F. Supp. 2d 398, 436 (S.D.N.Y. 2005); Coastal Tankships, U.S.A., Inc. v. Anderson, 87 S.W.3d 591, 608–09 (Tex. Ct. App. 2002); *see generally* Joseph Sanders & Julie Machal-Fulks, *The Admissibility of Differential Diagnosis Testimony to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law,* 64 Law & Contemp. Probs. 107, 122–25 (2001) (discussing cases rejecting differential diagnoses in the absence of other proof of general causation and contrary cases).

195 "The basic premise of probability of causation is that individual risk can be determined from epidemiologic data for a representative population; however the premise only holds if the individual is truly representative of the reference population." Council on Scientific Affairs, American Medical Association, *Radioepidemiological Tables* 257 JAMA 806 (1987).

196. Conversely, a risk estimate from a study that involved a greater exposure is not applicable to an individual exposed to a lower dose. *See, e.g., In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1175–76 (N.D. Cal. 2007) (relative risk found in studies of those who took twice the dose of others could not support expert's opinion of causation for latter group).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ing on the risk of heart disease cannot validly be applied to an individual without such a family history. Finally, if an individual has been differentially exposed to other risk factors from those in a study, the results of the study will not provide an accurate basis for the probability of causation for the individual.[197] Consider once again a study of the effect of smoking on lung cancer among subjects who have no asbestos exposure. The relative risk of smoking in that study would not be applicable to an asbestos insulation worker. More generally, if the study subjects are heterogeneous with regard to risk factors related to the outcome of interest, the relative risk found in a study represents *an average risk for the group* rather than a uniform increased risk applicable to each individual.[198]

3. *Nonacceleration of disease.* Another assumption embedded in using the risk findings of a group study to determine the probability of causation in an individual is that the disease is one that never would have been contracted absent exposure. Put another way, the assumption is that the agent did not merely accelerate occurrence of the disease without affecting the lifetime risk of contracting the disease. Birth defects are an example of an outcome that is not accelerated. However, for most of the chronic diseases of adulthood, it is not possible for epidemiologic studies to distinguish between acceleration of disease and causation of new disease. If, in fact, acceleration

197. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, in this manual (explaining the problems of employing a study outcome to determine the probability of an individual's having contracted the disease from exposure to the agent because of variations in individuals that bear on the risk of a given individual contracting the disease); David A. Freedman & Philip Stark, *The Swine Flu Vaccine and Guillain-Barré Syndrome: A Case Study in Relative Risk and Specific Causation,* 23 Evaluation Rev. 619 (1999) (analyzing the role that individual variation plays in determining the probability of specific causation based on the relative risk found in a study and providing a mathematical model for calculating the effect of individual variation); Mark Parascandola, *What Is Wrong with the Probability of Causation?* 39 Jurimetrics J. 29 (1998).

198. The comment of two prominent epidemiologists on this subject is illuminating:

> We cannot measure the individual risk, and assigning the average value to everyone in the category reflects nothing more than our ignorance about the determinants of lung cancer that interact with cigarette smoke. It is apparent from epidemiological data that some people can engage in chain smoking for many decades without developing lung cancer. Others are or will become primed by unknown circumstances and need only to add cigarette smoke to the nearly sufficient constellation of causes to initiate lung cancer. In our ignorance of these hidden causal components, the best we can do in assessing risk is to classify people according to measured causal risk indicators and then assign the average observed within a class to persons within the class.

Rothman & Greenland, *supra* note 131, at 9; *see also* Ofer Shpilberg et al., *The Next Stage: Molecular Epidemiology,* 50 J. Clinical Epidemiology 633, 637 (1997) ("A 1.5-fold relative risk may be composed of a 5-fold risk in 10% of the population, and a 1.1-fold risk in the remaining 90%, or a 2-fold risk in 25% and a 1.1-fold for 75%, or a 1.5-fold risk for the entire population.").

**EXHIBIT C**

*Reference Guide on Epidemiology*

is involved, the relative risk from a study will understate the probability that exposure accelerated the occurrence of the disease.[199]

4. *Agent operates independently*. Employing a risk estimate to determine the probability of causation is not valid if the agent interacts with another cause in a way that results in an increase in disease beyond merely the sum of the increased incidence due to each agent separately. For example, the relative risk of lung cancer due to smoking is around 10, while the relative risk for asbestos exposure is approximately 5. The relative risk for someone exposed to both is not the arithmetic sum of the two relative risks, that is, 15, but closer to the product (50- to 60-fold), reflecting an interaction between the two.[200] Neither of the individual agent's relative risks can be employed to estimate the probability of causation in someone exposed to both asbestos and cigarette smoke.[201]

5. *Other assumptions*. Additional assumptions include (a) the agent of interest is not responsible for fatal diseases other than the disease of interest[202] and (b) the agent does not provide a protective effect against the outcome of interest in a subpopulation of those being studied.[203]

Evidence in a given case may challenge one or more of these assumptions. Bias in a study may suggest that the study findings are inaccurate and should be estimated to be higher or lower or, even, that the findings are spurious, that is, do not reflect a true causal relationship. A plaintiff may have been exposed to a

---

199. *See* Sander Greenland & James M. Robins, *Epidemiology, Justice, and the Probability of Causation,* 40 Jurimetrics J. 321 (2000); Sander Greenland, *Relation of Probability of Causation to Relative Risk and Doubling Dose: A Methodologic Error That Has Become a Social Problem,* 89 Am. J. Pub. Health 1166 (1999). If acceleration occurs, then the appropriate characterization of the harm for purposes of determining damages would have to be addressed. A defendant who only accelerates the occurrence of harm, say, chronic back pain, that would have occurred independently in the plaintiff at a later time is not liable for the same amount of damages as a defendant who causes a lifetime of chronic back pain. *See* David A. Fischer, *Successive Causes and the Enigma of Duplicated Harm,* 66 Tenn. L. Rev. 1127, 1127 (1999); Michael D. Green, *The Intersection of Factual Causation and Damages,* 55 DePaul L. Rev. 671 (2006).

200. We use interaction to mean that the combined effect is other than the additive sum of each effect, which is what we would expect if the two agents operate independently. Statisticians employ the term interaction in a different manner to mean the outcome deviates from what was expected in the model specified in advance. *See* Jay S. Kaufman, *Interaction Reaction,* 20 Epidemiology 159 (2009); Sander Greenland & Kenneth J. Rothman, *Concepts of Interaction, in* Rothman & Greenland, *supra* note 131, at 329.

201. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c(5) (2010); Jan Beyea & Sander Greenland, *The Importance of Specifying the Underlying Biologic Model in Estimating the Probability of Causation,* 76 Health Physics 269 (1999).

202. This is because in the epidemiologic studies relied on, those deaths caused by the alternative disease process will mask the true magnitude of increased incidence of the studied disease when the study subjects die before developing the disease of interest.

203. *See* Greenland & Robins, *supra,* note 198, at 332–33.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

dose of the agent in question that is greater or lower than that to which those in the study were exposed.[204] A plaintiff may have individual factors, such as higher age than those in the study, that make it less likely that exposure to the agent caused the plaintiff's disease. Similarly, an individual plaintiff may be able to rule out other known (background) causes of the disease, such as genetics, that increase the likelihood that the agent was responsible for that plaintiff's disease. Evidence of a pathological mechanism may be available for the plaintiff that is relevant to the cause of the plaintiff's disease.[205] Before any causal relative risk from an epidemiologic study can be used to estimate the probability that the agent in question caused an individual plaintiff's disease, consideration of these (and related) factors is required.[206]

Having additional evidence that bears on individual causation has led a few courts to conclude that a plaintiff may satisfy his or her burden of production even if a relative risk less than 2.0 emerges from the epidemiologic evidence.[207] For example, genetics might be known to be responsible for 50% of the incidence of a disease independent of exposure to the agent.[208] If genetics can be ruled out

204. *See supra* Section V.C; *see also* Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1536 (D.C. Cir. 1984) ("The dose–response relationship at low levels of exposure for admittedly toxic chemicals like paraquat is one of the most sharply contested questions currently being debated in the medical community."); *In re* Joint E. & S. Dist. Asbestos Litig., 774 F. Supp. 113, 115 (S.D.N.Y. 1991) (discussing different relative risks associated with different doses), *rev'd on other grounds,* 964 F.2d 92 (2d Cir. 1992).

205. *See* Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528 (6th Cir. 1993) (plaintiff's expert relied predominantly on pathogenic evidence).

206. *See* Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997); Smith v. Wyeth-Ayerst Labs. Co., 278 F. Supp. 2d 684, 708–09 (W.D.N.C. 2003) (describing expert's effort to refine relative risk applicable to plaintiff based on specific risk characteristics applicable to her, albeit in an ill-explained manner); McDarby v. Merck & Co., 949 A.2d 223 (N.J. Super. Ct. App. Div. 2008); Mary Carter Andrues, *Proof of Cancer Causation in Toxic Waste Litigation,* 61 S. Cal. L. Rev. 2075, 2100–04 (1988). An example of a judge sitting as factfinder and considering individual factors for a number of plaintiffs in deciding cause in fact is contained in *Allen v. United States,* 588 F. Supp. 247, 429–43 (D. Utah 1984), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987), *cert. denied,* 484 U.S. 1004 (1988); *see also* Manko v. United States, 636 F. Supp. 1419, 1437 (W.D. Mo. 1986), *aff'd,* 830 F.2d 831 (8th Cir. 1987).

207. *In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1137 (9th Cir. 2002) (applying Washington law) (recognizing the role of individual factors that may modify the probability of causation based on the relative risk); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 606 (D.N.J. 2002) ("[A] relative risk of 2.0 is not so much a password to a finding of causation as one piece of evidence, among others for the court to consider in determining whether an expert has employed a sound methodology in reaching his or her conclusion."); Miller v. Pfizer, Inc., 196 F. Supp. 2d 1062, 1079 (D. Kan. 2002) (rejecting a threshold of 2.0 for the relative risk and recognizing that even a relative risk greater than 2.0 may be insufficient); Pafford v. Sec'y, Dept. of Health & Human Servs., 64 Fed. Cl. 19 (2005) (acknowledging that epidemiologic studies finding a relative risk of less than 2.0 can provide supporting evidence of causation), *aff'd,* 451 F.3d 1352 (Fed. Cir. 2006).

208. *See generally* Steve C. Gold, *The More We Know, the Less Intelligent We Are? How Genomic Information Should, and Should Not, Change Toxic Tort Causation Doctrine,* 34 Harv. Envtl. L. Rev. 369 (2010); Jamie A. Grodsky, *Genomics and Toxic Torts: Dismantling the Risk-Injury Divide,* 59 Stan. L. Rev.

EXHIBIT C

*Reference Guide on Epidemiology*

in an individual's case, then a relative risk greater than 1.5 might be sufficient to support an inference that the agent was more likely than not responsible for the plaintiff's disease.[209]

Indeed, this idea of eliminating a known and competing cause is central to the methodology popularly known in legal terminology as differential diagnosis[210] but is more accurately referred to as differential etiology.[211] Nevertheless, the logic is sound if the label is not: Eliminating other known and competing causes increases the probability that a given individual's disease was caused by exposure to the agent. In a differential etiology, an expert first determines other known causes of the disease in question and then attempts to ascertain whether those competing causes can be "ruled out" as a cause of plaintiff's disease[212] as in the

1671 (2007); Gary E. Marchant, *Genetic Data in Toxic Tort Litigation,* 14 J.L. & Pol'y 7 (2006); Gary E. Marchant, *Genetics and Toxic Torts,* 31 Seton Hall L. Rev. 949 (2001).

209. The use of probabilities in excess of .50 to support a verdict results in an all-or-nothing approach to damages that some commentators have criticized. The criticism reflects the fact that defendants responsible for toxic agents with a relative risk just above 2.0 may be required to pay damages not only for the disease that their agents caused, but also for all instances of the disease. Similarly, those defendants whose agents increase the risk of disease by less than a doubling may not be required to pay damages for any of the disease that their agents caused. *See, e.g.,* 2 American Law Inst., Reporter's Study on Enterprise Responsibility for Personal Injury: Approaches to Legal and Institutional Change 369–75 (1991). Judge Posner has been in the vanguard of those advocating that damages be awarded on a proportional basis that reflects the probability of causation or liability. *See, e.g.,* Doll v. Brown, 75 F.3d 1200, 1206–07 (7th Cir. 1996). To date, courts have not adopted a rule that would apportion damages based on the probability of cause in fact in toxic substances cases. *See* Green, *supra* note 192.

210. Physicians regularly employ differential diagnoses in treating their patients to identify the disease from which the patient is suffering. *See* Jennifer R. Jamison, Differential Diagnosis for Primary Practice (1999).

211. It is important to emphasize that the term "differential diagnosis" in a clinical context refers to identifying a set of diseases or illnesses responsible for the patient's symptoms, while "differential etiology" refers to identifying the causal factors involved in an individual's disease or illness. For many health conditions, the *cause* of the disease or illness has no relevance to its treatment, and physicians, therefore, do not employ this term or pursue that question. *See* Zandi v. Wyeth a/k/a Wyeth, Inc., No. 27-CV-06-6744, 2007 WL 3224242 (Minn. Dist. Ct. Oct. 15, 2007) (commenting that physicians do not attempt to determine the cause of breast cancer). Thus, the standard differential diagnosis performed by a physician is not to determine the cause of a patient's disease. *See* John B. Wong et al., Reference Guide on Medical Testimony, in this manual; Edward J. Imwinkelried, *The Admissibility and Legal Sufficiency of Testimony About Differential Diagnosis (Etiology): of Under — and Over — Estimations,* 56 Baylor L. Rev. 391, 402–03 (2004); *see also* Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000) (distinguishing between differential diagnosis conducted for the purpose of identifying the disease from which the patient suffers and one attempting to determine the cause of the disease); Creanga v. Jardal, 886 A.2d 633, 639 (N.J. 2005) ("Whereas most physicians use the term to describe the process of determining which of several diseases is causing a patient's *symptoms*, courts have used the term in a more general sense to describe the process by which causes of the patient's *condition* are identified.").

212. Courts regularly affirm the legitimacy of employing differential diagnostic methodology. *See, e.g., In re* Ephedra Prods. Liab. Litig., 393 F. Supp. 2d 181, 187 (S.D.N.Y. 2005); Easum v. Miller, 92 P.3d 794, 802 (Wyo. 2004) ("Most circuits have held that a reliable differential diagnosis satisfies *Daubert* and provides a valid foundation for admitting an expert opinion. The circuits reason that a differential diagnosis is a tested methodology, has been subjected to peer review/publication, does not

EXHIBIT C

*Reference Manual on Scientific Evidence*

genetics example in the preceding paragraph. Similarly, an expert attempting to determine whether an individual's emphysema was caused by occupational chemi-cal exposure would inquire whether the individual was a smoker. By ruling out (or ruling in) the possibility of other causes, the probability that a given agent was the cause of an individual's disease can be refined. Differential etiologies are most critical when the agent at issue is relatively weak and is not responsible for a large proportion of the disease in question.

Although differential etiologies are a sound methodology in principle, this approach is only valid if general causation exists and a substantial proportion of competing causes are known.[213] Thus, for diseases for which the causes are largely unknown, such as most birth defects, a differential etiology is of little benefit.[214] And, like any scientific methodology, it can be performed in an unreliable manner.[215]

# VIII. Acknowledgments

The authors are grateful for the able research assistance provided by Murphy Horne, Wake Forest Law School class of 2012, and Cory Randolph, Wake Forest Law School class of 2010.

frequently lead to incorrect results, and is generally accepted in the medical community." (quoting Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000))); Alder v. Bayer Corp., AGFA Div., 61 P.3d 1068, 1084–85 (Utah 2002).

213. Courts have long recognized that to prove causation plaintiff need not eliminate *all* poten-tial competing causes. *See* Stubbs v. City of Rochester, 134 N.E. 137, 140 (N.Y. 1919) (rejecting defendant's argument that plaintiff was required to eliminate all potential competing causes of typhoid); *see also* Easum v. Miller, 92 P.3d 794, 804 (Wyo. 2004). At the same time, before a competing cause should be considered relevant to a differential diagnosis, there must be adequate evidence that it *is* a cause of the disease. *See* Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 202 (4th Cir. 2001); Ranes v. Adams Labs., Inc., 778 N.W.2d 677, 690 (Iowa 2010).

214. *See* Perry v. Novartis Pharms. Corp., 564 F. Supp. 2d 452, 469 (E.D. Pa. 2008) (find-ing experts' testimony inadmissible because of failure to account for idiopathic (unknown) causes in conducting differential diagnosis); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 480, 519 (W.D. Pa. 2003) (criticizing expert for failing to account for idiopathic causes); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (observing that 90–95% of leukemias are of unknown causes, but proceeding incorrectly to assert that plaintiff was obliged to prove that her exposure to defendant's benzene was *the* cause of her leukemia rather than simply a cause of the disease that combined with other exposures to benzene). *But see* Ruff v. Ensign-Bickford Indus., Inc., 168 F. Supp. 2d 1271, 1286 (D. Utah 2001) (responding to defendant's evidence that most instances of disease are of unknown origin by stating that such matter went to the weight to be attributed to plaintiff's expert's testimony not its admissibility).

215. Numerous courts have concluded that, based on the manner in which a differential diag-nosis was conducted, it was unreliable and the expert's testimony based on it is inadmissible. *See, e.g.,* Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 989 (8th Cir. 2001).

**EXHIBIT C**

*Reference Guide on Epidemiology*

# Glossary of Terms

The following terms and definitions were adapted from a variety of sources, including A Dictionary of Epidemiology (Miquel M. Porta et al. eds., 5th ed. 2008); 1 Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy (1988); James K. Brewer, Everything You Always Wanted to Know about Statistics, but Didn't Know How to Ask (1978); and R.A. Fisher, Statistical Methods for Research Workers (1973).

**adjustment.** Methods of modifying an observed association to take into account the effect of risk factors that are not the focus of the study and that distort the observed association between the exposure being studied and the disease outcome. See also direct age adjustment, indirect age adjustment.

**agent.** Also, risk factor. A factor, such as a drug, microorganism, chemical substance, or form of radiation, whose presence or absence can result in the occurrence of a disease. A disease may be caused by a single agent or a number of independent alternative agents, or the combined presence of a complex of two or more factors may be necessary for the development of the disease.

**alpha.** The level of statistical significance chosen by a researcher to determine if any association found in a study is sufficiently unlikely to have occurred by chance (as a result of random sampling error) if the null hypothesis (no association) is true. Researchers commonly adopt an alpha of .05, but the choice is arbitrary, and other values can be justified.

**alpha error.** Also called Type I error and false-positive error, alpha error occurs when a researcher rejects a null hypothesis when it is actually true (i.e., when there is no association). This can occur when an apparent difference is observed between the control group and the exposed group, but the difference is not real (i.e., it occurred by chance). A common error made by lawyers, judges, and academics is to equate the level of alpha with the legal burden of proof.

**association.** The degree of statistical relationship between two or more events or variables. Events are said to be associated when they occur more or less frequently together than one would expect by chance. Association does not necessarily imply a causal relationship. Events are said not to have an association when the agent (or independent variable) has no apparent effect on the incidence of a disease (the dependent variable). This corresponds to a relative risk of 1.0. A negative association means that the events occur less frequently together than one would expect by chance, thereby implying a preventive or protective role for the agent (e.g., a vaccine).

**attributable fraction.** Also, attributable risk. The proportion of disease in exposed individuals that can be attributed to exposure to an agent, as distinguished from the proportion of disease attributed to all other causes.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**attributable proportion of risk (PAR).** This term has been used to denote the fraction of risk that is attributable to exposure to a substance (e.g., *X* percent of lung cancer is attributable to cigarettes). Synonymous terms include attributable fraction, attributable risk, etiologic fraction, population attributable risk, and risk difference. See attributable risk.

**background risk of disease.** Also, background rate of disease. Rate of disease in a population that has no known exposures to an alleged risk factor for the disease. For example, the background risk for all birth defects is 3–5% of live births.

**beta error.** Also called Type II error and false–negative error. Occurs when a researcher fails to reject a null hypothesis when it is incorrect (i.e., when there is an association). This can occur when no statistically significant difference is detected between the control group and the exposed group, but a difference does exist.

**bias.** Any effect at any stage of investigation or inference tending to produce results that depart systematically from the true values. In epidemiology, the term bias does not necessarily carry an imputation of prejudice or other subjective factor, such as the experimenter's desire for a particular outcome. This differs from conventional usage, in which bias refers to a partisan point of view.

**biological marker.** A physiological change in tissue or body fluids that occurs as a result of an exposure to an agent and that can be detected in the laboratory. Biological markers are only available for a small number of chemicals.

**biological plausibility.** Consideration of existing knowledge about human biology and disease pathology to provide a judgment about the plausibility that an agent causes a disease.

**case-comparison study.** See case-control study.

**case-control study.** Also, case-comparison study, case history study, case referent study, retrospective study. A study that starts with the identification of persons with a disease (or other outcome variable) and a suitable control (comparison, reference) group of persons without the disease. Such a study is often referred to as retrospective because it starts after the onset of disease and looks back to the postulated causal factors.

**case group.** A group of individuals who have been exposed to the disease, intervention, procedure, or other variable whose influence is being studied.

**causation.** As used here, an event, condition, characteristic, or agent being a necessary element of a set of other events that can produce an outcome, such as a disease. Other sets of events may also cause the disease. For example, smoking is a necessary element of a set of events that result in lung cancer, yet there are other sets of events (without smoking) that cause lung cancer. Thus, a cause may be thought of as a necessary link in at least one causal chain that

620

**EXHIBIT C**

*Reference Guide on Epidemiology*

results in an outcome of interest. Epidemiologists generally speak of causation in a group context; hence, they will inquire whether an increased incidence of a disease in a cohort was "caused" by exposure to an agent.

**clinical trial.** An experimental study that is performed to assess the efficacy and safety of a drug or other beneficial treatment. Unlike observational studies, clinical trials can be conducted as experiments and use randomization, because the agent being studied is thought to be beneficial.

**cohort.** Any designated group of persons followed or traced over a period of time to examine health or mortality experience.

**cohort study.** The method of epidemiologic study in which groups of individuals can be identified who are, have been, or in the future may be differentially exposed to an agent or agents hypothesized to influence the incidence of occurrence of a disease or other outcome. The groups are observed to find out if the exposed group is more likely to develop disease. The alternative terms for a cohort study (concurrent study, followup study, incidence study, longitudinal study, prospective study) describe an essential feature of the method, which is observation of the population for a sufficient number of person–years to generate reliable incidence or mortality rates in the population subsets. This generally implies study of a large population, study for a prolonged period (years), or both.

**confidence interval.** A range of values calculated from the results of a study within which the true value is likely to fall; the width of the interval reflects random error. Thus, if a confidence level of .95 is selected for a study, 95% of similar studies would result in the true relative risk falling within the confidence interval. The width of the confidence interval provides an indication of the precision of the point estimate or relative risk found in the study; the narrower the confidence interval, the greater the confidence in the relative risk estimate found in the study. Where the confidence interval contains a relative risk of 1.0, the results of the study are not statistically significant.

**confounding factor.** Also, confounder. A factor that is both a risk factor for the disease and a factor associated with the exposure of interest. Confounding refers to a situation in which an association between an exposure and outcome is all or partly the result of a factor that affects the outcome but is unaffected by the exposure.

**control group.** A comparison group comprising individuals who have not been exposed to the disease, intervention, procedure, or other variable whose influence is being studied.

**cross–sectional study.** A study that examines the relationship between disease and variables of interest as they exist in a population at a given time. A cross–sectional study measures the presence or absence of disease and other variables in each member of the study population. The data are analyzed to

621

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

determine if there is a relationship between the existence of the variables and disease. Because cross-sectional studies examine only a particular moment in time, they reflect the prevalence (existence) rather than the incidence (rate) of disease and can offer only a limited view of the causal association between the variables and disease. Because exposures to toxic agents often change over time, cross-sectional studies are rarely used to assess the toxicity of exogenous agents.

**data dredging.** Jargon that refers to results identified by researchers who, after completing a study, pore through their data seeking to find any associations that may exist. In general, good research practice is to identify the hypotheses to be investigated in advance of the study; hence, data dredging is generally frowned on. In some cases, however, researchers conduct exploratory studies designed to generate hypotheses for further study.

**demographic study.** See ecological study.

**dependent variable.** The outcome that is being assessed in a study based on the effect of another characteristic—the independent variable. Epidemiologic studies attempt to determine whether there is an association between the independent variable (exposure) and the dependent variable (incidence of disease).

**differential misclassification.** A form of bias that is due to the misclassification of individuals or a variable of interest when the misclassification varies among study groups. This type of bias occurs when, for example, it is incorrectly determined that individuals in a study are unexposed to the agent being studied when in fact they are exposed. See nondifferential misclassification.

**direct adjustment.** A technique used to eliminate any difference between two study populations based on age, sex, or some other parameter that might result in confounding. Direct adjustment entails comparison of the study group with a large reference population to determine the expected rates based on the characteristic, such as age, for which adjustment is being performed.

**dose.** Generally refers to the intensity or magnitude of exposure to an agent multiplied by the duration of exposure. Dose may be used to refer only to the intensity of exposure.

**dose–response relationship.** A relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or a decrease—in risk of disease.

**double blinding.** A method used in experimental studies in which neither the individuals being studied nor the researchers know during the study whether any individual has been assigned to the exposed or control group. Double blinding is designed to prevent knowledge of the group to which the individual was assigned from biasing the outcome of the study.

622

EXHIBIT C

*Reference Guide on Epidemiology*

**ecological fallacy**. Also, aggregation bias, ecological bias. An error that occurs from inferring that a relationship that exists for groups is also true for individuals. For example, if a country with a higher proportion of fishermen also has a higher rate of suicides, then inferring that fishermen must be more likely to commit suicide is an ecological fallacy.

**ecological study.** Also, demographic study. A study of the occurrence of disease based on data from populations, rather than from individuals. An ecological study searches for associations between the incidence of disease and suspected disease–causing agents in the studied populations. Researchers often conduct ecological studies by examining easily available health statistics, making these studies relatively inexpensive in comparison with studies that measure disease and exposure to agents on an individual basis.

**epidemiology.** The study of the distribution and determinants of disease or other health–related states and events in populations and the application of this study to control of health problems.

**error.** Random error (sampling error) is the error that is due to chance when the result obtained for a sample differs from the result that would be obtained if the entire population (universe) were studied.

**etiologic factor.** An agent that plays a role in causing a disease.

**etiology.** The cause of disease or other outcome of interest.

**experimental study.** A study in which the researcher directly controls the conditions. Experimental epidemiology studies (also clinical studies) entail random assignment of participants to the exposed and control groups (or some other method of assignment designed to minimize differences between the groups).

**exposed, exposure.** In epidemiology, the exposed group (or the exposed) is used to describe a group whose members have been exposed to an agent that may be a cause of a disease or health effect of interest, or possess a characteristic that is a determinant of a health outcome.

**false–negative error.** See beta error.

**false–positive error.** See alpha error.

**followup study.** See cohort study.

**general causation.** Issue of whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease. Because of individual variation, a toxic agent generally will not cause disease in every exposed individual.

**generalizable.** When the results of a study are applicable to populations other than the study population, such as the general population.

**in vitro.** Within an artificial environment, such as a test tube (e.g., the cultivation of tissue in vitro).

**in vivo.** Within a living organism (e.g., the cultivation of tissue in vivo).

623

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**incidence rate.** The number of people in a specified population falling ill from a particular disease during a given period. More generally, the number of new events (e.g., new cases of a disease in a defined population) within a specified period of time.

**incidence study.** See cohort study.

**independent variable.** A characteristic that is measured in a study and that is suspected to have an effect on the outcome of interest (the dependent variable). Thus, exposure to an agent is measured in a cohort study to determine whether that independent variable has an effect on the incidence of disease, which is the dependent variable.

**indirect adjustment.** A technique employed to minimize error that might result when comparing two populations because of differences in age, sex, or another parameter that may independently affect the rate of disease in the populations. The incidence of disease in a large reference population, such as all residents of a country, is calculated for each subpopulation (based on the relevant parameter, such as age). Those incidence rates are then applied to the study population with its distribution of persons to determine the overall incidence rate for the study population, which provides a standardized mortality or morbidity ratio (often referred to as SMR).

**inference.** The intellectual process of making generalizations from observations. In statistics, the development of generalizations from sample data, usually with calculated degrees of uncertainty.

**information bias.** Also, observational bias. Systematic error in measuring data that results in differential accuracy of information (such as exposure status) for comparison groups.

**interaction.** When the magnitude or direction (positive or negative) of the effect of one risk factor differs depending on the presence or level of the other. In interaction, the effect of two risk factors together is different (greater or less) than the sum of their individual effects.

**meta-analysis.** A technique used to combine the results of several studies to enhance the precision of the estimate of the effect size and reduce the plausibility that the association found is due to random sampling error. Meta-analysis is best suited to pooling results from randomly controlled experimental studies, but if carefully performed, it also may be useful for observational studies.

**misclassification bias.** The erroneous classification of an individual in a study as exposed to the agent when the individual was not, or incorrectly classifying a study individual with regard to disease. Misclassification bias may exist in all study groups (nondifferential misclassification) or may vary among groups (differential misclassification).

624

EXHIBIT C

*Reference Guide on Epidemiology*

**morbidity rate.** State of illness or disease. Morbidity rate may refer to either the incidence rate or prevalence rate of disease.

**mortality rate.** Proportion of a population that dies of a disease or of all causes. The numerator is the number of individuals dying; the denominator is the total population in which the deaths occurred. The unit of time is usually a calendar year.

**model.** A representation or simulation of an actual situation. This may be either (1) a mathematical representation of characteristics of a situation that can be manipulated to examine consequences of various actions; (2) a representation of a country's situation through an "average region" with characteristics resembling those of the whole country; or (3) the use of animals as a substitute for humans in an experimental system to ascertain an outcome of interest.

**multivariate analysis.** A set of techniques used when the variation in several variables has to be studied simultaneously. In statistics, any analytical method that allows the simultaneous study of two or more independent factors or variables.

**nondifferential misclassification.** Error due to misclassification of individuals or a variable of interest into the wrong category when the misclassification varies among study groups. The error may result from limitations in data collection, may result in bias, and will often produce an underestimate of the true association. See differential misclassification.

**null hypothesis.** A hypothesis that states that there is no true association between a variable and an outcome. At the outset of any observational or experimental study, the researcher must state a proposition that will be tested in the study. In epidemiology, this proposition typically addresses the existence of an association between an agent and a disease. Most often, the null hypothesis is a statement that exposure to Agent A does not increase the occurrence of Disease D. The results of the study may justify a conclusion that the null hypothesis (no association) has been disproved (e.g., a study that finds a strong association between smoking and lung cancer). A study may fail to disprove the null hypothesis, but that alone does not justify a conclusion that the null hypothesis has been proved.

**observational study.** An epidemiologic study in situations in which nature is allowed to take its course, without intervention from the investigator. For example, in an observational study the subjects of the study are permitted to determine their level of exposure to an agent.

**odds ratio (OR).** Also, cross–product ratio, relative odds. The ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed. For most purposes the odds ratio from a case–control study is quite similar to a risk ratio from a cohort study.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**$p$ (probability), $p$-value.** The $p$-value is the probability of getting a value of the test outcome equal to or more extreme than the result observed, given that the null hypothesis is true. The letter $p$, followed by the abbreviation "n.s." (not significant) means that $p > .05$ and that the association was not statistically significant at the .05 level of significance. The statement "$p < .05$" means that $p$ is less than 5%, and, by convention, the result is deemed statistically significant. Other significance levels can be adopted, such as .01 or .1. The lower the $p$-value, the less likely that random error would have produced the observed relative risk if the true relative risk is 1.

**pathognomonic.** When an agent must be present for a disease to occur. Thus, asbestos is a pathognomonic agent for asbestosis. See signature disease.

**placebo controlled.** In an experimental study, providing an inert substance to the control group, so as to keep the control and exposed groups ignorant of their status.

**power.** The probability that a difference of a specified amount will be detected by the statistical hypothesis test, given that a difference exists. In less formal terms, power is like the strength of a magnifying lens in its capability to identify an association that truly exists. Power is equivalent to one minus Type II error. This is sometimes stated as Power $= 1 - \beta$.

**prevalence.** The percentage of persons with a disease in a population at a specific point in time.

**prospective study.** A study in which two groups of individuals are identified: (1) individuals who have been exposed to a risk factor and (2) individuals who have not been exposed. Both groups are followed for a specified length of time, and the proportion that develops disease in the first group is compared with the proportion that develops disease in the second group. See cohort study.

**random.** The term implies that an event is governed by chance. See randomization.

**randomization.** Assignment of individuals to groups (e.g., for experimental and control regimens) by chance. Within the limits of chance variation, randomization should make the control group and experimental group similar at the start of an investigation and ensure that personal judgment and prejudices of the investigator do not influence assignment. Randomization should not be confused with haphazard assignment. Random assignment follows a predetermined plan that usually is devised with the aid of a table of random numbers. Randomization cannot ethically be used where the exposure is known to cause harm (e.g., cigarette smoking).

**randomized trial.** See clinical trial.

**recall bias.** Systematic error resulting from differences between two groups in a study in accuracy of memory. For example, subjects who have a disease may recall exposure to an agent more frequently than subjects who do not have the disease.

626

**EXHIBIT C**

*Reference Guide on Epidemiology*

**relative risk (RR).** The ratio of the risk of disease or death among people exposed to an agent to the risk among the unexposed. For instance, if 10% of all people exposed to a chemical develop a disease, compared with 5% of people who are not exposed, the disease occurs twice as frequently among the exposed people. The relative risk is 10%/5% = 2. A relative risk of 1 indicates no association between exposure and disease.

**research design.** The procedures and methods, predetermined by an investigator, to be adhered to in conducting a research project.

**risk.** A probability that an event will occur (e.g., that an individual will become ill or die within a stated period of time or by a certain age).

**risk difference (RD).** The difference between the proportion of disease in the exposed population and the proportion of disease in the unexposed population. $-1.0 \leq RD \geq 1.0$.

**sample.** A selected subset of a population. A sample may be random or nonrandom.

**sample size.** The number of subjects who participate in a study.

**secular–trend study.** Also, time-line study. A study that examines changes over a period of time, generally years or decades. Examples include the decline of tuberculosis mortality and the rise, followed by a decline, in coronary heart disease mortality in the United States in the past 50 years.

**selection bias.** Systematic error that results from individuals being selected for the different groups in an observational study who have differences other than the ones that are being examined in the study.

**sensitivity.** Measure of the accuracy of a diagnostic or screening test or device in identifying disease (or some other outcome) when it truly exists. For example, assume that we know that 20 women in a group of 1000 women have cervical cancer. If the entire group of 1000 women is tested for cervical cancer and the screening test only identifies 15 (of the known 20) cases of cervical cancer, the screening test has a sensitivity of 15/20, or 75%. Also see specificity.

**signature disease.** A disease that is associated uniquely with exposure to an agent (e.g., asbestosis and exposure to asbestos). See also pathognomonic.

**significance level.** A somewhat arbitrary level selected to minimize the risk that an erroneous positive study outcome that is due to random error will be accepted as a true association. The lower the significance level selected, the less likely that false–positive error will occur.

**specific causation.** Whether exposure to an agent was responsible for a given individual's disease.

**specificity.** Measure of the accuracy of a diagnostic or screening test in identifying those who are disease-free. Once again, assume that 980 women out of a group of 1000 women do not have cervical cancer. If the entire group of 1000 women is screened for cervical cancer and the screening test only iden-

627

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

tifies 900 women without cervical cancer, the screening test has a specificity of 900/980, or 92%.

**standardized morbidity ratio (SMR).** The ratio of the incidence of disease observed in the study population to the incidence of disease that would be expected if the study population had the same incidence of disease as some selected reference population.

**standardized mortality ratio (SMR).** The ratio of the incidence of death observed in the study population to the incidence of death that would be expected if the study population had the same incidence of death as some selected standard or known population.

**statistical significance.** A term used to describe a study result or difference that exceeds the Type I error rate (or *p*-value) that was selected by the researcher at the outset of the study. In formal significance testing, a statistically significant result is unlikely to be the result of random sampling error and justifies rejection of the null hypothesis. Some epidemiologists believe that formal significance testing is inferior to using a confidence interval to express the results of a study. Statistical significance, which addresses the role of random sampling error in producing the results found in the study, should not be confused with the importance (for public health or public policy) of a research finding.

**stratification.** Separating a group into subgroups based on specified criteria, such as age, gender, or socioeconomic status. Stratification is used both to control for the possibility of confounding (by separating the studied populations based on the suspected confounding factor) and when there are other known factors that affect the disease under study. Thus, the incidence of death increases with age, and a study of mortality might use stratification of the cohort and control groups based on age.

**study design.** See research design.

**systematic error.** See bias.

**teratogen.** An agent that produces abnormalities in the embryo or fetus by disturbing maternal health or by acting directly on the fetus in utero.

**teratogenicity.** The capacity for an agent to produce abnormalities in the embryo or fetus.

**threshold phenomenon.** A certain level of exposure to an agent below which disease does not occur and above which disease does occur.

**time-line study.** See secular-trend study.

**toxicology.** The science of the nature and effects of poisons. Toxicologists study adverse health effects of agents on biological organisms, such as live animals and cells. Studies of humans are performed by epidemiologists.

**toxic substance.** A substance that is poisonous.

628

**EXHIBIT C**

*Reference Guide on Epidemiology*

**true association.** Also, real association. The association that really exists between exposure to an agent and a disease and that might be found by a perfect (but nonetheless nonexistent) study.

**Type I error.** Rejecting the null hypothesis when it is true. See alpha error.

**Type II error.** Failing to reject the null hypothesis when it is false. See beta error.

**validity.** The degree to which a measurement measures what it purports to measure; the accuracy of a measurement.

**variable.** Any attribute, condition, or other characteristic of subjects in a study that can have different numerical characteristics. In a study of the causes of heart disease, blood pressure and dietary fat intake are variables that might be measured.

EXHIBIT C

*Reference Manual on Scientific Evidence*

# References on Epidemiology

Causal Inferences (Kenneth J. Rothman ed., 1988).

William G. Cochran, Sampling Techniques (1977).

A Dictionary of Epidemiology (John M. Last et al. eds., 5th ed. 2008).

Anders Ahlbom & Steffan Norell, Introduction to Modern Epidemiology (2d ed. 1990).

Robert C. Elston & William D. Johnson, Basic Biostatistices for Geneticists and Epidemiologists (2008)

Encyclopedia of Epidemiology (Sarah E. Boslaugh ed., 2008).

Joseph L. Fleiss et al., Statistical Methods for Rates and Proportions (3d ed. 2003).

Leon Gordis, Epidemiology (4th ed. 2009).

Morton Hunt, How Science Takes Stock: The Story of Meta-Analysis (1997).

International Agency for Research on Cancer (IARC), Interpretation of Negative Epidemiologic Evidence for Carcinogenicity (N.J. Wald & R. Doll eds., 1985).

Harold A. Kahn & Christopher T. Sempos, Statistical Methods in Epidemiology (1989).

David E. Lilienfeld, *Overview of Epidemiology,* 3 Shepard's Expert & Sci. Evid. Q. 25 (1995).

David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology (3d ed. 1994).

Marcello Pagano & Kimberlee Gauvreau, Principles of Biostatistics (2d ed. 2000).

Pharmacoepidemiology (Brian L. Strom ed., 4th ed. 2005).

Richard K. Riegelman & Robert A. Hirsch, Studying a Study and Testing a Test: How to Read the Health Science Literature (5th ed. 2005).

Bernard Rosner, Fundamentals of Biostatistics (6th ed. 2006).

Kenneth J. Rothman et al., Modern Epidemiology (3d ed. 2008).

David A. Savitz, Interpreting Epidemiologic Evidence: Strategies for Study Design and Analysis (2003).

James J. Schlesselman, Case-Control Studies: Design, Conduct, Analysis (1982).

Lisa M. Sullivan, Essentials of Biostatistics (2008).

Mervyn Susser, Epidemiology, Health and Society: Selected Papers (1987).

# References on Law and Epidemiology

American Law Institute, Reporters' Study on Enterprise Responsibility for Personal Injury (1991).

Bert Black & David H. Hollander, Jr., *Unraveling Causation: Back to the Basics*, 3 U. Balt. J. Envtl. L. 1 (1993).

Bert Black & David Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation*, 52 Fordham L. Rev. 732 (1984).

**EXHIBIT C**

*Reference Guide on Epidemiology*

Gerald Boston, *A Mass-Exposure Model of Toxic Causation: The Content of Scientific Proof and the Regulatory Experience,* 18 Colum. J. Envtl. L. 181 (1993).

Vincent M. Brannigan et al., *Risk, Statistical Inference, and the Law of Evidence: The Use of Epidemiological Data in Toxic Tort Cases,* 12 Risk Analysis 343 (1992).

Troyen Brennan, *Causal Chains and Statistical Links: The Role of Scientific Uncertainty in Hazardous-Substance Litigation,* 73 Cornell L. Rev. 469 (1988).

Troyen Brennan, *Helping Courts with Toxic Torts: Some Proposals Regarding Alternative Methods for Presenting and Assessing Scientific Evidence in Common Law Courts,* 51 U. Pitt. L. Rev. 1 (1989).

Philip Cole, *Causality in Epidemiology, Health Policy, and Law,* 27 Envtl. L. Rep. 10,279 (June 1997).

Comment, *Epidemiologic Proof of Probability: Implementing the Proportional Recovery Approach in Toxic Exposure Torts,* 89 Dick. L. Rev. 233 (1984).

George W. Conk, *Against the Odds: Proving Causation of Disease with Epidemiological Evidence,* 3 Shepard's Expert & Sci. Evid. Q. 85 (1995).

Carl F. Cranor, Toxic Torts: Science, Law, and the Possibility of Justice (2006).

Carl F. Cranor et al., *Judicial Boundary Drawing and the Need for Context-Sensitive Science in Toxic Torts After* Daubert v. Merrell Dow Pharmaceuticals, Inc., 16 Va. Envtl. L.J. 1 (1996).

Richard Delgado, *Beyond Sindell: Relaxation of Cause-in-Fact Rules for Indeterminate Plaintiffs,* 70 Cal. L. Rev. 881 (1982).

Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact,* 7 Harv. Envtl. L. Rev. 429 (1983).

Jean Macchiaroli Eggen, *Toxic Torts, Causation, and Scientific Evidence After* Daubert, 55 U. Pitt. L. Rev. 889 (1994).

Daniel A. Farber, *Toxic Causation*, 71 Minn. L. Rev. 1219 (1987).

Heidi Li Feldman, Science and Uncertainty in Mass Exposure Litigation, 74 Tex. L. Rev. 1 (1995).

Stephen E. Fienberg et al., *Understanding and Evaluating Statistical Evidence in Litigation,* 36 Jurimetrics J. 1 (1995).

Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy (1988).

Herman J. Gibb, *Epidemiology and Cancer Risk Assessment*, *in* Fundamentals of Risk Analysis and Risk Management 23 (Vlasta Molak ed., 1997).

Steve Gold, Note, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion and Statistical Evidence,* 96 Yale L.J. 376 (1986).

Leon Gordis, *Epidemiologic Approaches for Studying Human Disease in Relation to Hazardous Waste Disposal Sites,* 25 Hous. L. Rev. 837 (1988).

Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation,* 86 Nw. U. L. Rev. 643 (1992).

Michael D. Green, *The Future of Proportional Liability, in* Exploring Tort Law (Stuart Madden ed., 2005).

EXHIBIT C

*Reference Manual on Scientific Evidence*

Sander Greenland, *The Need for Critical Appraisal of Expert Witnesses in Epidemiology and Statistics,* 39 Wake Forest L. Rev. 291 (2004).

Khristine L. Hall & Ellen Silbergeld, *Reappraising Epidemiology: A Response to Mr. Dore*, 7 Harv. Envtl. L. Rev. 441 (1983).

Jay P. Kesan, *Drug Development: Who Knows Where the Time Goes?: A Critical Examination of the Post-*Daubert *Scientific Evidence Landscape,* 52 Food Drug Cosm. L.J. 225 (1997).

Jay P. Kesan, *An Autopsy of Scientific Evidence in a Post-*Daubert *World,* 84 Geo. L. Rev. 1985 (1996).

Constantine Kokkoris, Comment, DeLuca v. Merrell Dow Pharmaceuticals, Inc.: *Statistical Significance and the Novel Scientific Technique,* 58 Brook. L. Rev. 219 (1992).

James P. Leape, *Quantitative Risk Assessment in Regulation of Environmental Carcinogens,* 4 Harv. Envtl. L. Rev. 86 (1980).

David E. Lilienfeld, *Overview of Epidemiology*, 3 Shepard's Expert & Sci. Evid. Q. 23 (1995).

Junius McElveen, Jr., & Pamela Eddy, *Cancer and Toxic Substances: The Problem of Causation and the Use of Epidemiology,* 33 Clev. St. L. Rev. 29 (1984).

Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman et al. eds., 2009–2010).

Note, *Development in the Law—Confronting the New Challenges of Scientific Evidence,* 108 Harv. L. Rev. 1481 (1995).

Susan R. Poulter, *Science and Toxic Torts: Is There a Rational Solution to the Problem of Causation?* 7 High Tech. L.J. 189 (1992).

Jon Todd Powell, Comment, *How to Tell the Truth with Statistics: A New Statistical Approach to Analyzing the Data in the Aftermath of* Daubert v. Merrell Dow Pharmaceuticals, 31 Hous. L. Rev. 1241 (1994).

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28, cmt. c & rptrs. note (2010).

David Rosenberg, *The Causal Connection in Mass Exposure Cases: A Public Law Vision of the Tort System,* 97 Harv. L. Rev. 849 (1984).

Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life-Cycle of Mass Torts,* 43 Hastings L.J. 301 (1992).

Joseph Sanders, *Scientific Validity, Admissibility, and Mass Torts After* Daubert, 78 Minn. L. Rev. 1387 (1994).

Joseph Sanders & Julie Machal–Fulks, *The Admissibility of Differential Diagnosis to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law,* 64 L. & Contemp. Probs. 107 (2001).

Palma J. Strand, *The Inapplicability of Traditional Tort Analysis to Environmental Risks: The Example of Toxic Waste Pollution Victim Compensation,* 35 Stan. L. Rev. 575 (1983).

Richard W. Wright, *Causation in Tort Law*, 73 Cal. L. Rev. 1735 (1985).

**EXHIBIT C**

# Reference Guide on Toxicology

## BERNARD D. GOLDSTEIN AND MARY SUE HENIFIN

*Bernard D. Goldstein, M.D., is Professor of Environmental and Occupational Health and Former Dean, Graduate School of Public Health, University of Pittsburgh.*

*Mary Sue Henifin, J.D., M.P.H., is a Partner with Buchanan Ingersoll, P.C., Princeton, New Jersey.*

CONTENTS

I. Introduction, 635
   A. Toxicology and the Law, 637
   B. Purpose of the Reference Guide on Toxicology, 639
   C. Toxicological Study Design, 639
      1. In vivo research, 640
      2. In vitro research, 645
   D. Extrapolation from Animal and Cell Research to Humans, 646
   E. Safety and Risk Assessment, 646
      1. The use of toxicological information in risk assessment, 650
   F. Toxicological Processes and Target Organ Toxicity, 651
   G. Toxicology and Exposure Assessment, 656
   H. Toxicology and Epidemiology, 657
II. Demonstrating an Association Between Exposure and Risk of Disease, 660
   A. On What Species of Animals Was the Compound Tested? What Is Known About the Biological Similarities and Differences Between the Test Animals and Humans? How Do These Similarities and Differences Affect the Extrapolation from Animal Data in Assessing the Risk to Humans? 661
   B. Does Research Show That the Compound Affects a Specific Target Organ? Will Humans Be Affected Similarly? 662
   C. What Is Known About the Chemical Structure of the Compound and Its Relationship to Toxicity? 663
   D. Has the Compound Been the Subject of In Vitro Research, and if So, Can the Findings Be Related to What Occurs In Vivo? 664
   E. Is the Association Between Exposure and Disease Biologically Plausible? 664

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

III.   Specific Causal Association Between an Individual's Exposure and the
       Onset of Disease, 665
       A.  Was the Plaintiff Exposed to the Substance, and if So, Did the
           Exposure Occur in a Manner That Can Result in Absorption into
           the Body? 666
       B.  Were Other Factors Present That Can Affect the Distribution of the
           Compound Within the Body? 667
       C.  What Is Known About How Metabolism in the Human Body Alters
           the Toxic Effects of the Compound? 668
       D.  What Excretory Route Does the Compound Take, and How Does
           This Affect Its Toxicity? 668
       E.  Does the Temporal Relationship Between Exposure and the Onset
           of Disease Support or Contradict Causation? 668
       F.  If Exposure to the Substance Is Associated with the Disease, Is There
           a No Observable Effect, or Threshold, Level, and if So, Was the
           Individual Exposed Above the No Observable Effect Level? 669
 IV.   Medical History, 670
       A.  Is the Medical History of the Individual Consistent with the
           Toxicologist's Expert Opinion Concerning the Injury? 670
       B.  Are the Complaints Specific or Nonspecific? 671
       C.  Do Laboratory Tests Indicate Exposure to the Compound? 672
       D.  What Other Causes Could Lead to the Given Complaint? 672
       E.  Is There Evidence of Interaction with Other Chemicals? 673
       F.  Do Humans Differ in the Extent of Susceptibility to the Particular
           Compound in Question? Are These Differences Relevant in This
           Case? 674
       G.  Has the Expert Considered Data That Contradict His or Her
           Opinion? 674
  V.   Expert Qualifications, 675
       A.  Does the Proposed Expert Have an Advanced Degree in Toxicology,
           Pharmacology, or a Related Field? If the Expert Is a Physician,
           Is He or She Board Certified in a Field Such as Occupational
           Medicine? 675
       B.  Has the Proposed Expert Been Certified by the American Board
           of Toxicology, Inc., or Does He or She Belong to a Professional
           Organization, Such as the Academy of Toxicological Sciences or the
           Society of Toxicology? 677
       C.  What Other Criteria Does the Proposed Expert Meet? 678
 VI.   Acknowledgments, 679
Glossary of Terms, 680
References on Toxicology, 685

**EXHIBIT C**

# I.    Introduction

The discipline of toxicology is primarily concerned with identifying and understanding the adverse effects of external chemical and physical agents on biological systems. The interface of the evidence from toxicological science with toxic torts can be complex, in part reflecting the inherent challenges of bringing science into a courtroom, but also because of issues particularly pertinent to toxicology. For the most part, toxicological study begins with a chemical or physical agent and asks what impact it will have, while toxic tort cases begin with an individual or a group that has suffered an adverse impact and makes claims about its cause. A particular challenge is that only rarely is the adverse impact highly specific to the toxic agent; for example, the relatively rare lung cancer known as mesothelioma is almost always caused by asbestos. The more common form of lung cancer, bronchial carcinoma, also can be caused by asbestos, but asbestos is a relatively uncommon cause compared with smoking, radon, and other known causes of lung cancer.[1] Lung cancer itself is unusual in that for the vast majority of cases, we can point to a known cause—smoking. However, for many diseases, there are few if any known causes, for example, pancreatic cancer. Even when there are known causes of a disease, most individual cases are often not ascribable to any of the known causes, such as with leukemia.

In general, there are only a limited number of ways that biological tissues can respond, and there are many causes for each response. Accordingly, the role of toxicology in toxic tort cases often is to provide information that helps evaluate the causal probability that an adverse event with potentially many causes is caused by a specific agent. Similarly, toxicology is commonly used as a basis for regulating chemicals, depending upon their potential for effect. Assertions related to the toxicological predictability of an adverse consequence in relation to the stringency of the regulatory law are not uncommon bases for legal actions against regulatory agencies.

Identifying cause–and–effect relationships in toxicology can be relatively straightforward; for example, when placed on the skin, concentrated sulfuric acid will cause massive tissue destruction, and carbon monoxide poisoning is identifiable by the extent to which carbon monoxide is attached to the oxygen–carrying portion of blood hemoglobin, thereby decreasing oxygen availability to the body. But even these two seemingly straightforward examples serve to illustrate the complexity of toxicology and particularly its emphasis on understanding dose–response relationships. The tissue damage caused by sulfuric acid is not specific to this chemical, and at lower doses, no effect will be seen. Carbon monoxide is not only an external poison but is a product of normal internal metabolism such

---

1. Contrast this issue with the relatively straightforward situation in infectious disease in which the disease name identifies the cause; for example, cholera is caused by *Vibrio cholerae*, tuberculosis by the *Mycobacterium tuberculosis*, HIV–AIDs by the HIV virus, and so on.

**EXHIBIT C**

that about 1 out of 200 hemoglobin molecules will normally have carbon monoxide attached, and this can increase depending upon concomitant disease states. Furthermore, the complex temporal relation governing the uptake and release of carbon monoxide from hemoglobin also must be considered in assessing the extent to which an adverse impact may be ascribable to carbon monoxide exposure. Thus the diagnosis of carbon monoxide poisoning requires far more information than the simple presence of detectable carbon monoxide in the blood.

Complexity in toxicology is derived primarily from three factors. The first is that chemicals often change within the body as they go through various routes to eventual elimination.[2] Thus absorption, distribution, metabolism, and excretion are central to understanding the toxicology of an agent. The second is that human sensitivity to chemical and physical agents can vary greatly among individuals, often as a result of differences in absorption, distribution, metabolism, or excretion, as well as target organ sensitivity—all of which can be genetically determined. The third major source of complexity is the need for extrapolation, either across species, because much toxicological data are obtained from studies in laboratory animals, or across doses, because human toxicological and epidemiological data often are limited to specific dose ranges that differ from the dose suffered by a plaintiff alleging a toxic tort impact. All three of these factors are responsible for much of the complexity in utilizing toxicology for tort or regulatory judicial decisions and are described in more detail below.

Classically, toxicology is known as the science of poisons. It is the study of the adverse effects of chemical and physical agents on living organisms.[3] Although it is an age-old science, toxicology has only recently become a discipline distinct from pharmacology, biochemistry, cell biology, and related fields.

There are three central tenets of toxicology. First, "the dose makes the poison"; this implies that all chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose.[4] Even water, if consumed in large quantities, can be toxic. Second, each chemical or physical agent tends to produce a specific pattern of biological effects that can be used to establish disease

---

2. Direct-acting toxic agents are those whose toxicity is due to the parent chemical entering the body. A change in chemical structure through metabolism usually results in detoxification. Indirect-acting chemicals are those that must first be metabolized to a harmful intermediate for toxicity to occur. For an overview of metabolism in toxicology, see R.A. Kemper et al., *Metabolism: A Determinant of Toxicity*, *in* Principles and Methods of Toxicology 103–178 (A. Wallace Hayes ed., 5th ed. 2008).

3. Casarett and Doull's Toxicology: The Basic Science of Poisons 13 (Curtis D. Klaassen ed., 7th ed. 2007).

4. A discussion of more modern formulations of this principle, which was articulated by Paracelsus in the sixteenth century, can be found in David L. Eaton, *Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & Pol'y 5, 15 (2003); Ellen K. Silbergeld, *The Role of Toxicology in Causation: A Scientific Perspective*, 1 Cts. Health Sci. & L. 374, 378 (1991). A short review of the field of toxicology can be found in Curtis D. Klaassen, *Principles of Toxicology and Treatment of Poisoning*, *in* Goodman and Gilman's The Pharmacological Basis of Therapeutics 1739 (11th ed. 2008).

EXHIBIT C

*Reference Guide on Toxicology*

causation.[5] Third, the toxic responses in laboratory animals are useful predictors of toxic responses in humans. Each of these tenets, and their exceptions, is discussed in greater detail in this reference guide.

The science of toxicology attempts to determine at what doses foreign agents produce their effects. The foreign agents classically of interest to toxicologists are all chemicals (including foods and drugs) and physical agents in the form of radiation, but not living organisms that cause infectious diseases.[6]

The discipline of toxicology provides scientific information relevant to the following questions:

1. What hazards does a chemical or physical agent present to human populations or the environment?
2. What degree of risk is associated with chemical exposure at any given dose?[7]

Toxicological studies, by themselves, rarely offer direct evidence that a disease in any one individual was caused by a chemical exposure.[8] However, toxicology can provide scientific information regarding the increased risk of contracting a disease at any given dose and help rule out other risk factors for the disease. Toxicological evidence also contributes to the weight of evidence supporting causal inferences by explaining how a chemical causes a specific disease through describing metabolic, cellular, and other physiological effects of exposure.

## A. *Toxicology and the Law*

The growing concern about chemical causation of disease is reflected in the public attention devoted to lawsuits alleging toxic torts, as well as in litigation concerning the many federal and state regulations related to the release of potentially toxic compounds into the environment.

Toxicological evidence frequently is offered in two types of litigation: tort and regulatory. In tort litigation, toxicologists offer evidence that either supports

5. Some substances, such as central nervous system toxicants, can produce complex and non-specific symptoms, such as headaches, nausea, and fatigue.

6. Forensic toxicology, a subset of toxicology generally concerned with criminal matters, is not addressed in this reference guide, because it is a highly specialized field with its own literature and methodologies that do not relate directly to toxic tort or regulatory issues.

7. In standard risk assessment terminology, hazard is an intrinsic property of a chemical or physical agent, while risk is dependent both upon hazard and on the extent of exposure. Note that this first "law" of toxicology is particularly pertinent to questions of specific causation, while the second "law" of toxicology, the specificity of effect, is pertinent to questions of general causation.

8. There are exceptions, for example, when measurements of levels in the blood or other body constituents of the potentially offending agent are at a high enough level to be consistent with reasonably specific health impacts, such as in carbon monoxide poisoning.

EXHIBIT C

*Reference Manual on Scientific Evidence*

or refutes plaintiffs' claims that their diseases or injuries were caused by chemical exposures.[9] In regulatory litigation, toxicological evidence is used to either support or challenge government regulations concerning a chemical or a class of chemicals. In regulatory litigation, toxicological evidence addresses the issue of how exposure affects populations[10] rather than addressing specific causation, and agency determinations are usually subject to the court's deference.[11]

Dose is a central concept in the field of toxicology, and an expert toxicologist will consider the extent of a plaintiff's dose in making an opinion.[12] But dose has not been a central issue in many of the most important judicial decisions concerning the relation of toxicological evidence to toxic tort decisions. These have mostly been general causation issues: For example, is a silicon breast implant capable of causing rheumatoid arthritis, or is Bendectin capable of causing deformed babies.[13] However, in most specific causation issues involving exposure to a chemical known to be able to cause the observed effect, the primary issue will be whether there has been exposure to a sufficient dose to be a likely cause of this effect.

9. *See, e.g.*, Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Courts have held that toxicologists can testify as to disease causation related to chemical exposures. *See, e.g.*, Bonner v. ISP Techs, Inc., 259 F.3d 924, 928–31 (8th Cir. 2001); Paoli R.R. v. Monsanto Co., 915 F.2d 829 (3d Cir. 1990); Loudermill v. Dow Chem. Co., 863 F.2d 566, 569–70 (8th Cir. 1988).

10. Again, there are exceptions. For example, certain regulatory approaches, such as the control of hazardous air pollutants, are based on the potential impact to a putative maximally exposed individual rather than to the general population.

11. *See, e.g.*, Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor, 358 F.3d 40, 43–44 (D.C. Cir. 2004) (determinations by Secretary of Labor are given deference by the court, but must be supported by some evidence, and cannot be capricious or arbitrary); N.M. Mining Ass'n v. N.M. Water Quality Control Comm., 150 P.3d 991, 995–96 (N.M. Ct. App. 2006) (action by a government agency is presumptively valid and will be given deference by the court. The court will only overturn a regulatory decision if it is capricious and arbitrary, or not supported by substantial evidence).

12. Dose is a function of both concentration and duration. Haber's rule is a century-old simplified expression of dose effects in which the effect of a concentration and duration of exposure is a constant (e.g., exposure to an agent at 10 parts per million for 1 hour has the same impact as exposure to 1 part per million for 10 hours). Exposure levels, which are concentrations, are often confused with dose. This can be particularly problematic when attempting to understand the implications of exposure to a level that exceeds a regulatory standard that is set for a different time frame. For example, assume a drinking water contaminant is a known cause of cancer. To avoid a 1 in 100,000 lifetime risk caused by this contaminant in drinking water, and assuming that the average person will drink approximately 2000 mL of water daily for a lifetime, the regulatory authority sets the allowable contaminant standard in drinking water at 10 μg/L. Drinking one glass of water containing 20 μg/L of this contaminant, although exceeding the standard, does not come close to achieving a "reasonably medically probable" cause of an individual case of cancer.

13. *See, e.g., In re* Silicone Gel Breast Implants Prods. Liab. Litig., 318 F. Supp. 2d 879, 891 (C.D. Cal. 2004); Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Bendectin Cases*, 46 Stan. L. Rev. 1, 19 (1993).

EXHIBIT C

*Reference Guide on Toxicology*

## B. Purpose of the Reference Guide on Toxicology

This reference guide focuses on the scientific issues that arise most frequently in toxic tort cases. Where it is appropriate, the guide explores the use of regulatory data and how the courts treat such data. It also provides an overview of the basic principles and methodologies of toxicology and offers a scientific context for proffered expert opinion based on toxicological data.[14] The reference guide describes research methods in toxicology and the relationship between toxicology and epidemiology, and it provides model questions for evaluating the admissibility and strength of an expert's opinion. Following each question is an explanation of the type of toxicological data or information that is offered in response to the question, as well as a discussion of its significance.

## C. Toxicological Study Design

Toxicological studies usually involve exposing laboratory animals (in vivo research) or cells or tissues (in vitro research) to chemical or physical agents, monitoring the outcomes (such as cellular abnormalities, tissue damage, organ toxicity, or tumor formation), and comparing the outcomes with those for unexposed control groups. As explained below,[15] the extent to which animal and cell experiments accurately predict human responses to chemical exposures is subject to debate.[16] However, because it is often unethical to experiment on humans by exposing them to known doses of chemical agents, animal toxicological evidence often provides the best scientific information about the risk of disease from a chemical exposure.[17]

In contrast to their exposure to drugs, only rarely are humans exposed to environmental chemicals in a manner that permits a quantitative determination of adverse outcomes.[18] This area of toxicological study may consist of individual or multiple case reports, or even experimental studies in which individuals or groups of individuals have been exposed to a chemical under circumstances that permit analysis of dose–response relationships, mechanisms of action, or other aspects of

14. The use of toxicological evidence in regulatory decisionmaking is discussed in Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 3, at 13–14; Barbara D. Beck et al., *The Use of Toxicology in the Regulatory Process, in* Principles and Methods of Toxicology, *supra* note 2, at 45–102. For a more general discussion of issues that arise in considering expert testimony, *see* Margaret A. Berger, The Admissibility of Expert Testimony, Section IV, in this manual.

15. *See infra* Section I.D.

16. The controversy over the use of toxicological evidence in tort cases is described in Bernard D. Goldstein, *Toxic Torts: The Devil Is in the Dose*, 16 J.L. & Pol'y 551 (2008); Joseph V. Rodricks, *Evaluating Disease Causation in Humans Exposed to Toxic Substances*, 14 J.L. & Pol'y 39 (2006); Silbergeld, *supra* note 4, at 378.

17. *See, e.g.,* Office of Tech. Assessment, U.S. Congress, Reproductive Health Hazards in the Workplace 8 (1985).

18. However, it is from drug studies in which multiple animal species are compared directly with humans that many of the principles of toxicology have been developed.

**EXHIBIT C**

toxicology. For example, individuals occupationally or environmentally exposed to polychlorinated biphenyls (PCBs) prior to prohibitions on their use have been studied to determine the routes of absorption, distribution, metabolism, and excretion for this chemical. Human exposure occurs most frequently in occupational settings where workers are exposed to industrial chemicals such as lead or asbestos; however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure. Moreover, human populations are exposed to many other chemicals and risk factors, making it difficult to isolate the increased risk of a disease that is the result of exposure to any one chemical.[19]

Toxicologists use a wide range of experimental techniques, depending in part on their area of specialization. Toxicological research may focus on classes of chemical compounds, such as solvents and metals; body system effects, such as neurotoxicology, reproductive toxicology, and immunotoxicology; and effects on physiological processes, including inhalation toxicology, dermatotoxicology, and molecular toxicology (the study of how chemicals interact with cell molecules). Each of these areas of research includes both in vivo and in vitro research.[20]

## 1. In vivo research

Animal research in toxicology generally falls under two headings: safety assessment and classic laboratory science, with a continuum between them. As explained in Section I.E, safety assessment is a relatively formal approach in which a chemical's potential for toxicity is tested in vivo or in vitro using standardized techniques often prescribed by regulatory agencies, such as the Environmental Protection Agency (EPA) and the Food and Drug Administration (FDA).[21]

The roots of toxicology in the science of pharmacology are reflected in an emphasis on understanding the absorption, distribution, metabolism, and excretion of chemicals. Basic toxicological laboratory research also focuses on the mechanisms of action of external chemical and physical agents. Such research is based on the standard elements of scientific studies, including appropriate experimental design using control groups and statistical evaluation. In general, toxicological research attempts to hold all variables constant except for that of the chemical exposure.[22] Any change in the experimental group not found in the control group is assumed to be perturbation caused by the chemical.

19. *See, e.g.,* Office of Tech. Assessment, U.S. Congress, *supra* note 17, at 8.

20. *See infra* Sections I.C.1, I.C.2.

21. **W.J. White et al.,** *The Use of Laboratory Animals in Toxicology Research, in* Principles and Methods of Toxicology 1055–1102 (A. Wallace Hayes ed., 5th ed. 2008); M.A. Dorato et al., *The Toxicologic Assessment of Pharmaceutical and Biotechnology Products, in* Principles and Methods of Toxicology 325–68 (A. Wallace Hayes ed., 5th ed. 2008).

22. *See generally* Alan Poole & George B. Leslie, A Practical Approach to Toxicological Investigations (1989); Principles and Methods of Toxicology (A. Wallace Hayes ed., 2d ed. 1989); *see also* discussion on acute, short-term, and long-term toxicity studies and acquisition of data in Frank C. Lu, Basic Toxicology: Fundamentals, Target Organs, and Risk Assessment 77–92 (2d ed. 1991).

EXHIBIT C

*Reference Guide on Toxicology*

### a. Dose–response relationships

An important component of toxicological research is dose–response relationships. Thus, most toxicological studies generally test a range of doses of the chemical. Animal experiments are conducted to determine the dose–response relationships of a compound by measuring how response varies with dose, including diligently searching for a dose that has no measurable physiological effect. This information is useful in understanding the mechanisms of toxicity and extrapolating data from animals to humans.[23]

### b. Acute Toxicity Testing—Lethal Dose 50

To determine the dose–response relationship for a compound, a short–term lethal dose 50% ($LD_{50}$) may be derived experimentally. The $LD_{50}$ is the dose at which a compound kills 50% of laboratory animals within a period of days to weeks. The use of this easily measured end point for acute toxicity to a large extent has been replaced, in part because recent advances in toxicology have provided other pertinent end points, and in part because of pressure from animal rights activists to reduce or replace the use of animals in laboratory research.[24]

### c. No observable effect level

A dose–response study also permits the determination of another important characteristic of the biological action of a chemical—the no observable effect level (NOEL).[25] The NOEL sometimes is called a threshold, because it is the level above which observable effects in test animals are believed to occur and below which no toxicity is observed.[26] Of course, because the NOEL is dependent on the ability to

---

23. *See infra* Sections I.D, II.A.

24. Committee on Toxicity Testing and Assessment of Environmental Agents, National Research Council, Toxicity Testing in the 21st Century: A Vision and a Strategy (2007).

25. For example, undiluted acid on the skin can cause a horrible burn. As the acid is diluted to lower and lower concentrations, less and less of an effect occurs until there is a concentration sufficiently low (e.g., one drop in a bathtub of water, or a sample with less than the acidity of vinegar) that no effect occurs. This no observable effect concentration differs from person to person. For example, a baby's skin is more sensitive than that of an adult, and skin that is irritated or broken responds to the effects of an acid at a lower concentration. However, the key point is that there is some concentration that is completely harmless to the skin.

26. The significance of the NOEL was relied on by the court in *Graham v. Canadian National Railway Co.,* 749 F. Supp. 1300 (D. Vt. 1990), in granting judgment for the defendants. The court found the defendants' expert, a medical toxicologist, persuasive. The expert testified that the plaintiffs' injuries could not have been caused by herbicides, because their exposure was well below the reference dose, which he calculated by taking the NOEL and decreasing it by a safety factor to ensure no human effect. *Id.* at 1311–12 & n.11. *But see* Louderback v. Orkin Exterminating Co., 26 F. Supp. 2d 1298 (D. Kan. 1998) (failure to consider threshold levels of exposure does not necessarily render expert's opinion unreliable where temporal relationship, scientific literature establishing an association between exposure and various symptoms, plaintiffs' medical records and history of disease, and exposure to or

EXHIBIT C

*Reference Manual on Scientific Evidence*

observe an effect, the level is sometimes lowered once more sophisticated methods of detection are developed.

### d. Benchmark dose

For regulatory toxicology, the NOEL is being replaced by a more statistically robust approach known as the benchmark dose (BD). The BD is determined based on dose–response modeling and is defined as the exposure associated with a specified low incidence of risk, generally in the range of 1% to 10%, of a health effect, or the dose associated with a specified measure or change of a biological effect. To model the BD, sufficient data must exist, such as at least a statistically or biologically significant dose-related trend in the selected end point.[27]

### e. No-threshold model and determination of cancer risk

Certain genetic mutations, such as those leading to cancer and some inherited disorders, are believed to occur without any threshold. In theory, the cancer-causing mutation to the genetic material of the cell can be produced by any one molecule of certain chemicals. The no-threshold model led to the development of the one-hit theory of cancer risk, in which each molecule of a cancer-causing chemical has some finite possibility of producing the mutation that leads to cancer. (See Figure 1 for an idealized comparison of a no-threshold and threshold dose–response.) This risk is very small, because it is unlikely that any one molecule of a potentially cancer-causing agent will reach that one particular spot in a specific cell and result in the change that then eludes the body's defenses and leads to a clinical case of cancer. However, the risk is not zero. The same model also can be used to predict the risk of inheritable mutational events.[28]

---

the presence of other disease-causing factors were all considered). *See also* DiPirro v. Bondo Corp., 62 Cal. Rptr. 3d 722, 750 (Cal. Ct. App. 2007) (judgment for the maker of auto touchup paint based on finding that there was substantial evidence in the record to show that the level of a particular toxin [toluene] present in the paint fell 1000 times below the NOEL of that toxin and therefore no warning label needed on paint can).

27. *See* S. Sand et al., *The Current State of Knowledge on the Use of the Benchmark Dose Concept in Risk Assessment*, 28 J. Appl. Toxicol. 405–21 (2008); W. Slob et al., *A Statistical Evaluation of Toxicity Study Designs for the Estimation of the Benchmark Dose in Continuous Endpoints,* 84 Toxicol. Sci. 167–85 (2005). Courts also recognize the benchmark dose. *See, e.g.,* Am. Forest & Paper Ass'n Inc. v. EPA, 294 F.3d 113, 121 (D.C. Cir. 2002) (EPA's use of benchmark dose takes into account comprehensive dose–response information unlike NOEL and thus its use was not arbitrary in determining that methanol should remain on the list of hazardous air pollutants); California v. Tri-Union Seafoods, LLC, 2006 WL 1544384 (Cal. Super. Ct. May 11, 2006) (benchmark dose should not be equated with LOEL (lowest observable effect level) and thus toxicologist's testimony regarding methylmercury in tuna was unreliable for purposes of California's Proposition 65).

28. For further discussion of the no-threshold model of carcinogenesis, see James E. Klaunig & Lisa M. Kamendulis, *Chemical Carcinogens, in* Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 3, at 329. *But see* V.P. Bond et al., *Current Misinterpretations of the Linear No-Threshold*

**EXHIBIT C**

*Reference Guide on Toxicology*

Figure 1. Idealized comparison of a no-threshold and threshold dose–response
relationship.



*Hypothesis*, 70 Health Physics 877 (1996); Marvin Goldman, *Cancer Risk of Low-Level Exposure*, 271 Science 1821 (1996).

Although the one-hit model explains the response to most carcinogens, there is accumulating evidence that for certain cancers there is in fact a multistage process and that some cancer-causing agents, so-called epigenetic or nongenotoxic agents, act through nonmutational processes, Committee on Risk Assessment Methodology, National Research Council, Issues in Risk Assessment 34–35, 187, 198–201 (1993). For example, the multistage cancer process may explain the carcinogenicity of benzo[a]pyrene (produced by the combustion of hydrocarbons such as oil) and chlordane (a termite pesticide). However, nonmutational responses to asbestos, dioxin, and estradiol cause their carcinogenic effects. The appropriate mathematical model to use to depict the dose–response relationship for such carcinogens is still a matter of debate. *Id*. at 197–201. Proposals have been made to merge cancer and noncancer risk assessment models. Committee on Improving Risk Analysis Approaches Used by the U.S. EPA, National Research Council, Toward a Unified Approach to Dose–Response Assessment 127–87 (2009).

Courts continue to grapple with the no-threshold model. *See, e.g., In re* W.R. Grace & Co. 355 B.R. 462, 476 (Bankr. D. Del. 2006) (the "no threshold model . . . flies in the face of the toxicological law of dose-response . . . doesn't satisfy *Daubert,* and doesn't stand up to scientific scrutiny"); Cano v. Everest Minerals Corp., 362 F. Supp. 2d 814, 853–54 (W.D. Tex. 2005) (even accepting the linear, no-threshold model for uranium mining and cancer, it is not enough to show exposure, you must show causation as well). Where administrative rulemaking is the issue, the no-threshold model has been accepted by some courts. *See, e.g.,* Coalition for Reasonable Regulation of Naturally

643

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

f. Maximum tolerated dose and chronic toxicity tests

Another type of study uses different doses of a chemical agent to establish over a 90-day period what is known as the maximum tolerated dose (MTD) (the highest dose that does not cause significant overt toxicity). The MTD is important because it enables researchers to calculate the dose of a chemical to which an animal can be exposed without reducing its lifespan, thus permitting the evaluation of the chronic effects of exposure.[29] These studies are designed to last the lifetime of the species.

Chronic toxicity tests evaluate carcinogenicity or other types of toxic effects. Federal regulatory agencies frequently require carcinogenicity studies on both sexes of two species, usually rats and mice. A pathological evaluation is done on the tissues of animals that died during the study and those that are sacrificed at the conclusion of the study.

The rationale for using the MTD in chronic toxicity tests, such as carcinogenicity bioassays, often is misunderstood. It is preferable to use realistic doses of carcinogens in all animal studies. However, this leads to a loss of statistical power, thereby limiting the ability of the test to detect carcinogens or other toxic compounds. Consider the situation in which a realistic dose of a chemical causes a tumor in 1 in 100 laboratory animals. If the lifetime background incidence of tumors in animals without exposure to the chemical is 6 in 100, a toxicological test involving 100 control animals and 100 exposed animals who were fed the realistic dose would be expected to reveal 6 control animals and 7 exposed animals with the cancer. This difference is too small to be recognized as statistically significant. However, if the study started with 10 times the realistic dose, the researcher would expect to get 10 additional cases for a total of 16 cases in the exposed group and 6 cases in the control group, a significant difference that is unlikely to be overlooked.

Unfortunately, even this example does not demonstrate the difficulties of determining risk. Regulators are responding to public concern about cancer by regulating risks often as low as 1 in 1,000,000—not 1 in 100, as in the example given above. To test risks of 1 in 1,000,000, a researcher would have to either increase the lifetime dose from 10 times to 100,000 times the realistic dose or

Occurring Substances v. Cal. Air Res. Bd., 19 Cal. Rptr. 3d 635, 641 (Cal. Ct. App. 2004) (use of the no-threshold model to establish no safe level of asbestos exposure by regulatory agency upheld).

29. Even the determination of the MTD can be fraught with controversy. *See, e.g.,* Simpson v. Young, 854 F.2d 1429, 1431 (D.C. Cir. 1988) (petitioners unsuccessfully argued that FDA improperly certified color additive Blue No. 2 dye as safe because researchers failed to administer the MTD to research animals, as required by FDA protocols); Valentine v. PPG Indus., Inc., 821 N.E.2d 580, 607–08 (Ohio Ct. App. 2004) (summary judgment for defendant upheld based in part on expert's observation that "there is no reliable or reproducible epidemiological evidence that shows that chemicals capable of causing brain tumors in animals at maximum tolerated doses over a lifetime can cause brain tumors in humans. The biological plausibility of those chemicals causing brain tumors in humans is lacking.").

*See* L.R. Rhomberg et al., *Issues in the Design and Interpretation of Chronic Toxicity and Carcinogenicity Studies in Rodents: Approaches to Dose Selection,* 37 Crit. Rev. Toxicol. 729–837 (2007).

**EXHIBIT C**

*Reference Guide on Toxicology*

expand the numbers of animals under study into the millions. However, increases of this magnitude are beyond the world's animal testing capabilities and are also prohibitively expensive. Inevitably, then, animal studies must trade statistical power for extrapolation from higher doses to lower doses.

Accordingly, proffered toxicological expert opinion on potentially cancer-causing chemicals almost always is based on a review of research studies that extrapolate from animal experiments involving doses significantly higher than that to which humans are exposed.[30] Such extrapolation is accepted in the regulatory arena. However, in toxic tort cases, experts often use additional background information[31] to offer opinions about disease causation and risk.[32]

## 2. In vitro research

In vitro research concerns the effects of a chemical on human or animal cells, bacteria, yeast, isolated tissues, or embryos. Thousands of in vitro toxicological tests have been described in the scientific literature. Many tests are for mutagenesis in bacterial or mammalian systems. There are short-term in vitro tests for just about every physiological response and every organ system, such as perfusion tests and DNA studies. Relatively few of these tests have been validated by replication in many different laboratories or by comparison with outcomes in animal studies to determine if they are predictive of whole animal or human toxicity.[33] However, these tests, and their validation, are becoming increasingly important.

---

30. *See, e.g.,* International Agency for Research on Cancer, World Health Organization, *Preamble, in* 63 IARC Monographs on the Evaluation of Carcinogenic Risks to Humans 9, 17 (1995); James Huff, *Chemicals and Cancer in Humans: First Evidence in Experimental Animals*, 100 Envtl. Health Persp. 201, 204 (1993); Joseph V. Rodricks, *Evaluating Disease Causation in Humans Exposed to Toxic Substances*, 14 J.L. & Pol'y 39 (2006).

31. Central to offering an expert opinion on specific causation is a comparison of the estimated risk with the likelihood of the adverse event if the individual had not suffered the alleged exposure. This will differ depending on factors specific to that individual, including age, gender, medical history, and competing exposures.

Researchers have developed numerous biomathematical formulas to provide statistical bases for extrapolation from animal data to human exposure. *See generally* S.C. Gad, Statistics and Experimental Design for Toxicologists (4th ed. 2005). *See also infra* Sections III, IV.

32. Policy arguments concerning extrapolation from high doses to low doses are explored in Troyen A. Brennan & Robert F. Carter, *Legal and Scientific Probability of Causation of Cancer and Other Environmental Disease in Individuals*, 10 J. Health Pol., Pol'y & L. 33 (1985). For a general discussion of dose issues in toxic torts, see also Bernard D. Goldstein, *Toxic Torts: The Devil Is in the Dose*, 16 J.L. & Pol'y 551–85 (2008).

33. *See* R. Julian Preston & George R. Hoffman, *Genetic Toxicology, in* Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 3, at 381, 391–404. Use of in vitro data for evaluating human mutagenicity and teratogenicity is described in John M. Rogers & Robert J. Kavlock, *Developmental Toxicology, in* Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 3, at 415, 436–40. For a critique of expert testimony using in vitro data, see Wade-Greaux v. Whitehall Laboratories, Inc., 874 F. Supp. 1441, 1480 (D.V.I. 1994), *aff'd*, 46 F.3d 1120 (3d Cir. 1994); *In re* Welding Fume Prods. Liab. Litig., 2006 WL 4507859, at *13 (N.D. Ohio Aug. 8, 2005)

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

The criteria of reliability for an in vitro test include the following: (1) whether the test has come through a published protocol in which many laboratories used the same in vitro method on a series of unknown compounds prepared by a reputable organization (such as the National Institutes of Health (NIH) or the International Agency for Research on Cancer (IARC)) to determine if the test consistently and accurately measures toxicity, (2) whether the test has been adopted by a U.S. or international regulatory body, and (3) whether the test is predictive of in vivo outcomes related to the same cell or target organ system.

## D. *Extrapolation from Animal and Cell Research to Humans*

Two types of extrapolation must be considered: from animal data to humans and from higher doses to lower doses.[34] In qualitative extrapolation, one can usually rely on the fact that a compound causing an effect in one mammalian species will cause it in another species. This is a basic principle of toxicology and pharmacology. If a heavy metal, such as mercury, causes kidney toxicity in laboratory animals, it is highly likely to do so at some dose in humans. However, the dose at which mercury causes this effect in laboratory animals is modified by many internal factors, and the exact dose–response curve may be different from that for humans. Through the study of factors that modify the toxic effects of chemicals, including absorption, distribution, metabolism, and excretion, researchers can improve the ability to extrapolate from laboratory animals to humans and from higher to lower doses.[35] The mathematical depiction of the process by which an external dose moves through various compartments in the body until it reaches the target organ is often called physiologically based pharmacokinetics or toxicokinetics.[36]

Extrapolation from studies in nonmammalian species to humans is much more difficult but can be done if there is sufficient information on similarities in absorp-

(Toxicologist qualified to testify on relationship between welding fumes and Parkinson's disease including epidemiology and animal and in vitro toxicology studies).

34. *See* J.V. Rodricks et al., *Quantitative Extrapolations in Toxicology, in* Principles and Methods of Toxicology 365 (A. Wallace Hayes ed., 5th ed. 2008).

35. For example, benzene undergoes a complex metabolic sequence that results in toxicity to the bone marrow in all species, including humans. Robert Snyder, *Xenobiotic Metabolism and the Mechanism(s) of Benzene Toxicity*, 36 Drug Metab. Rev. 531, 547 (2004).

The exact metabolites responsible for this bone marrow toxicity are the subject of much interest but remain unknown. Mice are more susceptible to benzene than are rats. If researchers could determine the differences between mice and rats in their metabolism of benzene, they would have a useful clue about which portion of the metabolic scheme is responsible for benzene toxicity to the bone marrow. *See, e.g.,* Lois D. Lehman–McKeeman, *Absorption, Distribution, and Excretion of Toxicants*, *in* Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 3, at 131; Andrew Parkinson & Brian W. Ogilvie, *Biotransformation of Xenobiotics*, *in* Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 3, at 161.

36. For an analysis of methods used to extrapolate from animal toxicity data to human health effects, see references cited in notes 21 and 22, *supra.*

EXHIBIT C

*Reference Guide on Toxicology*

tion, distribution, metabolism, and excretion. Advances in computational toxicology have increased the ability of toxicologists to make such extrapolations.[37] Quantitative determinations of human toxicity based on in vitro studies usually are not considered appropriate. As discussed in Section I.F, in vitro or animal data for elucidating the mechanisms of toxicity are more persuasive when positive human epidemiological data or toxicological information also exists.[38]

## E. Safety and Risk Assessment

Toxicological expert opinion also relies on formal safety and risk assessments. Safety assessment is the area of toxicology relating to the testing of chemicals and drugs for toxicity. It is a relatively formal approach in which the potential for toxicity of a chemical is tested in vivo or in vitro using standardized techniques. The protocols for such studies usually are developed through scientific consensus and are subject to oversight by governmental regulators or other watchdog groups.

After a number of bad experiences, including outright fraud, government agencies have imposed codes on laboratories involved in safety assessment, including industrial, contract, and in-house laboratories.[39] Known as good laboratory practices (GLPs), these codes govern many aspects of laboratory standards, including such details as the number of animals per cage, dose and chemical verification, and the handling of tissue specimens. GLPs are remarkably similar across agencies, but the tests called for differ depending on the mission. For example, there are major differences between FDA's and EPA's required procedures for testing drugs

---

37. *See* R.J. Kavlock et al., *Computational Toxicology: A State of the Science Mini Review*, 103 Toxicological Sci. 14–27 (2008). *See also* D. Malacarne et al., *Relationship Between Molecular Connectivity and Carcinogenic Activity: A Confirmation with a New Software Program Based on Graph Theory*, 101 Envtl. Health Persp. 331–42 (1993), for validation of the use of a computational structure–based approach to carcinogenicity originally proposed by H.S. Rosenkranz & G. Klopman, *Structural Basis of Carcinogenicity in Rodents of Genotoxicants and Non-genotoxicants*, 228 Mutat. Res. 105–24 (1990). Structure–activity relationships have also been used to extend the threshold concept in toxicology to look at low-dose exposures to agents present in foods or cosmetics. *See* R. Kroes et al., *Structure-Based Thresholds of Toxicological Concern (TTC): Guidance for Application to Substances Present at Low Levels in the Diet*, 42 Food Chem. Toxicol. 65–83 (2004).

38. An example of toxicological information in humans that is pertinent to extrapolation is the finding in human urine of a carcinogenic metabolite found in studies of the same compound in laboratory animals. *See, e.g.,* Goewey v. United States, 886 F. Supp. 1268, 1280–81 (D.S.C. 1995) (extrapolation of neurotoxic effects from chickens to humans unwarranted without human confirmation).

39. A dramatic case of fraud involving a toxicology laboratory that performed tests to assess the safety of consumer products is described in *United States v. Keplinger,* 776 F.2d 678 (7th Cir. 1985). Keplinger and the other defendants in this case were toxicologists who were convicted of falsifying data on product safety by underreporting animal morbidity and mortality and omitting negative data and conclusions from their reports. For further discussion of reviewing animal studies in light of the FDA's Good Laboratory Practice guidelines, see Eli Lilly & Co. v. Zenith Goldline Pharm., Inc. 364 F. Supp. 2d 820, 860 (S.D. Ind. 2005).

EXHIBIT C

*Reference Manual on Scientific Evidence*

and environmental chemicals.[40] FDA requires and specifies both efficacy and safety testing of drugs in humans and animals. Carefully controlled clinical trials using doses within the expected therapeutic range are required for premarket testing of drugs because exposures to prescription drugs are carefully controlled and should not exceed specified ranges or uses. However, for environmental chemicals and agents, no premarket testing in humans is required by EPA. New European Union Regulation on Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH) requires extensive testing of new chemicals and chemicals in commerce.[41] Moreover, because exposures are less predictable, doses usually are given in a wider range in animal tests for nonpharmaceutical agents.[42]

Because exposures to environmental chemicals may continue over a lifetime and affect both young and old, test designs called lifetime bioassays have been developed in which relatively high doses are given to experimental animals. The interpretation of results requires extrapolation from animals to humans, from high to low doses, and from short exposures to multiyear estimates. It must be emphasized that less than 1% of the 60,000 to 75,000 chemicals in commerce have been subjected to a full safety assessment, and there are significant toxicological data on

40. *See, e.g.,* 40 C.F.R. Parts 160, 792 (1993); Lu, *supra* note 22, at 89. There is a major difference between the information needed to establish a regulatory standard or tolerance, and that needed to establish causation for clinical or tort purposes.

41. For comparison of Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq. (1978) and REACH, see E. Donald Elliott, Trying to Fix TSCA § 6: Lessons from REACH, Proposition 65, and the Clean Air Act, *available at* http://www.ucis.pitt.edu/euce/events/policyconf/07/PDFs/Elliott. pdf. For issues related to the intentional testing of environmental chemicals in humans, see Committee on the Use of Third Party Toxicity Research with Human Research Participation, National Research Council, Intentional Human Dosing Studies for EPA Regulatory Purposes: Scientific and Ethical Issues (2004).

42. It must be appreciated that the development of a new drug inherently requires searching for an agent that at useful doses has a biological effect (e.g., decreasing blood pressure), whereas those developing a new chemical for consumer use (e.g., a house paint) hope that at usual doses no biological effects will occur. There are other compounds, such as pesticides and antibacterial agents, for which a biological effect is desired, but it is intended that at usual doses humans will not be affected. These different expectations are part of the rationale for the differences in testing information available for assessing toxicological effects. Under FDA rules, approval of a new drug usually will require extensive animal and human testing, including a randomized double-blind clinical trial for efficacy and toxicity. In contrast, under TSCA, the only requirement before a new chemical can be marketed is that a premanufacturing notice be filed with EPA, including any toxicity data in the company's possession. EPA reviews this information, along with structure–activity relationship modeling, in order to determine whether any restrictions on release should be imposed. For existing chemicals, EPA may require companies to undertake animal and in vitro tests if the chemical may present an unreasonable risk to health. The lack of toxicity data for most chemicals in commerce has led EPA to propose methods of evaluation using in vitro toxicity pathway testing, followed by whole-animal testing where warranted. *See* Committee on Toxicity Testing and Assessment of Environmental Agents, National Research Council, Toxicity Testing in the 21st Century: A Vision and a Strategy (2007); U.S. Environmental Protection Agency, Strategic Plan for Evaluating the Toxicity of Chemicals (March 2009), *available at* http://www.epa.gov/spc/toxicitytesting.

EXHIBIT C

*Reference Guide on Toxicology*

only 10% to 20% of them. Under the current U.S. and international approaches to testing chemicals with high production volume, and with the advent of the REACH legislation, the extent of toxicological information is expanding rapidly.[43]

Risk assessment is an approach increasingly used by regulatory agencies to estimate and compare the risks of hazardous chemicals and to assign priority for avoiding their adverse effects.[44] The National Academy of Sciences defines four components of risk assessment: hazard identification, dose–response estimation, exposure assessment, and risk characterization.[45]

Risk assessment is not an exact science. It should be viewed as a useful framework to organize and synthesize information and to provide estimates on which policymaking can be based. In recent years, codification of the methodology used to assess risk has increased confidence that the process can be reasonably free of bias; however, significant controversy remains, particularly when actual data are limited and generally conservative default assumptions are used.[46]

Although risk assessment information about a chemical can be somewhat useful in a toxic tort case, at least in terms of setting reasonable boundaries regarding the likelihood of causation, the impetus for the development of risk assessment has been the regulatory process, which has different goals.[47] Because of their

43. *See* John S. Applegate, *The Perils of Unreasonable Risk: Information, Regulatory Policy, and Toxic Substances Control*, 261 Colum. L. Rev. 264–66 (1991) for a discussion of REACH and its potential impact on the availability of toxicological and risk information. *See* Sven O. Hanssen & Christina Ruden, *Priority Setting in the REACH System*, 90 Toxicological Sci. 304–08 (2005), for a discussion of the toxicological needs for REACH and its reliance on exposure.

44. The use of risk assessment by regulatory agencies was spurred by the Supreme Court's decision in *Industrial Union Dep't, AFL-CIO v. American Petroleum Institute,* 448 U.S. 607 (1980). A plurality of the court overturned the Occupational Safety and Health Administration's (OSHA) attempt to regulate benzene based on the intrinsic hazard of benzene being a human carcinogen. Instead, by requiring a risk assessment, the inclusion of exposure assessment and dose–response evaluation became a customary part of regulatory assessment. *See* John S. Applegate, *supra* note 43.

45. *See generally* National Research Council, Risk Assessment in the Federal Government: Managing the Process (1983); Bernard D. Goldstein, *Risk Assessment and the Interface Between Science and Law*, 14 Colum. J. Envtl. L. 343 (1989). Recently, a National Academy of Sciences panel has discussed potential approaches to updating the risk paradigm. *See* Committee on Improving Risk Analysis Approaches Used by the U.S. EPA, *supra* note 28.

46. An example of conservative default assumptions can be found in Superfund risk assessment. EPA has determined that Superfund sites should be cleaned up to reduce cancer risk from 1 in 10,000 to 1 in 1,000,000. A number of assumptions can go into this calculation, including conservative assumptions about intake, exposure frequency and duration, and cancer-potency factors for the chemicals at the site. *See, e.g.,* Robert H. Harris & David E. Burmaster, *Restoring Science to Superfund Risk Assessment*, 6 Toxics L. Rep. 1318 (1992).

47. *See* Committee on Improving Risk Analysis Approaches Used by the U.S. EPA, *supra* note 28. *See also* Rhodes v. E.I. du Pont de Nemours & Co., 253 F.R.D. 365, 377–78 (S.D. W. Va. 2008) (putative class-action plaintiffs alleging that contamination of their drinking water with industrial perfluorooctanoic acid entitled them to medical monitoring could not rely upon regulatory risk assessment that does not provide the requisite reasonable certainty required to show a medical monitoring injury). Risk assessment also has come under heavy criticism from those who prefer the precautionary

EXHIBIT C

*Reference Manual on Scientific Evidence*

use of appropriately prudent assumptions in areas of uncertainty and their use of default assumptions when there are limited data, risk assessments often intentionally encompass the upper range of possible risks.[48] An additional issue, particularly related to cancer risk, is that standards based on risk assessment often are set to avoid the risk caused by lifetime exposure at this level. Exposure to levels exceeding this standard for a small fraction of a lifetime does not mean that the overall lifetime risk of regulatory concern has been exceeded.[49]

## 1. The use of toxicological information in risk assessment

Risk assessment as practiced by government agencies involved in regulating exposure to environmental chemicals is highly dependent upon the science of toxicology and on the information derived from toxicological studies. EPA, FDA, OSHA, the Consumer Product Safety Commission, and other international (e.g., the World Trade Organization), national, and state agencies use risk assessment as a means to protect workers or the public from adverse effects.[50] Acceptable risk levels, for example, 1 in 1000 to 1 in 1,000,000, are usually well below what

principle as an alternative. For advocacy of the precautionary principle, see Joel A. Tickner, *Precautionary Principle Encourages Policies That Protect Human Health and the Environment in the Face of Uncertain Risks,* 117 Pub. Health Rep. 493–97 (2002). Although variously defined, the precautionary principle in many ways is a hazard-based approach.

48. It is also claimed that standard risk assessment will underestimate true risks, particularly for sensitive populations exposed to multiple stressors, an issue of particular pertinence to discussions of environmental justice. Committee on Environmental Justice, Institute of Medicine, Toward Environmental Justice: Research, Education, and Health Policy Needs (1999). The EPA has been developing formal guidance for cumulative risk assessment, which has been defined as "the combined threats from exposure via all relevant routes to multiple stressors including biological, chemical, physical, and psychosocial entities." Michael A. Callahan & Ken Sexton, *If Cumulative Risk Assessment Is the Answer, What Is the Question?* Envtl. Health Persp. 799–806 (2007). *See also* International Life Sciences Institute, A Framework for Cumulative Risk Assessment Workshop Report (1999). A related issue is aggregate risk assessment, which focuses on exposure to a single agent through multiple routes. For example, swimming in water containing a volatile organic contaminant is likely to lead to exposure through the skin, through inhalation of the contaminant off-gassing just above the water surface, and through swallowing water. For a discussion of aggregate risk assessment, see International Life Science Institute, Aggregate Exposure Assessment Workshop Report (1998). For a study of a child's indoor exposure through different routes to a pesticide, see V.G. Zartarian et al., *A Modeling Framework for Estimating Children's Residential Exposure and Dose to Chlorpyrifos Via Dermal Residue Contact and Nondietary Ingestion,* 108 Envtl. Health Persp. 505–14 (2000).

49. A public health standard to protect against the lifetime risk of inhaling a known carcinogen will usually be based on lifetime exposure calculations of 24 hours a day, everyday for 70 years. This is more than 25,000 days and 600,000 hours. Exceeding this standard for a few hours would presumably have little impact on cancer risk. In contrast, for a short-term standard set to avoid a threshold-based risk, exceeding the standard for this short time may make a major difference, for example, an asthma attack caused by being outdoors on a day that the ozone standard is exceeded.

50. Pharmaceuticals intended for human use are an exception in that a tradeoff between desired and adverse effects may be acceptable, and human data are available prior to, and as a result of, the marketing of the agent.

**EXHIBIT C**

can be measured through epidemiological study. Inevitably, this means that risk assessment is based solely on toxicological data—or, if epidemiological findings of an adverse effect are observed, then toxicological reasoning must be used to extrapolate to the appropriate lower dose standard aimed at protecting the public.

The four-part risk paradigm is heavily based on toxicological precepts. Hazard identification reflects the toxicological "law" of specificity of effects, and dose–response assessment is based upon "the dose makes the poison." The hazard identification process often uses "weight of evidence" approaches in which the toxicological, mechanistic, and epidemiological data are rigorously assessed to form a judgment regarding the likelihood that the agent produces a specific effect.[51] Establishing the appropriate dose–response curve, threshold, or "one-hit" is an exercise in toxicological reasoning. Even for those chemicals known to be carcinogens, a threshold model is appropriate if the toxicological mechanism of action can be demonstrated to depend upon a threshold. Exposure assessment requires knowledge of specific toxicological dynamics; for example, the impact on the lung of an air pollutant varies by factors such as inhalation rate per unit body mass, which is affected by exercise and by age; by the size of a particle or the solubility of a gas, both of which will affect the depth of penetrance into the more sensitive parts of the airways; by the competence of the usual airway defense mechanisms, such as mucus flow and macrophage function; and by the ability of the lung to metabolize the agent.[52]

## F. *Toxicological Processes and Target Organ Toxicity*

The biological, chemical, and physical phenomena that are the basis of life are astounding in their complexity. As a result, human subcellular, cellular, and organ function are both delicately balanced and highly robust. Small changes caused by external chemical and physical agents can have major effects; yet, through the millennia, evolutionary pressures have led to the emergence of safety mechanisms that defend against adverse environmental stresses.

The specialization that is a hallmark of organ development in vertebrates inherently leads to diversity in the underlying processes that are the basis of organ function. Certain chemicals poison virtually all cells by affecting a basic biological process essential to life. For example, cyanide interferes with the conversion of oxygen to energy in a subcellular component known as mitochondria.[53] Other

51.  *See* Section I.F for further discussion of weight-of-evidence approaches to potential human carcinogens.

52.  Some toxic agents pass through the lung without producing any direct effects on this organ. For example, inhaled carbon monoxide produces its toxicity in essence by being treated by the body as if it is oxygen. Carbon monoxide readily combines with the oxygen combining site of hemoglobin, the molecule in red blood cells that is responsible for transporting oxygen from the lung to the tissues. By doing so, the effective transport and tissue utilization of oxygen is blocked.

53.  Note that the diffuse toxicity of cyanide also reflects its ability to spread widely in the body. Certain mitochondrial poisons primarily affect the brain and active muscles, including the heart, which

EXHIBIT C

*Reference Manual on Scientific Evidence*

chemical agents interfere selectively with an organ-specific process. For example, organophosphate pesticides, often known as nerve gases, specifically interact within the specialized intercellular nerve cell transmission of impulses—a process that is pertinent primarily to the nervous system. Table 1 provides arbitrarily selected examples of toxicological end points and agents of concern, which are not meant to be inclusive or exhaustive.

Despite this specialization, there are pathological processes common to diseases affecting many different organs. For example, chronic inflammation of the skin leads to fiber formation that is recognized as scarring. Similarly, cirrhosis of the liver can result from fibrogenic processes caused by repetitive inflammation of the liver, such as from the overuse of ethanol, and fibrosis of the lung is an important pathological process resulting from asbestos, silica, and other agents.[54] The potential for endocrine disruption by chemicals, particularly those that persist within the body, has become an increasing concern. Many of these persistent agents belong to families of chemically similar compounds, such as dioxins or PCBs, that may differ in their effect. Particularly challenging to standard toxicological approaches are agents that react with different receptors present on the surface or internal components of the cell. These receptors often belong to complex families of related cellular components that are continually interacting with the broad range of hormones produced by our bodies.[55] The intricate dynamic processes of normal endocrine activity include feedback loops that allow cyclic variation, such as in the menstrual cycle or in the variation of hormone and receptor levels that are linked to normal functions such as sleeping and sexual activity. These complex normal "up and down" variations produce conceptual difficulties when attempting to extrapolate the results from model systems to the functioning human.[56]

---

are particularly oxygen dependent. Others, unable to penetrate the blood-brain barrier, will primarily affect peripheral muscle including the heart.

54. Lung fibrosis is a key pathological finding in a group of diseases known as pneumoconiosis that includes coal miners' black lung disease, silicosis, asbestosis, and other conditions usually caused by occupational exposures.

55. As a simplification, agent–receptor interactions often are described as a key in a lock, with the key needing to be able to both fit into the lock and turn the mechanism. An example from the nervous system is the use in treating a heroin overdose of another opiate that has a much higher affinity for the receptor site but produces little effect once bound. When given to a normal person, this second opiate would have a mild depressant effect, but it can reverse a near fatal overdose of heroin by displacing the heroin from the receptor site. Thus the directionality of opiate effect depends upon the interaction of the components of the mixture. This interaction is even more complex when dealing with estrogenic agents that are naturally occurring as well as made within the body at different levels in response to different external and internal stimuli and at different time intervals.

56. The complexity of the interaction of a mixture of dioxins with receptors governing the endocrine system can be contrasted with that of the reaction of carbon monoxide with the hemoglobin oxygen receptor discussed in note 52. The latter is unidirectional in that any additional carbon monoxide will interfere with oxygen delivery, of which there cannot be too much under normal physiological conditions.

EXHIBIT C

*Reference Guide on Toxicology*

## Table 1. Sample of Selected Toxicological End Points and Examples of Agents of Concern in Humans[a]

| Organ System | Examples of End Points | Examples of Agents of Concern |
|---|---|---|
| Skin | allergic contact dermatitis | nickel, poison ivy, cutting oils |
| | chloracne | dioxins |
| | cancer | polycyclic aromatic hydrocarbons |
| Respiratory tract | nonspecific irritation (reactive airway disease) | formaldehyde, acrolein, ozone |
| | asthma | toluene diisocyanate |
| | chronic obstructive pulmonary disease | cigarette smoke |
| | fibrosis, pneumoconiosis | silica, mineral dusts, cotton dust |
| | cancer | cigarette smoke, arsenic, asbestos, nickel |
| Blood and the immune system | anemia | arsine, lead, methyldopa |
| | secondary polycythemia | cobalt |
| | methemoglobinemia | nitrites, aniline dyes, dapsone |
| | pancytopenia | benzene, radiation, chemotherapeutic agents |
| | secondary lupus erythematosus | hydralazine |
| | leukemia | benzene, radiation, chemotherapeutic agents |
| Liver and gastrointestinal tract | hepatic damage (hepatitis) | acetaminophen, ethanol, carbon tetrachloride, vitamin A |
| | cancer | aflatoxin, vinyl chloride |
| Urinary tract | kidney toxicity | ethylene and diethylene glycols, lead, melamine, aminoglycoside antibiotics |
| | bladder cancer | aromatic amines |
| Nervous system | nervous system toxicity | cholinesterase inhibitors, mercury, lead, $n$-hexane, bacterial toxins (botulinum, tetanus) |
| | Parkinson's disease | manganese |
| Reproductive and developmental toxicity | fetal malformations | thalidomide, ethanol |

*continued*

653

EXHIBIT C

*Reference Manual on Scientific Evidence*

## Table 1. Continued

| Organ System | Examples of End Points | Examples of Agents of Concern |
| --- | --- | --- |
| Endocrine system | thyroid toxicity | radioactive iodine, perchlorate |
| Cardiovascular system | heart toxicity<br>high blood pressure<br>arrhythmias | anthracyclines, cobalt<br>lead<br>plant glycosides (e.g. digitalis) |

[a]This table presents only examples of toxicological end points and examples of agents of concern in humans and is provided to help illustrate the variety of toxic agents and end points. It is not an exhaustive or inclusive list of organs, end points, or agents. Absence from this list does not indicate a relative lack of evidence for a causal relation as to any agent of concern.

The processes that result in the causation of cancer are also of particular interest to the public, to litigators, and to regulators. A common denominator for the various diseases that fall under the heading of cancer is uncontrolled cellular growth, usually reflecting the failure of the normal progression of precursor cells to maturation and cell death. Central to the mechanism of cancer causation is the production of a genetic change that leads a precursor cell to no longer conform to usual processes that control cell growth. In virtually all cancers, the overgrowth of cells can be traced to a single mutation, such that cancer cells are a clone of the one mutated precursor cell.[57] The understanding of the relationship between mutation and cancer led to some of the first toxicological tests to determine whether an external agent could cause cancer. Such tests have grown in sophistication because of the advances in molecular biology and computational toxicology that have occurred concomitantly with an increased understanding of the variety of potential pathways that lead to mutagenesis.[58]

Toxicological testing for chemical carcinogens ranges from relatively simple studies to determine whether the substance is capable of producing bacterial mutations to observation of cancer incidence as a result of long-term administration of the substance to laboratory animals. Between these two extremes are a multiplicity of tests that build upon the understanding of the mechanism of cancer causation. In vitro or in vivo tests may focus on the evidence of effects in DNA, such as the presence of adducts of the chemical or its metabolites bound to the DNA molecule or the cross-linking of the DNA molecule to protein. Researchers may look for changes in the nucleus of the cell suggestive of DNA damage that could

57. There may, in fact, be multiple mutations as the initial clone of cells undergoes further transformation before or after the cancer becomes clinically manifest.

58. Committee on Toxicity Testing and Assessment of Environmental Agents, National Research Council, Toxicity Testing in the 21st Century: A Vision and a Strategy (2007).

EXHIBIT C

*Reference Guide on Toxicology*

result in mutagenesis and carcinogenesis, for example, the micronucleus test or the comet assay. Certain mutagens cause an increase in the normal exchange of nuclear material among DNA components during normal cell division, which gives rise to a test known as the "sister chromatid exchange."[59] The direct observation of chromosomes to look for specific abnormalities, known as cytogenetic analysis, is providing more information about the pathways of carcinogenesis. For cancers such as acute myelogenous leukemia, it has long been recognized that those individuals who present with recognizable chromosomal abnormalities are more likely to have been exposed to a known human chemical leukemogen such as benzene.[60] But at this time there is no chromosomal abnormality that is unequivocally linked to a specific chemical or physical carcinogen.[61] These and other tests provide information that can be used in evaluating whether a chemical is a potential human carcinogen.

The many tests that are pertinent to estimating whether a chemical or physical agent produces human cancer require careful evaluation. The World Health Organization's (WHO's) IARC and the U.S. National Toxicology Program (NTP) have formal processes to evaluate the weight of evidence that a chemical causes cancer.[62] Each classifies chemicals on the basis of epidemiological evidence, toxicological findings in laboratory animals, and mechanistic considerations, and then assigns a specific category of carcinogenic potential to the individual chemical or exposure situation (e.g., employment as a painter).[63] Only a small percentage of

---

59. All of these tests require validation regarding their relevance to predicting human carcinogenesis, as well as to their technical reproducibility. *See* Raffaella Corvi et al., *ECVAM Retrospective Validation of In Vitro Micronucleus Test*, 23 Mutagenesis 271–83 (2008), for an example of an approach to validating a short-term assay for carcinogenesis.

60. F. Mitelman et al., *Chromosome Pattern, Occupation, and Clinical Features in Patients with Acute Nonlymphocytic Leukemia*, 4 Cancer Genet. & Cytogenet. 197, 214 (1981).

61. *See* Luoping Zhang et al., *The Nature of Chromosomal Aberrations Detected in Humans Exposed to Benzene*, 32 Crit. Rev. Toxicol. 1–42 (2002).

62. The U.S. National Toxicology Program issues a congressionally mandated Report on Carcinogens. The 12th report is available at http://ntp.niehs.nih.gov/ntp/roc/twelfth/roc12.pdf. IARC produces its reports through a monograph series that provides detailed description of the agents or processes under consideration as well as the findings of the IARC expert working group. See the IARC Web site for a list of these monographs (http://monographs.iarc.fr/).

63. IARC uses the following classifications:

> Group 1, The agent (mixture) is carcinogenic to humans;
> Group 2A, The agent (mixture) is probably carcinogenic to humans,
> Group 2B, The agent (mixture) is possibly carcinogenic to humans;
> Group 3, The agent (mixture) is not classifiable as to its carcinogenicity to humans; and
> Group 4, The agent (mixture) is probably not carcinogenic to humans.

Inherent in putting chemicals into distinct categories when there is a continuum for the strength of the evidence is that some chemicals will be very close to the dividing line between the discrete categories. Inevitably, small differences in the interpretation of the evidence for such chemicals will lead to disagreement regarding categorization.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

the total chemicals in commerce are considered to be known human carcinogens. In the past, assignment to the highest category was dependent almost totally on epidemiological evidence, although animal data and mechanistic information were also considered. In recent years, with improved understanding of the mechanism of action of chemical carcinogens, there has been increased use of mechanistic data.[64] For example, higher credence is given to the likelihood that a chemical is a human carcinogen if the metabolite found to be responsible for carcinogenesis in a laboratory animal is also found in the blood or urine of humans exposed to this chemical, or if there is evidence of the same type of DNA damage in humans as there is in laboratory animals in which the agent does cause cancer.[65]

## G. *Toxicology and Exposure Assessment*

In recent decades, exposure assessment has developed into a scientific field with the usual trappings of journals, learned societies, and research funding processes.

---

64. *See* Vincent James Cogliano et al., *Use of Mechanistic Data in IARC Evaluations,* 49 Envt. & Molecular Mutagenesis 100–09 (2008) for a discussion and for specific examples of the use of mechanistic data in evaluating carcinogens. The evolution in the approach to determining cancer causality is evident from reviewing the guidelines used to assemble the weight of evidence for causality by IARC and NTP, two of the organizations that have the lengthiest track record of responsibility for the hazard identification of carcinogens. Both have increased the weight given to mechanistic evidence in characterizing the overall strength of the total evidence used to classify the potential for a chemical or an exposure to be causal. IARC now permits classification in Group 1 when there is less than sufficient evidence in humans but sufficient evidence in animals and "strong evidence in exposed humans that the agent acts through a relevant mechanism of carcinogenicity" *Id*. at 103. The criteria used by NTP for listing a chemical as a known human carcinogen in its biannual Report on Carcinogens is "There is sufficient evidence of carcinogenicity from studies in humans,★ which indicates a causal relationship between exposure to the agent, substance, or mixture, and human cancer." The asterisk is particularly notable in that it specifies that the evidence need not be solely epidemiological: "★This evidence can include traditional cancer epidemiology studies, data from clinical studies, and/or data derived from the study of tissues or cells from humans exposed to the substance in question that can be useful for evaluating whether a relevant cancer mechanism is operating in people." *See* National Toxicology Program, U.S. Dep't of Health and Human Servs., Report of Carcinogens (12th ed. 2011), at 4, *available at* http://ntp.niehs.nih.gov/ntp/roc/twelfth/roc12.pdf.

EPA also considers mechanism of action in its regulatory approaches and distinguishes further between mechanism of action and mode of action. *See* Katherine Z. Guyton et al., *Improving Prediction of Chemical Carcinogenicity by Considering Multiple Mechanisms and Applying Toxicogenomic Approaches,* 681 Mutation Res. 230, 240 (2009); Katherine Z. Guyton et al., *Mode of Action Frameworks: A Critical Analysis,* 11 J. Toxicol. & Envtl. Health Part B 16, 31 (2008).

65. A recent example is the IARC evaluation of formaldehyde that upgraded the categorization from 2A to 1 based upon epidemiological data that were strongly supported by the finding of nasal cancer in laboratory animals and by the presence of DNA–protein cross-links in the nasal tissue of the laboratory animals and of humans inhaling formaldehyde. However, epidemiological evidence associating formaldehyde with human acute myelogenous leukemia was questioned on the basis of the lack of mechanistic evidence, including questions about how such a highly reactive agent could reach the bone marrow following inhalation. *See Formaldehyde, 2-Butoxyethanol and 1-*tert-*Butoxypropan-2-ol, in* 88 IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (2006).

**EXHIBIT C**

*Reference Guide on Toxicology*

Exposure assessment methodologies include mathematical models predicting exposure resulting from an emission source, which might be a long distance upwind; chemical or physical measurements of media such as air, food, and water; and biological monitoring within humans, including measurements of blood and urine specimens. An exposure assessment should also look for competing exposures. In this continuum of exposure metrics, the closer to the human body, the greater the overlap with toxicology.[66]

Exposure assessment is central to epidemiology as well. Many of the causal associations between chemicals and human disease have been developed from epidemiological studies relating a workplace chemical to an increased risk of the specific disease in cohorts of workers, often with only a qualitative assessment of exposure. An improved quantitative understanding of such exposures enhances the likelihood of observing causal relations.[67] It also can provide the information needed by the expert toxicologist to opine on the likelihood that a specific exposure was responsible for an adverse outcome.

## H. Toxicology and Epidemiology

Epidemiology is the study of the incidence and distribution of disease in human populations. Clearly, both epidemiology and toxicology have much to offer in elucidating the causal relationship between chemical exposure and disease.[68] These

66. Toxicologists also have indirect means of approaching exposure through symptoms. For many agents, there is a known threshold for smell and a reasonable range of levels that might cause symptoms. For example, the use of toxicological expertise is appropriate in a situation in which chronic exposure to a volatile hydrocarbon is alleged to have occurred at levels at which acute exposure would be expected to render the individual unconscious. Toxicologists may also contribute knowledge of the extent of individual exposure based upon appropriate assumptions concerning inhalation rate or water use; for example, children inhale more per body mass than do adults, and outdoor workers in hot climates will drink more fluids.

67. In terms of general causation, accurate exposure assessment is important because a true effect can be missed because of the confounding caused by cohorts that often include workers with little exposure to the putative offending agent, thereby diluting the actual effect. *See* Peter F. Infante, *Benzene Exposure and Multiple Myeloma: A Detailed Meta-analysis of Benzene Cohort Studies,* 1976 Ann. N.Y. Acad. Sci. 90–109 (2006), for a discussion of this issue in relation to a meta-analysis of the potential causative role of benzene in multiple myeloma. On the other hand, an association between exposure and effect occurring solely by chance is more likely if the effect does not meet the expected standard of being more pronounced in those receiving the highest dose. *See* Bernard D. Goldstein, *Toxic Torts: The Devil Is in the Dose*, 16 J.L. & Pol'y 551–85 (2008). Setting regulatory standards based upon the observed effect in a cohort often requires a risk assessment, which in turn is dependent on understanding the extent of the exposure. This has led to extensive retrospective reconstruction of exposure in key cohorts.

68. *See* Michael D. Green et al., Reference Guide on Epidemiology, Section V, in this manual. For example, in *Norris v. Baxter Healthcare,* 397 F.3d 878, 882 (10th Cir. 2005), testimony was excluded as unreliable in which the expert ignored epidemiological studies that conflicted with the expert's opinion. However, epidemiological studies are not always necessary. Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 999 (8th Cir. 2001).

**EXHIBIT C**

sciences often go hand in hand with assessments of the risks of chemical exposure, without artificial distinctions being drawn between them. However, although courts generally rule epidemiological expert opinion admissible, the admissibility of toxicological expert opinion has been more controversial because of uncertainties regarding extrapolation from animal and in vitro data to humans. This particularly has been true in cases in which relevant epidemiological research data exist. However, the methodological weaknesses of some epidemiological studies, including their inability to accurately measure exposure and their small numbers of subjects, render these studies difficult to interpret.[69] In contrast, because animal and cell studies permit researchers to isolate the effects of exposure to a single chemical or to known mixtures, toxicological findings offer unique information concerning dose–response relationships, mechanisms of action, specificity of response, and other information relevant to the assessment of causation.[70]

The gold standard in clinical epidemiology and in the testing of pharmaceutical agents is the randomized double-blind cohort study in which the control and intervention groups are perfectly matched. Although appropriate and very informative for the testing of pharmaceutical agents, it is generally unethical for chemicals used for other purposes. The randomized control design in essence is what is used in a classic toxicological study in laboratory animals, although matching is more readily achieved because the animals are genetically similar and have identical environmental histories.

Dose issues are at the interface between toxicology and epidemiology. Many epidemiological studies of the potential risk of chemicals do not have direct information about dose, although qualitative differences among subgroups or in comparison with other studies can be inferred. The epidemiology database includes many studies that are probing for the potential for an association between a cause and an effect. Thus a study asking all those suffering from a specific disease a multiplicity of questions related to potential exposures is bound to find some statistical association between the disease and one or more exposure conditions. Such studies generate hypotheses that can then be evaluated more thoroughly by subsequent studies that more narrowly focus on the potential cause-and-effect

69. *Id. See also* Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

70. Both commonalities and differences between animal responses and human responses to chemical exposures were recognized by the court in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Pendergrass,* 878 F.2d 389 (D.C. Cir. 1989). In reviewing the results of both epidemiological and animal studies on formaldehyde, the court stated: "Humans are not rats, and it is far from clear how readily one may generalize from one mammalian species to another. But in light of the epidemiological evidence [of carcinogenicity] that was not the main problem. Rather it was the absence of data at low levels." *Id.* at 394. The court remanded the matter to OSHA to reconsider its findings that formaldehyde presented no specific carcinogenic risk to workers at exposure levels of 1 part per million or less. *See also* Hopkins v. Dow Corning Corp., 33 F.3d 1116 (9th Cir. 1994); *In re* Accutane Prod. Liab., 511 F. Supp. 2d 1288, 1292 (M.D. Fla. 2007); United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 182 (D.D.C. 2006); Ambrosini v. Labarraque, 101 F.3d 129, 141 (D.C. Cir. 1996).

EXHIBIT C

*Reference Guide on Toxicology*

relation. One way to evaluate the strength of the association is to assess whether those epidemiological studies evaluating cohorts with relatively high exposure observe the association.[71]

The requirement in certain jurisdictions for epidemiological evidence of a relative risk greater than two (RR > 2) for general causation also has limited the utilization of toxicological evidence.[72] A firm requirement for such evidence means that if the epidemiological database showed statistically significant evidence that cohorts exposed to 10 parts per million of an agent for 20 years produced an 80% increase in risk, the court could not hear the case of a plaintiff alleging that exposure to 50 parts per million for 20 years of the same agent caused the adverse outcome. Yet to a toxicologist there would be little question that exposure to the fivefold higher dose would lead to more than a doubling of the risk, all other facets of the case being similar.

Even though there is little toxicological data on many of the 75,000 compounds in general commerce, there is far more information from toxicological studies than from epidemiological studies.[73] It is much easier, and more economical, to expose an animal to a chemical or to perform in vitro studies than it is to perform epidemiological studies. This difference in data availability is evident even for cancer causation, for which toxicological study is particularly expensive and time-consuming. Of the perhaps two dozen chemicals that reputable international authorities agree are known human carcinogens based on positive epidemiological studies, arsenic is the only one not known to be an animal carcinogen. Yet there are more than 100 known animal carcinogens for which there is no valid epidemiological database, and others for which the epidemiological database has been

71. For common chemicals, it is not unusual that a literature search reveals an association with virtually any disease. As an example of considering dose issues across epidemiological studies, see Luoping Zhang et al., *Formaldehyde Exposure and Leukemia: A New Meta-Analysis and Potential Mechanisms,* 681 Mutat. Res. 150–68 (2008). The subject of the strength of an epidemiological association and its relation to causality is considered in Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

72. The basis for the use of RR > 2 is the translation of the preponderance of evidence, or "more likely than not," as a basis for tort law into at least a doubling of risk. An example is the Havner rule in Texas, which for general causation requires that there be at least two epidemiological studies with a statistically significant RR > 2 associating a putative cause with an effect (Merrell Dow Pharms. v. Havner, 953 S.W.2d 706, 716 (Tex. 1997)). For a discussion of the use by jurisdictions of relative risk > 2 for general and specific causation, see Russellyn S. Carruth & Bernard D. Goldstein, *Relative Risk GreaterThan Two in Proof of Causation in Toxic Tort Litigation*, 41 Jurimetrics 195 (2001); for the toxicological issues, see Bernard D. Goldstein, *Toxic Torts: The Devil Is in the Dose,* 16 J.L. & Pol'y 551–85 (2008).

73. *See generally* Committee on Toxicity Testing and Assessment of Environmental Agents, *supra* note 24. *See also* National Research Council, Toxicity Testing: Strategies to Determine Needs and Priorities (1984); Myra Karstadt & Renee Bobal, *Availability of Epidemiologic Data on Humans Exposed to Animal Carcinogens*, 2 Teratogenesis, Carcinogenesis & Mutagenesis 151 (1982); Lorenzo Tomatis et al., *Evaluation of the Carcinogenicity of Chemicals: A Review of the Monograph Program of the International Agency for Research on Cancer*, 38 Cancer Res. 877, 881 (1978).

EXHIBIT C

*Reference Manual on Scientific Evidence*

equivocal.[74] To clarify any findings, regulators can require a repeat of an equivocal 2-year animal toxicological study or the performance of additional laboratory studies in which animals deliberately are exposed to the chemical. Such deliberate exposure is not possible in humans. As a general rule, unequivocally positive epidemiological studies reflect prior workplace practices that led to relatively high levels of chemical exposure for a limited number of individuals and that, fortunately, in most cases no longer occur now. Thus an additional prospective epidemiological study often is not possible, and even the ability to do retrospective studies is constrained by the passage of time.

In essence, epidemiological findings of an adverse effect in humans represent a failure of toxicology as a preventive science or of regulatory authorities or other responsible parties in controlling exposure to a hazardous chemical or physical agent. A corollary of the tenet that, depending upon dose, all chemical and physical agents are harmful, is that society depends upon toxicological science to discover these harmful effects and on regulators and responsible parties to prevent human exposure to a harmful level or to ensure that the agent is not produced. Epidemiology is a valuable backup approach that functions to detect failures of primary prevention. The two disciplines complement each other, particularly when the approaches are iterative.

# II. Demonstrating an Association Between Exposure and Risk of Disease[75]

Once the expert has been qualified, he or she is expected to offer an opinion on whether the plaintiff's disease was caused by exposure to a chemical. To do so, the expert relies on the principles of toxicology to provide a scientifically valid

---

74. The absence of epidemiological data is due, in part, to the difficulties in conducting cancer epidemiology studies, including the lack of suitably large groups of individuals exposed for a sufficient period of time, long latency periods between exposure and manifestation of disease, the high variability in the background incidence of many cancers in the general population, and the inability to measure actual exposure levels. These same concerns have led some researchers to conclude that "many negative epidemiological studies must be considered inconclusive" for exposures to low doses or weak carcinogens. Henry C. Pitot III & Yvonne P. Dragan, *Chemical Carcinogenesis, in* Casarett and Doull's Toxicology: The Basic Science of Poisons 201, 240–41 (Curtis D. Klaassen ed., 5th ed. 1996).

75. Determinations about cause-and-effect relations by regulatory agencies often depend upon expert judgment exercised by assessing the weight of evidence. For a discussion of this process as used by the International Agency for Research on Cancer of the World Health Organization and the role of information about mechanisms of toxicity, see Vincent J. Cogliano et al., *Use of Mechanistic Data in IARC Evaluations*, 49 Envt'l & Molecular Mutagens 100 (2008). For the use of expert judgment in EPA's response to submission of information for premanufacture notification required under the Toxic Substances Control Act, 15 U.S.C. §§ 2604, 2605(e), 40 C.F.R. §§ 720 et seq., see Chemical Manufacturers Ass'n v. EPA, 859 F.2d 977 (D.C. Cir. 1988).

EXHIBIT C

*Reference Guide on Toxicology*

methodology for establishing causation and then applies the methodology to the facts of the case.

An opinion on causation should be premised on three preliminary assessments. First, the expert should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. Second, the expert should examine whether the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. Third, the expert should offer an opinion about whether the dose to which the plaintiff was exposed is sufficient to cause the disease.

The following questions help evaluate the strengths and weaknesses of toxicological evidence.

## A. On What Species of Animals Was the Compound Tested? What Is Known About the Biological Similarities and Differences Between the Test Animals and Humans? How Do These Similarities and Differences Affect the Extrapolation from Animal Data in Assessing the Risk to Humans?

All living organisms share a common biology that leads to marked similarities in the responsiveness of subcellular structures to toxic agents. Among mammals, more than sufficient common organ structure and function readily permit the extrapolation from one species to another in most instances. Comparative information concerning factors that modify the toxic effects of chemicals, including absorption, distribution, metabolism, and excretion, in the laboratory test animals and humans enhances the expert's ability to extrapolate from laboratory animals to humans.[76]

The expert should review similarities and differences between the animal species in which the compound has been tested and humans. This analysis should form the basis of the expert's opinion regarding whether extrapolation from animals to humans is warranted.[77]

---

76. *See generally supra* notes 35–36 and accompanying text.

77. The failure to review similarities and differences in metabolism in performing cross-species extrapolation has led to the exclusion of opinions based on animal data. *See In re* Silicone Gel Breast Implants Prods. Liab. Litig., 318 F. Supp. 2d 879, 891 (C.D. Cal. 2004); Fabrizi v. Rexall Sundown, Inc., 2004 WL 1202984, at *8 (W.D. Pa. June 4, 2004). Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1410 (D. Or. 1996); Nelson v. Am. Sterilizer Co., 566 N.W.2d 671 (Mich. Ct. App. 1997). *But see In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 779–80 (3d Cir. 1994) (noting that humans and monkeys are likely to show similar sensitivity to PCBs), *cert. denied sub nom.* Gen. Elec. Co. v. Ingram, 513 U.S. 1190 (1995). As the Supreme Court noted in *General Electric Co. v. Joiner,* 522 U.S. 136, 144 (1997), the issue regarding admissibility is not whether animal studies are ever admissible to establish causation, but whether the particular studies relied upon by plaintiff's experts were sufficiently supported. *See* Carl F. Cranor et al., *Judicial Boundary Drawing and the Need for Context-Sensitive Science in Toxic Torts After* Daubert v. Merrell Dow Pharmaceuticals, Inc., 16 Va. Envtl. L.J. 1, 38 (1996).

**EXHIBIT C**

In general, an overwhelming similarity is apparent in the biology of all living things, and there is a particularly strong similarity among mammals. Of course, laboratory animals differ from humans in many ways. For example, rats do not have gallbladders. Thus, rat data would not be pertinent to the possibility that a compound produces human gallbladder toxicity.[78] Note that many subjective symptoms are poorly modeled in animal studies. Thus, complaints that a chemical has caused nonspecific symptoms, such as nausea, headache, and weakness, for which there are no objective manifestations in humans, are difficult to test in laboratory animals.

## B. Does Research Show That the Compound Affects a Specific Target Organ? Will Humans Be Affected Similarly?

Some toxic agents affect only specific organs and not others. This organ specificity may be due to particular patterns of absorption, distribution, metabolism, and excretion; the presence of specific receptors; or organ function. For example, organ specificity may reflect the presence in the organ of relatively high levels of an enzyme capable of metabolizing or changing a compound to a toxic form of the compound,[79] or it may reflect the relatively low level of an enzyme capable of detoxifying a compound. An example of the former is liver toxicity caused by inhaled carbon tetrachloride, which affects the liver but not the lungs because of extensive metabolism to a toxic metabolite within the liver but relatively little such metabolism in the lung.[80]

Some chemicals, however, may cause nonspecific effects or even multiple effects. Lead is an example of a toxic agent that affects many organ systems, including the blood, the central and peripheral nervous systems, the reproductive system, and the kidneys.

The basis of specificity often reflects the function of individual organs. For example, the thyroid is particularly susceptible to radioactive iodine in atomic fallout because thyroid hormone is unique within the body in that it requires iodine. Through evolution, a very efficient and specific mechanism has developed that

78. *See, e.g.*, Edward J. Calabrese, Multiple Chemical Interactions 583–89 tbl.14-1 (1991). Species differences that produce a qualitative difference in response to xenobiotics are well known. Sometimes understanding the mechanism underlying the species difference can allow one to predict whether the effect will occur in humans. Thus, carbaryl, an insecticide commonly used for gypsy moth control, among other things, produces fetal abnormalities in dogs but not in hamsters, mice, rats, and monkeys. Dogs lack the specific enzyme involved in metabolizing carbaryl; the other species tested all have this enzyme, as do humans. Therefore, it has been assumed that humans are not at risk for fetal malformations produced by carbaryl.

79. Certain chemicals act directly to produce toxicity, whereas others require the formation of a toxic metabolite.

80. Brian Jay Day et al., *Potentiation of Carbon Tetrachloride-Induced Hepatotoxicity and Pneumotoxicity by Pyridine,* 8 J. Biochem. Toxicol. 11 (1993).

EXHIBIT C

*Reference Guide on Toxicology*

concentrates any absorbed iodine preferentially within the thyroid, rendering the thyroid particularly at risk from radioactive iodine. In a test tube, the radiation from radioactive iodine can affect the genetic material obtained from any cell in the body, but in the intact laboratory animal or human, only the thyroid is at risk.

The unfolding of the human genome already is beginning to provide information pertinent to understanding the wide variation in human risk from environmental chemicals. The impact of this understanding on toxic tort causation issues remains to be explored.[81]

## C. What Is Known About the Chemical Structure of the Compound and Its Relationship to Toxicity?

Understanding the structural aspects of chemical toxicology has led to the use of structure–activity relationships (SAR) as a formal method of predicting the potential toxicity of new chemicals. This technique compares the chemical structure of compounds with known toxicity and the chemical structure of compounds with unknown toxicity. Toxicity then is estimated based on the molecular similarities between the two compounds. Although SAR is used extensively by EPA in evaluating many new chemicals required to be tested under the registration requirements of TSCA, its reliability has a number of limitations.[82]

81. Committee on Applications of Toxicogenomic Technologies to Predictive Toxicology and Risk Assessment, National Research Council, Applications of Toxicogenomic Technologies to Predictive Toxicology and Risk Assessment (2007); Gary E. Marchant, *Toxicogenomics and Toxic Torts,* 20 Trends Biotech. 329 (2002). Genomics can also be misinterpreted. A recent example is the use of white blood cell gene expression to determine whether benzene was a cause of acute myelogenous leukemia (AML) in individual workers. M.T. Smith, 14 *Misuse of Genomics in Assigning Causation in Relation to Benzene Exposure,* Int'l J. Occup. Envtl. Health 144–46 (2008) describes why the failure to match a pattern of DNA expression in workers with AML who were previously exposed to benzene is not scientifically defensible as a means to establish the lack of causation, as said to have been done in workers' compensation cases in California. The wide range in the rate of metabolism of chemicals is at least partly under genetic control. A study of Chinese workers exposed to benzene found approximately a doubling of risk in people with high levels of either an enzyme that increased the rate of formation of a toxic metabolite or an enzyme that decreased the rate of detoxification of this metabolite. There was a sevenfold increase in risk for those who had both genetically determined variants. N. Rothman et al., *Benzene Poisoning, A Risk Factor for Hematological Malignancy, Is Associated with the NQO1 609C→T Mutation and Rapid Fractional Excretion of Chlorzoxazone,* 57 Cancer Res. 239–42 (1997). *See also* Frederica P. Perera, *Molecular Epidemiology: Insights into Cancer Susceptibility, Risk Assessment, and Prevention*, 88 J. Nat'l Cancer Inst. 496 (1996).

82. For example, benzene and the alkyl benzenes (which include toluene, xylene, and ethyl benzene) share a similar chemical structure. SAR works exceptionally well in predicting the acute central nervous system anesthetic-like effects of both benzene and the alkyl benzenes. Although there are slight differences in dose–response relationships, they are readily explained by the interrelated factors of chemical structure, vapor pressure, and lipid solubility (the brain is highly lipid). National Research Council, The Alkyl Benzenes (1981). However, only benzene produces damage to the bone marrow and leukemia; the alkyl benzenes do not have this effect. This difference is the result

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## D. Has the Compound Been the Subject of In Vitro Research, and if So, Can the Findings Be Related to What Occurs In Vivo?

Cellular and tissue culture research can be particularly helpful in identifying mechanisms of toxic action and potential target-organ toxicity. The major barrier to the use of in vitro results is the frequent inability to relate doses that cause cellular toxicity to doses that cause whole-animal toxicity. In many critical areas, knowledge that permits such quantitative extrapolation is lacking.[83] Nevertheless, the ability to quickly test new products through in vitro tests, using human cells, provides invaluable "early warning systems" for toxicity.[84]

## E. Is the Association Between Exposure and Disease Biologically Plausible?

No matter how strong the temporal relationship between exposure and the development of disease, or the supporting epidemiological evidence, it is difficult to accept an association between a compound and a health effect when no

of specific toxic metabolic products of benzene in comparison with the alkyl benzenes. Thus SAR is predictive of neurotoxic effects but not bone marrow effects. *See* Preston & Hoffman, *supra* note 33, at 277. Advances in computational approaches show promise in improving SAR. *See* Committee on Toxicity Testing and Assessment of Environmental Agents, National Research Council, Toxicity Testing in the 21st Century: A Vision and a Strategy, ch. 4 (2007).

    In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the Court rejected a per se exclusion of SAR, animal data, and reanalysis of previously published epidemiological data where there were negative epidemiological data. However, as the court recognized in *Sorensen v. Shaklee Corp.,* 31 F.3d 638, 646 n.12 (8th Cir. 1994), the problem with SAR is that "'[m]olecules with minor structural differences can produce very different biological effects.'" (quoting Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Bendectin Cases,* 46 Stan. L. Rev. 1, 19 (1993)). *See also* Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 990 (8th Cir. 2001); Polski v. Quigley Corp., 2007 WL 2580550, at ★6 (D. Minn. Sept. 5, 2007).

    83. In Vitro Toxicity Testing: Applications to Safety Evaluation 8 (John M. Frazier ed., 1992). Despite its limitations, in vitro research can strengthen inferences drawn from whole-animal bioassays and can support opinions regarding whether the association between exposure and disease is biologically plausible. *See* Preston & Hoffman, *supra* note 33, at 278–93; Rogers & Kavlock, *supra* note 33, at 319–23.

    84. Graham v. Playtex Prods., Inc., 993 F. Supp. 127, 131–32 (N.D.N.Y. 1998) (opinion based on in vitro experiments showing that rayon tampons were associated with higher risk of toxic shock syndrome was admissible in the absence of epidemiological evidence). *See also* Allgood v. General Motors Corp., 2006 WL 2669337, at ★7 (S.D. Ind. Sept. 18, 2006); *In re* Ephedra Prods. Liab. Litig., 393 F. Supp. 2d 181, 194 (S.D.N.Y. 2005) (in vitro studies may be subject of proper inferences "although the gaps between such data and definitive evidence of causality are real and subject to challenge before the jury, they are not so great as to require the opinion to be excluded from evidence. Inconclusive science is not the same as junk science").

**EXHIBIT C**

mechanism can be identified by which the chemical or physical exposure leads to the putative effect.[85]

# III. Specific Causal Association Between an Individual's Exposure and the Onset of Disease

An expert who opines that exposure to a compound caused a person's disease engages in deductive clinical reasoning.[86] In most instances, cancers and other diseases do not wear labels documenting their causation. The opinion is based on an assessment of the individual's exposure, including the amount, the temporal relationship between the exposure and disease, and other disease-causing factors. This information is then compared with scientific data on the relationship between exposure and disease. The certainty of the expert's opinion depends on the strength of the research data demonstrating a relationship between exposure and the disease at the dose in question and the presence or absence of other disease-causing factors (also known as confounding factors).[87]

Particularly problematic are generalizations made in personal injury litigation from regulatory positions. Regulatory standards are set for purposes far different than determining the preponderance of evidence in a toxic tort case. For example, if regulatory standards are discussed in toxic tort cases to provide a reference point for assessing exposure levels, it must be recognized that there is a great deal of variability in the extent of evidence required to support different regulations.[88] The extent of evidence required to support regulations depends on

---

85. However, theories of bioplausibility, without additional data, have been found to be insufficient to support a finding of causation. *See, e.g.,* Golod v. Hoffman La Roche, 964 F. Supp. 841, 860–61 (S.D.N.Y. 1997); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1414 (D. Or. 1996). *But see* Best v. Lowe's Home Centers, Inc., 2008 WL 2359986, at *8 (E.D. Tenn. June 5, 2008) (expert relied on temporal proximity in concluding that plaintiff lost his sense of smell due to chemical exposure).

86. For an example of deductive clinical reasoning based on known facts about the toxic effects of a chemical and the individual's pattern of exposure, see Bernard D. Goldstein, *Is Exposure to Benzene a Cause of Human Multiple Myeloma?* 609 Annals N.Y. Acad. Sci. 225 (1990).

87. Causation issues are discussed in Michael D. Green et al., Reference Guide on Epidemiology, Section V, and Wong et al., Reference Guide on Medical Testimony, Section IV, in this manual. *See also* David L. Bazelon, *Science and Uncertainty: A Jurist's View*, 5 Harv. Envtl. L. Rev. 209 (1981); Troyen A. Brennan, *Causal Chains and Statistical Links: The Role of Scientific Uncertainty in Hazardous-Substance Litigation*, 73 Cornell L. Rev. 469 (1988); Joseph Sanders, *Scientific Validity, Admissibility and Mass Torts After* Daubert, 78 Minn. L. Rev. 1387 (1994); Orrin E. Tilevitz, *Judicial Attitudes Towards Legal and Scientific Proof of Cancer Causation,* 3 Colum. J. Envtl. L. 344, 381 (1977).

88. *See, e.g., In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 781 (3d Cir. 1994) (district court abused its discretion in excluding animal studies relied upon by EPA), *cert. denied sub nom.* General

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

1. The law (e.g., the Clean Air Act National Ambient Air Quality Standard provisions have language focusing regulatory activity for primary pollutants on adverse health consequences to sensitive populations with an adequate margin of safety and with no consideration of economic consequences, while regulatory activity under TSCA clearly asks for some balance between the societal benefits and risks of new chemicals[89]);
2. The specific end point of concern (e.g., consider the concern caused by cancer and adverse reproductive outcomes versus almost anything else); and
3. The societal impact (e.g., the public's support for control of an industry that causes air pollution versus the public's relative lack of desire to alter personal automobile use patterns).

These three concerns, as well as others, including costs, politics, and the virtual certainty of litigation challenging the regulation, have an impact on the level of scientific proof required by the regulatory decisionmaker.[90]

In addition, regulatory standards traditionally include protective factors to reasonably ensure that susceptible individuals are not put at risk. Furthermore, standards often are based on the risk that results from lifetime exposure. Accordingly, the mere fact that an individual has been exposed to a level above a standard does not necessarily mean that an adverse effect has occurred.

## A. Was the Plaintiff Exposed to the Substance, and if So, Did the Exposure Occur in a Manner That Can Result in Absorption into the Body?

Evidence of exposure is essential in determining the effects of harmful substances. Basically, potential human exposure is measured in one of three ways. First, when direct measurements cannot be made, exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the receptor. For example, mathematical models take into account such factors as wind variations to allow calculation of

Elec. Co. v. Ingram, 513 U.S. 1190 (1995); Molden v. Georgia Gulf Corp., 465 F. Supp. 2d 606, 613 (M.D. La. 2006) (Plaintiff failed to establish prima facie case due to failure to establish exposure at a level considered dangerous by regulatory agency); *In re* W.R. Grace & Co. 355 B.R. 462, 490 (Bankr. D. Del. 2006) (OSHA standards of exposure relevant to causation but not determinative for exposure occurring due to home attic insulation). *See also* John Endicott, *Interaction Between Regulatory Law and Tort Law in Controlling Toxic Chemical Exposure*, 47 SMU L. Rev. 501 (1994).

89. *See, e.g.,* Clean Air Act Amendments of 1990, 42 U.S.C. § 7412(f) (1994); Toxic Substances Control, Act, 15 U.S.C. § 2605 (1994).

90. These concerns are discussed in Stephen Breyer, Breaking the Vicious Circle: Toward Effective Risk Regulation (1993).

EXHIBIT C

*Reference Guide on Toxicology*

the transport of radioactive iodine from a federal atomic research facility to nearby residential areas. Second, exposure can be directly measured in the medium in question—air, water, food, or soil. When the medium of exposure is water, soil, or air, hydrologists or meteorologists may be called upon to contribute their expertise to measuring exposure. The third approach directly measures human receptors through some form of biological monitoring, such as blood tests to determine blood lead levels or urinalyses to check for a urinary metabolite indicative of pollutant exposure. Ideally, both environmental testing and biological monitoring are performed; however, this is not always possible, particularly in instances of past exposure.[91]

The toxicologist must go beyond understanding exposure to determine if the individual was exposed to the compound in a manner that can result in absorption into the body. The absorption of the compound is a function of its physiochemical properties, its concentration, and the presence of other agents or conditions that assist or interfere with its uptake. For example, inhaled lead is absorbed almost totally, whereas ingested lead is taken up only partially into the body. Iron deficiency and low nutritional calcium intake, both common conditions of inner-city children, increase the amount of ingested lead that is absorbed in the gastrointestinal tract and passes into the bloodstream.[92]

## B. Were Other Factors Present That Can Affect the Distribution of the Compound Within the Body?

Once a compound is absorbed into the body through the skin, lungs, or gastrointestinal tract, it is distributed throughout the body through the bloodstream. Thus the rate of distribution depends on the rate of blood flow to various organs

---

91. *See, e.g.* Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999) ("[g]uesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case"); Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1107 (8th Cir. 1996); Ingram v. Solkatronic Chemical, Inc., WL 3544244, at ★11–★18 (N.D. Okla. 2005) (no information on dose so causation cannot be evaluated); *In re* Three Mile Island Litig. Consol. Proceedings, 927 F. Supp. 834, 870 (M.D. Pa. 1996) (plaintiffs failed to present direct or indirect evidence of exposure to cancer-inducing levels of radiation); Valentine v. Pioneer Chlor Alkali Co., 921 F. Supp. 666, 678 (D. Nev. 1996). *But see* CSX Transp., Inc. v. Moody, 2007 WL 2011626, at ★7 (Ky. Ct. App. July 13, 2007) (specific dose of solvent exposure not necessary as long as evidence of exposure that could cause plaintiff's toxic encephalopathy is presented including how often solvents were used, duration of exposure, and documentation of physical symptoms while plaintiff worked with solvents).

92. The term "bioavailability" is used to describe the extent to which a compound, such as lead, is taken up into the body. In essence, bioavailability is at the interface between exposure and absorption into the organism. For an example of the impact of bioavailability on a governmental decision, see Thomas H. Umbreit et al., *Bioavailability of Dioxin in Soil from a 2,4,5-T Manufacturing Site*, 232 Science 497–99 (1986), who found that the bioavailability of dioxins in the soil of Newark, New Jersey, was negligible compared with that of Times Beach, Missouri—the latter community having previously been evacuated because of dioxin soil contamination.

EXHIBIT C

*Reference Manual on Scientific Evidence*

and tissues. Distribution and resulting toxicity also are influenced by other factors, including the dose, the route of entry, tissue solubility, lymphatic supplies to the organ, metabolism, and the presence of specific receptors or uptake mechanisms within body tissues.

## C. *What Is Known About How Metabolism in the Human Body Alters the Toxic Effects of the Compound?*

Metabolism is the alteration of a chemical by bodily processes. It does not necessarily result in less toxic compounds being formed. In fact, many of the organic chemicals that are known human cancer-causing agents require metabolic transformation before they can cause cancer. A distinction often is made between direct-acting agents, which cause toxicity without any metabolic conversion, and indirect-acting agents, which require metabolic activation before they can produce adverse effects. Metabolism is complex, because a variety of pathways compete for the same agent; some produce harmless metabolites, and others produce toxic agents.[93]

## D. *What Excretory Route Does the Compound Take, and How Does This Affect Its Toxicity?*

Excretory routes are urine, feces, sweat, saliva, expired air, and lactation. Many inhaled volatile agents are eliminated primarily by exhalation. Small water-soluble compounds are usually excreted through urine. Higher-molecular-weight compounds are often excreted through the biliary tract into the feces. Certain fat-soluble, poorly metabolized compounds, such as PCBs, may persist in the body for decades, although they can be excreted in the milk fat of lactating women.

## E. *Does the Temporal Relationship Between Exposure and the Onset of Disease Support or Contradict Causation?*

In acute toxicity, there is usually a short time period between cause and effect. However, in some situations, the length of basic biological processes necessitates a longer period of time between initial exposure and the onset of observable disease. For example, in acute myelogenous leukemia, the adult form of acute leukemia, at least 1 to 2 years must elapse from initial exposure to radiation, benzene, or

---

93. Courts have explored the relationship between metabolic transformation and carcinogenesis. *See, e.g.*, *In re* Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 2008 WL 2607852, at ⋆2 (S.D.N.Y. July 1, 2008); Stites v. Sundstrand Heat Transfer, Inc., 660 F. Supp. 1516, 1519 (W.D. Mich. 1987).

**EXHIBIT C**

*Reference Guide on Toxicology*

cancer chemotherapy before the manifestation of a clinically recognizable case of leukemia, and the period of significantly higher risk from the last exposure usually persists for no more than about 15 years. A toxic tort claim alleging a shorter or longer time period between cause and effect is scientifically highly debatable. Much longer latency periods are necessary for the manifestation of solid tumors caused by agents such as asbestos and arsenic.[94]

## F. If Exposure to the Substance Is Associated with the Disease, Is There a No Observable Effect, or Threshold, Level, and if So, Was the Individual Exposed Above the No Observable Effect Level?

For agents that produce effects other than through mutations, it is assumed that there is some level that is incapable of causing harm. If the level of exposure was below this no observable effect, or threshold, level, a relationship between the exposure and disease cannot be established.[95] When only laboratory animal

94. The temporal relationship between exposure and causation is discussed in *Rolen v. Hansen Beverage Co.,* 193 F. App'x 468, 473 (6th Cir. 2006) ("Expert opinions based upon nothing more than the logical fallacy of post hoc ergo propter hoc typically do not pass muster under *Daubert*."). *See also* Young v. Burton, 2008 WL 2810237, at ★17 (D.D.C. July 22, 2008); Dellinger v. Pfizer, Inc., 2006 WL 2057654, at ★10 (W.D.N.C. July 16, 2006) (temporal relationship between exposure and illness alone not sufficient for causation when exposure was over an 18-month period); Cavallo v. Star Enterprise, 892 F. Supp. 756, 769–74 (E.D. Va. 1995) (expert testimony based primarily on temporal connection between exposure to jet fuel and onset of symptoms, without other evidence of causation, ruled inadmissible). *But see In re* Stand 'N Seal, Prods. Liab. Litig., 623 F. Supp. 2d 1355, 1371–72 (N.D. Ga. 2009) (toxicologist's causation opinion that exposure to grout sealer caused chemical pneumonitis not subject to *Daubert* challenge based on a strong temporal relationship between exposure and acute onset of respiratory symptoms despite lack of dose response data); *In re* Ephedra Prods. Liab. Litig., 2007 WL 2947451, at ★2 (S.D.N.Y. Oct. 9, 2007) (when exposure is known to produce quick biological effects, a temporal relationship between exposure and effect can be used to infer causation); Nat'l. Bank of Commerce v. Dow Chem. Co., 965 F. Supp. 1490, 1525 (E.D. Ark. 1996) ("[T]here may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology."). The issue of latency periods and the statute of limitations is considered in Carl F. Cranor, Toxic Torts: Science, Law and the Possibility of Justice 173 (2006).

95. *See, e.g.,* Allen v. Pennsylvania Eng'g Corp., 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case."); Redland Soccer Club, Inc. v. Dep't of the Army, 55 F.3d 827, 847 (3d Cir. 1995) (summary judgment for defendant precluded where exposure above cancer threshold level could be calculated from soil samples); Molden v. Georgia Gulf Corp., 465 F. Supp. 2d 606, 613 (M.D. La. 2006) (levels of phenol released into the air were not considered harmful by regulatory agencies); Adams v. Cooper Indus., Inc., 2007 WL 2219212, at ★8 (E.D. Ky. July 30, 2007) (because plaintiffs' experts have not attempted to quantify or measure the amount or dosage of a substance to which a plaintiff was exposed, their opinions are unreliable as to specific causation). *But see* Byers v. Lincoln Elec. Co, 607 F. Supp.

EXHIBIT C

*Reference Manual on Scientific Evidence*

data are available, the expert extrapolates the NOEL from animals to humans by calculating the animal NOEL based on experimental data and decreasing this level by one or more safety factors to ensure no human effect.[96] The NOEL can also be calculated from human toxicity data if they exist. This analysis, however, is not applied to substances that exert toxicity by causing mutations leading to cancer. Theoretically, any exposure at all to mutagens may increase the risk of cancer, although the risk may be very slight and not achieve medical probability.[97]

# IV. Medical History

## *A. Is the Medical History of the Individual Consistent with the Toxicologist's Expert Opinion Concerning the Injury?*

One of the basic and most useful tools in diagnosis and treatment of disease is the patient's medical history.[98] A thorough, standardized patient information ques-

2d 863, FN101 (N.D. Ohio 2009) (no welder could ever provide evidence of actual exposure levels after the fact "which is why the law does not require mathematical precision to show toxic exposure" to support claims that inhaled manganese in welding fumes caused neurological injury); Tamraz v. BOC Group, Inc., 2008 U.S. Dist. LEXIS 54932, at ★9–★10 (N.D. Ohio July 18, 2008) (plaintiffs were able to provide substantial evidential to support estimates of actual workplace conditions and exposure for welder exposed to manganese).

96. *See, e.g., supra* note 26 & accompanying text; Robert G. Tardiff & Joseph V. Rodricks, Toxic Substances and Human Risk: Principles of Data Interpretation 391 (1988); Joseph V. Rodricks, Calculated Risks 230–39 (2006); Lu, *supra* note 22, at 84. For regulatory toxicology, NOEL is being replaced by a more statistically robust approach known as the benchmark dose. *See supra* note 27 & accompanying text. For example, EPA's use of the benchmark dose takes into account comprehensive dose–response information, unlike NOEL.

97. See sources cited *supra* note 28. *See also* Henricksen v. ConocoPhillips Co., 605 F. Supp. 2d 1142, 1164–65 (E.D. Wa. 2009) (toxicologists' opinion that exposure to gasoline containing benzene caused truck driver's acute mylogenous leukemia found unreliable where dose calculation was unreliable, and "no-threshold model" lacked scientific support). U.S. regulatory approaches aimed at protecting the general population tend to avoid setting a standard for a known human carcinogen, because any allowable level below the standard is at least theoretically capable of causing cancer. However, exposure to many chemical carcinogens, including benzene and arsenic, cannot be eliminated. Thus, agencies and Congress have developed a number of ingenious means to regulate carcinogens while not seeming to acquiesce in exposure of the general population to a carcinogen. These include FDA's approach to de minimis risk and EPA's setting of a zero maximum contaminant level goal for carcinogens in drinking water while setting a maximum contaminant level above zero that is "set as closely as possible to the MCLG, taking technology and cost data into account," http://safewater.custhelp.com/cgi-bin/safewater.cfg/php/enduser/std_adp.php?p_faqid=1319. In contrast, occupational standards, which also take into account feasibility, permit exposure to known human carcinogens. A generally outmoded approach for environmental or indoor air guidelines has been to divide the permissible OSHA standard by a factor accounting for the presumed lifetime exposure to the environmental chemical compared with 45 years at a 40-hour workweek.

98. For a thorough discussion of the methods of clinical diagnosis, see John B. Wong et al., Reference Guide on Medical Testimony, in this manual. *See also* Jerome P. Kassirer & Richard I.

**EXHIBIT C**

*Reference Guide on Toxicology*

tionnaire would be particularly useful for identifying the etiology, or causation, of illnesses related to toxic exposures; however, there is currently no validated or widely used questionnaire that gathers all pertinent information.[99] Nevertheless, it is widely recognized that a thorough medical history involves the questioning and examination of the patient as well as appropriate medical testing. The patient's written medical records also should be examined.

The following information is relevant to a patient's medical history: past and present occupational and environmental history and exposure to toxic agents; life-style characteristics (e.g., use of nicotine and alcohol); family medical history (i.e., medical conditions and diseases of relatives); and personal medical history (i.e., present symptoms and results of medical tests as well as past injuries, medical conditions, diseases, surgical procedures, and medical test results).

In some instances, the reporting of symptoms can be in itself diagnostic of exposure to a specific substance, particularly in evaluating acute effects.[100] For example, individuals acutely exposed to organophosphate pesticides report headaches, nausea, and dizziness accompanied by anxiety and restlessness. Other reported symptoms are muscle twitching, weakness, and hypersecretion with sweating, salivation, and tearing.[101]

## B. Are the Complaints Specific or Nonspecific?

Acute exposure to many toxic agents produces a constellation of nonspecific symptoms, such as headaches, nausea, lightheadedness, and fatigue. These types of symptoms are part of human experience and can be triggered by a host of medical and psychological conditions. They are almost impossible to quantify or document beyond the patient's report. Thus, these symptoms can be attributed mistakenly to an exposure to a toxic agent or discounted as unimportant when in fact they reflect a significant exposure.[102]

Kopelman, Learning Clinical Reasoning (1991). A number of cases have considered the admissibility of the treating physician's opinion based, in part, on medical history, symptomatology, and laboratory and pathology studies.

99. Office of Tech. Assessment, U.S. Congress, *supra* note 17, at 365–89.

100. *But see* Moore v. Ashland Chem., Inc., 126 F.3d 679, 693 (5th Cir. 1997) (discussion of relevance of symptoms within 45 minutes of exposure); Armstrong v. Durango Georgia Paper Co. 2005 WL 2373443, at ★5 (S.D. Ga. Sept. 27, 2005) (plaintiffs exhibited temporary symptoms widely recognized by the medical community as those associated with exposure to chlorine gas).

101. Environmental Protection Agency, Recognition and Management of Pesticide Poisonings (4th ed. 1989).

102. The issue of whether the development of nonspecific symptoms may be related to pesticide exposure was considered in *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802 (3d Cir. 1997). The court ruled that the trial court abused its discretion in excluding expert opinion that considered, and rejected, a negative laboratory test. *Id.* at 808–09. *See also* Kerner v. Terminix Int'l, Co., 2008 WL 341363, at ★7 (S.D. Ohio Feb. 6, 2008) (expert testimony about causation admissible based on plaintiff's non-specific symptoms because scientific literature has linked exposure to pyrethrins and pyrethroids to

EXHIBIT C

*Reference Manual on Scientific Evidence*

In taking a careful medical history, the expert focuses on the time pattern of symptoms and disease manifestations in relation to any exposure and on the constellation of symptoms to determine causation. It is easier to establish causation when a symptom is unusual and rarely is caused by anything other than the suspect chemical (e.g., such rare cancers as hemangiosarcoma, associated with vinyl chloride exposure, and mesothelioma, associated with asbestos exposure). However, many cancers and other conditions are associated with several causative factors, complicating proof of causation.[103]

## C. Do Laboratory Tests Indicate Exposure to the Compound?

Two types of laboratory tests can be considered: tests that are routinely used in medicine to detect changes in normal body status and specialized tests that are used to detect the presence of the chemical or physical agent.[104] For the most part, tests used to demonstrate the presence of a toxic agent are frequently unavailable from clinical laboratories. Even when available from a hospital or a clinical laboratory, a test such as that for carbon monoxide combined to hemoglobin is done so rarely that it may raise concerns regarding its accuracy. Other tests, such as the test for blood lead levels, are required for routine surveillance of potentially exposed workers. However, if a laboratory is certified for the testing of blood lead in workers, for which the OSHA action level is 40 micrograms per deciliter (μg/dl), it does not necessarily mean that it will give reliable data on blood lead levels at the much lower Centers for Disease Control and Prevention action level of 10 μg/dl.

## D. What Other Causes Could Lead to the Given Complaint?

With few exceptions, acute and chronic diseases, including cancer, can be caused by either a single toxic agent or a combination of agents or conditions. In taking a careful medical history, the expert examines the possibility of competing causes, or confounding factors, for any disease, which leads to a differential diagnosis. In addition, ascribing causality to a specific source of a chemical requires that a history be taken concerning other sources of the same chemical. The failure of a physician to elicit such a history or of a toxicologist to pay attention to such a

---

numbness, tingling, burning sensations, and paresthesia); Wicker v. Consol. Rail Corp., 371 F. Supp. 2d 702, 732 (W.D. Pa. 2005).

103. Failure to rule out other potential causes of symptoms may lead to a ruling that the expert's report is inadmissible. *See, e.g.,* Perry v. Novartis Pharms. Corp., 564 F. Supp. 2d 452, 469 (E.D. Pa. 2008); Farris v. Intel Corp., 493 F. Supp. 2d 1174, 1185 (D.N.M. 2007); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1413 (D. Or. 1996); Rutigliano v. Valley Bus. Forms, 929 F. Supp. 779, 786 (D.N.J. 1996).

104. *See, e.g.,* Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 807 (3d Cir. 1997).

**EXHIBIT C**

*Reference Guide on Toxicology*

history raises questions about competence and leaves open the possibility of competing causes of the disease.[105]

## E. Is There Evidence of Interaction with Other Chemicals?

An individual's simultaneous exposure to more than one chemical may result in a response that differs from that which would be expected from exposure to only one of the chemicals.[106] When the effect of multiple agents is that which would be predicted by the sum of the effects of individual agents, it is called an additive effect; when it is greater than this sum, it is known as a synergistic effect; when one agent causes a decrease in the effect produced by another, the result is termed antagonism; and when an agent that by itself produces no effect leads to an enhancement of the effect of another agent, the response is termed potentiation.[107]

Three types of toxicological approaches are pertinent to understanding the effects of mixtures of agents. One is based on the standard toxicological evaluation of common commercial mixtures, such as gasoline. The second approach is from studies in which the known toxicological effect of one agent is used to explore the mechanism of action of another agent, such as using a known specific inhibitor of a metabolic pathway to determine whether the toxicity of a second agent depends on this pathway. The third approach is based on an understanding of the basic mechanism of action of the individual components of the mixture, thereby allowing prediction of the combined effect, which can then be tested in an animal model.[108]

105. *See, e.g.,* Perry v. Novartis Pharms. Corp., 564 F. Supp. 2d 452, 471 (E.D. Pa. 2008) (plaintiff's experts failed to adequately account for the possibility that plaintiff's T-LBL was idiopathic, and thus their conclusion that exposure to Elidel was a substantial cause of plaintiff's cancer is unreliable and inadmissible); Bell v. Swift Adhesives, Inc., 804 F. Supp. 1577, 1580 (S.D. Ga. 1992) (expert's opinion that workplace exposure to methylene chloride caused plaintiff's liver cancer, without ruling out plaintiff's infection with hepatitis B virus, a known liver carcinogen, was insufficient to withstand motion for summary judgment for defendant).

106. *See generally* Edward J. Calabrese, Multiple Chemical Interactions 97–115, 220–221 (1991).

107. Courts have been called on to consider the issue of synergy. In *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Pendergrass,* 878 F.2d 389, 391 (D.C. Cir. 1989), the court found that OSHA failed to sufficiently explain its findings that formaldehyde presented no significant carcinogenic risk to workers at exposure levels of 1 part per million or less. The court particularly criticized OSHA's use of a linear low-dose risk curve rather than a risk-adverse model after the agency had described evidence of synergy between formaldehyde and other substances that workers would be exposed to, especially wood dust. *Id.* at 395.

108. *See generally* Calabrese, *supra* note 106. EPA has been addressing the issue of multiple exposures to different agents within a community under the heading of cumulative risk assessment. This approach is particularly of importance in dealing with environmental justice concerns. *See, e.g.,* Institute of Medicine, Toward Environmental Justice: Research, Education, and Health Policy Needs (1999); Michael A. Callahan & Ken Sexton, *If Cumulative Risk Assessment Is the Answer, What Is the Question?* 115 Envtl. Health Persp. 799–806 (2006).

EXHIBIT C

## F. Do Humans Differ in the Extent of Susceptibility to the Particular Compound in Question? Are These Differences Relevant in This Case?

Individuals who exercise inhale more than sedentary individuals and therefore are exposed to higher doses of airborne environmental toxins. Similarly, differences in metabolism, which are inherited or caused by external factors, such as the levels of carbohydrates in a person's diet, may result in differences in the delivery of a toxic product to the target organ.[109]

Moreover, for any given level of a toxic agent that reaches a target organ, damage may be greater because of a greater response of that organ. In addition, for any given level of target–organ damage, there may be a greater impact on particular individuals. For example, an elderly individual or someone with preexisting lung disease is less likely to tolerate a small decline in lung function caused by an air pollutant than is a healthy individual with normal lung function.

A person's level of physical activity, age, sex, and genetic makeup, as well as exposure to therapeutic agents (such as prescription or over-the-counter drugs), affect the metabolism of the compound and hence its toxicity.[110] Advances in human genetics research are providing information about susceptibility to environmental agents that may be relevant to determining the likelihood that a given exposure has a specific effect on an individual.

## G. Has the Expert Considered Data That Contradict His or Her Opinion?

Multiple avenues of deductive reasoning based on scientific data lead to acceptance of causation in any field, particularly in toxicology. However, the basis for this deductive reasoning is also one of the most difficult aspects of causation to describe quantitatively. If animal studies, pharmacological research on mechanisms of toxicity, in vitro tissue studies, and epidemiological research all document toxic effects of exposure to a compound, an expert's opinion about causation in a particular case is much more likely to be true.[111]

---

109. *See generally* Calabrese, *supra* note 106.

110. The problem of differences in chemical sensitivity was addressed by the court in *Gulf South Insulation v. United States Consumer Product Safety Commission,* 701 F.2d 1137 (5th Cir. 1983). The court overturned the commission's ban on urea-formaldehyde foam insulation because the commission failed to document in sufficient detail the level at which segments of the population were affected and whether their responses were slight or severe: "Predicting how likely an injury is to occur, at least in general terms, is essential to a determination of whether the risk of that injury is unreasonable." *Id*. at 1148.

111. Consistency of research results was considered by the court in *Marsee v. United States Tobacco Co.,* 639 F. Supp. 466, 469–70 (W.D. Okla. 1986). The defendant, the manufacturer of snuff alleged to cause oral cancer, moved to exclude epidemiological studies conducted in Asia that demonstrate

EXHIBIT C

The more difficult problem is how to evaluate conflicting research results. When different research studies reach different conclusions regarding toxicity, the expert must be asked to explain how those results have been taken into account in the formulation of the expert's opinion.

# V. Expert Qualifications

The basis of the toxicologist's expert opinion in a specific case is a thorough review of the research literature and treatises concerning effects of exposure to the chemical at issue. To arrive at an opinion, the expert assesses the strengths and weaknesses of the research studies. The expert also bases an opinion on fundamental concepts of toxicology relevant to understanding the actions of chemicals in biological systems.

As the following series of questions indicates, no single academic degree, research specialty, or career path qualifies an individual as an expert in toxicology. Toxicology is a heterogeneous field. A number of indicia of expertise can be explored, however, that are relevant to both the admissibility and weight of the proffered expert opinion.

## *A. Does the Proposed Expert Have an Advanced Degree in Toxicology, Pharmacology, or a Related Field? If the Expert Is a Physician, Is He or She Board Certified in a Field Such as Occupational Medicine?*

A graduate degree in toxicology demonstrates that the proposed expert has a substantial background in the basic issues and tenets of toxicology. Many universities have established graduate programs in toxicology. These programs are administered by the faculties of medicine, pharmacology, pharmacy, or public health.

Although most recent toxicology Ph.D. graduates have no other credentials, many highly qualified toxicologists are physicians or hold doctoral degrees

---

a link between smokeless tobacco and oral cancer. The defendant also moved to exclude evidence demonstrating that the nitrosamines and polonium-210 contained in the snuff are cancer-causing agents in some 40 different species of laboratory animals. The court denied both motions, finding:

> There was no dispute that both nitrosamines and polonium-210 are present in defendant's snuff products. Further, defendant conceded that animal studies have accurately and consistently demonstrated that these substances cause cancer in test animals. Finally, the Court found evidence based on experiments with animals particularly valuable and important in this litigation since such experiments with humans are impossible. Under all these circumstances, the Court found this evidence probative on the issue of causation.

*Id*. *See also* sources cited *supra* note 14.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

in related disciplines (e.g., veterinary medicine, pharmacology, biochemistry, environmental health, or industrial hygiene). For a person with this type of background, a single course in toxicology is unlikely to provide sufficient background for developing expertise in the field.

A proposed expert should be able to demonstrate an understanding of the discipline of toxicology, including statistics, toxicological research methods, and disease processes. A physician without particular training or experience in toxicology is unlikely to have sufficient background to evaluate the strengths and weaknesses of toxicological research. Most practicing physicians have little knowledge of environmental and occupational medicine.[112] Generally, physicians are quite knowledgeable about the identification of effects and their treatment. The cause of these effects, particularly if they are unrelated to the treatment of the disease, is generally of little concern to the practicing physician. Subspecialty physicians may have particular knowledge of a cause-and-effect relationship (e.g., pulmonary physicians have knowledge of the relationship between asbestos exposure and asbestosis),[113] but most physicians have little training in chemical toxicology and lack an understanding of exposure assessment and dose–response relationships. An exception is a physician who is certified in medical toxicology as a subspeciality under the American Board of Medical Specialties' requirements, based on substantial training in toxicology and successful completion of rigorous examinations, including recertification exams.[114]

---

112. For recent documentation of how rarely an occupational history is obtained, see B.J. Politi et al., *Occupational Medical History Taking: How Are Today's Physicians Doing? A Cross-Sectional Investigation of the Frequency of Occupational History Taking by Physicians in a Major US Teaching Center*. 46 J. Occup. Envtl. Med. 550–55 (2004).

113. *See, e.g.,* Moore v. Ashland Chem., Inc., 126 F.3d 679, 701 (5th Cir. 1997) (treating physician's opinion admissible regarding causation of reactive airway disease); McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) (treating physician's opinion admissible regarding the effect of fumes from hot-melt glue on the throat, where physician was board certified in otolaryngology and based his opinion on medical history and treatment, pathological studies, differential etiology, and scientific literature); Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1384 (4th Cir. 1995) (treating physician's opinion admissible regarding the causation of liver failure by mixture of alcohol and acetaminophen, based on medical history, physical examination, laboratory and pathology data, and scientific literature—the same methodologies used daily in the diagnosis of patients); *In re* Ephedra Prods. Liab. Litig., 478 F. Supp. 2d 624, 633 (S.D.N.Y. 2007) (opinion of treating physician will assist the trier of fact because a reasonable juror would want to know what inferences a treating physician would make); Morin v. United States, 534 F. Supp. 2d 1179, 1185 (D. Nev. 2005) (treating physician does not have sufficient expertise to offer opinion about whether exposure to jet fuel caused cancer in his patient).

Treating physicians also become involved in considering cause-and-effect relationships when they are asked whether a patient can return to a situation in which an exposure has occurred. The answer is obvious if the cause-and-effect relationship is clearly known. However, this relationship is often uncertain, and the physician must consider the appropriate advice. In such situations, the physician will tend to give advice as though the causality was established, both because it is appropriate caution and because of fears concerning medicolegal issues.

114. Before 1990, the American Board of Medical Toxicology certified physicians, but beginning in 1990, medical toxicology became a subspecialty board under the American Board of Emer-

EXHIBIT C

*Reference Guide on Toxicology*

Some physicians who are occupational health specialists also have training in toxicology. Knowledge of toxicology is particularly strong among those who work in the chemical, petrochemical, and pharmaceutical industries, in which the surveillance of workers exposed to chemicals is a major responsibility. Of the occupational physicians practicing today, only about 1000 have successfully completed the board examination in occupational medicine, which contains some questions about chemical toxicology.[115]

## B. Has the Proposed Expert Been Certified by the American Board of Toxicology, Inc., or Does He or She Belong to a Professional Organization, Such as the Academy of Toxicological Sciences or the Society of Toxicology?

As of January 2008, more than 2000 individuals had received board certification from the American Board of Toxicology. To sit for the examination, the candidate must be involved full time in the practice of toxicology, including designing and managing toxicological experiments or interpreting results and translating them to identify and solve human and animal health problems. Diplomats must be recertified every 5 years. The Academy of Toxicological Sciences (ATS) was formed to provide credentials in toxicology through peer review only. It does not administer examinations for certification. Approximately 200 individuals are certified as Fellows of ATS.

gency Medicine, the American Board of Pediatrics, and the American Board of Preventive Medicine, as recognized by the American Board of Medical Specialties.

115. Clinical ecologists, another group of physicians, have offered opinions regarding multiple chemical hypersensitivity and immune system responses to chemical exposures. These physicians generally have a background in the field of allergy, not toxicology, and their theoretical approach is derived in part from classic concepts of allergic responses and immunology. This theoretical approach has often led clinical ecologists to find cause-and-effect relationships or low-dose effects that are not generally accepted by toxicologists. Clinical ecologists often belong to the American Academy of Environmental Medicine.

In 1991, the Council on Scientific Affairs of the American Medical Association concluded that until "accurate, reproducible, and well-controlled studies are available . . . multiple chemical sensitivity should not be considered a recognized clinical syndrome." Council on Scientific Affairs, American Med. Ass'n, Council Report on Clinical Ecology 6 (1991). In *Bradley v. Brown,* 42 F.3d 434, 438 (7th Cir. 1994), the court considered the admissibility of an expert opinion based on clinical ecology theories. The court ruled the opinion inadmissible, finding that it was "hypothetical" and based on anecdotal evidence as opposed to scientific research. *See also* Kropp v. Maine School Adm. Union No. 44, 471 F. Supp. 2d 175, 181–82 (D. Me. 2007) (expert physician does not rely upon scientifically valid methodologies or data in reaching the conclusion that plaintiff is hypersensitive to phenol vapors in indoor air); Coffin v. Orkin Exterminating Co., 20 F. Supp. 2d 107, 110 (D. Me. 1998); Frank v. New York, 972 F. Supp. 130, 132 n.2 (N.D.N.Y. 1997). *But see* Elam v. Alcolac, Inc., 765 S.W.2d 42, 86 (Mo. Ct. App. 1988) (expert opinion based on clinical ecology theories admissible).

EXHIBIT C

The Society of Toxicology (SOT), the major professional organization for the field of toxicology, was founded in 1961 and has grown dramatically in recent years. It now has 6300 members.[116] Criteria for membership is based either on peer-reviewed publications or on the active practice of toxicology. Physician toxicologists can join the American College of Medical Toxicology and the American Academy of Clinical Toxicologists. There are also societies of forensic toxicology, such as the International Academy of Forensic Toxicology. Other organizations in the field are the American College of Toxicology, for which experience in the active practice of toxicology is the major membership criterion; the International Society of Regulatory Toxicology and Pharmacology; and the Society of Occupational and Environmental Health. For membership, the last two organizations require only the payment of dues.

## C. What Other Criteria Does the Proposed Expert Meet?

The success of academic scientists in toxicology, as in other biomedical sciences, usually is measured by the following types of criteria: the quality and number of peer-reviewed publications, the ability to compete for research grants, service on scientific advisory panels, and university appointments.

Publication of articles in peer-reviewed journals indicates an expertise in toxicology. The number of articles, their topics, and whether the individual is the principal or senior author are important factors in determining the expertise of a toxicologist.[117]

Most research grants from government agencies and private foundations are highly competitive. Successful competition for funding and publication of the research findings indicate competence in an area.

Selection for local, national, and international regulatory advisory panels usually implies recognition in the field. Examples of such panels are the NIH Toxicology Study Section and panels convened by EPA, FDA, WHO, and IARC. Recognized industrial organizations, including the American Petroleum Institute and the Electric Power Research Institute, and public interest groups, such as the Environmental Defense Fund and the Natural Resources Defense Council,

---

116. There are currently 21 specialty sections of SOT that represent the different specialty areas involved in understanding the wide range of toxic effects associated with exposure to chemical and physical agents. These sections include mechanisms, molecular biology, inhalation toxicology, metals, neurotoxicology, carcinogenesis, risk assessment, and immunotoxicology.

117. Examples of reputable, peer-reviewed journals are the *Journal of Toxicology and Environmental Health; Toxicological Sciences; Toxicology and Applied Pharmacology; Science; British Journal of Industrial Medicine; Clinical Toxicology; Archives of Environmental Health; Journal of Occupational and Environmental Medicine; Annual Review of Pharmacology and Toxicology; Teratogenesis, Carcinogenesis and Mutagenesis; Fundamental and Applied Toxicology; Inhalation Toxicology; Biochemical Pharmacology; Toxicology Letters; Environmental Research; Environmental Health Perspectives; International Journal of Toxicology; Human and Experimental Toxicology;* and *American Journal of Industrial Medicine*.

EXHIBIT C

*Reference Guide on Toxicology*

employ toxicologists directly and as consultants and enlist academic toxicologists to serve on advisory panels. Because of a growing interest in environmental issues, the demand for scientific advice has outgrown the supply of available toxicologists. It is thus common for reputable toxicologists to serve on advisory panels.

Finally, a university appointment in toxicology, risk assessment, or a related field signifies an expertise in that area, particularly if the university has a graduate education program in that area.

# VI. Acknowledgments

The authors greatly appreciate the excellent research assistance provided by Eric Topor and Cody S. Lonning.

EXHIBIT C

*Reference Manual on Scientific Evidence*

# Glossary of Terms

The following terms and definitions were adapted from a variety of sources, including Office of Technology Assessment, U.S. Congress, Reproductive Health Hazards in the Workplace (1985); Casarett and Doull's Toxicology: The Basic Science of Poisons (Curtis D. Klaassen ed., 7th ed. 2007); National Research Council, Biologic Markers in Reproductive Toxicology (1989); Committee on Risk Assessment Methodology, National Research Council, Issues in Risk Assessment (1993); M. Alice Ottoboni, The Dose Makes the Poison: A Plain–Language Guide to Toxicology (2d ed. 1991); and Environmental and Occupational Health Sciences Institute, Glossary of Environment Health Terms (1989) [update].

**absorption.** The taking up of a chemical into the body orally, through inhalation, or through skin exposure.

**acute toxicity.** An immediate toxic response following a single or short–term exposure to an agent or dosing.

**additive effect.** When exposure to more than one toxic agent results in the same effect as would be predicted by the sum of the effects of exposure to the individual agents.

**antagonism.** When exposure to one toxic agent causes a decrease in the effect produced by another toxic agent.

**benchmark dose.** The benchmark dose is determined on the basis of dose–response modeling and is defined as the exposure associated with a specified low incidence of risk, generally in the range of 1% to 10%, of a health effect, or the dose associated with a specified measure or change of a biological effect.

**bioassay.** A test for measuring the toxicity of an agent by exposing laboratory animals to the agent and observing the effects.

**biological monitoring.** Measurement of toxic agents or the results of their metabolism in biological materials, such as blood, urine, expired air, or biopsied tissue, to test for exposure to the toxic agents, or the detection of physiological changes that are due to exposure to toxic agents.

**biologically plausible theory.** A biological explanation for the relationship between exposure to an agent and adverse health outcomes.

**carcinogen.** A chemical substance or other agent that causes cancer.

**carcinogenicity bioassay.** Limited or long–term tests using laboratory animals to evaluate the potential carcinogenicity of an agent.

**chronic toxicity.** A toxic response to long–term exposure or dosing with an agent.

**clinical ecologists.** Physicians who believe that exposure to certain chemi– cal agents can result in damage to the immune system, causing multiple–

680

**EXHIBIT C**

*Reference Guide on Toxicology*

chemical hypersensitivity and a variety of other disorders. Clinical ecologists often have a background in the field of allergy, not toxicology, and their theoretical approach is derived in part from classic concepts of allergic responses and immunology. There has been much resistance in the medical community to accepting their claims.

**clinical toxicology.** The study and treatment of humans exposed to chemicals and the quantification of resulting adverse health effects. Clinical toxicology includes the application of pharmacological principles to the treatment of chemically exposed individuals and research on measures to enhance elimination of toxic agents.

**compound.** In chemistry, the combination of two or more different elements in definite proportions, which when combined acquire properties different from those of the original elements.

**confounding factors.** Variables that are related to both exposure to a toxic agent and the outcome of the exposure. A confounding factor can obscure the relationship between the toxic agent and the adverse health outcome associated with that agent.

**differential diagnosis.** A physician's consideration of alternative diagnoses that may explain a patient's condition.

**direct–acting agents.** Agents that cause toxic effects without metabolic activation or conversion.

**distribution.** Movement of a toxic agent throughout the organ systems of the body (e.g., the liver, kidney, bone, fat, and central nervous system). The rate of distribution is usually determined by the blood flow through the organ and the ability of the chemical to pass through the cell membranes of the various tissues.

**dose, dosage.** A product of both the concentration of a chemical or physical agent and the duration or frequency of exposure.

**dose–response curve.** A graphic representation of the relationship between the dose of a chemical administered and the effect produced.

**dose–response relationships.** The extent to which a living organism responds to specific doses of a toxic substance. The more time spent in contact with a toxic substance, or the higher the dose, the greater the organism's response. For example, a small dose of carbon monoxide will cause drowsiness; a large dose can be fatal.

**epidemiology.** The study of the occurrence and distribution of disease among people. Epidemiologists study groups of people to discover the cause of a disease, or where, when, and why disease occurs.

**epigenetic.** Pertaining to nongenetic mechanisms by which certain agents cause diseases, such as cancer.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**etiology.** A branch of medical science concerned with the causation of diseases.

**excretion.** The process by which toxicants are eliminated from the body, including through the kidney and urinary tract, the liver and biliary system, the fecal excretor, the lungs, sweat, saliva, and lactation.

**exposure.** The intake into the body of a hazardous material. The main routes of exposure to substances are through the skin, mouth, and lungs.

**extrapolation.** The process of estimating unknown values from known values.

**good laboratory practice (GLP).** Codes developed by the federal government in consultation with the laboratory testing industry that govern many aspects of laboratory standards.

**hazard identification.** In risk assessment, the qualitative analysis of all available experimental animal and human data to determine whether and at what dose an agent is likely to cause toxic effects.

**hydrogeologists, hydrologists.** Scientists who specialize in the movement of ground and surface waters and the distribution and movement of contaminants in those waters.

**immunotoxicology.** A branch of toxicology concerned with the effects of toxic agents on the immune system.

**indirect–acting agents.** Agents that require metabolic activation or conversion before they produce toxic effects in living organisms.

**inhalation toxicology.** The study of the effect of toxic agents that are absorbed into the body through inhalation, including their effects on the respiratory system.

**in vitro.** A research or testing methodology that uses living cells in an artificial or test tube system, or that is otherwise performed outside of a living organism.

**in vivo.** A research or testing methodology that uses living organisms.

**lethal dose 50 ($LD_{50}$).** The dose at which 50% of laboratory animals die within days to weeks.

**lifetime bioassay.** A bioassay in which doses of an agent are given to experimental animals throughout their lifetime. See bioassay.

**maximum tolerated dose (MTD).** The highest dose of an agent to which an organism can be exposed without it causing death or significant overt toxicity.

**metabolism.** The sum total of the biochemical reactions that a chemical produces in an organism.

**molecular toxicology.** The study of how toxic agents interact with cellular molecules, including DNA.

**multiple–chemical hypersensitivity.** A physical condition whereby individuals react to many different chemicals at extremely low exposure levels.

EXHIBIT C

*Reference Guide on Toxicology*

**multistage events.** A model for understanding certain diseases, including some cancers, based on the postulate that more than one event is necessary for the onset of disease.

**mutagen.** A substance that causes physical changes in chromosomes or bio-chemical changes in genes.

**mutagenesis.** The process by which agents cause changes in chromosomes and genes.

**neurotoxicology.** A branch of toxicology concerned with the effects of exposure to toxic agents on the central nervous system.

**no observable effect level (NOEL).** The highest level of exposure to an agent at which no effect is observed. It is the experimental equivalent of a threshold.

**no–threshold model.** A model for understanding disease causation that postulates that any exposure to a harmful chemical (such as a mutagen) may increase the risk of disease.

**one–hit theory.** A theory of cancer risk in which each molecule of a chemical mutagen has a possibility, no matter how tiny, of mutating a gene in a manner that may lead to tumor formation or cancer.

**pharmacokinetics.** A mathematical model that expresses the movement of a toxic agent through the organ systems of the body, including to the target organ and to its ultimate fate.

**potentiation.** The process by which the addition of one agent, which by itself has no toxic effect, increases the toxicity of another agent when exposure to both agents occurs simultaneously.

**reproductive toxicology.** The study of the effect of toxic agents on male and female reproductive systems, including sperm, ova, and offspring.

**risk assessment.** The use of scientific evidence to estimate the likelihood of adverse effects on the health of individuals or populations from exposure to hazardous materials and conditions.

**risk characterization.** The final step of risk assessment, which summarizes information about an agent and evaluates it in order to estimate the risks it poses.

**safety assessment.** Toxicological research that tests the toxic potential of a chemical in vivo or in vitro using standardized techniques required by governmental regulatory agencies or other organizations.

**structure–activity relationships (SAR).** A method used by toxicologists to predict the toxicity of new chemicals by comparing their chemical structures with those of compounds with known toxic effects.

**synergistic effect.** When two toxic agents acting together have an effect greater than that predicted by adding together their individual effects.

**target organ.** The organ system that is affected by a particular toxic agent.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**target–organ dose.** The dose to the organ that is affected by a particular toxic agent.

**teratogen.** An agent that changes eggs, sperm, or embryos, thereby increasing the risk of birth defects.

**teratogenic.** The ability to produce birth defects. (Teratogenic effects do not pass to future generations.) See teratogen.

**threshold.** The level above which effects will occur and below which no effects occur. See no observable effect level.

**toxic.** Of, relating to, or caused by a poison—or a poison itself.

**toxic agent or toxicant.** An agent or substance that causes disease or injury.

**toxicology.** The science of the nature and effects of poisons, their detection, and the treatment of their effects.

**EXHIBIT C**

# References on Toxicology

A Textbook of Modern Toxicology (Ernest Hodgson ed., 4th ed. 2010).

Casarett and Doull's Toxicology: The Basic Science of Poisons (Curtis D. Klaassen ed., 7th ed. 2007).

Committee on Toxicity Testing and Assessment of Environmental Agents, National Research Council, Toxicity Testing in the 21st Century: A Vision and a Strategy (2007).

Environmental Toxicants (Morton Lippmann ed., 3d ed. 2009).

Patricia Frank & M. Alice Ottoboni, The Dose Makes the Poison: A Plain-Language Guide to Toxicology (3d ed. 2011).

Genetic Toxicology of Complex Mixtures (Michael D. Waters et al. eds., 1990).

Human Risk Assessment: The Role of Animal Selection and Extrapolation (M. Val Roloff ed., 1987).

In Vitro Toxicity Testing: Applications to Safety Evaluation (John M. Frazier ed., 1992).

Michael A. Kamrin, Toxicology: A Primer on Toxicology Principles and Applications (1988).

Frank C. Lu, Basic Toxicology: Fundamentals, Target Organs, and Risk Assessment (4th ed. 2002).

National Research Council, Biologic Markers in Reproductive Toxicology (1989).

Alan Poole & George B. Leslie, A Practical Approach to Toxicological Investigations (1989).

Principles and Methods of Toxicology (A. Wallace Hayes ed., 5th ed. 2008).

Joseph V. Rodricks, Calculated Risks (2d ed. 2006).

Short-Term Toxicity Tests for Nongenotoxic Effects (Philippe Bourdeau et al. eds., 1990).

Toxic Interactions (Robin S. Goldstein et al. eds., 1990).

Toxic Substances and Human Risk: Principles of Data Interpretation (Robert G. Tardiff & Joseph V. Rodricks eds., 1987).

Toxicology (Hans Marquardt et al. eds., 1999).

Toxicology and Risk Assessment: Principles, Methods, and Applications (Anna M. Fan & Louis W. Chang eds., 1996).

**EXHIBIT C**

EXHIBIT C

# Reference Guide on Medical Testimony

JOHN B. WONG, LAWRENCE O. GOSTIN, AND OSCAR A. CABRERA

*John B. Wong, M.D., is Chief of the Division of Clinical Decision Making, Informatics, and Telemedicine at the Institute for Clinical Research and Health Policy Studies, Tufts Medical Center, and Professor of Medicine at Tufts University School of Medicine.*

*Lawrence O. Gostin, J.D., is Linda D. and Timothy J. O'Neill Professor of Global Health Law and Faculty Director of O'Neill Institute for National and Global Health Law, Georgetown University Law Center.*

*Oscar A. Cabrera, Abogado, LL.M., is Deputy Director of the O'Neill Institute for National and Global Health Law and Adjunct Professor of Law, Georgetown University Law Center.*

CONTENTS

  I.  Introduction, 689

 II.  Medical Testimony Introduction, 689
      A.  Medical Versus Legal Terminology, 689
      B.  Applicability of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 692
      C.  Relationship of Medical Reasoning to Legal Reasoning, 693

III.  Medical Care, 695
      A.  Medical Education and Training, 695
          1.  Medical school, 695
          2.  Postgraduate training, 697
          3.  Licensure and credentialing, 698
          4.  Continuing medical education, 700
      B.  Organization of Medical Care, 700
      C.  Patient Care, 702
          1.  Goals, 702
          2.  Patient–physician encounters, 703

IV.  Medical Decisionmaking, 704
      A.  Diagnostic Reasoning, 704
          1.  Clinical reasoning process, 705
          2.  Probabilistic reasoning and Bayes' rule, 707
          3.  Causal reasoning, 714

EXHIBIT C

*Reference Manual on Scientific Evidence*

B.  Testing, 717
    1.  Screening, 717
    2.  Diagnostic testing, 719
    3.  Prognostic testing, 721
C.  Judgment and Uncertainty in Medicine, 721
    1.  Variation in medical care, 721
    2.  Evidence-based medicine, 722
    3.  Hierarchy of medical evidence, 723
    4.  Guidelines, 726
    5.  Vicissitudes of therapeutic decisionmaking, 728
D.  Informed Consent, 734
    1.  Principles and standards, 734
    2.  Risk communication, 737
    3.  Shared decisionmaking, 739
V.  Summary and Future Directions, 740
Glossary of Terms, 742
References on Medical Testimony, 745

**EXHIBIT C**

# I. Introduction

Physicians are a common sight in today's courtroom. A survey of federal judges published in 2002 indicated that medical and mental health experts constituted more than 40% of the total number of testifying experts.[1] Medical evidence is a common element in product liability suits,[2] workers' compensation disputes,[3] medical malpractice suits,[4] and personal injury cases.[5] Medical testimony may also be critical in certain kinds of criminal cases.[6] The goal of this reference guide is to introduce the basic concepts of diagnostic reasoning and clinical decisionmaking, as well as the types of evidence that physicians use to make judgments as treating physicians or as experts retained by one of the parties in a case. Following this introduction (Section I), Section II identifies a few overarching theoretical issues that courts face in translating the methods and techniques customary in the medical profession in a manner that will serve the court's inquiry. Sections III and IV describe medical education and training, the organization of medical care, the elements of patient care, and the processes of diagnostic reasoning and medical judgment. When relevant, each subsection includes examples from case law illustrating how the topic relates to legal issues.

# II. Medical Testimony Introduction

## A. Medical Versus Legal Terminology

Because medical testimony is common in the courtroom generally and indispensable to certain kinds of cases, courts have employed some medical terms in ways

---

1. Joe S. Cecil, *Ten Years of Judicial Gatekeeping Under* Daubert, 95 Am. J. Pub. Health S74–S80 (2005).

2. *See, e.g.*, *In re* Bextra & Celebrex Mktg. Sales Practices and Prod. Liab., 524 F. Supp. 2d 1166 (N.D. Cal. 2007) (thoroughly reviewing the proffered testimony of plaintiff's expert cardiologist and neurologist in a products liability suit alleging that defendant's arthritis pain medication caused serious cardiovascular injury).

3. *See, e.g.*, AT&T Alascom v. Orchitt, 161 P.3d 1232 (Alaska 2007) (affirming the decision of the state workers' compensation board and rejecting appellant's challenges to worker's experts).

4. Schneider *ex rel.* Estate of Schneider v. Fried, 320 F.3d 396 (3d Cir. 2003) (allowing a physician to testify in a malpractice case regarding whether administering a particular drug during angioplasty was within the standard of care).

5. *See, e.g.*, Epp v. Lauby, 715 N.W.2d 501 (Neb. 2006) (detailing the opinions of two physicians regarding whether plaintiff's fibromyalgia resulted from an automobile accident with two defendants).

6. Medical evidence will be at issue in numerous kinds of criminal cases. *See* State v. Price, 171 P.3d 293 (Mont. 2007) (an assault case in which a physician testified regarding the potential for a stun gun to cause serious bodily harm); People v. Unger, 749 N.W.2d 272 (Mich. Ct. App. 2008) (a second-degree murder case involving testimony of a forensic pathologist and neuropathologist); State v. Greene, 951 So. 2d 1226 (La. Ct. App. 2007) (a child sexual battery and child rape case involving the testimony of a board-certified pediatrician).

EXHIBIT C

*Reference Manual on Scientific Evidence*

that differ from their use by the medical profession. Differential diagnosis, for example, is an accepted method that a medical expert may employ to offer expert testimony that satisfies *Daubert*.[7] In the legal context, differential diagnosis refers to a technique "in which physician first rules in all scientifically plausible causes of plaintiff's injury, then rules out least plausible causes of injury until the most likely cause remains, thereby reaching conclusion as to whether defendant's product caused injury. . . ."[8] In the medical context, by contrast, differential diagnosis

7. *See, e.g.*, Feliciano-Hill v. Principi, 439 F.3d 18, 25 (1st Cir. 2006) ("[W]hen an examining physician calls upon training and experience to offer a differential diagnosis . . . most courts have found no *Daubert* problem."); Clausen v. M/V New Carissa, 339 F.3d 1049, 1058–59 (9th Cir. 2003) (recognizing differential diagnosis as a valid methodology); Mattis v. Carlon Elec. Prods., 295 F.3d 856, 861 (8th Cir. 2002) ("A medical opinion based upon a proper differential diagnosis is sufficiently reliable to satisfy [*Daubert*.]"); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999) (recognizing differential diagnosis as a reliable technique).

8. Wilson v. Taser Int'l, Inc. 2008 WL 5215991, at *5 (11th Cir. Dec. 16, 2008) ("[N]onetheless, Dr. Meier did not perform a differential diagnosis or any tests on Wilson to rule out osteoporosis and these corresponding alternative mechanisms of injury. Although a medical expert need not rule out every possible alternative in order to form an opinion on causation, expert opinion testimony is properly excluded as unreliable if the doctor 'engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes and the doctor offered no good explanation as to why his or her conclusion remained reliable' or if 'the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' action and [the doctor] offered no reasonable explanation as to why he or she still believed that the defendants' actions were a substantial factor in bringing about that illness.'"); Williams v. Allen, 542 F.3d 1326, 1333 (11th Cir. 2008) ("Williams also offered testimony from Dr. Eliot Gelwan, a psychiatrist specializing in psychopathology and differential diagnosis. Dr. Gelwan conducted a thorough investigation into Williams' background, relying on a wide range of data sources. He conducted extensive interviews with Williams and with fourteen other individuals who knew Williams at various points in his life.") (involving a capital murder defendant petitioning for habeus corpus offering supporting expert witness); Bland v. Verizon Wireless, L.L.C., 538 F.3d 893, 897 (8th Cir. 2008) ("Bland asserts Dr. Sprince conducted a differential diagnosis which supports Dr. Sprince's causation opinion. We have held, 'a medical opinion about causation, based upon a proper differential diagnosis is sufficiently reliable to satisfy *Daubert*.' A 'differential diagnosis [is] a technique that identifies the cause of a medical condition by eliminating the likely causes until the most probable cause is isolated.'") (stating expert's incomplete execution of differential diagnosis procedure rendered expert testimony unsatisfactory for *Daubert* standard) (citations omitted); Lash v. Hollis 525 F.3d 636, 640 (8th Cir. 2008) ("Further, even if the treating physician had specifically opined that the Taser discharges caused rhabdomyolysis in Lash Sr., the physician offered no explanation of a differential diagnosis or other scientific methodology tending to show that the Taser shocks were a more likely cause than the myriad other possible causes suggested by the evidence.") (finding lack of expert testimony with differential diagnosis enough to render evidence insufficient for jury to find causation in personal injury suit); Feit v. Great West Life & Annuity Ins. Co., 271 Fed. App'x. 246, 254 (3d Cir. 2008) ("However, although this Court generally recognizes differential diagnosis as a reliable methodology the differential diagnosis must be properly performed in order to be reliable. To properly perform a differential diagnosis, an expert must perform two steps: (1) 'Rule in' all possible causes of Dr. Feit's death and (2) 'Rule out' causes through a process of elimination whereby the last remaining potential cause is deemed the most likely cause of death.") (ruling that district court not in error for excluding expert medical testimony that relied on an improperly performed differential diagnosis) (citations omitted); Glastetter v. Novartis Pharms. Corp., 252 F.3d 986 (8th Cir. 2001).

EXHIBIT C

*Reference Guide on Medical Testimony*

refers to a set of diseases that physicians consider as possible causes for symptoms the patient is suffering or signs that the patient exhibits.[9] By identifying the likely potential causes of the patient's disease or condition and weighing the risks and benefits of additional testing or treatment, physicians then try to determine the most appropriate approach—testing, medication, or surgery, for example.[10]

Less commonly, courts often have used the term "differential etiology" interchangeably with differential diagnosis.[11] In medicine, etiology refers to the study of causation in disease,[12] but differential etiology is a legal invention not used by physicians. In general, both differential etiology and differential diagnosis are concerned with establishing or refuting causation between an external cause and a plaintiff's condition. Depending on the type of case and the legal standard, a medical expert may testify in regard to specific causation, general causation, or both. General causation refers to whether the plaintiff's injury could have been caused by the defendant, or a product produced by the defendant, while specific causation is established only when the defendant's action or product actually caused the harm.[13] An opinion by a testifying physician may be offered in support of both kinds of causation.[14]

Courts also refer to medical certainty or probability in ways that differ from their use in medicine. The standards "reasonable medical certainty" and "reasonable medical probability" are also terms of art in the law that have no analog for a practicing physician.[15] As is detailed in Section IV, diagnostic reasoning and medi-

9. Steadman's Medical Dictionary 531 (28th ed. 2006) (defining differential diagnosis as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.").

10. The Concise Dictionary of Medical-Legal Terms 36 (1998) (definition of differential diagnosis).

11. *See* Proctor v. Fluor Enters., Inc. 494 F.3d 1337 (11th Cir. 2007) (testifying medical expert employed differential etiology to reach a conclusion regarding the cause of plaintiff's stroke). *But see* McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1252 (11th Cir. 2005) (distinguishing differential diagnosis from differential etiology, with the former closer to the medical definition and the latter employed as a technique to determine external causation).

12. Steadman's Medical Dictionary 675 (28th ed. 2006) (defining etiology as "the science and study of the causes of disease and their mode of operation. . . ."). For a discussion of the term "etiology" in epidemiology studies, see Michael D. Green et al., Reference Guide on Epidemiology, Section I, in this manual.

13. *See* Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 268 (2d Cir. 2002).

14. *See*, *e.g.*, Ruggiero v. Warner-Lambert Co. 424 F.3d 249 (2d Cir. 2005) (excluding testifying expert's differential diagnosis in support of a theory of general causation because it was not supported by sufficient evidence).

15. *See, e.g.*, Dallas v. Burlington N., Inc., 689 P.2d 273, 277 (Mont. 1984) ("'[R]easonable medical certainty' standard; the term is not well understood by the medical profession. Little, if anything, is 'certain' in science. The term was adopted in law to assure that testimony received by the fact finder was not merely conjectural but rather was sufficiently probative to be reliable"). This reference guide will not probe substantive legal standards in any detail, but there are substantive differences in admissibility standards for medical evidence between federal and state courts. *See* Robin Dundis Craig, *When* Daubert *Gets* Erie*: Medical Certainty and Medical Expert Testimony in Federal Court*, 77 Denv. U. L. Rev. 69 (1999).

EXHIBIT C

*Reference Manual on Scientific Evidence*

cal evidence are aimed at recommending the best therapeutic option for a patient. Although most courts have interpreted "reasonable medical certainty" to mean a preponderance of the evidence,[16] physicians often work with multiple hypotheses while diagnosing and treating a patient without any "standard of proof" to satisfy.

Statutes and administrative regulations may also contain terms that are borrowed, often imperfectly, from the medical profession. In these cases, the court may need to examine the intent of the legislature and the term's usage in the medical profession.[17] If no intent is apparent, the court may need to determine whether the medical definition is the most appropriate one to apply to the statutory language. Whether the language is a term of art or a question of law will often dictate the admissibility and weight of evidence.[18]

## B. *Applicability of* Daubert v. Merrell Dow Pharmaceuticals, Inc.

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[19] changed the way that judges screen expert testimony. A 2002 study by the RAND Corporation indicated that after *Daubert*, judges began scrutinizing expert testimony much more closely and began more aggressively excluding evidence that does not meet its standards.[20] Despite the Court's subsequent decisions in *General Electric Co. v. Joiner*[21] and *Kumho Tire Co. v. Carmichael*[22] further defining the

16. *See, e.g.*, Sharpe v. United States, 230 F.R.D. 452, 460 (E.D. Va. 2005) ("It is not enough for the plaintiff's expert to testify that the defendant's negligence might or may have caused the injury on which the plaintiff bases her claim. The expert must establish that the defendant's negligence was 'more likely' or 'more probably' the cause of the plaintiff's injury . . . ").

17. *See, e.g.*, Feltner v. Lamar Adver., Inc., 83 F. App'x 101 (6th Cir. 2003) (holding that the statutory definition of "permanent total disability" under the Tennessee Workers Compensation Act was not the same as the medical definition); Endorf v. Bohlender, 995 P.2d 896 (Kan. Ct. App. 2000) (a medical malpractice case reversing a lower court's interpretation of the statutory phrase "clinical practice" because it did not comport with the legislature's intent that the statutory meaning reflect the medical definition).

18. *See, e.g.*, Coleman v. Workers' Comp. Appeal Bd. (Ind. Hosp.), 842 A.2d 349 (Pa. 2004) (holding that since the legislature did not define the medical term "physical examination," the common usage of the term is more appropriate than the strict medical definition).

19. 509 U.S. 579 (1993).

20. Lloyd Dixon & Brian Gill, Changes in the Standards for Admitting Expert Evidence in Federal Civil Cases Since the *Daubert* Decision (2002).

21. 522 U.S. 136 (1997) (holding that the trial court had properly excluded expert testimony extrapolated from animal studies and epidemiological studies).

22. 526 U.S. 137 (1999). In *Kumho*, the Court made clear that *Daubert* applies to all expert testimony and not just "scientific" testimony. Although the case involved a defect in tires, courts before *Kumho* were divided on whether expert medical opinion based on experience or clinical medical testimony were subject to *Daubert*. *See also* Joe S. Cecil*, Ten Years of Judicial Gatekeeping Under* Daubert, 95 Am. J. Pub. Health S74–S80 (2005). *See also* Lawrence O. Gostin, Public Health Law: Power, Duty, Restraint (2d ed. 2008).

**EXHIBIT C**

*Reference Guide on Medical Testimony*

*Daubert* standard, federal and state courts have sometimes employed conflicting interpretations of what *Daubert* requires from testifying physicians.

The standard of review is an important factor in understanding how *Daubert* has engendered seemingly inconsistent results. The Supreme Court adopted an abuse of discretion standard in *Joiner*[23] and affirmed it in *Kumho*.[24] Although in most product liability cases the courts reached the same conclusion, inconsistent determinations regarding the admissibility of similar evidence may not constitute an abuse of discretion under the federal standard of review or in states with a similar standard.[25]

## C. Relationship of Medical Reasoning to Legal Reasoning

As Section II.A suggested, the goal that guides the physician—recommending the best therapeutic options for the patient—means that diagnostic reasoning and the process of ongoing patient care and treatment involve probabilistic judgments concerning several working hypotheses, often simultaneously. When a court requires a testifying physician to offer evidence "to a reasonable medical certainty" or "reasonable medical probability," it is supplying the expert with a legal rule to which his or her testimony must conform.[26] In other words, a lawyer often will

23. 522 U.S. at 143.

24. 526 U.S. at 142.

25. Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1207 (10th Cir. 2002); *see also* Brasher v. Sandoz Pharm. Corp., 160 F. Supp. 2d 1291, 1298 n.17 (N.D. Ala. 2001); Reichert v. Phipps, 84 P.3d 353, 358 (Wyo. 2004).

26. Courts have occasionally noted the tension between the medical reasoning and legal reasoning when applying the reasonable medical certainty or reasonable medical probability standards. *See* Clark v. Arizona, 548 U.S. 735, 777 (2006) ("When . . . 'ultimate issue' questions are formulated by the law and put to the expert witness who must then say 'yea' or 'nay,' then the expert witness is required to make a leap in logic. He no longer addresses himself to medical concepts but instead must infer or intuit what is in fact unspeakable, namely, the *probable relationship* between medical concepts and legal or moral constructs such as free will. These impermissible leaps in logic made by expert witnesses confuse the jury. . . ."); Rios v. City of San Jose, 2008 U.S. Dist. LEXIS 84923, at ★4 (N.D. Cal. Oct. 9, 2008) ("In their fifth motion, plaintiffs seek to exclude the testimony of Dr. Brian Peterson who defendants designated to testify, among other subjects, about the 'proximate cause' of Rios' death. As the use of terms that also carry legal significance could confuse the jury, the motion is granted in part, and defendants are instructed to distinguish between medical and legal terms such as proximate cause to the extent possible. Where such terms must be used by the witness consistent with the language employed in his field of expertise, the parties shall craft a limiting instruction to advise the jury of the distinction between those terms and the issues they will be called upon to determine."); Norland v. Wash. Gen. Hosp., 461 F.2d 694, 697 (8th Cir. 1972) ("The use of the terms 'probable' and 'possible' as a basis for test of qualification or lack of qualification in respect to a medical opinion has frequently converted this aspect of a trial into a mere semantic ritual or hassle. The courts have come to recognize that the competency of a physician's testimony cannot soundly be permitted to turn on a mechanical rule of law as to which of the two terms he has employed. Regardless of which term he may have used, if his testimony is such nature and basis of hypothesis as to judicially impress that the opinion expressed represents his professional judgment as to the most likely one among the

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

need to explain the legal standard to the physician, who will then shape the form and content of his or her testimony in a manner that serves the legal inquiry.[27]

Legal standards will shape how physicians testify in a number of other ways. Although treating physicians generally are concerned less about discovering the actual causes of the disease than treating the patient, the testifying medical expert will need to tailor his or her opinions in a way that conforms to the legal standard of causation. As Section IV will demonstrate, when analyzing the patient's symptoms and making a judgment based on the available medical evidence, a physician will not expressly identify a "proximate cause" or "substantial factor." For example, in order to recommend treatment, a physician does not necessarily need to determine whether a patient's lung ailment was more likely the result of a long history of tobacco use or prolonged exposure to asbestos if the optimal treatment is the same. In contrast, when testifying as an expert in a case in which an employee with a long history of tobacco use is suing his employer for possible injuries as a result of asbestos exposure in the workplace, physicians may need to make judgments regarding the likelihood that either tobacco or asbestos—or both—could have contributed to the injury.[28]

Physicians often will be asked to testify about patients from whom they have never taken a medical history or examined and make estimates about proximate cause, increased risk of injury, or likely future injuries.[29] The doctor may even need to make medical judgments about a deceased litigant.[30] Testifying in all such cases requires making judgments that physicians do not ordinarily make in their profession, making these judgments outside of physicians' customary patient encounters, and adapting the opinion in a way that fits the legal standard. The purpose of this guide is not to describe or recommend competing legal standards, whether it be the standard of proof, causation, admissibility, or the applicable standard of care in medical malpractice cases. Instead, it aims to introduce the practice of medicine to federal and state judges, emphasizing the tools and methods that

possible causes of the physical condition involved, the court is entitled to admit the opinion and leave its weight to the jury.").

27. There are several cases that demonstrate the difficulty that physicians sometimes have in adapting their testimony to the legal standard. *See* Schrantz v. Luancing, 527 A.2d 967 (N.J. Super. Ct. Law Div. 1986) (malpractice case in which the medical expert's opinion was inadequate because of her understanding of "reasonable medical certainty").

28. Physicians will testify as experts in cases in which the plaintiff's condition may be the result of multiple causes. In these cases, the divergence between medical reasoning and legal reasoning are very apparent. *See, e.g.*, Tompkin v. Philip Morris USA, Inc., 362 F.3d 882 (6th Cir. 2004) (affirming district court's conclusion that testimony offered by the defendant's expert regarding the decedent's work-related asbestos exposure was not prejudicial in a suit against a tobacco company on behalf of plaintiff's deceased husband); Mobil Oil Corp. v. Bailey, 187 S.W.3d 265 (Tex. Ct. App. 2006) (involving claims from a worker who had a long history of tobacco use that exposure to asbestos increased his risk of cancer).

29. *See, e.g.*, *Tompkin*, 362 F.3d 882.

30. *See, e.g.*, *id.*

694

EXHIBIT C

*Reference Guide on Medical Testimony*

doctors use to make decisions and highlighting the challenges in adapting them when testifying as medical experts.

Sections III and IV of this guide explain in great detail the practice of medicine, including medical education, the structure of health care, and, most importantly, the methods that physicians use to diagnose and treat their patients. Special attention is given to the physician–patient relationship and to the types of evidence that physicians use to make medical judgments. In an effort to make each issue more salient, examples from case law are offered when they are illustrative.

# III. Medical Care

## *A. Medical Education and Training*

### *1. Medical school*

The Association of American Medical Colleges (AAMC) consists of 133 accredited U.S. medical schools and 17 Canadian medical schools.[31] The Liaison Committee on Medical Education performs the accreditation for AAMC and assesses the quality of postsecondary education by determining whether each institution or program meets established standards for function, structure, and performance. The goal of medical school is to prepare students in the art and science of medicine for graduate medical education.[32] Of the 4 years of medical school, the first 2 years are typically spent studying preclinical basic sciences involving the study of the normal structure and function of human systems (e.g., through anatomy, biochemistry, physiology, behavioral science, and neuroscience), followed by the study of abnormalities and therapeutic principles (e.g., through microbiology, immunology, pharmacology, and pathology). The final 2 years involve clinical experience, including rotations in patient care settings such as clinics or hospitals with required "core" clerkships in internal medicine, pediatrics, psychiatry, surgery, obstetrics/gynecology, and family medicine. All physicians who wish to be licensed must pass the United States Medical Licensing Examination Steps 1, 2, and 3.[33]

31. Association of American Medical Colleges, Membership, *available at* https://www.aamc.org/about/membership/ (last visited Feb. 12, 2011).

32. *See* Davis v. Houston Cnty., Ala. Bd. of Educ., 2008 WL 410619 (M.D. Ala. Feb. 13, 2008) (finding that an individual with no medical training was not qualified to give expert testimony).

33. Planned Parenthood Cincinnati Region v. Taft 444 F.3d 502, 515 (6th Cir. 2006), ("The State has not appealed the district court's order refusing to recognize Dr. Crockett as an expert in the critical review of medical literature. Although that order has not been placed before us, the only reason the district court gave for her ruling was that Dr. Crockett did not have any specific training in the critical review of medical literature beyond the training incorporated in her general medical school and residency training. This ruling ignored Dr. Crockett's testimony that her residency program at Georgetown University put particular emphasis on training residents in the critical review of medical literature, that she had taught classes on the subject, that she had done extensive reading and

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

In the United States, besides the more than 941,000 physicians, there are more than 61,000 doctors of osteopathy. The Commission on Osteopathic College Accreditation accredits 25 colleges of osteopathic medicine. Training is similar to that for medical physicians but with additional "special attention on the musculoskeletal system which reflects and influences the condition of all other body systems."[34] About 25% of current U.S. physicians are foreign medical graduates that include both U.S. citizens and foreign nationals.[35] Because educational standards and curricula outside the United States and Canada vary, the Education Commission for Foreign Medical Graduates has developed a certification exam to assess whether these graduates may enter Accreditation Council for Graduate Medical Education (ACGME) accredited residency and fellowship programs.[36]

self-education on the subject, and that she had critically reviewed medical literature for the FDA. If these qualifications are not sufficient to demonstrate expertise, this court is hard-pressed to imagine what qualifications would suffice."); Davis v. Houston Cnty., Ala. Bd. of Educ., 2008 WL 410619, at ★4 (M.D. Ala. Feb. 13, 2008) ("The Board has moved to exclude all evidence of Freet's opinions and conclusions related to the cause of Joshua Davis's behavior at the football game contained in his deposition as well as Freet's letter to Malcolm Newman. The Board argues that Freet is not qualified to give expert testimony, and that Plaintiff failed to comply with Fed. R. Civ. P. 26(a)(2)(B) by not providing a report of Freet's testimony that includes all of the information required by Rule 26(a)(2)(B). . . . In order to consider Freet's expert opinions, this Court must find that Freet meets the requirements of Fed. R. Evid. 702. Rule 702 requires an expert to be qualified by 'knowledge, skill, experience, training, or education.' Freet is not a medical doctor and never attended medical school. The only evidence of Freet's qualifications are: approximately five years working for the Department of Veterans Affairs in the vocational rehabilitation program, followed by approximately seven years working in private practice as a 'licensed professional counselor.' There is no evidence in the record of Freet's educational background, or any details of the exact nature of Freet's work experience."); Therrien v. Town of Jay, 489 F. Supp. 2d 116, 117 (D. Me. 2007) ("Citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and Rule 702 of the Federal Rules of Evidence, Officer Gould's first objection is that Dr. Harding does not possess sufficient expertise to express expert opinions about 'the mechanism and timing of Plaintiff's injuries.' This objection is not well taken. Dr. Harding was graduated from Dartmouth College and Georgetown Medical School; he completed a residency in internal medicine, is board certified in internal medicine, and has been licensed to practice medicine in the state of Maine since 1978."). United States Medical Licensing Examination, Examinations, *available at* http://www.usmle.org/Examinations/index.html (last visited Aug. 9, 2011).

34. Association of American Medical Colleges, What is a DO? *available at* http://www. osteopathic.org/osteopathic-health/about-dos/what-is-a-do/Pages/default.aspx (last visited Feb. 12, 2011); Association of American Medical Colleges, About Osteopathic Medicine, *available at* http:// www.osteopathic.org/osteopathic-health/about-dos/about-osteopathic-medicine/Pages/default.aspx (last visited Feb. 12, 2011).

35. American Medical Association, Physician Characteristics and Distribution in the U.S. (2009).

36. Commission for Foreign Medical Graduates, About ECFMG, *available at* http://www.ecfmg. org/about.html (last visited Feb. 12, 2011).

EXHIBIT C

*Reference Guide on Medical Testimony*

## *2. Postgraduate training*

After graduating from medical school, most physicians undergo additional training in a residency program in a chosen specialty.[37] Residencies typically range from 3 to 7 years at teaching hospitals and academic medical centers where residents care for patients while being supervised by physician faculty and participating in educational and research activities.[38] After graduating from an accredited residency program, physicians become eligible to take their board certification examinations.[39] Physician licensure in many states requires the completion of a residency program accredited by the ACGME, the organization which is responsible for accrediting the more than 8700 residency programs in 26 specialties and 130 subspecialties.[40] Following residency, some physicians opt for additional subspecialty fellowship training. ACGME divides fellowship training[41] into (1) Dependent Subspecialty Programs in which the program functions in conjunction with an accredited specialty/core program and (2) Independent Subspecialty Programs in which the program does not depend on the accreditation status of a specialty program.[42] For osteopathic physicians, the American Osteopathic Association approves osteopathic postdoctoral

37.  *See* Brown v. Harmot Med. Ctr., 2008 WL 55999 (W.D. Pa. Jan. 3, 2008). American Medical Association, Requirements for Becoming a Physician, *available at* http://www.ama-assn.org/ama/pub/education-careers/becoming-physician.page? (last visited Aug. 9, 2011).

38.  *See* Planned Parenthood Cincinnati Region v. Taft, 444 F.3d 502, 515 (6th Cir. 2006). American Medical Association, Requirements for Becoming a Physician, *available at* http://www.ama-assn.org/ama/pub/education-careers/becoming-physician.page? (last visited Aug. 9, 2011).

39.  *See* Therrien v. Town of Jay, 489 F. Supp. 2d 116, 117 (D. Me. 2007) (finding that a physician who completed a residency in internal medicine was qualified to give his opinion on trauma related to a § 1983 claim against a police department). American Medical Association, Requirements for Becoming a Physician, *available at* http://www.ama-assn.org/ama/pub/education-careers/becoming-physician.page? (last visited Aug. 9, 2011).

40.  Accreditation Council for Graduate Medical Education, The ACMGE at a Glance, *available at* http://www.acgme.org/acWebsite/newsRoom/newsRm_acGlance.asp (last visited Feb. 12, 2011).

41.  Accreditation Council for Graduate Medical Education, Specialty Programs with Dependent and Independent Subspecialties, *available at* http://www.acgme.org/acWebsite/RRC_sharedDocs/sh_progs_depIndSubs.asp (last visited Feb. 12, 2011).

42.  John Doe 21 v. Sec'y of Health and Human Servs., 84 Fed. Cl. 19, 35–36 (Fed. Cl. 2008) ("The Government's expert, Dr. Wiznitzer, is a board-certified neurologist by the American Board of Psychiatry and Neurology, with a special qualification in Child Neurology. In addition, Dr. Wiznitzer is certified by the American Board of Pediatrics. Since 1986, Dr. Wiznitzer has been an Associate Pediatrician and an Associate Neurologist at University Hospital of Cleveland, Ohio. And, since 1992, Dr. Wiznitzer has been Director of the Autism Center at Rainbow Babies and Children's Hospital in Cleveland, Ohio. During the past 24 years, Dr. Wiznitzer also has been an Associate Professor of Pediatrics and Associate Professor of Neurology at Case Western Reserve University. Dr. Wiznitzer completed his residency in Pediatrics from Children's Hospital Medical Center in Cincinnati and served as a Fellow in Developmental Disorders, Pediatric Neurology, and Higher Cortical Functions. Dr. Wiznitzer also has received numerous awards and honors in the neurology field and his work has been widely published.") (citations omitted); Brown v. Hamot Med. Ctr., 2008 WL 55999, at ⋆8–9

EXHIBIT C

*Reference Manual on Scientific Evidence*

training programs.[43] The American Osteopathic Association established the Osteopathic Postdoctoral Training Institutions (OPTI), wherein each OPTI partners a community-based training consortium with one or more colleges of osteopathic medicine and one or more hospitals and possibly ambulatory care facilities.[44]

## 3. Licensure and credentialing

Medical Practice Acts defining the practice of medicine and delegating enforcement to state medical boards exist for each of the 50 states, the District of Columbia, and the U.S. territories. Besides awarding medical licenses, state medical boards also investigate complaints, discipline physicians who violate the law, and evaluate and rehabilitate physicians. The Federation of State Medical Boards represents the 70 medical boards of the United States and its territories, and its mission is "promoting excellence in medical practice, licensure, and regulation as the national resource and voice on behalf of state medical boards in their protection of the public."[45]

Credentialing typically involves verifying medical education, postgraduate training, board certification, professional experience, state licensure, prior credentialing outcomes, medical board actions, malpractice, and adverse clinical events. Credentialing or recredentialing by hospitals involves an assessment of a physician's professional or technical competence and performance by evaluating and monitoring the quality of patient care. This credentialing process defines physicians' scope of practice and hospital privileges, that is, the clinical services they may provide.

The American Board of Medical Specialties (ABMS) provides certification in 24 medical specialties (e.g., emergency medicine, internal medicine, obstetrics and gynecology, family medicine, pediatrics, surgery, and others) to provide[46] "assurance of a physician's expertise in a particular specialty and/or subspecialty

(W.D. Pa. Jan. 3, 2008) ("As the United States Court of Appeals for the Fifth Circuit has explained in another context, a medical residency is primarily an academic enterprise:

> [a] residency program is distinct from other types of employment in that the resident's "work" is what is academically supervised and evaluated. [T]he primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. The certificate . . . tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas. . . . Successful completion of the residency program depends upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review. . . .").

43. American Osteopathic Association, Postdoctoral Training, *available at* http://www.osteopathic.org/inside-aoa/Education/postdoctoral-training/Pages/default.aspx (last visited Feb. 12, 2011).

44. *Id*.

45. Federation of State Medical Boards, FSMB Mission and Goals, *available at* http://www.fsmb.org/mission.html (last visited Feb. 12, 2011).

46. American Board of Medical Specialties, Who We Are and What We Do, *available at* http://www.abms.org/About_ABMS/who_we_are.aspx (last visited Feb. 12, 2011).

698

**EXHIBIT C**

*Reference Guide on Medical Testimony*

of medical practice."[47] Although the criteria vary depending on the field, board eligibility requires the completion of an appropriate residency, an institutional or valid license to practice medicine, and evaluation with written and—in some cases—oral examinations. Many boards also require an evaluation of practice performance for initial certification. Board certification documents the fulfillment of all criteria including passing the examinations. Originally, board certificates had no expiration, but a program of periodic recertification (every 6 to 10 years) was subsequently initiated to ensure that physicians remained current in their specialty. In 2006, the ABMS recertification process became the Maintenance of Certification to emphasize continuous professional development through a four-part process:

1. Licensure and professional standing;
2. Lifelong learning;
3. Cognitive expertise; and
4. Practice performance assessment in six core competencies
   a. patient care,
   b. medical knowledge,
   c. practice-based learning,
   d. interpersonal and communications skills,
   e. professionalism, and
   f. systems-based practice.[48]

In some cases, specialty organizations have opted to develop their own certification process outside of the ABMS (e.g., the American Board of Bariatric Medicine).[49]

The American Osteopathic Association (AOA) certifies osteopathic physicians in 18 osteopathic specialty boards (e.g., emergency medicine, internal medicine, obstetrics and gynecology, family medicine, pediatrics, surgery, and others).[50] The osteopathic continuous certification process involves (1) unrestricted licensure, (2) lifelong learning/continuing medical education, (3) cognitive assessment, (4) practice performance assessment and improvement, and (5) continuous AOA membership.[51]

---

47. Although specialization is a hallmark of modern medical practice, courts have not always required that medical testimony come from a specialist. *See* Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar, 245 F.3d 15, 24–25 (1st Cir. 2003) ("The proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline.").

48. American Board of Medical Specialties, ABMS Maintenance of Certification, *available at* http://www.abms.org/Maintenance_of_Certification/ABMS_MOC.aspx (last visited Feb. 12, 2011).

49. American Board of Bariatric Medicine, Certification, *available at* http://www.abbmcertification. org/ (last visited Feb. 12, 2011).

50. American Osteopathic Association, AOA Specialty Certifying Boards, *available at* http://www.osteopathic.org/inside-aoa/development/aoa-board-certification/Pages/aoa-specialty-boards.aspx (last visited Feb. 12, 2011).

51. *Id.*

699

EXHIBIT C

*Reference Manual on Scientific Evidence*

### 4. Continuing medical education

For relicensure, state medical boards require continuing medical education so that physicians can acquire new knowledge and maintain clinical competence. The Accreditation Council for Continuing Medical Education (ACCME) identifies, develops, and promotes quality standards for continuing medical education for physicians. ACCME requires certain elements of structure, method, and organization in the development of continuing medical education materials to ensure uniformity across states and to help assure physicians, state medical boards, medical societies, state legislatures, continuing medical education providers, and the public that the education meets certain quality standards. For osteopathic physicians, the AOA Board of Trustees also oversees accreditation for osteopathic CME sponsors through the Council on Continuing Medical Education (CCME).[52] The AOA's Healthcare Facilities Accreditation Program (HFAP) reviews services delivered by medical facilities.[53]

## B. Organization of Medical Care

The delivery of health care in the United States is highly decentralized and fragmented,[54] and is provided through clinics, hospitals, managed care organizations, medical groups, multispecialty clinics, integrated delivery systems, specialty standalone hospitals, imaging facilities, skilled nursing facilities, rehabilitation hospitals, emergency departments, and pharmacy-based and other walk-in clinics. When surveyed in 1996, patients viewed the health care system as a "nightmare to navigate."[55] Transitioning care from outpatient to inpatient hospitalization to recovery often involves multiple handoffs among different physicians and care providers with the need for accurate, timely, and complete transfer of information about the patient's acute and chronic medical conditions, medications, and treatments. Although hospitals increasingly belong to a network or system, most community physicians belong to practices involving 10 or fewer physicians.[56]

Concerns about the safety of the organization of medical care first arose from the Harvard Medical Practice Study which found that adverse events occurred in

---

52. American Osteopathic Association, Continuing Medical Education, *available at* http://www.osteopathic.org/inside-aoa/development/continuing-medical-education/Pages/default.aspx (last visited Feb. 12, 2011).

53. Healthcare Facilities Accreditation Program, About HFAP, *available at* http://www.hfap.org/about/overview.aspx (last visited Feb. 12, 2011).

54. Committee on Quality of Health Care in America, Institute of Medicine, Crossing the Quality Chasm: A New Health System for the 21st Century (2001) (hereinafter "2001 CQHCA Report").

55. *Id*. at 28.

56. *Id*. at 28.

EXHIBIT C

*Reference Guide on Medical Testimony*

3.7% of hospitalizations.[57] Following some highly publicized errors (fatal medication overdoses and amputation of the limb on the wrong side), the Institute of Medicine estimated that errors resulted in as many as 98,000 deaths in patients hospitalized during 1997.[58] The report highlights "The decentralized and fragmented nature of the health care delivery system (some would say 'nonsystem') also contributes to unsafe conditions for patients, and serves as an impediment to efforts to improve safety." While recognizing that "not all errors result in harm," the report defines safety as "freedom from accidental injury" and specifies two types of error: "the failure of a planned action to be completed as intended or the use of a wrong plan to achieve an aim."[59]

Subsequently, the Institute of Medicine recommended development of a learning health care delivery system "a system that both prevents errors and learns from them when they occur. The development of such a system requires, first, a commitment by all stakeholders to a culture of safety and, second, improved information systems."[60] Government and nongovernment institutions such as the Agency for Healthcare Research and Quality (designated as the federal lead for patient safety by the Healthcare Research and Quality Act of 1999 to "(1) identify the causes of preventable health care errors and patient injury in health care delivery; (2) develop, demonstrate, and evaluate strategies for reducing errors and improving patient safety; and (3) disseminate such effective strategies throughout the health care industry."),[61] the National Quality Forum (a nonprofit organization with multiple stakeholders developing and measuring performance standards), the Joint Commission (independent not-for-profit organization accrediting and certifying care quality and safety), Institute of Healthcare Improvement (independent not-for-profit organization fostering innovation that improves care), and the Leapfrog Group (a coalition of large employers rewarding performance) all have adopted as parts of their mission the assessment and promotion of safety at the healthcare system level. To deliver safe, effective, and efficient care, medical delivery systems having increasingly incorporated allied health professions, including nurses, nurse practitioners, physicians' assistants, pharmacists, and therapists into care delivery.

57. Troyen A. Brennan et al., *Incidence of Adverse Events and Negligence in Hospitalized Patients: Results of the Harvard Medical Practice Study I*, 324 New Eng. J. Med. 370–76 (1991); Lucian L. Leape et al., *The Nature of Adverse Events in Hospitalized Patients: Results of the Harvard Medical Practice Study II*, 324 New Eng. J. Med. 377–84 (1991).

58. Committee on Quality of Health Care in America, Institute of Medicine, To Err Is Human: Building a Safer Health System 26 (2000) (hereinafter "2000 CQHCA Report").

59. *Id* at 4, 54, 58.

60. Committee on Data Standards for Patient Safety, Institute of Medicine, Patient Safety: Achieving a New Standard for Care 1 (2005).

61. Agency for Healthcare Research and Quality, Advancing Patient Safety: A Decade of Evidence, Design and Implementation at 1, *available at* http://www.ahrq.gov/qual/advptsafety.htm (last visited Feb. 12, 2011.)

EXHIBIT C

*Reference Manual on Scientific Evidence*

## C. Patient Care

### 1. Goals

The Institute of Medicine (IOM) describes quality health care delivery as "[t]he degree to which health services for individuals and populations increase the likelihood of desired health outcomes and are consistent with current professional knowledge." The six specific aims for improving health care include

1. "Safe: avoiding injuries to patients from the care that is intended to help them;"
2. "Effective: providing services based on scientific knowledge to all who could benefit, and refraining from providing services to those not likely to benefit;"
3. "Patient-centered: providing care that is respectful of and responsive to individual patient preferences, needs, and values, and ensuring that patient values guide all clinical decisions;"
4. "Timely: reducing waits and sometimes harmful delays for both those who receive and those who give care;"
5. "Efficient: avoiding waste, including waste of equipment, supplies, ideas, and energy;" and
6. "Equitable: providing care that does not vary in quality because of personal characteristics such as gender, ethnicity, geographic location, and socioeconomic status."[62]

Health outcome goals include (1) improving longevity or life expectancy, (2) relieving symptoms (improving quality of life or reducing morbidity), and (3) preventing disease. These goals, however, may conflict with one another. For example, some patients may be willing to accept the chance of a reduced length of life to try to obtain a higher quality of life (e.g., if normal volunteers had a vocal cord cancer, about 20% of them would prefer radiation therapy instead of surgery to preserve their voice despite a reduction in survival[63]), whereas others may accept reduced quality of life to try to extend life (e.g., cancer chemotherapy). Some may accept a risk of dying from a procedure to prolong life or relieve symptoms (e.g., coronary revascularization), whereas others may prefer to avoid the near-term risk of the procedure or surgery despite future benefit (risk aversion). In *Crossing the Quality Chasm,* the IOM emphasized care delivery that should accommodate individual patient choices and preferences and be customized on the basis of patients needs and values.[64]

---

62. 2001 CQHCA Report, *supra* note 54, at 44, 5-6.
63. Barbara J. McNeil et al., *Speech and Survival: Tradeoffs Between Quality and Quantity of Life in Laryngeal Cancer,* 305 New Eng. J. Med. 982–87 (1981) (hereinafter "McNeil").
64. 2001 CQHCA Report, *supra* note 54, at 49.

**EXHIBIT C**

*Reference Guide on Medical Testimony*

The Charter on Medical Professionalism avers three fundamental principles: (1) patient welfare or serving the interest of the patient, (2) patient autonomy or empowering patients to make informed decisions, and (3) social justice or fair distribution of health care resources.[65] At times, the primacy of patient welfare places the physician in conflict with social justice—for example, a patient with an acute heart attack is in the emergency room with no coronary care unit (CCU) beds available, and the most stable patient in the CCU has a 2-day-old heart attack. Transferring the patient out of the CCU places him or her at a small risk for a complication, but the CCU bed is a limited societal resource that other patients should be able to access.[66] Similarly, patients may insist on an unneeded and costly test or treatment, and the first two principles would encourage physicians to acquiesce, yet these unnecessary tests or treatments expose patients to harm and expense and also diminish resources that would otherwise be available to others.[67]

## 2. Patient-physician encounters

A patient–physician encounter typically consists of four components: (1) patient history, (2) physical examination, (3) medical decisionmaking, and (4) counseling.[68] In many cases, patients seek medical attention because of a change in health that led to symptoms. During the patient history, physicians identify the chief complaint as the particular symptom that led the patient to seek medical evaluation. The history of the present illness includes the onset and progression of symptoms over time and may include eliciting pertinent symptoms that the patient does not exhibit. These "pertinent negatives" reduce the likelihood of certain competing diagnoses. A comprehensive encounter includes past medical history of prior illnesses, hospitalizations, surgeries, current medications, drug allergies, and lifestyle habits including smoking, alcohol use, illicit drug use, dietary habits, and exercise habits. Family history considers illnesses that have been diagnosed in related family members to identify potential genetic predispositions for disease. Social history usually includes education, employment, and social relationships and provides a socioeconomic context for developing or coping with illness and an employment context for exposure to environmental or toxin risks. Finally, the review of systems is a comprehensive checklist of symptoms that might or might not arise from the various organ systems and is an ancillary means to capture symp-

---

65. Medical Professionalism Project: ABIM Foundation, *Medical Professionalism in the New Millennium: A Physician Charter,* 136 Annals Internal Med. 243, 244 (2002).

66. Harold C. Sox et al., Medical Decision Making (2007).

67. Harold C. Sox, *Medical Professionalism and the Parable of the Craft Guilds*, 147 Annals Internal Med. 809–10 (2007).

68. *See generally* Davoll v. Webb, 194 F.3d 1116, 1138 (10th Cir. 1999) ("A treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including treatment of the party.").

EXHIBIT C

*Reference Manual on Scientific Evidence*

toms that the patient may have unintentionally neglected to mention, but which may lead physicians to consider additional diagnostic possibilities.

Patients, particularly the elderly, also may seek care to monitor multiple chronic conditions. This places an emphasis on collaborative and continuous care that involves patients (and their families) and providers, long-term care goals and plans, and self-management training and support.[69] The organizational needs for condition management, however, differ substantially from those necessary to deliver health services for acute episodic complaints. Taking a patient history in this case involves determining the status of the multiple conditions and whether symptoms from those conditions have progressed, improved, or stabilized and of the ability of patients to manage their condition.

The physical examination may be directed or complete. Physical findings are referred to as signs (distinct from symptoms noted by the patient). Directed physical examination refers to the examination of the relevant organ systems that may cause the symptoms or that may have positive or negative findings related to suspected diseases. When the disease is a chronic condition, the examination may be used to monitor disease progression or resolution. The complete physical examination of all organ systems may be performed as part of any annual examination, for difficult diagnoses, or for diseases that affect multiple organ systems.

The medical decisionmaking step of the encounter involves performing an assessment and plan. After the history and physical examination—based on the diagnostic possibilities, their likelihood, and the risks and benefits of treatment for each—the physician decides whether to recommend diagnostic testing, empiric treatment or referral to specialty or subspecialty care for further diagnostic evaluation, or a therapeutic intervention. Particularly challenging diagnoses are those that present with atypical symptoms, occur rarely, mimic other diseases, or involve multiple organ systems. For example, symptoms may arise from different organ systems: Wheezing, which is consistent with asthma, could be caused by acid going up from the stomach into the esophagus and then into the lungs (gastroesophageal reflux), congestive heart failure, or vocal cord dysfunction, among other diagnostic possibilities. The final step in the encounter is counseling the patient regarding diagnoses, tests, and treatments including dietary and lifestyle changes, medications, medical devices, and procedural interventions.

# IV. Medical Decisionmaking

## A. Diagnostic Reasoning

Uncertainty in defining a disease makes diagnosis difficult: (1) the difference between normal and abnormal is not always well demarcated; (2) many diseases

---

69. 2001 CQHCA Report, *supra* note 54, at 27.

704

EXHIBIT C

*Reference Guide on Medical Testimony*

do not progress with certainty (e.g., progression of ductal carcinoma in situ of the breast to invasive breast cancer occurs less than 50% of the time) but rather increase the risk of a poor outcome (e.g., hypertension raises the risk of developing heart disease or stroke); and (3) symptoms, signs, and findings for one disease overlap with others.[70] Variation also exists in the ability of physicians to elicit particular symptoms (e.g., in a group of patients interviewed by many physicians, 23% to 40% of the physicians reported cough as being present), observe signs (e.g., only 53% of physicians detected cyanosis—a blue or purple discoloration of the skin resulting from lack of oxygen—when present), or interpret tests (e.g., only 51% of pathologists agreed with each other when examining PAP smear slides with cells taken from a woman's cervix to look for signs of cervical cancer).[71] Moreover, prognosis (response to disease or treatment) with alternative therapies is in many cases uncertain. In a report by the Royal College of Physicians:

> The practice of medicine is distinguished by the need for judgement in the face of uncertainty. Doctors take responsibility for these judgements and their consequences. A doctor's up-to-date knowledge and skill provide the explicit scientific and often tacit experiential basis for such judgements. But because so much of medicine's unpredictability calls for wisdom as well as technical ability, doctors are vulnerable to the charge that their decisions are neither transparent nor accountable.[72]

## 1. Clinical reasoning process

Studies of clinical problem solving suggest that physicians employ combinations of two diagnostic approaches ranging from hypothetico-deductive (deliberative and analytical) to pattern recognition (quick and intuitive).[73] In the hypothetico-deductive approach, based on partial information, such as patient age, gender, and chief complaint, physicians[74] begin to generate a limited list of potential diagnostic hypotheses (hypothesis generation). Over the past 50 years, cognitive scientists

---

70. David M. Eddy, *Variations in Physician Practice: The Role of Uncertainty*, 3 Health Affairs 74, 75–76 (1984).

71. *Id*. at 77–78.

72. Royal College of Physicians, RCP Bookshop. *Doctors in Society. Medical Professionalism in a Changing World technical supplement full text* at 11, *available at* http://bookshop.rcplondon.ac.uk/contents/pub75-411c044b-3eee-462d-936d-1dad7313e4a0.pdf (last visited Feb. 12, 2011).

73. Jerome P. Kassirer et al., Learning Clinical Reasoning (2d ed. 2009) (hereinafter "Kassirer et al."); Arthur S. Elstein & Alan Schwartz, *Clinical Problem Solving and Diagnostic Decision Making: Selective Review of the Cognitive Literature*, 324 BMJ 729–32 (2002) (hereinafter "Elstein"); Jerome P. Kassirer & G. Anthony Gorry, *Clinical Problem Solving: A Behavioral Analysis*, 89 Annals Internal Med. 245 (1978); Geoffrey Norman, *Research in Clinical Reasoning: Past History and Current Trends*, 39 Med Educ. 418–27 (2005).

74. Steven N. Goodman, *Toward Evidence-Based Medical Statistics, 1: The p Value Fallacy*, 130 Annals Internal Med. 995–1004 (1999) (hereinafter "Goodman").

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

have demonstrated that human short-term memory capacity is limited,[75] and so this initial list of possible diagnoses is a cognitive necessity and provides an initial context that physicians use to evaluate subsequent data. Based on their knowledge of the diagnoses on that list, physicians have expectations about what symptoms, risk factors, disease course, signs, or test results would be consistent with each diagnosis (deductive inference).

As physicians gather additional information, they evaluate those data for their consistency with the possibilities on their initial list and whether those data would increase or decrease the likelihood of each possibility (hypothesis refinement). If the data are inconsistent, additional diagnostic possibilities are considered (hypothesis modification). The information gathering continues as an iterative process at the same visit or over time during multiple visits with the same or other physicians. The final cognitive step (diagnostic verification) involves testing the validity of the diagnosis for its coherency (consistency with predisposing risk factors, physiological mechanisms, and resulting manifestations), its adequacy (the ability to account for all normal and abnormal findings and the disease time course), and its parsimony (the simplest single explanation as opposed to requiring the simultaneous occurrence of two or more diseases to explain the findings).[76]

At the other end of clinical reasoning are heuristics, quick automatic "rules of thumb" or cognitive shortcuts. In such cases, pattern recognition leads to rapid recognition and a quick diagnosis, improving cognitive efficiency.[77] For example, a black woman with large shadows of lymph nodes in her chest x ray would trigger a diagnosis of a disease known as sarcoidosis for many physicians. The simplifying assumptions involved in heuristics, however, are subject to cognitive biases. For example, episodic headache, sweating, and a rapid heartbeat form the classic triad seen in patients with a rare adrenal tumor known as a pheochromocytoma that also can cause hypertension. Physicians finding those three symptoms in a patient with hypertension may overestimate the patient's likelihood of having pheochromocytoma based on representativeness bias, overestimating the likelihood of a less common disease just because case findings resemble those found in that disease.[78] Other cognitive errors include availability (overestimating the

75. Elstein, *supra* note 73; George A. Miller, *The Magical Number Seven Plus or Minus Two: Some Limits on Our Capacity for Processing Information*, 63 Psychol. Rev. 81–97 (1956).

76. Kassirer et al., *supra* note 73, at 5-6.

77. Stephen G. Pauker & John B. Wong, *How (Should) Physicians Think? A Journey from Behavioral Economics to the Bedside,* 304 JAMA 1233–35 (2010).

78. For additional discussion and definition of terms, see Section IV.A.2. Applying Bayes' rule, about 100 in 100,000 patients with hypertension have pheochromocytoma; this symptom triad occurs in 91% of patients with pheochromocytoma (sensitivity) and does not occur in 94% of those without pheochromocytoma (specificity), and so 6% of those without pheochromocytoma would have this symptom triad. On the basis of Bayes' rule, 91 of the 100 individuals with pheochromocytoma (91% times 100) would have this triad, and 5994 without a pheochromocytoma (6% times 99,900) will have the triad. Thus, among the 100,000 hypertensive patients, 6085 will have the classic triad, suggesting the possibility of pheochromocytoma, but only 91 out of the 6085 or 1.5%, will indeed have pheochromcytoma.

EXHIBIT C

*Reference Guide on Medical Testimony*

likelihood of memorable diseases because of severity or media attention and underestimating common or routine diseases) and anchoring (insufficient adjustment of the initial likelihood of disease).[79]

Clinical intuition refers to rapid, unconscious processes that select the pertinent findings out of the multitude of available data.[80] Such expertise results from practice, is context sensitive, and cannot always be reduced to cause and effect.[81] Cognitive research into the development of expertise suggests two competing hypotheses. In instance- or exemplar-based memory, physicians store scripts or "stories" of prior recalled case examples, for example, visual information such as that in pathology, dermatology, or radiology, and match new cases to those stories. The alternative prototype memory hypothesis is based on a mental model of disease wherein experts store structured "facts" about the disease to create abstractions. These "prototypes" enable experts to link findings to one another, to connect findings to the possible diagnoses, and to predict additional findings necessary to confirm the diagnosis, even in the absence of prior experience with exactly such a case.[82]

Physicians typically apply hypothetico-deductive approaches when seeing patients with problems outside of their expertise or difficult problems with atypical issues within their expertise and apply intuitive pattern recognition for cases within their expertise or less challenging cases. However, diagnostic accuracy appears to depend more on mastery of domain knowledge than on the particular problem-solving method.[83]

## 2. Probabilistic reasoning and Bayes' rule

There is no correlation between physicians' ability to collect data thoroughly and their ability to interpret the data accurately.[84] Making quantitative predictions or interpretation of test results constitutes probabilistic reasoning and avoids the use of ambiguous qualitative terms such as "low" or "always" that may contribute to different management decisions.[85]

Over 200 years ago, the Reverend Bayes first wrote a paper published posthumously which now forms a critical concept in modern medicine. Ignored for

79. Kassirer et al., *supra* note 73; Elstein, *supra* note 73.
80. Trisha Greenhalgh, *Intuition and Evidence—Uneasy Bedfellows?* 52 Brit. J. Gen. Practice 395–400 (2002).
81. *Id.* at 396.
82. Kassirer et al., *supra* note 73; Elstein, *supra* note 73.
83. Elstein, *supra* note 73.
84. Arthur S. Elstein & Alan Schwartz, *Clinical Reasoning in Medicine, in* Clinical Reasoning in the Health Professions 223–34 (Joy Higgs et al. eds., 3d ed. 2008).
85. When physicians were asked to quantify "low probability," the estimates had a mean of ~37% with a range from 0% to ~80% and when asked to quantify "always," physicians had a mean of ~88% with a range from 70% to 100%. Geoffrey D. Bryant & Geoffrey R. Norman, *Expressions of Probability: Words and Numbers,* 302 New Eng. J. Med. 411 (1980).

**EXHIBIT C**

nearly two centuries, his paper showed how to estimate the likelihood of disease following a test result using the likelihood of disease prior to testing and the specific test result obtained. Thus, Bayesian analysis refers to a method of combining existing evidence or a prior belief with additional evidence, for example, from test results. The additional evidence may be the presence or absence of a symptom, sign, test, or research study results.

The pretest suspicion of disease or, equivalently, the likelihood or prior probability of disease may be objective, that is, related to incidence (new cases over a specified period of time) or prevalence (existing cases at a particular point in time); based on clinical prediction rules (e.g., mathematical predictive models to estimate the likelihood of developing heart disease over the next 10 years using data from the Framingham Study); or subjective, that is, based on a clinician's estimated likelihood of disease prior to any testing.[86] Bayes' rule then combines that pretest suspicion with the observed test result. Those who have disease and a positive test are said to have true-positive test results. Those without disease who have a negative test are said to have true-negative test results. Tests, however, are almost always not perfectly accurate. That is, not everyone with disease has a positive test; these are called false-negative test results. Similarly, some individuals who are healthy may mistakenly have positive tests; these are called false-positive test results.

For example, consider screening mammography which is positive in 90% of women with breast cancer, and so the true-positive rate (or "sensitivity") of 90% is the likelihood of a positive test among those with disease. Mammography is negative in 93% of women without breast cancer, and so the true-negative rate (or "specificity") of 93% is the likelihood of a negative test among those who do not have disease (see Table 1).[87] Note that if the test is not negative, it must be positive, or vice versa, so that the sum of the columns in Table 1 must equal 100%.

Because a positive mammogram can occur among individuals with or without breast cancer, the interpretation of the likelihood of breast cancer with a positive mammogram can be problematic. Given that the prevalence of breast cancer among asymptomatic 40- to 50-year-old women is 8 in 1000, or 0.8%, Bayes' rule calculates the likelihood of breast cancer following a test result, for example, a positive mammogram (see Figures 1 and 2, Table 2).[88] This analysis helps explain in part why mammogram screening is controversial in women under age 50.

---

86. *See* Gonzalez v. Metro. Transp. Auth., 174 F.3d 1016, 1023 (9th Cir. 1999) (describing the implications of Bayes' rule for drug testing and noting that a test with the same false-positive rate will generate a higher proportion of false positives to true positives in a population with fewer drug users); *see generally* Michael O. Finkelstein & William B. Fairley, *A Bayesian Approach to Identification Evidence*, 83 Harv. L. Rev. 489 (1970). For a discussion of Baysian statistics, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.D, in this manual.

87. Gerd Gigerenzer, Calculated Risks: How to Know When Numbers Deceive You (2002) at 41 (hereinafter "Gigerenzer").

88. *Id.* at 45-48.

EXHIBIT C

*Reference Guide on Medical Testimony*

Table 1. 2 × 2 Test Characteristics of Screening Mammogram for Use in
Bayes' Rule

|  | Breast Cancer | No Breast Cancer |
|---|---|---|
| Positive mammogram | 90<br>true positives | 7<br>false positives |
| Negative mammogram | 10<br>false negatives | 93<br>true negatives |

Figure 1. Screening 1000 women for breast cancer.



Figure 2. Likelihood of breast cancer after a positive or a negative mammogram.



709

EXHIBIT C

*Reference Manual on Scientific Evidence*

Table 2. Tabular and Formula Forms of Bayes' Rule

Tabular Form of Bayes' Rule

| Condition | Pretest or Prior Probability (%) | Conditional Probability of Positive Test for the Condition (%) | Product of the Pretest and the Conditional Probabilities (%) | Posttest or Posterior Probability (%) |
|---|---|---|---|---|
| Breast cancer | 0.8 | 90 sensitivity | 0.72 | 9 = 0.72 ÷ 7.6 |
| No breast cancer | 99.2 | 7 1 − specificity | 6.9 | |

Sum = 7.6

Formula Form of Bayes' Rule

$$\frac{pD+ \star\ pT+|D+}{(pD+\star pT+|D+) + ((1-pD+)\star(1-pT-|D-))}$$

$pD+$ = prior probability of disease = 0.8%
$pT+|D+$ = Sensitivity = True Positive Rate = 90%
$pT-|D-$ = Specificity = True Negative Rate = 93%

$$\frac{0.008 \star 0.90}{(0.008\star0.90) + ((1-0.008)\star(1-0.93))}$$

$$= 9\%$$

Despite a test that has a 90% or higher rate on both sensitivity and specificity, a calculation using Bayes' theorem shows that having a low probability of breast cancer before testing means that even with a positive result on a screening mammogram, the likelihood that an average woman under age 50 has breast cancer is less than 10%.

The probability of breast cancer among those with a positive mammogram is termed the "predictive value positive." Similarly, if the test were negative, the likelihood of breast cancer in those with a negative mammogram ("false reassurance rate") would be 1 divided by 924 (1 woman with breast cancer and a negative test and 923 women without breast cancer who have negative tests in Figure 1), or about 0.1%. Interpreting a medical test result then depends on the pretest likelihood of disease and the test's sensitivity and specificity. Figure 2

710

**EXHIBIT C**

*Reference Guide on Medical Testimony*

illustrates the likelihood of breast cancer for differing pretest or prior probabilities of breast cancer.

The discriminating ability of a test can be succinctly summarized as a likelihood ratio. The likelihood ratio positive expresses how much more likely disease is to be present following a positive test result. It is the ratio of the true-positive rate to the false-positive rate (sensitivity divided by 1 minus the specificity), e.g., 12.5 (0.90 divided by 1 − 0.93) in the case of mammography. The likelihood ratio negative expresses how much less likely disease is to be present following a negative test result. It is 1 minus the ratio of the false-negative rate to the true-negative rate (1 minus the sensitivity divided by the specificity) or 0.11 (1 − 0.90 divided by 0.93) in the case of mammography. Likelihood ratios exceeding 10 or falling below 0.1 are believed to be strong discriminators causing "large" changes in the likelihood of disease; those between 5 and 10 or 0.1 and 0.2 cause "moderate" changes; and those between 2 and 5 or 0.2 and 0.5 cause "small" changes.[89] Note that even for a strongly discriminating test such as mammography, a positive or a negative test result does not change the likelihood of disease substantially for very low or very high probabilities of disease (see Figure 2), thereby highlighting the importance of the pretest likelihood of disease in interpreting test results.

Terms such as "sensitivity," "specificity," and "predictive value negative or positive" are called conditional probabilities because they express the likelihood of a particular result based on a particular condition (e.g., a positive test result among those with disease) or the likelihood of a particular condition among those with a particular result (e.g., disease among those with a positive test).[90] These kinds of expression, however, remove the base case probability (the pretest probability of disease, sometimes referred to as the prior probability of disease) as part of "normalization," so that Bayes' rule is required to interpret a test result. Moreover, confusion between sensitivity and predictive value positive may lead to errors in the interpretation of test results; for example, a 90% likelihood of having a positive mammogram in patients with breast cancer—the sensitivity—may be misinterpreted as the predictive value positive, implying that a woman with a positive mammogram has a 90% chance of having cancer. This misinterpretation ignores the role for pretest suspicion or likelihood of disease (or assumes that all

89. David A Grimes & Kenneth F Schulz, *Refining Clinical Diagnosis with Likelihood Ratios*, 365 Lancet 1500–05 (2005).

90. This terminology may be confusing. The predictive value negative (negative predictive value) is defined as the probability of no disease among those with a negative test. It also equals 1 minus the false reassurance rate. The false-alarm rate is defined as the probability of no disease among those with a positive test. It is also 1 minus the predictive value positive. The false reassurance rate may be confused with the false negative rate (among those with disease, the likelihood of a negative test) because both involve those with negative tests and those with disease but in one case the denominator is individuals with negative tests (false reassurance rate) and in the other case individuals with disease (false negative rate). Similarly, the false alarm document may be confused with the false positive rate (among those with no disease, the likelihood of a positive test).

EXHIBIT C

women undergoing the test have the disease). This confusion can be avoided by translating Bayes' rule into natural frequency expressions.[91] The natural frequency expression incorporates both the pretest likelihood and the conditional probabilities of the test results to yield the following statements (see Figure 1): Of 1000 women between 40 and 50 years old, 8 have breast cancer, and 7 of these will test positive. Of the remaining 992 who do not have breast cancer, about 69 will also test positive. When presented as a natural frequency (including the likelihood of disease), the likelihood of breast cancer becomes more transparent; thus 76 women will test positive, and 7 of the 76 will have breast cancer. When 48 physicians with an average of 14 years of professional experience were presented with the natural frequency version or the conditional probability version, 16 of 24 estimated the likelihood of breast cancer to exceed 50% with the conditional probability (sensitivity, specificity) version but only 5 of 24 did so with the natural frequency information.[92]

Just as mammography test results may be misinterpreted if Bayes' rule is not applied, the prosecutor's fallacy involves the misinterpretation of probabilistic information. For example, in *People v. Collins*, the prosecutor argued that 1 in 3 girls have blonde hair, 1 in 10 girls have a pony tail, 1 in 10 automobiles are partly yellow, 1 in 4 men have a mustache, 1 in 10 black men have a beard, and 1 in 1000 cars have an interracial couple in the car.[93] Multiplying these six probabilities together yields a 1 in 12 million joint probability of having all conditions present. Aside from being simply estimates and from assuming that the probabilities were independent of one another, the prosecutor made the statement that "The probability of the defendant matching on these six characteristics is 1 in 12 million," thereby assuming that someone other than the defendant being guilty is the same 1 in 12 million. However, if translated into natural frequency terms, 1 out of every 12 million couples would have these six characteristics, and so assuming that there are 24 million couples, there would be a 1 in 2 chance that the Collinses are innocent. The error results from confusing the probability of a positive test (having all six characteristics) among those with the disease (being guilty) and the probability of the disease (being guilty) among those with a positive test (having all six characteristics), that is, confusing the conditional probabilities—sensitivity and positive predictive value.

Bayes' rule becomes even more relevant in the genomic medicine era.[94] Suppose a genetic test has a sensitivity and specificity of 99.9%, and suppose the probability of disease is 1 in 1000 if a positive family history is present and 1 in 100,000 if no family history is present. Screening 1000 individuals with a positive family

91. **Gigerenzer,** *supra* note 87, at 42.

92. *Id.* at 43.

93. *Id.* at 152.

94. Isaac S. Kohane et al., *The Incidentalome: A Threat to Genomic Medicine*, 296 JAMA 212–15 (2006).

**EXHIBIT C**

*Reference Guide on Medical Testimony*

history for the gene results in 2 positive tests: 1 individual truly has disease, and in the other the test is a false positive. Screening 10 million individuals without a family history results in 10,100 positive tests in which 100 individuals have disease and 10,000 do not. Even with a specificity of 99.99%, if a test screens for 10,000 genes simultaneously, then 63% of individuals will have at least one false–positive test result. Based simply on the genetic test results alone, neither individuals nor physicians would be able to distinguish those with true–positive results from those with false–positive results, thereby potentially leading to inappropriate monitoring or treatment for all with positive test results.

Although a test is commonly thought of as a sample from a bodily fluid, tissue, or image, a test also could be the presence or absence of a symptom or physical sign. For example, both inhalation anthrax and influenza can cause symptoms of muscle aches, fever, and malaise. However, a critical symptom that helps distinguish one from the other is runny nose, which occurs in 14% of those with inhalation anthrax but in 78% to 89% of those with influenza or influenza-like illness. Thus, when faced with distinguishing between these diagnoses, patients with a runny nose given this symptom alone are about six times more likely to have influenza or a flu–like illness than to have anthrax.[95]

Sensitivity and specificity rely on setting a positivity criterion, the threshold level for determining normal above which tests are positive and below which the test is negative. If the criterion is made stricter (e.g., what is considered to be abnormal requires a higher test result), then sensitivity falls and specificity increases, and if the criterion is made laxer, then sensitivity rises and specificity falls. Depending on the context of the testing, it may be more appropriate to choose a laxer criterion (e.g., screening donated blood for HIV infection where the benefit is reducing transfusion–associated HIV transmission, and the risk is discarding some uninfected units of donated blood) or a stricter one (e.g., screening a low-prevalence population for HIV infection where the benefit is reducing false-positive diagnoses and the risk is missing some truly HIV–infected individuals).[96] Thus the benefits of finding and treating a person with disease versus the risk of treating a person without disease should help establish what is considered normal or abnormal.

The terms "sensitivity" and "specificity" apply to the simple situation in which disease is present or absent and a test can be positive or negative, but terminology and interpretation become more complicated when multiple diseases are under consideration and when multiple test results may occur.[97] For example, consider blood in the urine (hematuria), which could be caused by a urinary tract infection, a kidney stone, or a bladder cancer, among many other diseases. The

95. Nathaniel Hupert et al., *Accuracy of Screening for Inhalational Anthrax After a Bioterrorist Attack*, 139 Annals Internal Med. 337–45 (2003).

96. Klemens M. Meyer & Stephen G. Pauker, *Screening for HIV: Can We Afford the False Positive Rate?* 317 New Eng. J. Med. 238–41 (1987).

97. Kassirer et al., *supra* note 73, at 21–22.

EXHIBIT C

*Reference Manual on Scientific Evidence*

terms "sensitivity" and "specificity" are no longer appropriate because disease is not simply present or absent. Instead, they are replaced by the term conditional probabilities, that is, sensitivity is replaced by the likelihood of blood in the urine with a urinary tract infection, or with a kidney stone, or with a bladder cancer. Similarly, a very positive test has a different interpretation than a weakly positive test, and Bayes' rule can quantify the difference. Results from multiple tests can be combined with Bayes' rule by applying Bayes' rule to the first test result and then reapplying Bayes' rule to subsequent test results. This approach assumes that the result of the first test does not affect the test characteristics (sensitivity or specificity) of the second test (i.e., that there is conditional independence of each test). When two tests are available, screening will usually occur first with the high-sensitivity test to detect a high proportion of those with disease (true positives), or "ruling in" disease. Those with a positive first test will then undergo a high-specificity test to reduce the number of individuals who do not have disease but a positive first test (false positive), or "ruling out" disease.

## 3. Causal reasoning

To select the most appropriate therapy, physicians seek to identify the cause of a patient's complaints and findings. While considering the presence or absence of risk factors (e.g., the presence of male gender, advanced age, high cholesterol, high blood pressure, diabetes mellitus, and smoking for the medical condition coronary heart disease), physicians will often use any type of evidence[98] that might support causation, for example, biological plausibility,[99] physiological drug effects, case reports, or temporal proximity[100] to an exposure.[101] Although physicians use epidemiological studies in their decisionmaking, "they are accustomed to using *any* reliable data to assess causality, no matter what their source" because they must make care decisions even in the face of uncertainty.[102] This is in contrast to the courts which require a higher standard than clinicians or regulators, and wherein causation cannot just be "possible" but where "a 'preponderance of evidence' establishes that an injury was caused by an alleged exposure."[103] For physicians, causal reasoning typically involves

98. Jerome P. Kassirer & Joe S. Cecil, *Inconsistency in Evidentiary Standards for Medical Testimony: Disorder in the Courts*, 288 JAMA 1382–87 (2002) (hereinafter "Kassirer & Cecil"); *see also* Section IV.C.2, for levels of evidence.

99. *See* Kennan v. Sec'y of Health & Human Servs., 2007 WL 1231592 (Ct. Fed. Cl. Apr. 5, 2007).

100. *But see* Wilson v. Taser Int'l, Inc., 303 F. App'x 708, 714 (11th Cir. 2008) ("[A]lthough a doctor usually may primarily base his opinion as to the cause of a plaintiff's injuries on this history where the patient 'has sustained a common injury in a way that it commonly occurs,' . . . Dr. Meier could not rely upon the temporal connection between the two events to support his causation opinion in this case.").

101. Kassirer & Cecil, *supra* note 98, at 1384.

102. *Id*. at 1394.

103. *Id*. at 1384.

EXHIBIT C

*Reference Guide on Medical Testimony*

understanding how abnormalities in physiology, anatomy, genetics, or biochemistry lead to the clinical manifestations of disease. Through such reasoning, physicians develop a "causal cascade" or "chain or web of causation" linking a sequence of plausible cause-and-effect mechanisms to arrive at the pathogenesis or pathophysiology of a disease. For example, kidney failure leads to poor drug excretion, resulting in symptoms or signs of drug toxicity.[104] Although probabilistic reasoning typically dominates initial hypothesis generation by physicians based on prevalence or incidence, pattern recognition of concomitant symptoms and signs could trigger a diagnosis. For example, cough, lung lesions, and enlarged breasts (gynecomastia) in a 37-year-old man could trigger the diagnosis of metastatic germ cell cancer.[105] More typically, physicians use causal reasoning in diagnostic refinement and verification to examine a diagnosis for its coherency, namely, asking whether its physiological mechanism would be expected to lead to the observed manifestations and whether it is adequate to account for all normal and abnormal findings and the disease time course. Once treatment has been implemented, physicians must make causal judgments in determining whether an alteration in patient status is the result of progression of disease or an adverse consequence of treatment, or whether the absence of improvement results from therapeutic ineffectiveness that should prompt a change in therapy or even reconsideration of the diagnosis.

Pathophysiological reasoning, however, also can lead to incorrect conclusions. In patients with heart failure with a weakened heart, a class of medications called beta blockers had been thought to be contraindicated because beta blockers would decrease the strength of the heart muscle contraction. Subsequent studies found that beta blockers in patients with heart failure usually had no ill effect and actually increased survival. Similarly, physicians once thought that atherosclerotic blockages in heart arteries slowly progressed to cause a heart attack, so that revascularizing those plaques through heart bypass surgery would prevent heart attacks.[106] Over the past 15 years, however, scientific evidence has emerged that small vulnerable atherosclerotic plaques (not amenable to revascularization because of their small size) can suddenly rupture and cause heart attacks. Not surprisingly, revascularization trials involving either bypass surgery or percutaneous interventions such as stenting or angioplasty do not diminish the risk of having a heart attack or improve survival for most patients.[107]

Although treating physicians[108] may testify with regard to both general and specific causation, as with use of evidence for causation, their standards for evi-

---

104. Kassirer et al., *supra* note 73, at 63–66.

105. *Id.* at 29.

106. David S. Jones, *Visions of a Cure: Visualization, Clinical Trials, and Controversies in Cardiac Therapeutics, 1968–1998*, 91 Isis 504–41 (2000).

107. Thomas A. Trikalinos et al., *Percutaneous Coronary Interventions for Non-acute Coronary Artery Disease: A Quantitative 20-Year Synopsis and a Network Meta-analysis*, 373 Lancet 911–18 (2009).

108. *See generally* Bland v. Verizon Wireless, LLC, 538 F.3d 893 (8th Cir. 2008) (upholding the district court's decision to reject a treating physician's evidence of causation under *Daubert*).

715

EXHIBIT C

*Reference Manual on Scientific Evidence*

dence vary.[109] For example, some physicians may stop using a drug after the first reports of adverse effects, and others may continue to use a drug despite evidence of harm from randomized controlled trials. Determining whether an effect is a class effect or drug specific can be difficult. When considering beta blockers for patients with a weakened heart (heart failure), many studies have consistently demonstrated the benefit of beta blockers in reducing mortality in those with heart attacks often resulting in weakened heart function. However, in a randomized trial limited to patients with documented weakened heart, one particular beta blocker was found to not confer a survival benefit, and as a result the heart failure guidelines limited their beta blocker recommendation to just those three drugs with documented mortality benefit in trials.[110]

Although treating physicians may be aware of patient-specific risk factors such as smoking or family history, they may not routinely review specialized aspects of such data, for example, toxicology, industrial hygiene, environment, and some aspects of epidemiology. Additional experts may assist in distinguishing general from specific causation by using their specialized knowledge to weigh the relative contribution of each putative causative factor to determine "reasonable medical certainty" or "reasonable medical probability." The determination of general causation involves medical and scientific literature review and the evaluation of epidemiological data, toxicological data, and dose–response relationships. Consider for example, hormone replacement therapy for postmenopausal women. Multiple observational studies using methods such as case-control, cross-sectional, and cohort designs[111] suggested an association between hormone therapy and reduction in heart attack, but such designs are subject to confounding and bias and are particularly weak for causation because in case-control and cross-sectional studies, the sequence of the exposure and outcome is unknown. To resolve the question, the Women's Health Initiative (WHI) study randomized women to hormone replacement therapy or placebo and found a statistically significant increase in clot-related disorders—heart attack, stroke, and heart-related mortality over 5 years but most notable in the first year after initiation of hormone therapy.[112] Heart attacks are caused by blood clots and plaque rupture, and so the results were consistent with the known biological mechanism of estrogens in the clotting cascade. However, patients in the WHI were, on average, 63 years old and therefore not perimenopausal as analyzed in the observational studies. In a novel

109. Kassirer & Cecil, *supra* note 98, at 1384.

110. Mariell Jessup et al., *2009 Focused Update: ACCF/AHA Guidelines for the Diagnosis and Management of Heart Failure in Adults: A Report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines*, 119 Circulation 1977–2016 (2009).

111. *See* Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

112. Jacques E. Rossouw et al., *Risks and Benefits of Estrogen Plus Progestin in Healthy Postmenopausal Women: Principal Results from the Women's Health Initiative Randomized Controlled Trial*, 288 JAMA 321–33 (2002); JoAnn E. Manson et al., *Estrogen Plus Progestin and the Risk of Coronary Heart Disease*, 349 New Eng. J. Med. 523–34 (2003).

EXHIBIT C

approach, the observational Nurses' Health Study attempted to emulate the design and intention-to-treat (ITT) analysis aspect of the WHI randomized trial, and saw that the hormone replacement treatment effects were similar to those from the randomized trial, suggesting that "the discrepancies between the WHI and the Nurses' Health Study ITT estimates could be largely explained by differences in the distribution of time since menopause and length of followup."[113]

## B. Testing

### 1. Screening

Screening on a population basis requires that (1) the condition be present in the population and affect quality and length of life; (2) the incidence or prevalence be sufficiently high to justify any risks associated with the test; (3) preventive or early treatment should be available; (4) an asymptomatic period for early detection must exist; (5) the screening test should be accurate, acceptable, and affordable; and (6) screening benefits should exceed harms. Screening for disease in asymptomatic, otherwise healthy patients has become widely accepted and promulgated.[114] Screening differs from diagnostic testing used to elucidate the cause of symptoms or loss of function because screening involves apparently healthy individuals.[115] Although screening may prevent the development of disease-related morbidity and mortality, positive test results (both false positive and true positive) may lead to interventions that could be unnecessary or even risky because of overdiagnosis and overtreatment.[116]

Normal ranges for biochemical tests are often based on the 95% confidence intervals in a normal healthy population—that is, although everyone is healthy, by convention, values outside the 2.5% lower and upper extremes are considered to be abnormal. Consequently, ordering six blood tests in a normal healthy individual yields only a 74% chance that all six tests will be normal; that is, there is a 26% chance that one or more may be abnormal. Similarly, when ordering 12 tests in a normal person, there is a 54% chance that all 12 will be normal and a 46% chance that 1 or more will be abnormal. So simply ordering tests in healthy individuals or in the absence of clinical suspicion of a disease may result in many

113. Miguel A. Hernán et al., *Observational Studies Analyzed Like Randomized Experiments: An Application to Postmenopausal Hormone Therapy and Coronary Heart Disease*, 19 Epidemiology 766–79 (2008).

114. Lisa M. Schwartz et al., *Enthusiasm for Cancer Screening in the United States*, 291 JAMA 71–78 (2004).

115. David A. Grimes & Kenneth F. Schulz, *Uses and Abuses of Screening Tests*, 359 Lancet 881–84 (2002) (hereinafter Grimes and Schulz); William C. Black, *Overdiagnosis: An Under Recognized Cause of Confusion and Harm in Cancer Screening*, 92 J. Nat'l Cancer Inst. 1280–82 (2000) (hereinafter "Black").

116. Grimes & Schulz, *supra* note 115, at 884; Black, *supra* note 115, at 1280.

EXHIBIT C

*Reference Manual on Scientific Evidence*

false-positive test results that can lead to false alarms, anxiety, additional testing, and possible morbidity or mortality from subsequent testing or interventions.[117]

Even a valueless screening test may appear to be beneficial because of "lead-time bias." If screened or unscreened patients have the same prognosis from the time of onset of symptoms to death, then screened patients only appear to live longer because the time elapsed from diagnosis by screening to death exceeds that from diagnosis made at the time of symptom onset to death. A second bias, "length bias," also leads to overestimation of the benefit from screening.[118] Suppose that a randomized trial of screening or no screening is conducted over a limited length of time from study initiation to termination. The screening test detects patients with both aggressive and indolent forms of the disease. Among the unscreened patients, however, disease only becomes evident through the development of symptoms, which would be more likely in patients who have the aggressive form of the disease and a poorer prognosis. Thus screened patients with disease appear to have a better prognosis than unscreened patients with disease because a higher proportion of the screened patients have more indolent disease. Extending the concept of length bias further, screening can result in "pseudodisease" or "overdiagnosis," such as the identification of slow-growing cancers that even if untreated would never cause symptoms or reduce survival.[119] Although lung cancer is commonly thought to be one of the more aggressive cancers, an autopsy study found that one-third of lung cancers were unsuspected prior to autopsy, and nearly all of these patients with unsuspected lung cancer prior to autopsy died from other causes.[120] Lung cancer screening in these individuals would have resulted in pseudodisease or overdiagnosis because screening would have diagnosed their cancer but they would have died of something else (or from a severe adverse effect of the cancer treatment) before the cancer became evident.

To further illustrate bias in screening studies, the Mayo Lung Project was a randomized trial comparing screening for lung cancer with periodic chest X rays and sputum samples versus usual care. It found that screening did improve the likelihood of survival 5 years after diagnosis in those with lung cancer but surprisingly did not affect lung cancer deaths. Further analysis of the randomized trial found that the survival advantage of screening was attributable to the 46 extra

117. A radiologist described his own experience to illustrate the clinical aphorism that "the only 'normal' patient is one who has not yet undergone a complete work-up." He had a negative CT scan of the colon examination, but the CT scan also provided images outside the liver with radiologists identifying lesions in the kidneys, liver, and lungs. This resulted in additional CT scans, a liver biopsy, PET scan, video-aided thoracoscopy (a flexible scope inserted into the chest), and three wedge resections of the lung leading to multiple tubes, medications, and "excruciating pain" that required 5 weeks for recovery. William J. Casarella, *A Patient's Viewpoint on a Current Controversy*, 224 Radiology 927 (2002).

118. Grimes & Schulz, *supra* note 115, at 884.

119. Black, *supra* note 115, at 1280.

120. Charles K. Chan et al., *More Lung Cancer but Better Survival: Implications of Secular Trends in "Necropsy Surprise" Rates*, 96 Chest 291–96 (1989).

EXHIBIT C

lung cancer cases detected by screening. These 46 cases had indolent (or, at worst, very slowly progressive) lung cancer; that is, these patients would have a normal life expectancy, and so, including their prognosis in those with screen-detected lung cancer inflates the apparent 5-year survival with screening because of length bias and overdiagnosis.[121] More recently, CT scan screening found lung cancer to be present in the same proportion of nonsmokers as smokers,[122] suggesting that many of the cancers detected in the nonsmokers were ones that would have never progressed. This overdiagnosis can lead to morbidity and mortality: CT scan screening for lung cancer results in a threefold increase in diagnosis and threefold increase in surgery with an average surgical mortality of 5% and serious complication rate exceeding 20%,[123] as well as potential risk from radiation exposure. A similar phenomenon occurs with breast cancer where screening increases surgeries by about one-third from overdiagnosis and with prostate cancer where the lifetime risk of dying from prostate cancer is about 3%, yet 60% of men in their sixties have prostate cancer, and so, screening and detecting all men with prostate cancer in their sixties would lead to treatment of many men who would not have died from prostate cancer.[124] In patients found to have cancer by screening, it is not possible to distinguish those whose cancers would have progressed from those in whom the cancer-appearing cells would not have progressed or spread.

## 2. Diagnostic testing

Based on the history and physical examination, physicians will establish diagnostic possibilities. They may then request additional tests to reduce uncertainty and to confirm the diagnosis, as part of diagnostic verification. Although, theoretically, all tests could be ordered, tests should be chosen on the basis of a clinical suspicion because of possible morbidity or even mortality from inappropriate testing. Normative prescriptive decision models for reasoning in the presence of uncertainty suggest that whether and which tests get ordered should depend on the sensitivity and specificity of the test as discussed in Section IV.A.2, *supra*, but also the risk of mortality or morbidity from the test, and the benefit and risk of treatment.[125] In general, for sufficiently low probabilities of disease, no tests should be ordered and no treatment given. For sufficiently high probabilities of disease,

---

121. Black, *supra* note 115.

122. William C. Black & John A. Baron, *CT Screening for Lung Cancer: Spiraling into Confusion?* 297 JAMA 995–97 (2007).

123. *Id*. at 996.

124. Karsten J. Jørgensen & Peter C. Gøtzsche, *Overdiagnosis in Publicly Organised Mammography Screening Programmes: Systematic Review of Incidence Trends*, 339 BMJ b2587 (2009); Michael J. Barry, *Prostate-Specific–Antigen Testing for Early Diagnosis of Prostate Cancer*, 344 New Eng. J. Med. 1373–77 (2001).

125. Stephen G. Pauker & Jerome P. Kassirer, *The Threshold Approach to Clinical Decision Making*, 302 New Eng. J. Med. 1109–17 (1980).

EXHIBIT C

*Reference Manual on Scientific Evidence*

testing is unnecessary and treatment should be administered. For intermediate probabilities of disease, testing should be performed. When testing carries risks, the probabilities of disease for which testing should be done become narrower, and so physicians should be more likely to treat empirically or neither test nor treat. As sensitivity and specificity increase, the range of probabilities in which testing should be done expands.

Although an abnormal test result may be found, that abnormality may not be causing symptoms. For example, herniated lumbar discs are found in approximately 25% of healthy individuals without back pain; thus finding a herniated disc in patients with back pain may be an incidental finding. If signs such as a foot drop develop, additional muscle and nerve conduction studies might confirm evidence of nerve compromise from the herniated disc, but such tests are painful. Over time, sequential images show that the herniated disc has partial or complete resolution after 6 months without surgery. Therefore, a herniated disc may be seen with CT or MRI scanning in patients with or without symptoms, and so just having symptoms and evidence of a herniated disc would be an insufficient indication for back surgery.[126] In the absence of severe or progressive neurological deficits, elective disc surgery could be considered for patients with probable herniated discs who have persistent symptoms and findings consistent with sciatica (not just low back pain) for 4 to 6 weeks, but such "patients should be involved in decision making" (*see* Section IV.D.3, *infra*).[127]

Just as some therapies may eventually be found to be harmful or not beneficial, tests initially felt to be useful may be found to be less valuable.[128] Among other potential biases,[129] this may occur because of the choice of study population used to determine the test's sensitivity and specificity. For example, an FDA-approved rapid test for HIV infection has a reported specificity of 100%, implying that any positive tests must indicate truly infected individuals, yet one of the populations in which testing is recommended is women who have had prior children and are in labor but have not yet had an HIV test during the pregnancy.[130] In 15 multiparous women, this rapid HIV test resulted in one false-positive test result in the 15 women tested, yielding a specificity of 93%,[131] and so not all pregnant women with positive tests can be assumed to be truly infected.

126. Richard A. Deyo & James N. Weinstein, *Low Back Pain*, 344 New Eng. J. Med. 363–70 (2001); Richard A. Deyo et al., *Trends, Major Medical Complications, and Charges Associated with Surgery for Lumbar Spinal Stenosis in Older Adults*, 303 JAMA 1259–65 (2010).

127. Deyo & Weinstein, *supra* note 126, at 368.

128. David F. Ransohoff & Alvan R. Feinstein, *Problems of Spectrum and Bias in Evaluating the Efficacy of Diagnostic Tests*, 299 New Eng. J. Med. 926–30 (1978).

129. Penny Whiting et al., *Sources of Variation and Bias in Studies of Diagnostic Accuracy: A Systematic Review*, 140 Annals Internal Med. 189–202 (2004).

130. Food and Drug Administration, OraQuick® Rapid HIV-1 Antibody Test, *available at* http://www.fda.gov/downloads/BiologicsBloodVaccines/BloodBloodProducts/ApprovedProducts/PremarketApprovalsPMAs/ucm092001.pdf (last visited Mar. 2, 2011).

131. *Id*.

EXHIBIT C

### 3. Prognostic testing

Once a diagnosis has been established, additional prognostic testing may be performed to establish the extent of disease (e.g., staging of a cancer) or to monitor response to therapy. Molecular profiling of disease may not only characterize prognosis but also treatment response. In women with breast cancer, for example, finding a genetic marker called the human epidermal growth factor receptor type 2 (HER2, also called HER2/neu) gene identified patients who responded poorly to any of the standard chemotherapeutic agents and hence had a poor prognosis. Illustrative of the emerging era of pharmacogenomics, adjuvant chemotherapy combined with a monoclonal antibody in HER2-positive breast cancer patients has been found to delay progression and prolong survival.[132]

## C. Judgment and Uncertainty in Medicine

### 1. Variation in medical care

Studies over the past several decades show substantial geographic variation in the utilization rates for medical care within small areas or local regions (e.g., a three- to fourfold variation in the use of surgical procedures such as tonsillectomy when comparing children living in adjacent areas of similar demographics)[133] and between large areas or widespread regions (e.g., a 10-fold variation in the performance of other discretionary surgical procedures such as lower extremity revascularization, carotid endarterectomy, back surgery, and radical prostatectomy).[134] Even when limiting the analysis to 77 U.S. hospitals with reputations for high-quality care in managing chronic illness, the care that patients received in their last 6 months of life varied extensively, ranging from hospital stays of 9 to 27 days (threefold variation), intensive care unit stays of 2 to 10 days (fivefold variation); and physician visits of 18 to 76 (fourfold variation), depending on the hospital at which patients received their care.[135]

Four categories of variation are recognized: (1) underuse of effective care, (2) issues of patient safety, (3) concern for preference-sensitive care, and (4) notions of supply-sensitive services.[136] Effective care refers to treatments that are known to be beneficial and that nearly all patients should receive with little influence

---

132. Dennis J. Slamon et al., *Use of Chemotherapy Plus a Monoclonal Antibody Against HER2 for Metastatic Breast Cancer That Overexpresses* HER2, 344 New Eng. J. Med. 783–92 (2001).

133. John Wennberg & Alan Gittelsohn, *Small Area Variations in Health Care Delivery*, 182 Science 1102–08 (1973) (hereinafter "Wennberg & Gittelsohn").

134. John D. Birkmeyer et al., *Variation Profiles of Common Surgical Procedures*, 124 Surgery 917–23 (1998).

135. John E. Wennberg et al., *Use of Hospitals, Physician Visits, and Hospice Care During Last Six Months of Life Among Cohorts Loyal to Highly Respected Hospitals in the United States*, 328 BMJ 607 (2004).

136. John E. Wennberg, *Unwarranted Variations in Healthcare Delivery: Implications for Academic Medical Centres*, 325 BMJ 961–64 (2002) (hereinafter "Wennberg").

EXHIBIT C

*Reference Manual on Scientific Evidence*

of patient preferences, for example, use of beta blockers following myocardial infarction. The *underuse of effective care* was illustrated by one prominent study that identified 439 high-quality process measures for 30 conditions and preventive care. In assessing the use of measures that were clearly recommended (i.e., clearly beneficial), they found that only about 50% of patients received these highly recommended care processes.[137] Issues of *patient safety* refer to the execution of care and the occurrence of iatrogenic complications (i.e., complications resulting from health care interventions). The IOM estimates that hospitalized patients risk one medication error for every day they are hospitalized, resulting in an estimated 7000 deaths annually (more than from workplace injuries) at an annual cost of $3.5 billion in 2006 dollars.[138] Concern for *preference-sensitive care* refers to treatment choices that should depend on patient health goals or preferences. Prostate surgery helps relieve symptoms of an enlarged prostate (such as frequent urination, waking up at night to urinate) but carries a risk of losing sexual function. Separate from the probability of losing sexual function, in preference-sensitive care, the decision to have prostate surgery depends on how much the enlarged prostate symptoms bother the patient and on how important sexual function is to them, that is, their preferences and values.[139] Finally, *supply-sensitive services* refer to care that depends not on evidence of effectiveness or patient preferences, but rather on the availability of services. Specifically, patients living in areas with more doctors or more hospitals experience more office visits, tests, and hospitalizations.[140]

## 2. Evidence-based medicine

The exceptional variation in the delivery of medical care was a major factor that led to a careful reexamination of physician diagnostic strategies, therapeutic decision making, and the use of medical evidence, but it was not the only one. Other circumstances that set the stage for an intense focus on medical evidence included (1) the development of medical research, including randomized controlled trials and other observational study designs; (2) the growth of diagnostic and therapeutic interventions;[141] (3) interest in understanding medical decisionmaking and how physicians reason;[142] and (4) the acceptance of meta-analysis as a method to com-

---

137. Elizabeth A. McGlynn et al., *The Quality of Health Care Delivered to Adults in the United States,* 348 New Eng. J. Med. 2635–45 (2003).

138. Committee on Identifying and Preventing Medication Errors, Institute of Medicine, Preventing Medication Errors (2006); 2000 CQHCA Report, *supra* note 58.

139. Michael J. Barry et al., *Patient Reactions to a Program Designed to Facilitate Patient Participation in Treatment Decisions for Benign Prostatic Hyperplasia*, 1995 Med. Care 771–82 (1995).

140. Wennberg, *supra* note 136, at 142.

141. Cynthia D. Mulrow & K.N. Lohr, *Proof and Policy from Medical Research Evidence*, 26 J. Health Pol., Pol'y & L. 249–66 (2001) (hereinafter "Mulrow & Lohr").

142. Robert S. Ledley & Lee B. Lusted, *Reasoning Foundations of Medical Diagnosis; Symbolic Logic, Probability, and Value Theory Aid Our Understanding of How Physicians Reason*, 130 Science 9–21 (1959).

EXHIBIT C

*Reference Guide on Medical Testimony*

bine data from multiple randomized trials.[143] In response to the above conditions, "evidence-based medicine" gained prominence in 1992.[144] It is aptly defined as "the conscientious, explicit and judicious use of current best evidence in making decisions about the care of the individual patient. It means integrating individual clinical expertise with the best available external clinical evidence from systematic research."[145]

Evidence-based medicine contrasts with the traditional informal method of practicing based on anecdotes, applying the most recently read articles, doing what a group of eminent experts recommend, or minimizing costs.[146] Rather, it is "the use of mathematical estimates of the risks of benefit and harm, derived from high-quality research on population samples, to inform clinical decision making in the diagnosis, investigation or management of individual patients."[147] In a paper from a joint workshop held by IOM and the Agency for Healthcare Research and Quality[148] that addressed what physicians consider to be sufficient evidence to justify their clinical practice and treatment decisions, Mulrow and Lohr wrote "evidence-based medicine stresses a structured critical examination of medical research literature: relatively speaking, it deemphasizes average practice as an adequate standard and personal heuristics."[149]

### 3. Hierarchy of medical evidence

With the explosion of available medical evidence, increased emphasis has been placed on assembling, evaluating, and interpreting medical research evidence. A fundamental principle of evidence-based medicine (*see also* Section IV.C.5, *infra*) is that the strength of medical evidence supporting a therapy or strategy is hierarchical. When ordered from strongest to weakest, systematic review of randomized trials (meta-analysis) is at the top, followed by single randomized trials, systematic reviews of observational studies, single observational studies,

143.  *See* Michael D. Green et al., Reference Guide on Epidemiology, Section VI, in this manual; Video Software Dealers Ass'n v. Schwarzenegger, 556 F.3d 950, 963 (9th Cir. 2009) (analyzing a meta-analysis of studies on video games and adolescent behavior); Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin., 476 F.3d 946, 953 (D.C. Cir. 2007) (reviewing the Mine Safety and Health Administration's reliance on epidemiological studies and two meta-analyses).

144. Evidence-Based Medicine Working Group, *Evidence-Based Medicine. A New Approach to Teaching the Practice of Medicine,* 268 JAMA 2420–25 (1992).

145. David L. Sackett et al., *Evidence Based Medicine: What It Is and What It Isn't,* 312 BMJ 71–72, 71 (1996).

146. Trisha Greenhalgh, How to Read a Paper: The Basics of Evidence-Based Medicine (3d ed. 2006).

147. *Id.* at 1.

148. Clark C. Havighurst et al., *Evidence: Its Meanings in Health Care and in Law,* 26 J. Health Pol., Pol'y & L. 195–215 (2001).

149.  Mulrow & Lohr, *supra* note 141, at 253.

EXHIBIT C

physiological studies, and unsystematic clinical observations.[150] An analysis of the frequency with which various study designs are cited by others provides empirical evidence supporting the influence of meta-analysis followed by randomized controlled trials in the medical evidence hierarchy.[151] Although they are at the bottom of the evidence hierarchy, unsystematic clinical observations or case reports may be the first signals of adverse events or associations that are later confirmed with larger or controlled epidemiological studies (e.g., aplastic anemia caused by chloramphenicol,[152] or lung cancer caused by asbestos[153]). Nonetheless, subsequent studies may not confirm initial reports (e.g., the putative association between coffee consumption and pancreatic cancer).[154]

Just as in laboratory experiments, evidence about the benefits and risks of medical interventions arises through repetitive observations. A single randomized controlled trial relies on hypothesis testing, specifically assuming the null hypothesis that a new drug is equivalent to the comparator (e.g., placebo). As conceived nearly 100 years ago, interpreting the trial involved calculating the likelihood of the alpha error (*p*-value) wherein the study suggests that the drug or device is beneficial but the "truth" is that it is not, that is, a false-positive study result. Similarly, a beta error (1 minus power) is the likelihood of a study finding that the drug or device is not beneficial when the "truth" is that it is, that is, a false-negative study result (Table 3).

Table 3. Analogy Between Interpreting a Diagnostic Test and a Drug Study

|  | Truth | |
|---|---|---|
|  | Drug + | Drug − |
| Study + | Power (true positive) | α Type I error (false positive) |
| Study − | β Type II error (false negative) | True negative |

The choice of which specific error rates to use (e.g., false positive or *p*-value or alpha of 0.05) was suppose to depend on a judgment of the relative consequences of the two errors, missing an effective drug (Type II beta error) or

---

150. Gordon H. Guyatt et al., Users' Guides to the Medical Literature: A Manual for Evidence-Based Clinical Practice (2d ed. 2008) (hereinafter "Guyatt"); *see also* Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

151. Nikolaos A. Patsopoulos et al., *Relative Citation Impact of Various Study Designs in the Health Sciences,* 293 JAMA 2362–66 (2005).

152. W.T.W. Clarke, *Fatal Aplastic Anemia and Chloramphenicol*, 97 Can. Med. Ass'n J. 815 (1967) (hereinafter "Clarke").

153. Michael Gochfeld, *Asbestos Exposure in Buildings*, Envtl. Med. 438, 440 (1995).

154. Brian MacMahon et al., *Coffee and Cancer of the Pancreas,* 304 New Eng. J. Med. 630–33 (1981) (hereinafter "MacMahon").

EXHIBIT C

*Reference Guide on Medical Testimony*

considering an ineffective drug to be effective (Type I alpha error).[155] The null hypothesis, however, assumes equivalence, and so it does not provide any measure of evidence outside of the particular study (e.g., prior studies or biological mechanism or plausibility). Thus, the null hypothesis assumption necessitates abandoning the ability to measure evidence or determine "truth" from a single experiment, so that hypothesis testing is thereby "equivalent to a system of justice that is not concerned with which individual defendant is found guilty or innocent (that is, 'whether each separate hypothesis is true or false') but tries instead to control the overall number of incorrect verdicts."[156] From a Bayesian perspective, the interpretation of a new study depends on whether prior studies showed benefit or harm and on the existence of a biological mechanism or plausibility (e.g., the association between coffee consumption and pancreatic cancer was a "false-positive" result because in further testing the initial finding was not validated and there was no known plausible biological mechanism).[157]

Cumulative meta-analysis of treatments enables the accumulation of randomized trial evidence to examine trends in efficacy or risks, overcoming issues of underpowered trials that have insufficient numbers of patients enrolled to reliably detect a benefit. For example, between 1959 and 1988, 33 randomized trials with streptokinase for acute myocardial infarction involving over 35,000 patients had been published. By combining the results of each trial as they occurred, a cumulative meta-analysis found "a consistent, statistically significant reduction in total mortality" with streptokinase use by 1973.[158] In contrast, for many years, physicians used a drug called lidocaine to prevent life-threatening heart rhythm disturbances, yet none of the randomized trials of lidocaine demonstrated any benefit, and finally cumulative meta-analysis found a trend toward harm. When the results of meta-analysis were compared with comments in textbooks and review articles,

> discrepancies were detected between the meta-analytic patterns of effectiveness in the randomized trials and the recommendations of reviewers [the review article author]. Review articles often failed to mention important advances or exhibited delays in recommending effective preventive measures. In some cases, treatments that have no effect on mortality or are potentially harmful continued to be recommended by several clinical experts.[159]

---

155. Goodman, *supra* note 74, at 998.

156. *Id.* at 998.

157. MacMahon, *supra* note 154, at 630.

158. Joseph Lau et al., *Cumulative Meta-Analysis of Therapeutic Trials for Myocardial Infarction*, 327 New Eng. J. Med. 248–54 (1992).

159. Elliott M. Antman et al., *A Comparison of Results of Meta-Analyses of Randomized Control Trials and Recommendations of Clinical Experts: Treatments for Myocardial Infarction*, 268 JAMA 240, 240 (1992).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## 4. Guidelines

Clinical practice guidelines are "systematically developed statements to assist practitioner and patient decisions about appropriate health care for specific clinical circumstances."[160] Such guidelines have been widely developed and issued by medical specialty associations, professional societies, government agencies, or health care organizations.[161] To avoid biases inherent in review articles (particularly single-authored ones) and to encourage transparency and acceptance, a standard method to develop clinical practice guidelines has emerged. It involves systematically searching for and reviewing the evidence (summarizing the evidence), grading the quality of evidence for each outcome (the certainty of the recommendation), and assessing the balance of benefits versus risks (the size of the treatment effect or the strength of the recommendation).[162] Additional considerations include values and preferences (patient health goals) and costs (resource allocation) where increasing variability or uncertainty in preferences or the presence of higher costs reduces the likelihood of making a strong recommendation.[163] The number, length, and diversity of guidelines developed by various professional organizations challenge practicing physicians. An attempt to quantify guideline development found exponential growth, with 8 guidelines published in 1990, 138 in 1996, and 855 by mid-1997, including 160 that were more than 10 pages long.[164]

With this proliferation, different professional organizations may issue guidelines on the same topic, but with competing recommendations. The composition of the panel and the processes for developing guideline recommendations may differ. For example, the U.S. Preventive Services Task Force (USPSTF) is "an independent panel of non-Federal experts in prevention and evidence-based medicine and is composed of primary care providers (such as internists, pediatricians, family physicians, gynecologists/obstetricians, nurses, and health behavior specialists)."[165] In their evaluation of mammography, the USPSTF "recommends against routine screening mammography in women aged 40 to 49 years" (*see*

160. Committee to Advise the Public Health Service on Clinical Practice Guidelines, Institute of Medicine, Clinical Practice Guidelines: Directions for a New Program 8 (Marilyn J. Field & Kathleen N. Lohr, eds. 1994).

161. *See generally* Sofamor Danek Group v. Gaus, 61 F.3d 929 (D.C. Cir. 1995) (reviewing guidelines issued by the Agency for Health Care Policy and Research in light of the Federal Advisory Committee Act); Levine v. Rosen, 616 A.2d 623 (Pa. 1992) (finding that differing guidance from two groups was evidence that reasonable physicians could follow either school of thought); Michelle M. Mello, *Of Swords and Shields: The Role of Clinical Practice Guidelines in Medical Malpractice Litigation*, 149 U. Pa. L. Rev. 645 (2001).

162. David Atkins et al., *Grading Quality of Evidence and Strength of Recommendations*, 328 BMJ 1490 (2004).

163. Gordon H. Guyatt et al., *Going from Evidence to Recommendations*, 336 BMJ 1049–51 (2008).

164. Arthur Hibble et al., *Guidelines in General Practice: The New Tower of Babel?* 317 BMJ 862–63 (1998).

165. U.S. Preventive Services Task Force (USPSTF), Agency for Healthcare Research and Quality, *available at* http://www.ahrq.gov/clinic/uspstfix.htm (last visited Mar. 2, 2011).

EXHIBIT C

*Reference Guide on Medical Testimony*

*also* Section IV.D.2).[166] In contrast, based on a writing group composed of its members who are "directly responsible for performing these screening tests," the Society of Breast Imaging and the American College of Radiology recommend "annual screening from age 40" with mammography for "women at average risk for breast cancer."[167] Similarly, for prostate cancer screening, the USPSTF update "concludes that the current evidence is insufficient to assess the balance of benefits and harms of prostate cancer screening in men younger than age 75 years."[168] In the American Urological Association update, a statement panel composed of urologists, oncologists, and other physicians made two recommendations: "The decision to use PSA for the early detection of prostate cancer should be individualized. Patients should be informed of the known risks and the potential benefits" and "Early detection and risk assessment of prostate cancer should be offered to asymptomatic men 40 years of age or older who wish to be screened with an estimated life expectancy of more than 10 years."[169]

Practice guidelines provide recommendations on how to evaluate and treat patients, but because they apply to the general case, their recommendations may not apply to a particular individual patient, or some extrapolation may be required, particularly when multiple diseases exist, as they frequently do in the elderly,[170] or when treatment entails competing risks. For example, anticoagulation is generally recommended for patients with atrial fibrillation (an abnormal heart rhythm disturbance) to prevent blood clots that could cause a stroke, yet anticoagulation can also lead to life-threatening bleeding; therefore, for individual patients, physicians must weigh the risk of developing clots versus the risk of bleeding. Consequently, guidelines typically include statements such as "clinical or policy decisions involve more considerations than this body of evidence alone. Clinicians and policymakers should understand the evidence but individualize decision making to the specific patient or situation."[171] Some physicians who rely on personal style, review articles, and colleagues to influence their clinical practice have been concerned with how guidelines affect clinical autonomy and health care costs.[172]

---

166. U.S. Preventive Services Task Force, *Screening for Breast Cancer: U.S. Preventive Services Task Force Recommendation Statement*, 151 Annals Internal Med. 716–26 (2009).

167. Carol H. Lee et al., *Breast Cancer Screening with Imaging: Recommendations from the Society of Breast Imaging and the ACR on the Use of Mammography, Breast MRI, Breast Ultrasound, and Other Technologies for the Detection of Clinically Occult Breast Cancer*, 7 J. Am. C. Radiology 18–27 (2010).

168. U.S. Preventive Services Task Force, *Screening for Prostate Cancer: U.S. Preventive Services Task Force Recommendation Statement*, 149 Annals Internal Med. 185–91 (2008).

169. American Urological Association, Prostate-Specific Antigen Best Practice Statement (rev. 2009), *available at* http://www.auanet.org/content/media/psa09.pdf (last visited Mar. 2, 2011).

170. Cynthia M. Boyd et al., *Clinical Practice Guidelines and Quality of Care for Older Patients with Multiple Comorbid Diseases: Implications for Pay for Performance*, 294 JAMA 716–24 (2005).

171. U.S. Preventive Services Task Force, *Screening for Carotid Artery Stenosis: U.S. Preventive Services Task Force Recommendation Statement,* 147 Annals Internal Med. 854–59 (2007).

172. Sean R. Tunis et al., *Internists' Attitudes About Clinical Practice Guidelines*, 120 Annals Internal Med. 956–63 (1994).

EXHIBIT C

*Reference Manual on Scientific Evidence*

However, just as clinicians have been reluctant to apply guidelines in practice, courts have generally been slow to apply them in deciding cases.[173] There are political and legal issues that can arise with the development of guidelines.[174] Political sensitivities, conflicts of interest, and potential lawsuits often silence otherwise innovative and potentially useful guidelines. In 2006, the Connecticut Attorney General launched an antitrust suit against the Infectious Disease Society of America (IDSA) after IDSA promulgated guidelines recommending against the use of long-term antibiotics for the treatment of "chronic Lyme disease (CLD)."[175] Although the Centers for Disease Control and Prevention and the Food and Drug Administration (FDA) findings seemed to concur with IDSA's guidelines, a strong lobby representing patients afflicted with CLD and the physicians who treated them colored the Attorney General's decision to file suit.[176] Organizations can violate antitrust laws if their guideline-setting process is an unreasonable attempt to advance their members' economic interests by suppressing competition. IDSA settled without admitting guilt, but it is clear that organizations must be careful to maintain transparency in the guideline development process.[177]

Besides clinical practice guidelines, IOM defines other types of statements: (1) *medical review criteria* are systematically developed statements that can be used to assess the appropriateness of specific health care decisions, services, and outcomes; (2) *standards of quality* are authoritative statements of minimum levels of acceptable performance or results, excellent levels of performance or results, or the range of acceptable performance or results; and (3) *performance measures* are methods or instruments to estimate or monitor the extent to which the actions of a health care practitioner or provider conform to practice guidelines, medical review criteria, or standards of quality.

## 5. *Vicissitudes of therapeutic decisionmaking*

Medical decisionmaking often involves complexity, uncertainty, and tradeoffs[178] because of unique genetic factors, lifestyle habits, known conditions, medication histories, and ambiguity about possible diagnoses, test results, treatment benefits,

---

173. Arnold J. Rosoff, *Evidence-Based Medicine and the Law: The Courts Confront Clinical Practice Guidelines*, 26 J. Health Pol., Pol'y & L. 327–68 (2001).

174. One element in the near demise of the Agency for Health Care Policy and Research was a political audience receptive to complaints from an association of back surgeons who disagreed with the AHCPR practice guideline conclusions regarding low back pain. B.H. Gray et al., *AHCPR and the Changing Politics of Health Services Research*, Health Affairs, Suppl. Web Exclusives W3-283-307 (June 2003).

175. John D. Kraemer & Lawrence O. Gostin, *Science, Politics, and Values: The Politicization of Professional Practice Guidelines*, 301 JAMA 665–67 (2009).

176. *Id* at 666.

177. *Id* at 666.

178. John P.A. Ioannidis & Joseph Lau, *Systematic Review of Medical Evidence*, 12 J.L. & Pol'y 509–35 (2004).

EXHIBIT C

*Reference Guide on Medical Testimony*

and therapeutic harms. Given inherent diagnostic and therapeutic uncertainty, physicians often make treatment decisions in the face of uncertainty.

Donald Schön argued that regardless of the professional field, "An artful practice of the unique case appears anomalous when professional competence is modeled in terms of application of established techniques to recurrent events" and that specialization "fosters selective inattention to practical competence and professional artistry."[179] In the case of a patient with peanut allergies and heart disease, allergy guidelines recommend avoiding beta blockers, but heart disease guidelines recommend beta blockers because they have been shown to prolong life in patients with heart disease. An allergist would recommend against taking a beta blocker, yet a cardiologist would recommend taking it.[180]

Well-performed randomized trials provide the least biased estimates of treatment benefit and harm by creating groups with equivalent prognoses. Sticking strictly to the scientific evidence, some physicians may limit their use of medications to the specific drug at the specific doses found to be beneficial in such trials. Others may assume class effects until proven otherwise. Still others may consider additional factors such as out-of-pocket costs for patients or patient preferences. When physicians evaluate patients who might benefit from a treatment but who would have been excluded from the study in which the benefit was demonstrated, they must weigh the risks and benefits in the absence of definitive evidence of benefit or of harm. Indeed, because few medical recommendations are based on randomized trials (the least biased level of evidence) physicians frequently and necessarily face uncertainty in making testing and treatment decisions and trade-offs: Very few treatments come without some risk, and in many disciplines, clear evidence of efficacy and risks of treatment are lacking. In cardiology (one of the better studied areas of medical care), nearly one-half of guideline recommendations are based on expert opinion, case studies, or standards of care.[181]

Applying well-designed studies to populations of patients represents another problem. The Randomized Aldactone Evaluation Study demonstrated that spironolactone reduced mortality and hospitalizations for heart failure and improved quality of life with minimal risk of seriously high levels of potassium (hyperkalemia).[182] Published in a prominent medical journal, prescriptions for spironolactone rose quickly because of familiarity with the medication and the poor prognosis of patients with heart failure. As opposed to the study population, however, community individuals were older, more frequently women, often

179. Donald A. Schön, The Reflective Practitioner: How Professionals Think in Action, at vii (1983).

180. John A. TenBrook et al., *Should Beta-Blockers Be Given to Patients with Heart Disease and Peanut-Induced Anaphylaxis? A Decision Analysis*, 113 J. Allergy & Clin. Immunol. 977–82 (2004).

181. Pierluigi Tricoci et al., *Scientific Evidence Underlying the ACC/AHA Clinical Practice Guidelines*, 301 JAMA 831–41 (2009).

182. Bertram Pitt et al., *The Effect of Spironolactone on Morbidity and Mortality in Patients with Severe Heart Failure. Randomized Aldactone Evaluation Study Investigators*, 341 New Eng. J. Med. 709–17 (1999).

EXHIBIT C

*Reference Manual on Scientific Evidence*

had absolute or relative contraindications to treatment, and had not had tests of their heart function to establish the indication to treat or of their potassium level and kidney function to determine their risk for high potassium levels from treatment.[183] These factors increased the risk that spironolactone therapy in these patients might lead to high potassium levels that could be life-threatening. Indeed, hospitalizations per 1000 patients for high potassium rose from 2.4 in 1994 to 11.0 in 2001, resulting in an estimated 560 additional hospitalizations for high potassium and 73 additional hospital deaths in older patients with heart failure in Ontario.[184] Criteria for entry into randomized trials of drugs typically exclude individuals with concomitant medication use, medical comorbidities, and female gender, and they may limit participation by socioeconomic status or race and ethnicity, thereby limiting the ability to generalize the results of a trial to the clinical population being treated.[185] Physicians refer to randomized controlled studies as assessments of drug "efficacy" in restricted patient populations, whereas treatment in general clinical populations are often referred to as "effectiveness" studies.

To be sufficiently powered to demonstrate statistical significance,[186] randomized controlled trials usually require high event rates, prolonged followup, or large numbers of patients. Because of impracticality, expense, and the time period needed to obtain long-term outcomes, these trials may often choose a surrogate marker that is associated with a clinically important event or with survival. For example, statins were approved on the basis of their safety and efficacy in lowering cholesterol but were only demonstrated to improve survival in patients with known coronary heart disease years later.[187] Fast-track approval of new drugs for HIV infection was based on safety and efficacy in reducing viral levels (as a surrogate or substitute outcome measure felt to be related to survival) as opposed to demonstration of improved survival.

On the other hand, in the late 1970s, patients with frequent extra heartbeats (ventricular premature contractions) following a heart attack had an increased risk for sudden death. On that basis, those in the then-emerging field of cardiac electrophysiology believed that reducing ventricular premature beats (as a surrogate outcome measure) would decrease subsequent sudden cardiac death. In early randomized controlled trials, oral antiarrhythmic drugs such as encainide and flecainide were approved by FDA on the basis of their ability to suppress these extra heartbeats in patients who had had a myocardial infarction. Years after

183. **Dennis T. Ko et al.**, *Appropriateness of Spironolactone Prescribing in Heart Failure Patients: A Population-Based Study*, 12 J. Cardiac Failure 205–10 (2006).

184. **David N. Juurlink et al.**, *Rates of Hyperkalemia After Publication of the Randomized Aldactone Evaluation Study*. 351 New Eng. J. Med. 543–51 (2004).

185. Harriette G.C. Van Spall et al., *Eligibility Criteria of Randomized Controlled Trials Published in High-Impact General Medical Journals: A Systematic Sampling Review*, 297 JAMA 1233–40 (2007).

186. *See* Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

187. *Randomised Trial of Cholesterol Lowering in 4444 Patients with Coronary Heart Disease: The Scandinavian Simvastatin Survival Study* (4S), 344 Lancet 1383–89 (1994).

EXHIBIT C

*Reference Guide on Medical Testimony*

approval of these drugs, however, a randomized controlled trial designed to demonstrate a survival benefit of these drugs was discontinued after only 10 months because of a statistically significant higher rate of mortality in patients receiving the drugs. Although these drugs effectively suppressed the extra heartbeats, the study found that they also increased the likelihood of fatal heart rhythm disturbances.[188]

Prior to approval by FDA, drugs and devices must undergo Phase 1, 2, and 3 clinical trials to demonstrate safety and efficacy. Following preliminary chemical discovery, toxicology, and animal studies, Phase 1 studies examine the safety of new drugs in healthy individuals. Phase 2 studies involve varying drug doses in individuals with the disease to explore efficacy and responses and adverse effects. Based on the dose or doses identified in Phase 2, a Phase 3 study examines drug response in a larger number of patients to again determine safety and efficacy in the hope of getting a new drug approved for sale by regulatory authorities. However, because fewer than 10,000 individuals have usually received the drug during all of these trials, uncommon adverse outcomes may not become apparent until usage is broadened and extended. For example, depending on dosage, between 1 in 24,200 and 1 in 40,500 patients who received the antibiotic chloramphenicol[189] developed fatal aplastic anemia (in which the bone marrow no longer produces any blood cells). This adverse effect was discovered only in the 1960s after chloramphenicol was initially considered safe and had been widely used during the 1950s.[190]

For all approved drug and therapeutic biological products, FDA has managed postmarketing safety surveillance since 1969 through the Adverse Event Reporting System. Health care professionals, including physicians, pharmacists, nurses, and others, and consumers, including patients, family members, lawyers, and others, are expected to report adverse events and medication errors. It is a voluntary system with the following limitations: (1) uncertainty that the drug caused the reported event, (2) no requirement for proof of a causal relationship between product and event, (3) insufficient detail to evaluate events, (4) incomplete reporting of all adverse events, and (5) inability to determine the incidence of an adverse events because the actual number of patients receiving a product and the duration of use of those products are unknown.

In 1999, rofecoxib (Vioxx), a Cox-2 selective nonsteroidal anti-inflammatory drug, was approved for pain relief in part on the basis of studies that suggested that it induced less gastrointestinal bleeding than other nonsteroidal anti-inflammatory drugs. In 2004, the manufacturer announced a voluntary worldwide withdrawal

188. *Preliminary Report: Effect of Encainide and Flecainide on Mortality in a Randomized Trial of Arrhythmia Suppression After Myocardial Infarction: The Cardiac Arrhythmia Suppression Trial (CAST) Investigators*, 321 New Eng. J. Med. 406–12 (1989).

189. Two pre-*Daubert* cases from the Fifth Circuit dealt with product liability suits against the manufacturer: Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir. 1991); Osburn v. Anchor Labs., 825 F.2d 908 (5th Cir. 1987). Clarke, *supra* note 152, at 515.

190. Clarke, *supra* note 152, at 815.

EXHIBIT C

of rofecoxib when a prospective study confirmed that the drug increased the risk of myocardial infarctions (heart attacks) and stroke with chronic use.[191]

This section demonstrates some of the issues that physicians grapple with in treatment decisions. Some generally avoid using new drugs until sufficient experience with the medication provides an opportunity for unknown adverse effects to emerge following drug approval. Others may be quick to adopt new drugs, especially drugs perceived to have improved safety or efficacy such as through a novel mechanism of action. By withholding use of new drugs, more conservative physicians may avoid the occurrence of unforeseen adverse consequences, but they may also delay the use of new drugs that may benefit their patients. The converse may occur, of course, with physicians who are early adopters of new drugs, tests, or technologies.

Even in a randomized trial in which a drug is found to be beneficial, some patients who received the drug may have been harmed, emphasizing the need to individualize the balancing of risks and benefits and explaining in part why some physicians may not adhere to guideline recommendations. The fundamental dilemma articulated by Bernard in 1865 still haunts the clinician: The response of the "average" patient to therapy is not necessarily the response of the patient being treated.[192] Indeed, the average results of clinical trials do not apply to all patients in the trial. Even with well-defined inclusion and exclusion criteria, variation in outcome risk and, therefore, treatment benefit exists so that even "typical" patients included in the trial may not be likely to get the average benefits.

The Global Utilization of Streptokinase and tPA for Occluded Coronary Arteries Trial is a case in point. The trial suggested that accelerated tissue plasminogen accelerator (tPA) reduced mortality from acute myocardial infarction, with the tradeoff being an increased risk of bleeding from tPA.[193] In a reanalysis of this study, most (85%) of the survival benefit of tPA accrued to half of the patients (those at highest risk of dying from their heart attack). Some patients with very low risk of dying from their heart attack who received tPA likely were harmed because their risk of intracranial hemorrhage exceeded the benefit.[194] In practice then, even in a randomized controlled trial demonstrating survival benefit, *on average*, those benefits may not accrue to every patient in that trial that received treatment. Therefore, to optimize treatment decisions, physicians attempt to individualize treatment decisions based on their assessment of the patient's risk versus benefit. Even then, physicians may be reluctant to administer a medication such

191. *See generally In re* Vioxx Prods. Liab. Litig., 360 F. Supp. 2d 1352 (J.P.M.L. 2005).

192. Salim Yusuf et al., *Analysis and Interpretation of Treatment Effects in Subgroups of Patients in Randomized Clinical Trials*, 266 JAMA 93–98 (1991) (hereinafter "Yusuf").

193 *An International Randomized Trial Comparing Four Thrombolytic Strategies for Acute Myocardial Infarction. The GUSTO Investigators*, 329 New Eng. J. Med. 673–82 (1993).

194. David M Kent et al., *An Independently Derived and Validated Predictive Model for Selecting Patients with Myocardial Infarction Who Are Likely to Benefit from Tissue Plasminogen Activator Compared with Streptokinase*, 113 Am. J. Med. 104–11 (2002).

EXHIBIT C

*Reference Guide on Medical Testimony*

as tPA that can cause severe harm such as an intracranial hemorrhage. A single clinical experience with a patient who bled when given tPA might well color their judgment about the benefits of the treatment.

A fundamental principle of evidence-based medicine is that "Evidence alone is never sufficient to make a clinical decision."[195] Nearly all medical decisions involve some tradeoff between a benefit and a risk. Besides the options and the likelihood of the outcomes, patient preferences about the resulting outcomes should affect care choices, especially when there are tradeoffs such as a risk of complications or dying from a procedure or treatment versus some benefit such as living longer (provided the patient survives the short-term risk of the procedure) or improving their quality of life (relieving symptoms). Besides individualizing risk and benefit assessments, physicians may also deviate from guideline recommendations ("warranted variation") because of a particular patient's higher risk of adverse events or lower likelihood of benefit or because of patient preferences for the alternative outcomes, such as when risks occur at different times. For example, given a hypothetical choice between living 25 years for certain or a 50:50 chance of living 50 years or dying immediately, most individuals choose the 25 years for certain. Although both options yield, on average, 25 years, most individuals are risk averse and prefer to avoid the near-term risk of dying. When interviewed, some patients with "operable" lung cancer were quite averse to possible immediate death from surgery, and so, based on their preferences, these patients probably would opt for radiation therapy despite its poorer long-term survival.[196]

Besides risk aversion, some treatments may improve quality of life but place patients at risk for shortened life expectancy, and some patients may be willing to trade off quality of life for length of life. When presented with laryngeal cancer scenarios, some volunteer research subjects chose radiation therapy over surgery to preserve their voices despite a reduced likelihood of future survival. "These results suggest that treatment choices should be made on the basis of patients' attitudes toward the quality as well as the quantity of survival."[197]

To illustrate this principle, a National Institutes of Health Consensus Conference recommended breast-conserving surgery when possible for women with Stage I and II breast cancer[198] because well-designed studies with long-term followup on thousands of women demonstrated equivalence of lumpectomy and radiation therapy or mastectomy for survival and disease-free survival (being alive without breast cancer recurrence). In one study, lumpectomy and radiation appeared to have a lower risk of breast cancer recurrence with 5 women reported to have had breast cancer recurrences following lumpectomy and radiation versus

195. Guyatt, *supra* note 150, at 8; *see also supra* Section IV.C.3.
196. McNeil, *supra* note 63, at 986.
197. *Id*. at 982.
198. *NIH Consensus Conference: Treatment of Early-Stage Breast Cancer*, 265 JAMA 391–95 (1991).

EXHIBIT C

*Reference Manual on Scientific Evidence*

10 women after mastectomy.[199] However, breast cancer that recurred in the breast that had been operated on was censored (i.e., deliberately not considered in the statistical analysis).[200] When including these censored cancer recurrences, 20 breast cancer recurrences occurred after lumpectomy versus 10 after mastectomy, and so lumpectomy actually had a higher overall risk of recurrence.[201] As expressed by one woman, "The decision about treatment for breast cancer remains an intensely personal one. The mastectomy I chose . . . felt a lot less invasive than the prospect of six weeks of daily radiation, not to mention the 14% risk of local recurrence."[202] In such a case, patient preferences[203] regarding tradeoffs involving breast preservation and increased risk of breast cancer recurrence or the need for radiation therapy associated with lumpectomy may play an important role in determining the optimal decision for any particular patient.[204]

## D. Informed Consent

### 1. Principles and standards

Medical informed consent is an ethical, moral, and legal responsibility of physicians.[205] It is guided by four ethical principles: autonomy, beneficence, non-malfeasance, and justice.[206] Autonomy refers to informed, rational decisionmaking after unbiased and thoughtful deliberation. Beneficence represents the moral obligation of physicians to act for the benefit of patients.[207] These two principles place physicians in conflict because they wish to provide the care they believe is best for the patient, but because that care usually involves some risk or cost, physicians also recognize that patient preferences may affect their recommendation. In a study examining the incidence of erectile dysfunction with use of a beta blocker medication known to be beneficial, heart disease patients were (1) blinded

---

199. Joan A. Jacobson et al., *Ten-Year Results of a Comparison of Conservation with Mastectomy in the Treatment of Stage I and II Breast Cancer,* 332 New Eng. J. Med. 907–11 (1995) (hereinafter "Jacobson").

200. Bernard Fisher et al., *Eight-Year Results of a Randomized Clinical Trial Comparing Total Mastectomy and Lumpectomy With or Without Irradiation in the Treatment of Breast Cancer,* 320 New Eng. J. Med. 822–28 (1989); Jacobson, *supra* note 199, at 998.

201. Jacobson, *supra* note 199, at 999.

202. Karen Sepucha et al., *Policy Support for Patient-Centered Care: The Need For Measurable Improvements In Decision Quality*, Health Affairs Supp. Web Exclusives VAR 54, VAR 62 (2004).

203. Proctor & Gamble Pharm., Inc. v. Hoffman-LaRoche, Inc., 2006 WL 2588002, at *10 (S.D.N.Y. 2006) (detailing the testimony of a physician stating that, in addition to efficacy, he considers patient preferences when determining treatment for osteoporosis).

204. Jerome P. Kassirer, *Adding Insult to Injury. Usurping Patients' Prerogatives*, 308 New Eng. J. Med. 898–901 (1983) (hereinafter "1983 Kassirer").

205. Timothy J. Paterick et al., *Medical Informed Consent: General Considerations for Physicians,* 83 Mayo Clinic Proc. 313–19 (2008) (hereinafter "Paterick").

206. Jaime S. King & Benjamin W. Moulton, *Rethinking Informed Consent: The Case for Shared Decision Making,* 32 Am. J.L. & Med. 429–501 (2006) (hereinafter "King & Moulton").

207. *Id.* at 435.

EXHIBIT C

*Reference Guide on Medical Testimony*

to the drug, (2) informed of the drug name only, or (3) informed about its erectile dysfunction adverse effect. Among those blinded, 3.1% developed erectile dysfunction compared with 15.6% of those given the drug name and 31.2% of those informed about adverse effects, showing that being informed increased the risk for adverse effects and might deprive patients of benefit from a drug because they stop taking it.[208] Physicians must balance the desire to provide beneficial care with the obligation to promote autonomous decisions by informing patients of potential adverse effects or tradeoffs.

State jurisdictions differ in their standards for disclosure, with half adopting the physician or professional standard (the information that other local physicians with similar skill levels would provide) and the other half adopting the patient or materiality standard (the information that a reasonable patient would deem important in decisionmaking).[209] The informed consent process involves the disclosure of alternative treatment options including no treatment and the risks and benefits associated with each alternative. Discussion should include severe risks and frequent risks, but the courts have not provided explicit guidance about what constitutes sufficient severity or frequency. Patients should be considered by the court to be competent and should have the capacity to make decisions (understanding choices, risks, and benefits). The decision should be voluntary—of free mind and free will, without coercion or manipulation. The language used should be understandable to the patient, and treatment should not proceed unless the physician believes the patient understands the options and their risks and benefits.

Patients may withdraw consent or refuse treatment. Such an action should engender additional discussion, and documentation may include the completion of a withdrawal-of-consent form. In certain situations, exceptions to medical consent may arise in emergencies, when the treatment is recognized by prudent physicians to involve no material risk to patients and when the procedure is unanticipated and not known to be necessary at the time of consent.[210]

The Merenstein case described an unpublished trial in which, during his residency, Dr. Merenstein examined a highly educated man. The examination included a discussion of the relevant risks and benefits regarding prostate cancer screening using the prostate-specific antigen (PSA) test based on recommendations from the U.S. Preventive Services Task Force, the American College of Physicians–American Society of Internal Medicine, the American Medical Association, the American Urological Association, the American Cancer Association, and the American Academy of Family Physicians. Dr. Merenstein testified that the patient declined the test because of the high false-positive rate, the risk of treatment-related adverse effects, and the low risk of dying from prostate cancer.

---

208. **Antonello Silvestri et al.,** *Report of Erectile Dysfunction After Therapy with Beta-Blockers Is Related to Patient Knowledge of Side Effects and Is Reversed by Placebo,* 24 Eur. Heart J. 1928, 1928 (2003).

209. King & Moulton, *supra* note 206, at 430.

210. Paterick, *supra* note 205, at 315.

EXHIBIT C

*Reference Manual on Scientific Evidence*

Another physician seeing the same patient subsequently ordered a PSA without any patient discussion. The PSA was high and the patient was diagnosed with incurable advanced prostate cancer. The plaintiff's attorney argued that despite the guidelines above, the standard of care in Virginia was to order the blood test without discussion, based on four physician witnesses. The jury ruled in favor of the plaintiff.[211]

To illustrate the importance of patient preferences, a woman with breast cancer described her experience: "But as the surgeon diagramed incision points on my chest with a felt-tip pen, my husband asked a question: Is it really necessary to transfer this back muscle? The doctor's answer shocked us. No, he said, he could simply operate on my chest. That would cut surgery and recovery time in half. He had planned the more complicated procedure because he thought it would have the best cosmetic result. 'I assumed that's what you wanted.'"[212] Instead the woman preferred the less invasive approach that shortened her recovery time.

In the research setting, a randomized trial with and without informed consent demonstrated that the process of getting informed consent altered the effect of a placebo when given to patients with insomnia. The first patient of each pair was randomized to no informed consent and the second to informed consent. Out of 56 patients randomized to informed consent, 26 declined to participate in the study (the patients without informed consent had no choice and were unaware of their participation in a study). The informed consent process created a "biased" group because the age and gender for those who declined participation differed significantly from those who did agree to be included in the study. The hypnotic activity of placebo was significantly higher without informed consent, and adverse events were found more commonly in the group receiving informed consent. The study suggests that the process of getting informed consent introduced biases in the patient population and affected the efficacy and adverse effects observed in this clinical trial, thereby potentially affecting the general applicability of any findings involving informed consent.[213]

Besides physicians, patients may get health information from the Internet, family, friends, and the media (newspapers, magazines, television). Among Internet users, 80% had searched for information on at least 1 of 15 major health topics but use varied from 62% to 89% by age, gender, education, or race/ethnicity.[214] Conducted between November 2006 and May 2007, a cross-sectional national survey of U.S. adults who had made a medical decision found that Internet use

211. King & Moulton, *supra* note 206, at 432–34; Daniel Merenstein, *A Piece of My Mind: Winners and Losers,* 291 JAMA 15–16 (2004).

212. Julie Halpert, *Health: What Do Patients Want?* Newsweek, Apr. 28, 2003, at 63–64.

213. R. Dahan et al., *Does Informed Consent Influence Therapeutic Outcome? A Clinical Trial of the Hypnotic Activity of Placebo in Patients Admitted to Hospital,* 293 Brit. Med. J. Clin. Res. Ed. 363–64 (1986).

214. Pew Internet, Health Topics, http://pewinternet.org/Reports/2011/HealthTopics.aspx (last visited Feb. 12, 2011).

EXHIBIT C

*Reference Guide on Medical Testimony*

averaged 28% but varied from 17% for breast cancer screening to 48% for hip/knee replacement among those 40 years of age and older.[215] However, even among Internet users, health care providers were felt to be the most influential source of information for medical decisions, followed by the Internet, family and friends, and then media.

## 2. Risk communication

Multiple health outcomes may result from alternative treatment choices, and how patients feel about the relative importance of those outcomes varies.[216] When patients with recently diagnosed curable prostate cancer were presented with 93 possible questions that might be important to patients like themselves, 91 of the questions were cited as relevant to at least one patient.[217] Communication skills should include patient problem assessment (appropriate questioning techniques, seeking patient's beliefs, checking patient's understanding of the problem); patient education and counseling (eliciting patient's perspective, providing clear instructions and explanations, assessing understanding); negotiation and shared decisionmaking (surveying problems and delineating options, arriving at mutually acceptable solutions); relationship development and maintenance (encouraging patient expression, communicating a supportive attitude, explaining any jargon, and using nonverbal behavior to enhance communication).[218]

Certain forms of risk communication, however, may be confusing and should be avoided: "single event probabilities, conditional probabilities (such as sensitivity and specificity), and relative risks."[219] An example of a single-event probability would be the statement that a particular medication results in a 30% to 50% chance of developing erectile dysfunction.[220] Although physicians are referring to patients, patients may misinterpret this as referring to their own sexual encounters and having an erectile dysfunction problem in 30% to 50% of their sexual encounters. The preferred natural frequency statement would be "out of 100 people like you taking this medication, 30 to 50 of them experience erectile dysfunction." The natural frequency statement specifies a reference class, thereby reducing misunderstanding.[221]

---

215. Mick P. Couper et al., *Use of the Internet and Ratings of Information Sources for Medical Decisions: Results from the DECISIONS Survey*, 30 Med. Decision Making 106S–14S (2010).

216. 1983 Kassirer, *supra* note 203, at 889.

217. Deb Feldman-Stewart et al., *What Questions Do Patients with Curable Prostate Cancer Want Answered?* 20 Med. Decision Making 7–19 (2000).

218. Michael J. Yedidia et al., *Effect of Communications Training on Medical Student Performance*, 290 JAMA 1157–65 (2003).

219. Gerd Gigerenzer & Adrian Edwards, *Simple Tools for Understanding Risks: From Innumeracy to Insight*, 327 BMJ 741–44 (2003).

220. Gigerenzer, *supra* note 87, at 4.

221. *Id.* at 4; *see also* Section IV.A.2.

EXHIBIT C

*Reference Manual on Scientific Evidence*

Regarding relative risk, consider a statement that taking a cholesterol–lowering medication reduces the risk of dying by 22%.[222] This may be misinterpreted as saying that out of 1000 patients with high cholesterol, 220 of them can avoid dying by taking cholesterol–lowering medications. The actual data show that 32 deaths occur among 1000 patients taking the medication, and 41 deaths occur among 1000 patients taking the placebo. The relative risk reduction equals 9 divided by 41. A preferred way to express the benefit would be the absolute risk reduction (the difference between 41 and 32 deaths in 1000 patients), or to say that in 1000 people like you with high cholesterol, taking a cholesterol medication for 5 years helps 9 of them avoid dying.[223] Calculating an odds ratio, the cholesterol–lowering medication reduces the odds of dying by 23%; notice that neither the relative risk nor the odds ratio characterizes the number of events without treatment and that the odds ratio always magnifies the risk or benefit when compared with the relative risk. To illustrate further, a relative risk reduction of 20% has very different absolute risk reductions depending on the number of events without treatment. If 20 of 100 patients without treatment would die, then the absolute risk reduction is 4 of 100 or 4% (20% times 20), but if 20 of 100,000 patients without treatment would die, then the absolute reduction is 4 of 100,000 or 0.004%. The number needed to treat is an additional form of risk communication popularized as part of evidence-based medicine to account for the risk without treatment. It is the reciprocal of the absolute risk difference or 1 divided by the quantity 9 lives saved per 1000 (1 ÷ (9/1000)) treated with cholesterol medications in the above example. Therefore 111 patients need to be treated with a cholesterol medication for 5 years to save one of them, or in the illustrative example, with a relative risk reduction of 20%, either 25 or 25,000 would need to be treated to save 1 patient.

In the analysis of mammography for the U.S. Preventive Services Task Force, the number needed to be invited (NNI) for screening to avoid one breast cancer death was 1904 for 39- to 49-year-olds, 1339 for 50- to 59-year-olds, and 377 for 60- to 69-year-olds.[224] To account for possible harm, there is a corresponding determination of the number needed to harm (NNH) that is calculated in the same manner. Considering breast biopsy as a morbidity, 5 women need to undergo breast biopsy for every one woman diagnosed with breast cancer for 39- to 49-year-olds, and the corresponding numbers are 3 for women ages 50 to 59 and 2 for women ages 60 to 69 years old.[225] Estimates of overdiagnosis ranged mostly from 1% to 10%, and so, out of 100 women diagnosed with breast cancer from screening, 1 to 10 of them undergo treatment for a cancer that would never have caused any mortality.[226] Clearly no one can tell if any particular woman has

222. **Gigerenzer**, *supra* note 87, at 34.

223. *Id.* at 34–35.

224. Heidi D. Nelson et al., *Screening for Breast Cancer: An Update for the U.S. Preventive Services Task Force*, 151 Annals Internal Med. 727–37 (2009).

225. *Id.* at 732.

226. *Id.* at 731–732

EXHIBIT C

*Reference Guide on Medical Testimony*

been overdiagnosed because this is unobservable.[227] The estimated extent of over-diagnosis requires estimating mortality reductions in a screened population compared with an unscreened population over a long period. The difference between the two groups provides an estimate of the extent of overdiagnosis.

To summarize the evidence, "Mammography does save lives, more effectively among older women, but does cause some harm. Do the benefits justify the risks? The misplaced propaganda battle seems to now rest on the ratio of the risks of saving a life compared with the risk of overdiagnosis, two very low percentages that are imprecisely estimated and depend on age and length of followup."[228] In the USPSTF recommendations for mammography in 40- to 49-year-olds, the focus has been on the first part of their statement "The USPSTF recommends against routine screening mammography in women aged 40 to 49 years." Although screening has demonstrated benefits, in their view, the benefits of screening do not sufficiently and clearly outweigh the potential harms to make a recommendation that all women 40 to 49 years old have routine screening mammography from a public health or population perspective. Oft neglected, the USPSTF in their immediately subsequent sentence recognizes that individual preferences should affect the care that patients receive: "The decision to start regular, biennial screening mammography before the age of 50 years should be an individual one and take patient context into account, including the patient's values regarding specific benefits and harms."[229] The recommendation recognizes that depending on their experiences, values, and preferences, some women may seek the benefit in reducing breast cancer deaths and others may prefer to avoid possible morbidity (breast biopsy and worry) and potential overdiagnosis and overtreatment.

## 3. Shared Decisionmaking

The "professional values of competence, expertise, empathy, honesty, and commitment are all relevant to communicating risk: Getting the facts right and conveying them in an understandable way are not enough."[230] Shared and informed decision-making has emerged as one part of patient care. It distinguishes "problem solving" that identifies one "right" course that leaves little room for patient involvement from "decisionmaking" in which several courses of action may be reasonable and in which patient involvement should determine the optimal choice. In such cases, health care choices depend not only on the likelihood of alternative outcomes resulting from each strategy but also on the patient preferences for possible outcomes and their attitudes about risk taking to improve future survival or quality

---

227. Klim McPherson, *Screening for Breast Cancer—Balancing the Debate,* 341 BMJ 234–35 (2010).

228. *Id.* at 234.

229. U.S. Preventive Services Task Force, *Screening for Breast Cancer: U.S. Preventive Services Task Force Recommendation Statement*, 151 Annals Internal Med. 716, 716 (2009).

230. Adrian Edwards, *Communicating Risks*, 327 BMJ 691–92 (2003).

EXHIBIT C

of life and the timing of that risk whether the risk occurs now or in the future.[231] Informed decisionmaking occurs

> when an individual understands the nature of the disease or condition being addressed; understands the clinical service and its likely consequences, including risks, limitations, benefits, alternatives, and uncertainties; has considered his or her preferences as appropriate; has participated in decision making at a personally desirable level; and either makes a decision consistent with his or her preferences and values or elects to defer a decision to a later time.[232]

Shared decisionmaking occurs "when a patient and his or her healthcare provider(s), in the clinical setting, both express preferences and participate in making treatment decisions."[233]

To assist with shared decisionmaking, health decision aids have been developed to help patients and their physicians choose among reasonable clinical options together by describing the "benefits, harms, probabilities, and scientific uncertainties."[234] In 2007, the legislature in the state of Washington became the first to establish and recognize in law a role for shared decisionmaking in informed consent.[235] The bill goes on to encourage the development, certification, use, and evaluation of decision aids. The consent form provides written documentation that the consent process occurred, but the crux of the medical consent process is the discussion that occurs between a physician and a patient. The physician shares his or her medical knowledge and expertise and the patient shares his or her values (health goals) and preferences. It is an opportunity to strengthen the patient–physician relationship through shared decisionmaking, respect, and trust.

# V. Summary and Future Directions

Having sequenced the human genome, medical research is poised for exponential growth as the code for human biology (genomics) is translated into proteins (proteomics) and chemicals (metabolomics) to identify molecular pathways that lead to disease or that promote health. With advances in medical technologies in diagnosis and preventive and symptomatic treatment, the practice of medicine will be profoundly altered and redefined. For example, consider lymphoma, a blood cancer that used to be classified simply by appearance under the microscope as

231. Michael J. Barry, *Health Decision Aids to Facilitate Shared Decision Making in Office Practice*, 136 Annals Internal Med. 127–35 (2002).

232. Peter Briss et al., *Promoting Informed Decisions About Cancer Screening in Communities and Healthcare Systems*, 26 Am. J. Preventive Med. 67, 68 (2004).

233. *Id*. at 68.

234. Annette M. O'Connor et al., *Risk Communication in Practice: The Contribution of Decision Aids*, 327 BMJ 736, 736 (2003).

235. Bridget M. Kuehn, *States Explore Shared Decision Making*, 301 JAMA 2539–41 (2009).

EXHIBIT C

*Reference Guide on Medical Testimony*

either Hodgkin's or non–Hodgkin's lymphoma. As science has evolved, it is now further classified by cellular markers that identify the underlying cancer cells as one of two cells that help with immunity (protecting the body from infection and cancer): T cells or B cells. Current research is attempting to characterize those cells further by identifying underlying genetic and cellular markers and pathways that may distinguish these lymphomas and provide potential therapeutic targets. The growth in the research enterprise, both basic science and clinical translational (the translation of bench research to the bedside or basic science research into novel treatments or diagnostics), has greatly expanded research capacity to generate scientific research of all types.

With greatly expanded knowledge, research and specialization, judgments about admissibility and about what constitutes expertise become increasingly difficult and complex. The sifting of this research into sufficiently substantiated, competent, and reliable evidence, however, relies on the traditional scientific foundation: first, biological plausibility and prior evidence and, second, consistent repeated findings. The practice of medicine at its core will continue to be a physician and patient interaction with professional judgment and communication central elements of the relationship. Judgment is essential because of uncertainties in the underlying professional knowledge or because even if the evidence is credible and substantiated, there may be tradeoffs in risks and benefits for testing and for treatment. Communication is critical because most decisions involve tradeoffs, in which case individual patient preferences for the outcomes that may be unique to patients and that may affect decisionmaking should be considered.

In summary, medical terms shared in common by the legal and medical professions have differing meanings, for example, differential diagnosis, differential etiology, and general and specific causation. The basic concepts of diagnostic reasoning and clinical decisionmaking and the types of evidence used to make judgments as treating physicians or experts involve the same overarching theoretical issues: (1) alternative reasoning processes; (2) weighing risks, benefits, and evidence; and (3) communicating those risks.

EXHIBIT C

# Glossary of Terms

**adequacy.** In diagnostic verification, testing a particular diagnosis for its adequacy involves determining its ability to account for all normal and abnormal findings and the observed time course of the disease.

**attending physician**. The physician responsible for the patient's care at the hospital in which the patient is being treated.

**Bayes' theorem (rule).** A mathematical approach to integrating suspicion (pretest probability) with additional information such as from a test result (posttest probability) by using test characteristics (sensitivity and specificity) to demonstrate how well the test performs in individuals with and without the disease.

**causal reasoning.** For physicians, causal reasoning typically involves understanding how abnormalities in physiology, anatomy, genetics, or biochemistry lead to the clinical manifestations of disease. Through such reasoning, physicians develop a "causal cascade" or "chain or web of causation" linking a sequence of plausible cause-and-effect mechanisms to arrive at the pathogenesis or pathophysiology of a disease.

**chief complaint.** The primary or main symptom that caused the patient to seek medical attention.

**coherency.** In diagnostic verification, testing a particular diagnosis for its coherency involves determining the consistency of that particular diagnosis with predisposing risk factors, physiological mechanisms, and resulting manifestations.

**conditional probability.** The probability or likelihood of something given that something else has occurred or is present, for example, the likelihood of disease if a test is positive (posterior probability) or the likelihood of a positive test if disease is present (sensitivity). See Bayes' theorem or rule.

**consulting physician**. A physician, usually a specialist, asked by the patient's attending physician to provide an opinion regarding diagnosis, testing, or treatment or to perform a procedure or intervention, for example, surgery.

**diagnostic test.** A test ordered to confirm or exclude possible causes of a patient's symptoms or signs (distinct from screening test).

**diagnostic verification.** The last stage of narrowing the differential diagnosis to a final diagnosis by testing the validity of the diagnosis for its coherency, adequacy, and parsimony.

**differential diagnosis.** A set of diseases that physicians consider as possible causes for patients presenting with a chief complaint (hypothesis generation). As additional symptoms with further patient history, signs found on physical examination, test results, or specialty physician consultations become available, the likelihood of various diagnoses may change (hypothesis refinement) or new ones may be considered (hypothesis modification) until the diagnosis is nearly final (diagnostic verification).

EXHIBIT C

*Reference Guide on Medical Testimony*

**differential etiology.** Term used by the court or witnesses to establish or refute external causation for a plaintiff's condition. For physicians, etiology refers to cause.

**external causation.** External causation is established by demonstrating that the cause of harm or disease originates from outside the plaintiff's body, for example, defendant's action or product.

**general causation.** General causation is established by demonstrating, usually through scientific evidence, that a defendant's action or product causes (or is capable of causing) disease.

**heuristics.** Quick automatic "rules of thumb" or cognitive shortcuts often involving pattern recognition that facilitate rapid diagnostic and treatment decisionmaking. Although characteristic of experts, it may predispose to known cognitive errors. See Hypothetico–deductive.

**hypothesis generation.** A limited list of potential diagnostic hypotheses in response to symptoms, signs, and lab test results. See differential diagnosis.

**hypothesis modification.** A change in the list of diagnostic hypotheses (differential diagnosis) in response to additional information, e.g., symptoms, signs, and lab test results. See differential diagnosis.

**hypothesis refinement.** A change in the likelihood of the potential diagnostic hypotheses (differential diagnosis) in response to additional information, e.g., symptoms, signs, and lab test results. As additional information emerges, physicians evaluate those data for their consistency with the possibilities on the list and whether those data would increase or decrease the likelihood of each possibility. See differential diagnosis.

**hypothetico–deductive.** Deliberative and analytical reasoning involving hypothesis generation, hypothesis modification, hypothesis refinement, and diagnostic verification. Typically applied for problems outside an individual's expertise or difficult problems with atypical issues, it may avoid known cognitive errors. See Heuristics.

**individual causation.** See specific causation.

**inductive reasoning.** The process of arriving at a diagnosis based on symptoms, signs, and lab tests. See differential diagnosis.

**inferential reasoning.** See inductive reasoning.

**overdiagnosis.** Screening can lead to "pseudodisease" or "overdiagnosis," e.g., the identification of slow-growing cancers that even if untreated would never cause symptoms or reduce survival because the screening test cannot distinguish the abnormal–appearing cells that would become cancerous from those that would never do so. See overtreatment.

**overtreatment.** The treatment of patients with pseudodisease whose disease would never cause symptoms or reduce survival. The treatment may place

743

EXHIBIT C

*Reference Manual on Scientific Evidence*

patients at risk for treatment-related morbidity and possibly mortality. See overdiagnosis.

**parsimony.** In diagnostic verification, testing a particular diagnosis for its parsimony involves choosing the simplest single explanation as opposed to requiring the simultaneous occurrence of two diseases to explain the findings.

**pathogenesis.** See causal reasoning.

**pathology test.** Microscopic examination of body tissue typically obtained by a biopsy or during surgery to determine if the tissue appears to be abnormal (different than would be expected for the source of the tissue). The visual components of the abnormality are typically described (e.g., types of cells, appearance of cells, scarring, effect of stains or molecular markers that help facilitate identification of the components) and, on the basis of visual pattern, the abnormality may be classified, e.g., malignancy (cancer) or dysplasia (precancerous).

**posttest probability.** See predictive value.

**predictive value** or **posttest probability**. The suspicion or probability of a disease after additional information (such as from a test) has been obtained. The predictive value positive or positive predictive value is the probability of disease in those known to have a positive test result. The predictive value negative or negative predictive value is the probability of disease in those known to have a negative test result.

**pretest probability.** The suspicion or probability of a disease before additional information (such as from a test) is obtained.

**prior probability.** See pretest probability.

**screening test.** A test performed in the absence of symptoms or signs to detect disease earlier, e.g., cancer screening (distinct from diagnostic test).

**sensitivity.** Likelihood of a positive finding (usually referring to a test result but could also be a symptom or a sign) among individuals known to have a disease (distinct from specificity).

**sign.** An abnormal physical finding identified at the time of physical examination (distinct from symptoms).

**specific causation** or **individual causation.** Established by demonstrating that a defendant's action or product is the cause of a particular plaintiff's disease.

**specificity.** Likelihood of a negative finding (usually referring to a test result but could also be a symptom or a sign) among individuals who do not have a particular disease (distinct from sensitivity).

**syndrome.** A group of symptoms, signs, and/or test results that together characterize a specific disease.

**symptom.** The patient's description of a change in function, sensation, or appearance (distinct from sign).

EXHIBIT C

*Reference Guide on Medical Testimony*

# References on Medical Testimony

Lynn Bickley et al., Bates' Guide to Physical Examination and History Taking (10th ed. 2008).

Gerd Gigerenzer. Calculated Risks. How to Know When Numbers Deceive You (2002).

Trisha Greenhalgh. How to Read a Paper: The Basics of Evidence-Based Medicine (4th ed. 2010).

Gordon Guyatt et al., Users' Guides to the Medical Literature: Essentials of Evidence-Based Clinical Practice (2d ed. 2009).

Jerome P. Kassirer et al., Learning Clinical Reasoning (2d ed. 2009).

Harold C. Sox et al., Medical Decision Making (2006).

Sharon E. Straus et al., Evidence-Based Medicine (4th ed. 2010).

EXHIBIT C

EXHIBIT C

# Reference Guide on Neuroscience

## HENRY T. GREELY AND ANTHONY D. WAGNER

*Henry T. Greely, J.D., is Deane F. and Kate Edelman Johnson Professor of Law, Professor, by courtesy, of Genetics, and the Director of Center for Law and the Biosciences, Stanford University, Stanford, California.*

*Anthony D. Wagner, Ph.D., is Associate Professor of Psychology and Neuroscience, Stanford University, Stanford, California.*

CONTENTS

  I.  Introduction, 749

 II.  The Human Brain, 749

       A.  Cells, 750

       B.  Brain Structure, 754

       C.  Some Aspects of How the Brain Works, 759

III.  Some Common Neuroscience Techniques, 761

       A.  Neuroimaging, 761

           1.  CAT scans, 762

           2.  PET scans and SPECT scans, 763

           3.  MRI—structural and functional, 766

       B.  EEG and MEG, 772

       C.  Other Techniques, 773

           1.  Lesion studies, 773

           2.  Transcranial magnetic stimulation (TMS), 774

           3.  Deep brain stimulation (DBS), 775

           4.  Implanted microelectrode arrays, 775

 IV.  Issues in Interpreting Study Results, 776

       A.  Replication, 777

       B.  Problems in Experimental Design, 777

       C.  The Number and Diversity of Subjects, 779

       D.  Applying Group Averages to Individuals, 780

       E.  Technical Accuracy and Robustness of Imaging Results, 781

       F.  Statistical Issues, 782

       G.  Possible Countermeasures, 783

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

V.  Questions About the Admissibility and the Creation of Neuroscience
     Evidence, 784
        A.  Evidentiary Rules, 785
             1.  Relevance, 785
             2.  Rule 702 and the admissibility of scientific evidence, 785
             3.  Rule 403, 788
             4.  Other potentially relevant evidentiary issues, 789
        B.  Constitutional and Other Substantive Rules, 790
             1.  Possible rights against neuroscience evidence, 790
             2.  Possible rights to the creation or use of neuroscience
                 evidence, 795
             3.  The Fourth Amendment, 796
 VI.  Examples of the Possible Uses of Neuroscience in the Courts, 796
        A.  Criminal Responsibility, 799
        B.  Lie Detection, 802
             1.  Issues involved in the use of fMRI–based lie detection in
                 litigation, 803
             2.  Two cases involving fMRI–based lie detection, 805
             3.  fMRI–based lie detection outside the courtroom, 807
        C.  Detection of Pain, 807
VII.  Conclusion, 811
References on Neuroscience, 812

**EXHIBIT C**

*Reference Guide on Neuroscience*

# I. Introduction

Science's understanding of the human brain is increasing exponentially. We know almost infinitely more than we did 30 years ago; however, we know almost nothing compared with what we are likely to know 30 years from now. The results of advances in understanding human brains—and of the minds they generate—are already beginning to appear in courtrooms. If, as neuroscience indicates, our mental states are produced by physical states of our brain, our increased ability to discern those physical states will have huge implications for the law. Lawyers already are introducing neuroimaging evidence as relevant to questions of individual responsibility, such as claims of insanity or diminished responsibility, either on issues of liability or of sentencing. In May 2010, parties in two cases sought to introduce neuroimaging in court as evidence of honesty; we are also beginning to see efforts to use it to prove that a person is in pain. These and other uses of neuroscience are almost certain to increase with our growing knowledge of the human brain as well as continued technological advances in accurately and precisely measuring the brain. This chapter strives to give judges some background knowledge about neuroscience and the strengths and weaknesses of its possible applications in litigation in order to help them become better prepared for these cases.[1]

The chapter begins with a brief overview of the structure and function of the human brain. It then describes some of the tools neuroscientists use to understand the brain—tools likely to produce findings that parties will seek to introduce in court. Next, it discusses a number of fundamental issues that must be considered when interpreting neuroscientific findings. Finally, after discussing, in general, the issues raised by neuroscience-based evidence, the chapter concludes by analyzing a few illustrative situations in which neuroscientific evidence is likely to appear in court in the future.

# II. The Human Brain

This abbreviated and simplified discussion of the human brain describes the cellular basis of the nervous system, the structure of the brain, and finally our current understanding of how the brain works. More detailed, but still accessible, informa-

---

1. The Law and Neuroscience Project, funded by the John D. and Catherine T. MacArthur Foundation, is preparing a book about law and neuroscience for judges, which should be available by 2011. A Primer on Neuroscience (Stephen Morse & Adina Roskies eds., forthcoming 2011). The Project has already published a pamphlet written by neuroscientists for judges, with brief discussions of issues relevant to law and neuroscience. A Judge's Guide to Neuroscience: A Concise Introduction (M.S. Gazzaniga & J.S. Rakoff eds., 2010). One early book on a broad range of issues in law and neuroscience also deserves mention: Neuroscience and the Law: Brain, Mind, and the Scales of Justice (Brent Garland ed., 2004).

EXHIBIT C

tion about the human brain can be found in academic textbooks and in popular books for general audiences.[2]

## A. Cells

Like most of the human body the nervous system is made up of cells. Adult humans contain somewhere between 50 trillion and 100 trillion human cells. Each of those cells is both individually alive and part of a larger living organism.

Each cell in the body (with rare exceptions) contains each person's entire complement of human genes—his or her genome. The genes, found on very long molecules of deoxyribonucleic acid (DNA) that make up a human's 46 chromosomes, work by leading the cells to make other molecules, notably proteins and ribonucleic acid (RNA). We now believe that there are about 23,000 human genes. Cells are different from each other not because they contain different genes but because they turn on and off different sets of genes. All human cells seem to use the same group of several thousand "housekeeping" genes that run the cell's basic machinery, but skin cells, kidney cells, and brain cells differ in which other genes they use. Scientists count different numbers of "types" of human cells, with estimates ranging from a few hundred to a few thousand (depending largely on how narrowly or broadly one defines a cell type).

The most important cells in the nervous system are called neurons. Neurons pass messages from one neuron to another in a complex way that appears to be responsible for brain function, conscious or otherwise.

Neurons (Figure 1) come in many sizes, shapes, and subtypes (with their own names), but they generally have three features: a cell body (or "soma"), short extensions called dendrites, and a longer extension called an axon. The cell body contains the nucleus of the cell, which in turn contains the 46 chromosomes with the cell's DNA. The dendrites and axons both reach out to make connections with other neurons. The dendrites generally receive information from other neurons; the axons send information.

Communication between neurons occurs at areas called synapses (Figure 2), where two neurons almost meet. At a synapse, the two neurons will come within

2. The Society for Neuroscience, the very large scholarly society that covers a wide range of brain science, has published a brief and useful primer about the human brain called *Brain Facts*. The most recent edition, published in 2008, is available free at www.sfn.org/index.aspx?pagename=brainfacts.

Some particularly interesting books about various aspects of the brain written for a popular audience include Oliver W. Sacks, The Man Who Mistook His Wife for a Hat and Other Clinical Tales (1990); Antonio R. Damasio, Descartes' Error: Emotion, Reason, and the Human Brain (1994); Daniel L. Schacter, Searching for Memory: The Brain, the Mind, and the Past (1996); Joseph E. LeDoux, The Emotional Brain: The Mysterious Underpinnings of Emotional Life (1996); Christopher D. Frith, Making Up the Mind: How the Brain Creates Our Mental World (2007); and Sandra Aamodt & Sam Wang, Welcome to Your Brain: Why You Lose Your Car Keys But Never Forget How to Drive and Other Puzzles of Everyday Life (2008).

EXHIBIT C

*Reference Guide on Neuroscience*

Figure 1. Schematic of the typical structure of a neuron.



Source: Quasar Jarosz at en.wikipedia.

less than a micrometer (a millionth of a meter) of each other, with the presynaptic side, on the axon, separated from the postsynaptic side, on the dendrite, by a gap called the synaptic cleft. At synapses, when the axon (on the presynaptic side) "fires" (becomes active) it releases molecules, known as neurotransmitters, into the synaptic cleft. Some of those molecules are picked up by special receptors on the dendrite that is on the postsynaptic side of the cleft. More than 100 different neurotransmitters have been identified; among the best known are dopamine, serotonin, glutamate, and acetylcholine. Some of the neurotransmitters released into the synaptic cleft are picked up by special receptors on the postsynaptic side of the cleft by the dendrite.

At the postsynaptic side of the cleft, neurotransmitters binding to the receptors can have a wide range of effects. Sometimes they cause the receiving (postsynaptic) neuron to "fire," sometimes they suppress (inhibit) the postsynaptic neuron from firing, and sometimes they seem to do neither. The response of the receiving neuron is a complicated summation of the various messages it receives from multiple neurons that converge, through synapses, on its dendrites.

A neuron that does fire does so by generating an electrical current that flows down (away from the cell body) the length of its axon. We normally think of electrical current as flowing in things like copper wiring. In that case, free electrons move down the wire. The electrical currents of neurons are more complicated. Molecules with a positive or negative electrical charge (ions) move through the neuron's membrane and create differences in the electrical charge between the inside and outside of the neuron, with the current traveling along the axon, rather like a fire brigade passing buckets of water in only one direction

751

**EXHIBIT C**

Figure 2. Synapse. Communication between neurons occurs at the synapse, where the sending (presynaptic) and receiving (post-synaptic) neurons meet. When the presynaptic neuron fires, it releases neurotransmitters into the synaptic cleft, which bind to receptors on the postsynaptic neuron.



Source: From Carlson. Carlson, Neil R. Foundations of Physiological Psychology (with Neuroscience Animations and Student Study Guide CD-ROM), 6th. © 2005. Printed and electronically reproduced by permission of Pearson Education, Inc., Upper Saddle River, New Jersey.

EXHIBIT C

*Reference Guide on Neuroscience*

down the line. Firing occurs in milliseconds. This process of moving ions in and out of the cell membrane requires that the cell use large amounts of energy. When the current reaches the end of the axon, it may or may not cause the axon to release neurotransmitters into the synaptic cleft. This complicated part–electrical, part–chemical system is how information passes from one neuron to another.

The axons of human neurons are all microscopically narrow, but they vary enormously in length. Some are micrometers long; others, such as neurons running from the base of the spinal cord to the toes, are several feet long. Longer axons tend to be coated with a fatty substance called myelin. Myelin helps insulate the axon and thus increases the strength and efficiency of the electrical signal, much like the insulation wrapped around a copper wire. (The destruction of this myelin sheathing is the cause of multiple sclerosis.) Axons coated with myelin appear white; thus areas of the nervous system that have many myelin–coated axons are referred to as "white matter." Cell bodies, by contrast, look gray, and so areas with many cell bodies and relatively few axons make up our "gray matter." White matter can roughly be thought of as the wiring that connects gray matter to the rest of the body or to other areas of gray matter.

What we call nerves are really bundles of neurons. For example, we all have nerves that run down our arms to our fingers. Some of those nerves consist of neurons that pass messages from the fingers, up the arm, to other neurons in the spinal cord that then pass the messages on to the brain, where they are analyzed and experienced. This is how we feel things with our fingers. Other nerves are bundles of neurons that pass messages from the brain through the spinal cord to nerves that run down the arms to the fingers, telling them when and how to move.

Neurons can connect with other neurons or with other kinds of cells. Neurons that control body movements ultimately connect to muscle cells—these are called motor neurons. Neurons that feed information into the brain start with specialized sensory cells (i.e., cells specialized for detecting different types of stimuli—light, touch, heat, pain, and more) that fire in response to the appropriate stimulus. Their firings ultimately lead, directly or through other neurons, into the brain. These are sensory neurons. These neurons send information only in one direction—motor neurons ultimately from the brain, sensory neurons to the brain. The paralysis caused by, for example, severe damage to the spinal cord both prevents the legs from receiving messages to move that would come from the brain through the motor neurons and keeps the brain from receiving messages from sensory neurons in the legs about what the legs are experiencing. The break in the spinal column prevents the messages from getting through, just as a break in a local telephone line will keep two parties from connecting. (There are, unfortunately, not yet any human equivalents to wireless service.)

Estimates of the number of cells in a human brain vary widely, from a few hundred billion to several trillion. These cells include those that make up blood vessels and various connective tissues in the brain, but most of them are specialized brain cells. About 80 billion to 100 billion of these brain cells are neurons; the

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

other cells (and the source of most of the uncertainty about the number of cells) are principally another class of cells referred to generally as glial cells. Glial cells play many important roles in the brain, including, for example, producing and maintaining the myelin sheaths that insulate axons and serving as a special immune system for the brain. The full importance of glial cells is still being discovered; emerging data suggest that they may play a larger role in mental processes than as "support staff." At this point, however, we concentrate on neurons, the brain structures they form, and how those structures work.

## B. Brain Structure

Anatomists refer to the brain, the spinal cord, and a few other nerves directly connecting to the brain as the central nervous system. All the other nerves are part of the peripheral nervous system. This reference guide does not focus on the peripheral nervous system, despite its importance in, for example, assessing some aspects of personal injuries. We also, less fairly, ignore the central nervous system other than the brain, even though the spinal cord, in particular, plays an important role in modulating messages going into and coming out of the brain.

The average adult human brain (Figure 3) weighs about 3 pounds and fills a volume of about 1300 cubic centimeters. If liquid, it would almost fill two standard wine bottles with a little space left over. Living brains have a consistency about like that of gelatin. Despite the softness of brains, they are made up of regular shapes and structures that are generally consistent from person to person. Just as every nondamaged or nondeformed human face has two eyes, two ears,

Figure 3. Lateral (left) and mid-sagittal (right) views of the human brain.



Source: Courtesy of Anthony Wagner.

EXHIBIT C

*Reference Guide on Neuroscience*

one nose, and one mouth with standard numbers of various kinds of teeth, every normal brain has the same set of identifiable structures, both large and small.

Neuroscientists have long worked to describe and define particular regions of the brain. In some ways this is like describing parcels of land in property documents, and, like property descriptions, several different methods are used. At the largest scale, the brain is often divided into three parts: the brain stem, the cerebellum, and the cerebrum.[3]

The brain stem is found near the bottom of the brain and is, in some ways, effectively an extension of the spinal cord. Its various parts play crucial roles in controlling the body's autonomic functioning, such as heart rate and digestion. The brain stem also contains important regions that regulate processing in the cerebrum. For example, the substantia nigra and ventral tegmental area in the brain stem consist of critical neurons that generate the neurotransmitter dopamine. While the substantia nigra is crucial for motor control, the ventral tegmental area is important for learning about rewards. The loss of neurons in the substantia nigra is at the core of the movement problems of Parkinson's disease.

The cerebellum, which is about the size and shape of a squashed tennis ball, is tucked away in the back of the skull. It plays a major role in fine motor control and seems to keep a library of learned motor skills, such as riding a bicycle. It was long thought that damage to the cerebellum had little to no effect on a person's personality or cognitive abilities, but resulted primarily in unsteady gait, difficulty in making precise movements, and problems in learning movements. More recent studies of patients with cerebellar damage and functional brain imaging studies of healthy individuals indicate that the cerebellum also plays a role in more cognitive functions, including supporting aspects of working memory, attention, and language.

The cerebrum is the largest part of the human brain, making up about 85% of its volume. The cerebrum is found at the front, top, and much of the back of the human brain. The human brain differs from the brains of other mammals mainly because it has a vastly enlarged cerebrum.

There are several different ways to identify parts of, or locations in, the cerebrum. First, the cerebrum is divided into two hemispheres—the famous left and right brain. These two hemispheres are connected by tracts of white matter—of axons—most notably the large connection called the corpus callosum. Oddly, the right hemisphere of the brain generally receives messages from and controls the movements of the left side of the body, while the left hemisphere receives messages from and controls the movements of the right side of the body.

Each hemisphere of the cerebrum is divided into four lobes (Figure 4): The frontal lobe in the front of the cerebrum (behind the forehead), the parietal lobe at

3. The brain also is sometimes divided into the forebrain, midbrain, and hindbrain. This classification is useful for some purposes, particularly in describing the history and development of the vertebrate brain, but it does not entirely correspond to the categorization of cerebrum, brain stem, and cerebellum, and it is not used in this reference guide.

EXHIBIT C

*Reference Manual on Scientific Evidence*

Figure 4. Lobes of a hemisphere. Each hemisphere of the brain consists of four lobes—the frontal, parietal, temporal, and occipital lobes.



Source: http://commons.wikimedia.org/wiki/File:Gray728.svg. This image is in the public domain because its copyright has expired. This applies worldwide.

the top and toward the back, the temporal lobe on the side (just behind and above the ears), and the occipital lobe at the back. Thus, one could describe a particular region as lying in the left frontal lobe—the frontal lobe of the left hemisphere.

The surface of the cerebrum consists of the cortex, which is a sheet of gray matter a few millimeters thick. The cortex is not a smooth sheet in humans, but rather is heavily folded with valleys, called sulci ("sulcus" in the singular), and bulges, called gyri ("gyrus"). The sulci and gyri have their own names, and so a location can be described as in the inferior frontal gyrus in the left frontal lobe. These folds allow the surface area of the cortex, as well as the total volume of the cortex, to be much greater than in other mammals, while still allowing it to fit inside our skulls, similar to the way the many folds of a car's radiator give it a very large surface area (for radiating away heat) in a relatively small space.

The cerebral cortex is extraordinarily large in humans compared with other species and is clearly centrally involved in much of what makes our brains special, but the cerebrum contains many other important subcortical structures that we share with other vertebrates. Some of the more important areas include the thalamus, the hypothalamus, the basal ganglia, and the amygdala. These areas all connect widely, with the cortex, with each other, and with other parts of the brain to form complex networks.

The functions of all these areas are many, complex, and not fully understood, but some facts are known. The thalamus seems to act as a main relay that carries

EXHIBIT C

*Reference Guide on Neuroscience*

information to and from the cerebral cortex, particularly for vision, hearing, touch, and proprioception (one's sense of the position of the parts of one's body). It also is, importantly, involved in sleep, wakefulness, and consciousness. The hypothalamus has a wide range of functions, including the regulation of body temperature, hunger, thirst, and fatigue. The basal ganglia are a group of regions in the brain that are involved in motor control and learning, among other things. They seem to be strongly involved in selecting movements, as well as in learning through reinforcement (as a result of rewards). The amygdala appears to be important in emotional processing, including how we attach emotional significance to particular stimuli.

In addition, many other parts of the brain, in the cortex or elsewhere, have their own special names, usually with Latin or Greek roots that may or may not seem descriptive today. The hippocampus, for example, is named for the Greek word for seahorse. For most of us, these names will have no obvious rhyme or reason, but merely must be learned as particular structures in the brain—the superior colliculus, the tegmentum, the globus pallidus, the substantia nigra, the cingulate cortex, and more. All of these structures come in pairs, with one in the left hemisphere and one in the right hemisphere; only the pineal gland is unpaired. Brain atlases include scores of names for particular structures or regions in the brain and detailed information about the structures or regions.

Some of these smaller structures may have special importance to human behavior. The nucleus accumbens, for example, is a small subcortical region in each hemisphere of the cerebrum that appears important for reward processing and motivation. In experiments with rats that received stimulation of this region in return for pressing a lever, the rats would press the lever almost to the exclusion of any other behavior, including eating. The nucleus accumbens in humans appears linked to appetitive motivation, responding in anticipation of primary rewards (such as pleasure from food and sex) and secondary rewards (such as money). Through interactions with the orbital frontal cortex and dopamine-generating neurons in the midbrain (including the ventral tegmental area), the nucleus accumbens is considered part of a "reward network." With a hypothesized role in addictive behavior and in reward computations, more broadly, this putative reward network is a topic of considerable ongoing research.

All of these various locations, whether defined broadly by area or by the names of specific structures, can be further subdivided using directions: front and back, up and down, toward the middle, or toward the sides. Unfortunately, the directions often are not expressed in a straightforward manner, and several different terminological conventions exist. Locations toward the front or back of the brain can be referred to as either anterior or posterior or as rostral or caudal (literally, toward the nose, or beak, or the tail). Locations toward the bottom or top of the brain are termed inferior or superior or, alternatively, as ventral or dorsal (toward the stomach or toward the back). A location toward the middle of the brain is called medial; one toward the side is called lateral. Thus, different loca-

EXHIBIT C

*Reference Manual on Scientific Evidence*

tions could be described, for example, as in the left anterior cingulate cortex, in the dorsal medial (or sometimes dorsomedial) prefrontal cortex, or in the posterior hypothalamus.

Finally, one other method often is used, a method created by Korbinian Brodmann in 1909. Brodmann, a neuroanatomist, divided the brain into about 50 different areas or regions (Figure 5). Each region was defined on the basis of the

Figure 5. Brodmann's areas. Brodmann divided the cortex into different areas based on the cell types and how they were organized.



Source: Prof. Mark Dubin, University of Colorado.

EXHIBIT C

*Reference Guide on Neuroscience*

kinds of neurons found there and how those neurons are organized. A location described by Brodmann area may or may not correspond closely with a structural location. Other organizational schemes exist, but Brodmann's remains the most widely used to describe the approximate locations of findings in modern human brain imaging studies.

## C. Some Aspects of How the Brain Works

Most of neuroscience is dedicated to finding out how the brain works, but although much has been learned, considerably more remains unknown. We could use many different ways to describe what is known about how the brain works. This section discusses a few important aspects of brain function and makes several general points about the localization and distribution of functions, as well as brain plasticity, before commenting on the effects of hormones and other chemical influences on the brain.

Some brain functions are localized in, or especially dependent on, particular regions of the brain. This has been known for many years as a result of studies of people who, through traumatic injury, stroke, or cancer, have lost, or lost the use of, particular regions of their brains. For example, in the 1860s, French anatomist Paul Broca discovered through autopsies of patients that damage to a region in the left inferior frontal lobe (now known as Broca's area) caused an inability to speak. It is now known that some functions cannot normally be performed when particular brain areas are damaged or missing. The visual cortex, located at the back of the brain in the occipital lobes, is as necessary for vision as the eyes are; the hippocampus is necessary for the creation of many kinds of memory; and the motor cortex is necessary for voluntary movements. The motor cortex and the parallel somatosensory cortex, which is essential for processing sensory information such as the sense of touch from the body, are further subdivided, with particular regions necessary for causing motion or sensing feelings from the legs, arms, fingers, face, and so on. Other brain regions also will be involved in these actions or sensations, but these regions are necessary to them.

At the same time, the fact that a region is necessary to a particular class of sensations, behaviors, or cognition does not mean either that it is not involved in other brain functions or that other brain regions do not also contribute to these particular abilities. The amygdala, for example, is involved in our feelings of fear, but it is also involved broadly in emotional reactions, both positive and negative. It also modulates learning, memory, and even sensory perception. Although some functions are localized, others are widely distributed. For example, the visual cortex is essential to vision, but actual visual perception involves many parts of the brain in addition to the occipital lobes. Memories appear to be stored over much of the cortex. Networks of brain regions participate in many of these functions.

For example, if you touch something very hot with your left index finger, your spinal cord, through a reflex loop, will cause you to pull your finger back

759

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

very quickly. Then the part of your right somatosensory cortex devoted to the index finger will be involved in receiving and initially interpreting the sensation. Other areas of your brain will recognize the stimulus as painful, your motor regions will be involved in waving your hand back and forth or bringing your finger to your mouth, widespread parts of your cortex may lead to your remembering other instances of burning yourself, and your hippocampus may play a role in making a new long-term memory of this incident. There is no brain region "for" burning your finger; many regions, both specific and general, contribute to the brain's response.

In addition, brains are at least somewhat "plastic" or changeable on both small and large scales. Anyone who can see has a working visual cortex, and it is always located in the back of the brain (in the occipital lobe), but its exact borders will vary slightly from person to person. In other cases, the brain may adjust and change in response to a person's behavior or changes in that person's anatomy. For example, a right-handed violinist may develop an enlarged brain region for controlling the fingers of the left hand, used in fingering the violin. If a person loses an arm to amputation, the parts of the motor and somatosensory cortices that had dealt with that arm may be "taken over" by other body parts. In some cases, this brain plasticity can be extreme. A young child who has lost an entire hemisphere of his or her brain may grow up to have normal or nearly normal functionality as the remaining hemisphere takes on the tasks of the missing hemisphere. Unfortunately, the possibilities of this kind of extreme plasticity do diminish with age, but rehabilitation after stroke in adults sometimes does show changes in the brain functions undertaken by particular brain regions.

The picture of the brain as a set of interconnected neurons that fire in networks or patterns in response to stimuli is useful but not complete. In addition to neuron firings, other factors affect how the brain works, particularly chemical factors.

Some of these are hormones, generated by the body either inside or outside the brain. They can affect how the brain functions, as well as how it develops. Sex hormones such as estrogen and testosterone can have both short-term and long-term effects on the brain. So can other hormones, such as cortisol, associated with stress, and oxytocin, associated with, among other things, trust and bonding. Endorphins, chemicals secreted by the pituitary gland in the brain, are associated with pain relief and a sense of well-being. Still other chemicals, brought in from outside the body, can have major effects on the brain, both in the short term and the long term. Examples include alcohol, caffeine, nicotine, morphine, and cocaine. These can trigger very specific brain reactions or can have broad effects.

EXHIBIT C

*Reference Guide on Neuroscience*

# III. Some Common Neuroscience Techniques

Neuroscientists use many techniques to study the brain. Some of them have been used for centuries, such as autopsies and the observation of patients with brain damage. Some, such as the intentional destruction of parts of the brain, can be used ethically only in research on nonhuman animals. Of course, research with nonhuman animals, although often helpful in understanding human brains, is of less value when examining behaviors that are uniquely developed among humans. The current revolution in neuroscience is largely the result of a revolution in the tools available to neuroscientists, as new methods have been developed to image and to intervene in living brains. These methods, particularly the imaging methods that allow more precise measurements of human brain structure and function in living people, are giving rise to increasing efforts to introduce neuroscientific evidence in court.

This section of this chapter focuses on several kinds of neuroimaging—computerized axial tomography (CAT) scans, positron emission tomography (PET) scans, single photon emission computed tomography (SPECT) scans, and magnetic resonance imaging (MRI), as well as an older method, electro-encephalography (EEG), and its close relative, magnetoencephalography (MEG). Some of these methods show the structure of the brain, others show the brain's functioning, and some do both. These are not the only important neuroscience techniques; several others are discussed briefly at the end of this section. Genetic analysis provides yet another technique for increasing our understanding of human brains and behaviors, but this chapter does not deal with the possible applications of human genetics to understanding behavior.

## A. Neuroimaging

Traditional imaging technologies have not been very helpful in studying the brain. X-ray images are the shadows cast by dense objects. Not only is the brain surrounded by our very dense skulls, but there are no dense objects inside the brain to cast these shadows. Although a few features of the brain or its blood vessels could be seen through methods that involved the injection of air into some of the spaces in the brain or of contrast media into the blood, these pro-vided limited information. The opportunity to see inside a living brain itself only goes back to about the 1970s, with the development of CAT scans. This ability has since exploded with the development of several new techniques, three of which, with CAT, are discussed on the following pages.

EXHIBIT C

*Reference Manual on Scientific Evidence*

## 1. CAT scans

The CAT scan is a multidimensional, computer-assisted X-ray machine. Instead of taking one X ray from a fixed location, in a CAT scan both the X-ray source and (180 degrees opposite the source) the X-ray detectors rotate around the person being scanned. Rather than exposing negatives to make "pictures" of dense objects, as in traditional X rays, the X-ray detectors produce data for computer analysis. A complete modern CAT scan includes data sufficient to reconstruct the scanned object in three dimensions. Computerized algorithms can then be used to produce an image of any particular slice through the object. The multiple angles and computer analysis make it possible to pick out the relatively small density differences within the brain that traditional X-ray technology could not distinguish and to use them to produce images of the soft tissue (Figure 6).

Figure 6. CAT scan depicting axial sections of the human brain. The ventral most (bottom) surface of the brain is at upper left and the dorsal most (top) surface is at the lower right.



Source: http://en.wikipedia.org/wiki/File:CT_of_brain_of_Mikael_H%C3%A4ggstr%C3%B6m_large.png. Image in the public domain.

The CAT scan provides a structural image of the brain. It is useful for showing some kinds of structural abnormalities, but it provides no direct information

762

**EXHIBIT C**

*Reference Guide on Neuroscience*

about the brain's functioning. A CAT scan brain image is not as precise as the image produced from an MRI, but because the procedure is both quick and (relatively) inexpensive, CAT scanners are common in hospitals. Medically, brain CAT scans are used mainly to look for bleeding or swelling inside the brain, although they also will record sizeable tumors or other large structural abnormalities. For neuroscience, the great advantage of the CAT scan was its ability, for the first time, to reveal some details inside the skull, an ability that has been largely superseded for research by MRI. CAT scans have been used in courts to argue that structural changes in the brain, shown on the CAT scan, are evidence of insanity or other mental impairments. Perhaps their most notable use was in 1982 in the trial of John Hinckley for the attempted assassination of President Ronald Reagan. A CAT scan of Hinckley's brain that showed widened sulci (the "valleys" in the surface of the brain) was introduced into evidence to show that Hinckley suffered from organic brain damage in the form of shrinkage of his brain.[4]

## 2. PET scans and SPECT scans

Traditional X-ray machines and their more sophisticated descendant, the CAT scan, project X rays through the skull and create images based on how much of the X rays are blocked or absorbed. PET scans and SPECT scans operate very differently. In these methods, a substance that emits radiation is introduced into the body. That radiation then is detected from outside the body in a way that can determine the location of the radiation source. These scans generally are not used for determining the brain's structure, but for understanding how it is functioning. They are particularly good at measuring one aspect of brain structure—the density of particular receptors, such as those for dopamine, at synapses in some areas of the brain, such as the frontal lobes.

Radioactive decay of atoms can take several forms, producing alpha, beta, or gamma radiation. PET scanners take advantage of isotopes of atoms that decay by giving off positive beta radiation. Beta decay usually involves the emission of an electron; positive beta decay involves the emission of a positron, the positively charged antimatter equivalent of an electron. When positrons (antimatter) meet electrons (matter), the two particles are annihilated and converted into two photons of gamma radiation with a known energy (511,000 electron volts) that follow directly opposite paths from the site of the annihilation. Inside the body, the collision between the positron and electron and the consequent production of the gamma radiation photons takes place within a short distance (a millimeter or two) of the site of the initial radioactive decay that produced the positron.

---

4. The effects of this evidence on the verdict are unclear. *See* Lincoln Caplan, The Insanity Defense and the Trial of John W. Hinckley, Jr. (1984) for a discussion of the case and its consequences for the law.

763

EXHIBIT C

*Reference Manual on Scientific Evidence*

PET scans, therefore, start with the introduction into a person's body of a radioactive tracer that decays by giving off a positron. One common tracer is fluorodeoxyglucose (FDG), a molecule that is almost identical to the simple sugar, glucose, except that one of the oxygen atoms in glucose is replaced by an atom of fluorine-18, an isotope of the element fluorine with nine protons and nine neutrons. Fluorine normally found in nature is fluorine-19, with 9 protons and 10 neutrons, and is stable. Fluorine-18 is very unstable and decays, through positive beta decay, quickly losing about half of its mass every 110 minutes (its half-life). The body treats FDG as though it were glucose, and so the FDG is concentrated where the body needs the energy supplied by glucose. A major clinical use of PET scans derives from the fact that tumor cells use energy, and hence glucose, at much higher rates than normal cells.

After giving the FDG time to become concentrated in the body, which usually takes about an hour, the person is put inside the scanner itself. There, the person is entirely surrounded by a very sensitive radiation detector, tuned to respond to gamma radiation of the energy produced by annihilated positrons. When two "hits" are detected by two sensors at about the same time, the source is known to be located on a line connecting the two. Very small differences in the timing of when the radiation is detected can help determine where along that the line the annihilation took place. In this way, as more gamma radiation from the decaying FDG is detected, the general location of the FDG within the body can be determined and, as a result, tissue that is using a lot of glucose, such as a tumor, can be located.

In neuroscience research, PET scans also can be taken using different molecules that bind more specifically to particular tissues or cells. Some of these more specific ligands use fluorine-18, but others use a different radioactive tracer that also decays by emitting a positron—oxygen-15. This can be used to determine what parts of the brain are using more or less oxygen. Oxygen-15, however, has a much shorter half-life (2 minutes) and so is more difficult and expensive to use than FDG. Similarly, carbon-11, with a half-life of 20 minutes, also can be used. Carbon-11 atoms can be introduced into various molecules that bind to important receptors in the brain, such as receptors for dopamine, serotonin, or opioids. This allows the study of the distribution and function of these receptors, both in healthy people and in people with various mental illnesses or neurological diseases.

The result of a PET scan is a record of the locations of positron decay events in the brain. Computer visualization tools can then create cross-sectional images of the brain, showing higher and lower rates of decay, with differences in magnitude typically depicted through the use of different colors (Figure 7).

PET scans are excellent for showing the location of various receptors in normal and abnormal brains. PET scans are also very good for showing areas of different glucose use and, hence, of different levels of metabolism. This can be very useful, for example, in detecting some kinds of brain damage, such as the damage that occurs with Alzheimer's disease, where certain regions of the brain become abnormally inactive, or in brain regions that have been damaged by a stroke.

EXHIBIT C

*Reference Guide on Neuroscience*

Figure 7. PET scan depicting an axial section of the human brain.



Source: http://en.wikipedia.org/wiki/Positron_emission_tomography. Image in the public domain.

In addition, the comparison (subtraction) of two PET scan measurements, one scan when a person is engaged in a task that is thought to require particular brain functions and a second control (or baseline) scan that is not thought to require these functions, allows researchers indirectly to measure brain function. PET scans were initially used in this way in research to show what areas of the brain were used when people experienced various stimuli or performed particular tasks. PET has been substantially superseded for this purpose by functional MRI, which is less expensive, does not involve radiation exposure, provides better spatial resolution, and allows a longer period of testing.

SPECT scans are similar to PET scans. Each can produce a three-dimensional model of the brain and display images of any cross section through the brain. Like PET scans, they require the injection of a radioactive tracer material; unlike PET scans, the radioactive tracer in SPECT directly emits gamma radiation rather than emitting positrons. These kinds of tracers are more stable, more accessible, and much cheaper than the positron-emitting tracers needed for PET scans. With a PET scan, the gamma detector entirely surrounds the person; with a SPECT scan, one to three gamma detectors are rotated around the body over about 15 to

765

EXHIBIT C

*Reference Manual on Scientific Evidence*

20 minutes. As with PET scans, the SPECT tracers can be used to measure brain metabolism or to attach to specific molecular receptors in the brain. The spatial resolution of a SPECT scan, however, is poorer than with a PET scan, with an uncertainty of about 1 cm.

Both PET and SPECT scans are most useful if coupled with good structural images. Contemporary PET and SPECT scanners often include a simultaneous CAT scan; there is some experimental work aimed at providing simultaneous PET and MRI scans.

## *3. MRI—structural and functional*

MRI was developed in the 1970s, first came into wide use in the 1980s, and is currently the dominant neuroimaging technology for producing detailed images of the brain's structure and for measuring aspects of brain function. MRI operates on completely different principles than either CAT scans or PET or SPECT scans; it does not rely on X rays passing through the brain or on the decay of radioactive tracer molecules inside the brain. Rather, MRI's workings involve more complicated physics. This section discusses the general characteristics of MRI and then focuses on structural MRI, diffusion tensor imaging, and finally, functional MRI.

The power of an MRI scanner is measured by the strength of its magnetic field, measured in units called tesla (T). The magnetic field of a small bar magnet is about 0.01 T. The strength of the Earth's magnetic field is about 0.00005 T. The MRI machines used for clinical purposes use magnetic fields of between 0.2 T and 3.0 T, with 1.5 T or 3.0 T being the systems most commonly used today. MRI machines for human research purposes have reached 9.4 T. In general, the stronger the magnetic field, the better the image, although higher fields also can create their own measurement difficulties, especially when imaging brain function. MRI machines achieve these high magnetic fields through using superconducting magnets, made by cooling the electromagnet with liquid helium at a temperature 4° (Celsius) above absolute zero. For this and other reasons, MRI systems are complicated, with higher initial and continuing maintenance costs compared with some other methods for functional imaging (e.g., electroencephalography; *see infra* Section III.B).

In most MRI systems (Figure 8), the subject, on an examination table, slides into a cylindrical opening in the machine so that the part of the body to be imaged is in the middle of the magnet. Depending on the kind of imaging performed, the examination or experiment can take from about 30 minutes to more than 2 hours; throughout the scanning process the subject needs to stay as motionless as possible to avoid corrupting the images. The main sensations for the subject are the loud thumping and buzzing noises made by the machine, as well as the machine's vibration.

MRI examinations appear to involve minimal risk. Unlike the other neuroimaging technologies discussed above, MRI does not involve any high-energy

766

**EXHIBIT C**

*Reference Guide on Neuroscience*

Figure 8. MRI machine. Magnetic resonance imaging systems are used to acquire both structural and functional images of the brain.



Source: Courtesy of Anthony Wagner.

radiation. The magnetic field seems to be harmless, at least as long as magnetizable objects are kept away from it. MRI subjects need to remove most metal objects; people with some kinds of implanted metallic devices, with tattoos with metal in their ink, or with fragments of ferrous metal anywhere in their bodies cannot be scanned because of the dangerous effects of the field on those bits of metal.

When the subject is positioned in the MRI scanner, the powerful field of the magnet causes the nuclei of atoms (usually the hydrogen nuclei of the body's water molecules) to align with the direction of the main magnetic field of the magnet. Using a brief electromagnetic pulse, these aligned atoms are then "flipped" out of alignment from the main magnetic field, and, after the pulse stops, the nuclei then

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

rapidly realign with the strong main magnetic field. Because the nuclei spin (like a top), they create an oscillating magnetic field that is measured by a receiver coil. During structural imaging, the strength of the signal generated partially depends on the relative density of hydrogen nuclei, which varies from point to point in the body according to the density of water. In this manner, MRI scanners can generate images of the body's anatomy or of other scanned objects. Because an MRI scan can effectively distinguish between similar soft tissues, MRI can provide very-high-resolution images of the brain's anatomy, which is, after all, made up of soft tissue.

Structural MRI scans produce very detailed images of the brain (Figure 9). They can be used to spot abnormalities, large and small, as well as to see normal variation in the size and shape of brain features. Structural MRI can be used, for example, to see how brain features change as a person ages. Previously, getting that kind of detailed information about a brain required an autopsy or, at a minimum, extensive neurosurgery. This ability makes structural MRI both an important clinical tool and a very useful technique for research that tries to correlate human differences, normal and abnormal, with differences in brain structure, as well as for research that seeks to understand brain development.

Another structural imaging application of brain MRI has become increasingly prevalent over the past decade: diffusion tensor imaging (DTI). As noted above, neuronal tissue in the brain can be divided roughly into gray matter (the bodies of neurons) and white matter (neuronal axons that transmit signals over distance). DTI uses MRI to see what direction water diffuses through brain tissue. Tracts of white matter are made up of bundles of axons coated with fatty myelin. Water will diffuse through that white matter along the direction of the axons and not, generally, across them. This method can be used, therefore, to trace the location of these bundles of white matter and hence the long-distance connections between different parts of the brain. Abnormal patterns of these connections may be associated with various conditions, from Alzheimer's disease to dyslexia, some of which may have legal implications.

Functional MRI (fMRI) is perhaps the most exciting use of MRI in neuroscience for understanding brain function. This technique shows what regions of the brain are more or less active in response to the performance of particular tasks or the presentation of particular stimuli. It does not measure brain activity (the firing of neurons) directly but, instead, looks at how blood flow changes in response to brain activity and uses those changes, through the so-called BOLD response (the blood-oxygen-level dependent response), to allow the researcher to infer patterns of brain activity.

Structural MRI generally creates its images through detecting the density of hydrogen atoms in the subject and flipping them with radio pulses. For fMRI, the scanner detects changes in the ratio of oxygenated hemoglobin (oxyhemoglobin) and deoxygenated hemoglobin (deoxyhemoglobin) in particular locations in the brain. Hemoglobin is the protein in red blood cells that carries oxygen from the lungs to the body. On the basis of metabolic demands, hemoglobin molecules

768

EXHIBIT C

*Reference Guide on Neuroscience*

Figure 9. Brain MRI scan depicting an axial (upper), coronal (lower left), and sagittal (lower right) image of the human brain.



Source: Courtesy of Anthony Wagner.

769

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

supply oxygen for the body's needs. Accordingly, "fresher" blood will have a higher ratio of oxyhemoglobin to deoxyhemoglobin than more "used" blood. Importantly, because deoxyhemoglobin (which is found at a higher level in "used" blood) causes the fMRI signal to decay, a higher ratio of oxyhemoglobin to deoxyhemoglobin will produce a stronger fMRI signal.

Neural activity is energy intensive for neurons, and neurons do not contain any significant reserves of oxygen or glucose. Therefore, the brain's blood vessels respond quickly to increases in activity in any one region of the brain by sending more fresh blood to that area. This is the basis of the BOLD response, which measures changes in the ratio of oxyhemoglobin to deoxyhemoglobin in a brain region several seconds after activity in that region. In particular, when a brain region becomes more active, there is first, perhaps more intuitively, a *decline* in the ratio of oxyhemoglobin to deoxyhemoglobin immediately after activity in the region, apparently corresponding to the depletion of oxygen in the blood at the site of the activity. This decline, however, is very small and very hard to detect with fMRI. Immediately after this decrease, there is an infusion of fresh (oxyhemoglobin-rich) blood, which can take several seconds to reach maximum; it is this infusion that results in the *increase* in the oxy/deoxyhemoglobin ratio that is measured in BOLD fMRI studies. Because even this subsequent increase is relatively small and variable, fMRI experiments typically involve many trials of the same task or class of stimuli in order to be able to see the signal amidst the noise.

Thus, in a typical fMRI experiment the subject will be placed in the scanner and the researchers will measure differences in the BOLD response throughout his or her brain between different conditions. A subject might, for example, be told to look at a video screen on which images of places alternate with images of faces. For purposes of the experiment, the computer will impose a spatial map on the subject's brain, dividing it into thousands of little cubes, each a few cubic millimeters in size, referred to as "voxels." Either while the data are being collected (so-called "real-time fMRI"[5]) or after an entire dataset has been gathered, a computerized program will compare the BOLD signal for each voxel when the screen was showing *places* to that when the screen contained *faces*. Regions that showed a statistically significant increase in the BOLD response several seconds after the face was on the video screen compared with the effects several seconds after a screen showing a place appeared will be said to have been "activated" by seeing the face. The researchers will infer that those regions were, in some way, involved in how the brain processes images of faces. The results typically will be shown as a structural brain image on which areas of more or less activation, as shown by a statistical test, will be shown by different colors (Figure 10).[6]

---

5. Use of this "real-time" fMRI has been increasing, but it is not yet clear whether the claims for it will stand up.

6. This example is actually a simplified version of experiments performed by Professor Nancy Kanwisher at MIT in the early 2000s that explored a region of the brain called the fusiform face area

EXHIBIT C

*Reference Guide on Neuroscience*

Figure 10. fMRI image. Functional MRI data reveal regions associated with cognition and behavior. Here, regions of the frontal and parietal lobes that are more active when remembering past events relative to detecting novel stimuli are depicted.



Source: Courtesy of Anthony Wagner.

Functional MRI was first proposed in 1990, and the first research results using BOLD-contrast fMRI in humans were published in 1992. The past decade has seen an explosive increase in the number of research articles based on fMRI, with nearly 2500 articles published in 2008—compared with about 450 in 1998.[7]

which is particularly involved in processing visions of faces. *See* Kathleen M. O'Craven & Nancy Kanwisher, *Mental Imagery of Faces and Places Activates Corresponding Stimulus-Specific Brain Regions*, 12 J. Cog. Neurosci. 1013 (2000).

7. *See* the census of fMRI articles from 1993 to 2008 in Carole A. Federico et al., *Intersecting Complexities in Neuroimaging and Neuroethics*, *in* Oxford Handbook of Neuroethics (J. Illes & B.J. Sahakian eds., 2011). This continued an earlier census from 1993 to 2001. Judy Illes et al., *From Neuroimaging to Neuroethics*, 5 Nature Neurosci. 205 (2003).

**EXHIBIT C**

MRI (functional and structural) is quite safe, and MRI machines are widespread in developed countries, largely for clinical use but increasingly for research use as well. Although fMRI research is subject to many questions and controversies (discussed *infra* Section IV), this technique has been responsible for most of the recent interest in applying neuroscience to law, from criminal responsibility to lie detection.

## B. EEG and MEG

EEG is the measurement of the brain's electrical activity as exhibited on the scalp; MEG is the measurement of the small magnetic fields generated by the brain's electrical activity. The roots of EEG go back into the nineteenth century, but its use increased dramatically in the 1930s and 1940s.

The process uses electrodes attached to the subject's head with an electrically conductive substance (a paste or a gel) to record electrical currents on the surface of the scalp. Multiple electrodes are used; for clinical purposes, 20 to 25 electrodes are commonly used, although arrays of more than 200 electrodes can be used. (In MEG, superconducting "squids"[8] are positioned over the scalp to detect the brain's tiny magnetic signals.) The electrical currents are generated by the neurons throughout the brain, although EEG is more sensitive to currents emerging from neurons closer to the skull. It is therefore more challenging to use EEG to reveal the functioning of structures deep in the brain.

Because EEG and MEG directly measure neural activity, in contrast to the measures of blood flow in fMRI, the timing of the neural activity can be measured with great precision (the temporal resolution), down to milliseconds. On the other hand, in comparison to fMRI, EEG and MEG are poor at determining the location of the sources of the currents (the spatial resolution). The EEG/MEG signal is a summation of the activity of thousands to millions of neurons at any one time. Any one pattern of EEG or MEG signal at the scalp has an infinite number of possible source patterns, making the problem of determining the brain source of measured EEG/MEG signal particularly challenging and the results less precise.

The results of clinical EEG and MEG tests can be very useful for detecting some kinds of brain conditions, notably epilepsy, and are also part of the process of diagnosing brain death. EEG and MEG are also used for research, particularly in the form of event-related potentials, which correlate the size or pattern of the EEG or MEG signal with the performance of particular tasks or the presentation of particular stimuli. Thus, as with the hypothetical fMRI experiment described above, one could look for any consistent changes in the EEG or MEG signal when a subject sees faces rather than a blank screen. Apart from the determina-

---

8. SQUID stands for superconducting quantum interference device (and has nothing to do with the marine animal). This device can measure extremely small magnetic fields, including those generated by various processes in living organisms, and so is useful in biological studies.

EXHIBIT C

tion of brain death, where EEG is already used, the most discussed possible legally relevant uses of EEG have been lie detection and memory detection.

EEG is safe, cheap, quiet, and portable. MEG is safe and quiet, but the technology is considerably more expensive than EEG and is not easily portable. EEG methods can tolerate much more head movement by the subject than PET or MRI techniques, although movement is often a challenge for MEG. EEG and MEG have good temporal resolution, distinguishing between milliseconds, which makes them very attractive for research, but their spatial resolution is inadequate for many research questions. As a result, some researchers use a combination of methods, integrating MRI and EEG or MEG data (acquired simultaneously or at different times) using sophisticated data analysis techniques.

## C. Other Techniques

Functional neuroimaging (especially fMRI) and EEG seem to be the techniques that are most likely to lead to efforts to introduce neuroscience-based evidence in court, but several other neuroscience techniques also might have legal applications. This section briefly describes four other methods that may be discussed in court: lesion studies, transcranial magnetic stimulation, deep brain stimulation, and implanted microelectrode arrays.

### 1. Lesion studies

One powerful way to test whether particular brain regions are associated with particular mental processes is to study mental processes after those brain regions have been destroyed or damaged. Observations of the consequences of such lesions, created by accidents or disease, were, in fact, the main way in which localization of brain function was originally understood.

For ethical reasons, the experimental destruction of brain tissue is limited to nonhuman animals. Nonetheless, in addition to accidental damage, on occasion human brains will need to be intentionally damaged for clinical purposes. Tumors may have to be removed or, in some cases, epilepsy may have to be treated by removing the region of the brain that is the focus for the seizures. Valuable knowledge may be gained from following these subjects.

Our understanding of the role of the hippocampus in creating memories, as one example, was greatly aided by study of a patient known as H.M.[9] When he was 27 years old, H.M. was treated for intractable epilepsy, undergoing an

---

9. H.M.'s name, not publicly released until his death, was Henry Gustav Molaison. Details of his life can be found in several obituaries, including Benedict Carey, *H.M., An Unforgettable Amnesiac, Dies at 82*, N.Y. Times, Dec. 4, 2008, at A1, and *H.M., A Man Without Memories*, The Economist, Dec. 20, 2008. The first scientific report of his case was W.B. Scoville & Brenda Milner, *Loss of Recent Memory After Bilateral Hippocampal Lesions*, 20 J. Neurol., Neurosurg. Psychiatry 11 (1957).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

experimental procedure that surgically removed his left and right medial temporal lobes, including most of his two hippocampi. The surgery was successful, but from that time until his death in 2008, H.M. could not form new long-term memories, either of events or of facts. His short-term memory, also known as working memory, was intact, and he could learn new motor, perceptual, and (some) cognitive skills (his "procedural memory" still functioned). He also could remember his life's events from before his surgery, although his memories were weaker the closer the events were to the surgery. Those brain regions were clearly involved in *making* new long-term memories for facts or events, but not in storing old ones.

## 2. Transcranial magnetic stimulation (TMS)

TMS is a noninvasive method of creating a temporary, reversible functional brain "lesion." Using this technique, researchers disrupt the organized activity of the brain's neurons by applying an electrical current. The current is formed by a rapidly changing magnetic field that is generated by a coil held next to the subject's skull. The field penetrates the scalp and skull easily and causes a small current in a roughly conical portion of the brain below the coil. This current induces a change in the typical responses of the neurons, which can block the normal functioning of that part of the brain.

TMS can be done in a number of ways. In some approaches, TMS happens at the same time as the subject performs the task to be studied. These concurrent approaches include single pulses or paired pulses as well as rapid (more than once per second) repetitive TMS that is delivered during task performance. Another method uses TMS for an extended period, often several minutes, before the task is performed. This sequential TMS uses slow (less than once per second) repetitive TMS.

The effects of single-pulse/paired-pulse and concurrent repetitive TMS are present while the coil is generating the magnetic field, and can extend for a few tens of milliseconds after the stimulation is turned off. By contrast, the effects of pretask repetitive TMS are thought to last for a few minutes (about half as long as the actual stimulation). When TMS is repeated regularly in nonhumans, long-term effects have been observed. Therefore, guidelines regarding how much stimulation can be applied in humans have been established.

The Food and Drug Administration (FDA) has approved TMS as a treatment for otherwise untreatable depression. The neuroscience research value of TMS stems from its ability to alter brain function in a relatively small area (about 2 cm) in an otherwise healthy brain, thus allowing for targeted testing of the role of a particular brain region for a particular class of cognitive abilities. By blocking normal functioning of the affected neurons, this can be equivalent, in effect, to a temporary lesion of that area of the brain. TMS appears to have minimal risks, but its long-term effects are not known.

**EXHIBIT C**

### 3. Deep brain stimulation (DBS)

DBS is an FDA-approved treatment for several neurological conditions affecting movement, notably Parkinson's disease, essential tremor, and dystonia. The device used in DBS includes a lead that is implanted into a specific brain region, a pulse generator (generally implanted under the shoulder or in the abdomen), and a wire connecting the two. The pulse generator sends an electric current to the electrodes in the lead, which in turn affect the functioning of neurons in an area around the electrodes.

The precise manner by which DBS affects brain function remains unclear. Even for Parkinson's disease, for which it is widely used, individual patients sometimes benefit in unpredictable ways from placement of the lead in different locations and from different frequency or power of the stimulation.

Researchers are continuing to experiment with DBS for other conditions, such as depression, minimally conscious state, chronic pain, and overeating that leads to morbid obesity. The results are sometimes surprising. In a Canadian trial of DBS for appetite control, the obese patient did not ultimately lose weight but did suddenly develop a remarkable memory. That research group is now starting a trial of DBS for dementia.[10] Other surprises have included some negative side effects from DBS, such as compulsive gambling, hypersexuality, and hallucinations. These kinds of unexpected consequences from DBS make it of continuing broader research interest.

### 4. Implanted microelectrode arrays

Ultimately, to understand the brain fully one would like to know what each of its 100 billion neurons is doing at any given time, analyzed in terms of their collective patterns of activity.[11] No current technology comes close to that kind of resolution. For example, although fMRI has a voxel size of a few cubic millimeters, it is looking at the blood flow responding to thousands or millions of neurons at each point in the brain. Conversely, while direct electrical recordings allow individual neurons to be examined, and manipulated, it is not easy to record from many neurons at once. While still on a relatively small scale, recent developments now offer one method for recording from multiple neurons simultaneously by using an implanted microelectrode array.

A chip containing many tiny electrodes can be implanted directly into brain tissue. Some of those electrodes will make useable connections with neurons and can then be used either to record the activity of that neuron (when it is firing or

---

10. *See* Clement Hamani et al., *Memory Enhancement Induced by Hypothalamic/Fornix Deep Brain Stimulation*, 63 Annals Neurol. 119 (2008).

11. See the discussion in Emily R. Murphy & Henry T. Greely, *What Will Be the Limits of Neuroscience-Based Mindreading in the Law? in* The Oxford Handbook of Neuroethics (J. Illes & B.J. Sahakian eds., 2011).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

not) or to stimulate the neuron to fire. These kinds of implants have been used in research on motor function, both in monkeys and in occasional human patients. The research has aimed at understanding better what neuronal activity leads to motion and hence, in the long run, perhaps to a method of treating quadriplegia or other motion disorders.

These arrays have several disadvantages as research tools. Arrays require neurosurgery for their implantation, with all of its consequent risks of infection or damage. They also have a limited lifespan, because the brain's defenses eventually prevent the electrical connection between the electrode and the neuron, usually over the span of a few months. Finally, the arrays can only reach a tiny number of the billions of neurons in the brain; current arrays have about 100 microelectrodes.

# IV. Issues in Interpreting Study Results

Lawyers trying to introduce neuroscience evidence will almost always be arguing that, when interpreted in the light of some preexisting research study, some kind of neuroscience-based test of the brain of a person in the case—usually a party, though sometimes a witness—is relevant to the case. It might be a claim that a PET scan shows that a criminal defendant was likely to have been legally insane at the time of the crime; it could be a claim that an fMRI of a witness demonstrates that she is lying. The judge will have to determine whether the scientific evidence is admissible at all under the Federal Rules of Evidence, and particularly under Rule 702. If the evidence is admissible, the finder of fact will need to consider the validity and strength of the underlying scientific finding, the accuracy of the particular test performed on the party or witness, and the application of the former to the latter.

Neuroscience-based evidence will commonly raise several scientific issues relevant to both the initial admissibility decision and the eventual determination of the weight to be given the evidence. This section of the reference guide examines seven of these issues: replication, experimental design, group averages, subject selection and number, technical accuracy, statistical issues, and countermeasures. The discussion focuses on fMRI-based evidence, because that seems likely to be the method that will be used most frequently in the coming years, but most of the seven issues apply more broadly.

One general point is absolutely crucial. The various techniques discussed in Section III, *supra*, are generally accepted scientific procedures, both for use in research and, in most cases, in clinical care. Each one is a good scientific tool in general. The crucial issue is not likely to be whether the techniques meet the requirements for admissibility when used for *some* purposes, but whether the techniques—*when used for the purpose for which they are offered*—meet those requirements. Sometimes proponents of fMRI-based lie detection, for example, have argued that the technique should be accepted because fMRI is the subject of more than 12,000 peer-reviewed

EXHIBIT C

*Reference Guide on Neuroscience*

publications. That is true, but irrelevant—the question is the application of fMRI to lie detection, which is the subject of far fewer, and much less definitive, publications.

## A. Replication

A good general rule of thumb in science is never to rely on any experimental finding until it has been independently replicated. This may be particularly true with fMRI experiments, not because of fraud or negligence on the part of the experimenters, but because, for reasons discussed below, these experiments are very complicated. Replication builds confidence that those complications have not led to false results.

In many scientific fields, including much of fMRI research, replication is sometimes not as common as it should be. A scientist often is not rewarded for replicating (or failing to replicate) another's work. Grants, tenure, and awards tend to go to people doing original research. The rise of fMRI has meant that such original experiments are easy to conceive and to attempt—anyone with experimental expertise, access to research subjects (often undergraduates), and access to an MRI scanner (found at any major medical facility) can try his or her own experiments and, if the study design and logic are sound and the results are statistically significant, may well end up with published results. Experiments replicating, or failing to replicate, another's work are neither as exciting nor as publishable.

For example, as discussed in more detail below, more than 15 different laboratories have collectively published 20 to 30 peer-reviewed articles finding some statistically significant relationship between fMRI-measured brain activity and deception. None of the studies is an independent replication of another laboratory's work. Each laboratory used its own experimental design, its own scanner, and its own method of analysis. Interestingly, the published results implicate many different areas of the brain as being activated when a subject lies. A few of the brain regions are found to be important in most of the studies, but many of the other brain regions showing a correlation with deception differ from publication to publication. Only a few of the laboratories have published replications of their own work; some of those laboratories have actually published findings with different results from those in their earlier publications.

That a finding has been replicated does not mean it is correct; different laboratories can make the same mistakes. Neither does failure of replication mean that a result is wrong. Nonetheless, the existence of independent replication is important support for a finding.

## B. Problems in Experimental Design

The most important part of an fMRI experiment is not the MRI scanner, but the design of the underlying experiment being examined in the scanner. A poorly

EXHIBIT C

*Reference Manual on Scientific Evidence*

designed experiment may yield no useful information, and even a well-designed experiment may lead to information of uncertain relevance.

A well-designed experiment must focus on the particular mental state or brain process of interest while minimizing any systematic biases. This can be especially difficult with fMRI studies. After all, these studies are measuring blood flow in the brain associated with neuronal responses in particular regions. If, for example, in an experiment trying to assess how the brain reacts to pain, the experimental subjects are consistently distracted at one point in the experiment by thinking about something else, the areas of brain activation will include the areas activated by the distraction. One of the earliest published lie detection experiments was designed so that the experimental subjects pushed a button for "yes" only when saying (honestly) that they held the card displayed; they pushed the "no" button both when they did not hold the card displayed and when they did hold it but were following instructions to lie. They were to say "yes" only 24 times out of 432 trials.[12] The resulting differences might have come from the differences in thinking about telling the truth or telling a lie—but they also may have come from the differences in thinking about pressing the "no" button (the most common action) and pressing the "yes" button (the less frequent response). The results themselves cannot distinguish between the two explanations.

Designing good experiments is difficult, but in some respects the better the experiment, the less relevant it may prove to a real situation. A laboratory experiment attempts to minimize distractions and differences among subjects, but such factors will be common in real-world settings. Perhaps more important, for some kinds of experiments it will be difficult, if not impossible, to reproduce in the laboratory the conditions of interest in the real world. As an extreme example, if one is interested in how a murderer's brain functions during a murder, one cannot conduct an experiment that involves having the subject commit a murder in the scanner. For ethical reasons, that condition of interest *cannot* be tested in the experiment.

The problem of trying to detect deception provides a different example. All published laboratory-based experiments involve people who know that they are taking part in a research project. Most of them are students and are being paid to participate in the project. They have received detailed information about the experiment and have signed a consent form. Typically, they are instructed to "lie" about a particular matter. Sometimes they are told what the lie should be (to deny that they see a particular playing card, such as the seven of clubs, on a screen in the scanner); sometimes they are told to make up a lie (about their most recent

---

12. Daniel D. Langleben et al., *Telling Truth from Lie in Individual Subjects with Fast Event-Related fMRI*, 26 Human Brain Mapping 262 (2005). See discussion in Nancy Kanwisher, *The Use of fMRI in Lie Detection: What Has Been Shown and What Has Not*, *in* Emilio Bizzi et al., Using Imaging to Identify Deceit: Scientific and Ethical Questions (2009), at 10, and in Anthony Wagner, *Can Neuroscience Identify Lies? in* A Judge's Guide to Neuroscience, *supra* note 1, at 30.

EXHIBIT C

*Reference Guide on Neuroscience*

vacation, for example). In either case, they are following instructions—doing what they *should* be doing—when they tell the "lie."

This situation is different from the realistic use of lie detection, when a guilty person needs to tell a convincing story to avoid a high-stakes outcome such as arrest or conviction—and even an innocent person will be genuinely nervous about the possibility of an incorrect finding of deception. In an attempt to parallel these real-world characteristics, some laboratory-based studies have tried to give subjects some incentive to lie successfully; for example, the subjects may be told (falsely) that they will be paid more if they "fool" the experimenters. Although this may increase the perceived stakes, it seems unlikely that it creates a realistic level of stress. These differences between the laboratory and the real world do not mean that the experimental results of laboratory studies are unquestionably different from the results that would exist in a real-world situation, but they do raise serious questions about the extent to which the experimental data bear on detecting lies in the real world.

Few judges will be expert in the difficult task of designing valid experiments. Although judges may be able themselves to identify weaknesses in experimental design, more often they will need experts to address these questions. Judges will need to pay close attention to that expert testimony and the related argument, as "details" of experimental design may turn out to be absolutely crucial to the value of the experimental results.

## C. The Number and Diversity of Subjects

Doing fMRI scans is expensive. The total cost of performing an hour-long research scan of a subject ranges from about $300 to $1000. Much fMRI research, particularly work without substantial medical implications, is not richly funded. As a result, studies tend to use only a small number of subjects—many fMRI studies use 10 to 20 subjects, and some use even fewer. In the lie detection literature, for example, the number of subjects used ranges from 4 to about 30.

It is unclear how representative such a small group would be of the general population. This is particularly true of the many studies that use university students as research subjects. Students typically are from a restricted age range, are likely to be of above-average intelligence and socioeconomic background, may not accurately reflect the country's ethnic diversity, and typically will underrepresent people with serious mental conditions. To limit possible confounding variables, it can make sense for a study design to select, for example, only healthy, right-handed, native-English-speaking male undergraduates who are not using drugs. But the very process of selecting such a restricted group raises questions about whether the findings will be relevant to other groups of people. They may be directly relevant, or they may not be. At the early stages of any fMRI research, it may not be clear what kinds of differences among subjects will or will not be important.

EXHIBIT C

*Reference Manual on Scientific Evidence*

## D. *Applying Group Averages to Individuals*

Most fMRI-based research looks for statistically significant associations between particular patterns of brain activation across a number of subjects. It is highly unlikely than any fMRI pattern will be found always to occur under certain circumstances in *every* person tested, or even that it will always occur under those circumstances in any one person. Human brains and their responses are too complicated for that. Research is highly unlikely to show that brain pattern "A" follows stimulus "B" each and every time and in every single person, although it may show that A follows B most of the time.

Consider an experiment with 10 subjects that examines how brain activation varies with the sensation of pain. A typical approach to analyzing the data is to take the average brain activation patterns of all 10 subjects combined, looking for the regions that, across the group, have the greatest changes—the most statistically significant changes—when the painful stimulus is applied compared with when it is absent. Importantly, though, the most significant region showing increased activation on average may not be the region with the greatest increase in activation in any particular one of the 10 subjects. It may not even be the area with the greatest activation in *any* of the 10 subjects, but it may be the region that was most consistently active across the brains of the 10 subjects, even if the response was small in each person.

Although group averages are appropriate for many scientific questions, the problem is that the law, for the most part, is not concerned with "average" people, but with individuals. If these "averaged" brains show a particular pattern of brain activation in fMRI studies and a defendant's brain does not, what, if anything, does that mean?

It may or may not mean anything—or, more accurately, the chances that it is meaningful will vary. The findings will need to be converted into an assessment of an individual's likelihood of having a particular pattern of brain activation in response to a stimulus, and that likelihood can be measured in various ways.

Consider the following simplified example. Assume that 1000 people have been tested to see how their brains respond to a particular painful stimulus. Each is scanned twice, once when touched by a painfully hot metal rod and once when the rod is room temperature. Assume that all of them feel pain from the heated rod and that no one feels pain from the room temperature rod. And, finally, assume that 900 of the 1000 show a particular pattern of brain activation when touched with the hot rod, but only 50 of the 1000 show the same pattern when touched with the room temperature rod.

For these 1000 people, using the fMRI activation pattern as a test for the perception of this pain would have a sensitivity of 90% (90% of the 1000 who felt the pain would be correctly identified and only 10% would be false negatives). Using the activation as a test for the *lack* of the pattern would have a specificity of 95% (95% of those who did not feel pain were correctly identified and only

780

**EXHIBIT C**

*Reference Guide on Neuroscience*

5% were false positives). Now ask, of all those who showed a positive test result, how many were actually positive? This percentage, the positive predictive value, would be 94.7%—900 out of 950. Depending on the planned use of the test, one might care more about one of these measures than another and there are often tradeoffs between them. Making a test more sensitive (so that it misses fewer people with the sought characteristic) often means making it less specific (so that it picks up more people who do not have the characteristic in question). In any event, when more people are tested, these estimates of sensitivity, specificity, and positive predictive value become more accurate.

There are other ways of measuring the accuracy of a test of an individual, but the important point is that some such conversion is essential. A research paper that reveals that the average subject's brain (more accurately, the "averaged subjects' brain") showed a particular reaction to a stimulus does not, in itself, say anything useful about how likely any one person is to have the same reaction to that stimulus. Further analyses are required to provide that information. Researchers, who are often more interested in identifying possible mechanisms of brain action than in creating diagnostic tests, will not necessarily have analyzed their data in ways that make them useful for application to individuals—or even have obtained enough data for that to be possible. At least in the near future, this is likely to be a major issue for applying fMRI studies to individuals, in the courtroom, or elsewhere.

## E. Technical Accuracy and Robustness of Imaging Results

MRI machines are variable, complicated, and finicky. The machines come in several different sizes, based on the strength of the magnet, with machines used for clinical purposes ranging from 0.2 T to 3.0 T and research scanners going as high as 9.4 T. Three companies dominate the market for MRI machines—General Electric, Siemens, and Philips—although several other companies also make the machines. Both the power and the manufacturer of an MRI system can make a substantial difference in the resulting data (and images). These variations can be more important with functional MRI (though they also apply to structural MRI) so that a result seen on a 1.5-T Siemens scanner might not appear on a 3.0-T General Electric machine. Similarly, results from one 3.0-T General Electric machine may be different from those on an identical model.

Even the exact same MRI machine may behave differently from day to day or month to month. The machines frequently need maintenance or adjustments and sometimes can be inoperable for days or even weeks at a time. Comparing results from even the same machine before and after maintenance—or a system upgrade—can be difficult. This can make it hard to compare results across different studies or between the group average of one study and results from an individual subject.

These issues concern not only the quality of the scans done in research, but, even more importantly, the credibility of the individual scan sought to be intro-

EXHIBIT C

*Reference Manual on Scientific Evidence*

duced at trial. If different machines were used, care must be taken to ensure that the results are comparable. The individual scans also can have other problems. Any one scan is subject not only to machine-derived artifacts and other problems noted above, but also to human-generated artifacts, such as those caused by the subject's movements during the scan.

Finally, another technical problem of a different kind comes from the nature of fMRI research itself. The scanner will record changes in the relative levels of oxyhemoglobin to deoxyhemoglobin for thousands of voxels throughout the brain. During data analysis, these signal changes will be tested to see if they show any change in the response between the experimental condition and the baseline or control condition. Importantly, with fMRI, there is no definitive way to quantify precisely how large a change there was in the neural response compared to baseline; hence, the researcher must set a somewhat arbitrary statistical cutoff value (a threshold) for saying that a voxel was activated or deactivated. A researcher who wants only to look at strong effects will require a large change from baseline; a researcher who wants to see a wide range of possible effects will allow smaller changes from baseline to count.

Neither way is "right"—we do not know whether there is some minimum change in the BOLD response that means an "important" amount of brain activation has taken place, and if such a true value exists, it is likely to differ across brain regions, across tasks, and across experimental contexts. What this means is that different choices of statistical cutoff values can produce enormous differences in the apparent results. And, of course, the cutoff values used in the studies and in the scan of the individual of interest must be consistent across repeated tests. This important fact often may not be known.

## F. Statistical Issues

Interpreting fMRI results requires the application of complicated statistical methods.[13] These methods are particularly difficult, and sometimes controversial, for fMRI studies, partly because of the thousands of voxels being examined. Fundamentally, most fMRI experiments look at many thousands of voxels and try to determine whether any of them are, on average, activated or deactivated as a result of the task or stimulus being studied. A simple test for statistical significance asks whether a particular result might have arisen by chance more than 1 time in 20 (or 5%): Is it significant at the .05 level? If a researcher is looking at the results for thousands of different voxels, it is likely that a number of voxels will show an effect above the threshold *just* by chance. There are statistical ways to control the rate of these false positives, but they need to be applied carefully. At the same time, rigid control of false positives through statistical correction (or the use of

13. For a broad discussion of statistics, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, in this manual.

EXHIBIT C

a very conservative threshold) can create another problem—an increase in the false-negative rate, which results in failing to detect true brain responses that are present in the data but that fall below the statistical threshold. The community of fMRI researchers recognizes that these issues of statistical significance are difficult to resolve.

Over the past decade, other statistical techniques are increasingly being used in neuroimaging research, including techniques that do not look at the statistical significance of changes in the BOLD response in individual voxels, but that instead examine changes in the distributed patterns of activation across many voxels in a region of the brain or across the whole brain. These techniques include methods known as principal component analysis, multivariate analysis, and related machine learning algorithms. These methods, the details of which are not reviewed in this chapter, are being used increasingly in neuroimaging research and are producing some of the most interesting results in the field. The techniques are fairly complex, and determining how to interpret the results of these tests can be controversial. Thus, these methods alone may require substantial and potentially confusing expert testimony in addition to all the other expert testimony about the underlying neuroscience evidence.

## G. Possible Countermeasures

When neuroimaging is being used to compare the brain of one individual—a defendant, plaintiff, or witness, for example—to others, the individual undergoing neuroimaging might be able to use countermeasures to make the results unusable or misleading. And at least some of those countermeasures may prove especially hard to detect.

Subjects can disrupt almost any kind of scanning, whether done for structural or functional purposes, by moving in the scanner. Unwilling subjects could ruin scans by moving their bodies, heads, or, possibly, even by moving their tongues. Blatant movements to disrupt the scan would be apparent, both from watching the subject in the scanner and from seeing the results, leading to a possible negative inference that the person was trying to interfere with the scan. Nonetheless, that scan itself would be useless.

More interesting are possible countermeasures for functional scans. Polygraphy may provide a useful comparison. Countermeasures have long been tried in polygraphy with some evidence of efficacy. Polygraphy typically looks at the differences in physiological measurements of the subject when asked anxiety-provoking questions or benign control questions. Subjects can use drugs or alcohol to try to dampen their body reactions when asked anxiety-provoking questions. They can try to use mental measures to control or affect their physiological reactions, calming themselves during anxiety-provoking questions and increasing their emotional reaction to control questions. And, when asked control questions, they can try to increase the physiological signs the polygraph measures through physical means.

EXHIBIT C

Case No. 1:21-cv-01689-RMR-MDB    Document 45-4    filed 03/09/23    USDC Colorado
pg 254 of 486

*Reference Manual on Scientific Evidence*

For example, subjects might bite their tongues, step on tacks hidden in their shoes, or tighten various muscles to try to increase their blood pressure, galvanic skin response, and so on. The National Academy of Sciences report on polygraphs concluded that

> Basic science and polygraph research give reason for concern that polygraph test accuracy may be degraded by countermeasures, particularly when used by major security threats who have a strong incentive and sufficient resources to use them effectively. If these measures are effective, they could seriously undermine any value of polygraph security screening.[14]

Some of the countermeasures used by polygraph subjects can be detected by, for example, drug or alcohol tests or by carefully watching the subject's body. But purely mental actions cannot be detected. These kinds of countermeasures may be especially useful to subjects seeking to beat neuroscience-based lie detection. For example, some argue that deception produces different activation patterns than telling the truth because it is mentally harder to tell a lie—more of the brain needs to work to decide whether to lie and what lie to tell. If so, two mental counter-measures immediately suggest themselves: make the lie easier to tell (through, perhaps, memorization or practice) or make the brain work harder when telling the truth (through, perhaps, counting backward from 100 by sevens).

Countermeasures are not, of course, potentially useful only in the context of lie detection. A neuroimaging test to determine whether a person was having the subjective feeling of pain might be fooled by the subject remembering, in great detail, past experiences of pain. The possible uses of countermeasures in neuro-imaging have yet to be extensively explored, but at this point they cast additional doubt on the reliability of neuroimaging in investigations or in litigation.

# V. Questions About the Admissibility and the Creation of Neuroscience Evidence

The admissibility of neuroscience evidence will depend on many issues, some of them arising from the rules of evidence, some from the U.S. Constitution, and some from other legal provisions. Another often-overlooked reality is that judges may have to decide whether to order this kind of evidence to be created. Certainly, judges may be called to pass upon the requests for criminal defendants (or convicts seeking postconviction relief) to be able to use neuroimaging. They may also have to decide motions in civil or criminal cases to compel neuroimaging. One could even imagine requests for warrants to "search the brains" of possible

14. *See* National Research Council, The Polygraph and Lie Detection 5 (2003). This report is an invaluable resource for discussions of not just the scientific evidence about the reliability of the polygraph, but also for general background about the application of science to lie detection.

EXHIBIT C

*Reference Guide on Neuroscience*

witnesses for evidence. This guide does not seek to resolve any of these questions, but points out some of the problems that are likely to be raised about admitting neuroscience evidence in court.

## A. Evidentiary Rules

This discussion looks at the main evidentiary issues that are likely to be raised in cases involving neuroscience evidence. Note, though, that judges will not always be governed by the rules of evidence. In criminal sentencing or in probation hearings, among other things, the Federal Rules of Evidence do not apply,[15] and they apply with limitations in other contexts.[16] Nonetheless, even in those circumstances, many of the principles behind the Rules, discussed below, will be important.

### 1. Relevance

The starting point for all evidentiary questions must be relevance. If evidence is not relevant to the questions in hand, no other evidentiary concerns matter. This basic reminder may be particularly useful with respect to neuroscience evidence. Evidence admitted, for example, to demonstrate that a criminal defendant had suffered brain damage sometime before the alleged crime is not, in itself, relevant. The proffered fact of the defendant's brain damage must be relevant. It may be relevant, for example, to whether the defendant could have formed the necessary criminal intent, to whether the defendant should be found not guilty by reason of insanity, to whether the defendant is currently competent to stand trial, or to mitigation in sentencing. It must, however, be relevant to *something* in order to be admissible at all, and specifying its relevance will help focus the evidentiary inquiry. The question, for example, would not be whether PET scans meet the evidentiary requirements to be admitted to demonstrate brain damage, but whether they have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[17] The brain damage may be relevant to a fact, but that fact must be "of consequence to the determination of the action."

### 2. Rule 702 and the admissibility of scientific evidence

Neuroscience evidence will almost always be "scientific . . . knowledge" governed by Rule 702 of the Federal Rules of Evidence, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals*[18] and its progeny, both before and after the amendments to Rule 702 in 2000. Rule 702 allows the testimony of a qualified expert "if

---

15. Fed. R. Evid. 1101(d).
16. Fed. R. Evid. 1101(e).
17. Fed. R. Evid. 401.
18. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

EXHIBIT C

*Reference Manual on Scientific Evidence*

(1) the testimony is sufficiently based upon reliable facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In *Daubert*, the Supreme Court listed several, nonexclusive guidelines for trial court judges considering testimony under Rule 702. The Committee that proposed the 2000 Amendments to Rule 702 summarized these factors as follows:

> The specific factors explicated by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.[19]

The tests laid out in *Daubert* and in the evidentiary rules governing expert testimony have been the subjects of enormous discussion, both by commentators and by courts. And, to the extent some neuroscience evidence has been admitted in federal courts (and the courts of states that follow Rule 702 or *Daubert*), it has passed those tests. We do not have the knowledge needed to analyze them in detail, but we will merely point out a few aspects that seem especially relevant to neuroscience evidence.

Neuroscience evidence should often be subject to tests, as long as the point of the neuroscience evidence is kept in mind. An fMRI scan might provide evidence that someone was having auditory hallucinations, but it could not prove that someone was not guilty by reason of insanity. The latter is a legal conclusion, not a scientific finding. The evidence might be relevant to the question of insanity, but one cannot plausibly conduct a scientific test of whether a particular pattern of brain activation is always associated with legal insanity. One might offer neuroimaging evidence about whether a person is likely to have unusual difficulty controlling his or her impulses, but that is not, in itself, proof that the person acted recklessly. The idea of testing helps separate the conclusions that neuroscience might be able to reach from the legal conclusions that will be beyond it.

*Daubert*'s stress on the presence of peer review and publication corresponds nicely to scientists' perceptions. If something is not published in a peer-reviewed journal, it scarcely counts. Scientists only begin to have confidence in findings after peers, both those involved in the editorial process and, more important, those who read the publication, have had a chance to dissect them and to search intensively for errors either in theory or in practice. It is crucial, however, to recognize that publication and peer review are not in themselves enough. The publications need to be compared carefully to the evidence that is proffered.

---

19. Fed. R. Evid. 702 advisory committee's note.

786

**EXHIBIT C**

*Reference Guide on Neuroscience*

First, the published, peer-reviewed articles must establish the specific scientific fact being offered. An (accurate) assertion that fMRI has been the basis of more than 12,000 peer-reviewed publications will help establish that fMRI can be used in ways that the scientific community finds reliable. By themselves, however, those publications do not establish any particular use of fMRI. If fMRI is being offered as proof of deception, the 20 or 30 peer-reviewed articles concerning its ability to detect deception are most important, not the 11,980 articles involving fMRI for other purposes.

Second, the existence of several peer-reviewed publications on the same general method does not support the accuracy of any one approach if those publications are mutually inconsistent. There are now about 20 to 30 peer-reviewed publications that, using fMRI, find statistically significant differences in patterns of brain activation depending on whether the subjects were telling the truth or (typically) telling a lie when instructed to do so. Many of those publications find patterns that are different from, and often inconsistent with, the patterns described in the other publications. Multiple *inconsistent* publications do not add weight, and may indeed subtract it, from a scientific method or theory.

Third, the peer-reviewed publication needs to describe in detail the method about which the expert plans to testify. A commercial firm might, for example, claim that its method is "based on" some peer-reviewed publications, but unless the details of the firm's methods were included in the publication, those details were neither published nor peer reviewed. A proprietary algorithm used to generate a finding published in the peer-reviewed literature is not adequately supported by that literature.

The error rate is also crucial to most neuroscience evidence, in two different senses. One is the degree to which the machines used to produce the evidence make errors. Although these kinds of errors may balance out in a large sample used in published literature, any scan of any one individual may well be affected by errors in the scanning process. Second, and more important, neuroscience evidence will almost never give an absolute answer, but will give a probabilistic one. For example, a certain brain structure or activation pattern will be found in some percentage of people with a particular mental condition or state. These group averages will have error rates when they are applied to individuals. Those rates need to be known and presented.

The issue of standards and controls also is important in neuroscience. This area is new and has not undergone the kind of standardization seen, for example, in forensic DNA analysis. When trying to apply neuroscience findings to an individual, evidence from the individual needs to have been acquired in the same way, with the same standards and conditions, as the evidence from which the scientific conclusions were drawn—or, at least, in ways that can be made readily comparable. For example, there is no one standard in fMRI research for what statistical threshold should be used for a change in the BOLD signal to "count" as a meaningful activation or deactivation. An individual's scan would need to

EXHIBIT C

*Reference Manual on Scientific Evidence*

be analyzed under the same definition for activation as was used in the research supporting the method, and the effects of the chosen threshold on finding a false positive or false negative must be considered.

The final consideration, general acceptance in the scientific community, also needs to be applied carefully. There is clearly general acceptance in the scientific community that fMRI can provide scientifically and sometimes clinically useful information about the workings of human brains, but that does not mean there is general acceptance of any particular fMRI application. Similarly, there may be general acceptance that fMRI can provide some general information about the physical correlates of a particular mental state, but without general acceptance that it can do so reliably in an individual case.

## 3. Rule 403

Rule 702 is not the only test that neuroscience evidence will need to pass to be admitted in court. Even evidence admissible under that rule must still escape the exclusion provided by Rule 403:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or mis-leading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

As discussed in detail in a recent article,[20] Rule 403 may be particularly important with some attempted applications of neuroscience evidence because of the balance it requires between the value of evidence to the decisionmaker and its costs.

The probative value of such evidence may often be questioned. Neuroscience evidence will rarely, if ever, be definitive. It is likely to have a range of uncertainties, from the effectiveness of the method in general, to questions of its proper application in this case, to whether any given individual's reactions are the same as those previously tested.

The other side of Rule 403, however, is even more troublesome. The time necessary to introduce such evidence, and to educate the jury (and judge) about it, will usually be extensive. The possibilities for confusion are likely to be great. And there is at least some evidence that jurors (or, to be precise, "mock jurors") are particularly likely to overestimate the power of neuroscience evidence.[21]

---

20. Teneille Brown & Emily Murphy, *Through a Scanner Darkly: Functional Neuroimaging as Evidence of a Criminal Defendant's Past Mental States*, 62 Stan. L. Rev. 1119 (2010).

21. *See* Deena Skolnick Weisberg et al., *The Seductive Allure of Neuroscience Explanations*, 20 J. Cog. Neurosci. 470 (2008); David P. McCabe & Alan D. Castel, *Seeing Is Believing: The Effect of Brain Images on Judgments of Scientific Reasoning*, 107 Cognition 343 (2008). These articles are discussed in Brown & Murphy, *supra* note 20, at 1199–1202. *But see* N.J. Schweitzer et al., *Neuroimages as Evidence in a Mens Rea Defense: No Impact*, Psychol. Pub. Pol'y L. (in press) providing the experimental results that seem to indicate that showing neuroimages to mock jurors does not affect their decisions.

**EXHIBIT C**

*Reference Guide on Neuroscience*

A high-tech "picture" of a living brain, complete with brain regions shown in bright orange and deep purple (colors not seen in an actual brain), may have an unjustified appeal to a jury. In each case, judges will need to weigh possibilities of confusion or prejudice, along with the near certainty of lengthy testimony, against the claimed probative value of the evidence.

## 4. Other potentially relevant evidentiary issues

Neuroscience evidence will, of course, be subject in individual cases to all evidentiary rules, from the Federal Rules of Evidence or otherwise, and could be affected by many of them. Four examples follow where the application of several such rules to this kind of evidence may raise interesting issues; there are undoubtedly many others.

First, in June 2009 the U.S. Supreme Court decided *Melendez-Diaz v. Massachusetts*,[22] where the five-justice majority held that the Confrontation Clause required the prosecution to present the testimony at trial of state laboratory analysts who had identified a substance as cocaine. This would seem to apply to any use by the prosecution in criminal cases of neuroscience evidence about a scanned defendant or witness, although it is not clear who would have to testify. Would testimony be required from the person who observed the procedure, the person who analyzed the results of the procedure, or both? If the results were analyzed by a computerized algorithm, would the individual (or group) that wrote that algorithm have to testify? These questions, and others, are not unique to neuroscience evidence, of course, but will have to be sorted out generally after *Melendez-Diaz*.

Second, the Federal Rules of Evidence put special limits on the admissibility of evidence of character and, in some cases, of predisposition.[23] In some cases, neuroscience evidence offered for the purpose of establishing a regular behavior of the person might be viewed as evidence of character[24] or predisposition (or

---

22. 129 S. Ct. 2527 (2009).

23. Fed. R. Evid. 404, 405, 412–415, 608.

24. Evidence about lie detection has sometimes been viewed as "character evidence," introduced to bolster a witness's credibility. The Canadian Supreme Court has held that polygraph evidence is inadmissible in part because it violates the rule limiting character evidence.

> "What is the consequence of this rule in relation to polygraph evidence? Where such evidence is sought to be introduced, it is the operator who would be called as the witness, and it is clear, of course, that the purpose of his evidence would be to bolster the credibility of the accused and, in effect, to show him to be of good character by inviting the inference that he did not lie during the test. In other words, it is evidence not of general reputation but of a specific incident, and its admission would be precluded under the rule. It would follow, then, that the introduction of evidence of the polygraph test would violate the character evidence rule." R. v. Béland, 60 C.R. (3d) 1, ¶¶ 71–72 (1987).

> The Canadian court also held that polygraph evidence violated another rule concerning character evidence, the rule against "oath-helping."

> "From the foregoing comments, it will be seen that the rule against oath-helping, that is, adducing evidence solely for the purpose of bolstering a witness's credibility, is well grounded in authority. It

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

lack of predisposition). Whether such evidence could be admitted might hinge on whether it was offered in a civil case or a criminal case, and, if in a criminal case, by the prosecution or the defendant.

Third, Federal Rule of Evidence 406 allows the admission of evidence about a habit or routine practice to prove that the relevant person's actions conformed to that habit or routine practice. It is conceivable that neuroscience evidence might be used to describe "habits of mind" and thus be offered under this rule.

The fourth example applies to neuroscience-based lie detection. Although New Mexico is the only U.S. jurisdiction that generally allows the introduction of polygraph evidence,[25] several jurisdictions allow polygraph evidence in two specific situations. First, polygraph evidence is sometimes allowed when both parties have stipulated to its admission in advance of the performance of the test. (This does lead one to wonder whether a court would allow evidence from a psychic or from a fortune-telling toy, like the Magic Eight Ball, if both parties stipulated to it.) Second, polygraph evidence is sometimes allowed to impeach or to corroborate a witness's testimony.[26] If a neuroscience-based lie detection technique were found to be as reliable as the polygraph, presumably those jurisdictions would have to consider whether to extend these exceptions to such neuroscience evidence.

## B. Constitutional and Other Substantive Rules

In many contexts, courts will be asked to admit neuroscience evidence or to order, allow, or punish its creation. Such actions may implicate a surprisingly large number of constitutional rights, as well as other substantive legal provisions. Most of these would be rights against the creation or use of neuroscience evidence, although some would be possible rights to its use. And one constitutional provision, the Fourth Amendment, might cut both ways. Again, this section will not seek to discuss all possible such claims or to resolve any of them, but only to raise some of the most interesting issues.

### 1. Possible rights against neuroscience evidence

a. The Fifth Amendment privilege against self-incrimination

Could a person be forced to "give evidence" through a neuroscience technology, or would that violate his or her privilege against self-incrimination? This has

is apparent that, since the evidence of the polygraph examination has no other purpose, its admission would offend the well-established rule." R. v. Béland, 60 C.R. (3d) 1, ¶ 67(1) (The court also ruled against polygraph evidence as violating the rule against prior consistent statements and, because the jury needs no help in assessing credibility, the rule on the use of expert witnesses).

25. Lee v. Martinez, 96 P.3d 291 (N.M. 2004).

26. *See, e.g.,* United States v. Piccinonna, 885 F.2d 1529 (11th Cir. 1989) (en banc). *See also* United States v. Allard, 464 F.3d. 529 (5th Cir. 2006); Thornburg v. Mullin, 422 F.3d 1113 (10th Cir. 2005).

**EXHIBIT C**

*Reference Guide on Neuroscience*

already begun to be discussed by legal scholars in the context of lie detection.[27] One issue is whether the neuroscience evidence is "testimonial evidence." If it were held to be "testimonial" it would be subject to the privilege, but if it were nontestimonial, it would, under current law, not be. Examples of nontestimonial evidence for purposes of the privilege against self-incrimination include incriminating information from a person's private diaries, a blood alcohol test, or medical X rays. An fMRI scan is nothing more than a computer record of radio waves emitted by molecules in the brain. It does not seem like "testimony." On the other hand, fMRI-based lie detection currently involves asking the subject questions to which he or she gives answers, either orally, by pressing buttons, or by some other form of communication. Perhaps those answers would make the resulting evidence "testimonial."

It is possible, however, that answers may not be necessary. Two EEG-based systems claim to be able to determine whether a person either recognizes or has "experiential knowledge" of an event (a memory derived from experience as opposed to being told about it).[28] Very substantial scientific questions exist about each system, but, assuming they were to be admitted as reliable, they would raise this question more starkly because they do not require the subject of the procedure to communicate. The subject is shown photographs of relevant locations or read a description of the events while hooked up to an EEG. The brain waves,

27.  The law review literature, by both faculty and students, discussing the Fifth Amendment and neuroscience-based lie detection is already becoming voluminous. *See, e.g.*, Nita Farahany, *Incriminating Thoughts*, 64 Stan. L. Rev., Paper No. 11-17, *available at* SSRN: http://ssrn.com/abstract=1783101 (2011); Dov Fox, *The Right to Silence as Protecting Mental Control*, 42 Akron L. Rev. 763 (2009); Matthew Baptiste Holloway, *One Image, One Thousand Incriminating Words: Images of Brain Activity and the Privilege Against Self-Incrimination,* 27 Temp. J. Sci. Tech. & Envtl. L. 141 (2008); William Federspiel, *Neuroscience Evidence, Legal Culture, and Criminal Procedure*, 16 Wm. & Mary Bill Rts. J. 865 (2008); Sarah E. Stoller & Paul Root Wolpe, *Emerging Neurotechnologies for Lie Detection and the Fifth Amendment*, 33 Am. J.L. & Med. 359 (2007); Michael S. Pardo, *Neuroscience Evidence, Legal Culture, and Criminal Procedure*, 33 Am. J. Crim. L. 301 (2006); and Erich Taylor, *A New Wave of Police Interrogation? "Brain Fingerprinting," the Constitutional Privilege Against Self-Incrimination, and Hearsay Jurisprudence*, U. Ill. J.L. Tech. & Pol'y 287 (2006).

28.  The first system is the so-called Brain Fingerprinting, developed by Dr. Larry Farwell. This method was introduced successfully in evidence at the trial court level in a postconviction relief case in Iowa; the use of the method in that case is discussed briefly in the Iowa Supreme Court's decision on appeal, Harrington v. Iowa, 659 N.W.2d 509, 516 n.6 (2003). (The Court expressed no view on whether that evidence was properly admitted. *See id*. at 516.) The method is discussed on the Web site of Farwell's company, Brain Fingerprinting Laboratories, www.brainwavescience.com. It is criticized from a scientific perspective in J. Peter Rosenfeld, *"Brain Fingerprinting": A Critical Analysis*, 4 Sci. Rev. Mental Health Practice 20 (2005). See also the brief discussion in Henry T. Greely & Judy Illes, *Neuroscience-Based Lie Detection: The Urgent Need for Regulation*, 33 Am. J.L. & Med. 377, 387–88 (2007).

The second system is called Brain Electrical Oscillation Signature (BEOS) and was developed in India, where it has been introduced in trials and has been important in securing criminal convictions. *See* Anand Giridharadas, *India's Novel Use of Brain Scans in Courts Is Debated*, N.Y. Times, Sept. 15, 2008, at A10.

EXHIBIT C

*Reference Manual on Scientific Evidence*

it is asserted, demonstrate whether the subject recognizes the photographs or has "experiential knowledge" of the events—no volitional communication is necessary. It might be harder to classify these EEG records as "testimonial."

b. Other possible general constitutional protections against compulsory
    neuroscience procedures

Even if the privilege against self-incrimination applies to neuroscience methods of obtaining evidence, it only applies where someone invokes the privilege. The courts and other government bodies force people to answer questions all the time, often under penalty of criminal or civil sanctions or of the court's contempt power. For example, a plaintiff in a civil case alleging damage to his health can be compelled to undergo medical testing at a defendant's appropriate request. In that case, the plaintiff can refuse, but only at the risk of seeing his case dismissed. Presumably, a party could similarly demand that a party, or a witness, undergo a neuroimaging examination, looking for either structural or functional aspects of the person's brain relevant to the case. If the privilege against self-incrimination is not available, or is available but not attractive, could the person asked have any other protection?

The answer is not clear. One might try to argue, along the lines of *Rochin v. California*,[29] that such a procedure violates the Due Process Clause of the Fifth and Fourteenth Amendments because it intrudes on the person in a manner that "shocks the conscience." Alternatively, one might argue that a "freedom of the brain" is a part of the fundamental liberty or the right to privacy protected by the Due Process Clause.[30] Or one might try to use language in some U.S. Supreme Court First Amendment cases that talk about "freedom of thought" to argue that the First Amendment's freedoms of religion, speech, and the press encompass a broader protection of the contents of the mind. The Court never seems to have decided a case on that point. The closest case might be *Stanley v. Georgia*,[31] where the Court held that Georgia could not criminalize a man's private possession of pornography for his own use. None of these arguments is, in itself, strongly supported, but each draws some appeal from a belief that we should be able to keep our thoughts, and, by extension, the workings of our brain, to ourselves.

c. Other substantive rights against neuroscience evidence

At least one form of possible neuroscience evidence may already be covered by statutory provisions limiting its creation and use—lie detection. In 1988, Congress

29. 342 U.S. 165 (1952).

30. *See* Paul Root Wolpe, *Is My Mind Mine? Neuroethics and Brain Imaging*, *in* The Penn Center Guide to Bioethics (Arthur L. Caplan et al. eds., 2009).

31. 394 U.S. 557 (1969). In the context of finding that the First Amendment forbids criminalizing mere possession of pornography, in the home, for an adult's private use, the Court wrote "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." The leap from that language, or that holding, to some kind of mental privacy, is not small.

EXHIBIT C

*Reference Guide on Neuroscience*

passed the federal Employee Polygraph Protection Act (EPPA).[32] Under this Act, almost all employers are forbidden to "directly or indirectly, . . . require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test" or to "use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee."[33] The Act defines a "lie detector" broadly, as "a polygraph, deceptograph, voice stress analyzer, psychological stress evaluator, or any other similar device (whether mechanical or electrical) that is used, or the results of which are used, for the purpose of render-ing a diagnostic opinion regarding the honesty or dishonesty of an individual."[34] The Department of Labor can punish violators with civil fines, and those injured have a private right of action for damages.[35] The Act does provide narrow excep-tions for polygraph tests in some circumstances.[36]

In addition to federal statutes, many states passed their own versions of the EPPA, either before or after the federal act. The laws passed after EPPA generally apply similar prohibitions to some employers not covered by the federal act (such as state and local governments), but with their own idiosyncratic set of exceptions. Many states have also passed laws regulating lie detection services. Most of these seem clearly aimed at polygraphy, but, in some states, the language used is quite broad and may well encompass neuroscience-based lie detection.[37]

States also may provide protection against neuroscience evidence that goes beyond lie detection and could prevent involuntary neuroscience procedures. Some states have constitutional or statutory rights of privacy that could be read to include a broad freedom for mental privacy. And in some states, such as California, such privacy rights apply not just to state action but to private actors as well.[38] Most employment cases would be covered by EPPA and its state equivalents, but such state privacy protections might be used to help decide whether courts could

---

32. Federal Employee Policy Protection Act of 1988, Pub. L. No. 100-347, § 2, 102 Stat. 646 (codified as 29 U.S.C. §§ 2001–2009 (2006)). See generally the discussion of federal and state laws in Greely & Illes, *supra* note 28, at 405–10, 421–31.

33. 29 U.S.C. § 2002 (1)–(2) (2006) (The section also prohibits employers from taking action against employees because of their refusal to take a test, because of the results of such a test, or for asserting their rights under the Act); and *id*. § 2001 (3)–(4) (2006).

34. *Id*. § 2001(3) (2006).

35. *Id*. § 2005 (2006).

36. *Id*. § 2001(6) (2006).

37. *See generally* Greely & Illes, *supra* note 28, at 409–10, 421–31 (for both state laws on employee protection and state laws more broadly regulating polygraphy).

38. "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." (emphasis added). Calif. Const. art. I, § 1. The words, "and privacy" were added by constitutional amendment in 1972. The California Supreme Court has applied these privacy protections in suits against private actors: "In summary, the Privacy Initiative in article I, section 1 of the California Constitution creates a right of action against private as well as government entities." Hill v. Nat'l Collegiate Athletic Ass'n, 865 P.2d 633, 644 (Cal. 1994).

EXHIBIT C

*Reference Manual on Scientific Evidence*

compel neuroimaging scans or whether they could be required in nonemployment relationships, such as school/student or parent/child.

d. Neuroscience evidence and the Sixth and Seventh Amendment rights to trial by jury

One might also argue that some kinds of neuroscience evidence could be excluded from evidence as a result of the federal constitutional rights to trial by jury in criminal and most civil cases. In *United States v. Scheffer,*[39] the Supreme Court upheld an express ban in the Military Rules of Evidence on the admission of any polygraph evidence against a criminal defendant's claimed Sixth Amendment right to introduce the evidence in his defense. Justice Thomas wrote the opinion of the Court holding that the ban was justified by the questionable reliability of the polygraph. Justice Thomas continued, however, in a portion of the opinion joined only by Chief Justice Rehnquist and Justices Scalia and Souter, to hold that the Rule could also be justified by an interest in the role of the jury:

> It is equally clear that Rule 707 serves a second legitimate governmental interest: Preserving the jury's core function of making credibility determinations in criminal trials. A fundamental premise of our criminal trial system is that "the *jury* is the lie detector." *United States v. Barnard,* 490 F.2d 907, 912 (CA9 1973) (emphasis added), *cert. denied,* 416 U.S. 959, 40 L. Ed. 2d 310, 94 S. Ct. 1976 (1974). Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 35 L. Ed. 371, 11 S. Ct. 720 (1891).[40]

The other four justices in the majority, and Justice Stevens in dissent, disagreed that the role of the jury justified this rule, but the question remains open. Justice Thomas's opinion did not argue that exclusion was *required* as part of the rights to jury trials in criminal and civil cases under the Sixth and Seventh Amendments, respectively, but one might try to extend his statements of the importance of the jury as "the lie detector" to such an argument.[41]

---

39. 523 U.S. 303 (1998).

40. *Id.* at 312–13.

41. The Federal Rules of Criminal Procedure effectively give the prosecution a right to a jury trial, by allowing a criminal defendant to waive such a trial only with the permission of both the prosecution and the court. Fed. R. Crim. P. 23(a). Many states allow a criminal defendant to waive a jury trial unilaterally, thus depriving the prosecution of an effective "right" to a jury.

EXHIBIT C

*Reference Guide on Neuroscience*

## 2. Possible rights to the creation or use of neuroscience evidence

a. The Eighth Amendment right to present evidence of mitigating circumstances in capital cases

In one of many ways in which "death is different," in *Lockett v. Ohio*,[42] the U.S. Supreme Court held that the Eighth Amendment guarantees a convicted defendant in a capital case a sentencing hearing in which the sentencing authority must be able to consider any mitigating factors. In *Rupe v. Wood*,[43] the Ninth Circuit, in an appeal from the defendant's successful habeas corpus proceeding, applied that holding to find that a capital defendant had a constitutional right to have polygraph evidence admitted as mitigating evidence in his sentencing hearing. The court agreed that totally unreliable evidence, such as astrology, would not be admissible, but that the district court had properly ruled that polygraph evidence was not that unreliable. (The Washington Supreme Court had previously decided that polygraph evidence should be admitted in the penalty phase of capital cases under some circumstances.[44]) Thus, capital defendants may argue that they have the right to present neuroscience evidence as mitigation even if it would not be admissible during the guilt phase.

b. The Sixth Amendment right to present a defense

The *Scheffer* case arose in the context of another right guaranteed by the Sixth Amendment, the right of a criminal defendant to present a defense. It seems likely that neuroscience evidence will first be offered by parties who have been its voluntary subjects and who will argue that it strengthens their cases. In fact, the main use of neuroimaging in the courts so far, at least in criminal cases, has been by defendants seeking to demonstrate through the scans some element of a defense or mitigation. If jurisdictions were to exclude such evidence categorically, they might face a similar Sixth Amendment challenge.

The Supreme Court has held that some prohibitions on evidence in criminal cases violate the right to present a defense. Thus, in *Rock v. Arkansas*,[45] the Court struck down a *per se* rule in Arkansas against the admission of hypnotically refreshed testimony, holding that it was "arbitrary or disproportionate to the purposes [it is] designed to serve." The *Scheffer* case probably provides the model for how arguments about exclusions of neuroscience evidence would play out. Eight of the Justices in *Scheffer* agreed that the reliability of polygraphy was sufficiently

42. 438 U.S. 586 (1978).

43. 93 F.3d 1434, 1439–41 (9th Cir. 1996). *But see* United States v. Fulks, 454 F.3d 410, 434 (4th Cir. 2006). *See generally* Christopher Domin, *Mitigating Evidence? The Admissibility of Polygraph Results in the Penalty Phase of Capital Trials*, 41 U.C. Davis L. Rev. 1461 (2010), which argues that the Supreme Court should resolve the resulting circuit split by adopting the Ninth Circuit's position.

44. State v. Bartholomew, 101 Wash. 2d 631, 636, 683 P.2d 1079 (1984).

45. 483 U.S. 44, 56, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987).

EXHIBIT C

*Reference Manual on Scientific Evidence*

questionable as to justify the *per se* ban on its use. Justice Stevens, however, dissented, finding polygraphy sufficiently reliable to invalidate its per se exclusion.

### 3. The Fourth Amendment

The Fourth Amendment raises some particularly interesting questions. It provides, of course, that,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

On the one hand, an involuntary neuroscience examination would seem to be a search or seizure, and thus "unreasonable" neuroscience examinations are prohibited. To that extent, the Fourth Amendment would appear to be a protection against compulsory neuroscience testing.

On the other hand, if, say, an fMRI scan or an EEG were viewed as a "search or seizure" for purposes of the Fourth Amendment, presumably courts could issue a warrant for such a search or seizure, given probable cause and the relevant procedural requirements. The use of such a warrant might (or might not) be limited by the privilege against self-incrimination or by some constitutional privacy right, but, if such rights did not apply, would such warrants allow our brains to be searched? This is, in a way, the ultimate result of the revolution in neuroscience, which identifies our incorporeal "mind" with our physical "brain" and allows us to begin to draw inferences from the brain to the mind. If the brain is a physical thing or a place, it could be searchable, even if the goal in searching it is to find out something about the mind, something that, as a practical matter, had never itself been directly searchable.

# VI. Examples of the Possible Uses of Neuroscience in the Courts

Neuroscience may end up in court wherever someone's mental state or condition is relevant, which means it may be relevant to a vast array of cases. There are very few cases, civil or criminal, where the mental states of the parties are not at least theoretically relevant on issues of competency, intent, motive, recklessness, negligence, good or bad faith, or others. And even if the parties' own mental states were not relevant, the mental states of witnesses almost always will be potentially relevant—are they telling the truth? Are they biased against one party or another? The mental states of jurors and even of judges occasionally may be called into question.

There are some important limitations on the use of neuroscience in the courtroom. First, it is unlikely to be used that often, particularly if it remains expensive.

EXHIBIT C

*Reference Guide on Neuroscience*

With the possible exception of lie detection or bias detection, most cases will not present a practical use for it. The garden variety breach of contract or assault and battery is not likely to provide a plausible context for convincing neuroscience evidence, especially if there is no evidence that the actor or the actions were odd or bizarre. And many cases will not provide, or justify, the resources necessary for a scan. Those costs could come down, but it seems unlikely that such evidence would commonly be admitted without expert testimony, and the costs of that seem likely to remain high.

Second, neuroscience evidence usually has a "time machine" problem. Neuroscience seems unlikely ever to be able to discern a person's state of mind in the past. Unless the legally relevant action took place inside an MRI scanner or other neuroscience tool, the best it may be able to do is to say that, based on your current mental condition or state, as shown by the current structure or functioning of your brain, you are more or less likely than average to have had a particular mental state or condition at the time of the relevant event. If the time of the relevant event is the time of trial (or shortly before trial)—as would be the case with the truthfulness of testimony, the existence of bias, or the existence of a particular memory—that would not be a problem, but otherwise it would be.

Nonetheless, neuroscience evidence seems likely to be offered into evidence for several issues, and in many of them, it already has been offered and even accepted. In some cases it will be, and has been, offered as evidence of "legislative facts," of realities relevant to a broader legal issue than the mental state of any particular party or witness. Thus, amicus briefs in two Supreme Court cases involving the punishment of juveniles—one about capital punishment and one about life imprisonment without possibility of parole—and to some extent the Court itself, have discussed neuroscience findings about adolescent brains.[46] Three of

---

46. In *Roper v. Simmons,* 543 U.S. 551 (2005), the Court held that the death penalty could not constitutionally be imposed for crimes committed while a defendant was a juvenile. Two amicus briefs argued that behavioral and neuroscience evidence supported this position. *See* Brief of Amicus Curiae American Medical Association et al., *Roper v. Simmons*; and Brief of Amicus Curiae American Psychological Association and the Missouri Psychological Association Supporting Respondent (No. 03-633).

In *Roper,* the Court itself did not substantially rely on the neuroscientific evidence and does not cite those amicus briefs. The Court's opinion noted the scientific evidence only in passing as one part of three relevant differences between adults and juveniles: "First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' [citation omitted]" 543 U.S. at 569. Justice Scalia, however, did take the majority to task for even this limited invocation of science and sociology. 543 U.S. at 616–18.

In *Graham v. Florida,* 2010 U.S. Lexis 3881, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), the Court held that defendants could not be sentenced to life without the possibility of parole for nonhomicide crimes committed while they were juveniles. Two amicus briefs similar to those discussed in *Roper* were filed. *See* Brief of Amicus Curiae American Medical Association (No. 08-7412) and Brief Amicus Curiae American Academy of Child & Adolescent Psychiatry (No. 08-7621) Supporting Neither

EXHIBIT C

*Reference Manual on Scientific Evidence*

the handful of published cases in which fMRI evidence was offered in court con-cerned challenges to state laws requiring warning labels on violent videogames.[47] The states sought, without success, to use fMRI studies of the effects of violent videogames on the brains of children playing the games to support their statutes.[48]

These "wholesale" uses of neuroscience may (or may not) end up affect-ing the law, but the courts would be more affected if various "retail" uses of neuroscience become common, where a party or a witness is subjected to neuro-science procedures to determine something relevant only to that particular case. An incomplete list of some of the most plausible categories for such retail uses includes the following:

- Issues of responsibility, certainly criminal and likely also civil;
- Predicting future behavior for sentencing;
- Mitigating (or potentially aggravating) factors on sentencing;

Party; and Brief of Amicus Curiae American Psychological Association et al. Supporting Petitioners (Nos. 08-7412, 08-7621). The Court did refer more directly to the scientific findings in *Graham*, directly citing the amicus briefs:

> "No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." *See* Brief for American Medical Association et al. as Amici Curiae 16–24; Brief for American Psychological Association et al. as Amici Curiae 22–27.

Justice Thomas, in a dissent joined by Justice Scalia, reviewed some of the evidence from these amicus briefs:

> "In holding that the Constitution imposes such a ban, the Court cites 'developments in psychology and brain science' indicating that juvenile minds 'continue to mature through late adolescence,' *ante*, at 17 (citing Brief for American Medical Association et al. as *Amici Curiae* 16–24; Brief for American Psychological Association et al. as *Amici Curiae* 22–27 (hereinafter APA Brief)), and that juveniles are 'more likely [than adults] to engage in risky behaviors,'" *id*. at 7. But even if such generalizations from social science were relevant to constitutional rulemaking, the Court misstates the data on which it relies.

47. Entm't Software Ass'n v. Hatch, 443 F. Supp. 2d 1065 (D. Minn. 2006); Entm't Software Ass'n v. Blagojevich, 404 F. Supp. 2d 1051 (N.D. Ill. 2005); Entm't Software Ass'n v. Granholm, 404 F. Supp. 2d 978 (E.D. Mich. 2005). Each of the three courts held that the state statutes violated the First Amendment.

48. The courts, sitting in equity and so without juries, all considered the scientific evidence and concluded that it was insufficient to sustain the statutes' constitutionality. In *Blagojevich* the court heard testimony for the state directly from Dr. Kronenberger, the author of some of the fMRI-based articles on which the state relied, as well from Dr. Howard Nusbaum, for the plaintiffs, who attacked Dr. Kronenberger's study. After a substantial discussion of the scientific arguments, the district court judge, Judge Matthew Kennelly, found that "Dr. Kronenberger's studies cannot support the weight he attempts to put on them via his conclusions," and did not provide a basis for the statute. *Blagojevich*, 404 F. Supp. at 1063–67. Judge Kennelly's discussion of this point may be a good example of the kind of analysis neuroscience evidence may force upon judges.

EXHIBIT C

*Reference Guide on Neuroscience*

- Competency, now or in the past, to take care of one's affairs, to enter into agreements or make wills, to stand trial, to represent oneself, and to be executed;
- Deception in current statements;
- Existence or nonexistence of a memory of some event and, possibly, some information about the status of that memory (true, false; new, old, etc.);
- Presence of the subjective sensation of pain;
- Presence of the subjective sensation of remorse; and
- Presence of bias against a party.

Many, but not all, of these issues have begun to be discussed in the literature. A few of them, such as criminal responsibility, mitigation, memory detection, and lie detection, are appearing in courtrooms; others, such as pain detection, have reached the edge of trial. This chapter does not discuss all of these topics and does not discuss any of them in great depth, but it will describe three of them—criminal responsibility, detection of pain, and lie detection—in order to provide a flavor of the possibilities.

## A. Criminal Responsibility

Neuroscience may raise some deep questions about criminal responsibility. Assume we had excellent scientific evidence that a defendant could not help but commit the criminal acts because of a specific brain abnormality?[49] Should that affect the defendant's guilt and, if so, how? Should it affect his sentence or other subsequent treatment? The moral questions may prove daunting. Currently the law is not very interested in such deep questions of free will, but that may change.

Already, though, criminal law is concerned with the mental state of the defendant in many more specific contexts. A conviction generally requires both an *actus reus* and a *mens rea*—a "guilty act" and a "guilty mind." An unconscious person cannot "act," but even a conscious act is often not enough. Specific crimes often require specific intents, such as acting with a particular purpose or in a knowing or reckless fashion. Some crimes require even more defined mental states, such as a requirement for premeditation in some murder statutes. And almost all crimes can be excused by legal insanity. In these and other ways the mental state of the defendant may be relevant to a criminal case.

Neuroscience may provide evidence in some cases to support a defendant's claim of nonresponsibility. For example, a defendant who claims to have been insane at the time of the crime might try to support his or her claim by alleging that he or she is seeing and hearing hallucinations. Neuroimaging may be able

---

49. *See* Henry T. Greely, *Neuroscience and Criminal Responsibility Proving "Can't Help Himself" as a Narrow Bar to Criminal Liability, in* Law and Neuroscience, Current Legal Issues 13 (Michael Freeman ed. 2011).

799

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

to provide some evidence about whether the defendant is, in fact, hallucinating, at least at the time when he or she is in the scanner. Such imaging might show that the defendant had a stroke or tumor in a particular part of the brain, which then could be used to argue in some way against the defendant's criminal responsibility.[50]

Neuroimaging has been used more broadly in some criminal cases. For example, as noted above, in the trial of John Hinckley for the attempted assassination of President Reagan, the defense used CAT scans of Hinckley's brain to support the argument, based largely on his bizarre behavior, that he suffered from schizophrenia. The scientific basis for that conclusion, offered early in the history of brain CAT scans, was questionable at the time and has become even weaker since, but Hinckley was found not guilty by reason of insanity. More recently, in November 2009, testimony about an fMRI scan was introduced in the penalty phase of a capital case as mitigating evidence that the defendant suffered from psychopathy. The defendant was sentenced to death, but after longer jury deliberations than defense counsel expected.[51] (This appears to have been the first time fMRI results were introduced in a criminal case.[52])

Neuroscience evidence also may be relevant in wider arguments about criminal justice. Evidence about the development of adolescent brains has been referred to in appellate cases concerning the punishments appropriate for people who committed crimes while under age, including, as noted above, U.S. Supreme Court decisions. More broadly, some have urged that neuroscience will undercut much of the criminal justice system. The argument is that neuroscience ultimately will prove that no one—not even the sanest defendant—has free will and that this will fatally weaken the retributive aspect of criminal justice.[53]

---

50. In at least one fascinating case, a man who was convicted of sexual abuse of a child was found to have a large tumor pressing into his brain. When the tumor was removed, his criminal sexual impulses disappeared. When his impulses returned, so had his tumor. The tumor was removed a second time and, again, his impulses disappeared. J.M. Burns & R.H. Swerdlow, *Right Orbitofrontal Tumor with Pedophilia Symptom and Constructional Apraxia Sign*, 60 Arch. Neurology 437 (2003); *Doctors Say Pedophile Lost Urge After Tumor Removed*, USA Today, July 28, 2003. *See* Greely, *Neuroscience and Criminal Responsibility*, *supra* note 49 (offering a longer discussion of this case).

51. The defendant in this Illinois case, Brian Dugan, confessed to the murder but sought to avoid the death penalty. *See* Virginia Hughes, *Head Case*, 464 Nature 340 (2010) (providing an excellent discussion of this case).

52. Other forms of neuroimaging, particularly PET and structural MRI scans, have been more widely used in criminal cases. Dr. Amos Gur at the University of Pennsylvania estimates that he has used neuroimaging in testimony for criminal defendants about 30 times. *Id*.

53. *See, e.g.*, Robert M. Sapolsky, *The Frontal Cortex and the Criminal Justice System*, *in* Law and the Brain (Semir Zeki & Oliver Goodenough eds., 2006); Joshua Greene & Jonathan Cohen, *For the Law, Neuroscience Changes Nothing and Everything*, in Law and the Brain (Semir Zeki & Oliver Goodenough eds., 2006).

This argument has been forcefully attacked by Professor Stephen Morse. *See*, *e.g*., Stephen J. Morse, *Determinism and the Death of Folk Psychology: Two Challenges to Responsibility from Neuroscience*, 9 Minn. J.L. Sci. & Tech. 1 (2008); Stephen J. Morse, *The Non-Problem of Free Will in Forensic Psychiatry*

EXHIBIT C

*Reference Guide on Neuroscience*

The application of neuroscience evidence to individual claims of a lack of criminal responsibility should prove challenging.[54] Such claims will suffer from the time machine problem—the brain scan will almost always be from after, usually long after, the crime was committed and so cannot directly show the defendant's brain state (and hence, by inference, his or her mental state) at or before the time of the crime. Similarly, most of the neuroscience evidence will be from associations, not from experiments. It is hard to imagine an ethical experiment that would scan people when they are, or are not, committing particular crimes, leaving only indirect experiments. Evidence that, for example, more convicted rapists than nonrapists had particular patterns of brain activation when viewing sexual material might somehow be relevant to criminal responsibility, but it also might not.

Careful neuroscience studies, either structural or functional, of the brains of criminals are rare. It seems highly unlikely that a "responsibility region" will ever be found, one that is universally activated in law-abiding people and that is deactivated in criminals (or vice versa). At most, the evidence is likely to show that people with particular brain structures or patterns of brain functioning commit crimes more frequently than people without such structures or patterns. Applying this group evidence to individual cases will be difficult, if not impossible. All of the problems of technical and statistical analysis of neuroimaging data, discussed in Section IV, apply. And it is possible that the to-be-scanned defendants will be able to implement countermeasures to "fool" the expert analyzing the scan.

The use of neuroscience to undermine criminal responsibility faces another problem—identifying a specific legal argument. It is not generally a defense to a criminal charge to assert that one has a predisposition to commit a crime, or even a very high statistical likelihood, as a result of social and demographic variables, of committing a crime. It is not clear whether neuroscience would, in any more than a very few cases,[55] provide evidence that was not equivalent to predisposition evidence. (And, of course, prudent defense counsel might think twice before presenting evidence to the jury that his or her client was strongly predisposed to commit crimes.)

We are at an early stage in our understanding of the brain and of the brain states related to the mental states involved in criminal responsibility. At this point, about all that can be said is that at least some criminal defense counsel, seeking to represent their clients zealously, will watch neuroscience carefully for arguments they could use to relieve their clients from criminal responsibility.

*and Psychology*, 25 Behav. Sci. & L. 203 (2007); Stephen J. Morse, *Moral and Legal Responsibility and the New Neuroscience*, *in* Neuroethics: Defining the Issues in Theory, Practice, and Policy (Judy Illes ed., 2006); Stephen J. Morse, *Brain Overclaim Syndrome and Criminal Responsibility: A Diagnostic Note*, 3 Ohio St. J. Crim. L. 397 (2005).

54. A good short discussion of these challenges can be found in Helen Mayberg, *Does Neuroscience Give Us New Insights into Criminal Responsibility? in* A Judge's Guide to Neuroscience, *supra* note 1.

55. *See* Greely, *Neuroscience and Criminal Responsibility*, *supra* note 49 (arguing for a very narrow neuroscience-based defense).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## B. *Lie Detection*

The use of neuroscience methods for lie detection probably has received more attention than any other issue raised in this chapter.[56] This is due in part to the cultural interest in lie detection, dating back in its technological phase nearly 90 years to the invention of the polygraph.[57] But it is also due to the fact that two commercial firms currently are offering fMRI–based lie detection services for sale in the United States: Cephos and No Lie MRI.[58] Currently, as far as we know,

56. For a technology whose results have yet to be admitted in court, the legal and ethical issues raised by fMRI–based lie detection have been discussed in an amazingly long list of scholarly publications from 2004 to the present. An undoubtedly incomplete list follows: Nita Farahany, *supra* note 27; Brown & Murphy, *supra* note 20; Anthony D. Wagner, *supra* note 12; Frederick Schauer, *Can Bad Science Be Good Evidence?: Neuroscience, Lie-Detection, and the Mistaken Conflation of Legal and Scientific Norms,* 95 Cornell L. Rev. 1191 (2010); Frederick Schauer, *Neuroscience, Lie-Detection, and the Law: A Contrarian View,* 14 Trends Cog. Sci. 101 (2010); Emilio Bizzi et al., Using Imaging to Identify Deceit: Scientific and Ethical Questions (2009); Joelle Anne Moreno, *The Future of Neuroimaged Lie Detection and the Law,* 42 Akron L. Rev. 717 (2009); Julie Seaman, *Black Boxes: fMRI Lie Detection and the Role of the Jury*, 42 Akron L. Rev. 931 (2009); Jane Campbell Moriarty, *Visions of Deception: Neuroimages and the Search for Truth*, 42 Akron L. Rev. 739 (2009); Dov Fox, *supra* note 27; Benjamin Holley, *It's All in Your Head: Neurotechnological Lie Detection and the Fourth and Fifth Amendments,* 28 Dev. Mental Health L. 1 (2009); Brian Reese, *Comment: Using fMRI as a Lie Detector—Are We Lying to Ourselves?* 19 Alb. L.J. Sci. & Tech. 205 (2009); Cooper Ellenberg, Student Article: *Lie Detection: A Changing of the Guard in the Quest for Truth in Court?* 33 Law & Psychol. Rev. 139 (2009); Julie Seaman, *Black Boxes*, 58 Emory L.J. 427 (2008); Matthew Baptiste Holloway, *supra* note 27; William Federspiel, *supra* note 27; Greely & Illes, *supra* note 28; Sarah E. Stoller & Paul R. Wolpe, *supra* note 27; Mark Pettit, *FMRI and BF Meet FRE: Braining Imaging and the Federal Rules of Evidence*, 33 Am. J.L. & Med. 319 (2007); Jonathan H. Marks, *Interrogational Neuroimaging in Counterterrorism: A "No-Brainer" or a Human Rights Hazard?* 33 Am. J.L. & Med. 483 (2007); Leo Kittay, *Admissibility of fMRI Lie Detection: The Cultural Bias Against "Mind Reading" Devices*, 72 Brook. L. Rev. 1351, 1355 (2007); Jeffrey Bellin, *The Significance (if Any) for the Federal Criminal Justice System of Advances in Lie Detector Technology*, Temp. L. Rev. 711 (2007); Henry T. Greely, *The Social Consequences of Advances in Neuroscience: Legal Problems; Legal Perspectives*, *in* Neuroethics: Defining the Issues in Theory, Practice and Policy 245 (Judy Illes ed., 2006); Charles N.W. Keckler, *Cross-Examining the Brain: A Legal Analysis of Neural Imaging for Credibility Impeachment*, 57 Hastings L.J. 509 (2006); Archie Alexander, *Functional Magnetic Resonance Imaging Lie Detection: Is a "Brainstorm" Heading Toward the "Gatekeeper"?* 7 Hous. J. Health L. & Pol'y (2006); Michael S. Pardo, *supra* note 27; Erich Taylor, *supra* note 27; Paul R. Wolpe et al., *Emerging Neurotechnologies for Lie-Detection: Promises and Perils*, 5 Am. J. Bioethics 38, 42 (2005); Henry T. Greely, *Premarket Approval Regulation for Lie Detection: An Idea Whose Time May Be Coming*, 5 Am. J. Bioethics 50–52 (2005); Sean Kevin Thompson, Note: *The Legality of the Use of Psychiatric Neuroimaging in Intelligence Interrogation,* 90 Cornell L. Rev. 1601 (2005); Henry T. Greely, *Prediction, Litigation, Privacy, and Property: Some Possible Legal and Social Implications of Advances in Neuroscience*, *in* Neuroscience and the Law: Brain, Mind, and the Scales of Justice 114–56 (Brent Garland ed., 2004); and Judy Illes, *A Fish Story? Brain Maps, Lie Detection, and Personhood*, 6 Cerebrum 73 (2004).

57. An interesting history of the polygraph can be found in Ken Alder, The Lie Detectors: The History of an American Obsession (2007). Perhaps the best overall discussion of the polygraph, including some discussion of its history, is found in the National Research Council report, *supra* note 14, commissioned in the wake of the Wen Ho Lee case, on the use of the technology for screening.

58. The Web sites for the two companies are at Cephos, www.cephoscorp.com (last visited July 3, 2010); and No Lie MRI, http://noliemri.com (last visited July 3, 2010).

EXHIBIT C

*Reference Guide on Neuroscience*

evidence from fMRI-based lie detection has not been admitted into evidence in any court, but it was offered—and rejected—in two cases, *United States v. Semrau*[59] and *Wilson v. Corestaff Services, L.P.,*[60] in May 2010.[61] This section will begin by analyzing the issues raised for courts by this technology and then will discuss these two cases, before ending with a quick look at possible uses of this kind of technology outside the courtroom.

### 1. Issues involved in the use of fMRI-based lie detection in litigation

Published research on fMRI and detecting deception dates back to about 2001.[62] As noted above, to date between 20 and 30 peer-reviewed articles from about 15 laboratories have appeared claiming to find statistically significant correlations between patterns of brain activation and deception. Only a handful of the published studies have looked at the accuracy of determining deception in individual subjects as opposed to group averages. Those studies generally claim accuracy rates of between about 75% and 90%. No Lie MRI has licensed the methods used by one laboratory, that of Dr. Daniel Langleben at the University of Pennsylvania; Cephos has licensed the method used by another laboratory, that of Dr. Frank A. Kozel, first at the Medical University of South Carolina and then at the University of Texas Southwestern Medical Center. (The method used by a British researcher, Dr. Sean Spence, has been used on a British reality television show.)

All of these studies rely on research subjects, typically but not always college students, who are recruited for a study of deception. They are instructed to answer some questions truthfully in the scanner and to answer other questions inaccurately.[63] In the Langleben studies, for example, right-handed, healthy, male

59. No. 07-10074 M1/P, Report and Recommendation (W.D. Tenn. May 31, 2010).

60. 2010 NY slip op. 20176, 1 (N.Y. Super. Ct. 2010); 900 N.Y.S.2d 639; 2010 N.Y. Misc. LEXIS 1044 (2010).

61. In early 2009, a motion to admit fMRI-based lie detection evidence, provided by No Lie MRI, was made, and then withdrawn, in a child custody case in San Diego. The case is discussed in a prematurely entitled article, Alexis Madrigal, *MRI Lie Detection to Get First Day in Court*, WIRED SCI. (Mar. 16, 2009), *available at* http://blog.wired.com/wiredscience/2009/03/noliemri.html (last visited July 3, 2010). A somewhat similar method of using EEG to look for signs of "recognition" in the brain was admitted into one state court hearing for postconviction relief at the trial court level in Iowa in 2001, and both it and another EEG-based method have been used in India. As far as we know, evidence from the use of EEG for lie detection has not been admitted in any other U.S. cases. *See supra* note 28.

62. The most recent reviews of the scientific literature on this subject are Anthony D. Wagner, *supra* note 12; and S.E. Christ et al., *The Contributions of Prefrontal Cortex and Executive Control to Deception: Evidence from Activation Likelihood Estimate Meta-Analyses*, 19 Cerebral Cortex 2557 (2009). *See also* Greely & Illes, *supra* note 28 (for discussion of the articles through early 2007). The following discussion is based largely on those sources.

63. At least one fMRI study has attempted to investigate self-motivated lies, told by subjects who were *not* instructed to lie, but who chose to lie for personal gain. Joshua D. Greene & Joseph M. Paxton, *Patterns of Neural Activity Associated with Honest and Dishonest Moral Decisions*, 106 Proc. Nat'l Acad. Sci. 12,506 (2009). The experiment was designed to make it easy for subjects to realize they

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

University of Pennsylvania undergraduates were shown images of playing cards while in the scanner and asked to indicate whether they saw a particular card. They were instructed to answer truthfully except when they saw one particular card. Some of Kozel's studies used a different experimental paradigm, in which the subjects were put in a room and told to take either a watch or a ring. When asked in the scanner separately whether they had taken the watch and then whether they had taken the ring, they were to reply "no" in both cases—truthfully once and falsely the other time. When analyzed in various ways, the fMRI results showed statistically different patterns of brain activation (small changes in BOLD response) when the subjects were lying and when they were telling the truth.

In general, these studies are not guided by a consistent hypothesis about which brain regions should be activated or deactivated during truth or deception. The results are empirical; they see particular patterns that differ between the truth state and the lie state. Some have argued that the patterns show greater mental effort when deception is involved; others have argued that they show more impulse control when lying.

Are fMRI-based lie detection methods accurate? As a class of experiments, these studies are subject to all the general problems discussed in Section IV regarding fMRI scans that might lead to neuroscience evidence. So far there are only a few studies involving a limited number of subjects. (The method used by No Lie MRI seems ultimately to have been based on the responses of four right-handed, healthy, male University of Pennsylvania undergraduates.[64]) There have been, to date, no independent replications of any group's findings.

The experience of the research subjects in these fMRI studies of deception seems to be different from "lying" as the court system would perceive it. The subjects knew they were involved in research, they were following orders to lie, and they knew that the most harm that could come to them from being detected in a lie might be lesser payment for taking part in the experiment. This seems hard to compare to a defendant lying about participating in a murder. More fundamentally, it is not clear how one could conduct ethical but realistic experiments with lie detection. Research subjects cannot credibly be threatened with jail if they do not convince the researcher of the truth of their lies.

Only a handful of researchers have published studies showing reported accuracy rates with individual subjects and only with a small number of subjects.[65]

would be given more money if they lied about how many times they correctly predicted a coin flip. Investigators could not, however, determine if a subject lied in any particular trial.

64. Daniel D. Langleben et al., *Telling Truth from Lie in Individual Subjects with Fast Event-Related fMRI,* 26 Hum. Brain Mapping 262, 267 (2005).

65. See discussion in Anthony D. Wagner, *supra* note 12, at 29–35. Wagner analyzes 11 peer-reviewed, published papers. Seven come from Kozel's laboratory; three come from Langleben's. The only exception is a paper from John Cacciopo's group, which concludes " [A]lthough fMRI may permit investigation of the neural correlates of lying, at the moment it does not appear to provide a very accurate marker of lying that can be generalized across individuals or even perhaps across types

EXHIBIT C

*Reference Guide on Neuroscience*

Some of the studies used complex and somewhat controversial statistical techniques. And although subjects in at least one experiment were invited to try to use countermeasures against being detected, no specific countermeasures were tested.

Beyond the scientific validity of these techniques lie a host of legal questions. How accurate is accurate enough for admissibility in court or for other legal system uses? What are the implications of admissible and accurate lie detection for the Fourth, Fifth, Sixth, and Seventh Amendments? Would jurors be allowed to consider the failure, or refusal, of a party to take a lie detector test? Would lie detection be available in discovery? Would each side get to do its own tests—and who would pay?

Accurate lie detection could make the justice system much more accurate. Incorrect convictions might become rare; so might incorrect acquittals. Accurate lie detection also could make the legal system much more efficient. It seems likely that far fewer cases would go to trial if the witnesses could expect to have their veracity accurately determined.

Inaccurate lie detection, on the other hand, holds the potential of ruining the innocent and immunizing the guilty. It is at least daunting to remember some of the failures of the polygraph, such as the case of Aldrich Ames, a Soviet (and then Russian) mole in the Central Intelligence Agency, who passed two Agency polygraph tests while serving as a paid spy.[66] The courts already have begun to decide whether and how to use these new methods of lie detection in the judicial process; the rest of society also will soon be forced to decide on their uses and limits.

## *2. Two cases involving fMRI-based lie detection*

On May 31, 2010, U.S. Magistrate Judge Tu M. Pham of the Western District of Tennessee issued a 39-page report and recommendation on the prosecution's motion to exclude evidence from an fMRI-based lie detection report by Cephos in the case of *United States v. Semrau*.[67] The report came after a hearing on May 13–14 featuring testimony from Steve Laken, CEO of Cephos, for admission, and from two experts arguing against admission. (The district judge adopted the magistrate's report during the trial.)

The defendant in this case, a health professional accused of defrauding Medicare, offered as evidence a report from Cephos stating that he was being truthful

of lies by the same individuals." G. Monteleone et al., *Detection of Deception Using fMRI: Better Than Chance, But Well Below Perfection*, 4 Soc. Neurosci. 528 (2009). However, that study only looked at one brain region at a time, and it did not test combinations or patterns, which might have improved the predictive power.

66. *See* Senate Select Committee on Intelligence, Assessment of the Aldrich H. Ames Espionage Case and Its Implications for U.S. Intelligence (1994).

67. *See supra* note 59. The district court judge assigned to the case had a scheduling conflict on the date of the hearing on the prosecution's motion, and so the hearing was held before a magistrate judge from that district.

**EXHIBIT C**

when he answered a set of questions about his actions and knowledge concerning the alleged crimes.

Judge Pham first analyzed the motion under Rule 702, using the *Daubert* criteria. He concluded that the technique was testable and had been the subject of peer-reviewed publications. On the other hand, he concluded that the error rates for its use in realistic situations were unknown. Furthermore, he found there were no standards for its appropriate use. To the extent that the publications relied on by Cephos to establish its reliability constituted such standards, those standards had not actually been followed in the tests of the defendant. Cephos actually scanned Dr. Semrau 2 times on 1 day, asking questions about one aspect of the criminal charges during the first scan and then about another aspect in the second scan. The company's subsequent analysis of those scans indicated that the defendant had been truthful in the first scan but deceptive in the second scan. Cephos then scanned him a third time, several days later, on the second subject but with revised questions, and concluded that he was telling the truth that time. Nothing in the publications relied upon by Cephos indicated that the third scan was appropriate. Finally, Judge Pham found that the method was not generally accepted in the relevant scientific community as sufficiently reliable for use in court, citing several publications, including some written by the authors whose methods Cephos used.

The magistrate judge then examined the motion under Rule 403 and found that the potential prejudicial effect of the evidence outweighed its probative value. He noted that the test had been conducted without the government's knowledge or participation, in a context where the defendant risked nothing by taking the test—a negative result would never be disclosed. He noted the jury's central role in determining credibility and considered the likelihood that the lie detection evidence would be a lengthy and complicated distraction from the jury's central mission. Finally, he noted that the probative value of the evidence was greatly reduced because the report only gave a result concerning the defendant's general truthfulness when responding to more than 10 questions about the events but did not even purport to say whether the defendant was telling the truth about any particular question.

Earlier that month, a state trial court judge in Brooklyn excluded another Cephos lie detection report in a civil case, *Wilson v. Corestaff Services, L.P.*[68] This case involved a claim by a former employee under state law that she had been subject to retaliation for reporting sexual harassment. The plaintiff offered evidence from a Cephos report finding that her main witness was truthful when he described how defendant's management said it would retaliate against the plaintiff.

That case did not involve an evidentiary hearing or, indeed, any expert testimony. The judge decided the lie detection evidence was not appropriate under New York's version of the *Frye* test, noting that, in New York, "courts have advised that the threshold question under *Frye* in passing on the admissibility

---

68. Wilson v. Corestaff Services, L.P., *supra* note 60.

**EXHIBIT C**

of expert's testimony is whether the testimony is 'within the ken of the typical juror.'"[69] Because credibility is a matter for the jury, the judge concluded that this kind of evidence was categorically excluded under New York's version of *Frye*. He also noted that "even a cursory review of the scientific literature demonstrates that the plaintiff is unable to establish that the use of the fMRI test to determine truthfulness or deceit is accepted as reliable in the relevant scientific community."[70]

### 3. fMRI-based lie detection outside the courtroom

Lie detection might have applications to litigation without ever being introduced in trials. As is the case today with the polygraph, the fact that it is not generally admissible in court might not stop the police or the prosecutors from using it to investigate alleged crimes. Similarly, defense counsel might well use it to attempt to persuade the authorities that their clients should not be charged or should be charged with lesser offenses. One could imagine the same kinds of pretrial uses of lie detection in civil cases, as the parties seek to affect each other's perceptions of the merits of the case.

Such lie detection efforts could also affect society, and the law, outside of litigation. One could imagine prophylactic lie detection at the beginning of contractual relations, seeking to determine whether the other side honestly had the present intention of complying with the contract's terms. One can also imagine schools using lie detection as part of investigations of student misconduct or parents seeking to use lie detection on their children. The law more broadly may have to decide whether and how private actors can use lie detection, determining whether, for example, to extend to other contexts—or to weaken or repeal—the Employee Polygraph Protection Act.[71]

The current fMRI-based methods of lie detection provide one kind of protection for possible subjects—they are obvious. No one is going to be put into an MRI for an hour and asked to respond, repeatedly, to questions without realizing something important is going on. Should researchers develop less obtrusive or obvious methods of neuroscience-based lie detection, we will have to deal with the possibilities of involuntary and, indeed, surreptitious lie detection.

## C. Detection of Pain

No matter where an injury occurs and no matter where it seems to hurt, pain is felt in the brain.[72] Without sensory nerves leading to the brain from a body

---

69. *Id.* at 6, *citing* People v. Cronin, 60 N.Y.2d 430, 458 N.E.2d 351, 470 N.Y.S.2d 110 (1983).

70. *See* Wilson, *supra* note 60, at 7.

71. *See supra* text accompanying note 32.

72. *See* Brain Facts, *supra* note 2, at 19–21, 49–50, which includes a useful brief description of the neuroscience of pain.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

region, there is usually no experience of pain. Without the brain machinery and functioning to process the signal, no pain is perceived.

Pain turns out to be complicated—even the common pain that is experienced from an acute injury to, say, an arm. Neurons near the site of the injury called nociceptors transmit the pain signal to the spinal cord, which relays it to the brain. But other neurons near the site of the injury will, over time, adapt to affect the pain signal. Cells in the spinal cord can also modulate the pain signal that is sent to the brain, making it stronger or weaker. The brain, in turn, sends signals down to the spinal cord that cause or, at least, affect these modulations. And the actual sensation of pain—the "ouch"—takes place in the brain.

The immediate and localized sensation is processed in the somatosensory cortex, the brain region that takes sensory inputs from different body parts (with each body part getting its own portion of the somatosensory cortex) and processes them into a perceived sensation. The added knowledge that the sensation is painful seems to require the participation of other regions of the brain. Using fMRI and other techniques, some researchers have identified what they call the "pain matrix" in the brain, regions that are activated when experimental subjects, in scanners, are exposed to painful stimuli. The brain regions identified as part of the so-called pain matrix vary from researcher to researcher, but generally include the thalamus, the insula, parts of the anterior cingulate cortex, and parts of the cerebellum.[73]

Researchers have run experiments with subjects in the scanner receiving painful or not painful stimuli and have attempted to find activation patterns that appear when pain is perceived and that do not appear when pain is absent. (The subjects usually are given nonharmful painful stimuli such as having their skin touched with a hot metal rod or coated with a pepper-derived substance that causes a burning sensation.) Some have reported substantial success, detecting pain in more than 80% of the cases.[74] Other studies have found a positive correlation between the degree of activation in the pain matrix and the degree of subjective pain, both as reported by the subject and as possibly indicated by the heat of the rod or the amount of the painful substance—the higher the temperature or the concentration of the painful substance, the greater the average activation in the pain matrix.[75]

Other neuroscience studies of individual pain look not at brain function during painful episodes but at brain structure. Some researchers, for example, claim that different regions of the brain have different average size and neuron densities

---

73. A good review article on the uses of fMRI in studying pain is found in David Borsook & Lino R. Becerra, *Breaking Down the Barriers: fMRI Applications in Pain, Analgesia and Analgesics,* 2 Molecular Pain 30 (2006).

74. *See, e.g.,* Irene Tracey, *Imaging Pain*, 101 Brit J. Anaesth. 32 (2008).

75. *See, e.g.,* Robert C. Coghill et al., *Neural Correlates of Interindividual Differences in the Subjective Experience of Pain*, 100 Proc. Nat'l Acad. Sci. 8538 (2003).

**EXHIBIT C**

*Reference Guide on Neuroscience*

in patients who have had long-term chronic pain than in those who have not had such pain.[76]

Pain is clearly complicated. Placebos, distractions, or great need can sometimes cause people not to sense, or perhaps not to notice, pain that could otherwise be overwhelming. Similarly, some people can become hypersensitive to pain, reporting severe pain when the stimulus normally would be benign. Amputees with phantom pain—the feeling of pain in a limb that has been gone for years—have been scanned while reporting this phantom pain. They show activation in the pain matrix. In some fMRI studies, people who have been hypnotized to feel pain, even when there is no painful stimulus, show activation in the pain matrix.[77] And in one fMRI study, subjects who reported feeling emotional distress, as a result of apparently being excluded from a "game" being played among research subjects, also showed, on average, statistically significant activation of the pain matrix.[78]

Pain also plays an enormous role in the legal system.[79] The existence and extent of pain is a matter for trial in hundreds of thousands of injury cases each year. Perhaps more importantly, pain figures into uncounted workers' compensation claims and Social Security disability claims. Pain is often difficult to prove, and the uncertainty of a jury's response to claimed pain probably keeps much litigation alive. We know that the tests for pain currently presented to jurors, judges, and other legal decisionmakers are not perfect. Anecdotes of and the assessments by pain experts both are convincing that some nontrivial percentage of successful claimants are malingering and only pretending to feel pain; a much greater percentage may be exaggerating their pain.

A good test for whether a person is feeling pain, and, even better, a "scientific" way to measure the amount of that pain—at least compared to other pains felt by that individual, if not to pain as perceived by third parties—could help resolve a huge number of claims each year. If such pain detection were reliable, it would make justice both more accurate and more certain, leading to faster, and

76. *See, e.g.*, Vania Apkarian et al., *Chronic Back Pain Is Associated with Decreased Prefrontal and Thalamic Gray Matter Density*, 24 J. Neurosci. 10,410 (2004); *see also* Arne May, *Chronic Pain May Change the Structure of the Brain*, 137 Pain 7 (2008); Karen D. Davis, *Recent Advances and Future Prospects in Neuroimaging of Acute and Chronic Pain*, 1 Future Neurology 203 (2006).

77. Stuart W. Derbyshire et al., *Cerebral Activation During Hypnotically Induced and Imagined Pain*, 23 NeuroImage 392 (2004).

78. Naomi I. Eisenberg, *Does Rejection Hurt? An fMRI Study of Social Exclusion*, 302 Science 290 (2003).

79. The only substantial analysis of the legal implications of using neuroimaging to detect pain is found in Adam J. Kolber, *Pain Detection and the Privacy of Subjective Experience*, 33 Am. J.L. & Med. 433 (2007). Kolber expands on that discussion in interesting ways in Adam J. Kolber, *The Experiential Future of the Law*, 60 Emory L.J. 585, 595–601 (2011). The possibility of such pain detection was briefly discussed earlier in two different 2006 publications: Henry T. Greely*, Prediction, Litigation, Privacy, and Property: Some Possible Legal and Social Implications of Advances in Neuroscience*, *supra* note 56, at 141–42; and Charles Keckler, *Cross-Examining the Brain, supra* note 56, at 544.

EXHIBIT C

*Reference Manual on Scientific Evidence*

cheaper, resolution of many claims involving pain. The legal system, as well as the honest plaintiffs and defendants within it, would benefit.

A greater understanding of pain also might lead to broader changes in the legal system. For example, emotional distress often is treated less favorably than direct physical pain. If neuroscience were to show that, in the brain, emotional distress seemed to be the same as physical pain, the law might change. Perhaps more likely, if neuroscience could provide assurance that sincere emotional pain could be detected and faked emotional distress would not be rewarded, the law again might change. Others have argued that even our system of criminal punishment might change if we could measure, more accurately, how much pain different punishments caused defendants, allowing judges to let the punishment fit the criminal, if not the crime.[80] A "pain detector" might even change the practice of medicine in legally relevant ways, by giving physicians a more certain way to check whether their patients are seeking controlled substances to relieve their own pain or whether they are seeking them to abuse or to sell for someone else to abuse.

In at least one case, a researcher who studies the neuroscience of pain was retained as an expert witness to testify regarding whether neuroimaging could provide evidence that a claimant was, in fact, feeling pain. The case settled before the hearing.[81] In another case, a prominent neuroscientist was approached about being a witness against the admissibility of fMRI-based evidence of pain, but, before she had decided whether to take part, the party seeking to introduce the evidence changed its mind. This issue has not, as of the time of this writing, reached the courts yet, but lawyers clearly are thinking about these uses of neuroscience. (And note that in some administrative contexts, the evidentiary rules will not apply in their full rigor, possibly making the admission of such evidence more likely.)

Do either functional or structural methods of detecting pain work and, if so, how well? We do not know. These studies share many of the problems outlined in Section IV. The studies are few in number, with few subjects (and usually sets of subjects that are not very diverse). The experiments—usually involving giving college students a painful stimulus—are different from the experience of, for example, older people who claim to have low back pain. Independent replication is rare, if it exists at all. The experiments almost always report that, on average, the group shows a statistically significant pattern of activation that differs depending on whether they are receiving the painful stimulus, but the group average does not in itself tell us about the sensitivity or specificity of such a test when applied to individuals. And the statistical and technical issues are daunting.

In the area of pain, the issue of countermeasures may be the most interesting, particularly in light of the experiments conducted with hypnotized subjects. Does remembered pain look the same in an fMRI scan as currently experienced

---

80. Adam J. Kolber, *How to Improve Empirical Dessert*, 75 Brook. L. Rev. 429 (2009).
81. Greg Miller, *Brain Scans of Pain Raise Questions for the Law*, 323 Science 195 (2009).

**EXHIBIT C**

*Reference Guide on Neuroscience*

pain? Does the detailed memory of a kidney stone pain look any different from the present sensation of low back pain? Can a subject effectively convince himself that he is feeling pain and so appear to the scanner to be experiencing pain? The answers to these questions are clear—we do not yet know.

Pain detection also would raise legal questions. Could a plaintiff be forced to undergo a "pain scan"? If a plaintiff offered a pain scan in evidence, could the defendant compel the plaintiff to undergo such a scan with the defendant's machine and expert? Would it matter if the scan were itself painful or even dangerous? Who would pay for these scans and for the experts to interpret them?

Detecting pain would be a form of neuroscience evidence with straightforward and far-reaching applications to the legal system. Whether it can be done, and, if so, how accurately it can be done, remain to be seen. So does the legal system's reaction to this possibility.

# VII. Conclusion

Atomic physicist Niels Bohr is credited with having said "It is always hard to predict things, especially the future."[82] It seems highly likely that the massively increased understanding of the human brain that neuroscience is providing will have significant effects on the law and, more specifically, on the courts. Just what those effects will be cannot be accurately predicted, but we hope that this guide will provide some useful background to help judges cope with whatever neuroscience evidence comes their way.

---

82. This quotation has been attributed to many people, especially Yogi Berra, but Bohr seems to be the most likely candidate, even though it does not appear in anything he published. See discussion in Henry T. Greely, *Trusted Systems and Medical Records: Lowering Expectations*, 52 Stan. L. Rev. 1585, 1591–92 n.9 (2000). One of the authors, however, recently had a conversation with a scientist from Denmark, who knew the phrase (in Danish) as an old Danish saying and not something original with Bohr.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

# References on Neuroscience

Fundamental Neuroscience (Larry R. Squire et al. eds., 3d ed. 2008).
Eric R. Kandel et al., Principles of Neural Science (4th ed. 2000).
The Cognitive Neurosciences (Michael S. Gazzaniga ed., 4th ed. 2009).

**EXHIBIT C**

# Reference Guide on Mental Health Evidence

PAUL S. APPELBAUM

*Paul S. Appelbaum, M.D., is the Elizabeth K. Dollard Professor of Psychiatry, Medicine, and Law, and Director, Division of Law, Ethics, and Psychiatry, Department of Psychiatry, Columbia University and New York State Psychiatric Institute.*

CONTENTS

I.   Overview of Mental Health Evidence, 815
    A.  Range of Legal Cases in Which Mental Health Issues Arise, 815
        1.  Retrospective, contemporaneous, and prospective assessments, 817
        2.  Diagnosis versus functional impairment, 819
    B.  Mental Health Experts, 821
        1.  Psychiatrists, 821
        2.  Psychologists, 824
        3.  Other mental health professionals, 826
    C.  Diagnosis of Mental Disorders, 828
        1.  Nomenclature and typology—DSM-IV-TR and DSM-5, 828
        2.  Major diagnostic categories, 831
        3.  Approaches to diagnosis, 834
        4.  Accuracy of diagnosis of mental disorders, 839
        5.  Detection of malingering, 839
    D.  Functional Impairment Due to Mental Disorders, 841
        1.  Impact of mental disorders on functional capacities, 841
        2.  Assessment of functional impairment, 842
    E.  Predictive Assessments, 846
        1.  Prediction of violence risk, 846
        2.  Predictions of future functional impairment, 851
    F.  Treatment of Mental Disorders, 852
        1.  Treatment with medication, 853
        2.  Psychological treatments, 858
        3.  Treatment of functional impairments, 860
        4.  Electroconvulsive and other brain stimulation therapies, 861
        5.  Psychosurgery, 863
        6.  Prediction of responses to treatment, 863
    G.  Limitations of Mental Health Evidence, 865
        1.  Limits of psychodynamic theory, 865
        2.  Ultimate issue testimony, 867

EXHIBIT C

*Reference Manual on Scientific Evidence*

II.  Evaluating Evidence from Mental Health Experts, 869
    A.  What Are the Qualifications of the Expert? 869
        1.  Training, 870
        2.  Experience, 871
        3.  Licensure and board certification, 873
        4.  Prior relationship with the subject of the evaluation, 875
    B.  How Was the Assessment Conducted? 877
        1.  Was the evaluee examined in person? 877
        2.  Did the evaluee cooperate with the assessment? 879
        3.  Was the evaluation conducted in adequate circumstances? 880
        4.  Were the appropriate records reviewed? 881
        5.  Was information gathered from collateral informants? 882
        6.  Were medical diagnostic tests performed? 883
        7.  Was the evaluee's functional impairment assessed directly? 884
        8.  Was the possibility of malingering considered? 884
    C.  Was a Structured Diagnostic or Functional Assessment Instrument or
       Test Used? 885
        1.  Has the reliability and validity of the instrument or test been
           established? 885
        2.  Does the person being evaluated resemble the population for
           which the instrument or test was developed? 886
        3.  Was the instrument or test used as intended by its developers? 887
    D.  How Was the Expert's Judgment Reached Regarding the Legally
       Relevant Question? 889
        1.  Were the findings of the assessment applied appropriately to the
           question? 889
III.  Case Example, 892
    A.  Facts of the Case, 892
    B.  Testimony of the Plaintiff's Expert on Negligence, 893
    C.  Questions for Consideration, 893
    D.  Testimony of the Plaintiff's Expert on Damages, 893
    E.  Questions for Consideration, 894
References on Mental Health Diagnosis and Treatment, 895
References on Mental Health and Law, 895

**EXHIBIT C**

# I. Overview of Mental Health Evidence

## A. Range of Legal Cases in Which Mental Health Issues Arise

Evidence presented by mental health experts is common to a broad array of legal cases—criminal and civil. In the criminal realm, these include assessments of defendants' mental states at the time of their alleged offenses (e.g., criminal responsibility and diminished capacity[1]) and subsequent to the offenses, but prior to the initiation of the adjudicatory process (e.g., competence to consent to a search or waive *Miranda* rights[2]). As cases move toward adjudication, evaluation may be required of defendants' competence to stand trial or to represent themselves at trial.[3] Postconviction, mental health evidence may be introduced with regard to sentencing, including suitability for probation and conditions of probation.[4] Capital cases uniquely may raise questions regarding a condemned prisoner's competence to waive appeals or to be executed.[5] Postconfinement, mental health considerations may enter into parole determinations. Indeed, the development of

---

1. 18 U.S.C. § 17 (defining standard and burden of proof for insanity defense); Clark v. Arizona, 548 U.S. 735 (2006) (on the use of testimony for diminished capacity).

2. *See* Thomas Grisso, Evaluating Competencies: Forensic Assessments and Instruments (2002); Miranda v. Arizona, 384 U.S. 436 (1966) (holding confessions inadmissible unless suspect made aware of rights and waives them); Colorado v. Connelly, 479 U.S. 157 (1986) (holding that mental condition alone will not make a confession involuntary under the Fourth Amendment but may be used as a factor in assessing a defendant's voluntariness); United States v. Elrod, 441 F.2d 353 (5th Cir. 1971) (holding that a person of subnormal intelligence may be deemed incapable of giving consent). *See* Wayne R. LaFave, Search and Seizure 92–93 (2004); Wayne R. LaFave, Criminal Procedure 363–65 (2004); Brian S. Love, Comment: *Beyond Police Conduct: Analyzing Voluntary Consent to Warrantless Searches by the Mentally Ill and Disabled*, 48 St. Louis U. L.J. 1469 (2004).

3. Dusky v. United States, 362 U.S. 402 (1960) (establishing standard for competence to stand trial); Pate v. Robinson, 383 U.S. 375 (1966) (holding that the Due Process Clause of the Fourteenth Amendment does not allow a mentally incompetent criminal defendant to stand trial); Farretta v. California, 422 U.S. 806 (1975) (upholding defendant's right to refuse counsel and represent himself); Indiana v. Edwards, 554 U.S. 164 (2008) (finding that the standards for competency to stand trial and to represent oneself need not be the same).

4. Roger W. Haines, Jr., et al., Federal Sentencing Guidelines Handbook §§ 5B1.3(d)(5), 5D1.3(d)(5), 5H1.3 (2007–2008).

5. *See* Ford v. Wainwright, 477 U.S. 399 (1986) (upholding the common law bar against executing the insane and holding that a prisoner is entitled to a judicial hearing before he may be executed); Stewart v. Martinez–Villareal, 523 U.S. 637 (1998) (holding that death row prisoners are not barred from filing incompetence to be executed claims by dismissal of previous federal habeas petitions); Panetti v. Quarterman, 551 U.S. 930 (2007) (ruling that defendants sentenced to death must be competent at the time of their execution); Atkins v. Virginia, 536 U.S. 304 (2002) (finding that executing the mentally retarded constitutes cruel and unusual punishment under the Eighth Amendment); Rees v. Peyton, 384 U.S. 312 (1966) (formulating the test for competency to waive further proceedings as requiring that the petitioner "appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.").

EXHIBIT C

specialty services for probationers and parolees with mental disorders suggests that mental health professionals' input at this stage is likely to increase in the future.[6]

Mental health evidence in civil litigation is frequently introduced in personal injury cases, where emotional harms may be alleged with or without concomitant physical injury.[7] Issues of contract may turn on the competence of a party at the time that the contract was concluded or whether that person was subject to undue influence,[8] and similar questions may be at the heart of litigation over wills and gifts.[9] Broader questions of competence to conduct one's affairs are considered in guardianship cases,[10] and more esoteric ones may arise in litigation challenging a person's competence to enter into a marriage or to vote.[11] Suits alleging infringement of the statutory and constitutional rights of persons with mental disorders (e.g., under the Americans with Disabilities Act or the Civil Rights of Institutionalized Persons Act) often involve detailed consideration of psychiatric diagnosis and treatment and of institutional conditions.[12] Allegations of professional

6. Jennifer Skeem & Jennifer Eno Louden, *Toward Evidence-Based Practice for Probationers and Parolees Mandated to Mental Health Treatment*, 57 Psychiatric Servs. 333 (2006).

7. Dillon v. Legg, 441 P.2d 912 (Cal. 1968) (allowing recovery based on emotional distress not accompanied by physical injury); Molien v. Kaiser Foundation Hospitals, 616 P.2d 813 (Cal. 1980) (holding that plaintiff who is direct victim of negligent act need not be present when act occurs to recover for subsequent emotional distress); Rodriguez v. State, 472 P.2d 509 (Haw. 1970) (permitting recovery where a reasonable person would suffer serious mental distress as a result of defendant's behavior); Roes v. FHP, Inc., 985 P.2d 661 (Haw. 1999) (allowing assessment of damages for negligent infliction of emotional distress when plaintiff was in actual physical peril, even if no injury was suffered); Albright v. United States, 732 F.2d 181 (C.A.D.C. 1984) (holding that alleging mental distress is sufficient to confer standing); Cooper v. FAA, No. 07-1383 (N.D. Cal. Aug. 2008), r*ev'd and remanded,* 596 F.3d 538 (9th Cir. 2010) (discussing mental distress as a result of disclosure of personal information); Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173 (11th Cir. 2007) (holding damages available under § 504 of the Rehabilitation Act when emotional distress was foreseeable).

8. *See generally* E. Allan Farnsworth, Contracts 228–33 (2004); John Parry & Eric Y. Drogin, Mental Disability Law, Evidence, and Testimony 151–52, 185–86 (2007).

9. *See generally* William M. McGovern, Jr. & Sheldon F. Kurtz, Wills, Trusts and Estates Including Taxation and Future Interests 292–99 (2004); Parry & Drogin, *supra* note 8, at 149–51, 182–85.

10. Parry & Drogin, *supra* note 8, at 138–47, 177–81.

11. *Id*. at 54. Doe v. Rowe, 156 F. Supp. 2d 35 (D. Me. 2001) (finding a state law denying the vote to anyone under guardianship by reason of mental disability in violation of the Equal Protection Clause of the U.S. Constitution and Title II of the Americans with Disabilities Act (ADA)); Missouri Protection & Advocacy Servs. v. Carnahan, 499 F.3d 803 (8th Cir. 2007) (upholding a state law allowing disenfranchisement of persons under guardianship because it permits individualized determinations of capacity to vote).

12. Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206 (1998) (holding that ADA coverage extended to prisoners); Clark v. State of California, 123 F.3d 1267 (9th Cir. 1997) (finding state not immune on Eleventh Amendment grounds to suit alleging discrimination under ADA by developmentally disabled inmates); Gates v. Cook, 376 F.3d 323 (5th Cir. 2004) (upholding District Court's finding that prison conditions, including inadequate mental health provisions, violated the Eighth Amendment of the U.S. Constitution); Gaul v. AT&T, Inc., 955 F. Supp. 346 (D.N.J. 1997) (finding that depression and anxiety disorders may constitute a mental disability under the ADA); Anderson v. North Dakota State Hospital, 232 F.3d 634 (8th Cir. 2000) (finding that a plaintiff's fear

EXHIBIT C

*Reference Guide on Mental Health Evidence*

malpractice by mental health professionals, including failure to protect foreseeable victims of a patient's violence,[13] invariably call for mental health expert testimony, as do commitment proceedings for the hospitalization of persons with mental disorders[14] or who are alleged to be dangerous sexual offenders.[15]

## *1. Retrospective, contemporaneous, and prospective assessments*

Depending on the questions at issue in a given proceeding, evaluators may be asked to assess the state of mind—including diagnosis and functional capacities—of a person at some point in the past, at present, or in the future.

Retrospective assessments are called for when criminal defendants assert insanity or diminished responsibility defenses, claiming that their state of mind at the time of the crime should excuse or mitigate the consequences of their behaviors, or when questions are raised about competence at some point in the past to waive legal rights (e.g., waiver of *Miranda* rights).[16] In civil contexts, challenges to the capacity of a now-deceased testator to write a will or of a party to enter into a contract, among other issues, will call for a similar look back at a person's functioning at some point in the past.[17] A variety of sources of information are available for such assessments. In some cases (e.g., in criminal proceedings), the defendant is likely to be available for clinical examination, whereas in other cases he or she will not be able to be assessed directly (e.g., challenges to a will). Although the person being evaluated will usually have an interest in portraying him- or herself in a particular light, a direct assessment can nonetheless be valuable in assessing the consistency of the reported symptoms with other aspects of the history and current status of the person. Whether or not the person can be assessed directly, information from persons who were in contact with the person before and during the time in question, including direct reports and contemporaneous

---

of snakes did not limit ability to work); Sinkler v. Midwest Prop. Mgmt., 209 F.3d 678 (7th Cir. 2000) (holding driving phobia did not substantially limit major life activity of working and hence was not an impairment under the ADA); McAlinden v. County of San Diego, 192 F.3d 1226 (9th Cir. 1999), *cert. denied,* 120 S. Ct. 2689 (2000) (reversing summary judgment against plaintiff who alleged that anxiety and somatoform disorders impaired major life activities of sexual relations and sleep); Steele v. Thiokol Corp., 241 F.3d 1248 (10th Cir. 2001) (finding major life activity under the ADA of interacting with others not substantially impaired by obsessive–compulsive disorder).

13. Tarasoff v. Regents of the Univ. of California, 551 P.2d 334 (Cal. 1976).

14. Addington v. Texas, 441 U.S. 418 (1979) (holding that standard of proof for involuntary commitment is clear and convincing evidence); O'Connor v. Donaldson, 422 U.S. 563 (1975) (holding unconstitutional the confinement of a nondangerous mentally ill person capable of surviving safely in freedom alone or with assistance).

15. Kansas v. Hendricks, 521 U.S. 346 (1997); Kansas v. Crane, 534 U.S. 407 (2002).

16. Predicting the Past: Retrospective Assessment of Mental States in Litigation (Robert I. Simon & Daniel W. Shuman eds., 2002); Bruce Frumkin & Alfredo Garcia, *Psychological Evaluations and Competency to Waive Miranda Rights.* 9 The Champion 12 (2003).

17. *See* Thomas G. Gutheil, *Common Pitfalls in the Evaluation of Testamentary Capacity*, 35 J. Am. Acad. Psychiatry & L. 514 (2007); Farnsworth, *supra* note 8, at 228–33.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

records, is usually an essential part of the evaluation. Sometimes the available data from all of these sources are so limited or contradictory that they will not allow a judgment to be made of a person's state of mind at a point in the past. However, most experienced forensic evaluators appear to believe that conclusions regarding past mental state can often be reached with a reasonable degree of certainty if suf–ficient information is available.[18]

The most straightforward task for a mental health professional is to evaluate a person's current mental state. In criminal justice settings, concerns about a person's current competence to exercise or waive rights will call for such evaluations (e.g., competence to stand trial or to represent oneself at trial).[19] Civil issues calling for contemporaneous assessments include workers' compensation and other disability claims and litigation alleging emotional harms due to negligent or intentional torts, workplace discrimination, and other harm–inducing situations.[20] At the core of an assessment of current mental state is the diagnostic evaluation described below. As in all evaluations in legal contexts, careful consideration needs to be given to the possibility of secondary gain from manipulation of their presentation for persons being assessed.[21]

In contrast to contemporaneous assessments, the evaluation of a person's future mental state and consequent behaviors is fraught with particular difficulty, especially when the outcome being predicted occurs at a relatively low frequency.[22] Such predictive assessments may come into play in the criminal process when bail is set,[23] at sentencing,[24] and as part of probation and parole decisions.[25] They often involve

18. Robert I. Simon, *Retrospective Assessment of Mental States in Criminal and Civil Litigation: A Clinical Review* in Simon and Shuman, *supra* note 16 at 1, 8; McGregor v. Gibson, 248 F.3d 946, 962 (10th Cir. 2001) (stating that although disfavored, retrospective determinations of competence may be allowed in cases when a meaningful hearing can be conducted).

19. *See* Dusky v. United States, 362 U.S. 402 (1960) (holding that a criminal defendant must understand the charges and be able to participate in his defense); Godinez v. Moran, 509 U.S. 389 (1993) (holding that a defendant competent to stand trial is also sufficiently competent to plead guilty or waive the right to legal counsel).

20. *See, e.g.,* Kent v. Apfel, 75 F. Supp. 2d 1170 (D. Kan. 1999); Quigley v. Barnhart, 224 F. Supp. 2d 357 (D. Mass. 2002); Rivera v. City of New York, 392 F. Supp. 2d 644 (S.D.N.Y. 2005); Lahr v. Fulbright & Jaworski, L.L.P., 164 F.R.D. 204 (N.D. Tex. 1996).

21. *See* United States v. Binion, 132 F. App'x 89 (8th Cir. 2005) (upholding an obstruction of justice conviction and sentencing determination based on a finding that defendant had feigned mental illness). See discussion, *infra*, Section I.C.2.

22. Joseph M. Livermore et al., *On the Justifications for Civil Commitment*, 117 U. Pa. L. Rev. 75–96 (1968).

23. United States v. Salerno, 481 U.S. 739 (1987); United States v. Farris, 2008 WL 1944131 (W.D. Pa. May 1, 2008).

24. Tex. Code Crim. Proc. Ann. art. 37.071 (Vernon 1981); Barefoot v. Estelle, 463 U.S. 880 (1983).

25. *See* 28 C.F.R. § 2.19 (2008) for parole determination factors. For probation determination factors, see 18 U.S.C.A. § 356 (2008). *See generally* Neil Cohen, The Law of Probation and Parole §§ 2, 3 (2008).

**EXHIBIT C**

estimates of the probable effectiveness of treatment, especially in the juvenile justice system, where the lack of amenability of juveniles to mental health treatment is frequently a key consideration in decisions regarding transfer to adult courts.[26] Predictions regarding behavior related to mental disorders are also seen in civil cases, for example, in the civil commitments of persons with mental disorders and in the newer statutes authorizing the commitment of dangerous sex offenders.[27] Damage assessments in civil cases alleging emotional harms will usually call for some estimate regarding the duration of symptoms and response to treatment.[28] The inescapable uncertainties of the course of mental disorders and their responsiveness to interventions create part of the difficulty in such assessments, but an equally important contribution is made by the unknowable contingencies of life. Will a person's spouse leave or will the person lose his job or his home? As a consequence, will the person return to drinking, stop taking medication, or reconnect with friends who have continued to engage in criminal behaviors? At best, predictive assessments can lead to general statements of probability of particular outcomes, with an acknowledgment of the uncertainties involved.[29]

## *2. Diagnosis versus functional impairment*

A diagnosis of mental disorder per se will almost never settle the legal question in a case in which mental health evidence is presented. However, a diagnosis may play a role in determining whether a claim or proceeding can go forward. The clearest example in criminal law is embodied in the insanity defense, where the impairments of understanding, appreciation, and behavioral control that comprise the various standards must be based, in one popular formulation, on a "mental disease or defect."[30] In the absence of a diagnosis of mental disorder (including mental retardation and the consequences of injury to the brain), an affirmative

26. Michael G. Kalogerakis, Handbook of Psychiatric Practice in Juvenile Court 79–85 (1992).

27. *See* O'Connor v. Donaldson, 422 U.S. 563 (1975) (finding that a state may not confine a citizen who is nondangerous and capable of living by herself or with aid); for an example of a sex offender civil commitment statute, *see* Minn. Stat. § 253B.185 (2008). The constitutionality of civil commitment for dangerous sex offenders was upheld in *Kansas v. Hendricks,* 521 U.S. 346 (1997) (setting forth the procedures for the commitment of convicted sex offenders deemed dangerous due to a mental abnormality).

28. Gary B. Melton et al., Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers 413–14 (2007).

29. For a more detailed discussion of predictive assessment regarding future dangerousness, see Section I.E.

30. The American Law Institute standard for the insanity defense reads, "a person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Model Penal Code and Commentaries § 4.01(1) (Official Draft and Revised Comments 1985) (adopted by American Law Institute, May 24, 1962). The federal insanity defense was codified in the Insanity Defense Reform Act of 1984, *codified at* 18 U.S.C. § 17. *See also* Durham v. United States, 214 F.2d 862 (D.C. Cir. 1954) ("[A]n accused is not criminally responsible

EXHIBIT C

*Reference Manual on Scientific Evidence*

defense of insanity will not prevail.[31] Comparable situations exist in civil commitment proceedings and work disability determinations.[32]

Even where the presence of a mental disorder is not an absolute prerequisite to claims involving mental state, it will often play a de facto threshold role. Thus, evidence in cases involving claims of incompetence (e.g., to engage in a contractual relationship) or emotional harms will often address the presence of a diagnosis, even though that may not strictly be required.[33] In these cases, failure to establish a diagnosis may be taken by a factfinder as an indicator of the probable lack of validity of the claim. That is, it may be assumed that unless an underlying disorder can be identified, the claimed impairments are bogus. Thus, conflicting testimony over the presence or absence of a diagnosis is common in cases in which mental health evidence is offered, even when not mandated by the operative legal standard.

Notwithstanding the threshold role played by a mental disorder diagnosis in many cases, the ultimate legal issue usually will turn on the impact of the mental disorder on the person's functional abilities.[34] Those abilities may relate to the person's cognitive capacities, including the capacity to make a legally relevant decision (e.g., granting consent for the police to conduct a warrantless search, altering a will) or the capacity to behave in a particular way (e.g., conforming one's conduct to the requirements of the law, cooperating with an attorney in one's own defense, resisting undue influence), or both (e.g., skill as a parent, competence to proceed with criminal adjudication). The former set of capacities can be denoted as *decisional capacities* and the latter set as *performative capacities*. Many of the legal questions to which mental health evidence may be relevant will involve a determination of the influence of a mental state or disorder on one or both of these sets of capacities. The mere presence of a mental disorder will almost always be insufficient for that purpose. Mental disorder in a criminal defendant, for example, if it does not interfere substantially with competence to stand trial, does not present a basis for postponing adjudication of the case.[35] Some degree of mental disorder, including dementia, without affecting relevant abilities, does not provide grounds for voiding a will.[36] The point can be generalized to all criminal and civil competency determinations, most assessments of emotional harms, and

*if his unlawful act was the product of mental disease or defect.*"); *note* United States v. Brawner, 471 F.2d 969 (1972), which overturned the Durham Rule (or "product test").

31. Tennard v. Dretke, 542 U.S. 274 (2004); Bigby v. Dretke, 402 F.3d 551 (5th Cir. 2005).

32. Addington v. Texas, 441 U.S. 418 (1979) (setting the burden of proof required for involuntary civil commitment as requiring clear and convincing evidence); and Social Security Administration Listing of Impairments, *available at* http://www.ssa.gov/disability/professionals/bluebook/listing-impairments.htm.

33. Farnsworth, *supra* note 8, §§ 4.6–4.8, at 228–34.

34. Grisso, *supra* note 2.

35. United States v. Passman, 455 F. Supp. 794 (D.D.C. 1978); United States. v. Valierra, 467 F.2d 125 (9th Cir. 1972).

36. Rossi v. Fletcher, 418 F.2d 1169 (D.C. Cir. 1969); *In re* Estate of Buchanan, 245 A.D.2d 642 (3d Dept. 1997).

EXHIBIT C

*Reference Guide on Mental Health Evidence*

probably to the majority of cases in which mental health testimony is offered: Unless a mental disorder can be shown to have affected a person's functional capacity, decisional or performative, a diagnosis of mental disorder per se will not be determinative of the outcome.[37]

Despite its importance to the adjudicative process, mental health evidence is often introduced in the context of a serious stigma that attaches to mental disorders[38] and considerable confusion regarding their nature, consequences, and susceptibility to treatment.[39] Diagnoses of mental disorders often are perceived to be less reliable and more subjective than diagnoses of other medical conditions.[40] Symptoms of mental disorders may be seen as reflections of moral weakness or lack of will, and the impact of disorders on functional abilities may not be recognized, or occasionally may be exaggerated.[41] The potential impact and limits of current treatments are not widely understood. Indeed, even the various types of mental health professionals are frequently confused.[42] The remainder of Section I of this reference guide provides background to clarify these issues; Section II considers questions specifically related to the introduction of evidence by mental health experts.

## B. Mental Health Experts

Evidence related to mental state and mental disorders may be presented by experts from a number of disciplines, but it is most commonly introduced by psychiatrists or psychologists.

### 1. Psychiatrists

Psychiatrists are physicians who specialize in the diagnosis and treatment of mental disorders.[43] After college, they complete 4 years of medical school, during

37. For a brief overview of competency evaluations, *see* Patricia A. Zapf & Ronald Roesch, *Mental Competency Evaluations: Guidelines for Judges and Attorneys*, 37 Ct. Rev. 28 (2000), *available at* http://aja.ncsc.dni.us/courtrv/cr37/cr37-2/CR37-2ZapfRoesch.pdf. For the underlying standard for competency to stand trial, see Dusky v. United States, 362 U.S. 402 (1960).

38. Bruce G. Link et al., *Measuring Mental Illness Stigma*, 30 Schizophrenia Bull. 511 (2004).

39. Bruce G. Link et al., *Stigma and Coercion in the Context of Outpatient Treatment for People with Mental Illnesses*, 67 Soc. Sci. & Med. 409 (2008).

40. Thomas A. Widiger, *Values, Politics, and Science in the Construction of the DSMs*, *in* Descriptions and Prescriptions: Values, Mental Disorders, and the DSMs 25 (John Z. Sadler ed., 2002).

41. Michael L. Perlin, "*Half-Wracked Prejudice Leaped Forth*": Sanism, Pretextuality, and Why and How Mental Disability Law Developed as It Did, 10 J. Contemp. Legal Issues 3 (1999); Michael L. Perlin, "*You Have Discussed Lepers and Crooks*": Sanism in Clinical Teaching, 9 Clinical L. Rev. 683 (2003); Michael L. Perlin, The Hidden Prejudice: Mental Disability on Trial (2000).

42. The degree of popular confusion is underscored by the results of a Web-based search for "psychiatrist vs. psychologist," which turns up a remarkably large number of Web sites attempting to explain the differences between the two professions.

43. Narriman C. Shahrokh & Robert E. Hales, American Psychiatric Glossary 157 (2003).

EXHIBIT C

*Reference Manual on Scientific Evidence*

which they spend approximately 2 years in preclinical studies (e.g., physiology, pharmacology, genetics, pathophysiology), followed by 2 years of clinical rotations in hospital and clinic settings (e.g., medicine, surgery, pediatrics, obstetrics/gynecology, orthopedics, psychiatry).[44] Graduating medical students who elect to specialize in psychiatry enter residency programs of at least 4 years' duration.[45] Accredited residencies must currently offer at least 4 months in a primary care setting in internal medicine, family medicine, or pediatrics, and at least 2 months of training in neurology.[46] The remainder of a resident's time is spent learning psychiatry, including inpatient, outpatient, emergency, community, and consultation settings, and with exposure to the subspecialty areas of child and adolescent, geriatric, addiction, and forensic psychiatry. Residents will be taught how to use treatment techniques, among them medications and various forms of psychotherapy. Elective time is usually available to pursue particular interests in greater depth or to engage in research. Didactic seminars, including sessions on neuroscience, genetics, psychological theory, and treatment, and supervision sessions with experienced psychiatrists (and sometimes mental health professionals from other disciplines) complement the clinical experiences.[47]

After completion of 4 years of residency training, a psychiatrist is designated as "board eligible," that is, able to take the certification examination of the American Board of Psychiatry and Neurology in adult psychiatry.[48] Successful completion of this examination process results in the psychiatrist being designated "board certified." Psychiatrists who desire more intensive training in a subspecialty area of psychiatry—for example, child and adolescent or addiction psychiatry—can take a 1- or 2-year fellowship in that area. The psychiatrist who has completed an accred-

44. Medical schools in the United States are accredited by the Liaison Committee on Medical Education, which establishes general curricular and other standards that all schools must meet. Standards are available at http://www.lcme.org/standard.htm. Students can elect to extend their medical school training by taking additional time to conduct research or to obtain complementary training (e.g., in public health).

45. Residents who choose to combine adult and child psychiatry training can do so in a 5-year program, or can follow their 4 years of adult residency with 2 years of child training. Some residents will also extend their residency training by adding a year or more during which they conduct laboratory or clinical research.

46. Psychiatric residencies are accredited by the Accreditation Council on Graduate Medical Education. Program requirements are available at http://www.acgme.org/acwebsite/rrc_400/400_prindex.asp.

47. See descriptions of several leading psychiatry residency training programs on their Web sites: Columbia University (http://www.cumc.columbia.edu/dept/pi/residency/index.html); Johns Hopkins University (http://www.hopkinsmedicine.org/Psychiatry/for_med_students/residency_general/); Harvard/Longwood Psychiatry Residency (http://harvardlongwoodpsychiatry.org/).

48. Information regarding qualifications for board certification and the examination process is available from the American Board of Psychiatry and Neurology at http://www.abpn.com/Initial_Psych.htm.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

ited fellowship[49] is eligible for additional board certification in that subspecialty.[50] Although fellowship training and board certification indicate expertise in a particular area of psychiatry, some psychiatrists are recognized by the courts as having developed equivalent levels of expertise by virtue of extensive clinical experience and self-designed instruction (e.g., continuing education courses, remaining current with the professional literature).[51]

Forensic psychiatry is the subspecialty that focuses on the interrelationships between psychiatry and the law.[52] Hence, forensic psychiatrists are particularly likely to offer evidence as part of court proceedings. Fellowship training in forensic psychiatry involves a 1-year program in which fellows are taught forensic evaluation for civil and criminal litigation and become involved in the treatment of persons with mental disorders in the correctional system.[53] They also learn about the rules and procedures for providing evidence in legal proceedings and for working with attorneys. However, training and/or board certification in forensic psychiatry are not necessarily the best qualification for expertise in a particular case. Although forensic psychiatrists are likely to have more expertise than general psychiatrists for certain kinds of evaluations that are the focus of forensic training (e.g., competence to stand trial, emotional harms), when issues are raised concerning other substantive areas of psychiatry (e.g., the effects of psychopharmacological agents on a civil defendant's ability to drive at the time of an accident that allegedly resulted in injury to the plaintiff), a psychiatrist who specializes in that area will often have greater expertise than someone with forensic training.

49. Accredited subspecialty training is currently available in addiction, child and adolescent, forensic, and geriatric psychiatry, and in psychosomatic medicine. Psychiatrists are also eligible for training in hospice and palliative medicine, pain medicine, and sleep medicine. *See* accreditation standards at http://www.acgme.org/acwebsite/rrc_400/400_prindex.asp. Fellowship programs also exist in some subspecialty areas for which accreditation and board certification are not available, e.g., research, psychopharmacology, and public and community psychiatry.

50. Typically, when new subspecialties are recognized and accreditation standards are developed, a certain period of time (e.g., 5 years) is allowed for psychiatrists who have gained expertise in that area by virtue of experience or alternative training to achieve board certification. Thus, many psychiatrists who are today board certified in a subspecialty have not completed a fellowship.

51. For a comparable determination involving a counselor, see Leblanc v. Coastal Mech. Servs., LLC, 2005 WL 5955027 (S.D. Fla. Sept. 7, 2005) (quoting Jenkins v. United States, 307 F.2d 637 (D.C. Cir. 1962) for the proposition that the determination of a psychologist's competence to render an expert opinion is a case-by-case matter based on knowledge, not claim to a professional title).

52. See the definition of forensic psychiatry offered by the American Academy of Psychiatry and the Law: "Forensic psychiatry is a medical subspecialty that includes research and clinical practice in the many areas in which psychiatry is applied to legal issues," *available at* http://www.aapl.org/org.htm. Psychiatrists who have been certified in adult or child psychiatry by the American Board of Psychiatry and Neurology, and who have completed a forensic psychiatry fellowship, can take the examination for subspecialty certification in forensic psychiatry. A description of the requirements for certification can be found at http://www.abpn.com/fp.htm. Board certification must be renewed by taking a recertification examination every 10 years.

53. See the accreditation standards in forensic psychiatry at http://www.acgme.org/acWebsite/downloads/RRC_progReq/406pr703_u105.pdf.

EXHIBIT C

*Reference Manual on Scientific Evidence*

## *2. Psychologists*

Psychologists have received graduate training in the study of mental processes and behavior.[54] Only a subset of psychologists evaluate and treat persons with psychological or behavioral problems; they may be termed clinical, counseling, health, neuro-, rehabilitation, or school psychologists. In contrast, many psychologists teach and/or pursue research in one of the academic aspects of the field (e.g., cognitive, developmental, or social psychology), or provide consultation of a nonclinical nature (e.g., organizational or industrial psychology).[55] Independent practice in psychology requires licensure from the appropriate state licensure board and generally requires a doctoral degree and postgraduate clinical experience. Although use of the term *psychologist* is restricted in many jurisdictions to licensed psychologists,[56] the term may be applied in some settings to persons with master's-level training in psychology.[57]

After college, students who enter graduate doctoral programs generally require 4 to 6 years to complete their training. Those who intend to pursue clinical work generally receive training in clinical, counseling, or school psychology.[58] Accredited programs in these areas are required to provide a minimum of three academic years of graduate study, and students are required in addition to take a year of clinical internship.[59] Course work must include study of biological aspects of behavior, cognitive and affective aspects of behavior, social aspects of behavior, history and systems of psychology, psychological measurement, research methodology, and techniques of data analysis. Students also must be taught about

54. The American Psychological Association defines the field of psychology in this way: "Psychology is the study of the mind and behavior. The discipline embraces all aspects of the human experience—from the functions of the brain to the actions of nations, from child development to care for the aged. In every conceivable setting from scientific research centers to mental health care services, 'the understanding of behavior' is the enterprise of psychologists." http://74.125.45.104/search?q=cache:JKti-_3SfkQJ:www.apa.org/about/+psychologist+definition&hl=en&ct=clnk&cd=9&gl=us.

55. *See id.* for the American Psychological Association's characterization of the subspecialties in psychology.

56. *See, e.g.,* Mass. Gen. Laws ch. 112, § 122; N.Y. Educ. Law § 7601.

57. Note that the American Psychological Association urges that the use of the term be restricted to persons with doctoral degrees in psychology: "Psychologists have a doctoral degree in psychology from an organized, sequential program in a regionally accredited university or professional school . . . it is [the] general pattern to refer to master's-level positions as counselors, specialists, clinicians, and so forth (rather than as 'psychologists')." http://74.125.45.104/search?q=cache:JKti-_3SfkQJ:www.apa.org/about/+psychologist+definition&hl=en&ct=clnk&cd=9&gl=us.

58. Other psychology programs offer training in experimental, social, and cognitive psychology, for example, with the intent of producing graduates who will pursue research or teaching careers, but will not engage in clinical work. United States v. Fishman, 743 F. Supp. 713, 723 (N.D. Cal. 1990) (excluding the expert testimony of a social psychologist holding a Ph.D. in sociology).

59. Accreditation of programs in clinical, counseling, and school psychology is undertaken by the Commission on Accreditation of the American Psychological Association. Accreditation standards are available at http://www.apa.org/ed/accreditation/.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

individual differences in behavior, human development, dysfunctional behavior or psychopathology, and professional standards and ethics. A practicum experience, which usually involves placement in an agency or clinic that provides psychological services, is part of the training experience. Prior to receiving their degrees, students must also complete a 1-year clinical internship, which is often taken at a clinical facility that is separate from their graduate school.[60]

Psychology graduate programs award either the Ph.D. or Psy.D. ("professional psychology") degree.[61] Ph.D. programs generally place greater emphasis on research training, with students required to complete a research project and write a dissertation. Psy.D. programs ordinarily stress clinical issues and training and have less rigorous research requirements.[62] Supervised work may involve some combination of psychological treatment (e.g., individual or group psychotherapy) and the use of standardized testing techniques (i.e., "psychological tests"). Once licensed, psychologists can practice independently. At present, two states permit psychologists who complete additional training requirements to prescribe medications, although physicians' groups remain strongly opposed to the practice.[63]

Fellowships in subspecialty areas of psychology are becoming more common, although they are not always linked to subspecialty certification processes. Among the areas in which fellowships have been developed is forensic psychology, generally a 1-year program, with didactic and clinical training in forensic evaluation.[64] Certification in forensic psychology through an examination process is available for psychologists who have completed a fellowship in the field or who have at least 5 years of experience in forensic psychology.[65] As with psychiatry, whether the expertise of a forensic psychologist is relevant to a particular legal issue will vary and needs to be considered on a case-by-case basis.

---

60. *Id.*

61. See sample Ph.D. program curricula for programs at University of Illinois at Urbana-Champaign (http://www.psych.uiuc.edu/divisions/clinicalcommunity.php); Indiana University (http://bl-psy-appsrv.ads.iu.edu:8080/graduate/courses/clinical.asp); and University of California at Los Angeles (http://www.psych.ucla.edu/Grads/Areas/clinical.php). See sample Psy.D. curricula for programs at Massachusetts School of Professional Psychology (http://www.mspp.edu/academics/degree-programs/psyd/default.asp); and Wisconsin School of Professional Psychology (http://www.wspp.edu/courseswspp.html).

62. For a discussion of the so-called "Vail model" on which Psy.D. training is based, see John C. Norcross & Patricia H. Castle, *Appreciating the PsyD: The Facts*, 7 Eye on Psi Chi 22 (2002), *available at* http://www.psichi.org/pubs/articles/article_171.asp.

63. N.M. Stat. Ann. § 61-9 (2002); La. Rev. Stat. § 37:2371-78 (2004). Note that the New Mexico statute is set to expire in 2010 under a sunset provision. N.M. Stat. Ann. 61-9-19 (2002).

64. See, e.g., the description of the program at the University of Massachusetts Medical School at http://www.umassmed.edu/forensicpsychology/index.aspx.

65. Certification is provided by the American Board of Forensic Psychology. Requirements for candidates are available at: http://www.abfp.com/.

EXHIBIT C

*Reference Manual on Scientific Evidence*

## 3. Other mental health professionals

Persons with a variety of other forms of training provide mental health services, including services that generally are referred to as psychotherapy or counseling, with individuals, couples, or groups. The best established of these professions is social work. Schools of social work offer 2-year programs that lead to a master's degree (MSW), and students can elect a track that is often referred to as psychiatric social work, which involves instruction and experience in psychotherapy.[66] Graduate social workers can obtain state licensure after the completion of a period of supervised practice and an examination, resulting in their designation as a "licensed independent clinical social worker (LICSW)," with variation in nomenclature across the states.[67] Social workers may offer psychotherapeutic or counseling services through social service agencies or in private practice. Recently, a subspecialty of forensic social work has begun to develop, involving social workers with experience in the criminal justice system.[68]

Another group that offers mental health services, which may include psychotherapy or counseling and medications, are master's- or doctoral-level nurses. A growing number of nursing schools are developing programs that are termed "psychiatric nursing."[69] Nursing practice is regulated by state law and hence varies across jurisdictions, but master's-level nurses (sometimes referred to as "nurse practitioners") can achieve a status that allows them to provide psychotherapy and to dispense medications, although they may need to have a supervisory arrangement with a physician for the latter.[70]

Other master's-level mental health professionals include persons who may be called psychologists, counselors, marital and family therapists, group therapists, and a variety of other terms.[71] Because state law generally does not regulate the

66. See, e.g., the curricula for social work training at Columbia (http://www.columbia.edu/cu/ssw/admissions/pages/programs_and_curriculum/index.html) and at Smith (http://www.smith.edu/ssw/geaa/academics_msw.php).

67. The Association of Social Work Boards provides an overview of state licensure requirements at http://www.datapathdesign.com/ASWB/Laws/prod/cgi-bin/LawWebRpts2DLL.dll/EXEC/0/0j6ws4m1dqx37r1ce43dq091bxya.

68. See the description of forensic social work offered by the National Association of Forensic Social Work at http://www.nofsw.org/html/forensic_social_work.html. Postgraduate certification programs for forensic social workers are also beginning to be developed, e.g., at the University of Nevada at Las Vegas (http://socialwork.unlv.edu/PGC_forensic_social_work.html).

69. See the listing of training programs in psychiatric nursing, with links to their curricula, provided by the American Psychiatric Nurses Association at http://www.apna.org/i4a/pages/index.cfm?pageid=3311.

70. Sharon Christian et al., Overview of Nurse Practitioner Scopes of Practice in the United States—Discussion, Center for Health Professions, University of California, San Francisco (2007), at http://www.acnpweb.org/i4a/pages/index.cfm?page id=3465.

71. See, e.g., the variety of mental health professionals listed by the National Alliance on Mental Illness at http://www.nami.org/Content/ContentGroups/Helpline1/Mental_Health_Professionals_Who_They_Are_and_How_to_Find_One.htm. United States v. Huber, 603 F.2d 387, 399 (2d Cir.

826

EXHIBIT C

*Reference Guide on Mental Health Evidence*

practice of psychotherapy—although the use of titles such as "psychologist" or "psychotherapist" may be restricted—there is no barrier to persons with variable levels of training in mental health opening independent practices.[72] This includes persons with degrees in educational psychology (M.Ed. or Ed.D.), clergypersons (who may have had some training in pastoral counseling in seminary), and members of disciplines unrelated to mental health. Because of the unregulated nature of their practices, they are largely beyond the reach of professional oversight and discipline.

Although psychiatrists and doctoral-level psychologists generally provide expert evidence related to mental health issues, courts will sometimes admit testimony from other mental health professionals.[73] Given that training and experience vary considerably, and titles may be used inconsistently, an individualized inquiry into the qualifications of the proposed expert is usually required.

1979) (affirming trial court's rejection of expert testimony on defendant's mental state from a professor of economics who was also a certified psychoanalyst).

72. The classic study, albeit now somewhat outdated, is Daniel Hogan, The Regulation of Psychotherapists (1979); *see also* Geoffrey Marczyk & Ellen Wertheimer, *The Bitter Pill of Empiricism: Health Maintenance Organizations, Informed Consent and the Reasonable Psychotherapist Standard of Care*, 46 Vill. L. Rev. 33 (2001).

73. Leblanc v. Coastal Mech. Servs., LLC, 2005 WL 5955027 (S.D. Fla. Sept. 7, 2005) (finding a marriage and family counselor holding a Ph.D. in family therapy, bachelor's and master's degrees in psychology, and a record of relevant publications may be qualified to offer helpful testimony about a plaintiff's alleged psychological condition); Jenkins v. United States, 307 F.2d 637, 646 (D.C. Cir. 1962) ("The critical factor in respect to admissibility is the actual experience of the witness and the probable probative value of his opinion. . . . The determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge. It does not depend upon his claim to the title 'psychologist.'"); United States v. Azure, 801 F.2d 336, 342 (8th Cir. 1986) ("The social worker was most likely qualified as an expert under Rule 702"); *see also* United States v. Raya, 45 M.J. 251 (1996) (finding that trial court's admission of expert testimony from a social worker on whether the victim suffered from PTSD was not an abuse of discretion) *and* United States v. Johnson, 35 M.J. 17 (1992) (holding social worker qualified to render opinion that child suffered trauma). Note, however, not all courts have been receptive to social worker testimony offered as expert opinion on the diagnosis of PTSD, *e.g.,* Neely v. Miller Brewing Co., 246 F. Supp. 2d 866 (S.D. Ohio 2003), Blackshear v. Werner Enters., Inc., 2005 WL 6011291 (E.D. Ky. May 19, 2005). For more restrictive approaches to testimony by non-Ph.D. psychologists, see also State v. Bricker, 321 Md. 86 (Md. Ct. App. 1990) (rejecting expert testimony from a nonpracticing psychologist who did not hold a doctorate and did not qualify for a reciprocal license under state law). People v. McDarrah, 175 Ill. App. 3d 284, 291 (1988) (affirming the trial court's rejection as an expert witness of a doctoral candidate who did not have the experience level required for state registration as a psychologist). Parker v. Barnhart, 67 F. App'x 495 (9th Cir. 2003) (finding error in an administrative law judge's failure to call a licensed psychologist, rather than another expert, as an expert witness for appropriate testimony). Earls v. Sexton, 2010 U.S. Dist. LEXIS 52980 (M.D. Pa. May 28, 2010) (allowing a nurse practitioner to testify in a negligence action concerning whether a motor vehicle accident caused psychiatric injuries).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## C. Diagnosis of Mental Disorders

### 1. Nomenclature and typology—DSM-IV-TR and DSM-5

The standard nomenclature and diagnostic criteria for mental disorders in use in the United States are embodied in the *Diagnostic and Statistical Manual of Mental Disorders,* published by the American Psychiatric Association, and now in its fourth edition with revised text (DSM–IV–TR).[74] It is anticipated that the next edition of the manual (*DSM-5*) will appear in 2013.[75] According to the *DSM* framework, the presence of a mental disorder is typically diagnosed by a combination of the symptoms reported by the patient (e.g., sadness, difficulty falling asleep, anxiety) and signs observed by the clinician (e.g., attentional difficulties, sad affect, crying). To qualify for a *DSM* diagnosis, persons must meet a set of criteria that are characteristic of the disorder.[76] The presence of certain signs and symptoms may be

---

74. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (hereinafter DSM–IV–TR).

75. An alternative nomenclature and set of criteria used internationally can be found in the *International Classification of Diseases,* now in its 10th edition (*ICD-10*), published by the World Health Organization. Although the DSM–IV–TR and ICD–10 nomenclature and criteria are generally similar, there are differences that can result in diagnostic variations in particular cases, depending on which criteria are applied.

76 E.g., A diagnosis of obsessive–compulsive disorder requires the following:

A.  Either obsessions or compulsions:
    *Obsessions as defined by (1), (2), (3), and (4):*
    (1)  recurrent and persistent thoughts, impulses, or images that are experienced, at some time during the disturbance, as intrusive and inappropriate and that cause marked anxiety or distress
    (2)  the thoughts, impulses, or images are not simply excessive worries about real-life problems
    (3)  the person attempts to ignore or suppress such thoughts, impulses, or images, or to neutralize them with some other thought or action
    (4)  the person recognizes that the obsessional thoughts, impulses, or images are a product of his or her own mind (not imposed from without as in thought insertion)
    *Compulsions as defined by (1) and (2):*
    (1)  repetitive behaviors (e.g., hand washing, ordering, checking) or mental acts (e.g., praying, counting, repeating words silently) that the person feels driven to perform in response to an obsession, or according to rules that must be applied rigidly
    (2)  the behaviors or mental acts are aimed at preventing or reducing distress or preventing some dreaded event or situation; however, these behaviors or mental acts either are not connected in a realistic way with what they are designed to neutralize or prevent or are clearly excessive
B.  At some point during the course of the disorder, the person has recognized that the obsessions or compulsions are excessive or unreasonable.
    **NOTE: This does not apply to children.**
C.  The obsessions or compulsions cause marked distress, are time consuming (take more than 1 hour a day), or significantly interfere with the person's normal routine, occupational (or academic) functioning, or usual social activities or relationships.
D.  If another Axis I disorder is present, the content of the obsessions or compulsions is not restricted to it (e.g., preoccupation with food in the presence of an Eating Disorder; hair pulling in the presence of Trichotillomania; concern with appearance in the presence of Body Dysmorphic Disorder; preoccupation with drugs in the presence of a Substance Use Disorder; preoccupation with having a serious illness in the presence of Hypochondriasis; preoccupation with sexual urges or fantasies in the presence of a Paraphilia; or guilty ruminations in the presence of Major Depressive Disorder).

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

mandatory for a diagnosis to be made, but in most cases—given the variable presentation of most mental disorders—only some proportion of signs and symptoms must be present (e.g., five out of nine).[77]

Since the influential third edition of *DSM* in 1980,[78] the manual has taken a "multiaxial" approach to diagnosis. That is, it recognizes that multiple aspects of a person's situation—not just the signs and symptoms of disorder—may be relevant to a full understanding of his or her situation. Currently, there are five *DSM* axes: Axis 1 is for the designation of most mental disorders, including substance abuse; Axis 2 covers disorders of personality and mental retardation, which may be present together with or independent of an Axis 1 disorder; Axis 3 addresses concurrent medical disorders; Axis 4 allows the designation of stressors confronting the person; and Axis 5 is a structured scale that speaks to the person's overall level of functioning.[79] A complete diagnosis in the *DSM* system requires some notation regarding all five axes, although clinicians commonly focus on Axes 1–3. More than one condition may be indicated on Axes 1–4; for example, major depressive disorder and alcohol abuse may coexist on Axis 1, and more than one personality disorder may be noted on Axis 2.

---

E.   The disturbance is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition.

DSM–IV–TR at 462–463.

77.  E.g., among the criteria required to be met for a diagnosis of Major Depressive Episode are:

A.   Five (or more) of the following symptoms have been present during the same 2-week period and represent a change from previous functioning; at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure.
   (1)   depressed mood most of the day, nearly every day, as indicated by either subjective report (e.g., feels sad or empty) or observation made by others (e.g., appears tearful).
      **NOTE: In children and adolescents, can be irritable mood.**
   (2)   markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by either subjective account or observation made by others)
   (3)   significant weight loss when not dieting or weight gain (e.g., a change of more than 5% of body weight in a month), or decrease or increase in appetite nearly every day. Note: In children, consider failure to make expected weight gains.
   (4)   insomnia or hypersomnia nearly every day
   (5)   psychomotor agitation or retardation nearly every day (observable by others, not merely subjective feelings of restlessness or being slowed down)
   (6)   fatigue or loss of energy nearly every day
   (7)   feelings of worthlessness or excessive or inappropriate guilt (which may be delusional) nearly every day (not merely self-reproach or guilt about being sick)
   (8)   diminished ability to think or concentrate, or indecisiveness, nearly every day (either by subjective account or as observed by others)
   (9)   recurrent thoughts of death (not just fear of dying), recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide.

DSM–IV–TR at 356.

78. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980).

79.  DSM–IV–TR at 27–37.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

The *DSM* approach has been criticized on a number of grounds, at least one of which is relevant to the evidence likely to be presented in legal proceedings. By requiring that persons being evaluated meet a certain number of particular criteria (e.g., five out of nine signs and symptoms of major depressive disorder), the *DSM* all but guarantees that there will be people who fall just short of qualifying for a diagnosis but may nonetheless be experiencing significant symptoms and impairment.[80] When a mental disorder diagnosis is required as a threshold determination for legal purposes, this may preclude a claim or defense based on the presence of a disorder. In part, *DSM* compensates for this problem by allowing alternative "not otherwise specified" diagnoses to be assigned to persons who fail to meet the full criteria set (e.g., "depressive disorder, not otherwise specified" for persons who fall short of meeting criteria for major depressive disorder),[81] but the problem remains. Suggestions that a more dimensional approach to diagnosis be adopted, that is, one that recognizes a spectrum of extent and severity of symptoms along a continuum associated with a given disorder,[82] have so far been rejected in favor of continuing with the current categorical system.

The goal of the *DSM* is to provide a typology that is useful to clinicians and researchers and that reflects the latest psychiatric understanding of mental disorders.[83] Periodic revisions, such as the process now under way that will result in *DSM-5*, are accomplished by groups of experts, mostly psychiatrists, but include some experts from other disciplines and are ultimately subject to the review and approval of the Board of Trustees and Assembly of the American Psychiatric Association. Hence, the process is sometimes criticized as reflecting social or political biases, as opposed to science.[84] Although such effects cannot be ruled out, to the extent that they exist, they are likely to be associated with a small number of controversial categories and proposed categories (e.g., premenstrual dysphoric disorder,[85] paraphilic rapism[86]). In addition, the *DSM* itself recognizes—in a cautionary statement in the introduction to the text—that diagnostic criteria that are appropriate for clinical or research purposes may not map directly onto legally relevant categories.[87] Caution is therefore required in moving between clinical diagnoses and legal conclusions.

80.  Harold A. Pincus et al., *Subthreshold Mental Disorders: Nosological and Research Recommendations*, *in* Advancing DSM: Dilemmas in Psychiatric Diagnosis 129 (Katharine A. Phillips et al. eds., 2002).

81.  DSM–IV–TR at 381–82.

82. See the papers on dimensional approaches to psychiatric diagnosis published in the *International Journal of Methods in Psychiatric Research,* vol. 16, supplement.

83. Because of confusion regarding the connotations of the term "mental illness," the *DSM* eschews its use. All *DSM* conditions are referred to as "mental disorders." DSM–IV–TR at xxx–xxxi.

84.  Widiger, *supra* note 40, at 25–41.

85. Anne E. Figert, Women and the Ownership of PMS: The Structuring of a Psychiatric Disorder (1996).

86. Herb Kutchins & Stuart A. Kirk, Making Us Crazy: DSM, the Psychiatric Bible and the Creation of Mental Disorders (2003).

87. The cautionary statement reads, in part: "The purpose of DSM-IV is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose,

830

EXHIBIT C

*Reference Guide on Mental Health Evidence*

Given that the anticipated publication of *DSM-5* is not due until 2013,[88] it is not possible at this writing to specify the changes that will appear in the new edition. However, current indications are that the major categories of diagnoses described in the following section will be retained, although specific changes may be made to individual diagnostic criteria.[89] The task force directing the revision process is considering potential changes to the five–axis structure that has existed since 1980,[90] minor modifications to the core definition of a mental disorder,[91] and the introduction of structured assessments of dimensions that cut across diagnostic categories, such as depressed mood, anxiety, substance use, or sleep problems.[92] Proposed changes prior to publication can be tracked on a Web site established by the American Psychiatric Association, which also offers a time line of the steps in the process.[93]

## *2. Major diagnostic categories*

Some hint of the number and diversity of mental disorders embodied in the current diagnostic typology is provided by the fact that *DSM-IV-TR* is approximately 900 pages long. However, the characteristics of the major categories of disorders that are likely to be relevant in legal proceedings can be summarized more concisely.[94]

---

communicate about, study, and treat people with various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency." DSM-IV-TR at xxxvii.

88. American Psychiatric Association, DSM-5 Development, Timeline, *available at* http://www.dsm5.org/about/Pages/Timeline.aspx.

89. American Psychiatric Association, DSM-5 Development, Proposed Draft Revisions to DSM Disorders and Criteria, *available at* http://www.dsm5.org/ProposedRevisions/Pages/Default.aspx.

90. American Psychiatric Association, DSM-5 Development, Classification Issues Under Discussion, *available at* http://www.dsm5.org/ProposedRevisions/Pages/ClassificationIssuesUnderDiscussion.aspx.

91. American Psychiatric Association, DSM-5 Development, Definition of a Mental Disorder, *available at* http://www.dsm5.org/ProposedRevisions/Pages/proposedrevision.aspx?rid=465.

92. American Psychiatric Association, DSM-5 Development, Cross–Cutting Dimensional Assessment in DSM-5, *available at* http://www.dsm5.org/ProposedRevisions/Pages/Cross–Cutting DimensionalAssessmentinDSM–5.aspx.

93. American Psychiatric Association, DSM-5 Development, DSM–5: The Future of Psychiatric Diagnosis, *available at* http://www.dsm5.org.

94. These brief summaries of complex and variable conditions are meant to provide an orientation to the nature and course of major mental disorders. The current edition of the *DSM* itself or standard psychiatric textbooks should be consulted for more complete descriptions. Note that for a diagnosis of any disorder to be made per the *DSM*, the symptoms must be deemed to "cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-IV-TR at 7.

EXHIBIT C

*Reference Manual on Scientific Evidence*

- *Schizophrenia* is a complex psychotic[95] disorder, involving delusions, hallucinations, disorganization of thought, speech, and behavior, and social withdrawal. Social and occupational functioning are markedly impaired. The course is chronic, marked by periodic exacerbations, and often by slow deterioration over time.[96]

- *Bipolar disorder* (formerly called manic–depressive disorder) is a disturbance of mood marked by episodic occurrence of both mania and depression. During manic periods, persons experience elevated, expansive, or irritable mood, accompanied by such symptoms as grandiosity, racing thoughts and pressured speech, decreased sleep, and hypersexuality. The course is chronic, but intermittent, though some patients experience a downward trajectory.[97]

- *Major depressive disorder* involves one or more episodes of depression, typically involving depressed mood, loss of pleasure, weight loss, insomnia, feelings of worthlessness, diminished ability to think or concentrate, and thoughts of death. Episodes are often, but not always, recurrent.[98]

- *Substance disorders* include both substance abuse and substance dependence, the most common of which are alcohol abuse and dependence. Abuse consists of "a maladaptive pattern of substance use leading to clinically significant impairment or distress."[99] Dependence involves, in addition, signs of tolerance, withdrawal, and lack of success in restricting substance use. These are chronic, and often relapsing, disorders, though successful recovery, with or without treatment, is possible.[100]

- *Personality disorders* are inflexible, maladaptive, and enduring patterns of perceiving and relating to oneself, other people, and the external world that cause functional impairment and distress.[101]

- *Antisocial personality disorder* is often seen in criminal courts, because it is marked by a pervasive pattern of disregard for and violation of the rights of others. Personality disorders tend to be longstanding and difficult to treat.[102]

- *Dementia* is marked by progressive impairment of cognitive abilities, including memory, language, motor functions, recognition of objects, and executive functioning.[103] The most common form of dementia is Alzheimer's disease, the incidence of which increases with age and the cause of which remains unclear, although in many cases genetics seem

---

95. Psychotic conditions involve some degree of detachment from reality, characterized by delusional thinking and hallucinatory perceptions. *Id.* at 770.

96. *Id.* at 297–317.

97. *Id.* at 382–92.

98. *Id.* at 369–76.

99. *Id.* at 199.

100. *Id.* at 192–98.

101. *Id.* at 686.

102. *Id.* at 701–06.

103. *Id.* at 147–71.

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

to play a role.[104] Other causes of dementia include multiple small strokes ("multi–infarct dementia"), trauma, and infection with certain virus–like agents.

Additional disorders that may have special legal relevance include anxiety disorders (including post-traumatic stress disorder (PTSD)), dissociative disorders (such as dissociative identity disorder, formerly multiple personality disorder), impulse control disorders (such as kleptomania and pyromania), sexual disorders (especially the paraphilias, such as pedophilia), delirium, and mental retardation.[105]

The causes of mental disorders remain to be elucidated. However, as a general proposition, it appears that many mental disorders may derive from a genetic predisposition that is activated by particular environmental circum-stances.[106] This hypothesis is supported by extensive studies of the genetics of mental disorders[107] and epidemiological studies showing a relationship between various environmental factors and occurrence of illness.[108] Only rarely at this point, however, have particular genes and given stressors been linked to a particular disorder. For example, a genetic variant in an enzyme that regulates neurotransmitter reuptake has been shown to predispose to depression, but only when the susceptible person has been exposed to stressful life events.[109]

104. Matthew B. McQueen & Deborah Blacker, *Genetics of Alzheimer's Disease*, *in* Psychiatric Genetics: Applications in Clinical Practice (Jordan W. Smoller et al. eds., 2008).

105. Rebrook v. Astrue, 2008 WL 822104 (N.D. W. Va. Mar. 26, 2008) (anxiety disorder); United States v. Holsey, 995 F.2d 960 (10th Cir. 1993) (dissociative disorder); Coe v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) (dissociative identity disorder); United States v. Miller, 146 F.3d 1281 (11th Cir. 1998) (impulse control disorder); United States v. McBroom, 991 F. Supp. 445 (D.N.J. 1998) (person receiving treatment for bipolar disorder and impulse control disorder sentenced for possession of child pornography); United States v. Silleg, 311 F.3d 557 (2d Cir. 2002) (pedophilia determination in a child pornography case); Fields v. Lyng, 705 F. Supp. 1134 (D. Md. 1988) (kleptomania); United States v. Warr, 530 F.3d 1152 (9th Cir. 2008) (sentencing of an arsonist diagnosed with pyromania upheld); Kansas v. Hendricks, 531 U.S. 346 (1997) (upholding commitment of man unable to control pedophilic impulses); United States v. Gigante, 996 F. Supp. 194 (E.D.N.Y. 1998) (dementia); Johnson v. City of Cincinnati, 39 F. Supp. 2d 1013 (S.D. Ohio 1999) (estate of man who died from police restraint during a seizure sued the city under 28 U.S.C. § 1983; Bertl v. City of Westland, 2007 WL 3333011 (E.D. Mich. Nov. 9, 2007) (finding that delirium tremens is an objectively serious medical need); Atkins v. Virginia, 536 U.S. 304 (2002) (banning the execution of the mentally retarded as a violation of the Eighth Amendment); *In re* Hearn, 418 F.3d 444 (5th Cir. 2005); Hamilton v. Southwestern Bell Tel. Co., 136 F.3d 1047, 1050 (5th Cir. 1998) (recognizing PTSD as a mental impairment for the purposes of the Americans with Disabilities Act).

106. Michael Rutter & Judy Silberg, *Gene-Environment Interplay in Relation to Emotional and Behavioral Disturbance*, 53 Ann. Rev. Psychol. 463 (2002).

107. Jordan W. Smoller et al., Psychiatric Genetics: Applications in Clinical Practice (2008).

108. Ezra Susser et al., Psychiatric Epidemiology: Searching for the Causes of Mental Disorders (2006).

109. Avshalom Caspi et al., *Role of Genotype in the Cycle of Violence in Maltreated Children*, 287 Science 851 (2002).

833

EXHIBIT C

*Reference Manual on Scientific Evidence*

Active efforts are under way to explore this "diathesis/stress hypothesis" in other mental disorders as well.[110]

## 3. Approaches to diagnosis

The solicitation of symptoms and the observation of signs necessary for a mental disorder diagnosis can be accomplished with a variety of techniques.

### a. Clinical examination

Direct clinical examination of the person whose condition is at issue is still the core of most mental health evaluations.[111] In contrast to general medicine, where examination involves the laying on of hands, evaluation of mental disorders is accomplished by careful elicitation of symptoms and observation of signs. A typical sequence of clinical examination involves exploring with the person being evaluated: the current presenting problem, including the specific symptoms experienced and the duration of such symptoms; past history of similar symptoms or other disorders and of treatment for those disorders; developmental history; social and occupational history; family history; medical history, including a review of current medical symptoms, medications taken, and substances used (e.g., alcohol, street drugs, cigarettes); and mental status examination.[112] The last category involves a structured assessment of the person's mental state, including motor function, speech, mood and affect, thought process and content, cognitive functioning, judgment, and insight, along with the presence of ideation or history of self-harm or harm toward others. Simultaneously, the clinician is observing the person's behavior and appearance to glean signs associated with mental disorders.[113] If indicated, a physical examination may be performed, if the evaluator is a psychiatrist who has maintained his or her general clinical skills, or requested.

The duration of a clinical examination sufficient to diagnose the person's condition will vary depending on the complexity of the case, the cooperativeness of the evaluee, and the questions being addressed. Examinations may take from one to several hours, sometimes spread over multiple sessions. When previous records of contact with mental health professionals are available, the clinician will ordinarily want to review them prior to the clinical examination, so that questions can be targeted more efficiently, and previous conclusions confirmed or

---

110. Margit Burmeister et al., *Psychiatric Genetics: Progress Amid Controversy*, 9 Nat. Rev. Genetics 527 (2008).

111. For an overview of the evaluation of mental health problems, see Linda B. Andrews, *The Psychiatric Interview and Mental Status Examination*, *in* The American Psychiatric Publishing Textbook of Clinical Psychiatry 3 (Robert E. Hales et al. eds., 2008).

112. American Psychiatric Association Work Group on Psychiatric Evaluation, *Practice Guideline for the Psychiatric Evaluation of Adults* (Supplement), 163 Am. J. Psychiatry 7 (2006) [hereinafter Psychiatric Evaluation of Adults].

113. Paula T. Trzepacz & Robert W. Baker, The Psychiatric Mental Status Examination (1993).

834

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

rejected.[114] Information from collateral sources (e.g., spouses, family members, friends, other health professionals) can be valuable in confirming the account given by an evaluee or in providing information not communicated by the evaluee, especially when an incentive may exist for the person being examined to exaggerate or downplay the nature and extent of symptoms.[115] In difficult cases, it may not be possible to distinguish with reasonable clinical certainty among two or more possible diagnoses; in such cases, clinicians may assign "rule out" diagnoses, indicating the range of possibilities and deferring a definitive diagnosis until more information is available.

b. Structured diagnostic interviews

When a diagnosis is based solely on a clinical examination, which is still most frequently the case, the clinician is being relied upon to conduct a complete evaluation and to apply the diagnostic criteria accurately. Studies that showed considerable variation in the results of clinical evaluations motivated the development, largely for research purposes, of structured diagnostic interviews.[116] Structured interviews provide a fixed set of questions—ensuring that important issues are not omitted from consideration—and a schema for applying the results to the diagnostic framework. Hence, they tend to show increased reliability over unassisted clinical evaluations. More complete diagnostic interviews may allow consideration of a large number of diagnostic categories;[117] focal interviews clarify whether a single disorder (e.g., obsessive–compulsive disorder[118]) or category of disorders is present (e.g., dissociative disorders[119]).

The disadvantages of structured diagnostic assessments include the time that may be required (i.e., more extensive instruments may take several hours to complete) and the fact that many persons respond negatively to an evaluation with a series of preset questions.[120] Many instruments require that the person conducting the interview be trained in their use; administration by untrained personnel may not achieve the level of reliability or validity demonstrated in research studies.[121]

114. Psychiatric Evaluation of Adults, *supra* note 112, at 16.

115. *Id.*

116. Robert Spitzer & Joseph Fleiss, *A Re-analysis of the Reliability of Psychiatric Diagnosis*, 125 Brit. J. Psychiatry 341 (1974).

117. See *generally* Michael B. First et al., User's Guide for the Structured Clinical Interview for DSM-IV Axis I Disorders: SCID-1 Clinician Version (1997).

118. *See*, *e.g.*, Wayne K. Goodman et al., The Yale Brown Obsessive Compulsive Scale (YBOCS), 1: Development, Use and Reliability, 46 Arch. Gen. Psychiatry 1006 (1989).

119. *See*, *e.g.*, Marlene Steinberg, Structured Clinical Interview for DSM-IV Dissociative Disorders (SCID-D) (1995).

120. Deborah Blacker, *Psychiatric Rating Scales*, *in* Comprehensive Textbook of Psychiatry 9th ed., 1032 (Benjamin J. Sadock, Virginia A. Sadock, & Pedro Ruiz, eds., 2009).

121. See, e.g., the recommended training requirements for the SCID, *available at* http://www.scid4.org/training/overview.html.

EXHIBIT C

*Reference Manual on Scientific Evidence*

Although structured diagnostic interviews do not reflect the current standard of care for clinical purposes, there may be some value in their use for purposes of forensic evaluation in cases with particularly difficult diagnostic questions.

Diagnostic interviews should be distinguished from instruments that assess the nature and extent of psychiatric symptomatology.[122] The former yield a conclusion about the presence or absence of a psychiatric diagnosis; the latter allow estimates of the type and magnitude of symptoms experienced, regardless of diagnosis. As with diagnostic interviews, symptom measures may be broad in their scope or assess a single type of symptom.[123] Although they are not likely to be used for the purpose of diagnosis per se, the results of applying such instruments may be introduced in evidence to establish the severity of symptoms associated with a disorder.

c. Psychological and neuropsychological tests

Formal testing of psychological functions may be used to complement the clinical diagnostic process, but often it is not necessary for a diagnosis to be made.[124] Psychological tests such as the Minnesota Multiphasic Personality Inventory (MMPI) assess multiple dimensions of personality and mental state; research over many years of use has established correlations between patterns of performance on the MMPI and particular mental disorders, which may be helpful in establishing or confirming a diagnosis, particularly when the results of a clinical examination are inconclusive.[125] Tests of intelligence, such as the Wechsler Adult Intelligence Scale (WAIS-III), are important in establishing the presence of mental retardation and determining its severity.[126] Projective tests, such as the famed Rorschach ink-blot test or the Thematic Apperception Test, were once used more widely than they are today as a means of probing the nature and content of a person's thought processes; although results were said to be helpful for diagnostic purposes, questions about the reliability and validity of projective measures have limited their use.[127] Other tests target personality traits, such as psychopathy, or behavioral characteristics, such as impulsivity, and may be helpful but not determinative in making a diagnosis of mental disorder.[128]

122. *See*, *e.g.*, John E. Overall & Donald R. Gorham, *The Brief Psychiatric Rating Scale (BPRS): Recent Developments in Ascertainment and Scaling*, 24 Psychopharmacology Bull. 97 (1988).

123. Compare the BPRS, *supra* note 122, with the *Beck Depression Inventory*, *in* Aaron T. Beck et al., Manual for the Beck Depression Inventory-II (1996).

124. See discussion in John F. Clarkin et al., *The Role of Psychiatric Measures in Assessment and Treatment*, *in* Hales et al., *supra* note 111, at 73.

125. Starke R. Hathaway & John C. McKinley, Minnesota Multiphasic Personality Inventory-2 (1989).

126. David Wechsler, Wechsler Adult Intelligence Scale-III Administrative and Scoring Manual (1997).

127. Scott O. Lilienfeld et al., *The Scientific Status of Projective Techniques*, 1 Psychol. Sci. Publ. Int. 27 (2000).

128. *See*, *e.g.*, Robert Hare, The Psychopathy Checklist-Revised (1991); Ernest S. Barratt, *Impulsiveness and Aggression*, *in* Violence and Mental Disorder: Developments in Risk Assessment 61 (John Monahan & Henry J. Steadman eds., 1996).

EXHIBIT C

*Reference Guide on Mental Health Evidence*

No bright line distinguishes psychological from neuropsychological tests, but in general the latter are focused on assessing the integrity of the functioning of the brain itself.[129] Hence, they may be helpful—and sometimes even essential—in the diagnosis of states of impaired brain function, such as may occur in the wake of traumatic brain injury, infections such as meningitis, and learning disabilities. Neuropsychological testing usually involves the administration of a battery of measures, each targeting a relatively discrete area of function, such as attention, memory, verbal abilities, visual recognition, spatial perception, and the like. The tests selected by neuropsychologists as part of a battery will often vary on the basis of the person's history and suspected condition; thus, it is important before accepting a conclusion that "neuropsychological testing showed no signs of abnormality" to ascertain precisely which functions were specifically assessed.

Neuropsychological testing can be particularly helpful in the diagnosis of dementia, a condition that may lead to legal challenges to a person's decisional or performative capacities. Although the diagnosis may be suggested by elements of the person's history (e.g., forgetfulness, disorientation), serial testing of cognitive functions can provide strong evidence for a progressive disorder.[130] The most frequently used test is the Mini–Mental Status Examination (MMSE), a 20-question screening tool that can be applied by primary care and other clinicians in ordinary treatment settings. Structural and functional brain imaging can be helpful in ruling out other causes of the person's cognitive decline.[131]

d. Imaging studies

Progress has been made in recent years in the use of radiological techniques to assist in the diagnosis and evaluation of mental disorders. With the development of computer-assisted tomography (CAT or CT), a noninvasive technique became available for clinicians to visualize aspects of the gross structure of the brain.[132] CT scans, which use traditional X rays to provide computer-reconstructed pictures of "slices" through the brain, especially when combined with injection of radio-opaque dye into the bloodstream, permit the detection of intracranial masses (e.g., tumors), stroke, atrophy (e.g., associated with Alzheimer's disease and other dementias), and other deformations of brain structure. More recently, magnetic resonance imaging (MRI) has replaced CT scans in many of the situations in which they previously would have been used. MRI offers higher resolution of

129. Clarkin et al., *supra* note 124.

130. Diane B. Howieson & Muriel D. Lezak, *The Neuropsychological Examination*, *in* The American Psychiatric Publishing Textbook of Neuropsychiatry and Clinical Neurosciences 215–43 (Stuart C. Yudovsky & Robert E. Hales eds., 5th ed. 2008).

131. Marshall F. Folstein et al., *Mini-Mental State: A Practical Method for Grading the Cognitive State of Patients for the Clinician*, 12 J. Psychiatric Res. 189 (1975). *See* discussion *infra* Section I.C.3.d.

132. Robin A. Hurley et al., *Clinical and Functional Imaging in Neuropsychiatry*, *in* Yudofsky & Hales, *supra* note 130, 245.

EXHIBIT C

*Reference Manual on Scientific Evidence*

brain structures without exposure to X-rays.[133] Regardless of whether CT or MRI is used, however, it is important to note that, despite evidence for the localization of some brain functions (e.g., speech, vision), the general tendency for the brain to function as an integrated network limits the conclusions that can be drawn about a person's functional abilities on the basis of structural studies alone.[134]

Functional imaging techniques have augmented the ability of clinicians to get inside the "black box" of the brain to more directly assess aspects of brain function. These include functional MRI (fMRI), single-photon emission computerized tomography (SPECT), and proton emission tomography (PET).[135] What they have in common is the capacity to detect changes in such characteristics of the brain as blood flow or oxygen saturation of the blood that presumably correlate with the activity of a given brain area. Thus, functional imaging can identify regions with aberrant patterns of activity that may be associated with impaired function in that area of the brain. Again, however, conclusions relevant to diagnosis or impairment of capacities are limited by the frequent absence of a tight correlation between functional imaging findings and actual functional impairment of a sort likely to have legal relevance.[136]

### e. Laboratory tests

Use of standard laboratory tests may be helpful in ruling out general medical causes of abnormal mental states and behavior. For example, low levels of thyroid hormone may be associated with a state that resembles a major depressive episode, vitamin B-12 deficiency can lead to psychosis, and disturbance of the balance of electrolytes in the blood can cause states of delirium.[137] Each of these conditions is responsive to treatment of the underlying disorder, and all can lead to more severe and permanent impairments if untreated. Infectious diseases such as HIV, syphilis, and Lyme disease can present as mental disorders otherwise indistinguishable from depression, mania, and acute psychosis; all can be detected with appropriate blood tests.[138] Behavioral abnormalities that may be mistaken for mental disorders can be caused by several forms of epilepsy, which are usually detectable

---

133. *Id*.

134. William R. Uttal, The New Phrenology: The Limits of Localizing Cognitive Processes in the Brain (2003).

135. Yudofsky & Hales, Hurley et al., *supra* note 132 at 261–2.

136. Stephen J. Morse, *Moral and Legal Responsibility and the New Neuroscience*, *in* Neuroethics: Defining the Issues in Theory, Practice and Policy 33 (Judy Illes ed., 2006).

137. H. Florence Kim et al., *Laboratory Testing and Imaging Studies in Psychiatry*, *in* Hales et al., *supra* note 111, at 19–49.

138. Glenn J. Treisman et al., *Neuropsychiatric Aspects of HIV Infection and AIDS*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 506–31; Brian A. Fallon, *Neuropsychiatric Aspects of Other Infectious Diseases (non-HIV)*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 532–41.

EXHIBIT C

by electroencephalogram (EEG).[139] When there is any reason to suspect, on the basis of a person's history or the findings of a clinical evaluation, that a general medical disorder may exist, laboratory testing is an essential aspect of a complete evaluation. On the other hand, despite many years of investigation of possible correlates of the major mental disorders in blood, urine, and other bodily fluids, there are no laboratory tests that can identify schizophrenia, bipolar disorder, major depression, or other mental disorders.[140]

### f. Previous medical and mental health records

Among the most helpful adjunctive sources of information for a diagnostic assessment are the person's records of previous contact with the medical and mental health systems.[141] Past records can confirm a person's account or point to discrepancies that require further exploration (which is particularly important, as described in Section I.C.4, *infra*, when malingering is suspected). Such factors as age of onset, progression of illness, and variability of symptoms, all of which may affect diagnostic choices, can be determined from records of previous medical and mental health evaluations, as can susceptibility to treatment and need for other supportive interventions.

## 4. Accuracy of diagnosis of mental disorders

Diagnostic accuracy has two separate aspects: (1) reliability—the extent to which two or more examiners of the same person would derive the same diagnosis, and (2) validity—the extent to which the diagnosis corresponds to the person's actual mental state.[142] It is axiomatic that reliability is a necessary, but not sufficient, condition for validity. Prior to the introduction of *DSM-III* in 1980, several influential studies showed poor reliability of psychiatric diagnosis, even for major disorders such as schizophrenia.[143] Reliability improved with the new, criteria-based categories that were introduced at that point, but remains greater for broader categories of diagnosis, such as psychosis, than for finer distinctions, such as whether a person suffers from schizophrenia or the similar but not identical syndrome of schizoaffective disorder.[144] For most purposes, however, as discussed

---

139. H. Florence Kim, et al., *Neuropsychiatric Aspects of Seizure Disorders*, *in* Yudofsky & Hales, *supra* note 132, at 649–76.

140. Barry H. Guze & Martha J. Love, *Medical Assessment and Laboratory Testing in Psychiatry*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 996.

141. Psychiatric Evaluation of Adults, *supra* note 112, at 16.

142. *See* Robert E. Kendell, *Five Criteria for an Improved Taxonomy of Mental Disorders*, *in* Defining Psychopathology in the 21st Century 3 (John E. Helzer & James J. Hudziak eds., 2002).

143. Spitzer and Fleiss, *supra* note 116.

144. Robert L. Spitzer et al., *DSM-III Field Trials: I. Initial Interrater Diagnostic Reliability*, 136 Am. J. Psychiatry 815 (1979); *see also* DSM-III at 467–72; Joseph D. Matarazzo, *The Reliability of Psychiatric and Psychological Diagnosis*, 3 Clinical Psychol. Rev. 103–45 (1983); Peter E. Nathan & James

EXHIBIT C

below (*see* Section I.D), it is unlikely that differences within broader categories of diagnosis will have significance for the legal issue at stake.

The validity of a diagnosis of mental disorder depends on the underlying validity of the diagnostic criteria, that is, the extent to which they accurately characterize a particular psychiatric disorder; and on the validity of the judgment of the diagnosing clinician in a given case, that is, how well the clinician has applied the criteria. Diagnostic criteria can be judged on how well they identify a syndrome whose symptomatology, heritability, course, and treatment response, among other variables, differentiate it from similar disorders.[145] *DSM-IV-TR* diagnostic criteria vary along these dimensions, and it is impossible to make a general statement about the validity of the diagnostic framework as a whole.[146] Again, however, for most legal determinations it is the presence or absence of any mental disorder and associated levels of functional impairment that will be at issue, rather than distinctions among similar disorders. How well the criteria have been applied in a particular case can be determined more easily, whether by means of cross-examination or by virtue of conflicting expert testimony offered by the adverse party.

## 5. Detection of malingering

Because the diagnosis of mental disorders rests heavily on the elicitation of symptoms from the person being evaluated and observations of the person's behavior, the possibility of malingering—the deliberate simulation of symptoms of mental disorder—must always be considered.[147] Most commonly, the likelihood of malingering is assessed as part of a clinical evaluation. The pattern of symptoms reported by the person is compared with known syndromes, and the consistency of his or her behaviors is observed. Contrary to common belief, mental disorders are not easy to fake, especially when the deception must be sustained over a period of time.[148]

When deception is suspected, efforts to confirm it should begin during the clinical examination, as the person is offered the opportunity to endorse symptoms that are unlikely to occur naturally (e.g., "Do you ever feel as though the cars on the street are talking about you?") or do not fit the condition from which the

W. Langenbucher, *Psychopathology: Description and Classification*, 50 Ann. Rev. Psychol. 79 (1999). Reliability in actual clinical practice may well be less than has been demonstrated in research settings, especially when the latter make use of structured assessment instruments. *See*, *e.g.*, M. Katherine Shear et al., *Diagnosis of Nonpsychotic Patients in Community Clinics*, 157 Am. J. Psychiatry 581 (2000).

145. The Validity of Psychiatric Diagnosis (Lee N. Robins & James E. Barrett eds., 1989).

146. Kendell, *supra* note 142.

147. Phillip J. Resnick, *Malingering*, *in* Principles and Practice of Forensic Psychiatry 543 (Richard Rosner ed., 2003).

148. *Id*. at 544.

**EXHIBIT C**

patient is claiming to suffer.[149] Psychological testing can be helpful in detecting deception; the MMPI-2, for example, has scales that correlate with persons who are both "faking bad" (i.e., fabricating symptoms) and "faking good" (i.e., hiding symptoms that actually exist).[150] Other instruments specifically for the assessment of malingering also have been developed, with varying degrees of validation.[151] Information from records of previous psychiatric or psychological evaluations can be helpful in determining the congruence of the person's current symptoms with past reports and behaviors. In addition, given the difficulty in maintaining a consistent pattern of deception over a sustained period, data provided by collateral sources (e.g., family members, roommates, prisoners in adjoining cells, correctional officers, nurses and other hospital staff, and others who have been in contact with the person) who have observed the person informally outside of the evaluator's presence can be crucial in distinguishing real from malingered disorders.[152]

The difficulty of simulating a mental disorder does not imply that it is impossible to do. Indeed, a skilled and determined person can sometimes fool even an experienced evaluator. Thus, the only honest response that a clinician can give in almost every circumstance to a question about the possibility of malingering is that it is always possible, but is more or less likely in this particular case, given the characteristics of the person being evaluated.[153]

## D. Functional Impairment Due to Mental Disorders

### 1. Impact of mental disorders on functional capacities

Mental disorders can affect functional capacities in a variety of ways. Among these, *attention* and *concentration* may be impaired by the preoccupations that appear in anxiety and depressive disorders, or the grosser distractions (e.g., auditory hallucinations) of psychotic disorders.[154] *Perception* is often distorted in psychotic condi-

---

149. Paul S. Appelbaum & Thomas G. Gutheil, Clinical Handbook of Psychiatry and the Law 248–49 (2007).

150. Roger L. Greene, *Malingering and Defensiveness on the MMPI-II*, *in* Clinical Assessment of Malingering and Deception 159 (Richard Rogers ed., 2008). These scales, especially the most prominent of them, the "Fake Bad Scale (FBS)," are not without controversy that has sometimes led courts to rule them inadmissible. David Armstrong, *Malingerer Test Roils Personal-Injury Law: "Fake Bad Scale" Bars Real Victims, Its Critics Contend*, Wall Street J., Mar. 5, 2008, at A1. However, the bulk of the psychological literature appears to support the validity of the FBS and many of the other MMPI-based malingering scales. Nathaniel W. Nelson et al., *Meta-Analysis of the MMPI-2 Fake Bad Scale: Utility in Forensic Practice*, 20 Clinical Neuropsychologist 39 (2006).

151. Richard Rogers, *Structured Interviews and Dissimulation*, *in* Clinical Assessment of Malingering and Deception 301–22 (Richard Rogers ed., 2008).

152. Appelbaum & Gutheil, *supra* note 149.

153. Resnick, *supra* note 147.

154. Ronald A. Cohen et al., *Neuropsychiatric Aspects of Disorders of Attention*, *in* Yudofsky and Hales, *supra* note 132, at 405–44.

EXHIBIT C

*Reference Manual on Scientific Evidence*

tions, as manifest by hallucinations of the auditory, visual, tactile, or other sensory systems.[155] *Cognition*, encompassing both the process and content of thought, is also often affected: Thought processes can be impeded by the slowing of thought in depression, its acceleration in mania, or the scrambling of thought experienced by persons with schizophrenia or other psychotic disorders; thought content may be altered by the odd reasoning to which persons with delusions appear to be prone.[156] *Motivation* to act, even in one's self-interest, is often globally reduced in states of intense depression and in schizophrenia.[157] *Judgment and insight* may be altered under the pressure of delusions.[158] *Control of behavior* can be weakened by the impulsivity seen in mania and psychosis, the drives of the impulse disorders, and the use of disinhibiting substances, especially alcohol.[159] Any of these impairments in principle could affect a person's relevant decisional and performative capacities.

This necessarily incomplete list of the ways in which mental disorders can affect functional capacities illustrates the vulnerability of almost every aspect of mental functioning to perturbation. Moreover, although it is common to divide mental functions into categories such as these for heuristic purposes, most neuroscientists recognize that the brain operates as a unified entity.[160] Thus, it is rare that impairments are limited to a single area of functioning. Impaired concentration, for example, inherently affects cognitive abilities, which in turn may alter judgment and therefore the person's choice of behaviors. Although focal deficits may occur, for example, the anxiety associated with exposure to a phobic stimulus such as a spider, more severe disorders will have a broader impact on a person's functional capacities as a whole.[161]

## 2. Assessment of functional impairment

Determining the nature and extent of past, present, or future functional impairment, therefore, is usually the most critical aspect of a mental health evaluation and subsequent presentation of mental health evidence.

155. Andre Aleman & Frank Laroi, Hallucinations: The Science of Idiosyncratic Perception (2008).

156. Ann A. Matorin & Pedro Ruiz, *Clinical Manifestations of Psychiatric Disorders*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 1076–81.

157. *Id.* at 1092–93.

158. Phillipa A. Garety, *Insight and Delusions*, *in* Insight and Psychosis 66, 66–77 (Xavier F. Amador & Anthony S. David eds., 1998).

159. Eric Hollander et al., *Neuropsychiatric Aspects of Aggression and Impulse-Control Disorders*, *in* Yudofsky & Hales, *supra* note 132, at 535–66.

160. William R. Uttal, *supra* note 134.

161. The pervasive impact of schizophrenia on all aspects of personality and functioning is the most extreme example. *See* Michael J. Minzenberg et al., *Schizophrenia*, *in* Hales et al., *supra* note 111, at 407–56.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

### a. Clinical examination

As in establishing a diagnosis, the core of the assessment of functional impairment remains the clinical examination.[162] A diagnostic assessment may be integral to the functional assessment process, suggesting to the examiner areas of possible impairment to be explored in greater depth (e.g., attentional and concentration abilities in an anxiety disorder; impairments in motivation in a depressive disorder). Beginning in the 1970s, however, there was growing recognition among the mental health professions that merely establishing a diagnosis is insufficient to permit a conclusion to be drawn about a legally relevant capacity, because a broad range of functional impairments can be associated with almost any mental disorder.[163]

Thus, in addition to a diagnostic assessment, an adequate examination will explore the person's perspective on the alleged functional impairment and will probe for symptoms associated with such impairment. The process involves more than simply taking the person's word for the issue in question, for example, that she was not able to comprehend the details of the contract to which she is a party, or that he remains incapable of the careful calculations required in his job. Assessors compare the claimed impairments with the person's overall history and other areas of function, looking for congruence or incongruence. For example, the assertion by a plaintiff that because of being harassed on the job he has been unable to concentrate sufficiently to work will be more or less plausible depending on the consistency and extent of his symptoms and the degree to which the impairment may generalize to other areas of his life. Degrees of impairment that are out of scale with the extent of symptoms or the person's functional history are inherently suspect.[164]

In addition to questioning the evaluee directly, the use of collateral information can be essential to a valid assessment, particularly when the person has an incentive to malinger, which will often be the case in legal proceedings.[165] Family members, coworkers, and others who have had an opportunity to observe the person can provide invaluable information about the nature and extent of impairments, although one must always be alert to the possibility that informants will be motivated to assist the person by distorting or exaggerating their accounts. Records of performance, such as educational test results and work evaluations, especially if generated prior to the filing of the legal claim, may shed somewhat more objective light on the person's capacities.[166] To the extent that impairments

---

162. *See supra* Section I.C.2.a.

163. Michael Kindred, *Guardianship and Limitations upon Capacity*, *in* The Mentally Retarded and the Law 62 (The President's Committee on Mental Retardation, 1976); Laboratory of Community Psychiatry, Harvard Medical School, Competency to Stand Trial and Mental Illness (1973).

164. Richard Rogers, *Detection Strategies for Malingering and Defensiveness*, *in* Clinical Assessment of Malingering and Deception 14 (Richard Rogers ed., 2008).

165. Appelbaum & Gutheil, *supra* note 149.

166. Melton et al., *supra* note 28, at 53–55.

843

EXHIBIT C

*Reference Manual on Scientific Evidence*

may be rooted in disruptions of brain functions per se, neuropsychological testing can also be helpful in documenting their nature and extent. Increasingly, however, it has been accepted that an unstructured clinical evaluation, even when supplemented by collateral information, is not necessarily the most accurate tool, standing on its own, for determining functional capacity.[167]

### b. Structured assessment techniques

As with determination of diagnosis, the evaluation of the limitations of function due to mental disorders increasingly involves the use of structured assessment techniques.[168] Most commonly, these are standardized interviews or data-gathering protocols (e.g., based on a person's psychiatric record) designed to ensure that all relevant information is obtained. In addition, where research has established the validity of the instruments by demonstrating a correlation between the results and actual impairments, these techniques may allow a quantitative estimate to be made of the extent of actual functional deficiencies. A recent compendium of assessment instruments included structured evaluations that address criminal defendants' competence to stand trial, waiver of rights to silence and legal counsel, criminal responsibility and persons' parenting capacity, competence to manage one's affairs (i.e., need for a guardian or conservator), and competence to consent to medical treatment and research.[169] Given that this area is a rapidly developing focus of research, instruments to address other legally relevant functional capacities and states—propensity to commit violent or sexual offenses comes quickly to mind[170]—are continuously being tested and developed.

Although most assessment techniques rely on information gathered from the person being evaluated or from existing records, some approaches involve direct testing of the person's capacity to perform particular tasks. Examples include computerized assessment of driving capacities,[171] observation of tasks involving

---

167. **Grisso,** *supra* note 2. Surprisingly few studies exist of the reliability of clinical forensic evaluations. The only U.S. study of actual assessments showed good interrater reliability of evaluations of competence to stand trial, although many of the reports were deficient in other ways. Jennifer L. Skeem et al., *Logic and Reliability of Evaluations of Competence to Stand Trial,* 22 Law Hum. Behav. 519 (1998). A more recent Australian study found only fair to moderate reliability across assessments of competence to stand trial, but moderate to good reliability of criminal responsibility evaluations. Matthew Large et al., *Reliability of Psychiatric Evidence in Serious Criminal Matters: Fitness to Stand Trial and the Defence of Mental Illness*, 43 Austl. N.Z. J. Psychiatry 446 (2009).

168. *Id*.

169. *Id*.

170. *See*, *e.g.*, Christopher D. Webster et al., HCR-20 Assessing Risk for Violence Manual, Version 2 (1997); Vernon L. Quinsey et al., Violent Offenders: Appraising and Managing Risk (1998); John Monahan et al., COVR—Classification of Violence Risk, Professional Manual (2005).

171. Maria T. Schultheis et al., *The Neurocognitive Driving Test: Applying Technology to the Assessment of Driving Ability Following Brain Injury*, 48 Rehabilitation Psychol. 275 (2003).

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

the handling and management of money[172] and of parenting skills,[173] and direct measurement of such capacities as understanding and reasoning about medical information when a person's competence to decide about medical treatment is at issue.[174] In general, these approaches reduce the degree of inference required in drawing conclusions about a person's functioning because the person is observed performing something close to the precise tasks in question. Of course, such techniques may not be relevant when the legal issue relates to the impact of mental disorder on functional abilities at some time in the past or in the future, especially if the person's mental state at present may be different from what it was or will be. Nonetheless, these can be useful approaches to evaluation in appropriate legal contexts.

The advantages that attend the use of structured assessment instruments include the thoroughness of the evaluation, because the likelihood is reduced that variables that have been shown to be important to assessment will be omitted, and in many cases, a research base exists from which conclusions can be drawn regarding the degree of functional impairment of the person being assessed.[175] Indeed, in some jurisdictions, the use of structured assessments is required for particular purposes (e.g., evaluation of sexual offenders).[176] However, it remains true that the use of structured assessments performed for the purpose of being introduced in legal proceedings is variable and far from universal.[177] Grisso, the leading scholar in this area, suggests three reasons why this is still true: (1) it is easier and may be more lucrative (i.e., where a fixed rate is being paid per evaluation) for an examiner to avoid the frequently time-consuming use of a structured instrument; (2) many cases involve persons whose functional impairments—or lack of impairment—are obvious, and use of a structured assessment instrument would be "overkill"; and (3) perhaps paradoxically, the use of an assessment tool makes experts more vulnerable to attack on cross-examination.[178] To this list should be added the lack of knowledge of many expert witnesses regarding the existence of these instruments and a sense that their use denigrates the evaluator's expertise.

The vulnerability of testimony based on assessment instruments to cross-examination is worth special emphasis. Opinions offered on the basis of "clinical

---

172. Dan Marson et al., *Assessing Financial Capacity in Patients with Alzheimer's Disease: A Conceptual Model and Prototype Instrument*, 57 Archives Neurology 877 (2000).

173. Marc J. Ackerman & Kathleen Schoendorf, Ackerman-Schoendorf Scales for Parent Evaluation of Custody Manual (1992).

174. Thomas Grisso & Paul S. Appelbaum, MacArthur Competence Assessment Tool for Treatment (MacCAT-T) (1998).

175. Grisso, *supra* note 2, at 45–47.

176. *See, e.g.,* Va. Code Ann. § 37.2-903-C: "Each month the Director shall review the database and identify all such prisoners who are scheduled for release from prison within 10 months from the date of such review who receive a score of five or more on the Static-99 or a like score on a comparable, scientifically validated instrument designated by the Commissioner. . . ."

177. Grisso, *supra* note 2, at 481.

178. *Id.* at 481–82.

EXHIBIT C

experience," which appears to be the norm, are difficult to challenge when expert witnesses in fact have appropriate training and a good deal of experience with the condition in question.[179] On the other hand, assessment instruments can be subjected to scrutiny with regard to the empirical database that supports their use, including their reliability and validity, their acceptance by the relevant professional community, and their probative value in a particular case. There may also be questions regarding the examiner's training and experience with the instrument and whether it was administered in the manner intended by its developers. All of these are legitimate questions, of course, and an argument can be made that the introduction of data from assessment instruments into evidence should be held to a more rigorous standard, because factfinders may give such data greater credence than unassisted clinical judgment.[180] But the undoubted consequence is that the arguably more reliable and perhaps more valid data from empirically derived assessment techniques are less likely to be introduced in evidence than evaluators' subjective judgments of unknown validity.[181]

## E. Predictive Assessments

As noted above,[182] predictive assessments are the most challenging evaluations performed by mental health professionals.[183] The most common tasks involve the prediction of violence risk and of future functional impairment and responses to treatment.

### 1. Prediction of violence risk

The probability that a person may commit a violent act at some point in the future may come into play in the criminal process regarding determinations of suitability for diversion, bail, sentencing, probation, and parole, and in the civil process in hearings for civil commitment to psychiatric facilities and sexual offender treat-

---

179. *See* 4 Jack B. Weinstein, Weinstein's Federal Evidence § 702:02 n.1 (2d ed. 2008) on the liberal admissibility of expert testimony under Federal Rule of Evidence 702; § 702.02[4] nn.25–27 on the trial judge's broad discretion to admit or exclude expert testimony, to determine its helpfulness and relevancy, and the application of the "abuse of discretion" standard of review to determinations of whether a witness qualifies as an expert; § 702.04[1][c] on the typical "academic credentials plus experience" combination. Bryan v. City of Chicago, 200 F.3d 1092 (7th Cir. 2000) (an expert may qualify based on academic expertise and practical experience).

180. Christopher Slobogin, *Experts, Mental States, and Acts*, 38 Seton Hall L. Rev. 1009 (2008).

181. Grisso, *supra* note 2, at 482.

182. *See supra* Section I.A.1.

183. Yogi Berra, New York Yankees' Hall of Fame catcher and philosopher of everyday life, is purported to have said, "It's tough to make predictions, especially about the future." *See* http://www.famous-quotes-and-quotations.com/yogi-berra-quotes.html. For a discussion of the origin of this phrase, see Henry T. Greely & Anthony D. Wagner, Reference Guide on Neuroscience, Section VII, in this manual.

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

ment programs and when considering the imposition of liability on clinicians and facilities for failing to protect victims of patients' violence.[184] Although not all persons for whom such assessments must be made will have mental disorders, many will, and, in any event, psychiatrists and psychologists are seen by the courts as having expertise in this area and hence are almost invariably called upon for these evaluations.[185]

Persons with serious mental disorders, such as schizophrenia or bipolar disorder, are often considered by the general public to be at high risk for violence.[186] However, data on the relationship between serious mental disorders (schizophrenia is the disorder most frequently studied) and violence are variable. Although most studies suggest a moderately elevated risk, the proportion of violence accounted for by serious mental disorders is small, probably 3% to 5%, based on the best available U.S. estimates.[187] Data also suggest that the stereotype of violent mental patients who assault strangers in public places is inaccurate: Most violence by persons with serious mental disorders is directed at family members and friends and usually occurs in the living quarters of the perpetrator or the victim.[188] Much higher rates of violence are associated with substance use, especially alcohol use, and with traits such as psychopathy, often found in antisocial personality disorders.[189] Indeed, most of the strongest predictors of violence are common to both persons with serious mental disorders and those without, suggesting that the impact of the disorders per se is slight.[190]

a. Approaches to prediction of violence risk

Clinical evaluation of violence risk ordinarily focuses on those variables that have been shown in empirical research to have the strongest relationship to future violence,[191] whether the information is gleaned directly from the person or

---

184. *See, e.g.*, Kansas v. Hendricks, 521 U.S. 346 (1997); White v. Johnson, 153 F.3d 197 (5th Cir. 1998). A unanimous U.S. Supreme Court pointed to the importance of considering empirical data in identifying circumstances associated with increased risk of violence in *Chambers v. United States*, 130 S. Ct. 567, 691–93 (2009).

185. *See* Joanmarie Ilaria Davoli, *Psychiatric Evidence on Trial*, 56 SMU L. Rev. 2191 (2003).

186. Bernice Pescosolido et al., *The Public's View of the Competence, Dangerousness and Need for Legal Coercion Among Persons with Mental Illness*, 89 Am. J. Pub. Health 1339 (1999).

187. Jeffrey W. Swanson, *Mental Disorder, Substance Abuse, and Community Violence: An Epidemiologic Approach*, *in* Violence and Mental Disorder: Developments in Risk Assessment 101, 101–36 (John Monahan & Henry J. Steadman eds., 1994); Paul S. Appelbaum, *Violence and Mental Disorders: Data and Public Policy* (editorial), 163 Am. J. Psychiatry 1319 (2006).

188. Henry J. Steadman et al., *Violence by People Discharged from Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods*, 55 Archives Gen. Psychiatry 393 (1998).

189. John Monahan et al., Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence (2001).

190. *Id*. at 37–90; Simon Wessely, *The Epidemiology of Crime, Violence, and Schizophrenia*, 170 Brit. J Psychiatry 11 (1997).

191. Appelbaum & Gutheil, *supra* note 149, at 56.

847

EXHIBIT C

*Reference Manual on Scientific Evidence*

derived from collateral informants or from a review of relevant records. These variables include a history of previous violence, age (violence risk peaks in the late teens and early twenties, declines slowly through the twenties and thirties, and drops off precipitously after age 40), male gender, lower socioeconomic status and employment instability, substance abuse, psychopathic personality traits, and childhood victimization.[192] The evaluation process is complicated by the fact that literally scores of variables show some significant correlation with future violence, but usually with little predictive power for each.[193] However, beginning with the variables noted above, the evaluator estimates the baseline risk of violence for the person and then adjusts that value by taking into account foreseeable perturbations to the current equilibrium. When previous violence has occurred, the risk estimate is adjusted to include those specific variables that have been associated with violence by this person in the past (e.g., being left by a girlfriend), including whether they are present at the time of evaluation or likely to recur in the future.[194]

The past two decades have seen the development of a growing number of structured assessment instruments specific to the prediction of future violence risk. Among the best known of these are the HCR–20,[195] the Violence Risk Assessment Guide (VRAG),[196] and the computerized Classification of Violence Risk (COVR).[197] A set of instruments also exists for the prediction of the risk of future sexual offenses.[198] Violence risk–assessment instruments have been developed in one of two ways: either by assembling known predictors from the research literature and combining them with variables drawn from clinical experience (e.g., HCR–20), or on the basis of statistical analysis of research data from large subject populations (e.g., VRAG and COVR). Attempts are then made to validate the instruments on populations similar to the ones with which it is anticipated they will be used. The more sophisticated measures yield estimates of the degree of risk, rather than dichotomous predictions that violence will or will not occur. In general, the most commonly used instruments have shown a correlation between the estimated degree of risk and future violence.[199]

---

192. *Id.*

193. Monahan et al., *supra* note 189, at 163–68.

194. Appelbaum & Gutheil, *supra* note 149.

195. Webster et al., *supra* note 170.

196. Quinsey et al., *supra* note 170.

197. Monahan et al., *supra* note 170.

198. Calvin M. Langton et al., *Actuarial Assessment of Risk for Reoffense Among Adult Sex Offender: Evaluating the Predictive Accuracy of the Static-2002 and Five Other Instruments*, 34 Crim. Just. & Behav. 37–59 (2007).

199. Kevin S. Douglas et al., *Assessing Risk for Violence Among Psychiatric Patients*, 67 J. Consulting Clinical Psychol. 917 (1999); Grant T. Harris et al., *Prospective Replication of the Violence Risk Appraisal Guide in Predicting Violent Recidivism Among Forensic Patients*, 26 Law & Hum. Behav. 377 (2002); John Monahan et al., *An Actuarial Model of Violence Risk Assessment for Persons with Mental Disorders*, 56 Psychiatric Servs. 810 (2005).

EXHIBIT C

*Reference Guide on Mental Health Evidence*

The literature on prediction is marked by strong and unresolved differences of opinion over the best basis for the ultimate risk estimate. Partisans of exclusive reliance on the quantitative predictions generated by structured assessment instruments, which is often referred to as "actuarial" prediction, argue that any attempts to modify the resulting risk estimates necessarily reduce accuracy.[200] Proponents of clinical evaluation note that exclusive reliance on instrumentation is unwise because of the inevitable questions about the applicability of the group data on which an instrument is based to the person being evaluated; the failure of a fixed set of questions ever to capture all the variables that may be relevant in a particular situation; and the potential uncooperativeness of evaluees with a structured process.[201] Compromise approaches include anchoring the estimate in the actuarial prediction, but allowing clinical judgment to modify the results on the basis of additional considerations, or using an instrument to structure the evaluation and ensure its completeness, but allowing the evaluator to reach a judgment on the basis of the totality of the information. This last approach has been termed "structured professional judgment,"[202] and at least one study has suggested that it is capable of yielding predictions with reasonable degrees of accuracy.[203] It is fair to say that the question of which approach is best remains unresolved.

b. Limitations of violence risk prediction

A voluminous research literature exists on violence risk prediction. Studies of predictions by psychiatrists and psychologists in the 1960s and 1970s showed poor accuracy in judging whether persons with mental disorders and sex offenders would be likely to be violent at some point after release.[204] Indeed, the most frequently cited conclusion was Monahan's statement that when mental health professionals predicted that a person would be violent, they were twice as likely to be wrong as right.[205] The cumulative impact of these findings stimulated a great deal of research to identify variables that predict violence and their incorporation into both clinical predictions and the structured assessment instruments described above.[206]

---

200. N. Zoe Hilton et al., *Sixty-Six Years of Research on the Clinical Versus Actuarial Prediction of Violence*, 34 Counseling Psychol. 400 (2006).

201. Thomas R. Litwak, *Actuarial Versus Clinical Assessments of Dangerousness*, 7 Psychol. Pub. Pol'y & L. 409 (2001); Andrew Carroll, *Are Violence Risk Assessment Tools Clinically Useful?* 41 Austrl. & N.Z. J. Psychiatry 301 (2007).

202. Kevin S. Douglas & P. Randall Kropp, *A Prevention-Based Paradigm for Violence Risk Assessment: Clinical and Research Applications*, 29 Crim. Just. & Behav. 617 (2002).

203. Kevin S. Douglas et al., *Evaluation of a Model of Violence Risk Assessment Among Forensic Psychiatric Patients*, 54 Psychiatric Servs. 1372 (2003).

204. John Monahan, The Clinical Prediction of Violent Behavior (1981).

205. *Id.* at 60.

206. John Monahan, *Clinical and Actuarial Predictions of Violence: II. Scientific Status, in* Modern Scientific Evidence: The Law and Science of Expert Testimony, vol. 1, at 122, 122–47 (David L. Faigman et al., 2007).

EXHIBIT C

*Reference Manual on Scientific Evidence*

At this point, it is possible to identify several items of consensus from the research literature. Violence is not a unitary phenomenon; that is, it occurs for different reasons, related both to the motivations of the perpetrator and to the environmental context.[207] A bar-room brawl has different roots than a mugging; the precipitants of spouse abuse bear little similarity to the motivations underlying a killing that has been premeditated as an act of revenge. Thus, no single variable or set of variables can be relied upon in all cases to ascertain violence risk. Long-term prediction of violence is inherently inaccurate, due both to the intrinsic limitations in the prediction of low-frequency events[208] and to the difficulty that clinicians have in anticipating changes in the person and the environment over time and their effects on the person's behavior.[209] However, shorter-term prediction (i.e., days to weeks) holds greater potential for accuracy. Indeed, recent studies focused on shorter-term prediction, often from hospital emergency rooms, have found accuracies for predictions of violence in the range of 40% to 60%.[210] It is worth noting that even when the leading actuarial instruments are used to make dichotomous judgments of future violence—that is, a cutoff is set to simulate the clinical prediction process—their rates of accuracy are similar.[211] Mental health professionals, therefore, have been encouraged to move away from attempting to make dichotomous judgments of dangerousness and toward predictions couched in terms of the risk of future violence.[212] Even here, though, precision has not yet been attained—and may be unattainable. The state of the art probably allows well-trained clinicians, especially if they are using structured assessment instruments, to assign persons into high-, medium-, and low-risk groups with reasonable accuracy. At present, the hope of designating risk categories with greater precision than that for most categories of persons with mental disorders is likely illusory.[213] When quantitative data are available, however, precision in communication of risk

207. Paul S. Appelbaum, *Preface*, *in* Clinical Assessment of Dangerousness: Empirical Contributions ix–xiv (Georges-Franck Pinard & Linda Pagani eds., 2001).

208. Paul E. Meehl, Clinical Versus Statistical Prediction: A Theoretical Analysis and a Review of the Evidence (1954).

209. Jennifer L. Skeem et al., *Building Mental Health Professionals' Decisional Models into Tests of Predictive Validity: The Accuracy of Contextualized Predictions of Violence*, 24 Law & Hum. Behav. 607 (2000).

210. That is, 40% to 60% of those who have been predicted to be violent go on to commit violent acts. Note that because interventions to prevent the predicted violence (e.g., hospitalization) may be taken with many of these subjects, the figures probably underestimate the proportion of true positive predictions. In addition, when clinicians predicted that a person would not be violent, they almost always tended to be correct, with well over 90% of such predictions in most studies being accurate. *See, e.g.,* Charles W. Lidz et al., *The Accuracy of Predictions of Violence to Others*, 269 JAMA 1007 (1993); Dale E. McNiel & Renée L. Binder, *Clinical Assessment of the Risk of Violence Among Psychiatric Inpatients*, 148 Am. J. Psychiatry 1317 (1991).

211. See studies cited *supra* note 199.

212. Henry J. Steadman et al., *From Dangerousness to Risk Assessment: Implications for Appropriate Research Strategies*, *in* Mental Disorder and Crime (Sheilagh Hodgins ed., 1993).

213. Webster et al., *supra* note 170, at 10.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

would undoubtedly be enhanced if they were utilized and if assessors specified their definitions of the categories being employed.[214]

The studies on the accuracy of prediction, whether clinical or actuarial, have typically involved the direct evaluation of the person about whom the prediction was being made. In many cases, considerable additional information about the person was available. Opinions about the risk of future violence by persons whom the evaluator has not examined have never been validated, and there are persuasive reasons to believe that such predictions are not likely to be highly accurate.[215] Such opinions have been introduced, for example, in death penalty cases in which the prosecution sought to prove that further violence was likely, but the defense denied the prosecution expert direct access to the defendant.[216] If such evidence is to be introduced, at a minimum, one would expect that the limitations on the assessor's knowledge of the evaluee and on the certainty with which conclusions can be reached would be noted.

## *2. Predictions of future functional impairment*

Cases involving claims of emotional harms, along with disability and workers' compensation claims, often require that efforts be made to estimate the plaintiff's future functional impairment so that damages can be determined accordingly.[217] Techniques for the assessment of function were described above. See discussion *supra* Section I.D.2. However, these cases call for something more: predictions of the degree of change in functional impairment due to mental disorders that are likely to occur over time. In contrast to the structured assessment tools that assist in the prediction of future violence risk, no instruments have been developed

214. *See* Kelly M. Babchishin & R. Karl Hanson, *Improving Our Talk: Moving Beyond the "Low," "Moderate," and "High" Typology of Risk Communication*, 16 Crime Scene 11 (2009). Suggestions for improving the clarity of risk communications include distinguishing between the likelihood of future violence and the anticipated severity of the offense, specifying the period for which the prediction is being made (e.g., "over the next 6 months"), indicating the comparison population for the estimate (e.g., "risk is high compared with the general population" or "risk is high compared with the population of persons with similar histories of violence"), and providing both absolute and relative risks when quantitative data are available (e.g., "risk of future violence over the next year is between 8 and 12%, which is between 4 and 6 times greater than would be expected for the general population").

215. Brief of Amici Curiae American Psychiatric Association, Barefoot v. Estelle, 463 U.S. 880 (1983) (No. 82-6080).

216. *See* Barefoot v. Estelle, 463 U.S. 880 (1983); Ron Rosenbaum, *Travels with Doctor Death*, Vanity Fair, May 1990, at 141.

217. 20 C.F.R. § 404.1520a (2008). *See generally* Thomas P. Harding, *Psychiatric Disability and Clinical Decision Making: The Impact of Judgment Error and Bias*, 24 Clinical Psychol. Rev. 707 (2004); Harold A. Pincus et al., *Determining Disability Due to Mental Impairment: APA's Evaluation of Social Security Administration Guidelines*, 148 Am. J. Psychiatry 1037 (1991); Cille Kennedy, *SSA's Disability Determination of Mental Impairments: A Review Toward an Agenda for Research*, *in* The Dynamics of Disability: Measuring and Monitoring Disability for Social Security Programs 241 (Gooloo S. Wunderlich et al. eds., 2002); Dan B. Dobbs, The Law of Torts 1048–53, 1087–1110 (2000).

EXHIBIT C

*Reference Manual on Scientific Evidence*

and validated to predict future functional status at this writing. Such predictions are complicated by the need for simultaneous estimates of several parameters that affect long-term functional outcome: variables intrinsic to the person (e.g., symptomatic fluctuation, changes in motivation to work), variables that relate to the environment (e.g., divorce, availability of new categories of jobs), and responses to treatment (see discussion *infra* Section I.F.6). Research aimed at identifying variables associated with some types of future functional impairment exists, but is largely focused on progressive disorders (e.g., Alzheimer's disease), and even here the accuracy of the predictions of forensic evaluators has not been determined.[218] Hence, acknowledgment of the uncertainties inherent in these predictions would appear to be unavoidable for experts undertaking this task.

## F. *Treatment of Mental Disorders*

The nature of available treatments for mental disorders, the probability that they will be effective, the side effects that they may induce, and the existence of alternatives are likely to be material to a variety of legal cases. In criminal proceedings, for example, the continued confinement of a defendant in a psychiatric hospital on the basis of incompetence to stand trial will be based in part on the probability that treatment of the person will restore capacity;[219] involuntary treatment of the defendant will turn on a number of factors, including the likelihood of success and the side effects and their potential for impairing the defendant's defense.[220] Decisions about probation and parole of mentally disordered offenders may also relate to the likelihood that symptoms will remain in check, and courts may order ongoing treatment as a condition of release.[221] Among the civil cases for which treatment-related questions will be at issue are liability claims for malpractice and failure to protect third parties from patient violence, claims involving emotional harms (e.g., in calculating the cost of future care), and issues related to the deprivation of rights of prisoners in correctional facilities to have adequate mental health treatment.[222] Treatment of mental disorders today offers multiple options for most disorders, often with different levels of likely effectiveness and varying side-effect profiles. Planning treatment has become an increasingly complex task.

218. *See, e.g.,* Roy Martin et al., *Declining Financial Capacity in Patients with Mild Alzheimer Disease: A One-Year Longitudinal Study*, 16 Am. J. Geriatric Psychiatry 209 (2008).

219. *See* Jackson v. Indiana, 406 U.S. 715 (1972).

220. *See* Sell v. United States, 539 U.S. 166 (2003).

221. *See, e.g.,* United States v. Holman, 532 F. 2d 284 (4th Cir. 2008).

222. For an overview of the considerable body of case law on this issue, see Michael L. Perlin, 4 Mental Disability Law § 11-4.3 (2d ed. 1989).

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

## 1. Treatment with medication

The past 50 years have seen the ongoing introduction of new medications for the treatment of mental disorders. Currently, medications are a mainstay in the treatment of schizophrenia and bipolar disorder; indeed, it is a rare patient who can be treated successfully for these disorders without medication as part of the treatment plan.[223] Medications are also used commonly to treat and prevent the recurrence of depression, anxiety disorders, attention-deficit/hyperactivity disorder, and a large number of other conditions.[224] The field of psychopharmacology, as the treatment of mental disorders with medications is known, has become a complex and challenging part of psychiatric practice.

### a. Targets of medication treatment

As a general rule, medications are targeted at the symptoms of mental disorders, which may occur in a large number of conditions, rather than being specific for the treatment of a given disorder. Psychotic phenomena such as delusions and hallucinations, for example, are generally responsive to antipsychotic medications, whether the underlying disorder is schizophrenia or bipolar disorder.[225] Antianxiety medications can be effective in primary anxiety disorders (e.g., agoraphobia) or in anxiety that develops secondary to another condition (e.g., depression).[226] Mood stabilizers, first introduced for bipolar disorder and its variants, can be helpful to some patients with personality disorders that are marked by fluctuations in mood.[227] Medications that aid patients in falling asleep work in many different disorders.[228]

Moreover, the same drug can have multiple effects. The best-known example is the selective serotonin reuptake inhibitors (SSRIs), the first and most famous of which is Prozac (the generic name is fluoxetine).[229] Originally introduced for the treatment of depression, for which they proved effective, SSRIs have since also proved helpful for anxiety, even in the absence of depression.[230] The newer antipsychotic medications, intended to target psychotic symptoms, can also be helpful for mania, even when psychosis per se is absent.[231] Indeed, one of the

---

223. Minzenberg et al., supra note 161; Steven L. Dubovsky et al., *Mood Disorders, in* Hales et al., *supra* note 111.

224. *See generally* Alan F. Schatzberg et al., Manual of Clinical Psychopharmacology (2003).

225. Stephen M. Stahl, Stahl's Essential Psychopharmacology: Neuroscientific Basis and Practical Applications 425 (2008).

226. *Id.* at 726.

227. C. Robert Cloninger & Dragan M. Svrakic, *Personality Disorders, in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2236.

228. Stahl, *supra* note 225, at 831–39.

229. Prozac was the first SSRI to be introduced to the market, and its use was widely discussed in popular media, including Peter Kramer's bestseller, Listening to Prozac (1993).

230. Norman Sussman, *Selective Serotonin Reuptake Inhibitors, in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3191.

231. Stahl, *supra* note 225, at 689–94.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

antipsychotics is often prescribed to aid in sleep, as is one of the newer anti-depressants.[232] These multiple effects of a single medication are probably due to their impact on more than one neurotransmitter system.

Another reality of contemporary psychopharmacology is that medications are often used for indications that have not been approved by the Food and Drug Administration (FDA).[233] FDA approval is required for a new medication to be marketed in the United States, and approval is granted only after evidence from clinical trials is presented to the agency demonstrating the efficacy of the drug for a particular purpose, within a given dosage range, and often with a particular population.[234] Once FDA has granted approval for a compound to be marketed, however, physicians are free to prescribe it for any purpose for which they believe it to be indicated, at a dosage of their choosing, and for whichever patients they believe will benefit—although pharmaceutical companies can advertise its use only for FDA-approved purposes. Because approval of a single indication for drug use makes the medication generally available for other purposes as well, and over time drugs lose patent protection, pharmaceutical companies often have little incentive to pursue FDA approval for additional indications.[235] Thus, many medications have long been used for purposes other than the one endorsed by FDA, often with impressive bodies of clinical experience supporting such use.[236]

As is true for many classes of medications, the precise mechanisms of action of most psychopharmacological compounds have not yet been established. Most appear to block or stimulate neuronal receptors in the brain, which trigger or inhibit the propagation of electrical impulses, and it has been assumed that this represents their primary mechanism of action.[237] Indeed, many compounds interact with multiple receptor systems, perhaps accounting for their efficacy against a variety of symptoms, as well as the diverse side effects they produce. But other

232. The antidepressant trazodone is a popular sleep-inducing medication, *id.* at 845; the antipsychotic quetiapine is also used for this purpose, *id.* at 848.

233. David C. Radley et al., *Off-Label Prescribing Among Office-Based Physicians*, 166 Archives Internal Med. 1021 (2006).

234. Celia J. Winchell, *Drug Development and Approval Process in the United States*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2988–96; FDA regulatory information on new drug approvals can be accessed at http://www.fda.gov/Drugs/DevelopmentApprovalProcess/default.htm.

235. Steven R. Salbu, *Off-Label Use, Prescription, and Marketing of FDA-Approved Drugs: An Assessment of Legislative and Regulatory Policy*, 51 Fla. L. Rev. 181 (1999); Rebecca Dresser, *The Curious Case of Off-Label Use*, 37 Hastings Center Rep. 9 (2007).

236. For example, the various formulations of valproic acid are among the most commonly used treatments for bipolar disorder, including maintenance treatment to prevent recurrence. Although an FDA indication was obtained for the treatment of acute mania, long-term maintenance use is "off-label." Schatzberg et al., *supra* note 224. *See also* Norman Sussman, *General Principles of Psychopharmacology*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2972–3.

237. Stahl, *supra* note 225, at 91–122.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

mechanisms, such as initiating changes in DNA transcription, are also possible and remain to be fully explored.[238]

b. Categories of medications

Although a large number of medications are used to treat the symptoms of mental disorders, several major categories account for the largest number of prescriptions.

- Antipsychotic medications, first introduced in the 1950s, appear to have selective effects on psychotic symptoms such as delusions, hallucinations, and disordered thoughts.[239] The first generation of antipsychotics, marked by the introduction of chlorpromazine, often caused acute neuromuscular side effects, such as spasms of the muscles, along with a long-term risk of tardive dyskinesia, a condition characterized by involuntary movements of the muscles in the face, trunk, and extremities.[240] A second generation of these medications, introduced in the 1990s with great fanfare, presents lower risks of neuromuscular problems, but several of the most popular members of this group can cause weight gain, along with diabetes, hyper-lipidemia, and increased cardiac risk.[241] There does not appear to be a difference in efficacy between the earlier and later medications.[242]
- Mood stabilizers were introduced for the treatment of bipolar disorder, which is characterized by episodic mood swings from mania to depres-sion.[243] The first of these drugs was lithium, whose effect was discovered in the 1940s, but which was not widely adopted in the United States until the 1970s. Lithium can be very effective, but it often causes problematic side effects.[244] Subsequently, a number of medications that are also effec-tive as treatment for seizure disorders were found to have mood stabilizing effects as well, and they are generally better tolerated.[245]

238. *Id.* at 41–89.

239. *Id.* at 425.

240. Irene Hurford & Daniel P. van Kammen, *First-Generation Antipsychotics, in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3105–27.

241. Stephen R. Marder, Irene Hurford, & Daniel P. van Kammen, *Second-Generation Antipsychotics*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3206–40.

242. Jeffrey A. Lieberman et al., *Effectiveness of Antipsychotic Drugs in Patients with Chronic Schizophrenia*, 353 New Eng. J. Med. 1209 (2005); Peter B. Jones et al., *Randomized Controlled Trial of Effect on Quality of Life of Second- vs. First-Generation Antipsychotic Drugs in Schizophrenia: Cost Utility of the Latest Antipsychotic Drugs in Schizophrenia Study* (CUtLASS 1), 63 Archives Gen. Psychiatry 1079 (2006).

243. Stahl, *supra* note 225, at 667–719.

244. James W. Jefferson & John H. Greist, *Lithium, in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3132–45.

245. Robert M. Post & Mark A. Frye, *Carbamazepine, in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3073–89; Robert M. Post & Mark A. Frye, *Valpronte,* in Sadock, Sadock, & Ruiz, *supra* note 120 at 3278.

EXHIBIT C

*Reference Manual on Scientific Evidence*

- Antidepressants include the older class of tricyclic compounds, which offered the first effective medication treatment for depression.[246] Again, a less–than–optimal side-effect profile led to efforts to discover alternatives. The SSRI medications turned out to have equal efficacy, but are generally better tolerated.[247] They too, though, have adverse side effects, including diminished sexual function, a numbing of emotional intensity, or increased anxiety.[248] Data suggesting that SSRIs may lead to suicidal ideation in some patients remain controversial, but have led to FDA-mandated "black–box" warnings for the drugs.[249] A group of non-SSRI, but chemically related, compounds has effects and side effects similar to those of the SSRIs, and the medications are often used interchangeably.[250]

- Antianxiety medications, which began with nonspecific sedatives, soon moved on to drugs with targeted effects on anxiety per se.[251] Benzodiazepines, including the well-known Valium and Librium, were used as mainstays of anxiety treatment for many years, but carry liabilities that include the potential for abuse and addiction. Today, the much safer SSRIs and related compounds are the drugs of choice for long-term treatment of anxiety, as they are for depression, with benzodiazepines often reserved for situations in which immediate effects are a priority.[252] Newer agents have been introduced from entirely different chemical classes specifically for anxiety.[253]

This is by no means a complete list of medications for the treatment of mental disorders, but represents a brief introduction to the major classes that are likely to be the focus of evidence presented in legal proceedings.

c. Polypharmacy

The use of more than one psychiatric medication for a patient—often called "polypharmacy"—is common for several reasons.[254] First, because medications

---

246. J. Craig Nelson, *Tricyclics and Tetracyclics*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3259.

247. Sussman, *supra* note 230.

248. *Id.*

249. *See* FDA guidance at http://www.fda.gov/cder/drug/antidepressants/default.htm.

250. These medications include drugs that selectively target the brain's norepinephrine transporters, the so-called selective norepinephrine reuptake inhibitors (SNRIs), along with medications that appear to act on both serotonin and norepinephrine systems. Michael E. Thase, *Selective Serotonin-Norepinephrine Reuptake Inhibitors*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3184–90.

251. Steven Dubovsky, *Benzodiazepine Receptor Agonists and Antagonists*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3044.

252. Stahl, *supra* note 225, at 765–71.

253. *See, e.g.,* Anthony J. Levitt, Ayal Schaffer, & Krista Lanctot, *Buspirone*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3060.

254. Sussman, *supra* note 236.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

typically target symptoms rather than underlying disorders, and most disorders present with multiple symptoms, there may be an obvious rationale for the use of more than one agent (e.g., an antidepressant along with a sleep medication for a patient with depression who is experiencing insomnia). Second, some disorders that are imperfectly responsive to a single, initial medication may respond to an augmentation strategy involving the addition of a second medication, often from a different chemical class (e.g., an antidepressant medication can be augmented with lithium, thyroid hormone, or a second unrelated antidepressant).[255]

Although greater efficacy often can be obtained from combined treatment, there are risks as well. Multiplying medications increases the chance of adverse effects from both the individual medications and their interactions.[256] Hence, polypharmacy is best reserved for situations in which documented evidence of benefit exists or a compelling theoretical rationale is present. Failure to apply these principles accounts for the vaguely disreputable connotation that the term "polypharmacy" conveys.

d. Side effects

The specific side effects of several classes of medications have been referred to earlier. A general point to be noted, however, is that all medications have side effects, even commonly used drugs that are generally thought of as harmless, such as aspirin or acetaminophen.[257] Prescribers balance the positive effects of medication against the range of possible side effects in making recommendations for treatment to patients, who, of course, retain the right to decide that the adverse consequences do not warrant the possibility of therapeutic gains.[258] It is a reality, however, that the side effects of psychiatric medications limit the tolerability of many drugs, even among people who are benefiting from them. Moreover, some medications may have adverse effects with particular significance in legal settings.[259] These include sedation, which may be associated with antipsychotic or antianxiety medications and sometimes with other classes of drugs, and restricted expression of emotion, occasionally experienced with the first generation of antipsychotic medications. In the absence of previous exposure to a given medication, it is difficult to anticipate the side effects that may arise. Clinicians typically monitor those effects and adjust dosage or change medications accordingly.

255. Charles DeBattista & Alan F. Schatzberg, *Combination Pharmacotherapy*, in Sadock, Sadock, & Ruiz, *supra* note 120, at 3322.

256. Sussman, *supra* note 236.

257. *Id.* at 2684.

258. *See generally* Jessica W. Berg et al., Informed Consent: Legal Theory and Clinical Practice (2001).

259. Sell v. United States, 539 U.S. 166 (2003); Dora W. Klein, *Curiouser and Curiouser: Involuntary Medications and Incompetent Criminal Defendants After* Sell v. United States, 13 Wm. & Mary Bill Rts. J. 897 (2005); Debra A. Breneman, *Forcible Antipsychotic Medication and the Unfortunate Side Effects of* Sell v. United States, *539 U.S. 166, 123 S. Ct. 2174 (2004),* 27 Harv. J.L. & Pub. Pol'y 965 (2004).

EXHIBIT C

*Reference Manual on Scientific Evidence*

#### e. Efficacy and effectiveness

Efficacy refers to a medication's ability to reduce or eliminate its target symptoms; effectiveness denotes the extent to which that effect can be achieved in ordinary clinical treatment.[260] An illustration of the difference is evident with antipsychotic medications, the efficacy of which in controlling the positive symptoms of psychosis has been demonstrated in numerous studies.[261] However, in real-world clinical settings, the effectiveness of these medications, particularly over the long term, is substantially limited by patients' reluctance to continue taking them, despite symptomatic relief.[262] This may be due in part to the nature of some mental disorders, especially schizophrenia, given that affected persons often deny their impairments.[263] But there is no question that the side effects of the medications lead many patients to stop them, because of their unwillingness to tolerate the weight gain, lethargy, sexual dysfunction, neuromuscular manifestations, or other side effects that often accompany the use of the drugs.[264] Because demonstrations of efficacy are required for FDA approval to market medications, it can be assumed that drugs for mental disorders are efficacious for their approved indications. However, their effectiveness may be more limited, and this can be an important consideration when predictions of long-term symptom control are called for in both criminal and civil contexts.

### 2. Psychological treatments

Although medications are a mainstay for treatment of serious mental disorders, a variety of psychological treatments may be important as either primary or adjunctive treatments.

#### a. Psychoanalysis and psychodynamic psychotherapy

Psychoanalysis was developed as a therapeutic technique by Sigmund Freud and is probably the form of psychotherapy that comes first to mind for most lay people.[265] It involves three to four sessions a week for many years, during which patients recline on a couch and free associate, with little direction from the analyst, whose job it is to analyze patients' developing unconscious attachment (or transference) to the analyst. Despite its ubiquity in *New Yorker* cartoons, psycho-

---

260. Gerard E. Hogarty et al., *Efficacy Versus Effectiveness*, 48 Psychiatric Servs. 1107 (1997).

261. Philip G. Janicak et al., Principles and Practice of Psychopharmacotherapy 118–27 (1993).

262. Lieberman et al., *supra* note 242.

263. Xavier F. Amador & Henry Kronengold, *The Description and Meaning of Insight in Psychosis*, *in* Insight and Psychosis 15, 15–32 (Xavier F. Amador & Anthony S. David eds., 1998).

264. Diana O. Perkins, *Predictors of Noncompliance in Patients with Schizophrenia*, 63 J. Clinical Psychiatry 1121 (2002).

265. T. Byram Karasu & Sylvia R. Karasu, *Psychoanalysis and Psychoanalytic Psychotherapy*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2746.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

analysis is used with only a tiny percentage of patients, usually those who have less severe disorders, live in major urban centers, and can afford to pay for their own extended care. Efforts to demonstrate the efficacy of psychoanalysis have run into resistance from practitioners and considerable logistical problems; data supporting its use are therefore hard to find.[266] Thus, it is likely to have limited relevance when mental disorders are at issue in legal proceedings.

Psychodynamic psychotherapies, which are offshoots of psychoanalysis, are used more frequently and hence have more relevance to the law.[267] Based on similar notions of a dynamic unconscious, that is, processes out of the awareness of the person affect mood and behavior, psychodynamic therapies generally involve sessions once or twice a week, for periods ranging from months to several years, with patients sitting upright and greater activity on the part of the therapist in identifying conflicts and maladaptive behaviors. As in psychoanalysis, the under-lying premise is that when unconscious motivations are made conscious, they become susceptible to control and alteration by the patient.

Psychodynamic therapies are easier to study and have a somewhat more robust set of data speaking to their efficacy—for example, in anxiety and depression.[268] It is often difficult, though, for patients with more severe disorders, such as schizophrenia and bipolar disorder, to tolerate the in-depth exploration and uncovering of intrapsychic conflicts that accompany the therapeutic process. But many patients with personality disorders, depression, and other conditions will attribute their stability to ongoing therapy.

b. Cognitive behavioral and related therapies

In contrast to the premises of psychodynamic therapies that mood and behavior are affected by unconscious conflicts, cognitive behavioral therapy (CBT) is based on the idea that conscious patterns of thought determine how one feels and behaves.[269] CBT is generally shorter term (weeks to months), highly structured, and focused on helping patients recognize and control maladaptive patterns of thinking. Patients are often given homework assignments to complete between sessions. A strong database supports its use in anxiety disorders, depression (where it can be as effective as medi-cations and may be more likely to prevent relapse), and for control of some psy-chotic symptoms, and its use is steadily being extended to additional conditions.[270] Specialized forms of CBT have been developed for use with sex offenders, based on

266. Glen O. Gabbard et al., *The Place of Psychoanalytic Treatments Within Psychiatry*, 59 Archives Gen. Psychiatry 505 (2002).

267. **Karasu**, *supra* note 265.

268. Falk Leichsenring & Sven Rabung, *Effectiveness of Long-Term Psychodynamic Psychotherapy: A Meta-Analysis*, 300 JAMA 1551 (2008).

269. Cory F. Newman & Aaron T. Beck, *Cognitive Therapy*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2857–8.

270. Andrew C. Butler et al., *The Empirical Status of Cognitive-Behavioral Therapy: A Review of Meta-Analyses*, 26 Clinical Psychol. Rev. 17 (2006).

EXHIBIT C

*Reference Manual on Scientific Evidence*

a model that is often termed "relapse prevention" that teaches patients to recognize situations that are likely to lead to recidivism and avoid them.[271] Dialectical behavior therapy is an offshoot of CBT that has shown success with patients with borderline personality disorders, an otherwise difficult disorder to treat.[272]

### c. Other psychological therapies

Hundreds of forms of talking therapies have been catalogued, but it would be impossible to review them all here. Many have shown efficacy with particular disorders, and efforts have been made to identify common therapeutic elements, which may include the relationship with the therapist and the ability to instill hope for the future in the patient.[273] In addition to individual therapies, persons with mental disorders may benefit from group therapies of a variety of orientations, including psychodynamic and cognitive.[274] Group therapies can be especially helpful when socialization and relationships with other people are among the person's problems. Family and couples therapies generally target relationships within the family unit or marital dyad; because mental disorders are often disruptive to relationships, such approaches may be helpful adjuncts to treatments focused on the affected person's primary disorder.[275] Severely ill patients, including those with schizophrenia, may benefit from what is termed supportive therapy, which involves regular contacts aimed at identifying concrete problems in the person's life and helping to find solutions. It may also provide a nonthreatening outlet for social interaction when other relationships are limited.[276]

## 3. Treatment of functional impairments

Control of positive symptoms does not necessarily address deficits in function, particularly in the psychotic disorders. What may be required are techniques that focus on functional difficulties per se. Persons with schizophrenia, for example, given that the disorder often affects ability to function socially and occupationally, may need to be taught how to interact with other people, an approach known as social skills therapy.[277] Occupational therapy can provide them with a graded introduc-

---

271. *See, e.g.,* D. Richard Laws, Relapse Prevention with Sex Offenders (1989).

272. M. Zachary Rosenthal & Thomas R. Lynch, *Dialectical Behavior Therapy*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2884.

273. Jerome D. Frank & Julia B. Frank, Persuasion and Healing: A Comparative Study of Psychotherapy (1993).

274. Henry I. Spitz, *Group Psychotherapy*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2832.

275. Henry I. Spitz & Susan Spitz, *Family and Couple Therapy*, *in* Sadock, Sadock, & Ruiz,*supra* note 120, at 2584.

276. Peter J. Buckley, *Applications of Individual Supportive Psychotherapy to Psychiatric Disorders: Efficacy and Indications*, *in* Textbook of Psychotherapeutic Treatments (Glen O. Gabbard ed., 2009).

277. Melinda Stanley & Deborah C. Beidel, *Behavior Therapy*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2795–6.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

tion (or reintroduction) to the workplace, with patients taught how to maintain focus and deal with the demands of the work setting.[278] More focal impairments can be addressed, as well. Thus, defendants found incompetent to stand trial can be taught about the nature of the courtroom and the expectations they must meet to be found competent to proceed. Studies of such programs have shown higher rates of restoration of competence than occurs with treatment of the primary disorder alone.[279] Comparable programs are available for anger management,[280] control of spousal abuse,[281] and training in parenting skills,[282] among other areas of function that are often the target of legal proceedings.

### 4. Electroconvulsive and other brain stimulation therapies

The therapeutic effect of seizure induction by electrical or chemical means on psychosis and depression was first demonstrated in the 1930s.[283] Electroconvulsive therapy (ECT) became the most popular of these approaches in the era before efficacious medications existed for mental disorders. The early techniques for ECT involved application of an electrical current to the brain of patients while they were awake. Not only was this often terrifying for the patients, but the resulting violent seizures could cause bone fractures and other complications. Contemporary use of ECT is quite different, with patients anesthetized prior to the procedure and paralyzing agents used to prevent muscular contractions.[284] Although temporary confusion and memory loss often occur, long-term adverse effects are uncommon, making ECT a safe procedure—indeed, for elderly patients with complex medical problems, it may be preferable to the use of medications. Unfortunately, the graphic images associated with early ECT use, embodied in novels and films, dominate the popular mind and often lead to a distorted perception of the treatment.[285]

---

278. *See generally* Jennifer Creek, Occupational Therapy and Mental Health: Principles, Skills and Practice (2002).

279. *See, e.g.,* Alex M. Siegel & Amiram Elwork, *Treating Incompetence to Stand Trial*, 14 L. & Hum. Behav. (1990); Barry W. Wall et al., *Restoration of Competency to Stand Trial: A Training Program for Persons with Mental Retardation*, 31 J. Am. Acad. Psychiatry L. 189 (2003).

280. Raymond DiGiuseppe & Raymond C. Tafrate, *Anger Treatment for Adults: A Meta-Analytic Review*, 10 Clinical Psychol.: Sci. & Prac. 70 (2006).

281. Julia C. Babcock et al., *Does Batterers' Treatment Work? A Meta-Analytic Review of Domestic Violence Treatment*, 23 Clin. Psychol. Rev. 1023 (2004). Note that in contrast to anger management and parenting training, the data on the efficacy of treatment for batterers indicates that effects are limited at best.

282. Kathryn M. Bigelow & John R. Lutzker, *Training Parents Reported for or at Risk for Child Abuse and Neglect to Identify and Treat Their Children's Illnesses,* 15 J. Fam. Violence 311 (2000).

283. Joan Prudic, *Electroconvulsive Therapy*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 3285–3301.

284. *Id.*

285. Ken Kesey, One Flew Over the Cuckoo's Nest (1962); the popular movie version appeared in 1976 (see description at http://www.imdb.com/title/tt0073486/); Garry Walter & Andrew McDonald, *About to Have ECT? Fine, but Don't Watch It in the Movies: The Sorry Portrayal of ECT in Film*, 21 Psychiatric Times 65 (2004), *available at* http://www.psychiatrictimes.com/display/

EXHIBIT C

*Reference Manual on Scientific Evidence*

ECT is used today primarily for the acute treatment of depression, for which it has been demonstrated to be effective.[286] Although it can also have a therapeutic effect on psychotic symptoms, it is not commonly used for that purpose. An exception involves states of catatonic stupor or excitement, both of which can be life threatening and for which ECT can provide immediate relief.[287] For patients responsive to ECT but not to medications, maintenance ECT (i.e., periodic, perhaps monthly, treatments) can be used.[288] In most cases, though, ECT is reserved for patients who have not responded to one or more medications or whose conditions are sufficiently severe (e.g., acute suicidal urges) that a more rapidly acting intervention than medication—which can take up to 6 to 8 weeks before an effect is seen—is indicated. ECT's history continues to haunt its current use, with many states imposing statutory or regulatory restrictions.[289] However, it can be a safe and effective treatment—and in some cases a life-saving one. The mechanism of effect for ECT remains unclear.

Given that brain function is integrally linked to electrical transmission of impulses between nerve cells, it is not surprising that other efforts have been made to use electrical stimulation for therapeutic purposes. Electrical stimulation of the vagus nerve has been approved by FDA for the treatment of depression, although the supporting data are generally thought to be weak.[290] The therapeutic use of transcranial magnetic stimulation, in which a strong magnetic field is applied externally, is being explored, including for depression, autism, and other disorders.[291] Successful use of implanted devices for deep brain stimulation (DBS) for Parkinson's disease have led to trials of DBS for obsessive–compulsive disorder and depression;[292] further experimentation in other disorders seems likely.

article/10168/48111; C. Lauber et al., *Can a Seizure Help? The Public's Attitude Toward Electroconvusive Therapy*, 134 Psychiatry Res. 205 (2005); Balkrishna Kalayam & Melvin J. Steinhart, *A Survey of Attitudes on the Use of Electroconvulsive Therapy*, 32 Hosp. Community Psychiatry 185 (1981); Richard Abrams, Electroconvulsive Therapy (1997).

286. Daniel Pagnin et al., *Efficacy of ECT in Depression: A Meta-Analytic Review*, 20 J. Electroconvulsive Therapy 13 (2004).

287. Barbara M. Rohland et al., *ECT in the Treatment of the Catatonic Syndrome*, 29 J. Affective Disorders 255 (1993).

288. Prudic, *supra* note 283, at 3297.

289. For a review, though now somewhat out of date, see William J. Winslade et al., *Medical, Judicial, and Statutory Regulation of ECT in the United States,* 141 Am. J. Psychiatry 1349 (1984). Restrictive regulations appear to reduce the incidence of ECT use in the Unied States; Richard C. Hermann et al., *Variation in ECT Use in the United States*, 152 Am. J. Psychiatry 869 (1995).

290. Although approved by the FDA for use in depression, concern over the weak database for TMS led the Centers for Medicare & Medicaid Services to withhold approval for payment for the procedure. Miriam Shuchman, *Approving the Vagus-Nerve Stimulator for Depression*, 356 New Eng. J. Med. 1604 (2007).

291. Philip B. Mitchell & Colleen K. Loo, *Transcranial Magnetic Stimulation for Depression*, 40 Austrl. N.Z. J. Psychiatry 406 (2006).

292. Helen S. Mayberg et al., *Deep Brain Stimulation for Treatment-Resistant Depression*, 45 Neuron 651 (2005); Benjamin D. Greenberg et al., *Three-Year Outcomes in Deep Brain Stimulation for Highly*

EXHIBIT C

*Reference Guide on Mental Health Evidence*

## 5. Psychosurgery

Direct surgical intervention to alter brain function in mental disorders has an unfortunate history.[293] Prefrontal leucotomy or lobotomy was developed in the 1930s as a treatment for intractable disorders such as schizophrenia, and became popular in the United States after World War II. Although there was never persuasive evidence of its efficacy, lobotomies were performed in many facilities, often in primitive conditions, on thousands of patients. Consequences frequently included a dulling of sensation and emotion. Interest in lobotomies faded in the late 1950s, because it became clear that the procedures were not having a positive effect, and they are not used today. Surgical interventions are used only rarely for psychiatric disorders, and only then for otherwise untreatable conditions. The most common procedures today involve parallel focal lesions in each of the two halves of the brain, which seems to help intractable and disabling obsessive–compulsive disorder and depression.[294] But psychosurgery for the treatment of psychiatric disorders is, in any form, extremely uncommon.

## 6. Prediction of responses to treatment

In a number of legal contexts, experts are called on to anticipate the responses of persons with mental disorders to treatment. For example, likely effectiveness must be considered before a court orders treatment over objections for a defendant who is incompetent to stand trial,[295] and the probable impact of future treatment may need to be estimated in determining damages in emotional harm cases.[296] The difficulty with these projections relates to several parameters that are inherently challenging to predict:

- *Effectiveness of treatment.* Even highly effective treatments for mental disorders do not work in all cases, and when they do work, they may provide varying levels of relief.[297]

*Resistant Obsessive-Compulsive Disorder*, 31 Neuropsychopharmacology 2384 (2006).

293. Elliot S. Valenstein, Great and Desperate Cures: The Rise and Decline of Psychosurgery and Other Radical Treatments for Mental Illness (1987).

294. Scott L. Rauch et al., *Neurosurgical Treatments and Deep Brain Stimulation*, *in* Sadock, Sadock, & Ruiz, *supra* note 120, at 2983–90.

295. Sell v. United States, 539 U.S. 166 (2003).

296. Melton et al., *supra* note 28.

297. For example, only 45% to 60% of patients receiving antidepressant medication for uncomplicated major depression show clinically significant responses to the first medication they receive, and of those who fail to respond, a similar percentage will respond positively to a second medication. A. John Rush & Andrew A. Nierenberg, *Mood Disorders: Treatment of Depression, in* Sadock, Sadock, & Ruiz, *supra* note 120, at 1734–9. Rates of response in unselected populations of patients with depression are lower. Madhukar H. Trivedi et al., *Evaluation of Outcomes with Citalopram for Depression Using Measurement-Based Care in STAR*D: Implications for Clinical Practice,* 163 Am. J. Psychiatry 28 (2006).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

- *Adherence*. Treatment has no chance of being effective if a person declines to pursue or to continue it, a particular issue in cases where the court lacks control over the person's future behavior.[298] Tolerability of side effects may play an important role in these decisions.
- *Fluctuations in the course and responsiveness of the disorder*. Many mental disorders are chronic, and tend to wax and wane in intensity. Although adjustments in treatment can sometimes bring more severe symptoms under good control, that is not always possible. Moreover, for reasons that are not understood, previously responsive disorders may become resistant to the therapeutic effects of medication.[299]
- *Environmental conditions*. Unpredictable stresses in a person's life may exacerbate symptoms, reduce the effectiveness of treatment, or lead to diminished adherence.

However, given that estimates sometimes must be made of probable treatment effects, there are several indicators to which clinicians can turn.[300] Previous treatment response is the best predictor of future response; it is likely, for example, that someone whose previous delusions have rapidly resolved with antipsychotic medication will have a similar response in the future. In the absence of a documented history of successful treatment, estimates should be based on evidence indicating base rates of response for the person's disorder, along with any specific prognostic factors present in the person's case (e.g., a schizophrenic disorder that develops slowly over many years and that is associated with gradual functional decline generally has a poorer prognosis than one with rapid onset and good premorbid functioning). To a greater or lesser extent, however, it needs to be acknowledged that there is always uncertainty associated with these predictions.

298. Rates of nonadherence to medications among patients with psychiatric disorders are in the range of 50% or more. Although these figures are perhaps somewhat higher than those seen in other chronic conditions, long-term treatment with medication in general is marked by high rates of noncompliance with prescribed medications. Lars Osterberg & Terrence Blaschke, *Adherence to Medication*, 353 New Eng. J. Med. 487 (2005).

299. So-called "poop-out" during treatment of depression is a commonly encountered example. *See, e.g.,* Sarah E. Byrne & Anthony J. Rothschild, *Loss of Antidepressant Efficacy During Maintenance Therapy: Possible Mechanisms and Treatments*, 59 J. Clin. Psychiatry 279 (1998).

300. *See, e.g.,* for predictors of response to treatment for depression, Stuart M. Sotsky et al., *Patient Predictors of Response to Psychotherapy and Pharmacotherapy: Findings in the NIMH Treatment of Depression Collaborative Research Program*, 148 Am. J. Psychiatry 997 (1991); for predictors of response to treatment for schizophrenia, Delbert G. Robinson et al., *Predictors of Treatment Response from a First Episode of Schizophrenia or Schizoaffective Disorder*, 156 Am. J. Psychiatry 544 (1999).

EXHIBIT C

*Reference Guide on Mental Health Evidence*

## G. Limitations of Mental Health Evidence

Certain limitations exist where mental health evidence is concerned that may not come into play with other types of scientific evidence. Both retrospective assessments of past mental states and prospective estimates of future behavior depend on estimates of variables that are inherently difficult to know with a high degree of certainty. Even contemporaneous assessments of functional abilities depend, in part, on the evaluee's self-report of such difficult-to-measure attributes as distress, motivation, and judgment. Where empirically validated assessment tools are used, the usual concerns about measurement error are present. Two additional problematic areas involve the use of psychodynamic theory and testimony that speaks to the ultimate legal issue.

### 1. Limits of psychodynamic theory

Psychoanalysis developed a complex theory of the mind that included both functional elements (i.e., ego, superego, and id) and processes by which unconscious motivations are brought to bear on conscious thought and behavior (e.g., displacement, projection, reaction formation), largely in the service of protecting the conscious mind from unbearable conflict.[301] Freud's basic schemata, which underwent evolution even during his lifetime, subsequently have been subject to permutation and elaboration by a large number of theorists. These schemata form the theoretical basis for the dynamic psychotherapies and have been incorporated into popular culture, as reflected in the work of historians, literary theorists, novelists, and cartoonists, among others.[302] However, although these concepts have proven useful in a variety of fields, many of them have been resistant to empirical testing. Even when ample evidence exists to support a psychodynamic construct—e.g., recovery of unconscious, nontraumatic memories[303] or repression[304]—it has been difficult to prove the postulated functional role for the process. Nonetheless, psychodynamic concepts—and the use of psychodynamic therapies—remain mainstays in many psychiatry and psychology training programs. Testimony based on these concepts is often introduced, for example, in discussions of a defendant's mental state at the time of the crime, in relation to defenses of insanity, dimin-

301. William W. Meissner, *Classical Psychoanalysis*, *in* Sadock & Sadock, *supra* note 120, at 701–46.

302. *See, e.g.,* Psychoanalytic Literary Criticism (Maud Ellmann ed., 1994); Peter Loewenberg, *Psychoanalytic Models of History: Freud and After*, *in* Psychology and Historical Interpretation (William M. Runyan ed., 1980).

303. Matthew H. Erdelyi, The Recovery of Unconscious Memories: Hypermnesia and Reminiscence (1996).

304. David S. Holmes, *The Evidence for Repression: An Examination of Sixty Years of Research*, *in* Repression and Dissociation: Implications for Personality Theory, Psychopathology, and Health 85–102 (Jerome L. Singer ed., 1990).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ished capacity, self-defense, provocation, duress, and entrapment.[305] It may also play a role in civil cases, regarding questions as disparate as a parent's capacity to raise a child and whether a testator was subject to undue influence.[306] Because these concepts were generally accepted in the relevant fields, although there have always been skeptics, the test of admissibility under *Frye v. United States* and similar state rules was usually met.[307] The reinvigorated admissibility requirements promulgated under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and *Kumho Tire Co. v. Carmichael*, with their emphasis on empirical verification of the bases for the expert's testimony, have called the future of testimony based on most psychodynamic concepts into question.[308]

Questions about testimony based on psychodynamic theory can be raised with regard both to the legitimacy of the underlying constructs (e.g., displacement of affect) and to the techniques by which the examiner can know that such a mechanism came into play in a particular case (e.g., the displacement of the defendant's unconscious rage at his mother led to a loss of behavioral control that resulted in an assault on another woman). Slobogin has argued, with regard to criminal defendants, that frankly speculative testimony about psychodynamic influences on the crime should be held to a lesser standard of admissibility than required under *Daubert*.[309] In part, he suggests that the very concepts on which the law relies—such as extreme emotional stress and reasonable apprehension of harm—are themselves not easily susceptible to determinations that would meet *Daubert's* reliability considerations. Thus, if defendants are to be able to introduce evidence that would overcome the presumptions against them, testimony that relies on accepted but inherently unprovable constructs is essential. Moreover,

---

305. Christopher Slobogin, Proving the Unprovable: The Role of Law, Science, and Speculation in Adjudicating Culpability and Dangerousness (2007).

306. Robertson v. McCloskey, 676 F. Supp. 351 (D.D.C. 1988) (declining to admit psychodynamic testimony under the *Frye* standard); United States v. Libby, 461 F. Supp. 2d 3 n.6 (D.D.C. 2006) (noting that although psychodynamic testimony was not admissible under the *Frye* standard, that does not necessarily hold under *Daubert*, and that "there can be little doubt that today . . . the science of memory is well established and accepted in the scientific community . . . has been well tested and subjected to peer review"); United States v. Fishman, 743 F. Supp. 713 (N.D. Cal. 1990) (excluding testimony on "thought reform" theory from a qualified mental health professional).

307. Frye v. United States, 293 F. 1013 (1923).

308. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

309. Slobogin, *supra* note 305, at 39–57. Note that Slobogin's argument is not limited to testimony rooted in psychodynamic concepts, but extends to other mental health evidence that intends to speak to aspects of a person's mental state at some point in the past, knowledge of which is unlikely ever to meet scientific standards of proof. Under the *Daubert* standard, the judge serves as the gatekeeper for scientific testimony. The admissibility of evidence is determined on the basis of relevance and reliability. Reliability factors offered as examples include falsifiability, peer review, the known or potential rate of error, and general acceptance by the relevant scientific community. *Daubert*, 509 U.S. at 593–95.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

Slobogin claims that this is, in fact, why trial courts usually resist efforts to exclude mental health testimony.[310]

Granting the legitimacy of Slobogin's analysis, there is still reason for caution in a wholesale embrace of psychodynamic theories. Because persuasive empirical demonstrations of either the concepts themselves or their application in particular cases is unlikely, their speculative—even if plausible—nature should be recognized. Moreover, to say that such testimony should not be held to reliability-based standards of admissibility is not to say that no relevant standards exist. Idiosyncratic concepts and conclusions that would not be generally accepted by clinicians with appropriate training might well run afoul of prevailing rules for admissibility, because they lack support even under the older standard of acceptance in the relevant professional community,[311] and to the extent that techniques are available for generating testable data, they would appear to be preferable. This appears, in fact, to be the way in which courts generally approach such evidence.[312]

## 2. Ultimate issue testimony

Whether mental health experts should testify—or be permitted to testify—to the ultimate legal issue in a case has been the subject of longstanding controversy.[313] The question arises, for example, in criminal cases where experts often have commented directly on whether a defendant is competent to stand trial or whether the legal standard for insanity has been met.[314] Similar issues can arise in civil settings, in which experts may be asked to testify directly about a person's capacity to manage affairs or to serve as a custodial parent, or regarding whether a person was competent to sign a contract at an earlier point in time.[315] Some mental health experts find themselves encouraged or pressured by attorneys to draw conclusions about the ultimate issue, and judges have been known to exclude testimony in which experts are unwilling to take that step on the grounds that the evidence that they would otherwise provide lacks probative value.[316] Concerns arise over the fact that conclusions about the ultimate issue in a case are matters to be decided by the factfinder, on whose legitimate territory an expert who speaks to the issue may be encroaching and whose deliberations may be preempted.[317]

310. For a response to Slobogin's argument, see Edward J. Imwinkelried, *The Case Against Abandoning the Search for Substantive Accuracy*, 38 Seton Hall L. Rev. 1031 (2008).

311. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

312. Slobogin, *supra* note 305, at 21–29.

313. *See* Fed. R. Evid. 704. *See* Anne Lawson Braswell, *Resurrection of the Ultimate Issue Rule: Federal Rule of Evidence 704(b) and the Insanity Defense*, 72 Cornell L. Rev. 620 (1987).

314. But see discussion below regarding the current prohibition on this practice in federal courts.

315. *See* Restatement (Second) of Contracts § 15.

316. Appelbaum & Gutheil, *supra* note 149, at 221.

317. Insanity Defense Workgroup, *American Psychiatric Association Position on the Insanity Defense*, 140 Am. J. Psychiatry 681, 686 (1983); American Bar Association, ABA Criminal Justice Standards:

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Proponents of ultimate issue testimony often include attorneys and judges, who may be concerned that an expert who provides a clinical formulation without tying it directly to the ultimate legal issue will leave a group of confused jurors unable to discern the connection on their own.[318] Many experts themselves share similar concerns or worry that mental health issues will simply be ignored if their relevance to the legal question at hand is not made clear; moreover, they note that courts have applied such rules erratically.[319] They counter concerns about such testimony having an undue impact on jurors' deliberations by noting that members of juries appear to be little influenced by whether or not ultimate issue testimony is offered by an expert.[320]

Moreover, efforts to restrict testimony on the ultimate issue often quickly run into line-drawing problems. As an example, after a jury found John W. Hinckley, Jr. not guilty by reason of insanity of the attempted assassination of President Reagan, the verdict led to wholesale revision of laws governing the insanity defense at the federal and state levels.[321] Among the changes wrought by the Federal Insanity Defense Reform Act of 1984 was a prohibition on experts directly addressing the question of insanity.[322] The Federal Rules of Evidence were amended to effect this change: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime or of a defense thereto."[323] Although it seems clear that, according to the terms of the rule, the expert is precluded from opining directly that a defendant lacked criminal responsibility, it is less clear whether the expert could say that the defendant could not "appreciate the wrongfulness of his acts," the language used in the statute to define the relevant standard.[324] And if that, too, were prohibited, could the expert say that the defendant "could not grasp how wrong his behavior was," and if so, would that language be likely to have any different impact on a jury than simply speaking in the words of the statute? Empirical data exist to suggest that the answer to that question is no.[325]

Still, a large number of mental health and legal scholars oppose experts addressing the ultimate legal question, and during the high-pitched debate follow-

Mental Health, Standard 7-6.6 (1984). Note that the APA position was recently withdrawn as outdated and replaced by a briefer statement that does not address the question of ultimate issue testimony.

318. Ralph Slovenko, *Commentary: Deceptions to the Rule on Ultimate Issue Testimony*, 34 J. Am. Acad. Psychiatry & L. 22 (2006).

319. Alec Buchanan, *Psychiatric Evidence on the Ultimate Issue,* 34 J. Am. Acad. Psychiatry & L. 14 (2006).

320. Solomon M. Fulero & Norman J. Finkel, *Barring Ultimate Issue Testimony: An "Insane" Rule?* 15 L. & Hum. Behav. 495 (1991).

321. Henry J. Steadman, Before and After Hinckley: Evaluating Insanity Defense Reform (1993).

322. 18 U.S.C. § 17.

323. Fed. R. Evid. 704(b).

324. *Id*.

325. Fulero & Finkel, *supra* note 320.

EXHIBIT C

ing the Hinckley trial, both the American Psychiatric Association and the American Bar Association adopted positions against ultimate issue testimony.[326] In addition to the argument that such testimony trenches on the function of the jury, opponents often point to the legal and moral nature of the question whether someone is criminally responsible.[327] Although mental health expertise may be helpful in determining the person's mental state at the relevant time, determining whether the resulting impairment was sufficient to negate responsibility requires the application of the relevant legal standard and a moral judgment of the fairness or unfairness of punishing the person for his or her behavior. Psychiatrists and psychologists have no particular expertise on legal or moral issues; hence, opponents of ultimate issue testimony urge that they should not be permitted to speak to those issues. Such preclusion may also reduce the much bemoaned "battle of the experts," because a good deal of disagreement may derive from views of how data from the evaluation should be applied to the ultimate legal question, rather than from differences regarding the person's mental state. Although testimony on the ultimate legal issue is now barred in federal courts in insanity defense cases (18 U.S.C. § 17), it remains common in many states, and even in federal jurisdictions it may be offered in other sorts of cases.[328]

# II. Evaluating Evidence from Mental Health Experts

To this point, we have considered the kind of evidence that is likely to be offered by mental health experts and some of the challenges that such testimony presents. The remainder of the chapter addresses those factors that should enter into consideration of the value and impact of such testimony.

## A. What Are the Qualifications of the Expert?

The appropriate qualifications of a mental health professional whose testimony is proffered will depend on the nature of the evidence that will be presented. However, a number of relevant parameters can be identified.

---

326. Insanity Defense Workgroup, *supra* note 317; American Bar Association, *supra* note 317. *See also* Grisso, *supra* note 2, at 208; Fulero & Finkel, *supra* note 320, at 496.

327. Mark S. Brodin, *Behavioral Science Evidence in the Age of* Daubert*: Reflections of a Skeptic*, 73 U. Cin. L. Rev. 867 (2005); Michele Cotton, *A Foolish Consistency: Keeping Determinism Out of the Criminal Law*, 18 B.U. Pub. Int. L.J. 1, 21–23 (2005); Ric Simmons, *Conquering the Province of the Jury: Expert Testimony & the Professionalization of Fact-Finding*, 74 U. Cin. L. Rev. 1013 (2006).

328. Fed. R. Evid. 704. Pennsylvania's law represents a typical formulation: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Pa. R. Evid. 704.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## 1. Training

Most mental health expert testimony is given by psychiatrists or doctoral–level clinical psychologists. Given the differences in the education and training of each profession, their testimony is not necessarily interchangeable. As a rule, psychiatrists are prepared by their training to speak to the diagnosis of mental disorders, including medical issues that may play a role in a particular case, and to treatment approaches, including psychopharmacological treatment.[329] They should be capable of testifying, within the limits of existing knowledge and the information available to them, regarding the impact of a disorder on a person's behavior and functional abilities. Psychologists' training, in contrast, may provide deeper knowledge of the theoretical and experimental bases for understanding the function of the mind, both normal and abnormal.[330] As a general matter, doctoral–level clinical psychologists will be prepared by their training to provide evidence regarding diagnosis and psychotherapeutic treatment of mental disorders, the results of psychological and neuropsychological testing, and the roots of normal and abnormal behavior.

However, although the core elements of training in psychiatry and psychology may be similar across training programs, the variability is substantial.[331] Moreover, variation in subspecialty (in psychiatry) or specialty (in psychology) training—for example, in geriatric psychiatry or neuropsychology—contributes to further differentiation among experts. Thus, inquiries regarding the specific training afforded an expert may be necessary. This is particularly true when an expert is testifying about topics that would ordinarily fall outside disciplinary boundaries, for example, a psychiatrist discussing the results of psychological testing or a psychologist offering evidence regarding the effect of medication on a person's behavior. The same is true for experts who are testifying beyond the range of their specialty or subspecialty training. In addition, in recent years, expert testimony on mental health issues has been admitted at times from nonpsychiatric physicians and mental health professionals of other disciplines.[332] These include

---

329. See discussion of psychiatrists' training in Section I.B.1, *supra.*

330. See discussion of psychologists' training in Section I.B.2, *supra.*

331. *See, e.g.,* Khurshid A. Khurshid et al., *Residency Programs and Psychotherapy Competencies: A Survey of Chief Residents*, 29 Academic Psychiatry 452 (2005); Committee on Incorporating Research into Psychiatry Residency Training, Institute of Medicine, Research Training in Psychiatric Residency: Strategies for Reform 91–132 (Michael T. Abrams et al. eds., 2003); Charles J. Gelso, *On the Making of a Scientist-Practitioner: A Theory of Research Training in Professional Psychology*, S(1) Training and Education in Professional Psychology 3–16 (2006); Brendan A. Maher, *Changing Trends in Doctoral Training Programs in Psychology: A Comparative Analysis of Research-Oriented Versus Professional-Applied Programs*, 10 Psychol. Sci. 475 (1999).

332. Campbell v. Metropolitan Prop. & Cas. Ins. Co., 239 F.3d 179 (2d Cir. 2001) (professor of pediatrics with substantial relevant publications found qualified to testify on neurological injuries resulting from lead paint exposure); Carroll v. Otis Elevator Co., 896 F.2d 210 (7th Cir. 1990) (experimental psychologist found qualified to give expert testimony on likelihood that product design

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

social work and nursing, and in the future arguably could include master's-level psychologists, marriage and family therapists, physician assistants, and additional disciplines as well. Specific inquiry into relevant training will probably be needed at least until testimony from such disciplines becomes more widely accepted and their specific qualifications more generally known.

## *2. Experience*

Experience is relevant to the qualifications of mental health experts in at least two ways. First, as the Federal Rules of Evidence recognize, experience may substitute for training as a basis for concluding that a witness has special expertise.[333] Many experts in forensic psychiatry and forensic psychology, for example, lack formal training in conducting evaluations of the sort provided in forensic fellowships, because such training programs have become widely available only fairly recently. In addition, formal training is simply unavailable (or at least difficult to acquire) in a number of substantive areas of clinical psychiatry and psychology. For example, most professionals who acquire special knowledge about particular mental disorders will do so by pursuing their interest through reading and following the literature and by means of clinical contact with patients with the disorders, as opposed to formal training. Thus, experience must often be relied upon as a stand-in for more conventional credentials.

The second way in which experience can be material to expert qualifications relates to the attrition of skills and knowledge over time. Mental health professionals often complete their training within several years of their 30th birthdays and may engage in practice, including the provision of expert testimony, over the subsequent four or five decades. Brief exposure to information about a particular disorder[334] or some experience in evaluating and treating the condition may fade from memory several decades later unless reinforced in a direct way. Just as problematic is the possibility that additional knowledge about the condition has

---

would cause children to press escalator's emergency stop button); United States v. Withorn, 204 F.3d 790 (8th Cir. 2000) (trial court properly admitted testimony from midwife on alleged sexual assault on basis of bachelor's degree, some postgraduate work, and clinical experience). *But see* United States v. Moses, 137 F.3d 894 (8th Cir. 1998) (social worker lacked expertise to opine that victim of alleged child abuse would suffer trauma from facing the accused abuser in the courtroom).

333. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702 (2000).

334. Although this discussion in framed in terms of a particular disorder, the condition in issue may not constitute a disorder in a formal sense. Rather it may involve a symptom (e.g., auditory hallucinations), a mental state not linked to a specific disorder (e.g., dissociation), or a behavioral propensity (e.g., violent behavior). The argument in this section is generally applicable to all these categories of phenomena.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

been gained in the interim, familiarity with which might alter an expert's evaluation or opinion. Training regarding a mental disorder or treatment, therefore, may be a necessary but not sufficient aspect of an expert's qualifications, in the absence of ongoing experience. Indicia of such experience may include evaluating or treating patients with the disorder, teaching trainees how to assess or treat the disorder, systematically reviewing the literature on the disorder, attending continuing education sessions concerning the disorder, and conducting research on the disorder.

Although experience, including ongoing experience, with the condition at issue is important in establishing expertise for the purpose of providing evidence in a case, there is a danger that experience can be overemphasized as a criterion of expertise as well. Assuming a baseline degree of adequate training and some ongoing experience in a field or with a condition, it is not clear that additional experience necessarily enhances an expert's authoritativeness. Experts will sometimes boast of the number of evaluations they have performed of a particular type of evaluee (e.g., alleged or convicted murderers) or of a given kind (e.g., assessments of competence to stand trial). However, if evaluations are performed inadequately or used as the basis for invalid conclusions, especially if there is no feedback loop to correct the expert's errors, mere experience may only have the effect of reinforcing bad clinical habits. Indeed, studies of diagnostic performance by mental health professionals divided into groups by the duration of their clinical experience have shown no consistent correlation between years of experience and reliability.[335] An explanation for the failure to find a consistent effect of expertise may be that, despite less clinical experience, recently trained clinicians are more familiar with the contemporary diagnostic framework and are less tempted to use their clinical experience as a substitute for generally accepted criteria (e.g., "I know schizophrenia when I see it, regardless of what the criteria say"). It is of interest that few studies have compared the performance of experienced forensic psychiatrists and psychologists to their nonforensic colleagues.[336] Although it might be expected that experts with forensic training would be more sensitive to the unique aspects of forensic examinations discussed above, for example, the importance of maintaining a level of suspicion regarding secondary gain and of confirming the evaluee's account, when possible, with collateral information, that hypothesis remains to be tested. One small study has shown that forensic psychiatrists may be less susceptible to some kinds of hindsight bias than their clinical

335. Here reliability is being used in its technical sense of agreement across more than one rater. For an example of the failure to find a consistent effect of previous experience, *see*, *e.g.*, Sean H. Yutzy et al., *DSM-IV Field Trial: Testing a New Proposal for Somatization Disorder*, 152 Am. J. Psychiatry 97 (1995).

336. There are, however, data to suggest, as might be expected, that clinicians with forensic training have higher levels of knowledge regarding relevant legal issues, *e.g.*, Gary B. Melton et al., Community Mental Health Centers and the Courts: An Evaluation of Community-Based Forensic Services 43–55 (1985).

EXHIBIT C

*Reference Guide on Mental Health Evidence*

colleagues,[337] but additional research would be helpful before firm conclusions are drawn.

## 3. Licensure and board certification

a. Licensure

Possession of a valid professional license is usually considered a threshold requirement in the qualification of an expert in legal proceedings. Licensure of physicians (including psychiatrists) is governed by a licensure board in each state.[338] Although criteria may differ somewhat, generally a physician who has graduated from an accredited American medical school, passed a sequence of tests designed to ensure adequate levels of knowledge and clinical judgment,[339] and completed 1 or 2 years of residency training is eligible for full licensure.[340] Prior to that point, a temporary license, allowing practice under supervision, is usually issued. Graduates of medical schools that are not in the United States are usually subject to a different set of requirements, often requiring longer periods of residency training and individual review of qualifications. Once licensure is attained in a state, should a physician desire to acquire a license in another state, the process is variable. Some states will grant such a license fairly easily; others, such as California, will require that the physician take and pass a test of general medical knowledge if a certain period of time (e.g., 10 years in California) has passed since the original sequence of testing was completed.[341]

For clinical psychologists, standards for licensure differ somewhat by state, but generally after completion of an accredited Ph.D. program in the United States (including a 1-year internship), they are required to complete 2 years of clinical work under the supervision of a licensed psychologist and to pass a national licensure examination.[342] Because the states do not restrict the practice of psychotherapy per se, but regulate the use of professional titles instead, an unlicensed psychologist can engage in many aspects of the clinical practice of psychology, including all forms of psychotherapy, but will not be able to use the title of psychologist. For psychologists who are seeking licensure in another jurisdiction, many states will grant reciprocity—that is, they will not engage in an independent

---

337. Herbert W. LeBourgeois et al., *Hindsight Bias Among Psychiatrists*, 35 J. Am. Acad. Psychiatry & L. 67 (2007).

338. A summary of the requirements for medical licensure in each jurisdiction is available from the Federation of State Medical Boards at http://www.fsmb.org/usmle_eliinitial.html.

339. See a description of the tests and the examination process at http://www.usmle.org/General_Information/general_information_about.html.

340. Federation of State Medical Boards, *supra* note 338.

341. Cal Bus. & Prof. Code §§ 2080–99, 2184.

342. Details of requirements in each state can be found at the Web site of the Association of State and Provincial Psychology Boards at http://www.asppb.net.

873

**EXHIBIT C**

process of reviewing the applicant's credentials, relying instead on the review conducted by the initial licensure board.

## b. Board certification

Board certification represents a level of qualifications beyond those required for licensure in either medicine or psychology. Although well-trained, competent psychiatrists may have reasons for not attaining board certification (e.g., examination anxiety that interferes with performance, a career centered on nonclinical research for which clinical board certification is thought to be unnecessary), the tests are designed to be passed by a competent psychiatrist and do not require exceptional levels of clinical skill. Thus, in most cases board certification can be viewed as reflecting attainment of an adequate level of clinical competence to engage in independent psychiatric practice. Whether a court chooses to admit testimony from a psychiatrist who has not been board certified may depend on the reasons why certification has not been achieved and on the specific question(s) that will be addressed in the psychiatrist's testimony.[343]

Professional psychology also has a board certification process, administered by the American Board of Professional Psychology.[344] Certification is only offered in psychology specialties, but these include such general clinical fields as clinical psychology, counseling psychology, and group psychology. As in subspecialty certification in psychiatry, candidates are expected to exhibit advanced competence in the specialty area, defined specifically for each specialty. Board certification is less common among psychologists than among psychiatrists, in part perhaps because the process is more recent.[345] Given this, it is less likely that certification will be applied as a minimum standard for expert testimony in psychology than in psychiatry or other areas of medicine.

343. For examples of the scope of judicial discretion on this issue, see, e.g., Hall v. Quarterman, 534 F.3d 365 (5th Cir. 2008) (finding that a state requirement that only a licensed expert may testify in a civil commitment hearing as to mental retardation did not extend to expert testimony on the same topic); Oberlander v. Oberlander, 460 N.W.2d 400 (1990) (reversing as abuse of discretion the trial court's exclusion of expert testimony from a psychologist who was licensed in the neighboring state); Williams v. Brown, 244 F. Supp. 2d 965 (N.D. Ill. 2003) (finding that psychiatrists who were not board-certified child psychiatrists may nonetheless testify about the condition of juvenile plaintiffs).

344. A description of the process and eligibility requirements for the examination process can be found at http://www.abpp.org/abpp_certification_specialties.htm.

345. A recent study suggests that approximately 85% of psychiatrists become board certified in the 8 years following completion of residency training. Dorthea Juul et al., *Achieving Board Certification in Psychiatry: A Cohort Study,* 160 Am. J. Psychiatry 563 (2003). In contrast, it was estimated that in 2000 only 3.5% of psychologists had achieved board certification. Frank M. Dattilio, *Board Certification in Psychology: Is It Really Necessary?* 33 Prof. Psychol.: Res. & Prac. 54 (2002).

EXHIBIT C

*Reference Guide on Mental Health Evidence*

## 4. Prior relationship with the subject of the evaluation

A presumption may exist among some attorneys, judges, and jurors that a mental health professional who has had a treatment relationship with the person whose mental state is in question is better qualified to testify about aspects of that mental state than an evaluator who is meeting the person for the first time. The logic seems strong: A professional who has known the person for some period of time, perhaps a substantial one, should be better able to offer conclusions about the person's diagnosis, treatment requirements, and the impact of the person's mental state on the person's function and behavior. Thus, it may seem surprising that the ethics guidelines produced by both the American Academy of Psychiatry and the Law, the leading organization of forensic psychiatrists, and the American Psychological Association's division of forensic psychologists point to problems inherent in such situations.[346] Although neither set of guidelines construes testimony involving current or former patients as unethical, they both have words of caution to offer and discourage clinicians from playing both clinical and expert roles.[347]

The professional literature on this issue, and the ethics guidelines themselves, cite several reasons why having a treating professional perform the evaluation for

346. American Academy of Psychiatry and the Law: Ethics Guidelines for the Practice of Forensic Psychiatry, May 2005, https://www.aapl.org/ethics.htm; Committee on Ethical Guidelines for Forensic Psychologists (Division 41 of the American Psychological Association and the American Academy of Forensic Psychology), *Specialty Guidelines for Forensic Psychologists*, 15 L. & Hum. Behav. 655 (1991).

347. The forensic psychiatry guidelines are explicitly discouraging of this practice:

Psychiatrists who take on a forensic role for patients they are treating may adversely affect the therapeutic relationship with them. Forensic evaluations usually require interviewing corroborative sources, exposing information to public scrutiny, or subjecting evaluees and the treatment itself to potentially damaging cross-examination. The forensic evaluation and the credibility of the practitioner may also be undermined by conflicts inherent in the differing clinical and forensic roles. Treating psychiatrists should therefore generally avoid acting as an expert witness for their patients or performing evaluations of their patients for legal purposes.

American Academy of Psychiatry and the Law: Ethics Guidelines for the Practice of Forensic Psychiatry, Sec. IV (May 2005), *available at* https://www.aapl.org/ethics.htm. In contrast, the forensic psychology guidelines could be seen as being somewhat more permissive:

"D. Forensic psychologists recognize potential conflicts of interest in dual relationships with parties to a legal proceeding, and they seek to minimize their effects.

1. Forensic psychologists avoid providing professional services to parties in a legal proceeding with whom they have personal or professional relationships that are inconsistent with the anticipated relationship.

2. When it is necessary to provide both evaluation and treatment services to a party in a legal proceeding (as may be the case in small forensic hospital settings or small communities), the forensic psychologist takes reasonable steps to minimize the potential negative effects of these circumstances on the rights of the party, confidentiality, and the process of treatment and evaluation."

Committee on Ethical Guidelines for Forensic Psychologists (Division 41 of the American Psychological Association and the American Academy of Forensic Psychology): *Specialty Guidelines for Forensic Psychologists*, 15 Law & Hum. Behav. 655 (1991).

875

EXHIBIT C

*Reference Manual on Scientific Evidence*

legal purposes may not be prudent.[348] First, offering testimony, even if it is supportive of the patient's legal claim, may interfere with the therapeutic relationship. Not only will it often come as a shock to a patient to hear herself described in diagnostic terms, but details of the treating clinician's view of the patient revealed under both direct and cross-examination may alienate the person from the clinician. The treating clinician, in fact, may be aware of more information that is not relevant to the legal question than an evaluator called in specifically for purposes of providing evidence, and hence may be even more likely to reveal it during testimony. At best, when this happens it impedes the therapeutic process and takes time away from the primary therapeutic goals; at worst, it may lead the person to abandon treatment. This effect is likely to be exacerbated if the testimony is adverse to the patient's legal position.

Second, the underlying assumption regarding the desirability of having the clinician testify may be flawed. That is, although the clinician may have known the person for a long time as a patient, the clinical process may never have required the clinician to collect the type of information that would be relevant to the legal question. Even if that information was discussed, the treating clinician is less likely to have approached it with the degree of caution that a forensic evaluator would be likely to employ or to have attempted to verify the information through collateral sources. Indeed, even after agreeing to participate as an expert witness, a clinician may be unaware of the importance of assessing the veracity of the person's claim or afraid that doing so may lead to strains in the therapeutic relationship.

A third problem is that the clinician, having formed an alliance with the person as a patient, perhaps over a considerable period of time, may feel a natural allegiance to the person and a desire, even if not a conscious one, to support the person's contentions in the case. Thus, presentation of evidence may undergo subtle distortion, or may be subject to conscious manipulation by a clinician who sees his or her role as being the patient's advocate. Fourth, there is an ethical problem when the clinician is subpoenaed to testify over the patient's objection. The preexisting therapeutic relationship was premised on the information that the patient revealed being used for treatment purposes. It places the clinician whose testimony cannot support the person's legal claim in an extremely awkward position to be compelled now to use that information to the patient's detriment.[349]

---

348. Larry H. Strasburger et al., *On Wearing Two Hats: Role Conflict in Serving as Both Psychotherapist and Expert Witness*, 154 Am. J. Psychiatry 448 (1997); Ronald Schouten, *Pitfalls of Clinical Practice: The Treating Clinician as Expert* Witness, 1 Harv. Rev. Psychiatry 405 (1993); Stuart Greenberg & Daniel Shuman, *Irreconcilable Conflict Between Therapeutic and Forensic Roles*, 28 Prof. Psychol.: Res. & Prac. 50 (1997); Appelbaum & Gutheil, *supra* note 149, at 236–39.

349. Although all states have psychotherapist–patient and/or physician–patient testimonial privilege statutes that limit testimony by treating psychiatrists and psychologists (and often other mental health professionals) without the patient's consent, the exceptions in many of these statutes—including the so-called patient-litigant exception that is invoked when patients place their mental state at issue

876

EXHIBIT C

Thus, in contrast to what might seem the logical assumption—that the treating clinician is the best qualified person to testify regarding the patient—there are multiple reasons to avoid relying on the treater, and in fact to discourage that person from serving as an expert witness in the case.

## B. How Was the Assessment Conducted?

The reliability and validity of an expert opinion related to mental health issues depends heavily on the manner in which the assessment that forms the basis for the conclusions was conducted.

### 1. Was the evaluee examined in person?

Given the range of cases in which mental health experts provide testimony and the various questions to which they are asked to respond, situations arise in which the experts are providing evidence without having examined the person about whom they are testifying.[350] Such circumstances may arise when direct evaluation is impossible, for example, in contests over testamentary capacity, where often only after the testator is deceased will a claim regarding the person's capacity be litigated. Other civil litigation in which there may be issues regarding the state of mind of a deceased person include contractual capacity, wrongful death, and medical malpractice claims.[351] Testimony regarding a person who cannot be evaluated directly is less likely to occur in criminal cases, but a highly contentious example occurs in death penalty cases in Texas; defendants have the right to decline evaluation by prosecution experts,[352] but such experts frequently testify on the basis of a hypothetical question that reflects some of the facts regarding the defendants' history and behavior.[353]

---

in a case—are sufficiently numerous that this situation cannot be ruled out. Jaffee v. Redmond, 518 U.S. 1 n.13 (1996); Bruce J. Winick, *The Psychotherapist-Patient Privilege: A Therapeutic Jurisprudence View*, 50 U. Miami L. Rev. 249 (1996).

350. In addition, on some occasions, testimony will provide contextual information for the decisionmaker, for example, how a person in a given situation or with a given disorder would usually respond, without being applied directly to a specific person. John Monahan & Laurens Walker, *Social Authority: Obtaining, Evaluating, & Establishing Social Science in Law*, 134 U. Pa. L. Rev. 477 (1986); John Monahan & Laurens Walker, *Social Science Research in Law: A New Paradigm*, 43 Am. Psychol. 465 (1988).

351. Farnsworth, *supra* note 8, § 3:11. For a case study of the use of postmortem analysis in the USS *Iowa* explosion investigation, see Charles Patrick Ewing & Joseph T. McCann, Minds on Trial: Great Cases in Law and Psychology 129–39 (2006); *see also* Norman Poythress et al., *APA's Expert Panel in the Congressional Review of the USS* Iowa *Incident*, 48 Am. Psychol. 8 (1993). *See* Moon v. United States, 512 F. Supp. 140 (D. Nev. 1981) (finding that hospital psychiatrists were negligent in diagnosing as schizophrenic a patient who later committed suicide); Urbach v. United States, 869 F.2d 829 (5th Cir. 1989) (finding no medical malpractice where a mental patient on furlough from a VA hospital was arrested and beaten to death in a Mexican prison).

352. Estelle v. Smith, 451 U.S. 454 (1981).

353. Barefoot v. Estelle, 463 U.S. 880 (1983); Satterwhite v. Texas, 486 U.S. 249 (1988).

**EXHIBIT C**

Conclusions about persons who have not been directly examined may be drawn on the basis of available records, including medical, mental health, police, educational, armed services, and other records; information from informants who have been or are in contact with the person, which may derive from interviews by the expert, prior testimony, depositions, police reports, and other sources; and on some occasions observations by the expert of the person's behavior, for example, in a prison or courtroom setting.[354] Although it may be possible to draw valid conclusions on the basis of such data, conclusions generally are more limited and have a lesser degree of certainty than when a direct evaluation has taken place. The ethics statements of the major forensic psychiatry and forensic psychology organizations offer words of caution about such testimony.[355] There are several reasons why caution is warranted.

Expert knowledge in mental health can be viewed as comprising two components: the knowledge of how to conduct an evaluation to obtain relevant data and the knowledge of how to weigh those data to reach a conclusion.[356] When a direct examination of the person cannot be carried out, the expert must rely on information accumulated by others, sometimes for other purposes. The likelihood

354. **Kirk Heilbrun et al.,** *Third Party Information in Forensic Assessment*, *in* Handbook of Psychology, Vol. 11: Forensic Psychology 69 (Alan M. Goldstein ed., 2003). Testimony offered in capital sentencing contexts without examination of the defendant has been particularly controversial, *see, e.g.,* Bennett v. State, 766 S.W.2d 227, 232 (Tex. Crim. App. 1989) (Teague, J., dissenting) ("[W]hen Dr. Grigson testifies at the punishment stage of a capital murder trial he appears to the average lay juror . . . to be the second coming of the Almighty. . . . Dr. Grigson is extremely good at persuading jurors to vote to answer the [future dangerousness] issue in the affirmative."); "*They Call Him Dr. Death,*" Time. June 1, 1981; Rosenbaum, *supra* note 216.

355. The Ethics Guidelines for the Practice of Forensic Psychiatry of the American Academy of Psychiatry and Law (available at https://www.aapl.org/ethics.htm) note:

> For certain evaluations (such as record reviews for malpractice cases), a personal examination is not required. In all other forensic evaluations, if, after appropriate effort, it is not feasible to conduct a personal examination, an opinion may nonetheless be rendered on the basis of other information. Under these circumstances, it is the responsibility of psychiatrists to make earnest efforts to ensure that their statements, opinions and any reports or testimony based on those opinions, clearly state that there was no personal examination and note any resulting limitations to their opinions.

The comparable guidelines for forensic psychology state:

> Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statements, opinions, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

Committee on Ethical Guidelines for Forensic Psychologists (Division 41 of the American Psychological Association and the American Academy of Forensic Psychology), *Specialty Guidelines for Forensic Psychologists*, 15 Law & Hum. Behav. 655 (1991).

356. Paul S. Appelbaum, *Hypotheticals, Psychiatric Testimony, and the Death Sentence*, 12 Bull. Am. Acad. Psychiatry & L. 169 (1984); *see also* American Psychiatric Ass'n amicus brief in *Barefoot*, *supra* note 215.

EXHIBIT C

that all the data that the expert would have wanted to obtain will be available in such circumstances is remote. This is true even when the data have been generated by another mental health professional, for example, in medical or mental health records, both because that person may not have asked all the questions that the testifying expert would have asked and because all of the person's responses may not have been fully recorded. The intangible aspects of an evaluation, including the person's relatedness, affect, and degree of cooperation, may be especially difficult to convey. Because many of the diagnostic categories require that other possibilities have been excluded first,[357] the absence of pertinent negative information (e.g., the person does not abuse substances) can restrict the ability to make definitive diagnoses. Moreover, to the extent that the data available to the expert have been shaped by someone with an interest in the outcome of the case, as when an expert testifies in sole reliance on information in a hypothetical question that is designed to mirror the defendant's or plaintiff's situation, these problems are compounded.

Thus, the major professional organizations in forensic mental health agree that evidence based on sources other than a direct evaluation of the person should be framed with due regard for its limitations and that those limitations should be made clear in reports or testimony by the expert. Failure to do so may represent unethical behavior on the part of the expert witness[358] and should probably cast doubt on the credibility of the evidence presented.

## 2. Did the evaluee cooperate with the assessment?

Even when a direct evaluation has taken place, the degree of cooperativeness of the person may affect the validity of the data obtained.[359] Civil plaintiffs and criminal defendants have obvious reasons to distrust experts who are examining them on behalf of adverse parties, and may be less than forthcoming in such interactions. However, even when an evaluation is being conducted by an expert hired by the person's own attorney, his or her cooperativeness may be limited by the symptoms of the disorder. For example, the person who is experiencing paranoid delusions may be suspicious and fearful even of an expert with whom his or her attorney encourages cooperation (indeed, even of the attorney). As a consequence, it is important for the expert to clarify, in the presentation of the evidence and

---

357. For example, DSM-IV-TR criteria for Major Depressive Episode require both that the symptoms on which a diagnosis is based not be due to the direct physiological effects of a drug (licit or illicit) that has been ingested or to a general medical condition; and that they not be better accounted for by a diagnosis of Bereavement after the death of a loved one. DSM-IV-TR at 356. Other major diagnostic categories carry similar requirements to rule out the possibility that the person's presentation is due to other causes before making the diagnosis in question.

358. For one highly publicized case of a psychiatric expert witness who was expelled from the American Psychiatric Association on these grounds, see Ron Rosenbaum, *supra* note 216; Estelle v. Smith, 451 U.S. 454 (1981).

359. Melton et al., *supra* note 28, at 46.

EXHIBIT C

*Reference Manual on Scientific Evidence*

conclusions based on the evaluation, the extent to which the evaluee cooperated with the examination process.

## 3. Was the evaluation conducted in adequate circumstances?

Mental health evaluations often involve discussions of sensitive material, including histories of abuse, use of illegal substances, sexual practices, intimate fears and fantasies, and potentially embarrassing symptoms. Although some persons may be reluctant to speak freely about these issues with an evaluator whom they barely know—and who may reveal this information in the courtroom—the reassurance that they are talking with a mental health professional often substantially mitigates those concerns.[360] However, when the evaluation takes place in a setting that is less than private, the likelihood of such disclosures is reduced.[361] This is often a problem in correctional institutions, where interviews may take place where guards or other inmates can overhear them. Medical hospitals are another location where privacy may be compromised, with nursing staff or other patients nearby. Even if no one is within earshot, interview sites that are noisy or subject to other distractions may interfere with the evaluee's ability to attend to the questions and respond accurately; this can be a particular problem for people with mental disorders that may impair concentration and attention. Whenever possible, a competent evaluator tries to obtain a venue that is free of these intrusions, and when it is not possible, the situation should be noted as a limitation on the completeness of the evaluation in the report or testimony.

Attorneys sometimes ask to sit in on the evaluation. Their presence can raise similar concerns, even when they are representing the person being evaluated, because the type of information discussed in a mental health evaluation may be quite different from what a client usually discloses to an attorney.[362] Particularly when the examination is being conducted by an expert for an adverse party, attorneys may be tempted to object to questions or to signal the person regarding their answers. Thus, if an attorney is present, as will sometimes be unavoidable, the ground rules should include having the attorney sit out of the line of sight of the evaluee and not interrupt the examination. An alternative is to have the evaluation audiotaped or videotaped, a technique that some experts now use routinely. Empirical data on

360. Indeed, a considerable literature exists on the question of whether evaluees may too easily be induced to speak frankly with someone who is introduced as a mental health professional, but whose role is very different than would obtain in treatment settings and who may reach opinions adverse to the person's interests. See, e.g., Daniel Shuman, *The Use of Empathy in Forensic Evaluations*, 3 Ethics & Behav. 289 (1993); Strasburger et al., *supra* note 348; Greenberg & Shuman, *supra* note 348.

361. Melton et al., *supra* note 28, at 47. Distraction can be a particular problem when formal psychological tests are used; *see, e.g.*, Kirk Heilbrun, *The Role of Psychological Testing in Forensic Assessment*, 16 Law & Hum. Behav. 257 (1992).

362. Robert I. Simon, *"Three's a Crowd": The Presence of Third Parties During the Forensic Psychiatric Examination*, 27 J. Psychiatry & L. 3 (1999); Robert L. Goldstein, *Consequences of Surveillance of the Forensic Psychiatric Examination: An Overview*, 145 Am. J. Psychiatry 1234 (1988).

EXHIBIT C

the impact of taping on evaluees' willingness to be forthcoming are lacking, but experienced forensic examiners have expressed the view that evaluees rapidly adjust to the recording equipment, with little impact on the evaluation.[363]

A final consideration is the time available for the examination.[364] Time constraints may result from correctional rules (e.g., prisoners are only available during given periods of time), medical illnesses or mental disorders (e.g., the evaluee has limited strength or attention), or limitations on resources (e.g., the party employing the expert only has funds for a certain number of hours of work). Appropriate duration of a direct examination is difficult to specify for all situations. It is likely to depend on the question being asked, the complexity of the person's history and presentation, and the person's degree of cooperation with the evaluation. Needless to say, the duration of an examination, standing alone, is not a good indicator either of its quality or of the validity of the conclusions that were drawn. However, an expert should be able to assess the time necessary to perform an adequate evaluation and, if sufficient time is not available, should indicate the limitations on the resulting opinions that are offered.

## 4. Were the appropriate records reviewed?

The importance for the evaluator of having access to the person's records will vary somewhat depending on the legal question being addressed, but can often be critical to the validity of the evaluation.[365] When retrospective assessments are being conducted—for example, an evaluation of a defendant's state of mind at the time of a crime that occurred months to years before the examination, or an assessment of a person's capacity to enter into a contract at some distant prior date—reviewing contemporary or nearly contemporary records can provide crucial insights into the person's symptoms and functioning at that time. However, even when contemporaneous function or future behavior is being assessed, having access to available records may still be of great importance. Because distinctions between mental disorders can depend in part on the pattern of symptoms over time, accurate diagnosis often is dependent on having a view of the person's prior psychiatric history.[366] In addition, when malingering is a consideration, as it will frequently be, the consistency of the person's presentation over time can be an important datum in the assessment.[367] And given that past behavior is generally the

---

363. AAPL Task Force, *Videotaping of Forensic Psychiatric Evaluations*, 27 J. Am. Acad. Psychiatry & L. 345 (1999).

364. Melton et al., *supra* note 28, at 47.

365. Kirk Heilbrun et al., *supra* note 354; see also discussion in Section I.C.3.f, *supra*.

366. Diagnosis and subcategorization of bipolar disorder, for example, is dependent not only on assessing the person's current symptoms—whether manic or depressed—but also on ascertaining whether mania or depression was present in the past if it is not apparent at present. *See* DSM-IV-TR at 388–89.

367. *See generally* Section I.C.5, *supra*.

EXHIBIT C

best predictor of future behavior, especially where violence is concerned, knowledge of a person's previous history can be essential for predictions of reasonable accuracy.[368] Thus, regardless of the focus of the evaluation, an effort should be made to obtain all relevant available records.

Which records are relevant will depend somewhat on the nature of the legal question being asked.[369] Whenever possible, records of past mental health evaluations or treatment should be obtained. Medical records often contain information about patients' psychiatric symptoms, alcohol and drug use, and functional levels, and thus can be useful as well. Light can be shed on both patterns of symptoms and functional impairment by educational, work, and military records. Educational records may be especially helpful where disorders of early onset are suspected, and work and military records are often illuminating when occupational disability is at issue. In criminal cases, particularly those involving assessments of the defendant's state of mind at the time of the crime, police records can often be valuable, including interviews with witnesses or the defendant, and the results of physical evaluations—including pictures—of the crime scene. It can be helpful to compare the data obtained by these means with the defendant's own accounts of the episode that led to the arrest. Diaries or other accounts written by the person whose mental state is at issue are sometimes available and, to the extent that they were generated prior to the initiation of legal proceedings, can be enlightening regarding the person's state of mind and motivation, the influence of third parties, and the like. When there has been previous litigation involving the person being evaluated, depositions or transcripts of testimony can be helpful for information about state of mind and factual data.

## 5. *Was information gathered from collateral informants?*

In addition to reviewing records, interviewing informants with relevant data can provide important perspectives on the person being evaluated.[370] Family members and friends, including coworkers, often can report on patterns of behavior indicative of symptoms of mental disorder or of functional impairment. They may know about prior treatment for mental disorders, including hospitalization, or histories of involvement with the criminal justice system. Current or former therapists can share useful impressions of diagnosis and comment on levels of function, although to the extent that their interactions with the person are subsumed under a psychotherapist–patient or physician–patient privilege, and do not fall under one of the exceptions in that jurisdiction, it may not be possible to contact them without the person's consent. Witnesses to an alleged crime or workplace

---

368. *See generally* Section I.E.1.a, *supra*.

369. *See*, *e.g.*, Deborah Giori-Guarnieri et al., *AAPL Practice Guideline for Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense*, 30 J. Am. Acad. Psychiatry & L. 22 (Supplement) (2002).

370. **Heilbrun et al.**, *supra* note 354.

**EXHIBIT C**

*Reference Guide on Mental Health Evidence*

harassment can similarly round out a picture of the person and help to confirm or disconfirm the evaluator's impressions. Access to collateral informants may be complicated by legal restrictions or, if they are close to the person being evaluated, by their reluctance to speak to an expert working for an adverse party. When contact does occur, the assessor needs to take into account possible distortions by the informant in the service of helping, or sometimes of harming, the interests of the person who is the subject of the evaluation.

## 6. Were medical diagnostic tests performed?

Dualistic views of human behavior, in which mind and body are seen as distinctly separate entities, have been rejected by scientists who study thought and behavior, and clinicians who treat mental disorders.[371] The relevant fields, including cognitive science, neuroscience, psychology, psychiatry, and philosophy, now acknowledge the brain as the seat of mentation and behavior, and recognize that all mental phenomena, including abnormal mental states, result from perturbations in the function of the brain. At some level, there must be a physical concomitant of every mental phenomenon, and sometimes the physical influences on abnormal behavior are gross enough to be detected by existing techniques, which may reveal potentially treatable conditions. Thus, identification of the causes of abnormal thought or behavior and formulation of a diagnosis may require an evaluation of the person's physical state, along with the mental state.[372] If there is any reason to suspect that an identifiable general medical disorder lies at the root of the person's condition (e.g., a sudden and unprecedented appearance of symptoms, disproportionate impairment of aspects of cognitive function), medical testing, including EEGs and imaging studies, may be indicated.[373]

[371]. *See, e.g.,* DSM-IV-TR, *supra,* at xxx, "the term *mental disorder* unfortunately implies a distinction between 'mental' and 'physical' disorders that is a reductionistic anachronism of mind-body dualism." *See also* Kenneth S. Kendler, *Toward a Philosophical Structure for Psychiatry*, 162 Am. J. Psychiatry 433 (2005).

[372]. *See generally* Section I.C.3.e, *supra.*

[373]. Identification of structural or electrical abnormalities, however, does not necessarily imply that they impaired the person's functioning or were responsible for the person's behavior. For discussion of a well-known case in which this issue was raised, see Stephen Morse, *Brain and Blame*. 84 Geo. L.J. 527 (1996). For a more general discussion of the introduction of findings of abnormalities demonstrated on brain imaging in court, see Dean Mobbs et al., *Law, Responsibility and the Brain*, 5 PLoS Biology 693 (2007). Moreover, as with structural findings, the mere presence of a functional abnormality is not sufficient to establish a causal link to the person's mentation or behavior. Growing legal and neuroscience literatures are being generated on the use of functional imaging data in court. *See, e.g.,* Neal Feigenson, *Brain Imaging and Courtroom Evidence: On the Admissibility and Persuasiveness of fMRI*, 2 Int'l J.L. Context 233 (2006); Hal S. Wortzel et al., *Forensic Applications of Cerebral Single Photon Emission Computed Tomography in Mild Traumatic Brain Injury*, 36 J. Am. Acad. Psychiatry & L. 310 (2008).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

### 7. *Was the evaluee's functional impairment assessed directly?*

As previously discussed, mental health evidence will often focus on the extent to which a person is capable of performing a particular task or set of tasks, that is, testimony will relate to a person's impairment on one or more functional abilities.[374] Sometimes an evaluator will be able to infer from an examination of the person's mental state and information from other sources whether the person is or was capable of performing the task at hand (e.g., standing trial, returning to work, managing property). However, another option for evaluation exists, namely direct assessment of the relevant function.[375] Where a functional ability that relates to a discrete task or set of tasks is at issue, a competent evaluator should have considered direct assessment of performance on those tasks and be able to explain a decision not use such a technique. It should be noted, though, that conclusions drawn even from direct assessments of function involve a degree of inference. A person claiming occupational impairment as a result of anxiety induced by longstanding harassment on the job, for example, might respond very differently to the demands of a work-related task in the actual workplace compared with the safe confines of a mental health professional's office. Therefore, when actual observation of functional capacity is employed, the evaluator should be prepared to comment on the ecological validity of the test, that is, the degree to which the environment in which the test took place resembled the real-world environment in the person's life.[376] Although observations in very different settings may have some value as part of the broader dataset available in an evaluation, they do not carry the same weight as conclusions reached in environments similar to those at issue in the case.

### 8. *Was the possibility of malingering considered?*

In almost every mental health evaluation for legal purposes, the person being evaluated has an incentive to exaggerate or confabulate symptoms or to distort the impact of actual symptoms on his or her functional abilities.[377] Thus, the possibility of malingering should be considered by the evaluator in every assessment. Techniques for detecting malingering are described above.[378] Although such

---

374. *See generally* Section I.D, *supra.*

375. *See* Section I.D.2.b, *supra.*

376. Additional issues related to the use of functional tests are discussed in Section II.C, *infra.*

377. There are situations in which the incentive runs in the opposite direction. For example, a defendant facing relatively minor charges for whom an evaluation of competence to stand trial was ordered may have every reason to minimize his or her level of symptoms, preferring to go to trial rapidly rather than spend an extended period of time in a psychiatric facility being treated to restore competence. A second example is a defendant whose risk for violence is being evaluated prior to a bail hearing, who also has a powerful incentive to downplay the presence of risk factors associated with violence and to minimize a past history of violence.

378. *See* Section I.C.5, *supra.*

884

EXHIBIT C

techniques are not foolproof, and well-prepared evaluees can sometimes mislead mental health professionals regarding the existence or severity of disorders, successful malingering over time is a difficult task. However, uncovering distortions of the degree of actual symptoms or exaggerations of their impact is usually more challenging than detecting wholesale invention of disorders that are not present. Competent evaluators should be able to explain how they took into account the possibility of malingering and why they believe that their conclusions are valid and to acknowledge that their degree of certainty can never be absolute.

## C. Was a Structured Diagnostic or Functional Assessment Instrument or Test Used?

Notwithstanding the advantages of structured assessment techniques, they raise a set of concerns that must be addressed to determine their relevance to the question at issue and the weight that should be given to their results.

### 1. Has the reliability and validity of the instrument or test been established?

Reliability and validity are key concepts in test development.[379] Each contains several subcategories. Reliability refers to the reproducibility of results obtained with a particular test. That is, it is an estimate of the precision of an assessment technique. *Interrater reliability* is a measure of whether different examiners using the same test or instrument with the same subject come out with similar results, an important characteristic for an assessment approach that will be used by many raters. *Test-retest reliability* assesses the stability of results from an instrument or test over time; poor correspondence of results between time periods may indicate either an unreliable technique or a condition subject to periodic changes in status. It is an axiom of test and instrument development that good reliability is a prerequisite for having a valid assessment technique, but does not in itself guarantee validity.

Validity connotes the degree to which an instrument or test yields results that accurately reflect reality. *Construct validity* refers to the extent that an instrument or test reflects the theoretical construct that it purports to measure (e.g., anxiety or depression). Elements of construct validity include *discriminant validity*, which is the degree to which the test distinguishes between related conditions or states, and *convergent validity,* the extent to which the results of this test resemble results of other instruments that assess the same or a similar construct. *Content validity* describes the adequacy or thoroughness with which a test has sampled the variables associated with a given domain (e.g., does a measure of ability to work assess all relevant aspects of a given occupation?). Finally, *predictive validity* denotes

---

379. For the discussion in the following two paragraphs, see generally American Psychological Association, Standards for Educational and Psychological Testing (1999).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

the ability of an instrument or test to foretell a person's condition or behavior at some point in the future.

When the results of an evaluation using an instrument or test are offered in evidence, clarification of the extent to which reliability and validity have been demonstrated is an essential aspect of determining admissibility and weight. Indeed, based on its discussion in *Daubert,* when the U.S. Supreme Court referred to the "reliability" of a scientific technique, it was encompassing both reliability and validity as usually understood in the social sciences.[380] Which aspects of reliability and validity are relevant to a particular case will depend on the purpose for which the data from the test are being introduced. For example, if the evidence is addressing change in a person's test results over time, a measure's test–retest reliability becomes crucial. If more than one evaluator was involved, interrater reliability may be key. Discriminant validity will be relevant when two states or conditions must be distinguished from each other and predictive validity when forecasts of future mental state or behavior are being made. Careful evaluators will only use instruments or tests that have had the relevant types of reliability and validity confirmed in peer–reviewed publications and will be prepared to cite such data should questions be raised. Of course, some tests are so widely used over a sustained period that their reliability and validity are generally accepted (e.g., the MMPI–2) and do not ordinarily need to be demonstrated again prior to introducing data based on an evaluation in which they were employed. However, the reliability and validity of some longstanding tests (e.g., the Rorschach ink–blot test) remain controversial,[381] and data even from established tests can be used to reach conclusions of uncertain validity. Thus, novel uses of instruments or tests may also require that their psychometric characteristics for that purpose be demonstrated.

## 2. Does the person being evaluated resemble the population for which the instrument or test was developed?

Reliability and validity once established are not necessarily universally applicable. If an assessment technique is being used on someone drawn from a different population than the one for which the instrument or test was developed, and the new group is likely to differ in some material way, reliability and/or validity may need to be reestablished. An example with regard to reliability might be the use with a child of an instrument that was developed to measure symptoms of mental disorders in adults.[382] Either the nature of the symptoms that adults experience or

---

380. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).

381. Lilienfeld et al., *supra* note 127.

382. The frequently differing presentations of mental disorders in children have led to the development of instruments intended specifically for use in that population. *See, e.g.,* David Shaffer et al., *NIMH Diagnostic Interview Schedule for Children, Version IV (NIMH DISC-IV): Description, Differences from Previous Versions, and Reliability of Some Common Diagnoses*, 39 J. Am. Acad. Child & Adolescent Psychiatry 28 (2000).

886

**EXHIBIT C**

the ability of adults to describe their symptoms could be substantially different with children, leading to greater difficulty in applying the instrument or test. Thus, it might be prudent for an evaluator to ascertain that data exist showing good reliability in this new population before using this assessment approach. An example involving validity is the use of predictive scales, such as instruments to assess risk of future violence, with a different group than the one from which the predictive algorithm was derived.[383] Concretely, if a predictive test is based on a criminal, but nonmentally disordered sample, applying it to persons with mental disorders—for whom very different variables may affect their behavior—is dubious in the absence of data demonstrating that it is valid in the latter group and vice versa.

It should be emphasized, however, that reestablishing reliability and validity is only necessary when the original group and the new population are likely to differ in some relevant way. Why an instrument developed in California, for example, would not be as reliable and valid when used in Texas is not at all clear. Moreover, the nature of the instrument or test will play a role. Diagnostic tests are likely to differ in their characteristics across populations only if the disorders or the ways in which they manifest themselves are different, which will not usually be the case. Predictive tests, however, may be more sensitive to cultural, socioeconomic, geographic, and other considerations that could introduce new predictors of future conditions or behaviors into the mix. In addition, tests that involve comparisons with broader populations are said to be "normed" against those groups,[384] and the comparative data (e.g., the evaluee is in the lowest quartile of performance) may be invalid unless the test is renormed for the group of which the person being evaluated is a member. Thus, whether additional reliability and validity testing is required for a new use, or whether a test must be renormed before being used in this way, is necessarily a fact-specific determination.

### *3. Was the instrument or test used as intended by its developers?*

Established reliability and validity are necessary but not sufficient to determine whether an instrument or test has yielded reliable and valid results. Unless the assessment approach was applied in the manner intended by the developers, the data on reliability and validity may simply not be applicable to a particular use. Three possible areas of deviation relate to training in, administration of, and scoring of the assessment tool.

#### a. Training

Some instruments and tests are so straightforward in their use that little or no training is required. Reading the instructions accompanying the assessment tool might be

---

383. *See, e.g.,* John Monahan et al., *The Classification of Violence Risk*, 24 Behav. Sci. & L. 721 (2006).

384. For a good discussion of norming in the forensic context, *see* Grisso, *supra* note 2, at 56–59.

EXHIBIT C

*Reference Manual on Scientific Evidence*

sufficient. In some cases, though, training may be required to ask the questions properly, especially when followup probing of responses is necessary or when evaluees are asked to perform tasks that must be conducted in a particular way. Diagnostic instruments, in particular, may have complex "skip–out" rules, that is, procedures for determining when to include or omit certain questions based on the person's responses to previous questions.[385] When information is acquired at least in part from existing records, rather than from the evaluee directly, rules may exist for how the information should be identified and abstracted. All of these characteristics of an assessment approach may require elaborate training for proper implementation.[386] Sometimes the training can be acquired from test manuals, but for more complex instruments or tests, face–to–face training with an opportunity to practice administration is necessary. Developers of such instruments or tests may offer such training in 1-day or multiday seminars that professionals can arrange to take.[387] Thus, a key question in assessing data based on an instrument or test is whether proper use requires special training, and if so, whether the assessor was trained in the technique.

### b. Administration

Even if training was obtained, the reliability and validity of an instrument or test will depend on whether the assessor administered the test in the proper way. Many assessment tools require that questions be asked in a given sequence and that they be phrased in a particular way. After an incorrect response, it may be permissible to ask the question again, but only a certain number of times. Probing of responses may be needed, but only certain probes may be permitted. Some tests are timed, with a given period allotted for the completion of a particular task. Deviations from any of these requirements could make the published data on the psychometric characteristics of the tool inapplicable to its use in a particular instance. Thus, a second crucial question is whether the instrument or test was administered in the same way as it was when its reliability and validity were established.

### c. Scoring

Assessment tools generally require that evaluees' responses be scored in some way. For some instruments and tests, the scoring is simple and self–evident, for example, the number of positive responses is totaled to yield the score for the test, or evaluees themselves are asked to indicate the severity of their symptoms on a

---

385. The Diagnostic Interview Schedule, which is widely used in epidemiological studies of mental disorders in the United States, is an example. See a description of the latest version of the instrument at http://epi.wustl.edu/CDISIV/dishome.aspx.

386. Indeed, some psychological and neuropsychological tests should be administered only by psychologists trained in their use.

387. The creator of the popular Psychopathy Check List (PCL-R), for example, offers an extensive training program for clinicians and researchers desiring to learn proper administration of the instrument. See the Web site at http://www.hare.org/training/.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

1-to-7 scale. Or the results could be calculated by a computer program that automatically applies the relevant algorithm, generates statistical data, and even draws comparisons with broader groups, such as the general population or persons with a particular disorder. Often, however, particularly when evaluees' verbal or narrative responses are elicited, more complex scoring rules exist. An instrument assessing the severity of symptoms, for example, may require the person administering it to categorize responses along a numerical scale,[388] and specific capacity assessment tools frequently require similar judgments to be applied.[389] Published data on the reliability of scoring may indicate that it is possible for an instrument to be scored in the same way by many different raters, but unless the person administering the instrument in this particular circumstance adheres to the usual rules, the results of the evaluation may not be comparable to those that would be obtained by another rater and may be invalid as well. Hence, a third important question when such evidence is introduced deals with whether the rules for scoring responses were properly applied.

## D. How Was the Expert's Judgment Reached Regarding the Legally Relevant Question?

In evaluating testimony from mental health experts, as noted in the preceding sections, their training and the manner in which they conduct their assessments is vital information. However, the value of an expert's opinion also depends on the process by which the data were assessed and a conclusion was reached.

### 1. Were the findings of the assessment applied appropriately to the question?

a. Were diagnostic and functional issues distinguished?

Mental health professionals without experience in performing particular forensic evaluations may fail to recognize that the legal question being asked deals with a person's functional capacity, not with some aspect of their clinical state per se.[390] As a result, they may mistakenly base their opinions on the presence of a particular diagnosis or symptom cluster rather than on the person's capacity to perform in the legally relevant manner. Studies over many years indicate that this has occurred frequently in testimony regarding defendants' competence to stand trial, in which experts often conflated the presence of psychosis with incompetence, and concluded that any psychotic defendant was ipso facto incapable of proceed-

---

388. *E.g.,* the Brief Psychiatric Rating Scale. *See* Overall & Gorham, *supra* note 122.

389. *E.g.,* the MacArthur Competence Assessment Tool for Treatment; Thomas Grisso & Paul S. Appelbaum, MacArthur Competence Assessment Tool for Treatment (MacCAT-T) (1998).

390. *See* Dusky v. United States, 362 U.S. 402 (1960); Thomas Grisso, Competency to Stand Trial Evaluations: A Manual for Practice 1–23 (1988).

889

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ing to trial.[391] Similar problems may occur in hearings on guardianship or contests regarding testimonial capacity, where the person's ability to manage or dispose of assets might be thought incorrectly to turn solely on the clinical question of whether dementia is present, as opposed to the legal issue of whether the person retains the necessary capacities despite his or her condition.[392] This problem may be more likely to occur—and to go undetected—when experts are allowed or encouraged to address the ultimate legal issue in their testimony.[393] When experts are permitted to testify to the ultimate question, the importance of probing their reasoning is magnified.[394] Experts can be asked to identify the relevant functional capacities and to speak directly to the impact of the person's mental state on those capacities.[395] That allows their reasoning processes and the correctness of their assumptions about the relevant functional standard to be tested.

b. Were the limitations of the assessment and the conclusions acknowledged?

Most assessments are imperfect. Evaluees are less than cooperative. Records are unavailable. Evidence from witnesses is conflicting. Inadequate time is available. Or the evaluator may simply have forgotten to ask about some piece of information that would have been helpful. Experts should be able to identify the limitations of their evaluations, and the possible impact of those less-than-optimal aspects of the assessments. It is unlikely that an expert would be prepared to offer testimony if he or she believed that the limitations rendered the opinions invalid. But competent experts should be able to explain why, despite the limitations (which can occur even in the best evaluations by the most experienced experts), their evaluations were adequate to allow them to draw the conclusions that they intend to present.

A comparable set of limitations can occur when conclusions are drawn and opinions formulated. Just as all assessment tools have error rates, so do expert witnesses, although their rates are difficult to subject to statistical analysis. Errors may be introduced by inadequacies in the data available or the uncertainties inherent in particular determinations, especially predictions of future mental states and behaviors. As noted above, it is often impossible to specify the contingencies that may arise in a person's life that could influence their mental states and actions. Thus, any prediction, no matter how firmly grounded in available data, has a

391. *See, e.g.,* A. Louis McGarry, *Competence for Trial and Due Process Via the State Hospital*, 122 Am. J. Psychiatry 623 (1965). More recent studies suggest that this is now a less common problem, as educational efforts among mental health professionals who do such work have had a positive impact. Robert A. Nicholson & Karen E. Kugler, *Competent and Incompetent Criminal Defendants: A Quantitative Review of Comparative Research*, 109 Psychol. Bull. 355 (1991).

392. *See* Parry & Drogin, *supra* note 8, at 149–51.

393. *See* Section I.G.2, *supra.*

394. *See* Parry & Drogin, *supra* note 8, at 429–31.

395. Buchanan, *supra* note 319.

EXHIBIT C

*Reference Guide on Mental Health Evidence*

degree of uncertainty attached to it that a competent expert should be expected to acknowledge.

c. Are opinions based on valid empirical data rather than theoretical formulations?

From the development of Freud's theories in the late nineteenth and early twentieth centuries until the present, many mental health professionals have based their clinical approaches on psychoanalytically inspired concepts. Some of these concepts have been confirmed scientifically (e.g., the existence of unconscious mental states), whereas others have not (e.g., dreams always represent the fantasied fulfillment of wishes). Although psychoanalytical theories and the psychodynamic psychotherapies that derive from them have declined in popularity in recent decades, many mental health professionals have received psychodynamic training and use the concepts they have learned to assess and treat their patients. Regardless of the possible utility of these theories from a clinical perspective, which is controversial and may depend on the condition being treated, they are arguably more problematic when they serve as the basis for conclusions offered as part of legal proceedings. Nor are psychoanalytical theories the only ones that mental health professionals use; alternative approaches may be based on theories that have a greater or lesser degree of empirical support.

To the extent that expert opinions are introduced to inform the judgments of legal factfinders, it is important for them to be based, insofar as possible, on empirically validated conclusions rather than on untested or untestable theories. That appears to be the import of the U.S. Supreme Court's decision in *Kumho Tire*.[396] As Slobogin plausibly maintains, some legal questions (such as those concerning past mental states) may not easily lend themselves to approaches based on scientific methods, but expert opinions may nonetheless be of assistance to the finders of fact.[397] At a minimum, it would seem fair for an expert to indicate when that is the case, so that the factfinder can make an informed judgment about the appropriate degree of reliance to be had on that opinion. And when empirically tested approaches are available, it would appear to be incumbent on an expert to use them or to be prepared to explain why they were not employed.

---

396. Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) (holding that the *Daubert* standard for admitting expert testimony also applies to nonscientists).
397. Christopher Slobogin, *supra* note 305.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

# III. Case Example

## A. Facts of the Case

John, a 25-year-old Army veteran who saw combat in Iraq, had begun to have anomalous experiences in the 4 years since his discharge from active duty. At first, he believed that people were staring at him, though he was not sure why. Later, he came to the conclusion that they thought he was a drug addict or a criminal, ideas confirmed when he heard voices coming through the walls of his apartment, which he attributed to the neighbors, saying, "He's using drugs" and "He steals things." To avoid people's stares, John left his apartment less often, spending most of his time listening to loud music, which helped to drown out the voices. He also found that alcohol made it easier to ignore the voices, and began to drink up to a gallon of wine each day.

One evening when the voices were particularly loud and insistent, he began banging on the walls of his apartment and yelling that he would kill the neighbors if they did not stop talking about him. Thirty minutes later, the police arrived to take him to the local Department of Veterans Affairs (VA) hospital, where he was admitted to the psychiatric unit. Over the course of his hospitalization, he received antipsychotic medication and participated in group therapy. By the end of his hospital stay, although he still wondered whether people were staring at him oddly, he no longer heard people's voices making derogatory statements about him. He denied having thoughts of hurting himself and other people. When asked whether he would continue taking his medication and would attend outpatient sessions, he said he would. Fourteen days after admission, John was discharged to outpatient care.

Immediately after discharge, John stopped his medication, and he never saw his outpatient therapist. As he became more suspicious of his neighbors, he again began to hear them talking about him, and he resumed drinking several bottles of wine each day to deal with the situation. Three weeks after discharge, while he was on his way to the grocery store to pick up more wine, a passerby accidentally bumped into John. Reacting with fury, John pummeled the older man with his fists, then began beating him with a broomstick that he found on the sidewalk nearby. It took four people who lived in nearby buildings to pull John off his victim.

In the wake of the assault, the victim brought suit against the VA for negligence in John's treatment. The suit alleged that VA mental health staff should have known that John was dangerous as a result of his mental disorder and not fit for discharge. Damages were claimed as a result of physical injuries and the development of PTSD.

892

**EXHIBIT C**

## B. Testimony of the Plaintiff's Expert on Negligence

At trial, the plaintiff introduced testimony from a board-certified forensic psychiatrist, Dr. A, who was 20 years out of residency training and had not directly treated patients for the past 13 years. Dr. A had reviewed the medical records of John's treatment and the police records of the assault, but he had not examined John directly. On direct examination, he testified that John had a diagnosis of schizophrenia, with a number of risk factors for violence, including having killed enemy combatants in Iraq, excessive alcohol consumption, and delusions of persecution. It was Dr. A's opinion that the VA treatment team had failed to abide by the standard of care because they had not used a structured violence risk-assessment instrument to determine John's dangerousness. Moreover, although they had obtained a CT brain scan that had shown frontal lobe injury from an old automobile accident, the team had failed to recognize that this constituted an additional risk factor for violence. However, Dr. A believed that, even on the basis of the available information, at the time of hospital discharge it was reasonably foreseeable that John would be violent, and thus he should not have been allowed to leave the hospital.

## C. Questions for Consideration

1. Given that Dr. A had devoted himself entirely to forensic evaluations and had not actually treated a patient for 13 years, should he have been considered qualified to offer opinions about whether John's evaluation and treatment had conformed to the standard of care?
2. How reliable were Dr. A's conclusions regarding John's diagnosis and likelihood of committing an act of violence, given that he did not examine John or speak directly to anyone who had been in contact with him, but relied solely on hospital and police records?
3. What information would be needed to determine whether the failure to use a structured violence risk-assessment tool should be considered evidence of negligence? What information would be needed to determine whether the alleged failure to recognize the relationship between CT evidence of frontal brain damage and the risk of violence should be considered evidence of negligence?
4. Is the assertion that John's violence was reasonably foreseeable sufficient to establish a prima facie case for the plaintiff? If not, what type of data should Dr. A have presented to support his testimony?

## D. Testimony of the Plaintiff's Expert on Damages

A second expert, Dr. B, a clinical psychologist in general clinical practice, offered testimony on the mental health consequences of the assault. Dr. B had been treat-

893

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ing the victim prior to the assault and had been seeing him weekly for cognitive behavioral therapy since the assault. She testified that the patient described having intrusive thoughts about the attack, nightmares, difficulty concentrating, and startle responses when people came near him without his having noticed them. He also felt overwhelming anxiety walking down the street where the attack had occurred. Dr. B diagnosed the victim as suffering from PTSD and had used a structured assessment tool to help make the diagnosis. On cross-examination, she admitted that she had only seen three or four cases of PTSD in her 5 years of practice and that the diagnosis was based entirely on the victim's report of his symptoms. Although she had not considered the possibility that the victim was malingering, she considered it very unlikely. Because of his symptoms, she concluded to a reasonable degree of psychological certainty that he was disabled from working in his job as a middle manager for a utility company. On cross-examination, she admitted that she did not know exactly what his job entailed and had not determined how each of his symptoms might interfere with his work—but she nonetheless believed that normal work performance was not possible given his condition.

## E. *Questions for Consideration*

1. Should Dr. B be qualified as an expert with regard to the damages suffered by the plaintiff?
2. To what extent should the following considerations affect the weight given to Dr. B's testimony:
   a. Dr. B had been treating the plaintiff prior to the attack, and continued to treat him afterward.
   b. Dr. B has seen only three or four cases of PTSD in her practice.
   c. Dr. B's diagnosis was made on the basis of the patient's self-report, without corroboration from collateral informants, and she had not considered the possibility that he might be malingering.
3. What information regarding the structured assessment tool that was used in making the diagnosis of PTSD would be needed to determine whether the results of the assessment should be admissible?
4. Was an appropriate evaluation done with regard to the extent of the victim's work disability? If not, what additional information should have been obtained and by what means? Should the testimony as offered have been admissible?

**EXHIBIT C**

# References on Mental Health Diagnosis and Treatment

American Psychiatric Association, American Psychiatric Association Practice Guidelines for the Treatment of Psychiatric Disorders: Compendium 2006 (2006).

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders DSM–IV–TR (4th ed. Text Rev. 2000).

American Psychiatric Publishing Textbook of Clinical Psychiatry (Robert E. Hales et al. eds., 5th ed. 2008).

Kaplan and Sadock's Comprehensive Textbook of Psychiatry (Benjamin J. Sadock et al. eds, 9th ed. 2009).

Alan F. Schatzberg et al., Manual of Clinical Psychopharmacology (6th ed. 2007).

Stephen M. Stahl, Essential Psychopharmacology: The Prescriber's Guide (3d ed. 2009).

# References on Mental Health and Law

Paul S. Appelbaum, *A Theory of Ethics for Forensic Psychiatry*, 25 J. Am. Acad. Psychiatry L. 233 (1997).

Paul S. Appelbaum & Thomas G. Gutheil, Clinical Handbook of Psychiatry and the Law (4th ed. 2007).

Deborah Giorgi–Guarnieri et al., *American Academy of Psychiatry and the Law Practice Guideline for Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense,* 30 J. Am. Acad. Psychiatry L. S1 (2002).

Thomas Grisso, Evaluating Competencies: Forensic Assessments and Instruments (2d ed. 2002).

Gisli H. Gudjonsson, The Psychology of Interrogation and Confessions (2003).

Glenn J. Larrabee, Forensic Neuropsychology: A Scientific Approach (2005).

Gary B. Melton et al., Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (3d ed. 2007).

Douglas Mossman et al., *American Academy of Psychiatry and the Law Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial,* 35 J. Am. Acad. Psychiatry L. S3 (2007).

Mental Disorder, Work Disability, and the Law (Richard J. Bonnie & John Monahan eds., 1997).

John Monahan, *The Scientific Status of Research on Clinical and Actuarial Predictions of Violence*, *in* Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman et al. eds., 2007).

Michael L. Perlin, Mental Disability Law, Civil and Criminal (2d ed. 2002).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Retrospective Assessment of Mental States in Litigation: Predicting the Past (Robert I. Simon & Daniel W. Shuman eds., 2002).

Richard Rogers, Clinical Assessment of Malingering and Deception (3d ed. 2008).

Christopher Slobogin, Proving the Unprovable: The Role of Law, Science, and Speculation in Adjudicating Culpability and Dangerousness (2006).

Robert M. Wettstein, Treatment of Offenders with Mental Disorders (1998).

**EXHIBIT C**

# Reference Guide on Engineering

CHANNING R. ROBERTSON, JOHN E. MOALLI, AND DAVID L. BLACK

*Channing R. Robertson, Ph.D., is Ruth G. and William K. Bowes Professor, School of Engineering, and Professor, Department of Chemical Engineering, Stanford University, Stanford, California.*

*John E. Moalli, Sc.D., is Group Vice President & Principal, Exponent, Menlo Park, California.*

*David L. Black, J.D., is Partner, Perkins Coie, Denver, Colorado.*

CONTENTS

  I.  What Is Engineering? 899
      A.  Thinking About Engineering and Science, 899
      B.  Engineering Disciplines and Fields of Practice, 900
      C.  Cross-Disciplinary Domains, 900
 II.  How Do Engineers Think? 902
      A.  Problem Identification, 902
      B.  Solution Paradigms, 903
III.  How Do Engineers Make Things? 904
      A.  The Design Process—How Engineers Use This Guiding Principle, 904
      B.  The Design Process—How Engineers Think About Safety and Risk in Design, 908
          1.  What is meant by "safe"? 908
          2.  What is meant by "risk"? 910
          3.  Risk metric calculation assumptions, 912
          4.  Risk metric evaluation, 914
          5.  What is meant by "acceptable risk"? 915
      C.  The Design Process—Examples in Which This Guiding Principle Was Not Followed, 920
          1.  Inadequate response to postmarket problems: Intrauterine devices (IUD), 920
          2.  Initial design concept: Toxic waste site, 921
          3.  Forseeable safety hazards: Air coolers, 922
          4.  Failure to validate a design: Rubber hose for radiant heating, 922
          5.  Proper design—improper assembly: Kansas City Hyatt Regency Hotel, 923
          6.  Failure to validate a design: Tacoma Narrows Bridge, 924

*897*

EXHIBIT C

*Reference Manual on Scientific Evidence*

      7.    Failure to conform to standards and validate a design: Automotive lift, 924

      8.    Lack of sufficient information and collective expertise to consummate a design: Dam collapse, 925

      9.    Operation outside of design intent and specifications: Space shuttle *Challenger*, 926

     10.  Foreseeable failure and lack of design change in light of field experience: Air France 4590, 928

IV.  Who Is an Engineer? 929

    A.  Academic Education and Training, 929

    B.  Experience, 930

    C.  Licensing, Registration, Certification, and Accreditation, 931

V.  Evaluating an Engineer's Qualifications and Opinions, 932

    A.  Qualification Issues and the Application of *Daubert* Standards, 932

    B.  Information That Engineers Use to Form and Express Their Opinions, 933

      1.    Observations, 933

      2.    Calculations, 936

      3.    Modeling—mathematical and computational, 936

      4.    Literature, 938

      5.    Internal documents, 938

VI.  What Are the Types of Issues on Which Engineers May Testify? 939

    A.  Product Liability, 939

      1.    Design, 939

      2.    Manufacturing, 941

      3.    Warnings, 941

      4.    Other issues, 942

    B.  Special Issues Regarding Proof of Product Defect, 943

    C.  Intellectual Property and Trade Secrets, 945

    D.  Other Cases, 946

VII.  What Are Frequent Recurring Issues in Engineering Testimony? 948

    A.  Issues Commonly in Dispute, 948

      1.    Qualifications, 949

      2.    Standard of care, 949

      3.    State of the art, 950

      4.    Best practice, 950

      5.    Regulations, standards, and codes, 951

      6.    Other similar incidents, 952

    B.  Demonstratives and Simulations, 956

VIII. Epilogue, 958

IX.  Acknowledgments, 959

**EXHIBIT C**

*"Scientists investigate that which already is; Engineers create that which has never been."*

Albert Einstein

# I. What Is Engineering?

## A. Thinking About Engineering and Science

Although this is a reference manual on *scientific* evidence, the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael*[1] extended the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[2] decision on admissibility of scientific evidence to encompass nonscientific expert testimony as well.[3] Put another way, experts not proffered as "scientists" also are held to the *Daubert* standard.[4] So then we might ask, who are these nonscience experts and where do they come from? Many emerge from the realm of engineering and hence the relevance of "engineering" or "technical" expert testimony to this manual.

The Court's distinction between these two kinds of expert testimony might suggest that there is a bright line dividing science and engineering. Indeed, a great deal has been written and discussed about this matter and arguments made for why science and engineering are either similar or different. It is a conversation that resonates among philosophers, historians, "scientists," "engineers," politicians, and lawyers. Apparently even Albert Einstein had a point of view on this issue as attested to by the above quotation. Perhaps this deceptively attractive dichotomy is best resolved by recognizing that at the end of the day engineering and science can be as different as they are alike.

There is no shortage of "sound bites" that attempt to categorize science from engineering and vice versa. Consider, for instance, the notion that engineering is nothing more than "applied science." This is a too often recited, simple and uninformed view and one that has long been discredited.[5] Indeed, it is not the case that science is only about knowing and experimentation, and that engineering is only about doing, designing, and building. These are false asymmetries that defy reality. The reality is that who is in science or who is in engineering or who is doing science or who is doing engineering are questions to be answered based on the merit of accomplishments and not on pedigree alone.

---

1. 526 U.S. (1999).
2. 509 U.S. 579 (1993).
3. *See* Margaret A. Berger, The Admissibility of Expert Testimony, in this manual.
4. *See* David Goodstein, How Science Works, in this manual, for a discussion of science and scientists.
5. Walter G. Vincenti, What Engineers Know and How They Know It (1990).

899

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## B. Engineering Disciplines and Fields of Practice

One can think of engineering in terms of its various disciplines as they relate to the academic enterprise and the names of departments or degrees with which they are associated, for instance electrical engineering or chemical engineering. One also can consider the technological context in which engineering is practiced as in the case of nanotechnology, aerospace engineering, biotechnology, green buildings, or clean energy.

In the same sense that some struggle trying to identify the differences and likenesses between science and engineering, others pursue a different kind of identity crisis by staking out their turf through title assignment. It is pointless to list titles of engineering disciplines because such a list would be incomplete and not stand the test of time as disciplines come and go, merge, diverge, and evolve. Bioengineering, biochemical engineering, molecular engineering, nanoengineering, and biomedical engineering are relative newcomers and have emerged in response to discoveries in the sciences that underlie biological and physiological processes. Software engineering and financial engineering are two other examples of disciplines that have developed in recent years.

In the end, it is not the names of disciplines that are critical, they being no more than labels. Names of disciplines are at best imprecise descriptors of the activities taking place within those disciplines and ought not to be relied on for accurate characterizations of pursuits that may or may not be occurring within them.

## C. Cross-Disciplinary Domains

Whereas engineering disciplines are often associated with their scientific roots (i.e., mechanical engineering and physics, electrical engineering and physics, chemical engineering and chemistry, bioengineering and biology, biomedical engineering and physiology) some lack this kind of direct association (i.e., aerospace engineering, materials engineering, civil engineering, polymer engineering, marine engineering). Indeed, there are software engineers, hardware engineers, financial engineers, and management engineers. There is no shortage of adjectives here.

Nonetheless, these and many other such discipline titles have meant or mean something to someone, and new ones are emerging all the time as the historical barriers that once separated and defined the "classic" engineering disciplines continue to disintegrate and become a thing of the past. No longer can we rely on discipline names to inform us of specific enterprises and activities. There is, after all, nothing wrong with this as long as it is recognized that they ought not be used as reliable descriptors to subsume all possible activities that might be occurring within a domain. One must reach into a domain and investigate what kind of engineering is being conducted and resist the temptation to draw conclusions based on name only. Doing otherwise could easily lead to an unreliable and inaccurate characterization.

**EXHIBIT C**

*Reference Guide on Engineering*

To provide a tangible example, consider cases involving personal injury in which central questions often revolve around the specifics of how a particular trauma occurred. In situations where proximate cause is an issue, the trier of fact can benefit from a thorough understanding of the mechanics that created an injury. The engineering and scientific communities are increasingly called on to provide expert testimony that can assist courts and juries in coming to this type of understanding. What qualifies an individual to offer expert opinions in this area is often a matter of dispute. As gatekeepers of admission of scientific evidence, courts are required to evaluate the qualifications of experts offering opinions regarding the physical mechanics of a particular injury. As pointed out earlier, however, this gatekeeping function should not rise and fall on whether a person is referred to or refers to himself or herself as a scientist or engineer.

Specifically, one cross-disciplinary domain deals with the study of injury mechanics, which spans the interface between mechanics and biology. The traditional role of the physician is the diagnosis (identification) of injuries and their treatment, not necessarily a detailed assessment of the physical forces and motions that created injuries during a specific event. The field of biomechanics (alternatively called biomechanical engineering) involves the application of mechanical principles to biological systems, and is well suited to answering questions pertaining to injury mechanics. Biomechanical engineers are trained in principles of mechanics (the branch of physics concerned with how physical bodies respond to forces and motion), and also have varying degrees of training or experience in the biological sciences relevant to their particular interest or expertise. This training or experience can take a variety of forms, including medical or biological coursework, clinical experience, study of real-world injury data, mechanical testing of human or animal tissue in the laboratory, studies of human volunteers in non-injurious environments, or computational modeling of injury-producing events.

Biomechanics by its very nature is diverse and multidisciplinary; therefore courts may encounter individuals being offered as biomechanical experts with seemingly disparate degrees or credentials. For example, qualified experts may have one or more advanced degrees in mechanical engineering, bioengineering, or related engineering fields, the basic sciences or even may have a medical degree. The court's role as gatekeeper requires an evaluation of an individual's specific training and experience that goes beyond academic degrees. In addition to academic degrees, practitioners in biomechanics may be further qualified by virtue of laboratory research experience in the testing of biological tissues or human surrogates (including anthropomorphic test devices, or "crash-test dummies"), experience in the reconstruction of real-world injury events, or experience in computer modeling of human motion or tissue mechanics. A record of technical publications in the peer-reviewed biomechanical literature will often support these experiences. Such an expert would rely on medical records to obtain information regarding clinical diagnoses, and would rely on engineering and physics training to understand the mechanics of the specific event that created the injuries. A practitioner whose expe-

901

**EXHIBIT C**

rience spans the interface between mechanics (i.e., engineering) and biology (i.e., science), considered in the context of the facts of a particular case, can be of significant assistance in answering questions pertaining to injury mechanism and causation.

This example illustrates the futility of trying to untangle engineering from science and vice versa and to the inappropriateness of using semantics, dictionary definitions, or labels (i.e., degree names) to parse, dissect, or portray the intellectual activities of an expert witness. In the end, it is their background and experience that are the dominant defining factors—not whether they are a scientist and/or an engineer and not by the titles they hold.

# II. How Do Engineers Think?

## A. Problem Identification

Although a somewhat overworked part of our lexicon, it is indeed the case that "necessity is the mother of invention." Engineering breeds a culture of technological responsiveness. All the "science" explaining a solution to a problem need not be known before an engineer can solve a problem.

Take steam engines, for example. Their history goes back several thousand years and their utility forged the beginning of the industrial revolution late in the seventeenth century. It was not until the middle of the nineteenth century that the science of thermodynamics began to gain a firm ground and offer explanations for the how and why of steam power.[6] In this instance, technology came first—science second. This, of course, is not always the case, but demonstrates that one does not necessarily precede the other and notions otherwise ought to be discarded. So here the problem was one of wanting to produce mechanical motions from a heat source, and engineers designed and built systems that did this even though the science base was essentially nonexistent.

To reinforce the point that technology can precede science, consider the design of the shape of aircraft wings. This, of course, was driven by the desire of humans to fly, a problem already solved in nature since the time of the dinosaurs but one that had eluded humankind for tens of thousands of years. Practical solutions to this problem began to emerge with the Wright brothers' first motive-powered flight and continued into the twentieth century before the "science" of fluid flow over wing structures had been fully elucidated. Once that happened, wings could be designed to reduce drag and increase lift using a set of "first principles" rather than relying solely on the results of empirical testing in wind tunnels and prototype aircraft.[7]

6. Pierre Perrot, A to Z of Thermodynamics (1998).

7. The pioneering aerodynamicist Walter Vincenti provides a detailed and fascinating account of this. *See* Vincenti, *supra* note 5, ch. 2; *see also* John D. Anderson, *Ludwig Prandtl's Boundary Layer*, Physics Today, December 2005, at 42–48.

**EXHIBIT C**

So, in short, engineers create, design, and construct because interesting and challenging problems arise in the course of human events and emergent societal needs. Whether a science base exists or only partially exists is just one of a myriad of constraints that shapes the process. Other constraints might include, but are not limited to, the availability of materials; device shape, size, and/or weight; cost; demand; efficiency; safety; robustness; and utility. It has been said, and possibly overstated, but it does make the point, that if engineers waited until scientists completed their work, they might well still be starting fires with flint stones.

## B. Solution Paradigms

So when faced with a vexing and challenging problem, along with its particular or peculiar constraints, an engineer seeks a path to follow that has a reasonable chance of leading to a solution. In so doing an engineer must contend with uncertainty and be comfortable with it. In very few instances will everything be known that is required to proceed with a project. Assumptions need to be made and here it is critical that the engineer understand the difference between what is incidental and what is essential. There are excellent assumptions, good assumptions, fair assumptions, poor assumptions, and very bad assumptions. Along this spectrum the engineer must carefully pick and choose to make those assumptions that ensure the robustness, safety, and utility of a design without undue compromise. This is the sort of wisdom that comes from experience and is not often well honed in the novice engineer.

This impreciseness that accompanies uncertainty can be used as a perceived disadvantage for the engineer in the role of expert witness. Yet it is this very uncertainty that lies at the heart of technological innovation and is not to be viewed as so much a weakness as it is a strength. To overcome uncertainty in design under the burden of constraints is the hallmark of great design, and although subtle and not always well understood by those who seek precision (i.e., why can't you define your error rate?), this is the way the world works and one must accept it for what it is. Assumptions and approximations are key elements of the engineering enterprise and must be regarded as such. And as with all things, hindsight might suggest that a particular assumption or approximation was not appropriate. Even so, given what was known, it may well have been the right thing to do at the time it was made.

In addition to evolving business opportunities and changing financial markets, technological innovation results from the continuing and many times unexpected advances in science and technology that occur as time passes. Buildings constructed in Los Angeles in the 1940s would never be built there in the same way now. We have a much better understanding of earthquakes and the forces they exert on structures now than then. Airbags were not placed in automobiles until recently because we did not have cost-effective systems and materials in place to accurately measure deceleration and acceleration forces, trigger explosives, contain

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

the explosion, and do this on a timescale that was effective without harming an occupant more-so than the impending collision. It is unavoidable that as we learn from new discoveries about the natural world and accumulate more experience with our designed systems, products, and infrastructure, engineers will be in an increasingly better place to move forward with improved and new designs. It is both an evolutionary and a revolutionary process, one that produces both failures and successes.

# III. How Do Engineers Make Things?

## A. The Design Process—How Engineers Use This Guiding Principle

The genesis of nearly every object, thing, or environment conceived by engineers is the design process. Surprisingly, although products designed using it can be incredibly complex, the general tenets of the design process are relatively simple, and are illustrated in Figure 1.

The progression is iterative from two perspectives: (1) Changes in the design resulting from testing and validation lead to new formulations that are retested. (2) After the design is complete, performance data from the field can also lead to design changes.

As a first step, engineers begin with a concept—an idea that addresses a need, concern, or function desired by society. The concept is refined through research, appropriate goals and constraints are identified, and one or more prototypes are constructed. Although confined to a sentence here, this stage can take a significant amount of time to complete.

In the next phase of the design process, the prototypes are tested and evaluated against the design requirements, and refinements, perhaps even significant changes, are made. The process is iterative, as faults identified during the testing phase manifest themselves as changes in the concept, and the testing and evaluation process is restarted after having been reset to a higher point on the learning curve. As knowledge is gained with each iteration, the design progresses and is eventually validated, although as alternative solutions are considered, it is possible that certain undesirable characteristics in the design cannot be completely mitigated through changes in design and should be guarded against to minimize their impact on safety or other constraints. A classic example of this step in the design process is the installation of a protective shield over the blade in a table saw; although the saw may have the unwanted characteristic of cutting fingers or arms, the blade clearly cannot be eliminated (designed out) in a functioning product. As a last resort, anomalies that cannot be designed out or guarded against can be addressed through warnings. Not every design is amenable to guarding or warning, but instead the iterative process of testing and prototype revision is relied

904

**EXHIBIT C**

*Reference Guide on Engineering*

Figure 1. Schematic of the engineering design process.



upon to perfect designs. Indeed, in some instances, an acceptable design solution cannot be found and the work is abandoned.

The testing process itself can be complex, ranging from simple evaluations to examine a certain characteristic to multifaceted procedures that evaluate the prototype in conditions it is anticipated to see in the real world. The latter type of evaluation is often denoted as *end-use testing*, and is very effective in identifying faults in the prototype. Because many designs cannot be evaluated over their anticipated life cycle because of time constraints (a product expected to last for 20 years cannot be tested for 20 years in the development process), the testing

905

EXHIBIT C

*Reference Manual on Scientific Evidence*

cycle is often accelerated. For example, if it is known that a pressure vessel will see 50,000 cycles over a 10-year lifetime, those cycles can be performed in several months and the resultant effects on vessel performance established. Another method of accelerating the evaluation cycle involves testing at an elevated temperature and using scientific theory and principles to equate the temperature increase to a timescale reduction. The efficacy of this approach is highly dependent on correct execution, but done properly and with appropriate care, it allows product development to go forward rather than having good or even great designs languish on the drawing boards because there is no feasible way to validate them under the exact end-use environment.

Regulations, standards, and guidelines also play an important role in testing of products during the design process. Federal requirements are imposed on design and testing of aircraft, medical devices, and motor vehicles, for example, and mostly govern how those products are evaluated by engineers. Standards organizations such as the American Society for Testing and Materials (ASTM), the American National Standards Institute (ANSI), and the European Committee for Standardization (CEN) promulgate test methods and associated performance requirements for a large number of objects and materials, and are relied on by engineers as they evaluate their designs. It is critical to understand, however, that ASTM, ANSI, CEN, and other such national and international standards organizations describe testing methods that engineers use to obtain reliable data about either the products they are evaluating (or components thereof), but most often they do not in and of themselves provide a means to evaluate a finished product in its actual end-use environment. It is also important to understand the difference between a performance standard and a testing standard—the former actually specifies values (strength, ductility, environmental resistance) that a product must achieve, whereas the latter simply describes how a test to measure a parameter should be conducted. It is the engineer's job to use the correct testing procedures from those that have been approved and on which he or she can rely. Or, alternatively, if no approved test exists, the engineer must create one that is reproducible, repeatable, reliable, and efficacious. Furthermore, it is the engineer's job to ensure the relevance of such testing to the overall and final product performance in its end-use environment. No testing or standards organization can foresee, nor do they claim to do so, all possible combinations of product components, design choices, and functional end-use requirements. Therefore, testing of a design in accordance with a testing standard does not necessarily validate the design, nor does it necessarily mean that the design will function in its end-use environment.

After testing and validation are complete, and the product is introduced to the market, the design process is still not finished. As field experience is gained, and products are used by consumers and sometimes returned to the manufacturer, engineers often fine-tune and perfect designs based on newly acquired data. In this part of the design process, engineers will analyze failures and performance

EXHIBIT C

*Reference Guide on Engineering*

problems in products returned from the field, and adjust product parameters appropriately.[8] The process of continual product improvement, illustrated by an arrow from the "Go" stage to the "Design/Formulate" and "Test/Validate" stages in Figure 1, is taught to engineers as a method to effectively optimize designs. Such refinements of product design are often the topic of inquiry in depositions of engineers and others involved in product design, and frequently misunderstood as an indication that the initial design was defective.[9] The engineering design process anticipates review and ongoing refinement of product design as a means of developing better and safer products. In fact, retrospective product modification is mandated as company practice in some industries, and regulated or suggested by the government in others. For example, examination of FDA guidelines for medical device design will show a process that mirrors the one described above.

Another important component of the design process relates to changes in technology that render a design, design feature, or even tools used by an engineer obsolete. Engineers consider obsolescence to be a consequence of advancement, and readily adjust designs, or create new designs, as new technology becomes available. This concept is apparent in the automotive industry, where tremendous advances in restraint systems and impact protection have greatly reduced the risk of fatal injuries from driving (see discussion below). Although vehicles with lap belts as the sole means of occupant protection would today be considered unacceptable, they were by no means deficient when introduced in the 1950s. From the engineer's perspective, errors and omissions in the design process can render a design defective; however, changes in technology can render a design obsolete, not retrospectively defective.

Of course even well-designed products can fail, especially if they are not manufactured or used in the manner intended by the design engineer. For example, a steel structure may be adequately designed, but if the welds holding it together are not properly made, the structure can fail. Similarly, a well-designed plastic component manufactured in such a way as to overheat and degrade its constituents may also be prone to premature failure. In terms of misuse of a product, most engineers are trained to consider foreseeable misuse as part of the design process, and one can generally expect to encounter a debate over what is reasonably foreseeable and what is not.

---

8. Although feedback on product performance and failure analysis on returned products is most often used to perfect designs, the iterative nature of the process can also cause the design to progress toward failure when cost becomes the driving factor.

9. Although the reasons for subsequent refinements in product design may be explored in depositions, Federal Rule of Evidence 407 bars the introduction of evidence of such improvements at trial as evidence of a defect in a product or a product's design.

EXHIBIT C

*Reference Manual on Scientific Evidence*

## B. The Design Process—How Engineers Think About Safety and Risk in Design

Almost everything that an engineer designs involves some aspect of safety, and the elegance and efficiency of designs are often forced to balance safety with competing parameters such as cost and physical constraints. The legal dilemmas that often arise from this balance are a direct result of the way an engineer must deal with safety in the reality of the engineering world (i.e., assertions that safety must be considered over everything else or that a particular design should or could be safer). Therefore, a discussion of how safety factors into design, and "how safe is safe enough" is prudent for an understanding of engineering and engineering design. It is critical that the reader note that in the framework of this discussion, risk is something engineers constantly face, and while we discuss what levels of risk are acceptable, the context is clearly engineering, and no legal construct is intended.

There is practically no product that cannot be made safer by reducing the product benefits (making it more inconvenient) or increasing the product cost, or both. In product design, safety is just one of the many variables factored into the design, as also is cost, and often safety and cost trade off directly on the product price point. In product design there are rarely instances where small cost changes render a substantial improvement in the risks. Safety always has a cost; the question is whether the consumer will find it reasonable in the face of what else the design has to offer. Conversely, the claim that the product is as safe as possible is almost never true either.

The simple and completely correct answer to the question "How safe is safe enough?" is "It depends." Exactly what safety is, and what conditions determine its adequacy, that is, what adequate safety depends on, are the topics briefly discussed in the following sections.

### 1. What is meant by "safe"?

Few words are used more often in the context of a product liability tort than the words "safe" and "unsafe," and their close cousin, "defective." Because the word "safe" is commonly used in so many different contexts, it is seldom, if ever, used with precision. Indeed, its common use has given it a number of meanings, some of which are in conflict.

Intuitively we understand the word and have a grasp of what a speaker probably means when declaring a product or environment "safe." We have to say "probably" because some would mean by a "safe" product one that presents no risk to the user under normal circumstances, and others would mean no risk to the user under any circumstances. Still others who ask the question "how safe is safe enough?" clearly evidence an understanding that safety is a continuum and not an absolute. Although "safe" is a simple word, it is used in so many ways that

908

**EXHIBIT C**

*Reference Guide on Engineering*

rigorous definition presents much of the complexity of other deceptively simple but widely used four letter words, for example, "good."

Fortunately, there is a whole field of scholarship, science, and technology related to the study of "safety." The field was spawned during the industrial revolution, when it came to be recognized that preventable industrial accidents were simply economically, if not morally, unacceptable.[10] For the remainder of this discussion, we examine the concept of safety as it relates to the possibility of physical harm to persons.

Safety is technically defined, and empirically measured, by the concept of "risk." And often a speaker who declares a product or environment "safe" does indeed mean to say that the product or environment is risk-free. However, as we will discuss in more detail, there is no product or product environment that attains the ideal status of "risk-free."[11] Every product manufactured by man, with his imperfections, and every environment, no matter how carefully constructed, presents some risk in its use, even if this risk is extremely small. This fact of life is easily illustrated.

For example, the U.S. Consumer Product Safety Commission (CPSC) estimates that nationally in the year 2007 alone, there were approximately 42,000 injuries serious enough to require treatment at a hospital emergency room associated with the use, and more often the misuse, of first-aid equipment. Thousands of these injuries were associated with the use of first-aid kits. The CPSC maintains the National Electronic Injury Surveillance System (NEISS), which monitors a statistically selected sample of all the emergency rooms in the United States, so that data collected on each consumer injury associated with the categories of consumer products that fall under the jurisdiction of the CPSC can be extrapolated to a national estimate.

It is not immediately obvious how so many injuries could be associated with first-aid equipment. And this reaction is an excellent lesson about the reliability of intuition for determining risk.[12] One soon learns that the cotton swabs in a first-aid kit can puncture eardrums; the ointments, pills, and antibiotic creams can be ingested by infants; the ice packs can cause thermal burns to the skin; and the cotton can become lodged in all sorts of unintended places.

With the understanding that there are no risk-free products, then we have no choice but to define safe in terms of the amount of risk. Of course with "risk" defining "safe," the task of defining "safety," or "safe enough," has been replaced

---

10. The rigorously scientific portion of this field is a product of the past 50 years. Although it has no single father, the seminal contributions of Dr. Chauncey Starr, ultimately recognized through his receipt in 1990 of the National Medal of Technology from President George H.W. Bush, deserve mention. http://www.rpi.edu/about/hof/starr.html.

11. S.C. Black & F. Niehaus, *How Safe Is "Too" Safe*, 22 IAEA Bull. 1 (1980); Water Quality: Guidelines, Standards and Health 207 (Lorna Fewtrell & Jamie Bartram eds., 2001).

12. The emergency room treatment records of CPSC's NEISS can be retrieved by anyone online at the CPSC Web site, www.cpsc.gov.

EXHIBIT C

*Reference Manual on Scientific Evidence*

with the task of defining "risk" or "acceptable risk." This then is the definition of safe; something is "safe" when it presents "acceptable risk"[13] (the reader is again reminded that we are discussing an engineering, not legal, construct).

## 2. What is meant by "risk"?

"Risk" is another of those deceptively simple four-letter words that society uses in a wide variety of ways. Perhaps a few decades ago, when the field was developing its rigorous intellectual underpinnings, a term other than "risk" could have been chosen. But now there is a Harvard Center for Risk Analysis,[14] a Food Safety Risk Analysis Clearinghouse at the University of Maryland,[15] and many other academically oriented risk analysis organizations too numerous to name. There is a convenient Web site, Risk World, that lists many of the other Web sites that reference risk analysis.[16] Risk as the technical term for safety is now too institutionalized to be changed, and for the remainder of this discussion we are concerned with safety as the risk of physical harm, that is, health or safety risk.

The concept of risk is slightly more complicated and significantly more rigorous than the concept of safety. Again we have an intuitive understanding of the concept of "risk," and that it involves some concept of probability, more specifically the probability of some "bad" thing. In the case of safety the "bad" thing is injury or physical harm.

Risk is often empirically measured and expressed quantitatively, and a "risk" number always contains units of frequency (or probability) and severity. This is a substantial advantage over the concept of "safe." It would make no sense to say, "this product was found to be 2.73 safe." Risk on the other hand is the measure of safety. For example, the fatal risk of driving in the United States in 2007 was 1.36 fatalities for every hundred million vehicle-miles traveled (note: 100 million = $100,000,000 = 10^8$).[17] This is a risk number because it contains a severity, "fatal," and the frequency, per every $10^8$ miles. This fatality risk is not a complete measure of the safety or risk of U.S. vehicular travel in 2007 because the same $10^8$ vehicle miles traveled that produced the 1.36 fatalities also produced 82 injuries; "injuries" as defined by the National Highway Traffic Safety Administration (NHTSA).[18]

13. International Organization for Standardization & International Electrotechnical Commission, *ISO/IEC Guide 51: Safety Aspects—Guidelines for Their Inclusion in Standards* (2d ed. 1999); William W. Lowrance, Of Acceptable Risk: Science and the Determination of Safety 8 (1976); Fred A. Manuele, On the Practice of Safety 58 (3d ed. 2003); National Safety Council, Accident Prevention Manual—Engineering & Technology 6 (Philip Hagan et al. eds., 12th ed. 2000).

14. http://www.hcra.harvard.edu/.

15. http://www.foodriskclearinghouse.umd.edu/.

16. http://www.riskworld.com/websites/webfiles/ws5aa013.htm.

17. National Highway Traffic Safety Administration, Motor Vehicle Traffic Crash Fatality Counts and Estimates of People Injured for 2007, DOT HS 811 034 (Sept. 2008, updated Feb. 2009) (hereinafter "NHTSA, Motor Vehicle Traffic Crash Fatality Counts").

18. *Id.,* slide 9.

910

EXHIBIT C

*Reference Guide on Engineering*

These two different risk metrics, one for injuries and one for fatalities, naturally invite the question of a single metric that characterizes the risk, and therefore safety, of highway travel in the United States.

Sadly, the answer is that the single metric does not exist. For decades the risk analysis community has worked on developing some calculus through which injuries of differing severity could be rigorously combined and expressed as a defensible "average" severity. Some safety data are collected in a form that naturally lends itself to this exercise. When occupational injury severity is characterized by a "lost workday" metric, that is, the more severe injuries obviously result in more lost days of work, then the average number of lost work days is a defensible average severity with which one can characterize a population of occupational injuries. But this exercise quickly breaks down in the face of permanently disabling occupational injuries and deaths. Obviously, one could impute an entire career's worth of lost workdays in the case of fatal injury or permanent injury, but then these injuries would completely overwhelm all other types of occupational injury. And the issue of whether a permanently disabling injury is really of the same severity as a fatal injury remains unresolved.

Similarly the CPSC attempted soon after its creation in the early 1970s, to develop a geometric sliding scale to numerically categorize the differing consumer product–associated injury severities being treated in the hospital emergency rooms that the agency monitored. The CPSC scale had six to eight severity categories over the years, to which numerical weights were applied, ranging from 10 for severity category 1, mild injuries and sprains, to 34,721 for severity category 8, all deaths, in its original configuration. The weighting for deaths has changed and has been as low as 2516. An amputation was accorded a weight of 340, and fell into category 6, unless it resulted in hospitalization, at which time it became a category 7 with a weight of 2516. In the end, this scheme has proved generally unsatisfactory, but it still appears in the occasional CPSC document, and is used to generate a "mean severity" for emergency room–treated injuries.[19] Even if somehow a calculus for comparing and combining various injury severities could be developed, the challenge of how to compare the risk of differing injury frequencies at different severity levels would remain. There is practically no chance that the relationship would be linear, and the nonlinear characteristics would be highly subjective.

Instead of trying to develop a calculus to combine severities with differing frequency, it has become the custom and practice in the risk analysis community to express risk frequency or probability by stratified severity. That is, if a level of severity is specified, then the risk likelihood is stated. There is no agreement on the proper stratification, but rather a de facto consensus that fatal injuries are the most severe, and fatality risk is commonly measured. In addition, calculations of accident risk with no injury, injury risk, and hospitalized injury risk are often seen

19. U.S. Consumer Product Safety Commission, 1995 Annual Report to Congress A-5 (1995).

911

EXHIBIT C

in the risk literature. Rather than being combined into a single metric, these risks are expressed as independent risk frequencies or probabilities. Specialized average severities, such as average number of lost workdays as a risk metric for the severity of average occupational injury, are occasionally used.

The upshot of our inability to develop a severity calculus means that risk metrics cease to be parameters with units of both frequency and severity, and become merely frequencies or likelihood of an injury of a given severity. Frequencies are easier to compute and merely require what is called "numerator" data (i.e., the actual number of adverse events for which the risk is being calculated) and "denominator" data (i.e., some measure of the opportunity to have the adverse event). In the previously cited 1.36 fatal injuries per $10^8$ miles of vehicle travel, the numerator datum was the 41,059 deaths in 2007 traffic accidents and the denominator datum was the 3,029,822 million vehicles miles traveled by all vehicles in 2007.[20] The division of these two numbers gives 1.36 deaths per $10^8$ miles. Vehicle-miles traveled (VMT) is one obvious measure of the opportunity to have a vehicular accident. However, it is not the only measure. If the data are available, vehicle hours can be substituted for vehicle miles, and then the fatal risk can be expressed as a frequency per vehicle hour. Measures such as miles and hours are often called "exposure" data, and must be some empirical measure of the opportunity to encounter the hazard (the adverse event itself) for which the risk is being calculated. The "correct" exposure measure is usually determined by the analysis being performed. Miles is appropriate for on-road vehicles, because travel is what the automotive products are intended to produce. For off-road recreational vehicles, where recreation as opposed to travel is the purpose of the product, hours of use would probably be a more appropriate exposure measure.

## 3. Risk metric calculation assumptions

Having determined that the fatality risk of driving in the United States is 1.36 deaths per $10^8$ VMT, does that mean one's risk of dying in a traffic accident is $1.36 \times 10^{-8}$ every time a mile is driven? No. With the danger of presenting too much detail, we can use this one risk parameter as a tool to briefly illustrate that many assumptions are inherent in any risk calculation, and that questions should arise in the court's mind when encountering any number that purports to represent the "risk" and therefore "safety" of any product or activity.

First, the number 1.36 is the gross fatality risk for vehicular travel in the United States. It is the risk we as a society de facto accept for the benefits of vehicular travel. Some of those deaths are pedestrians, motorcyclists, passengers, and bicyclists, and their deaths are part of the risk society must accept to have motorized vehicular travel. But, the fatal risk to you as a driver, by your "exposure" driving a mile, clearly does not involve any pedestrian risk or bicycle risk

---

20. NHTSA, Motor Vehicle Traffic Crash Fatality Counts, *supra* note 18, slide 40.

**EXHIBIT C**

*Reference Guide on Engineering*

or motorcycle risk or vehicle passenger risk. Thus, fatally injured pedestrians (4654),[21] pedal cyclists (698),[22] motorcyclists (5154),[23] vehicle passengers (8657),[24] and others (147 skate boarders, etc.)[25] have to be subtracted from the 41,059 traffic deaths in 2007 numerator datum, to compute a "fatal risk of you being a driver" number, because none of them was driving a car. That leaves us with 21,647[26] fatally injured vehicle drivers in 2007. Because all of the vehicles had to have a driver to go even a mile, it might be tempting to just use the 3,029,822 million vehicle miles number in 2007 as the denominator without adjustment. But, to be accurate, the motorcycle operators were "vehicle" drivers, and so we cannot remove their 5154 deaths from the numerator without removing the approximately 13,610 million[27] vehicle miles those motorcycles were driven from the denominator datum. Because the motorcycle operator fatal injury risk per mile is 37.86 per $10^8$ VMT,[28] more than 52 times that of an automobile driver, removing the motorcycle data entirely when trying to compute an automotive risk number is sound. If we do the appropriate adjustments, then we compute a fatality risk for a nonmotorcycle vehicle driver of 0.718 deaths per $10^8$ VMT.

Now, we can again ask the question, "Is $0.718 \times 10^{-8}$ one's risk of being killed every time a mile is driven?" The answer is now "Possibly, but unlikely." This risk number is the composite risk for all drivers in society for 2007. And, because of lifestyle choices, this number might serendipitously be accurate for some but not for everyone. Every driver has significant control over the majority of his or her risk of being killed on the road. For example, 33.6% of the fatally injured drivers, 7283, almost exactly one-third, had blood alcohol levels at or above 0.08 g/dL.[29] Exactly how much a blood alcohol level of 0.08 increases one's risk of dying per mile driven is a topic of some debate, but the consensus would fall somewhere between 3 and 5 times. You are much more likely to be killed if you drive on the weekends during the early morning hours. Even restricting ourselves to passenger vehicle fatalities in the daytime, when 82% of vehicle occupants wear their seat belts, 45% of the drivers killed in the daytime were unrestrained by their seat belts.[30] Numerous other decisions that we make concerning our driving or circumstances that affect us, such as the size of the car we drive, cell phone use,

21. *Id.*

22. National Highway Traffic Safety Administration, Traffic Safety Facts 2007 Data: Pedestrians, DOT HS 810 994, at 3 (hereinafter "NHTSA, Pedestrians").

23. National Highway Traffic Safety Administration, Traffic Safety Facts 2007 Data: Motorcycles, DOT HS 810 990, at 1 (hereinafter "NHTSA, Motorcycles").

24. NHTSA, Motor Vehicle Traffic Crash Fatality Counts, *supra* note 18, slides 52, 74, 85.

25. *Id., * slide 9.

26. *Id., * slide 40.

27. *Id.*

28. NHTSA, Motorcycles, *supra* note 23, at 1.

29. National Highway Traffic Safety Administration, Traffic Safety Facts: 2007 Traffic Safety Annual Assessment—Alcohol-Impaired Driving Fatalities, DOT HS 811 016, at 2 (Aug. 2008).

30. NHTSA, Pedestrians, *supra* note 22, at 3.

913

**EXHIBIT C**

regard for yellow lights, aggressiveness, medication, vision correction, etc., may contribute in some way to the likelihood that we will be fatally injured driving the next mile, but are beyond the scope of this brief discussion.

## 4. Risk metric evaluation

With some understanding of what comprises the calculation of a risk metric, we can now turn to the more important questions related to its meaning. A fair question about the vehicular risk we just examined might be: "Is a fatal motor vehicle risk of $1.36 \times 10^8$ VMT good or bad?" Should society be ashamed or proud? This question for vehicle safety, and every other arena of risk analysis, can only be answered comparatively. The only absolute risk standard is "zero," but this ideal can never be achieved. So, to answer the question of how "good" the 1.36 number is, we can look to several comparisons. A logical starting point might be previous years; are we getting better or worse? Fortunately, with a few singular exceptions (such as motorcycles), everything is getting safer, and has been for the past 100 years. Although 1.36 people dead for every $10^8$ VMT is surely not desirable, in 1966, that same number was over 5.[31]

The data in Table 1 are for the previous decade:[32]

Table 1. Fatalities per 100 Million Vehicle Miles Traveled

| Year | Fatalities per $10^8$ VMT |
| --- | --- |
| 1996 | 1.69 |
| 1997 | 1.64 |
| 1998 | 1.58 |
| 1999 | 1.55 |
| 2000 | 1.53 |
| 2001 | 1.51 |
| 2002 | 1.51 |
| 2003 | 1.48 |
| 2004 | 1.44 |
| 2005 | 1.45 |
| 2006 | 1.42 |

These data illustrate the fact that a risk number such as 1.36 deaths per $10^8$ VMT in isolation is practically meaningless. But when put in a historical context, or in the context of other products or activities, a perspective is gained to evaluate the magnitude of the risk. As can be seen in Table 1, we as a society are making steady progress on reducing the fatal risk of driving, and our current risk number

---

31. Matthew L. Wald, *Deaths on Motorcycles Rise Again*, N.Y. Times, Aug. 15, 2008, at A11.

32. NHTSA, Motor Vehicle Traffic Crash Fatality Counts, *supra* note 18, slides 52, 74, 85.

**EXHIBIT C**

*Reference Guide on Engineering*

does not look too bad. Similarly, if our risk number were presented in the context of the fatal highway risk of other industrialized nations, it would compare very favorably as well.

## 5. What is meant by "acceptable risk"?[33]

With an understanding of how risk is calculated, and that risk must necessarily be viewed in a comparative context, we now turn our discussion back to our original question "how safe is safe enough?" which in light of what we have learned must be rephrased "how much risk is acceptable?"

How much risk is acceptable is not a simple question; books are written with "acceptable risk" in the title. However, a simple answer to this question is typically another question: "acceptable to whom?" As individuals we exhibit radically different de facto risk acceptance, and the same individual will exhibit significantly different risk acceptance throughout his or her lifetime. Certainly, as compared with a stuntman, the average person would have widely variant views on what is an acceptable risk. And, neither could nor probably should make this decision for society as a whole. There is no absolute standard of how much risk is too much or too little, but innumerable federal, state, and voluntary standards prescribe maximum risk levels, and we touch on them briefly.

Risk acceptance has been studied extensively, and there are more than a dozen factors that influence how much risk is acceptable either to an individual, or to society as a whole, in a given situation. And they are not always the same factors. Examining and discussing all these factors is beyond the scope of this guide, but a few of the most important are illustrated.

Probably the single most important factor for determining how much risk is "acceptable" is how much "benefit" we gain from accepting the risk. We are willing to accept substantial risk for substantial benefit. Motorized vehicular transportation confers tremendous benefits in our society and almost the entire population participates, and by our participation we indisputably evidence our de facto "acceptance" of the known risks for the known benefits, even if we do not find the risks of driving intellectually "acceptable." That does not mean we have to like the level of risk, or that we "accept" the current level of risk in the sense that we do not need to do anything about it. Indeed we spend billions and billions of dollars trying to reduce the level of risk associated with motorized vehicular travel. That being said, the overwhelming majority of the current population finds the current level of motorized vehicular travel risks low enough, given the benefits, to participate. This would not be too surprising if the level of risk associated with motorized transportation were low, because the benefits of motorized transport are clearly high. However, the fatal risk associated with motorized vehicle travel is not low.

---

33. Although acceptable risk is also a legal concept, we are merely using engineering vernacular in this chapter, and no legal construct is intended.

915

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Returning to our fatality risk for a nonmotorcycle vehicle driver of 0.718 deaths per $10^8$ VMT, this translates into a fatal risk of $0.718 \times 10^{-8}$ for each mile. That $10^{-8}$ term makes this number quite small, and the fatal risk per mile low. However, very few people drive just a mile in a week or year. In fact, according to the Federal Highway Administration, the average U.S. driver logs about 13,500 miles behind the wheel every year.[34] That means for the year, the average U.S. driver faces $0.718 \times 1.35 \times 10^4 \times 10^{-8} = 0.97 \times 10^{-4}$ risk of a fatal accident every year, or about 1/10,000. But, very few people drive for a year. It is not uncommon to drive 60 years. Certainly the mileage we drive when young and old is less each year, and when middle-aged, more, but for the purpose of calculation let's assume the average value for 60 years. Then the risk of driving for one's adult lifetime, on average, is $0.97 \times 6 \times 10 \times 10^{-4} = 5.82 \times 10^{-3}$ Stated another way, if we drive for a lifetime, even at the low fatal risk of 2007, the average driver runs a risk of 0.00582 of being killed in his lifetime in a vehicular accident, a little more than a chance of 1/200. So, one out of every 200 drivers will die in his or her lifetime from the activity of driving a vehicle.

Needless to say, this number does not look so small any more. This brings us to the most commonly advanced argument against de facto "risk acceptance" being the measure of "acceptable risk" or "safe enough." Critics argue that no one can be said to "accept" a risk if they do not know what the risk is. Logically this is true, but it ignores the fact that even if we cannot cite a specific risk parameter, that does not mean we do not have an intuitive grasp of the risk. For example, in the case of motorized vehicle travel above, relatively few people can go through the calculation above and derive the number 1/200. But, we all have personally known in our lifetime more than one person (not just luminaries such as James Dean, Jayne Mansfield, Princess Grace Kelly, General George Patton, and Princess Diana, and even Barack Obama Sr., father of our current President) who has died in a vehicular accident. For the 1/200 number to be true, since we all know a few hundred people, we must know at least a couple who have died in vehicular accidents. Therefore, even though we may not be able to calculate the number, society has an excellent grasp of the risk associated with vehicular travel.

This 1/200 risk of fatal vehicular injury also illustrates the important difference between a "unit of participation risk" and a "lifetime risk." Because, fortunately, average lifetime is so long, when a risk to which we are constantly exposed is summed over a lifetime, the resulting fraction can become uncomfortably large. For example, the lifetime risk of developing cancer from merely exposure to the background levels of environmental chemicals has been estimated to between 1/1000 to 1/100.[35]

Indeed, people who study common perceptions of risk have found that people do a fair job of estimating the national death toll from a great many com-

---

34. http://www.fhwa.dot.gov/ohim/onh00/bar8.htm.
35. C.C. Travis & S.T. Hester, *Global Chemical Pollution,* 25 Envtl. Sci. & Tech. 814–19 (1991).

EXHIBIT C

*Reference Guide on Engineering*

mon risks, such as vehicular travel, but typically overestimate risks, such as airplane crashes, that have significant publicity associated with them.[36] We all know there is a small, but highly controllable, risk of drowning when we go swimming. Yet most of the U.S. population participates in this activity on some basis.

After the benefits gained from assuming the risk, probably the second most important factor determining the acceptability of a given risk level is "control." Is the risk under our control or in the hands of fate? We are willing to voluntarily assume up to 1000 times more risk if we perceive we are assuming the risk voluntarily and it is under our control. This is certainly a substantial factor in the acceptance of the risk of motorized vehicular travel. It is also observed very commonly in sports recreation activities. We perceive that the overwhelming majority of this risk is under our direct control, so we are almost universally willing to accept it for the perceived benefits on a societal basis. On the other hand, if we perceive the risk is imposed on us involuntarily, and it is out of our control, such as a nuclear power plant being built in our city, then the amount of risk we are willing to "accept" being imposed on us is dramatically less.

Another important factor in determining if a particular risk is "acceptable" is the cost of reducing or eliminating the risk. This issue is commonly encountered in product–related injury tort litigation, and it is often not a simple one. As mentioned above, there is practically no product that cannot be made safer by reducing the product benefits or increasing the product cost, or both.

Unfortunately, plaintiffs and defendants often muddy the intellectual landscape related to safety in products litigation. Plaintiffs will often assert that the product should be completely risk free, an impossible ideal to achieve, even if the product is being misused. Defendants will often assert that safety is the "highest" priority in their product's design. However, this cannot be true either. If safety were the highest priority in any product's design, the cost would be uneconomical, because at no point in the design, no matter how low the risk, would the level of risk be as low as could be achieved with more cost. Everyone knows that a big car is safer than a small car. And this is demonstrably true. It is particularly true when the big car hits the small car, and death risk in the small car is commonly 8 to 10 times higher than that of occupants of the big car in such collisions. Big cars also present less risk to their occupants, even hitting stationary obstacles such as trees. But, big cars cost more than small cars. If safety were the highest priority in vehicle design, we would all have to pay for vehicles with the weight, complexity of design, and handwork found in nameplates such as Mercedes. In the real world we can choose among more than 300 car models. Some of the very smallest and lightest mass–produced models are very inexpensive relative to a Mercedes, but they also do not remotely protect their occupants to the degree of a Mercedes. All cars must provide their occupants a minimum level of protection by compliance with the Federal Motor

36. Baruch Fischhoff et al., Acceptable Risk (1981).

917

**EXHIBIT C**

Vehicle Safety Standards (FMVSS). But even with the FMVSS, there is demonstrably more risk associated with driving a small car.

How much risk is "acceptable" is further complicated by the fact that risk cannot be spread uniformly in society. The fatal risk of motorized vehicle travel is borne by those relatively few who die, and by the rest of us only by taxes and insurance premiums. Unfortunately, some purchasers are willing to assume the additional risk of a small car in the showroom for the very substantial cost savings, but change their minds after a collision demonstrates the complete cost of the tradeoff. Our economic system permits purchasers to trade cost for safety in innumerable other products, from helmets, to tools, to furniture and houses. In reality, consumers and manufacturers must engage in consideration of cost versus safety virtually every day, because there are few products where a safer and more expensive model is not available, and no products exist that cannot be made safer by being made less convenient and/or more expensive. Denying or obfuscating this process does not advance safety, science, engineering, or justice.

In light of all the preceding considerations, we last examine the question of whether there is any absolute level of risk low enough that it almost always is regarded as "acceptable" and therefore "safe." Unfortunately, there are a multitude of such levels from a myriad of sources. In the United States, Chauncey Starr in 1969 quantified the risk of disease to the general population as one fatality per million hours of exposure, and after studying risk acceptance and participation of society in many activities concluded that "the statistical risk set by disease appears to be a psychological yardstick for establishing the level of acceptability of other risks."[37] Starr observed the de facto level of risk people accept, not necessarily that which they would say is "acceptable," was about one in a million chance of fatality per hour, or unit of, exposure. If an activity presents this level of fatal risk, and a person wants the benefit of that activity, he or she will almost always accept this level of risk for the perceived benefit. As a consequence of this initial observation, "one in a million risk" calculations are now commonplace in the risk literature.[38]

As the risk level rises above this threshold, a decreasing fraction of the population will find the risk worth the benefits. This is why very high risk sports, such as skydiving, have many fewer participants. Let us return one more time to our driver fatality risk of $0.718 \times 10^{-8}$ for each mile. This can be conveniently converted into a risk per hour by recognizing that the average driving speed in the United States is about 30 miles per hour.[39] That means in an hour, the fatal risk to the average driver is $30 \times 0.718 \times 10^{-8} = 0.214 \times 10^{-6}$ or about 0.2 per million hours or 2 in 10 million hours. It is perhaps more appropriate to return

37. C. Starr, *An Overview of the Problems of Public Safety*, in *Proceedings of Symposium on Public Safety* 18 (1969).

38. R. Wilson & C. Crouch, Risk–Benefit Analysis 208–09 (2d ed. 2001).

39. See, for example, government calculations at http://www.epa.gov/OMS/models/ap42/apdx-g.pdf or http://nhts.ornl.gov/briefs/Is%20Congestion%20Slowing%20us%20Down.pdf.

EXHIBIT C

*Reference Guide on Engineering*

to the $1.36 \times 10^{-8}$ per mile traveled for the overall risk to society of motorized vehicular travel, not just the driver risk, to compute the risk level that society de facto accepts for the benefits of motorized vehicular transport. Then the risk per hour becomes $30 \times 1.36 \times 10^{-8} = 0.408 \times 10^{-6}$ or a little less than half a fatality per million hours of exposure. This is well below the "one in a million" threshold, and thus 98%+ of the society will participate in this activity. As a final sanity check on our work, let's return to the 37.86 risk of fatal injury per $10^8$ VMT for motorcycles. This translates into a risk per hour of $30 \times 37.86 \times 10^{-8} = 1.136 \times 10^{-5}$ or more than 11 fatal injuries per million exposure hours. This is above the one-in-a-million threshold, and, understandably, motorcycle riding is regarded as an unacceptable risk by a large fraction of the population.

This threshold of "one in a million" as the "acceptable" risk level has many variants. In the United Kingdom, for example, the Health and Safety Executive[40] adopted the following levels of risk, in terms of the probability of an individual dying in any one year:

- 1 in 1000 as the "'just about tolerable risk'" for any substantial category of workers for any large part of a working life;
- 1 in 10,000 as the "'maximum tolerable risk'" for members of the public from any single nonnuclear plant;
- 1 in 100,000 as the "'maximum tolerable risk'" for members of the public from any new nuclear power station;
- 1 in 1,000,000 as the level of "'acceptable risk'" at which no further improvements in safety need to be made.

There are essentially innumerable regulations promulgated by different agencies within states and the federal government that are beyond the scope of this guide, but which mandate expenditures to maintain certain maximum risk levels either implicitly or explicitly. These regulations cover everything from food additives to acceptable levels of remediation at toxic Superfund sites. Regrettably, there is little or no coordination among regulating agencies, and no standardized procedures for addressing risk within the federal government, or within the states. As a result, the amount spent to "save a life," which should be termed "forestall a fatality" (because everyone eventually dies) varies by six orders of magnitude. Table 2 lists a number of regulations, the year that they were mandated, their issuing agency, and the cost they effectively mandate be expended "per life saved." Needless to say, these are estimates, and the data are somewhat dated, but the relative costs will be approximately the same. Executive orders from recent Presidents starting with Reagan have attempted to introduce "cost-effectiveness" in one form or another into the regulatory process, but with little observable effect at this writing.

40. Water Quality: Guidelines, Standards and Health 208–09 (L. Fewtrell & J. Bartram eds., 2001).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Table 2. Relative Cost of Selected Regulations as a Function of Lives
Saved

| Regulation | Year | Agency | Cost per Life Saved (Millions of Dollars in 1990) |
|---|---|---|---|
| Unvented space heater ban | 1980 | CPSC | 0.1 |
| Aircraft cabin fire protection | 1985 | FAA | 0.1 |
| Aircraft seat cushion flammability | 1984 | FAA | 0.5 |
| Trenching and excavation standards | 1989 | OSHA | 1.8 |
| Rear lap/shoulder belts for cars | 1989 | NHTSA | 3.8 |
| Asbestos occupational exposure limit | 1972 | OSHA | 9.9 |
| Ethylene oxide occupational exposure limit | 1984 | EPA | 24.4 |
| Acrylonitrile occupational exposure limit | 1978 | OSHA | 61.3 |

*Note:* CPSC = Consumer Product Safety Commission; EPA = Environmental Protection Agency;
FAA = Federal Aviation Administration; NHTSA = National Highway Traffic Safety Administration;
OSHA = Occupational Safety and health Administration.
*Source:* W. Kip Viscusi & Ted Gayer*, Safety at Any Price?* Regulation 54, 58 (Fall 2002).

Finally, although we acknowledge that this section on safety is quite extensive, we also believe it is extremely important for the court to recognize how engineers think about safety. Engineers are dedicated to making safe products. At the same time, they recognize that every increment in safety has an expense associated with it. Just as there is no product or environment that is risk-free, there is no bright-line threshold that universally divides safe and unsafe products; safety is not binary. For each properly designed product, there is a unique set of constraints (including cost), and a safe-enough level exists that balances constraints with acceptable risk.

## C. The Design Process—Examples in Which This Guiding Principle Was Not Followed

To illustrate ways in which flawed design processes lead to adverse outcomes, a number of examples are selected covering a range of incidents that occurred during the past century. In each instance, the link in the design process that was either missing or corrupted is highlighted and discussed. The reader may wish to refer to Figure 1 when considering these examples.

### 1. Inadequate response to postmarket problems: Intrauterine devices (IUDs)

Insertion of objects into a woman's uterus has long been a means of contraception. In the twentieth century, IUDs were designed, manufactured, and mass marketed

920

EXHIBIT C

*Reference Guide on Engineering*

around the world. Many of them were associated with adverse health consequences, in particular, pelvic inflammatory disease, which led to long-term disabilities and even death in substantial numbers of women. An example was the Dalkon Shield, marketed and sold by A.H. Robbins. The health problems of wearers of this device put its manufacturer in bankruptcy and led Congress to pass legislation to enhance medical device regulation generally, including most IUDs. Thus, those authorities corrected the flawed design process employed by A.H Robins which had led it to conclude that the product could be initially marketed and even continued to be marketed in the face of reports of serious health problems and death.

The Copper-7 IUD, marketed and sold by G.D. Searle, represented a somewhat different situation. That device received FDA approval as a drug. After it reached the market, Searle received reports of health problems. In litigation brought by women who used the product, some courts concluded that the risk associated with its use was "unacceptable."[41]

With all IUDs, the inserted device has a "string" attached to it that passes from the uterus through the cervix and into the vagina. The "string" is used for the purposes of removal as well as to provide certainty to the woman that the IUD remains in place and has not been expelled. But, to provide these functions, it compromises a biological firewall that ensures sterility of the uterus—the cervix. Therefore, in choosing the string material and fabrication method, designers had to assess choices that if properly made, reduced, if not eliminated, the potential for bacteria to migrate from the vagina into the uterus. With both the Dalkon Shield and the Copper-7, the designers set aside this consideration and traded it for the ability to enhance manufacturability and appearance by using strings that resulted in the unacceptable transmission of infectious agents into the uterus. These design choices were made for the purpose of reducing expense and gaining a competitive marketing edge, not to enhance consumer safety, and therefore led to unacceptable risk. They turned out to be lethal choices, two more examples of failures to adhere to the well-established and time-honored design process.

## 2. Initial design concept: Toxic waste site

For 17 years, over 35 million gallons of industrial waste were deposited in pits dug into the ground in what had been presumably certified to be a granite-lined impermeable geological formation that would not leak. These were known as the Stringfellow Acid Pits located near the Riverside suburb of Glen Avon, California, some 50 miles east of Los Angeles. History proved otherwise and millions of gallons of toxic materials escaped containment and contaminated groundwater supplies and exposed local inhabitants to chemical vapors.[42]

41. *See* Robinson v. G.D. Searle & Co., 286 F. Supp. 2d 1216 (N.D. Cal. 2003); Kociemba v. G.D. Searle & Co., 683 F. Supp. 1577 (D. Minn. 1988).

42. *See* State v. Underwriters at Lloyd's London, 54 Cal. Rptr. 3d 343 (Cal. Ct. App. 2006), *pet. for review granted,* 156 P.3d 1014 (Cal. 2007) for general overview and United States v. Stringfellow, No.

EXHIBIT C

In this instance, the design process was flawed from the very beginning (i.e., the incomplete and incorrect geological analysis) and led to an "engineered" site for the containment of toxic wastes, which had no chance of performing properly. This is an excellent example showing that once the design process is corrupted, everything that follows in the design cascade, although perhaps done correctly, will most likely not lead to a successful design outcome.

### 3. Forseeable safety hazards: Air coolers

In low-humidity locales, it is possible to "air condition" a structure using evaporative cooling of water. This is done in devices known as "swamp coolers." They either sit beside or in most instances on the roofs of the structures being cooled. The operation is simple. They consist of an enclosure or a box in which a small pump is used to saturate porous panels through which air is drawn thereby evaporating the water and cooling the air that is directed into the interior spaces. The pumps are electrically powered and are known to short-circuit and fail, thus becoming a potential source of ignition and fire. A simple design solution is to make the box inflammable. This, of course, is the case when the box is metal, but then one has to be concerned with corrosion and subsequent maintenance. To obviate the corrosion issue, the box can be made of plastic. Plastic does not corrode but it is potentially flammable unless flame retardants are added as part of the materials formulation. Foreseeing this occurrence and making the conscious choice not to add flame retardants is an abdication of the design process and with that comes tragic consequences.

This scenario was played out in *Vanasen v. Tradewinds*,[43] where a 5–year–old girl was killed as the result of a foreseeable pump failure, subsequent electrical short circuit, and ignition of a non-fire retardant plastic swamp cooler attached to the roof of her home. Again, failure to adhere to the straightforward tenets of the design process (i.e., designing out the known tendency of many plastics to burn) is tantamount to "rolling the dice" and hoping for the best. Experience teaches us time and again that taking design "shortcuts" seldom translates into an acceptable design outcome.

### 4. Failure to validate a design: Rubber hose for radiant heating

Radiant heating has been in use since Roman times, and a common variant of this heating method involves placement of tubes that circulate heated fluids beneath floors, thus warming the floors that then in turn heat the surrounding structure. Even though metallic tubes once frequented this application, their cumbersome

---

CV 83-2501 JMI, 1993 WL 565393 (C.D. Cal. Nov. 30, 1993) for discussion of specific findings of fact by the special master; P. Kemezis, *Stringfellow Cleanup Settlement: Companies Agree to Pay $150 Million*, Chemical Week, Aug. 12, 1992, at 11; http://www.dtsc.ca.gov/PressRoom/upload/t-01-99.pdf.

43. Tulare County, CA Sup. Ct., No. 93-161828.

EXHIBIT C

*Reference Guide on Engineering*

installation and susceptibility to corrosion led to the development of plastic tubes. One manufacturer recognized that rubber hose would be even easier to install than the somewhat rigid plastic conduits, and engaged a major rubber company to design a hose for the radiant heating market. The rubber company supplied a hose formulation that was designed for and used in automotive cooling applications, which made some sense given that similar fluids at similar temperatures are circulated in both cases. The rubber company failed to test the newly developed hose under end-use conditions, and thereby neglected to detect a failure mode caused by hose hardening and embrittlement. Engineering experts for the plaintiffs conducted a simple end-use test that verified that the hose would degrade under foreseeable conditions, thus completing the step in the design process that was not performed by the rubber company.[44]

## 5. Proper design—improper assembly: Kansas City Hyatt Regency Hotel

On July 17, 1981, during a tea dance in the vast atrium at the Hyatt Regency Hotel in Kansas City, two elevated walkways collapsed onto the people celebrating in the lobby, killing 114 of them and injuring more than 200.

The determination of what happened focused on the design and construction of the walkways. The 40-story complex featured a unique main lobby design consisting of a 117-foot by 145-foot atrium that rose to a height of 50 feet. Three walkways spanned the atrium at the second, third, and fourth floors. The second-floor walkway was directly below the fourth, and the third was offset to the side of the other two walkways. The third- and fourth-floor walkways were suspended directly from the atrium roof trusses, while the second-floor walkway was suspended from the fourth-floor walkway. During construction, the design, fabrication, and installation of the walkway hanger system were changed from that originally intended by the design engineer. Instead of one hanger rod connecting the second- and fourth-floor walkways to the roof trusses, two rods were used—one to connect the second- to the fourth-floor walkway, and another to connect the fourth-floor walkway to the roof, thus doubling the stresses in the ill-conceived connection.

Just prior to the collapse, about 2000 people had gathered in the atrium to participate in and watch a dance contest, including dozens who filled the walkways. At 7 p.m., the walkways on the second, third, and fourth floor were packed with visitors as they looked down to the lobby, also full of people. It was the second- and fourth-floor walkways—the ones that experienced the design changes—that collapsed. Clearly then, in the iterative cycle of the design process, modifications to the original design need to be validated, and failure to do so can

---

44. http://www.entraniisettlement.com/PDFs/PreliminaryApprovalAmended.pdf; J. Moalli et al., *Failure Analysis of Nitrile Radiant Tubing*, ANTEC 2006 Plastics: Annual Technical Conference, Society of Plastics Engineers, May 7–11, 2006, Charlotte, NC (2006).

923

EXHIBIT C

have severe consequences. Further details of this event can be found in the second edition of this manual.[45]

## *6. Failure to validate a design: Tacoma Narrows Bridge*

Spanning a strait, the third longest suspension bridge of its time, the Tacoma Narrows Bridge opened on July 1, 1940. In November of that same year, it collapsed into Puget Sound. During the design process, engineers failed to adequately account for the effects of aerodynamic flutter on the structure, a phenomenon in which forces exerted by winds couple with the natural mode of vibration of the structure to establish rapid and growing oscillations. In essence, the bridge self-destructed.

It is fair to say, however, that aerodynamic flutter was not well understood at the time this bridge was constructed. Indeed, the term was not coined until the late 1940s, years after the bridge collapsed. The root cause of this unfortunate circumstance was a desire to build a bridge with enhanced visual elegance (i.e., long and narrow) and to use an untested girder system that offered significant cost savings. This should have led to a thorough testing and validation program to ensure that venturing into uncharted waters in bridge design would not result in unintended or unanticipated consequences. Indeed, after the bridge was constructed and put into use on July 1, 1940, it gained a reputation for its unusual oscillations and was known as "Galloping Gertie." It was only then that engineers built a scale model of the bridge and began testing its behavior in a wind tunnel. Those studies were completed and remedies proposed in November 1940, just days before the bridge fell into the Tacoma Narrows channel.

A substantial departure from the norm of appropriate testing and validation is an unacceptable application of the design process, and the collapse of this bridge is an all too sobering reminder of this. Stated in another way, end-use testing should not be done by the "consumer" and in cases where this occurs, a clear violation of the design process tenets has taken place.[46]

## *7. Failure to conform to standards and validate a design: Automotive lift*

Automotive lifts are often used in dealerships and service stations to raise vehicles and provide access to components on the bottom of the vehicle for service. To reduce the propensity for injury, ANSI and the American Lift Institute (ALI) promulgate standards that specify, among other things, the minimum resistance on the horizontal swing-arm restraints. The lift in question had a label on the lift support structure that indicated it was in compliance with these specifications, so

---

45. Henry Petroski, *Reference Guide on Engineering Practice and Methods*, *in* Reference Manual on Scientific Evidence 577, 601–02 (2d ed. 2000).

46. This example is also further discussed in the second edition of this manual.

924

EXHIBIT C

*Reference Guide on Engineering*

when a Jeep Wrangler fell from the lift and injured the owner of a service station, verification of conformity to the standards was assessed by the plaintiff.

Testing by the plaintiff's expert revealed that the swing-arm lift restraints resisted only 30% of the criteria specified in the standard, and that simple reconfiguration of the restraint components could create a conforming lift. Furthermore, the plaintiff's expert calculated that for the vehicle-lift configuration in question, the amount of force required to provide positive restraint was less than that required by the standards, and therefore the accident would have been prevented had the standards been met. Finally, the plaintiff's expert opined that the label on the lift that claimed compliance with the standard would tend to convey to the end-user of the product that the presence of the swing-arm restraint added a layer of insurance for the operator in the event that there was an imperfect placement of the vehicle over the lifting pads.

In response, the lift manufacturer claimed that the intended swing-arm restraining forces arose from the friction created when the lifting pad contacted the vehicle undercarriage, and further argued that the swing-arm restraint was nothing but "fluffery" forced upon lift manufacturers to remain competitive in the marketplace. The jury found for the plaintiff, implicitly recognizing the tenant of the design process that calls for testing and validation of design claims and features.

## 8. Lack of sufficient information and collective expertise to consummate a design: Dam collapse

After 2 years of construction the St. Francis dam in southern California was completed in 1926 and the reservoir behind it began to fill. As the reservoir reached near capacity behind the 195-foot-high concrete arch dam, the eastern abutment gave way shortly before midnight on March 12, 1928, unleashing a wall of water over 100 feet high that eventually dissipated into the Pacific Ocean some 50 miles downstream. The flood killed more than 600 people and most likely more. The collapse of the St. Francis dam is one of the worst American civil engineering failures of the twentieth century.[47]

The dam was designed and certified by a single individual, William Mulholland, chief engineer and general manager of the Los Angeles Department of Water & Power (at the time known as the Bureau of Water Works & Supply). Mulholland had no formal education and was a self-taught individual. While the ultimate physical cause of the failure was the proximity of a paleomegalandslide to the eastern dam abutment, a geological anomaly that geologists argue today as to whether such a feature could have been detected in the 1920s, the inquest that followed the disaster determined that improper engineering, design, and governmental inspection was where the responsibility for this tragedy resided.

47. St. Francis Dam Disaster Revisited (Doyce B. Nunis. Jr., ed., 2002).

925

EXHIBIT C

Indeed, we now know that the design of this structure failed to meet accepted design principles already in place in the 1920s. The dam height was increased by 10 feet at the start of construction, and another 10 feet midway through construction, bringing the final capacity to 38,000 acre feet. No modifications were made to the base to accommodate this additional capacity, and there were a number of weaknesses in the design of the base. It is estimated that the factor of safety, which was meant to be above 4 in the initial design, may have been as low as 0.77 on the dam that was actually constructed.

Geoforensics expert J. David Rogers enumerated many other design deficiencies associated with the St. Francis Dam, among them the lack of hydraulic uplift theory being incorporated into the dam's design; lack of uplift relief wells on the sloping abutment sections of the dam; failure to batter the upstream face of the dam to reduce tensile forces via cantilever action; failure to analyze arch stresses of the main dam; failure to remove high-water-content cement paste (laitance layer) between concrete lifts; failure to account for the mass concrete heat-of-hydration; failure to recognize the tendency of the Vasquez formation to slake upon submersion and failure to provide the dam with grouted contraction joints; failure to recognize that the dam concrete would eventually become saturated; and failure to wash concrete aggregate before incorporation in the dam's concrete.[48]

In this instance there simply was no credible design process from concept, through design, execution, and postconstruction surveillance. As a result, a massive failure ensued.[49]

### 9. *Operation outside of design intent and specifications: Space shuttle* Challenger

On January 28, 1986 the space shuttle *Challenger* and its accompanying liquid hydrogen and oxygen external tank (ET) disintegrated over the Atlantic Ocean after only about 70 seconds of flight. The two attached solid rocket boosters (SRB) separated from the shuttle and ET and were remotely destructed by the range safety officer. All seven of the NASA crewmembers were killed.

We now know the physical reason for this catastrophe. Two rubber "O"-rings placed at the aft joint where two sections of the right SRB came together had failed to "extrude" themselves as the SRB metal shell deformed during the early moments of ignition. Because of this, hot gases escaped through the breach created by the ineffective seal at the O-ring joint and led to the separation of the aft strut that attached the right SRB to the ET. This was followed by failure of the

48. J. D. Rogers, *The St. Francis Dam Disaster Revisited*, 77 Southern California Q. (1-2) (2003); J. D. Rogers, *The St. Francis Dam Disaster Revisited*, 40 Ventura County Q. (3-4) (2003).

49. Donald C. Jackson & Norris Hundley, *Privilege and Responsibility: William Mulholland and the St. Francis Dam Disaster,* California History (Fall 2004).

EXHIBIT C

*Reference Guide on Engineering*

aft dome of the liquid hydrogen tank. The massively uneven thrust created by the escaping hydrogen gas altered the trajectory of the shuttle and aerodynamic forces destroyed it. The failure of the "O"–rings to alter their conformations with SRB shell deformation was attributed to the low ambient temperature at the time of launch. The O-rings had "hardened" and as a result lost their required flexibility.

Two investigations into the circumstances surrounding this disaster took place. Reports and findings were issued by the Presidential Rogers Commission[50] and the U.S. House Committee on Science and Technology.[51] While both reports agreed on the technical causes of the catastrophe (failure of the "O"–rings to perform as intended), their conclusions as to the root cause were stated somewhat differently but in the end pointed to the same basic issue. The Rogers Commission concluded that the National Aeronautics and Space Administration (NASA) and the O-ring manufacturer, Morton Thiokol, failed to respond adequately to a known design flaw in the O-ring system and communicated poorly in reaching the decision to launch the shuttle under extremely low ambient temperature conditions. The House Committee concluded that there was a history of poor decisionmaking over a period of several years by NASA and Morton Thiokol in that they failed to act decisively to solve the increasingly serious anomalies in the SRB joints.

Another way of stating what both reports essentially say is that the design process resulting in the double O-ring (now a triple O-ring system) was flawed. Moreover, NASA managers knew of this problem as early as 1977. Warnings by engineers not to launch that cold morning were disregarded. Each SRB consisted of six pieces, three welded together in the factory and the remaining three fastened together at the launch facility in Florida using the double O-ring seal system. Thiokol engineers lacked sufficient data to guarantee seal performance of the O-rings below 53 degrees Fahrenheit (°F). Temperature at launch hovered at 31°F. When originally designed, the O-rings were intended to remain in circumferential grooves. After several shuttle launches, it became evident that the SRB shell was deforming and that hot gases could escape but that the O-rings were "extruding" to seal these temporary breaches. As a result, the design specifications were changed to accommodate this process. The design itself, however, remained unchanged.

If one considers that the original design concept was to ensure a seal between the SRB field–joined sections using two O-rings, the question on the table is whether the actual design and subsequent execution were consistent with the design process. Clearly this was not the case. First, the system performed differently than expected (i.e., extrusion occurred). Validation and testing to ensure that

50. Rogers Commission, Report of the Presidential Commission on the Space Shuttle Challenger Accident (1986).

51. Committee on Science and Technology, *Investigation of the Challenger Accident*, H.R. Rep. No. 99-1016, (Oct. 29, 1986).

EXHIBIT C

*Reference Manual on Scientific Evidence*

this aberrant behavior of the original seal system actually was acceptable never was done other than to monitor shuttle launches and hope for the best. Second, the O-rings were known to have insufficient resiliency at temperatures substantially higher than those encountered on the day of the *Challenger* launch; therefore, launching at such a low ambient temperature equated to misuse of the system. The unfortunate truth of all this is that an unsound design process most certainly will produce a flawed product.

## 10. Foreseeable failure and lack of design change in light of field experience: Air France 4590

On July 25, 2000, Air France flight 4590, a Concorde supersonic passenger jet departed Charles de Gaulle Airport and crashed into a nearby hotel killing 100 passengers, 9 crew, and 4 others on the ground. The physical cause was readily determined. The Concorde was designed to take off without flaps or leading-edge slats as a weight-saving measure. Because of this, it required a very high takeoff roll speed to become airborne. This placed unusually high stresses on the tires. A piece of titanium metal approximately 1 × 16 inches was lying on the departure runway. It had fallen from a thrust reverser assembly on a Continental Airlines DC-10 that had departed minutes earlier. During its takeoff roll, the Concorde struck the metal debris and this punctured and subsequently shredded one of its tires. The tire remnants broke an electrical cable and created a shock wave that fractured a fuel tank. The fuel ignited and an engine caught fire. The plane had reached a ground speed such that the pilot elected that it was prudent to continue the takeoff rather than abort. The crew shut down the burning engine. Unable to retract the landing gear, and now experiencing problems with the remaining engines, the crew was unable to climb and the aircraft rolled substantially to the left and contacted the ground.[52]

In this instance, a design decision was made to save weight by not having retractable flaps and slats. This led to higher than normal landing and takeoff speeds. This in turn placed additional demands on the tires. They would be rotating at higher speeds and contain much increased kinetic energy. This meant that when one or more failed, the rubber shrapnel would be released with additional force. This led to a greater risk of puncture of the aircraft structure and therefore special consideration to ensure that the aircraft skin could maintain integrity in the foreseeable event of a tire rupture. Making the skin more resilient to puncture implied additional weight and this would work against the primary reasoning for not having the slats and flaps. And there we have the design conundrum.

Having made what was initially regarded as a reasonable compromise in the aircraft design, the manufacturer subsequently gained experience with the Concorde, learning that tire failures could be potentially catastrophic (the type

---

52. http://www.bea-fr.org/docspa/2000/f-sc000725a/htm/f-sc000725a.html.

EXHIBIT C

of experience illustrated by the "Performance" arrow from the "Go" stage to the "Design/Formulate" and "Test/Validate" stages in Figure 1). Between July 1979 and February 1981, there were four documented tire ruptures on takeoff. In two of these instances, substantial damage was done to the aircraft structure, but the planes were able to land without incident. Despite having these critical data related to the initial design assumptions and associated compromises in hand, no remedial changes were made to either the tire or aircraft design. After the 2000 crash, design changes were made to the electrical cables, the fuel tanks were lined with Kevlar, and specially designed burst-resistant tires were put into use. The Concorde fleet was retired from service in 2003, with declining passenger revenues cited as the major cause.

In the case of the Concorde, the record appears to indicate that designers chose not to alter the design, even in the face of significant data, until a fatal accident occurred. Although these actions may be consistent with the above discussion on risk, and how it is perceived, the crash is illustrative of how the fundamentally simple design process works, and that departures from it can have serious consequences.

# IV. Who Is an Engineer?

## *A. Academic Education and Training*

Having earned a bachelor's degree in an engineering curriculum is generally sufficient to enter the professional workplace and begin to immediately solve a wide variety of problems. It is less so the case for students who graduate with degrees in the basic sciences such as physics, chemistry, or biology or in mathematics. Typically, but not always, these basic science students will go on to earn graduate degrees.

It is also the case that some students who have earned an engineering degree will continue to the master's or even doctorate level of study. In 2004, U.S. colleges and universities awarded approximately 75,000 bachelor's degrees, 36,000 master's degrees, and 6000 doctoral degrees in all areas of engineering.[53]

One can think of the educational process as providing engineering students with a toolkit from which they select "tools" to enable them to either individually or in teams participate in scientific and technological innovation. Because these students are educated, as opposed to having been trained, one can never be quite sure how they will choose to use their tools, or add to the kit, or delete from the kit. Although carpenters share a common toolkit, we know the structures they build can be appreciably different in size, shape, and scope. So it is with engineers.

---

53. *Report 1004D: Total Numbers of Bachelor's, Master's and Doctoral Degrees Awarded per Million Population Since AY1945-46—Including Data for Degrees Awarded to US Citizens Since AY1970-71,* Engineering Trends Quarterly Newsletter, Oct. 2004, at 1.

EXHIBIT C

*Reference Manual on Scientific Evidence*

One example that scientists and engineers can be one and the same is epitomized by Renaissance humanism during a period almost five centuries past. There, Leonardo da Vinci, with a minimalist toolkit by today's standards, lived a life equally as an engineer and a scientist, and indeed an artist. Four centuries later, Buckminster Fuller seamlessly combined elements of geometry (aka "science"), structures (aka "engineering"), and architecture (aka "art") to conceive and develop an entirely new approach to architectural design. Architects Norman Foster and Frank Ghery seized on recent advances in computer science and engineering to provide innovative platforms for architectural design that paved the way for radical changes in structural and visual renderings. Striking examples include the Guggenheim Museum Bilbao, the Walt Disney Concert Hall Los Angeles, the Experience Music Project Seattle, the City Hall London, the Beijing Airport, and the Reichstag Berlin.

Searching for ways to create or define the "bright line" that classifies da Vinci, Fuller, Foster, or Gehry as engineers, scientists, architects, or artists is as empty an exercise today as it would have been five centuries ago. This, of course, does not preclude one from considering himself or herself as an "engineer" or a "scientist"; however, the subtler point is that one can also be both or either at different points in time or at the same time. This can be overlooked or ignored in the quest for limiting or excluding expert testimony.

## B. Experience

Without knowing how an engineer or scientist will use his or her toolkit and to what extent it will be replenished or modified as time goes on, it is not possible to begin to even second-guess what any particular individual may do to shape his or her career as time passes. There is a great deal of truth to the notion of "learning on the job." Indeed, as one's career unfolds, the number of opportunities expands and with that comes additional skills and an ever-increasing ability to make wise and informed choices and decisions. Being an engineer affords one the opportunity to continually remodel oneself as new and unexpected problems and challenges become evident.

And so it is with the passage of time that the "title" of one's degree becomes an increasingly murky description of who one is and what one does. This is why it is so critical when evaluating whether an "engineer" is testifying within his or her realm of expertise that titles do not overshadow the actual context of a degree (i.e., the name may not reflect the knowledge attributes accurately) and the experience base at hand. Even though it is an all too common tactic to attempt to confine expert witness testimony to the asserted domain of his or her named academic credentials, it is one that may necessarily lead to less-informed testimony than otherwise would be the case. This is a high price to pay when the desired outcome is finding the right path to both truth and justice.

EXHIBIT C

*Reference Guide on Engineering*

## C. Licensing, Registration, Certification, and Accreditation

Licenses are required for engineering professionals in all 50 states and the District of Columbia, *if their services are offered directly to the public and they would affect public health and safety*. Licensed engineers are called professional engineers (PEs). In general, to become a PE, a person must have a degree from an ABET[54]-accredited engineering college or university, have a specified time of practical and pertinent work experience, and pass two examinations. The first examination—Fundamentals of Engineering (FE)[55]—can be taken after 3 years of university-level education, or can be waived in lieu of pertinent experience. The FE examination is a measure of minimum competency to enter the profession. Many colleges and universities encourage students to take the FE exam as an outcome assessment tool following the completion of the education coursework. Students who pass this examination are called engineering interns (EIs) or engineers in training (EIT) and take the second examination after some work experience. This is the Principles and Practice of Engineering examination. The earmark that distinguishes a licensed/registered PE is the authority to sign and seal or "stamp" documents (reports, drawings, and calculations) for a study, estimate, design, or analysis, thus taking legal responsibility for it.

Many engineering professionals do not seek a PE license because *their services are not offered directly to the public* or they have no need to sign, seal, or "stamp" engineering documents. Whether an individual is licensed as a PE is neither sufficient nor necessary to establish his or her competency as an engineer. Furthermore, the two examinations test only for knowledge gained and assimilated at the undergraduate level. It is therefore common for professors of engineering in colleges and universities not to have PE licensure—indeed, they are the ones who teach and prepare those who do take these examinations. Despite this, a common litigation practice is to attempt to preclude "engineering" testimony offered by professionals who have had no need to obtain PE licensure as if this was intended to be some sort of requirement for practicing in the profession or for testifying in court. Such an approach is unwarranted and inconsistent with the way in which engineers behave and think about the work they do.

54. Founded in 1932 as the Engineer's Council for Professional Development (ECPD), it was later renamed ABET (Accreditation Board for Engineering and Technology). In the United States, accreditation is a nongovernmental, peer-review process that ensures the quality of the postsecondary education that students receive. Educational institutions or programs volunteer to undergo this review periodically to determine if certain criteria are being met. ABET accreditation is assurance that a college or university program meets the quality standards established by the profession for which it prepares its students. The quality standards that programs must meet to be ABET-accredited are set by the ABET professions themselves. This is made possible by the collaborative efforts of many different professional and technical societies. These societies and their members work together through ABET to develop the standards, and they provide the professionals who evaluate the programs to make sure that they meet those standards.

55. In the past, this examination was known as the Engineer in Training (EIT) exam.

EXHIBIT C

*Reference Manual on Scientific Evidence*

PE licensure is quite different from board certification for a physician or bar certification for a lawyer. Physicians and lawyers may not practice their professions without having such board certification. Such is not always the case for engineers and therefore it is not appropriate or correct to construe this to be so. The title "engineer" is legally protected in many states, meaning that it is unlawful to use it to offer engineering services *to the public* unless permission is specifically granted by that state, through a professional engineering license, an "industrial exemption," or certain other nonengineering titles such as "operating engineer." Employees of state or federal agencies may also call themselves engineers if that term appears in their official job title. In some states, businesses generally cannot offer engineering services *to the public* or have a name that implies that it does so unless it employs at least one PE. For example, New York requires that the owners of a company offering engineering services be PEs. In summary, licensing procedures and requirements are state specific, but such licensure is not a requirement to testify in federal court.

As a postscript to this discussion, civil engineers often seek PE registration because of their association with public works projects. This can be traced directly back to the failure and subsequent legacy of the St. Francis dam collapse in southern California in the late 1920s. More about this disaster is discussed in Section III.C.8.

# V. Evaluating an Engineer's Qualifications and Opinions

## A. Qualification Issues and the Application of Daubert Standards[56]

Engineers are treated like other witnesses when it comes to determining whether they can testify as factual or expert witnesses. Thus, if they have information regarding facts in dispute, an engineer can be a fact witness describing that information. In the context of the design of a product or the conception of an allegedly protectable method or device, that may take the form of describing what the engineer did to create the product or construct at issue, how he or she conceived of the subject of that product or construct, and how the product or allegedly

---

56. *Daubert* standards were established in the trilogy of cases, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), *General Elec. Co. v. Joiner,* 522 U.S. 136 (1997), and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), and refer to factors to be considered when assessing the admissibility of expert testimony. *See generally* Margaret A. Berger, The Admissibility of Expert Testimony, in this manual.

EXHIBIT C

*Reference Guide on Engineering*

protectable property compares to other designs or intellectual property that are claimed to relate to the subject of the dispute.

As discussed above, engineers can also be expert witnesses. Like any other proffered expert, an engineer's training, background, and experience play a role in qualifying him or her to provide expert opinions. Education, licensing, professional activities, patents, professional society involvement, committee work, standards development, professional consulting experience, and involvement in a business based on similar technology or engineering principles can all help to fortify an engineering expert's qualifications. The work that the engineer did to acquire facts about the matter at issue (described below) and to test the engineer's hypothesis as to how the incident in question occurred and what caused it provide still stronger bases for allowing the engineer to testify as an expert witness.

Ultimately, the court's application of *Daubert* standards to the qualifications asserted by the engineer and the opinions that the engineer seeks to give determines whether the engineer may testify. In the role of gatekeeper of scientific or technical testimony, the trial judge determines whether the engineering testimony is both "relevant" and "reliable." The relevance and reliability of engineering testimony is judged in the context of the design process and the way that engineers approach a problem as described above. And as the court clarified in *Kumho Tire*, *Daubert* extends to all expert testimony, including testimony based on experience alone.[57]

## B. Information That Engineers Use to Form and Express Their Opinions

Under Federal Rule of Civil Procedure 26(a)(2)(B)(i), the expert report must contain the basis and reasons for all opinions expressed, and certainly the expectation is that oral testimony will do the same. Apart from opinions based purely on knowledge, skill, experience, training, or education, nearly all expert opinion is based on observations, calculations, experimentation, or some combination thereof.

### 1. Observations

#### a. Inspections

When called as an expert in a products liability case, engineers will often complete a physical inspection of a failed product or accident scene. ASTM and the National Fire Protection Association (NFPA) have published several standard practices that

---

57. *See* Margaret A. Berger, The Admissibility of Expert Testimony, in this manual.

EXHIBIT C

*Reference Manual on Scientific Evidence*

offer guidance on inspections and related issues.[58] Although it is not required that engineers adopt and follow these standards, if the court has questions as to whether the techniques or procedures used by an engineer are reasonable, reference to the standards can certainly be helpful.

As a first step in the inspection process, engineers will typically document evidence or the accident scene using photography and videography. It may be worth noting that just as 2009 represents the first year that the official presidential portrait is digital, most engineers will record photos and video digitally. Other measurements and readings can also be made at the initial inspection, as engineers establish the state of the evidence and attempt to determine if it has been altered subsequent to the incident.

One important issue that often arises during an inspection is the destruction of evidence, and engineers sometimes argue as to whether testing is truly destructive. ASTM E 860 provides some guidance that could be useful to the court in terms of providing a reference to engineers:

> Destructive testing—testing, examination, re-examination, disassembly, or other actions likely to alter the original, as-found nature, state or condition of items of evidence, so as to preclude or adversely affect additional examination or testing.

In terms of inspections, destruction of evidence typically relates to disassembly or displacement of parts, and disputes can usually be resolved by establishing an agreed-on protocol between parties. If items that have physically broken or separated are at issue, it should be remembered that two fracture surfaces are created, each a mirror image of the other, and one can be preserved while the other is evaluated. Microscopic examination of failure surfaces, also known as fractography, is commonly used by engineers to determine the cause of failure. Fractography can be used to establish such things as how the product failed (overload versus a fatigue or time-dependent failure) and whether manufacturing defects (poor welds, voids, inclusions) exist.

b. Experiments and testing

After performing inspections of the evidence, engineers develop hypotheses as to the cause of what they are investigating and evaluate these hypotheses. One common method of testing a hypothesis is experimentation, and engineers are educated and trained to conduct experiments, often to the displeasure of their

---

58. Although not intended to be an exhaustive list, these standards include:

- ASTM E 860—*Standard Practice for Examining and Preparing Items That Are or May Become Involved in Criminal or Civil Litigation,*
- ASTM E 2332—*Standard Practice for Investigation and Analysis of Physical Component Failures,*
- ASTM E 1188—*Standard Practice for Collection and Preservation of Information and Physical Items by A Technical Investigator,* and
- NFPA 921—*Guide for Fire and Explosion Investigations.*

**EXHIBIT C**

*Reference Guide on Engineering*

client-attorneys who would rather not perform any test for which the outcome is uncertain. Engineers can design tests to study kinematics (motions) and kinetics (forces) and to recreate accidents; to evaluate physical, mechanical, and chemical properties of materials; or to assess specific characteristics against claims in a patent. Because the circumstances surrounding accident and product failure investigation can be quite complex, and often novel as well, engineers sometimes must design experiments that have never before been performed. This notion, experiments conducted for the first time for purposes of litigation, has been the topic of much debate.

Although it is typically suggested that such work is biased and therefore ought to be excluded, an experiment that is designed and executed for the purposes of litigation is not inherently suspect. If the experiment has a well-defined protocol that can be interpreted and duplicated by others, articulates underlying assumptions, uses instrumentation and equipment that is properly calibrated, and is demonstrated to be reliable and reproducible, it should not be summarily discarded simply because it is new. It is often the case that the precise matter in dispute has not been the subject of engineering or scientific studies, because in the normal course of events, the problem at hand was never addressed in a public forum and no peer-reviewed literature spoke directly to it. In typical engineering problems, because a multitude of factors can vary, it is often difficult to find suitable pre-existing information, and the question at hand may not have been asked in such a way as is before the court.

The fact that problem identification occurs within the course of a legal dispute does not mean that the problem cannot then be explored directly using either the scientific method or the engineering design process or both to ascertain and understand the physical or chemical behavior of the issue at hand. In point of fact, an experiment that is designed for litigation will better fit the issues standing before the court, and either the plaintiff or the defendant is free to pursue this and to subsequently criticize the results. Not only will experiments designed to specifically address the matter at issue be more directly relevant to questions at hand, they will also provide data the court can use in thoughtful deliberation.

Indeed our personal experience has found this not only to be helpful in adjudicating complex issues for which no directly relevant prior work had been done, but in the end, after the litigation had been completed, peer-reviewed articles were written about the work that was done for the purposes of studying an issue for litigation.[59]

---

59. Richard D. Hurt & Channing R. Robertson, *Prying Open the Door of the Tobacco Industry's Secrets About Nicotine: The Minnesota Tobacco Trial,* 280 JAMA 1173 (1998); John Moalli et al., *supra* note 44; Monique E. Muggli et al., *Waking a Sleeping Gaint: The Tobacco Industry's Response to the Polonium-210 Issue*, 98 Am. J. Pub. Health 1643 (2008); M.S. Warner et al., *Performance of Polypropylene as the Copper-7 Intrauterine Device Tailstring*, 2 J. Applied Biomaterials 73 (1991); Richard Hurt et al., *Open Doorway to Truth: Legacy of the Minnesota Tobacco Trial*, 84 Mayo Clinic Proc. 444 (2009).

EXHIBIT C

Of course not all situations require novel techniques to be developed, and in those instances an abundance of standards for testing materials and products exist. Typically promulgated by organizations such as ASTM, ANSI, CEN, and others, these standards envelop everything from sample preparation, to sampling procedures, to test equipment operation and calibration, to analysis of data acquired during testing. Although such a broad array of standards and guidelines exist, it is possible that some portion of even the more novel test may not be covered. It is also common for engineers to follow a standard to the maximum extent allowed by the circumstances and state of the evidence, and to note deviations from that standard in their protocols and reports.

## 2. Calculations

A substantial portion of an engineer's education is spent learning how to calculate things, so it should come as no surprise that when litigation is involved, engineers would be making calculations as well. As part of this education, engineers learn how to derive equations based on scientific and mathematical principles, and consequently become aware of the limitations of a particular equation or expression. Although it would be convenient if a single equation could be used to solve every engineering problem, this is clearly not the case, and so engineers must learn what principles to apply, and when to apply them.

The difference between a good calculation and a marginal one is related to how applicable the equations used in the calculation are to the situation at hand, and how valid the underlying assumptions are. As mentioned above, it is the rare case in which an engineering analysis contains no assumptions. For example, there are well-known equations that relate the pressure inside a cylindrical vessel to the stresses in the wall of that vessel. These equations assume, however, that the wall thickness of the pressure vessel is small compared with the inner diameter, and if this is not the case, significant error may result. If an engineer uses the more simplified approach, he should assess whether his analysis is conservative (i.e., how the assumptions affect the overall calculated result).

In the modern age, it is simple to download programs from the Internet that will make calculations based on input variables. These programs can save engineers considerable time, because they can reduce hours of "paper" calculation to minutes. Used blindly, though, without proper understanding of core assumptions or approximations, these programs can be precarious. Computer programs should always be validated, and the simplest way to accomplish that task is to have the program calculate a range of solutions for which the result is already known. The program is then validated within that range.

## 3. Modeling—mathematical and computational

When hand calculations become overly tedious, or are too simplified to handle a highly complex problem, engineers will often use computer models to examine

**EXHIBIT C**

*Reference Guide on Engineering*

systems, processes, or phenomena. Quite distinct from the simple programs mentioned above used to solve an equation or two, these computer models employ enormous bodies of code that can solve thousands of equations. One of the most common techniques employed by these programs is the finite element method (FEM), which can be used to solve problems in stress analysis, heat transfer, and fluid flow behavior.

FEM is dependent on the computational power of computers, and basically divides the system or component into small units, or elements, of uniform geometry. This mesh, as it is called, reflects the geometry of the actual system or component as closely as possible. Boundary conditions are established on the basis of known applied loads, and the fundamental equations of Newtonian mechanics are solved by iterative calculations for each individual cell. The resulting loads and displacements (or stresses and strains) in each cell are then summed at each increment of time to give an overall picture of the load/displacement (or stress/strain) history of the system or component. The literally millions of calculations required for each time step can only be handled by a computer. These data can then be used to determine the loads and displacements at the time of failure, information that otherwise could not be obtained from hand (or "back of the envelope") calculations.

In its early stages, FEM code could only be found in universities and corporate and governmental laboratories, and was executed by doctoral–level engineers who used separate programs to postprocess results into usable graphical output. Today, commercial FEM programs are widely available, and are capable of generating eye–catching graphics that appeal to juries. Other software programs are available that create similar graphics for car–crash or mechanical simulations. This tool is as much an accepted part of the engineering design community as the slide rule was in the 1960s. In addition, engineers involved in determining the cause of failure of mechanical systems have been using FEM since the 1980s to determine the loads and strains at critical points in complex geometries as part of root–cause analysis efforts. This is often a principal means to determine what actually caused something to break, and ultimately to determine whether a design or manufacturing defect or overload or abuse was ultimately at fault. FEM can, in certain circumstances, be a valuable tool to assess the cause of a design failure.

To be sure, FEM, like any scientific tool, must be properly applied and interpreted within its limitations. It can be abused and misused, and because the output from these models can be made to appear extremely realistic, especially when coupled with computer graphics, their use needs to be carefully considered. To summarily reject FEM as a simulation, though, would be to deprive a modern–day engineer of a tool that is regularly used. There is an old adage in the modeling world, called "garbage in—garbage out," or GIGO, that gets to the heart of the issue. No matter how sophisticated the software, or how realistic the output seems, if the data fed to the program are inaccurate, the results will be poor, and thus can be misleading. The proper way to evaluate the efficacy of the model or simulation is to validate it, and this is usually done by processing known scenarios

937

**EXHIBIT C**

or input conditions, and making certain the results are representative of the known output within the validated range. Regardless of the qualifications of the engineer, if any mathematical model has not been validated within the boundaries at issue, its use in the courtroom should be carefully considered. Additionally, once the model is used in litigation, engineers should be prepared to provide a fully executable copy of the model if requested during discovery.

## *4. Literature*

Engineers are trained to rely on literature as part of their work, and the literature they employ is nearly as varied as engineers themselves. Structural and mechanical engineers use codes and regulations when they design everything from buildings to bridges, and pressure vessels to heating systems (an extended discussion on the use and misuse of codes is provided below). Engineers rely on published standard methods when they conduct runofthemill tests, scientific literature to test the efficacy of complex calculations and experiments, and textbooks to validate techniques and methods from their educational training.

It is common for engineers to gather literature that addresses an issue about which they are testifying. Industrial engineers may gather literature related to warnings, materials engineers may collect literature related to development and processing of a compound, and mechanical engineers may assemble literature related to stress analysis. Inevitably, literature exists that is not concurrent with the engineer's perspective, and a proper analysis of the available literature should include this as well, with the engineer addressing discrepancies directly.

Engineers may also rely on scientific and technical literature to assess the state of knowledge at a given period in time. This is especially useful in matters involving intellectual property (discussions related to prior art, best mode, and the like) or product design (stateoftheart analysis). The appropriateness of reliance on this type of literature should not only be weighed by its applicability to the case in discussion, but also by the engineer's mastery and frequency of use of the particular subject. The topic of peer review is often raised concerning scientific and technical literature, and although the peer review process aids in the promotion of sound science and engineering, its presence does not ensure accuracy or validity, and its absence does not imply that a reference is scientifically unsound.

## *5. Internal documents*

Engineers called as experts by either party in a products or personal injury case will likely review documents produced during discovery that relate to the design process of the product in question. From these documents, engineers can often assess whether appropriate actions were taken during the product design process, including product development, product testing and validation, warning and risk communication, and safety and risk assessment. Because the specific constraints imposed on a design are not always apparent from internal engineering

EXHIBIT C

documents, and understanding constraints can be critical in terms of effective critical review, engineers called as experts may need to review deposition testimony relating to the design to supplement what they learn from the documents themselves.

# VI. What Are the Types of Issues on Which Engineers May Testify?

Because engineers are problem solvers, their work frequently becomes the subject of disputes, which eventually involve lawyers and courtrooms. Many times these disputes involve the sort of "scientific, technical or other specialized knowledge" that may be best understood with the help of one or more engineers.[60] Stated differently, these issues may be difficult for a jury of laypersons, or even judges, to understand and resolve without the assistance of an engineer who was not directly involved in the facts of the case. As a result, disputes involving engineering concepts and principles may be properly the subject of expert testimony from one or more witnesses qualified in the field of engineering.

Just as there are a multitude of disciplines within engineering, there are a multitude of issues upon which engineers may be called upon to testify. Some examples follow.

## A. Product Liability

Generally speaking, a product may be defective if it contains a design defect, a manufacturing defect, or inadequate warnings or instructions. Therefore, disputes regarding the efficacy or safety of products typically involve questions regarding whether the product was properly designed, tested, manufactured, sold, or marketed. These issues are examined from the perspective of what was known at the time of first sale and also what was done after information became available about the product's performance.

### 1. Design

The conception and design of a product is often a focus of dispute in a product liability case. An understanding of the way that engineers think and the engineering design process described above is essential to determine the nature of and extent to which engineering testimony should be admitted. For example, in medical device litigation, it may be significant to know the purpose for which the medical device was designed and the process by which the design at issue was

---

60. Fed. R. Evid. 702.

EXHIBIT C

achieved. To gain that understanding, testimony from the product designer as well as testimony by engineers with experience in design may be helpful.[61]

The adequacy of testing done on a product is closely related to the issue of design defect. This is true whether the testing in question occurred before the product was first sold ("premarket") or after the product had been on the market for a time and information regarding its performance became available ("postmarket").[62] Engineering testimony may be helpful to the court and to the trier of fact in these circumstances as well.

An engineer's examination of products that have failed in use may result in valuable evidence for a court and trier of fact to consider. For example, an engineer skilled in fractography can testify regarding how and why a product failed.[63] Such testimony may prove helpful to the court and a trier of fact on such issues as whether the subject product was defective as originally designed, whether an alternative design could have been used, what the cost of such response would be and whether the manufacturer's response to such incidents of product failure was reasonable.

61. Russell v. Howmedica Osteonics Corp., No. C06-4078-MWB, 2008 WL 913320 (N.D. Iowa 2008) (biomechanical expert allowed to testify that medical device's inability to handle weight loads was a design defect and hence caused the plaintiff's injuries, and that the defendant's failure to warn surgeons of this fact that caused the failure of the device); Poust v. Huntleigh Healthcare, 998 F. Supp. 478 (D.N.J. 1998) (engineer with expertise in medical device use, safety, and design allowed to testify about defects concerning lack of instructions, the alarm, lack of fail-safe mechanism, and lack of pressure gauge in pneumatic compression device); *see also* Dunton v. Arctic Cat, Inc., 518 F. Supp. 2d 296 (D. Me. 2007) (admitting expert testimony of mechanical engineer and product designer regarding, among other things, purpose and design of certain components of allegedly defectively designed snowmobile); Floyd v. Pride Mobility Prods. Corp., No. 1:05-CV-00389, 2007 WL 4404049 (S.D. Ohio 2007) (three engineering experts, including mechanical engineer with expertise as product designer, allowed to testify about defects in design of scooter); Tunnell v. Ford Motor Co., 330 F. Supp. 2d 731 (W.D. Va. 2004) (engineer allowed to testify about feasibility of proposed safer auto design).

62. *See, e.g.,* Smith v. Ingersoll-Rand Co., 214 F.3d 1235 (10th Cir. 2000) (human factors engineering expert allowed to testify that defendant's failure to conduct human factors analysis of milling machine was inadequate); Montgomery v. Mitsubishi Motors Corp., 448 F. Supp. 2d 619 (E.D. Penn. 2006) (engineer allowed to testify improper or deficient testing rendered vehicle design defective and unsafe, based in part on his review of test results of another engineer); *accord* Phelan v. Synthes (U.S.A.), 35 F. App'x 102 (4th Cir. 2002) (biomedical engineer not allowed to testify about inadequacy of premarket testing of medical device when underlying opinion that device was unreasonably dangerous was not supported by reliable methodology).

63. *See* Parkinson v. Guidant Corp., 315 F. Supp. 2d 754 (W.D. Pa. 2004) (metallurgist who reviewed fractographs was allowed to testify in product liability action that manufacturing flaws caused the premature fracture of guidewire used in angioplasty); Hickman v. Exide, Inc., 679 So. 2d 527 (La. Ct. App. 1996) (expert in, among other things, fracture analysis was allowed to testify about cause of explosion of car battery in product liability action); Reif v. G & J Pepis-Cola Bottlers, Inc., No. CA87-05-041, 1988 WL 14052 (Ohio Ct. App. Feb. 15, 1988) (fractography expert was allowed to testify about cause of break in broken glass bottle).

**EXHIBIT C**

*Reference Guide on Engineering*

## 2. Manufacturing

The manufacture of a product and the quality process through which uniformity of ingredients, processes, and the final product are ensured may properly be the subject of product safety litigation. Testimony of engineers with experience in designing and implementing manufacturing systems to ensure product quality may be critical in resolving product disputes and helpful to the court and trier of fact.[64]

## 3. Warnings

Warnings issues in product liability cases are at the intersection of factual evidence and legal standards and thus are particularly difficult for the court and/or other trier of fact to resolve. Many product disputes involve claims concerning the adequacy of warnings that accompanied the product when it was first sold. In these cases, the focus may be on what was known through the conception and design phases of the design process and the necessity for and adequacy of warnings that accompanied the product in view of that knowledge. Other disputes center upon the warnings that were added or could have been added after the product had been used and the company received feedback from users of the product. The reasonableness of the company's response to these reports may be an issue. Thus, the case may be decided on the basis of whether the company conducted, or failed to conduct, design and testing activities in view of that information or whether the company modified the product or communicated to users of the product what it knew.

But not all warnings issues are properly the subject of expert testimony, particularly with respect to products that are regulated by federal law.[65] Properly qualified engineers may be able to provide opinions that could help the court and the trier of fact to understand such issues with respect to such products, but

64. *See, e.g.,* Galloway v. Big G Express, Inc., 590 F. Supp. 2d 989 (E.D. Tenn. 2008) (defendant's expert with significant experience in engineering fields, including product design, allowed to testify about manufacturing process used by the defendant); Schmude v. Tricam Indus., Inc., 550 F. Supp. 2d 846 (E.D. Wis. 2008) (discussing generally the propriety of admitting testimony of expert who studied mechanical engineering and had degree in product design regarding manufacturing process for rivets used in ladder that collapsed); Yanovich v. Sulzer Orthopedics, Inc., No. 1:05 CV 2691, 2006 WL 3716812 (N.D. Ohio 2006) (discussing testimony of engineering experts regarding manufacture of medical device). *See also* Pineda v. Ford Motor Co., 520 F.3d 237 (3d Cir. 2008) (metallurgical engineer allowed to testify about explicit procedure for replacing allegedly defective product in order to reduce likelihood of product failure).

65. The FDA's drug approval process may preempt state law product liability claims based on a failure to warn. *See, e.g.,* Riegel v. Medtronic, Inc*.,* 552 U.S. 312, 128 S. Ct. 999 (2008). *See also* Bates v. Dow Agrosciences LLC, 332 F.3d 323 (2005) (discussing preemption of state law product liability claims by the Federal Insecticide, Fungicide, and Rodenticide Act). *But see* Wyeth v. Levine*,* 555 U.S. 555, 129 S. Ct. 1187 (2009) (holding that FDA approval of a drug did not preempt state law tort claim based on inadequate drug warnings).

941

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

nonetheless may not be allowed to testify based on the substantive law applicable to such products.[66]

For example, industrial engineers, or engineers educated in human factors, may have training that allows them not only to testify when warnings are necessary from an engineering perspective (recall the discussion above about the design process), but also about the efficacy of warnings, and development of risk communications including text, pictures, auditory, or visual signals.

## 4. *Other issues*

Issues regarding the sale and marketing of products often concern promises made regarding the expected performance of the product, including both the positive results that a product is able to achieve and, especially, what possible harm that a product may cause. The efficacy of a product may be proved by a straightforward comparison between premarket data on product performance and sales and marketing claims, and engineers may provide helpful testimony regarding the interpretation of such data. There may be a dispute about whether the claims made about the product's safety exceeded the testing results that had been obtained for the product or led to a hazardous situation because the product was not properly tested. These may also be the subject of appropriately qualified engineering testimony.

Common personal injury cases may also present issues on which engineering testimony may be helpful. Such disputes often turn on testimony as to how a particular trauma occurred. Our discussion of biomechanical engineering highlights some of these issues.[67] In a car accident case, properly qualified engineers may provide opinion testimony regarding how an accident occurred, including reconstructing the conduct of each of the parties and how that conduct affected the accident. In a slip-and-fall case, engineering testimony can concern such basic issues as why the injured person slipped and what could have been done to prevent it.

In addition to the above, engineers may also testify about various aspects of a party's damages and give an opinion about whether those alleged damages were caused by the conduct in question. Testimony about causation in a products dispute often involves both factual and legal questions. Through experience, training, and activities in the case, engineers may have the ability to understand the interrelationship between events and thus can provide helpful testimony on whether the asserted damages had a relationship to the asserted misconduct so as to have

66. *See* Pineda v. Ford Motor Co.*,* 520 F.3d 237 (3d Cir. 2008) (metallurgical engineer permitted to testify that safety manual should have contained warning about glass failure in SUV); Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992 (W.D. Wis. 2006) (human factors engineering expert allowed to testify about the adequacy of product warning); Nesbitt v. Sears, Roebuck & Co., 415 F. Supp. 2d 530 (E.D. Pa. 2005) (expert with practical experience as engineer allowed to testify that the plaintiff would have responded to an additional warning); Santoro v. Donnelly, 340 F. Supp. 2d 464 (S.D.N.Y. 2004) (mechanical engineer allowed to testify about adequacy of warnings for fireplace heater).

67. *Supra* Section I.C.

EXHIBIT C

*Reference Guide on Engineering*

been "caused" by it.[68] But issues regarding the standard to apply for the sufficiency of causal proof may be both scientific and legal issues. Thus, the adequacy or admissibility of an engineer's opinion on causation will be evaluated in light of the law, as well as the adequacy of the science that forms the basis for the opinion.[69]

Situations where property damages are asserted may pose special problems on which engineering testimony may be appropriate. For example, determining whether a product problem is an isolated occurrence or whether it is part of a widespread product problem may be difficult to resolve in the absence of engineering testing and analysis, which aims at determining a product defect and a product breakdown process.

## B. Special Issues Regarding Proof of Product Defect

Although the definition of what is defective may be the subject of a jury instruction at trial,[70] proof of a product defect may involve identifying key facts that

---

68. *See, e.g.,* Nemir v. Mitsubishi Motors Corp., 381 F.3d 540 (6th Cir. 2004) (automotive safety engineer allowed to testify that defective seatbelt latching mechanism caused plaintiff's injuries); Babcock v. General Motors, 299 F.3d 60 (1st Cir. 2002) (structural and mechanical engineer allowed to give testimony about impact speed, cause of injuries, how the product allegedly ultimately failed, and testing procedures for the product); McCullock v. H.B. Fuller Co., 61 F.3d 1038 (2d Cir. 1995) (engineer allowed to testify regarding whether plaintiff was within "breathing zone" for hot-melt glue in workplace); Perez v. Townsend Eng'g Co., 545 F. Supp. 2d 461 (M.D. Penn. 2008) (engineer allowed to testify that product was defective, that defect caused plaintiff's injury, and that alternative design would have prevented injury); Farmland Mut. Ins. Co. v. AGCO Corp., 531 F. Supp. 2d 1301 (D. Kan. 2008) (electrical engineer allowed to testify about cause of farm equipment fire); Phillips v. Raymond Corp., 364 F. Supp. 2d 730 (N.D. Ill. 2005) (biomechanical engineer testified as to the mechanics of plaintiff's injury resulting from allegedly defective forklift); Tunnell v. Ford Motor Co., 330 F. Supp. 2d 731 (W.D. Va. 2004) (engineer allowed to testify there was an absence of evidence that the accident was caused by electrical arcing); Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361 (S.D.N.Y. 2003) (expert with substantial experience, education, and knowledge in engineering field allowed to testify about cause of damage to plaintiff); Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470 (D.N.J. 2002) (expert in forensic and safety engineering, among other subjects, allowed to testify that bicycle seat caused the plaintiff's erectile dysfunction); Traharne v. Wayne Scott Fetzer Co., 156 F. Supp. 2d 690 (N.E. Ill. 2001) (electrical engineer allowed to testify about cause of deceased's electrocution); Bowersfield v. Suzuki Motor Corp., 151 F. Supp. 2d 625 (E.D. Pa. 2001) (engineer allowed to testify about causation of automobile passenger's injuries).

69. *See generally* Margaret A. Berger, The Admissibility of Expert Testimony, in this manual; *see also* Michael D. Green et al., Reference Guide on Epidemiology, Section V, in this manual.

70. Restatement (Third) of Torts § 2 (1998) provides that the general definition of a product defect is as follows:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
>
> (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor,

EXHIBIT C

*Reference Manual on Scientific Evidence*

relate to that definition. These issues may be the subjects of the testimony of an engineer. The issue of whether a product is unreasonably dangerous may involve proof of available alternative designs, the existence of modifications to the product that would make it safer (which directs us back to the discussion on risk, above; all products can be made safer at the expense of cost and/or convenience) and what consumers expect the product to do or not to do, to identify a few such issues.[71] Engineers may be asked to engage in testing to determine a cause and/or mechanism of failure and as a basis for an opinion regarding product defect. Such testing may include accelerated testing and end-use testing to replicate the conditions that the products see in use.

To understand the product and its expected or anticipated uses, engineers may review documents regarding the product at issue and published literature about like products or product elements. Visits to sites where the product is or was in use may provide information to engineers about recurring characteristics of product performance and aspects of the environment of use, which bear on that performance. Visual examination, measurements made at the site and experiments conducted at the site and in the laboratory may provide valuable information regarding the characteristics of the product that affect product performance or nonperformance.

In sum, the engineer's problem-solving approach using the design process as described above can provide valuable information about the nature and cause of product problems and the limitations of the design of the product at issue, including the characteristics of the environment of use and the choice of materials for the subject product. Armed with this and other information, properly qualified engineers can provide valuable opinions on issues going to the heart of the question of whether the product at issue is defective and caused the claimed damages.[72]

or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

*See also* Restatement (Second) of Torts § 402A (1965), which defines a defect as one that makes a product "unreasonably dangerous."

71. Martinez v. Triad Controls, Inc., 593 F. Supp. 2d 741 (E.D. Pa. 2009) (engineer allowed to testify about design defects and warnings); Page v. Admiral Craft Equip. Corp., No. 9:02-CV-15, 2003 WL 25685212 (E.D. Tex. 2003) (mechanical engineer allowed to testify about defect in design of bucket and safer alternative).

72. "While an expert's legal conclusions are not admissible, an opinion as to the ultimate issue of fact is admissible, so long as it is based upon a valid scientific methodology and supported by facts. *See* Fed. R. Evid. 704. The 'ultimate issue of fact,' as used in Rule 704, means that the expert furnishes an opinion about inferences that should be drawn from the facts and the trier's decision on such issue necessarily determines the outcome of the case." Strickland v. Royal Lubricant Co., Inc., 911 F. Supp. 1460, 1469 (M.D. Ala. 1995).

**EXHIBIT C**

*Reference Guide on Engineering*

## C. Intellectual Property and Trade Secrets

Engineering testimony may be helpful in disputes regarding patents and other forms of intellectual property. Knowledge has become a key source to wealth in our economy,[73] and we increasingly depend on innovation and the protection of innovation.[74] The federal government's power to protect patents and copyrights is one of only a handful of enumerated powers in the U.S. Constitution.[75] Engineers are at the very heart of technology and innovation and therefore often become natural contributors to the resolutions of disputes involving these subjects.

The issues for factual or expert engineering testimony in this area are closely allied to those highlighted in the above description of the product design process. Key issues concern conception and development of the invention or protected trade secret, commercialization and sales/marketing of the protected concept, infringement or theft of the protected concept, and damages, including proof of willfulness or bad intent. There are a myriad of situations in which engineering testimony may be received. We will highlight a few of them.

The patentability of an idea is measured by its advance over prior art in the relevant field. Almost all new inventions are combinations or uses of known elements. What constitutes prior art and what is the relevant field for such art are thus questions that relate to the conception stage of the design process. Who is a qualified engineer to testify about these issues is answered under the *Daubert* standard. Thus, engineering testimony may be helpful on such issues as whether the invention is new or novel and whether it is non-obvious to one who has ordinary skill in the art. And engineers can help to define the description of the person with ordinary skill and interpret what such a person would learn from the art in question. Prior art is meant to include all prior work in the field. It sometimes connotes "public" prior art, not hidden or unknown art. A properly qualified engineer witness can provide relevant and reliable testimony regarding these and other prior art–related questions.

The rules for using engineering experts in patent infringement proceedings in federal courts are reasonably well defined. For example, under the U.S. Supreme Court's decision in *KSR International Co. v. Teleflex, Inc.*,[76] non-obviousness is

---

73. *See, e.g.,* Thomas A. Stewart, Intellectual Capital (1997).

74. "There is established within the [National Institute of Standards and Technology] a program linked to the purpose and functions of the Institute, to be known as the 'Technology Innovation Program' for the purpose of assisting United States businesses and institutions of higher education or other organizations, such as national laboratories and nonprofit research institutions, to support, promote, and accelerate innovation in the United States through high-risk, high–reward research in areas of critical national need." 15 U.S.C. § 278n. *See also* Prioritizing Resources and Organization for Intellectual Property (PRO-IP) Act of 2008, Pub. L. No. 110-403, 122 Stat. 4256 (2008); America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act, Pub. L. No. 110-69 (2007).

75. U.S. Const. art. I, § 8.

76. 550 U.S. 398 (2007). *See also* Dennison Mfg. Co. v. Panduit Corp., 475 U.S. 809 (1986).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ultimately a question of law for the court to decide. However, the underlying factual determinations, including the secondary factors involved in determining patent validity, remain jury questions concerning which expert engineering testimony may be admitted.[77] Questions regarding the scope and teachings of prior art also may invite engineering testimony and interpretation.[78]

A similar analysis applies to trade secret matters. The nature and scope of the claimed trade secret, including the existence of steps taken to protect the trade secret are all issues where the engineer as a witness may be involved. This is true of protected processes and methods as well as devices or other products of the subject trade secret.[79]

When an assertion is made that intellectual property or protected trade secrets have been infringed, engineering testimony may be necessary on a number of issues as courts attempt to resolve issues regarding identifying features of the challenged device, methods or processes that infringe the protected property.[80] Additional issues may relate to knowledge regarding the protected property and conception and design of the subject of the alleged infringement.[81]

Proof of damages may involve a number of issues that relate to or derive from an engineer's analysis of the scope of claims or protected methods and processes, commercial viability of the subject intellectual property, and scope of protection afforded by the subject patent. Qualification of engineers as witnesses to provide testimony in these areas may present its own challenges under *Daubert* as to both reliability and relevance.

## D. Other Cases

There are many other areas where engineering testimony may be helpful to the court and trier of fact. Because the range of such possible situations is virtually limitless, we will list only a few examples.

---

77. *See* Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1338 (Fed. Cir. 2008).

78. *See, e.g.,* Rosco, Inc. v. Mirror Lite Co., 506 F. Supp. 2d 137 (E.D.N.Y. 2007) (mechanical engineer allowed to present testimony of his review of patent for teaching or suggestion as to meaning of the claims).

79. Am. Heavy Moving & Rigging Co. v. Robb Technologies, LLC, No. 2:04-CV-00933-JCM (GWF), 2006 WL 2085407 (D. Nev. 2006) (in case involving misuse of trade secrets, engineer appointed by the court to assist in making discovery rulings).

80. *See, e.g.,* The Post Office v. Portec, Inc., 913 F.2d 802 (10th Cir. 1990).

81. *See* State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057 (Fed. Cir. 2003) (expert in civil and structural engineering testified about whether different pieces of prior art are in the same field of endeavor as patents at issue); Philips Indus., Inc. v. State Stove & Mfg. Co., 522 F.2d 1137 (6th Cir. 1975) (use of engineering expert to establish the presence of design concept in prior art); Mayview Corp. v. Rodstein, 385 F. Supp. 1122 (C.D. Cal. 1974) (tool engineer testifying about concept of balance in hand-tool design in prior art).

946

EXHIBIT C

*Reference Guide on Engineering*

- Claims of personal injury or property damage resulting from the spread of a toxic substance may involve a number of issues where engineering testimony may be both reliable and relevant.[82]
- Environmental disputes regarding the necessity for and nature of an environmental problem and the responsibility for and cost of its cleanup involve numerous issues concerning which properly qualified engineers may provide reliable and relevant evidence.[83]
- The testimony of an engineer can be helpful in determining causation in both product liability cases and nonproducts liability cases as well. Recent cases in the electrical engineering area demonstrate the range of possible situations where such issues may arise and engineering testimony may be admitted.[84] For example, an electrical engineer was allowed to testify about lightning in *Walker v. Soo Line Railroad Co.*[85] The plaintiff in that case filed suit under the Federal Employees Liability Act. Claiming that he had been injured by lightning while working in a railroad tower, the plaintiff sought to introduce the testimony of the chairman of the electrical engineering department at the University of Florida to the effect that lightning could have struck a number of places in the yard and penetrated the tower without a direct hit. The district court excluded the evidence and the Seventh Circuit reversed, finding that the jury would have been helped by hearing the engineer's testimony about the ways in which lightning could have struck the tower, even if he could not testify which of the locations was struck or if any of them were struck at all.
- In a slightly different context than might be expected, an electricity transmission line planning engineer testified as an expert at a administrative hearing in *California Public Utilities Commission v. California Energy Resources Conservation & Development Commission.*[86] The dispute in that case was the extent of the CERCDC's jurisdiction over transmission line siting, and more specifically the interpretation of a section in California's

---

82. *See, e.g.,* Jaasma v. Shell Oil Co., 412 F.3d 501 (3d Cir. 2005) (civil and environmental engineer permitted to testify about environmental status of real property, which was relevant to damages and efforts to mitigate); *In re* Train Derailment Near Amite La., No. Civ. A. MDL. 1531, 2006 WL 1561470 (E.D. La. 2006) (court relied on declaration of environmental engineer regarding exposure to airborne contaminants in concluding that claims of potential class were not based on actual physical harm).

83. Olin Corp. v. Lloyd's London, 468 F.3d 120 (2d Cir. 2006) (admission of environmental civil engineer testimony on issue of property damage in pollution liability insurance coverage case not an abuse of discretion).

84. *See, e.g.,* Newman v. State Farm Fire & Cas. Co., 290 F. App'x. 106 (10th Cir. 2008) (electrical engineer was allowed to testify about the origin of fire that destroyed insureds' house); McCoy v. Whirlpool Corp., 287 F. App'x 669 (10th Cir. 2008) (electrical engineer was allowed to testify in product liability case that manufacturing defect in dishwasher caused fire).

85. 208 F.3d 581 (7th Cir. 2000).

86. 50 Cal. App. 3d 437 (Cal. Ct. App. 1984).

947

EXHIBIT C

> Public Resources Code which defined "electric transmission line" as "any electric power line carrying electric power from a thermal power plant located within the state to a point of junction with any interconnected transmission system."[87] The engineer, employed by Pacific Gas & Electric, testified at the hearing before the CERCD about the use of certain terms in the industry related to that definition and about electricity transmission principles. The court subsequently relied on that testimony in part in determining that "electric transmission line" had a plain meaning, and that the plain meaning cut off the CERCDC's jurisdiction at the first point at which a power line emanating from a thermal power plant joined to the interconnected transmission grid.

- Civil engineers have been allowed to testify in a broad range of circumstances also, including those involving an improper application of the design process in the building of a bridge. Numerous examples of situations involving roles of engineers involved in building bridges, which ultimately failed, have been described in an earlier version of this guide.[88] In each of those situations, engineering testimony from engineers who were involved in the design of the bridge or who had experience in designing other bridges or who had experience with design generally could be qualified to testify in an inquiry or lawsuit about the causes and financial implications of the failures.

# VII. What Are Frequent Recurring Issues in Engineering Testimony?

## *A. Issues Commonly in Dispute*

Following are several issues with which engineers frequently are confronted in the course of attempting to give testimony as experts. Each of them is controlled by the specific fact pattern that gives rise to the case and the way in which the case is presented. In this section we describe the *issues as they are perceived by the engineer in the courtroom*. Because this is not a treatise on the procedural or substantive law at issue, we do not summarize the state of the law on each issue. We assume that the court and other readers of this guide are familiar with the applicable law on these issues.

---

87. *Id*. at 440.

88. Petroski, *supra* note 45, at 593–94, 597–600, 604–06, 608–09, 612–13.

**EXHIBIT C**

*Reference Guide on Engineering*

## 1. Qualifications

In an earlier section of this guide (Section III.C.2), we referred to the *Stringfellow* case.[89] An important aspect of this litigation revolved around estimates of the mass of toxic materials released over a long time period some 20 to 30 years after the fact. To reconstruct events long past, a chemical engineer used aerial photographs of the site taken during its period of operation to estimate the surface areas of the toxic waste ponds. His qualifications were challenged under *Frye v. United States*[90] because he was not a photogrammist. Despite having a background and credentials to support the work he did using the aerial photographs, but not the pedigree, the court found that a photogrammist would need to confirm his findings. In the end a photogrammist corroborated the engineer's work. This is but one example of an all too common situation where an engineering expert's qualifications have been challenged based on "name" rather than on relevant and documented experience. Under *Daubert,* there may be even more pressure on the court to assess who can or cannot testify as an expert. But this example illustrates that a court should be cautious about drawing conclusions about an expert's qualifications based solely on titles, licenses, registration, and other such documentation.

## 2. Standard of care

Another common issue for engineers to confront in their testimony is the standard of care. Engineers do not think of the concepts of standard of care and duty of care as they relate to tort law, particularly negligence. Instead, for many engineers, "standard of care" means "how we do it in my office" or some variation thereof.

Following the Oklahoma City bombing, a structural engineering expert prepared a report regarding blast damage and progressive collapse for the U.S. Attorney prosecuting McVeigh. In an attempt to block this testimony, McVeigh's defense team obtained an affidavit from an engineer with a well-known structural engineering firm to the effect that the prosecution expert's report did not meet minimal standards for a building condition report because it did not include detailed architectural and structural drawings, measurements, and specifications, all of which were irrelevant to the issues at bar. The defense expert engineer argued essentially that he and his firm were leaders in the field of building assessment reports and therefore what they did set the standard. He was wrong on two counts: (1) the practice of any single firm or office does not establish the standard of care, and (2) the standard of care for one technical purpose (condition assessment of commercial buildings with leaky curtain walls) cannot be applied to another technical purpose (determination of number of bombs employed to destroy a building) just because both involve buildings and engineers.

---

89. United States v. Stringfellow, No. CV 83-2501 JMI, 1993 WL 565393 (C.D. Cal. Nov. 30, 1993).

90. 293 F. 1013 (D.C. Cir. 1923).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

The phrase "standard of care" has various meanings and connotations to engineers that are somewhat discipline specific. Standard of care in the medical sciences may be different than standard of care in some other context. In engineering, it can be said that the standard of care is met whenever the design process was properly employed at the point in time that the event or incident happened. Although the design process itself is "fixed," when properly applied to a problem in the 1940s and again to the same problem in 2009, the design outcome can be quite different and indeed might be expected to be so. Even so, the standard of care may be met each time.

### 3. *State of the art*

"State of the art" has a specific meaning in the law and may be the subject of a particular statute in many jurisdictions. In addition, state of the art can be a distinct defense in many states.[91] To engineers, however, its meaning may be slightly different.

Simply put, this phrase refers to the current stage of development of a particular technology or technological application. It does not imply that it is the best one can ever hope for but is merely a statement that at whatever point in time referenced, technology was in a certain condition or form. For instance, the Intel 4004 4-bit microprocessor was state of the art in 1971 whereas the Intel 64-bit microprocessor was the state of the art in 2006. Of course, there is the question as to whether in either of these cases those microprocessors were state of the art for just Intel, for all American semiconductor companies, or for all semiconductor companies in the world. The question of the context in which this phrase is used often lies at the heart of disputes. Because appropriate context may be difficult to pin down, experts are often challenged with defining the "state of the art" in relation to a particular technology or application. The answer from an engineering perspective is often an assumption, nothing more, nothing less. As such, from an engineering perspective, it is best to accept this phrase as a general colloquialism that is difficult to define even though it is simple to state.

### 4. *Best practice*

Although this term is used colloquially and oftentimes in "business" activities, to engineers it is not a phrase that is easily quantifiable and suffers from meaning different things to different people. Despite this, it generally refers to the notion that at any point in time there exists a method, technique, or process that is preferred over any other to deliver a particular outcome. That being said, there is great latitude in how one goes about determining that preference and associating it with the desired outcome. So, although it sounds good, this phrase is fraught

---

91. *See, e.g.,* Ariz. Rev. Stat. § 12–683(1) (2009); Colo. Rev. Stat. § 13–21–403(1)(a) (2009); Ind. Code § 34–20–5–1(1) (2009).

950

**EXHIBIT C**

*Reference Guide on Engineering*

with ambiguity. In the end, the more important issue is whether there was adherence to the design process.

## 5. Regulations, standards, and codes

An issue that often arises in matters involving buildings and structures is the distinction between design codes and physics (political laws vs. physical laws) in the context of failure analysis. Design codes and standards are very conservative political documents. They are conservative because they are intended to address the worst-case scenario with a comfortable margin of safety. But buildings do not fail because of code violations—they fail according to the laws of physics. They do not fail when the code-prescribed loads exceed the code-prescribed strength of the materials—they fail when the actual imposed loads exceed the physical strength of the components. Buildings fail not when the laws of man are ignored but when the laws of physics are violated. Examples of this are most common in the context of earthquake-damaged structures. Buildings are not designed to resist 100% of expected earthquake forces. Rather, they are designed to resist only a fraction of the expected load (typically about one-eighth) without permanently deforming. The code implicitly recognizes that buildings are much stronger than assumed in design and also have considerable ability to absorb overloads without failure or collapse. Yet following an earthquake, engineers may inappropriately compare the ground accelerations recorded by the U.S. Geological Survey with design values in the code.

In the Northridge, California earthquake, recorded acceleration values were 2–3 times greater than the design code values. Many engineers concluded that the buildings had been "overstressed" by 200–300% and were thus extensively damaged, even if that damage was not visually apparent. In a line of reasoning remarkably similar to that of the plaintiff's expert in *Kumho*,[92] the damage was "proved" analytically, even though it could not be physically seen (or disproved) in the building itself. (If the same logic were applied to cars, every car that sustained an impact greater than the design capacity of the bumper would be a total loss.) If this approach was accepted, the determination of damage could only be done by a few wizards with supposedly sophisticated, yet often unproven, analytical tools. The technical issues in the Northridge situation were thus removed from the realm of observation and common sense (where a jury has a chance of understanding the issues) to the realm of arcane analysis where the experts have the final say.

This is not to say that standards and codes do not have their place in the courtroom. We described above how standards are often used by engineers to conduct tests, and cases that involve malpractice or standard-of-care may often critically examine if a particular code was followed in the course of a design. On

92. 526 U.S. 137 (1999). In *Kuhmo*, the expert inferred the defect from an alleged set of conditions, even though the alleged defect was not observed.

951

EXHIBIT C

*Reference Manual on Scientific Evidence*

the other hand, failure to use a code, or comparison of code values to actual values does not guarantee that a disaster will occur. Common sense is often the best judge in these situations—if a code value is exceeded, yet no damage is observed, it is likely that the conservative nature of the code met its objectives and protected its subject.

## *6. Other similar incidents*

From an evidentiary perspective, evidence of similar or like circumstances has a number of evidentiary hurdles to overcome before it can be admitted into evidence.[93] To an engineer, however, the concept of similarity or "other similar incidents" (OSIs) has a somewhat different meeting and describes the types of circumstances and documentation of such circumstances that an engineer can rely on as a basis for his or her opinions. Although this section focuses primarily on product design issues, the underlying theme is nonetheless broadly applicable across the domain of engineering forensics.

Sometimes these other events are recorded in documentary form and relate to events regarding product performance characteristics, product failures, product anomalies, product performance anomalies, operational problems associated with product use, product malfunctions, or other types of product failures. These events are sometimes alleged by a party to a dispute to be substantially similar in kind to an event or circumstance that had precipitated the subject case. Alleged OSIs can be documented in multiple forms: (1) written narratives from various sources (consumers, employees of the manufacturer, bystanders to a reported event, insurers' representatives, investigators, law enforcement personnel, owners of a location involved in the dispute at bar, etc.) who might prepare and submit a record of observation to a legal entity who retains those records of submission; (2) telephonic reports of the same character and source as written reports, but documented through telephone reports made to a recording representative or office staff responsible for collecting event reports of interest to a legal entity; (3) electronic submissions of the same character and source as written narratives; (4) reports in a standardized format that are intended to record and document events of interest (the forms may be in written or electronic media; (5) images of events in film or electronic media that may or may not also have been recorded and submitted in alternative formats. As a result, each may have its evidentiary hurdles to overcome before it is admitted into evidence.

Similarly, each OSI may have legal issues regarding authentication, which may be overcome by the repository where the underlying documentation is

---

93. For evidence of other similar incidents (OSIs) to be admissible, the proponent must show that the OSIs are (1) relevant, *see* Fed. R. Evid. 401; (2) "substantially similar" to the defect alleged in the case at bar; and (3) the probative value of the evidence outweighs its prejudicial effect, *see* Fed. R. Evid. 403. Some courts merge the first two requirements; to be relevant, the OSIs must be substantially similar to the incident at issue.

952

**EXHIBIT C**

*Reference Guide on Engineering*

found. The repositories of documents and reports that may be alleged to be OSIs to an issue at bar can have many original purposes, and a collection of such documents may serve multiple purposes for the owner institution. Such document collections may be used by the owner of the repository for various administrative purposes, accounting, claims management and resolution, an archive of information and/or data, database management, institutional knowledge building, warranty management, in-service technology performance assessment and discovery, service records, customer interactions, and satisfaction of regulatory specifications or requirements, to name a few. Discovery requests may call for the owner of the materials to search and retrieve records, documents, and reports from such repositories even if the collections and repositories themselves may not have been constructed for the purposes of document search and retrieval. Sometimes engineers can be of use in searching and retrieving potentially relevant materials.

OSIs are discovered and may be offered into evidence to (1) demonstrate prior knowledge on the part of the record owner regarding an alleged defect or danger manifest to the consuming public that is causally related to the issue at bar; (2) demonstrate by the number, volume, or rate of reports that a defect exists; and/or (3) demonstrate careless disregard for the safety of others.[94] To be admitted or relied upon by an engineering expert, the proponent must demonstrate that the event recorded and reported is "substantially similar" to the issue at bar.[95] Testifying engineers can be useful in identifying and describing the specific characteristics that must be known and shown to make an assessment of similarity, including specifying objective parameters for determinations of the degree of similarity or dissimilarity and detailing the objective parameters and physical measurements necessary and sufficient to determine substantial similarity. The conditions that are necessary and sufficient to demonstrate substantial similarity include the following: (1) the product or circumstance in the alleged OSI must be of like design to the product or condition at issue in the instant case; (2) the product or circumstance in the alleged OSI must be of like function to the product or condition at issue in the instant case; (3) the application to which the product had been subjected must be like the application to which the product at issue in the instant case was subjected; and (4) the condition of the product, its state of repair, and/or its relevant state of wear must be like the state of repair and the relevant state of wear of the product that had been involved in the instant case.[96] Engineers can contribute to a technical understanding of each of these dimensions and, in some cases, they may be able

---

94. *See, e.g.,* Sparks v. Mena, No. E2006-02473-COA-R3-CV, 2008 WL 341441, at *2 (Tenn. Ct. App. Feb. 6, 2008); Francis H. Hare, Jr. & Mitchell K. Shelly, *The Admissibility of Other Similar Incident Evidence: A Three-Step Approach*, 15 Am. J. Trial Advoc. 541, 544–45 (1992).

95. *See, e.g.,* Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1126 (10th Cir. 2004); Whaley v. CSX Transp. Inc., 609 S.E.2d 286, 300 (S.C. 2005); Cottrell, Inc. v. Williams, 596 S.E.2d 789, 793–94 (Ga. Ct. App. 2004).

96. *See, e.g.,* Brazos River Auth. v. GE Ionics, Inc., 469 F.3d 416, 427 (5th Cir. 2006); Steele v. Evenflo Co., 147 S.W.3d 781, 793 (Mo. Ct. App. 2004).

EXHIBIT C

*Reference Manual on Scientific Evidence*

to apply objective measures to questions of substantial similarity and thus quantify the level of similarity between an event proffered as an OSI and the instant case.

The reverse is also true. Failure to establish likeness in any of these dimensions is failure to demonstrate substantial similarity to the circumstances of the subject case.[97] If one or more of the necessary and sufficient conditions are unknown or unknowable, the test of substantial similarity also fails; the lack of demonstrable similarity is a lack of substantial similarity.

To demonstrate like design, a product or condition need not be identical in all aspects of form.[98] It must simply be similar in form to the product or condition at issue in the instant case.[99] Consider a machine control design with a feature alleged to have been the proximate cause of an injury-producing event that gave rise to a product liability lawsuit. Events proffered as OSIs that involve products having an identical control design meet the test of "likeness" in design. In addition, other control designs that differ in aspects not related to the feature that is alleged to have served as the proximate cause for the instant injury event may also be considered to be "like" if the relevant design elements on the two products cannot be differentiated. Engineers can assess the design elements of the control, determine which features may be relevant to questions of design likeness, and provide testimony to answer such questions.

Like function can be demonstrated if the operational purpose of the product or condition defined in the alleged OSI is similar to the function of the product or condition in the instant case. In the control design hypothesized above, a control that is applied to command the dichotomous functional states to start and stop (either "on" or "off") a crane winch might serve the same operational purpose to start and stop another type of equipment or winch. In such a case, the functions and purpose of the control design may be alike. If however, that same control design is applied to a machine in which the operational purpose is not simply to command a dichotomous "on" or "off" signal, but rather its purpose is to provide a modulated signal to which the machine response is a continuously variable function of control placement, the control design function is unlike the purpose of dichotomous positioning. Engineers can provide assessments and analyses of the functions embedded in a specific design and assist in the determination of likeness or lack of likeness between an instant condition and one proffered as an OSI.

Like application can be demonstrated if it can be shown that the operational conditions to which the product is subject are alike in the proffered OSI and in the instant case.[100] The environmental exposure to which a product is subjected must be of like condition. A control design function can vary with temperature,

97. *See, e.g.,* Peters v. Nissan Forklift Corp. N. Am., No. 06-2880, 2008 WL 262552, at *2 (E.D. La. Feb. 1, 2008); Whaley v. CSX Transp., Inc., 609 S.E.2d 286, 300 (S.C. 2005).
98. *See, e.g.,* Bitler v. A.O. Smith, 391 F.3d 1114, 1126 (10th Cir. 2004).
99. *Id*.
100. *See, e.g.,* Steele v. Evenflo Co., 147 S.W.3d 781, 793 (Mo. Ct. App. 2004).

EXHIBIT C

*Reference Guide on Engineering*

air or water exposure, reactions to corrosive elements, reactions to acid or base contaminants, and in potential interactions with surrounding materials and components that can be of differing electrochemical potential. Engineers with the appropriate technical background can evaluate operating conditional applications and determine if the conditions that obtain for a proffered OSI are similar to those that had obtained in an instant case, thereby assisting the determination of substantial similarity.

Differing environmental exposures resulting from differing applications may render an event proffered as an OSI unlike and not substantially similar. Further, like applications must comprehend that the load and stress conditions to which a product or condition is placed is substantially similar to the circumstances that obtained in the instant case to which the OSIs are being proffered for comparison. In our control design identified above, the control device may be manually actuated through a lever. Levers of differing length will apply differing forces to the control device and produce differing operational stresses upon the control device itself. The durability and performance of the control design itself can be affected by these differing operating applications, and anomalies or failures under one application may not be at all similar to those that obtain under differing circumstances in which the operating loads and applied stresses are different. Engineers are well qualified to assess conditions of comparative loading and applied stresses.

A like state of repair can be demonstrated if there is reasonable evidence that products involved in the proffered OSI are (1) in a specific working order, (2) in a condition of adjustment (if possible to adjust), (3) in a state of wear, and (4) within an expected range of tolerance that would not differentiate the product or condition from that which obtained in the product or condition involved in the instant case. Additionally, the products or conditions reported in the proffered OSIs must be shown to be free of modification from an original design state, or must be shown to be in a state of modification that is reflective of the product or condition involved in the instant case.[101] An absence of evidence to demonstrate a state of likeness in application, operating environment, state of repair and wear, or state of modification is not sufficient to show similarity. Engineers with appropriate background can review data and information about modifications and service conditions related to wear and wear rates, as well as assess information related to the state of repair or disrepair, and thereby contribute to understanding of the level of similarity or dissimilarity among specific events and operational conditions.

For evidentiary reasons, OSIs generally are not admissible to demonstrate the truth of the matter recorded therein.[102] Event records are necessarily reports of noteworthy events made after the fact by parties who may or may not have an interest in establishing a specific fact pattern, may or may not be qualified to

---

101. *See, e.g.,* Cottrell, Inc. v. Williams, 596 S.E.2d 789, 791, 794 (Ga. Ct. App. 2004).
102. Fed. R. Evid. 801 & 802.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

make the observations and assertions included in such reports, and may or may not have any specialized training necessary to evaluate proper system function or state of repair. The persons who report events collected and offered as OSIs may not be fully informed of the set of circumstantial conditions that are necessary and sufficient to determine causation of the reported event. Thus, often-reported events have incomplete or insufficient data and information to determine substantial similarity. Even if informed, persons reporting events may not have the correct observational powers, tools, and insights necessary for accurate evaluation and reporting. The individuals who make reports regarding recorded events may be unable to factually assess and accurately report all of the conditions relevant to determination of event causation and resolution of questions regarding substantial similarity. Reports of events made by parties who may have an interest in economic recovery or other compensation may not always accurately disclose known or knowable facts that could bear on determinations of causation and substantial similarity. Furthermore, some parties may have an economic or other interest in the outcome of a report or claim. Therefore, such reports, if offered to prove the truth of the other incidents, are typically excluded as hearsay (unless the business records exception applies).[103]

## B. Demonstratives and Simulations

Computer animations, simulation models, and digital displays have become more common in television and movies, especially in entertainment media concerning forensic investigation, law enforcement, and legal drama. The result is an increased expectation among the court and juries that visual graphics and displays will be used by engineering experts and other expert witnesses to explain and illustrate their testimony. Additionally, boxed presentation software such as PowerPoint, is often a technology used. Attorneys and their clients typically expect their experts will use computer animations, simulations, and/or exhibits to educate the jury and demonstrate the bases for their opinions. When used correctly, these tools can make the expert's testimony understandable and can leave a lasting impression with the trier of fact of that party's theory of the case. For that very reason, the role of the court as the gatekeeper for use of these demonstratives has become increasingly critical. As the technology underlying these tools rapidly advances, the court's task likewise becomes more difficult. In assessing the validity of these tools, the court is often forced to decide whether the visual display accurately represents the evidence and/or is supported by the

---

103. *See* Willis v. Kia Motors Corp., No. 2:07CV062-PA, 2009 WL 2351766 (N.D. Miss. July 29, 2009) (finding customer complaints of similar accidents were not hearsay because they were offered to notice, not the truth of the matter asserted, and even if they were hearsay, they fell under the business records exception of Fed. R. Evid. 803(6)).

EXHIBIT C

*Reference Guide on Engineering*

expert's opinions and qualifications.[104] To assist the court in this difficult task, we present some guidance regarding the types of technology presently in use and the strengths and weaknesses of each.

A primary basis for misunderstanding and uncertainty is the difference between a computer animation and a computer simulation. An animation is a sequence of still images graphically illustrated (two dimensions) or modeled (three dimensions), and are often textured and rendered to create the illusion of motion. A cartoon is a simple example. There are no constraints inherent in an animation, and the laws of physics, or any other science, do not necessarily apply (a black mouse can be dressed in red shorts with yellow shoes and be made to dance, sing, and fly). The lack of imposed restriction does not make the animation deficient a priori; if the still images that comprise the animation are accurate in their representation of individual snapshots of time, then the animation itself can be proven precise. The converse, of course, is also true.

Animations contain key frames that define the starting and ending points of actions, with sequences of intermediate frames defining how movements are depicted. For example, a series of still photographs can depict the path of a vehicle vaulting off an embankment, with a single image at the takeoff, mid–flight, and landing positions each correct in its representation. However, when an animation of the event is created, the intermediate frames fill in the missing areas, and if so desired, contrary to known physical phenomena, the animation could show the vault trajectory of the vehicle to remain flat and then suddenly drop, similar to the inaccurate representation of motion experienced by a cartoon coyote momentarily contemplating his fate after chasing a bird off a cliff. Thus, in an animation, some of the inputs (stills) may represent reality, but the sum of the parts (intermediate frames) may not.

Unlike an animation, a simulation is a computer program that relies on source data and algorithms to mathematically model a particular system (see, e.g., the discussion on finite element modeling, above), and allows the user to rapidly and inexpensively gain insight into the operation and sensitivity of that system to certain constraints. Perhaps the most common example of a simulation can be found daily as a computer-generated image showing the predicted growth of a storm system.

On the surface, a simulation would seem to provide more accuracy than an animation. However, this is not necessarily the case. The simulation model is only as accurate as its input data and/or constraining variables and the equations that form its calculation stream. Simulation models also require a sensitivity analysis— just because a model produces an answer does not mean that it is the best model or

---

104. *See* Lorraine v. Market Am. Ins. Co., 241 F.R.D. 534 (D. Md. 2007) (distinguishing between demonstrative computer animations and scientific computer simulations and discussing the evidentiary requirements, including authentication, for each); People v. Cauley, 32 P.3d 602 (Colo. Ct. App. 2001) (same).

EXHIBIT C

*Reference Manual on Scientific Evidence*

the most correct answer. For example, a computer model depicting the motions of a vehicle prior to and after an impact with a pole may be correct if it matches the known physical evidence (e.g., tire marks and vehicle damage). However, whether the model is accurate depends on the accuracy of the inputs for tire friction, vehicle stiffness, vehicle weight, location of the vehicle's center of gravity, etc. Even if the inputs are accurate, once a solution is found, other solutions may exist that also match the evidence. Assessing the accuracy of each solution requires an iterative process of making changes to those variables believed to have the greatest effect on the output. Simply put, the difference between a vehicle accident simulation model that predicts 10 inches of crush deformation and two complete revolutions post impact versus 14 inches of crush and three complete revolutions may depend on just a few selected vehicle characteristics. Thus, compared to an animation, in a simulation model, the sum of the constraining variables and equations may represent reality, but some of the user-selected inputs may not.

The difficulty for the court is the need to decide whether some or all of the computer animation or simulation accurately represents the facts and/or opinions of the expert.[105] This is not an easy endeavor, but can usually be executed in a reasonable fashion for simulations by evaluating whether the simulation has been validated. If the underlying program predicts the behavior of vehicles in a crash, it can be validated by crashing vehicles under controlled conditions, and comparing the actual results to those predicted by the simulation. If the software in question predicts the response of a complex object to applied forces, it can be validated by modeling a simple object, the response of which can be calculated by hand, and comparing the simulation to those known results.[106]

Similarly, for animations, engineers need to establish authenticity, relevance, and accuracy in representing the evidence using visual means.[107] They may rely on blueprint drawings, CAD (computer-aided design) drawings, U.S. Geological Survey data, photogrammetry, geometric databases (vehicles, aircraft, etc.), eye-witness statements, and field measurements to establish accuracy of an animation.

# VIII. Epilogue

Most engineers are not educated in the law and to them the setting of a deposition or a courtroom is peculiar and often uncomfortable. The rules are different

---

105. *See id.*

106. *See* Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534 (D. Md. 2007); Livingston v. Isuzu Motors, Ltd., 910 F. Supp. 1473 (D. Mont. 1995) (finding computer simulation of rollover accident by expert to be reliable and admissible under *Daubert* whether computer program was made up of various physical laws and equations commonly understood in science, program included case-specific data, and expert's computer simulation methodology had been peer reviewed).

107. *See, e.g.,* Friend v. Time Mfg. Co., No. 03-343-TUC-CKL, 2006, WL 2135807 (D. Ariz. July 28, 2006); People v. Cauley, 32 P.3d 602 (Colo. Ct. App. 2001).

**EXHIBIT C**

from those to which they are accustomed. The conversations are somewhat alien. Treading in this unfamiliar territory is a challenge. And so, although it is important for the engineer to "fit" into this environment, it is equally important for the triers of fact and the court to understand the engineer's world. We hope this chapter has provided a glimpse into that world, and by considering it, the reader will have some insight as to why engineers respond to questions as they do. The foundation that underlies and supports essentially all that has been done and all that will be done by engineers is the design process. It is the roadmap for innovation, invention, and reduction to practice that characterizes those who do engineering and who call themselves "engineers." It is the key metric against which products and processes can be and should be evaluated.

# IX. Acknowledgments

The authors would like to thank the following for their significant contributions: Dr. Roger McCarthy, Robert Lange, Dr. Catherine Corrigan, Dr. John Osteraas, Michael Kuzel, Dr. Shukri Souri, Dr. Stephen Werner, Dr. Robert Caligiuri, Jeffrey Croteau, Kerri Atencio, and Jess Dance.

EXHIBIT C

EXHIBIT C

# Appendix A
# Biographical Information of Committee and Staff

**Jerome P. Kassirer (Co-Chair)** served as the Editor-in-Chief of the *New England Journal of Medicine* (1991–1999). He is currently Distinguished Professor of Medicine at Tufts University School of Medicine where he has also served as vice chairman of the Department of Medicine. Dr. Kassirer has served on the American College of Physician's Board of Governors and Board of Regents, chaired the National Library of Medicine's Board of Scientific Counselors, and is past chairman of the American Board of Internal Medicine. He is a member of the Association of American Physicians, the Institute of Medicine of the National Academies, and the American Academy of Arts and Sciences. Dr. Kassirer's current interests are reliable approaches to the assessment of the quality of health care, professionalism, ethical scientific conduct, and patient involvement in decisionmaking. He has been highly critical of for-profit medicine, abuses of managed care, and political intrusion into medical decisionmaking. Dr. Kassirer received his M.D. from the University of Buffalo School of Medicine and trained in internal medicine at Buffalo General Hospital. He trained in nephrology at the New England Medical Center. His latest book, on financial conflicts of interest in medicine, entitled *On the Take: How Medicine's Complicity with Big Business Can Endanger Your Health*, was published by Oxford University in 2004. He has also published extensively on nephrology, medical decisionmaking, and the diagnostic process.

**Gladys Kessler (Co-Chair)** was appointed to the United States District Court for the District of Columbia in July 1994. She received a B.A. from Cornell University and her LL.B. from Harvard Law School. Following graduation, Judge Kessler was employed by the National Labor Relations Board, served as legislative assistant to a U.S. senator and a U.S. congressman, worked for the New York City Board of Education, and then opened a public interest law firm. In June 1977, she was appointed Associate Judge of the Superior Court of the District of Columbia. From 1981 to 1985, Judge Kessler served as Presiding Judge of the Family Division and was a major architect of one of the nation's first Multi-Door Courthouses. She was president of the National Association of Women Judges from 1983 to 1984, served on the Executive Committee of the ABA's Conference of Federal Trial Judges and the U.S. Judicial Conference's Committee on Court Administration and Management. She is a board member and has been chair of the board of directors of Our Place, D.C., an organization devoted to serving the

EXHIBIT C

needs of incarcerated women returning to the community. She now chairs the District of Columbia Commission on Disabilities and Tenure.

**Ming W. Chin** was appointed to the California Supreme Court in March 1996. Before being named to the high court, Justice Chin served from 1990 to 1996 on the First District Court of Appeal, Division Three, San Francisco. Prior to his appointment to the Court of Appeal, Justice Chin served on the bench of the Alameda County Superior Court. Previously, Justice Chin was a partner in an Oakland law firm specializing in business and commercial litigation. He also served as a prosecutor in the Alameda County District Attorney's office. Justice Chin earned his bachelor's degree in political science and law degree from the University of San Francisco. After his graduation from law school, Justice Chin served 2 years as a Captain in the U.S. Army, including a year in Vietnam, where he was awarded the Army Commendation Medal and the Bronze Star. Justice Chin chairs the Judicial Council of California's Court Technology Advisory Committee, as well as the California Commission for Impartial Courts. He frequently lectures on DNA, genetics, and the courts. Justice Chin served as chair of the Judicial Council's Science and the Law Steering Committee. In 2009 the Judicial Council named him California Jurist of the Year. He is an author of *California Practice Guide: Employment Litigation* (The Rutter Group 2011). He is also an author of *California Practice Guide: Forensic DNA* (The Rutter Group, to be published in 2012).

**Pauline Newman** is a Judge on the United States Court of Appeals for the Federal Circuit. She received a B.A. degree from Vassar College in 1947, M.A. in pure science from Columbia University in 1948, Ph.D. in chemistry from Yale University in 1952, and LL.B. from New York University School of Law in 1958. She was admitted to the New York bar in 1958 and to the Pennsylvania bar in 1979. Judge Newman worked as research scientist for the American Cyanamid Company from 1951 to 1954; as patent attorney and house counsel for the FMC Corp. from 1954 to 1984; and, since 1969, as director of the FMC Patent, Trademark, and Licensing Department. On leave from FMC Corp. in 1961–62, she worked for the United Nations Educational, Scientific and Cultural Organization as a science policy specialist in the Department of Natural Sciences. Offices in scientific and professional organizations include member of Council of the Patent, Trademark and Copyright Section of the American Bar Association, 1982–84; board of directors of the American Patent Law Association, 1981–84; vice president of the United States Trademark Association, 1978–79, and member of its board of directors, 1975–76, 1977–79; member of board of governors of the New York Patent Law Association, 1970–74; president of the Pacific Industrial Property Association, 1978–80; member of executive committee of the International Patent and Trademark Association, 1982–84; member of board of directors of the American Chemical Society, 1973–75, 1976–78, 1979–81; member of board of directors of the American

EXHIBIT C

*Appendix: Biographical Information of Committee and Staff*

Institute of Chemists, 1960–66, 1970–76; member of the board of trustees of Philadelphia College of Pharmacy and Science, 1983–84; member of patent policy board of State University of New York, 1983–84; member of national board of Medical College of Pennsylvania, 1975–84; and member of board of directors of Research Corp., 1982–84. Service on government committees included State Department Advisory Committee on International Intellectual Property, 1974–84; Advisory Committee to the Domestic Policy Review of Industrial Innovation, 1978–79; Special Advisory Committee on Patent Office Procedure and Practice, 1972–74; and member of the U.S. Delegation to the Diplomatic Conference on the Revision of the Paris Convention for the Protection of Industrial Property, 1982–84. Judge Newman received the Wilbur Cross Medal of Yale University Graduate School, 1989; the Jefferson Medal of the New Jersey Patent Law Association, 1988; the Award for Outstanding Contributions in the Intellectual Property Field of the Pacific Industrial Property Association, 1987; Vanderbilt Medal of New York University School of Law, 1995; and Vassar College Distinguished Achievement Award, 2002. She was Distinguished Professor of Law, George Mason University (adjunct faculty), served on the Council on Foreign Relations, and was appointed judge of the U.S. Court of Appeals for the Federal Circuit by President Reagan and entered upon duties of that office on May 7, 1984.

**Kathleen McDonald O'Malley** was appointed to the United States Court of Appeals for the Federal Circuit by President Barack H. Obama on December 27, 2010. Prior to joining the Federal Circuit, Judge O'Malley was a District Judge on the United States District Court for the Northern District of Ohio, a position to which she was appointed by President William J. Clinton on October 12, 1994. Prior to her appointment to the bench, Judge O'Malley served as First Assistant Attorney General and Chief of Staff in the Office of the Attorney General for the State of Ohio from 1992 to 1994, and Chief Counsel in that office from 1991 to 1992. From 1983 to 1991, Judge O'Malley was in private practice, where she focused on complex corporate and intellectual property litigation; she was with Porter, Wright, Morris & Arthur from 1985 to 1991 and with Jones Day from 1983 to 1985. As an educator, Judge O'Malley has taught patent litigation at Case Western Reserve University School of Law and is a regular lecturer on issues arising in complex litigation, including intellectual property matters. Judge O'Malley began her legal career as a law clerk to the Honorable Nathaniel R. Jones, United States Court of Appeals for the Sixth Circuit, from 1982 to 1983. She received her J.D. degree from Case Western Reserve University School of Law, Order of the Coif, in 1982, and her undergraduate degree from Kenyon College in Gambier, magna cum laude and Phi Beta Kappa, in 1979. She received an honorary Doctor of Laws degree from Kenyon College in 1995.

**Jed S. Rakoff** has been a United States District Judge for the Southern District of New York since 1996. Prior to his appointment, he was a partner at Fried,

EXHIBIT C

*Reference Manual on Scientific Evidence*

Frank, Harris, Shriver & Jacobson LLP. From 1980 to 1990, he was a partner at Mudge, Rose, Guthrie, Alexander & Ferdon LLP. Judge Rakoff was an Assistant U.S. Attorney for the Southern District of New York from 1973 to 1980 and chief of the Business and Securities Fraud Prosecutions Unit from 1978 to 1980. Before joining the U.S. Attorney's Office, Judge Rakoff spent 2 years in private practice as an associate attorney at Debevoise & Plimpton LLP. He served as a law clerk to the Honorable Abraham L. Freedman, U.S. Court of Appeals for the Third Circuit, in 1969–70. Judge Rakoff is coauthor of five books and author of more than 110 published articles, more than 375 speeches, and more than 900 judicial opinions. He has been a lecturer in law at Columbia Law School since 1988. He was a member of the Board of Managers, Swarthmore College, from 2004 to 2008. Judge Rakoff currently serves as a Trustee for the William Nelson Cromwell Foundation and from 2007–10 served as a member of the Governance Board for the MacArthur Foundation Initiative on Law and Neuroscience. From 1998–2011, he was chair of the Criminal Justice Advisory Board, Southern District of New York; from 2003–11 he was chair of the Second Circuit Bankruptcy Committee; and from 2006–09 he was chair of the Honors Committee of the New York City Bar Association. Since 2001 he has served as chair of the Grievance Committee of the Southern District of New York. He is a Judicial Fellow at the American College of Trial Lawyers and was chair of the Downstate New York Chapter in 1993–94. Judge Rakoff is the former director of the New York Council of Defense Lawyers and former chair of the Criminal Law Committee, New York City Bar Association. He has been a Judicial Fellow at the American Board of Criminal Lawyers since 1995. Judge Rakoff received a B.A. from Swarthmore College in 1964, an M.Phil. from Oxford University in 1966, and a J.D. from Harvard Law School in 1969. He was awarded honorary LL.D.s from Swarthmore College in 2003 and St. Francis University in 2005.

**Channing R. Robertson** is Ruth G. and William K. Bowes Professor and former Dean of Faculty and Academic Affairs, School of Engineering, and Professor, Department of Chemical Engineering, Stanford University. He was named a Bass University Fellow in Undergraduate Education in 2010. Dr. Robertson received his B.S. Chemical Engineering, from the University of California, Berkeley; M.S. in Chemical Engineering, from Stanford University; and Ph.D. in Chemical Engineering—emphasis on fluid mechanics and transport phenomena, from Stanford University. Professor Robertson began his career at the Denver Research Center of the Marathon Oil Company and worked in the areas of enhanced oil recovery, geophysical chemistry, and polyurethane chemistry. Since 1970, he has been on the faculty of Stanford's Department of Chemical Engineering. He has educated and trained over 40 Ph.D. students, holds seven patents, and has published over 140 articles. He is past director of the Stanford-NIH Graduate Training Program in Biotechnology. He was co-director of the Stanford initiative in biotechnology known as BioX, which in part includes the Clark Center for Bio-

964

EXHIBIT C

*Appendix: Biographical Information of Committee and Staff*

medical Engineering and Sciences. He directed the summer Stanford Engineering Executive Program. He received the 1990 Stanford Associates Award for service to the University, the Stanford Associates Centennial Medallion Award in 1991, the 1991 Richard W. Lyman Award, the Society of Women Engineers Award for Teacher of the Year 2000 at Stanford, the Stanford Society of Chicano/Latino Engineers & Scientists Faculty of the Year Award in 2004, and the Lloyd W. Dinkelspiel Award for Distinctive Contributions to Undergraduate Education in 2009. He is a Founding Fellow of the American Institute of Medical and Biological Engineering. Professor Robertson serves on the Scientific Advisory Committee on Tobacco Product Regulation of the World Health Organization and served on the Panel on Science, Technology, and Law, National Research Council, National Academy of Sciences, 1999–2006. Because of his interests in biotechnology, he has consulted widely in the design of biomedical diagnostic devices. He has also served as an expert witness in several trials, including the Copper-7 intrauterine contraceptive cases (United States and Australia), the Stringfellow Superfund case, and most recently the Minnesota tobacco trial. He has cofounded 2 and consulted with over 30 Silcion Valley startups during the past three decades.

**Joseph V. Rodricks** is an internationally recognized expert in the field of toxicology and risk analysis, and their uses in the regulation and evaluation of toxic tort and product liability cases. Since 1980, he has consulted for hundreds of manufacturers, for government agencies, and the World Health Organization, and he has served on 30 boards and committees of the National Academy of Sciences and the Institute of Medicine. He has more than 120 publications on toxicology and risk analysis, and has lectured nationally and internationally on these topics. Dr. Rodricks was formerly Deputy Associate Commissioner, Health Affairs, and Toxicologist, U.S. Food and Drug Administration (1965–80), and is a visiting professor at The Johns Hopkins University School of Public Health. He has been certified as a Diplomate, American Board of Toxicology, since 1982. Dr. Rodricks' experience includes chemical products and contaminants in foods, food ingredients, air, water, hazardous wastes, the workplace, consumer products, and medical devices and pharmaceutical products. He is the author of *Calculated Risks* (Cambridge University Press), a nontechnical introduction to toxicology and risk analysis that is now available in a fully revised and updated second edition, for which he won an award from the American Medical Writers Association.

**Allen Wilcox** is Senior Investigator, Epidemiology Branch at the National Institute of Environmental Health Sciences, NIH, and Editor-in-Chief of *Epidemiology*. His research is primarily on human reproduction, with research topics ranging from fertility and early pregnancy loss to fetal growth and birth defects. Dr. Wilcox earned his undergraduate and medical degrees at the University of Michigan, Ann Arbor, and his M.P.H. (maternal and child health) and Ph.D. (epidemiology) at the University of North Carolina School of Public Health at

965

EXHIBIT C

*Reference Manual on Scientific Evidence*

Chapel Hill, where he is an adjunct professor in the Department of Epidemiology. The school recognized him with its Distinguished Alumni Award in 2006. Other distinctions include the Distinguished Service Medal (highest award of the U.S. Public Health Service); election as a Fellow of the American College of Epidemiology; and election as president of the Society of Epidemiologic Research, the American Epidemiologic Society, and the Society for Pediatric Epidemiologic Research. In 2008, he received the National Maternal and Child Health Epidemiology Award. He holds an honorary doctorate from the University of Bergen (Norway). He is the author of *Fertility and Pregnancy: An Epidemiologic Perspective* (Oxford University Press 2010).

**Sandy L. Zabell** is Professor of Mathematics and Statistics at Northwestern University. He received his A.B. from Columbia College in 1968, his A.M. in biochemistry and molecular biology from Harvard University in 1971, and his Ph.D. in mathematics from Harvard University in 1974. He was Assistant Professor of Statistics at the University of Chicago from 1974 to 1979, and joined Northwestern University as Associate Professor of Mathematics in 1980. He is a Fellow of the American Statistical Association and the Institute of Mathematical Statistics. In the past he has served as an associate editor of the *American Mathematical Monthly* and the *Journal of Mathematical Analysis and Applications,* and book review editor of the *Annals of Probability.* His principal research interests revolve around mathematical probability (in particular, large deviation theory) and Bayesian statistics (in particular, the study of exchangeability). He has also written extensively on the history and philosophical foundations of probability and statistics, is an affiliated faculty member of the Northwestern Philosophy Department, and the author of *Symmetry and its Discontents* (Cambridge University Press, 2006). Professor Zabell has had a longstanding involvement in the legal applications of statistics, including serving on two panels of the National Research Council, and teaching courses on statistics at both the University of Chicago and Northwestern Law Schools. One of his primary interests at present is forensic science, in particular, the statistical issues arising from the use of DNA in human identification. He has spoken numerous times at forensic science conferences, and lectured on forensic DNA identification in courses at Northwestern. He is also interested in the statistical proof of employment discrimination and the legal uses of sampling. In addition to his scholarly interests, he has assisted legal counsel over the years in more than 200 cases, both civil and criminal.

## Staff

**Joe S. Cecil** is a Senior Research Associate and Project Director in the Division of Research at the Federal Judicial Center. Currently, he is directing the Center's Program on Scientific and Technical Evidence. As part of this program, he served

EXHIBIT C

*Appendix: Biographical Information of Committee and Staff*

as principal editor of the first and second editions of the Center's Reference Manual on Scientific Evidence. He has published several articles on the use of court-appointed experts and is currently examining changes in dispositive motion practice in federal district courts over the past 30 years. Dr. Cecil received his J.D. and a Ph.D. in psychology from Northwestern University. He serves on the editorial boards of social science and legal journals. He has served as a member of several panels of NAS, and currently is serving as a member of the National Academies Committee on Science, Technology, and Law. Other areas of research interest include federal civil and appellate procedure, jury competence in complex civil litigation, claim construction in patent litigation, and judicial governance.

**Anne-Marie Mazza** is the Director of the Committee on Science, Technology, and Law. Dr. Mazza joined the National Research Council in 1995. She has served as Senior Program Officer with both the Committee on Science, Engineering, and Public Policy and the Government-University-Industry Research Roundtable. In 1999, she was named the first director of the Committee on Science, Technology, and Law, a newly created activity designed to foster communication and analysis among scientists, engineers, and members of the legal community. Dr. Mazza has been the study director on numerous Academy reports including *Review of the Scientific Approaches Used During the FBI's Investigation of the 2001 Anthrax Mailings* (2011), *Managing University Intellectual Property in the Public Interest* (2010); *Strengthening Forensic Science in the United States: A Path Forward* (2009); *Science and Security in a Post-9/11 World* (2007); Daubert *Standards: Summary of Meetings* (2006); *Reaping the Benefits of Genomic and Proteomic Research: Intellectual Property Rights, Innovation, and Public Health* (2005); *Intentional Human Dosing Studies for EPA Regulatory Purposes: Scientific and Ethical Issues* (2004); *Ensuring the Quality of Data Disseminated by the Federal Government* (2003). Dr. Mazza received an NRC distinguished service award in 2008. In 1999–2000, Dr. Mazza divided her time between the National Academies and the White House Office of Science and Technology Policy (OSTP), where she served as a Senior Policy Analyst responsible for issues associated with a Presidential Review Directive on the government-university research partnership. Before joining the Academy, Dr. Mazza was a Senior Consultant with Resource Planning Corporation. Dr. Mazza received a B.A., an M.A., and a Ph.D. from the George Washington University.

**Steven Kendall** is Associate Program Officer for the Committee on Science, Technology, and Law. Mr. Kendall has contributed to numerous Academy reports including *Review of the Scientific Approaches Used During the FBI's Investigation of the 2001 Anthrax Mailings* (2011), *Managing University Intellectual Property in the Public Interest* (2010); and *Strengthening Forensic Science in the United States: A Path Forward* (2009). He is currently a Ph.D. candidate in the Department of the History of Art and Architecture at the University of California, Santa Barbara, where he is

967

EXHIBIT C

*Reference Manual on Scientific Evidence*

completing a dissertation on nineteenth-century British painting. Mr. Kendall received his M.A. in Victorian Art and Architecture at the University of London. Prior to joining the NRC in 2007, he worked at the Smithsonian American Art Museum and the Huntington in San Marino, California.

**Guruprasad Madhavan** is a Program Officer with the Board on Population Health and Public Health Practice, and the Committee on Science, Engineering, and Public Policy at the National Academies. Previously, he served as a Program Officer for the Committee on Science, Technology, and Law and as a Christine Mirzayan Science and Technology Policy Fellow with the Board on Science, Technology and Economic Policy. He has worked on such National Academies' publications as *Direct-to-Consumer Genetic Testing: Summary of a Workshop* (2010); *Managing University Intellectual Property in the Public Interest* (2010); and *Rising Above the Gathering Storm, Revisited* (2010). Dr. Madhavan completed his Ph.D. in biomedical engineering at the State University of New York (SUNY) at Binghamton where his research was directed toward developing noninvasive, nonpharmacological, neuromuscular stimulation approaches for enhancing circulation. He received his B.E. (honors with distinction) in instrumentation and control engineering from the University of Madras, and M.S. in biomedical engineering from SUNY Stony Brook. Following his medical device industry experience as a research scientist at AFx, Inc. and Guidant Corporation in California, Dr. Madhavan completed his M.B.A. in leadership and healthcare management from SUNY Binghamton. Among other honors, he was selected as an outstanding young scientist to attend the 2008 World Economic Forum Annual Meeting of the New Champions, and 1 among 14 people as the "New Faces of Engineering" of 2009 in *USA Today*. He is co-editor of *Career Development in Bioengineering and Biotechnology* (Springer 2008) and *Pathological Altruism* (Oxford University Press 2011).

EXHIBIT C

# Index

## A

Abuse-of-discretion standard, 14, 16, 17, 18, 19, 21, 25, 35–36, 100 n.279, 101 n.282, 104 n.303, 112 n.353, 226 n.36, 308 n.18, 563–564 n.44, 565 n.48, 693, 827 n.73, 846 n.179, 874 n.343, 947 n.83

Academy of Toxicological Sciences (ATS), 677

Accreditation
engineering education, 931
laboratories, 28, 62 n.30, 66, 68–69, 70 n.83, 98, 154, 156, 171 n.98, 538
medical education, 695, 696, 697, 700, 701, 822, 823 n.49, 824, 873

Accreditation Board for Engineering and Technology (ABET), 931

Accreditation Council for Continuing Medical Education (ACCME), 700

Accreditation Council for Graduate Medical Education (ACGME), 696, 697

Acute myelogenous leukemia, 20 n.51, 26, 505, 655, 656 n.65, 663 n.81, 668–669, 670 n.97

Additive effects, 615 n.200, 673, 680

Admissibility of expert testimony, generally (*see also individual disciplines*)
applying *Daubert*, 22-26, 63 n.39
class certification proceedings, 30–32, 307 n.7, 365, 463, 489
credibility issues, 21–22, 36, 99, 318 n.41, 376 n.75, 741, 781–782, 789-790 n.24, 794, 806, 807, 875 n.347, 879
*Daubert* hearings, 6, 14, 23 n.61, 31, 35-36, 74 n.105, 76-77, 122
discovery, 32–35

*Frye* test, 12, 53, 60, 63, 82, 102 n.291, 103 n.300, 110 n.343, 133 n.7, 166, 173 n.102, 186, 189, 195 n.183, 197, 367, 368, 806-807, 866, 867, 949
interpreting *Daubert*, 19–22
procedural issues, 30–36
qualifications of expert witness, 22–23
relevancy standard, 13
reliability standard, 13
scientific foundation of studies, 23–25
standard of review, 14, 16, 17, 18, 19, 21, 25, 100 n.279, 101 n.282, 104 n.303, 112 n.353, 226 n.36, 563–564 n.44, 565 n.48, 693, 827 n.73, 846 n.179, 874 n.343, 947 n.83
sufficiency conflated with, 20–21
Supreme Court cases, 12–19 (*see also Daubert*; *General Electric*; *Kumho*; *Weisgram*)
synthesizing multiple studies vs. piecemeal examination, 19–20, 21, 23–24
technical and other specialized knowledge, 16–18

Advertising
costs, 321 n.48, 322, 326
deceptive, 224, 231–233, 363 n.10, 366, 398–399, 400, 403-404, 410, 441

Advisory Committee on Civil Rules, 33

Agency for Healthcare Research and Quality, 701, 723, 728 n.174

Agent Orange litigation, 507 n.8, 520 n.38, 565 n.48, 583 n.100, 592 n.130, 609 n.179

*Ake v. Oklahoma*, 29 n.85, 127

Alcohol, blood levels, 228, 373 n.64, 791, 913

Alleles
binning, 200
defined, 139, 199

EXHIBIT C

*Reference Manual on Scientific Evidence*

drop in, drop out, 151, 152, 153, 160

electropherogram, 144, 145-146, 182-183

genetic typing, 139-140, 152, 159, 182, 196 n.185

haplotype, 178, 181, 182, 204

Hardy-Weinberg equilibrium, 165, 166, 204, 207

heterozygosity, 139, 140, 147, 183 n.139, 199, 204

homozygosity, 139, 140, 183 n.139, 199, 204

kinship and, 163, 190

ladders, 146, 147, 199

linkage equilibrium, 166, 205, 207

location description, 200

match, 205

mixtures of DNA, 182-183, 184-185

multilocus genotype, 166, 204

nonhuman DNA, 195, 196, 197, 198

null, 144

population frequencies, 148, 155, 163, 164-165, 166, 191, 195, 196 n.185, 197, 200, 203, 204-205, 207

preferential amplification, 144

probes, 140, 207, 209

randomly mating population, 165, 198, 204, 208

sex-typing test, 146-147

single-locus genotype, 204

size considerations, 153

at STR loci, 141-143, 144, 145-147, 153, 159, 182-183

three-allele locus, 183 n.140

variation, 142-143

at VNTR loci, 142, 199, 200, 202

Alternative hypotheses

beta error calculation in epidemiology, 582

DNA profiling, 205

hypothesis testing, 205, 254 n.106, 255 n.110, 257, 276, 278, 283, 297, 299, 300, 319-321, 353

multiple regression models, 319-321, 353

American Academy of Clinical Toxicologists, 678

American Academy of Environmental Medicine, 677 n.115

American Academy of Family Physicians, 735

American Academy of Forensic Sciences, 125

American Academy of Psychiatry and the Law, 823 n.52, 875

American Association for Public Opinion Research, 417

American Association for the Advancement of Science, 8, 39 n.3, 46

American Association on Mental Retardation, 371

American Bar Association, 8, 869

American Board of Bariatric Medicine, 699

American Board of Criminalistics, 156 n.52

American Board of Emergency Medicine, 676-677 n.114

American Board of Forensic Odontology (ABFO), 107

American Board of Forensic Psychology, 825 n.65

American Board of Forensic Toxicology, 69 n.78

American Board of Medical Specialties (ABMS), 676, 677 n.114, 698, 699

American Board of Medical Toxicology, 676 n.114

American Board of Pediatrics, 677 n.114, 697 n.42

American Board of Preventive Medicine, 677 n.114

American Board of Professional Psychology, 874

American Board of Psychiatry and Neurology, 697 n.42, 822, 823 n.52

American Board of Toxicology, 677, 678

American Cancer Association, 735

American Chemical Society, 46

970

EXHIBIT C

*Index*

American College of Medical Toxicology, 678

American College of Physicians, 735

American College of Radiology, 727

American Conference of Governmental Industrial Hygienists, 529 n.65

*American Honda Motor Co. v. Allen,* 31

American Industrial Hygiene Association, 539, 540

American Law Institute, 890 n.30

American Lift Institute (ALI), 924

American Medical Association, 677 n.115, 735

American National Standards Institute (ANSI), 906, 924

American Osteopathic Association (AOA), 697-698, 699, 700

American paddlefish, 194

American Petroleum Institute, 678

American Physical Society, 46

American Psychiatric Association, 828, 830, 831, 869, 879 n.358

American Psychiatric Nurses Association, 826 n.69

American Psychological Association, 367, 824 nn.54, 57, & 59, 875

American Society for Testing and Materials (ASTM), 906

American Society of Crime Lab Directors/Laboratory Accreditation Board (ASCLD/LAB), 68, 69 nn.76 & 78, 154 n.48, 156 n.52

American Society of Internal Medicine, 735

American Urological Association, 727, 735

Americans with Disabilities Act, 816, 833 n.105

Ames, Aldrich, 805

Amicus curiae briefs, 5, 30, 371, 797-798

Anecdotal evidence, 59 n.17, 85, 217, 218, 220, 310, 677 n.115, 809

Anthrax, 194, 713

Antibodies, 199

Antigens, 199, 202, 203, 735

Antitrust litigation, 22, 31 n.90, 213, 226 n.36, 260, 305, 306, 307 n.7, 313, 320, 321 n.48, 326, 328, 348 n.90, 365, 366 n.25, 373, 429 n.1, 431, 439, 475, 491 n.89, 498, 728

Aplastic anemia, 561, 724, 731

Appraisal approaches, 242-244, 248-249, 278, 444, 445-446, 447, 501

Asbestos, 248 n.93, 489, 519 n.36, 523, 532 n.67, 551 n.3, 573 n.68, 585 n.104, 587, 588 n.114, 606, 607 n.171, 609 n.178, 614, 615, 626, 627, 635, 640, 643-644 n.28, 652, 653, 669, 672, 676, 694, 724, 920

Association of American Medical Colleges, 695, 696 n.34

Association of Firearm and Tool Mark Examiners (AFTE), 93, 94, 95, 97 n.258, 100 n.273

Association of Social Work Boards, 826 n.67

Association of State and Provincial Psychology Boards, 873

Associations (*see also* Causation)
  aggregation of data from multiple sources and, 235
  biological plausibility, 20, 573, 600, 604-605, 606, 620, 664-665
  causation and, 20, 218, 221, 222, 262, 264, 552-553, 559, 562, 566, 567, 570, 571, 574, 577 n.81, 578 n.85, 584, 591, 592-593, 604-605, 610 n.184, 664-665
  confounders, 262-264
  correlation coefficients, 213, 227, 228, 260, 261-264, 265, 266, 286, 290, 301, 333
  defined, 552 n.7
  ecological correlations, 266, 267
  exposure–disease, 552-553, 554, 555-556, 557, 559, 561, 566, 567-568, 570, 572, 573, 574-575, 576, 577, 578 n.85, 579, 580, 581, 582, 583, 584, 585, 586 nn.107 & 108, 588 n.115, 589, 590, 591-593, 595, 597-606, 610 n.184, 611-612, 613, 622

EXHIBIT C

*Reference Manual on Scientific Evidence*

income–education, 219, 260–262, 264-266, 312

linear, 261, 262, 264-268, 286, 321, 348, 352

negative, 566 n.51

statistical, between variables, 213, 217-218, 219, 221-222, 230, 233-235, 252 n.103, 253, 254, 260-263, 264, 265 n.129, 266, 285, 286, 291, 295, 298, 312, 321, 352, 356

true or real, 559, 568, 572, 574, 575, 581–582, 590, 591, 592 n.126, 625, 627, 629

*Atkins v. Virginia*, 369–371, 815 n.5, 833 n.105

Attributable risk, 566, 570-571, 612 n.191, 619

Autoradiograph, 141 n.17, 199

# B

Bacon, Francis, 39-40, 42, 43, 45, 50

Ballistics evidence

ammunition, 92, 93, 99, 120-121, 125-126

automated identification systems, 95-96

cartridge identification, 27 n.79, 92, 94-95, 98

case law development, 58, 91, 100–103

clarity of testimony, 120-121

class characteristics, 72 n.93, 92, 97, 100-101

computer imaging of bullets, 99

consecutive matching striae, 94

*Daubert* and, 101

empirical record, 61, 65, 97-100, 121

error rates, 97, 98

firearms, 65, 72 n.93, 91-92

individual characteristics, 72 n.93, 93-94, 97, 99

inductively coupled plasma–atomic emission spectrometry, 120 n.415

Integrated Ballistics Information System (IBIS), 95

lands and grooves, 91-92

limits on testimony, 27 n.79, 101-102, 122, 123 n.440

neutron activation analysis, 120 n.415, 123 n.440, 126

pretrial discovery, 125-126

proficiency testing, 97-98

subclass charateristics, 93

techniques, 91-97, 120

toolmarks, 72 n.93, 93 n.241, 96-97, 98, 99, 103 n.300

Bayes, Thomas, 241 n.84

Bayesian approach (Bayes' theorem; subjectivist approach)

to conditional probabilities of related events, 259 n.122, 274

to decision theory, 242 n.84

defined, 200, 283, 742

to DNA matches, 173, 174, 188, 189, 190–191, 200, 209

to empirical distributions, 259 n.123

in epidemiology, 611 n.188

to error rates, 259 n.122, 282

frequentists compared with, 273-275

inference writ large, 242 n.84

limitations, 174

medical decisionmaking, 259 n.122, 706 n.78, 707-714, 725, 742

"objective," 259 n.123

to posterior probabilities, 241, 242, 258, 259

to prior probabilities, 259, 283

to probative value, 259 n.122

to statistical inference, 173, 174, 242 n.48, 273-275

Bayh–Dole Act, 48

Bendectin litigation, 13-14, 562 n.38, 565 n.48, 578 n.85, 579 n.86, 604 n.164, 638

Benzalkonium chloride, 507 n.8

Benzene, 20 n.51, 26, 217 n.14, 505–506, 514, 526 n.27, 532, 539, 543, 587 n.112, 606 n.169, 617-618 n.214, 646 nn.34 & 35, 649 n.44, 653, 655, 656 n.65, 657 n.67, 663-664 nn.81 & 82, 668-669, 670 n.97

972

**EXHIBIT C**

*Index*

Bias (*see also* Confounding factors;
  *individual disciplines*)
  aggregation, 623
  ascertainment, 187
  cognitive, 29, 79-80, 169 n.89, 706,
    743
  conceptual errors, 590
  contextual (expectation), 29, 67 n.63,
    80
  controlling for/minimizing, 68 n.70,
    225, 246, 573-575
  expectation, 411
  information, 585-590, 624
  jury pool, 365, 403
  misclassification, 588 n.115, 589-590,
    622, 624, 625
  nonresponse, 225, 226, 249, 290, 332,
    362 n.8, 383-385, 407, 408, 416
  observer effects, 67-68, 160
  order effects, 395-396
  publication, 590
  recall, 249, 585, 586, 626
  selection, 98, 187, 224-225, 226 n.36,
    249, 290, 293, 296, 370, 386, 408,
    512 n.22, 583-585, 591, 627
  systematic, 394, 572 n.67, 573
Biomarkers, 509, 536 n.76, 586 n.110
Bipolar disorder, 832, 833 n.105, 839,
    847, 853, 854 n.236, 855, 859, 881
    n.366
Birth defects, 13-14, 249, 552 n.4, 562,
    563, 570 n.63, 578 n.85, 579 n.86,
    585 n.106, 587 n.112, 590, 614,
    618, 620, 638, 984
Bite mark evidence
  ABFO guidelines, 107, 123
  case law development, 105, 110-112
  comparison methods, 106-107
  computer-generated overlays, 106
    n.317
  crimes involving, 103-104
  *Daubert* and, 112
  DNA exonerations, 62 n.32, 109-110
  empirical record, 61, 65, 108-111
  proficiency testing, 109
  specificity of expert's opinion, 111,
    123, 215

technique, 71, 104-107
uniqueness of dentition, 105-106
Blood bank samples, 164
Blood evidence
  ABO typing, 72, 132 n.3, 275
  alcohol levels, 228, 373 n.64, 791, 913
  animal, 197
  DNA analysis, 143, 151, 155, 156,
    158, 160 n.60, 164, 169 n.89, 173
    n.103, 182, 197
  exposure, 508, 509, 518-519, 535-
    537, 544, 656, 657, 672
  preservative for, 202
  serology analysis, 58, 62 n.32, 132 n.3
  spatter examinations, 71 n.88
  toxicology, 508, 509, 518-519, 535-
    537, 544, 635, 636, 637 n.8, 653,
    656, 657, 662, 667, 672
Bootstrap simulation, 284, 469
Brain (*see also* Neuroimaging;
    Neuroscience evidence)
  brain stem, 755
  cellular structure, 750-754
  cerebellum, 755, 808
  cerebrum, 755, 756, 757
  cortex, 756-758, 759-760, 808
  deep brain stimulation, 773, 775, 862
  frontal lobe, 755, 756, 757, 759, 763,
    771, 893
  functional aspects, 759-760
  implanted microelectrode arrays,
    775-776
  lesion studies, 774
  neurons, 750-754, 755, 757, 758-759,
    760, 768, 770, 772, 774, 775-776,
    778, 808-809, 854
  neurotransmitters, 751, 752, 753, 755,
    763, 764, 833, 854
  occipital lobe, 756, 759, 760
  parietal lobe, 755, 756, 771
  structure, 754-759
  synapse, 750-751, 752, 763
  temporal lobe, 755-756, 774
  transcranial magnetic stimulation,
    773-774
Breach of contract, 433, 434, 436, 437,
    461 n.54, 466 n.68, 797

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Breach–of–warranty action, 31

Breast cancer, 259 n.122, 562, 607 n.170, 617 n.211, 704–705, 708, 710, 711–712, 719, 721, 727, 733–734, 736–737, 738–739

Bundy, Ted, 112

Bureau of Economic Analysis, 484

Bureau of Labor Statistics (BLS), 471, 484

*Burke v. Town of Walpole*, 110, 123


# C

*California Public Utilities Commission v. California Energy Resources Conservation & Development Commission*, 947–948

Canadian General Social Survey, 408 n.212

Cancer risk, 635, 638 n.12, 642–643, 644–645, 649 n.46, 650, 653, 654, 655, 656, 659, 660 n.74, 665, 668–669, 670, 683

Capital Asset Pricing Model (CAPM), 459, 469

Capital punishment (*see* Death penalty)

Carbon monoxide, 513 n.27, 540 n.88, 587 n.111, 635–636, 637 n.8, 651 n.52, 652 n.56, 672, 681

Carbon tetrachloride, 543, 544, 653, 662

Carcinogens/carcinogenicity, 643 n.29, 644, 645, 647 nn.37 & 38, 649 n.44, 650 n.49, 651, 655–656, 658 n.70, 659, 660 n.74, 670 n.97, 673 n.105, 680

Carcinogenicity bioassay, 644, 654–655, 680

Case management (*see also* Disclosures to opposing parties; Discovery)
    amicus curiae briefs, 5, 30, 371, 797–798
    bifurcation, 476
    closing arguments, restriction on, 124
    court-appointed experts, 6–8, 14, 35, 311, 329, 489, 599 nn.141 & 143
    cross-examination, 169 n.84

*Daubert* hearings, 6, 14, 23 n.61, 31, 35–36, 74 n.105, 76–77, 122
    in limine motions, 14, 22, 414 n.213
    jury instructions, 29, 168 n.84, 170 n.95, 383 n.104, 455, 943
    pretrial conferences, 6, 488
    pretrial *Daubert* hearings, 6, 18, 30, 311, 362
    pretrial lie detection, 807
    protective orders, 487
    special masters or expert assistants, 6, 7, 35, 135, 488, 489
    structuring expert testimony, 23–24
    survey uses, 366–367
    videotaped testimony, 7, 880–881

Case reports, 23 n.59, 25 n.69, 108 n.329, 217 n.14, 639, 714, 724

Case-control studies, 556, 557, 558, 559–560, 568, 569, 583–584, 585–586, 587 n.112, 588 n.115, 589–590, 591 n.122, 607, 620, 625

Cats, 196, 197

Causation (*see also specific disciplines*)
    abuse-of-discretion standard and, 24
    alternative explanations, 552–553 n.7, 570 n.63, 582, 595, 598, 600, 605, 672–673
    anecdotal evidence, 217, 218, 220
    association and, 20, 218, 221, 222, 262, 264, 552–553, 559, 562, 566, 567, 570, 571, 574, 577 n.81, 578 n.85, 584, 591, 592–593, 604–605, 610 n.184, 664–665
    biodistribution of toxic agents, 667–668
    biological plausibility of associations, 20, 573, 600, 604–605, 606, 620, 664–665
    but-for analysis and, 429, 431, 432, 433, 436, 438–439, 440–443, 449–450, 455, 460, 461, 470, 471, 472, 473, 475, 476–477, 491, 492, 493–494, 496–497, 498, 501, 597, 598 n.136
    cessation of exposure and, 605
    conflicting research, 606, 674–675

**EXHIBIT C**

*Index*

confounding factors, 218, 220, 221, 222, 591, 592-593, 598, 672-673

consistency of trends, 606

correlation and, 309

*Daubert* trilogy and, 12

defined, 552 n.7

differential diagnosis, 217 n.14, 512 n.21

direction of, 322-323

dose–response relationship, 603

ecological studies, 561 n.34, 562

epidemiological studies, 23, 217 n.14, 218, 597-606

excretion routes for toxic agents and, 668

exposure evidence, 25-26, 558, 587 n.111, 588, 597-606, 666-667

extrapolation issues, 23, 222, 223, 563-565, 661-662, 664

general, 24, 551 n.2, 552, 565 n.48, 578 n.85, 597-606, 637 n.7, 638, 657 n.87, 659, 660-665

generalizability of studies, 222, 564, 595 n.133, 623

guidelines for assessing, 599-600

latency period for disease and, 668-669

level of exposure and, 669-670

medical evidence, 217 n.14, 438, 670-671

metabolism of toxic agents and, 668

observational studies, 215-216, 218, 220-222

preponderance of the evidence standard, 565 n.48, 610 n.182

proximate cause, 463, 464

randomized controlled experiments, 218, 220, 221, 222

replication of results, 604

specific, 24, 25-26, 551 n.2, 552, 608-618, 637 n.7, 638, 645 n.31, 659 n.72, 665-666, 669-670 n.95

specificity of association, 605-606

statistical studies, 213, 216-223, 249, 260-272, 288

strength of association, 602

structure–activity relationships, 663

subsequent unexpected events and, 438, 480-481, 495, 500

synthesizing multiple studies, 19-20, 21, 23-24, 217 n.14

target organ specificity, 662-663

temporal relationship, 217 n.14, 323 n.52, 558, 560-561, 562-563, 587 n.111, 600-601, 606, 669 n.94, 714 n.100

"weight-of-the-evidence" methodology, 565 n.48

Censuses, undercount litigation, 2-3, 213, 223-224, 247 n.90, 268, 275 n.149, 307, 308

Centers for Disease Control and Prevention (CDC), 418 n.246, 536-537, 561-562 n.36, 672

Centers for Medicare & Medicaid Services, 862 n.290

Central Intelligence Agency, 805

Charter on Medical Professionalism, 703

Chloramphenicol, 724, 731

Chlordane, 543, 643 n.28

Chromosomes (*see also* Genes)
    allele variations on, 142
    anomalies, 183 n.140
    autosomes, 200, 201, 204
    cytogenetic analysis, 655
    defined, 201
    diploid number, 202, 204
    haploid number, 204
    homologous, 204
    inheritance, 137-138, 142, 183 n.139
    loci used for profiling, 142-143, 144, 145-146, 147, 148, 151, 153, 155, 159, 162, 163, 164, 165, 166, 175-176, 182, 183, 188 n.157, 190, 191, 192, 196, 197, 198, 199, 201, 202, 204, 205, 206, 207, 209
    monomorphic loci, 139
    mutations, 206, 655, 683
    recombination, 138
    reduction process, 137-138
    structure, 136-137, 142, 750
    X, 136, 137, 138, 147, 201
    Y, 136, 137, 138, 147, 181-182, 184, 201

EXHIBIT C

*Reference Manual on Scientific Evidence*

Chronic Lyme disease (CLD), 728

Chronic lymphocytic leukemia, 505 n.4

Civil Rights Act, 228, 350

Class-action cases, 7, 238 n.72, 247 n.90, 248 n.93, 429, 462, 463, 483, 486, 489-491, 649 n.47

Class certification proceedings, 30-32, 307 n.7, 365, 463, 489

Classification of Violence Risk  (COVR), 848

Clean Air Act, 666

Clinical studies, 510, 555, 556, 575, 590, 607, 621, 640, 648 n.42, 656 n.64, 658, 659, 661

Cocaine, 126, 536 n.76, 760, 789

Cohort studies, 556, 557-559, 560, 567, 568, 573, 583, 584, 585 n.104, 589, 590, 592, 593, 594, 607, 621, 624, 625, 626, 628, 657, 658-659, 716

*Coker v. Georgia*, 370

Collaborative Testing Services, Inc., 69 n.82, 78, 85, 87, 88, 98

Commission on Osteopathic College Accreditation, 696

Common-law fraud action, 31

*Commonwealth v. Patterson*, 81-82

Competency
   confinement based on, 852
   to consent to treatment and research, 844, 845
   to enter into contracts or make wills, 816, 817, 820, 867
   evaluations, 817-819, 820-821, 823, 844 n.167, 872, 880, 884, 885, 889, 890
   to manage one's affairs, 816, 844, 867
   to marry or to vote, 816
   of medical patients, 735
   neuroscience applications, 796, 799
   parenting capacity, 820, 844, 867
   to represent oneself, 3, 799, 815, 818
   restoration of, 852, 861, 863
   to stand trial, 3, 785, 799, 815, 818, 820, 821 n.37, 823, 844, 852, 861, 863, 867, 872, 885 n.377, 889
   to waive rights, 815, 817, 844

Computer assisted tomography (CAT scan), 718 n.117, 719, 720, 762-763, 837-838, 893

Confessions, coerced, 59 n.16

Confidence intervals (*see specific disciplines*)

Conflicts of interest, 8, 21-22, 48-49, 590, 728, 875

Confounding factors (*see also specific disciplines*)
   controlling for, 596-597
   identifying, 595
   lurking variables, 262-264
   preventing or limiting, 595

Confrontation Clause, 26-27, 30, 789

"Consistent with" testimony, 70, 104 n.302, 111, 113, 116, 120, 121, 160 n.60, 184, 604-605, 606, 927

Consumer Product Safety Commission (CPSC), 650, 909, 911, 920

Convenience samples, 164, 224-225, 248, 285, 287

Costs of expert testimony, 19

Council of American Survey Research Organizations, 382 n.102, 416 n.240

Council on Continuing Medical Education, 700

Coupon settlements, 491

Credibility issues (*see also* Conflicts of interest)
   *Daubert* and, 21-22

Crime Laboratory Proficiency Testing Program, 97

Criminal Justice Act of 1964, 127

Cross-sectional studies, 319, 345, 352, 556, 560-561, 621-622, 716, 736-737

Cruel and unusual punishment, 3, 369, 815 n.5

Current Population Survey, 260 n.125, 266

Cyanide, 651-652

**EXHIBIT C**

*Index*

# D

Damages (*see* Economic damages)

*Daubert v. Merrell Dow Pharmaceuticals* (*see also individual disciplines*)

    admissibilty conflated with sufficiency, 20–21

    application issues, 22–26

    atomization, 19–20

    characteristics of scientific knowledge, 49 n.16 (*see also* Reliability of scientific testimony)

    and civil cases, 63

    and class certification proceedings, 30–32

    credibility issues, 21–22

    definition of science, 39 n.3

    and empirical testing, 62–64

    evidentiary (*Daubert*) hearings on admissibility, 6, 14, 18, 30, 31, 35–36, 74 n.105, 76–77, 122, 125–126, 216, 362

    exposure assessment, 22, 25–26

    and Fed. R. Evid. 702, 12

    and forensic identification evidence, 62–64, 101, 112

    and *Frye* test, 12

    gatekeeping function of trial judges, 6, 12–13, 16, 17, 102 n.291, 866 n.309, 901, 933, 956

    and in limine motions, 14

    interpretive issues, 19–22

    overview and impact, 12–14

    pretrial hearings, 6, 14, 23 n.61, 31, 35–36, 74 n.105, 76–77, 122

    qualifications of expert witness, 22–23

    and scientific foundation of studies, 23–25

    scientist's view of, 52–54

    sufficiency conflated with admissibility, 20–21

Death penalty, 3, 27 n.78, 126, 216, 220, 221, 223, 307, 308, 369 n.45, 370–371, 797, 800 n.51, 851, 877

Decision theory, 242 n.84

*DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 247 n.92, 551 n.2, 553, 567 n.55, 572 n.67, 575 nn.73 & 75, 577 n.81, 578 n.85, 579–580 n.88, 582 n.91, 599 n.143, 609 n.178, 610 n.184

*Department of Commerce v. United States House of Representatives*, 2–3

Department of Defense, 46

Department of Energy, 46

Department of Health and Human Services, 46

Department of Justice, 80, 117, 411, 491

Department of Labor, 793

Department of Veterans Affairs, 696 n.33, 892

Diagnosis of mental disorders

    accuracy, 839–840

    approaches, 834–839

    clinical examination, 834–835

    functional impairment vs., 819–821

    laboratory tests, 838–839, 883

    major diagnostic categories, 831–834

    malingering detection, 840–841

    neuroimaging studies, 837–838

    nomenclature and typology (DSM-IV-TR and DSM-V), 828–831

    psychological and neuropsychological tests, 836–837

    records of previous assessments, 839

    structured interviews, 835–836

Dioxins, 522, 536 n.76, 545, 643 n.28, 652, 653, 667 n.92

Disclosures to opposing parties (*see also* Discovery)

    analytical methods and nonsupporting analyses, 216

    damages data, 486–488

    data dictionaries, 487–488

    database information and analytical procedures, 331–332

    dispute resolution, 488

    drafts and communications, 33

    format standardization, 487

    unretained testifying experts, 32 n.96, 34

EXHIBIT C

*Reference Manual on Scientific Evidence*

Discovery (*see also* Disclosures to
    opposing parties)
  amended rules, 32–34
  "assumptions" provision, 34
  DNA evidence, 125–126, 191
  e-discovery, 34–35
  improving the process, 330–331
  laboratory reports, 125
  mass torts litigation, 366–367
  motions to compel, 34–35, 373 n.62
  opinion work product, 33, 374
  pretrial, 57, 125–126, 216, 310 n.24
  procedural issues, 32–35, 125–126
  statistical evidence, 310 n.24, 330–331
  of summary of expert's opinion, 125
  undue burden or cost, 33, 34
Discrimination (*see* Racial discrimination;
    Sex discrimination)
DNA (deoxyribonucleic acid) (*see also*
    Alleles; Chromosomes; Genes;
    Genome)
  base pairs, 138, 139, 140, 141, 142,
    143, 146, 147, 149, 152, 153, 176,
    177, 180, 200, 201, 202, 203, 204,
    206, 209
  chemical structure, 131, 136–139, 202
  complementary sequences, 143, 150,
    201, 204, 207, 208
  damage from toxic chemicals, 645,
    654–655, 656, 663, 682
  defined, 202
  D-loop, 177, 201, 202
  environmental insult, 153 n.44,
    202–203
  individual variation, 135–136, 137
  introns and exons, 138 n.16
  mitochondrial, 143 n.23, 202, 206,
    651
  polymorphisms, 139–143, 148, 177,
    182, 197, 199, 207, 208, 209
  pseudogenes, 138 n.16
  repetitive sequences, 141, 142–143 (*see
    also* STR under DNA sequencing
    and testing)
DNA Advisory Board (DAB), 61–62, 154
    n.46, 187

DNA databases and database searches
  all–pairs matching, 191–192
  Arizona offender database, 191–192
  Australian offender database, 192
  birthday problem, 192 n.170
  British National DNA Database,
    144–145
  CODIS (Combined DNA Index
    System), 61, 62 n.30, 145, 201
  comprehensive population-wide
    database, 163 n.73
  disclosure of trawling to juries, 189–
    190 n.164
  judicial opinions on adjustment, 189
  laboratory quality assurance
    requirements, 154
  mitochondrial DNA, 178–180, 190
  near-miss (familial) searching, 189–191
  New Zealand offender database, 191,
    192
  population databases for validation of
    new loci, 148, 155, 163–164, 197–
    198, 199
  probative value of matches, 165 n.76,
    186–189, 190
  proficiency testing for participants,
    69–70, 156
  representativeness of populations, 179
  sampling error, 178
  selection effects, 187
  statistical analyses of adjustments, 165
    n.76, 179, 186, 187–188
  trawling, 174 n.109, 186–191
  verification of random-match
    probabilities, 191–192
DNA Identification Act of 1994, 61, 69,
    70 n.83, 154 n.46, 156
DNA identification evidence
  admissibility, 131, 132–133, 140, 166,
    173 n.102, 181 n.134, 182, 186,
    189, 195 n.183, 197
  Bayesian approach to matches, 173,
    174, 188, 189, 190–191, 200, 209
  bite marks, 62 n.32, 109–110, 151
  blood, 143, 151, 155, 156, 158, 160
    n.60, 164, 169 n.89, 173 n.103,
    182, 197

EXHIBIT C

*Index*

case law development, 131, 132–133

ceiling principles, 167 n.80, 200, 204–205

chain of custody, 157, 162

coincidence hypothesis, 161, 163–167, 172, 173 n.106

contact, 151

database matches, 165 n.76, 179, 186–189, 190, 191–192

*Daubert* and, 166, 167, 171 n.98, 173 n.102, 181, 186, 189, 194 n.176

defendant's fallacy, 168 n.89

defense experts, 127, 162, 168 n.84

empirical testing, 60–62, 66, 148

error rates, 162, 170, 171 nn.96–98

exclusions, 116, 133, 135, 144 n.25, 156, 158 n.56, 159–160, 167–168, 169, 171, 173, 175 n.111, 177–178, 179, 180, 181, 184, 185, 186, 188, 190 n.164, 196 n.185

exonerations, 27, 62, 109–110, 116, 117, 119, 124, 125 n.450, 134, 157 n.55

*Frye* (general acceptance) test, 133 n.7, 166, 167, 173 n.102, 181, 186, 189, 195 n.183, 197

hair, 113, 116, 143, 149 n.133, 151, 155, 170, 177, 178 n.123, 179, 180, 181 n.134

history, 132–134

hypotheses for matching profiles, 160–161

jury comprehension of, 167–171, 175 n.111, 189–190 n.164

laboratory errors, 160–162

likelihood ratios, 169 n.89, 172–173, 174, 175, 177–178, 185–186, 205, 206

matches/inclusions, 74 n.107, 159–160

mishandling or mislabeling, 156–158, 175

mitochondrial DNA, 113, 116

multilocus profile frequency, 164, 166, 202, 204

NRC reports, 60–61, 125, 127, 133, 134 n.12, 141 n.19, 143, 161, 162, 163 n.72, 164 n.75, 166–167, 168 n.84, 169 n.89, 170 n.95, 174 n.110, 175, 176 n.114, 185, 187–188, 192 n.170

objections to, 135

population frequencies, 134 n.12, 148, 155, 163–165, 166, 178, 182, 191, 195, 196 n.185, 197, 200, 203, 204–205, 207

population structure adjustments, 166–167, 179, 182, 192, 207

posterior probabilities, 172, 173–174

prejudicial testimony, 167–170, 171 n.97, 181 n.136, 185–186, 189, 190 n.164

pretrial discovery, 125–126

prior probabilities, 173, 174

probability sampling, 184

product rule, 165–167, 198, 199, 204–205, 207

qualifications of experts, 134–135, 156 n.52

random match probabilities, 60, 135, 155, 164, 165, 167–171, 172, 173, 175–176, 181 n.34, 182, 186, 187, 188, 189, 190, 191–192, 196, 197, 198 n.194, 205, 208, 251 n.99

random sample/sampling, 164–165, 178

in randomly mating populations, 165–166, 179, 198, 204, 208

"rarity" or "strength" testimony, 175

reappraisal of, 60–62

relatives as sources (kinship hypothesis), 161, 162–163, 170, 172, 173 n.105, 174, 175–176, 184 n.143, 190, 192, 202

reliability, 60, 62 n.32, 73, 227

semen, 143, 151, 155, 159 n.58, 169 n.89

source attribution, 156–157, 161–162, 175–176

EXHIBIT C

*Reference Manual on Scientific Evidence*

statistical conclusions, 131, 133, 134,
135, 155, 160, 163, 166, 167, 168
n.85, 169 n.91, 171, 172, 174,
178, 179, 181, 182–183, 185, 186–
189, 193, 197
transposition fallacy, 168–169, 170
n.92, 173, 209
"uniqueness" testimony, 175–176
unrelated person as source, 163–167
vaginal swabs, 147, 151, 158, 182, 183
verbal expressions of probative value,
174–176, 182
wrongful convictions on, 62 n.32, 141
n.18
DNA laboratories
accreditation, 62, 154, 156, 171 n.98
certification, 154 n.48, 156
documentation requirements, 154–155
errors in matches, 160–162, 171
performance standards, 153–159
population genetics research, 192
proficiency testing, 60–62, 69–70, 148,
154, 155–156, 160–161, 162, 171,
196, 207
quality assurance and quality control,
61–62, 143–144, 153–156
retention of samples, 157
sample handling, 156–159
validation of procedures, 155
DNA sequencing and testing (*see also*
Nonhuman DNA testing)
allele-specific oligonucleotide (ASO)
probes, 140, 207, 209
amplification, 142, 143–144, 148, 151,
152 n.41, 153, 158, 182, 183, 196,
199, 205, 208
amplified fragment length
polymorphism, 199
artifacts, 153, 156–157, 185
autoradiography, 141 n.17, 199
capillary electrophoresis, 144–147,
200, 202
contaminated samples, 143–144, 153,
155, 156–157, 158, 160–161, 170,
181 n.134

degraded samples, 147, 149, 151, 152–
153, 155, 157 n.55, 158, 160, 177,
201
denaturation, 143, 201
electropherograms, 144, 145, 146,
147, 182–183, 184, 199, 202, 208
emerging (next-generation)
technologies, 140, 148–150
extraction, 132, 143–144, 148, 151,
153 n.44, 177, 183
false-negative rates, 115–116, 162
false-positive rates, 161–162, 170–171
gel electrophoresis, 141, 200, 203, 209
heteroplasmy and, 177, 179, 180, 181,
204
high-throughput sequencing, 149–150
"lab-on-a-chip" devices, 148–149,
200–201
limitations, 141
low copy number (LCN) or low
template (LT), 151–152
measurement error, 141, 205
microarrays, 150
mitochondrial DNA, 71, 113, 116,
140, 150, 176-181, 201, 204
mixtures of DNA, 155, 158, 172–173,
182–186
multiplexing, 142, 144, 145–146, 206
phylogenetic analysis, 193, 194, 195
polymerase chain reaction (PCR),
133, 140, 142, 143–144, 145, 146,
147, 148, 151, 152 n.41, 153, 158,
177, 182, 196, 199, 202, 205, 206,
207, 209
population genetics, 133, 135, 148,
164, 181, 182, 191, 192, 198, 207
primers, 143, 144, 153, 182, 196, 204,
206, 207
quality of sample and, 152–153
quantity of DNA in sample and,
151–152
random amplified polymorphic DNA
(RAPD) analysis, 196
regions for forensic sequencing, 139
relative fluorescent units, 145, 146,
208
RFLP testing, 132, 140–141, 208

**EXHIBIT C**

*Index*

sample collection and preservation, 151–153

sequence-specific oligonucleotide (SSO) probes, 140, 209

sex-typing test, 146–147

size of sample, 141, 151–152

SNP chips, 140, 201

SNPs (single nucleotide polymorphisms), 139, 140, 142, 148, 149 n.33, 150, 181, 182–183 n.138, 197, 201, 206, 208, 209

Southern blotting, 141 n.17, 209

special issues, 150, 176–192

STR (short tandem repeat or microsatellite) profiling, 132, 133, 134, 141–142, 143, 144–147, 148, 149, 151–152, 153, 159, 160, 164, 170, 175, 176 n.115, 181–182, 183, 184 n.143, 189, 190, 191, 192, 196, 197, 198, 200, 201, 205, 209, 210

validation of methods and procedures, 133, 134, 148, 150, 153, 154, 155, 185, 193, 195

VNTR (variable number of tandem repeats) testing, 140–143, 147, 166, 199, 200, 202, 205, 209–210

Y chromosomes (Y-STRs and Y-SNPs), 132, 160 n.60, 181–182, 184 n.143, 190

Dogs
bite marks, 104

DNA profiling, 193, 197, 198 n.193

extrapolation of studies to humans, 535 n.75, 662 n.78

scent evidence, 62 n.32

Dose, dosage
benchmark, 642, 670 n.96, 680

exposure, 507, 508, 509, 513 n.26, 518–520, 525–528, 529, 531 n.67, 533–534, 535, 536, 538, 539, 541, 544, 545, 546, 547

extrapolation, 4–5, 603 n.160, 636, 641, 645, 648, 651

lethal dose 50 (LD$_{50}$), 641, 682

limits, 512 n.22, 521 n.43, 528–529, 536

low–dose risk curve, 673 n.107

maximum tolerated dose (MTD), 644–645, 682

target site/organ, 507, 519, 535, 536, 547, 636, 646

toxicology, 525, 636–637, 638, 641, 642, 644–645, 646, 647, 648, 651, 657 n.67, 658–659, 660, 661, 664, 665, 667 n.91, 668, 670 n.96, 673 n.107, 674, 677 n.115, 680, 681, 682, 684

Dose-response curve, 646, 651, 673 n.107, 681

Dose-response relationships, 4–5, 563, 565, 585, 600, 603, 613, 616 n.204, 622, 635, 636, 639, 641, 642–643, 645, 646, 648, 649, 651, 658, 663 n.82, 669, 670, 676, 680, 681

Drugs, illegal, 59

Due process, 44 n.10, 59 n.16, 104 n.306, 119, 127, 134 n.10, 157 n.55, 170 n.92, 171 n.97, 186 n.151, 226 n.35, 792, 815 n.3

Duke University Private Adjudication Center, 8

# E

Ecological fallacy, 623

Ecological studies, 556–557, 561–563, 623

Economic damages
actual earnings of plaintiff after harmful event, 450–451, 493

antitrust, 22, 260, 305, 320, 328, 348 n.90, 365, 366 n.25, 373, 429 n.1, 431, 439, 475, 491 n.89, 498

apportionment, 477, 479–480, 617 n.209

appraisal approaches, 444, 445–446, 447, 501

assets and liabilities (balance sheet) approach, 443, 446

avoided costs, 429, 449–450, 456, 466–467, 501, 502

EXHIBIT C

*Reference Manual on Scientific Evidence*

avoided losses, 449, 464-465, 466-
467, 478
but-for analysis, 311, 319, 429, 431,
432, 433, 436, 438-439, 440-443,
449-450, 455, 460, 461, 470, 471,
472, 473, 475, 476-477, 491, 492,
493-494, 496-497, 498, 501
capitalization factor, 444, 459-460,
469, 501
causation, 22, 438, 463-464, 480-481,
495, 500, 942-943
class actions, 7, 238 n.72, 247 n.90,
248 n.93, 429, 462, 463, 483, 486,
489-491
class certification and, 30-31, 32 n.95,
463, 489
compensatory, 238 n.71, 239-240,
388, 433, 434 n.10, 437, 455
compound interest, 457, 458, 501
constant dollars, 451, 452, 453, 454,
495, 501
court-appointed experts and special
masters, 7, 488, 489
data used to measure damages,
482-486
*Daubert* and, 22, 30-31, 32 n.95, 431-
432, 461, 462
defined benefit plan, 472-473
defined contribution plan, 472, 473
disaggregation, 429, 438, 475-477,
479
disclosure standards, 429, 481,
486-488
discount rates, 452-454, 459, 471,
493, 495
discounted lost cash flows, 429, 430,
443, 444, 448-460, 469, 471, 500
double-counting, 442, 443 n.29
earnings losses, 429, 431, 443, 453-
454, 455 n.44, 458, 460, 465, 472,
490, 491-497, 501
earnings projections, 430, 438, 439-
440, 454 n.40, 470-471, 492,
496-499
electronic data, 482, 486, 487, 488
employment cases, 434 n.11, 457, 478
engineering testimony, 942-943

escalation, 451, 452, 453, 454, 495,
501
examples of calculations, 491-500,
893-894
exclusionary conduct, 441-442, 476
expectation damages, 433, 434, 435,
436, 437, 442-443, 449, 467, 497,
501
expected value approach, 437, 459,
462, 463, 468-469
fairness of settlement, 490-491
fixed cost, 446, 450, 499, 502
foreseeability rule, 463, 464
fringe benefits, 455, 470, 471-473,
492-494
future dollars, 451, 501
general approach to quantification,
432-443
harmful act/event analyzed, 432, 439,
440, 442
hypothetical acts of defendant,
439-440
hypothetical property, 447-448
individual class members, 490
inflation, 429, 444, 451-454, 469,
495, 499, 501, 502
intellectual property damages, 307,
311, 429 n.1, 439, 440, 441,
498-499, 501, 502, 932-933, 938,
945-946
interest for losses, 429, 430, 436 n.19,
441 n.26, 444, 452-453, 454, 457-
459, 460, 490, 495, 500, 501, 502
life expectancy, 471, 472, 473, 474,
492, 493, 495-496
lifetime income calculations, 470-471,
474, 493, 495-496
limitations on recoverable damages,
461-467
liquidated damages, 429, 461, 467,
476
marginal costs, 446, 499
market approach based on prices and
values, 429, 431, 440, 443, 444-
448, 459-460, 469, 481, 498, 501
market effect of adverse information,
448

982

**EXHIBIT C**

*Index*

market friction adjustments, 446–447

mean vs. median awards, 238

measures of losses, legally prescribed, 433–439

medical expenses, 472, 474, 505 n.3

medical insurance benefits, 471–472

medical malpractice, 474

missing data, 319, 485–486

mitigation of losses, 450–451, 461, 464–466, 470, 481, 496, 497, 498, 499–500, 502

multiple challenged acts, 429, 438, 475–477, 479

nominal (ordinary) interest rate, 453, 495, 502

offsets, 443, 448, 451, 453–454, 465, 471, 474, 475

pain and suffering, 429 n.2, 434, 475

paper data, 482, 487, 488

partial losses, 445–446, 477–478

patent infringement cases, 311, 319, 440 n.24, 441

personal income losses, 470–475, 491–497

prejudgment interest, 430, 441 n.26, 444, 454 n.42, 457–458, 459, 502

present value, 443, 444, 448–449, 452, 455, 469, 472, 473, 474, 475, 495, 500, 502

price erosion, 440, 441, 502

profit losses, 429, 439, 440 n.24, 441, 443, 453–456, 459, 461 n.64, 464, 466, 468, 469, 478, 491, 497–500

profitability of business, 326, 442–443, 444, 449, 460, 461 n.64, 462, 468–470

proximate cause (remoteness of damages), 463–464

punitive, 239–240, 433, 436, 437

qualifications of experts, 431–432

quality of life, 428 n.2, 475

real interest rate, 444, 453, 495, 502

reasonable certainty standard, 434 n.11, 461–463, 468

regression analysis, 305–306, 308 n.12, 311, 319, 326, 348, 431, 446, 450, 481, 499, 502

reliance damages, 433, 434, 435, 436 n.18, 437, 442–443, 449, 497, 502

restitution, 433, 435, 497, 502

retirement issues and benefits, 465, 470, 471, 472–473, 492, 493, 495–496

sampling data, 482–483, 485, 486

securities litigation, 429 n.1, 431, 448

services lost, 474

speculative, 454 nn.40 & 43, 461–463, 468

startup businesses, 447, 449, 456, 465–466, 468–470

statutory damages, 433, 457, 500

stock options, 429, 456

subsequent unexpected events, 438, 451, 480–481, 495, 500

supervening events, 480–481

survey and market research data, 389, 431, 469–470, 482, 483, 484, 486

taxes, 429, 447, 454–456, 458, 459, 460, 470, 500

unjust enrichment, 433

validity of data, 449, 469–470, 483–485

variable costs, 450, 502

wrongful death, 238 n.71, 470, 471, 473–474, 475 n.77

wrongful termination, 470, 471, 475, 491

zero damages, 438–439, 460, 461, 463, 468, 476, 477, 479

Economic loss rule, 435, 436, 437 n.22

Education Commission for Foreign Medical Graduates, 696

*EEOC v. Sears, Roebuck & Co.*, 257 n.115, 308, 313 n.36, 365 n.20

Eighth Amendment cases, 3, 369–370, 795, 815 n.5, 816 n.12, 833 n.105

*Eisen v. Carlisle & Jacquelin*, 31–32

Electric Power Research Institute, 678

Electroencephalography (EEG), 761, 766, 772–773, 791–792, 796, 803, 838–839

Electropherogram, 144, 145–146, 182–183

Eleventh Amendment, 816 n.12

Emphysema, 592, 593, 595, 606, 618

EXHIBIT C

*Reference Manual on Scientific Evidence*

Empirical testing (*see also specific disciplines*)
    *Daubert* and, 62-64
Engineering evidence
    accelerated testing, 905-906, 944
    acceptable risk, 908, 909-910, 915-920
    accreditation, 931-932
    administrative hearings, 947-948, 953
    admissibility, 899, 932-933, 943, 944
        n.72, 952 n.93, 955, 958 n.106
    air cooler flaws, 922
    Air France 4590 disaster, 928-929
    animated presentations, 956-958
    approximations, 903, 913, 919, 936
    assumptions, 903, 912-913, 935, 936,
        950
    automotive lift design, 924-925
    best practice, 950-951
    certification, 932
    *Challenger* space shuttle disaster,
        926-928
    computer simulation and digital
        displays, 901, 936-937, 956-958
    Concorde design flaws, 928-929
    cross–disciplinary domains, 900-902
    dam collapse, 925-926
    *Daubert* and, 899, 932-933, 945, 946,
        949, 958 n.106
    "defect" testimony, 907, 908, 934,
        937, 939-944, 947 n.84, 951 n.92,
        952, 953
    design issues, 920-929, 939-940, 948
    design process, 904–929
    disciplines and fields of practice, 900
    disputed issues commonly occurring,
        948-956
    education and training, 929-930, 931
    end use testing, 905-906, 923, 924,
        925, 944
    engineering calculations, 936-937,
        938, 957
    engineering interns, 931
    engineers in training, 931
    environmental disputes, 906, 916, 947,
        954-955
    examples of flawed design processes,
        920-929

experience, 901, 902, 903, 904, 906,
    922, 928-929, 930
experiment-based evidence, 933, 934–
    936, 938, 944
Federal Motor Vehicle Safety
    Standards (FMVSS), 917-918
finite element modeling (FEM), 937,
    957
formulation of products and materials,
    907, 922, 923, 929
Fundamentals of Engineering (FE)
    exam, 931
gatekeeping role of judges, 901, 933,
    956
inspections, 925, 933-934
intellectual property disputes, 932–
    933, 938, 945-946
internal documents, 938-939
intrauterine device (IUD) flaws,
    920-921
issues for litigation, 939-948
Kansas City Hyatt Regency Hotel
    disaster, 389, 923-924
licensure, 931-932, 933, 949
literature analysis, 938
manufacturing issues, 906, 907, 918,
    920–921, 923, 925, 927, 928–929,
    934, 937, 939, 940, 941, 943 n.70,
    947 n.84, 952
modeling, mathematical and
    computational, 901, 936-938, 957
observational evidence, 933-936, 952,
    955-956
obsolescence, 907
opinion testimony, 901, 933-939, 940
    n.62, 941–942, 943, 944, 952, 956–
    957, 958
other similar incidents (OSIs) concept,
    952-956
patent cases, 935, 945–946
personal injury cases, 942, 947
presentation of evidence, 901, 936–
    937, 956-958
problem identification, 902-903
product defects, 907, 908, 934, 937,
    939-944, 947 n.84, 951 n.92, 952,
    953

984

**EXHIBIT C**

*Index*

product liability litigation, 901, 938, 939-943, 947

professional engineers (PEs), 931, 932

property damage, 943, 947

qualifications of experts, 831, 901, 932-939, 949

radiant heating hose flaws, 922-923

reasoning processes, 902-904

registration, 931, 932, 949

regulatory context, 919, 947-948, 951-952, 953

reliability of evidence, 900, 906, 933, 935, 940 n.62, 945, 946, 947, 958 n.106

retrospective product modification, 907

risk assessment, 909, 910-914

risk calculations, 911-912, 918

"safe" products, 908-909

safety considerations, 908-910

severity of injury, 910, 911-912

solution paradigms, 902-903

standard of care, 949-950

standards and codes, 924-925, 947-948, 951-952

state of the art, 950

Tacoma Narrows Bridge collapse, 924

testing-related evidence, 934-936

toxic waste site design, 921-922

trade secret disputes, 946

uncertainty, 903

validation, 904, 906, 907, 922-925, 927-928, 929, 936, 937-938, 944 n.72, 958

vehicle-miles-traveled (VMT), 912, 913-914, 916, 919

warning issues, 904, 938, 939, 941-942, 943-944 n.70

Environmental Defense Fund, 678

Environmental Protection Agency (EPA), 506, 530 n.66, 532, 577-578, 640, 648, 649 n.46, 650, 656 n.64, 663, 665 n.88, 673 n.108, 679, 920

Ephedra litigation, 23-24 n.61, 25 n.67, 577 n.81, 579 n.85, 617 n.212, 664 n.84, 669 n.94, 676 n.113

Epidemiology

adjustments for noncomparable study groups, 571-572

admissibility of evidence, 551 n.2, 553, 555 n.14, 562 n.38, 565 n.48, 579 n.85, 581 n.89, 583 n.100, 601 n.153, 606 n.169, 609 n.181, 610, 618 nn.213 & 214

agent, defined, 551 n.3, 619

alpha, 576, 577, 578 n.84, 579-581, 582, 619

alternative explanations, 552-553 n.7, 582, 595, 598, 600, 605

animal studies of toxicity, 563-565, 603 n.160, 625

association (exposure–disease), 552-553, 554, 555-556, 557, 559, 561, 566, 567-568, 570, 572, 573, 574-575, 576, 577, 578 n.85, 579, 580, 581, 582, 583, 584, 585, 586 nn.107 & 108, 588 n.115, 589, 590, 591-593, 595, 597-606, 610 n.184, 611-612, 613, 622

attributable risk, 566, 570-571, 612 n.191, 619

Bayesian approach, 611 n.188

beta, 576 n.80, 581, 582

biases, 24, 553 n.9, 554, 567-568, 572, 573-574, 575 n.74, 583-591, 592 n.127, 595 n.133, 598, 602, 605, 610 n.184, 612-613, 615, 620, 622, 624, 625, 626, 627

biological markers, 586, 620

biological plausibility of association, 573, 600, 604-605, 606, 620

case-control studies, 556, 557, 558, 559-560, 568, 569, 583-584, 585-586, 587 n.112, 588 n.115, 589-590, 591 n.122, 597-606, 607, 620, 625

causation, 23, 24, 217 n.14, 218, 551-552, 553, 554, 558, 559, 560-563, 564 n.48, 566, 570, 574, 577 n.81, 579 n.85, 584, 585-586, 587 n.111, 588, 591, 592-593, 597-618

clinical studies, 555, 556, 575, 590, 607, 621

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

cohort study, 556, 557–559, 560, 567,
    568, 573, 583, 584, 585 n.104, 589,
    590, 592, 593, 594, 607, 621, 624,
    625, 626, 628, 657, 658–659, 716
conceptualization problems, 589–590
confidence intervals, 573, 578 n.85,
    579–580, 581, 582 n.94, 585
    n.106, 608, 621, 628
confounding factors, 24, 554, 563,
    567–568, 572, 574, 575 n.74, 584
    n.103, 585, 591–597, 598, 602, 605,
    612–613, 621, 622, 628, 657 n.67
cross–sectional studies, 556, 560–561,
    621–622
*Daubert* and, 551 n.2, 574 n.72, 575
    n.74, 576 n.77, 578–579 n.85, 581
    n.89, 610–611 n.185, 617 n.212
design of studies, 556–563, 589–590
differential diagnosis/etiology, 217
    n.14, 512 n.21, 589–590, 591, 610
    n.183, 613 n.193, 617–618
dose–response relationship, 563, 565,
    585, 600, 603, 613, 616 n.204, 622
ecological fallacy, 623
ecological studies, 556–557, 561–563,
    623
error sources, 556 n.19, 572–597, 612-
    613, 619, 620, 621, 623, 624, 626,
    627, 628, 629
experimentaI studies, 555–556
and exposure science, 505, 506, 508,
    509, 512, 518, 519, 533, 535, 536,
    537, 538, 540, 547
extrapolation, 535 n.75, 563, 565, 603
    n.160, 613
false negatives (beta errors or Type II
    errors), 577 n.81, 581–582, 620,
    629
false positives (alpha errors or Type I
    errors), 575–581, 589, 619, 627,
    628, 629
false results (erroneous association),
    572–597
general causation, 24, 551 n.2, 552,
    565 n.48, 578 n.85, 597–606
generalizability of studies, 564, 595
    n.133, 623

hospital–based studies, 584
human (in vitro) studies, 555–556,
    564, 623
incidence of disease, 551, 557, 558,
    560, 561 n.34, 562, 566, 567, 568
    n.58, 569 n.61, 570, 571, 577
    n.83, 582, 592, 594, 595, 598, 603,
    605, 608 612, 613, 615, 616, 619,
    621, 622, 623, 624, 625, 628
information bias, 585–590, 624
interpretation of study results, 566–572
meta-analysis, 15, 19–20, 23, 579, 581
    n.89, 606–608, 624
misclassification bias, 588 n.115, 589-
    590, 622, 624, 625
missing data, 595–596
multivariate analysis, 596, 597, 625
null hypothesis, 574, 575, 576 n.78,
    577 nn.81 & 82, 579, 581–582,
    619, 620, 625, 626, 628, 629
observational studies, 555–563, 566,
    581, 590, 592, 593, 607, 608, 624,
    625, 627
odds ratio, 566, 568–569, 573, 584,
    589, 625
power of hypothesis tests, 580 n.88,
    582–583, 607
prevalence, 560, 567 n.54, 602 n.157,
    622, 625, 626
publication bias, 590
*p*-values, 575 n.74, 576, 577 n.81,
    578–580, 626, 628
random assignment, 555, 556 n.15,
    592, 607, 623, 626
random error, 556 n.19, 572 n.67,
    573, 574–582, 585 n.106, 589,
    612–613, 621, 623, 624, 626, 627,
    628
random sample/sampling, 572 n.67
randomized controlled studies, 398,
    555, 556, 581 n.89, 592, 607, 621
randomness, generally, 555, 626
relative risk (RR), 566–568, 569, 570
    n.62, 572, 573, 574, 575–576, 577
    n.82, 578 n.85, 579, 580, 581,
    582, 592, 594, 602, 611, 612, 614-
    615, 616, 619, 621, 626, 627

**EXHIBIT C**

*Index*

replication of results, 604

selection bias, 583–585, 591, 627

specific causation, 24, 551 n.2, 552, 606–618

specificity of association, 605–606

standardized mortality (or morbidity) ratio (SMR), 572, 607 n.171, 624, 628

statistical significance, 24, 573, 575–581, 582, 585 n.106, 607 n.171, 619, 620, 631, 626, 628

stratification, 593, 596, 628

strength of association, 557, 566, 600, 602, 611 n.186, 626

sufficiency of evidence, 552–553 nn.7 & 9, 565 n.48, 579 n.85, 600 n.146, 604 n.164, 605 n.167, 610, 611, 612, 616–617

temporal relationships, 601–602, 606

time-line (secular trend) studies, 562–563, 627

toxic agents, 555–556, 563–565

toxicology studies compared, 563–565, 603 n.160, 628, 636, 639, 644 n.29, 645–646 n.33, 647, 650-651, 655, 656, 657–660, 664–665, 674, 681

true association, 559, 568, 572, 574, 575, 581–582, 590, 591, 592 n.126, 625, 627, 629

two-tailed tests, 577 n.83

types of studies, 555–565

Equal Protection Clause, 2, 816 n.11

Error, defined, 51–52

Error rates (*see also specific disciplines*)

and reliability of methodology, 13, 29, 49 n.16, 64, 65, 69 n.80, 78, 79, 86, 87, 88–89, 97, 99, 102 n.290, 103 n.300, 122, 162, 171 nn.96–98, 214, 217, 259 n.122, 628, 724–725, 787, 806, 890, 903

zero, 29, 79, 99, 122, 171 n.97

European Committee for Standardization (CEN), 906, 936, 956-957

European Union Regulation on Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH), 648, 649

Evidence, defined, 51

Evolution, theory of, 50

Ex parte contact, 329–330

ExperimentaI studies, 555–556

Experts/expertise (*see also individual disciplines*)

consulting vs. testifying, 33

court-appointed, 6–8, 14, 35, 311, 329–330, 489, 599 nn.141 & 143

defense due process rights to, 29, 127

ethical responsibilities, 125

examiners and witnesses, 30, 86, 369, 672–673, 693 n.26, 823 n.51, 827 n.73, 890

national register of, 8

resources for identifying, 8

secondary experts, 375–376

of survey interviewers, 409

unretained, 32, 373 n.62

Exposure science (*see also* Epidemiology; Toxicology; *specific substances*)

absorption, 518, 523, 524, 526, 532, 534, 535, 543, 544, 545, 547

acute exposure, 545, 657 n.66, 671

admissibility of evidence, 25–26, 506 n.5, 512 n.22

analytical chemistry (direct measurement), 528–530, 535, 540

analytical detection limits, 530

assessment of exposure, 510, 511, 512, 513 n.26, 519, 529, 531 n.66, 533–534, 539, 543–544, 656–657

biomonitoring, 505 n.3, 535–537, 559, 587, 649 n.47, 657, 667, 680

blood evidence, 508, 509, 518–519, 535–537, 544, 656, 657, 672

blood lead levels (BPb), 536–537, 662, 667, 672

body burdens, 534–535, 537, 538, 545

causation analysis, 22, 25–26, 505, 509, 511–513, 518, 519 n.35, 525 n.53, 528 n.63, 534, 535, 538, 539, 543–544, 597-606

certification programs, 540

children and infants, 518, 521 n.40, 524 n.49, 527, 531 n.67, 536-537, 544, 552 n.4

EXHIBIT C

*Reference Manual on Scientific Evidence*

concentration, 506 n.5, 519 n.35, 525, 527–529, 530, 531, 532, 533, 534, 535, 536, 540 n.88, 541–542, 543, 544, 546

consumer products, 505, 506, 507, 509–511, 515, 516, 519–520, 524, 526, 527, 528, 533, 537, 545, 546

contexts for, 509–512

*Daubert* and, 25–26

distribution, 511, 518, 532, 534, 535, 546

dose, 507, 508, 509, 513 n.26, 518–520, 525–528, 529, 531 n.67, 533–534, 535, 536, 538, 539, 541, 544, 545, 546, 547

duration of exposure, 518, 519, 525, 526

environmental contaminants, 25, 508, 509, 510–511, 515–516, 520–522, 536, 537

environmental degradation, 521–522, 524, 531, 532

environmental media, 507, 508, 509, 510, 518, 521–522, 524, 527–528, 530, 533, 541, 546

environmental models, 530–533

environmental sampling, 528, 529, 530, 533, 538, 541

epidemiology and, 505, 506, 508, 509, 512, 518, 519, 533, 535, 536, 537, 538, 540, 547

excretion, 518, 523, 527, 532, 534–535

fate and transport, 507, 521, 532

gastrointestinal (GI) tract/ingestion, 518, 523–524, 525, 526, 531 n.67, 534, 546

general causation, 26

goal of, 318–319

hazardous waste sites, 528, 531, 536 n.78, 543–544, 546

indirect pathways, 512 n.26, 517, 518, 520, 527–528, 533, 546

industrial chemistry/chemicals, 507, 510, 511, 514–516, 521

inorganic chemicals, 513–514, 515, 520, 522

laboratory certification, 529–530

lungs/respiratory tract/inhalation, 507, 509, 516, 517, 518, 519 n.36, 520, 522–523, 524, 526, 534, 544, 545, 546, 547

metabolism/metabolites, 518, 527 n.62, 534–535

modeling, 508, 521, 528, 530–533, 538, 544, 546

occupational exposures, 26, 217 n.14, 505–506 n.5, 511, 516, 517, 526, 529, 536, 539, 540, 652 n.54, 663 n.81

organic chemicals, 508–509, 513–514, 515, 520–521, 522, 528 n.63, 537

overview, 506–507

particulate matter (PM), 511 n.17, 512 n.22, 515, 523–524, 528 n.63, 532, 533 n.72

pathways of exposure, 512 n.26, 517, 518, 519–523, 524, 527–528, 531, 532, 533, 536, 538, 543, 544, 546

persistance, 521–522, 353–536, 537

pharmacokinetics, 535, 540

presentation of data, 541–542

processes of human exposure, 516–525

product contaminants, 505, 506, 507, 509–511, 515, 516, 519–520, 524, 526, 527, 528, 533, 537, 545, 546

qualifications of experts, 508, 539–540

quality of assessment, 537–539

quantification of exposure, 525–534

reconstruction of exposure, 512, 513 n.26, 529, 531 n.66, 539, 657 n.57

regulatory context, 505, 506, 509–511, 517 n.31, 528–529, 534

risk assessment, 505, 506, 507, 510–511, 525, 526, 528, 533, 534, 535, 536, 537, 538 n.84, 547

routes of exposure, 507, 509, 518, 519, 520, 522–524, 526, 533, 536, 537 n.80, 538, 547, 588, 650 n.48, 682

scope of, 507–508

skin (dermal exposure), 507, 509, 516, 517, 518, 520, 523, 524, 526, 534, 536 n.76, 543, 544, 546, 547, 650, 660, 682

**EXHIBIT C**

*Index*

sources of exposure, generally, 516–517

specific causation, 26

standards for dose limits, 512 n.22, 521 n.43, 528–529, 536

target site (systemic) dose, 507, 519, 535, 536, 547

toxicology and, 505, 506, 508, 509, 518, 159, 533, 535, 537, 538, 540, 547

units of concentration, 525, 541–542

volatile chemicals, 514, 520, 521, 531, 650 n.48, 657 n.66, 668

Extrapolation

animals to humans, 4–5, 15, 23, 223 n.26, 535 n.75, 563, 565, 636, 641, 645, 646–647, 648, 658, 661–662, 669–670, 692 n.21

in class actions, 238 n.72

of damages from past earnings, 438

defined, 682

dose–response relationships, 4–5, 603 n.160, 636, 641, 645, 648, 651

exclusion of evidence, 23, 692 n.21

representativeness of populations for, 613, 727

in risk assessment, 547, 603 n.160, 651, 661–662

from samples to populations, 226, 238 n.72, 244, 299, 909

from short exposures to multiyear estimates, 648

statistical models, 222, 223, 226, 238, 244, 645 n.31

from tissue or cell cultures to humans, 564, 646–647, 652, 664

*Exxon Shipping Co. v. Bake*r, 239

Eyewitness testimony, 13 n.10, 59, 62, 72 n.95, 328–329, 365 n.22, 384, 958

# F

Federal Bureau of Investigation

anthrax investigation, 194

Automated Fingerprint Identification System, 77

ballistics analysis, 120 n.415

CODIS, 61, 62 n.30, 145, 201

crime laboratory, 58

DNA analysis, 61–62, 69–70, 116, 145, 154, 156, 157, 178, 179 n.128, 180, 187, 194

fingerprint analysis, 67 n.66, 74, 75, 77, 78, 79-80, 81, 83 n.175

hair analysis, 112 n.357

toolmark identification, 203 n.300

Uniform Crime Reports, 231

Federal Communications Commission, 378

Federal Employees Liability Act, 947

Federal Highway Administration, 916

Federal Insanity Defense Reform Act, 868

Federal Judicial Center, 8-9, 63 n.39

Federal Rules of Civil Procedure

Rule 23, 30–31, 32

Rule 26, 32, 33, 34, 35, 374, 414, 417–418 n.246, 486–487, 696 n.33

Rule 53, 35

Federal Rules of Criminal Procedure

Rule 16, 125

Rule 23(a), 794 n.41

Federal Rules of Evidence

Rule 104(a), 12

Rule 401, 27 n.79, 101 n.281, 123, 785, 952 n.93

Rule 403, 29, 121, 167, 174, 181, 214, 610 n.185, 788–789, 806, 952 n.93

Rule 404, 171 n.96, 189–190 n.164, 789

Rule 406, 790

Rule 702, 12–13, 16, 17, 18, 22–23, 34–35, 63, 82 n.169, 90 n.221, 101, 102 n.291, 121 n.426, 122, 167, 174, 181, 214, 551 n.2, 579 n.85, 696 n.33, 776, 785–788, 806, 827 n.73, 846 n.179, 871 n.333, 939

Rule 703, 214, 361, 363–364, 610 n.184

Rule 704, 868, 944 n.72

Rule 706, 24 n.66, 135, 329–330

Rule 803, 363–364 n.12

Federal Trade Commission, 399 n.178

989

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Federation of American Societies for Experimental Biology, 46

Federation of State Medical Boards, 698

Fiber analysis, 57, 61, 62 n.32, 71 n.88, 112, 119 n.409

Fifth Amendment, 790-792

Fingerprint evidence
admissibility, 27 n.78, 73, 81-83
analysis, comparison, evaluation, and verification (ACE-V), 75, 76, 79, 81, 82-83
artifacts, 74 n.105, 75
Automated Fingerprint Identification System (AFIS), 65, 77
"black box" approach, 81
case law development, 58, 71, 73, 81-83
confirmation bias, 67 n.66, 79-80
*Daubert* and, 74 n.105, 82, 122
DNA exonerations, 62 n.32
DNA profiling compared, 60 n.23, 61, 73, 74 n.107
empirical record, 59 n.17, 61 n.25, 76-81, 109 n.331
error rates, 78, 79, 122
expectation (context) bias, 80
FBI examiners, 28 n.82, 67 n.66, 74, 75, 77, 78, 79-80, 81, 83 n.175
*Frye* test, 82-83
Galton details, 73, 75 n.113
history, 72-73
individuation, 57 n.1, 72, 73, 82, 84, 117 n.393
latent prints, 74, 75-77, 78 n.143, 79, 80 n.156, 81, 82 n.169, 109 n.331
"match" opinions, 73-74, 75-76, 81 n.167, 82 n.169, 84, 175
Mayfield case, 28 n.82, 67, 75 n.116, 79-81
minimum threshold approach, 80
observer bias, 67
"one-discrepancy" rule, 75 n.111
population frequency data, 73
proficiency testing, 27 n.78, 67-68, 76-77, 78-79, 78 n.143
simultaneous impressions, 83
technique, 71, 73-76, 575 n.74
validity, 76-77

Firearms identification (*see* Ballistics evidence)

First Amendment, 792

Food additives, 5, 216, 510, 515, 517, 525 n.56, 919

Food and Drug Administration, 25, 217 n.14, 461-462, 525, 581 n.89, 640, 644 n.29, 647-648, 650, 670 n.97, 678, 696 n.33, 720, 728, 730, 731, 774, 775, 854, 856, 858, 862, 907, 921, 941 n.65

Food Safety Risk Analysis Clearinghouse, 910

Forensic dentistry, 57, 101-102, 105 (*see also* Bite mark evidence)

Forensic identification expertise, 55-127 (*see also* Bite mark evidence; DNA; Fingerprint evidence; Handwriting evidence; Microscopic hair evidence; *other specific disciplines*)
accreditation of crime laboratories, 28, 66, 68-69, 98, 154 n.48
admissibility of, 26-30, 57, 59-60, 61, 62-64, 65, 71, 72, 74 n.105, 76-77, 82, 85-86, 89-90, 101, 102, 103, 110-111, 112, 117, 118-119, 121 n.426, 122, 123, 124, 127
certification of examiners, 28, 66, 68-69, 79, 80 n.157, 89
clarity of testimony, 70, 120-121
class characteristics, 57, 72, 84, 92, 93, 94, 96, 97, 101, 114
closing arguments, 124
confirmation bias, 67 n.66, 80
Confrontation Clause and, 26-27, 30
contextual (expectation) bias, 29, 67 n.63, 80
court-appointed experts, 29-30
cross-examination, 30
*Daubert* and, 26-30, 57, 60, 62-64, 72, 74 n.105, 76-77, 82, 85-86, 89, 90 n.220, 101, 112, 118-119, 122, 124
defense experts, 80 n.157, 111 n.351, 124, 125 nn.450 & 454, 127
development of techniques, 58-60
DNA exonerations, 27, 62, 109-110, 116, 117, 119, 125 n.450, 134

EXHIBIT C

*Index*

drug analysis, 59

empirical testing, 60-64, 66 n.62

ethical responsibilities of experts, 125

false-positive errors, 77, 78, 100, 109, 115

Fed. R. Evid. 401 and, 101 n.281, 123

Fed. R. Evid. 702 and, 12-13, 16, 17, 18, 22-23, 34-35, 63, 82 n.169, 90 n.221, 101, 102 n.291, 121 n.426, 122

*Frye* and, 60, 63, 82, 102 n.291, 103 n.300, 110 n.343

individual characteristics, 57, 72, 73, 84, 92, 93-94, 96, 97, 99, 113

individuation opinions, 57, 59 n.12, 60, 66, 71 n.91, 72, 74, 82, 84, 89, 90, 94, 106, 113, 114

interpretation of evidence, 27, 29

*Kumho Tire* and, 62-63, 89 n.214

laboratories, 28-29, 58-59, 66

laboratory report format, 28-29, 70

limitations on testimony, 121-124, 126-127

match probability, 72

NRC Forensic Science Report, 27, 30, 60 n.23, 64-70, 71, 74 n.106, 75-76, 77-78, 79, 82 n.171, 84, 85, 97, 100, 105 n.314, 108, 113-114, 115-116, 119-120, 121, 122, 126

objectionable testimony, 29

observer effects, 67-68

prejudicial, 29

pretrial discovery, 125-126

procedural issues, 124-127

proficiency of experts, 28, 61, 62 n.30, 68, 69-70, 76, 78-79, 85, 87-89, 97-98, 116

reappraisal of, 60-64

recurrent problems, 120-124

reliability, 71-72

research recommendations, 66

terminology, 70, 71-72

testifying beyond the report, 126-127

validity, 27-28, 71-72

wood evidence, 58

Forensic Science Service (UK), 144

Forensic Sciences Foundation, 69 n.82

Formaldehyde, 522 n.47, 528 n.64, 653, 656 n.65, 658 n.70, 673 n.107, 674 n.110

Fourteenth Amendment, 792

Fourth Amendment, 796

Framingham Study, 708

Freud, Sigmund, 858

*Frye* (general acceptance) test, 12, 53, 60, 63, 82, 102 n.291, 103 n.300, 110 n.343, 133 n.7, 166, 173 n.102, 186, 189, 195 n.183, 197, 367, 368, 806-807, 866, 867, 949

Functional impairments
 assessment, 842-846
 clinical examination, 843-844
 diagnosis of mental disorders vs., 819-821
 from mental disorders and, 841-846, 851-852, 860-861
 predictive assessments, 851-852
 structured assessment techniques, 844-846
 treatment of, 860-861

Functional MRI (fMRI), 765, 766, 768-772, 773, 775, 776-777, 778, 779, 780, 781, 782-783, 786, 787-788, 791, 796, 797-798, 800, 803-807, 809, 810-811, 838

*Furman v. Georgia*, 370

# G

Gatekeeping role of judges, 6, 12-13, 16, 17, 102 n.291, 866 n.309, 901, 933, 956 (*see also* Case management)

Gender discrimination (*see* Sex discrimination)

*General Electric v. Joiner*, 14-16, 17, 18, 19-20, 24 n.65, 53, 82-83, 364 n.17, 563-564 n.44, 565 n.48, 579 n.85, 638 n.9, 661 n.77, 692-693, 932 n.56

EXHIBIT C

*Reference Manual on Scientific Evidence*

Genes (*see also* Alleles; Chromosomes; DNA)
    amelogenin, 146, 147, 183
    coding and noncoding sequences, 138, 139, 177, 201
    defined, 138, 142
    DQA, 202
Genome (*see also* Chromosomes; DNA)
    Alu sequences, 199
    defined, 203
    environmental impacts, 663
    Human Genome Project, 144, 149
    mitochondrial, 150, 176, 177–178, 202
    nuclear, 137, 138, 139, 140, 141, 142, 144, 148, 149–150, 176, 177, 204
    structure, 137, 138, 204, 209
Genome-wide association studies, 581 n.90
Glass analysis, 57, 69 n.81, 116 n.383
Global Utilization of Streptokinase and tPA for Occluded Coronary Arteries Trial, 732
*Gregg v. Georgia,* 307 n.10, 370

# H

Habeas corpus proceedings, 118, 119, 126, 170 n.92, 795, 815 n.5
Hair (*see* Microscopic hair evidence)
Handwriting evidence
    case law development, 58, 63 n.41, 83, 89–90, 101 n.284
    class characteristics, 84
    *Daubert* and, 63 n.41, 85–86, 89, 90 n.220
    empirical record, 59 n.17, 85–89
    error rates, 86, 87, 88, 89
    experts compared to laypersons, 86–87
    Fed. R. Evid. 901(b)(3), 89
    individual characteristics, 84
    individuation opinions, 84
    *Kumho Tire* and, 89 n.214
    limits on testimony, 27 n.79, 89–90, 101 n.284, 121 n.426, 123 n.440

    observer effects, 67
    proficiency studies, 85–89
    technique, 83–84
Haplotypes, 178, 181, 182, 204
Hardy-Weinberg equilibrium, 165, 166, 204, 207
Harvard Center for Risk Analysis, 910
Harvard Medical Practice Study, 700–701
HCR–20, 848
Healthcare Facilities Accreditation Program (HFAP), 700
Healthcare Research and Quality Act of 1999, 701
Hearsay, 214, 225 n.32, 227 n.37, 363–364, 610 n.184, 956
Hemangiosarcoma, 672
*Henricksen v. ConocoPhilips Co.*, 26
Heterozygosity, 139, 140, 147, 183 n.139, 199, 204
Hinkley, John, 800
HIV, 194, 195 n.181, 385, 402, 635 n.1, 713, 720, 730, 838
Homozygosity, 139, 140, 183 n.139, 199, 204
Hooke's law, 269, 271, 281
Hughes, Howard, will dispute, 83
*Hunt v. Cromartie*, 2

# I

Impeachment by bias, 21
Infectious Disease Society of America (IDSA), 728
Informed consent (*see* Medical informed consent)
Innocence Project, 27 n.77
Insanity defense, 29 n.85, 222, 749, 763, 785, 786, 799, 800, 815 n.1, 817, 819–820, 865–866, 867, 868, 869
Institute of Healthcare Improvement, 701
Institute of Medicine, 20, 46, 49, 701, 702, 723, 728
Integrated Ballistics Information System (IBIS), 95

992

EXHIBIT C

*Index*

Intellectual property litigation, 307, 311,
419 n.1, 439, 440, 441, 498-499,
501, 502, 932-933, 938, 945-946
(*see also* Patents)
"Intelligent Design" litigation, 50
International Academy of Forensic
Toxicology, 678
International Agency for Research on
Cancer (IARC), 20, 564 n.46, 646,
656 nn.64 & 65, 660 n.75, 665, 678
International Association of Identification,
80 n.187
International Organization for
Standardization, 68
International Society of Regulatory
Toxicology and Pharmacology, 678
Intrauterine device (IUD) litigation, 574
n.70, 920-921

## J

Joint Commission, 701
*Jones & Laughlin Steel Corp. v. Pfeifer*, 454
Jury
change-of-venue surveys, 376-377, 403
comprehension of evidence, 5, 29,
91 n.226, 118 n.400, 124, 126,
134, 167, 168, 169, 171, 173, 175
n.111, 189-190 n.164, 329, 463,
475, 693 n.26, 788, 868, 901, 937,
939, 947, 951, 956
damage awards, 238-239, 240 n.82,
475
death penalty cases, 370
decisions as indicators of national
opinion, 370
discrimination in composition, 7, 234,
249-250, 253 nn.104 & 105, 275-
278, 365
impartiality, 223 n.27, 224, 365, 370,
376-377, 403
instructions to, 29, 168 n.84, 383
n.104, 455, 943
law enforcement officers excluded
from, 252 n.102

questionnaires, 226 n.36
right to a trial by, 5, 21, 226 n.35,
794-795
selection, 225, 226 n.36, 249, 253
n.104
Jury Selection and Service Act, 226 n.36,
252 n.102
Justice for All Act, 62 n.30, 154 n.48

## K

*Knoll v. State*, 112
*Kochert v. Greater Lafayette Health Serv.
Inc.*, 22
*KSR International Co. v. Teleflex, Inc.*,
945-946
Kuhn, Thomas, 41-43, 44-45, 49, 50
*Kumho Tire Co. v. Carmichael*, 16-18, 35,
53, 62, 63, 89 n.214, 214 n.4, 308,
431, 575 n.74, 692-693, 866, 891,
899, 932 n.56, 933, 951

## L

Laboratories (*see also* DNA laboratories;
Laboratory reports)
accreditation, 28, 62 n.30, 66, 68-69,
70 n.83, 98, 154, 156, 171 n.98,
538
growth in number of, 58-59
practices, 28-29
quality assurance and quality control,
68, 529-530
regulation, 61, 66
Laboratory Proficiency Testing Program,
69, 97, 116
Laboratory reports
format standardization, 70
jury comprehension, 126
pretrial discovery, 125-126
testifying beyond the report, 126-127
Lanham Act, 363 n.10, 366, 382, 400,
422
Law, language of science compared, 51-52

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Law Enforcement Assistance
Administration (LEAA), 69, 97
n.262, 116
Lead exposure, 510 n.15, 521 n.41, 522,
524 n.49, 531 n.67, 536–537, 640,
653, 654, 662, 667, 870 n.332
Leapfrog Group, 701
Lethal injection, 3
Lie detection (*see also* Polygraph evidence)
fMRI, 801–807
nonlitigation applications, 807
Life expectancy, 365, 471, 472, 473, 474,
492, 493, 495–496, 702, 719, 727,
733
Likelihood ratios, 169 n.89, 172–173,
174, 175, 177–178, 185–186, 205,
206, 710–711
Lindbergh kidnapping trial, 58, 83, 89
Linear
associations, 261, 262, 264–268, 286,
321, 348, 352, 603 n.160
combinations, 271 n.139, 280, 287,
289, 290, 298
low-dose risk curve, 673 n.107
no-threshold model, 642–643 n.28
regression, 260 n.124, 264, 298, 316,
317 n.36, 336–339, 347, 353, 354
Linkage equilibrium, 166, 205, 207
*Lockett v. Ohio*, 795
Lockheed–Martin, 77–78
Lung cancer, 14, 15 n.26, 218, 219, 221,
552, 558–559, 570 n.63, 578 n.85,
585 n.104, 593, 597, 600, 602,
605, 606, 613, 615, 620, 635, 718–
719, 724, 733

# M

Madrid terrorist train bombing, 28 n.82,
67, 75 n.116, 79–81
Magnetic resonance imaging (MRI), 720,
761, 763, 766–772, 773, 777–778,
781, 797, 800 n.52, 837–838
Magnetoencephalography (MEG), 761,
772–773

Major depressive disorder, 828 n.76, 829,
830, 832, 838, 839, 863 n.297, 879
n.357
Mammography, 259 n.122, 708, 710,
711–712, 726–727, 738–739
Management of expert evidence (*see* Case
management)
Manganese, 505 n.3, 515, 522 n.47, 528
n.64, 529 n.65, 653, 670 n.95
*Mapes Casino, Inc. v. Maryland Casualty
Co.*, 257
Mass torts litigation, 366–367
Maximum Contaminant Levels (MCLs),
528–529
Mayfield, Brandon, 28 n.82, 67, 75
n.116, 79–81
Mayo Lung Project, 718
*McNeilab, Inc. v. American Home Products
Corp.*, 392 n.146, 415
Medical education and training
accreditation, 695, 696, 697, 700, 701,
822, 823 n.49, 824, 873
continuing medical education, 700
licensure and credentialing, 695, 696
n.33, 697, 698–699
medical school, 695–696, 821, 822
n.44, 873
postgraduate training, 697–698, 824
Medical history
consistency with toxicology expert's
opinion, 670–671
differential diagnosis, 672–673
disclosure of contradictory data,
674–675
interaction of chemicals, 673
laboratory tests, 672
susceptibility to environmental agents,
674
symptoms of toxic exposure, 671–672
Medical informed consent
principles and standards, 734–737
risk communication, 737–739
shared decisionmaking, 739–740
Medical malpractice litigation, 474, 689,
692, 694 n.27, 695, 698, 816–817,
852, 877, 878, 951

**EXHIBIT C**

*Index*

Medical practice
delivery of care, 700-701, 721-722
education and training for, 695-700
outcome goals, 702-703
patient–physician encounters, 703-704
quality of care, 702-704, 721-722
Medical Practice Acts, 698
Medical testimony
absolute risk, 738
Bayes' rule, 259 n.122, 706 n.78, 707-714, 725, 742
causal reasoning, 23, 714-717, 742
clinical practice guidelines, 726-728
clinical reasoning process, 689, 705-707, 741
conditional probability, 710, 712, 714, 737, 742
cross-sectional studies, 716, 736-737
*Daubert* and, 690, 692-693, 696 n.33
diagnostic reasoning, 689, 693, 704-717, 719, 741
diagnostic testing, 704, 717, 719-720, 724, 742
diagnostic verification, 706, 715, 719, 742, 743, 744
differential etiology, 690-691, 741, 742-743
etiology, defined, 691, 743
evidence-based medicine, 722-723, 726, 733, 738
false-negative test, 708, 711, 724
false-positive test, 708, 710-711, 713, 714, 717-718, 720, 724, 725, 735
*General Electric Co. v. Joiner*, 692-693
hierarchy of evidence, 723-725
hypothesis generation, 705, 715, 742, 743
hypothesis modification, 706, 742, 743
hypothesis refinement, 706, 742, 743
hypothesis testing, 724-725
hypothetico-deductive approaches, 705, 707, 743
judgment and uncertainty in, 693-694, 721-734
*Kumho Tire Co. v. Carmichael*, 692-693
likelihood ratios, 711

malpractice litigation, 474, 689, 692, 694 n.27, 695, 698, 816-817, 852, 877, 878, 951
medical decisionmaking, 704-740
medical reasoning, 693–695
meta-analysis, 722-723, 724, 725
natural frequency statements, 712, 737
negative predictive value, 710, 711, 744
null hypothesis, 724, 725
odds ratio, 738
pathophysiological reasoning, 715
personal injury cases, 689, 690 n.8
positive predictive value, 710, 711, 712, 744, 781
posterior probabilities, 710, 742
posttest probability, 742, 744
predictive value, 710, 711, 712, 744, 781
pretest probability, 710-711, 742, 744
prior probability, 708, 710-711
probabilistic reasoning, 707-714, 715
product liability cases, 22, 689, 693, 703, 731 n.189
prognostic testing, 721
prosecutor's fallacy, 712
*p*-value, 724
qualifications of experts, 698, 700, 729
randomized controlled studies, 716, 718, 722-723, 724, 725, 729, 730-731, 732, 736
"reasonable medical certainty/probability," 123, 691-692, 693, 694 n.27, 716
relative risk, 737, 738
screening tests, 708, 712-713, 714, 717-719, 726-727, 735, 736-737, 738-739, 743, 744
sensitivity of tests, 706 n.78, 708, 709, 710-711, 712, 713, 714, 719-720, 737, 742, 744
single event probability, 737
specificity of tests, 706 n.78, 708, 709, 710-711, 712, 713, 714, 719-720, 737, 742, 744
terminology, 689-692
testing, 717-721

995

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

treatment–related, 728–734
true–negative test, 708, 710, 711, 724
true–positive test, 708, 711, 712–713, 717, 724
variations in care, 721–722
Medications for mental disorders (*see also specific medications*)
  categories of, 855–856
  efficacy and effectiveness, 858
  polypharmacy, 856–857
  side effects, 857
  targets of treatment, 853–855
*Melendez-Diaz v. Massachusetts*, 30, 62 n.33, 64 n.48, 71 n.88, 126, 789
Mental health assessment (*see also* Competency; Diagnosis of mental disorders)
  adequacy of circumstances for, 880–881
  collateral informants, interviews with, 835, 841, 843, 844, 847–848, 872, 876, 882–883, 894
  conduct of, 877–885
  contemporaneous, 817–818, 865, 881
  cooperativeness of evaluee, 834, 849, 879–880, 881, 890
  disclosure of limitations, 890–891
  functional impairments, 817, 838, 842–846, 851–852, 864, 865, 882, 884, 885–886, 889–890
  in–person examination, 851, 877–879, 884
  malingering considerations, 839, 840–841, 843, 881–882, 884–885, 894
  predictive assessment, 818–819, 846–852, 858, 863–864, 865, 881–882, 885–886, 887, 890
  process of expert in reaching conclusions, 889–891
  records review, 817–818, 834–835, 839, 841, 843–844, 847–848, 878, 879, 881–882, 888, 890, 893
  retrospective, 817, 818 n.18, 865, 881
  structured instruments, 835, 836, 840 n.144, 841, 844, 845–846, 848, 849, 850, 851–852, 885–889, 893

Mental health evidence (*see also* Mental health assessment; Competency; Diagnosis of mental disorders; Treatment of mental disorders)
  admissibility of, 815–821, 827, 846 n.179, 866, 867, 869 n.328, 886, 894
  board certification of experts, 822–823, 825, 826 n.68, 827, 874, 893
  case example, 892–894
  criminal responsibility, 815, 819 n.30, 844, 868, 869
  damages assessments, 816 n.7, 819, 851, 863, 892, 893–894
  *Daubert* and, 866, 886, 891 n.396
  diagnostic vs. functional issues, 889–890
  disability, 816 nn.11 & 12, 818, 819–820, 831 n.87, 837, 851, 882, 894
  disclosures, 890–891
  emotional harm or distress, 432 n.22, 496, 810, 816, 818, 819, 820–821, 823, 851, 852, 863, 866
  empirical support, 846, 847, 865, 866, 867, 868, 880–881, 891
  experience of experts, 818, 822, 823, 824, 825, 826, 827, 841, 846, 848, 854, 871–873, 881, 889, 890
  *Frye* and, 866, 867
  functional impairments, 3, 819–821, 832, 840, 841–842, 883 n.373
  *Kumho Tire* and, 866, 891
  legal cases involving, 815–821
  licensure of experts, 824, 825, 826, 827 n.73, 873–874
  limitations of, 818, 836, 849–851, 859, 865–869
  negligence actions, 816 n.7, 818, 827 n.73, 877 n.351, 892, 893
  overview, 815–869
  prior professional relationship, 875–877, 893–894
  psychiatric nurses, 826, 870–871
  psychiatric social workers, 826, 870–871
  psychiatrists, 821–823, 827, 834, 841, 847, 849, 853, 865, 870, 872–873, 874, 875, 876–877 n.349, 878, 879 n.358, 893

996

EXHIBIT C

*Index*

psychodynamic theory, 859, 865–867, 891

psychology/psychologists, 822, 823 n.51, 824–825, 826–827, 847, 849, 865, 869, 870–871, 872, 873–874, 875, 876 n.349, 878, 888, 893–894

psychopharmacology (*see* Medications for mental disorders)

psychotherapists/psychotherapy, 822, 825, 826-827, 858–859, 870, 873–874, 876 n.349, 882, 891

qualifications of experts, 821–829, 869–877

relative risk, 851 n.214

social workers, 826

structured instrument reliability and validity, 885–889

theoretical basis, 865, 885, 891

training of expert witnesses, 870-871

ultimate issue testimony, 867–869

violence risk (future dangerousness), 3, 819, 846–851, 878 n.354, 893

Mental retardation, 369–371, 815 n.5, 819, 829, 833, 836, 874 n.343 (*see also* Competency)

Mercury, 515, 536 n.76, 642 n.27, 646, 653

Mesothelioma, 585 n.104, 588 n.114, 606, 635, 672

Meta–analysis, 217 n.14, 254 n.107, 289, 579, 581 n.89, 606–608, 624, 657 n.67, 722–723, 724, 725

*Meyers v. Arcudi*, 367 n.32, 368

Microscopic hair evidence (*see also* Fiber analysis)

admissibility, 118–119, 178 n.123, 181 n.134

bias, 67

case law development, 112, 117–119

class characteristics, 114

*Daubert* and, 118–119

DNA analysis, 116, 143, 149 n.133, 151, 155, 170, 177, 178 n.123, 179, 180, 181 n.134

DNA exonerations, 62 n.32, 116, 117, 124

empirical record, 61, 113-117

individual characteristics, 113, 114–115

neutron activation analysis, 114, 123 n.437

proficiency testing, 69 n.81, 116

random-match probability, 118 n.401

technique, 112–113

Military Rules of Evidence, 794

Military Service Act, 249

*Millsap v. McDonnell-Douglas,* 490

Mini-Mental Status Examination (MMSE), 837

Minnesota Multiphasic Personality Inventory (MMPI), 836, 841, 886

Monte Carlo simulations, 284, 469

"More likely than not" standard, 27 n.79, 102, 123, 463, 577 n.81, 612, 613 n.194, 617

Morton Thiokol, 927

Multiple regression

admissibility, 308–309, 314 n.33, 319 n.43, 324 n.54, 330–332

antitrust litigation, 305, 306, 307 n.7, 313, 320, 321 n.48, 326, 328, 348 n.90

basics of, 333–351

bias, 312, 314, 315, 322 n.50, 325, 327, 352

causality, 309, 310, 311, 312, 314, 321 n.48, 322–324, 327, 353

census undercountng litigation, 307, 308

class certifications, 306–307

computer output interpretation, 346–348

confidence intervals, 321, 332 n.69, 342–343, 352

correlation, 309, 310, 311, 314, 315, 322, 324–325, 333–334, 342 n.79, 352, 354, 355, 356

court-appointed neutral experts, 329–330

covariates, 311–312, 322, 336–337, 350, 351, 352

cross–sectional analysis, 319, 345, 352

database information and analytical procedures, 331–332

*Daubert* and, 308–309

EXHIBIT C

*Reference Manual on Scientific Evidence*

death penalty deterrence analysis, 307, 308

dependent variable, 305, 308, 311–313, 314, 315, 316, 317, 321, 322–324, 325 n.55, 326, 327, 332, 334, 335, 336, 337, 338, 339, 340, 345, 347, 348, 352, 353, 354, 355, 356

design of research, 308–309, 310, 311–317

discovery process, 330–331

discrimination cases, 305, 306, 309–310, 312–314, 315–317, 318–320, 323–324, 336–347, 350–351

dispute resolution over statistical studies, 331–332

economic damages, 305–306, 308 n.12, 311, 319, 328, 348, 431, 446, 450, 481, 499, 502

errors in modeling, 325–326

error terms, 325, 326, 336, 337, 339, 342, 344, 347, 348 n.91, 352, 355

explanatory (independent) variable(s), 305, 308, 310, 311–312, 313–316, 317 n.36, 322–325, 326, 327, 334, 335, 336, 337, 338, 339–340, 341, 342, 345, 346 n.88, 348, 349, 350–352, 353, 354, 355, 356

fitted values, 270, 295, 298, 337, 338, 339, 353

forecasting, 348–349

formulation of research question, 311

functional form of model, 316–317

goodness of fit, 338, 340, 344–345, 347, 355

heteroscedasticity, 296, 326 nn.56 & 57, 353

hypothesis tests, 319–321, 342–343, 348, 353, 354, 356

hypothetical example, 350–351

independence, 325, 326, 353

influential data points, 327, 345, 346, 353

interaction variables, 316–317, 339 n.79, 351, 353

intercepts, 335, 338, 345, 347, 348, 353, 354

interpreting results, 318–328, 339–340

job aptitude test–performance correlation, 333–336

justifying choice of model, 317

least squares method, 326–327, 335, 336, 337, 339, 340, 341, 342, 345–346, 347, 354, 355

linear associations, 321, 348, 352

linear regression model, 260 n.124, 264, 298, 316–317, 336–339, 347, 353, 354

mean, 332, 341, 342, 343, 350, 351, 354, 356

mean squared error (MSE), 344, 347, 354

measurement error, 327–328

misleading data, 349

model specification (research design), 311–317, 337

multicollinearity, 324–325, 354

nonlinearities, 339

nonprobability sampling, 332 n.68

normal curve, 342

normal distribution, 343 n.82, 354

null hypothesis, 319–321, 342–343, 348, 353, 354, 356

observational studies, 312, 318, 332, 340, 342, 347

one-tailed tests, 321, 354

outlier, 327 n.58, 345, 346, 354, 355

overview, 305–311

parameters, 312, 314 n.32, 315, 316–317, 320, 324, 325, 326, 327, 332, 336, 337, 338, 340–341, 342, 343, 344, 347, 348 n.91, 352, 353, 354, 355, 356

patent infringement cases, 306, 307 n.12, 309, 311, 319, 321

percentages, 318 n.40, 320, 341, 345, 355

perfect collinearity, 324

practical significance of results 318–321, 355

precision of results, 340–346

presentation of statistical evidence, 330–332

probability sample/sampling, 332, 355

probative value, 315 n.33

998

**EXHIBIT C**

*Index*

*p*-values, 320–321, 324 n.54, 347, 350–351, 354, 356

qualifications of experts, 328–329

quasi–experiments, 312, 355

random (sampling) error, 314 n.30, 336, 337, 339, 342 n.79, 355

random variables, 355, 356

ranges, 312 n.26, 333, 343, 345, 353

rate regulation cases, 307

recording data, 327, 330–331

regression line, 337–339

regression residuals, 336, 339, 344, 347, 354, 355, 356

reliability, 340, 341

robustness of results, 310–311, 322–328, 346, 355

*R*-squared statistic, 314 n.31, 345, 347, 348, 350, 351, 353, 355

scatterplots, 333, 335, 337, 355

sensitivity to individual data points, 326–327, 345–346

serial correlation, 326 nn.56 & 57, 355

significance levels, 320–321, 324 n.54, 347, 350–351, 354, 356

size of sample, 316, 318–319

spurious correlations, 309, 310 n.24, 311, 322, 356

standard deviation (SD), 341, 343 n.83, 344, 348, 354, 356

standard errors (SE), 316 n.35, 326, 340–344, 347, 348, 349, 350, 354, 356

statistical significance, 318–319, 320–321, 324 n.54, 347, 350–351, 354, 356

surveys, 307 n.8, 332

*t*-statistics, 320, 340–344, 347, 356

*t*-test, 320, 356

theory development, 311–317

time-series analysis, 317 n.37, 319, 323 n.52, 326, 345, 356

trends, 345

two–tailed tests, 321, 356, 577 n.83

voting rights cases, 307

Myelofibrosis, 217 n.14

# N

National Academy of Engineering, 46

National Academy of Sciences, 46, 47, 649

National Aeronautics and Space Administration, 927

National Ambient Air Quality Standards (NAAQS), 529, 666

National Cancer Institute, 564 n.48

National Conference of Lawyers and Scientists, 8

National Electronic Injury Surveillance System, 909

National Fire Protection Association, 933–934

National Forensic DNA Review Panel, 156 n.53

National Geographic Society, 408 n.212

National Health and Nutrition Examination Survey (NHANES), 536–537

National Highway Traffic Safety Administration, 910–911, 920

National Human Genome Research Institute, 149

National Institute for Environmental Health Sciences, 20

National Institute of Forensic Sciences (proposed), 66

National Institute of Justice, 156 n.53

National Institute of Standards and Technology, 81

National Institutes of Health (NIH), 45, 646, 678, 733

National Quality Forum, 701

National Research Council, 20, 46
  Ballistic imaging report, 99
  DNA reports, 60-61, 125, 127, 133, 134 n.12, 141 n.19, 143, 161, 162, 163 n.72, 164 n.75, 166–167, 168 n.84, 169 n.89, 170 n.95, 174 n.110, 175, 176 n.114, 185, 187–188, 192 n.170
  Forensic Science Report, 27, 30, 60 n.23, 64–70, 71, 74 n.106, 75, 76, 77–78, 79, 82 n.171, 84, 85, 97, 100, 105 n.314, 108, 113–114, 115–116, 119–120, 121, 122, 126

EXHIBIT C

*Reference Manual on Scientific Evidence*

National Rifle Association, 411

National Science Foundation, 45

National Toxicology Program (NTP), 655, 656 n.64

Natural experiments, 290, 312, 355

Natural Resources Defense Council, 678

Negligence, 893

Neuroimaging
  accuracy and robustness of results, 781-782
  computer assisted tomography (CAT), 762-763, 837-838, 893
  countermeasures, 776, 783-784, 801, 805, 810
  diffusion tensor imaging, 768
  electroencephalography (EEG), 761, 766, 772-773, 791-792, 796, 803, 838-839
  false negatives, 780, 782-783, 788
  false positives, 780-781, 782-783, 788
  functional MRI (fMRI), 765, 766, 768-772, 773, 775, 776-777, 778, 779, 780, 781, 782-783, 786, 787-788, 791, 796, 797-798, 800, 803-807, 809, 810-811, 838
  magnetic resonance imaging (MRI), 761, 763, 766-772, 773, 777-778, 781, 797, 800 n.52, 837-838
  magnetoencephalography (MEG), 761, 772-773
  positron emission tomography (PET), 761, 763-765, 766, 773, 776, 785, 800 n.52, 838
  single photon emission computed tomography (SPECT), 761, 765-766, 838

Neuroscience evidence (*see also* Brain)
  admissibility issues, 784-796
  blood oxygen level dependent (BOLD) response, 768, 770, 771, 782, 783, 787-788, 804
  character evidence, 789-790
  Confrontation Clause and, 789
  criminal responsibility (culpability) determinations, 749, 772, 798, 799-801
  *Daubert* and, 785-786, 806

  Due Process Clause and, 792
  Eighth Amendment and, 795
  Employee Polygraph Protection Act, 792-794
  examples of uses in litigation, 796-811
  experimental design issues, 777-779
  Fed. R. Evid. 403 and, 788-789, 806
  Fed. R. Evid. 406 and, 790
  Fed. R. Evid. 702 and, 776, 785-788, 806
  Fifth Amendment and, 790-792
  First Amendment and, 792
  Fourteenth Amendment and, 792
  Fourth Amendment and, 796
  *Frye*, 806-807
  group averages applied to individuals, 780-781
  "habits of mind," 788-789
  insanity defense, 749, 763, 785, 786, 799, 800
  interpreting study results, 776-784
  lie detection, 772, 773, 776-777, 778-779, 784, 787, 789 n.24, 790-791, 792-795, 797, 799, 801-807
  mitigation in capital cases, 785, 795, 798, 799, 800
  pain detection and management, 749, 753, 775, 778, 780-781, 799, 807-811
  predisposition evidence, 789-790, 801
  privacy rights, 792, 793-794, 796
  privilege against self-incrimination, 790-792
  relevance, 749, 773, 776, 777-778, 779, 785, 786, 788, 789-790, 792, 796, 797, 798, 799, 800, 801, 810
  replication of finding, 776, 777, 804, 810
  representativeness of studies, 779
  Seventh Amendment and, 794-795, 805
  Sixth Amendment and, 794-796
  statistical issues, 770, 776, 777, 780, 782-783, 787, 801, 803, 804, 805, 809, 810
  techniques, 760-776 (*see also* Neuroimaging)

1000

**EXHIBIT C**

*Index*

Neutron activation analysis, 120 n.415, 123 n.440, 126

New Scotland Yard, 73, 78 n.143

Newton, Isaac, 42, 43

Non-Hodgkin's lymphoma, 552 n.4, 740-741

Nonhuman DNA testing
    affinal model, 198 n.194, 199
    cats, 196, 197
    dogs, 193, 197, 198 n.193
    HIV, 194, 195 n.181
    individual organisms, 195-198
    microbial bioterrorism agents, 149, 194
    mitochondrial, 193, 194, 195 n.180
    phylogenetic analysis, 193, 194-195
    sequencing/profiling methods, 196, 197-198
    species and subspecies, 193-195

Nurses' Health Study, 717

# O

Objections to expert testimony, 29 (*see also Daubert*)

Obscenity cases, 224, 365

Observational studies
    causation, 215-216, 218, 220-222
    epidemiology, 555-563, 566, 581, 590, 592, 593, 607, 608, 624, 625, 627
    natural experiments, 312

Observer effects, 67-68

Occupational exposures, 26, 217 n.14, 505-506 n.5, 511, 516, 517, 526, 529, 536, 539, 540, 663 n.81

Occupational Safety and Health Administration (OSHA), 528 n.64, 529 n.65, 649 n.44, 650, 658 n.70, 666 n.88, 670 n.97, 672, 673 n.107, 920

Odds ratio, 235, 289, 291, 566, 568-569, 573, 584, 589, 625, 738

Oklahoma City bombing, 949-950

*Otero v. Warnick*, 109-110

# P

Paradigm, defined, 41-42

Parlodel litigation, 25 n.69, 562 n.38, 564 n.47, 591 n.122

Partial-birth abortion cases, 7

Patents
    assessment of claims in, 935, 946
    conflicts of interest, 48-49
    drugs, 854
    expert testimony, 933, 945-946
    infringement cases, 3-4, 6, 193, 306, 307 n.12, 309, 311, 319, 321, 440 n.24, 441, 945-946

Paternity cases, 132, 158 n.56, 164, 172, 174, 206

Peer review, 13, 44-45, 48, 49 n.16, 50, 53, 64, 66, 102 n.290, 103 n.300, 108, 328, 375, 508 n.11, 608, 617-618 n.212, 677, 678, 679, 776-777, 786, 787, 803, 806, 866 nn.306 & 309, 886, 901, 931, 935, 938, 958 n.106

*People v. Collins*, 712

*People v. Jennings*, 58, 73, 81-82

*People v. Linscott,* 117 n.387, 124

*People v. Marx*, 110

*People v. Pizarro*, 147, 183, 184

Perfluoroctanoic acid, 505 n.3

Permissible Exposure Limits (PELs), 529

Personal injury cases, 435, 455, 470, 475, 665, 689, 690 n.8, 816, 901, 938, 942, 947

Pesticides, 4, 510, 516, 517, 520, 522, 527 n.60, 528-529, 530 n.66, 537, 543, 546, 586, 643 n.28, 648 n.42, 650 n.48, 652, 662 n.78, 671-672 n.102

*Pfizer, Inc. v. Astra Pharmaceutical Products, Inc.,* 387

Pharmacokinetics, 535, 540

Pheochromocytoma, 706

*Philip Morris, Inc. v. Loew's Theatres, Inc.*, 231

Physician-assisted suicide, 3

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Polychlorinated biphenyls (PCBs), 14, 15, 522, 545, 565 n.48, 581 n.89, 586 n.109, 640, 652, 661 n.77, 665 n.88, 668

Polygraph evidence (*see also* Lie detection)
    accuracy level, 369, 805
    admissibility of, 60, 790, 794, 795–796
    as character evidence, 789 n.24
    countermeasures, 783–784
    *Frye* test, 60
    history, 802
    for mitigation in sentencing, 795
    pretrial uses, 807
    Sixth Amendment and, 794
    statutory protections, 792–793, 807
    surveys of general acceptance, 365 n.22, 367–368, 369
    validity, 228

Popper, Karl, 40-41, 43, 44, 49, 50, 53, 64

Population
    frequency data, 74, 85, 113, 119, 148, 155, 163, 164-165, 166, 178-179, 191, 195, 196 n.185, 197, 200, 203, 204-205, 207, 275
    randomly mating, 165, 198, 204, 208
    statistics, 217, 221 n.23, 223-225, 226-227, 241-250, 275-277, 278-279, 292, 295, 296, 298, 299, 300, 301

Positron emission tomography (PET), 718 n.117, 761, 763-765, 766, 773, 776, 785, 800 n.52, 838

*Post hoc ergo propter hoc* fallacy, 217 n.14, 669 n.94

Preponderance of the evidence standard, 32 n.95, 252 n.103, 271 n.138, 314 n.33, 319 n.43, 565 n.48, 577, 610 n.182, 611 n.187, 659 n.72, 665, 692, 714

Presidential Recordings and Materials Preservation Act of 1974, 242

Price fixing, 31 n.91, 306 n.6, 321 n.48, 322 n.50, 349 n.90, 491

Probabilty
    conditional, 205, 209, 259 n.122, 273-274, 284, 710, 712, 742
    expressing testimony as, 123
    forensic evidence match, 72, 118 n.401

medical probabilistic reasoning, 707–714
    posterior, 172, 173–174, 241–242, 258–259, 274, 275, 283, 710, 742
    prior, 173, 174, 241–242, 258, 259, 274, 275, 282, 283, 710, 711, 744
    random-match, 60, 118 n.401, 135, 155, 164, 165, 167–171, 172, 173, 175–176, 181 n.34, 182, 186, 187, 188, 189, 190, 191–192, 196, 197, 198 n.194, 205, 208, 251 n.99
    sampling, 184, 226, 230, 238 n.71, 241, 246, 248, 283, 293, 295, 299, 332, 355, 361, 362 n.8, 380, 381, 382, 385, 398 n.175, 408, 416, 419, 420, 421
    theory, 173, 214, 258 (*see also* Bayesian approach)

Product liability
    causation, 24, 947
    conflicts of interest, 21
    damages, 22, 942-943
    design disputes, 939-940
    engineering testimony, 939-943, 947
    exposure to contaminants, 505, 506, 507, 509–511, 515, 516, 519–520, 524, 526, 527, 528, 533, 537, 545, 546
    manufacturing issues, 941
    medical testimony, 22, 689, 693, 703, 731 n.189
    personal injury, 22, 942
    proof of defect, 943-944
    sale and marketing concerns, 942-943
    warning issues, 941-942

Proficiency testing (*see also individual disciplines*)
    blind, 61, 68, 69, 70 n.83, 80, 81, 98, 156, 160–161, 162, 171 n.98, 196, 207
    and error rate, 69 n.80, 161–162, 171–172
    external, 156
    internal, 155-156
    obstacles to, 28
    mandatory, 69-70
    programs, 69 n.82, 78, 85, 87, 88, 98

**EXHIBIT C**

*Index*

quality of tests, 78-79, 86-87, 98

reporting results in court, 171

types, 69

Proof (*see* Causation; Standard of Proof)

Prosecutor's fallacy, 712

Prostate-specific antigen (PSA) test, 735-736

Publication of research, 13, 45 n.11, 50, 64, 155, 328, 375, 384 n.108, 431, 590, 617 n.211, 678, 776-777, 786, 787, 806, 827 n.23, 870 n.332, 886, 901

*p*-value (*see individual disciplines*)


# Q

Qualifications of experts (*see also* Proficiency testing; *individual disciplines*)

advisory panel memberships, 678-679

certification, 68-69, 677-678, 874

conflicts of interest, 8, 21-22, 875

consideration of contrary conclusions, 22-23

*Daubert* and, 22-23, 431-432

discretion of judges in evaluating, 135

education and training, 328, 375, 431, 675-677, 870-871

experience, 431, 818, 822, 823, 824, 825, 826, 827, 841, 846, 848, 854, 871-873, 881, 889, 890

Federal Rule of Evidence 22, 702

knowledge requirement, 22-23

licensure, 873-874

prior relationships, 875-877

professional autonomy, 215-216

professional memberships, 328, 677-678

publications, 328, 375, 678

research grants, 678

university appointments, 679

Questioned document examinations, 83-84, 85, 87 n.198, 88, 89 n.215, 90, 121-122 (*see also* Handwriting evidence)

# R

*R. v. Beamish*, 196-197

Racial discrimination, 2, 7, 233, 267-268 n.133, 287, 306, 313, 314 n.33, 319, 324 n.53, 365 n.19

Radioactive iodine, 654, 662, 663, 666-667

Randomized Aldactone Evaluation Study, 729-730

Randomly mating population, 165, 198, 204, 208

Rape cases, 104, 131, 132, 159 n.58, 183, 370, 689 n.6 (*see also* Sexual assault cases)

Rate regulation cases, 307

"Reasonable medical certainty" testimony, 123

"Reasonable scientific certainty" testimony, 122-124

Redistricting litigation, 2, 267-268 n.133, 307 n.9

Regulatory contexts

engineering evidence, 919, 947-948, 951-952, 953

exposure science and, 505, 506, 509-511, 517 n.31, 528-529, 534

presumptive validity of government testimony, 638 n,11

toxicology, 635, 636, 637, 638 n.10, 639, 640, 642, 644-645, 646, 647, 648 n.40, 649, 650-651, 654, 656 n.54, 657 n.67, 660, 665-666, 669 n.95, 670 n.96, 678

Reliability of scientific testimony (*see also specific disciplines*)

between-observer variability, 228

correlation coefficients, 213, 227, 228, 260, 261-264, 265, 266, 286, 290, 301, 333

DNA identification, 60, 62 n.32, 73, 227

error rates and, 13, 29, 49 n.16, 53, 64, 65, 69 n.80, 78, 79, 86, 87, 88-89, 97, 99, 102 n.290, 103 n.300, 122, 162, 171 nn.96-98, 214, 217, 259 n.122, 628, 724-725, 787, 806, 890, 903

EXHIBIT C

*Reference Manual on Scientific Evidence*

falsifiability or testability, 13, 16,
    40-41, 43-44, 48, 49, 53, 63, 64,
    866 n.309
general acceptance of methodology,
    12, 13, 52 n.20, 53, 59-60, 63, 82,
    102 n.291, 103 n.300, 110 n.343,
    133 n.7, 166, 173 n.102, 186, 189,
    195 n.183, 197, 367, 368, 617
    n.211, 806-807, 866, 867, 949
peer review of research and, 13, 44-45,
    48, 49 n.16, 50, 53, 64, 66, 102
    n.290, 103 n.300, 108, 328, 375,
    508 n.11, 608, 617 n.211, 677,
    678, 679, 776-777, 786, 787, 803,
    806, 866 nn.306 & 309, 886, 901,
    931, 935, 938, 958 n.106
publication of research and, 13, 45
    n.11, 50, 64, 155, 328, 375, 384
    n.108, 431, 590, 617 n.211, 678,
    776-777, 786, 787, 806, 827 n.23,
    870 n.332, 886, 901
validity distinguished from, 13 n.11,
    71-72
within-observer variability, 227-228
Reproducibility of research, 48
*Rex v. Castleton*, 73
*Rhodes v. E.I. du Pont de Nemours & Co.*,
    31, 32, 505 n.3, 649 n.47
"Right-to-die" cases, 3, 5
Risk
    absolute, 738
    acceptable, 908, 909-910, 915-920
    assessment, 505, 506, 507, 510-511,
        525, 526, 528, 533, 534, 535, 536,
        537, 538 n.84, 547, 603 n.160,
        637, 642-643, 648-651, 657 n.67,
        661-662, 663, 673 n.108, 678
        n.116, 679, 683, 909, 910-914
    attributable, 566, 570-571, 612 n.191,
        619
    calculations, 911-912, 918
    cancer, 635, 638 n.12, 642-643, 644-
        645, 649 n.46, 650, 653, 654, 655,
        656, 659, 660 n.74, 665, 668-669,
        670, 683
    characterization, 637, 638 n.12, 645
        n.31, 659, 683

communication, 737-739
extrapolation, 547, 603 n.160, 651,
    661-662
low-dose risk curve, 673 n.107
medical, 737, 738
relative (RR), 234 n.62, 247 n.91,
    295, 566-568, 569, 570 n.62, 572,
    573, 574, 575-576, 577 n.82, 578
    n.85, 579, 580, 581, 582, 591, 594,
    601, 611, 612, 614-615, 616, 619,
    621, 626, 627, 659, 737, 738, 851
    n.214
violence (future dangerousness), 3,
    819, 846-851, 878 n.354, 893
Risk World Web site, 910
*R.J. Reynolds Tobacco Co. v. Loew's
    Theatres, Inc.*, 231
*Rochin v. California*, 792
*Rock v. Arkansas*, 795
Rofecoxib (Vioxx), 731-732
Rorschach ink-blot test, 836, 886
Royal College of Physicians, 705
*Rupe v. Wood*, 795


# S

Sacco and Vanzetti trial, 58, 91
Schizophrenia, 800, 832, 839, 842, 847,
    853, 858, 859, 860, 863, 864, 872,
    877 n.351, 893
Science and scientists
    *Daubert's* definition, 39 n.3
    evidence defined, 51
    "good science," 64 n.45
    historical background, 38-39, 42
    honesty and integrity, 43, 45, 50
    importance in litigation, 3-4
    indicators of good science, 13, 49 n.16
    institutions, 45-46
    language of, 51-52
    law compared with, 51-52
    legal training and education, 9
    myths and facts about, 47-50
    objectives, 52

**EXHIBIT C**

*Index*

peer review and, 44-45, 48, 49 n.16, 50, 53

as profession or career, 45-47

pseudoscience, 49, 52

reward system and authority structure, 46-47

theories, 39-45, 50, 51

view of *Daubert,* 52-54

Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 64

Scientific method

criteria for judging, 53 (*see also* Reliability of scientific testimony)

Francis Bacon and, 39-40, 42, 43, 50

Kuhn's paradigm shifts, 41-43

Popper's falsification theory, 40-41

synthesis of multiple studies, 20, 23

Scientific revolutions, 41-43

Scientific Working Group for Firearms and Toolmarks, 93 n.236, 154 n.46, 156, 157 n.54, 159

Scientific Working Group on DNA Analysis Methods (SWGDAM), 62 n.29

Scotland Yard, 73

Securities and Exchange Commission, 484

Securities litigation, 429 n.1, 431, 448

Semen evidence, 58, 62 n.32, 143, 151, 155, 159 n.58, 169 n.89

Seventh Amendment rights, 5, 21, 794-795, 805

Sex discrimination, 233, 234-235, 257 n.115, 270-271, 272, 279-282, 305-306, 313, 315-317, 318 n.42, 319-320, 323-324, 336-347, 350-351, 365-366

Sex offenders, 819, 849, 859-860

Sex-typing test, 146-147

Sexual assault cases, 104, 147, 158, 182, 184, 689 n.86, 800, 871 n.332

Shoe print evidence, 57, 62 n.32

Silicone gel breast implant litigation, 6, 7, 247 n.91, 589 n.117, 638

Single photon emission computed tomography (SPECT), 761, 765-766, 838

Sixth Amendment, 794-796

Society for Neuroscience, 750 n.2

Society for Psychophysiological Research, 367

Society of Breast Imaging, 727

Society of Occupational and Environmental Health, 678

Society of Toxicology (SOT), 678

Soil contaminants, 507, 510 n.15, 517, 524 n.49, 531, 532, 536 n.78, 537, 667, 669 n.95

Soil evidence, 57, 62 n.32, 669 n.95

St. Valentine's Day Massacre, 91

Standard of proof

"more likely than not," 27 n.79, 32 n.95, 102, 123, 463, 577 n.81, 611, 612, 616

preponderance of the evidence, 32 n.95, 252 n.103, 271 n.138, 314 n.33, 319 n.43, 565 n.48, 610 n.182, 611 n.187, 659 n.72, 665, 692, 714

reasonable certainty, 123, 434 n.11, 461-463, 468, 691-692, 693, 694 n.27, 716

Standard of review, 14, 16, 17, 18, 19, 21, 25, 100 n.279, 101 n.282, 104 n.303, 112 n.353, 226 n.36, 563-564 n.44, 565 n.48, 693, 827 n.73, 846 n.179, 874 n.343, 947 n.83

Standard Table of Mortality, 365

*Stanley v. Georgia,* 792

*State of Arizona v. Bogan*, 195-196

*State of Arizona v. Garrison*, 107 n.319, 215

*State of Arizona v. Krone*, 109, 110 n.341

*State of Connecticut v. Pappas*, 178, 179, 180 n.133, 181 nn.135 & 136

*State of Louisiana v. Schmidt*, 194, 195

*State of Washington v. Leuluaialii*, 197

Statistics, 211-302 (*see also* Multiple regression)

absolute value, 275, 282, 283

admissibility and weight of studies, 214

aggregation from multiple sources, 235, 254 n.107

EXHIBIT C

*Reference Manual on Scientific Evidence*

alternative hypotheses, 205, 254 n.106, 255 n.110, 257, 276, 278, 283, 297, 299, 300, 319–321, 353, 582

anecdotal evidence, 217, 218, 220, 310

applied statistics, 214, 229, 328

appraisal approaches, 242–244, 248–249, 278

artifacts from multiple testing, 256

associations between variables, 213, 217–218, 219, 221–222, 230, 233–235, 252 n.103, 253, 254, 260–263, 264, 265 n.129, 266, 285, 286, 291, 295, 298, 312, 321, 352, 356

averages, 219, 226 n.35, 238 n.70, 241, 242–243, 244–245, 246, 248 n.95, 264, 265 n.129, 266, 269, 278–279, 284, 287, 289, 294, 298, 300

base of a percentage, 233

Bayesian approach (subjectivist), 173, 174, 242 n.48, 273–275

benchmarks, 230–231

bias, 220, 224–225, 226, 227, 240, 241, 246, 249, 256, 266 n.130, 283, 285, 290, 293, 296, 312, 314, 315, 322 n.50, 325, 327, 352

categories for comparison, 231–232

causality inferred from, 213, 216–223, 249, 260–272, 288

census undercount litigation, 2–3, 213, 223–224, 247 n.90, 268, 275 n.149, 307, 308

center–of–distribution measure, 238–239

central limit theorem, 276, 278, 279, 284, 285

changes in data collection, 232

coding reliability, 227–228

collection of data, 216–230, 231

comparisons, 233

conditional probability, 205, 209, 273–274, 284, 710, 712, 742

confidence intervals, 165 n.76, 213, 230, 240 n.83, 241, 243–246, 247, 248, 249, 252–253, 255, 259 n.121, 284–285, 289, 321, 332 n.69, 342–343, 352

confounding variables, 219, 220, 221, 222, 240, 257 n.115, 262–264, 265, 266, 285, 286, 288, 289, 298–299

convenience sample, 224–225, 248, 285, 287

correlation coefficients, 213, 227, 228, 260, 261–264, 265, 266, 286, 290, 301, 333

*Daubert* and, 214, 217 n.14, 227 n.37

dependent variables (outcome variable, response variable), 219, 264, 268, 270, 274, 285, 286, 287, 288, 290, 294, 295

design of research, 213, 214, 216–230, 231, 240, 243, 246, 279, 301, 308–309, 310, 311–317

disclosure of methods and nonsupporting analyses, 216

discovery process, 216, 217 n.14, 310 n.24, 330–332

discrimination cases, 213, 228, 233–234, 250, 253 n.105, 257 nn.115 & 116, 260, 270–271, 272, 275, 276, 279–282

distributions, 236–239, 248 n.95, 251, 259 n.123, 275, 276, 278, 279, 283–284, 286, 287, 288, 290–291, 292, 293, 294, 296, 297, 298, 300, 301

DNA profiling, 74 n.105, 134 n.12

ecological regression, 266, 267

enhancing statistical testimony, 215–216

epidemiological study analysis, 574–582

estimation/estimators, 213, 226 n.35, 228, 229, 230, 232 n.56, 241, 242–249, 252–253, 256–257, 258 n.117, 259 n.123, 260, 264, 265, 267, 269–270, 271, 273 n.146, 278, 279, 280, 281–282, 283, 284, 285, 287, 289, 292, 295, 296, 298, 299–300, 301

expertise/experts, 214, 215–216, 222, 248 nn.93 & 94, 251, 271, 272

external validity, 222, 301

**EXHIBIT C**

*Index*

false negatives, 115–116, 162, 232, 254 n.106, 259 n.122, 301, 577 n.81, 581–582, 620, 708, 711, 724, 780, 782–783, 788

false positives, 161–162, 170–171, 232, 251 n.100, 254 n.106, 575–581, 589, 619, 627, 708, 710–711, 713, 714, 717–718, 720, 724, 725, 735, 780–781, 782–783, 788

frequentist approach (objectivist), 187, 189, 190, 241–242, 247, 252, 254 n.106, 258, 259, 273, 275, 287, 611 n.188

gender discrimination, 233, 234–235, 257 n.115, 270–271, 272, 279–282

generalization of results, 222–223, 301

graphs, 213, 230, 236–237, 240 n.82, 260–261, 272 n.144, 276, 294, 296

histograms, 236–237, 276–279, 283, 284, 288

hypothesis (significance) tests, 40, 163, 213, 241, 249–253, 254, 255, 297, 319–320, 352, 353, 354, 356, 574–582, 626, 724, 725

income–education association, 219, 260–262, 264–266, 312

independence, 227, 228, 269, 275, 288, 325, 326, 353, 714

independent variables, 219, 221, 268, 285, 287, 288, 289, 290, 294, 295, 297, 305 n.2, 308, 353

individual measurements, 227–228

inferences drawn from data, 213, 217, 220, 221, 222, 227, 240–259, 264, 266, 270, 283

integrity of data, 229

intercept, 265–266, 267, 269–270 n.135, 280, 335, 338, 345, 347, 348, 353, 354

internal validity, 222, 228, 229, 288

interquartile range, 239

least squares method, 269–270, 271, 280, 289, 295

linear associations, 261, 262, 264–268, 286, 321, 348, 352

linear combinations, 271 n.139, 280, 287, 289, 290, 298

linear regression, 260 n.124, 264, 298, 316, 317 n.36, 336–339, 347, 353, 354

mean, 213, 230, 238, 239, 240, 247 n.92, 269, 278, 279, 284, 286, 289, 290, 291, 293, 296, 297, 298, 332, 341, 342, 343, 350, 351, 354, 356

median, 213, 230, 238, 239, 240 n.82, 289, 292, 492

misleading data, 220, 230, 231, 247 n.92, 265, 349

missing data, 223–224, 229, 332

mode, 238, 289

models and model development, 241, 253–257, 268–272, 279–281

multiple hypothesis tests, 256–257

Nixon papers valuation, 242–246, 247, 248–249, 278–279

nonresponse bias, 225, 226, 249, 290, 332

normal curve, 239 n.81, 244, 246, 255, 276, 277–278, 279, 284, 287, 298, 303, 342

normal distribution, 239 n.81, 284, 290, 292, 294, 298, 343 n.82, 354

null hypothesis, 241, 249–251, 252, 253–254, 257, 271 n.138, 275, 276, 278, 282, 283, 287, 288, 290, 291, 292, 296, 297, 299–301, 319–321, 342–343, 348, 353, 354, 356, 574, 576, 577 nn.81 & 83, 579, 581–582, 619, 620, 625, 626, 628, 629, 724, 725

observational studies, 213, 217–218, 219, 220–222, 241, 248, 269, 285, 288, 290, 291, 312, 318, 332, 340, 342, 347

odds ratio, 235, 289, 291, 566, 568–569, 573, 584, 589, 625, 738

one-tailed tests, 255–256, 291, 297, 321, 354, 577 n.83

outliers, 238, 239 n.76, 240, 262, 263, 291, 327 n.58, 345, 346, 354, 355

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

parameters, 241, 247, 248, 254 n.106, 255, 269-270, 271, 275, 280, 281-282, 283, 284, 287, 291, 292, 293, 295, 298, 299, 300, 312, 314 n.32, 315, 316-317, 320, 324, 325, 326, 327, 332, 336, 337, 338, 340-341, 342, 343, 344, 347, 348 n.91, 352, 353, 354, 355, 356

percentages, 88-89, 213, 224 n.31, 230-232, 233-234, 247, 248 n.93, 249 n.96, 257, 267-268, 284, 293, 318 n.40, 320, 341, 345, 355, 381, 382-383, 499, 626, 781, 787

percentiles, 2, 239, 288, 289, 292, 293, 525

population, 217, 221 n.23, 223-225, 226-227, 241-250, 275-277, 278-279, 292, 295, 296, 298, 299, 300, 301

posterior probabilities, 172, 173-174, 241-242, 258-259, 274, 275, 283, 710, 742

power of statistical tests, 174, 181 n.136, 253-254, 255, 276-277, 283, 292, 296, 579 n.88, 581-582, 607, 626, 644, 645, 724, 730, 805 n.65, 848

practical significance of results, 252, 292, 318-321, 355

presentation and analysis of data, 230-240

prior probability, 173, 174, 241-242, 258, 259, 274, 275, 282, 283, 710, 711, 744

probability sampling, 184, 226, 230, 238 n.71, 241, 246, 248, 283, 293, 295, 299, 332, 355, 361, 362 n.8, 380, 381, 382, 385, 398 n.175, 408, 416, 419, 420, 421

probability theory, 173, 214, 258 (*see also* Bayesian approach)

product rule, 165-167, 198, 199, 204-205, 207, 273-274

professional autonomy, 215-216

public school funding litigation, 2

*p*-values, 213, 230, 240 n.83, 241, 249-256, 257, 258, 271 n.138, 281, 287, 288, 289, 290, 291-292, 296-297, 299, 300, 320-321, 324 n.54, 347, 350-351, 354, 356, 575 n.74, 576, 577 n.81, 578-579, 626, 628, 724

qualifications of statistical experts, 215-216, 275

quotas, 225, 361 n.4

random (sampling) error, 240, 241, 243, 244, 246, 248, 249 n.96, 252, 256, 257, 258, 269, 271, 280, 282, 287, 293, 295, 296, 314 n.30, 336, 337, 339, 342 n.79, 355, 388, 556 n.19, 572 n.67, 573, 574-582, 585 n.106, 589, 612-613, 621, 623, 624, 626, 627, 628

random sample/sampling, 164-165 nn.75 & 76, 178, 225-226 & nn.32-35, 230, 241, 242, 247, 248, 249, 250, 275, 276, 277, 278, 283, 284, 288, 290, 296, 297, 299, 332, 363 n.12, 380-382, 383, 385-386, 412, 420, 421

random-start systematic sample, 299

random variables, 288, 289, 293-294, 295, 355, 356

randomized controlled studies, 218, 220, 221, 222, 230, 241, 248, 285, 294, 301, 398, 555, 556, 580 n.89, 592, 607, 621, 648 n.42, 658, 716, 718, 722-723, 724, 725, 729, 730-731, 732, 736

randomness, generally, 222, 230, 240 n.83, 285, 290, 555, 626

ranges, 237, 239, 245, 247, 250, 253, 276, 284, 288, 292, 293, 294, 298, 299, 300, 312 n.26, 333, 343, 345, 353

rates, 218, 220, 221, 226, 230-233, 234, 235, 236, 243, 250, 253 n.105, 258 n.119, 259 n.122, 266, 267, 268, 275, 279, 284, 288, 290, 291, 294, 298

recording data, 217, 229, 327, 330

**EXHIBIT C**

*Index*

redistricting litigation, 2, 267–268 n.133, 307 n.9

regression lines, 213, 260, 264–268, 294

regression models/analysis, 213, 221 n.21, 248 n.94, 256, 257 n.115, 260–272, 279–282, 284, 285, 286, 288, 289, 293, 294–295, 298 (*see also* Multiple regression)

relative risk (RR), 234 n.62, 247 n.91, 295, 566-568, 569, 570 n.62, 572, 573, 574, 575–576, 577 n.82, 578 n.85, 579, 580, 581, 582, 591, 594, 601, 611, 612, 614–615, 616, 619, 621, 627, 659, 737, 738, 851 n.214

reliability of measurements, 217, 223, 227–229, 247 n.91, 248 n.94, 269, 270, 291, 295, 301, 340, 341

rival hypotheses, 163, 174, 257

sample size, 243, 246–247, 252–253, 254–255, 318–319

scatter diagrams, 213, 240 n.82, 260-262, 263, 264, 265, 267, 296, 333, 335, 337, 355

selection bias, 224–225, 226 n.36, 249, 290, 293, 296

selection ratio, 234, 235, 275

significance levels, 213, 230, 240 n.83, 241, 249–256, 257, 258, 271 n.138, 281–282, 287, 288, 289, 290, 291–292, 296–297, 299, 300, 320–321, 324 n.54, 347, 350–351, 354, 356, 575 n.74, 576, 577 n.81, 578–579, 626, 628, 724

significance testing, 40, 163, 213, 220 n.19, 241, 249–253, 254, 255–256, 291, 297, 300, 319–320, 321, 352, 353, 354, 356, 574–582, 626, 724, 725

slopes and intercepts, 265–266, 267, 269–270 n.135, 280, 335, 338, 345, 347, 348, 353, 354

*Spock* jury example, 249–250, 275–278

standard deviation (SD), 126, 213, 230, 239, 240, 242, 243, 247 n.92, 248, 251–252 nn.101 & 103, 278, 179 n.153, 286, 293, 298, 301, 341, 343 n.83, 344, 348, 354, 356

standard error (SE), 213, 230, 240 n.83, 241, 243–246, 248, 249, 251, 255, 258, 276, 278, 279, 281–282, 284–285, 289, 290, 293, 294, 298, 300, 316 n.35, 326, 340–344, 347, 348, 349, 350, 354, 356

stratification, 221 n.23, 226, 288, 290, 299, 308

subfields, 214

surveys, 213, 214 nn.4 & 5, 223–227, 229 n.45, 257 n.115, 290, 307 n.8, 332

technical difficulties, 247–249

theoretical statistics, 214, 241–242, 247, 250, 255–256, 258, 270, 273-275, 277–278, 279, 284, 290 (*see also* Bayesian approach)

time-series analysis, 231, 317 n.37, 319, 323 n.52, 326, 345, 356

trademark infringement, 363 n.10, 366, 373, 376, 378, 379, 382 n.101, 387, 396 n.165, 397–398, 399–400, 401, 410, 413–414, 421

transposition fallacy, 250–251 n.100, 258 n.119, 259 n.122

trends, 233, 236, 264–265, 345

*t*-statistics, 281–282, 297, 299–300, 320, 340–344, 347, 356

two–expert cases, 215, 329

two–tailed tests, 255–256, 297, 300, 321, 356, 577 n.83

Type I (alpha) error, 251 n.100, 283

Type II (beta) error, 254 n.106, 283, 301

units measured, 226–227

units of analysis, 217, 223–225, 266–268

validity of measurement process, 222-223, 228–229, 241, 288, 301

variability measures, 239–240

voting rights cases, 213, 266–268, 307

Statutes of limitations, 134

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Stearns, Richard, 6

Structured instruments and tests
administration, 888
mental status assessment, 885–889
population appropriateness, 886–887
reliability and validity, 885–886
scoring, 888–889
training considerations, 887–888

Summary judgment, 3, 14, 16, 18, 24
n.64, 309 n.20, 315 n.33, 384
n.110, 547, 644 n.29, 669 n.95,
673 n.105, 817 n.12

Survey research
acquiescence, 394, 400
admissibility under *Daubert*, 214, 226
n.36, 361, 363–369, 410
*Atkins v. Virginia*, 369–371
attorney independence, 374
audio computer-assisted self-
interviewing (ACASI), 402
bias, 225, 226, 249, 290, 332, 362,
364 n.16, 373, 374, 379, 381 n.96,
383–386, 394, 395 n.160, 396,
407, 408, 410, 411–412, 416, 417
causal inferences, 398
causal propositions, 392, 397–401, 421
census undercounts, 307 n.8
change of venue, 365, 376–377 n.76,
388, 403, 413 n.228
children and other special populations,
377
clarity of questions, 362, 387–388,
389, 402–403, 406, 410
closed-ended questions, 392–394, 395,
399, 419
cluster sampling, 380, 419
community standards assessment, 224,
369–371
computer-assisted interview (CAI),
402, 412, 419
computer-assisted personal
interviewing (CAPI), 403, 405,
410, 419
computer-assisted telephone
interviewing (CATl), 402, 405,
410, 419

confidence interval, 380, 381, 383,
419
confidentiality, 405, 417, 418
consumer impressions, 361, 366, 373,
377 n.79, 378, 386–387, 393, 397,
399–400, 410, 413 n.228
consumer preferences, 231–232, 365,
377, 382, 385–386, 396 n.166,
416, 470
control groups, 394, 397–401, 421
control questions, 368, 369, 394, 401
convenience sampling, 224–225, 285,
382, 383 n.104, 385, 398 n.175,
419, 420
coverage or noncoverage error, 362
n.8, 378, 407, 419, 420
on expert acceptance of, 63 n.39,
367–369
data entry, 229, 363, 405, 412–413
*Daubert* and, 214 n.5
design of survey, 362, 363, 367, 373–
376, 381 n.97, 384, 386, 389, 394,
396, 399, 400 n.185, 406, 409, 414
n.231, 415, 416, 420
disclosure of methodology and results,
362, 373 n.62, 389 n.132, 405,
410, 413–415, 416–417
"don't know" or "no opinion"
options, 362 n.7, 389–391, 421
economic damages determinations,
389, 431, 469–470, 482, 483, 484,
486
error and bias minimization, 362 n.7,
382, 406–407, 411–412
ethical obligations of survey research
organization, 417
expertise in design, conduct, and
analysis, 364 n.16, 372, 375, 385–
386, 398, 399, 409
expertise in testimony, 362 n.8, 367,
372, 375–376, 381 n.96, 382, 383,
385, 408, 414, 416
extrapolation of data from, 226
filters to prevent guessing by
respondents, 389–391, 420, 421
on general acceptance of scientific
expertise, 365, 367–369

**EXHIBIT C**

*Index*

identifying the appropriate population, 367, 376-377, 379, 383-384

individual testimony compared to, 372

in-person (face-to-face) interviews, 363, 382, 383 n.106, 385 n.112, 392, 396, 401, 402-403, 404, 405, 419

instrument design and structure, 387-409

internet surveys, 382 n.102, 401, 403, 405, 406-408

interviewer errors and bias, 402, 406-407, 411

interviewer training and qualifications, 376, 386, 388 n.129, 389, 394, 395, 402-403, 409-410, 411

mall intercept surveys, 386, 398 n.175

mail surveys, 383 n.106, 384, 396, 401, 402 n.193, 403, 405-406

marketing, 364 n.13, 373 n.63, 382

measurement error, 362 n.8, 401, 420, 422

missing data, 229, 376, 385

mixed-mode design, 409

monitoring administration, 411-412

nonprobability sampling, 361, 382, 383 n.104, 420

nonresponse bias, 225, 226, 249, 290, 332, 362 n.8, 383-385, 407, 408, 416

objectivity in administration, 410-411

objectivity of, 362, 374, 387, 393

open-ended questions, 391-394, 406, 413, 420

order of questions, 395-396, 402, 403, 406-407, 408-409 n.217, 411, 420

pilot tests, 388, 389, 416-417

population definition and sampling, 223-225, 361, 362 n.8, 380, 381, 382, 383 n.104, 385, 398 n.175, 408, 416, 419, 420, 421

pretests, 388-389, 414 n.231, 430

primacy effect, 396, 420

probability sampling, 226, 361, 362 n.8, 380, 381, 382, 385, 398 n.175, 408, 416, 419, 420, 421

probes to clarify ambiguous responses, 389, 394-395, 402-403, 406, 410, 421

professional standards for survey researchers, 371, 389 n.131, 417

public opinion, 369, 370-371, 403 n.195

purpose of survey, 373

qualifications of experts, 375-376, 381 n.96

questions, 368, 369, 373, 391-394, 395, 397-401, 419, 421

random assignment, 398 n.175

random error, 314 n.30, 336, 337, 339, 342 n.79, 355, 388

random sample/sampling, 332, 363 n.12, 380-382, 383, 385-386, 412, 420, 421

random selection, 398 n.175, 408

random-digit dialing, 404, 408

randomized controlled studies, 398

recency effect, 396, 420, 421

relevance of survey, 362, 363, 367, 368, 370, 373, 374, 375, 376, 377-378, 379, 380-383, 386, 407, 413

report content, 362, 364 n.13, 371, 372, 373, 376 n.75, 377, 386, 401 n.186, 405, 413 n.228, 415-417

representativeness of respondents, 226, 362, 367, 370, 379, 380-383, 384, 405, 406, 407, 409, 417

response grouping, 413, 416

response rates, 226, 362, 367-368, 383, 384-385, 390, 405-406, 407, 408, 409, 416

sample surveys, 223, 361-363, 365 n.18, 381, 382

sampling error, 362 n.8, 380-381, 382, 398, 416, 419, 421

sampling frame (or universe), 224, 225, 226, 267, 283, 292, 293, 296, 297, 377-379, 404 n.198, 406, 415, 419, 420, 421

screening respondents, 386-387, 401 n.188, 404, 415, 420, 421

selection bias, 226 n.36, 385-386, 408

self-selected pseudosurveys, 407-408

EXHIBIT C

*Reference Manual on Scientific Evidence*

skip pattern, 402, 403, 406, 410, 421

sponsorship disclosure, 372, 374, 410–411

stratified sampling, 225, 299, 380, 381–382, 421

surveyor–respondent privilege, 417

systematic sampling, 380 n.93

target population, 362, 367, 371, 376, 377–378, 379, 382, 383, 384, 385, 386, 406, 407, 409, 415, 419, 420, 421

telephone surveys, 363, 371, 384, 396, 401, 402, 403-405, 407, 408, 410, 411, 412, 419

validation of interviews, 412

weight, evidentiary, 362–363, 368, 377–378, 379 n.89, 396 n.166, 399, 408, 413-414, 415

weights/weighting, statistical, 382, 384, 408, 416

# T

Tarrance Group, 371

Technical Working Group on DNA Identification Methods (TWGDAM), 61-62 n.29, 154 n.46

Thalidomide, 562-563, 653

Thematic Apperception Test, 886

Theory, law vs. science, 51

Threshold Limit Values (TLVs), 529

Tissue plasminogen accelerator, 732-733

Toolmark evidence
  ballistics, 72 n.93, 93 n.241, 96-97, 98, 99, 103 n.300
  case law development, 102-103
  class characteristics, 96
  empirical testing, 61, 65
  error rates, 98
  exclusion, 27 n.79
  identification testimony, 96-97
  individual characteristics, 96
  proficiency testing, 98
  random markings, 94, 99

Toxic Substances Control Act (TSCA), 648 nn.41 & 42, 663, 666

Toxic tort cases, 19, 21, 25–26, 31 n.91, 213, 223, 238, 505, 512, 551 n.2, 635, 636, 637, 638, 639, 645, 649, 663, 665, 667 n.91, 669

Toxicology
  absorption, 636, 640, 646–647, 661, 662–663, 666–667, 680, 682
  acute toxicity, 641, 668, 671, 680
  acute toxicity testing, 641
  additive effects, 673, 680
  agents of concern, 652, 653–654
  animal research, 510, 563–565, 603 n.160, 625, 636, 637, 639, 640–647, 648, 654, 655, 656, 658, 659, 660, 661–662, 663, 664, 669–670, 673, 674, 675 n.111, 677, 680, 682
  antagonism, 673, 680
  benchmark dose, 642, 670 n.96, 680
  bioassay, 644, 648, 664 n.83, 680
  bioavailability of compounds, 545, 667
  biodistribution of toxic agents, 636, 640, 646–647, 661, 662, 667–668, 681
  biological monitoring, 639, 649 n.47, 657, 667, 680
  biological plausiblility of associations, 644 n.29, 661, 664–665, 680
  blood analysis, 508, 509, 518–519, 535–537, 544, 635, 636, 637 n.8, 653, 656, 657, 662, 667, 672
  cancer risk, 635, 638 n.12, 642–643, 644–645, 649 n.46, 650, 653, 654, 655, 656, 659, 660 n.74, 665, 668–669, 670, 683
  carcinogenicity bioassay, 644, 654–655, 680
  carcinogens/carcinogenicity, 643 n.29, 644, 645, 647 nn.37 & 38, 649 n.44, 650 n.49, 651, 655–656, 658 n.70, 659, 660 n.74, 670 n.97, 673 n.105, 680
  chemical toxicology, 635, 636, 637–638, 639–640, 644, 645, 646, 647, 649, 654, 663, 673, 677, 681

**EXHIBIT C**

*Index*

chronic toxicity, 644, 652, 653, 672, 680

chronic toxicity tests, 644–645

clinical ecologists, 677 n.115, 680-681

clinical studies, 510, 640, 648 n.42, 656 n.64, 658, 659, 661

compounds, 640, 644, 648 n.42, 661–664, 667-669, 672, 674, 681

confounding factors, 657 n.67, 665, 672–673, 681

contact, 534

*Daubert* and, 638 n.9, 643 n.28, 664 n.84, 669 n.94

dermatotoxicology, 640, 641 n.24, 650 n.48, 653

design of studies, 639–646

differential diagnosis, 512 n.21, 672, 676 n.113, 681

direct–acting toxic agents, 636 n.2, 668, 681

DNA damage, 645, 654–655, 656, 663, 682

dose, dosage, 525, 636–637, 638, 641, 642, 644–645, 646, 647, 648, 651, 657 n.67, 658–659, 660, 661, 664, 665, 667 n.91, 668, 670 n.96, 673 n.107, 674, 677 n.115, 680, 681, 682, 684

dose–response curve, 646, 651, 673 n.107, 681

dose–response relationships, 635, 639, 641, 642-643, 646, 649, 651, 658, 663 n.82, 669, 670, 676, 680, 681

end points, 641, 642, 652, 653–654, 666

epidemiology and, 563–565, 603 n.160, 628, 636, 639, 644 n.29, 645–646 n.33, 647, 650–651, 655, 656, 657–660, 664–665, 674, 681

epigenetics, 643 n.28, 681

etiology, 670–671, 676 n.113, 682

excretion of toxicants, 636, 640, 646, 647, 661, 662, 668, 682

exposure assessment, 510, 533–534, 543–544, 637, 638 n.13, 642, 649, 650, 651, 656–657, 658, 665, 671, 672, 674

exposure evidence, 636, 637–638, 640, 641–642 n.26, 643 n.28, 644 n.28, 645 n.31, 647 n.37, 658, 659, 660–670

and exposure science, 505, 506, 508, 509, 518, 519, 533, 535, 537, 538, 540, 547

extrapolation from animals and cell research to humans, 636, 641, 645, 646–647, 648, 651, 652, 658, 661–662, 664, 669–670

extrapolation from short exposures to multiyear estimates, 648

general causation, 637 n.7, 638, 657 n.87, 659, 660–665

good laboratory practice (GLP), 647–648, 682

hazard identification, 637 n.7, 649, 650 n.47, 651, 656 n.64, 682

hydrogeologists, hydrologists, 682

immunotoxicology, 640, 653, 677 n.115, 678 n.116, 680-681, 682

in vitro research, 639, 640, 645–646, 647, 648 n.42, 654, 658, 659, 664, 674, 682, 683

in vivo research, 639, 640–645, 646, 647, 654, 664, 682, 683

indirect–acting chemicals, 668, 682

inhalation toxicology, 640, 650 n.48, 651, 656 n.65, 657 n.66, 662, 667, 668, 670 n.97, 674, 678 n.116, 680, 682

*Joiner* and, 638 n.9, 661 n.77

laboratory tests, 671 n.102, 672

latency period for disease, 512, 660 n.74, 668–669

legal contexts for, 635, 637–638

lethal dose 50 (LD$_{50}$), 641, 682

level of exposure and, 638 n.12, 641–642, 658 n.70, 660 n.74, 665, 667 n.91, 669–670, 673 n.107, 682, 683

lifetime bioassay, 648, 680

maximum contaminant level (MCL), 670 n.97

maximum tolerated dose (MTD), 644–645, 682

1013

EXHIBIT C

*Reference Manual on Scientific Evidence*

medical history and, 645 n.31, 670-675, 676 n.113

metabolism, 535-536, 668, 674

molecular toxicology, 640, 645, 654-655, 656, 663, 678 n.116, 682

multiple chemical hypersensitivity, 677 n.115, 680-682

mutagens and mutagenesis, 642, 643 n.28, 645, 654-655, 670, 683

neurotoxicology, 640, 647 n.38, 663-664 n.82, 670 n.95, 678 n.116, 683

no observable effect level (NOEL), 641-642, 669-670

no threshold model, 642-643, 669-670

one-hit theory, 642, 643, 651, 683

pharmacokinetics, 646, 648, 674, 675, 683

potentiation, 673, 683

premarket testing of drugs, 648

qualifications of experts, 646 n.33, 660-661, 675-679

randomized controlled studies, 648 n.42, 658

regulatory context, 635, 636, 637, 638 nn.10 & 12, 639, 640, 642, 644-645, 646, 647, 648 n.40, 649, 650-651, 654, 656 n.54, 657 n.67, 660, 665-666, 669 n.95, 670 n.96, 678

reproductive toxicology, 640, 653, 662, 666

risk assessment, 637, 642-643, 648-651, 657 n.67, 661-662, 663, 673 n.108, 678 n.116, 679, 683

risk characterization, 637, 638 n.12, 645 n.31, 659, 683

safety assessment, 640, 647-649, 683

scientific foundation of studies, 23

specific causation, 23, 637 n.7, 638, 645 n.31, 659 n.72, 665-666, 669-670 n.95

statistical evaluation, 640, 642, 644, 645, 658-659, 670 n.96, 676

structure–activity relationships (SAR), 647 n.37, 648 n.42, 663, 683

susceptibility/sensitivity differences, 527 n.61, 636, 641 n.25, 646 n.35, 650 n.48, 661 n.77, 662-663, 666, 674

symptoms of exposure, 637 n.5, 641-642 n.26, 657 n.66, 662, 667 n.91, 669 n.94, 671-672

synergistic effect, 673, 683

systemic, 534-535

target organ dose, 636, 646

target organ specificity, 651-656, 662-663

temporal relationships, 636, 641 n.26, 664, 665, 668-669

teratogen and teratogenicity, 645 n.33, 684

threshold, 641-642, 643, 647 n.37, 650 n.49, 651, 657 n.66, 669-670, 683, 684

tort litigation, 635, 636-637, 638, 639, 645, 649, 663, 665, 667 n.91, 669

toxic agent defined, 684

Trademark infringement, 224, 308 n.12, 363 n.10, 366, 373, 376, 378, 379, 382 n.101, 387, 396 n.165, 397-398, 399-400, 401, 410, 413-414, 421

Transposition fallacy, 168, 169 n.91, 170 n.92, 173, 209, 250-251 n.100, 258 n.119, 259 n.122

Treatment of mental disorders (*see also* Medications for mental disorders)
  cognitive behavioral and related therapies, 859-860
  electroconvulsive and other brain stimulation therapies, 861-862
  family and couples therapies, 860
  functional impairments, 860-861
  group therapies, 860
  prediction of response to, 863-864
  psychoanalysis, 858-859
  psychodynamic psychotherapy, 859, 860, 865-866
  psychosurgery, 863
  supportive therapy, 860
  talking therapies, 860

*Trigon Ins. Co. v. United States*, 33

**EXHIBIT C**

*Index*

*Troedel v. Wainwright*, 126

*Trop v. Dulles*, 369

Tsar Nicholas family identification, 152, 177

# U

Uniform Commercial Code, 466

*United States v. Cordoba*, 368

*United States v. Cyphers*, 123

*United States v. Diaz*, 101

*United States v. Glynn*, 27 n.79, 101-102, 124 n.444

*United States v. Green*, 27 n.79, 101, 122 n.427

*United States v. Llera Plaza*, 28, 73, 74, 79, 82 n.169

*United States v. Mitchell*, 74 n.105, 76-77, 82 n.170, 122

*United States v. Monteiro*, 98 n.265, 101, 122 n.434

*United States v. Nacchio*, 35

*United States v. Orians*, 368

*United States v. Scheffer,* 365 n.22, 368 n.35, 794, 795-796

*United States v. Semrau*, 803, 805-806

*United States v. Starzecpyzel*, 63 n.42, 84 n.183, 86 n.190, 89, 122 n.435

*United States v. Williams*, 63 n.42, 102

*United States v. Yazback*, 193-194

U.S. Census Bureau, 260, 365 n.18, 383, 484

U.S. Forest Service, Forest Products Laboratory, 58 n.10

U.S. Geological Survey, 951, 958

U.S. Preventive Services Task Force, 726-727, 735, 738, 739

# V

Vaginal
    adenocarcinoma, 560, 609 n.178
    DNA swabs, 147, 151, 158, 182, 183

Validity/validation
    comparative measurements, 228
    correlation coefficients, 228
    criteria for determining, 484
    damages data, 483-485
    developmental, 155
    DNA methods and procedures, 133, 134, 148, 150, 153, 154, 155, 185, 193, 195
    external, 222, 301
    forensic evidence, 27-28
    internal, 155-156, 228-229
    quantitative methods, 485
    reliability distinguished from, 71-72
    test-retest correlations, 228-229

*Vanasen v. Tradewinds,* 922

*Victor Shirley, Inc. v. Creative Pipe, Inc.*, 35

Videotaped testimony, 7, 880-881

Vinyl chloride (monochloroethylene), 522, 605-606 n.169, 653, 672

Violence Risk Assessment Guide (VRAG), 848

Voice stress analyzer, 792

Voiceprint evidence, 3, 62 n.32, 71 n.88, 73, 579 n.85

Volatile chemicals, 514, 520, 521, 531, 650 n.48, 657 n.66, 668

Voting Rights Act, 266-267 nn.131 & 133, 307 n.9

Voting rights cases, 213, 266-268, 307

# W

*Walker v. Soo Line Railroad Co.*, 947

Warning issues, 233, 941-942

Wechsler Adult Intelligence Scale (WAIS-III), 836

Weight-of-the-evidence approach, 15, 16, 20

*Weisgram v. Marley*, 18-19, 22, 63

*Wilhoite v. Olin Corp.*, 366-367, 392 n.144

*Wilson v. Corestaff Services, L.P.,* 803, 806-807

EXHIBIT C

*Reference Manual on Scientific Evidence*

Women's Health Initiative (WHI),
716–717
World Health Organization (WHO), 655,
678
World Trade Organization, 650
Wrongful death, 238 n.71, 470, 471,
473–474, 475 n.77
Wrongful termination, 470, 471, 475,
491

## Z

*Zuni Public Schools District No. 89 v.
Department of Education*, 2
Zyprexa litigation, 24

**EXHIBIT C**