Case No. 1:21-cv-01689-RMR-MDB    Document 57-3    filed 04/21/23    USDC Colorado
pg 1 of 550

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

EXHIBIT C

**THE NATIONAL ACADEMIES PRESS  500 Fifth Street, N.W.  Washington, DC 20001**

The Federal Judicial Center contributed to this publication in furtherance of the Center's statutory mission to develop and conduct educational programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

The development of the third edition of the *Reference Manual on Scientific Evidence* was supported by Contract No. B5727.R02 between the National Academy of Sciences and the Carnegie Corporation of New York and a grant from the Starr Foundation. The views expressed in this publication are those of the authors and do not necessarily reflect those of the National Academies or the organizations that provided support for the project.

International Standard Book Number-13: 978-0-309-21421-6
International Standard Book Number-10: 0-309-21421-1

Library of Congress Cataloging-in-Publication Data

Reference manual on scientific evidence. — 3rd ed.
    p. cm.
 Includes bibliographical references and index.
 ISBN-13: 978-0-309-21421-6 (pbk.)
 ISBN-10: 0-309-21421-1 (pbk.)
 1.  Evidence, Expert—United States.  I. Federal Judicial Center.
 KF8961.R44 2011
 347.73′67—dc23
                                2011031458

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

Copyright 2011 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

**EXHIBIT C**

# THE FEDERAL JUDICIAL CENTER

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States, with the mission to "further the development and adoption of improved judicial administration in the courts of the United States." By statute, the Chief Justice of the United States chairs the Federal Judicial Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The Center undertakes empirical and exploratory research on federal judicial processes, court management, and sentencing and its consequences, often at the request of the Judicial Conference and its committees, the courts themselves, or other groups in the federal system. In addition to orientation and continuing education programs for judges and court staff on law and case management, the Center produces publications, videos, and online resources. The Center provides leadership and management education for judges and court employees, and other training as needed. Center research informs many of its educational efforts. The Center also produces resources and materials on the history of the federal courts, and it develops resources to assist in fostering effective judicial administration in other countries.

Since its founding, the Center has had nine directors. Judge Barbara J. Rothstein became director of the Federal Judicial Center in 2003

**www.fjc.gov**

EXHIBIT C

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

EXHIBIT C

*Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence*

*Co-Chairs:*

**JEROME P. KASSIRER** (IOM), Distinguished Professor, Tufts University School of Medicine

**GLADYS KESSLER**, Judge, U.S. District Court for the District of Columbia

*Members:*

**MING W. CHIN**, Associate Justice, The Supreme Court of California

**PAULINE NEWMAN**, Judge, U.S. Court of Appeals for the Federal Circuit

**KATHLEEN MCDONALD O'MALLEY**, Judge, U.S. Court of Appeals for the Federal Circuit

**JED S. RAKOFF**, Judge, U.S. District Court, Southern District of New York

**CHANNING R. ROBERTSON,** Ruth G. and William K. Bowes Professor, School of Engineering, and Professor, Department of Chemical Engineering, Stanford University

**JOSEPH V. RODRICKS,** Principal, Environ

**ALLEN WILCOX,** Senior Investigator, Institute of Environmental Health Sciences

**SANDY L. ZABELL,** Professor of Statistics and Mathematics, Weinberg College of Arts and Sciences, Northwestern University

*Consultant to the Committee:*

**JOE S. CECIL,** Project Director, Program on Scientific and Technical Evidence, Division of Research, Federal Judicial Center

*Staff:*

**ANNE–MARIE MAZZA,** Director

**STEVEN KENDALL,** Associate Program Officer

**GURUPRASAD MADHAVAN,** Program Officer (until November 2010)

EXHIBIT C

## *Board of the Federal Judicial Center*

The Chief Justice of the United States, *Chair*

Judge Susan H. Black, U.S. Court of Appeals for the Eleventh Circuit

Magistrate Judge John Michael Facciola, U.S. District Court for the District of Columbia

Judge James B. Haines, U.S. Bankruptcy Court for the District of Maine

Chief Judge James F. Holderman, U.S. District Court for the Northern District of Illinois

Judge Edward C. Prado, U.S. Court of Appeals for the Fifth Circuit

Chief Judge Loretta A. Preska, U.S. District Court for the Southern District of New York

Chief Judge Kathryn H. Vratil, U.S. District Court for the District of Kansas

James C. Duff, Director of the Administrative Office of the U.S. Courts

EXHIBIT C

*Committee on Science, Technology, and Law*
*National Research Council*

**DAVID KORN** (*Co-Chair*), Professor of Pathology, Harvard Medical School, and formerly, Inaugural Vice Provost for Research, Harvard University

**RICHARD A. MESERVE** (*Co-Chair*), President, Carnegie Institution for Science, and Senior of Counsel, Covington & Burling LLP

**FREDERICK R. ANDERSON, JR.,** Partner, McKenna, Long & Aldridge LLP

**ARTHUR I. BIENENSTOCK,** Special Assistant to the President for Federal Research Policy, and Director, Wallenberg Research Link, Stanford University

**BARBARA E. BIERER,** Professor of Medicine, Harvard Medical School, and Senior Vice President, Research, Brigham and Women's Hospital

**ELIZABETH H. BLACKBURN,** Morris Herzstein Professor of Biology and Physiology, University of California, San Francisco

**JOHN BURRIS,** President, Burroughs Wellcome Fund

**ARTURO CASADEVALL,** Leo and Julia Forchheimer Professor of Microbiology and Immunology; Chair, Department of Biology and Immunology; and Professor of Medicine, Albert Einstein College of Medicine

**JOE S. CECIL,** Project Director, Program on Scientific and Technical Evidence, Division of Research, Federal Judicial Center

**ROCHELLE COOPER DREYFUSS,** Pauline Newman Professor of Law and Director, Engelberg Center on Innovation Law and Policy, New York University School of Law

**DREW ENDY,** Assistant Professor, Bioengineering, Stanford University, and President, The BioBricks Foundation

**PAUL G. FALKOWSKI,** Board of Governors Professor in Geological and Marine Science, Department of Earth and Planetary Science, Rutgers, The State University of New Jersey

**MARCUS FELDMAN,** Burnet C. and Mildred Wohlford Professor of Biological Sciences, Stanford University

**ALICE P. GAST,** President, Lehigh University

**JASON GRUMET,** President, Bipartisan Policy Center

**BENJAMIN W. HEINEMAN, JR.,** Senior Fellow, Harvard Law School and Harvard Kennedy School of Government

**D. BROCK HORNBY,** U.S. District Judge for the District of Maine

**ALAN B. MORRISON,** Lerner Family Associate Dean for Public Interest and Public Service, George Washington University Law School

**PRABHU PINGALI,** Deputy Director of Agricultural Development, Global Development Program, Bill and Melinda Gates Foundation

*vii*

**EXHIBIT C**

**HARRIET RABB,** Vice President and General Counsel, Rockefeller
   University
**BARBARA JACOBS ROTHSTEIN,** Director, The Federal Judicial Center
**DAVID S.TATEL,** Judge, U.S. Court of Appeals for the District of Columbia
   Circuit
**SOPHIE VANDEBROEK**, Chief Technology Officer and President, Xerox
   Innovation Group, Xerox Corporation

*Staff*

**ANNE-MARIE MAZZA,** Director
**STEVEN KENDALL,** Associate Program Officer

EXHIBIT C

# Foreword

In 1993, in the case *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed trial judges to serve as "gatekeepers" in determining whether the opinion of a proffered expert is based on scientific reasoning and methodology. Since *Daubert,* scientific and technical information has become increasingly important in all types of decisionmaking, including litigation. As a result, the science and legal communities have searched for expanding opportunities for collaboration.

Our two institutions have been at the forefront of trying to improve the use of science by judges and attorneys. In *Daubert,* the Supreme Court cited an *amicus curiae* brief submitted by the National Academy of Sciences and the American Association for the Advancement of Science to support the view of science as "a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement." Similarly, in *Kumho Tire Co. v. Carmichael* (1999) the Court cited an amicus brief filed by the National Academy of Engineering for its assistance in explaining the process of engineering.

Soon after the *Daubert* decision the Federal Judicial Center published the first edition of the *Reference Manual on Scientific Evidence*, which has become the leading reference source for federal judges for difficult issues involving scientific testimony. The Center also undertook a series of research studies and judicial education programs intended to strengthen the use of science in courts.

More recently the National Research Council through its Committee on Science, Technology, and Law has worked closely with the Federal Judicial Center to organize discussions, workshops, and studies that would bring the two communities together to explore the nature of science and engineering, and the processes by which science and technical information informs legal issues. It is in that spirit that our organizations joined together to develop the third edition of the *Reference Manual on Scientific Evidence*. This third edition, which was supported by grants from the Carnegie Foundation and the Starr Foundation, builds on the foundation of the first two editions, published by the Center. This edition was overseen by a National Research Council committee composed of judges and scientists and engineers who share a common vision that together scientists and engineers and members of the judiciary can play an important role in informing judges about the nature and work of the scientific enterprise.

Our organizations benefit from the contributions of volunteers who give their time and energy to our efforts. During the course of this project, two of the chapter authors passed away: Margaret Berger and David Friedman. Both Margaret and David served on NRC committees and were frequent contributors to Center judicial education seminars. Both were involved in the development of the *Reference Manual* from the beginning, both have aided each of our institutions through their services on committees, and both have made substantial contributions to our understanding of law and science through their individual scholarship.

*ix*

EXHIBIT C

*Reference Manual on Scientific Evidence*

They will be missed but their work will live on in the thoughtful scholarship they have left behind.

We extend our sincere appreciation to Dr. Jerome Kassirer and Judge Gladys Kessler and all the members of the committee who gave so generously to make this edition possible.

THE HONORABLE BARBARA J. ROTHSTEIN
*Director*
*Federal Judicial Center*

RALPH J. CICERONE
*President*
*National Academy of Sciences*

x

EXHIBIT C

# Acknowledgments

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the National Academies' Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards for objectivity, accuracy, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the process.

We wish to thank the following individuals for their review of selected chapters of this report: Bert Black, Mansfield, Tanick & Cohen; Richard Bjur, University of Nevada; Michael Brick, Westat; Edward Cheng, Vanderbilt University; Joel Cohen, Rockefeller University; Morton Corn, Morton Corn and Associates; Carl Cranor, University of California, Riverside; Randall Davis, Massachusetts Institute of Technology; John Doull, University of Kansas; Barry Fisher, Los Angeles County Sheriff's Department; Edward Foster, University of Minnesota; David Goldston, Natural Resources Defense Council; James Greiner, Harvard University; Susan Haack, University of Miami; David Hillis, University of Texas; Karen Kafadar, Indiana University; Graham Kalton, Westat; Randy Katz, University of California, Berkeley; Alan Leshner, American Association for the Advancement of Science; Laura Liptai, Biomedical Forensics; Patrick Malone, Patrick Malone & Associates; Geoffrey Mearns, Cleveland State University; John Monahan, The University of Virginia; William Nordhaus, Yale University; Fernando Olguin, U.S. District Court for the Central District of California; Jonathan Samet, University of Southern California; Nora Cate Schaeffer, University of Wisconsin; Shira Scheindlin, U.S. District Court for the Southern District of New York; and Reggie Walton, U.S. District Court for the District of Columbia.

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the report, nor did they see the final draft of the report before its release. The review of this report was overseen by D. Brock Hornby, U.S. District Judge for the District of Maine. Appointed by the National Academies, he was responsible for making certain that an independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of this report rests entirely with the authoring committee and the institution.

EXHIBIT C

EXHIBIT C

# Preface

Supreme Court decisions during the last decade of the twentieth century mandated that federal courts examine the scientific basis of expert testimony to ensure that it meets the same rigorous standard employed by scientific researchers and practitioners outside the courtroom. Needless to say, this requirement places a demand on judges not only to comprehend the complexities of modern science but to adjudicate between parties' differing interpretations of scientific evidence. Science, meanwhile, advances. Methods change, new fields are born, new tests are introduced, the lexicon expands, and fresh approaches to the interpretation of causal relations evolve. Familiar terms such as enzymes and molecules are replaced by microarray expression and nanotubes; single-author research studies have now become multi-institutional, multi-author, international collaborative efforts.

No field illustrates the evolution of science better than forensics. The evidence provided by DNA technology was so far superior to other widely accepted methods and called into question so many earlier convictions that the scientific community had to reexamine many of its time-worn forensic science practices. Although flaws of some types of forensic science evidence, such as bite and footprint analysis, lineup identification, and bullet matching were recognized, even the most revered form of forensic science—fingerprint identification—was found to be fallible. Notably, even the "gold standard" of forensic evidence, namely DNA analysis, can lead to an erroneous conviction if the sample is contaminated, if specimens are improperly identified, or if appropriate laboratory protocols and practices are not followed.

Yet despite its advances, science has remained fundamentally the same. In its ideal expression, it examines the nature of nature in a rigorous, disciplined manner in, whenever possible, controlled environments. It still is based on principles of hypothesis generation, scrupulous study design, meticulous data collection, and objective interpretation of experimental results. As in other human endeavors, however, this ideal is not always met. Feverish competition between researchers and their parent institutions, fervent publicity seeking, and the potential for dazzling financial rewards can impair scientific objectivity. In recent years we have experienced serious problems that range from the introduction of subtle bias in the design and interpretation of experiments to overt fraudulent studies. In this welter of modern science, ambitious scientists, self-designated experts, billion-dollar corporate entities, and aggressive claimants, judges must weigh evidence, judge, and decide.

As with previous editions of the *Reference Manual*, this edition is organized according to many of the important scientific and technological disciplines likely to be encountered by federal (or state) judges. We wish to highlight here two critical issues germane to the interpretation of all scientific evidence, namely issues of causation and conflict of interest. Causation is the task of attributing cause and effect, a normal everyday cognitive function that ordinarily takes little or

*xiii*

EXHIBIT C

*Reference Manual on Scientific Evidence*

no effort. Fundamentally, the task is an inferential process of weighing evidence and using judgment to conclude whether or not an effect is the result of some stimulus. Judgment is required even when using sophisticated statistical methods. Such methods can provide powerful evidence of associations between variables, but they cannot prove that a causal relationship exists. Theories of causation (evolution, for example) lose their designation as theories only if the scientific community has rejected alternative theories and accepted the causal relationship as fact. Elements that are often considered in helping to establish a causal relationship include predisposing factors, proximity of a stimulus to its putative outcome, the strength of the stimulus, and the strength of the events in a causal chain. Unfortunately, judges may be in a less favorable position than scientists to make causal assessments. Scientists may delay their decision while they or others gather more data. Judges, on the other hand, must rule on causation based on existing information. Concepts of causation familiar to scientists (no matter what stripe) may not resonate with judges who are asked to rule on general causation (i.e., is a particular stimulus known to produce a particular reaction) or specific causation (i.e., did a particular stimulus cause a particular consequence in a specific instance). In the final analysis, a judge does not have the option of suspending judgment until more information is available, but must decide after considering the best available science. Finally, given the enormous amount of evidence to be interpreted, expert scientists from different (or even the same) disciplines may not agree on which data are the most relevant, which are the most reliable, and what conclusions about causation are appropriate to be derived.

Like causation, conflict of interest is an issue that cuts across most, if not all, scientific disciplines and could have been included in each chapter of the *Reference Manual*. Conflict of interest manifests as bias, and given the high stakes and adversarial nature of many courtroom proceedings, bias can have a major influence on evidence, testimony, and decisionmaking. Conflicts of interest take many forms and can be based on religious, social, political, or other personal convictions. The biases that these convictions can induce may range from serious to extreme, but these intrinsic influences and the biases they can induce are difficult to identify. Even individuals with such prejudices may not appreciate that they have them, nor may they realize that their interpretations of scientific issues may be biased by them. Because of these limitations, we consider here only financial conflicts of interest; such conflicts are discoverable. Nonetheless, even though financial conflicts can be identified, having such a conflict, even one involving huge sums of money, does not necessarily mean that a given individual will be biased. Having a financial relationship with a commercial entity produces a conflict of interest, but it does not inevitably evoke bias. In science, financial conflict of interest is often accompanied by disclosure of the relationship, leaving to the public the decision whether the interpretation might be tainted. Needless to say, such an assessment may be difficult. The problem is compounded in scientific publications by obscure ways in which the conflicts are reported and by a lack of disclosure of dollar amounts.

xiv

EXHIBIT C

*Preface*

Judges and juries, however, must consider financial conflicts of interest when assessing scientific testimony. The threshold for pursuing the possibility of bias must be low. In some instances, judges have been frustrated in identifying expert witnesses who are free of conflict of interest because entire fields of science seem to be co-opted by payments from industry. Judges must also be aware that the research methods of studies funded specifically for purposes of litigation could favor one of the parties. Though awareness of such financial conflicts in itself is not necessarily predictive of bias, such information should be sought and evaluated as part of the deliberations.

*The Reference Manual on Scientific Evidence*, here in its third edition, is formulated to provide the tools for judges to manage cases involving complex scientific and technical evidence. It describes basic principles of major scientific fields from which legal evidence is typically derived and provides examples of cases in which such evidence was used. Authors of the chapters were asked to provide an overview of principles and methods of the science and provide relevant citations. We expect that few judges will read the entire manual; most will use the volume in response to a need when a particular case arises involving a technical or scientific issue. To help in this endeavor, the *Reference Manual* contains completely updated chapters as well as new ones on neuroscience, exposure science, mental health, and forensic science. This edition of the manual has also gone through the thorough review process of the National Academy of Sciences.

As in previous editions, we continue to caution judges regarding the proper use of the reference guides. They are not intended to instruct judges concerning what evidence should be admissible or to establish minimum standards for acceptable scientific testimony. Rather, the guides can assist judges in identifying the issues most commonly in dispute in these selected areas and in reaching an informed and reasoned assessment concerning the basis of expert evidence. They are designed to facilitate the process of identifying and narrowing issues concerning scientific evidence by outlining for judges the pivotal issues in the areas of science that are often subject to dispute. Citations in the reference guides identify cases in which specific issues were raised; they are examples of other instances in which judges were faced with similar problems. By identifying scientific areas commonly in dispute, the guides should improve the quality of the dialogue between the judges and the parties concerning the basis of expert evidence.

In our committee discussions, we benefited from the judgment and wisdom of the many distinguished members of our committee, who gave time without compensation. They included Justice Ming Chin of the Supreme Court of California; Judge Pauline Newman of the U.S. Court of Appeals for the Federal Circuit in Washington, D.C.; Judge Kathleen MacDonald O'Malley of the U.S. Court of Appeals for the Federal Circuit; Judge Jed Rakoff of the U.S. District Court for the Southern District of New York; Channing Robertson, Ruth G. and William K. Bowes Professor, School of Enginering, and Professor, Department of Chemical Engineering, Stanford University; Joseph Rodricks,

EXHIBIT C

*Reference Manual on Scientific Evidence*

Principal, Environ, Arlington, Virginia; Allen Wilcox, Senior Investigator, Institute of Environmental Health Sciences, Research Triangle Park, North Carolina; and Sandy Zabell, Professor of Statistics and Mathematics, Weinberg College of Arts and Sciences, Northwestern University.

Special commendation, however, goes to Anne-Marie Mazza, Director of the Committee on Science, Technology, and Law, and Joe Cecil of the Federal Judicial Center. These individuals not only shepherded each chapter and its revisions through the process, but provided critical advice on content and editing. They, not we, are the real editors.

Finally, we would like to express our gratitude for the superb assistance of Steven Kendall and for the diligent work of Guru Madhavan, Sara Maddox, Lillian Maloy, and Julie Phillips.

JEROME P. KASSIRER AND GLADYS KESSLER
*Committee Co-Chairs*

xvi

EXHIBIT C

# Summary Table of Contents

A detailed Table of Contents appears at the front of each chapter.

Introduction, 1
>    Stephen Breyer

The Admissibility of Expert Testimony, 11
>    Margaret A. Berger

How Science Works, 37
>    David Goodstein

Reference Guide on Forensic Identification Expertise, 55
>    Paul C. Giannelli, Edward J. Imwinkelried, & Joseph L. Peterson

Reference Guide on DNA Identification Evidence, 129
>    David H. Kaye & George Sensabaugh

Reference Guide on Statistics, 211
>    David H. Kaye & David A. Freedman

Reference Guide on Multiple Regression, 303
>    Daniel L. Rubinfeld

Reference Guide on Survey Research, 359
>    Shari Seidman Diamond

Reference Guide on Estimation of Economic Damages, 425
>    Mark A. Allen, Robert E. Hall, & Victoria A. Lazear

Reference Guide on Exposure Science, 503
>    Joseph V. Rodricks

Reference Guide on Epidemiology, 549
>    Michael D. Green, D. Michal Freedman, & Leon Gordis

Reference Guide on Toxicology, 633
>    Bernard D. Goldstein & Mary Sue Henifin

Reference Guide on Medical Testimony, 687
>    John B. Wong, Lawrence O. Gostin, & Oscar A. Cabrera

Reference Guide on Neuroscience, 747
>    Henry T. Greely & Anthony D. Wagner

Reference Guide on Mental Health Evidence, 813
>    Paul S. Appelbaum

Reference Guide on Engineering, 897
>    Channing R. Robertson, John E. Moalli, & David L. Black

Appendix A. Biographical Information of Committee and Staff, 961

**EXHIBIT C**

EXHIBIT C

# Introduction

STEPHEN BREYER

*Stephen Breyer, L.L.B., is Associate Justice of the Supreme Court of the United States.*

Portions of this Introduction appear in Stephen Breyer, *The Interdependence of Science and Law,* 280 Science 537 (1998).

1

EXHIBIT C

*Reference Manual on Scientific Evidence*

IN THIS AGE OF SCIENCE, SCIENCE SHOULD EXPECT TO find a warm welcome, perhaps a permanent home, in our courtrooms. The reason is a simple one. The legal disputes before us increasingly involve the principles and tools of science. Proper resolution of those disputes matters not just to the litigants, but also to the general public—those who live in our technologically complex society and whom the law must serve. Our decisions should reflect a proper scientific and technical understanding so that the law can respond to the needs of the public.

Consider, for example, how often our cases today involve statistics—a tool familiar to social scientists and economists but, until our own generation, not to many judges. In 2007, the U.S. Supreme Court heard *Zuni Public Schools District No. 89 v. Department of Education*,[1] in which we were asked to interpret a statistical formula to be used by the U.S. Secretary of Education when determining whether a state's public school funding program "equalizes expenditures" among local school districts. The formula directed the Secretary to "disregard" school districts with "per-pupil expenditures . . . above the 95th percentile or below the 5th percentile of such expenditures . . . in the State." The question was whether the Secretary, in identifying the school districts to be disregarded, could look to the number of pupils in a district as well as the district's expenditures per pupil. Answering that question in the affirmative required us to draw upon technical definitions of the term "percentile" and to consider five different methods by which one might calculate the percentile cutoffs.

In another recent Term, the Supreme Court heard two cases involving consideration of statistical evidence. In *Hunt v. Cromartie*,[2] we ruled that summary judgment was not appropriate in an action brought against various state officials, challenging a congressional redistricting plan as racially motivated in violation of the Equal Protection Clause. In determining that disputed material facts existed regarding the motive of the state legislature in redrawing the redistricting plan, we placed great weight on a statistical analysis that offered a plausible alternative interpretation that did not involve an improper racial motive. Assessing the plausibility of this alternative explanation required knowledge of the strength of the statistical correlation between race and partisanship, understanding of the consequences of restricting the analysis to a subset of precincts, and understanding of the relationships among alternative measures of partisan support.

In *Department of Commerce v. United States House of Representatives*,[3] residents of a number of states challenged the constitutionality of a plan to use two forms of statistical sampling in the upcoming decennial census to adjust for expected "undercounting" of certain identifiable groups. Before examining the constitutional issue, we had to determine if the residents challenging the plan had standing to sue because of injuries they would be likely to suffer as a result of the sampling

1. 127 S. Ct. 1534 (2007).
2. 119 S. Ct. 1545 (1999).
3. 119 S. Ct. 765 (1999).

2

EXHIBIT C

*Introduction*

plan. In making this assessment, it was necessary to apply the two sampling strategies to population data in order to predict the changes in congressional apportionment that would most likely occur under each proposed strategy. After resolving the standing issue, we had to determine if the statistical estimation techniques were consistent with a federal statute.

In each of these cases, we judges were not asked to become expert statisticians, but we were expected to understand how the statistical analyses worked. Trial judges today are asked routinely to understand statistics at least as well, and probably better.

But science is far more than tools, such as statistics. And that "more" increasingly enters directly into the courtroom. The Supreme Court, for example, has recently decided cases involving basic questions of human liberty, the resolution of which demanded an understanding of scientific matters. Recently we were asked to decide whether a state's method of administering a lethal injection to condemned inmates constituted cruel and unusual punishment in violation of the Eighth Amendment.[4] And in 1997, we were asked to decide whether the Constitution protects a right to physician-assisted suicide.[5] Underlying the legal questions in these cases were medical questions: What effect does a certain combination of drugs, administered in certain doses, have on the human body, and to what extent can medical technology reduce or eliminate the risk of dying in severe pain? The medical questions did not determine the answer to the legal questions, but to do our legal job properly, we needed to develop an informed—although necessarily approximate—understanding of the science.

Nor were the lethal-injection and "right-to-die" cases unique in this respect. A different case concerned a criminal defendant who was found to be mentally competent to stand trial but not mentally competent to represent himself. We held that a state may insist that such a defendant proceed to trial with counsel.[6] Our opinion was grounded in scientific literature suggesting that mental illness can impair functioning in different ways, and consequently that a defendant may be competent to stand trial yet unable to carry out the tasks needed to present his own defense.

The Supreme Court's docket is only illustrative. Scientific issues permeate the law. Criminal courts consider the scientific validity of, say, DNA sampling or voiceprints, or expert predictions of defendants' "future dangerousness," which can lead courts or juries to authorize or withhold the punishment of death. Courts review the reasonableness of administrative agency conclusions about the safety of a drug, the risks attending nuclear waste disposal, the leakage potential of a toxic waste dump, or the risks to wildlife associated with the building of a dam. Patent law cases can turn almost entirely on an understanding of the underlying technical

---

4. Baze v. Rees, 128 S. Ct. 1520 (2008).
5. Washington v. Glucksberg, 521 U.S. 702 (1997); Vacco v. Quill, 521 U.S. 793 (1997).
6. Indiana v. Edwards, 128 S. Ct. 2379 (2008).

3

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

or scientific subject matter. And, of course, tort law often requires difficult determinations about the risk of death or injury associated with exposure to a chemical ingredient of a pesticide or other product.

The importance of scientific accuracy in the decision of such cases reaches well beyond the case itself. A decision wrongly denying compensation in a toxic substance case, for example, can not only deprive the plaintiff of warranted compensation but also discourage other similarly situated individuals from even trying to obtain compensation and encourage the continued use of a dangerous substance. On the other hand, a decision wrongly granting compensation, although of immediate benefit to the plaintiff, can improperly force abandonment of the substance. Thus, if the decision is wrong, it will improperly deprive the public of what can be far more important benefits—those surrounding a drug that cures many while subjecting a few to less serious risk, for example. The upshot is that we must search for law that reflects an understanding of the relevant underlying science, not for law that frees companies to cause serious harm or forces them unnecessarily to abandon the thousands of artificial substances on which modern life depends.

The search is not a search for scientific precision. We cannot hope to investigate all the subtleties that characterize good scientific work. A judge is not a scientist, and a courtroom is not a scientific laboratory. But consider the remark made by the physicist Wolfgang Pauli. After a colleague asked whether a certain scientific paper was wrong, Pauli replied, "That paper isn't even good enough to be wrong!"[7] Our objective is to avoid legal decisions that reflect that paper's so-called science. The law must seek decisions that fall within the boundaries of scientifically sound knowledge.

Even this more modest objective is sometimes difficult to achieve in practice. The most obvious reason is that most judges lack the scientific training that might facilitate the evaluation of scientific claims or the evaluation of expert witnesses who make such claims. Judges typically are generalists, dealing with cases that can vary widely in subject matter. Our primary objective is usually process-related: seeing that a decision is reached fairly and in a timely way. And the decision in a court of law typically (though not always) focuses on a particular event and specific individualized evidence.

Furthermore, science itself may be highly uncertain and controversial with respect to many of the matters that come before the courts. Scientists often express considerable uncertainty about the dangers of a particular substance. And their views may differ about many related questions that courts may have to answer. What, for example, is the relevance to human cancer of studies showing that a substance causes some cancers, perhaps only a few, in test groups of mice or rats? What is the significance of extrapolations from toxicity studies involving high doses to situations where the doses are much smaller? Can lawyers or judges or anyone else expect scientists always to be certain or always to have uniform views

7. Peter W. Huber, Galileo's Revenge: Junk Science in the Courtroom 54 (1991).

**EXHIBIT C**

*Introduction*

with respect to an extrapolation from a large dose to a small one, when the causes of and mechanisms related to cancer are generally not well known? Many difficult legal cases fall within this area of scientific uncertainty.

Finally, a court proceeding, such as a trial, is not simply a search for dispassionate truth. The law must be fair. In our country, it must always seek to protect basic human liberties. One important procedural safeguard, guaranteed by our Constitution's Seventh Amendment, is the right to a trial by jury. A number of innovative techniques have been developed to strengthen the ability of juries to consider difficult evidence.[8] Any effort to bring better science into the courtroom must respect the jury's constitutionally specified role—even if doing so means that, from a scientific perspective, an incorrect result is sometimes produced.

Despite the difficulties, I believe there is an increasingly important need for law to reflect sound science. I remain optimistic about the likelihood that it will do so. It is common to find cooperation between governmental institutions and the scientific community where the need for that cooperation is apparent. Today, as a matter of course, the President works with a science adviser, Congress solicits advice on the potential dangers of food additives from the National Academy of Sciences, and scientific regulatory agencies often work with outside scientists, as well as their own, to develop a product that reflects good science.

The judiciary, too, has begun to look for ways to improve the quality of the science on which scientifically related judicial determinations will rest. The Federal Judicial Center is collaborating with the National Academy of Sciences through the Academy's Committee on Science, Technology, and Law.[9] The Committee brings together on a regular basis knowledgeable scientists, engineers, judges, attorneys, and corporate and government officials to explore areas of interaction and improve communication among the science, engineering, and legal communities. The Committee is intended to provide a neutral, nonadversarial forum for promoting understanding, encouraging imaginative approaches to problem solving, and discussing issues at the intersection of science and law.

In the Supreme Court, as a matter of course, we hear not only from the parties to a case but also from outside groups, which file amicus curiae briefs that help us to become more informed about the relevant science. In the "right-to-die" case, for example, we received about 60 such documents from organizations of doctors, psychologists, nurses, hospice workers, and handicapped persons, among others. Many discussed pain-control technology, thereby helping us to identify areas of technical consensus and disagreement. Such briefs help to educate the justices on potentially relevant technical matters, making us not experts, but moderately educated laypersons, and that education improves the quality of our decisions.

---

8.  *See generally* Jury Trial Innovations (G. Thomas Munsterman et al. eds., 1997).

9.  A description of the program can be found at Committee on Science, Technology, and Law, http://www.nationalacademies.org/stl (last visited Aug. 10, 2011).

5

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Moreover, our Court has made clear that the law imposes on trial judges the duty, with respect to scientific evidence, to become evidentiary gatekeepers.[10] The judge, without interfering with the jury's role as trier of fact, must determine whether purported scientific evidence is "reliable" and will "assist the trier of fact," thereby keeping from juries testimony that, in Pauli's sense, isn't even good enough to be wrong. This requirement extends beyond scientific testimony to all forms of expert testimony.[11] The purpose of *Daubert*'s gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[12]

Federal trial judges, looking for ways to perform the gatekeeping function better, increasingly have used case-management techniques such as pretrial conferences to narrow the scientific issues in dispute, pretrial hearings where potential experts are subject to examination by the court, and the appointment of specially trained law clerks or scientific special masters. For example, Judge Richard Stearns of Massachusetts, acting with the consent of the parties in a highly technical genetic engineering patent case,[13] appointed a Harvard Medical School professor to serve "as a sounding board for the court to think through the scientific significance of the evidence" and to "assist the court in determining the validity of any scientific evidence, hypothesis or theory on which the experts base their testimony."[14] Judge Robert E. Jones of Oregon appointed experts from four different fields to help him assess the scientific reliability of expert testimony in silicone gel breast implant litigation.[15] Judge Gladys Kessler of the District of Columbia hired a professor of environmental science at the University of California at Berkeley "to answer the Court's technical questions regarding the meaning of terms, phrases, theories and rationales included in or referred to in the briefs and exhibits" of the parties.[16] Judge A. Wallace Tashima of the Ninth Circuit has described the role of technical advisor as "that of a … tutor who aids the court in understanding the 'jargon and theory' relevant to the technical aspects of the evidence."[17]

Judge Jack B. Weinstein of New York suggests that courts should sometimes "go beyond the experts proffered by the parties" and "appoint indepen-

10. Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

11. Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167 (1999).

12. *Id*. at 1176.

13. Biogen, Inc. v. Amgen, Inc., 973 F. Supp. 39 (D. Mass. 1997).

14. MediaCom Corp. v. Rates Tech., Inc., 4 F. Supp. 2d 17 app. B at 37 (D. Mass. 1998) (quoting the Affidavit of Engagement filed in Biogen, Inc. v. Amgen, Inc., 973 F. Supp. 39 (D. Mass. 1997) (No. 95-10496)).

15. Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 (D. Or. 1996).

16. Conservation Law Found. v. Evans, 203 F. Supp. 2d 27, 32 (D.D.C. 2002).

17. Ass'n of Mexican-American Educators v. State of California, 231 F.3d 572, 612 (9th Cir. 2000) (en banc) (Tashima, J., dissenting).

6

EXHIBIT C

*Introduction*

dent experts" as the Federal Rules of Evidence allow.[18] Judge Gerald Rosen of Michigan appointed a University of Michigan Medical School professor to testify as an expert witness for the court, helping to determine the relevant facts in a case that challenged a Michigan law prohibiting partial-birth abortions.[19] Chief Judge Robert Pratt of Iowa hired two experts—a professor of insurance and an actuary—to help him review the fairness of a settlement agreement in a complex class-action insurance-fraud case.[20] And Judge Nancy Gertner of Massachusetts appointed a professor from Brandeis University to assist the court in assessing a criminal defendant's challenge to the racial composition of the jury venire in the Eastern Division of the District of Massachusetts.[21]

In what one observer has described as "the most comprehensive attempt to incorporate science, as scientists practice it, into law,"[22] Judge Sam Pointer, Jr., of Alabama appointed a "neutral science panel" of four scientists from different disciplines to prepare a report and testimony on the scientific basis of claims in silicone gel breast implant product liability cases consolidated as part of a multidistrict litigation process.[23] The panel's report was cited in numerous decisions excluding expert testimony that connected silicone gel breast implants with systemic injury.[24] The scientists' testimony was videotaped and made part of the record so that judges and jurors could consider it in cases returned to the district courts from the multidistrict litigation process. The use of such videotape testimony can result in more consistent decisions across courts, as well as great savings of time and expense for individual litigants and courts.

These case-management techniques are neutral, in principle favoring neither plaintiffs nor defendants. When used, they have typically proved successful. Nonetheless, judges have not often invoked their rules-provided authority to appoint their own experts.[25] They may hesitate simply because the process is unfamiliar or because the use of this kind of technique inevitably raises questions. Will use of an independent expert, in effect, substitute that expert's judgment for that of the court? Will it inappropriately deprive the parties of control over the presentation of the case? Will it improperly intrude on the proper function of the jury? Where is one to find a truly neutral expert? After all, different experts, in total honesty, often interpret the same data differently. Will the search for the expert

18. Jack B. Weinstein, Individual Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and Other Multiparty Devices 116 (1995).

19. Evans v. Kelley, 977 F. Supp. 1283 (E.D. Mich. 1997).

20. Grove v. Principal Mutual Life Ins. Co., 200 F.R.D. 434, 443 (S.D. Iowa 2001).

21. United States v. Green, 389 F. Supp. 2d 29, 48 (D. Mass. 2005).

22. Olivia Judson, *Slide-Rule Justice,* Nat'l J., Oct. 9, 1999, at 2882, 2885.

23. *In re* Silicone Gel Breast Implant Prod. Liab. Litig., Order 31 (N.D. Ala. filed May 30, 1996) (MDL No. 926).

24. *See* Laura L. Hooper et al., *Assessing Causation in Breast Implant Litigation: The Role of Science Panels,* 64 Law & Contemp. Probs. 139, 181 n.217 (collecting cases).

25. Joe S. Cecil & Thomas E. Willging, *Accepting Daubert's Invitation: Defining a Role for Court-Appointed Experts in Assessing Scientific Validity,* 43 Emory L.J. 995, 1004 (1994).

7

EXHIBIT C

*Reference Manual on Scientific Evidence*

create inordinate delay or significantly increase costs? Who will pay the expert? Judge William Acker, Jr., of Alabama writes:

> Unless and until there is a national register of experts on various subjects and a method by which they can be fairly compensated, the federal amateurs wearing black robes will have to overlook their new gatekeeping function lest they assume the intolerable burden of becoming experts themselves in every discipline known to the physical and social sciences, and some as yet unknown but sure to blossom.[26]

A number of scientific and professional organizations have come forward with proposals to aid the courts in finding skilled experts. The National Conference of Lawyers and Scientists, a joint committee of the American Association for the Advancement of Science (AAAS) and the Science and Technology Section of the American Bar Association, has developed a program to assist federal and state judges, administrative law judges, and arbitrators in identifying independent experts in cases that present technical issues, when the adversarial system is unlikely to yield the information necessary for a reasoned and principled resolution of the disputed issues. The program locates experts through professional and scientific organizations and with the help of a Recruitment and Screening Panel of scientists, engineers, and health care professionals.[27]

The Private Adjudication Center at Duke University—which unfortunately no longer exists—established a registry of independent scientific and technical experts who were willing to provide advice to courts or serve as court-appointed experts.[28] Registry services also were available to arbitrators and mediators and to parties and lawyers who together agreed to engage an independent expert at the early stages of a dispute. The registry recruited experts primarily from major academic institutions and conducted targeted searches to find experts with the qualifications required for particular cases. Registrants were required to adhere to a code of conduct designed to ensure confidence in their impartiality and integrity.

Among those judges who have thus far experimented with court-appointed scientific experts, the reaction has been mixed, ranging from enthusiastic to disappointed. The Federal Judicial Center has examined a number of questions arising from the use of court-appointed experts and, based on interviews with participants in Judge Pointer's neutral science panel, has offered lessons to guide courts in future cases. We need to learn how better to identify impartial experts, to screen for possible conflicts of interest, and to instruct experts on the scope of

26. Letter from Judge William Acker, Jr., to the Judicial Conference of the United States et al. (Jan. 2, 1998).

27. Information on the AAAS program can be found at Court Appointed Scientific Experts, http://www.aaas.org/spp/case/case.htm (last visited Aug. 10, 2011).

28. Letter from Corinne A. Houpt, Registry Project Director, Private Adjudication Center, to Judge Rya W. Zobel, Director, Federal Judicial Center (Dec. 29, 1998) (on file with the Research Division of the Federal Judicial Center).

EXHIBIT C

*Introduction*

their duties. Also, we need to know how better to protect the interests of the parties and the experts when such extraordinary procedures are used. We also need to know how best to prepare a scientist for the sometimes hostile legal environment that arises during depositions and cross-examination.[29]

It would also undoubtedly be helpful to recommend methods for efficiently educating (i.e., in a few hours) willing scientists in the ways of the courts, just as it would be helpful to develop training that might better equip judges to understand the ways of science and the ethical, as well as practical and legal, aspects of scientific testimony.[30]

In this age of science we must build legal foundations that are sound in science as well as in law. Scientists have offered their help. We in the legal community should accept that offer. We are in the process of doing so. This manual seeks to open legal institutional channels through which science—its learning, tools, and principles—may flow more easily and thereby better inform the law. The manual represents one part of a joint scientific–legal effort that will further the interests of truth and justice alike.

---

29. Laura L. Hooper et al., Neutral Science Panels: Two Examples of Panels of Court-Appointed Experts in the Breast Implants Product Liability Litigation 93–98 (Federal Judicial Center 2001); Barbara S. Hulka et al., *Experience of a Scientific Panel Formed to Advise the Federal Judiciary on Silicone Breast Implants,* 342 New Eng. J. Med. 812 (2000).

30. Gilbert S. Omenn, *Enhancing the Role of the Scientific Expert Witness,* 102 Envtl. Health Persp. 674 (1994).

EXHIBIT C

EXHIBIT C

# The Admissibility of Expert Testimony

MARGARET A. BERGER

*Margaret A. Berger, J.D., was the Trustee Professor of Law, Brooklyn Law School, Brooklyn, New York.*

[Editor's Note: While revising this chapter Professor Berger became ill and, tragically, passed away. We have published her last revision, with a few edits to respond to suggestions by reviewers.]

CONTENTS

   I.  Supreme Court Cases, 12
        A.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 12
        B.  *General Electric v. Joiner,* 14
        C.  *Kumho Tire Co. v. Carmichael,* 16
        D.  *Weisgram v. Marley,* 18
  II.  Interpreting *Daubert*, 19
        A.  Atomization, 19
        B.  Conflating Admissibility with Sufficiency, 20
        C.  Credibility, 21
 III.  Applying *Daubert*, *22*
        A.  Is the Expert Qualified? 22
        B.  Assessing the Scientific Foundation of Studies from Different
            Disciplines, 23
        C.  How Should the Courts Assess Exposure? 25
 IV.  Forensic Science, 26
        A.  Validity, 27
        B.  Proficiency, 28
        C.  Malfunctioning Laboratories, 28
        D.  Interpretation, 29
        E.  Testimony, 29
        F.  Assistance for the Defense and Judges, 29
        G.  Confrontation Clause, 30
  V.  Procedural Context, 30
        A.  Class Certification Proceedings, 30
        B.  Discovery, 32
             1.  Amended discovery rules, 32
             2.  E-discovery, 34
        C.  *Daubert* Hearings, 35
 VI.  Conclusion, 36

EXHIBIT C

*Reference Manual on Scientific Evidence*

# I. Supreme Court Cases

In 1993, the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals*[1] ushered in a new era with regard to the admissibility of expert testimony. As expert testimony has become increasingly essential in a wide variety of litigated cases, the *Daubert* opinion has had an enormous impact. If plaintiffs' expert proof is excluded on a crucial issue, plaintiffs cannot win and usually cannot even get their case to a jury. This discussion begins with a brief overview of the Supreme Court's three opinions on expert testimony—often called the *Daubert* trilogy[2]—and their impact. It then examines a fourth Supreme Court case that relates to expert testimony, before turning to a variety of issues that judges are called upon to resolve, particularly when the proffered expert testimony hinges on scientific knowledge.

## *A.* Daubert v. Merrell Dow Pharmaceuticals, Inc.

In the seminal *Daubert* case, the Court granted certiorari to decide whether the so-called *Frye* (or "general acceptance") test,[3] which some federal circuits (and virtually all state courts) used in determining the admissibility of scientific evidence, had been superseded by the enactment of the Federal Rules of Evidence in 1973. The Court held unanimously that the *Frye* test had not survived. Six justices joined Justice Blackmun in setting forth a new test for admissibility after concluding that "Rule 702 . . . clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify."[4] While the two other members of the Court agreed with this conclusion about the role of Rule 702, they thought that the task of enunciating a new rule for the admissibility of expert proof should be left to another day.[5]

The majority opinion in *Daubert* sets forth a number of major themes that run throughout the trilogy. First, it recognized the trial judge as the "gatekeeper" who must screen proffered expert testimony.[6] Second, the objective of the screening is to ensure that expert testimony, in order to be admissible, must be "not only relevant, but reliable."[7] Although there was nothing particularly novel about the Supreme Court finding that a trial judge has the *power* to make an admissibility determination—Federal Rules of Evidence 104(a) and 702 pointed to such a conclusion—and federal trial judges had excluded expert testimony long before

---

1. 509 U.S. 579 (1993).
2. The other two cases are *Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). The disputed issue in all three cases was causation.
3. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).
4. *Daubert*, 509 U.S. at 589.
5. *Id*. at 601.
6. *Id*. at 589.
7. *Id*.

12

**EXHIBIT C**

*The Admissibility of Expert Testimony*

*Daubert,* the majority opinion in *Daubert* stated that the trial court has not only the power but the *obligation* to act as gatekeeper.[8]

The Court then considered the meaning of its two-pronged test of relevancy and reliability in the context of scientific evidence. With regard to relevancy, the Court explained that expert testimony cannot assist the trier in resolving a factual dispute, as required by Rule 702, unless the expert's theory is tied sufficiently to the facts of the case. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."[9] This consideration, the Court remarked, "has been aptly described by Judge Becker as one of 'fit.'"[10]

To determine whether proffered scientific testimony or evidence satisfies the standard of evidentiary reliability,[11] a judge must ascertain whether it is "ground[ed] in the methods and procedures of science."[12] The Court, emphasizing that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one,"[13] then examined the characteristics of scientific methodology and set out a nonexclusive list of four factors that bear on whether a theory or technique has been derived by the scientific method.[14] First and foremost, the Court viewed science as an empirical endeavor: "[W]hether [a theory or technique] can be (and has been) tested" is the "methodology [that] distinguishes science from other fields of human inquiry."[15] The Court also mentioned as indicators of good science whether the technique or theory has been subjected to peer review or publication, whether the existence of known or potential error rates has been determined, and whether standards exist for controlling the technique's operation.[16] In addition, although general acceptance of the methodology within the scientific community is no longer dispositive, it remains a factor to be considered.[17]

The Court did not apply its new test to the eight experts for the plaintiffs who sought to testify on the basis of in vitro, animal, and epidemiological studies

8.  *Id.*

9.  *Id.* at 591–92.

10.  *Id.* at 591. Judge Becker used this term in discussing the admissibility of expert testimony about factors that make eyewitness testimony unreliable. *See* United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985) (on remand court rejected the expert testimony on ground of "fit" because expert discussed factors such as the high likelihood of inaccurate cross-racial identifications that were not present in the case) *and* United States v. Downing, 609 F. Supp. 784, 791–92 (E.D. Pa. 1985), *aff'd*, 780 F.2d 1017 (3d Cir. 1985).

11.  Commentators have faulted the Court for using the label "reliability" to refer to the concept that scientists term "validity." The Court's choice of language was deliberate. It acknowledged that scientists typically distinguish between validity and reliability and that "[i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity." *Daubert*, 509 U.S. at 590 n.9.

12.  *Id.* at 590.

13.  *Id.* at 594.

14.  *Id.* at 593–94. "[W]e do not presume to set out a definitive checklist or test." *Id.* at 593.

15.  *Id.*

16.  *Id.* at 593–94.

17.  *Id.* at 594.

13

EXHIBIT C

*Reference Manual on Scientific Evidence*

that the drug Bendectin taken by the plaintiffs' mothers during pregnancy could cause or had caused the plaintiffs' birth defects. Instead, it reversed and remanded the case. Nor did the Court deal with any of the procedural issues raised by the *Daubert* opinion, such as the burden, if any, on the party seeking a ruling excluding expert testimony, or the standard of review on appeal.

The *Daubert* opinion soon led to *Daubert* motions followed by *Daubert* hearings as parties moved *in limine* to have their opponents' experts precluded from testifying at trial for failure to satisfy the new requirements for expert testimony. The motions raised numerous questions that the Court had not dealt with, some of which were dealt with in the next two opinions by the Supreme Court.

## *B.* General Electric v. Joiner

In *General Electric Co. v. Joiner,*[18] the second case in the trilogy, certiorari was granted in order to determine the appropriate standard an appellate court should apply in reviewing a trial court's *Daubert* decision to admit or exclude scientific expert testimony. In *Joiner,* the 37-year-old plaintiff, a longtime smoker with a family history of lung cancer, claimed that exposure to polychlorinated biphenyls (PCBs) and their derivatives had promoted the development of his small-cell lung cancer. The trial court applied the *Daubert* criteria, excluded the opinions of the plaintiff's experts, and granted the defendants' motion for summary judgment.[19] The court of appeals reversed the decision, stating that "[b]ecause the Federal Rules of Evidence governing expert testimony display a preference for admissibility, we apply a particularly stringent standard of review to the trial judge's exclusion of expert testimony."[20]

All the justices joined Chief Justice Rehnquist in holding that abuse of discretion is the correct standard for an appellate court to apply in reviewing a district court's evidentiary ruling, regardless of whether the ruling allowed or excluded expert testimony.[21] The Court unequivocally rejected the suggestion that a more stringent standard is permissible when the ruling, as in *Joiner,* is "outcome determinative" because it resulted in a grant of summary judgment for the defendant because the plaintiff failed to produce evidence of causation.[22] In a concurring opinion, Justice Breyer urged judges to avail themselves of techniques, such as the use of court-appointed experts, that would assist them in making determinations about the admissibility of complex scientific or technical evidence.[23]

---

18. 522 U.S. 136 (1997).

19. Joiner v. Gen. Elec. Co., 864 F. Supp. 1310 (N.D. Ga. 1994).

20. Joiner v. Gen. Elec. Co., 78 F.3d 524, 529 (11th Cir. 1996).

21. Gen. Elec. Co. v. Joiner, 522 U.S. at 141–43.

22. *Id*. at 142–43.

23. *Id*. at 147–50. This issue is discussed in further detail in Justice Breyer's introduction to this manual.

EXHIBIT C

*The Admissibility of Expert Testimony*

With the exception of Justice Stevens, who dissented from this part of the opinion, the justices then did what they had not done in *Daubert*—they examined the record, found that the plaintiff's experts had been properly excluded, and reversed the court of appeals decision without a remand to the lower court. The Court concluded that it was within the district court's discretion to find that the statements of the plaintiff's experts with regard to causation were nothing more than speculation. The Court noted that the plaintiff never explained "how and why the experts could have extrapolated their opinions"[24] from animal studies far removed from the circumstances of the plaintiff's exposure.[25] It also observed that the district court could find that the four epidemiological studies the plaintiff relied on were insufficient as a basis for his experts' opinions.[26] Consequently, the court of appeals had erred in reversing the district court's determination that the studies relied on by the plaintiff's experts "were not sufficient, whether individually or in combination, to support their conclusions that Joiner's exposure to PCBs contributed to his cancer."[27]

The plaintiff in *Joiner* had argued that the epidemiological studies showed a link between PCBs and cancer if the results of all the studies were pooled, and that this weight-of-the-evidence methodology was reliable. Therefore, according to the plaintiff, the district court erred when it excluded a conclusion based on a scientifically reliable methodology because it thereby violated the Court's precept in *Daubert* that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."[28] The Supreme Court responded to this argument by stating that

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.[29]

---

24. *Id.* at 144.

25. The studies involved infant mice that had massive doses of PCBs injected directly into their bodies; Joiner was an adult who was exposed to fluids containing far lower concentrations of PCBs. The infant mice developed a different type of cancer than *Joiner* did, and no animal studies showed that adult mice exposed to PCBs developed cancer or that PCBs lead to cancer in other animal species. *Id.*

26. The authors of the first study of workers at an Italian plant found lung cancer rates among ex-employees somewhat higher than might have been expected but refused to conclude that PCBs had caused the excess rate. A second study of workers at a PCB production plant did not find the somewhat higher incidence of lung cancer deaths to be statistically significant. The third study made no mention of exposure to PCBs, and the workers in the fourth study who had a significant increase in lung cancer rates also had been exposed to numerous other potential carcinogens. *Id.* at 145–46.

27. *Id.* at 146–47.

28. *Id.* at 146 (quoting *Daubert*, 509 U.S. at 595).

29. *Id.* at 146.

15

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Justice Stevens, in his partial dissent, assumed that the plaintiff's expert was entitled to rely on such a methodology, which he noted is often used in risk assessment, and that a district court that admits expert testimony based on a weight-of-the-evidence methodology does not abuse its discretion.[30] Justice Stevens would have remanded the case for the court below to determine if the trial court had abused its discretion when it excluded the plaintiff's experts.[31]

## C. Kumho Tire Co. v. Carmichael

Less than one year after deciding *Joiner,* the Supreme Court granted certiorari in *Kumho* to decide if the trial judge's gatekeeping obligation under *Daubert* applies only to scientific evidence or if it extends to proffers of "technical, or other specialized knowledge," the other categories of expertise recognized in Federal Rule of Evidence 702. In addition, there was uncertainty about whether disciplines such as economics, psychology, and other "soft" sciences were governed by this standard; about when the four factors endorsed in *Daubert* as indicators of reliability had to be applied; and how experience factors into the gatekeeping process. Although Rule 702 specifies that an expert may be qualified through experience, the Court's emphasis in *Daubert* on "testability" suggested that an expert should not be allowed to base a conclusion solely on experience if the conclusion can easily be tested.

In *Kumho,* the plaintiffs brought suit after a tire blew out on a minivan, causing an accident in which one passenger died and others were seriously injured. The tire, which was manufactured in 1988, had been installed on the minivan sometime before it was purchased as a used car by the plaintiffs in 1993. In their diversity action against the tire's maker and its distributor, the plaintiffs claimed that the tire was defective. To support this allegation, the plaintiffs relied primarily on deposition testimony by an expert in tire-failure analysis, who concluded on the basis of a visual inspection of the tire that the blowout was caused by a defect in the tire's manufacture or design.

When the defendants moved to exclude the plaintiffs' expert, the district court agreed with the defendants that the *Daubert* gatekeeping obligation applied not only to scientific knowledge but also to "technical analyses."[32] The district court excluded the plaintiffs' expert and granted summary judgment. Although the court conceded on a rehearing that it had erred in treating the four factors discussed in *Daubert* as mandatory, it adhered to its original determination because the court simply found the *Daubert* factors appropriate, analyzed them, and discerned no competing criteria sufficiently strong to outweigh them.[33]

---

30. *Id.* at 153–54.

31. *Id.* at 150–51.

32. Carmichael v. Samyang Tire, Inc., 923 F. Supp. 1514, 1522 (S.D. Ala. 1996), *rev'd,* 131 F.3d 1433 (11th Cir. 1997), *rev'd sub nom.* Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

33. *Id.* at 1522, 1524.

16

EXHIBIT C

*The Admissibility of Expert Testimony*

The Eleventh Circuit reversed the district court's decision in *Kumho,* holding, as a matter of law under a de novo standard of review, that *Daubert* applies only to scientific opinions.[34] The court of appeals drew a distinction between expert testimony that relies on the application of scientific theories or principles—which would be subject to a *Daubert* analysis—and testimony that is based on the expert's "skill- or experience-based observation."[35] The court then found that the testimony proffered by plaintiff was "non-scientific" and that "the district court erred as a matter of law by applying *Daubert* in this case."[36] The circuit court agreed that the trial court has a gatekeeping obligation; its quarrel with the district court was with that court's assumption that *Daubert*'s four factors had to be applied.

All of the justices of the Supreme Court, in an opinion by Justice Breyer, held that the trial court's gatekeeping obligation extends to all expert testimony,[37] and unanimously rejected the Eleventh Circuit's dichotomy between the expert who "relies on the application of scientific principles" and the expert who relies on "skill- or experience-based observation."[38] The Court noted that Federal Rule of Evidence 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge," and "applies its reliability standard to all . . . matters within its scope."[39] Furthermore, said the Court, "no clear line" can be drawn between the different kinds of knowledge, and "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."[40]

The Court also unanimously found that the court of appeals had erred when it used a de novo standard, instead of the *Joiner* abuse-of-discretion standard, to determine that *Daubert*'s criteria were not reasonable measures of the reliability of the expert's testimony.[41] As in *Joiner,* and again over the dissent of Justice Stevens,[42] the Court then examined the record and concluded that the trial court had not abused its discretion when it excluded the testimony of the witness. Accordingly, it reversed the opinion of the Eleventh Circuit.

The opinion adopts a flexible approach that stresses the importance of identifying "the particular circumstances of the particular case at issue."[43] The court must then make sure that the proffered expert will observe the same standard of "intellectual rigor" in testifying as he or she would employ when dealing with similar matters outside the courtroom.[44]

---

34. Carmichael v. Samyang Tire, Inc., 131 F.3d 1433, 1435 (11th Cir. 1997).
35. *Id.*
36. *Id.* at 1436 (footnotes omitted).
37. Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).
38. *Id.* at 151.
39. *Id.* at 148.
40. *Id.* at 156.
41. *Id.* at 152.
42. *Id.* at 158.
43. *Id.* at 150.
44. *Id.* at 152.

17

EXHIBIT C

*Reference Manual on Scientific Evidence*

How this extremely flexible approach of the Court is to be applied emerges in Part III of the opinion when the Court engages in a remarkably detailed analysis of the record that illustrates its comment in *Joiner* that an expert must account for "how and why" he or she reached the challenged opinion.[45]

The Court illustrated the application of this standard to the facts of the case and its deference to the district court findings as follows:

> After examining the transcript in some detail, and after considering respondents' defense of Carlson's methodology, the District Court determined that Carlson's testimony was not reliable. It fell outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is shaky. In our view, the doubts that triggered the District Court's initial inquiry here were reasonable, as was the court's ultimate conclusion.[46]

Although *Kumho* is the most recent pronouncement by the Supreme Court on how to determine whether proffered testimony by an expert is admissible, and Rule 702 of the Federal Rules of Evidence was amended in 2000 to provide "some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony," it is still *Daubert* that trial courts cite and rely on most frequently when ruling on a motion to preclude expert testimony.[47] Even though *Daubert* interprets a federal rule of evidence, and rules of evidence are designed to operate at trial, *Daubert's* greatest impact has been pretrial: If plaintiff's experts can be excluded from testifying about an issue crucial to plaintiff's case, the litigation may end with summary judgment for the defendant. Furthermore, although summary judgment grants are reviewed de novo by an appellate court, there is nothing to review if plaintiff failed to submit admissible evidence on a material issue. Consequently, only the less stringent abuse-of-discretion standard will apply, and there will be less chance for a reversal on appeal.

## *D*. Weisgram v. Marley

Plaintiff is entitled to only one chance to select an expert who can withstand a *Daubert* motion. In a fourth Supreme Court case, *Weisgram v. Marley*,[48] the district court ruled for plaintiffs on a *Daubert* motion and the plaintiffs won a jury verdict. On appeal, the circuit court found that, despite the abuse-of-discretion standard, plaintiff's experts should have been excluded and granted judgment as a matter of law for the defendants. Plaintiffs argued that they now had the right to a new trial at which they could introduce more expert testimony. The Supreme Court

---

45. Gen. Elec. Co v. Joiner, 522 U.S. 136, 144 (1997).

46. Kumho Tire Co. v. Carmichael, 526 U.S. at 153.

47. A search of federal cases on Westlaw after *Kumho* was decided indicates that the *Daubert* decision has been cited more than twice as often as the *Kumho* decision.

48. 528 U.S. 440 (2000).

18

EXHIBIT C

*The Admissibility of Expert Testimony*

granted certiorari limited to the new trial issue (it did not review the *Daubert* determination) but refused to grant a new trial. Justice Ginsberg explained:

> Since *Daubert,* moreover, parties relying on expert testimony have had notice of the exacting standards of reliability such evidence must meet. . . . It is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first trial fail.[49]

*Weisgram* causes tactical problems for plaintiffs about how much to spend for expert testimony. Should they pay for additional expensive expert testimony even though they think the district court would rule in their favor on a *Daubert* motion, or is the risk of a reversal on *Daubert* grounds and a consequent judgment for the defendant too great despite the abuse-of-discretion standard? *Weisgram* may indeed push plaintiffs to bring the very best expertise into litigation—a stated goal of the trilogy, but it may also make it difficult to litigate legitimate claims because of the cost of expert testimony. Is access to the federal courts less important than regulating the admissibility of expert testimony? Even if plaintiffs successfully withstand a *Daubert* motion, that does not guarantee they will win were the case to be tried. But very few cases now go to trial, and an inability by the defendant to exclude plaintiffs' experts undoubtedly affects the willingness of the defendant to negotiate a settlement.

# II. Interpreting *Daubert*

Although almost 20 years have passed since *Daubert* was decided, a number of basic interpretive issues remain.

## *A. Atomization*

When there is a *Daubert* challenge to an expert, should the court look at all the studies on which the expert relies for their collective effect or should the court examine the reliability of each study independently? The issue arises with proof of causation in toxic tort cases when plaintiff's expert relies on studies from different scientific disciplines, or studies within a discipline that present different strengths and weaknesses, in concluding that defendant's product caused plaintiff's adverse health effects. Courts rarely discuss this issue explicitly, but some appear to look at each study separately and give no consideration to those studies that cannot alone prove causation.

Although some use the language in *Joiner* as the basis for this slicing-and-dicing approach,[50] scientific inference typically requires consideration of numerous

---

49. 528 U.S. at 445 (internal citations omitted).
50. See discussion, *supra* notes 28–31 and related text.

EXHIBIT C

*Reference Manual on Scientific Evidence*

findings, which, when considered alone, may not individually prove the contention.[51] It appears that many of the most well-respected and prestigious scientific bodies (such as the International Agency for Research on Cancer (IARC), the Institute of Medicine, the National Research Council, and the National Institute for Environmental Health Sciences) consider all the relevant available scientific evidence, taken as a whole, to determine which conclusion or hypothesis regarding a causal claim is best supported by the body of evidence. In applying the scientific method, scientists do not review each scientific study individually for whether by itself it reliably supports the causal claim being advocated or opposed. Rather, as the Institute of Medicine and National Research Council noted, "summing, or synthesizing, data addressing different linkages [between kinds of data] forms a more complete causal evidence model and can provide the biological plausibility needed to establish the association" being advocated or opposed.[52] The IARC has concluded that "[t]he final overall evaluation is a matter of scientific judgment reflecting the weight of the evidence derived from studies in humans, studies in experimental animals, and mechanistic and other relevant data."[53]

## B. Conflating Admissibility with Sufficiency

In *Daubert,* Justice Blackmun's opinion explicitly acknowledges that in some cases admissible evidence may not suffice to support a verdict in favor of plaintiffs. In other words, it seems to recognize that the admissibility determination comes first and is separate from the sufficiency determination. But in *Joiner* the Court pays little attention to this distinction and suggests that plaintiff's expert testimony may be excluded if the evidence on which he seeks to rely is itself deemed insufficient.

But what difference does it make if sufficiency is conflated with admissibility?[54] After all, the case's final outcome will be the same. As *Daubert* recognizes, the trial judge's authority to decide whether the plaintiff has produced sufficient evidence to withstand a dispositive motion under Rule 56 or 50 is indisputable; a one-step process that considers sufficiency when adjudicating a *Daubert* motion is arguably

51. *See e.g.,* Susan Haack, *An Epistemologist in the Bramble-Bush: At the Supreme Court with Mr. Joiner,* 26 J. Health Pol. Pol'y & L. 217–37 (1999) (discussing the individual studies that lead to the compelling inference of a double-helical structure of a DNA molecule, which, when considered separately, fail to compel that inference). *See also* Milward v. Acuity Specialty Products Group, Inc., __ F.3d __, 2011 WL 982385, ⋆10 639 F.3d 11, 26 (1st Cir. 2011) (reversing the district court's exclusion of expert testimony based on an assessment of the direct causal effect of the individual studies, finding that the "weight of the evidence" properly supported the expert's opinion that exposure to benzene can cause acute promyelocytic leukemia).

52. Institute of Medicine and National Research Council, Dietary Supplements: A Framework for Evaluating Safety 262 (2005).

53. Vincent J. Cogliano et al., *The Science and Practice of Carcinogen Identification and Evaluation,* 112 Envtl. Health Persp. 1272 (2004).

54. The distinction between admissibility and sufficiency is also discussed in Michael D. Green et al., Reference Guide on Epidemiology, Section VII, in this manual.

EXHIBIT C

*The Admissibility of Expert Testimony*

more efficient than a two-step process that requires the district judge to analyze admissibility before it can turn to sufficiency.

There are, however, consequences to conflating admissibility and sufficiency. The de novo standard of review that ordinarily applies to judgments as a matter of law following a determination of insufficient evidence is converted into the lower abuse-of-discretion standard that governs evidentiary rulings on admissibility, and thereby undermines the jury trial mandate of the Seventh Amendment. Science proceeds by cumulating and synthesizing evidence until there is enough for a new paradigm. That does not mean that every study meets the most rigorous scientific standards. Judgment is required in determining which inferences are appropriate, but an approach that encourages looking at studies sequentially rather than holistically has costs that must be considered.

## C. Credibility

*Daubert* and the expense of litigation make it difficult for courts to hew to the line that assigns credibility issues to the jury rather than the court. One troublesome area is conflicts of interest. To what extent should a court permit the plaintiff to inquire into the defense expert's relationship with the defendant? If the expert testified at trial, information that could have skewed the expert's testimony could be brought to the attention of the jury through cross-examination or extrinsic evidence. Impeachment by bias suffers from fewer constraints than other forms of impeachment.[55] But suppose the defendant seeks through a *Daubert* challenge to exclude the plaintiff's expert witness as relying on unreliable evidence to show causation in a toxic tort action. The defendant supports its argument with testimony by an academic from a highly respected institution whose research shows that the defendant's product is safe. Should the court permit the plaintiff to inquire whether the expert was on the payroll of the defendant corporation, or attended conferences paid for by the defendant, or received gifts from the defendant? What about corporate employees ghostwriting reports about their products that are then submitted in someone else's name? Other ties that an expert may have to industry have also been reported: royalties, stock ownership, working in an institution that receives considerable funding from the defendant. These are all practices that have been reported in the media and are practices that the plaintiff would like to question the expert about under oath.[56] A court is unlikely to allow a wide-ranging

55. *See* United States v. Abel, 469 U.S. 45, 50 (1984) (explaining that "proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony").

56. *See, e.g., In re* Welding Fume Products, 534 F. Supp. 2d 761, 764 (N.D. Ohio 2008) (requiring all parties to the litigation to "disclose the fact of, and the amounts of, payments they made, either directly or indirectly, to any entity (whether an individual or organization) that has authored or published any study, article, treatise, or other text upon which any expert in this MDL litigation relies, or has relied").

21

EXHIBIT C

fishing expedition if the plaintiff has no proof that the defense expert engaged in such behavior. But even if the plaintiff has extrinsic evidence available that points to conflicts of interest on the part of the expert, how should a court assess this information in ruling on the admissibility of plaintiff's experts? Is this a credibility determination? Should allegations about conflicts be resolved by the judge at an in limine hearing, or should the plaintiff's expert be permitted to testify so that this issue can be explored at trial?

Another troublesome issue about credibility arises when an expert seeks to base an opinion on controverted evidence in the case. May the court exclude the expert's opinion on a *Daubert* motion if it finds that the expert's model did not incorporate the appropriate data that fit the facts of the case, or is this an issue for the jury?[57]

Does the court avoid a credibility determination if it finds that the expert is qualified but the court disagrees with the theory on which the expert is relying? In *Kochert v. Greater Lafayette Health Serv. Inc.*,[58] a complex antitrust case, the court held that the trial court properly excluded the plaintiff's economic experts on the ground that the plaintiff's antitrust theory was based on the wrong legal standard after ruling for the plaintiff on *Daubert* challenges.

# III. Applying *Daubert*

Application of *Daubert* raises a number of persistent issues, many of which relate to proof of causation. The three cases in the trilogy and *Weisgram* all turned on questions of causation, and the plaintiffs in each of the cases ultimately lost because they failed to introduce admissible expert testimony on this issue.

Causation questions have been particularly troubling in cases in which plaintiffs allege that the adverse health effects for which they seek damages are a result of exposure to the defendant's product.

## A. Is the Expert Qualified?

As a threshold matter, the witness must be qualified as an expert to present expert opinion testimony. An expert needs more than proper credentials, whether grounded in "skill, experience, training or education" as set forth in Rule 702 of the Federal Rules of Evidence. A proposed expert must also have "knowledge."

---

57. *Compare* Consol. Insured Benefits, Inc. v. Conseco Med. Ins. Co., No. 03–cv–3211, 2006 WL 3423891 (D.S.C. 2006) (fraud case; *Daubert* motion to exclude plaintiff's expert economist's testimony on damages; court finds that testimony question of weight, not admissibility) *with* Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055-56 (8th Cir. 2000) (excluding expert's testimony as "mere speculation" that ignored inconvenient evidence).

58. 463 F.3d 710 (7th Cir. 2006).

EXHIBIT C

*The Admissibility of Expert Testimony*

For example, an expert who seeks to testify about the findings of epidemiological studies must be knowledgeable about the results of the studies and must take into account those studies that reach conclusions contrary to the position the expert seeks to advocate.

## B. Assessing the Scientific Foundation of Studies from Different Disciplines

Expert opinion is typically based on multiple studies, and those studies may come from different scientific disciplines. Some courts have explicitly stated that certain types of evidence proffered to prove causation have no probative value and therefore cannot be reliable.[59] Opinions based on animal studies have been rejected because of reservations about extrapolating from animals to humans or because the plaintiff's extrapolated dose was lower than the animals'—which is invariably the case because one would have to study unmanageable, gigantic numbers of animals to see results if animals were not given high doses. The field of toxicology, which, unlike epidemiology, is an experimental science, is rapidly evolving, and prior case law regarding such studies may not take into account important new developments.

But even when there are epidemiological studies, a court may conclude that they cannot prove causation because they are not conclusive and therefore unreliable. And if they are unreliable, they cannot be combined with other evidence.[60]

Experts will often rely on multiple studies, each of which has some probative value but, when considered separately, cannot prove general causation.

As noted above, trial judges have great discretion under *Daubert* and a court is free to choose an atomistic approach that evaluates the available studies one by one. Some judges have found this practice contrary to that of scientists who look at knowledge incrementally.[61] But there are no hard-and-fast scientific rules for synthesizing evidence, and most research can be critiqued on a variety of grounds.

---

59. *See, e.g., In re* Rezulin, 2004 WL 2884327, at *3 (S.D.N.Y. 2004); Cloud v. Pfizer Inc., 198 F. Supp. 2d 1118, 1133 (D. Ariz. 2001) (stating that case reports were merely compilations of occurrences and have been rejected as reliable scientific evidence supporting an expert opinion that *Daubert* requires); Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1164 (S.D. Fla. 1996), *aff'd,* 158 F.3d 588 (11th Cir. 1998) ("scientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies"); Wade-Greaux v. Whitehall Labs., Inc., 874 F. Supp. 1441, 1454 (D.V.I. 1994), *aff'd,* 46 F.3d 1120 (3d Cir. 1994) (stating there is a need for consistent epidemiological studies showing statistically significant increased risks).

60. *See* Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1216 n.21 (10th Cir. 2002) ("To suggest that those individual categories of evidence deemed unreliable by the district court may be added to form a reliable theory would be to abandon 'the level of intellectual rigor of the expert in the field.'").

61. *See, e.g., In re* Ephedra, 393 F. Supp. 2d 181, 190 (S.D.N.Y. 2005) (allowing scientific expert testimony regarding "a confluence of suggestive, though non-definitive, scientific studies [that] make[s] it more-probable-than-not that a particular substance . . . contributed to a particular result. . . ."; after a two-week *Daubert* hearing in a case in which there would never be epidemiological evidence, the court concluded that some of plaintiffs' experts could testify on the basis of animal studies, analogous

23

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Few studies are flawless. Epidemiology is vulnerable to attack because of problems with confounders and bias. Furthermore, epidemiological studies are grounded in statistical models. What role should statistical significance play in assessing the value of a study? Epidemiological studies that are not conclusive but show some increased risk do not prove a lack of causation. Some courts find that they therefore have some probative value,[62] at least in proving general causation.[63]

Even, however, if plaintiffs convince the trial judge that their experts relied on reliable and relevant evidence in establishing general causation, that is, in opining that the defendant's product can cause the adverse effects for which plaintiffs seek compensation, plaintiffs must also present admissible expert testimony that the defendant's product caused their specific injuries. For example, in the Zyprexa litigation,[64] the court found that plaintiffs' expert's conclusion that Zyprexa may cause excessive weight gain leading to diabetes was well supported, but the expert's assertion that Zyprexa had a direct adverse effect on cells essential to the production of insulin by the body in cases in which there was no documented weight gain lacked scientific support. The record demonstrates that the expert's opinions relied on a subjective methodology, a fast-and-loose application of his scientific theories to the facts, and conclusion-driven assessments on the issues of causation in the cases on which he proposed to testify. He was not allowed to testify because his opinions were neither "based upon sufficient facts or data," nor were they "the product of reliable principles and methods," and he had not "applied the principles and methods reliably to the facts of the case."[65]

Courts handling *Daubert* motions sometimes sound as though only one possible answer is legitimate. If scientists seeking to testify for opposing sides disagree, some courts conclude that one side must be wrong.[66] The possibility that both sides are offering valid scientific inferences is rarely recognized, even though this happens often in the world of science.

As noted above, district courts have great discretion in deciding how to proceed when faced with evidence from different scientific disciplines and presenting different degrees of scientific rigor. In assessing the proffered testimony of the

human studies, plausible theories of the mechanisms involved, etc.); Milward v. Acuity Specialty Prods. Group, Inc., 639 F.3d 11 (1st Cir. 2011).

62. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071 (D. Colo. 2006) (discussing why the court excluded expert's testimony, even though his epidemiological study did not produce statistically significant results).

63. *In re* Viagra Prods., 572 F. Supp. 2d 1071 (D. Minn. 2008) (extensive review of all expert evidence proffered in multidistricted product liability case).

64. *See In re* Zyprexa Prods., 2009 WL 1357236 (E.D.N.Y. May 12, 2009) (providing citations to opinions dealing with *Daubert* rulings and summary judgment motions in the Zyprexa litigation).

65. *See* Fed. R. Evid. 702; *cf. Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (opinion that "is connected to existing data only by the *ipse dixit* of the expert" need not be admitted).

66. *See* Soldo v. Sandoz Pharm. Corp., 2003 WL 22005007 (W.D. Pa. 2003) (stating that court appointed three experts to assist it pursuant to Fed. R. Evid. 706 and then rejected opinion expressing minority view).

24

**EXHIBIT C**

*The Admissibility of Expert Testimony*

expert in light of the studies on which the testimony is based, courts may choose to limit the opinion that the expert would be allowed to express if the case went to trial.[67] Given the expense of trials, the paucity of trials, and the uncertainty about how jurors would evaluate such testimony, limiting an expert's opinion may lead to settlements.[68]

The abuse-of-discretion standard may lead to inconsistent results in how courts handle proof of causation. There can be inconsistencies even within circuits when district judges disagree on whether plaintiffs' experts have met their burden of proof.[69]

## C. How Should the Courts Assess Exposure?

Another difficulty in proving causation in toxic tort cases is that plaintiff must establish that he or she was exposed to defendant's product. Obviously this is not a problem with prescription drugs, but in other types of cases, such as environmental torts, establishing exposure and the extent of the exposure can be difficult.[70] Although exact data on exposure need not be required, an expert should, however, be able to provide reasonable explanations for his or her conclusions about the amount of exposure and that it sufficed to cause plaintiffs' injuries.[71]

---

67 *See, e.g., In re* Ephedra, 393 F. Supp. 2d 181 (S.D.N.Y. 2005) (stating that qualified experts may testify to a reliable basis for believing that ephedra may contribute to cardiac injury and strokes in persons with high blood pressure, certain serious heart conditions, or a genetic sensitivity to ephedra; experts would have to acknowledge that none of this has been the subject of definitive studies and may yet be disproved).

68. *But cf.* Giles v. Wyeth, 556 F.3d 596 (7th Cir. 2009) (plaintiff won *Daubert* challenge but lost at trial).

69. *Compare* Bonner v. ISP Techs., Inc., 259 F.3d 924 (8th Cir. 2001) (affirming jury verdict that exposure to solvent caused plaintiff's psychological and cognitive impairment and Parkinsonian symptoms; defendant argued that expert's opinion based on case reports, animal studies, structural analysis studies should have been excluded on *Daubert* grounds; the court stated: "The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed.") *with* Glastetter v. Novartis Pharm. Corp., 107 F. Supp. 2d 1015 (E.D. Mo. 2000), *aff'd per curiam,* 252 F.3d 986 (8th Cir. 2001) (plaintiff claimed that drug she had taken for lactation suppression had caused her stroke; trial court held that *Daubert* precluded experts from finding causation on the basis of case reports, animal studies, human dechallenge/rechallenge data, internal documents from defendant, and Food and Drug Administration's revocation of drug for lactation suppression; appellate court stated: "We do not discount the possibility that stronger evidence of causation exists, or that, in the future, physicians will demonstrate to a degree of medical certainty that Parlodel can cause ICHs. Such evidence has not been presented in this case, however, and we have no basis for concluding that the district court abused its discretion in excluding Glastetter's expert evidence." *Id*. at 992.

70. Issues involving assessment of exposure are discussed in Joseph V. Rodricks, Reference Guide on Exposure Science, in this manual.

71. Anderson v. Hess Corp., 592 F. Supp. 2d 1174, 1178 (D.N.D. 2009) ("[A] plaintiff [in a toxic tort case] is not required to produce a mathematically precise table equating levels of exposure

25

EXHIBIT C

Suppose, for example, that plaintiff alleges that her unborn child suffered injuries when her room was sprayed with an insecticide. Plaintiff's expert is prepared to testify that she relied on another expert's opinion that the insecticide can cause harm of the sort suffered by the child and that academic studies have found injuries when less than the amount sprayed in this case was used. But the expert who offered this opinion reached this conclusion without considering the size of the house, or the area treated, or how it was applied, or the amount applied to the outside of the house. And no one had measured this substance in the mother. Consequently, the court found that plaintiff had not provided adequate proof of exposure.[72]

A recent case that illustrates the complex problems that arise with exposure issues is *Henricksen v. ConocoPhilips Co.*[73] In *Henricksen*, the plaintiff who drove a gasoline tanker truck for 30 years alleged that his acute myelogenous leukemia (AML) was caused by his occupational exposure to benzene, a component of gasoline. Although some studies show that AML, or at least some forms of AML, may be caused by exposure to benzene, the same is not true with regard to gasoline. The court rejected testimony by plaintiff's experts that sought to link the exposure to the benzene in the gasoline to plaintiff's claim. There were numerous problems: Did plaintiff manifest symptoms typical of AML that was chemically induced and not idiopathic? How could one calculate how much benzene plaintiff would have been exposed to considering how many hours he worked and how the gasoline was delivered? How much benzene exposure is required to support the conclusion that general causation has been established? Each of these issues is discussed in considerable detail, suggesting that the studies that would logically be needed to conclude that the alleged exposure can be linked to causation may simply not have been done. Because the plaintiff bears the burden of proof, this means that plaintiff's experts often will be excluded.

# IV. Forensic Science

To date, *Daubert* has rarely been raised in the forensic context, but this may be about to change.[74] We do not know as yet what shifts may occur in response to the National Academies' highly critical report on the forensic sciences.[75] We do know that the report played a role in the Supreme Court's opinion in *Melendez-*

with levels of harm—plaintiff must only produce evidence from which a reasonable person could conclude that the defendant's emissions probably caused the plaintiff's harms.").

72. Junk v. Terminix Int'l. Co., 594 F. Supp. 2d 1062 (S.D. Iowa 2008).

73. 605 F. Supp. 2d 1142 (E.D. Wash. 2009).

74. These issues are discussed at greater length in Paul C. Giannelli et al., Reference Guide on Forensic Identification Expertise, in this manual.

75. National Research Council, Strengthening Forensic Science in the United States: A Path Forward (2009).

EXHIBIT C

*The Admissibility of Expert Testimony*

*Diaz v. Massachusetts*[76] concerning the application of the Confrontation Clause to expert forensic testimony. But it will take some time to understand the repercussions this opinion will cause in the criminal justice system.

Even aside from this constitutional development and in the absence of congressional or other institutional action, the extensive coverage of the National Academies' report by the media and academia may bring about change. Furthermore, analysts of the more than 200 DNA exonerations to date claim that in more than 50% of the cases, invalid, or improperly conducted, or misleadingly interpreted forensic science contributed to the wrongful convictions.[77] The seriousness of these mistakes is aggravated because some of the inmates were on death row. These developments may affect judicial approaches to opinions offered by prosecution experts. Also, as judges write more sharply focused opinions in civil cases, the very different approach they use in criminal cases stands out in vivid contrast. Supposedly, the federal rules are trans-substantive, and it is certainly arguable that errors that bear on life and liberty should weigh more heavily than errors in civil cases concerned primarily with money.

To date, however, few prosecution experts have been excluded as witnesses in criminal prosecutions.[78] Usually judges have allowed them to testify or, at most, have curtailed some of the conclusions that prosecution experts sought to offer.[79] However, there are a number of issues in forensic sciences that may become the object of *Daubert* challenges.

## *A. Validity*

As the discussion in Chapter 5 of the National Academies' report recounts, forensic fields vary considerably with regard to the quantity and quality of research done to substantiate that a given technique is capable of making reliable individualized

76. 129 S. Ct. 2527, 2536 (2009).

77. The Innocence Project, *available at* www.innocenceproject.org.

78. *See* Maryland v. Rose, Case No. K06-0545 at 31 (Balt. County Cir. Ct. Oct. 19, 2007) (excluding fingerprint evidence in a death penalty case as a "subjective, untested, unverifiable identification procedure that purports to be infallible").

79. *See, e.g.,* United States v. Green, 405 F. Supp. 2d 104 (D. Mass. 2005) (explaining that an expert would be permitted to describe similarities between shell casings but prohibited from testifying to match; Judge Gertner acknowledged that toolmark identification testimony should be excluded under *Daubert*, but that every single court post-*Daubert* admitted the testimony); United States v. Glynn, 578 F. Supp. 2d 567 (S.D.N.Y. 2008) (explaining that testimony linking bullet and casings to the defendant was inadmissible under *Daubert*, but testimony that the evidence was "more likely than not" from the firearm was admissible under Federal Rule of Evidence 401); United States v. Rutherford, 104 F. Supp. 2d 1190, 1193 (D. Neb. 2000) (handwriting experts permitted to testify to similarities between sample from defendant and document in question but not permitted to conclude that defendant was the author). *See* United States v. Rutherford, 104 F. Supp. 2d 1190, 1193 (D. Neb. 2000); United States v. Hines, 55 F. Supp. 2d 530 (D. Md. 2002).

27

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

identifications. Non–DNA forensic techniques often turn on subjective analyses.[80] But making *Daubert* objections in these fields requires defense counsel to understand in detail how the particular technique works, as well as to be knowledgeable about the scientific method and statistical issues.[81]

## B. *Proficiency*

Non–DNA forensic techniques often rely on subjective judgments, and the proficiency of the expert to make such judgments may become the focus of a *Daubert* challenge. In theory, proficiency tests could determine whether well-trained experts in those fields can reach results with low error rates. In practice, however, there are numerous obstacles to such tests. Sophisticated proficiency tests are difficult and expensive to design. If the tests are too easy, the results will not assess the ability of examiners to draw correct conclusions when forensic evidence presents a difficult challenge in identifying a specific individual or source.[82] Furthermore, in many jurisdictions, forensic examiners are not independent of law enforcement agencies and/or prosecutors' offices and can often obtain information about a proficiency testing program through those sources.

## C. *Malfunctioning Laboratories*

Numerous problems have been identified in crime laboratories ranging from uncertified laboratory professionals and unaccredited laboratories performing incompetent work to acts of deliberate fraud, such as providing falsified results from tests that were never done.[83] Although outright fraud may be rare, unintended inaccurate results that stem from inadequate supervision, training, and record keeping, failure to prevent contamination, and failure to follow proper statistical procedures can have devastating effects. Evidence that a laboratory has engaged in such practices should certainly lead to *Daubert* challenges for lack of reliability, but this requires that such investigations be undertaken and the defense have access to the results. Whether courts can be persuaded to almost automatically reject laboratory results in the absence of proper accreditation of laboratories and certification

---

80. *See* National Research Council, *supra* note 75, at 133.

81. Specific forensic science techniques are discussed in Paul C. Giannelli et al., Reference Guide on Forensic Identification Expertise, Sections V–X, in this manual.

82. United States v. Llera Plaza, 188 F. Supp. 2d 549 (E.D. Pa. 2002) (court acknowledged that defense raised real questions about the adequacy of proficiency tests taken by FBI fingerprint examiners but concluded that fingerprint testimony satisfied *Daubert* in part because no examples were shown of erroneous identifications by FBI examiners). An erroneous FBI identification was made in the Brandon Mayfield case discussed in the introduction to *Strengthening Forensic Science in the United States, supra* note 75, at 45–46.

83. *See* National Research Council, *supra* note 75, at 183–215 and Paul C. Giannelli et al., Reference Guide on Forensic Identification Expertise, Section IV, in this manual.

EXHIBIT C

*The Admissibility of Expert Testimony*

of forensic practitioners remains to be seen. Laboratory techniques, such as drug analyses, that do not suffer from the same uncertainties regarding validity as the forensic identification techniques can, of course, also produce erroneous results if the laboratory is failing to follow proper procedures.

## D. Interpretation

Forensic techniques that rest on subjective judgments are susceptible to cognitive biases.[84] We have seen instances of contextual bias, but as yet there has been little research on contextual or other types of cognitive bias. We do not yet know whether courts will consider this type of evidence when expertise is challenged.

## E. Testimony

Defense counsel may of course object to testimony that a prosecution expert seeks to give. When the prosecution relies on a subjective identification technique, lawyers for the defense should attempt to clarify what "match" means if the expert uses this terminology and to explain to the jury that studies to date do not permit conclusions about individualization. To do this, the defense may have to call its own experts and ask for jury instructions. Defense counsel must also remain alert and object to prosecution testimony in which the witness claims to know probabilities—that have not been established in a particular field—on the basis of extensive personal experience. Objections also should be raised to testimony about zero error rates. The defense must also remember that the *Daubert* opinion itself recognized that testimony can be excluded under Federal Rule of Evidence 403 if its prejudicial effect substantially outweighs its probative value.

## F. Assistance for the Defense and Judges

Perhaps the most troubling aspect of trying to apply *Daubert* to forensic evidence is that very few defense counsel are equipped to take on this challenge. Such counsel lack the training and resources to educate judges on these complex issues. Judges in the state criminal justice system that handle the great majority of criminal cases often have overloaded dockets and little or no assistance. Whether a defendant in a particular case is constitutionally entitled to expert assistance is a complicated issue that defense counsel needs to explore.[85] Possibly the best chance for the defense to get meaningful help that also would assist the court is to get pro bono assistance

---

84. National Research Council, *supra* note 75, at 184–185.

85. *See* Ake v. Oklahoma, 470 U.S. 68 (1985) (recognizing indigent's right to psychiatric expert assistance in a capital case in which defendant raised insanity defense). Jurisdictions differ widely in how they interpret *Ake*.

EXHIBIT C

from other counsel who are knowledgeable about *Daubert* and have a sophisticated understanding of statistical reasoning. Lawyers who have handled complex issues about causation may be able to transfer their expertise to other difficult issues relating to expert testimony.[86] Judges might also consider asking for amicus briefs from appropriate organizations or governmental units.

## G. Confrontation Clause

The majority in *Melendez-Diaz v. Massachusetts*, in an opinion by Justice Scalia over a strong dissent by Justice Kennedy, held that the defendant has a constitutional right to demand that a forensic analyst whose conclusions the prosecution wishes to introduce into evidence must be produced in court for cross–examination. In a drug case, for example, the prosecution may not simply introduce a report or an affidavit from the analyst if the defendant demands production of the analyst for cross–examination. When the analyst is produced, this will gave the defense the opportunity through cross–examination to raise questions about fraud, incom-petence, and carelessness and to ask questions about laboratory procedures and other issues discussed in the National Research Council report. Effective cross–examination will demand of defense counsel the same type of expertise needed to succeed on *Daubert* challenges. Numerous unanswered questions about the operation of *Melendez-Diaz* will have to be litigated. It remains to be seen how often, if at all, defense counsel will take advantage of the Confrontation Clause or whether they will waive the defendant's right to confront expert witnesses.[87]

# V. Procedural Context

Apart from their effect on admissibility of expert testimony, *Daubert* and its sub-sequent interpretations have also affected the broader context in which such cases are litigated and have altered the role of testifying experts in the pretrial stages of litigation.

## A. Class Certification Proceedings

One question that arises with increasing frequency is whether and how *Daubert* is to be applied at class certification proceedings. The problem arises because of the commonality and predominance requirements in Rule 23(a) of the Federal Rules

---

86. *Cf.* Kitzmiller v. Dover Area School Dist., 400 F. Supp. 2d 707 (M.D. Pa. 2005) (attorneys who specialized in defense product liability litigation and had expertise about the nature of science participated in case objecting to teaching intelligent design in public schools).

87. Both defendants and prosecutors face concerns about the resources required to fully imple-ment such protections. *See* National Research Council, *supra* note 75, at 187.

EXHIBIT C

*The Admissibility of Expert Testimony*

of Civil Procedure and has emerged with regard to a wide variety of substantive claims that plaintiffs seek to bring as a class action. For example, in *Sanneman v. Chrysler Corp.*,[88] plaintiff sought class certification of a common-law fraud action and a breach-of-warranty action, the gist of which was "that Chrysler had fraudulently concealed a paint defect in many of the vehicles it manufactured beginning on or about 1990."[89] Plaintiff's expert testified at the class certification hearing that the paint problem is always caused by ultraviolet rays, but acknowledged "that other causes may contribute to or exacerbate the problem."[90] After oral argument, the court concluded that plaintiff's expert's testimony satisfied *Daubert,* but because ultraviolet rays are not always the only cause of problems with paint, proof of damages would probably have to be made vehicle by vehicle. The motion for class certification was therefore denied. *Daubert* challenges have been raised to class certification in numerous other cases.[91]

As of this writing, there is a decided trend toward rejecting class certification on the ground that plaintiff's proffered expert testimony does not satisfy the Rule 23(a) requirements, although the circuits are not unanimous in how rigorous the examination of expert proof needs to be. Must the expert testimony be subjected to the same rigorous scrutiny to determine whether it is relevant and reliable as when the issue is admissibility at trial, or is a less searching analysis appropriate at the certification stage? In other words, should the trial judge conduct a *Daubert* hearing and analysis identical to that undertaken when a defendant seeks to preclude a plaintiff's witness from testifying at trial? Not only "should" the trial judge conduct a *Daubert* hearing, but, as the Seventh Circuit has ruled in *American Honda*, the trial judge "must" do so. If a full *Daubert* hearing is required in every class certification case, what has happened to the broad and case-familiar discretion that a trial judge is supposed to exercise?"

The trial judge in *Rhodes v. E.I. du Pont de Nemours & Co.*[92] concluded that the expert opinions offered in support of class certification should be subjected to a full-scale *Daubert* analysis, including a *Daubert* hearing. The judge explained

---

88.  191 F.R.D. 441 (E.D. Pa. 2000).

89.  *Id.* at 443.

90.  *Id.* at 451.

91.  *See, e.g.,* Blades v. Monsanto Co., 400 F.3d 562 (8th Cir. 2005) (antitrust price-fixing conspiracy); Rhodes v. E.I. du Pont de Nemours & Co., 2008 WL 2400944 (S.D. W. Va. June 11, 2008) (medical monitoring claim in toxic tort action); Gutierrez v. Johnson & Johnson, 2006 WL 3246605 (D.N.J. Nov. 6, 2006) (employment discrimination); Nichols v. SmithKline Beecham Corp., 2003 WL 302352 (E.D. Pa. Jan. 29, 2003) (violation of Sherman Antitrust Act); *In re* St. Jude Med., Inc., 2003 WL 1589527 (D. Minn. Mar. 27, 2003) (product liability action); Bacon v. Honda of Am. Mfg Inc., 205 F.R.D. 466 (S.D. Ohio 2001) (same); Midwestern Mach v. Northwest Airlines, Inc., 211 F.R.D. 562 (D. Minn. 2001) (violation of Clayton Act); *In re* Polypropylene Carpet, 996 F. Supp. 18 (N.D. Ga. 1997) (same); *In re* Monosodium Glutamate, 205 F.R.D. 229 (D. Minn. 2001).

92.  2008 WL 2400944 (S.D. W. Va. June 11, 2008). *See also* American Honda Motor Co. v. Allen, 600 F.3d 813, 816 (7th Cir. 2010) (district court must perform a full *Daubert* analysis before certifying a class action where the expert's report or testimony is critical to class certification).

EXHIBIT C

*Reference Manual on Scientific Evidence*

that decisions that see a more limited role for *Daubert* in class certification hearings stem in part from misinterpreting the Supreme Court's opinion in *Eisen v. Carlisle & Jacquelin*.[93] In *Eisen*, which predated *Daubert* by 19 years, the Court instructed district courts to refrain from conducting "a preliminary inquiry into the merits of a proposed class action" when they consider certification.[94] At this time, only the Ninth Circuit forbids the lower courts from examining evidence that relates to the merits and from requiring a rigorous examination of the expert testimony and Rule 23(a) requirements.[95] The *Rhodes* case deplored this approach because the overwhelming majority of class actions settle and therefore allowing the action to proceed as a class action "might invite plaintiffs to seek class status for settlement purposes." On the other hand, knocking out the possibility of class certification early in the proceedings affects the possibility of settling cases in which liability is debatable. A possible compromise is partial certification that would allow a common issue to be established at a class trial, leaving individual issues for separate proceedings.

## B. Discovery

### 1. Amended discovery rules

Rule 26 of the Federal Rules of Civil Procedure—the core rule on civil discovery—was amended in 1993 more or less contemporaneously with *Daubert* to allow judges to exert greater control of expert testimony. Those amendments required experts retained or specially employed to provide expert testimony, or whose duties as the party's employee regularly involve giving expert testimony, to furnish an extensive report prior to his or her deposition.[96] These reports were required to indicate

93. 417 U.S. 156 (1974).

94. *Id*. at 177–78.

95. *See* Dukes v. Wal–Mart, Inc., 474 F.3d 1214 (9th Cir. 2007). The Supreme Court declined an opportunity to address the role of *Daubert* in class certification when it granted certiorari in *Dukes*, even though the issue was raised in some of the petitions. The Court subsequently granted a petition for certiorari in *Erica P. John Fund Inc. v. Halliburton Co*. (U.S. Jan. 7, 2011) (No. 09-1403), which raises related questions regarding the extent to which the district court may consider the merits of the underlying litigation and require that loss causation be demonstrated by a preponderance of admissible evidence at the class certification stage under Federal Rule of Civil Procedure 23. Other courts accord *Daubert* a limited role, such as requiring the trial judge to determine only that the expert testimony is "not fatally flawed." *See* Fogarazzo v. Lehman Bros., Inc., 2005 WL 361205 (S.D.N.Y. Feb. 16, 2005).

96. Fed R. Civ. P. 26(a)(2)(B), as amended December 1, 2010, made substantial changes to the 1993 amendments. The 1993 amendments also recognized a second category of testifying experts who were not retained or specially employed in anticipation of litigation, such as treating physicians, who were not required to provide reports. *But see* 3M v. Signtech USA, 177 F.R.D. 459 (D. Minn. 1998) (requiring report from employee experts who do not regularly provide expert testimony because it eliminates surprise and is consistent with the spirit of Rule 26(a)(2)(B)). Under the 2010 amendments the attorney must submit a report indicating the subject matter and the facts and opinions to which an unretained testifying expert is expected to testify. Fed. R. Civ. P. 26(a)(2)(C) (amended Dec. 1, 2010).

32

EXHIBIT C

"the data *or other information* considered by the expert witness in forming the opin-ions" (emphasis added). Many, although not all, courts construed this language as opening the door to discovery of anything conveyed by counsel to the expert.[97] Courts taking this approach found that all communications between counsel and experts were discoverable even if the communication was opinion work product. In other words, these courts found that the protection for opinion work product in Rule 26(b)(3) was trumped by the disclosure provisions in Rule 26(a)(2)(B). These courts also required disclosure of all the expert's draft reports and notes.

*Trigon Ins. Co. v. United States,*[98] went a step further. It held that drafts prepared with the assistance of consultants who would not testify, as well as all communications between the consultants and the experts, including e-mails, were discoverable. In *Trigon,* many of these materials had been destroyed. The court ordered the defendant to hire an outside technology consultant to retrieve as much of these data as possible, allowed adverse inferences to be drawn against the defendant, and awarded more than $179,000 in fees and costs to plaintiff.[99]

Those who favor the free discovery of communications between counsel and experts and draft reports justified these results as shedding light on whether the expert's opinions are his or her own or those of counsel. Critics of this approach found it costly and time-consuming and point out that lawyers have developed strategies to overcome transparency, such as retaining two sets of experts—one to consult and the other to testify—which makes discovery even more expensive.

After a series of public hearings the Advisory Committee on Civil Rules determined that the disclosure rules increased the cost of litigation with no offset-ting advantage to the conduct of litigation. The report of the Advisory Committee noted that such an extensive inquiry into expert communications with attorneys did not lead to better testing of expert opinions "because attorneys and expert witnesses go to great lengths to forestall discovery."[100]

Under amended rules that became effective in December 2010, disclosure is limited to "the facts or data" considered by the expert, and does not extend to "other information." Draft reports are no longer discoverable, and communica-tions between counsel and an expert are protected from discovery unless the communications: (1) relate to compensation for the expert's study or testimony;

97. *See* Karn v. Ingersoll Rand, 168 F.R.D. 633 (N.D. Ind. 1996) (requiring disclosure of all documents reviewed by experts in forming their opinions); Reg'l Airport Auth. v. LFG, LLC, 460 F.3d 697, 716 (6th Cir. 2006) ("other information" interpreted to include all communications by counsel to expert).

98. 204 F.R.D. 277 (E.D. Va. 2002).

99. *Id. See also* Semtech Corp. v. Royal Ins. Co., 2007 WL 5462339 (C.D. Cal. Oct. 24, 2007) (explaining that preclusion of expert from testifying for failure to disclose drafts and failing to disclose input of counsel at hearing made it impossible to discern the basis for his opinion).

100. Report of the Civil Rules Advisory Committee, from Honorable Mark R. Kravitz, Chair, Advisory Committee on Federal Rules of Civil Procedure, to Honorable Lee H. Rosenthal, Chair, Standing Committee on Rules of Practice and Procedure (May 8, 2008), *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/CV05-2009.pdf.

EXHIBIT C

*Reference Manual on Scientific Evidence*

(2) identify facts or data provided by counsel and considered by the expert; or (3) identify assumptions furnished by counsel that the expert relied upon in forming opinions. Testifying experts who were not required to provide a report under the previous rules—such as treating physicians—are now required to provide a summary of the facts or opinions to which the witness expects to testify. While this requirement relating to experts not required to file a report would provide more disclosure than under the 1993 amendments, the main thrust of the 2010 amendments is to narrow expert discovery with an eye toward minimizing expense and focusing attention on the expert's opinion.

Nothing in the amendments precludes asking an expert at a deposition to explain the bases or foundations for his or her opinions or asking whether the expert considered other possible approaches, but inquiries into counsel's input would be severely curtailed. Aside from communications with counsel relating to compensation, or inquiring into "facts or data" provided by counsel that the expert considered, the expert may also be asked if counsel furnished him or her with assumptions on which he or she relied. Now that the amended rules have become effective, it remains to be seen how broadly courts and magistrates will interpret the "assumptions" provision. Are there instances in which it will be inferred that counsel was seeking to have the expert make an assumption although this was never explicitly stated? Those who think more transparency is desirable in dealing with expert testimony will certainly push to expand this category. Whether these amendments if adopted can constrain the gamesmanship that surrounds expert testimony remains to be seen.

## *2. E-discovery*

Also uncertain is whether experts will be needed to determine the proper scope of e-discovery. Rule 26(b)(2)(B) provides the following:

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost.

The burden is on the party from whom discovery is sought to show this undue burden or cost, but the court may nevertheless order discovery if the requesting party can show good cause.

May the requesting party making a motion to compel proffer expert testimony to show that the requested information would have been readily accessible if the party with the information had used a different search methodology? Recent opinions by a magistrate judge so suggest.[101] Magistrate Judge John Facciola notes that "[w]hether search terms or 'keywords' will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer

---

101. *See e.g.* United States v. O'Keefe, 537 F. Supp. 2d 14 (D.D.C. 2008); Equity Analytics, LLC v. Lunden, 248 F.R.D. 331 (D.D.C. 2008).

EXHIBIT C

technology, statistics and linguistics. . . . This topic is clearly beyond the ken of a layman and requires that any conclusion be based on evidence that, for example, meets the criteria of Rule 702 of the Federal Rules of Evidence."[102]

Superimposing *Daubert* hearings on top of e-discovery proceedings will make an already costly procedure even more costly, one of the consequences that Rule 26(b)(2)(B) seeks to avoid. On the other hand, a search that would not lead to the information sought defeats the objectives of discovery. A helpful opinion on how these factors should be balanced that examines the issues a court must consider can be found in *Victor Shirley, Inc. v. Creative Pipe, Inc.*,[103] which also contains a very brief overview of the various techniques for conducting searches of electronically stored information. A court may well require technical assistance in dealing with these issues. In some instances, a court-appointed expert or a special master appointed pursuant to Rule 53 of the Federal Rules of Civil Procedure might be more desirable than a full-fledged *Daubert* battle among experts, particularly if one of the parties has far fewer resources than its opponent.

## *C.* Daubert *Hearings*

When a *Daubert* issue arises, the trial court has discretion about how to proceed.[104] It need not grant an evidentiary hearing and has leeway to decide when and how issues about the admissibility of expert testimony should be determined. The burden is on the parties to persuade the court that a particular procedure is needed.[105]

The generally unfettered power of the trial judge to make choices emerges clearly if we look at *United States v. Nacchio*,[106] a criminal case. The defendant claimed that the trial judge erred in granting the government's *Daubert* motion to exclude his expert in the middle of the trial without an evidentiary hearing, leading to his conviction. On appeal, a divided panel of the Tenth Circuit reversed on the ground that the expert testimony had been improperly excluded and remanded for a new trial. After a rehearing, the conviction was reinstated in a 5-4 opinion. The majority rejected the defense's central argument that the court had to take into account that this was a criminal case; the majority saw this purely as a *Daubert* issue and found that the burden of satisfying *Daubert* and convincing the trial judge to hold a hearing rested solely on the defendant. Although there may be some cases in which a reviewing court would find that the trial court abused its discretion in the procedures it used in handling a *Daubert* motion,[107] this has

---

102. *See Equity Analytics,* 248 F.R.D. at 333.

103. 250 F.R.D. 251 (D. Md. 2008).

104. Kumho Tire Co. v. Carmichael, 526 U.S. at 137, 150 (1999).

105. For example, in the government's RICO tobacco case, all *Daubert* issues were decided on the papers without any testimony being presented. United States v. Phillip Morris Inc., 2002 WL 34233441, at ★1 (D.D.C. Sept. 30, 2002).

106. 555 F.3d 1234 (10th Cir. 2009).

107. *See* Padillas v. Stork-Gamco, Inc., 186 F.3d 412 (3d Cir. 1999).

EXHIBIT C

*Reference Manual on Scientific Evidence*

become more and more unlikely in civil cases as *Daubert* rulings have accumulated
and courts increasingly expect litigators to understand their obligations.

# VI. Conclusion

The *Daubert* trilogy has dramatically changed the legal landscape with regard to
expert witness testimony. The Supreme Court attempted in *Daubert* to articulate
basic principles to guide trial judges in making decisions about the admissibility
of complex scientific and technological expert testimony. Unfortunately, the
*Daubert* trilogy has, in actuality, spawned a huge, and expensive, new subject of
litigation and have left many procedural and substantive questions unanswered.
Moreover, there are serious concerns about whether the guidelines enunciated by
the Court have been interpreted by lower courts to limit, rather than respect, the
discretion of trial judges to manage their complex cases, whether the guidelines
conflict with the preference for admissibility contained in both the Federal Rules
of Evidence and *Daubert* itself, and whether the guidelines have resulted in trial
judges encroaching on the province of the jury to decide highly contested factual
issues and to judge the overall credibility of expert witnesses and their scientific
theories. Perhaps most disturbingly, there are serious concerns on the part of
many scientists as to whether the courts are, as *Daubert* prescribed, making admis-
sibility decisions—decisions that may well determine the ultimate outcome of a
case—which are in fact "ground[ed] in the methods and procedures of science."[108]

---

108. Daubert v. Merrill Dow Pharms., 509 U.S. at 579, 590 (1993).

EXHIBIT C

# How Science Works

## DAVID GOODSTEIN

*David Goodstein, Ph.D., is Professor of Physics and Applied Physics, and the Frank J. Gilloon Distinguished Teaching and Service Professor, Emeritus, California Institute of Technology, Pasadena, California, where he also served for 20 years as Vice Provost.*

CONTENTS

  I.  Introduction, 38
 II.  A Bit of History, 38
III.  Theories of Science, 39
        A.  Francis Bacon's Scientific Method, 39
        B.  Karl Popper's Falsification Theory, 40
        C.  Thomas Kuhn's Paradigm Shifts, 41
        D.  An Evolved Theory of Science, 43
 IV.  Becoming a Professional Scientist, 45
        A.  The Institutions, 45
        B.  The Reward System and Authority Structure, 46
  V.  Some Myths and Facts About Science, 47
 VI.  Comparing Science and the Law, 51
        A.  Language, 51
        B.  Objectives, 52
VII.  A Scientist's View of *Daubert*, 52

EXHIBIT C

*Reference Manual on Scientific Evidence*

# I. Introduction

Recent Supreme Court decisions have put judges in the position of having to decide what is scientific and what is not.[1] Some judges may not be entirely comfortable making such decisions, despite the guidance supplied by the Court and illuminated by learned commentators.[2] The purpose of this chapter is not to resolve the practical difficulties that judges will encounter in reaching those decisions; it is to demystify somewhat the business of science and to help judges understand the *Daubert* decision, at least as it appears to a scientist. In the hope of accomplishing these tasks, I take a mildly irreverent look at some formidable subjects. I hope the reader will accept this chapter in that spirit.

# II. A Bit of History

Modern science can reasonably be said to have come into being during the time of Queen Elizabeth I of England and William Shakespeare. Almost immediately, it came into conflict with the law.

While Shakespeare was composing his sonnets and penning his plays in England, Galileo Galilei in Italy was inventing the idea that careful experiments in a laboratory could reveal universal truths about the way objects move through space. A bit later, after hearing about the newly invented telescope, he made one for himself, and with it he made discoveries in the heavens that astonished and thrilled all of Europe. Nonetheless, in 1633, Galileo was put on trial for his scientific teachings. The trial of Galileo is usually portrayed as a conflict between science and the Roman Catholic Church, but it was, after all, a trial, with judges and lawyers, and all the other trappings of a formal legal procedure.

Another great scientist of the day, William Harvey, who discovered the circulation of blood, worked not only at the same time as Galileo, but also at the same place—the University of Padua, not far from Venice. If you visit the University of Padua today and tour the old campus at the heart of the city, you will be shown Galileo's *cattedra,* the wooden pulpit from which he lectured (and curiously, one of his vertebrae in a display case just outside the rector's office—maybe the rector needs to be reminded to have a little spine). You will also be shown the lecture

---

1. These Supreme Court decisions are discussed in Margaret A. Berger, The Admissibility of Expert Testimony, Sections II–III, IV.A, in this manual. For a discussion of the difficulty in distinguishing between science and engineering, see Channing R. Robertson et al., Reference Guide on Engineering, in this manual.

2. Since publication of the first edition of this manual, a number of works have been developed to assist judges and attorneys in understanding a wide range of scientific evidence. *See, e.g.,* 1 & 2 Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman et al. eds., 1997); Expert Evidence: A Practitioner's Guide to Law, Science, and the FJC Manual (Bert Black & Patrick W. Lee eds., 1997).

EXHIBIT C

*How Science Works*

theater in which Harvey dissected cadavers while eager students peered downward from tiers of overhanging balconies. Because dissecting cadavers was illegal in Harvey's time, the floor of the theater was equipped with a mechanism that whisked the body out of sight when a lookout gave the word that the authorities were coming. Obviously, both science and the law have changed a great deal since the seventeenth century.

Another important player who lived in the same era was not a scientist at all, but a lawyer who rose to be Lord Chancellor of England in the reign of Elizabeth's successor, James I. His name was Sir Francis Bacon, and in his magnum opus, which he called *Novum Organum,* he put forth the first theory of the scientific method. In Bacon's view, the scientist should be an impartial observer of nature, collecting observations with a mind cleansed of harmful preconceptions that might cause error to creep into the scientific record. Once enough such observations were gathered, patterns would emerge, giving rise to truths about nature.

Bacon's theory has been remarkably influential down through the centuries, even though in his own time there were those who knew better. "That's exactly how a Lord Chancellor *would* do science," William Harvey is said to have grumbled.

# III. Theories of Science

Today, in contrast to the seventeenth century, few would deny the central importance of science to our lives, but not many would be able to give a good account of what science is. To most, the word probably brings to mind not science itself, but the fruits of science, the pervasive complex of technology and discoveries that has transformed all of our lives. However, science also might equally be thought to include the vast body of knowledge we have accumulated about the natural world. There are still mysteries, and there always will be mysteries, but the fact is that, by and large, we understand how nature works.

## A. Francis Bacon's Scientific Method

But science is even more than that. Ask a scientist what science is, and the answer will almost surely be that it is a process—a way of examining the natural world and discovering important truths about it. In short, the essence of science is the scientific method.[3]

---

3. The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, acknowledged the importance of defining science in terms of its methods as follows: "'Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement'" (emphasis in original). 509 U.S. 579, 590 (1993) (quoting Brief for the American Association for the Advancement of Science and the National Academy of Sciences as Amici Curiae at 7–8).

EXHIBIT C

*Reference Manual on Scientific Evidence*

This stirring description suffers from an important shortcoming. We do not really know what the scientific method is.[4] There have been many attempts at formulating a general theory of how science works, or at least how it should work, starting, as we have seen, with the theory of Sir Francis Bacon. But Bacon's idea, that science proceeds through the collection of observations without prejudice, has been rejected by all serious thinkers. Everything about the way we do science—the language we use, the instruments we use, the methods we use—depends on clear presuppositions about how the world works. Modern science is full of things that cannot be observed at all, such as force fields and complex molecules. At the most fundamental level, it is impossible to observe nature without having some reason to choose what is and is not worth observing. Once that elementary choice is choice is made, Bacon has been left behind.

## B. Karl Popper's Falsification Theory

Over the past century, the ideas of the Vienna–born philosopher Sir Karl Popper have had a profound effect on theories of the scientific method.[5] In contrast to Bacon, Popper believed that all science begins with a prejudice, or perhaps more politely, a theory or hypothesis. Nobody can say where the theory comes from. Formulating the theory is the creative part of science, and it cannot be analyzed within the realm of philosophy. However, once the theory is in hand, Popper tells us, it is the duty of the scientist to extract from it logical but unexpected predictions that, if they are shown by experiment not to be correct, will serve to render the theory invalid.

Popper was deeply influenced by the fact that a theory can never be proved right by agreement with observation, but it can be proved wrong by disagreement with observation. Because of this asymmetry, science uniquely makes progress by proving that good ideas are wrong so that they can be replaced by even better ideas. Thus, Bacon's impartial observer of nature is replaced by Popper's skeptical theorist. The good Popperian scientist somehow comes up with a hypothesis that fits all or most of the known facts, then proceeds to attack that hypothesis at its weakest point by extracting from it predictions that can be shown to be false. This process is known as falsification.[6]

---

4. For a general discussion of theories of the scientific method, see Alan F. Chalmers, What Is This Thing Called Science? (1982). For a discussion of the ethical implications of the various theories, see James Woodward & David Goodstein, *Conduct, Misconduct and the Structure of Science,* 84 Am. Scientist 479 (1996).

5. *See, e.g.,* Karl R. Popper, The Logic of Scientific Discovery (Karl R. Popper trans., 1959).

6. The Supreme Court in *Daubert* recognized Popper's conceptualization of scientific knowledge by noting that "[o]rdinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." 509 U.S. at 593. In support of this point, the Court cited as parenthetical passages from both Carl Gustav Hempel, Philosophy of Natural Science 49 (1966) ("'[T]he statements constituting

**EXHIBIT C**

*How Science Works*

Popper's ideas have been fruitful in weaning the philosophy of science away from the Baconian view and some other earlier theories, but they fall short in a number of ways in describing correctly how science works. The first of these is the observation that, although it may be impossible to prove a theory is true by observation or experiment, it is as almost equally impossible to prove one is false by these same methods. Almost without exception, in order to extract a falsifiable prediction from a theory, it is necessary to make additional assumptions beyond the theory itself. Then, when the prediction turns out to be false, it may well be one of the other assumptions, rather than the theory itself, that is false. To take a simple example, early in the twentieth century it was found that the orbits of the outermost planets did not quite obey the predictions of Newton's laws of gravity and mechanics. Rather than take this to be a falsification of Newton's laws, astron-omers concluded that the orbits were being perturbed by an additional unseen body out there. They were right. That is precisely how Pluto was discovered.

The apparent asymmetry between falsification and verification that lies at the heart of Popper's theory thus vanishes. But the difficulties with Popper's view go even beyond that problem. It takes a great deal of hard work to come up with a new theory that is consistent with nearly everything that is known in any area of science. Popper's notion that the scientist's duty is then to attack that theory at its most vulnerable point is fundamentally inconsistent with human nature. It would be impossible to invest the enormous amount of time and energy necessary to develop a new theory in any part of modern science if the primary purpose of all that work was to show that the theory was wrong.

This point is underlined by the fact that the behavior of the scientific com-munity is not consistent with Popper's notion of how it should be. Credit in science is most often given for offering correct theories, not wrong ones, or for demonstrating the correctness of unexpected predictions, not for falsifying them. I know of no example of a Nobel Prize awarded to a scientist for falsifying his or her own theory.

## C. *Thomas Kuhn's Paradigm Shifts*

Another towering figure in the twentieth century theory of science is Thomas Kuhn.[7] Kuhn was not a philosopher but a historian (more accurately, a physi-cist who retrained himself as a historian). It is Kuhn who popularized the word *paradigm*, which has today come to seem so inescapable.

A paradigm, for Kuhn, is a kind of consensual worldview within which scien-tists work. It comprises an agreed-upon set of assumptions, methods, language, and

---

a scientific explanation must be capable of empirical test'") and Karl R. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("'[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability'").

7.  Thomas S. Kuhn, The Structure of Scientific Revolutions (1962).

41

EXHIBIT C

*Reference Manual on Scientific Evidence*

everything else needed to do science. Within a given paradigm, scientists make steady, incremental progress, doing what Kuhn calls "normal science."

As time goes on, difficulties and contradictions arise that cannot be resolved, but the tendency among scientists is to resist acknowledging them. One way or another they are swept under the rug, rather than being allowed to threaten the central paradigm. However, at a certain point, enough of these difficulties accumulate to make the situation intolerable. At that point, a scientific revolution occurs, shattering the paradigm and replacing it with an entirely new one.

This new paradigm, says Kuhn, is so radically different from the old that normal discourse between the practitioners of the two paradigms becomes impossible. They view the world in different ways and speak different languages. It is not even possible to tell which of the two paradigms is superior, because they address different sets of problems. They are incommensurate. Thus, science does not progress incrementally, as the science textbooks would have it, except during periods of normal science. Every once in a while, a scientific revolution brings about a paradigm shift, and science heads off in an entirely new direction.

Kuhn's view was formed largely on the basis of two important historical revolutions. One was the original scientific revolution that started with Nicolaus Copernicus and culminated with the new mechanics of Isaac Newton. The very word *revolution*, whether it refers to the scientific kind, the political kind, or any other kind, refers metaphorically to the revolutions in the heavens that Copernicus described in a book, *De Revolutionibus Orbium Caelestium*, published as he lay dying in 1543.[8] Before Copernicus, the dominant paradigm was the worldview of ancient Greek philosophy, frozen in the fourth century B.C.E. ideas of Plato and Aristotle. After Newton, whose masterwork, *Philosophiæ Naturalis Principia Mathematica*, was published in 1687, every scientist was a Newtonian, and Aristotelianism was banished forever from the world stage. It is even possible that Sir Francis Bacon's disinterested observer was a reaction to Aristotelian authority. Look to nature, not to the ancient texts, Bacon may have been saying.

The second revolution that served as an example for Kuhn occurred early in the twentieth century. In a headlong series of events that lasted a mere 25 years, the Newtonian paradigm was overturned and replaced with the new physics, in the form of quantum mechanics and Einstein's theories of special and general relativity. This second revolution, although it happened much faster, was no less profound than the first.

The idea that science proceeds by periods of normal activity punctuated by shattering breakthroughs that make scientists rethink the whole problem is an appealing one, especially to the scientists themselves, who believe from personal experience that it really happens that way. Kuhn's contribution is important. It offers us a useful context (a paradigm, one might say) for organizing the entire history of science.

8. I. Bernard Cohen, Revolution in Science (1985).

EXHIBIT C

*How Science Works*

Nonetheless, Kuhn's theory does suffer from a number of shortcomings. One of them is that it contains no measure of how big the change must be in order to qualify as a revolution or paradigm shift. Most scientists will say that there is a paradigm shift in their laboratory every 6 months or so (or at least every time it becomes necessary to write another proposal for research support). That is not exactly what Kuhn had in mind.

Another difficulty is that even when a paradigm shift is truly profound, the paradigms it separates are not necessarily incommensurate. The new sciences of quantum mechanics and relativity, for example, did indeed show that Newton's laws of mechanics were not the most fundamental laws of nature. However, they did not show that they were wrong. Quite the contrary, they showed why Newton's laws were right: Newton's laws arose out of newly discovered laws that were even deeper and that covered a wider range of circumstances unimagined by Newton and his followers—that is, phenomena as small as atoms, or nearly as fast as the speed of light, or as dense as black holes. In our more familiar realms of experience, Newton's laws go on working just as well as they always did. Thus, there is no quarrel and no ambiguity at all about which paradigm is "better." The new laws of quantum mechanics and relativity subsume and enhance the older Newtonian worldview.

## D. *An Evolved Theory of Science*

If neither Bacon nor Popper nor Kuhn gives us a perfect description of what science is or how it works, all three of them help us to gain a much deeper understanding of it.

Scientists are not Baconian observers of nature, but all scientists become Baconians when it comes to describing their observations. With very few exceptions, scientists are rigorously, even passionately, honest about reporting scientific results and how they were obtained. Scientific data are the coin of the realm in science, and they are always treated with reverence. Those rare instances in which scientists are found to have fabricated or altered their data in some way are always traumatic scandals of the first order.[9]

Scientists are also not Popperian falsifiers of their own theories, but they do not have to be. They do not work in isolation. If a scientist has a rival with a different theory of the same phenomenon, the rival will be more than happy to perform the Popperian duty of attacking the scientist's theory at its weakest point.

---

9. Such instances are discussed in David Goodstein, *Scientific Fraud,* 60 Am. Scholar 505 (1991). For a summary of recent investigations into scientific fraud and lesser instances of scientific misconduct, see Office of Research Integrity, Department of Health and Human Services, Scientific Misconduct Investigations: 1993–1997, http://ori.dhhs.gov/PDF/scientific.pdf (last visited Nov. 21, 1999) (summarizing 150 scientific misconduct investigations closed by the Office of Research Integrity).

EXHIBIT C

*Reference Manual on Scientific Evidence*

Moreover, if falsification is no more definitive than verification, and scientists prefer in any case to be right rather than wrong, they nonetheless know how to hold verification to a very high standard. If a theory makes novel and unexpected predictions, and those predictions are verified by experiments that reveal new and useful or interesting phenomena, then the chances that the theory is correct are greatly enhanced. And, even if it is not correct, it has been fruitful in the sense that it has led to the discovery of previously unknown phenomena that might prove useful in themselves and that will have to be explained by the next theory that comes along.

Finally, science does not, as Kuhn seemed to think, periodically self-destruct and need to start over again. It does, however, undergo startling changes of perspective that lead to new and, invariably, better ways of understanding the world. Thus, although science does not proceed smoothly and incrementally, it is one of the few areas of human endeavor that is genuinely progressive. There is no doubt at all that the quality of twentieth century science is better than nineteenth century science, and we can be absolutely confident that the quality of science in the twenty-first century will be better still. One cannot say the same about, say, art or literature.[10]

To all of this, a few things must be added. The first is that science is, above all, an adversarial process. It is an arena in which ideas do battle, with observations and data the tools of combat. The scientific debate is very different from what happens in a court of law, but just as in the law, it is crucial that every idea receive the most vigorous possible advocacy, just in case it might be right. Thus, the Popperian ideal of holding one's hypothesis in a skeptical and tentative way is not merely inconsistent with reality; it would be harmful to science if it were pursued. As will be discussed shortly, not only ideas, but the scientists themselves, engage in endless competition according to rules that, although they are not written down, are nevertheless complex and binding.

In the competition among ideas, the institution of peer review plays a central role. Scientific articles submitted for publication and proposals for funding often are sent to anonymous experts in the field, in other words, to peers of the author, for review. Peer review works superbly to separate valid science from nonsense,

10.  The law, too, can claim to be progressive. The development of legal constructs, such as due process, equal protection, and individual privacy, reflects notable progress in the betterment of mankind. *See* Laura Kalman, The Strange Career of Legal Liberalism 2–4 (1996) (recognizing the "faith" of legal liberalists in the use of law as an engine for progressive social change in favor of society's disadvantaged). Such progress is measured by a less precise form of social judgment than the consensus that develops regarding scientific progress. *See* Steven Goldberg, *The Reluctant Embrace: Law and Science in America,* 75 Geo. L.J. 1341, 1346 (1987) ("Social judgments, however imprecise, can sometimes be reached on legal outcomes. If a court's decision appears to lead to a sudden surge in the crime rate, it may be judged wrong. If it appears to lead to new opportunities for millions of citizens, it may be judged right. The law does gradually change to reflect this kind of social testing. But the process is slow, uncertain, and controversial; there is nothing in the legal community like the consensus in the scientific community on whether a particular result constitutes progress.").

44

EXHIBIT C

*How Science Works*

or, in Kuhnian terms, to ensure that the current paradigm has been respected.[11] It works less well as a means of choosing between competing valid ideas, in part because the peer doing the reviewing is often a competitor for the same resources (space in prestigious journals, funds from government agencies or private foundations) being sought by the authors. It works very poorly in catching cheating or fraud, because all scientists are socialized to believe that even their toughest competitor is rigorously honest in the reporting of scientific results, which makes it easy for a purposefully dishonest scientist to fool a referee. Despite all of this, peer review is one of the venerated pillars of the scientific edifice.

# IV. Becoming a Professional Scientist

Science as a profession or career has become highly organized and structured.[12] It is not, relatively speaking, a very remunerative profession—that would be inconsistent with the Baconian ideal—but it is intensely competitive, and material well-being does tend to follow in the wake of success (successful scientists, one might say, do get to bring home the Bacon).

## A. The Institutions

These are the institutions of science: Research is done in the Ph.D.-granting universities and, to a lesser extent, in colleges that do not grant Ph.D.s. It is also done in national laboratories and in industrial laboratories. Before World War II, basic science was financed mostly by private foundations (Rockefeller, Carnegie), but since the war, the funding of science (except in industrial laboratories) has largely been taken over by agencies of the federal government, notably the National Science Foundation (an independent agency), the National Institutes of

---

11. The Supreme Court received differing views regarding the proper role of peer review. *Compare* Brief for Amici Curiae Daryl E. Chubin et al. at 10, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) (No. 92-102) ("peer review referees and editors limit their assessment of submitted articles to such matters as style, plausibility, and defensibility; they do not duplicate experiments from scratch or plow through reams of computer-generated data in order to guarantee accuracy or veracity or certainty"), *with* Brief for Amici Curiae New England Journal of Medicine, Journal of the American Medical Association, and Annals of Internal Medicine in Support of Respondent, Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) (No. 92-102) (proposing that publication in a peer-reviewed journal be the primary criterion for admitting scientific evidence in the courtroom). *See generally* Daryl E. Chubin & Edward J. Hackett, Peerless Science: Peer Review and U.S. Science Policy (1990); Arnold S. Relman & Marcia Angell, *How Good Is Peer Review?* 321 New Eng. J. Med. 827–29 (1989). As a practicing scientist and frequent peer reviewer, I can testify that Chubin's view is correct.

12. The analysis that follows is based on David Goodstein & James Woodward, *Inside Science,* 68 Am. Scholar 83 (1999).

EXHIBIT C

*Reference Manual on Scientific Evidence*

Health (part of the Department of Health and Human Services), and parts of the Department of Energy and the Department of Defense.

Scientists who work at all these organizations—universities, colleges, national and industrial laboratories, and funding agencies—belong to scientific societies that are organized mostly by discipline. There are large societies, such as the American Physical Society and the American Chemical Society; societies for subdisciplines, such as optics and spectroscopy; and even organizations of societies, such as FASEB, the Federation of American Societies for Experimental Biology.

Scientific societies are private organizations that elect their own officers, hold scientific meetings, publish journals, and finance their operations from the collection of dues and from the proceeds of their publishing and educational activities. The American Association for the Advancement of Science also holds meetings and publishes *Science*, a famous journal, but it is not restricted to any one discipline. The National Academy of Sciences holds meetings and publishes the *Proceedings of the National Academy of Sciences*, and, along with the National Academy of Engineering, Institute of Medicine, and its operational arm, the National Research Council, advises various government agencies on matters pertaining to science, engineering, and health. In addition to the advisory activities, one of its most important activities is to elect its own members.

These are the basic institutions of American science. It should not come as news that the universities and colleges engage in a fierce but curious competition, in which no one knows who is keeping score, but everyone knows roughly what the score is. (In recent years, some national and international media outlets have found it worthwhile to appoint themselves scorekeepers in this competition. Academic officials dismiss these journalistic judgments, except when their own institutions come out on top.) Departments in each discipline compete with one another, as do national and industrial laboratories and even funding agencies. Competition in science is at its most refined, however, at the level of individual careers.

## B. The Reward System and Authority Structure

To regulate competition among scientists, there is a reward system and an authority structure. The fruits of the reward system are fame, glory, and immortality. The purposes of the authority structure are power and influence. The reward system and the authority structure are closely related to one another, but scientists distinguish sharply between them. When they speak of a colleague who has become president of a famous university, they will say sadly, "It's a pity—he was still capable of good work," sounding like warriors lamenting the loss of a fallen comrade. The university president is a kingpin of the authority structure, but, with rare exceptions, he is a dropout from the reward system. Similar kinds of behavior can be observed in industrial and government laboratories, but a description of what goes on in universities will be enough to illustrate how the system works.

46

EXHIBIT C

A career in academic science begins at the first step on the reward system ladder, earning a Ph.D., followed in many areas by one or two stints as a post-doctoral fellow. The Ph.D. and postdoctoral positions had best be at universities (or at least departments) that are high up in that fierce but invisible competition, because all subsequent steps are more likely than not to take the individual sideways or downward on the list. The next step is a crucial one: appointment to a tenure-track junior faculty position. About two-thirds of all postdoctoral fellows in biology in American universities believe that they are going to make this step, but in fact, only about a quarter of them succeed. This step and all subsequent steps require growing renown as a scientist beyond the individual's own circle of acquaintances. Thus, it is essential by this time that the individual has accomplished something. The remaining steps up the reward system ladder are promotion to an academic tenured position and full professorship; various prizes, medals, and awards given out by the scientific societies; an endowed chair (the virtual equivalent of Galileo's wooden *cattedra*); election to the National Academy of Sciences; particularly prestigious awards up to and including the Nobel Prize; and, finally, a reputation equivalent to immortality.

Positions in the authority structure are generally rewards for having achieved a certain level in the reward system. For example, starting from the Ph.D. or junior faculty level, it is possible to step sideways temporarily or even permanently into a position as contract officer in a funding agency. Because contract officers influence the distribution of research funds, they have a role in deciding who will succeed in the climb up the reward system ladder. At successively higher levels one can become a journal editor; department chair; dean, provost, director of national research laboratory or president of a university; and even the head of a funding agency, a key player in determining national policy as it relates to science and technology. People in these positions have stepped out of the traditional reward system, but they have something to say about who succeeds within it.

# V. Some Myths and Facts About Science

"In matters of science," Galileo wrote, "the authority of thousands is not worth the humble reasoning of one single person."[13] Doing battle with the Aristotelian professors of his day, Galileo believed that kowtowing to authority was the enemy of reason. But, contrary to Galileo's famous remark, the fact is that within the scientific community itself, authority is of fundamental importance. If a paper's

---

13. I found this statement framed on the office wall of a colleague in Italy in the form, "I*n questioni di scienza L'autorità di mille non vale l'umile ragionare di un singolo*." However, I have not been able to find the famous remark in this form in Galileo's writings. An equivalent statement in different words can be found in Galileo's Il Saggiatore (1623). *See* Andrea Frova & Mariapiera Marenzona, Parola di Galileo 473 (1998).

EXHIBIT C

*Reference Manual on Scientific Evidence*

author is a famous scientist, the paper is probably worth reading. The triumph of reason over authority is just one of the many myths about science. Following is a brief list of some others:

*Myth:* Scientists must have open minds, being ready to discard old ideas in favor of new ones.

*Fact:* Because science is an adversarial process through which each idea deserves the most vigorous possible defense, it is useful for the successful progress of science that scientists tenaciously cling to their own ideas, even in the face of contrary evidence.

*Myth:* The institution of peer review assures that all published papers are sound and dependable.

*Fact:* Peer review generally will catch something that is completely out of step with majority thinking at the time, but it is practically useless for catching outright fraud, and it is not very good at dealing with truly novel ideas. Peer review mostly assures that all papers follow the current paradigm (see comments on Kuhn, above). It certainly does not ensure that the work has been fully vetted in terms of the data analysis and the proper application of research methods.

*Myth:* Science must be an open book. For example, every new experiment must be described so completely that any other scientist can reproduce it.

*Fact:* There is a very large component of skill in making cutting-edge experiments work. Often, the only way to import a new technique into a laboratory is to hire someone (usually a postdoctoral fellow) who has already made it work elsewhere. Nonetheless, scientists have a solemn responsibility to describe the methods they use as fully and accurately as possible. And, eventually, the skill will be acquired by enough people to make the new technique commonplace.

*Myth:* When a new theory comes along, the scientist's duty is to falsify it.

*Fact:* When a new theory comes along, the scientist's instinct is to verify it. When a theory is new, the effect of a decisive experiment that shows it to be wrong is that both the theory and the experiment are in most cases quickly forgotten. This result leads to no progress for anybody in the reward system. Only when a theory is well established and widely accepted does it pay off to prove that it is wrong.

*Myth:* University-based research is pure and free of conflicts of interest.

*Fact:* The Bayh–Dole Act of the early 1980s permits universities to patent the results of research supported by the federal government. Many universities have become adept at obtaining such patents. In many cases

48

EXHIBIT C

*How Science Works*

this raises conflict-of-interest problems when the universities' interest in pursuing knowledge comes into conflict with its need for revenue. This is an area that has generated considerable scrutiny. For instance, the recent Institute of Medicine report *Conflict of Interest in Medical Research, Education, and Practice* sheds light on the changing dimensions of conflicts of interest associated with growing interdisciplinary collaborations between individuals, universities, and industry especially in life sciences and biomedical research.[14]

*Myth:* Real science is easily distinguished from pseudoscience.

*Fact:* This is what philosophers call the problem of demarcation: One of Popper's principal motives in proposing his standard of falsifiability was precisely to provide a means of demarcation between real science and impostors. For example, Einstein's general theory of relativity (with which Popper was deeply impressed) made clear predictions that could certainly be falsified if they were not correct. In contrast, Freud's theories of psychoanalysis (with which Popper was far less impressed) could never be proven wrong. Thus, to Popper, relativity was science but psychoanalysis was not.

Real scientists do not behave as Popper says they should, and there is another problem with Popper's criterion (or indeed any other criterion) for demarcation: Would-be scientists read books too. If it becomes widely accepted (and to some extent it has) that falsifiable predictions are the signature of real science, then pretenders to the throne of science will make falsifiable predictions too.[15] There is no simple, mechanical criterion for distinguishing real science from something that is not real science. That certainly does not mean, however, that the job cannot be done. As I discuss below, the Supreme Court, in the *Daubert* decision, has made a respectable stab at showing how to do it.[16]

14. Institute of Medicine, Conflict of Interest in Medical Research, Education, and Practice (Bernard Lo & Marilyn Field eds., 2009).

15. For a list of such pretenders, see Larry Laudan, Beyond Positivism and Relativism 219 (1996).

16. The Supreme Court in *Daubert* identified four nondefinitive factors that were thought to be illustrative of characteristics of scientific knowledge: testability or falsifiability, peer review, a known or potential error rate, and general acceptance within the scientific community. 509 U.S. at 590. Subsequent cases have expanded on these factors. *See, e.g., In re* TMI Litig. Cases Consol. II, 911 F. Supp. 775, 787 (M.D. Pa. 1995) (which considered the following additional factors: the relationship of the technique to methods that have been established to be reliable, the qualifications of the expert witness testifying based on the methodology, the nonjudicial uses of the method, logical or internal consistency of the hypothesis, the consistency of the hypothesis with accepted theories, and the precision of the hypothesis or theory). *See generally* Bert Black et al., *Science and the Law in the Wake of* Daubert*: A New Search for Scientific Knowledge,* 72 Tex. L. Rev. 715, 783–84 (1994) (discussion of expanded list of factors).

EXHIBIT C

*Reference Manual on Scientific Evidence*

*Myth:* Scientific theories are just that: theories. All scientific theories are eventually proved wrong and are replaced by other theories.

*Fact:* The things that science has taught us about how the world works are the most secure elements in all of human knowledge. Here I must distinguish between science at the frontiers of knowledge (where by definition we do not yet understand everything and where theories are indeed vulnerable) and textbook science that is known with great confidence. Matter is made of atoms, DNA transmits the blueprints of organisms from generation to generation, light is an electromagnetic wave—these things are not likely to be proved wrong. The theory of relativity and the theory of evolution are in the same class and are still called "theories" for historic reasons only.[17] The GPS device in my car routinely uses the general theory of relativity to make calculations accurate enough to tell me exactly where I am and to take me to my destination with unerring precision. The phenomenon of natural selection has been observed under numerous field conditions as well as in controlled laboratory experiments.

In recent times, the courts have had much to say about the teaching of the theory of evolution in public schools.[18] In one instance the school district decided that students should be taught the "gaps/problems" in Darwin's theory and given "Intelligent Design" as an alternative explanation. The courts (Judge Jones of the United States District Court for the Middle District of Pennsylvania) came down hard on the side of Darwin, ruling that "Intelligent Design" was thinly disguised religion that had no place in the science classroom.

It should be said here that the incorrect notion that all theories must eventually be wrong is fundamental to the work of both Popper and Kuhn, and these theorists have been crucial in helping us understand how science works. Thus, their theories, like good scientific theories at the frontiers of knowledge, can be both useful and wrong.

*Myth:* Scientists are people of uncompromising honesty and integrity.

*Fact:* They would have to be if Bacon were right about how science works, but he was not. Most scientists are rigorously honest where honesty matters most to them: in the reporting of scientific procedures and data in peer-reviewed publications. In all else, they are ordinary mortals.

---

17. According to the National Academy of Sciences and Institute of Medicine's 2008 report *Science, Evolution, and Creationism*, "the strength of a theory rests in part on providing scientists with the basis to explain observed phenomena and to predict what they are likely to find when exploring new phenomena and observations." The report also helps differentiate a theory from a hypothesis, the latter being testable natural explanations that may offer tentative scientific insights.

18. *Kitzmiller v. Dover Area School District*, 400 F. Supp. 2d 707 (M.D. Pa. 2005).

50

**EXHIBIT C**

*How Science Works*

# VI. Comparing Science and the Law

Science and the law differ both in the language they use and the objectives they seek to accomplish.

## A. Language

Oscar Wilde (and G.B. Shaw too) once remarked that the United States and England are two nations divided by a common language. Something similar can be said, with perhaps more truth (if less wit), of science and the law. There are any number of words commonly used in both disciplines, but with different meanings.

For example, the word *force*, as it is used by lawyers, has connotations of violence and the domination of one person's will over another, when used in phrases such as "excessive use of force" and "forced entry." In science, *force* is something that when applied to a body, causes its speed and direction of motion to change. Also, all forces arise from a few fundamental forces, most notably gravity and the electric force. The word carries no other baggage.

In contrast, the word *evidence* is used much more loosely in science than in law. The law has precise rules of evidence that govern what is admissible and what is not. In science, the word merely seems to mean something less than "proof." A certain number of the papers in any issue of a scientific journal will have titles that begin with "Evidence for (or against) . . ." What that means is, the authors were not able to prove their point, but are presenting their results anyway.

The word *theory* is a particularly interesting example of a word that has different meanings in each discipline. A legal theory is a proposal that fits the known facts and legal precedents and that favors the attorney's client. What's required of a theory in science is that it make new predictions that can be tested by new experiments or observations and falsified or verified (as discussed above).

Even the word *law* has different meanings in the two disciplines. To a legal practitioner, a law is something that has been promulgated by some human authority, such as a legislature or parliament. In science, a law is a law of nature, something that humans can hope to discover and describe accurately, but that can never be changed by any human authority or intervention.

My final example is, to me, the most interesting of all. It is the word *error*. In the law, and in common usage, *error* and *mistake* are more or less synonymous. A legal decision can be overturned if it is found to be contaminated by judicial error. In science, however, *error* and *mistake* have different meanings. Anyone can make a mistake, and scientists have no obligation to report theirs in the scientific literature. They just clean up the mess and go on to the next attempt. Error, on the other hand, is intrinsic to any measurement, and far from ignoring it or covering it up or even attempting to eliminate it, authors of every paper about a scientific experiment will include a careful analysis of the errors to put limits on

51

EXHIBIT C

*Reference Manual on Scientific Evidence*

the uncertainty in the measured result. To make mistakes is human, one might say, but error is intrinsic to our interaction with nature, and is therefore part of science.

## B. Objectives

Beyond the meanings of certain key words, science and the law differ fundamentally in their objectives. The objective of the law is justice; that of science is truth.[19] These are among the highest goals to which humans can aspire, but they are not the same thing. Justice, of course, also seeks truth, but it requires that clear decisions be made in a reasonable and limited period of time. In the scientific search for truth there are no time limits and no point at which a final decision must be made.

And yet, despite all these differences, science and the law share, at the deepest possible level, the same aspirations and many of the same methods. Both disciplines seek, in structured debate and using empirical evidence, to arrive at rational conclusions that transcend the prejudices and self-interest of individuals.

# VII. A Scientist's View of *Daubert*

In the 1993 *Daubert* decision, the U.S. Supreme Court took it upon itself to resolve, once and for all, the knotty problem of the demarcation between science and pseudoscience. Better yet, it undertook to enable every federal judge to solve that problem in deciding the admissibility of each scientific expert witness in every case that arises. In light of all the uncertainties discussed in this chapter, it must be considered an ambitious thing to do.[20]

The presentation of scientific evidence in a court of law is a kind of shotgun marriage between the two disciplines. Both are obliged to some extent to yield

19. This point was made eloquently by D. Allen Bromley in Science and the Law, Address at the 1998 Annual Meeting of the American Bar Association (Aug. 2, 1998).

20. Chief Justice Rehnquist, responding to the majority opinion in *Daubert*, was the first to express his uneasiness with the task assigned to federal judges, as follows: "I defer to no one in my confidence in federal judges; but I am at a loss to know what is meant when it is said that the scientific status of a theory depends on its 'falsifiability,' and I suspect some of them will be, too." 509 U.S. at 579 (Rehnquist, C.J., concurring in part and dissenting in part). His concern was then echoed by Judge Alex Kozinski when the case was reconsidered by the U.S. Court of Appeals for the Ninth Circuit following remand by the Supreme Court. 43 F.3d 1311, 1316 (9th Cir. 1995) ("Our responsibility, then, unless we badly misread the Supreme Court's opinion, is to resolve disputes among respected, well-credentialed scientists about matters squarely within their expertise, in areas where there is no scientific consensus as to what is and what is not 'good science,' and occasionally to reject such expert testimony because it was not 'derived by the scientific method.' Mindful of our position in the hierarchy of the federal judiciary, we take a deep breath and proceed with this heady task.").

EXHIBIT C

*How Science Works*

to the central imperatives of the other's way of doing business, and it is likely that neither will be shown in its best light. The *Daubert* decision is an attempt (not the first, of course) to regulate that encounter. Judges are asked to decide the "evidential reliability" of the intended testimony, based not on the conclusions to be offered, but on the methods used to reach those conclusions.

In particular, *Daubert* says, the methods should be judged by the following four criteria:

1. The theoretical underpinnings of the methods must yield testable predictions by means of which the theory could be falsified.
2. The methods should preferably be published in a peer-reviewed journal.
3. There should be a known rate of error that can be used in evaluating the results.
4. The methods should be generally accepted within the relevant scientific community.

In reading these four illustrative criteria mentioned by the Court, one is struck immediately by the specter of Karl Popper looming above the robed justices. (It is no mere illusion. The dependence on Popper is explicit in the written decision.) Popper alone is not enough, however, and the doctrine of falsification is supplemented by a bow to the institution of peer review, an acknowledgment of the scientific meaning of error, and a paradigm check (really, an inclusion of the earlier *Frye* standard).[21]

The *Daubert* case and two others (*General Electric v. Joiner*,[22] and *Kumho Tires v. Carmichael*[23]) have led to increasing attention on the part of judges to scientific and technical issues and have led to the increased exclusion of expert testimony, but the *Daubert* criteria seem too general to resolve many of the difficult decisions the courts face when considering scientific evidence. Nonetheless, despite some inconsistency in rulings by various judges, the *Daubert* decision has given the courts new flexibility, and so far, it has stood the test of time.

All in all, I would give the decision pretty high marks.[24] The justices ventured into the treacherous crosscurrents of the philosophy of science—where even most scientists fear to tread—and emerged with at least their dignity intact. Falsifiability may not be a good way of doing science, but it is not the worst a posteriori way to judge science, and that is all that's required here. At least they managed to avoid the Popperian trap of demanding that the scientists be skeptical of their own ideas.

21. In *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), the court stated that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community.

22. 522 U.S. 136 (1997).

23. 526 U.S. 137 (1999).

24. For a contrary view, see Gary Edmond & David Mercer, *Recognizing Daubert: What Judges Should Know About Falsification*, 5 Expert Evid. 29–42 (1996).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

The other considerations help lend substance and flexibility.[25] The jury is still out (so to speak) on how well this decision will work in practice, but it is certainly an impressive attempt to serve justice, if not truth. Applying it in practice will never be easy, but then that is what this manual is about.[26]

25. *See supra* note 16.

26. For further reading, see John Ziman, PublicKnowledge: An Essay Concerning the Social Dimension of Science (Cambridge University Press 1968).

54

EXHIBIT C

# Reference Guide on Forensic Identification Expertise

PAUL C. GIANNELLI, EDWARD J. IMWINKELRIED, AND JOSEPH L. PETERSON

*Paul C. Giannelli, L.L.M, is Albert J. Weatherhead III and Richard W. Weatherhead Professor of Law, and Distinguished University Professor, Case Western Reserve University.*

*Edward J. Imwinkelried, J.D., is Edward L. Barrett, Jr. Professor of Law and Director of Trial Advocacy, University of California, Davis.*

*Joseph L. Peterson, D.Crim., is Professor of Criminal Justice and Criminalistics, California State University, Los Angeles.*

CONTENTS

  I.  Introduction, 57
 II.  Development of Forensic Identification Techniques, 58
III.  Reappraisal of Forensic Identification Expertise, 60
      A.  DNA Profiling and Empirical Testing, 60
      B.  *Daubert* and Empirical Testing, 62
 IV.  National Research Council Report on Forensic Science, 64
      A.  Research, 66
      B.  Observer Effects, 67
      C.  Accreditation and Certification, 68
      D.  Proficiency Testing, 69
      E.  Standard Terminology, 70
      F.  Laboratory Reports, 70
  V.  Specific Techniques, 71
      A.  Terminology, 71
 VI.  Fingerprint Evidence, 72
      A.  The Technique, 73
      B.  The Empirical Record, 76
          1.  Proficiency testing, 78
          2.  The Mayfield case, 79
      C.  Case Law Development, 81
VII.  Handwriting Evidence, 83
      A.  The Technique, 83
      B.  The Empirical Record, 85
          1.  Comparison of experts and laypersons, 86
          2.  Proficiency studies comparing experts' performance to chance, 87

EXHIBIT C

*Reference Manual on Scientific Evidence*

C.  Case Law Development, 89
VIII. Firearms Identification Evidence, 91
    A.  The Technique, 91
        1.  Firearms, 91
        2.  Ammunition, 92
        3.  Class characteristics, 92
        4.  Subclass characteristics, 93
        5.  Individual characteristics, 93
        6.  Consecutive matching striae, 94
        7.  Cartridge identification, 94
        8.  Automated identification systems, 95
        9.  Toolmarks, 96
    B.  The Empirical Record, 97
    C.  Case Law Development, 100
IX.  Bite Mark Evidence, 103
    A.  The Technique, 104
        1.  Theory of uniqueness, 105
        2.  Methods of comparison, 106
        3.  ABFO Guidelines, 107
    B.  The Empirical Record, 108
        1.  DNA exonerations, 109
    C.  Case Law Development, 110
        1.  Specificity of opinion, 111
        2.  Post–*Daubert* cases, 112
X.  Microscopic Hair Evidence, 112
    A.  The Technique, 112
    B.  The Empirical Record, 113
        1.  Mitochondrial DNA, 116
        2.  Proficiency testing, 116
        3.  DNA exonerations, 117
    C.  Case Law Development, 117
XI.  Recurrent Problems, 120
    A.  Clarity of Testimony, 120
    B.  Limitations on Testimony, 121
    C.  Restriction of Final Argument, 124
XII. Procedural Issues, 124
    A.  Pretrial Discovery, 125
        1.  Testifying beyond the report, 126
    B.  Defense Experts, 127

**EXHIBIT C**

*Reference Guide on Forensic Identification Expertise*

# I. Introduction

Forensic identification expertise encompasses fingerprint, handwriting, and fire-arms ("ballistics"), and toolmark comparisons, all of which are used by crime laboratories to associate or dissociate a suspect with a crime. Shoe and tire prints also fall within this large pattern evidence domain. These examinations consist of comparing a known exemplar with evidence collected at a crime scene or from a suspect. Bite mark analysis can be added to this category, although it developed within the field of forensic dentistry as an adjunct of dental identification and is not conducted by crime laboratories. In a broad sense, the category includes trace evidence such as the analysis of hairs, fibers, soil, glass, and wood. Some forensic disciplines attempt to individuate and thus attribute physical evidence to a par-ticular source—a person, object, or location.[1] Other techniques are useful because they narrow possible sources to a discrete category based upon what are known as "class characteristics" (as opposed to "individual characteristics"). Moreover, some techniques are valuable because they eliminate possible sources.

Following this introduction, Part II of this guide sketches a brief history of the development of forensic expertise and crime laboratories. Part III discusses the impact of the advent of DNA analysis and the Supreme Court's 1993 *Daubert* decision,[2] developments that prompted a reappraisal of the trustworthiness of tes-timony by forensic identification experts. Part IV focuses on the 2009 National Research Council (NRC) report on forensic science.[3] Parts V through X examine specific identification techniques: (1) fingerprint analysis, (2) questioned document examination, (3) firearms and toolmark identification, (4) bite mark comparison, and (5) microscopic hair analysis. Part XI considers recurrent problems, including the clarity of expert testimony, limitations on its scope, and restrictions on closing arguments. Part XII addresses procedural issues—pretrial discovery and access to defense experts.

---

1. Some forensic scientists believe the word *individualization* is more accurate than *identification*. Paul L. Kirk, *The Ontogeny of Criminalistics*, 54 J. Crim. L., Criminology & Police Sci. 235, 236 (1963). The identification of a substance as heroin, for example, does not individuate, whereas a fingerprint identification does.

2. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). *Daubert* is discussed in Margaret A. Berger, The Admissibility of Expert Testimony, in this manual.

3. National Research Council, Strengthening Forensic Science in the United States: A Path Forward (2009) [hereinafter NRC Forensic Science Report], *available at* http://www.nap.edu/catalog.php?record_id=12589.

EXHIBIT C

*Reference Manual on Scientific Evidence*

# II. Development of Forensic Identification Techniques

An understanding of the current issues requires some appreciation of the past. The first reported fingerprint case was decided in 1911.[4] This case preceded the establishment of the first American crime laboratory, which was created in Los Angeles in 1923.[5] The Federal Bureau of Investigation (FBI) laboratory came online in 1932. At its inception, the FBI laboratory staff included only firearms identification and fingerprint examination.[6] Handwriting comparisons, trace evidence examinations, and serological testing of blood and semen were added later. When initially established, crime laboratories handled a modest number of cases. For example, in its first full year of operation, the FBI laboratory processed fewer than 1000 cases.[7]

Several sensational cases in these formative years highlighted the value of forensic identification evidence. The Sacco and Vanzetti trial in 1921 was one of the earliest cases to rely on firearms identification evidence.[8] In 1935, the extensive use of handwriting comparison testimony[9] and wood evidence[10] at the Lindbergh kidnapping trial raised the public consciousness of identification expertise and solidified its role in the criminal justice system. Crime laboratories soon sprang up in other large cities such as Chicago and New York.[11] The num-

---

4.  People v. Jennings, 96 N.E. 1077 (Ill. 1911).

5.  *See* John I. Thornton, *Criminalistics: Past, Present and Future*, 11 Lex et Scientia 1, 23 (1975) ("In 1923, Vollmer served as Chief of Police of the City of Los Angeles for a period of one year. During that time, a crime laboratory was established at his direction.").

6.  *See* Federal Bureau of Investigation, U.S. Department of Justice, FBI Laboratory 3 (1981), *available at* http://www.ncjrs.gov/App/publications/Abstract.aspx?id=78689.

7.  *See Anniversary Report, 40 Years of Distinguished Scientific Assistance to Law Enforcement,* FBI Law Enforcement Bull., Nov. 1972, at 4 ("During its first month of service, the FBI Laboratory examiners handled 20 cases. In its first full year of operation, the volume increased to a total of 963 examinations. By the next year that figure more than doubled.").

8.  *See* G. Louis Joughin & Edmund M. Morgan, The Legacy of Sacco & Vanzetti 15 (1948); *see also* James E. Starrs, *Once More Unto the Breech: The Firearms Evidence in the Sacco and Vanzetti Case Revisited*, Parts I & II, 31 J. Forensic Sci. 630, 1050 (1986).

9.  *See* D. Michael Risinger et al., *Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise,"* 137 U. Pa. L. Rev. 731, 738 (1989).

10.  *See* Shirley A. Graham, *Anatomy of the Lindbergh Kidnapping,* 42 J. Forensic Sci. 368 (1997). The kidnapper had used a wooden ladder to reach the second-story window of the child's bedroom. Arthur Koehler, a wood technologist and identification expert for the Forest Products Laboratory of the U.S. Forest Service, traced part of the ladder's wood from its mill source to a lumberyard near the home of the accused. Relying on plant anatomical comparisons, he also testified that a piece of the ladder came from a floorboard in the accused's attic.

11.  *See* Joseph L. Peterson, *The Crime Lab*, *in* Thinking About Police 184, 185 (Carl Klockars ed., 1983) ("[T]he Chicago Crime Laboratory has the distinction of being one of the oldest in the country. Soon after, however, many other jurisdictions also built police laboratories in an attempt to cope with the crimes of violence associated with the 1930s gangster era.").

**EXHIBIT C**

*Reference Guide on Forensic Identification Expertise*

ber of laboratories gradually grew and then skyrocketed. The national campaign against drug abuse led most crime laboratories to create forensic chemistry units, and today the analysis of suspected contraband drugs constitutes more than 50% of the caseload of many laboratories.[12] By 2005, the nation's crime laboratories were handling approximately 2.7 million cases every year.[13] According to a 2005 census, there are now 389 publicly funded crime laboratories in the United States: 210 state or regional laboratories, 84 county laboratories, 62 municipal laboratories, and 33 federal laboratories.[14] Currently, these laboratories employ more than 11,900 full-time staff members.[15]

The establishment of crime laboratories represented a significant reform in the types of evidence used in criminal trials. Previously, prosecutors had relied primarily on eyewitness testimony and confessions. The reliability of physical evidence is often superior to that of other types of proof.[16] However, the seeds of the current controversies over forensic identification expertise were sown during this period. Even though the various techniques became the stock and trade of crime laboratories, many received their judicial imprimatur without a critical evaluation of the supporting scientific research.[17]

This initial lack of scrutiny resulted, in part, from the deference that previous standards of admissibility accorded the community of specialists in the various fields of expert testimony. In 1923, the D.C. Circuit adopted the "general accep-

12. J. Peterson & M. Hickman, Bureau of Just. Stat. Bull. (Feb. 2005), NCJ 207205. In most cases, the forensic chemist simply identifies the unknown as a particular drug. However, in some cases the chemist attempts to individuate and establish that several drug samples originated from the same production batch at a particular illegal drug laboratory. *See* Fabrice Besacier et al., *Isotopic Analysis of 13C as a Tool for Comparison and Origin Assignment of Seized Heroin Samples,* 42 J. Forensic Sci. 429 (1997); C. Sten et al., *Computer Assisted Retrieval of Common-Batch Members in Leukart Amphetamine Profiling,* 38 J. Forensic Sci. 1472 (1993).

13. Matthew R. Durose, *Crime Labs Received an Estimated 2.7 Million Cases in 2005*, Bureau of Just. State. Bull. (July 2008) NCJ 222181, *available at* http://pjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&lid=490 (summarizing statistics compiled by the Justice Department's Bureau of Justice Statistics).

14. NRC Forensic Science Report, *supra* note 3, at 58.

15. *Id.* at 59.

16. For example, in 1927, Justice Frankfurter, then a law professor, sharply critiqued the eyewitness identifications in the Sacco and Vanzetti case. *See* Felix Frankfurter, The Case of Sacco and Vanzetti 30 (1927) ("What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy."). In 1936, the Supreme Court expressed grave reservations about the trustworthiness of confessions wrung from a suspect by abusive interrogation techniques. *See* Brown v. Mississippi, 297 U.S. 278 (1936) (due process violated by beating a confession out of a suspect).

17. "[F]ingerprints were accepted as an evidentiary tool without a great deal of scrutiny or skepticism" of their underlying assumptions. Jennifer L. Mnookin, *Fingerprint Evidence in an Age of DNA Profiling*, 67 Brook. L. Rev. 13, 17 (2001); *see also* Risinger et al., *supra* note 9, at 738 ("Our literature search for empirical evaluation of handwriting identification turned up one primitive and flawed validity study from nearly 50 years ago, one 1973 paper that raises the issue of consistency among examiners but presents only uncontrolled impressionistic and anecdotal information not qualifying as data in any rigorous sense, and a summary of one study in a 1978 government report. Beyond this, nothing.").

EXHIBIT C

*Reference Manual on Scientific Evidence*

tance" test for determining the admissibility of scientific evidence. The case, *Frye
v. United States*,[18] involved a precursor of the modern polygraph. Although the
general acceptance test was limited to mostly polygraph cases for several decades, it
eventually became the majority pre-*Daubert* standard.[19] However, under that test,
scientific testimony is admissible if the underlying theory or technique is generally
accepted by the specialists within the expert's field. The *Frye* test did not require
foundational proof of the empirical validity of the technique's scientific premises.

# III. Reappraisal of Forensic Identification Expertise

The advent of DNA profiling in the late 1980s, quickly followed by the Supreme
Court's 1993 *Daubert* decision (rejecting *Frye*), prompted a reassessment of iden-
tification expertise.[20]

## A. DNA Profiling and Empirical Testing

In many ways, DNA profiling revolutionized the use of expert testimony in crimi-
nal cases.[21] Population geneticists, often affiliated with universities, used statistical
techniques to define the extent to which a match of DNA markers individuated
the accused as the possible source of the crime scene sample.[22] Typically, the
experts testified to a random-match probability, supporting their opinions by
pointing to extensive empirical testing.

The fallout from the introduction of DNA analysis in criminal trials was sig-
nificant in three ways. First, DNA profiling became the gold standard, regarded
as the most reliable of all forensic techniques.[23] NRC issued two reports on the

---

18. 293 F. 1013 (D.C. Cir. 1923).

19. *Frye* was cited only five times in published opinions before World War II, mostly in poly-
graph cases. After World War II, it was cited 6 times before 1950, 20 times in the 1950s, and 21 times
in the 1960s. Bert Black et al., *Science and the Law in the Wake of* Daubert: *A New Search for Scientific
Knowledge*, 72 Tex. L. Rev. 715, 722 n.30 (1994).

20. *See* Michael J. Saks & Jonathan J. Koehler, *The Coming Paradigm Shift in Forensic Identification
Science*, 309 Science 892 (2005).

21. *See* People v. Wesley, 533 N.Y.S.2d 643, 644 (County Ct. 1988) (calling DNA evidence the
"single greatest advance in the 'search for truth' . . . since the advent of cross-examination").

22. DNA Profiling is examined in detail in David H. Kaye & George Sensabaugh, Reference
Guide on DNA Identification Evidence, in this manual.

23. *See* Michael Lynch, *God's Signature: DNA Profiling, The New Gold Standard in Forensic Science*, 27
Endeavour 2, 93 (2003); Joseph L. Peterson & Anna S. Leggett, *The Evolution of Forensic Science: Progress
Amid the Pitfalls,* 36 Stetson L. Rev. 621, 654 (2007) ("The scientific integrity and reliability of DNA test-
ing have helped DNA replace fingerprinting and made DNA evidence the new 'gold standard' of forensic
evidence"); *see also* NRC Forensic Science Report, *supra* note 3, at 40–41 (the ascendancy of DNA).

60

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

subject, emphasizing the importance of certain practices: "No laboratory should let its results with a new DNA typing method be used in court, unless it has undergone . . . proficiency testing via blind trials."[24] Commentators soon pointed out the broader implications of this development:

> The increased use of DNA analysis, which has undergone extensive validation, has thrown into relief the less firmly credentialed status of other forensic science identification techniques (fingerprints, fiber analysis, hair analysis, ballistics, bite marks, and tool marks). These have not undergone the type of extensive testing and verification that is the hallmark of science elsewhere.[25]

Second, the DNA admissibility battles highlighted the absence of mandatory regulation of crime laboratories.[26] This situation began to change with the passage of the DNA Identification Act of 1994,[27] the first federal statute regulating a crime laboratory procedure. The Act authorized the creation of a national database for the DNA profiles of convicted offenders as well as a database for unidentified profiles from crime scenes: the Combined DNA Index System (CODIS). Bringing CODIS online was a major undertaking, and its successful operation required an effective quality assurance program. As one government report noted, "the integrity of the data contained in CODIS is extremely important since the DNA matches provided by CODIS are frequently a key piece of evidence linking a suspect to a crime."[28] The statute also established a DNA Advisory Board (DAB) to assist in promulgating quality assurance standards[29] and required proficiency

24. National Research Council, DNA Technology in Forensic Science 55 (1992) [hereinafter NRC I], *available at* http://www.nap.edu/catalog.php?record _id=1866. A second report followed. *See* National Research Council, The Evaluation of Forensic DNA Evidence (1996), *available at* http://www.nap.edu/catalog.php/record_id=5141. The second report also recommended proficiency testing. *Id*. at 88 (Recommendation 3.2: "Laboratories should participate regularly in proficiency tests, and the results should be available for court proceedings.").

25. Donald Kennedy & Richard A. Merrill, *Assessing Forensic Science*, 20 Issues in Sci. & Tech. 33, 34 (2003); *see also* Michael J. Saks & Jonathan J. Koehler, *What DNA "Fingerprinting" Can Teach the Law About the Rest of Forensic Science*, 13 Cardozo L. Rev. 361, 372 (1991) ("[F]orensic scientists, like scientists in all other fields, should subject their claims to methodologically rigorous empirical tests. The results of these tests should be published and debated."); Sandy L. Zabell, *Fingerprint Evidence*, 13 J.L. & Pol'y 143, 143 (2005) ("DNA identification has not only transformed and revolutionized forensic science, it has also created a new set of standards that have raised expectations for forensic science in general.").

26. In 1989, Eric Lander, a prominent molecular biologist who became enmeshed in the early DNA admissibility disputes, wrote: "At present, forensic science is virtually unregulated—with the paradoxical result that clinical laboratories must meet higher standards to be allowed to diagnose strep throat than forensic labs must meet to put a defendant on death row." Eric S. Lander, *DNA Fingerprinting on Trial*, 339 Nature 501, 505 (1989).

27. 42 U.S.C. § 14131 (2004).

28. Office of Inspector General, U.S. Department of Justice, Audit Report, The Combined DNA Index System, ii (2001), *available at* http://www.justice.gov/oig/reports/FBI/a0126/final.pdf.

29. 42 U.S.C. § 14131(b). The legislation contained a "sunset" provision; DAB would expire after 5 years unless extended by the Director of the FBI. The board was extended for several months and then ceased to exist. The FBI had established the Technical Working Group on DNA Identifica-

61

EXHIBIT C

testing for FBI analysts as well as those in laboratories participating in the national database or receiving federal funding.[30]

Third, the use of DNA evidence to exonerate innocent convicts led to a reexamination of the evidence admitted to secure their original convictions.[31] Some studies indicated that, after eyewitness testimony, forensic identification evidence was one of the most common types of testimony that jurors relied on at the earlier trials in returning erroneous verdicts.[32] These studies suggested that flawed forensic analyses may have contributed to the convictions.[33]

## B. Daubert *and Empirical Testing*

The second major development prompting a reappraisal of forensic identification evidence was the *Daubert* decision.[34] Although there was some uncertainty about the effect of the decision at the time *Daubert* was decided, the Court's subsequent cases, *General Electric Co. v. Joiner*[35] and *Kumho Tire Co. v. Carmichael,*[36] signaled

tion Methods (TWGDAM) in 1988 to develop standards. TWGDAM functioned under DAB. It was renamed the Scientific Working Group on DNA Analysis Methods (SWGDAM) in 1999 and replaced DAB when the latter expired.

30. 42 U.S.C. § 14132(b)(2) (2004) (external proficiency testing for CODIS participation); *id*. § 14133(a)(1)(A) (2004) (FBI examiners). DAB Standard 13 implements this requirement. The Justice for All Act, enacted in 2004, amended the statute, requiring all DNA labs to be accredited within 2 years "by a nonprofit professional association of persons actively involved in forensic science that is nationally recognized within the forensic science community" and to "undergo external audits, not less than once every 2 years, that demonstrate compliance with standards established by the Director of the Federal Bureau of Investigation." 42 U.S.C. § 14132(b)(2).

31. *See* Samuel R. Gross et al., *Exonerations in the United States 1989 Through 2003*, 95 J. Crim. L. & Criminology 523, 543 (2005).

32. A study of 200 DNA exonerations found that expert testimony (55%) was the second leading type of evidence (after eyewitness identifications, 79%) used in the wrongful conviction cases. Pre-DNA serology of blood and semen evidence was the most commonly used technique (79 cases). Next came hair evidence (43 cases), soil comparison (5 cases), DNA tests (3 cases), bite mark evidence (3 cases), fingerprint evidence (2 cases), dog scent (2 cases), spectrographic voice evidence (1 case), shoe prints (1 case), and fibers (1 case). Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 81 (2008). These data do not necessarily mean that the forensic evidence was improperly used. For example, serological testing at the time of many of these convictions was simply not as discriminating as DNA profiling. Consequently, a person could be included using these serological tests but be excluded by DNA analysis. Yet, some evidence was clearly misused. *See also* Paul C. Giannelli, *Wrongful Convictions and Forensic Science: The Need to Regulate Crime Labs*, 86 N.C. L. Rev. 163, 165–70, 172–207 (2007).

33. *See* Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2537 (2009) (citing Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1, 34–84 (2009)). *See also* Brandon L. Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong, ch. 4 (2011).

34. *Daubert* is discussed in detail in Margaret A. Berger, The Admissibility of Expert Testimony, in this manual.

35. 522 U.S. 136 (1997).

36. 526 U.S. 137 (1999).

EXHIBIT C

that the *Daubert* standard may often be more demanding than the traditional *Frye* standard.[37] *Kumho* extended the reliability requirement to all types of expert testimony, and in 2000, the Court characterized *Daubert* as imposing an "exacting" standard for the admissibility of expert testimony.[38]

*Daubert's* impact in civil cases is well documented.[39] Although *Daubert's* effect on criminal litigation has been less pronounced,[40] it nonetheless has partially changed the legal landscape. Defense attorneys invoked *Daubert* as the basis for mounting attacks on forensic identification evidence, and a number of courts view the *Daubert* trilogy as "inviting a reexamination even of 'generally accepted' venerable, technical fields."[41] Several courts have held that a forensic technique is not exempt from Rule 702 scrutiny simply because it previously qualified for admission under *Frye*'s general acceptance standard.[42]

In addition to enunciating a new reliability test, *Daubert* listed several factors that trial judges may consider in assessing reliability. The first and most important *Daubert* factor is testability. Citing scientific authorities, the *Daubert* Court noted that a hallmark of science is empirical testing. The Court quoted Hempel:

---

37. *See* United States v. Horn, 185 F. Supp. 2d 530, 553 (D. Md. 2002) ("Under *Daubert*, . . . it was expected that it would be easier to admit evidence that was the product of new science or technology. In practice, however, it often seems as though the opposite has occurred—application of *Daubert/Kumho Tire* analysis results in the exclusion of evidence that might otherwise have been admitted under *Frye*.").

38. Weisgram v. Marley Co., 528 U.S. 440, 455 (2000).

39. *See* Lloyd Dixon & Brian Gill, Changes in the Standards of Admitting Expert Evidence in Federal Civil Cases Since the *Daubert* Decision 25 (2002) ("[S]ince *Daubert*, judges have examined the reliability of expert evidence more closely and have found more evidence unreliable as a result."); Margaret A. Berger, *Upsetting the Balance Between Adverse Interests: The Impact of the Supreme Court's Trilogy on Expert Testimony in Toxic Tort Litigation*, 64 Law & Contemp. Probs. 289, 290 (2001) ("The Federal Judicial Center conducted surveys in 1991 and 1998 asking federal judges and attorneys about expert testimony. In the 1991 survey, seventy-five percent of the judges reported admitting all proffered expert testimony. By 1998, only fifty-nine percent indicated that they admitted all proffered expert testimony without limitation. Furthermore, sixty-five percent of plaintiff and defendant counsel stated that judges are less likely to admit some types of expert testimony since *Daubert*.").

40. *See* Jennifer L. Groscup et al., *The Effects of* Daubert *on the Admissibility of Expert Testimony in State and Federal Criminal Cases*, 8 Psychol. Pub. Pol'y & L. 339, 364 (2002) ("[T]he *Daubert* decision did not impact on the admission rates of expert testimony at either the trial or the appellate court levels."); D. Michael Risinger, *Navigating Expert Reliability: Are Criminal Standards of Certainty Being Left on the Dock?* 64 Alb. L. Rev. 99, 149 (2000) ("[T]he heightened standards of dependability imposed on expertise proffered in civil cases has continued to expand, but . . . expertise proffered by the prosecution in criminal cases has been largely insulated from any change in pre–*Daubert* standards or approach.").

41. United States v. Hines, 55 F. Supp. 2d 62, 67 (D. Mass. 1999) (handwriting comparison); s*ee also* United States v. Hidalgo, 229 F. Supp. 2d 961, 966 (D. Ariz. 2002) ("Courts are now confronting challenges to testimony, as here, whose admissibility had long been settled"; discussing handwriting comparison).

42. *See, e.g.*, United States v. Williams, 506 F.3d 151, 162 (2d Cir. 2007) ("Nor did [*Daubert*] 'grandfather' or protect from *Daubert* scrutiny evidence that had previously been admitted under *Frye*."); United States v. Starzecpyzel, 880 F. Supp. 1027, 1040 n.14 (S.D.N.Y. 1995).

EXHIBIT C

*Reference Manual on Scientific Evidence*

"[T]he statements constituting a scientific explanation must be capable of empirical test,"[43] and then Popper: "[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability."[44] The other factors listed by the Court are generally complementary. For example, the second factor, peer review and publication, is a means to verify the results of the testing mentioned in the first factor; and in turn, verification can lead to general acceptance of the technique within the broader scientific community.[45] These factors serve as circumstantial evidence that other experts have examined the underlying research and found it to be sound. Similarly, another factor, an error rate, is derived from testing.

# IV. National Research Council Report on Forensic Science

In 2005, the Science, State, Justice, Commerce, and Related Agencies Appropriations Act became law.[46] The accompanying Senate report commented that, "[w]hile a great deal of analysis exists of the requirements of the discipline of DNA, there exists little or no analysis of the . . . needs of the [forensic] community outside of the area of DNA."[47] In the Act, Congress authorized the National Academy of Sciences (NAS) to conduct a comprehensive study of the current state of forensic science to develop recommendations. In fall 2006, the Academy established the Committee on Identifying the Needs of the Forensic Science Community within NRC to fulfill the task appointed by Congress. In February 2009, NRC released the report *Strengthening Forensic Science in the United States: A Path Forward*.[48]

---

43. Carl G. Hempel, Philosophy of Natural Science 49 (1966).

44. Karl R. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989).

45. In their amici brief in *Daubert*, the *New England Journal of Medicine* and other medical journals observed:

> "Good science" is a commonly accepted term used to describe the scientific community's system of quality control which protects the community and those who rely upon it from unsubstantiated scientific analysis. It mandates that each proposition undergo a rigorous trilogy of publication, replication and verification before it is relied upon.

Brief for the New England Journal of Medicine, Journal of the American Medical Association, and Annals of Internal Medicine as Amici Curiae supporting Respondent at *2, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) (No. 92–102), 1993 WL 13006387. Peer review's "role is to promote the publication of well-conceived articles so that the most important review, the consideration of the reported results by the scientific community, may occur after publication." *Id*. at *3.

46. Pub. L. No. 109–108, 119 Stat. 2290 (2005).

47. S. Rep. No. 109–88, at 46 (2005).

48. NRC Forensic Science Report, *supra* note 3. The Supreme Court cited the report 3 months later. Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009).

64

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

In keeping with its congressional charge, the NRC committee did not address admissibility issues. The NRC report stated: "No judgment is made about past convictions and no view is expressed as to whether courts should reassess cases that already have been tried."[49] When the report was released, the co-chair of the NRC committee stated:

> I want to make it clear that the committee's report does not mean to offer any judgments on any cases in the judicial system. The report does not assess past criminal convictions, nor does it speculate about pending or future cases. And the report offers no proposals for law reform. That was beyond our charge. Each case in the criminal justice system must be decided on the record before the court pursuant to the applicable law, controlling precedent, and governing rules of evidence. The question whether forensic evidence in a particular case is admissible under applicable law is not coterminous with the question whether there are studies confirming the scientific validity and reliability of a forensic science discipline.[50]

Yet, in one passage, the report remarked: "Much forensic evidence—including, for example, bite marks and firearm and toolmark identifications—is introduced in criminal trials without any meaningful scientific validation, determination of error rates, or reliability testing to explain the limits of the discipline."[51] Moreover, the report did discuss a number of forensic techniques and, where relevant, passages from the report are cited throughout this chapter.

As the NRC report explained, its primary focus is forward-looking—to outline an "agenda for progress."[52] The report's recommendations are wide-ranging, covering diverse topics such as medical examiner systems,[53] interoperability of the automated fingerprint systems,[54] education and training in the forensic sciences,[55] codes of ethics,[56] and homeland security issues.[57] Some recommendations are

---

49. *Id.* at 85. The report goes on to state:

> The report finds that the existing legal regime—including the rules governing the admissibility of forensic evidence, the applicable standards governing appellate review of trial court decisions, the limitations of the adversary process, and judges and lawyers who often lack the scientific expertise necessary to comprehend and evaluate forensic evidence—is inadequate to the task of curing the documented ills of the forensic science disciplines.

*Id.*

50. Harry T. Edwards, Co-Chair, Forensic Science Committee, Opening Statement of Press Conference (Feb. 18, 2009), transcript *available at* http://www.nationalacademies.org/includes/OSEdwards.pdf.

51. NRC Forensic Science Report, *supra* note 3, at 107–08.

52. *Id.* at xix.

53. Recommendation 10 (urging the replacement of the coroner with medical examiner system in medicolegal death investigation).

54. Recommendation 11.

55. Recommendation 2.

56. Recommendation 9.

57. Recommendation 12.

**EXHIBIT C**

structural—that is, the creation of an independent federal entity (to be named the National Institute of Forensic Sciences) to oversee the field[58] and the removal of crime laboratories from the "administrative" control of law enforcement agencies.[59] The National Institute of Forensic Sciences would be responsible for (1) establishing and enforcing best practices for forensic science professionals and laboratories; (2) setting standards for the mandatory accreditation of crime laboratories and the mandatory certification of forensic scientists; (3) promoting scholarly, competitive, peer-reviewed research and technical development in the forensic sciences; and (4) developing a strategy to improve forensic science research. Congressional action would be needed to establish the institute. Several other recommendations are discussed below.

## *A. Research*

The NRC report urged funding for additional research "to address issues of accuracy, reliability, and validity in the forensic science disciplines."[60] In the report's words, "[a]mong existing forensic methods, only nuclear DNA analysis has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between an evidentiary sample and a specific individual or source."[61] In another passage, the report discussed the need for further research into the premises underlying forensic disciplines other than DNA:

> A body of research is required to establish the limits and measures of performance and to address the impact of sources of variability and potential bias. Such research is sorely needed, but it seems to be lacking in most of the forensic disciplines that rely on subjective assessments of matching characteristics. These disciplines need to develop rigorous protocols to guide these subjective interpretations and pursue equally rigorous research and evaluation programs.[62]

---

58. Recommendation 1.

59. Recommendation 4.

60. *Id*. at 22 (Recommendation 3).

61. *Id*. at 100; *see also id*. at 7 & 87.

62. *Id*. at 8; *see also id*. at 15 ("Of the various facets of underresourcing, the committee is most concerned about the knowledge base. Adding more dollars and people to the enterprise might reduce case backlogs, but it will not address fundamental limitations in the capabilities of forensic science disciplines to discern valid information from crime scene evidence."); *id*. at 22 ("[S]ome forensic science disciplines are supported by little rigorous systematic research to validate the discipline's basic premises and techniques. There is no evident reason why such research cannot be conducted.").

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

## B. Observer Effects

Another recommendation focuses on research to investigate observer bias and other sources of human error in forensic examinations.[63] According to psychological theory of observer effects, external information provided to persons conducting analyses may taint their conclusions—a serious problem in techniques with a subjective component.[64] A growing body of modern research, noted in the report,[65] demonstrates that exposure to such information can affect forensic science experts. For example, a handwriting examiner who is informed that an exemplar belongs to the prime suspect in a case may be subconsciously influenced by this information.[66]

One of the first studies to document the biasing effect was a research project involving hair analysts.[67] Some recent studies involving fingerprints have found biasing.[68] Another study concluded that external information had an effect but not toward making errors. Instead, these researchers found fewer definitive and

63.  Recommendation 8:

Such programs might include studies to determine the effects of contextual bias in forensic practice (e.g., studies to determine whether and to what extent the results of forensic analyses are influenced by knowledge regarding the background of the suspect and the investigator's theory of the case). In addition, research on sources of human error should be closely linked with research conducted to quantify and characterize the amount of error.

64.  *See generally* D. Michael Risinger et al., *The* Daubert/Kumho *Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion*, 90 Cal. L. Rev. 1 (2002).

65.  NRC Forensic Science Report, *supra* note 3, at 139 n.23 & 185 n.2.

66.  *See* L.S. Miller, *Bias Among Forensic Document Examiners: A Need for Procedural Change*, 12 J. Police Sci. & Admin. 407, 410 (1984) ("The conclusions and opinions reported by the examiners supported the bias hypothesis."). Confirmation bias is another illustration. The FBI noted the problem in its internal investigation of the Mayfield case. A review by another examiner was not conducted blind—that is, the reviewer knew that a positive identification had already been made—and thus was subject to the influence of confirmation bias. Robert B. Stacey, *A Report on the Erroneous Fingerprint Individualization in the Madrid Train Bombing Case*, 54 J. Forensic Identification 707 (2004).

67.  *See* Larry S. Miller, *Procedural Bias in Forensic Science Examinations of Human Hair*, 11 Law & Hum. Behav. 157 (1987). In the conventional method, the examiner is given hair samples from a known suspect along with a report including other facts and information relating to the guilt of the suspect. "The findings of the present study raise some concern regarding the amount of unintentional bias among human hair identification examiners. . . . A preconceived conclusion that a questioned hair sample and a known hair sample originated from the same individual may influence the examiner's opinion when the samples are similar." *Id*. at 161.

68.  *See* Itiel Dror & Robert Rosenthal, *Meta-analytically Quantifying the Reliability and Biasability of Forensic Experts,* 53 J. Forensic Sci. 900 (2008); Itiel E. Dror et al., *Contextual Information Renders Experts Vulnerable to Making Erroneous Identifications*, 156 Forensic Sci. Int'l 74 (2006); Itiel Dror et al., *When Emotions Get the Better of Us: The Effect of Contextual Tap-Down Processing on Matching Fingerprints,* 19 App. Cognit. Psychol. 799 (2005).

**EXHIBIT C**

erroneous judgments.[69] In any event, forensic examinations should, to the extent feasible, be conducted "blind."[70]

## C. Accreditation and Certification

The NRC report called for the mandatory accreditation of crime labs and the certification of examiners.[71] Accreditation and certification standards should be based on recognized international standards, such as those published by the International Organization for Standardization (ISO). According to the report, no person (public or private) ought to practice or testify as a forensic expert without certification.[72] In addition, laboratories should establish "quality assurance and quality control procedures to ensure the accuracy of forensic analyses and the work of forensic practitioners."[73]

The American Society of Crime Lab Directors/Laboratory Accreditation Board (ASCLD/LAB) is the principal accrediting organization in the United States. Accreditation requirements generally include ensuring the integrity of evidence, adhering to valid and generally accepted procedures, employing qualified examiners, and operating quality assurance programs—that is, proficiency testing, technical reviews, audits, and corrective action procedures.[74] Currently, accreditation is mostly voluntary. Only a few states require accreditation of crime

---

69. Glenn Langenburg et al., *Testing for Potential Contextual Bias Effects During the Verification Stage of the ACE-V Methodology When Conducting Fingerprint Comparisons*, 54 J. Forensic Sci. 571 (2009). As the researchers acknowledge, the examiners knew that they were being tested.

70. *See* Mike Redmayne, Expert Evidence and Criminal Justice 16 (2001) ("To the extent that we are aware of our vulnerability to bias, we may be able to control it. In fact, a feature of good scientific practice is the institution of processes—such as blind testing, the use of precise measurements, standardized procedures, statistical analysis—that control for bias.").

71. Recommendation 3; *see also* NRC Forensic Science Report, *supra* note 3, at 23 ("In short, oversight and enforcement of operating standards, certification, accreditation, and ethics are lacking in most local and state jurisdictions.").

72. *Id.,* Recommendation 7. The recommendation goes on to state:

Certification requirements should include, at a minimum, written examinations, supervised practice, proficiency testing, continuing education, recertification procedures, adherence to a code of ethics, and effective disciplinary procedures. All laboratories (public or private) should be accredited and all forensic science professionals should be certified, when eligible, within a  time period estbalished by NIFS.

73. *Id.,* Recommendation 8. The recommendation further comments: "Quality control procedures should be designed to: identify mistakes, fraud, and bias; confirm the continued validity and reliability of standard operating procedures and protocols; ensure that best practices are being followed; and correct procedures and protocols that are found to need improvement."

74. *See* Jan S. Bashinski & Joseph L. Peterson, *Forensic Sciences, in* Local Government: Police Management 559, 578 (William Geller & Darrel Stephens eds., 4th ed. 2004).

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

laboratories.[75] New York mandated accreditation in 1994.[76] Texas[77] and Oklahoma[78] followed after major crime laboratory failures.

## D. Proficiency Testing

Several of the report's recommendations referred to proficiency testing,[79] of which there are several types: internal or external, and blind or nonblind (declared).[80] The results of the first Laboratory Proficiency Testing Program, sponsored by the Law Enforcement Assistance Administration (LEAA), were reported in 1978.[81] Voluntary proficiency testing continued after this study.[82] The DNA Identification Act of 1994 mandated proficiency testing for examiners at the FBI as well as for

75. The same is true for certification. NRC Forensic Science Report, *supra* note 3, at 6 ("[M]ost jurisdictions do not require forensic practitioners to be certified, and most forensic science disciplines have no mandatory certification program.").

76. N.Y. Exec. Law § 995-b (McKinney 2003) (requiring accreditation by the state Forensic Science Commission); *see also* Cal. Penal Code § 297 (West 2004) (requiring accreditation of DNA units by ASCLD/LAB or any certifying body approved by ASCLD/LAB); Minn. Stat. Ann. § 299C.156(2)(4) (West Supp. 2006) (specifying that the Forensic Science Advisory Board should encourage accreditation by ASCLD/LAB or other accrediting body).

77. Tex. Code Crim. Proc. Ann. art. 38.35 (Vernon 2004) (requiring accreditation by the Department of Public Safety). Texas also created a Forensic Science Commission. *Id.* art. 38.01 (2007).

78. Okla. Stat. Ann. tit. 74, § 150.37(D) (West 2004) (requiring accreditation by ASCLD/LAB or the American Board of Forensic Toxicology).

79. Recommendations 6 & 7.

80. Proficiency testing does not automatically correlate with a technique's "error rate." There is a question whether error rate should be based on the results of declared and/or blind proficiency tests of simulated evidence administered to crime laboratories, or if this rate should be based on the retesting of actual case evidence drawn randomly (1) from the files of crime laboratories or (2) from evidence presented to courts in prosecuted and/or contested cases.

81. Joseph L. Peterson et al., Crime Laboratory Proficiency Testing Research Program (1978) [hereinafter Laboratory Proficiency Test]. The report concluded: "A wide range of proficiency levels among the nation's laboratories exists, with several evidence types posing serious difficulties for the laboratories. . . ." *Id.* at 3. Although the proficiency tests identified few problems in certain forensic disciplines such as glass analysis, tests of other disciplines such as hair analysis produced very high rates of "unacceptable proficiency." According to the report, unacceptable proficiency was most often caused by (1) misinterpretation of test results due to carelessness or inexperience, (2) failure to employ adequate or appropriate methodology, (3) mislabeling or contamination of primary standards, and (4) inadequate databases or standard spectra. *Id.* at 258.

82. *See* Joseph L. Peterson & Penelope N. Markham, *Crime Laboratory Proficiency Testing Results, 1978–1991, Part I: Identification and Classification of Physical Evidence*, 40 J. Forensic Sci. 994 (1995); Joseph L. Peterson & Penelope N. Markham, *Crime Laboratory Proficiency Testing Results, 1978–1991, Part II: Resolving Questions of Common Origin*, 40 J. Forensic Sci. 1009 (1995). After collaborating with the Forensic Sciences Foundation in the initial LEAA-funded crime laboratory proficiency testing research program, Collaborative Testing Services, Inc. (CTS) began in 1978 to offer a fee-based testing program. Today, CTS offers samples in many scientific evidence testing areas to more than 500 forensic science laboratories worldwide. See test results at www.collaborativetesting.com/.

EXHIBIT C

analysts in laboratories that participate in the national DNA database or receive federal funding.[83]

## E. Standard Terminology

The NRC report voiced concern about the use of terms such as "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." These terms can have "a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates scientific evidence."[84] Such terms need to be defined and standardized, according to the report.

## F. Laboratory Reports

A related recommendation concerns laboratory reports and the need for model formats.[85] The NRC report commented:

> As a general matter, laboratory reports generated as the result of a scientific analysis should be complete and thorough. They should contain, at minimum, "methods and materials," "procedures," "results," "conclusions," and, as appropriate, sources and magnitudes of uncertainty in the procedures and conclusions (e.g., levels of confidence). Some forensic science laboratory reports meet this standard of reporting, but many do not. Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "the greenish, brown plant material in item #1 was identified as marijuana"), and they include no mention of methods or any discussion of measurement uncertainties.[86]

In addition, reports "must include clear characterizations of the limitations of the analyses, including measures of uncertainty in reported results and associated estimated probabilities where possible."[87]

---

83. 42 U.S.C. § 14131(c) (2005). The DNA Act authorized a study of the feasibility of blind proficiency testing; that study raised questions about the cost and practicability of this type of examination, as well as its effectiveness when compared with other methods of quality assurance such as accreditation and more stringent external case audits. Joseph L. Peterson et al.*, The Feasibility of External Blind DNA Proficiency Testing. 1. Background and Findings*, 48 J. Forensic Sci. 21, 30 (2003) ("In the extreme, blind proficiency testing is possible, but fraught with problems (including costs), and it is recommended that a blind proficiency testing program be deferred for now until it is more clear how well implementation of the first two recommendations [accreditation and external case audits] are serving the same purposes as blind proficiency testing.").

84. NRC Forensic Science Report, *supra* note 3, at 21.

85. *Id.* at 22, Recommendation 2.

86. *Id.* at 21.

87. *Id.* at 21–22.

EXHIBIT C

# V. Specific Techniques

The broad field of forensic science includes disparate disciplines such as forensic pathology, forensic anthropology, arson investigation, and gunshot residue testing.[88] The NRC report explained:

> Some of the forensic science disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks, and specimens such as hair). . . . There are also sharp distinctions between forensic practitioners who have been trained in chemistry, biochemistry, biology, and medicine (and who bring these disciplines to bear in their work) and technicians who lend support to forensic science enterprises.[89]

The report devoted special attention to forensic disciplines in which the expert's final decision is subjective in nature: "In terms of scientific basis, the analytically based disciplines generally hold a notable edge over disciplines based on expert interpretation."[90] Moreover, many of the subjective techniques attempt to render the most specific conclusions—that is, opinions concerning "individualization."[91] Following the report's example, the remainder of this chapter focuses on "pattern recognition" disciplines, each of which contains a subjective component. These disciplines exemplify most of the issues that a trial judge may encounter in ruling on the admissibility of forensic testimony. Each part describes the technique, the available empirical research, and contemporary case law.

## *A. Terminology*

Although courts often use the terms "validity" and "reliability" interchangeably, the terms have distinct meanings in scientific disciplines. "Validity" refers to the ability of a test to measure what it is supposed to measure—its accuracy. "Reliability" refers to whether the same results are obtained in each instance in which the test is performed—its consistency. Validity includes reliability, but the converse is not necessarily true. Thus, a reliable, invalid technique will consistently

---

88. Other examples include drug analysis, blood spatter examinations, fiber comparisons, toxicology, entomology, voice spectrometry, and explosives and bomb residue analysis. As the Supreme Court noted in Melendez–Diaz v. Massachusetts, 129 S. Ct. 2527, 2537–38 (2009), errors can be made when instrumental techniques, such as gas chromatography/mass spectrometry analysis, are used.

89. NRC Forensic Science Report, *supra* note 3, at 7.

90. *Id.*

91. "Often in criminal prosecutions and civil litigation, forensic evidence is offered to support conclusions about 'individualization' (sometimes referred to as 'matching' a specimen to a particular individual or other source) or about classification of the source of the specimen into one of several categories. With the exception of nuclear DNA analysis, however, no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." *Id.*

EXHIBIT C

yield inaccurate results. The Supreme Court acknowledged this distinction in *Daubert*, but the Court indicated that it was using the term "reliability" in a different sense. The Court wrote that its concern was "evidentiary reliability—that is, trustworthiness. . . . In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*."[92]

In forensic science, class and individual characteristics are distinguished. Class characteristics are shared by a group of persons or objects (e.g., ABO blood types).[93] Individual characteristics are unique to an object or person. The term "match" is ambiguous because it is sometimes used to indicate the "matching" of individual characteristics, but on other occasions it is used to refer to "matching" class characteristics (e.g., blood type A at a crime scene "matches" suspect's type A blood). Expert opinions involving "individual" and "class" characteristics raise different issues. In the former, the question is whether an individuation determination rests on a firm scientific foundation.[94] For the latter, the question is determining the size of the class.[95]

# VI. Fingerprint Evidence

Sir William Herschel, an Englishman serving in the Indian civil service, and Henry Faulds, a Scottish physician serving as a missionary in Japan, were among the first to suggest the use of fingerprints as a means of personal identification. Since 1858, Herschel had been collecting the handprints of natives for that purpose. In 1880, Faulds published an article entitled "On the Skin—Furrows

---

92. 509 U.S. at 590 n.9 ("We note that scientists typically distinguish between 'validity' (does the principle support what it purports to show?) and 'reliability' (does application of the principle produce consistent results?). . . .").

93. *See* Bashinski & Peterson, *supra* note 74, at 566 ("The forensic scientist first investigates whether items possess similar 'class' characteristics—that is, whether they possess features shared by all objects or materials in a single class or category. (For firearms evidence, bullets of the same caliber, bearing rifling marks of the same number, width, and direction of twist, share class characteristics. They are consistent with being fired from the same *type* of weapon.) The forensic scientist then attempts to determine an item's 'individuality'—the features that make one thing different from all others similar to it, including those with similar class characteristics.").

94. *See* Michael Saks & Jonathan Koehler, *The Individualization Fallacy in Forensic Science Evidence*, 61 Vand. L. Rev. 199 (2008).

95. *See* Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert *Test*, 78 Minn. L. Rev. 1345, 1356–57 (1994) ("We allow eyewitnesses to testify that the person fleeing the scene wore a yellow jacket and permit proof that a defendant owned a yellow jacket without establishing the background rate of yellow jackets in the community. Jurors understand, however, that others than the accused own yellow jackets. When experts testify about samples matching in every respect, the jurors may be oblivious to the probability concerns if no background rate is offered, or may be unduly prejudiced or confused if the probability of a match is confused with the probability of guilt, or if a background rate is offered that does not have an adequate scientific foundation.").

EXHIBIT C

of the Hand" in *Nature*.[96] Sir Francis Galton authored the first textbook on the subject.[97] Individual ridge characteristics came to be known as "Galton details."[98] Subsequently, Edward Henry, the Inspector General of Police in Bengal, realized the potential of fingerprinting for law enforcement and helped establish the Fingerprint Branch at Scotland Yard when he was recalled to England in 1901.[99]

English and American courts have accepted fingerprint identification testimony for just over a century. "The first English appellate endorsement of fingerprint identification testimony was the 1906 opinion in *Rex v. Castleton.* . . . In 1906 and 1908, Sergeant Joseph Faurot, a New York City detective who had in 1904 been posted to Scotland Yard to learn about fingerprinting, used his new training to break open two celebrated cases: in each instance fingerprint identification led the suspect to confess. . . ."[100] A 1911 Illinois Supreme Court decision, *People v. Jennings*,[101] is the first published American appellate opinion sustaining the admission of fingerprint testimony.

Over the years, fingerprint analysis became the gold standard of forensic identification expertise. In fact, proponents of new, emerging techniques in forensics would sometimes attempt to invoke onto the new techniques the prestige of fingerprint analysis. Thus, advocates of sound spectrography referred to it as "voiceprint" analysis.[102] Likewise, some early proponents of DNA typing alluded to it as "DNA fingerprinting."[103] However, as previously noted, DNA analysis has replaced fingerprint analysis as the gold standard.

## *A. The Technique*

Even a cursory study of fingerprints establishes that there is "intense variability . . . in even small areas of prints."[104] Given that variability, it is generally assumed that an identification is possible if the comparison involves two sets of clear images of all 10 fingerprints. These are known as "record" prints and are typically rolled onto a fingerprint card or digitized and scanned into an electronic file. Two complete fingerprint sets are available for comparison in some settings such as

---

96. Henry Faulds, *On the Skin—Furrows of the Hand,* 22 Nature 605 (1881). *See generally* Simon Cole, Suspect Identities: A History of Fingerprint and Criminal Identification (2001).

97. Francis Galton, Fingerprints (1892).

98. *See* Andre A. Moenssens, Scientific Evidence in Civil and Criminal Cases § 10.02, at 621 (5th ed. 2007).

99. United States v. Llera Plaza, 188 F. Supp. 2d 549, 554 (E.D. Pa. 2002).

100. *Id.* at 572.

101. 96 N.E. 1077 (Ill. 1911).

102. Kenneth Thomas, *Voiceprint—Myth or Miracle, in* Scientific and Expert Evidence 1015 (2d ed. 1981).

103. Colin Norman, *Maine Case Deals Blow to DNA Fingerprinting,* 246 Science 1556 (Dec. 22, 1989).

104. David A. Stoney, *Scientific Status, in* 4 David L. Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 32:45, at 361 (2007–2008 ed.).

EXHIBIT C

immigration matters. However, in the law enforcement setting, the task is more challenging because only a partial impression (latent print) of a single finger may be left by a criminal.

Fingerprint evidence is based on three assumptions: (1) the uniqueness of each person's friction ridges, (2) the permanence of those ridges throughout a person's life, and (3) the transferability of an impression of that uniqueness to another surface. The last point raises the most significant issue of reliability because a crime scene (latent) impression is often only a fifth of the size of the record print. Furthermore, variations in pressure and skin elasticity almost inevitably distort the impression.[105] Consequently, fingerprint impressions from the same person typically differ in some respects each time the impression is left on an object.[106]

Although fingerprint analysis is based on physical characteristics, the final step in the analysis—the formation of an opinion regarding individuation—is subjective.[107] Examiners lack population frequency data to quantify how rare or common a particular type of fingerprint characteristic is.[108] Rather, in making that judgment, the examiner relies on personal experience and discussions with colleagues. Although examiners in some countries must find a certain minimum number of points of similarities between the latent and the known before declaring a match,[109] neither the FBI nor New Scotland Yard requires any set number.[110] A single inexplicable difference between the two impressions precludes finding a match. Because there are frequently "dissimilarities" between the crime scene and record prints, the examiner must decide whether there is a *true* dis-

105. *See* United States v. Mitchell, 365 F.3d 215, 220–21 (3d Cir. 2004) ("Criminals generally do not leave behind full fingerprints on clean, flat surfaces. Rather, they leave fragments that are often distorted or marred by artifacts. . . . Testimony at the *Daubert* hearing suggested that the typical latent print is a fraction—perhaps 1/5th—of the size of a full fingerprint."). "In the jargon, artifacts are generally small amounts of dirt or grease that masquerade as parts of the ridge impressions seen in a fingerprint, while distortions are produced by smudging or too much pressure in making the print, which tends to flatten the ridges on the finger and obscure their detail." *Id.* at 221 n.1.

106. NRC Forensic Science Report, *supra* note 3, at 144 ("The impression left by a given finger will differ every time, because of inevitable variations in pressure, which change the degree of contact between each part of the ridge structure and the impression medium.").

107. *See* Commonwealth v. Patterson, 840 N.E.2d 12, 15, 16–17 (Mass. 2005) ("These latent print impressions are almost always partial and may be distorted due to less than full, static contact with the object and to debris covering or altering the latent impression"; "In the evaluation stage, . . . the examiner relies on his subjective judgment to determine whether the quality and quantity of those similarities are sufficient to make an identification, an exclusion, or neither"); Zabell, *supra* note 25, at 158 ("In contrast to the scientifically-based statistical calculations performed by a forensic scientist in analyzing DNA profile frequencies, each fingerprint examiner renders an opinion as to the similarity of friction ridge detail based on his subjective judgment.").

108. NRC Forensic Science Report, *supra* note 3, at 139–40 & 144.

109. Stoney, *supra* note 104, § 32:34, at 354–55.

110. United States v. Llera Plaza, 188 F. Supp. 2d 549, 566–71 (E.D. Pa. 2002).

EXHIBIT C

similarity, or whether the apparent dissimilarity can be discounted as an artifact or resulting from distortion.[111]

Three levels of details may be scrutinized: Level 1 details are general flow ridge patterns such as whorls, loops, and arches.[112] Level 2 details are fine ridges or minutiae such as bifurcations, dots, islands, and ridge endings.[113] These minutiae are essentially ridge discontinuities.[114] Level 3 details are "microscopic ridge attributes such as the width of a ridge, the shape of its edge, or the presence of a sweat pore near a particular ridge."[115] Within the fingerprint community there is disagreement about the usefulness and reliability of Level 3 details.[116]

FBI examiners generally follow a procedure known as analysis, comparison, evaluation, and verification (ACE-V). In the *analysis* stage, the examiner studies the latent print to determine whether the quantity and quality of details in the print are sufficient to permit further evaluation.[117] The latent print may be so fragmentary or smudged that analysis is impossible. In the *evaluation* stage, the examiner considers at least the Level 2 details, including "the type of minutiae (forks or ridge endings), their direction (loss or production of a ridge) and their relative position (how many intervening ridges there are between minutiae and how far along the ridges it is from one minutiae to the next)."[118] Again, if the examiner finds a single, inexplicable difference between the two prints, the examiner concludes that there is no match.[119] Alternatively, if the examiner concludes that there is a match, the examiner seeks *verification* by a second examiner. "[T]he friction ridge community actively discourages its members from testifying in terms of the probability of a match; when a latent print examiner testifies that two impressions

---

111. *Patterson*, 840 N.E.2d at 17 ("There is a rule of examination, the 'one-discrepancy' rule, that provides that a nonidentification finding should be made if a single discrepancy exists. However, the examiner has the discretion to ignore a possible discrepancy if he concludes, based on his experience and the application of various factors, that the discrepancy might have been caused by distortions of the fingerprint at the time it was made or at the time it was collected.").

112. *See id*. at 16 ("Level one detail involves the general ridge flow of a fingerprint, that is, the pattern of loops, arches, and whorls visible to the naked eye. The examiner compares this information to the exemplar print in an attempt to exclude a print that has very clear dissimilarities.").

113. *See id*. ("Level two details include ridge characteristics (or Galton Points) like islands, dots, and forks, formed as the ridges begin, end, join or bifurcate."). *See generally* FBI, The Science of Fingerprints (1977).

114. Stoney, *supra* note 104, § 32:31, at 350.

115. *See Patterson*, 840 N.E.2d at 16.

116. *See* Office of the Inspector General, U.S. Dep't of Justice, A Review of the FBI's Handling of the Brandon Mayfield Case, Unclassified Executive Summary 8 (Jan. 2006) *available at* www.justice. gov/oig/special/s0601/PDF list.htm. ("Because Level 3 details are so small, the appearance of such details in fingerprints is highly variable, even between different fingerprints made by the same finger. As a result, the reliability of Level 3 details is the subject of some controversy within the latent fingerprint community.").

117. NRC Forensic Science Report, *supra* note 3, at 137–38.

118. Stoney, *supra* note 104, § 32:31, at 350–51.

119. NRC Forensic Science Report, *supra* note 3, at 140.

EXHIBIT C

*Reference Manual on Scientific Evidence*

'match,' they are communicating the notion that the prints could not possibly have come from two different individuals."[120] The typical fingerprint analyst will give one of only three opinions: (1) the prints are unsuitable for analysis, (2) the suspect is definitely excluded, or (3) the latent print is definitely that of the suspect.

## *B. The Empirical Record*

At several points, the 2009 NRC report noted that there is room for human error in fingerprint analysis. For example, the report stated that because "the ACE-V method does not specify particular measurements or a standard test protocol, . . . examiners must make subjective assessments throughout."[121] The report further commented that the ACE-V method is too "broadly stated" to "qualify as a validated method for this type of analysis."[122] The report added that "[t]he latent print community in the United States has eschewed numerical scores and corresponding thresholds" and consequently relies "on primarily subjective criteria" in making the ultimate attribution decision.[123] In making the decision, the examiner must draw on his or her personal experience to evaluate such factors as "inevitable variations" in pressure, but to date these factors have not been "characterized, quantified, or compared."[124] At the conclusion of the section devoted to fingerprint analysis, the report outlined an agenda for the research it considered necessary "[t]o properly underpin the process of friction ridge identification."[125] The report noted that some of these research projects have already begun.[126]

Fingerprint analysis raises a number of scientific issues. For example, do the salient features of fingerprints remain constant throughout a person's life?[127] Few of the underlying scientific premises have been subjected to rigorous empirical investigation,[128] although some experiments have been conducted, and proficiency test results are available.

Two experimental studies were discussed at the 2000 trial in *United States v. Mitchell*[129]:

> One of the studies conducted by the government for the *Daubert* hearing [in *Mitchell*] employed the two actual latent and the known prints that were at issue in the case. These prints were submitted to 53 state law enforcement agency

120. *Id.* at 140–41.
121. *Id.* at 139.
122. *Id.* at 142.
123. *Id.* at 141.
124. *Id.* at 144.
125. *Id.*
126. *Id.*
127. Stoney, *supra* note 104, § 32:21, at 342.
128. *See* Zabell, *supra* note 25, at 164 ("Although there is a substantial literature on the uniqueness of fingerprints, it is surprising how little true scientific support for the proposition exists.").
129. 365 F.3d 215 (3d Cir. 2004).

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

crime laboratories around the country for their evaluation. Though, of the 35 that responded, most concluded that the latent and known prints matched, eight said that no match could be made to one of the prints and six said that no match could be made to the other print.[130]

Although there were no false positives, a significant percentage of the participating laboratories reported at best inconclusive findings.

Lockheed–Martin conducted the second test, the FBI–sponsored 50K study. This was an empirical study of 50,000 fingerprint images taken from the FBI's Automated Fingerprint System, a computer database. The study

> was an effort to obtain an estimate of the probability that one person's fingerprints would be mistaken for those of another person, at least to a computer system designed to match fingerprints. The FBI asked Lockheed–Martin, the manufacturer of its . . . automated fingerprint identification system, . . . to help it run a comparison of the images of 50,000 single fingerprints against the same 50,000 images, and produce a similarity score for each comparison. The point of this exercise was to show that the similarity score for an image matched against itself was far higher than the scores obtained when it was compared to the others.[131]

The comparisons between the two identical images yielded "extremely high scores."[132] Nonetheless, some commentators disputed whether the Lockheed–Martin study demonstrated the validity of fingerprint analysis.[133] The study compared a computerized image of a fingerprint impression against other computerized images in the database. The study did not address the problem examiners encounter in the real world; it did not attempt to match a partial fingerprint impression against images in the database. As noted earlier, crime scene prints are typically distorted from pressure and sometimes only one-fifth the size of record prints.[134] Even the same finger will not leave the exact impression each time: "The impression left by a given finger will differ every time, because of inevitable variations in pressure, which change the degree of contact between each part of the ridge structure and the impression medium."[135] Thus, one scholar asserted that the "study addresses the irrelevant question of whether one image of a fingerprint is immensely more similar to itself than to other images—including those of the same finger."[136] Citing

---

130. Stoney, *supra* note 104, § 32:3, at 287.

131. *Id*. § 32:3, at 288.

132. *Id*. (quoting James L. Wayman, Director, U.S. National Biometric Test Center at the College of Engineering, San Jose State University).

133. *E.g.,* David H. Kaye, *Questioning a Courtroom Proof of the Uniqueness of Fingerprints*, 71 Int'l Statistical Rev. 521 (2003); S. Pankanti et al., *On the Individuality of Fingerprints*, 24 IEEE Trans. Pattern Analysis Mach. Intelligence 1010 (2002).

134. *See supra* note 105 & accompanying text.

135. NRC Forensic Science Report, *supra* note 3, at 144.

136. Kaye, *supra* note 133, at 527–28. In another passage, he wrote: "[T]he study merely demonstrates the trivial fact that the same two-dimensional representation of the surface of a finger is far

EXHIBIT C

*Reference Manual on Scientific Evidence*

this assertion, the 2009 NRC report stated that the Lockheed–Martin study "has several major design and analysis flaws."[137]

## 1. Proficiency testing

In *United States v. Llera Plaza*,[138] the district court described internal and external proficiency tests of FBI fingerprint analysts and their supervisors. Between 1995 and 2001, the supervisors participated in 16 external tests created by CTS.[139] One false-positive result was reported among the 16 tests.[140] During the same period, there was a total of 431 internal tests of FBI fingerprint personnel. These personnel committed no false-positive errors, but there were three false eliminations.[141] Hence, the overall error rate was approximately 0.8%.[142]

Although these proficiency tests yielded impressive accuracy rates, the quality of the tests became an issue. First, the examinees participating in the tests knew that they were being tested and, for that reason, may have been more meticulous than in regular practice. Second, the rigor of proficiency testing was questioned. The *Llera Plaza* court concluded that the FBI's internal proficiency tests were "less demanding than they should be."[143] In the judge's words, "the FBI examiners got very high proficiency grades, but the tests they took did not."[144]

---

more similar to itself than to such representation of the source of finger from any other person in the data set." *Id*. at 527.

137.  NRC Forensic Science Report, *supra* note 3, at 144 n.35.

138.  188 F. Supp. 2d 549 (E.D. Pa. 2002).

139.  *Id*. at 556.

140.  However, a later inquiry led Stephen Meagher, Unit Chief of Latent Print Unit 3 of the Forensic Analysis Section of the FBI Laboratory "to conclude that the error was not one of faulty evaluation but of faulty recording of the evaluation—i.e., a clerical error rather than a technical error." *Id*.

141.  *Id*.

142.  Sharon Begley, *Fingerprint Matches Come Under More Fire as Potentially Fallible,* Wall St. J., Oct. 7, 2005, at B1.

143.  *Llera Plaza*, 188 F. Supp. 2d at 565. A fingerprint examiner from New Scotland Yard with 25 years' experience testified that the FBI tests were deficient:

> Mr. Bayle had reviewed copies of the internal FBI proficiency tests. . . . He found the latent prints utilized in those tests to be, on the whole, markedly unrepresentative of the latent prints that would be lifted at a crime scene. In general, Mr. Bayle found the test latent prints to be far clearer than the prints an examiner would routinely deal with. The prints were too clear—they were, according to Mr. Bayle, lacking in the "background noise" and "distortion" one would expect in latent prints lifted at a crime scene. Further, Mr. Bayle testified, the test materials were deficient in that there were too few latent prints that were not identifiable; according to Mr. Bayle, at a typical crime scene only about ten percent of the lifted latent prints will turn out to be matched. In Mr. Bayle's view the paucity of non–identifiable latent prints "makes the test too easy. It's not testing their ability. . . . [I]f I gave my experts these tests, they'd fall about laughing."

*Id*. at 557–58.

144.  *Id*. at 565*; see also* United States v. Crisp, 324 F.3d 261, 274 (4th Cir. 2003) (Michael, J., dissenting) ("Proficiency testing is typically based on a study of prints that are far superior to those usually retrieved from a crime scene.").

78

**EXHIBIT C**

*Reference Guide on Forensic Identification Expertise*

In an earlier proficiency study (1995), the examiners did not do as well,[145] although many of the subjects were not certified FBI examiners. Of the 156 examiners who participated, only 44% reached the correct conclusion on all the identification tasks. Eighty-eight examiners or 56% provided divergent (wrong, incorrect, erroneous) answers. Six examiners failed to identify any of the latent prints. Forty eight of the 156 examiners made erroneous identifications—representing 22% of the total identifications made by the examiners.

A 2006 study resurrected some of the questions raised by the 1995 test. In that study, examiners were presented with sets of prints that they had previously reviewed.[146] The researchers found that "experienced examiners do not necessarily agree with even their own past conclusions when the examination is presented in a different context some time later."[147]

These studies call into question the soundness of testimonial claims that fingerprint analysis is infallible[148] or has a zero error rate.[149] In 2008, Haber and Haber reviewed the literature describing the ACE-V technique and the supporting research.[150] Although many practitioners professed using the technique, Haber and Haber found that the practitioners' "descriptions [of their technique] differ, no single protocol has been officially accepted by the profession and the standards upon which the method's conclusion rest[s] have not been specified quantitatively."[151] After considering the Haber study, NRC concluded that the ACE-V "framework is not specific enough to qualify as a validated method for this type of analysis."[152]

## 2. The Mayfield case

Like the empirical data, several reports of fingerprint misidentifications raised questions about the reliability of fingerprint analysis. The FBI misidentified Brandon Mayfield as the source of the crime scene prints in the terrorist train bombing in Madrid, Spain, on March 11, 2004.[153] The mistake was attributed in part to several types of cognitive bias. According to an FBI review, the "power" of the automated

145. *See* David L. Grieve, *Possession of Truth,* 46 J. Forensic Identification 521, 524–25 (1996); James Starrs, *Forensic Science on the Ropes: An Upper Cut to Fingerprinting,* 20 Sci. Sleuthing Rev. 1 (1996).

146. Itiel E. Dror et al., *Contextual Information Renders Experts Vulnerable to Making Erroneous Identifications*, 156 Forensic Sci. Int'l 74, 76 (2006) (Four of five examiners changed their opinions; three directly contradicted their prior identifications, and the fourth concluded that data were insufficient to reach a definite conclusion); *see also* I. E. Dror & D. Charlton, *Why Experts Make Errors,* 56 J. Forensic Identification 600 (2006).

147. NRC Forensic Science Report, *supra* note 3, at 139.

148. *Id*. at 104.

149. *Id*. at 143–44.

150. Lyn Haber & Ralph Norman Haber, *Scientific Validation of Fingerprint Evidence Under Daubert,* 7 Law, Probability & Risk 87 (2008).

151. NRC Forensic Science Report, *supra* note 3, at 143.

152. *Id*. at 142.

153. *Id*. at 46 & 105.

EXHIBIT C

*Reference Manual on Scientific Evidence*

fingerprint correlation "was thought to have influenced the examiner's initial judgment and subsequent examination."[154] Thus, he was subject to confirmation bias. Moreover, a second review by another examiner was not conducted blind—that is, the reviewer knew that a positive identification had already been made and was thus subject to expectation (context) bias. Indeed, a third expert from outside the FBI, one appointed by the court, also erroneously confirmed the identification.[155] In addition to the Bureau's review, the Inspector General of the Department of Justice investigated the case.[156] The Mayfield case is not an isolated incident.[157]

The Mayfield case led to a more extensive FBI review of the scientific basis of fingerprints.[158] In January 2006, the FBI created a three-person review committee to evaluate the fundamental basis of fingerprint analysis. The committee identified two possible approaches. One approach would be to "develop a quantifiable minimum threshold based on objective criteria"—if possible.[159] "Any minimum threshold must consider both the clarity (quality) and the quantity of features and include all levels of detail, not simply points or minutiae."[160] Apparently, some FBI examiners use an unofficial seven-point cutoff, but this standard has never been tested.[161] As the FBI Review cautioned: "It is compelling to focus on a quantifiable threshold; however, quality/clarity, that is, distortion and degradation of prints, is the fundamental issue that needs to be addressed."[162]

154. Stacey, *supra* note 66, at 713.

155. In addition, the culture at the laboratory was poorly suited to detect mistakes: "To disagree was not an expected response." *Id*.

156. *See* Office of the Inspector General, U.S. Dep't of Justice, A Review of the FBI's Handling of the Brandon Mayfield Case, Unclassified Executive Summary 9 (Jan. 2006). The I.G. made several recommendations that went beyond the FBI's internal report:

> These include recommendations that the Laboratory [1] develop criteria for the use of Level 3 details to support identifications, [2] clarify the "one discrepancy rule" to assure that it is applied in a manner consistent with the level of certainty claimed for latent fingerprint identifications, [3] require documentation of features observed in the latent fingerprint before the comparison phase to help prevent circular reasoning, [4] adopt alternate procedures for blind verifications, [5] review prior cases in which the identification of a criminal suspect was made on the basis of only one latent fingerprint searched through IAFIS, and [6] require more meaningful and independent documentation of the causes of errors as part of the Laboratory's corrective action procedures.

157. In 2005, Professor Cole released an article identifying 23 cases of documented fingerprint misidentifications. *See* Simon A. Cole, *More Than Zero: Accounting for Error in Latent Fingerprint Identification*, 95 J. Crim. L. & Criminology 985 (2005). The misidentification cases include some that involved (1) verification by one or more other examiners, (2) examiners certified by the International Association of Identification, (3) procedures using a 16-point standard, and (4) defense experts who corroborated misidentifications made by prosecution experts.

158. *See* Bruce Budowle et al., *Review of the Scientific Basis for Friction Ridge Comparisons as a Means of Identification: Committee Findings and Recommendations*, 8 Forensic Sci. Comm. (Jan. 2006) [hereinafter FBI Review].

159. *Id*. at 5.

160. *Id*.

161. There is also a 12-point cutoff, under which a supervisor's approval is required.

162. *Id*.

EXHIBIT C

The second approach would treat the examiner as a "black box." This methodology would be necessary if minimum criteria for rendering an identification cannot be devised—in other words, there is simply too much subjectivity in the process to formulate meaningful, quantitative guidelines. Under this approach, it becomes critical to determine just how good a "black box" each examiner is: "The examiner(s) can be tested with various inputs of a range of defined categories of prints. This approach would demonstrate whether or not it is possible to obtain a degree of accuracy (that is, assess the performance of the black-box examiner for rendering an identification)."[163] The review committee noted that this approach would provide the greatest assurance of reliability if it incorporated blind technical review. According to the review committee's report, "[t]o be truly blind, the second examiner should have no knowledge of the interpretation by the first examiner (to include not seeing notes or reports)."[164]

Although the FBI Review concluded that reliable identifications could be made, it conceded that "there are scientific areas where improvements in the practice can be made particularly regarding validation, more objective criteria for certain aspects of the ACE-V process, and data collection."[165] Efforts to improve fingerprint analysis appear to be under way. In 2008, a symposium on validity testing of fingerprint examinations was published.[166] In late 2008, the National Institute of Standards and Technology formed the Expert Group on Human Factors in Latent Print Analysis tasked to identify the major sources of human error in fingerprint examination and to develop strategies to minimize such errors.

## C. Case Law Development

As noted earlier, the seminal American decision is the Illinois Supreme Court's 1911 opinion in *Jennings*.[167] Fingerprint testimony was routinely admitted in later

---

163. *Id.* at 4.

164. *Id.*

165. *Id.* at 10.

166. The lead article is Lyn Haber & Ralph Norman Haber, *supra* note 150. Other contributors are Christopher Champod, *Fingerprint Examination: Towards More Transparency*, 7 Law, Probability & Risk 111 (2008); Simon A. Cole, *Comment on "Scientific Validation of Fingerprint Evidence Under Daubert,"* 7 Law, Probability & Risk 119 (2008); Jennifer Mnookin, *The Validity of Latent Fingerprint Identification: Confessions of a Fingerprinting Moderate*, 7 Law, Probability & Risk 127 (2008).

167. People v. Jennings, 96 N.E. 1077 (Ill. 1911); *see* Donald Campbell, *Fingerprints: A Review*, [1985] Crim. L. Rev. 195, 196 ("Galton gave evidence to the effect that the chance of agreement would be in the region of 1 in 64,000,000,000."). As Professor Mnookin has noted, however, "fingerprints were accepted as an evidentiary tool without a great deal of scrutiny or skepticism." Mnookin, *supra* note 17, at 17. She elaborated:

Even if no two people had identical *sets* of fingerprints, this did not establish that no two people could have a *single* identical print, much less an identical *part* of a print. These are necessarily matters of prob-

EXHIBIT C

years. Some courts stated that fingerprint evidence was the strongest proof of a person's identity.[168]

With the exception of one federal district court decision that was later withdrawn,[169] the post-*Daubert* federal cases have continued to accept fingerprint testimony about individuation at least as sufficiently reliable nonscientific expertise.[170]

Two subsequent state court decisions also deserve mention. In one, a Maryland trial judge excluded fingerprint evidence under the *Frye* test, which still controls in that state.[171] In the other case, *Commonwealth v. Patterson*,[172] the Supreme Judicial

---

> ability, but neither the court in *Jennings* nor subsequent judges ever required that fingerprint identification be placed on a secure statistical foundation.

*Id.* at 19.

168. People v. Adamson, 165 P.2d 3, 12 (Cal. 1946), *aff'd,* 332 U.S. 46 (1947).

169. United States v. Llera Plaza, 179 F. Supp. 2d 492 (E.D. Pa.), *vacated, mot. granted on recons.*, 188 F. Supp. 2d 549 (E.D. Pa. 2002). The ruling was limited to excluding expert testimony that two sets of prints "matched"—that is, a positive identification to the exclusion of all other persons:

> Accordingly, this court will permit the government to present testimony by fingerprint examiners who, suitabl[y] qualified as "expert" examiners by virtue of training and experience, may (1) describe how the rolled and latent fingerprints at issue in this case were obtained, (2) identify and place before the jury the fingerprints and such magnifications thereof as may be required to show minute details, and (3) point out observed similarities (and differences) between any latent print and any rolled print the government contends are attributable to the same person. What such expert witnesses will not be permitted to do is to present "evaluation" testimony as to their "opinion" (Rule 702) that a particular latent print is in fact the print of a particular person.

*Id.* at 516. On rehearing, however, the court reversed itself. A spate of legal articles followed. *See, e.g.,* Simon A. Cole, *Grandfathering Evidence: Fingerprint Admissibility Rulings from* Jennings *to* Llera Plaza *and Back Again*, 41 Am. Crim. L. Rev. 1189 (2004); Robert Epstein, *Fingerprints Meet* Daubert: *The Myth of Fingerprint "Science" Is Revealed*, 75 S. Cal. L. Rev. 605 (2002); Kristin Romandetti, *Recognizing and Responding to a Problem with the Admissibility of Fingerprint Evidence Under* Daubert, 45 Jurimetrics J. 41 (2004).

170. *See, e.g.,* United States v. Baines, 573 F.3d 979, 990 (10th Cir. 2009) ("[U]nquestionably the technique has been subject to testing, albeit less rigorous than a scientific ideal, in the world of criminal investigation, court proceedings, and other practical applications, such as identification of victims of disasters. Thus, while we must agree with defendant that this record does not show that the technique has been subject to testing that would meet all of the standards of science, it would be unrealistic in the extreme for us to ignore the countervailing evidence. Fingerprint identification has been used extensively by law enforcement agencies all over the world for almost a century."); United States v. Abreu, 406 F.3d 1304, 1307 (11th Cir. 2005) ("We agree with the decisions of our sister circuits and hold that the fingerprint evidence admitted in this case satisfied *Daubert*."); United States v. Janis, 387 F.3d 682, 690 (8th Cir. 2004) (finding fingerprint evidence to be reliable); United States v. Mitchell, 365 F.3d 215, 234–52 (3d Cir. 2004); United States v. Crisp, 324 F.3d 261, 268–71 (4th Cir. 2003); United States v. Collins, 340 F.3d 672, 682 (8th Cir. 2002) ("Fingerprint evidence and analysis is generally accepted."); United States v. Hernandez, 299 F.3d 984, 991 (8th Cir. 2002); United States v. Sullivan, 246 F. Supp. 2d 700, 704 (E.D. Ky. 2003); United States v. Martinez-Cintron, 136 F. Supp. 2d 17, 20 (D.P.R. 2001).

171. State v. Rose, No. K06-0545, 2007 WL 5877145 (Cir. Ct. Baltimore, Md., Oct. 19, 2007). *See* NRC Forensic Science Report, *supra* note 3, at 43 & 105. However, in a parallel federal case, the evidence was admitted. United States v. Rose, 672 F. Supp. 2d 723 (D. Md. 2009).

172. 840 N.E.2d 12 (Mass. 2005).

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

Court of Massachusetts considered the reliability of applying the ACE-V methodology to simultaneous impressions. Simultaneous impressions "are two or more friction ridge impressions from the fingers and/or palm on one hand that are determined to have been deposited at the same time."[173] The key is deciding whether the impressions were left at the same time and therefore came from the same person, rather than having been left by two different people at different times.[174] Although the court found that the ACE-V method is generally accepted by the relevant scientific community, the record did not demonstrate similar acceptance of that methodology as applied to simultaneous impressions. The court consequently remanded the case to the trial court.[175]

# VII. Handwriting Evidence

The Lindbergh kidnapping trial showcased testimony by questioned document examiners. Later, in the litigation over Howard Hughes' alleged will, both sides relied on handwriting comparison experts.[176] Thanks in part to such cases, questioned document examination expertise has enjoyed widespread use and judicial acceptance.

## A. The Technique

Questioned document examiners are called on to perform a variety of tasks such as determining the sequence of strokes on a page and whether a particular ink formulation existed on the purported date of a writing.[177] However, the most common task performed is signature authentication—that is, deciding whether to attribute the handwriting on a document to a particular person. Here, the examiner compares known samples of the person's writing to the questioned

---

173. FBI Review, *supra* note 158, at 7.

174. *Patterson*, 840 N.E.2d at 18 ("[T]he examiner apparently may take into account the distance separating the latent impressions, the orientation of the impressions, the pressure used to make the impression, and any other facts the examiner deems relevant. The record does not, however, indicate that there is any approved standardized method for making the determination that two or more print impressions have been made simultaneously.").

175. The FBI review addressed this subject: "[I]f an item could only be held in a certain manner, then the only way of explaining the evidence is that the multiple prints are from the single person. In some cases, identifying simultaneous prints may infer, for example, the manner in which a knife was held." FBI Review, *supra* note 158, at 8. However, the review found that there was not agreement on what constitutes a "simultaneous impression," and therefore, more explicit guidelines were needed.

176. Irby Todd, *Do Experts Frequently Disagree?* 18 J. Forensic Sci. 455, 457–59 (1973).

177. Questioned document examinations cover a wide range of analyses: handwriting, hand printing, typewriting, mechanical impressions, altered documents, obliterated writing, indented writing, and charred documents. *See* 2 Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence ch. 21 (4th ed. 2007).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

document. In performing this comparison, examiners consider (1) class and (2) individual characteristics. Of class characteristics, two types are weighed: system[178] and group. People exhibiting system characteristics would include, for example, those who learned the Palmer method of cursive writing, taught in many schools. Such people should manifest some of the characteristics of that writing style. An example of people exhibiting group characteristics would include persons of certain nationalities who tend to have some writing mannerisms in common.[179] The writing of arthritic or blind persons also tends to exhibit some common general characteristics.[180]

Individual characteristics take several forms: (1) the manner in which the author begins or ends the word, (2) the height of the letters, (3) the slant of the letters, (4) the shading of the letters, and (5) the distance between the words. An identification rarely rests on a single characteristic. More commonly, a combination of characteristics is the basis for an identification. As in fingerprint analysis, there is no universally accepted number of points of similarity required for an individuation opinion. As with fingerprints, the examiner's ultimate judgment is subjective.

There is one major difference, though, between the approaches taken by fingerprint analysts and questioned document examiners. As previously stated, the typical fingerprint analyst will give one of only three opinions: (1) the prints are unsuitable for analysis, (2) the suspect is definitely excluded, or (3) the latent print is definitely that of the suspect. In contrast, questioned document examiners recognize a wider range of permissible opinions: (1) definite identification, (2) strong probability of identification, (3) probable identification, (4) indication of identification, (5) no conclusion, (6) indication of nonauthorship, (7) probability of nonauthorship, (8) strong probability of nonauthorship, and (9) elimination.[181] In short, in many cases, a questioned document examiner explicitly acknowledges the uncertainty of his or her opinion.[182] Whether such a nine-level scale is justified is another matter.[183]

---

178. *See* James A. Kelly, *Questioned Document Examination, in* Scientific and Expert Evidence 695, 698 (2d ed. 1981).

179. *See* Nellie Chang et al., *Investigation of Class Characteristics in English Handwriting of the Three Main Racial Groups: Chinese, Malay, and Indian in Singapore,* 50 J. Forensic Sci. 177 (2005); Robert J. Muehlberger, *Class Characteristics of Hispanic Writing in the Southeastern United States,* 34 J. Forensic Sci. 371 (1989); Sandra L. Ramsey, *The Cherokee Syllabary,* 39 J. Forensic Sci. 1039 (1994) (one of the landmark questioned document cases, *Hickory v. United States,* 151 U.S. 303 (1894), involved Cherokee writing); Marvin L. Simner et al., *A Comparison of the Arabic Numerals One Through Nine, Written by Adults from Native English-Speaking vs. Non-Native English-Speaking Countries,* 15 J. Forensic Doc. Examination (2003).

180. *See* Larry S. Miller, *Forensic Examination of Arthritic Impaired Writings,* 15 J. Police Sci. & Admin. 51 (1987).

181. NRC Forensic Science Report, *supra* note 3, at 166.

182. *See id.* at 47.

183. *See* United States v. Starzecpyzel, 880 F. Supp. 1027, 1048 (S.D.N.Y. 1995) ("No showing has been made, however, that FDEs can combine their first stage observations into such accurate conclusions as would justify a nine level scale.").

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

## B. The Empirical Record

The 2009 NRC report included a section discussing questioned document examination. The report acknowledged that some tasks performed by examiners are similar in nature "to other forensic chemistry work."[184] For example, some ink and paper analyses use the same hardware and rely on criteria as objective as many tests in forensic chemistry. In contrast, other analyses depend heavily on the examiner's subjective judgment and do not have as "firm [a] scientific foundation" as the analysis of inks and paper.[185] In particular, the report focused on the typical task of deciding common authorship. With respect to that task, the report stated:

> The scientific basis for handwriting comparisons needs to be strengthened. Recent studies have increased our understanding of the individuality and consistency of handwriting . . . and suggest that there may be a scientific basis for handwriting comparison, at least in the absence of intentional obfuscation or forgery. Although there has been only limited research to quantify the reliability and replicability of the practices used by trained document examiners, the committee agrees that there may be some value in handwriting analysis.[186]

Until recently, the empirical record for signature authentication was sparse. Even today there are no population frequency studies establishing, for example, the incidence of persons who conclude their "w" with a certain lift. As a 1989 article commented,

> our literature search for empirical evaluation of handwriting identification turned up one primitive and flawed validity study from nearly 50 years ago, one 1973 paper that raises the issue of consistency among examiners but presents only uncontrolled impressionistic and anecdotal information not qualifying as data in any rigorous sense, and a summary of one study in a 1978 government report. Beyond this, nothing.[187]

This 1989 article then surveyed five proficiency tests administered by CTS in 1975, 1984, 1985, 1986, and 1987. The article set out the results from each of the tests[188] and then aggregated the data by computing the means for the various categories of answers: "A rather generous reading of the data would be that in 45% of the reports forensic document examiners reached the correct finding, in 36% they erred partially or completely, and in 19% they were unable to draw a conclusion."[189]

The above studies were conducted prior to *Daubert*, which was decided in 1993. After the first post-*Daubert* admissibility challenge to handwriting evidence

---

184. NRC Forensic Science Report, *supra* note 3, at 164.

185. *Id*. at 167.

186. *Id*. at 166–67.

187. Risinger et al., *supra* note 9, at 747.

188. *Id*. at 744 (1975 test), at 745 (1984 and 1985 tests), at 746 (1986 test), and at 747 (1987 test).

189. *Id*. at 747.

EXHIBIT C

*Reference Manual on Scientific Evidence*

in 1995,[190] a number of research projects investigated two questions: (1) are experienced document examiners better at signature authentication than laypersons and (2) do experienced document examiners reach correct signature authentication decisions at a rate substantially above chance?

## 1. Comparison of experts and laypersons

Two Australian studies support the claim that experienced examiners are more competent at signature authentication tasks than laypersons. The first study was reported in 1999.[191] In this study, document examiners chose the "inconclusive" option far more frequently than did the laypersons. However, in the cases in which a conclusion was reached, the overall error rate for lay subjects was 28%, compared with 2% for experts. More specifically, the lay error rate for false authentication was 7% while it was 0% for the experts. The second Australian study was released in 2002.[192] Excluding "inconclusive" findings, the error rate for forensic document examiners was 5.8%; for laypersons, it was 23.5%.

In the United States, Dr. Moshe Kam, a computer scientist at Drexel University, has been the leading researcher in signature authentication. Dr. Kam and his colleagues have published five articles reporting experiments comparing the signature authentication expertise of document examiners and laypersons. Although the last study involved printing,[193] the initial four were related to cursive writing. In the first, excluding inconclusive findings, document examiners were correct 92.41% of the time and committed false elimination errors in 7.59% of their decisions.[194] Lay subjects were correct 72.84% of the time and made false elimination errors in 27.16% of their decisions. In the second through fourth studies, the researchers provided the laypersons with incentives, usually monetary, for correct decisions. In the fourth study, forgeries were called genuine only 0.5% of the time by experts but 6.5% of the time by laypersons.[195] Laypersons were 13 times more likely to err in concluding that a simulated document was genuine.

Some critics of Dr. Kam's research have asserted that the tasks performed in the tests do not approximate the signature authentication challenges faced by

---

190. *See* United States v. Starzecpyzel, 880 F. Supp. 1027 (S.D.N.Y. 1995).

191. Bryan Found et al., *The Development of a Program for Characterizing Forensic Handwriting Examiners' Expertise: Signature Examination Pilot Study,* 12 J. Forensic Doc. Examination 69, 72–76 (1999).

192. Jodi Sita et al., *Forensic Handwriting Examiners' Expertise for Signature Comparison,* 47 J. Forensic Sci. 1117 (2002).

193. Moshe Kam et al., *Writer Identification Using Hand-Printed and Non-Hand-Printed Questioned Documents,* 48 J. Forensic Sci. 1 (2003).

194. Moshe Kam et al., *Proficiency of Professional Document Examiners in Writer Identification,* 39 J. Forensic Sci. 5 (1994).

195. Moshe Kam et al., *Signature Authentication by Forensic Document Examiners,* 46 J. Forensic Sci. 884 (2001); Moshe Kam et al., *The Effects of Monetary Incentives on Performance of Nonprofessionals in Document Examiners Proficiency Tests,* 43 J. Forensic Sci. 1000 (1998); Moshe Kam et al., *Writer Identification by Professional Document Examiners,* 42 J. Forensic Sci. 778 (1997).

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

examiners in real life.[196] In addition, critics have claimed that even the monetary incentives for the laypersons do not come close to equaling the powerful incentives that experts have to be careful in these tests.[197] Yet by now the empirical research record includes a substantial number of studies. With the exception of a 1975 German study,[198] the studies uniformly conclude that professional examiners are much more adept at signature authentication than laypersons.[199]

## 2. *Proficiency studies comparing experts' performance to chance*

Numerous proficiency studies have been conducted in the United States[200] and Australia.[201] Some of the American tests reported significant error rates. For example, on a 2001 test, excluding inconclusive findings, the false authentication rate was 22%, while the false elimination rate was 0%. Moreover, as previously stated, on the five CTS proficiency tests mentioned in the 1989 article, 36% of the participating examiners erred partially or completely.[202] Further, critics have claimed that some of the proficiency tests were far easier than the tasks encountered in actual practice,[203] and that consequently, the studies tend to overstate examiners' proficiency.

196. D. Michael Risinger, *Cases Involving the Reliability of Handwriting Identification Expertise Since the Decision in* Daubert, 43 Tulsa L. Rev. 477, 490 (2007).

197. *Id.*

198. The German study included 25 experienced examiners, laypersons with no handwriting background, and some university students who had taken courses in handwriting psychology and comparison. On the one hand, the professional examiners outperformed the regular laypersons. The experts had a 14.7% error rate compared with the 34.4% rate for laypersons without any training. On the other hand, the university students had a lower aggregate error rate than the professional questioned document examiners. Wolfgang Conrad, *Empirische Untersuchungen uber die Urteilsgute vershiedener Gruppen von Laien und Sachvertstandigen bei der Unterscheidung authentischer und gefalschter Unterschriften* [Empirical Studies Regarding the Quality of Assessments of Various Groups of Lay Persons and Experts in Differentiating Between Authentic and Forged Signatures]*,* 156 Archiv für Kriminologie 169–83 (1975).

199. *See* Roger Park, *Signature Identification in the Light of Science and Experience,* 59 Hastings L.J. 1101, 1135–36 (2008).

200. *E.g.,* Collaborative Testing Service (CTS), Questioned Document Examination, Report No. 92-6 (1992); CTS, Questioned Document Examination, Report No. 9406 (1994), CTS, Questioned Document Examination, Report No. 9606 (1996); CTS, Forensic Testing Program, Handwriting Examination, Report No. 9714 (1997); CTS, Forensic Testing Program, Handwriting Examination, Report No. 9814 (1998); CTS, Forensic Testing Program, Handwriting Examination, Test No. 99-524 (1999); CTS, Forensic Testing Program, Handwriting Examination, Test No. 00-524 (2000); CTS, Forensic Testing Program, Handwriting Examination, Test No. 01-524 (2001); CTS, Forensic Testing Program, Handwriting Examination, Test No. 02-524 (2003); *available at* http://www.ctsforensics.com/reports/main.aspx.

201. Bryan Found & Doug Rogers, *The Probative Character of Forensic Handwriting Examiners' Identification and Elimination Opinions on Questioned Signatures*, 178 Forensic Sci. Int'l 54 (2008).

202. Risinger et al., *supra* note 9, at 747–48.

203. Risinger, *supra* note 196, at 485.

87

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

The CTS proficiency test results for the 1978–2005 period addressed the comparison of known and questioned signatures and other writings to determine authorship. In other exercises participants were asked to examine a variety of mechanical impressions on paper and the use of photocopying and inks.

- Between 1978 and 1999,[204] fewer than 5% of the mechanical impression comparisons were in error, but 10% of the replies were inconclusive where the examiner should have excluded the impressions as having a common source. With regard to handwriting comparisons, the examiners did very well on the straightforward comparisons, with almost 100% of the comparisons correct. However, in more challenging tests, such as those involving multiple authors, as high as 25% of the replies were inconclusive and nearly 10% of the author associations were incorrect.
- In the 2000–2005 time period, the participants generally performed very well (some approaching 99% correct responses) in determining the genuineness of documents where text in a document had been manipulated or where documents had been altered with various pens and inks. The handwriting exercises were not as successful; in those exercises, comparisons of questioned and known writings were correct about 92% of the time, inconclusive 7% of the time, and incorrect 1% of the time. Nearly all incorrect responses occurred where participants reported handwriting to be of common origin when it was not.

During these tests, some examiners characterized the tests as too easy, while others described them as realistic and very challenging.

Thus, the results of the most recent proficiency studies are encouraging. Moreover, the data in the five proficiency tests discussed in the 1989 article[205] can be subject to differing interpretation. The critics of questioned document examination sometimes suggest that the results of the 1985 test in particular prove that signature authentication has "a high error rate."[206] However,

> [t]hese results can be characterized in different ways. [Another] way of viewing the result would be to disaggregate the specific decisions made by the experts. . . . [S]uppose that a teacher gives a multiple-choice test containing fifty questions. There are different ways that the results could be reported. One could calculate the percentage of students who got any of the fifty questions wrong, and report that as the error rate. A more customary approach would be to treat

---

204. John I. Thornton & Joseph L. Peterson, *The General Assumptions and Rationale of Forensic Identification, in* 4 Modern Scientific Evidence: The Law and Science of Expert Testimony, *supra* note 104, § 29:40, at 54.

205. Risinger et al., *supra* note 9.

206. Park, *supra* note 199, at 1113.

EXHIBIT C

each question as a separate task, and report the error rate as the mean percentage of questions answered incorrectly.[207]

If the specific decisions made by the examiners were disaggregated, each examiner had to make 66 decisions regarding whether certain pairs of signatures were written by the same person.[208] Under this approach, the false authentication error rate was 3.8%, and the false elimination error rate was 4.5%.[209] In that light, even the 1985 study supports the contention that examiners perform signature authentication tasks at a validity rate considerably exceeding chance.

## C. Case Law Development

Although the nineteenth-century cases were skeptical of handwriting expertise,[210] in the twentieth century the testimony in leading cases, such as the Lindbergh prosecution, helped the discipline gain judicial acceptance. There was little dispute that handwriting comparison testimony was admissible at the time the Federal Rules of Evidence were enacted in 1975. Rule 901(b)(3) recognized that a document could be authenticated by an expert, and the drafters explicitly mentioned handwriting comparison "testimony of expert witnesses."[211]

The first significant admissibility challenge under *Daubert* was mounted in *United States v. Starzecpyzel*.[212] In that case, the district court concluded that "forensic document examination, despite the existence of a certification program, professional journals and other trappings of science, cannot, after *Daubert*, be regarded as 'scientific . . . knowledge.'"[213] Nonetheless, the court did not exclude handwriting comparison testimony. Instead, the court admitted the individuation testimony as nonscientific "technical" evidence.[214] *Starzecpyzel* prompted more attacks that questioned the lack of empirical validation in the field.[215]

---

207. *Id.* at 1114.

208. *Id.* at 1115.

209. *Id.* at 1116.

210. *See* Strother v. Lucas, 31 U.S. 763, 767 (1832); Phoenix Fire Ins. Co. v. Philip, 13 Wend. 81, 82–84 (N.Y. Sup. Ct. 1834).

211. Fed. R. Evid. 901(b)(3) advisory committee's note.

212. 880 F. Supp. 1027 (S.D.N.Y. 1995).

213. *Id.* at 1038.

214. *Kumho Tire* later called this aspect of the *Starzecpyzel* opinion into question because *Kumho* held that the reliability requirement applies to all types of expertise—"scientific," "technical," or "specialized." Moreover, the Supreme Court indicated that the *Daubert* factors, including empirical testing, may be applicable to technical expertise. Some aspects of handwriting can and have been tested.

215. *See, e.g.,* United States v. Hidalgo, 229 F. Supp. 2d 961, 967 (D. Ariz. 2002) ("Because the principle of uniqueness is without empirical support, we conclude that a document examiner will not be permitted to testify that the maker of a known document is the maker of the questioned document. Nor will a document examiner be able to testify as to identity in terms of probabilities.").

EXHIBIT C

*Reference Manual on Scientific Evidence*

As of the date of this publication, there is a three-way split of authority. The majority of courts permit examiners to express individuation opinions.[216] As one court noted, "all six circuits that have addressed the admissibility of handwriting expert [testimony] . . . [have] determined that it can satisfy the reliability threshold" for nonscientific expertise.[217] In contrast, several courts have excluded expert testimony,[218] although one involved handprinting[219] and another Japanese handprinting.[220] Many district courts have endorsed a third view. These courts limit the reach of the examiner's opinion, permitting expert testimony about similarities and dissimilarities between exemplars but not an ultimate conclusion that the defendant was the author ("common authorship" opinion) of the questioned document.[221] The expert is allowed to testify about "the specific similarities and idiosyncrasies between the known writings and the questioned writings, as well as testimony regarding, for example, how frequently or infrequently in his experience, [the expert] has seen a particular idiosyncrasy."[222] As the justification for this limitation, these courts often state that the examiners' claimed ability to individuate lacks "empirical support."[223]

216. *See, e.g.,* United States v. Prime, 363 F.3d 1028, 1033 (9th Cir. 2004); United States v. Crisp, 324 F.3d 261, 265–71 (4th Cir. 2003); United States v. Jolivet, 224 F.3d 902, 906 (8th Cir. 2000) (affirming the introduction of expert testimony that it was likely that the accused wrote the questioned documents); United States v. Velasquez, 64 F.3d 844, 848–52 (3d Cir. 1995); United States v. Ruth, 42 M.J. 730, 732 (A. Ct. Crim. App. 1995), *aff'd on other grounds,* 46 M.J. 1 (C.A.A.F. 1997); United States v. Morris, No. 06-87-DCR, 2006 U.S. Dist. LEXIS 53983, *5 (E.D. Ky. July 20, 2006); Orix Fin. Servs. v. Thunder Ridge Energy, Inc., No. 01Civ. 4788 (RJH) (HBP). 2005 U.S. Dist. LEXIS 41889 (S.D.N.Y. Dec. 29, 2005).

217. *Prime*, 363 F.3d at 1034.

218. United States v. Lewis, 220 F. Supp. 2d 548 (S.D. W. Va. 2002).

219. United States v. Saelee, 162 F. Supp. 2d 1097 (D. Alaska 2001).

220. United States v. Fujii, 152 F. Supp. 2d 939, 940 (N.D. Ill. 2000) (holding expert testimony concerning Japanese handprinting inadmissible: "Handwriting analysis does not stand up well under the *Daubert* standards. Despite its long history of use and acceptance, validation studies supporting its reliability are few, and the few that exist have been criticized for methodological flaws.").

221. *See, e.g.,* United States v. Oskowitz, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2003) ("Many other district courts have similarly permitted a handwriting expert to analyze a writing sample for the jury without permitting the expert to offer an opinion on the ultimate question of authorship."); United States v. Rutherford, 104 F. Supp. 2d 1190, 1194 (D. Neb. 2000) ("[T]he Court concludes that FDE Rauscher's testimony meets the requirements of Rule 702 to the extent that he limits his testimony to identifying and explaining the similarities and dissimilarities between the known exemplars and the questioned documents. FDE Rauscher is precluded from rendering any ultimate conclusions on authorship of the questioned documents and is similarly precluded from testifying to the degree of confidence or certainty on which his opinions are based."); United States v. Hines, 55 F. Supp. 2d 62, 69 (D. Mass. 1999) (expert testimony concerning the general similarities and differences between a defendant's handwriting exemplar and a stick-up note was admissible while the specific conclusion that the defendant was the author was not).

222. United States v. Van Wyk, 83 F. Supp. 2d 515, 524 (D.N.J. 2000).

223. United States v. Hidalgo, 229 F. Supp. 2d 961, 967 (D. Ariz. 2002).

90

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

# VIII. Firearms Identification Evidence

It is widely considered that the first written reference to firearms identification (popularly known as "ballistics") in the United States appeared in 1900.[224] In the 1920s, the technique gained considerable attention because of the work of Calvin Goddard[225] and played a controversial role in the Sacco and Vanzetti case during the same decade.[226] Goddard also analyzed the bullet evidence in the St. Valentine's Day Massacre in 1929, in which five gangsters and two acquaintances were gunned down in Chicago.[227] In 1923, the Illinois Supreme Court wrote that positive identification of a bullet was not only impossible but "preposterous."[228] Seven years later, however, that court did an about-face and became one of the first courts in this country to admit firearms identification evidence.[229] The technique subsequently gained widespread judicial acceptance and was not seriously challenged until recently.

## A. The Technique

### 1. Firearms

Typically, three types of firearms—rifles, handguns, and shotguns—are encountered in criminal investigations.[230] The barrels of modern rifles and handguns are *rifled*; that is, parallel spiral grooves are cut into the inner surface (bore) of the barrel. The surfaces between the grooves are called *lands*. The lands and grooves twist in a direction: right twist or left twist. For each type of firearm produced, the manufacturer specifies the number of lands and grooves, the direction of twist, the angle of twist (pitch), the depth of the grooves, and the width of the lands and grooves. As a bullet passes through the bore, the lands and grooves force the

---

224. *See* Albert Llewellyn Hall, *The Missile and the Weapon*, 39 Buff. Med. J. 727 (1900).

225. Calvin Goddard, often credited as the "father" of firearms identification, was responsible for much of the early work on the subject. *E.g.*, Calvin Goddard, *Scientific Identification of Firearms and Bullets*, 17 J. Crim. L., Criminology & Police Sci. 254 (1926).

226. *See* Joughin & Morgan, *supra* note 8, at 15 (The firearms identification testimony was "carelessly assembled, incompletely and confusedly presented, and . . . beyond the comprehension" of the jury); Starrs, *supra* note 8, at 630 (Part I), 1050 (Part II).

227. *See* Calvin Goddard, *The Valentine Day Massacre: A Study in Ammunition-Tracing*, 1 Am. J. Police Sci. 60, 76 (1930) ("Since two of the members of the execution squad had worn police uniforms, and since it had been subsequently intimated by various persons that the wearers of the uniforms might really have been policeman rather than disguised gangsters, it became a matter of no little importance to ascertain, if possible, whether these rumors had any foundation in fact."); Jim Ritter, *St. Valentine's Hit Spurred Creation of Nation's First Lab*, Chicago Sun-Times, Feb. 9, 1997, at 40 ("Sixty-eight years ago this Friday, Al Capone's hit men, dressed as cops, gunned down seven men in the Clark Street headquarters of rival mobster Bugs Moran.").

228. People v. Berkman, 139 N.E. 91, 94 (Ill. 1923).

229. People v. Fisher, 172 N.E. 743, 754 (Ill. 1930).

230. Other types of firearms, such as machine guns, tear gas guns, zip guns, and flare guns, may also be examined.

EXHIBIT C

*Reference Manual on Scientific Evidence*

bullet to rotate, giving it stability in flight and thus increased accuracy. Shotguns are smooth-bore firearms; they do not have lands and grooves.

Rifles and handguns are classified according to their caliber. The caliber is the diameter of the bore of the firearm; the caliber is expressed in either hundredths or thousandths of an inch (e.g., .22, .45, .357 caliber) or millimeters (e.g., 7.62 mm).[231] The two major types of handguns are revolvers[232] and semiautomatic pistols. A major difference between the two is that when a semiautomatic pistol is fired, the cartridge case is automatically ejected and, if recovered at the crime scene, could help link the case to the firearm from which it was fired. In contrast, when a revolver is discharged the case is not ejected.

## 2. Ammunition

Rifle and handgun cartridges consist of the projectile (bullet),[233] case,[234] propellant (powder), and primer. The primer contains a small amount of an explosive mixture, which detonates when struck by the firing pin. When the firing pin detonates the primer, an explosion occurs that ignites the propellant. The most common modern propellant is smokeless powder.

## 3. Class characteristics

Firearms identifications may be based on either bullet or cartridge case examinations. Identifying features include class, subclass, and individual characteristics.

The class characteristics of a firearm result from design factors and are determined prior to manufacture. They include the following caliber and rifling specifications: (1) the land and groove diameters, (2) the direction of rifling (left or right twist), (3) the number of lands and grooves, (4) the width of the lands and grooves, and (5) the degree of the rifling twist.[235] Generally, a .38-caliber bullet with six land and groove impressions and with a right twist could have been fired only from a firearm with these same characteristics. Such a bullet could not have been fired from a .32-caliber firearm, or from a .38-caliber firearm with a different number of lands and grooves or a left twist. In sum, if the class characteristics do not match, the firearm could not have fired the bullet and is excluded.

---

231. The caliber is measured from land to land in a rifled weapon. Typically, the designated caliber is more an approximation than an accurate measurement. *See* 1 J. Howard Mathews, Firearms Identification 17 (1962) ("'nominal caliber' would be a more proper term").

232. Revolvers have a cylindrical magazine that rotates behind the barrel. The cylinder typically holds five to nine cartridges, each within a separate chamber. When a revolver is fired, the cylinder rotates and the next chamber is aligned with the barrel. A single-action revolver requires the manual cocking of the hammer; in a double-action revolver the trigger cocks the hammer.

233. Bullets are generally composed of lead and small amounts of other elements (hardeners). They may be completely covered (jacketed) with another metal or partially covered (semijacketed).

234. Cartridge cases are generally made of brass.

235. 1 Mathews, *supra* note 231, at 17.

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

## 4. Subclass characteristics

Subclass characteristics are produced at the time of manufacture and are shared by a discrete subset of weapons in a production run or "batch." According to the Association of Firearm and Tool Mark Examiners (AFTE),[236] subclass characteristics are discernible surface features that are more restrictive than class characteristics in that they are (1) "produced incidental to manufacture," (2) "relate to a smaller group source (a subset to which they belong)," and (3) can arise from a source that changes over time.[237] The AFTE states that "[c]aution should be exercised in distinguishing subclass characteristics from class characteristics."[238]

## 5. Individual characteristics

Bullet identification involves a comparison of the evidence bullet and a test bullet fired from the firearm.[239] The two bullets are examined by means of a comparison microscope, which permits a split-screen view of the two bullets and manipulation in order to attempt to align the striations (marks) on the two bullets.

Barrels are machined during the manufacturing process, and imperfections in the tools used in the machining process are imprinted on the bore.[240] The subsequent use of the firearm adds further individual imperfections. For example, mechanical action (erosion) caused by the friction of bullets passing through the bore of the firearm produces accidental imperfections. Similarly, chemical action (corrosion) caused by moisture (rust), as well as primer and propellant chemicals, produce other imperfections.

When a bullet is fired, microscopic striations are imprinted on the bullet surface as it passes through the bore of the firearm. These bullet markings are produced by the imperfections in the bore. Because these imperfections are randomly produced, examiners assume that they are unique to each firearm.[241] Although the assumption is plausible, there is no statistical basis for this assumption.[242]

---

236. AFTE is the leading professional organization in the field. There is also the Scientific Working Group for Firearms and Toolmarks (SWGGUN), which promulgates guidelines for examiners.

237. *Theory of Identification, Association of Firearm and Toolmark Examiners*, 30 AFTE J. 86, 88 (1998) [hereinafter *AFTE Theory*].

238. *Id*.

239. Test bullets are obtained by firing a firearm into a recovery box or bullet trap, which is usually filled with cotton, or into a recovery tank, which is filled with water.

240. "No two barrels are microscopically identical, as the surfaces of their bores all possess individual and characteristic markings." Gerald Burrard, The Identification of Firearms and Forensic Ballistics 138 (1962).

241. 1 Mathews, *supra* note 231, at 3 ("Experience has shown that no two firearms, even those of the same make and model and made consecutively by the same tools, will produce the same markings on a bullet or a cartridge.").

242. Alfred A. Biasotti, *The Principles of Evidence Evaluation as Applied to Firearms and Tool Mark Identification*, 9 J. Forensic Sci. 428, 432 (1964) ("[W]e lack the fundamental statistical data needed to

EXHIBIT C

*Reference Manual on Scientific Evidence*

Although an identification is based on objective data (the striations on the bullet surface), the AFTE explains that the examiner's individuation is essentially a subjective judgment. The AFTE describes the traditional pattern recognition methodology as "subjective in nature, founded on scientific principles and based on the examiner's training and experience."[243] There are no objective criteria governing this determination: "Ultimately, unless other issues are involved, it remains for the examiner to determine for himself the modicum of proof necessary to arrive at a definitive opinion."[244]

The condition of a firearm or evidence bullet may preclude an identification. For example, there may be insufficient marks on the bullet or, because of mutilation, an insufficient amount of the bullet may have been recovered. Likewise, if the bore of the firearm has changed significantly as a result of erosion or corrosion, an identification may be impossible. (Unlike fingerprints, firearms change over time.) In these situations, the examiner may render a "no conclusion" determination. Such a conclusion, however, may have some evidentiary value even if the examiner cannot form an individuation opinion; that is, the firearm could have fired the bullet if the class characteristics match.

## 6. Consecutive matching striae

In an attempt to make firearms identification more objective, some commentators advocate a technique known as consecutive matching striae (CMS). As the name implies, this method is based on finding a specified number of consecutive matching striae on two bullets. Other commentators have questioned this approach,[245] and it remains a minority position.[246]

## 7. Cartridge identification

Cartridge case identification is based on the same theory of random markings as bullet identification.[247] As with barrels, defects produced in the manufacturing

develop verifiable criteria."); *see also* Alfred A. Biasotti, *A Statistical Study of the Individual Characteristics of Fired Bullets*, 4 J. Forensic Sci. 34 (1959).

243. *AFTE Theory*, *supra* note 237, at 86.

244. Laboratory Proficiency Test, *supra* note 81, at 207; *see also* Alfred A. Biasotti, *The Principles of Evidence Evaluation as Applied to Firearms and Tool Mark Identification*, *supra* note 242, at 429 ("In general, the texts on firearms identification take the position that each practitioner must develop his own intuitive criteria of identity gained through practical experience.").

245. *See* Stephen G. Bunch, *Consecutive Matching Striation Criteria: A General Critique*, 45 J. Forensic Sci. 955, 955 (2000) (finding the traditional methodology superior: "[P]resent-day firearm identification, in the final analysis is subjective.").

246. Roger C. Nichols, *Firearm and Toolmark Identification Criteria: A Review of the Literature, Part II*, 48 J. Forensic Sci. 318, 326 (2003) (CMS "has not been promoted as an alternative [to traditional pattern recognition], but as a numerical threshold.").

247. Burrard, *supra* note 240, at 107. However, bullet and cartridge case identifications differ in several respects. Because the bullet is traveling through the barrel at the time it is imprinted with the

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

process leave distinctive characteristics on the breech face, firing pin, chamber, extractor, and ejector. Subsequent use of the firearm produces additional defects. When the trigger is pulled, the firing pin strikes the primer of the cartridge, causing the primer to detonate. This detonation ignites the propellant (powder). In the process of combustion, the powder is converted rapidly into gases. The pressure produced by this process propels the bullet from the weapon and also forces the base of the cartridge case backward against the breech face, imprinting breech face marks on the base of the cartridge case. Similarly, the firing pin, ejector, and extractor may leave characteristic marks on a cartridge case.[248]

Cartridge case identification involves a comparison of the cartridge case recovered at the crime scene and a test cartridge case obtained from the firearm after it has been fired. Shotgun shell casings may be identified in this way, as well. As in bullet identification, the comparison microscope is used in the examination. According to AFTE, "interpretation of toolmark individualization and identification is still considered to be subjective in nature, based on one's training and experience."[249]

## 8. *Automated identification systems*

"These ballistic imaging systems use the powerful searching capabilities of the computer to match the images of recovered crime scene evidence against digitized images stored in a computer database."[250] The current system is the Integrated Ballistics Information System (IBIS).[251] Automated systems "give[ ] firearms examiners the ability to screen virtually unlimited numbers of bullets and cartridge casings for possible matches."[252] These systems identify a number of candidate matches. They do not replace the examiner, who still must make the final comparison: "'High Confidence' candidates (likely hits) are referred to a firearms examiner for examination on a comparison microscope."[253] The examiner need

---

bore imperfections, these marks are "sliding" imprints, called striated marks. In contrast, the cartridge case receives "static" imprints, called impressed marks. *Id*. at 145.

248. Ejector and extractor marks by themselves may indicate only that the cartridge case had been *loaded in,* not fired from, a particular firearm.

249. Eliot Springer, *Toolmark Examinations—A Review of Its Development in the Literature*, 40 J. Forensic Sci. 964, 966–67 (1995).

250. *Benchmark Evaluation Studies of the Bulletproof and Drugfire Ballistic Imaging Systems*, 22 Crime Lab. Digest 51 (1995); *see also* Jan De Kinder & Monica Bonfanti, *Automated Comparisons of Bullet Striations Based on 3D Topography*, 101 Forensic Sci. Int'l 85, 86 (1999) ("[A]n automatic system will cut the time demanding and tedious manual searches for one specific item in large open case files.").

251. *See* Jan De Kinder et al., *Reference Ballistic Imaging Database Performance*, 140 Forensic Sci. Int'l 207 (2004); Ruprecht Nennstiel & Joachim Rahm, *An Experience Report Regarding the Performance of the IBIS™ Correlator*, 51 J. Forensic Sci. 24 (2006).

252. Richard E. Tontarski & Robert M. Thompson, *Automated Firearms Evidence Comparison: A Forensic Tool for Firearms Identification—An Update*, 43 J. Forensic Sci. 641, 641 (1998).

253. *Id*.

EXHIBIT C

*Reference Manual on Scientific Evidence*

not accept the highest ranked candidate identified by the system. For that matter, the examiner may reject all the candidates.

## 9. Toolmarks

Toolmark identifications rest on essentially the same theory as firearms identifications.[254] Tools have both (1) class characteristics and (2) individual characteristics; the latter are accidental imperfections produced by the machining process and subsequent use. When the tool is used, these characteristics are sometimes imparted onto the surface of another object struck by the tool. Toolmarks may be impressions (compression marks), striations (friction or scrape marks), or a combination of both.[255] Fracture matches constitute another type of examination.

The marks may be left on a variety of different materials, such as wood or metal. In some cases, only class characteristics can be matched. For example, it may be possible to identify a mark (impression) left on a piece of wood as having been produced by a hammer, punch, or screwdriver. A comparison of the mark and the evidence tool may establish the size of the tool (another class characteristic). Unusual features of the tool, such as a chip, may permit a positive identification. Striations caused by scraping with a tool can also produce distinguishing marks in much the same way that striations are imprinted on a bullet when a firearm is discharged. This type of examination has the same limitations as firearms identification: "[T]he characteristics of a tool will change with use."[256]

Firearms identification could be considered a subspecialty of toolmark identification; the firearm (tool) imprints its individual characteristics on the bullet. However, the markings on a bullet or cartridge case are imprinted in roughly the same way every time a firearm is fired. In contrast, toolmark analysis can be more complicated because a tool can be employed in a variety of different ways, each producing a different mark: "[I]n toolmark work the angle at which the tool was used must be duplicated in the test standard, pressures must be dealt with, and the degree of hardness of metals and other materials must be taken into account."[257]

The comparison microscope is also used in this examination. As with firearms identification testimony, toolmark identification testimony is based on the subjective judgment of the examiner, who determines whether sufficient marks of

254. *See* Biasotti, *The Principles of Evidence Evaluation as Applied to Firearms and Tool Mark Identification*, *supra* note 242; *see also* Springer, *supra* note 249, at 964 ("The identification is based . . . on a series of scratches, depressions, and other marks which the tool leaves on the object it comes into contact with. The combination of these various marks ha[s] been termed toolmarks and the claim is that every instrument can impart a mark individual to itself.").

255. David Q. Burd & Roger S. Greene, *Tool Mark Examination Techniques*, 2 J. Forensic Sci. 297, 298 (1957).

256. Emmett M. Flynn, *Toolmark Identification*, 2 J. Forensic Sci. 95, 102 (1957).

257. *Id.* at 105.

96

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

similarity are present to permit an identification.[258] There are no objective criteria governing the determination of whether there is a match.[259]

## B. The Empirical Record

In its 2009 report, NRC summarized the state of the research as follows:

> Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable.[260]

The 1978 Crime Laboratory Proficiency Testing Program reported mixed results on firearms identification tests. In one test, 5.3% of the participating laboratories misidentified firearms evidence, and in another test 13.6% erred. These tests involved bullet and cartridge case comparisons. The Project Advisory Committee considered these errors "particularly grave in nature" and concluded that they probably resulted from carelessness, inexperience, or inadequate supervision.[261] A third test required the examination of two bullets and two cartridge cases to identify the "most probable weapon" from which each was fired. The error rate was 28.2%. In later tests,

> [e]xaminers generally did very well in making the comparisons. For all fifteen tests combined, examiners made a total of 2106 [bullet and cartridge case] comparisons and provided responses which agreed with the manufacturer responses 88% of the time, disagreed in only 1.4% of responses, and reported inconclusive results in 10% of cases.[262]

---

258. *See* Springer, *supra* note 249, at 966–67 ("According to the Association of Firearms and Toolmarks Examiners' Criteria for Identification Committee, interpretation of toolmark individualization and identification is still considered to be subjective in nature, based on one's training and experience.").

259. As one commentator has noted: "[I]t is not possible at present to categorically state the number and percentage of the [striation] lines which must correspond." Burd & Greene, *supra* note 255, at 310.

260. *Id.*

261. Laboratory Proficiency Test, *supra* note 81, at 207–08.

262. Peterson & Markham, *supra* note 82, at 1018. The authors also stated:

> The performance of laboratories in the firearms tests was comparable to that of the earlier LEAA study, although the rate of successful identifications actually was slightly over—88% vs. 91%. Laboratories cut the rate of errant identifications by half (3% to 1.4%) but the rate of inconclusive responses doubled, from 5% to 10%.

*Id.* at 1019.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Proficiency testing on toolmark examinations has also been reported.[263]

For the period 1978–1999, firearms examiners performed well on their CTS proficiency tests, with only 2% to 3% of their comparisons incorrect, but with 10% to 13% of their responses inconclusive.[264] The scenarios that accompanied the test materials asked examiners to compare test-fired bullets and/or cartridge cases with evidence projectiles found at a crime scene. Between 2000 and 2005, participants, again, performed very well, averaging less than 1% incorrect responses, but with inconclusive results about 10% of the time. Most of the inconclusive results in these tests occurred where bullets and/or cartridge cases were actually fired from different weapons. Examiners frequently stated they were unable to reach the proper conclusion because they did not have the actual weapon with which they could perform their own test fires of ammunition.

In CTS toolmark proficiency comparisons, laboratories were asked to compare marks made with such tools as screwdrivers, bolt cutters, hammers, and hand-stamps. In some cases, tools were supplied to participants, but in most cases they were given only test marks. Over the entire 1978–2005 period, fewer than 5% of responses were in error, but individual test results varied substantially. In some cases, 30% to 40% of replies were inconclusive, because laboratories were unsure if the blade of the tool in question might have been altered between the time(s) different markings had been made. During the final 6-year period reviewed (2000–2005), laboratories averaged a 1% incorrect comparison rate for toolmarks. Inconclusive responses remained high (30% and greater) and, together with firearms testing, constitute the evidence category where evidence comparisons have the highest rates of inconclusive responses.

Questions have arisen concerning the significance of these tests. First, such testing is not required of all firearms examiners, only those working in laboratories voluntarily seeking accreditation by the ASCLD. In short, "the sample is self-selecting and may not be representative of the complete universe of firearms examiners."[265] Second, the examinations are not blind—that is, examiners know when they are being tested. Thus, the examiner may be more meticulous and careful than in ordinary case work. Third, the results of an evaluation can vary, depending on whether an "inconclusive" answer is counted. Fourth, the rigor of the examinations has been questioned. According to one witness, in a 2005 test involving cartridge case comparisons, *none* of the 255 test-takers nationwide answered incorrectly. The court observed: "One could read these results to mean that the technique is foolproof, but the results might instead indicate that the test was somewhat elementary."[266]

---

263. *Id*. at 1025 ("Overall, laboratories performed not as well on the toolmark tests as they did on the firearms tests.").

264. Thornton & Peterson, *supra* note 204, § 29:47, at 66.

265. United States v. Monteiro, 407 F. Supp. 2d 351, 367 (D. Mass. 2006).

266. *Id*.

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

In 2008, NAS published a report on computer imaging of bullets.[267] Although firearms identification was not the primary focus of the investigation, a section of the report commented on this subject.[268] After surveying the literature on the uniqueness, reproducibility, and permanence of individual characteristics, the committee noted that "[m]ost of these studies are limited in scale and have been conducted by firearms examiners (and examiners in training) in state and local law enforcement laboratories as adjuncts to their regular casework."[269] The report concluded: "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms–related toolmarks has not yet been fully demonstrated."[270] This statement, however, was qualified:

> There is one baseline level of credibility . . . that must be demonstrated lest any discussion of ballistic imaging be rendered moot—namely, that there is at least some "signal" that may be detected. In other words, the creation of toolmarks must not be so random and volatile that there is no reason to believe that any similar and matchable marks exist on two exhibits fired from the same gun. The existing research, and the field's general acceptance in legal proceedings for several decades, is more than adequate testimony to that baseline level. Beyond that level, we neither endorse nor oppose the fundamental assumptions. Our review in this chapter is not—and is not meant to be—a full weighing of evidence for or against the assumptions, but it is ample enough to suggest that they are not fully settled, mechanically or empirically.
>
> Another point follows directly: *Additional general research on the uniqueness and reproducibility of firearms-related toolmarks would have to be done if the basic premises of firearms identification are to be put on a more solid scientific footing.*[271]

The 2008 report cautioned:

> *Conclusions drawn in firearms identification should not be made to imply the presence of a firm statistical basis when none has been demonstrated.* Specifically, . . . examiners tend to cast their assessments in bold absolutes, commonly asserting that a match can be made "to the exclusion of all other firearms in the world." Such comments cloak an inherently subjective assessment of a match with an extreme probability statement that has no firm grounding and unrealistically implies an error rate of zero.[272]

267. National Research Council, Ballistic Imaging (2008), *available at* http://www.nap.edu/catalog.php?record_id=12162.

268. The committee was asked to assess the feasibility, accuracy, reliability, and technical capability of developing and using a national ballistic database as an aid to criminal investigations. It concluded: (1) "A national reference ballistic image database of all new and imported guns is not advisable at this time." (2) "NIBIN can and should be made more effective through operational and technological improvements." *Id.* at 5.

269. *Id.* at 70.

270. *Id.* at 81.

271. *Id.* at 81–82.

272. *Id.* at 82.

EXHIBIT C

The issue of the adequacy of the empirical basis of firearms identification expertise remains in dispute,[273] and research is ongoing. A recent study reported testing concerning 10 consecutively rifled Ruger pistol barrels. In 463 tests during the study, no false positives were reported; 8 inconclusive results were reported.[274] "But the capsule summaries [in this study] suggest a heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability."[275]

## C. Case Law Development

Firearms identification developed in the early part of the last century, and by 1930, courts were admitting evidence based on this technique.[276] Subsequent cases followed these precedents, admitting evidence of bullet,[277] cartridge case,[278] and shot shell[279] identifications. A number of courts have also permitted an expert to

273. *Compare* Roger G. Nichols, *Defending the Scientific Foundations of the Firearms and Tool Mark Identification Discipline: Responding to Recent Challenges*, 52 J. Forensic Sci. 586 (2007), *with* Adina Schwartz, *Commentary on "Nichols, R.G., Defending the scientific foundations of the firearms and tool mark identification discipline: Responding to recent challenges, J. Forensic Sci. 52(3):586-94 (2007),"* 52 J. Forensic Sci. 1414 (2007) (responding to Nichols). Moreover, AFTE disputed the Academy's conclusions. *See The Response of the Association of Firearm and Tool Mark Examiners to the National Academy of Sciences 2008 Report Assessing the Feasibility, Accuracy, and Capability of a National Ballistic Database August 20, 2008*, 40 AFTE J. 234 (2008) (concluding that underlying assumptions of uniqueness and reproducibility have been demonstrated, and the implication that there is no statistical basis is unwarranted); s*ee also* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005).

274. James E. Hamby et al., *The Identification of Bullets Fired from 10 Consecutively Rifled 9mm Ruger Pistol Barrels—A Research Project Involving 468 Participants from 19 Countries*, 41 AFTE J. 99 (Spring 2009).

275. NRC Forensic Science Report, *supra* note 3, at 155.

276. *E.g.,* People v. Fisher, 172 N.E. 743 (Ill. 1930); Evans v. Commonwealth, 19 S.W.2d 1091 (Ky. 1929); Burchett v. State, 172 N.E. 555 (Ohio Ct. App. 1930).

277. *E.g.,* United States v. Wolff, 5 M.J. 923, 926 (N.C.M.R. 1978); State v. Mack, 653 N.E.2d 329, 337 (Ohio 1995) (The examiner "compared the test shot with the morgue bullet recovered from the victim, . . . and the spent shell casings recovered from the crime scene, concluding that all had been discharged from appellant's gun.").

278. *E.g.,* Bentley v. Scully, 41 F.3d 818, 825 (2d Cir. 1994) ("[A] ballistic expert found that the spent nine millimeter bullet casing recovered from the scene of the shooting was fired from the pistol found on the rooftop."); State v. Samonte, 928 P.2d 1, 6 (Haw. 1996) ("Upon examining the striation patterns on the casings, [the examiner] concluded that the casing she had fired matched six casings that police had recovered from the house.").

279. *E.g.,* Williams v. State, 384 So. 2d 1205, 1210–11 (Ala. Crim. App. 1980); Burge v. State, 282 So. 2d 223, 229 (Miss. 1973); Commonwealth v. Whitacre, 878 A.2d 96, 101 (Pa. Super. Ct. 2005) ("no abuse of discretion in the trial court's decision to permit admission of the evidence regarding comparison of the two shell casings with the shotgun owned by Appellant").

**EXHIBIT C**

testify that a bullet *could have been fired* from a particular firearm;[280] that is, the class characteristics of the bullet and the firearm are consistent.[281]

The early post-*Daubert* challenges to the admissibility of firearms identification evidence failed.[282] This changed in 2005 in *United States v. Green*,[283] where the court ruled that the expert could describe only the ways in which the casings were similar but not that the casings came from a specific weapon "to the exclusion of every other firearm in the world."[284] In *United States v. Monteiro*[285] the expert had not made any sketches or taken photographs and thus adequate documentation was lacking: "Until the basis for the identification is described in such a way that the procedure performed by [the examiner] is reproducible and verifiable, it is inadmissible under Rule 702."[286]

In 2007 in *United States v. Diaz*,[287] the court found that the record did not support the conclusion that identifications could be made to the exclusion of all other firearms in the world. Thus, "the examiners who testify in this case may only testify that a match has been made to a 'reasonable degree of certainty in the ballistics field.'"[288] In 2008, *United States v. Glynn*[289] ruled that the expert could

280. *E.g.,* People v. Horning, 102 P.3d 228, 236 (Cal. 2004) (expert "opined that both bullets and the casing could have been fired from the same gun . . . ; because of their condition he could not say for sure"); Luttrell v. Commonwealth, 952 S.W.2d 216, 218 (Ky. 1997) (expert "testified only that the bullets which killed the victim could have been fired from Luttrell's gun"); State v. Reynolds, 297 S.E.2d 532, 539–40 (N.C. 1982); Commonwealth v. Moore, 340 A.2d 447, 451 (Pa. 1975).

281. This type of evidence has some probative value and satisfies the minimal evidentiary test for logical relevancy. *See* Fed. R. Evid. 401. As one court commented, the expert's "testimony, which established that the bullet which killed [the victim] could have been fired from the same caliber and make of gun found in the possession of [the defendant], significantly advanced the inquiry." Commonwealth v. Hoss, 283 A.2d 58, 68 (Pa. 1971).

282. *See* United States v. Hicks, 389 F.3d 514, 526 (5th Cir. 2004) (ruling that "the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades"); United States v. Foster, 300 F. Supp. 2d 375, 377 n.1 (D. Md. 2004) ("Ballistics evidence has been accepted in criminal cases for many years. . . . In the years since *Daubert,* numerous cases have confirmed the reliability of ballistics identification."); United States v. Santiago, 199 F. Supp. 2d 101, 111 (S.D.N.Y. 2002) ("The Court has not found a single case in this Circuit that would suggest that the entire field of ballistics identification is unreliable."); State v. Anderson, 624 S.E.2d 393, 397–98 (N.C. Ct. App. 2006) (no abuse of discretion in admitting bullet identification evidence); *Whitacre*, 878 A.2d at 101 ("no abuse of discretion in the trial court's decision to permit admission of the evidence regarding comparison of the two shell casings with the shotgun owned by Appellant").

283. 405 F. Supp. 2d 104 (D. Mass. 2005).

284. *Id*. at 107. The court had followed the same approach in a handwriting case. *See* United States v. Hines, 55 F. Supp. 2d 62, 67 (D. Mass. 1999) (expert testimony concerning the general similarities and differences between a defendant's handwriting exemplar and a stick-up note was admissible but not the specific conclusion that the defendant was the author).

285. 407 F. Supp. 2d 351 (D. Mass. 2006).

286. *Id*. at 374.

287. No. CR 05-00167 WHA, 2007 WL 485967 (N.D. Cal. Feb. 12, 2007).

288. *Id*. at *1.

289. 578 F. Supp. 2d 567 (S.D.N.Y. 2008).

EXHIBIT C

*Reference Manual on Scientific Evidence*

not use the term "reasonable scientific certainty" in testifying. Rather, the expert would be permitted to testify only that it was "more likely than not" that recovered bullets and cartridge cases came from a particular weapon.

Yet other courts continued to uphold admission.[290] By way of example, in *United States v. Williams*,[291] the Second Circuit upheld the admissibility of firearms identification evidence—bullets and cartridge casings. The opinion, however, contained some cautionary language: "We do not wish this opinion to be taken as saying that any proffered ballistic expert should be routinely admitted."[292] Several cases limited testimony after the 2009 NAS Report was published.[293] In the past, courts often have admitted toolmark identification evidence,[294] includ-

290. *See* United States v. Natson, 469 F. Supp. 2d 1253, 1261 (M.D. Ga. 2007) ("According to his testimony, these toolmarks were sufficiently similar to allow him to identify Defendant's gun as the gun that fired the cartridge found at the crime scene. He opined that he held this opinion to a 100% degree of certainty. . . . The Court also finds [the examiner's] opinions reliable and based upon a scientifically valid methodology. Evidence was presented at the hearing that the toolmark testing methodology he employed has been tested, has been subjected to peer review, has an ascertainable error rate, and is generally accepted in the scientific community."); Commonwealth v. Meeks, Nos. 2002-10961, 2003-10575, 2006 WL 2819423, at ⋆ 50 (Mass. Super. Ct. Sept. 28, 2006) ("The theory and process of firearms identification are generally accepted and reliable, and the process has been reliably applied in these cases. Accordingly, the firearms identification evidence, including opinions as to matches, may be presented to the juries for their consideration, but only if that evidence includes a detailed statement of the reasons for those opinions together with appropriate documentation.").

291. 506 F.3d 151, 161–62 (2d Cir. 2007) ("*Daubert* did make plain that Rule 702 embodies a more liberal standard of admissibility for expert opinions than did *Frye*. . . . But this shift to a more permissive approach to expert testimony did not abrogate the district court's gatekeeping function. Nor did it 'grandfather' or protect from *Daubert* scrutiny evidence that had previously been admitted under *Frye*.") (citations omitted).

292. *Id.* at 161.

293. *See* United States v. Willock, 696 F. Supp. 2d 536, 546, 549 (D. Md. 2010) (holding, based on a comprehensive magistrate's report, that "Sgt. Ensor shall not opine that it is a 'practical impossibility' for a firearm to have fired the cartridges other than the common 'unknown firearm' to which Sgt. Ensor attributes the cartridges." Thus, "Sgt. Ensor shall state his opinions and conclusions without any characterization as to the degree of certainty with which he holds them."); United States v. Taylor, 663 F. Supp. 2d 1170, 1180 (D.N.M. 2009) ("[B]ecause of the limitations on the reliability of firearms identification evidence discussed above, Mr. Nichols will not be permitted to testify that his methodology allows him to reach this conclusion as a matter of scientific certainty. Mr. Nichols also will not be allowed to testify that he can conclude that there is a match to the exclusion, either practical or absolute, of all other guns. He may only testify that, in his opinion, the bullet came from the suspect rifle to within a reasonable degree of certainty in the firearms examination field.").

294. In 1975, the Ninth Circuit noted that toolmark identification "rests upon a scientific basis and is a reliable and generally accepted procedure." United States v. Bowers, 534 F.2d 186, 193 (9th Cir. 1976).

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

ing screwdrivers,[295] crowbars,[296] punches,[297] knives,[298] as well as other objects.[299] An expert's opinion is admissible even if the expert cannot testify to a positive identification.[300]

# IX. Bite Mark Evidence

Bite mark analysis has been used for more than 50 years to establish a connection between a defendant and a crime.[301] The specialty developed within the field of forensic dentistry as an adjunct of dental identification, rather than originating in

---

295. *E.g.,* State v. Dillon, 161 N.W.2d 738, 741 (Iowa 1968) (screwdriver and nail bar fit marks on door frame); State v. Wessling, 150 N.W.2d 301 (Iowa 1967) (screwdriver); State v. Hazelwood, 498 P.2d 607, 612 (Kan. 1972) (screwdriver and imprint on window molding); State v. Wade, 465 S.W.2d 498, 499–500 (Mo. 1971) (screwdriver and pry marks on door jamb); State v. Brown, 291 S.W.2d 615, 618–19 (Mo. 1956) (crowbar and screwdriver marks on window sash and door); State v. Eickmeier, 191 N.W.2d 815, 816 (Neb. 1971) (screwdriver and marks on door).

296. *E.g., Brown*, 291 S.W.2d at 618–19 (Mo. 1956) (crowbar and screwdriver marks on window sash and door); State v. Raines, 224 S.E.2d 232, 234 (N.C. Ct. App. 1976).

297. *E.g.,* State v. Montgomery, 261 P.2d 1009, 1011–12 (Kan. 1953) (punch marks on safe).

298. *E.g.,* State v. Baldwin, 12 P. 318, 324–25 (Kan. 1886) (experienced carpenters could testify that wood panel could have been cut by accused's knife); Graves v. State, 563 P.2d 646, 650 (Okla. Crim. App. 1977) (blade and knife handle matched); State v. Clark, 287 P. 18, 20 (Wash. 1930) (knife and cuts on tree branches); State v. Bernson, 700 P.2d 758, 764 (Wash. Ct. App. 1985) (knife tip comparison).

299. *E.g.,* United States v. Taylor, 334 F. Supp. 1050, 1056–57 (E.D. Pa. 1971) (impressions on stolen vehicle and impressions made by dies found in defendant's possession), *aff'd,* 469 F.2d 284 (3d Cir. 1972); State v. McClelland, 162 N.W.2d 457, 462 (Iowa 1968) (pry bar and marks on "jimmied" door); Adcock v. State, 444 P.2d 242, 243–44 (Okla. Crim. App. 1968) (tool matched pry marks on door molding); State v. Olsen, 317 P.2d 938, 940 (Or. 1957) (hammer marks on the spindle of a safe).

300. For example, in *United States v. Murphy,* 996 F.2d 94 (5th Cir. 1993), an FBI expert gave limited testimony "that the tools such as the screwdriver associated with Murphy 'could' have made the marks on the ignitions but that he could not positively attribute the marks to the tools identified with Murphy." *Id.* at 99; *see also* State v. Genrich, 928 P.2d 799, 802 (Colo. App. 1996) (upholding expert testimony that three different sets of pliers recovered from the accused's house were used to cut wire and fasten a cap found in the debris from pipe bombs: "The expert's premise, that no two tools make exactly the same mark, is not challenged by any evidence in this record. Hence, the lack of a database and points of comparison does not render the opinion inadmissible.").

Although most courts have been receptive to toolmark evidence, a notable exception was *Ramirez v. State,* 810 So. 2d 836, 849–51(Fla. 2001). In *Ramirez,* the Florida Supreme Court rejected the testimony of five experts who claimed general acceptance for a process of matching a knife with a cartilage wound in a murder victim—a type of "toolmark" comparison. Although the court applied *Frye*, it emphasized the lack of testing, the paucity of "meaningful peer review," the absence of a quantified error rate, and the lack of developed objective standards. In *Sexton v. State,* 93 S.W.3d 96 (Tex. Crim. App. 2002), an expert testified that cartridge cases from *unfired* bullets found in the appellant's apartment had distinct marks that matched fired cartridge cases found at the scene of the offense. The court ruled the testimony inadmissible: "This record qualifies Crumley as a firearms identification expert, but does not support his capacity to identify cartridge cases on the basis of magazine marks only." *Id.* at 101.

301. *See* E.H. Dinkel, *The Use of Bite Mark Evidence as an Investigative Aid*, 19 J. Forensic Sci. 535 (1973).

EXHIBIT C

crime laboratories. Courts have admitted bite mark comparison evidence in homicide, rape, and child abuse cases. In virtually all the cases, the evidence was first offered by the prosecution. The typical bite mark case has involved the identification of the defendant by matching his dentition with a mark left on the victim. In several cases, however, the victim's teeth have been compared with marks on the defendant's body. One bite mark case involved dentures[302] and another braces.[303] A few cases have entailed bite impressions on foodstuff found at a crime scene: apple,[304] piece of cheese,[305] and sandwich.[306] Still other cases involved dog bites.[307]

Bite marks occur primarily in sex-related crimes, child abuse cases, and offenses involving physical altercations, such as homicide. A survey of 101 cases reported these findings: "More than one bitemark was present in 48% of all the bite cases studied. Bitemarks were found on adults in 81.3% of the cases and on children under 18 years-of-age in 16.7% of cases. Bitemarks were associated with the following types of crimes: murder, including attempted murder (53.9%), rape (20.8%), sexual assault (9.7%), child abuse (9.7%), burglary (3.3%), and kidnapping (12.6%)."[308]

## A. The Technique

Bite mark identification is an offshoot of the dental identification of deceased persons, which is often used in mass disasters. Dental identification is based on the assumption that every person's dentition is unique. The human adult dentition consists of 32 teeth, each with 5 anatomic surfaces. Thus, there are 160 dental surfaces that can contain identifying characteristics. Restorations, with varying shapes, sizes, and restorative materials, may offer numerous additional points of individuality. Moreover, the number of teeth, prostheses, decay, malposition,

---

302. *See* Rogers v. State, 344 S.E.2d 644, 647 (Ga. 1986) ("Bite marks on one of Rogers' arms were consistent with the dentures worn by the elderly victim.").

303. *See* People v. Shaw, 664 N.E.2d 97, 101, 103 (Ill. App. Ct. 1996) (In a murder and aggravated sexual assault prosecution, the forensic odontologist opined that the mark on the defendant was caused by the orthodontic braces on the victim's teeth; "Dr. Kenney admitted that he was not a certified toolmark examiner"; no abuse of discretion to admit evidence).

304. *See* State v. Ortiz, 502 A.2d 400, 401 (Conn. 1985).

305. *See* Doyle v. State, 263 S.W.2d 779, 779 (Tex. Crim. App. 1954); Seivewright v. State, 7 P.3d 24, 26 (Wyo. 2000) ("On the basis of his comparison of the impressions from the cheese with Seivewright's dentition, Dr. Huber concluded that Seivewright was the person who bit the cheese.").

306. *See* Banks v. State, 725 So. 2d 711, 714–16 (Miss. 1997) (finding a due process violation when prosecution expert threw away sandwich after finding the accused's teeth consistent with the sandwich bite).

307. *See* Davasher v. State, 823 S.W.2d 863, 870 (Ark. 1992) (expert testified that victim's dog could be eliminated as the source of mark found on defendant); State v. Powell, 446 S.E.2d 26, 27–28 (N.C. 1994) ("A forensic odontologist testified that dental impressions taken from Bruno and Woody [accused's dogs] were compatible with some of the lacerations in the wounds pictured in scale photographs of Prevette's body.").

308. Iain A. Pretty & David J. Sweet, *Anatomical Location of Bitemarks and Associated Findings in 101 Cases from the United States,* 45 J. Forensic Sci. 812, 812 (2000).

EXHIBIT C

malrotation, peculiar shapes, root canal therapy, bone patterns, bite relationship, and oral pathology may also provide identifying characteristics.[309] The courts have accepted dental identification as a means of establishing the identity of a homicide victim,[310] with some cases dating back to the nineteenth century.[311] According to one court, "it cannot be seriously disputed that a dental structure may constitute a means of identifying a deceased person . . . where there is some dental record of that person with which the structure may be compared."[312]

## 1. Theory of uniqueness

Identification of a suspect by matching his or her dentition with a bite mark found on the victim of a crime rests on the theory that each person's dentition is unique. However, there are significant differences between the use of forensic dental techniques to identify a decedent and the use of bite mark analysis to identify a perpetrator.[313] In 1969, when bite mark comparisons were first studied, one authority raised the following problems:

> [Bite]marks can never be taken to reproduce accurately the dental features of the originator. This is due partially to the fact that bite marks generally include only a limited number of teeth. Furthermore, the material (whether food stuff or human skin) in which the mark has been left is usually found to be a very unsatisfactory impression material with shrinkage and distortion characteristics that are unknown. Finally, these marks represent only the remaining and fixed picture of an action, the mechanism of which may vary from case to case. For instance, there is as yet no precise knowledge of the possible differences between biting off a morsel of food and using one's teeth for purposes of attack or defense.[314]

---

309. The identification is made by comparing the decedent's teeth with antemortem dental records, such as charts and, more importantly, radiographs.

310. *E.g.,* Wooley v. People, 367 P.2d 903, 905 (Colo. 1961) (dentist compared his patient's record with dentition of a corpse); Martin v. State, 636 N.E.2d 1268, 1272 (Ind. Ct. App. 1994) (dentist qualified to compare X rays of one of his patients with skeletal remains of murder victim and make a positive identification); Fields v. State, 322 P.2d 431, 446 (Okla. Crim. App. 1958) (murder case in which victim was burned beyond recognition).

311. *See* Commonwealth v. Webster, 59 Mass. (5 Cush.) 295, 299–300 (1850) (remains of the incinerated victim, including charred teeth and parts of a denture, were identified by the victim's dentist); Lindsay v. People, 63 N.Y. 143, 145–46 (1875).

312. People v. Mattox, 237 N.E.2d 845, 846 (Ill. App. Ct. 1968).

313. *See* Iain A. Pretty & David J. Sweet, *The Scientific Basis for Human Bitemark Analyses—A Critical Review,* 41 Sci. & Just. 85, 88 (2001) ("A distinction must be drawn from the ability of a forensic dentist to identify an individual from their dentition by using radiographs and dental records and the science of bitemark analysis.").

314. S. Keiser-Nielson, *Forensic Odontology*, 1 U. Tol. L. Rev. 633, 636 (1969); *see also* NRC Forensic Science Report, *supra* note 3, at 174 ("[B]ite marks on the skin will change over time and can be distorted by the elasticity of the skin, the unevenness of the surface bite, and swelling and healing. These features may severely limit the validity of forensic odontology. Also, some practical difficulties, such as distortions in photographs and changes over time in the dentition of suspects, may limit the accuracy of the results.").

EXHIBIT C

Dental identifications of decedents do not pose any of these problems; the expert can often compare all 32 teeth with X rays depicting all those teeth. However, in the typical bite mark case, all 32 teeth cannot be compared; often only 4 to 8 are biting teeth that can be compared. Similarly, all five anatomic surfaces are not engaged in biting; only the edges of the front teeth come into play. In sum, bite mark identification depends not only on the uniqueness of each person's dentition but also on "whether there is a [sufficient] representation of that uniqueness in the mark found on the skin or other inanimate object."[315]

## 2. Methods of comparison

Several methods of bite mark analysis have been reported. All involve three steps: (1) registration of both the bite mark and the suspect's dentition, (2) comparison of the dentition and bite mark, and (3) evaluation of the points of similarity or dissimilarity. The reproductions of the bite mark and the suspect's dentition are analyzed through a variety of methods.[316] The comparison may be either direct or indirect. A model of the suspect's teeth is used in direct comparisons; the model is compared to life-size photographs of the bite mark. Transparent overlays made from the model are used in indirect comparisons.

Although the expert's conclusions are based on objective data, the ultimate opinion regarding individuation is essentially a subjective one.[317] There is no accepted minimum number of points of identity required for a positive iden- tification.[318] The experts who have appeared in published bite mark cases have testified to a wide range of points of similarity, from a low of eight points to a

---

315. Raymond D. Rawson et al., *Statistical Evidence for the Individuality of the Human Dentition*, 29 J. Forensic Sci. 252 (1984).

316. *See* David J. Sweet, *Human Bitemarks: Examination, Recovery, and Analysis*, in Manual of Forensic Odontology 162 (American Society of Forensic Odontology, 3d ed. 1997) [hereinafter ASFO Manual] ("The analytical protocol for bitemark comparison is made up of two broad cat- egories. Firstly, the measurement of specific traits and features called a *metric analysis*, and secondly, the physical matching or comparison of the configuration and pattern of the injury called a *pattern association*."); *see also* David J. Sweet & C. Michael Bowers, *Accuracy of Bite Mark Overlays: A Com- parison of Five Common Methods to Produce Exemplars from a Suspect's Dentition*, 43 J. Forensic Sci. 362, 362 (1998) ("A review of the forensic odontology literature reveals multiple techniques for overlay production. There is an absence of reliability testing or comparison of these methods to known or reference standards.").

317. *See* Roland F. Kouble & Geoffrey T. Craig, *A Comparison Between Direct and Indirect Methods Available for Human Bite Mark Analysis*, 49 J. Forensic Sci. 111, 111 (2004) ("It is important to remember that computer-generated overlays still retain an element of subjectivity, as the selection of the biting edge profiles is reliant on the operator placing the 'magic wand' onto the areas to be highlighted within the digitized image.").

318. *See* Keiser-Nielsen, *supra* note 314, at 637–38; *see also* Stubbs v. State, 845 So. 2d 656, 669 (Miss. 2003) ("There is little consensus in the scientific community on the number of points which must match before any positive identification can be announced.").

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

high of 52 points.[319] Moreover, disagreements among experts in court appear commonplace: "Although bite mark evidence has demonstrated a high degree of acceptance, it continues to be hotly contested in 'battles of the experts.' Review of trial transcripts reveals that distortion and the interpretation of distortion is a factor in most cases."[320] Because of the subjectivity, some odontologists have argued that "bitemark evidence should only be used to exclude a suspect. This [argument] is supported by research which shows that the exclusion of non–biters within a population of suspects is extremely accurate; far more so than the positive identification of biters."[321]

### 3. ABFO Guidelines

In an attempt to develop an objective method, in 1984 the American Board of Forensic Odontology (ABFO) promulgated guidelines for bite mark analysis, including a uniform scoring system.[322] According to the drafting committee, "[t]he scoring system . . . has demonstrated a method of evaluation that produced a high degree of reliability among observers."[323] Moreover, the committee characterized "[t]he scoring guide . . . [as] the beginning of a truly scientific approach to bite mark analysis."[324] In a subsequent letter, however, the drafting committee wrote:

> While the Board's published guidelines suggest use of the scoring system, the authors' present recommendation is that all odontologists await the results of further research before relying on precise point counts in evidentiary proceedings. . . . [T]he authors believe that further research is needed regarding the quantification of bite mark evidence before precise point counts can be relied upon in court proceedings.[325]

---

319. *E.g.*, State v. Garrison, 585 P.2d 563, 566 (Ariz. 1978) (10 points); People v. Slone, 143 Cal. Rptr. 61, 67 (Cal. Ct. App. 1978) (10 points); People v. Milone, 356 N.E.2d 1350, 1356 (Ill. App. Ct. 1976) (29 points); State v. Sager, 600 S.W.2d 541, 564 (Mo. Ct. App. 1980) (52 points); State v. Green, 290 S.E.2d 625, 630 (N.C. 1982) (14 points); State v. Temple, 273 S.E.2d 273, 279 (N.C. 1981) (8 points); Kennedy v. State, 640 P.2d 971, 976 (Okla. Crim. App. 1982) (40 points); State v. Jones, 259 S.E.2d 120, 125 (S.C. 1979) (37 points).

320. Raymond D. Rawson et al., *Analysis of Photographic Distortion in Bite Marks: A Report of the Bite Mark Guidelines Committee*, 31 J. Forensic Sci. 1261, 1261–62 (1986). The committee noted: "[P]hotographic distortion can be very difficult to understand and interpret when viewing prints of bite marks that have been photographed from unknown angles." *Id.* at 1267.

321. Iain A. Pretty, *A Web-Based Survey of Odontologist's Opinions Concerning Bitemark Analyses*, 48 J. Forensic Sci. 1117, 1120 (2003) [hereinafter *Web-Based Survey*].

322. ABFO, *Guidelines for Bite Mark Analysis*, 112 J. Am. Dental Ass'n 383 (1986).

323. Raymond D. Rawson et al., *Reliability of the Scoring System of the American Board of Forensic Odontology for Human Bite Marks*, 31 J. Forensic Sci. 1235, 1259 (1986).

324. *Id.*

325. Letter, *Discussion of "Reliability of the Scoring System of the American Board of Forensic Odontology for Human Bite Marks,"* 33 J. Forensic Sci. 20 (1988).

**EXHIBIT C**

## B. The Empirical Record

The 2009 NRC report concluded:

> More research is needed to confirm the fundamental basis for the science of bite mark comparison. Although forensic odontologists understand the anatomy of teeth and the mechanics of biting and can retrieve sufficient information from bite marks on skin to assist in criminal investigations and provide testimony at criminal trials, the scientific basis is insufficient to conclude that bite mark comparisons can result in a conclusive match.[326]

Moreover, "[t]here is no science on the reproducibility of the different methods of analysis that lead to conclusions about the probability of a match."[327] Another passage provides: "Despite the inherent weaknesses involved in bite mark comparison, it is reasonable to assume that the process can sometimes reliably exclude suspects."[328]

Although bitemark identifications are accepted by forensic dentists, only a few empirical studies have been conducted[329] and only a small number of forensic dentists have addressed the empirical issue. In the words of one expert,

> The research suggests that bitemark evidence, at least that which is used to identify biters, is a potentially valid and reliable methodology. It is generally accepted within the scientific [dental] community, although the basis of this acceptance within the peer-reviewed literature is thin. Only three studies have examined the ability of odontologists to utilise bitemarks for the identification of biters, and only two studies have been performed in what could be considered a contemporary framework of attitudes and techniques.[330]

326. NRC Forensic Science Report, *supra* note 3, at 175. *See also id*. at 176. ("Although the majority of forensic odontologists are satisfied that bite marks can demonstrate sufficient detail for positive identification, no scientific studies support this assessment, and no large population studies have been conducted."),

327. *Id*. at 174.

328. *Id*. at 176.

329. *See* C. Michael Bowers, Forensic Dental Evidence: An Investigator's Handbook 189 (2004) ("As a number of legal commentators have observed, bite mark analysis has never passed through the rigorous scientific examination that is common to most sciences. The literature does not go far in disputing that claim."); Iain A. Pretty, *Unresolved Issues in Bitemark Analysis*, *in* Bitemark Evidence 547, 547 (Robert B.J. Dorion ed., 2005) ("As a general rule, case reports add little to the scientific knowledge base, and therefore, if these, along with noncritical reviews, are discarded, very little new empirical evidence has been developed in the past five years."); *id*. at 561 ("[T]he final question in the recent survey asked, 'Should an appropriately trained individual positively identify a suspect from a bitemark on skin'—70% of the respondents stated yes. However, it is the judicial system that must assess validity, reliability, and a sound scientific base for expert forensic testimony. A great deal of further research is required if odontology hopes to continue to be a generally accepted science.").

330. Iain A. Pretty, *Reliability of Bitemark Evidence*, *in* Bitemark Evidence at 543 (Robert B.J. Dorion ed., 2005).

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

Commentators have highlighted the following areas of controversy: "a) accuracy of the bitemark itself, b) uniqueness of the human dentition, and c) analytical techniques."[331]

One part of a 1975 study involved identification of bites made on pigskin: "Incorrect identification of the bites made on pigskin ranged from 24% incorrect identifications under ideal laboratory conditions to as high as 91% incorrect identifications when the bites were photographed 24 hours after the bites made."[332] A 1999 ABFO Workshop, "where ABFO diplomats attempted to match four bitemarks to seven dental models, resulted in 63.5% false positives."[333] A 2001 study of bites on pigskin "found false positive identifications of 11.9–22.0% for various groups of forensic odontologists (15.9% false positives for ABFO diplomats), with some ABFO diplomats faring far worse."[334] Other commentators take a more favorable view of these studies.[335]

## 1. DNA exonerations

In several cases, subsequent DNA testing has demonstrated the error in a prior bite mark identification. In *State v. Krone*,[336] two experienced experts concluded that the defendant had made the bite mark found on a murder victim. The defendant, however, was later exonerated through DNA testing.[337] In *Otero v. Warnick*,[338] a forensic dentist testified that the "plaintiff was the only person in the world who

---

331. Pretty & Sweet, *supra* note 313, at 87. Commentators had questioned the lack of research in the field as long ago as 1985. Two commentators wrote:

> There is effectively no valid documented scientific data to support the hypothesis that bite marks are demonstrably unique. Additionally, there is no documented scientific data to support the hypothesis that a latent bite mark, like a latent fingerprint, is a true and accurate reflection of this uniqueness. To the contrary, what little scientific evidence that does exist clearly supports the conclusion that crime-related bite marks are grossly distorted, inaccurate, and therefore unreliable as a method of identification.

Allen P. Wilkinson & Ronald M. Gerughty, *Bite Mark Evidence: Its Admissibility Is Hard to Swallow*, 12 W. St. U. L. Rev. 519, 560 (1985).

332. C. Michael Bowers, *Problem-Based Analysis of Bitemark Misidentifications: The Role of DNA*, 159S Forensic Sci. Int'l S104, S106 (2006) (citing D.K. Whittaker, *Some Laboratory Studies on the Accuracy of Bite Mark Comparison*, 25 Int'l Dent. J. 166 (1975)) [hereinafter *Problem-Based Analysis*].

333. Bowers, *Problem-Based Analysis*, *supra* note 332, at S106. *But see* Kristopher L. Arheart & Iain A. Pretty, *Results of the 4th ABFO Bitemark Workshop 1999*, 124 Forensic Sci. Int'l 104 (2001).

334. Bowers, *Problem-Based Analysis*, *supra* note 332, at S106 (citing Iain A. Pretty & David J. Sweet, *Digital Bitemark Overlays—An Analysis of Effectiveness*, 46 J. Forensic Sci. 1385, 1390 (2001) ("While the overall effectiveness of overlays has been established, the variation in individual performance of odontologists is of concern.")).

335. *See* Pretty, *Reliability of Bitemark Evidence*, *in* Bitemark Evidence, *supra* note 330, at 538–42.

336. 897 P.2d 621, 622, 623 (Ariz. 1995) ("The bite marks were crucial to the State's case because there was very little other evidence to suggest Krone's guilt."; "Another State dental expert, Dr. John Piakis, also said that Krone made the bite marks. . . . Dr. Rawson himself said that Krone made the bite marks. . . .").

337. *See* Mark Hansen, *The Uncertain Science of Evidence*, A.B.A. J. 49 (2005) (discussing *Krone*).

338. 614 N.W.2d 177 (Mich. Ct. App. 2000).

EXHIBIT C

could have inflicted the bite marks on [the murder victim's] body. On January 30, 1995, the Detroit Police Crime Laboratory released a supplemental report that concluded that plaintiff was excluded as a possible source of DNA obtained from vaginal and rectal swabs taken from [the victim's] body."[339] In *Burke v. Town of Walpole*,[340] the expert concluded that "Burke's teeth matched the bite mark on the victim's left breast to a 'reasonable degree of scientific certainty.' That same morning . . . DNA analysis showed that Burke was excluded as the source of male DNA found in the bite mark on the victim's left breast."[341] In the future, the availability of nuclear DNA testing may reduce the need to rely on bite mark identifications.[342]

## C. Case Law Development

*People v. Marx* (1975)[343] emerged as the leading bite mark case. After *Marx*, bite mark evidence became widely accepted.[344] By 1992, it had been introduced or noted in 193 reported cases and accepted as admissible in 35 states.[345] Some courts described bite mark comparison as a "science,"[346] and several cases took judicial notice of its validity.[347]

---

339. *Id.* at 178.

340. 405 F.3d 66, 73 (1st Cir. 2005).

341. *See also* Bowers, *Problem-Based Analysis, supra* note 332, at S104 (citing several cases involving bitemarks and DNA exonerations: *Gates, Bourne, Morris, Krone, Otero, Young,* and *Brewer*); Mark Hansen, *Out of the Blue*, A.B.A. 50, 51 (1996) (DNA analysis of skin taken from fingernail scrapings of the victim conclusively excluded Bourne).

342. *See* Pretty, *Web-Based Survey, supra* note 321, at 1119 ("The use of DNA in the assessment of bitemarks has been established for some time, although previous studies have suggested that the uptake of this technique has been slow. It is encouraging to note that nearly half of the respondents in this case have employed biological evidence in a bitemark case.").

343. 126 Cal. Rptr. 350 (Cal. Ct. App. 1975). The court in *Marx* avoided applying the *Frye* test, which requires acceptance of a novel technique by the scientific community as a prerequisite to admissibility. According to the court, the *Frye* test "finds its rational basis in the degree to which the trier of fact must accept, on faith, scientific hypotheses not capable of proof or disproof in court and not even generally accepted outside the courtroom." *Id.* at 355–56.

344. Two Australian cases, however, excluded bite mark evidence. *See* Lewis v. The Queen (1987) 29 A. Crim. R. 267 (odontological evidence was improperly relied on, in that this method has not been scientifically accepted); R v. Carroll (1985) 19 A. Crim. R. 410 ("[T]he evidence given by the three odontologist is such that it would be unsafe or dangerous to allow a verdict based upon it to stand.").

345. Steven Weigler, *Bite Mark Evidence: Forensic Odontology and the Law*, 2 Health Matrix: J.L.-Med. 303 (1992).

346. *See* People v. Marsh, 441 N.W.2d 33, 35 (Mich. Ct. App. 1989) ("the science of bite mark analysis has been extensively reviewed in other jurisdictions"); State v. Sager, 600 S.W.2d 541, 569 (Mo. Ct. App. 1980) ("an exact science").

347. *See* State v. Richards, 804 P.2d 109, 112 (Ariz. Ct. App. 1990) ("[B]ite mark evidence is admissible without a preliminary determination of reliability. . . ."); People v. Middleton, 429 N.E.2d 100, 101 (N.Y. 1981) ("The reliability of bite mark evidence as a means of identification is sufficiently

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

## 1. Specificity of opinion

In some cases, experts testified only that a bite mark was "consistent with" the defendant's teeth.[348] In other cases, they went further and opined that it is "highly probable" or "very highly probable" that the defendant made the mark.[349] In still other cases, experts made positive identifications (to the exclusion of all other persons).[350] It is not unusual to find experts disagreeing in individual cases—often over the threshold question of whether a wound was even a bite mark.[351]

established in the scientific community to make such evidence admissible in a criminal case, without separately establishing scientific reliability in each case. . . ."); State v. Armstrong, 369 S.E.2d 870, 877 (W. Va. 1988) (judicially noticing the reliability of bite mark evidence).

348. *E.g.,* Rogers v. State, 344 S.E.2d 644, 647 (Ga. 1986) ("Bite marks on one of Rogers' arms were consistent with the dentures worn by the elderly victim."); People v. Williams, 470 N.E.2d 1140, 1150 (Ill. App. Ct. 1984) ("could have"); State v. Hodgson, 512 N.W.2d 95, 98 (Minn. 1994) (en banc) (Board-certified forensic odontologist testified that "there were several similarities between the bite mark and the pattern of [the victim's] teeth, as revealed by known molds of his mouth."); State v. Routh, 568 P.2d 704, 705 (Or. Ct. App. 1977) ("similarity"); Williams v. State, 838 S.W.2d 952, 954 (Tex. Ct. App. 1992) ("One expert, a forensic odontologist, testified that Williams's dentition was consistent with the injury (bite mark) on the deceased."); State v. Warness, 893 P.2d 665, 669 (Wash. Ct. App. 1995) ("[T]he expert testified that his opinion was not conclusive, but the evidence was consistent with the alleged victim's assertion that she had bitten Warness. . . . Its probative value was therefore limited, but its relevance was not extinguished.").

349. *E.g.,* People v. Slone, 143 Cal. Rptr. 61, 67 (Cal. Ct. App. 1978); People v. Johnson, 289 N.E.2d 722, 726 (Ill. App. Ct. 1972).

350. *E.g.,* Morgan v. State, 639 So. 2d 6, 9 (Fla. 1994) ("[T]he testimony of a dental expert at trial positively matched the bite marks on the victim with Morgan's teeth."); Duboise v. State, 520 So. 2d 260, 262 (Fla. 1988) (Expert "testified at trial that within a reasonable degree of dental certainty Duboise had bitten the victim."); Brewer v. State, 725 So. 2d 106, 116 (Miss. 1998) ("Dr. West opined that Brewer's teeth inflicted the five bite mark patterns found on the body of Christine Jackson."); State v. Schaefer, 855 S.W.2d 504, 506 (Mo. Ct. App. 1993) ("[A] forensic dentist testified that the bite marks on Schaefer's shoulder matched victim's dental impression, and concluded that victim caused the marks."); State v. Lyons, 924 P.2d 802, 804 (Or. 1996) (forensic odontologist "had no doubt that the wax models were made from the same person whose teeth marks appeared on the victim's body"); State v. Cazes, 875 S.W.2d 253, 258 (Tenn. 1994) (A forensic odontologist "concluded to a reasonable degree of dental certainty that Cazes' teeth had made the bite marks on the victim's body at or about the time of her death.").

351. *E.g.,* Ege v. Yukins, 380 F. Supp. 2d 852, 878 (E.D. Mich. 2005) ("[T]he defense attempted to rebut Dr. Warnick's testimony with the testimony of other experts who opined that the mark on the victim's cheek was the result of *livor mortis* and was not a bite mark at all."); Czapleski v. Woodward, No. C-90-0847 MHP, 1991 U.S. Dist. LEXIS 12567, at ⋆3–4 (N.D. Cal. Aug. 30, 1991) (dentist's initial report concluded that "bite" marks found on child were consistent with dental impressions of mother; several experts later established that the marks on child's body were postmortem abrasion marks and not bite marks); Kinney v. State, 868 S.W.2d 463, 464–65 (Ark. 1994) (disagreement that marks were human bite marks); People v. Noguera, 842 P.2d 1160, 1165 n.1 (Cal. 1992) ("At trial, extensive testimony by forensic ondontologists [sic] was presented by both sides, pro and con, as to whether the wounds were human bite marks and, if so, when they were inflicted."); State v. Duncan, 802 So. 2d 533, 553 (La. 2001) ("Both defense experts testified that these marks on the victim's body were not bite marks."); Stubbs v. State, 845 So. 2d 656, 668 (Miss. 2003) ("Dr. Galvez denied the impressions found on Williams were the results of bite marks.").

111

EXHIBIT C

*Reference Manual on Scientific Evidence*

## 2. Post-Daubert *cases*

Although some commentators questioned the underlying basis for the technique after *Daubert*,[352] courts have continued to admit the evidence.[353]

# X. Microscopic Hair Evidence

The first reported use of forensic hair analysis occurred more than 150 years ago in 1861 in Germany.[354] The first published American opinion was an 1882 Wisconsin decision, *Knoll v. State*.[355] Based on a microscopic comparison, the expert testified that the hair samples shared a common source. Hair and the closely related fiber analysis played a prominent role in two of the most famous twentieth-century American prosecutions: Ted Bundy in Florida and Wayne Williams, the alleged Atlanta child killer.[356] Although hair comparison evidence has been judicially accepted for decades, it is another forensic identification discipline that is being reappraised today.

## A. The Technique

Generally, after assessing whether a sample is a hair and not a fiber, an analyst may be able to determine: (1) whether the hair is of human or animal origin, (2) the part of the body that the hair came from, (3) whether the hair has been dyed, (4) whether the hair was pulled or fell out as a result of natural causes or disease,[357] and (5) whether the hair was cut or crushed.[358]

---

352. *See* Pretty & Sweet, *supra* note 313, at 86 ("Despite the continued acceptance of bitemark evidence in European, Oceanic and North American Courts the fundamental scientific basis for bite-mark analysis has never been established.").

353. *See* State v. Timmendequas, 737 A.2d 55, 114 (N.J. 1999) ("Judicial opinion from other jurisdictions establish that bite-mark analysis has gained general acceptance and therefore is reliable. Over thirty states considering such evidence have found it admissible and no state has rejected bite-mark evidence as unreliable.") (citations omitted); *Stubbs*, 845 So. 2d at 670; Howard v. State, 853 So. 2d 781, 795–96 (Miss. 2003); Seivewright v. State, 7 P.3d 24, 30 (Wyo. 2000) ("Given the wide acceptance of bite mark identification testimony and Seivewright's failure to present evidence challenging the methodology, we find no abuse of discretion in the district court's refusal to hold an evidentiary hearing to analyze Dr. Huber's testimony.").

354. E. James Crocker, *Trace Evidence*, *in* Forensic Evidence in Canada 259, 265 (1991) (the analyst was Rudolf Virchow, a Berliner).

355. 12 N.W. 369 (Wis. 1882).

356. Edward J. Imwinkelried, *Forensic Hair Analysis: The Case Against the Underemployment of Scientific Evidence,* 39 Wash. & Lee L. Rev. 41, 43 (1982).

357. *See* Delaware v. Fensterer, 474 U.S. 15. 16–17 (1985) (FBI analyst testified hair found at a murder scene had been forcibly removed.).

358. *See* 2 Giannelli & Imwinkelried, *supra* note 177, § 24-2.

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

The most common subject for hair testimony involves an attempt to individuate the hair sample, at least to some degree. If the unknown is head hair, the expert might gather approximately 50 hair strands from five different areas of the scalp (the top, front, back, and both sides) from the known source.[359] Before the microscopic analysis, the expert examines the hair macroscopically to identify obvious features visible to the naked eye such as the color of the hair and its form, that is, whether it is straight, wavy, or curved.[360] The expert next mounts the unknown hair and the known samples on microscope slides for a more detailed examination of characteristics such as scale patterns, size, color, pigment distribution, maximum diameter, shaft length, and scale count. Some of these comparative judgments are subjective in nature: "Human hair characteristics (e.g., scale patterns, pigmentation, size) vary within a single individual. . . . Although the examination procedure involves objective methods of analysis, the subjective weights associated with the characteristics rest with the examiner."[361]

Often the examiner determines only whether the hair samples from the crime scene and the accused are "microscopically indistinguishable." Although this finding is consistent with the hypothesis that the samples had the same source, its probative value would, of course, vary if only a hundred people had microscopically indistinguishable hair as opposed to several million. As discussed below, experts have often gone beyond this "consistent with" testimony.

## B. The Empirical Record

The 2009 NRC report contained an assessment of hair analysis. The report began the assessment by observing that there are neither "scientifically accepted [population] frequency" statistics for various hair characteristics nor "uniform standards on the number of features on which hairs must agree before an examiner may declare a 'match.'"[362] The report concluded,

> [T]estimony linking microscopic hair analysis with particular defendants is highly unreliable. In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies are of limited probative value. The committee found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA. Microscopy and mtDNA analysis can be used in tandem and add to one another's value for classifying a common source, but no studies have been performed specifically to quantify the reliability of their joint use.[363]

359.  NRC Forensic Science Report, *supra* note 3, at 157.
360.  *Id.*
361.  Miller, *supra* note 67, at 157–58.
362.  NRC Forensic Science Report, *supra* note 3, at 160.
363.  *Id.* at 8.

EXHIBIT C

*Reference Manual on Scientific Evidence*

There is a general consensus that hair examination can yield reliable information about class characteristics of hair strands.[364] Indeed, experts can identify major as well as secondary characteristics. Major characteristics include such features as color, shaft form, and hair diameter.[365] Secondary characteristics are such features as pigment size and shaft diameter.[366] These characteristics can help narrow the class of possible sources for the unknown hair sample.

There have been several major efforts to provide an empirical basis for individuation opinions in hair analysis. In the 1940s, Gamble and Kirk investigated whether hair samples from different persons could be distinguished on the basis of scale counts.[367] However, they used a small database of only thirty-nine hair samples, and a subsequent attempt to replicate the original experiment yielded contradictory results.[368]

In the 1960s, neutron activation analysis was used in an effort to individuate hair samples. The research focused on determining the occurrence of various trace element concentrations in human hair.[369] Again, subsequent research tended to show that there are significant hair-to-hair variations in trace element concentration among the hairs of a single person.[370]

In the 1970s, two Canadian researchers, Gaudette and Keeping, attempted to develop a "ballpark" estimate of the probability of a false match in hair analysis. They published articles describing three studies: (1) a 1974 study involving scalp hair,[371] (2) a

364. *Id.* at 157.

365. *Id.* at 5–23.

366. *Id.*

367. Their initial research indicated that: (1) the scale count of even a single hair strand is nearly always representative of all scalp hairs; and (2) while the average or mean scale count is constant for the individual, the count differs significantly from person to person. Lucy L. Gamble & Paul L. Kirk, *Human Hair Studies II. Scale Counts,* 31 J. Crim. L. & Criminology 627, 629 (1941); Paul L. Kirk & Lucy L. Gamble, *Further Investigation of the Scale Count of Human Hair,* 33 J. Crim. L. & Criminology 276, 280 (1942).

368. Joseph Beeman, *The Scale Count of Human Hair,* 32 J. Crim. L. & Criminology 572, 574 (1942).

369. Rita Cornelis, *Is It Possible to Identify Individuals by Neutron Activation Analysis of Hair?* 12 Med. Sci. & L. 188 (1972); Lima et al., *Activation Analysis Applied to Forensic Investigation: Some Observations on the Problem of Human Hair Individualization,* 1 Radio Chem. Methods of Analysis 119 (Int'l Atomic Energy Agency 1965); A.K. Perkins, *Individualization of Human Head Hair, in* Proceedings of the First Int'l Conf. on Forensic Activation Analysis 221 (V. Guin ed., 1967).

370. Rita Cornelis, *Truth Has Many Facets: The Neutron Activation Analysis Story*, 20 J. Forensic Sci. 93, 95 (1980) ("I am convinced that irrefutable hair identification from its trace element composition still belongs to the realm of wishful thinking. . . . The state of the art can be said to be that nearly all interest for trace elements present in hair, as a practical identification tool, has faded."); Dennis S. Karjala, *Evidentiary Uses of Neutron Activation Analysis,* 59 Cal. L. Rev. 977, 1039 (1971).

371. B.D. Gaudette & E.S. Keeping, *An Attempt at Determining Probabilities in Human Scalp Hair Comparison,* 19 J. Forensic Sci. 599 (1974).

**EXHIBIT C**

*Reference Guide on Forensic Identification Expertise*

1976 study using pubic hair,[372] and (3) a 1978 followup.[373] In the two primary studies (1974 and 1976), hair samples were analyzed to determine whether hairs from different persons were microscopically indistinguishable. The analysts used 23 different characteristics such as color, pigment distribution, maximum diameter, shaft length, and scale count.[374] Based on those data, they estimated the probability of a false match in scalp hair to be 1 in 4500 and the probability of a false match in pubic hair to be 1 in 800.

In the view of one commentator, Gaudette and Keeping's probability estimates "are easily challenged."[375] One limitation was the relatively small database in the study.[376] Moreover, the studies involved samples from different individuals and sought the probability that the samples from different persons would nonetheless appear microscopically indistinguishable. In a criminal trial, the question is quite different: Assuming the samples appear microscopically indistinguishable, what is the probability that they came from the same person?[377]

Early in the twenty-first century, the Verma research team revisited the individualization issue and attempted to develop an objective, automated method for identifying matches.[378] The authors claimed that their "system accurately judged whether two populations of hairs came from the same person or from different persons 83% of the time." However, a close inspection of the authors' tabular data indicates that (1) relying on this method, researchers characterized "9 of 73 different pairs as 'same' for a false positive rate of 9/73 = 12%"; and (2) the

372. B.D. Gaudette, *Probabilities and Human Pubic Hair Comparisons,* 21 J. Forensic Sci. 514, 514 (1976).

373. B.D. Gaudette, *Some Further Thoughts on Probabilities in Human Hair Comparisons,* 23 J. Forensic Sci. 758 (1978); *see also* Ray A. Wickenhaiser & David G. Hepworth, *Further Evaluation of Probabilities in Human Scalp Hair Comparisons,* 35 J. Forensic Sci. 1323 (1990).

374. They prescribed that with respect to each characteristic, the analysts had to classify into one of a number of specified subcategories. For example, the length characteristic was subdivided into five groups, depending on the strand's length in inches. They computed both the total number of comparisons made by the analysts and recorded the number of instances in which the analysts reported finding samples indistinguishable under the specified criteria.

375. D. Kaye, Science in Evidence 28 (1997); s*ee also* NRC Forensic Science Report, *supra* note 3, at 158 ([T]he "assignment of probabilities [by Gaudette and Keeping] has since been shown to be unreliable."); P.D. Barnett & R.R. Ogle, *Probabilities and Human Hair Comparisons,* 27 J. Forensic Sci. 272, 273–74 (1982); Dalva Moellenberg, *Splitting Hairs in Criminal Trials: Admissibility of Hair Comparison Probability Estimates,* 1984 Ariz. St. L.J. 521. *See generally* Nicholas Petrarco et al., *The Morphology and Evidential Significance of Human Hair Roots,* 33 J. Forensic Sci. 68, 68 (1988) ("Although many instrumental techniques to the individualization of human hair have been tried in recent years, these have not proved to be useful or reliable.").

376. For example, the pubic hair study involved a total of 60 individuals. In addition, the experiments involved primarily Caucasians. While the scalp hair study included 92 Caucasians, there were only 6 Asians and 2 African Americans in the study.

377. A Tawshunsky, *Admissibility of Mathematical Evidence in Criminal Trials,* 21 Am. Crim. L. Rev. 55, 57–66 (1983).

378. M.S. Verma et al., *Hair-MAP: A Prototype Automated System for Forensic Hair Comparison and Analysis,* 129 Forensic Sci. Int'l 168 (2002).

115

EXHIBIT C

*Reference Manual on Scientific Evidence*

researchers characterized "4 sets of hairs from the same person as 'different' for a false negative rate of 4/9 = 44%."[379]

The above studies do not provide the only data relevant to the validity of hair analysis. There are also comparative studies of microscopic analysis and mtDNA, proficiency tests, and DNA exoneration cases involving microscopic analysis.

## *1. Mitochondrial DNA[380]*

An FBI study compared microscopic ("consistent with" testimony) and mtDNA analysis of hair: "Of the 80 hairs that were microscopically associated, nine comparisons were excluded by mtDNA analysis."[381]

## *2. Proficiency testing*

Early proficiency tests indicated a high rate of laboratory error in microscopic comparisons of hair samples. In the 1970s the LEAA conducted its Laboratory Proficiency Testing Program.[382] The crime laboratories' performance on hair analysis was the weakest. Fifty-four percent misanalyzed hair sample C and 67% submitted unacceptable responses on hair sample D.[383] Followup studies between 1980 and 1991 yielded similar results.[384] Summarizing the results of this series of tests, two commentators concluded: "Animal and human (body area) hair identifications are clearly the most troublesome of all categories tested."[385]

In another series of hair tests, the examiners were asked to "include" or "exclude" in comparing known and unknown samples: "Laboratories reported inclusions and exclusions which agreed with the manufacturer in approximately 74% of their comparisons. About 18% of the responses were inconclusive, and 8% in disagreement with the manufacturers' information."[386]

---

379. NRC Forensic Science Report, *supra* note 3, at 159.

380. For a detailed discussion of mitochondrial DNA, see David H. Kaye & George Sensabaugh, Reference Guide on DNA Identification Evidence, Section V.A, in this manual

381. Max M. Houck & Bruce Budowle, *Correlation of Microscopic and Mitochondrial DNA Hair Comparisons*, 47 J. Forensic Sci. 964, 966 (2002).

382. Laboratory Proficiency Test, *supra* note 81.

383. *Id.* at 251. By way of comparison, 20% of the laboratories failed a paint analysis (test #5); 30% failed glass analysis (test #9).

384. Peterson & Markham, *supra* note 82, at 1007 ("In sum, laboratories were no more successful in identifying the correct species of origin of animal hair . . . than they were in the earlier LEAA study.").

385. *Id.*

386. *Id.* at 1023; *see also id.* at 1022 ("Examiners warned that they needed to employ particular caution in interpreting the hair results given the virtual impossibility of achieving complete sample homogeneity.").

116

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

### 3. DNA exonerations

The publication of the Department of Justice study of the first 28 DNA exonerations spotlighted the significant role that hair analysis played in several of these miscarriages of justice.[387] For example, in the trial of Edward Honeker, an expert testified that the crime scene hair sample "was unlikely to match anyone" else[388]— a clear overstatement. Moreover, an exoneration in Canada triggered a judicial inquiry, which recommended that "[t]rial judges should undertake a more critical analysis of the admissibility of hair comparison evidence as circumstantial evidence of guilt."[389] One study of 200 DNA exoneration cases reported that hair testimony had been presented at 43 of the original trials.[390] A subsequent examination of 137 trial transcripts in exoneration cases concluded: "Sixty-five of the trials examined involved microscopic hair comparison analysis. Of those, 25—or 38%—had invalid hair comparison testimony. Most (18) of these cases involved invalid individualizing claims."[391] The other cases contained flawed probability testimony.

## C. Case Law Development

Prior to *Daubert*, an overwhelming majority of courts accepted expert testimony that hair samples are microscopically indistinguishable.[392] Experts often conceded that microscopic analysis did not permit a positive identification of the source.[393]

---

387. Edward Connors et al., Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial (1996). *See id*. at 73 (discussing David Vasquez case); *id.* at 64–65 (discussing Steven Linscott case).

388. Barry Scheck et al., Actual Innocence: Five Days to Execution and Other Dispatches from the Wrongly Convicted 146 (2000).

389. Hon. Fred Kaufman, The Commission on Proceedings Involving Guy Paul Morin (Ontario Ministry of the Attorney General 1998) (Recommendation 2). Morin was erroneously convicted based, in part, on hair evidence.

390. Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 81 (2008).

391. Garrett & Neufeld, *supra* note 33, at 47.

392. *See, e.g.,* United States v. Hickey, 596 F.2d 1082, 1089 (1st Cir. 1979); United States v. Brady, 595 F.2d 359, 362–63 (6th Cir. 1979); United States v. Cyphers, 553 F.2d 1064, 1071–73 (7th Cir. 1977); Jent v. State, 408 So. 2d 1024, 1028–29 (Fla.1981), Commonwealth v. Tarver, 345 N.E.2d 671, 676–77 (Mass. 1975); State v. White, 621 S.W.2d 287, 292–93 (Mo. 1981); State v. Smith, 637 S.W.2d 232, 236 (Mo. Ct. App. 1982); People v. Allweiss, 396 N.E.2d 735 (N.Y. 1979); State v. Green, 290 S.E.2d 625, 629–30 (N.C. 1982); State v. Watley, 788 P.2d 375, 381 (N.M. 1989).

393. Moore v. Gibson, 195 F.3d 1152, 1167 (10th Cir. 1999); Butler v. State, 108 S.W.3d 18, 21 (Mo. Ct. App. 2003); *see also* Thompson v. State, 539 A.2d 1052, 1057 (Del. 1988) ("it is now universally recognized that although fingerprint comparisons can result in the positive identification of an individual, hair comparisons are not this precise"). *But see* People v. Kosters, 467 N.W.2d 311, 313 (Mich. 1991) (Cavanaugh, C.J., dissenting) (the "minuscule probative value" of such opinions is "clearly . . . outweighed by the unfair prejudicial effect"); State v. Wheeler, 1981 WL 139588, at ★4 (Wis. Ct. App. Feb. 8, 1981) (in an unpublished opinion, the appellate court held that the trial judge did not err in finding that the expert's opinion that the accused "could have been the source" of the hair lacked probative value, because it "only include[d] defendant in a broad class of possible assailants").

117

EXHIBIT C

*Reference Manual on Scientific Evidence*

Nonetheless, the courts varied in how far they permitted the expert to go. In some cases, analysts testified only that the samples matched[394] or were similar[395] and thus consistent with the hypothesis that the samples had the same source.[396] Other courts permitted experts to directly opine that the accused was the source of the crime scene sample.[397] However, a 1990 decision held it error to admit testimony that "it would be improbable that these hairs would have originated from another individual."[398] In the court's view, this testimony amounted "effectively, [to] a positive identification of defendant. . . ."[399]

On the basis of Gaudette and Keeping research, several courts admitted opinions in statistical terms (e.g., 1 in 4500 chance of a false match).[400] In contrast, other courts, including a federal court of appeals, reached a contrary conclusion.[401]

The most significant post–*Daubert* challenge to microscopic hair analysis came in *Williamson v. Reynolds*,[402] a habeas case decided in 1995. There, an expert testified that, after considering approximately 25 characteristics, he concluded that the hair samples were "consistent microscopically." He then elaborated: "In other words, hairs are not an absolute identification, but they either came from this individual or there is—could be another individual *somewhere in the world* that would have the same characteristics to their hair."[403] The district court was "unsuccessful in its attempts to locate *any* indication that expert hair comparison testimony

---

394. Garland v. Maggio, 717 F.2d 199, 207 n.9 (5th Cir. 1983).

395. United States v. Brady, 595 F.2d 359, 362–63 (6th Cir. 1979).

396. People v. Allen, 115 Cal. Rptr. 839, 842 (Cal. Ct. App. 1974).

397. In the 1986 Mississippi prosecution of Randy Bevill for murder, the expert testified that "there was a transfer of hair from the Defendant to the body of" the victim. Clive A. Stafford Smith & Patrick D. Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil?* 27 Colum. Hum. Rts. L. Rev. 227, 273 (1996).

398. State v. Faircloth, 394 S.E.2d 198, 202–03 (N.C. Ct. App. 1990).

399. *Id*. at 202.

400. United States v. Jefferson, 17 M.J. 728, 731 (N.M.C.M.R. 1983); People v. DiGiacomo, 388 N.E.2d 1281, 1283 (Ill. App. Ct. 1979); *see also* United States *ex rel*. DiGiacomo v. Franzen, 680 F.2d 515, 516 (7th Cir. 1982) (During its deliberations, the jury submitted the following question to the judge: "Has it been established by sampling of hair specimens that the defendant was positively proven to have been in the automobile?").

401. United States v. Massey, 594 F.2d 676, 679–80 (8th Cir. 1979) (the expert testified that he "had microscopically examined 2,000 cases and in only one or two cases was he ever unable to make identification"; the expert cited a study for the proposition that there was a 1 in 4500 chance of a random match; the expert added that "there was only 'one chance in a 1,000' that hair comparisons could be in error"); State v. Carlson, 267 N.W.2d 170, 176 (Minn. 1978).

402. 904 F. Supp. 1529, 1554 (E.D. Okla. 1995), *rev'd on this issue sub nom*. Williamson v. Ward, 110 F.3d 1508, 1523 (10th Cir. 1997). The district court noted that the "expert did not explain which of the 'approximately' 25 characteristics were consistent, any standards for determining whether the samples were consistent, how many persons could be expected to share this same combination of characteristics, or how he arrived at his conclusions." *Id*. at 1554.

403. *Id*. (emphasis added).

118

**EXHIBIT C**

*Reference Guide on Forensic Identification Expertise*

meets *any* of the requirements of *Daubert*."[404] Finally, the prosecutor in closing argument declared, "There's a match."[405] Even the state court had misinterpreted the evidence, writing that the "hair evidence placed [petitioner] at the decedent's apartment."[406] Although the Tenth Circuit did not fault the district judge's reading of the empirical record relating to hair analysis and ultimately upheld habeas relief, that court reversed the district judge on this issue. The Tenth Circuit ruled that the district had committed legal error because the due process (fundamental fairness), not the more stringent *Daubert* (reliability), standard controls evidentiary issues in habeas corpus proceedings.[407] Before retrial, the defendant was exonerated by exculpatory DNA evidence.[408]

Post–*Daubert,* many cases have continued to admit testimony about microscopic hair analysis.[409] In 1999, one state court judicially noticed the reliability of hair evidence,[410] implicitly finding this evidence to be not only admissible but also based on a technique of indisputable validity.[411] In contrast, a Missouri court reasoned that, without the benefit of population frequency data, an expert overreached in opining to "a reasonable degree of certainty that the unidentified hairs were in fact from" the defendant.[412] The NRC report commented that there appears to be growing judicial support for the view that "testimony linking microscopic hair analysis with particular defendants is highly unreliable."[413]

---

404. *Id*. at 1558. The court also observed: "Although the hair expert may have followed procedures accepted in the community of hair experts, the human hair comparison results in this case were, nonetheless, scientifically unreliable." *Id*.

405. *Id*. at 1557.

406. *Id*. (quoting Williamson v. State, 812 P.2d 384, 387 (Okla. Crim. 1991)).

407. Williamson v. Ward, 110 F.3d 1508, 1523 (10th Cir. 1997).

408. Scheck et al., *supra* note 388, at 146 (hair evidence was shown to be "patently unreliable."); *see also* John Grisham, The Innocent Man (2006) (examining the Williamson case).

409. *E.g.,* State v. Fukusaku, 946 P.2d 32, 44 (Haw. 1997) ("Because the scientific principles and procedures underlying hair and fiber evidence are well-established and of proven reliability, the evidence in the present case can be treated as 'technical knowledge.' Thus, an independent reliability determination was unnecessary."); McGrew v. State, 682 N.E.2d 1289, 1292 (Ind. 1997) (concluding that hair comparison is "more a 'matter of observation by persons with specialized knowledge' than 'a matter of scientific principles'"); *see also* NRC Forensic Science Report, *supra* note 3, at 161 n.88 (citing State v. West, 877 A.2d 787 (Conn. 2005), and Bookins v. State, 922 A.2d 389 (Del. Super. Ct. 2007)).

410. *See* Johnson v. Commonwealth, 12 S.W.3d 258, 262 (Ky. 1999).

411. *See* Fed. R. Evid. 201(b); *Daubert*, 509 U.S. at 593 n.11 ("[T]heories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule [of] Evidence 201.").

412. Butler v. State, 108 S.W.3d 18, 21–22 (Mo. Ct. App. 2003).

413. NRC Forensic Science Report, *supra* note 3, at 161.

119

EXHIBIT C

*Reference Manual on Scientific Evidence*

# XI. Recurrent Problems

The discussions of specific techniques in this chapter, as well as the 2009 NRC report, reveal several recurrent problems in the presentation of testimony about forensic expertise.

## A. Clarity of Testimony

As noted earlier, the report voiced concern about the use of terms such as "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." These terms can have "a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates scientific evidence."[414]

The comparative bullet lead cases are illustrative of this point.[415] The technique was used when conventional firearms identification was not possible because the recovered bullet was so deformed that the striations were destroyed. In the bullet lead cases, the phrasing of the experts' opinions varied widely. In some, experts testified only to the limited opinion that two exhibits were "analytically indistinguishable."[416] In other cases, examiners concluded that samples *could have* come from the same "source" or "batch."[417] In still others, they stated that the samples *came* from the same source.[418] In several cases, the experts went even further and identified a particular "box" of ammunition (usually 50 loaded cartridges, sometimes 20) as the source of the bullet recovered at the crime scene. For example, experts opined that two specimens:

- Could have come from the same box.[419]
- Could have come from the same box or a box manufactured on the same day.[420]

---

414. *Id.* at 21.

415. The technique compared trace chemicals found in bullets at crime scenes with ammunition found in the possession of a suspect. It was used when firearms ("ballistics") identification could not be employed. FBI experts used various analytical techniques (first, neutron activation analysis, and then inductively coupled plasma–atomic emission spectrometry) to determine the concentrations of seven elements—arsenic, antimony, tin, copper, bismuth, silver, and cadmium—in the bullet lead alloy of both the crime-scene and suspect's bullets. Statistical tests were then used to compare the elements in each bullet and determine whether the fragments and suspect's bullets were "analytically indistinguishable" for each of the elemental concentration means.

416. *See* Wilkerson v. State, 776 A.2d 685, 689 (Md. Ct. Spec. App. 2001).

417. *See* State v. Krummacher, 523 P.2d 1009, 1012–13 (Or. 1974) (en banc).

418. *See* United States v. Davis, 103 F.3d 660, 673–74 (8th Cir. 1996); People v. Lane, 628 N.E.2d 682, 689–90 (Ill. App. Ct. 1993).

419. *See* State v. Jones, 425 N.E.2d 128, 131 (Ind. 1981); State v. Strain, 885 P.2d 810, 817 (Utah Ct. App. 1994).

420. *See* State v. Grube, 883 P.2d 1069, 1078 (Idaho 1994); People v. Johnson, 499 N.E.2d 1355, 1366 (Ill. 1986); Earhart v. State, 823 S.W.2d 607, 614 (Tex. Crim. App. 1991) (en banc) ("He

120

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

- Were consistent with their having come from the same box of ammunition.[421]
- Probably came from the same box.[422]
- Must have come from the same box or from another box that would have been made by the same company on the same day.[423]

Moreover, these inconsistent statements were not supported by empirical research. According to a 2004 NRC report, the number of bullets that can be produced from an "analytically indistinguishable" melt "can range from the equivalent of as few as 12,000 to as many as 35 million 40 grain, .22 caliber long-rifle bullets."[424] Consequently, according to the 2004 NRC report, the "available data do not support any statement that a crime bullet came from a particular box of ammunition. [R]eferences to 'boxes' of ammunition in any form should be excluded as misleading under Federal Rule of Evidence 403."[425]

## B. Limitations on Testimony

Some courts have limited the scope of the testimony, permitting expert testimony about the similarities and dissimilarities between exemplars but not the specific conclusion that the defendant was the author ("common authorship" opinion).[426] Although the courts have used this approach most frequently in questioned docu-

later modified that statement to acknowledge that analytically indistinguishable bullets which do not come from the same box most likely would have been manufactured at the same place on or about the same day; that is, in the same batch."), *vacated*, 509 U.S. 917 (1993).

421. *See* State v. Reynolds, 297 S.E.2d 532, 534 (N.C. 1982).

422. *See* Bryan v. State, 935 P.2d 338, 360 (Okla. Crim. App. 1997).

423. *See Davis*, 103 F.3d at 666–67 ("An expert testified that such a finding is rare and that the bullets must have come from the same box or from another box that would have been made by the same company on the same day."); Commonwealth v. Daye, 587 N.E.2d 194, 207 (Mass. 1992); State v. King, 546 S.E.2d 575, 584 (N.C. 2001) (Kathleen Lundy "opined that, based on her lead analysis, the bullets she examined either came from the same box of cartridges or came from different boxes of the same caliber, manufactured at the same time.").

424. National Research Council, Forensic Analysis: Weighing Bullet Lead Evidence 6 (2004), [hereinafter NRC Bullet Lead Evidence], *available at* http://www.nap.edu/catalog.php?record_id=10924.

425. *Id*.

426. *See* United States v. Oskowitz, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2003) ("Many other district courts have similarly permitted a handwriting expert to analyze a writing sample for the jury without permitting the expert to offer an opinion on the ultimate question of authorship."); United States v. Rutherford, 104 F. Supp. 2d 1190, 1194 (D. Neb. 2000) ("[T]he Court concludes that FDE Rauscher's testimony meets the requirements of Rule 702 to the extent that he limits his testimony to identifying and explaining the similarities and dissimilarities between the known exemplars and the questioned documents. FDE Rauscher is precluded from rendering any ultimate conclusions on authorship of the questioned documents and is similarly precluded from testifying to the degree of confidence or certainty on which his opinions are based."); United States v. Hines, 55 F. Supp. 2d 62, 69 (D. Mass. 1999) (expert testimony concerning the general similarities and differences between a defendant's handwriting exemplar and a stick-up note was admissible but not the specific conclusion that the defendant was the author).

EXHIBIT C

*Reference Manual on Scientific Evidence*

ment cases, they have sometimes applied the same approach to other types of forensic expertise such as firearms examination as well.[427]

The NRC report criticized "exaggerated"[428] testimony such as claims of perfect accuracy,[429] infallibility,[430] or a zero error rate.[431] Several courts have barred excessive expert claims for lack of empirical support. For example, in *United States v. Mitchell*,[432] the court commented: "Testimony at the *Daubert* hearing indicated that some latent fingerprint examiners insist that there is no error rate associated with their activities. . . . This would be out-of-place under Rule 702."[433] Similarly, in a firearms identification case, one court noted that

> during the testimony at the hearing, the examiners testified to the effect that they could be 100 percent sure of a match. Because an examiner's bottom line opinion as to an identification is largely a subjective one, there is no reliable statistical or scientific methodology which will currently permit the expert to testify that it is a 'match' to an absolute certainty, or to an arbitrary degree of statistical certainty.[434]

Other courts have excluded the use of terms such as "science" or "scientific," because of the risk that jurors may bestow the aura of the infallibility of science on the testimony.[435]

In particular, some courts are troubled by the use of the expression "reasonable scientific certainty" by some forensic experts. The term "reasonable scientific certainty" is problematic. Although it is used frequently in cases, its legal meaning is ambiguous.[436] Sometimes it is used in lieu of a confidence statement (i.e., "high degree of certainty"), in which case the expert could altogether avoid the term and directly testify how confident he or she is in the opinion.

In other cases, courts have interpreted reasonable scientific certainty to mean that the expert must testify that a sample *probably* came from the defendant and not

---

427. United States v. Green, 405 F. Supp. 2d 104, 124 (D. Mass. 2005).

428. NRC Forensic Science Report, *supra* note 3, at 4.

429. *Id*. at 47.

430. *Id*. at 104.

431. *Id*. at 142–43.

432. 365 F.3d 215 (3d Cir. 2004).

433. *Id*. at 246.

434. United States v. Monteiro, 407 F. Supp. 2d 351, 372 (D. Mass. 2006).

435. United States v. Starzecpyzel, 880 F. Supp. 1027, 1038 (S.D.N.Y. 1995).

436. James E. Hullverson, *Reasonable Degree of Medical Certainty: A Tort et a Travers*, 31 St. Louis U. L.J. 577, 582 (1987) ("[T]here is nevertheless an undercurrent that the expert in federal court express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate."); Edward J. Imwinkelried & Robert G. Scofield, *The Recognition of an Accused's Constitutional Right to Introduce Expert Testimony Attacking the Weight of Prosecution Science Evidence: The Antidote for the Supreme Court's Mistaken Assumption in* California v. Trombetta, 33 Ariz. L. Rev. 59, 69 (1991) ("Many courts continue to exclude opinions which fall short of expressing a probability or certainty. . . . These opinions have been excluded in jurisdictions which have adopted the Federal Rules of Evidence.").

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

that it *possibly* came from the defendant.[437] However, experts frequently testify that two samples "could have come from the same source." Such testimony meets the relevancy standard of Federal Rule 401, and there is no requirement in Article VII of the Federal Rules that an expert's opinion be expressed in terms of "prob-abilities." Thus, in *United States v. Cyphers*[438] the expert testified that hair samples found on items used in a robbery "could have come" from the defendants.[439] The defendants argued that the testimony was inadmissible because the expert did not express his opinion in terms of reasonable scientific certainty. The court wrote: "There is no such requirement."[440]

In *Burke v. Town of Walpole*,[441] a bite mark identification case, the court of appeals had to interpret the term as used in an arrest warrant:

> [W]e must assume that the magistrate who issued the arrest warrant assigned no more than the commonly accepted meaning among lawyers and judges to the term "reasonable degree of scientific certainty"—"a standard requiring a showing that the injury was more likely than not caused by a particular stimulus, based on the general consensus of recognized [scientific] thought." Black's Law Dictionary 1294 (8th ed. 2004) (defining "reasonable medical probability," or "reasonable medical certainty," as used in tort actions). That standard, of course, is fully consistent with the probable cause standard.[442]

The case involved the guidelines adopted by ABFO that recognized several levels of certainty ("reasonable medical certainty," "high degree of certainty," and "virtual certainty"). The guidelines described "reasonable medical certainty" as "convey[ing] the connotation of virtual certainty or beyond reasonable doubt."[443] This is not the way that some courts use the term.

---

437. State v. Holt, 246 N.E.2d 365, 368 (Ohio 1969). The expert testified, based on neutron activation analysis, that two hair samples were "similar *and . . . likely* to be from the same source" (emphasis in original).

438. 553 F.2d 1064 (7th Cir. 1977).

439. *Id.* at 1072; s*ee also* United States v. Davis, 44 M.J. 13, 16 (C.A.A.F. 1996) ("Evidence was also admitted that appellant owned sneakers which 'could have' made these prints.").

440. *Cyphers*, 553 F.2d at 1072; *see also* United States v. Oaxaca, 569 F.2d 518, 526 (9th Cir. 1978) (expert's opinion regarding hair comparison admissible even though expert was less than certain); United States v. Spencer, 439 F.2d 1047, 1049 (2d Cir. 1971) (expert's opinion regarding handwriting comparison admissible even though expert did not make a positive identification); United States v. Longfellow, 406 F.2d 415, 416 (4th Cir. 1969) (expert's opinion regarding paint comparison admissible, even though expert did not make a positive identification); State v. Boyer, 406 So. 2d 143, 148 (La. 1981) (reasonable scientific certainty not required where expert testifies concerning the presence of gunshot residue based on neutron activation analysis).

441. 405 F.3d 66 (1st Cir. 2005).

442. *Id.* at 91.

443. *Id.* at 91 n.30 (emphasis omitted).

123

EXHIBIT C

*Reference Manual on Scientific Evidence*

Moreover, the term may be problematic for a different reason—misleading the jury. One court ruled that the term "reasonable scientific certainty" could not be used because of the subjective nature of the opinion.[444]

## C. *Restriction of Final Argument*

In a number of cases, in summation counsel has overstated the content of the expert testimony. In *People v. Linscott*,[445] for example, "the prosecutor argued that hairs found in the victim's apartment and on the victim's body were in fact defendant's hairs."[446] Reversing, the Illinois Supreme Court wrote: "With these statements, the prosecutor improperly argued that the hairs removed from the victim's apartment were conclusively identified as coming from defendant's head and pubic region. There simply was no testimony at trial to support these statements. In fact, [the prosecution experts] and the defense hair expert . . . testified that no such identification was possible."[447] DNA testing exculpated Linscott.[448] Trial judges can police the attorneys' descriptions of the testimony during closing argument as well as the content of expert testimony presented.

# XII. Procedural Issues

The *Daubert* standard operates in a procedural setting, not a vacuum. In *Daubert*, the Supreme Court noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[449] Adversarial testing presupposes advance notice of the content of the expert's testimony and access to comparable expertise to evaluate that testimony. This section discusses some of the procedural mechanisms that trial judges may use to assure that jurors properly evaluate any expert testimony by forensic identification experts.

---

444. United States v. Glynn, 578 F. Supp. 2d 567, 568–75 (S.D.N.Y. 2008) (firearms identification case).

445. 566 N.E.2d 1355 (Ill. 1991).

446. *Id.* at 1358.

447. *Id.* at 1359.

448. *See* Connors et al., *supra* note 387, at 65 ("The State's expert on the hair examination testified that only 1 in 4,500 persons would have consistent hairs when tested for 40 different characteristics. He only tested between 8 and 12 characteristics, however, and could not remember which ones. The appellate court ruled on July 29, 1987, that his testimony, coupled with the prosecution's use of it at closing arguments, constituted denial of a fair trial.") (citation omitted).

449. 509 U.S. at 596 (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)).

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

## A. Pretrial Discovery

Judges can monitor discovery in scientific evidence cases to ensure that disclosure is sufficiently comprehensive.[450] Federal Rule 16 requires discovery of laboratory reports[451] and a summary of the expert's opinion.[452] The efficacy of these provisions depends on the content of the reports and the summary. The *Journal of Forensic Sciences*, the official publication of the American Academy of Forensic Sciences, published a symposium on the ethical responsibilities of forensic scientists in 1989. One symposium article described a number of unacceptable laboratory reporting practices, including (1) "preparation of reports containing minimal information in order not to give the 'other side' ammunition for cross-examination," (2) "reporting of findings without an interpretation on the assumption that if an interpretation is required it can be provided from the witness box," and (3) "[o]mitting some significant point from a report to trap an unsuspecting cross-examiner."[453]

NRC has recommended extensive discovery in DNA cases: "All data and laboratory records generated by analysis of DNA samples should be made freely available to all parties. Such access is essential for evaluating the analysis."[454] The NRC report on bullet lead contained similar comments about the need for a thorough report in bullet lead cases:

> The conclusions in laboratory reports should be expanded to include the limitations of compositional analysis of bullet lead evidence. In particular, a further

450. *See* Fed. R. Crim. P. 16 (1975) advisory committee's note ("[I]t is difficult to test expert testimony at trial without advance notice and preparation."), *reprinted in* 62 F.R.D. 271, 312 (1974); Paul C. Giannelli, *Criminal Discovery, Scientific Evidence, and DNA*, 44 Vand. L. Rev. 791 (1991). "Early disclosure can have the following benefits: [1] Avoiding surprise and unnecessary delay. [2] Identifying the need for defense expert services. [3] Facilitating exoneration of the innocent and encouraging plea negotiations if DNA evidence confirms guilt." National Institute of Justice, President's DNA Initiative: Principles of Forensic DNA for Officers of the Court (2005), *available at* http://www.dna. gov/training/otc.

451. Fed. R. Crim. P. 16(a)(1)(F).

452. *Id*. 16(a)(1)(G).

453. Douglas M. Lucas, *The Ethical Responsibilities of the Forensic Scientist: Exploring the Limits*, 34 J. Forensic Sci. 719, 724 (1989). Lucas was the Director of The Centre of Forensic Sciences, Ministry of the Solicitor General, Toronto, Ontario.

454. National Research Council, DNA Technology in Forensic Science 146 (1992) ("The prosecutor has a strong responsibility to reveal fully to defense counsel and experts retained by the defendant all material that might be necessary in evaluating the evidence."); *see also id*. at 105 ("Case records—such as notes, worksheets, autoradiographs, and population databanks—and other data or records that support examiners' conclusions are prepared, retained by the laboratory, and made available for inspection on court order after review of the reasonableness of a request."); National Research Council, The Evaluation of Forensic DNA Evidence 167–69 (1996) ("Certainly, there are no strictly scientific justifications for withholding information in the discovery process, and in Chapter 3 we discussed the importance of full, written documentation of all aspects of DNA laboratory operations. Such documentation would facilitate technical review of laboratory work, both within the laboratory and by outside experts. . . . Our recommendations that all aspects of DNA testing be fully documented is most valuable when this documentation is discoverable in advance of trial.").

125

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

explanatory comment should accompany the laboratory conclusions to portray the limitations of the evidence. Moreover, a section of the laboratory report translating the technical conclusions into language that a jury could understand would greatly facilitate the proper use of this evidence in the criminal justice system. Finally, measurement data (means and standard deviations) for all of the crime scene bullets and those deemed to match should be included.[455]

As noted earlier, the recent NRC report made similar comments:

> Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "the greenish, brown plant material in item #1 was identified as marijuana"), and they include no mention of methods or any discussion of measurement uncertainties.[456]

*Melendez-Diaz v. Massachusetts*[457] illustrates the problem. The laboratory report in that case "contained only the bare-bones statement that '[t]he substance was found to contain: Cocaine.' At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed."[458]

## 1. Testifying beyond the report

Experts should generally not be allowed to testify beyond the scope of the report without issuing a supplemental report. *Troedel v. Wainwright*,[459] a capital murder case, illustrates the problem. In that case, a report of a gunshot residue test based on neutron activation analysis stated the opinion that swabs "from the hands of Troedel and Hawkins contained antimony and barium in amounts typically found on the hands of a person who has discharged a firearm or has had his hands in close proximity to a discharging firearm."[460] An expert testified consistently with this report at Hawkins' trial but embellished his testimony at Troedel's trial by adding the more inculpatory opinion that "Troedel had fired the murder weapon."[461] In contrast, at a deposition during federal habeas proceedings, the *same* expert testified that "he could not, from the results of his tests, determine or say to a scientific certainty who had fired the murder weapon" and the "amount of barium and antimony on the hands of Troedel and Hawkins were basically insignificant."[462] The district court found the trial testimony, "at the very least," misleading and

455. *See* NRC Bullet Lead Evidence, *supra* note 424, at 110–11.
456. NRC Forensic Science Report, *supra* note 3, at 21.
457. 129 S. Ct. 2527 (2009).
458. *Id.* at 2537.
459. 667 F. Supp. 1456 (S.D. Fla. 1986), *aff'd*, 828 F.2d 670 (11th Cir. 1987).
460. *Id.* at 1458.
461. *Id.*
462. *Id.* at 1459.

EXHIBIT C

*Reference Guide on Forensic Identification Expertise*

granted relief.[463] The expert claimed that the prosecutor had "pushed" him to embellish his testimony, a claim the prosecutor substantiated.[464]

## B. Defense Experts

In appropriate cases, trial judges can provide the opposition with access to expert resources. Defense experts are often important in cases involving forensic identification expertise. Counsel will frequently need expert guidance to determine whether a research study is methodologically sound and, if so, whether the data adequately support the specific opinion proffered, and the role, if any, that subjective judgment played in forming the opinion.

The NAS 1992 DNA report stressed that experts are necessary for an adequate defense in many cases: "Defense counsel must have access to adequate expert assistance, even when the admissibility of the results of analytical techniques is not in question because there is still a need to review the quality of the laboratory work and the interpretation of results."[465] According to the *President's DNA Initiative*, "[e]ven if DNA evidence is admitted, there still may be disagreement about its interpretation—what do the DNA results mean in a particular case?"[466]

The need for defense experts is not limited to cases involving DNA evidence. In *Ake v. Oklahoma*,[467] the Supreme Court recognized a due process right to a defense expert under certain circumstances.[468] In federal trials, the Criminal Justice Act of 1964[469] provides for expert assistance for indigent defendants.

---

463. "[T]he Court concludes that the opinion Troedel had fired the weapon was known by the prosecution not to be based on the results of the neutron activation analysis tests, or on any scientific certainty or even probability. Thus, the subject testimony was not only misleading, but also was used by the State knowing it to be misleading." *Id.* at 1459–60.

464. *Id.* at 1459 ("[A]s Mr. Riley candidly admitted in his deposition, he was 'pushed' further in his analysis at Troedel's trial than at Hawkins' trial. . . . [At the] evidentiary hearing held before this Court, one of the prosecutors testified that, at Troedel's trial, after Mr. Riley had rendered his opinion which was contained in his written report, the prosecutor *pushed* to 'see if more could have been gotten out of this witness.'").

465. NRC I, *supra* note 24, at 149 ("Because of the potential power of DNA evidence, authorities must make funds available to pay for expert witnesses. . . .").

466. President's DNA Initiative, *supra* note 450.

467. 470 U.S. 68 (1985); *see* Paul C. Giannelli, Ake v. Oklahoma*: The Right to Expert Assistance in a Post-*Daubert, *Post-DNA World*, 89 Cornell L. Rev. 1305 (2004).

468. *Ake*, 470 U.S. at 74.

469. 18 U.S.C. § 3006(A).

EXHIBIT C

EXHIBIT C

# Reference Guide on DNA Identification Evidence

DAVID H. KAYE AND GEORGE SENSABAUGH

*David H. Kaye, M.A., J.D., is Distinguished Professor of Law, Weiss Family Scholar, and Graduate Faculty Member, Forensic Science Program, The Pennsylvania State University, University Park, and Regents' Professor Emeritus, Arizona State University Sandra Day O'Connor College of Law and School of Life Sciences, Tempe.*

*George Sensabaugh, D.Crim., is Professor of Biomedical and Forensic Sciences, School of Public Health, University of California, Berkeley.*

CONTENTS

I. Introduction, 131
 A. Summary of Contents, 131
 B. A Brief History of DNA Evidence, 132
 C. Relevant Expertise, 134
II. Variation in Human DNA and Its Detection, 135
 A. What Are DNA, Chromosomes, and Genes? 136
 B. What Are DNA Polymorphisms and How Are They Detected? 139
  1. Sequencing, 139
  2. Sequence-specific probes and SNP chips, 140
  3. VNTRs and RFLP testing, 140
  4. STRs, 141
  5. Summary, 142
 C. How Is DNA Extracted and Amplified? 143
 D. How Is STR Profiling Done with Capillary Electrophoresis? 144
 E. What Can Be Done to Validate a Genetic System for Identification? 148
 F. What New Technologies Might Emerge? 148
  1. Miniaturized "lab-on-a-chip" devices, 148
  2. High-throughput sequencing, 149
  3. Microarrays, 150
  4. What questions do the new technologies raise? 150
III. Sample Collection and Laboratory Performance, 151
 A. Sample Collection, Preservation, and Contamination, 151
  1. Did the sample contain enough DNA? 151
  2. Was the sample of sufficient quality? 152

EXHIBIT C

*Reference Manual on Scientific Evidence*

B. Laboratory Performance, 153
　　1. What forms of quality control and assurance should be followed? 153
　　2. How should samples be handled? 156
IV. Inference, Statistics, and Population Genetics in Human Nuclear DNA Testing, 159
　A. What Constitutes a Match or an Exclusion? 159
　B. What Hypotheses Can Be Formulated About the Source? 160
　C. Can the Match Be Attributed to Laboratory Error? 161
　D. Could a Close Relative Be the Source? 162
　E. Could an Unrelated Person Be the Source? 163
　　1. Estimating allele frequencies from samples, 164
　　2. The product rule for a randomly mating population, 165
　　3. The product rule for a structured population, 166
　F. Probabilities, Probative Value, and Prejudice, 167
　　1. Frequencies and match probabilities, 167
　　2. Likelihood ratios, 172
　　3. Posterior probabilities, 173
　G. Verbal Expressions of Probative Value, 174
　　1. "Rarity" or "strength" testimony, 175
　　2. Source or uniqueness testimony, 175
V. Special Issues in Human DNA Testing, 176
　A. Mitochondrial DNA, 176
　B. Y Chromosomes, 181
　C. Mixtures, 182
　D. Offender and Suspect Database Searches, 186
　　1. Which statistics express the probative value of a match to a defendant located by searching a DNA database? 186
　　2. Near-miss (familial) searching, 189
　　3. All-pairs matching within a database to verify estimated random-match probabilities, 191
VI. Nonhuman DNA Testing, 193
　A. Species and Subspecies, 193
　B. Individual Organisms, 195
Glossary of Terms, 199
References on DNA, 210

**EXHIBIT C**

# I. Introduction

Deoxyribonucleic acid, or DNA, is a molecule that encodes the genetic information in all living organisms. Its chemical structure was elucidated in 1954. More than 30 years later, samples of human DNA began to be used in the criminal justice system, primarily in cases of rape or murder. The evidence has been the subject of extensive scrutiny by lawyers, judges, and the scientific community. It is now admissible in all jurisdictions, but there are many types of forensic DNA analysis, and still more are being developed. Questions of admissibility arise as advancing methods of analysis and novel applications of established methods are introduced.[1]

This reference guide addresses technical issues that are important when considering the admissibility of and weight to be accorded analyses of DNA, and it identifies legal issues whose resolution requires scientific information. The goal is to present the essential background information and to provide a framework for resolving the possible disagreements among scientists or technicians who testify about the results and import of forensic DNA comparisons.

## A. Summary of Contents

Section I provides a short history of DNA evidence and outlines the types of scientific expertise that go into the analysis of DNA samples.

Section II provides an overview of the scientific principles behind DNA typing. It describes the structure of DNA and how this molecule differs from person to person. These are basic facts of molecular biology. The section also defines the more important scientific terms and explains at a general level how DNA differences are detected. These are matters of analytical chemistry and laboratory procedure. Finally, the section indicates how it is shown that these differences permit individuals to be identified. This is accomplished with the methods of probability and statistics.

Section III considers issues of sample quantity and quality as well as laboratory performance. It outlines the types of information that a laboratory should produce to establish that it can analyze DNA reliably and that it has adhered to established laboratory protocols.

Section IV examines issues in the interpretation of laboratory results. To assist the courts in understanding the extent to which the results incriminate the defendant, it enumerates the hypotheses that need to be considered before concluding that the defendant is the source of the crime scene samples, and it explores the

---

1. For a discussion of other forensic identification techniques, see Paul C. Giannelli et al., Reference Guide on Forensic Identification Expertise, in this manual. *See also* David H. Kaye et al., The New Wigmore, A Treatise on Evidence: Expert Evidence (2d ed. 2011).

EXHIBIT C

issues that arise in judging the strength of the evidence. It focuses on questions of statistics, probability, and population genetics.[2]

Section V describes special issues in human DNA testing for identification. These include the detection and interpretation of mixtures, Y-STR testing, mitochondrial DNA testing, and the evidentiary implications of DNA database searches of various kinds.

Finally, Section VI discusses the forensic analysis of nonhuman DNA. It identifies questions that can be useful in judging whether a new method or application of DNA science has the scientific merit and power claimed by the proponent of the evidence.

A glossary defines selected terms and acronyms encountered in genetics, molecular biology, and forensic DNA work.

## B. A Brief History of DNA Evidence

"DNA evidence" refers to the results of chemical or physical tests that directly reveal differences in the structure of the DNA molecules found in organisms as diverse as bacteria, plants, and animals.[3] The technology for establishing the identity of individuals became available to law enforcement agencies in the mid to late 1980s.[4] The judicial reception of DNA evidence can be divided into at least five phases.[5] The first phase was one of rapid acceptance. Initial praise for RFLP (restriction fragment length polymorphism) testing in homicide, rape, paternity, and other cases was effusive. Indeed, one judge proclaimed "DNA fingerprinting" to be "the single greatest advance in the 'search for truth' . . . since the advent of cross-examination."[6] In this first wave of cases, expert testimony for the prosecution rarely was countered, and courts readily admitted DNA evidence.

In a second wave of cases, however, defendants pointed to problems at two levels—controlling the experimental conditions of the analysis and interpreting the results. Some scientists questioned certain features of the procedures for extracting and analyzing DNA employed in forensic laboratories, and it became apparent

---

2. For a broader discussion of statistics, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, in this manual.

3. Differences in DNA also can be revealed by differences in the proteins that are made according to the "instructions" in a DNA molecule. Blood group factors, serum enzymes and proteins, and tissue types all reveal information about the DNA that codes for these chemical structures. Such immunogenetic testing predates the "direct" DNA testing that is the subject of this chapter. On the nature and admissibility of the "indirect" DNA testing, see, for example, David H. Kaye, The Double Helix and the Law of Evidence 5–19 (2010); 1 McCormick on Evidence § 205(B) (Kenneth Broun ed., 6th ed. 2006).

4. The first reported appellate opinion is *Andrews v. State,* 533 So. 2d 841 (Fla. Dist. Ct. App. 1988).

5. The description that follows is adapted from 1 McCormick on Evidence, *supra* note 3, § 205(B).

6. People v. Wesley, 533 N.Y.S.2d 643, 644 (Alb. County. Ct. 1988).

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

that declaring matches or nonmatches in the DNA variations being compared was not always trivial. Despite these concerns, most cases continued to find the DNA analyses to be generally accepted, and a number of states provided for admissibility of DNA tests by legislation. Concerted attacks by defense experts of impressive credentials, however, produced a few cases rejecting specific proffers on the ground that the testing was not sufficiently rigorous.[7]

A different attack on DNA profiling begun in cases during this period proved far more successful and led to a third wave of cases in which many courts held that estimates of the probability of a coincidentally matching DNA profile were inadmissible. These estimates relied on a simple population genetics model for the frequencies of DNA profiles, and some prominent scientists claimed that the applicability of the mathematical model had not been adequately verified. A heated debate on this point spilled over from courthouses to scientific journals and convinced the supreme courts of several states that general acceptance was lacking. A 1992 report of the National Academy of Sciences proposed a more "conservative" computational method as a compromise,[8] and this seemed to undermine the claim of scientific acceptance of the less conservative procedure that was in general use.

In response to the population genetics criticism and the 1992 report came an outpouring of critiques of the report and new studies of the distribution of the DNA variations in many populations. Relying on the burgeoning literature, a second National Academy panel concluded in 1996 that the usual method of estimating frequencies in broad racial groups generally was sound, and it proposed improvements and additional procedures for estimating frequencies in subgroups within the major population groups.[9] In the corresponding fourth phase of judicial scrutiny of DNA evidence, the courts almost invariably returned to the earlier view that the statistics associated with DNA profiling are generally accepted and scientifically valid.

In the fifth phase of the judicial evaluation of DNA evidence, results obtained with the newer "PCR-based methods" entered the courtroom. Once again, courts considered whether the methods rested on a solid scientific foundation and were generally accepted in the scientific community. The opinions are practically unanimous in holding that the PCR-based procedures satisfy these standards. Before long, forensic scientists settled on the use of one type of DNA variation (known as short tandem repeats, or STRs) to include or exclude individuals as the source of crime scene DNA.

---

7. Moreover, a minority of courts, perhaps concerned that DNA evidence might be conclusive in the minds of jurors, added a "third prong" to the general-acceptance standard of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). This augmented *Frye* test requires not only proof of the general acceptance of the ability of science to produce the type of results offered in court, but also of the proper application of an approved method on the particular occasion. For criticism of this approach, see David H. Kaye et al., *supra* note 1, § 6.3.3(a)(2).

8. National Research Council, DNA Technology in Forensic Science (1992) [hereinafter NRC I].

9. National Research Council, The Evaluation of Forensic DNA Evidence (1996) [hereinafter NRC II].

EXHIBIT C

*Reference Manual on Scientific Evidence*

Throughout these phases, DNA tests also exonerated an increasing number of men who had been convicted of capital and other crimes, posing a challenge to traditional postconviction remedies and raising difficult questions of postconviction access to DNA samples.[10] The value of DNA evidence in solving older crimes also prompted extensions of some statutes of limitations.[11]

In sum, in little more than a decade, forensic DNA typing made the transition from a novel set of methods for identification to a relatively mature and well-studied forensic technology. However, one should not lump all forms of DNA identification together. New techniques and applications continue to emerge, ranging from the use of new genetic systems and new analytical procedures to the typing of DNA from plants and animals. Before admitting such evidence, courts normally inquire into the biological principles and knowledge that would justify inferences from these new technologies or applications. As a result, this guide describes not only the predominant STR technology, but also newer analytical techniques that can be used for forensic DNA identification.

## C. Relevant Expertise

Human DNA identification can involve testimony about laboratory findings, about the statistical interpretation of those findings, and about the underlying principles of molecular biology. Consequently, expertise in several fields might be required to establish the admissibility of the evidence or to explain it adequately to the jury. The expert who is qualified to testify about laboratory techniques might not be qualified to testify about molecular biology, to make estimates of population frequencies, or to establish that an estimation procedure is valid.[12]

---

10. *See, e.g.*, Osborne v. District Attorney's Office for Third Judicial District, 129 S. Ct. 2308 (2009) (narrowly rejecting a convicted offender's claim of a due process right to DNA testing at his expense, enforceable under 42 U.S.C. § 1983, to establish that he is probably innocent of the crime for which he was convicted after a fair trial, when (1) the convicted offender did not seek extensive DNA testing before trial even though it was available, (2) he had other opportunities to prove his innocence after a final conviction based on substantial evidence against him, (3) he had no new evidence of innocence (only the hope that more extensive DNA testing than that done before the trial would exonerate him), and (4) even a finding that he was not source of the DNA would not conclusively demonstrate his innocence); Skinner v. Switzer, 131 S. Ct. 1289 (2011); Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55 (2008); Brandon L. Garrett, *Claiming Innocence*, 92 Minn. L. Rev. 1629 (2008).

11. *See, e.g.*, Veronica Valdivieso, *DNA Warrants: A Panacea for Old, Cold Rape Cases?* 90 Geo. L.J. 1009 (2002).

12. Nonetheless, if previous cases establish that the testing and estimation procedures are legally acceptable, and if the computations are essentially mechanical, then highly specialized statistical expertise might not be essential. Reasonable estimates of DNA characteristics in major population groups can be obtained from standard references, and many quantitatively literate experts could use the appropriate formulae to compute the relevant profile frequencies or probabilities. NRC II, *supra* note 9, at 170. Limitations in the knowledge of a technician who applies a generally accepted statistical procedure can be explored on cross-examination. *See* Kaye et al., *supra* note 1, § 2.2. *Accord* Roberson v. State, 16 S.W.3d 156, 168 (Tex. Crim. App. 2000).

**EXHIBIT C**

Trial judges ordinarily are accorded great discretion in evaluating the qualifications of a proposed expert witness, and the decisions depend on the background of each witness. Courts have noted the lack of familiarity of academic experts—who have done respected work in other fields—with the scientific literature on forensic DNA typing and on the extent to which their research or teaching lies in other areas.[13] Although such concerns may affect the persuasiveness of particular testimony, they rarely result in exclusion on the grounds that the witness simply is not qualified as an expert.

The scientific and legal literature on the objections to DNA evidence is extensive. By studying the scientific publications, or perhaps by appointing a special master or expert adviser to assimilate this material, a court can ascertain where a party's expert falls within the spectrum of scientific opinion. Furthermore, an expert appointed by the court under Federal Rule of Evidence 706 could testify about the scientific literature generally or even about the strengths or weaknesses of the particular arguments advanced by the parties.

Given the great diversity of forensic questions to which DNA testing might be applied, it is not feasible to list the specific scientific expertise appropriate to all applications. Assessing the value of DNA analyses of a novel application involving unfamiliar species can be especially challenging. If the technology is novel, expertise in molecular genetics or biotechnology might be necessary. If testing has been conducted on a particular organism or category of organisms, expertise in that area of biology may be called for. If a random-match probability has been presented, one might seek expertise in statistics as well as the population biology or population genetics that goes with the organism tested. Given the penetration of molecular technology into all areas of biological inquiry, it is likely that individuals can be found who know both the technology and the population biology of the organism in question. Finally, when samples come from crime scenes, the expertise and experience of forensic scientists can be crucial. Just as highly focused specialists may be unaware of aspects of an application outside their field of expertise, so too scientists who have not previously dealt with forensic samples can be unaware of case-specific factors that can confound the interpretation of test results.

# II. Variation in Human DNA and Its Detection

DNA is a complex molecule that contains the "genetic code" of organisms as diverse as bacteria and humans. Although the DNA molecules in human cells are

---

13. *E.g.*, State v. Copeland, 922 P.2d 1304, 1318 n.5 (Wash. 1996) (noting that defendant's statistical expert "was also unfamiliar with publications in the area," including studies by "a leading expert in the field" whom he thought was "a 'guy in a lab somewhere'").

EXHIBIT C

*Reference Manual on Scientific Evidence*

largely identical from one individual to another, there are detectable variations—except for identical twins, every two human beings have some differences in the detailed structure of their DNA. This section describes the basic features of DNA and some ways in which it can be analyzed to detect these differences.

## A. What Are DNA, Chromosomes, and Genes?

The DNA molecule is made of subunits that include four chemical structures known as nucleotide bases. The names of these bases (adenine, thymine, guanine, and cytosine) usually are abbreviated as A, T, G, and C. The physical structure of DNA is often described as a double helix because the molecule has two spiraling strands connected to each other by weak bonds between the nucleotide bases. As shown in Figure 1, A pairs only with T and G only with C. Thus, the order of the single bases on either strand reveals the order of the pairs from one end of the molecule to the other, and the DNA molecule could be said to be like a long sequence of As, Ts, Gs, and Cs.

Figure 1. Sketch of a small part of a double-stranded DNA molecule. Nucleotide bases are held together by weak bonds. A pairs with T; C pairs with G.



Most human DNA is tightly packed into structures known as chromosomes, which come in different sizes and are located in the nuclei of cells. The chromosomes are numbered (in descending order of size) 1 through 22, with the remaining chromosome being an X or a much smaller Y. If the bases are like letters, then each chromosome is like a book written in this four-letter alphabet, and the nucleus is like a bookshelf in the interior of the cell. All the cells in one

**EXHIBIT C**

*Reference Guide on DNA Identification Evidence*

individual contain identical copies of the same collection of books. The sequence of the As, Ts, Gs, and Cs that constitutes the "text" of these books is referred to as the individual's nuclear genome.

All told, the genome comprises more than three billion "letters" (As, Ts, Gs, and Cs). If these letters were printed in books, the resulting pile would be as high as the Washington Monument. About 99.9% of the genome is identical between any two individuals. This similarity is not really surprising—it accounts for the common features that make humans an identifiable species (and for features that we share with many other species as well). The remaining 0.1% is particular to an individual. This variation makes each person (other than identical twins) genetically unique. This small percentage may not sound like a lot, but it adds up to some three million sites for variation among individuals.

The process that gives rise to this variation among people starts with the production of special sex cells—sperm cells in males and egg cells in females. All the nucleated cells in the body other than sperm and egg cells contain two versions of each of the 23 chromosomes—two copies of chromosome 1, two copies of chromosome 2, and so on, for a total of 46 chromosomes. The X and Y chromosomes are the sex-determining chromosomes. Cells in females contain two X chromosomes, and cells in males contain one X and one Y chromosome. An egg cell, however, contains only 23 chromosomes—one chromosome 1, one chromosome 2, . . . , and one X chromosome—each selected at random from the woman's full complement of 23 chromosome pairs. Thus, each egg carries half the genetic information present in the mother's 23 chromosome pairs, and because the assortment of the chromosomes is random, each egg carries a different complement of genetic information. The same situation exists with sperm cells. Each sperm cell contains a single copy of each of the 23 chromosomes selected at random from a man's 23 pairs, and each sperm differs in the assortment of the 23 chromosomes it carries. Fertilization of an egg by a sperm therefore restores the full number of 46 chromosomes, with the 46 chromosomes in the fertilized egg being a new combination of those in the mother and father. The process resembles taking two decks of cards (a male and a female deck) and shuffling a random half from the male deck into a random half from the female deck, to produce a new deck.

During pregnancy, the fertilized cell divides to form two cells, each of which has an identical copy of the 46 chromosomes. The two then divide to form four, the four form eight, and so on. As gestation proceeds, various cells specialize ("differentiate") to form different tissues and organs. Although cell differentiation yields many different kinds of cells, the process of cell division results in each progeny cell having the same genomic complement as the cell that divided. Thus, each of the approximately 100 trillion cells in the adult human body has the same DNA text as was present in the original 23 pairs of chromosomes from the fertilized egg, one member of each pair having come from the mother and one from the father.

A second mechanism operating during the chromosome reduction process in sperm and egg cells further shuffles the genetic information inherited from mother

137

EXHIBIT C

*Reference Manual on Scientific Evidence*

and father. In the first stage of the reduction process, each chromosome of a chromosome pair aligns with its partner. The maternally inherited chromosome 1 aligns with the paternally inherited chromosome 1, and so on through the 22 pairs; X chromosomes align with each other as well, but X and Y chromosomes do not. While the chromosome pairs are aligned, they exchange pieces to create new combinations. The recombined chromosomes are passed on in the sperm and eggs. As a consequence, the chromosomes we inherit from our parents are not exact copies of their chromosomes, but rather are mosaics of these parental chromosomes.

The swapping of material between chromosome pairs (as they align in the emerging sex cells) and the random selection (of half of each parent's 46 chromosomes) in making sex cells is called recombination. Recombination is the principal source of diversity in individual human genomes.

The diverse variations occur both within the genes and in the regions of DNA sequences between the genes. A gene can be defined as a segment of DNA, usually from 1000 to 10,000 base pairs long, that "codes" for a protein. The cell produces specific proteins that correspond to the order of the base pairs (the "letters") in the coding part of the gene.[14] Human genes also contain noncoding sequences that regulate the cell type in which a protein will be synthesized and how much protein will be produced.[15] Many genes contain interspersed noncoding, nonregulatory sequences that no longer participate in protein synthesis. These sequences, which have no apparent function, constitute about 23% of the base pairs within human genes.[16] In terms of the metaphor of DNA as text, the gene is like an important paragraph in the book, often with some gibberish in it.

Proteins perform all sorts of functions in the body and thus produce observable characteristics. For example, a tiny part of the sequence that directs the production of the human group-specific complement protein (a protein that binds to vitamin D and transports it to certain tissues) is

G C A A A A T T G C C T G A T G C C A C A C C C A A G G A A C T G G C A.

14. The sequence in which the building blocks (amino acids) of a protein are arranged corresponds to the sequence of base pairs within a gene. (A sequence of three base pairs specifies a particular 1 of the 20 possible amino acids in the protein. The mapping of a set of three nucleotide bases to a particular amino acid is the genetic code. The cell makes the protein through intermediate steps involving coding RNA transcripts.) About 1.5% of the human genome codes for the amino acid sequences.

15. These noncoding but functional sequences include promoters, enhancers, and repressors.

16. This gene-related DNA consists of introns (which interrupt the coding sequences, called exons, in genes and which are edited out of the RNA transcript for the protein), pseudogenes (evolutionary remnants of once-functional genes), and gene fragments. The idea of a gene as a block of DNA (some of which is coding, some of which is regulatory, and some of which is functionless) is an oversimplification, but it is useful enough here. *See, e.g.,* Mark B. Gerstein et al., *What Is a Gene, Post-ENCODE? History and Updated Definition*, 17 Genome Res. 669 (2007).

**EXHIBIT C**

This gene always is located at the same position, or locus, on chromosome 4. As we have seen, most individuals have two copies of each gene at a given locus—one from the father and one from the mother.

A locus where almost all humans have the same DNA sequence is called monomorphic ("of one form"). A locus where the DNA sequence varies among significant numbers of individuals (more than 1% or so of the population possesses the variant) is called polymorphic ("of many forms"), and the alternative forms are called alleles. For example, the GC protein gene sequence has three common alleles that result from substitutions in a base at a given point. Where an A appears in one allele, there is a C in another. The third allele has the A, but at another point a G is swapped for a T. These changes are called single nucleotide polymorphisms (SNPs, pronounced "snips").

If a gene is like a paragraph in a book, a SNP is a change in a letter somewhere within that paragraph (a substitution, a deletion, or an insertion), and the two versions of the gene that result from this slight change are the alleles. An individual who inherits the same allele from both parents is called a homozygote. An individual with distinct alleles is a heterozygote.

DNA sequences used for forensic analysis usually are not genes. They lie in the vast regions between genes (about 75% of the genome is extragenic) or in the apparently nonfunctional regions within genes. These extra- and intragenic regions of DNA have been found to contain considerable sequence variation, which makes them particularly useful in distinguishing individuals. Although the terms "locus," "allele," "homozygous," and "heterozygous" were developed to describe genes, the nomenclature has been carried over to describe all DNA variation—coding and noncoding alike. Both types are inherited from mother and father in the same fashion.

## B. What Are DNA Polymorphisms and How Are They Detected?

By determining which alleles are present at strategically chosen loci, the forensic scientist ascertains the genetic profile, or genotype, of an individual (at those loci). Although the differences among the alleles arise from alterations in the order of the ATGC letters, genotyping does not necessarily require "reading" the full DNA sequence. Here we outline the major types of polymorphisms that are (or could be) used in identity testing and the methods for detecting them.

### 1. Sequencing

Researchers are investigating radically new and efficient technologies to sequence entire genomes, one base pair at a time, but the direct sequencing methods now in existence are technically demanding, expensive, and time-consuming for whole-genome sequencing. Therefore, most genetic typing focuses on identifying only

EXHIBIT C

*Reference Manual on Scientific Evidence*

those variations that define the alleles and does not attempt to "read out" each and every base pair as it appears. The exception is mitochondrial DNA, described in Section V. As next-generation sequencing technologies are perfected, however (*see infra* Section II.F), this situation could change.

## 2. Sequence-specific probes and SNP chips

Simple sequence variation, such as that for the GC locus, is conveniently detected using sequence-specific oligonucleotide (SSO) probes. A probe is a short, single strand of DNA. With GC typing, for example, probes for the three common alleles are attached to designated locations on a membrane. Copies of the variable sequence region of the GC gene in the crime scene sample are made with the polymerase chain reaction (PCR), which is discussed in the next section. These copies (in the form of single strands) are poured onto the membrane. Whichever allele is present in a single-stranded DNA fragment will cause the fragment to stick to the corresponding, immobilized probe strands. To permit the fragments of this type to be seen, a chemical "label" that catalyzes a color change at the spot where the DNA binds to its probe can be attached when the copies are made. A colored spot showing that the allele is present thus should appear on the membrane at the location of the probe that corresponds to this particular allele. If only one allele is present in the crime scene DNA (because of homozygosity), there will be no change at the spots where the other probes are located. If two alleles are present (heterozygosity), the corresponding two spots will change color.

This approach can be miniaturized and automated by embedding probes for many loci on a silicon chip. Commercially available "SNP chips" for disease research incorporate enough different probes to detect on the order of a million different known SNPs throughout the human genome. These chips have become a basic tool in searches for genetic changes associated with human diseases. They are described further in Section II.F.

## 3. VNTRs and RFLP testing

Another category of DNA variations comes from the insertion of a variable number of tandem repeats (VNTR) at a locus. These were the first polymorphisms to find widespread use in identity testing and hence were the subject of most of the court opinions on the admissibility of DNA in the late 1980s and early 1990s. The core unit of a VNTR is a particular short DNA sequence that is repeated many times end-to-end. The first VNTRs to be used in genetic and forensic testing had core repeat sequences of 15–35 base pairs. In this testing, bacterial enzymes (known as "restriction enzymes") were used to cut the DNA molecule both before and after the VNTR sequence. A small number of repeats in the VNTR region gives rise to a small "restriction fragment," and a large number of repeats yields a large fragment. A substantial quantity of DNA from a crime scene sample is required to give a detectable number of VNTR fragments with this procedure.

140

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

The detection is accomplished by applying a probe that binds when it encounters the repeated core sequence. A radioactive or fluorescent molecule attached to the probe provides a way to mark the VNTR fragment. The probe ignores DNA fragments that do not include the VNTR core sequence. (There are many of these unwanted fragments, because the restriction enzymes chop up the DNA throughout the genome—not just at the VNTR loci.) The restriction fragments are sorted by a process known as electrophoresis, which separates DNA fragments based on size. Many early court opinions refer to this process as RFLP testing.[17]

## 4. STRs

Although RFLP-VNTR profiling is highly discriminating,[18] it has several drawbacks. Not only does it require a substantial sample size, but it also is time-consuming and does not measure the fragment lengths to the nearest number of repeats. The measurement error inherent in the form of electrophoresis used (known as "gel electrophoresis") is not a fundamental obstacle, but it complicates the determination of which profiles match and how often other profiles in the population would be declared to match.[19] Consequently, forensic scientists have moved from VNTRs to another form of repetitive DNA known as short tandem repeats (STRs) or microsatellites. STRs have very short core repeats, two to seven base pairs in length, and they typically extend for only some 50 to 350 base pairs.[20] Like the larger VNTRs, which extend for thousands of base pairs, STR sequences do not code for proteins, and the ones used in identity testing convey little or no information about an individual's propensity for disease.[21] Because STR alleles

---

17. It would be clearer to call it RFLP-VNTR testing, because the fragments being measured contain the VNTRs rather than some simpler polymorphisms that were used in genetic research and disease testing. A more detailed exposition of the steps in RFLP-VNTR profiling (including gel electrophoresis, Southern blotting, and autoradiography) can be found in the previous edition of this guide and in many judicial opinions circa 1990.

18. Alleles at VNTR loci generally are too long to be measured precisely by electrophoretic methods—alleles differing in size by only a few repeat units may not be distinguished. Although this makes for complications in deciding whether two length measurements that are close together result from the same allele, these loci are quite powerful for the genetic differentiation of individuals, because they tend to have many alleles that occur relatively rarely in the population. At a locus with only 20 such alleles (and most loci typically have many more), there are 210 possible genotypes. With five such loci, the number of possible genotypes is $210^5$, which is more than 400 billion.

19. For a case reversing a conviction as a result of an expert's confusion on this score, see *People v. Venegas,* 954 P.2d 525 (Cal. 1998). More suitable procedures for match windows and probabilities are described in NRC II, *supra* note 9.

20. The numbers, and the distinction between "minisatellites" (VNTRs) and microsatellites (STRs), are not precise, but the mechanisms that give rise to the shorter tandem repeats differ from those that produce the longer ones. *See* Benjamin Lewin, Genes IX 124–25 (9th ed. 2008).

21. *See* David H. Kaye, *Please, Let's Bury the Junk: The CODIS Loci and the Revelation of Private Information*, 102 Nw. U. L. Rev. Colloquy 70 (2007), *available at* http://www.law.northwestern.edu/lawreview/colloquy/2007/25/.

141

EXHIBIT C

*Reference Manual on Scientific Evidence*

are much smaller than VNTR alleles, however, they can be amplified with PCR designed to copy only the locus of interest. This obviates the need for restriction enzymes, and it allows laboratories to analyze STR loci much more quickly. Because the amplified fragments are shorter, electrophoretic detection permits the exact number of base pairs in an STR to be determined, allowing alleles to be defined as discrete entities. Figure 2 illustrates the nature of allelic variation at an STR locus found on chromosome 16.

Figure 2. Three alleles of the D16S539 STR. The core sequence is GATA. The first allele listed has 9 tandem repeats, the second has 10, and the third has 11. The locus has other alleles (different numbers of repeats), shown in Figure 4.

Nine-repeat allele:
GATAGATAGATAGATAGATAGATAGATAGATAGATA
Ten-repeat allele:
GATAGATAGATAGATAGATAGATAGATAGATAGATAGATA
Eleven-repeat allele:
GATAGATAGATAGATAGATAGATAGATAGATAGATAGATAGATA

Although there are fewer alleles per locus for STRs than for VNTRs, there are many STRs, and they can be analyzed simultaneously. Such "multiplex" systems now permit the simultaneous analysis of 16 loci. A subset of 13 is standard in the United States (*see infra* Section II.D), and these are capable of distinguishing among almost everyone in the population.[22]

## 5. Summary

DNA contains the genetic information of an organism. In humans, most of the DNA is found in the cell nucleus, where it is organized into separate chromosomes. Each chromosome is like a book, and each cell has the same library (genome) of books of various sizes and shapes. There are two copies of each book of a particular size and shape, one that came from the father, the other from the mother. Thus, there are two copies of the book entitled "Chromosome One," two copies of "Chromosome Two," and so on. Genes are the most meaningful paragraphs in the books. Other parts of the text appear to have no coherent message. Two individuals sometimes have different versions (alleles) of the same paragraph. Some alleles result from the substitution of one letter for another. These are SNPs. Others come about from the insertion or deletion of single letters, and still

22. Usually, there are between 7 and 15 STR alleles per locus. Thirteen loci that have 10 STR alleles each can give rise to $55^{13}$, or 42 billion trillion, possible genotypes.

142

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

others represent a kind of stuttering repetition of a string of extra letters. These are the VNTRs and STRs.[23] The locations within a chromosome where these interpersonal variations occur are called loci.

## C. How Is DNA Extracted and Amplified?

DNA usually can be found in biological materials such as blood, bone, saliva, hair, semen, and urine. A combination of routine chemical and physical methods permits DNA to be extracted from cell nuclei and isolated from the other chemicals in a sample. PCR then is used to make exponentially large numbers of copies of targeted regions of the extracted DNA. PCR might be applied to the double-stranded DNA segments extracted and purified from a forensic sample as follows: First, the purified DNA is separated into two strands by heating it to near the boiling point of water. This "denaturing" takes about a minute. Second, the single strands are cooled, and "primers" attach themselves to the points at which the copying will start and stop. (Primers are small, manmade pieces of DNA, usually between 15 and 30 nucleotides long, of known sequences. If a locus of interest starts near the sequence ATCGAATCGGTAGCCATATG on one strand, a suitable primer would have the complementary sequence TAGCTTAGCCATCGGTATAC.) "Annealing" these primers takes about 45 seconds. Finally, the soup containing the annealed DNA strands, the enzyme DNA polymerase, and lots of the four nucleotide building blocks (A, C, G, and T) is warmed to a comfortable working temperature for the polymerase to insert the complementary base pairs one at a time, building a matching second strand bound to the original "template" and thus replicating part of the DNA strand that was separated from its partner in the first step. The same replication occurs with the separated partner as the template. This "extension" step for both templates takes about 2 minutes. The result is two identical double-stranded DNA segments, one made from each strand of the original DNA. The three-step cycle is repeated, usually 20 to 35 times in automated machines known as thermocyclers. Ideally, the first cycle results in two double-stranded DNA segments. The second cycle produces four, the third eight, and so on, until the number of copies of the original DNA is enormous. In practice, there is some inefficiency in the doubling process, but the yield from a 30-cycle amplification is generally about 1 million to 10 million copies of the targeted sequence.[24] In this way, PCR magnifies short sequences of interest in a small number of DNA fragments into millions of exact copies. Machines that automate the PCR process are commercially available.

For PCR amplification to work properly and yield copies of only the desired sequence, however, care must be taken to achieve the appropriate chemical con-

23. In addition to the 23 pairs of books in the cell nucleus, other scraps of text reside in each of the mitochondria, the power plants of the cell. *See infra* Section V.

24. NRC II, *supra* note 9, at 69–70.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ditions and to avoid excessive contamination of the sample. A laboratory should be able to demonstrate that it can amplify targeted sequences faithfully with the equipment and reagents that it uses and that it has taken suitable precautions to avoid or detect contamination from foreign DNA. With small samples, it is possible that some alleles will be amplified and others missed (preferential amplification, discussed *infra* Section III.A.1), and mutations in the region of a primer can prevent the amplification of the allele downstream of the primer (null alleles).[25]

## D. How Is STR Profiling Done with Capillary Electrophoresis?

In the most commonly used analytical method for detecting STRs, the STR fragments in the sample are amplified using primers with fluorescent tags. Each new STR fragment made in a PCR cycle bears a fluorescent dye. When struck by a source light, each dye glows with a particular color. The fragments are separated according to their length by electrophoresis in automated "genetic analyzer" machinery—a byproduct of the technology developed for the Human Genome Project that first sequenced most of the entire genome. In these machines, a long, narrow tube (a "capillary") is filled with an entangled polymer or comparable sieving medium, and an electric field is applied to pull DNA fragments placed at one end of the tube through the medium. Shorter fragments slip through the medium more quickly than larger, bulkier ones. A laser beam is sent through a small glass window in the tube. The laser light excites the dye, causing it to fluoresce at a characteristic wavelength as the tagged fragments pass under the light. The intensity of the light emitted by the dye is recorded by a kind of electronic camera and transformed into a graph (an electropherogram), which shows a peak as an STR flashes by. A shorter allele will pass by the window and fluoresce first; a longer fragment will come by later, giving rise to another peak on the graph. Figure 3 provides a sketch of how the alleles with five and eight repeats of the GATA sequence at the D16S539 STR locus might appear in an electropherogram.

Medical and human geneticists were interested in STRs as markers in family studies to locate the genes that are associated with inherited diseases, and papers on their potential for identity testing appeared in the early 1990s. Developmental research to pick suitable loci moved into high gear in England, Europe, and Canada. Britain's Forensic Science Service applied a four-locus testing system in 1994. Then it introduced the "second generation multiplex" (SGM)—for simultaneously typing six loci in 1996. These soon would be used to build England's National DNA Database. The database system allows a computer to check the STR types of millions of known or suspected criminals against thousands of crime

---

25. A null allele will not lead to a false exclusion if the two DNA samples from the same individual are amplified with the same primer system, but it could lead to an exclusion at one locus when searching a database of STR profiles if the database profile was determined with a different PCR kit than the one used to analyze the crime scene DNA.

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

Figure 3. Sketch of an electropherogram for two D16S539 alleles. One allele has five repeats of the sequence GATA; the other has eight. Each GATA repeat is depicted as a small rectangle. Although only one copy of each allele (with a fluorescent molecule, or "tag" attached) is shown here, PCR generates a great many copies from the DNA sample with these alleles at the D16S539 locus. These copies are drawn through the capillary tube, and the tags glow as the STR fragments move through the laser beam. An electronic camera measures the colored light from the tags. Finally, a computer processes the signal from the camera to produce the electropherogram. Source: David H. Kaye, The Double Helix and the Law of Evidence 189, fig. 9.1 (2010).



scene samples. A six-locus STR profile can be represented as a string of 12 digits; each digit indicates the number of repeat units in the alleles at each locus. These discrete, numerical DNA profiles are far easier to compare mechanically than the complex patterns of fingerprints. In the United States, the FBI settled on 13 "core loci" to use in the U.S. national DNA database system. These are often called the "CODIS core loci," and an additional 7 STR loci are under consideration.[26]

Modern genetic analyzers produce electropherograms for many loci at once. This "multiplexing" is accomplished by using dyes that fluoresce at distinct colors

26. Douglas R. Hares, *Expanding the CODIS Core Loci in the United States*, Forensic Sci. Int'l: Genetics (forthcoming 2011). CODIS stands for "convicted offender DNA index system."

145

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

to label the alleles from different groups of loci. A separate set of fragments of known sizes that comigrate through the capillary function as a kind of ruler (an "internal-lane size standard") to determine the lengths of the allelic fragments. Software processes the raw data to generate an electropherogram of the separate allele peaks of each color. By comparing the positions of the allele peaks to the size standard, the program determines the number of repeats in each allele. The plotted heights of the peaks (measured in relative fluorescent units, or RFUs) are proportional to the amount of the PCR product.

Figure 4 is an electropherogram of all 203 major alleles at 15 STR loci that can be typed in a single "multiplex" PCR reaction. (In addition, it shows the two alleles of the gene used to determine the sex of the contributor of a DNA

Figure 4. Alleles of 15 STR loci and the amelogenin sex-typing test from the AmpFISTR Identifiler kit. The bottom panel is a "sizing standard"—a set of peaks from DNA sequences of known lengths (in base pairs). The numbers in the vertical axis in each panel are relative fluorescence units (RFUs) that indicate the amount of light emitted after the laser beam strikes the fluorescent tag on an STR fragment.



Note: Applied Biosystems makes the kit that produced these allelic ladders.
Source: John M. Butler, Forensic DNA Typing: Biology, Technology, and Genetics of STR Markers 128 (2d ed. 2005), Copyright Elsevier 2005, with the permission of Elsevier Academic Press. John Butler supplied the illustration.

146

**EXHIBIT C**

*Reference Guide on DNA Identification Evidence*

sample.[27]) An electropherogram from an individual's DNA would have only one or two peaks at each of these 15 STR loci (depending on whether the person is homozygous or heterozygous). These "allelic ladders" aid in deciding which allele a peak from an unknown sample represents.

Figure 5 is an electropherogram from the vaginal epithelial cells of the body of a girl who had been sexually assaulted and killed in *People v. Pizarro*.[28] It was produced for the retrial in 2008 of the defendant who was linked to the victim by VNTR typing at his first trial in 1990.

Figure 5. Electropherogram for nine STR loci of the victim's DNA in *People v. Pizzaro*. (The amelogenin locus and a sizing standard at the bottom also are included.) Some STR loci have small peaks, indicating that there was not much PCR product for those loci, likely because of DNA degradation. All of the STR loci have two peaks, as would be expected when the source is heterozygous at those loci.



Source: Steven Myers and Jeanette Wallin, California Department of Justice, provided the image.

27.  The amelogenin gene, which is found on the X and the Y chromosomes, codes for a protein that is a major component of tooth enamel matrix. The copy on the X chromosome is 112 bp long. The copy on the Y chromosome has a string of six base pairs deleted, making it slightly shorter (106 bp). A female (XX) will have one peak at 112 bp. A male (XY) will have two peaks (at 106 and 112 bp).

28. 12 Cal. Rptr. 2d 436 (Ct. App. 1992), *after remand*, 3 Cal. Rptr. 3d 21 (Ct. App. 2003), *review denied* (Oct 15, 2003).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## E. What Can Be Done to Validate a Genetic System for Identification?

Regardless of the kind of genetic system used for typing—STRs, SNPs, or still other polymorphisms—some general principles and questions can be applied to each system that is offered for courtroom use. First, the nature of the polymorphism should be well characterized. Is it a simple sequence polymorphism or a fragment length polymorphism? This information should be in the published literature or in archival genome databanks.

Second, the published scientific literature can be consulted to verify claims that a particular method of analysis can produce accurate profiles under various conditions. Although such validation studies have been conducted for all the systems ordinarily used in forensic work, determining the point at which the empirical validation of a particular system is sufficiently convincing to pass scientific muster may well require expert assistance.

Finally, the population genetics of the system should be characterized. As new systems are discovered, researchers typically analyze convenient collections of DNA samples from various human populations and publish studies of the relative frequencies of each allele in these population samples. These studies measure the extent of genetic variability at the polymorphic locus in the various populations, and thus of the potential probative power of the marker for distinguishing among individuals.

At this point, the capability of PCR-based procedures to ascertain DNA genotypes accurately cannot be doubted. Of course, the fact that scientists have shown that it is possible to extract DNA, to amplify it, and to analyze it in ways that bear on the issue of identity does not mean that a particular laboratory has adopted a suitable protocol and is proficient in following it. These case-specific issues are considered in Sections III and IV.

## F. What New Technologies Might Emerge?

### 1. Miniaturized "lab-on-a-chip" devices

Miniaturized capillary electrophoresis (CE) devices have been developed for rapid detection of STRs (described in Section II.D) and other genetic analyses. The mini-CE systems consist of microchannels roughly the diameter of a hair etched on glass wafers ("chips") using technology borrowed from the computer industry. The principles of electrophoretic separation are the same as with conventional CE systems. With microfluidic technologies, it is possible to integrate DNA extraction and PCR amplification processes with the CE separation in a single device, a so-called lab on a chip. Once a sample is added to the device, all the analytical steps are performed on the chip without further human contact. These integrated devices combine the benefits of simplified sample handling with rapid analysis

148

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

and are under active development for point–of–care medical diagnostics.[29] Efforts are under way to develop an integrated microdevice for STR analysis that would improve the speed and efficiency of forensic DNA profiling. A portable device for rapid and secure analysis of samples in the field is a distinct possibility.[30]

## 2. High-throughput sequencing

The initial success of the Human Genome Project and the promise of "personalized medicine" is driving research to develop technologies for DNA analysis that are faster, cheaper, and less labor intensive. In 2004, the National Human Genome Research Institute announced funding for research leading to the "$1000 genome," an achievement that would permit sequencing an individual's genome for medical diagnosis and improved drug therapies. Advances in the years since 2004 suggest that this goal will be achieved before the target date of 2014,[31] and the successful innovations could provide major advances in forensic DNA testing. However, it is too soon to identify which of the nascent sequencing technologies might emerge from the pack.

As of 2009, three different next-generation sequencing technologies were commercially available, and more instruments are in the pipeline.[32] These new technologies generate massive amounts of DNA sequence data (100 million to 1 billion base pairs per run) at very low cost (under $50 per megabase). They do so by simultaneously sequencing millions of short fragments, then applying bioinformatics software to assemble the sequences in the correct order. These high–throughput sequencing technologies have demonstrated their usefulness in research applications. Two of these applications, the analysis of highly degraded DNA[33] and the identification of microbial bioterrorism agents, are of forensic relevance.[34] As the speed and cost of sequencing diminish and the necessary bioinformatics software becomes more accessible and effective, full–genome sequence

29. P. Yager et al., *Microfluidic Diagnostic Technologies for Global Public Health*, 442 Nature 412 (2006).

30. K.M. Horsman et al., *Forensic DNA Analysis on Microfluidic Devices: A Review*, 52 J. Forensic Sci. 784 (2007). As indicated in this review, there remain challenges to overcome before the forensic lab on a chip comes to fruition. However, given the progress being made on multiple research fronts in chip fabrication design and in microfluidic technology, these challenges seem surmountable.

31. R.F. Service, *The Race for the $1000 Genome*, 311 Science 1544 (2006).

32. Michael L. Metzker, *Sequencing Technologies—The Next Generation*, 11 Nature Rev. Genetics 31 (2010).

33. The next-generation technologies have been used to sequence highly degraded DNA from Neanderthal bones and from the hair of the extinct woolly mammoth. R.E. Green et al., *Analysis of One Million Base Pairs of Neanderthal DNA*, 444 Nature 330 (2006); W. Miller, *Sequencing the Nuclear Genome of the Extinct Woolly Mammoth*, 456 Nature 387 (2008). The approaches used in these studies are readily translatable to SNP typing of highly degraded DNA such as found in cases involving victims of mass disasters.

34. By sequencing entire bacterial genomes, researchers can rapidly differentiate organisms that have been genetically modified for biological warfare or terrorism from routine clinical and envi-

149

EXHIBIT C

*Reference Manual on Scientific Evidence*

analysis or something approaching it could become a practical tool for human identification.

### 3. Microarrays

Hybridization microarrays are the third technological innovation with readily foreseeable forensic application. A microarray consists of a two-dimensional grid of many thousands of microscopic spots on a glass or plastic surface, each containing many copies of a short piece of single-stranded DNA tethered to the surface at one end; each spot can be thought of as a dense cluster of tiny, single-stranded DNA "whiskers" with their own particular sequence. A solution containing single-stranded target DNA is washed over the microarray surface. The whiskers on the array serve as probes to detect DNA (or RNA) with the corresponding complementary sequence. The spots that capture target DNA are identified, indicating the presence of that sequence in the target sample. (The hybridization can be detected in several different ways.) Microarrays are commercially available for the detection of SNPs in the human genome and for sequencing human mitochondrial DNA.[35]

### 4. What questions do the new technologies raise?

As these or other emerging technologies are introduced in court, certain basic questions will need to be answered. What is the principle of the new technology? Is it simply an extension of existing technologies, or does it invoke entirely new concepts? Is the new technology used in research or clinical applications independent of forensic science? Does the new technology have limitations that might affect its application in the forensic sphere? Finally, what testing has been done and with what outcomes to establish that the new technology is reliable when used on forensic samples? For next-generation sequencing technologies and microarray technologies, the questions may be directed as well to the bioinformatics methods used to analyze and interpret the raw data. Obtaining answers to these questions would likely require input both from experts involved in technology development and application and from knowledgeable forensic experts.

ronmental strains. B. La Scola et al., *Rapid Comparative Genomic Analysis for Clinical Microbiology: The Francisella Tularensis Paradigm*, 18 Genome Res. 742 (2008).

35. One study of 3000 Europeans used a commercial microarray with over half a million SNPs "to infer [the individuals'] geographic origin with surprising accuracy—often to within a few hundred kilometers." John Novembre et al., *Genes Mirror Geography Within Europe*, 456 Nature 98, 98 (2008). Microarrays also are used in studies of variation in the number of copies of certain genes in different people's genomes (copy number variation). Microarrays to detect pathogens and other targets also have been developed.

EXHIBIT C

# III. Sample Collection and Laboratory Performance

## A. Sample Collection, Preservation, and Contamination

The primary determinants of whether DNA typing can be done on any particular sample are (1) the quantity of DNA present in the sample and (2) the extent to which it is degraded. Generally speaking, if a sufficient quantity of reasonable quality DNA can be extracted from a crime scene sample, no matter what the nature of the sample, DNA typing can be done without problem. Thus, DNA typing has been performed on old blood stains, semen stains, vaginal swabs, hair, bone, bite marks, cigarette butts, urine, and fecal material. This section discusses what constitutes sufficient quantity and reasonable quality in the context of STR typing. Complications from contaminants and inhibitors also are discussed. The special technique of mitotyping and the treatment of samples that contain DNA from two or more contributors are discussed in Section V.

### 1. Did the sample contain enough DNA?

Amounts of DNA present in some typical kinds of samples vary from a trillionth or so of a gram for a hair shaft to several millionths of a gram for a postcoital vaginal swab. Most PCR test protocols recommend samples on the order of 1 billionth to 5 billionths of a gram for optimum yields. Normally, the number of amplification cycles for nuclear DNA is limited to 28 or so to ensure that there is no detectable product for samples containing less than about 20 cell equivalents of DNA.[36]

Procedures for typing still smaller samples—down to a single cell's worth of nuclear DNA—have been studied. These have been shown to work, to some extent, with trace or contact DNA left on the surface of an object such as the steering wheel of a car. The most obvious strategy is to increase the number of amplification cycles. The danger is that chance effects might result in one allele being amplified much more than another. Alleles then could drop out, small peaks from unusual alleles at other loci might "drop in," and a bit of extraneous DNA could contribute to the profile. Other protocols have been developed for typing such "low copy number" (LCN) or "low template" (LT) DNA.[37] LT-STR

---

36. This is about 100 to 200 trillionths of a gram. A lower limit of about 10 to 15 cells' worth of DNA has been determined to give balanced amplification.

37 *See, e.g.,* John Buckleton & Peter Gill, *Low Copy Number, in* Forensic DNA Evidence Interpretation 275 (John S. Buckleton et al. eds., 2005); Pamela J. Smith & Jack Ballantyne, *Simplified Low-Copy-Number DNA Analysis by Post-PCR Purification*, 52 J. Forensic Sci. 820 (2007).

EXHIBIT C

*Reference Manual on Scientific Evidence*

profiles have been admitted in courts in a few countries,[38] and they are beginning to appear in prosecutions in the United States.[39]

Although there are tests to estimate the quantity of DNA in a sample, whether a particular sample contains enough human DNA to allow typing cannot always be predicted accurately. The best strategy is to try. If a result is obtained, and if the controls (samples of known DNA and blank samples) have behaved properly, then the sample had enough DNA. The appearance of the same peaks in repeated runs helps assure that these alleles are present.[40]

## 2. Was the sample of sufficient quality?

The primary determinant of DNA quality for forensic analysis is the extent to which the long DNA molecules are intact. Within the cell nucleus, each molecule of DNA extends for millions of base pairs. Outside the cell, DNA spontaneously degrades into smaller fragments at a rate that depends on temperature, exposure to oxygen, and, most importantly, the presence of water.[41] In dry biological samples, protected from air, and not exposed to temperature extremes, DNA degrades very slowly. STR testing has proved effective with old and badly degraded material such as the remains of the Tsar Nicholas family (buried in 1918 and recovered in 1991).[42]

38. *E.g.,* R. v. Reed [2009] (CA Crim. Div.) EWCA Crim. 2698, ¶ 74 (reviewing expert submissions and concluding that "Low Template DNA can be used to obtain profiles capable of reliable interpretation if the quantity of DNA that can be analysed is above the stochastic threshold [of] between 100 and 200 picograms").

39. People v. Megnath, 898 N.Y.S.2d 408 (N.Y. Sup. Ct. 2010) (reasoning that "LCN DNA analysis" uses the same steps as STR analysis of larger samples and that the modifications in the procedure used by the laboratory in the case were generally accepted); *cf.* United States v. Davis, 602 F. Supp. 2d 658 (D. Md. 2009) (avoiding "making a finding with regard to the dueling definitions of LCN testing advocated by the parties" by finding that "the amount of DNA present in the evidentiary samples tested in this case" was in the normal range). These cases and the admissibility of low-template DNA analysis are discussed in Kaye et al., *supra* note 1, § 9.2.3(c).

40. John M. Butler & Cathy R. Hill, *Scientific Issues with Analysis of Low Amounts of DNA*, LCN Panel on Scientific Issues with Low Amounts of DNA, Promega Int'l Symposium on Human Identification, Oct. 15, 2009, *available at* http://www.cstl.nist.gov/strbase/pub_pres/Butler_Promega2009-LCNpanel-for-STRBase.pdf.

41. Other forms of chemical alteration to DNA are well studied, both for their intrinsic interest and because chemical changes in DNA are a contributing factor in the development of cancers in living cells. Some forms of DNA modification, such as that produced by exposure to ultraviolet radiation, inhibit the amplification step in PCR-based tests, whereas other chemical modifications appear to have no effect. C.L. Holt et al., *TWGDAM Validation of AmpFlSTR PCR Amplification Kits for Forensic DNA Casework*, 47 J. Forensic Sci. 66 (2002); George F. Sensabaugh & Cecilia von Beroldingen, *The Polymerase Chain Reaction: Application to the Analysis of Biological Evidence*, *in* Forensic DNA Technology 63 (Mark A. Farley & James J. Harrington eds., 1991).

42. Peter Gill et al., *Identification of the Remains of the Romanov Family by DNA Analysis*, 6 Nature Genetics 130 (1994).

EXHIBIT C

The extent to which degradation affects a PCR-based test depends on the size of the DNA segment to be amplified. For example, in a sample in which the bulk of the DNA has been degraded to fragments well under 1000 base pairs in length, it may be possible to amplify a 100-base-pair sequence, but not a 1000-base-pair target. Consequently, the shorter alleles may be detected in a highly degraded sample, but the larger ones may be missed. Fortunately, the size differences among STR alleles at a locus are quite small (typically no more than 50 base pairs). Therefore, if there is a degradation effect on STR typing, it is usually "locus dropout"—in cases involving severe degradation, loci yielding larger products (greater than 200 base pairs) may not be detected.[43]

DNA can be exposed to a great variety of environmental insults without any effect on its capacity to be typed correctly. Exposure studies have shown that contact with a variety of surfaces, both clean and dirty, and with gasoline, motor oil, acids, and alkalis either have no effect on DNA typing or, at worst, render the DNA untypable.[44]

Although contamination with microbes generally does little more than degrade the human DNA, other problems sometimes can occur. Therefore, the validation of DNA typing systems should include tests for interference with a variety of microbes to see if artifacts occur. If artifacts are observed, then control tests should be applied to distinguish between the artifactual and the true results.

## B. Laboratory Performance

### 1. What forms of quality control and assurance should be followed?

DNA profiling is valid and reliable, but confidence in a particular result depends on the quality control and quality assurance procedures in the laboratory. Quality control refers to measures to help ensure that a DNA-typing result (and its interpretation) meets a specified standard of quality. Quality assurance refers to monitoring, verifying, and documenting laboratory performance. A quality assurance program helps demonstrate that a laboratory is meeting its quality control objectives and thus justifies confidence in the quality of its product.[45]

---

43. Holt et al., *supra* note 41. Special primers and very short STRs give better results with extremely degraded samples. *See* Michael D. Coble & John M. Butler, *Characterization of New MiniSTR Loci to Aid Analysis of Degraded DNA*, 50 J. Forensic Sci. 43 (2005).

44. Holt et al., *supra* note 41. Most of the effects of environmental insult readily can be accounted for in terms of basic DNA chemistry. For example, some agents produce degradation or damaging chemical modifications. Other environmental contaminants inhibit restriction enzymes or PCR. (This effect sometimes can be reversed by cleaning the DNA extract to remove the inhibitor.) But environmental insult does not result in the selective loss of an allele at a locus or in the creation of a new allele at that locus.

45. For a review of the history of quality assurance in forensic DNA testing, *see* J.L. Peterson et al., *The Feasibility of External Blind DNA Proficiency Testing. I. Background and Findings*, 48 J. Forensic Sci. 21, 22 (2003).

EXHIBIT C

Professional bodies within forensic science have described procedures for quality assurance. Guidelines for DNA analysis have been prepared by FBI-appointed groups (the current incarnation is known as SWGDAM);[46] a number of states require forensic DNA laboratories to be accredited;[47] and federal law requires accreditation or other safeguards of laboratories that receive certain federal funds[48] or participate in the national DNA database system.[49]

### a. Documentation

Quality assurance guidelines normally call for laboratories to document laboratory organization and management, personnel qualifications and training, facilities, evidence control procedures, validation of methods and procedures, analytical procedures, equipment calibration and maintenance, standards for case documentation and report writing, procedures for reviewing case files and testimony, proficiency testing, corrective actions, audits, safety programs, and review of subcontractors.

46. The FBI established the Technical Working Group on DNA Analysis Methods (TWGDAM) in 1988 to develop standards. The DNA Identification Act of 1994, 42 U.S.C. § 14131(a) & (c) (2006), created a DNA Advisory Board (DAB) to assist in promulgating quality assurance standards, but the legislation allowed the DAB to expire after 5 years (unless extended by the Director of the FBI). 42 U.S.C. § 14131(b) (2008). TWGDAM functioned under DAB, 42 U.S.C. § 14131(a) (2006), and was renamed the Scientific Working Group on DNA Analysis Methods (SWGDAM) in 1999. When the FBI allowed DAB to expire, SWGDAM replaced DAB. *See* Norah Rudin & Keith Inman, An Introduction to Forensic DNA Analysis 180 (2d ed. 2002); Paul C. Giannelli, *Regulating Crime Laboratories: The Impact of DNA Evidence*, 15 J.L. & Pol'y 59, 82–83 (2007).

47. New York was the first state to impose this requirement. N.Y. Exec. Law § 995-b (McKinney 2006) (requiring accreditation by the state Forensic Science Commission).

48. The Justice for All Act, enacted in 2004, required DNA labs to be accredited within 2 years "by a nonprofit professional association of persons actively involved in forensic science that is nationally recognized within the forensic science community" and to "undergo external audits, not less than once every 2 years, that demonstrate compliance with standards established by the Director of the Federal Bureau of Investigation." 42 U.S.C. § 14132(b)(2) (2006). Established in 1981, the American Society of Crime Laboratory Directors–Laboratory Accreditation Board (ASCLD-LAB) accredits forensic laboratories. Giannelli, *supra* note 46, at 75. The 2004 Act also requires applicants for federal funds for forensic laboratories to certify that the laboratories use "generally accepted laboratory practices and procedures, established by accrediting organizations or appropriate certifying bodies," 42 U.S.C. § 3797k(2) (2004), and that "a government entity exists and an appropriate process is in place to conduct independent external investigations into allegations of serious negligence or misconduct substantially affecting the integrity of the forensic results committed by employees or contractors of any forensic laboratory system, medical examiner's office, coroner's office, law enforcement storage facility, or medical facility in the State that will receive a portion of the grant amount." *Id*. § 3797k(4). There have been problems in implementing the § 3797k(4) certification requirement. *See* Office of the Inspector General, U.S. Dep't of Justice, Review of the Office of Justice Programs' Paul Coverdell Forensic Science Improvement Grants Program, Evaluation and Inspections Report I-2008-001 (2008), *available at* http://www.usdoj.gov/oig/reports/OJP/e0801/index.htm.

49. *See* 42 U.S.C § 14132 (b)(2) (2006) (requiring as of late 2006, that records in the database come from laboratories that "have been accredited by a nonprofit professional association . . . and . . . undergo external audits, not less than once every 2 years [and] that demonstrate compliance with standards established by the Director of the Federal Bureau of Investigation. . . .").

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

Of course, maintaining documentation and records alone does not guarantee the correctness of results obtained in any particular case. Errors in analysis or interpretation might occur as a result of a deviation from an established procedure, analyst misjudgment, or an accident. Although case review procedures within a laboratory should be designed to detect errors before a report is issued, it is always possible that some incorrect result will slip through. Accordingly, determination that a laboratory maintains a strong quality assurance program does not eliminate the need for case-by-case review.

b. Validation

The validation of procedures is central to quality assurance. Developmental validation is undertaken to determine the applicability of a new test to crime scene samples; it defines conditions that give reliable results and identifies the limitations of the procedure. For example, a new genetic marker being considered for use in forensic analysis will be tested to determine if it can be typed reliably in both fresh samples and in samples typical of those found at crime scenes. The validation would include testing samples originating from different tissues—blood, semen, hair, bone, samples containing degraded DNA, samples contaminated with microbes, samples containing DNA mixtures, and so on. Developmental validation of a new set of loci also includes the generation of population databases and the testing of alleles for statistical independence. Developmental validation normally results in publication in the scientific literature, but a new procedure can be validated in multiple laboratories well ahead of publication.

Internal validation, on the other hand, involves the capacity of a specific laboratory to analyze the new loci. The laboratory should verify that it can reliably perform an established procedure that already has undergone developmental validation. In particular, before adopting a new procedure, the laboratory should verify its ability to use the system in a proficiency trial.[50]

c. Proficiency testing

Proficiency testing in forensic genetic testing is designed to ascertain whether an analyst can correctly determine genetic types in a sample whose origin is unknown to the analyst but is known to a tester. Proficiency is demonstrated by making correct genetic typing determinations in repeated trials. The laboratory also can be tested to verify that it correctly computes random-match probabilities or similar statistics.

An internal proficiency trial is conducted within a laboratory. One person in the laboratory prepares the sample and administers the test to another person in the labo-

---

50. Both forms of validation build on the accumulated body of knowledge and experience. Thus, some aspects of validation testing need be repeated only to the extent required to verify that previously established principles apply.

EXHIBIT C

ratory. In an external trial, the test sample originates from outside the laboratory—from another laboratory, a commercial vendor, or a regulatory agency. In a declared (or open) proficiency trial, the analyst knows the sample is a proficiency sample. The DNA Identification Act of 1994 requires proficiency testing for analysts in the FBI as well as those in laboratories participating in the national database or receiving federal funding,[51] and the standards of accrediting bodies typically call for periodic open, external proficiency testing.[52]

In a blind (or, more properly, "full blind") trial, the sample is submitted so that the analyst does not recognize it as a proficiency sample. A full-blind trial provides a better indication of proficiency because it ensures that the analyst will not give the trial sample any special attention, and it tests more steps in the laboratory's processing of samples. However, full-blind proficiency trials entail considerably more organizational effort and expense than open proficiency trials. Obviously, the "evidence" samples prepared for the trial have to be sufficiently realistic that the laboratory does not suspect the legitimacy of the submission. A police agency and prosecutor's office have to submit the "evidence" and respond to laboratory inquiries with information about the "case." Finally, the genetic profile from a proficiency test must not be entered into regional and national databases. Consequently, although some forensic DNA laboratories participate in full-blind testing, they are not required to do so.[53]

## 2. How should samples be handled?

Sample mishandling, mislabeling, or contamination, whether in the field or in the laboratory, is more likely to compromise a DNA analysis than is an error in genetic typing. For example, a sample mixup due to mislabeling reference blood samples taken at the hospital could lead to incorrect association of crime scene samples to a reference individual or to incorrect exclusions. Similarly, packaging two items with wet bloodstains into the same bag could result in a transfer of stains between the items, rendering it difficult or impossible to determine whose blood was originally on each item. Contamination in the laboratory may result in artifactual

---

51. 42 U.S.C. § 14132(b)(2) (requiring external proficiency testing of laboratories for participation in the national database); *id*. § 14133(a)(1)(A) (2006) (same for FBI examiners).

52. *See* Peterson et al., *supra* note 45, at 24 (describing the ASCL-LAB standards). Certification by the American Board of Criminalistics as a specialist in forensic biology DNA analysis requires one proficiency trial per year. Accredited laboratories must maintain records documenting compliance with required proficiency test standards.

53. The DNA Identification Act of 1994 required the director of the National Institute of Justice to report to Congress on the feasibility of establishing an external blind proficiency testing program for DNA laboratories. 42 U.S.C. § 14131(c) (2006). A National Forensic DNA Review Panel advised the Director that "blind proficiency testing is possible, but fraught with problems" of the kind listed above). Peterson et al., *supra* note 46, at 30. It "recommended that a blind proficiency testing program be deferred for now until it is more clear how well implementation of the first two recommendations [the promulgation of guidelines for accreditation, quality assurance, f[and] external audits of casework] are serving the same purposes as blind proficiency testing." *Id*.

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

typing results or in the incorrect attribution of a DNA profile to an individual or to an item of evidence. Procedures should be prescribed and implemented to guard against such error.

Mislabeling or mishandling can occur when biological material is collected in the field, when it is transferred to the laboratory, when it is in the analysis stream in the laboratory, when the analytical results are recorded, or when the recorded results are transcribed into a report. Mislabeling and mishandling can happen with any kind of physical evidence and are of great concern in all fields of forensic science. Checkpoints should be established to detect mislabeling and mishandling along the line of evidence flow. Investigative agencies should have guidelines for evidence collection and labeling so that a chain of custody is maintained. Similarly, there should be guidelines, produced with input from the laboratory, for handling biological evidence in the field.

Professional guidelines and recommendations require documented procedures to ensure sample integrity and to avoid sample mixups, labeling errors, recording errors, and the like.[54] They also mandate case review to identify inadvertent errors before a final report is released. Finally, laboratories must retain, when feasible, portions of the crime scene samples and extracts to allow reanalysis.[55] However, retention is not always possible. For example, retention of original items is not to be expected when the items are large or immobile (e.g., a wall or sidewalk). In such situations, a swabbing or scraping of the stain from the item would typically be collected and retained. There also are situations where the sample is so small that it will be consumed in the analysis.

Assuming that appropriate chain–of–custody and evidence–handling protocols are in place, the critical question is whether there are deviations in the particular case. This may require a review of the total case documentation as well as the laboratory findings. In addition, the opportunity to retest original evidence items or the material extracted from them is an important safeguard against error because of mislabeling and mishandling. Should mislabeling or mishandling have occurred, reanalysis of the original sample and the intermediate extracts should detect not only the fact of the error but also the point at which it occurred.[56]

54. SWGDAM guidelines are published as FBI, Standards for Forensic DNA Testing Labs, *available at* http://www.fbi.gov/hq/lab/codis/forensic.htm (last visited Feb. 16, 2010).

55. Forensic laboratories have a professional responsibility to preserve retained evidence so as to minimize degradation. *See id*., standard 7.2.1. Furthermore, failure to preserve potentially exculpatory evidence has been treated as a denial of due process and grounds for suppression. People v. Nation, 604 P.2d 1051, 1054–55 (Cal. 1980). In *Arizona v. Youngblood,* 488 U.S. 51 (1988), however, the Supreme Court held that a police agency's failure to preserve evidence not known to be exculpatory does not constitute a denial of due process unless "bad faith" can be shown. Ironically, DNA testing that was not available at Youngblood's trial established that he had been falsely convicted. Maurice Possley, *DNA Exonerates Inmate Who Lost Key Test Case: Prosecutors Ruined Evidence in Original Trial*, Chi. Trib., Aug. 10, 2000, at 6.

56. Of course, retesting cannot correct all errors that result from mishandling of samples, but it is even possible in some cases to detect mislabeling at the point of sample collection if the genetic

EXHIBIT C

Contamination describes any situation in which foreign material is mixed with a sample of DNA. As noted in Section III.A.2, contamination by non-biological materials, such as gasoline or grit, can cause test failures, but they are not a source of genetic typing errors. Similarly, contamination with nonhuman biological materials, such as bacteria, fungi, or plant materials, is generally not a problem. These contaminants may accelerate DNA degradation, but they do not generate spurious human genetic types.

The contamination of greatest concern is that resulting from the addition of human DNA. This sort of contamination can occur three ways. First, the crime scene samples by their nature may contain a mixture of fluids or tissues from different individuals. Examples include vaginal swabs collected as sexual assault evidence and bloodstain evidence from scenes where several individuals shed blood. Mixtures are the subject of Section V.C.

Second, the crime scene samples may be inadvertently contaminated in the course of sample handling in the field or in the laboratory. Inadvertent contamination of crime scene DNA with DNA from a reference sample could lead to a false inclusion.

Third, carryover contamination in PCR-based typing can occur if the amplification products of one typing reaction are carried over into the reaction mix for a subsequent PCR reaction. If the carryover products are present in sufficient quantity, they could be preferentially amplified over the target DNA. The primary strategy used in most forensic laboratories to protect against carryover contamination is to keep PCR products away from sample materials and test reagents by having separate work areas for pre-PCR and post-PCR sample handling, by preparing samples in controlled-air-flow biological safety hoods, by using dedicated equipment (such as pipetters) for each of the various stages of sample analysis, by decontaminating work areas after use (usually by wiping down or by irradiating with ultraviolet light), and by having a one-way flow of sample from the pre-PCR to post-PCR work areas. Additional protocols are used to detect any carryover contamination.[57]

In the end, whether a laboratory has conducted proper tests and whether it conducted them properly depends both on the general standard of practice and

typing results on a particular sample are inconsistent with an otherwise consistent reconstruction of events. For example, a mislabeling of husband and wife samples in a paternity case might result in an apparent maternal exclusion, a very unlikely event. The possibility of mislabeling could be confirmed by testing the samples for gender and ultimately verified by taking new samples from each party under better controlled conditions.

57. Standard protocols include the amplification of blank control samples—those to which no DNA has been added. If carryover contaminants have found their way into the reagents or sample tubes, these will be detected as amplification products. Outbreaks of carryover contamination can also be recognized by monitoring test results. Detection of an unexpected and persistent genetic profile in different samples indicates a contamination problem. When contamination outbreaks are detected, appropriate corrective actions should be taken, and both the outbreak and the corrective action should be documented.

158

EXHIBIT C

on the questions posed in the particular case. There is no universal checklist, but the selection of tests and the adherence to the correct test procedures can be reviewed by experts and by reference to professional standards such as the SWGDAM guidelines.

# IV. Inference, Statistics, and Population Genetics in Human Nuclear DNA Testing

The results of DNA testing can be presented in various ways. With discrete allele systems, such as STRs, it is natural to speak of "matching" and "nonmatching" profiles. If the genetic profile obtained from the biological sample taken from the crime scene or the victim (the "trace evidence sample") matches that of a particular individual, that individual is included as a possible source of the sample. But other individuals also might possess a matching DNA profile. Accordingly, the expert should be asked to provide some indication of how significant the match is. If, on the other hand, the genetic profiles are different, then the individual is excluded as the source of the trace evidence. Typically, proof tending to show that the defendant is the source incriminates the defendant, whereas proof that someone else is the source exculpates the defendant.[58] This section elaborates on these ideas, indicating issues that can arise in connection with an expert's testimony interpreting the results of a DNA test.

## A. What Constitutes a Match or an Exclusion?

When the DNA from the trace evidence clearly does not match the DNA sample from the suspect, the DNA analysis demonstrates that the suspect's DNA is not in the forensic sample. Indeed, if the samples have been collected, handled, and analyzed properly, then the suspect is excluded as a possible source of the DNA in the forensic sample. As a practical matter, such exclusionary results normally would keep charges from being filed against the excluded suspect.

At the other extreme, the genotypes at a large number of loci can be clearly identical. In these cases, the DNA evidence is quite incriminating, and the challenge for the legal system lies in explaining just how probative it is. Naturally, as with exclusions, inclusions are most powerful when the samples have been

---

58. Whether being the source of the forensic sample is incriminating and whether someone else being the source is exculpatory depends on the circumstances. For example, a suspect who might have committed the offense without leaving the trace evidence sample still could be guilty. In a rape case with several rapists, a semen stain could fail to incriminate one assailant because insufficient semen from that individual is present in the sample.

EXHIBIT C

*Reference Manual on Scientific Evidence*

collected, handled, and analyzed properly. But there is one logical difference between exclusions and inclusions. If it is accepted that the samples have different genotypes, then the conclusion that the DNA in them came from different individuals is essentially inescapable.[59] In contrast, even if two samples have the same genotype, there is a chance that the forensic sample came not from the defendant, but from another individual who has the same genotype. This complication has produced extensive arguments over the statistical procedures for assessing this chance or related quantities. This problem of describing the significance of an unequivocal match is the subject of the remaining parts of this section.

Some cases lie between the poles of a clear inclusion or a definite exclusion. For example, when the trace evidence sample is small and extremely degraded, STR profiling can be afflicted with allelic "drop-in" and "drop-out," requiring judgments as to whether true peaks are missing and whether spurious peaks are present. Experts then might disagree about whether a suspect is included or excluded—or whether any conclusion can be drawn.[60]

## B. What Hypotheses Can Be Formulated About the Source?

If the defendant is the source of DNA of sufficient quantity and quality found at a crime scene, then a DNA sample from the defendant and the crime scene sample should have the same profile. The inference required in assessing the evidence, however, runs in the opposite direction. The forensic scientist reports that the sample of DNA from the crime scene and a sample from the defendant have the same genotype. The prosecution's hypothesis is that the defendant is the source of the crime scene sample.[61]

Conceivably, other hypotheses could account for the matching profiles. One possibility is laboratory error—the genotypes are not actually the same even though the laboratory thinks that they are. This situation could arise from mistakes

59.  The legal implications of this fact are discussed in Kaye et al., *supra* note 1, § 13.3.2.

60.  *See, e.g.,* State v. Murray, 174 P.3d 407, 417–18 (Kan. 2008) (inconclusive Y-STR results were presented as consistent with the defendant's blood). Since the early days of DNA testing, concerns have been expressed about subjective aspects of specific procedures that leave room for "observer effects" in interpreting data. *See* William C. Thompson & Simon Ford, *The Meaning of a Match: Sources of Ambiguity in the Interpretation of DNA Prints*, *in* Forensic DNA Technology (M. Farley & J. Harrington eds., 1990); *see generally* D. Michael Risinger et al., *The* Daubert/Kumho *Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion*, 90 Calif. L. Rev. 1 (2002). A number of commentators have proposed that the analyst determine the profile of a trace evidence sample before knowing the profile of any suspects. Dan E. Krane et al., *Sequential Unmasking: A Means of Minimizing Observer Effects in Forensic DNA Interpretation*, 53 J. Forensic Sci. 1006 (2008).

61.  That the defendant is the source does not necessarily mean that the defendant is guilty of the offense charged. Aside from issues of intent or knowledge that have nothing to do with DNA, there remains, for example, the possibility that the two samples match because someone framed the defendant by putting a sample of defendant's DNA at the crime scene or in the container of DNA thought to have come from the crime scene.

160

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

in labeling or handling samples or from cross-contamination of the samples. As the 1992 NRC report cautioned, "[e]rrors happen, even in the best laboratories, and even when the analyst is certain that every precaution against error was taken."[62]

Another possibility is that the laboratory analysis is correct—the genotypes are truly identical—but the forensic sample came from another individual. In general, the true source might be a close relative of the defendant[63] or an unrelated person who, as luck would have it, just happens to have the same profile as the defendant. The former hypothesis we shall refer to as kinship, and the latter as coincidence. To infer that the defendant is the source of the crime scene DNA, one must reject these alternative hypotheses of laboratory error, kinship, and coincidence. Table 1 summarizes the logical possibilities.

Table 1. Hypotheses That Might Explain a Match Between Defendant's DNA and DNA at a Crime Scene[a]

| IDENTITY: | Same genotype, defendant's DNA at crime scene |
|---|---|
| NONIDENTITY: | |
| Lab error | Different genotypes mistakenly found to be the same |
| Kinship | Same genotype, relative's DNA at crime scene |
| Coincidence | Same genotype, unrelated individual's DNA |

[a]*Cf.* N.E. Morton, *The Forensic DNA Endgame*, 37 Jurimetrics J. 477, 480 tbl. 1 (1997).

Some scientists have urged that probabilities associated with false-positive error, kinship, or coincidence be presented to juries. Although it is not clear that this goal is feasible, scientific knowledge and more conventional evidence can help in assessing the plausibility of these alternative hypotheses. If laboratory error, kinship, and coincidence are rejected as implausible, then only the hypothesis of identity remains. We turn, then, to the considerations that affect the chances of a match when the defendant is not the source of the trace evidence.

## C. Can the Match Be Attributed to Laboratory Error?

Although many experts would concede that even with rigorous protocols, the chance of a laboratory error exceeds that of a coincidental match, quantifying the former probability is a formidable task. Some commentary proposes using the proportion of false positives that the particular laboratory has experienced in blind

---

62. NRC I, *supra* note 8, at 89.

63. A close relative, for these purposes, would be a brother, uncle, nephew, etc. For relationships more distant than second cousins, the probability of a chance match is nearly as small as for persons of the same ethnic subgroup. Bernard Devlin & Kathryn Roeder, *DNA Profiling: Statistics and Population Genetics*, *in* 1 Modern Scientific Evidence: The Law and Science of Expert Testimony § 18-3.1.3, at 724 (David L. Faigman et al. eds., 1997).

EXHIBIT C

*Reference Manual on Scientific Evidence*

proficiency tests or the rate of false positives on proficiency tests averaged across all laboratories.[64] Indeed, the 1992 NRC Report remarks that "proficiency tests provide a measure of the false-positive and false-negative rates of a laboratory."[65] Yet the same report recognizes that "errors on proficiency tests do not necessarily reflect permanent probabilities of false-positive or false-negative results,"[66] and the 1996 NRC report suggests that a probability of a false-positive error that would apply to a specific case cannot be estimated objectively.[67] If the false-positive probability were, say, 0.001, it would take tens of thousands of proficiency tests to estimate that probability accurately, and the application of an historical industry-wide error rate to a particular laboratory at a later time would be debatable.[68]

Most commentators who urge the use of proficiency tests to estimate the probability that a laboratory has erred in a particular case agree that blind proficiency testing cannot be done in sufficient numbers to yield an accurate estimate of a small error rate. However, they maintain that proficiency tests, blind or otherwise, should be used to provide a conservative estimate of the false-positive error probability.[69] For example, if there were no errors in 100 tests, a 95% confidence interval would include the possibility that the error rate could be almost as high as 3%.[70]

Whether or not a case-specific probability of laboratory error can be estimated with proficiency tests, traditional legal and scientific procedures can help to assess the possibilities of errors in handling or analyzing the samples. Scrutinizing the chain of custody, examining the laboratory's protocol, verifying that it adhered to that protocol, and conducting confirmatory tests (including testing by the defense) can help show that the profiles really do match.

## D. Could a Close Relative Be the Source?

With enough loci to test, all individuals except identical twins should be distinguishable. With existing technology and small sample sizes of DNA recovered from crime scenes, however, this ideal is not always attainable. A thorough inves-

---

64. *E.g.,* Jonathan J. Koehler, *Error and Exaggeration in the Presentation of DNA Evidence at Trial*, 34 Jurimetrics J. 21, 37–38 (1993).

65. NRC I, *supra* note 8, at 94.

66. *Id*. at 89.

67. NRC II, *supra* note 9, at 85–87.

68. *Id*. at 85–86; Devlin & Roeder, *supra* note 63, § 18-5.3, at 744–45. Such arguments have not persuaded the proponents of estimating the probability of error from industry-wide proficiency testing. *E.g.*, Jonathan J. Koehler, *Why DNA Likelihood Ratios Should Account for Error (Even When a National Research Council Report Says They Should Not)*, 37 Jurimetrics J. 425 (1997).

69. *E.g.*, Jonathan J. Koehler, *DNA Matches and Statistics: Important Questions, Surprising Answers*, 76 Judicature 222, 228 (1993); Richard Lempert, *After the DNA Wars: Skirmishing with NRC II*, 37 Jurimetrics J. 439, 447–48, 453 (1997).

70. *See* NRC II, *supra* note 9, at 86 n.1. For an explanation of confidence intervals, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, in this manual.

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

tigation might extend to all known relatives, but this is not feasible in every case, and there is always the chance that some unknown relatives are in the suspect population. Formulas are available for computing the probability that any person with a specified degree of kinship to the defendant also possesses the incriminating genotype. For example, the probability that an untested brother (or sister) would match at four loci (with alleles that each occur in 10% of the population) is about 1/380;[71] the probability that an aunt (or uncle) would match is about 1/100,000.[72]

## E. Could an Unrelated Person Be the Source?

Another rival hypothesis is coincidence: The defendant is not the source of the crime scene DNA but happens to have the same genotype as an unrelated individual who is the true source. Various procedures for assessing the plausibility of this hypothesis are available. In principle, one could test all conceivable suspects. If everyone except the defendant has a nonmatching profile, then the defendant must be the source. But exhaustive, error-free testing of the population of conceivable suspects is almost never feasible. The suspect population normally defies any enumeration, and in the typical crime where DNA evidence is found, the population of possible perpetrators is so huge that even if all of its members could be listed, they could not all be tested.[73]

An alternative procedure would be to take a sample of people from the suspect population, find the relative frequency of the profile in this sample, and use that statistic to estimate the frequency in the entire suspect population. The smaller the frequency, the less likely it is that the defendant's DNA would match if the defendant were not the source of trace evidence. Again, however, the suspect population is difficult to define, so some surrogate must be used. The procedure commonly followed is to estimate the relative frequency of the incriminating

---

71. For a case with conflicting calculations of the probability of an untested brother having a matching genotype, see *McDaniel v. Brown*, 130 S. Ct. 665 (2010) (per curiam). The correct computation is given in David H. Kaye, *"False, but Highly Persuasive": How Wrong Were the Probability Estimates in* McDaniel v. Brown? 108 Mich. L. Rev. First Impressions 1 (2009), *available at* http://www.michiganlawreview.org/assets/fi/108/kaye.pdf.

72. These figures follow from the equations in NRC II, *supra* note 9, at 113. The large discrepancy between two siblings on the one hand, and an uncle and nephew on the other, reflects the fact that the siblings have far more shared ancestry. All their genes are inherited through the same two parents. In contrast, a nephew and an uncle inherit from two unrelated mothers, and so will have few maternal alleles in common. As for paternal alleles, the nephew inherits not from his uncle, but from his uncle's brother, who shares by descent only about one-half of his alleles with the uncle.

73. As the cost of DNA profiling drops, it will become technically and economically feasible to have a comprehensive, population-wide DNA database that could be used to produce a list of nearly everyone whose DNA profile is consistent with the trace evidence DNA. Whether such a system would be constitutionally and politically acceptable is another question. *See* David H. Kaye & Michael S. Smith, *DNA Identification Databases: Legality, Legitimacy, and the Case for Population-Wide Coverage*, 2003 Wis. L. Rev. 413.

EXHIBIT C

genotype in a large population. But even this cannot be done directly because each possible multilocus profile is so rare that it is not likely to show up in any sample of a reasonable size. However, the frequencies of most alleles can be determined accurately by sampling the population to construct databases that reveal how often each allele occurs. Principles of population genetics then can be applied to combine the estimated allele frequencies into an estimate of the probability that a person born in the population will have the multilocus genotype. This probability often is referred to as the random-match probability. This section describes how the allele frequencies are estimated from samples and how the random-match probability is computed from allele frequencies.

## 1. Estimating allele frequencies from samples

As we saw in Section II.B, the loci currently used in forensic testing have been chosen partly because their alleles tend to be different in different people. For example, 2% of the population might have the alleles with 7 and 10 repeats at a particular STR locus; 1% might have the combination of 5 and 6; and so on. If we take a DNA molecule's view of the population, human beings are containers for DNA and machines for copying and propagating them to the next generation of human beings. The different DNA molecules are swimming, so to speak, in a huge pool of humanity. All the possible alleles (the fives, sixes, sevens, and so on) form a large population, or pool, of alleles. Each allele constitutes a certain proportion of allele pool. Suppose, then, that a five-repeat allele represents 12% of all of the allele pool, a six-repeat allele contributes 20%, and so on, for all the alleles at a locus.

The first step in computing a random-match probability is to estimate these allele frequencies. Ideally, a probability sample from the human population of interest would be taken.[74] We would start with a list of everyone who might have left the trace evidence, take a random sample of these people, and count the numbers of alleles of each length that are present in the sample. Unfortunately, a list of the people who comprise the entire population of possible suspects is almost never available; consequently, probability sampling from the directly relevant population is impossible. Probability sampling from a comparable population (with regard to the individuals' DNA) is possible, but it is not the norm in studies of the distributions of genes in populations. Typically, convenience samples (from blood banks or paternity cases) are used.[75] Rela-

---

74. Probability sampling is described in Kaye & Freedman, *supra* note 2, and Shari Seidman Diamond, Reference Guide on Survey Research, in this manual.

75. A few experts have testified that no meaningful conclusions can be drawn in the absence of random sampling. *E.g.,* People v. Soto, 88 Cal. Rptr. 2d 34 (1999); State v. Anderson, 881 P.2d 29, 39 (N.M. 1994). The 1996 NRC report suggests that for the purpose of estimating allele frequencies, convenience sampling should give results comparable to random sampling, and it discusses procedures for estimating the random sampling error. NRC II, *supra* note 9, at 126–27, 146–48, 186. The courts

EXHIBIT C

tively small samples can produce fairly accurate estimates of individual allele frequencies.[76]

Once the allele frequencies have been estimated, the next step in arriving at a random-match probability is to combine them. This requires some knowledge of how DNA is copied and recombined in the course of sexual reproduction and how human beings choose their mates.

## 2. The product rule for a randomly mating population

All scientists use simplified models of a complex reality. Physicists solve equations of motion in the absence of friction. Economists model exchanges among rational agents who bargain freely with no transaction costs. Population geneticists compute genotype frequencies in an infinite population of individuals who choose their mates independently of their alleles at the loci in question. Although geneticists describe this situation as random mating, geneticists know that people do not choose their mates by a lottery. "Random mating" simply indicates that the choices are uncorrelated with the specific alleles that make up the genotypes in question.

In a randomly mating population, the expected frequency of a pair of alleles at any single locus depends on whether the two alleles are distinct. If the offspring happens to inherit the same allele from each parent, the expected single-locus genotype frequency is the square of the allele frequency ($p^2$). If a different allele is inherited from each parent, the expected single-locus genotype frequency is twice the product of the two individual allele frequencies (often written as $2p_1p_2$).[77] These proportions are known as Hardy-Weinberg proportions. Even if two populations with distinct allele frequencies are thrown together, within the limits of chance variation, random mating produces Hardy-Weinberg equilibrium in a single generation.

---

generally have rejected the argument that random samples are essential to valid or generally accepted random-match probabilities. *See* D.H. Kaye, *Bible Reading: DNA Evidence in Arizona*, 28 Ariz. St. L.J. 1035 (1996).

76. In the formative years of forensic DNA testing, defendants frequently contended that forensic databases were too small to give accurate estimates, but this argument generally proved unpersuasive. *E.g.*, United States v. Shea, 957 F. Supp. 331, 341–43 (D.N.H. 1997); State v. Dishon, 687 A.2d 1074, 1090 (N.J. Super. Ct. App. Div. 1997); State v. Copeland, 922 P.2d 1304, 1321 (Wash. 1996). To the extent that the databases are comparable to random samples, confidence intervals are a standard method for indicating the uncertainty resulting from sample size. Unfortunately, the meaning of a confidence interval is subtle, and the estimate commonly is misconstrued. *See* Kaye & Freedman, *supra* note 2.

77. Suppose that 10% of the sperm in the gene pool of the population carry allele 1 (A1), and 50% carry allele 2 (A2). Similarly, 10% of the eggs carry A1, and 50% carry A2. (Other sperm and eggs carry other types.) With random mating, we expect 10% × 10% = 1% of all the fertilized eggs to be A1A1, and another 50% × 50% = 25% to be A2A2. These constitute two distinct homozygote profiles. Likewise, we expect 10% × 50% = 5% of the fertilized eggs to be A1A2 and another 50% × 10% = 5% to be A2A1. These two configurations produce indistinguishable profiles—a peak, band, or dot for A1 and another mark for A2. So the expected proportion of heterozygotes A1A2 is 5% + 5% = 10%.

EXHIBIT C

Once the proportion of the population that has each of the single-locus genotypes for the forensic profile has been estimated, the proportion of the population that is expected to share the combination of them—the multilocus profile frequency—is given by multiplying all the single-locus proportions. This multiplication is exactly correct when the single-locus genotypes are statistically independent. In that case, the population is said to be in linkage equilibrium.

Early estimates of DNA genotype frequencies assumed that alleles were inherited independently within and across loci (Hardy-Weinberg and linkage equilibrium, respectively). Because the frequencies of the VNTR loci then in use were shown to vary across census groups (whites, blacks, Hispanics, Asians, and Native Americans), it became common to present the estimated genotype frequencies within each of these groups (in cases in which the "race" of the source of the trace evidence was unknown) or only in a particular census group (if the "race" of the source was known).[78]

## 3. The product rule for a structured population

Population geneticists understood that the equilibrium frequencies were only approximations and that the major racial populations are composed of ethnic subpopulations whose members tend to mate among themselves. Within each ethnic subpopulation, mating still can be random, but if, say, Italian Americans have allele frequencies that are markedly different than the average for all whites, and if Italian Americans only mate among themselves, then using the average frequencies for all whites in the basic product formula could understate—or overstate—a multilocus profile frequency for the subpopulation of Italian Americans. Similarly, using the population frequencies could understate—or overstate—the profile frequencies in the white population itself.

Consequently, if we want to know the frequency of an incriminating profile among Italian Americans, the basic product rule applied to the allele frequencies for whites in general could be in error; and there is even some chance that the rule will understate the profile frequency in the white population as a whole. Experts have disagreed, however, as to whether the major population groups are so severely structured that the departures from equilibrium would be substantial. Courts applying the *Daubert* and *Frye* rules for scientific evidence issued conflicting opinions as to the admissibility of basic product-rule estimates.[79] A 1992 report from a committee of the National Academy of Sciences did not resolve the question, but a second committee concluded in 1996 that the basic product rule provided reasonable estimates in most cases, and it described a modified version of the product rule

78. The use of a range of estimates conditioned on race is defended, and several alternatives are discussed in Kaye, *supra* note 3, at 192–97; David H. Kaye, *The Role of Race in DNA Evidence: What Experts Say, What California Courts Allow*, 37 Sw. U. L. Rev. 303 (2008).

79. These legal and scientific developments are chronicled in detail in Kaye, *supra* note 3.

**EXHIBIT C**

*Reference Guide on DNA Identification Evidence*

to account for population structure.[80] By the mid–1990s, the population–structure objection to admitting random–match probabilities had lost its power.[81]

## F. Probabilities, Probative Value, and Prejudice

Up to this point, we have described the random–match probabilities that commonly are presented in conjunction with the finding that the trace evidence sample contains DNA of the same type as the defendant's. We have concentrated on the methods used to compute the probabilities. Assuming that these methods meet *Daubert*'s demand for scientific validity and reliability (or, in many states, *Frye*'s requirement of general acceptance in the scientific community) and thus satisfy Federal Rule of Evidence 702, a further issue can arise under Rule 403: To what extent will the presentation assist the jury in understanding the meaning of a match so that the jury can give the evidence the weight that it deserves? This question involves psychology and law, and we summarize the arguments about probative value and prejudice that have been made in litigation and in the legal and scientific literature. We take no position on how the legal issue of the admissibility of any particular statistic generally should be resolved under the balancing standard of Rule 403. The answer may turn not only on the general features of the evidence described here, but on the context and circumstances of particular cases.

### 1. Frequencies and match probabilities

a. Argument: Frequencies or probabilities are prejudicial because they are so small

The most common form of expert testimony about matching DNA involves an explanation of how the laboratory ascertained that the defendant's DNA has the profile of the forensic sample plus an estimate of the profile frequency or random–match probability. It has been suggested, however, that jurors do not understand probabilities in general, and that infinitesimal match probabilities will so bedazzle jurors that they will not appreciate the other evidence in the case or any innocent explanations for the match.[82] Empirical research into this hypothesis has been limited,[83] and commentators have noted that remedies short of exclusion

---

80. The 1996 committee's recommendations for computing random–match probabilities with broad populations and particular subpopulations are summarized in the previous edition of this guide. The 1992 committee had proposed a more conservative (and less elegant) method of dealing with variations across subpopulations (the "ceiling principle"), also described in the previous edition.

81. *See, e.g.,* Kaye, *supra* note 3.

82. *Cf.* Gov't of the Virgin Islands v. Byers, 941 F. Supp. 513, 527 (D.V.I. 1996) ("Vanishingly small probabilities of a random match may tend to establish guilt in the minds of jurors and are particularly suspect.").

83. This research is tabulated in David H. Kaye et al., *Statistics in the Jury Box: Do Jurors Understand Mitochondrial DNA Match Probabilities?* 4 J. Empirical Legal Stud. 797 (2007). The findings do

167

EXHIBIT C

*Reference Manual on Scientific Evidence*

are available.[84] Thus, although there once was a line of cases that excluded probability testimony in criminal matters, by the mid-1990s, no jurisdiction excluded DNA match probabilities on this basis.[85] The opposite argument—that relatively large random-match probabilities are prejudicial—also has been advanced without success.[86]

b. Argument: Frequencies or probabilities are prejudicial because they might be transposed

A related concern is that the jury will misconstrue the random-match probability as the probability that the evidence DNA came from a random individual.[87] The words are almost identical, but the probabilities can be quite different. The random-match probability is the probability that the suspect has the DNA genotype of the crime scene sample *if he is not the true source of that sample* (and is unrelated to the true source). The tendency to invert or transpose the probability—to go from a one-in-a-million chance *if the suspect is not the source* to a million-to-one chance that *the suspect is the source* is known as the fallacy of the transposed conditional.[88] To appreciate that the transposition is fallacious, consider the probability

not clearly support the argument that jurors will overweight the probability, but the details of how the probability is presented and countered may be important.

84. According to the 1996 NRC committee, suitable cross-examination, defense experts, and jury instructions might reduce the risk that small estimates of the match probability will produce an unwarranted sense of certainty and lead a jury to disregard other evidence. NRC II, *supra* note 9, at 197.

85. *E.g.,* United States v. Chischilly, 30 F.3d 1144 (9th Cir. 1994) (citing cases); State v. Weeks, 891 P.2d 477, 489 (Mont. 1995) (rejecting the argument that "the exaggerated opinion of the accuracy of DNA testing is prejudicial, as juries would give undue weight and deference to the statistical evidence" and "that the probability aspect of the DNA analysis invades the province of the jury to decide the guilt or innocence of the defendant").

86. *See* United States v. Morrow, 374 F. Supp. 2d 51, 65 (D.D.C. 2005) (rejecting the argument because "the DNA evidence remains probative, and helps to corroborate other evidence and support the Government's case as to the identity of the relevant perpetrators. Indeed, the low statistical significance actually benefits Defendants, as Defendants can argue that having random match probabilities running between 1:12 and 1:1 means that hundreds, if not thousands, of others in the Washington, D.C. area cannot be excluded as possible contributors as well.").

87. Numerous opinions or experts present the random-match probability in this manner. *E.g.,* State v. Davolt, 84 P.3d 456, 475 (Ariz. 2004) (stating that "the chance the saliva found on cigarette remains in the house did not belong to [the defendant] was one in 280 quadrillion for the Caucasian population"); Kaye et al., *supra* note 1, § 14.1.2(a) (collecting opinions reflecting this fallacy).

88. The transposition fallacy also is called the "prosecutor's fallacy" in the legal literature—despite the fact that it hardly is limited to prosecutors. Our description of the fallacy is imprecise. In this context, the random-match probability is the chance that (A) the suspect has the crime scene genotype given that (B) he is not the true source. The probability that the match is random is the probability that (B) the individual tested has been selected at random given that (A) the individual has the requisite genotype. In general, for two events A and B, the probability of A given B, which we can write as $P$(A given B), does not equal $P$(B given A). *See* Kaye & Freedman, *supra* note 2. The claim that the probabilities are necessarily equal is the transposition fallacy. *Id.* (also noting instances of the fallacy in other types of litigation).

168

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

that a lawyer picked at random from all lawyers in the United States is an appellate judge. This "random-judge probability" is practically zero. But the probability that a person randomly selected from the current appellate judiciary is a lawyer is one. The random-judge probability, *P*(judge given lawyer), does not equal the transposed probability *P*(lawyer given judge). Likewise, the random-match probability *P*(genotype given unrelated source) does not necessarily equal *P*(unrelated source given genotype).[89]

No federal court has excluded a random-match probability (or, for that matter, an estimate of the small frequency of a DNA profile in the general population) as unfairly prejudicial simply because the jury might misinterpret it as a probability that the defendant is the source of the forensic DNA.[90] Courts, however, have noted the need to have the concept "properly explained,"[91] and prosecutorial or expert misrepresentations of the random-match probabilities for

89. To avoid this fallacious reasoning by jurors, some scientific and legal commentators have urged the exclusion of random-match probabilities. In response, the 1996 NRC committee suggested that "if the initial presentation of the probability figure, cross-examination, and opposing testimony all fail to clarify the point, the judge can counter [the fallacy] by appropriate instructions to the jurors that minimize the possibility of cognitive errors." NRC II, *supra* note 9, at 198 (footnote omitted). The committee suggested the following instruction to define the random-match probability:

> In evaluating the expert testimony on the DNA evidence, you were presented with a number indicating the probability that another individual drawn at random from the [specify] population would coincidentally have the same DNA profile as the [bloodstain, semen stain, etc.]. That number, which assumes that no sample mishandling or laboratory error occurred, indicates how distinctive the DNA profile is. It does not by itself tell you the probability that the defendant is innocent.

*Id.* at 198 n.93. An alternative adopted in England is to confine the prosecution to stating a frequency rather than a probability. *See* Kaye et al., *supra* note 1, § 14.1.2(b); *cf.* D.H. Kaye, *The Admissibility of "Probability Evidence" in Criminal Trials—Part II*, 27 Jurimetrics J. 160, 168 (1987) (similar proposal).

The NRC committee also noted the opposing "defendant's fallacy" of dismissing or undervaluing the matches with high likelihood ratios because other matches are to be expected in unrealistically large populations of potential suspects. For example, defense counsel might argue that (1) with a random-match probability of one in a million, we would expect to find three or four unrelated people with the requisite genotypes in a major metropolitan area with a population of 3.6 million; (2) the defendant just happens to be one of these three or four, which means that the chances are at least 2 out of 3 that someone unrelated to the defendant is the source; so (3) the DNA evidence does nothing to incriminate the defendant. The problem with this argument is that in a case involving both DNA and non-DNA evidence against the defendant, it is unrealistic to assume that there are 3.6 million equally likely suspects. When juries are confronted with both fallacies, the defendant's fallacy seems to dominate. NRC II, *supra* note 9, at 198; *cf.* Jonathan J. Koehler, *The Psychology of Numbers in the Courtroom: How to Make DNA-Match Statistics Seem Impressive or Insufficient*, 74 S. Cal. L. Rev. 1275 (2001) (discussing ways of framing the evidence that make it more or less persuasive).

90. *See, e.g.,* United States v. Morrow, 374 F. Supp. 2d 51, 66 (D.D.C. 2005) ("careful oversight by the district court and proper explanation can easily thwart this issue").

91. United States v. Shea, 957 F. Supp. 331, 345 (D.N.H. 1997); *see also* United States v. Chischilly, 30 F.3d 1144, 1158 (9th Cir. 1994) (stating that the government must be "careful to frame the DNA profiling statistics presented at trial as the probability of a random match, not the probability of the defendant's innocence that is the crux of the prosecutor's fallacy").

EXHIBIT C

DNA and other trace evidence have produced reversals or contributed to the setting aside of verdicts.[92]

c. Argument: Random-match probabilities that are smaller than false-positive error probabilities are irrelevant or prejudicial

Some scientists and lawyers have maintained that match probabilities are logically irrelevant when they are far smaller than the probability of a frameup, a blunder in labeling samples, cross-contamination, or other events that would yield a false positive.[93] The argument is that the jury should concern itself only with the chance that the forensic sample is reported to match the defendant's profile even though the defendant is not the source. Match probabilities do not express this chance unless the probability of a false-positive report (because of fraud or an error in the collection, handling, or analysis of the DNA samples) is essentially zero. The mathematical observation has led to the argument that because these other possible explanations for a match are more probable than the very small random-match probabilities for most STR profiles, the latter probabilities are irrelevant. Commentators have crafted theoretical, doctrinal, and practical rejoinders to this claim.[94] The essence of the counterargument is that it is logical to give jurors information about kinship or random-match probabilities because, even if these numbers do not give the whole picture, they address pertinent hypotheses about the true source of the trace evidence.

It also has been argued that even if very small match probabilities are logically relevant, they are unfairly prejudicial in that they will cause jurors to neglect the probability of a match arising due to a false-positive laboratory error.[95] A court

---

92. *E.g.,* United States v. Massey, 594 F.2d 676, 681 (8th Cir. 1979) (explaining that in closing argument about hair evidence, "the prosecutor 'confuse[d] the probability of concurrence of the identifying marks with the probability of mistaken identification'") (alteration in original). The Supreme Court noted the transposition fallacy in the prosecution's presentation of DNA evidence as a basis for a federal writ of habeas corpus in *McDaniel v. Brown,* 130 S. Ct. 665 (2010) (per curiam). The Court unanimously held that the prisoner had not properly raised the issue of whether this error amounted to a violation of due process. For comments on that issue, *see* Kaye, *supra* note 71.

93. *E.g.,* Jonathan J. Koehler et al., *The Random Match Probability in DNA Evidence: Irrelevant and Prejudicial?* 35 Jurimetrics J. 201 (1995); Richard C. Lewontin & Daniel L. Hartl, *Population Genetics in Forensic DNA Typing*, 254 Science 1745, 1749 (1991) ("[p]robability estimates like 1 in 738,000,000,000,000 . . . are terribly misleading because the rate of laboratory error is not taken into account").

94. *See* Kaye et al., *supra* note 1, § 14.1.1 (discussing the issue).

95. Some commentators believe that this prejudice is so likely and so serious that "jurors ordinarily should receive *only* the laboratory's false positive rate. . . ." Richard Lempert, *Some Caveats Concerning DNA as Criminal Identification Evidence: With Thanks to the Reverend Bayes*, 13 Cardozo L. Rev. 303, 325 (1991) (emphasis added). The 1996 NRC committee was skeptical of this view, especially when the defendant has had a meaningful opportunity to retest the DNA at a laboratory of his or her choice, and it suggested that judicial instructions can be crafted to avoid this form of prejudice. NRC II, *supra* note 9, at 199. Pertinent psychological research includes Dale A. Nance & Scott B. Morris, *Juror Understanding of DNA Evidence: An Empirical Assessment of Presentation Formats for Trace*

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

that shares this concern might require the expert who presents a random-match probability also to report a probability that the laboratory is mistaken about the profiles. Of course, for reasons given in Section III.B.2, some experts would deny that they can provide a meaningful statistic for the case at hand, but it has been pointed out that they could report the results of proficiency tests and leave it to the jury to use this figure as best it can in considering whether a false-positive error has occurred.[96] In any event, the courts have been unreceptive to efforts to replace random-match probabilities with a blended figure that incorporates the risk of a false-positive error[97] or to exclude random-match probabilities that are not accompanied by a separate false-positive error probability.[98]

*Evidence with a Relatively Small Random Match Probability*, 34 J. Legal Stud. 395 (2005); Dale A. Nance & Scott B. Morris, *An Empirical Assessment of Presentation Formats for Trace Evidence with a Relatively Large and Quantifiable Random Match Probability*, 42 Jurimetrics J. 1 (2002); Jason Schklar & Shari Seidman Diamond, *Juror Reactions to DNA Evidence: Errors and Expectancies*, 23 Law & Hum. Behav. 159, 179 (1999) (concluding that separate figures for laboratory error and a random match to a correctly ascertained profile are desirable in that "[j]urors . . . may need to know the disaggregated elements that influence the aggregated estimate as well as how they were combined in order to evaluate the DNA test results in the context of their background beliefs and the other evidence introduced at trial").

96. *Cf.* Williams v. State, 679 A.2d 1106, 1120 (Md. 1996) (reversing because the trial court restricted cross-examination about the results of proficiency tests involving other DNA analysts at the same laboratory). *But see* United States v. Shea, 957 F. Supp. 331, 344 n.42 (D.N.H. 1997) ("The parties assume that error rate information is admissible at trial. This assumption may well be incorrect. Even though a laboratory or industry error rate may be logically relevant, a strong argument can be made that such evidence is barred by Fed. R. Evid. 404 because it is inadmissible propensity evidence.").

97. United States v. Ewell, 252 F. Supp. 2d 104, 113–14 (D.N.J. 2003) (stating that exclusion of the random-match probability is not justified when "the defendant's argument is not based on evidence of actual errors by the laboratory, but instead has simply challenged the Government's failure to quantify the rate of laboratory error," while "the Government has demonstrated the scientific method has a virtually zero rate of error, and that it employs sufficient procedures and controls to limit laboratory error," and the defendant had an expert who could testify to the probability of error); United States v. Shea, 957 F. Supp. 331, 334–45 (D.N.H. 1997) (holding that separate figures for match and error probabilities are not prejudicial); People v. Reeves, 109 Cal. Rptr. 2d 728, 753 (Ct. App. 2001) (holding that probability of laboratory error need not be combined with random-match probability); Armstead v. State, 673 A.2d 221, 245 (Md. 1996) (finding that the failure to combine a random-match probability with an error rate on proficiency tests that was many orders of magnitude greater (and that was placed before the jury) did not deprive the defendant of due process); State v. Tester, 968 A.2d 895 (Vt. 2009).

98. United States v. Trala, 162 F. Supp. 2d 336, 350–51 (D. Del. 2001) (stating that presenting a nonzero laboratory error rate is not a condition of admissibility, and *Daubert* does not require separate figures for match and error probabilities to be combined); United States v. Lowe, 954 F. Supp. 401, 415–16 (D. Mass. 1997), *aff'd*, 145 F.3d 45 (1st Cir. 1998) (finding that a "theoretical" error rate need not be presented when quality assurance standards have been followed and defendant had the opportunity to retest the sample); Roberts v. United States, 916 A.2d 922, 930–31 (D.C. 2007) (finding that presenting a laboratory error rate is not a condition of admissibility); Roberson v. State, 16 S.W.3d 156, 168 (Tex. Crim. App. 2000) (finding that error rate not needed when laboratory was accredited and underwent blind proficiency testing); *Tester*, 968 A.2d 895 (stating that when the laboratory chemist stated that "[t]here is no error rate to report" because the number of proficiency

EXHIBIT C

*Reference Manual on Scientific Evidence*

## *2. Likelihood ratios*

Sufficiently small probabilities of a match for close relatives and unrelated members of the suspect population undermine the hypotheses of kinship and coincidence. Adequate safeguards and checks for possible laboratory error make that explanation of the finding of matching genotypes implausible. The inference that the defendant is the source of the crime scene DNA is then secure. But this mode of reasoning by elimination is not the only way to analyze DNA evidence. This subsection and the next describe alternatives—likelihoods and posterior probabilities—that some statisticians prefer and that have been used in a growing number of court cases.

To choose between two competing hypotheses, one can compare how probable the evidence is under each hypothesis. Suppose that the probability of a match in a well-run laboratory is close to 1 when the samples both contain only the defendant's DNA, while both the probability of a coincidental match and the probability of a match to a close relative are close to 0. In these circumstances, the DNA profiling strongly supports the claim that the defendant is the source, because the observed outcome—the match—is many times more probable when the defendant is the source than when someone else is. How many times more probable? Suppose that there is a 1% chance that the laboratory would miss a true match, so that the probability of its finding a match when the defendant is the source is 0.99. Suppose further that $p = 0.00001$ is the random-match probability. Then the match is 0.99/0.00001, or 99,000 times more likely to be seen if the defendant is the source than if an unrelated individual is. Such a ratio is called a likelihood ratio, and a likelihood ratio of 99,000 means that the DNA profiling supports the claim of identity 99,000 times more strongly than it supports the hypothesis of coincidence.[99]

Likelihood ratios have been presented in court in many cases. They are routinely introduced under the name "paternity index" in civil and criminal cases that involve DNA testing for paternity.[100] Experts also have used them in cases in which the issue is whether two samples originated from the same individual. For example, in one California case, an expert stated that "for the Caucasian population, the evidence DNA profile was approximately 1.9 trillion times more likely to match appellant's DNA profile if he was the contributor of that DNA rather than some unknown, unrelated individual; for the Hispanic population, it was 2.6 trillion times more likely; and for the African-American population, it was about 9.1 trillion times more likely."[101] And, as explained below (Section V.C), likeli-

---

trials was insufficient, the random-match probability was admissible and preferable to presenting the finding of a match with no accompanying statistic).

99. Another likelihood ratio would give the relative likelihood of the hypotheses of identity and a falsely declared match arising from an error in the laboratory. *See supra* Section IV.F.1.

100. *See* Kaye, *supra* note 3; 1 McCormick on Evidence, *supra* note 3, § 211.

101. People v. Prince, 36 Cal. Rptr. 3d 300, 310 (Ct. App. 2005), *review denied*, 142 P.3d 1184 (Cal. 2006).

172

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

hood ratios are especially useful for samples that are mixtures of DNA from several people.

The major objection to likelihoods is not statistical, but psychological.[102] As with random-match probabilities, they are easily transposed.[103] With random-match probabilities, we saw that courts have reasoned that the possibility of transposition does not justify a blanket rule of exclusion. The same issue has not been addressed directly for likelihood ratios.

## 3. Posterior probabilities

The likelihood ratio expresses the relative strength of two hypotheses, but the judge or jury ultimately must assess a different type of quantity—the probability of the hypotheses themselves. An elementary rule of probability theory known as Bayes' theorem yields this probability. The theorem states that the odds in light of the data (here, the observed profiles) are the odds as they were known prior to receiving the data times the likelihood ratio. More succinctly, posterior odds = likelihood ratio × prior odds.[104] For example, if the relevant match probability[105] were 1/100,000, and if the chance that the laboratory would report a match between samples from the same source were 0.99, then the likelihood ratio would be 99,000, and the jury could be told how the DNA evidence raises various prior probabilities that the defendant's DNA is in the evidence sample.[106]

---

102. For legal commentary and additional cases upholding the admission of likelihood ratios over objections based on *Frye* and *Daubert*, see Kaye et al., *supra* note 1, § 14.2.2.

103. United States v. Thomas, 43 M.J. 626 (A.F. Ct. Crim. App. 1995), provides an example. In this murder case, a military court described testimony from a population geneticist that "conservatively, it was 76.5 times more likely that the samples . . . came from the victim than from someone else in the Filipino population." *Id.* at 635. Yet, this is not what the DNA testing showed. A more defensible statement is that "the match between the bloodstains was 76.5 times more probable if the stains came from the victim than from an unrelated Filipino" or "the match supports the hypothesis that the stains came from the victim 76.5 times more than it supports the hypothesis that they came from an unrelated Filipino woman." Kaye et al., *supra* note 7, § 14.2.2.

104. Odds and probabilities are two ways to express chances quantitatively. If the probability of an event is $P$, the odds are $P/(1 - P)$. If the odds are $O$, the probability is $O/(O + 1)$. For instance, if the probability of rain is 2/3, the odds of rain are 2 to 1 because $(2/3)/(1 - 2/3) = (2/3)/(1/3) = 2$. If the odds of rain are 2 to 1, then the probability is $2/(2 + 1) = 2/3$.

105. By "relevant match probability," we mean the probability of a match given a specified type of kinship or the probability of a random match in the relevant suspect population. For relatives more distantly related than second cousins, the probability of a chance match is nearly as small as for persons of the same subpopulation. Devlin & Roeder, *supra* note 63, § 18-3.1.3, at 724.

106. If this procedure is followed, the analyst could explain that these calculations rest on many premises, including the premise that the genotypes have been correctly determined. *See, e.g.,* Richard Lempert, *The Honest Scientist's Guide to DNA Evidence*, 96 Genetica 119 (1995). If the jury accepted these premises and also decided to accept the hypothesis of identity over those of kinship and coincidence, it still would be open to the defendant to offer explanations of how the forensic samples came to include his or her DNA even though he or she is innocent.

173

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

One difficulty with this use of Bayes' theorem is that the computations consider only one alternative to the claim of identity at a time. As indicated earlier, however, several rival hypotheses might apply in a given case. If the DNA in the crime scene sample is not the defendant's, is it from his father, his brother, his uncle, or another relative? Is the true source a member of the same subpopulation? Or is the source a member of a different subpopulation in the same general population? In principle, the likelihood ratio can be generalized to a likelihood function that takes on suitable values for every person in the world, and the prior probability for each person can be cranked into a general version of Bayes' rule to yield the posterior probability that the defendant is the source. In this vein, some commentators suggest that Bayes' rule be used to combine the various likelihood ratios for all possible degrees of kinship and subpopulations.[107]

As with likelihood ratios, Bayes' rule is routine in cases involving parentage testing. Some courts have held that the "probability of paternity" derived from the formula is inadmissible in criminal cases, but most have reached the opposite conclusion, at least when the prior odds used in the calculation are disclosed to the jury.[108] An extended literature has grown up on the subject of how posterior probabilities might be useful in criminal cases.[109]

## G. *Verbal Expressions of Probative Value*

Having surveyed the issues related to the value and dangers of probabilities and statistics for DNA evidence, we turn to a related issue that can arise under Rules 702 and 403: Should an expert be permitted to offer a nonnumerical judgment about the DNA profiles? Many courts have held that a DNA match is inadmissible unless the expert attaches a scientifically valid number to the match. Indeed, some opinions state that this requirement flows from the nature of science itself. However, this view has been challenged,[110] and not all courts agree that an expert must explain the power of a DNA match in purely numerical terms.

---

107. David J. Balding, Weight-of-Evidence for Forensic DNA Profiles (2005); David J. Balding & Peter Donnelly, *Inference in Forensic Identification*, 158 J. Royal Stat. Soc'y Ser. A 21 (1995); *cf.* Lempert, *supra* note 69, at 458 (describing a similar procedure).

108. Kaye et al., *supra* note 1, § 14.3.2.

109. *See id.*; 1 McCormick on Evidence, *supra* note 3, § 211; David H. Kaye, *Rounding Up the Usual Suspects: A Legal and Logical Analysis of DNA Database Trawls*, 87 N.C. L. Rev. 425 (2009) (defending a Bayesian presentation by a defendant identified by a "cold hit" in a DNA database).

110. *See, e.g.,* Commonwealth v. Crews, 640 A.2d 395, 402 (Pa. 1994) (explaining that "[t]he factual evidence of the physical testing of the DNA samples and the matching alleles, even without statistical conclusions, tended to make appellant's presence more likely than it would have been without the evidence, and was therefore relevant."). The 1996 NRC committee wrote that science only demands "underlying data that permit some reasonable estimate of how rare the matching characteristics actually are," and "[o]nce science has established that a methodology has some individualizing power, the legal system must determine whether and how best to import that technology into the trial process." NRC II, *supra* note 9, at 192.

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

## 1. "Rarity" or "strength" testimony

Instead of presenting numerical frequencies or match probabilities, a scientist could characterize a 13-locus STR profile as "rare," "extremely rare," or the like. Instead of quoting a numerical likelihood ratio, the analyst could refer to the match as "powerful," "very strong evidence," and so on. At least one state supreme court has endorsed this qualitative approach as a substitute to the presentation of quantitative estimates.[111]

## 2. Source or uniqueness testimony

The most extreme case of a purely verbal description of the infrequency of a profile occurs when that profile can be said to be unique. Of course, the uniqueness of any object, from a snowflake to a fingerprint, in a population that cannot be enumerated never can be proved directly. As with all sample evidence, one must generalize from the sample to the entire population. There is always some probability that a census would prove the generalization to be false. Over a decade ago, the second NRC committee therefore wrote that "[t]here is no 'bright-line' standard in law or science that can pick out exactly how small the probability of the existence of a given profile in more than one member of a population must be before assertions of uniqueness are justified. . . . There might already be cases in which it is defensible for an expert to assert that, assuming that there has been no sample mishandling or laboratory error, the profile's probable uniqueness means that the two DNA samples come from the same person."[112] Before concluding that a DNA profile is unique in a given population, however, a careful expert also should consider not only the random-match probability (which pertains to unrelated individuals) but also the chance of a match to a close relative. Indeed, the possible existence of an unknown, identical twin also means that a scientist never can be absolutely certain that crime scene evidence could have come from only the defendant.

Courts have accepted or approved of expert assertions of uniqueness or of individual source identification.[113] For these assertions to be justified, a large

---

111. State v. Bloom, 516 N.W.2d 159, 166–67 (Minn. 1994) ("Since it may be pointless to expect ever to reach a consensus on how to estimate, with any degree of precision, the probability of a random match and that, given the great difficulty in educating the jury as to precisely what that figure means and does not mean, it might make sense to simply try to arrive at a fair way of explaining the significance of the match in a verbal, qualitative, nonquantitative, nonstatistical way."). A related question is whether an expert should be allowed to declare a match without adding any information on how common or rare the profile is. For discussion of such pure "defendant-not-excluded" testimony, see United States v. Morrow, 374 F. Supp. 2d 51 (D.D.C. 2005); Kaye et al., *supra* note 1, § 15.4.

112. NRC II, *supra* note 9, at 194.

113. *E.g.,* United States v. Davis, 602 F. Supp. 2d 658 (D. Md. 2009) ("the random match probability figures . . . are sufficiently low so that the profile can be considered unique"); People v. Baylor, 118 Cal. Rptr. 2d 518, 522 (Ct. App. 2002) (testimony that "defendant had a unique DNA

175

**EXHIBIT C**

number of sufficiently polymorphic loci must have been tested, making the prob-abilities of matches to both relatives and unrelated individuals so tiny that the probability of finding another person who could be the source within the relevant population is negligible.[114]

# V. Special Issues in Human DNA Testing

## A. Mitochondrial DNA

Mitochondria are small structures, with their own membranes, found inside the cell but outside its nucleus. Inside these organelles, molecules are broken down to supply energy. Mitochondria have a small genome—a circle of 16,569 nucleotide base pairs within the mitochondrion—that bears no relation to the comparatively monstrous chromosomal genome in the cell nucleus.[115]

Mitochondrial DNA (mtDNA) has four features that make it useful for forensic DNA testing. First, the typical cell, which has but one nucleus, contains hundreds or thousands of nearly identical mitochondria. Hence, for every copy of

profile that 'probably does not exist in anyone else in the world.'"); State v. Hauge, 79 P.3d 131 (Haw. 2003) (uniqueness); Young v. State, 879 A.2d 44, 46 (Md. 2005) (holding that "when a DNA method analyzes genetic markers at sufficient locations to arrive at an infinitesimal random match probability, expert opinion testimony of a match and of the source of the DNA evidence is admissible"; hence, it was permissible to introduce a report providing no statistics but stating that "(in the absence of an identical twin), Anthony Young (K1) is the source of the DNA obtained from the sperm fraction of the Anal Swab (R1)."); State v. Buckner, 941 P.2d 667, 668 (Wash. 1997) (finding that in light of 1996 NRC Report, "we now conclude there should be no bar to an expert giving his or her expert opinion that, based upon an exceedingly small probability of a defendant's DNA profile matching that of another in a random human population, the profile is unique.").

114. We apologize for the length of this sentence, but there are three distinct probabilities that arise in speaking of the uniqueness of DNA profiles. First, there is the probability of a match to a single, randomly selected individual in the population. This is the random-match probability. Second, there is the probability that the particular profile is unique. This probability involves pairing the profile with every member of the population. Third, there is the probability that all pairs of all profiles are unique. The first probability is larger than the second, which is many times larger than the third. Uniqueness or source testimony need only establish that *the one* DNA profile in the trace evidence is unique—and not that *all* DNA profiles are unique. Thus, it is the second probability, properly computed, that must be quite small to warrant the conclusion that no one but the defendant (and any identical twins) could be the source of the crime scene DNA. *See* David H. Kaye, *Identification, Individuality, and Uniqueness: What's the Difference?* 8 Law, Probability & Risk 85 (2009).

Formulas for estimating all these probabilities are given in NRC II, *supra* note 9, but DNA analysts and judges sometimes infer uniqueness on the basis of incorrect intuitions about the size of the random-match probability. *See* Balding, *supra* note 107, at 148 (2005) (describing "the unique-ness fallacy"); *cf.* State v. Lee, 976 So. 2d 109, 117 (La. 2008) (incorrect but harmless miscalculation).

115. Mitochondria probably started out as bacteria that were engulfed by cells eons ago. Some of their genes have migrated to the chromosomes, but STR and other DNA sequences in the nucleus are not physically or statistically associated with the sequences of the DNA in the mitochondria.

EXHIBIT C

chromosomal DNA, there are hundreds or thousands of copies of mitochondrial DNA. This means that it is possible to detect mtDNA in samples, such as bone and hair shafts, that contain too little nuclear DNA for conventional typing.

Second, two "hypervariable" regions that tend to be different in different individuals lie within the "control region" or "D-loop" (displacement loop) of the mitochondrial genome.[116] These regions extend for a bit more than 300 base pairs each—short enough to be typable even in highly degraded samples such as very old human remains.

Third, mtDNA comes solely from the egg cell.[117] For this reason, mtDNA is inherited maternally, with no fatherly contribution:[118] Siblings, maternal half-siblings, and others related through maternal lineage normally possess the same mtDNA sequence. This feature makes mtDNA particularly useful for associating persons related through their maternal lineage. It has been exploited to identify the remains of the last Russian tsar and other members of the royal family, of soldiers missing in action, and of victims of mass disasters.

Finally, point mutations accumulate in the noncoding D-loop without altering how the mitochondrion functions. Hence, a single individual can develop distinct internal populations of mitochondria.[119] As discussed below, this phenomenon, known as heteroplasmy, complicates the interpretation of mtDNA sequences. Yet, it is mutations that make mtDNA polymorphic and hence useful in identifying individuals. Over time, mutations in egg cells can propagate to later generations, producing more heterogeneity in mitochondrial genomes in the human population.[120] This polymorphism allows scientists to compare mtDNA from crime scenes to mtDNA from given individuals to ascertain whether the tested individuals are within the maternal line (or another coincidentally matching maternal line) of people who could have been the source of the trace evidence.

The small mitochondrial genome can be analyzed with a PCR-based method that gives the order of all the base pairs.[121] The sequences of two samples—say, DNA extracted from a hair shaft found at a crime scene and hairs plucked from a suspect—then can be compared. Most analysts describe the results in terms on

116. A third, somewhat less polymorphic, region in the D-loop can be used for additional discrimination. The remainder of the control region, although noncoding, consists of DNA sequences that are involved in the transcription of the mitochondrial genes. These control sequences are essentially the same in everyone (monomorphic).

117. The relatively few mitochondria in the spermatozoan that fertilizes the egg cell soon degrade and are not replicated in the multiplying cells of the pre-embryo.

118. The possibility of paternal contributions to mtDNA in humans is discussed in, *e.g.*, John Buckleton et al., *Nonautosomal Forensic Markers*, *in* Forensic DNA Evidence Interpretation 299, 302 (John Buckleton et al. eds., 2005).

119. A single tissue has only one mitotype; another tissue from the same individual might have another mitotype; a third might have both mitotypes.

120. Evolutionary studies suggest an average mutation rate for the mtDNA control region of as little as one nucleotide difference every 300 generations, or one difference every 6000 years.

121. Other methods to ascertain the base-pair sequences also are available.

EXHIBIT C

*Reference Manual on Scientific Evidence*

inclusions and exclusions, although, in principle, a likelihood ratio is better suited to cases in which there are slight sequence differences.[122] In the simplest case, the two sequences show a good number of differences (a clear exclusion), or they are identical (an inclusion). In such cases, mitotyping can exclude individuals as the source of stray hairs even when the hairs are microscopically indistinguishable.[123]

As with nuclear DNA, to indicate the significance of the match, analysts usually estimate the frequency of the sequence in some population. The estimation procedure is actually much simpler with mtDNA. It is not necessary to combine any allele frequencies because the entire mtDNA sequence, whatever its internal structure may be, is inherited as a single unit (a "haplotype"). In other words, the sequence itself is like a single allele, and one can simply see how often it occurs in a sample of unrelated people.[124]

Laboratories therefore refer to databases of mtDNA sequences to see how often the type in question has been seen before. Often, the mtDNA sequence from the crime scene is not represented in the database, indicating that it is a relatively rare sequence. For example, in *State v. Pappas*,[125] the reference database consisted of 1219 mtDNA sequences from whites, and it did not include the sequence that was present in the hairs near the crime scene and in the defendant. Thus, this particular sequence was observed once (at the crime scene) out of 1220 times (adding the new sequence to the 1219 different sequences on file). This would correspond to a population frequency of 0.082%. However, to account for sampling error (the inevitable differences between random samples and the population from which they are drawn), a laboratory might use a slightly different estimate. In general, laboratories count the occurrences in the database and take the upper end of a 95% confidence interval around the corresponding proportion.[126] Applying this logic, an FBI analyst in *Pappas* testified to "the *maximum* match probability . . . of three in 1000. . . . [O]ut of 1000 randomly selected persons, it could be expected that three persons would share the same mtDNA type as the defendant."[127] The basic idea is that even if 3/1000 people in the white population have the sequence, there still is a 5% chance that it would not show up in a specific (randomly drawn) database of size 1219; hence, 3/1000 is a reasonable

122. The likelihood-ratio approach is developed in Buckleton et al., *supra* note 118.

123. The implications of this fact for the admissibility of microscopic hair analysis is discussed in Kaye, *supra* note 3.

124. In this context, "unrelated people" means individuals with a different maternal lineage.

125. 776 A.2d 1091 (Conn. 2001).

126. The Reference Manual on Statistics discusses the meaning of a confidence interval. It has been argued that instead of using $x/N$ in forming the confidence interval, one should use the proportion $(x + 1)/(N + 1)$, where $x$ is the number of matching sequences in the database and $N$ is the size of the database. After all, following the testing, $x + 1$ is the number of times that the sequence has been seen in $N + 1$ individuals. This is the reasoning that produced the point estimate of 1/1220 rather than 0/1219. For large databases, this alteration will make little difference in the confidence interval.

127. 776 A.2d at 1111 (emphasis added).

178

EXHIBIT C

upper estimate for the population frequency.[128] If the population frequency of the sequence in unrelated whites were much larger, the chance that the sequence would have been missed in the database sampling would be even less than 5%.

Computations that rely on databases of major population groups (such as whites) assume that the reference database is a representative sample of a population of unrelated individuals who might have committed the alleged crime. This assumption is justified if there has been sufficient random mating within the racial population. In principle, the adjustment that accounts for population structure (*see supra* Section IV.E.3) could be used, but how large the adjustment should be is not clear.[129] Statistics derived from many databases from different locations also have been proposed.[130] An alternative is to develop local databases that would reflect the proportion of all the people in the vicinity of the crime possessing each possible mitotype.[131] Until these databases exist, an expert might give rather restricted quantitative testimony. In *Pappas*, for example, the expert could have said that the hairs and the defendants have the same mitotype and that this mitotype did not appear in a group of 1219 other people in a national sample, and the expert could have refrained from offering any estimate of the frequency in all whites. This restricted presentation suggests that the match has some probative value, but a court might need to consider whether it is sufficient to leave it to the jury to decide how to weigh the fact of the match and the absence of the same sequence in a convenience sample that might—or might not—be representative of the local white population.

Another issue is heteroplasmy. The simple inclusion–exclusion approach must be modified to account for the fact that the same individual can have detectably different mitotypes in different tissues or even in different cells in the same tissue. To understand the implications of heteroplasmy, we need to understand how it comes into existence.[132] Heteroplasmy can occur because of mtDNA mutations during the division of adult cells, such as those at the roots of hair shafts. These new mitotypes are confined to the individual. They will not be passed on to future generations. Heteroplasmy also can result from a mutation contained in the egg cell that grew into an individual. Such mutations can make their way into succeeding generations, establishing new mitotypes in the population. But this is

---

128. In general, if the sequence does not exist in the database of size $N$, the upper 95% confidence limit is approximately $3/N$. *E.g.*, J.A. Hanley & A. Lipp-Hand, *If Nothing Goes Wrong, Is Everything All Right? Interpreting Zero Numerators*, 249 JAMA 1743 (1983). In *Pappas*, $3/N$ is $3/1219 = 0.25\%$, which rounds off to the 3 per 1000 figure quoted by the FBI analyst.

129. *See* Buckleton et al., *supra* note 118.

130. T. Egeland & A. Salas, *Statistical Evaluation of Haploid Genetic Evidence*, 1 Open Forensic Sci. J. 4 (2008).

131. *Id.*; *see also* F.A. Kaestle et al., *Database Limitations on the Evidentiary Value of Forensic Mitochondrial DNA Evidence*, 43 Am. Crim. L. Rev. 53 (2006).

132. An entertaining discussion can be found in Brian Sykes, The Seven Daughters of Eve: The Science That Reveals Our Genetic Ancestry 55–57, 62, 77–78 (2001).

EXHIBIT C

*Reference Manual on Scientific Evidence*

an uncertain process. Eggs cells contain many mitochondria, and the mature egg cell will not contain just the mutation—it will house a mixed population of the old-style mitochondria and a number of the mutated ones (with DNA that usually differs from the original at a single base pair). Figuratively speaking, the original mtDNA sequence and the mutated version fight it out for several generations until one of them becomes "fixed" in the population. In the interim, the progeny of the mutated egg cell will harbor both strains of mitochondria.

When mtDNA from a crime scene sample is compared to a suspect's sample, there are three possibilities: (1) neither sample is detectably heteroplasmic; (2) one sample displays heteroplasmy, but the other does not; (3) both samples display heteroplasmy. In each scenario, the comparison can produce an exclusion or an inclusion:

1. *Neither sample heteroplasmic.* In the first situation, if the sequence in the crime scene sample is markedly different from the sequence in the suspect's sample, then the suspect is excluded. But heteroplasmy could be the reason for a difference of only a single base or so. For example, the sequence in a hair shaft coming from the suspect could be a slight mutation of the dominant sequence in the suspect. Therefore, the FBI treats a difference at a single base pair as inconclusive.[133] When the one mtDNA sequence characteristic of each sample is identical, the issue becomes how to use the reference database of mtDNA sequences, as discussed above.

2. *Suspect's sample heteroplasmic, crime scene sample not.* One version of the second scenario arises when heteroplasmy is seen in the suspect's tissues but not in the crime scene sample. If the crime scene sequence is not close to either of the suspect's sequences, then the suspect is excluded. If it is identical to one of the suspect's sequences, then the suspect is included, and a suitable reference database should indicate how infrequent such an inclusion would be. If crime scene DNA is one base pair removed from either of the suspect's sequences, then the result is inconclusive.

133. Scientific Working Group on DNA Analysis Methods (SWGDAM), *Guidelines for Mitochondrial DNA (mtDNA) Nucleotide Sequence Interpretation*, Forensic Sci. Comm., Apr. 2003, *available at* http://www.fbi.gov/hq/lab/fsc/backissu/april2003/swgdammitodna.htm. *But see* Vaughn v. State, 646 S.E.2d 212, 215 (Ga. 2007) (apparently transforming the statement that a suspect "cannot be excluded" when "there is a single base pair difference" into "a match"). These inconclusive sequences contribute to the number of people who would not be excluded. Therefore, in *Pappas*, it is misleading to conclude "that approximately 99.75% of the Caucasian population could be excluded as the source of the mtDNA in the sample." 776 A.2d 1091, 1104 (Conn. 2001) (footnote omitted). This percentage neglects the individuals whose mtDNA sequences are off by one base pair. Along with the 0.25% who are included because their mtDNA matches completely, these one-off people would not be excluded. An analyst who speaks of the fraction of people who would not be excluded should report a nonexclusion rate that accounts for these inconclusive cases. Of course, the difference may be fairly small. In *Pappas*, a defense expert reported that the actual nonexclusion rate was still "99.3 percent of the Caucasian population." *Id*. at 1105 (footnote omitted). *See* Kaye et al., *supra* note 83.

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

3. *Both samples heteroplasmic.* In this third scenario, multiple sequences are seen in each sample. To keep track of things, we can call the sequences in the crime scene sample C1 and C2, and those in the suspect's sample S1 and S2. If either C1 or C2 is very different from both S1 and S2, the suspect is excluded. If C1 and C2 are the same as S1 and S2, the suspect is included. Because detectable heteroplasmy is not very common, this inclusion is stronger evidence of identity than the simple match in the first scenario. Finally, in the middle range, where C1 is very close to S1 or S2, or C2 is very close to S1 or S2, the result is inconclusive.

A number of courts have rejected objections that the methods for mtDNA sequencing do not comport with *Frye*[134] or *Daubert*[135] and that the phenomenon of heteroplasmy or the limitations in the statistical analysis preclude the forensic use of this technology under either Rule 702 or Rule 403.[136]

## B. Y Chromosomes

Y chromosomes contain genes that result in development as a male rather than a female. Therefore, men are type XY and women are XX. A male child receives an X chromosome from his mother and a Y from his father; females receive two different X chromosomes, one from each parent. Like all chromosomes, the Y chromosome contains STRs and SNPs.

Because there is limited recombination between Y and X chromosomes, Y-STRs and Y-SNPs are inherited as a single block—a haplotype—from father to son. This means that the issues of population genetics and statistics are similar to those for mtDNA. No matter how many Y-STRs are in the haplotype, all the men in the same paternal line (up to the last mutation giving rise to a new line in the family tree) would match the crime scene sample.

134. *E.g.,* Magaletti v. State, 847 So. 2d 523, 528 (Fla. Dist. Ct. App. 2003) ("[T]he mtDNA analysis conducted [on hair] determined an exclusionary rate of 99.93 percent. In other words, the results indicate that 99.93 percent of people randomly selected would not match the unknown hair sample found in the victim's bindings."); People v. Sutherland. 860 N.E.2d 178, 271–72 (Ill. 2006); People v. Holtzer, 660 N.W.2d 405, 411 (Mich. Ct. App. 2003); Wagner v. State, 864 A.2d 1037, 1043–49 (Md. Ct. Spec. App. 2005) (mtDNA sequencing admissible despite contamination and heteroplasmy).

135. *E.g.,* United States v. Beverly, 369 F.3d 516, 531 (6th Cir. 2004) ("The scientific basis for the use of such DNA is well established."); United States v. Coleman, 202 F. Supp. 2d 962, 967 (E.D. Mo. 2002) ("'[a]t the most,' seven out of 10,000 people would be expected to have that exact sequence of As, Ts, Cs, and Gs."), *aff'd*, 349 F.3d 1077 (8th Cir. 2003); *Pappas*, 776 A.2d at 1095; State v. Underwood, 518 S.E.2d 231, 240 (N.C. Ct. App. 1999); State v. Council, 515 S.E.2d 508, 518 (S.C. 1999).

136. *E.g.*, *Beverly*, 369 F.3d at 531 ("[T]he mathematical basis for the evidentiary power of the mtDNA evidence was carefully explained, and was not more prejudicial than probative."); *Pappas*, 776 A.2d 1091.

**EXHIBIT C**

Consequently, multiplication of allele frequencies is inappropriate, and an estimate of how many men might share the haplotype must be based on the frequency of that one haplotype in a relevant population. Population structure is a concern, and obtaining a suitable sample to estimate the frequency in a local population could be a challenge. If such a database is not available, DNA analysts might consider limiting their testimony on direct examination to the size of the available database, the population sampled, and the number of individuals in the database who share the crime scene haplotype. This presentation is less ambitious than a random-match probability, and courts must decide whether it gives the jury sufficient information to fairly assess the probative value of the match, which could be substantial.

When a standard DNA profile (involving a reasonable number of STRs or other polymorphisms of the other chromosomes) is available, there is little reason to add a Y-STR test. The profiles already are extremely rare. In some cases, however, standard STR typing will fail. Consider, for example, what happens when a PCR primer that targets an STR locus on, say, chromosome 16 is applied to a sample that contains a small number of sperm (from, say, a vasectomized man) and a huge number of cells from a woman who is a victim of sexual assault. Almost never will the primer lock onto the man's chromosome 16. Therefore, his alleles on this chromosome will not produce a detectable peak in an electropherogram. But a primer for a Y-STR will not bind to the victim's chromosomes—her chromosomes swamp the sample, but they are essentially invisible to the Y-STR primer. Because this primer binds only to the Y chromosomes from the man, only his STRs will be amplified. This is one example of how Y-STR profiling can be valuable in dealing with a mixture of DNA from several individuals. The next section provides other examples and describes other ways in which analysis of the Y chromosome can be valuable in mixture cases.

Although the statistics and population genetics of Y-STRs are different from the other STRs, the underlying technology for obtaining the profile is the same. On this basis, some courts have upheld the admission of these markers.[137]

## C. Mixtures

Samples of biological trace evidence recovered from crime scenes often contain a mixture of fluids or tissues from different individuals. Examples include vaginal swabs collected as sexual assault evidence and bloodstain evidence from scenes where several individuals shed blood. However, not all mixed samples produce mixed STR profiles.[138] Consider a sample in which 99% of the DNA comes from

---

137. *E.g.,* Shabazz v. State, 592 S.E.2d 876, 879 (Ga. Ct. App. 2004); Curtis v. State, 205 S.W.3d 656, 660–61 (Tex. Ct. App. 2006).

138. The discussion in this section is limited to electropherograms of STR alleles. A recent paper reports a statistical technique that compares the known SNP genotypes (involving hundreds of

EXHIBIT C

the defendant and 1% comes from a different individual. Even if some of the molecules from the minor contributor come in contact with the polymerase and an STR is amplified, the resulting signal might be too small to be detected—the peak in an electropherogram will blend into the background. Because the vast bulk of the amplified STRs will come from the defendant's DNA, the electropherogram should show only one STR profile. In these situations, the interpretation of the single DNA profile is the same as when 100% of the DNA molecules in the sample are the defendant's.

When the mixtures are more evenly balanced among contributors, however, the STRs from multiple contributors can appear as "extra" peaks. As a rule, because DNA from a single individual can have no more than two alleles at each locus,[139] the presence of three or more peaks at several loci indicates that a mixture of DNA is in the sample.[140] Figure 6 shows another electropherogram from DNA recovered in *People v. Pizarro*.[141] The fact that there are as many as four alleles at some loci and that many of the peaks match the victim's) suggests that the sample is a mixture of the victim's and another person's DNA. Furthermore, a peak at the amelogenein locus shows that male DNA is part of the mixture. Because all the peaks that do not match the victim are part of the defendant's STR profile, the mixture is consistent with the state's theory that the defendant raped the victim.

Five approaches are available to cope with detectable mixtures. First, if a laboratory has other samples that do not show evidence of mixing, it can avoid the problem of deciphering the convoluted set of profiles. Even across a single stain, the proportions of a mixture can vary, and it might be possible to extract a DNA sample that does not produce a mixed signal.

Second, a chemical procedure exists to separate the DNA from sperm from a rape victim's vaginal epithelial cell DNA.[142] When this procedure works, the

---

thousands of SNPs) of a set of individuals to the SNPs detected in complex mixtures. The report states that the technique is able to discern "whether an individual is within a series of complex mixtures (2 to 200 individuals) when the individual contributes trace levels (at and below 1%) of the total genomic DNA." Nils Homer et al., *Resolving Individuals Contributing Trace Amounts of DNA to Highly Complex Mixtures Using High-Density SNP Genotyping Microarrays*, 4 PLoS Genetics No. 8 (2008), *available at* http://www.plosgenetics.org/article/info%3Adoi%2F10.1371%2Fjournal.pgen.1000167.

139. This follows from the fact that individuals inherit chromosomes in pairs, one from each parent. An individual who inherits the same allele from each parent (a homozygote) can contribute only that one allele to a sample, and an individual who inherits a different allele from each parent (a heterozygote) will contribute those two alleles. Finding three or more alleles at several loci therefore indicates a mixture.

140. On rare occasions, an individual exhibits a phenotype with three alleles at a locus. This can be the result of a chromosome anomaly (such as a duplicated gene on one chromosome or a mutation). A sample from such an individual is usually easily distinguished from a mixed sample. The three-allele variant is seen at only the affected locus, whereas with mixtures, more than two alleles typically are evident at several loci.

141. *See supra* Figure 5.

142. The nucleus of a sperm cell lies behind a protective structure that does not break down as easily as the membrane in an epithelial cell. This makes it possible to disrupt the epithelial cells first and extract their DNA, and then to use a harsher treatment to disrupt the sperm cells.

183

EXHIBIT C

*Reference Manual on Scientific Evidence*

Figure 6. Electropherogram in *People v. Pizarro* that can be interpreted as a mixture of DNA from the victim and the defendant.



Source: Steven Myers and Jeanette Wallin, California Department of Justice, provided the image.

laboratory can assign the DNA profiles to the different individuals because it has created, in effect, two samples that are not mixtures.

Third, in sexual assault cases, Y chromosome testing can reveal the number of men (from different paternal lines) whose DNA is being detected and whether the defendant's Y chromosome is consistent with his being in one of these paternal lines.[143] Because only males have Y chromosomes, the female DNA in a mixture has no effect.

Fourth, a laboratory simply can report that a defendant's profile is consistent with the mixed profile, and it can provide an estimate of the proportion of the relevant population that also cannot be excluded (or would be included).[144] When

---

143  *E.g.*, State v. Polizzi, 924 So. 2d 303, 308–09 (La. Ct. App. 2006) (testing for Y-STRs on "the genital swab with the DNA profile from the Defendant's buccal swab, . . . the Defendant or any of his paternal relatives could not be excluded as having been a donor to the sample from the victim," while "99.7 percent of the Caucasian population, 99.8 percent of the African American population, and 99.3 percent of the Hispanic population could be excluded as donors of the DNA in the sample.").

144. *E.g.*, State v. Roman Nose, 667 N.W.2d 386, 394 n.5 (Minn. 2003). If the laboratory can explain why one or more of the defendant's alleles do not appear in the mixed profile from the

184

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

an individual's DNA—for example, the victim's—is known to be in a two-person crime scene sample, the profile of the unknown person is readily deduced. In those situations, the analysis of a remaining single-person profile can proceed in the ordinary fashion.

Finally, a laboratory can try to determine (or make assumptions about) how many contributors are present and then deduce which set of alleles is likely to be from each contributor. To accomplish this, DNA analysts look to such clues as the number of peaks in an expected allele-size range and the imbalance in the heights of the peaks.[145] A good deal of judgment can go into the determination of which peaks are real, which are artifacts, which are "masked," and which are absent for some other reason.[146] Courts generally have rejected arguments that mixture analysis is so unreliable or so open to manipulation that the results are inadmissible.[147] In addition, expert computer systems have been devised for facilitating the analysis and for automatically "deconvoluting" mixtures.[148] Once they are validated, these systems can make the process more standardized.

The five approaches listed here are not mutually exclusive (and not all apply to every case). When the number of contributors to a mixture is in doubt, for example, a laboratory is not limited to giving the overall probability of excluding (or including) an individual as a possible contributor (the statistic mentioned as part of the fourth method). The 1996 NRC report observed that "when the contributors to a mixture are not known or cannot otherwise be distinguished, a likelihood-ratio approach offers a clear advantage [over the simplistic exclusion-inclusion statistic] and is particularly suitable."[149] Despite the arguments of some

crime scene, it might be willing to declare a match not withstanding this discrepancy. Of course, as the number of alleles that must be present for there to be a match declines, the proportion of the population that would be included goes up.

145. *See, e.g.,* Roberts v. United States, 916 A.2d 922, 932–35 (D.C. 2007) (holding such inferences to be admissible).

146. The proportion of the population included in a mixture and the likelihood ratios conditioned on a particular genotype do not take into account the other possible genotypes that the expert eliminated in a subjective analysis. William C. Thompson, *Painting the Target Around the Matching Profile: The Texas Sharpshooter Fallacy in Forensic DNA Interpretation*, 8 Law, Probability & Risk 257 (2009). Adhering to preestablished standards and protocols for interpreting mixtures reduces the range of judgment in settling on the most likely set of genotypes to consider. Recent recommendations appear in Bruce Budowle et al., *Mixture Interpretation: Defining the Relevant Features for Guidelines for the Assessment of Mixed DNA Profiles in Forensic Casework*, 54 J. Forensic Sci. 810 (2009) (with commentary at 55 J. Forensic Sci. 265 (2010)); Peter Gill et al., *National Recommendations of the Technical UK DNA Working Group on Mixture Interpretation for the NDNAD and for Court Going Purposes*, 2 Forensic Sci. Int'l Genetics 76 (2008).

147. *Roberts*, 916 A.2d at 932 n.9 (citing cases).

148. *See, e.g.,* Tim Clayton & John Buckleton, *Mixtures*, *in* Forensic DNA Evidence Interpretation 217 (John Buckleton et al. eds., 2005); Mark W. Perlin et al., *Validating TrueAllele® DNA Mixture Interpretation*, 56 J. Forensic Sci. (forthcoming 2011).

149. NRC II, *supra* note 9, at 129.

EXHIBIT C

*Reference Manual on Scientific Evidence*

legal commentators that likelihood ratios are inherently prejudicial,[150] and despite objections based on *Frye* or *Daubert*, almost all courts have found likelihood ratios admissible in mixture cases.[151]

## D. Offender and Suspect Database Searches

### 1. Which statistics express the probative value of a match to a defendant located by searching a DNA database?

States and the federal government are amassing huge databases consisting of the DNA profiles of suspected or convicted offenders.[152] If the DNA profile from a crime scene stain matches one of those on file, the person identified by this "cold hit" will become the target of the investigation. Prosecution may follow.

These database-trawl cases can be contrasted with traditional "confirmation cases" in which the defendant already was a suspect and the DNA testing provided additional evidence against him. In confirmation cases, statistics such as the estimated frequency of the matching DNA profile in various populations, the equivalent random-match probabilities, or the corresponding likelihood ratios can be used to indicate the probative value of the DNA match.[153]

In trawl cases, however, an additional question arises—does the fact that the defendant was selected for prosecution by trawling require some adjustment to the usual statistics? The legal issues are twofold. First, is a particular quantity—be it the unadjusted random-match probability or some adjusted probability—scientifically valid (or generally accepted) in the case of a database search? If not, it must be excluded under the *Daubert* (or *Frye*) standards. Second, is the statistic irrelevant or unduly misleading? If so, it must be excluded under the rules that

---

150. *E.g.,* William C. Thompson, *DNA Evidence in the O.J. Simpson Trial,* 67 U. Colo. L. Rev. 827, 855–56 (1996); *see also* R.C. Lewontin, *Population Genetic Issues in the Forensic Use of DNA, in* 1 Modern Scientific Evidence: The Law and Science of Expert Testimony § 17-5.0, at 703–05 (Faigman et al. eds, 1st ed. 1998).

151. *E.g.,* State v. Garcia, 3 P.3d 999 (Ariz. Ct. App. 1999) (likelihood ratios admissible under *Frye* to explain mixed sample); Commonwealth v. Gaynor, 820 N.E.2d 233, 252 (Mass. 2005) ("Likelihood ratio analysis is appropriate for test results of mixed samples when the primary and secondary contributors cannot be distinguished. . . . It need not be applied when a primary contributor can be identified.") (citation omitted); People v. Coy, 669 N.W.2d 831, 835–39 (Mich. Ct. App. 2003) (incorrectly treating mixed-sample likelihood ratios as a part of the statistics on single-source DNA matches that had already been held to be generally accepted); State v. Ayers, 68 P.3d 768, 775 (Mont. 2003) (affirming trial court's admission of expert testimony where expert used likelihood ratios to explain DNA results from a sample known to contain a mixture of DNA); *cf.* Coy v. Renico, 414 F. Supp. 2d 744, 762–63 (E.D. Mich. 2006) (stating that the use of likelihood ratio and other statistics for a mixed stain in *People v. Coy, supra,* was sufficiently accepted in the scientific community to be consistent with due process).

152. *See supra* Section II.E.

153. On the computation and admissibility of such statistics, see *supra* Section IV.

186

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

require all evidence to be relevant and not unfairly prejudicial. To clarify, we summarize the statistical literature on this point. Then, we describe the emerging case law.

a. The statistical analyses of adjustment

All statisticians agree that, in principle, the search strategy affects the probative value of a DNA match. One group describes and emphasizes the impact of the database match on the hypothesis that the database does not contain the source of the crime scene DNA. This is a "frequentist" view. It asks how frequently searches of innocent databases—those for which the true source is someone outside the database—will generate cold hits. From this perspective, trawling is a form of "data mining" that produces a "selection effect" or "ascertainment bias." If we pick a lottery ticket at random, the probability $p$ that we have the winning ticket is negligible. But if we search through all the tickets, sooner or later we will find the winning one. And even if we search through some smaller number $N$ of tickets, the probability of picking a winning ticket is no longer $p$, but $Np$.[154] Likewise, if DNA from $N$ innocent people is examined to determine if any of them match the crime scene DNA, then the probability of a match in this group is not $p$, but some quantity that could be as large as $Np$. This type of reasoning led the 1996 NRC committee to recommend that "[w]hen the suspect is found by a search of DNA databases, the random-match probability should be multiplied by $N$, the number of persons in the database."[155] The 1992 committee[156] and the FBI's former DNA Advisory Board[157] took a similar position.

154. The analysis of the DNA database search is more complicated than the lottery example suggests. In the simple lottery, there was exactly one winner. The trawl case is closer to a lottery in which we hold a ticket with a winning number, but it might be counterfeit, and we are not sure how many counterfeit copies of the winning ticket were in circulation when we bought our $N$ tickets.

155. NRC II, *supra* note 9, at 161 (Recommendation 5.1).

156. Initially, the board explained that

> Two questions arise when a match is derived from a database search: (1) What is the rarity of the DNA profile? and (2) What is the probability of finding such a DNA profile in the database searched? These two questions address different issues. That the different questions produce different answers should be obvious. The former question addresses the random match probability, which is often of particular interest to the fact finder. Here we address the latter question, which is especially important when a profile found in a database search matches the DNA profile of an evidence sample.

DNA Advisory Board, *Statistical and Population Genetics Issues Affecting the Evaluation of the Frequency of Occurrence of DNA Profiles Calculated from Pertinent Population Database(s)*, 2 Forensic Sci. Comm., July 2000, *available at* http://www.fbi.gov/hq/lab/fsc/backissu/july2000/dnastat.htm. After a discussion of the literature as of 2000, the Board wrote that "we continue to endorse the recommendation of the NRC II Report for the evaluation of DNA evidence from a database search."

157. The first NRC committee wrote that "[t]he distinction between finding a match between an evidence sample and a suspect sample and finding a match between an evidence sample and one of many entries in a DNA profile databank is important." It used the same $Np$ formula in a numerical example to show that "[t]he chance of finding a match in the second case is considerably higher,

187

EXHIBIT C

No one questions the mathematics that show that when the database size *N* is very small compared with the size of the population, *Np* is an upper bound on the expected frequency with which searches of databases will incriminate innocent individuals when the true source of the crime scene DNA is not represented in the databases. The "Bayesian" school of thought, however, suggests that the frequency with which innocent databases will be falsely accused of harboring the source of the crime scene DNA is basically irrelevant. The question of interest to the legal system is whether the one individual whose database DNA matches the trace-evidence DNA is the source of that trace. As the size of a database approaches that of the entire population, finding one and only one matching individual should be more, not less, convincing evidence against that person. Thus, instead of looking at how surprising it would be to find a match in a large group of innocent suspects, this school of thought asks how much the result of the database search enhances the probability that the individual so identified is the source. The database search is actually more probative than the confirmation search because the DNA evidence in the trawl case is much more extensive. Trawling through large databases excludes millions of people, thereby reducing the number of people who might have left the trace evidence if the suspect did not. This additional information increases the likelihood that the defendant is the source, although the effect is indirect and generally small.[158]

Of course, when the cold hit is the only evidence against the defendant, the total package of evidence in the trawl case is less than in the confirmation case. Nonetheless, the Bayesian treatment shows that the DNA part of the total evidence is more powerful in a cold-hit case because this part of the evidence is more complete than when the search for matching DNA is limited to a single suspect. This reasoning suggests that the random-match probability (or, equivalently, the frequency *p* in the population) understates the probative value of the unique DNA match in the trawl case. And if this is so, then the unadjusted random-match probability or frequency *p* can be used as a conservative indication of the probative value of the finding that, of the many people in the database, only the defendant matches.[159]

because one . . . fishes through the databank, trying out many hypotheses." NRC I, *supra* note 8, at 124. Rather than proposing a statistical adjustment to the match probability, however, that committee recommended using only a few loci in the databank search, then confirming the match with additional loci, and presenting only "the statistical frequency associated with the additional loci. . . ." *Id*. at 124 tbl. 1.1.

158. When the size of the database approaches the size of the entire population, the effect is large. Finding that only one individual in a large database has a particular profile also raises the probability that this profile is very rare, further enhancing the probative value of the DNA evidence.

159. This analysis was developed by David Balding and Peter Donnelly. For informal expositions, see, for example, Peter Donnelly & Richard D. Friedman, *DNA Database Searches and the Legal Consumption of Scientific Evidence*, 97 Mich. L. Rev. 931 (1999); Kaye, *supra* note 109; Simon Walsh & John Buckleton, *DNA Intelligence Databases*, *in* Forensic DNA Evidence Interpretation 439 (John Buckleton et al. eds., 2005). For a related analysis directed at the average probability that an individual

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

b. The judicial opinions on adjustment

The need for an adjustment has been vigorously debated in the statistical, and to a lesser extent, the legal literature.[160] The dominant view in the journal articles is that the random-match probability or frequency need *not* be inflated to protect the defendant. The major opinions to confront this issue agree that $p$ is admissible against the defendant in a trawl case.[161] They reason that all the statistics are admissible under *Frye* and *Daubert* because there is no controversy over how they are computed. They then assume that both $p$ and $Np$ are logically relevant and not prejudicial in a trawl case.

But commentators have pointed out that if the frequentist position that trawling degrades the probative value of the match is correct, then it is hard to see what $p$ offers the jury. Conversely, if the Bayesian position that trawling enhances the probative value of the match is correct, then it is hard to see what $Np$ offers the jury.[162] Thus, it has been argued that, to decide whether $p$ should be admissible when offered by the prosecution and whether $Np$ (or some variant of it) should be admissible when offered by the defense, the law needs to directly confront the schism between the frequentist and Bayesian perspectives on characterizing the probative value of a cold hit.[163]

## 2. Near-miss (familial) searching

Normally, police trawl a DNA database to see if any recorded STR profiles match a crime scene profile. It is not generally necessary to inform the jury that the defendant was located in this manner. Indeed, the rules of evidence sometimes prohibit this proof over the objection of the defendant.[164] Another search pro-

identified through a database trawl is the source of a crime scene DNA sample, see Yun S. Song et al., *Average Probability That a "Cold Hit" in a DNA Database Search Results in an Erroneous Attribution*, 54 J. Forensic Sci. 22, 23–24 (2009).

160. For citations to this literature, see Kaye, *supra* note 109; Walsh & Buckleton, *supra* note 159, at 464.

161. People v. Nelson, 185 P.3d 49 (Cal. 2008); United States v. Jenkins, 887 A.2d 1013 (D.C. 2005). The cases are analyzed in Kaye, *supra* note 109.

162. Furthermore, even if an adjustment is logically required, $Np$ might be too extreme because the offender databases include the profiles of individuals—those in prison at the time of the offense, for instance—who could not have been the source of the crime scene sample. To that extent, $Np$ overstates the expected frequency of matches to innocent individuals in the database. Kaye, *supra* note 109; David H. Kaye, People v. Nelson: *A Tale of Two Statistics*, 7 Law, Probability & Risk 249 (2008).

163. Kaye, *supra* note 109; Kaye, *supra* note 162.

164. The common law of evidence and Federal Rule of Evidence 404 prevent the government from proving that a defendant has committed other crimes when the only purpose of the revelation is to suggest a general propensity toward criminality. *See, e.g.,* 1 McCormick on Evidence, *supra* note 3, § 190. Proof that the defendant was identified through a database search is likely to suggest the existence of a criminal record, because it is widely known that existing law enforcement DNA databases are largely filled with the profiles of convicted offenders. Nonetheless, where the bona fide and important purpose of the disclosure is "to complete the story" (*id.*) or to help the jury to understand an $Np$

189

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

cedure can lead to charges against a defendant who is not even in the database. The clearest illustration is the case of identical twins, one of whom is a convicted offender whose DNA type is on file and the other who has never been typed. If the convicted twin was in prison when the crime under investigation was committed, and if the police realized that he had an identical twin, suspicion should fall on the identical twin. Presumably, the police would seek a sample from this twin, and at trial it would not be necessary for the prosecution to explain the roundabout process through which he was identified.

In this example, the defendant was found because a relative's DNA led the police to him. More generally, the fact that close relatives share more alleles than other members of the same subpopulation can be exploited as an investigative tool. Rather than search for a match at all 13 loci in an STR profile, police could search for a near miss—a partial match that is much more probable when the partly matching profile in the database comes from a close relative than when it comes from an unrelated person. (Analysis of Y-STRs or mtDNA then could determine whether the offender who provided the partially matching DNA in the database probably is in the same paternal or maternal lineage as the unknown individual who left DNA at the scene of the crime.)

Such "familial searching" raises technical and policy questions. The technical and practical challenge is to devise a search strategy that keeps the number of false leads to a tolerable level. The policy question is whether exposing relatives to the possibility of being investigated on the basis of genetic leads from their kin is appropriate.[165]

In receiving the DNA evidence, courts might consider having the prosecution describe the match without revealing that the defendant's close relative is a known or suspected criminal. In addition, if database trawls degrade the probative value of a perfect match in the database—a theory discussed in the previous subsection—then the usual random-match probability or estimated frequency exaggerates the value of the match derived from a database search. From the frequentist perspective, one must ask how often trawling databases for leads to individuals (both within and outside the database) will produce false accusations. From the Bayesian perspective, however, the usual match probabilities and likeli-

statistic, Rule 404 itself arguably does not prevent the prosecution (and certainly not the defense) from revealing that the defendant was found through a DNA database trawl. In the absence of a categorical rule of exclusion (like the one in Rule 404), a case-by-case balancing of the value of the information for its legitimate purposes as against its potential prejudice to the defendant is required. *See id.*

165. *See, e.g.,* Bruce Budowle et al., *Clarification of Statistical Issues Related to the Operation of CODIS, in* Genetic Identity Conference Proceedings: 18th Int'l Symposium on Human Identification (2006), *available at* http://www.promega.com/GENETICIDPROC/ussymp17proc/oralpresentations/budowle.pdf; Henry T. Greely et al., *Family Ties: The Use of DNA Offender Databases to Catch Offenders' Kin*, 34 J.L. Med. & Ethics 248 (2006); Erica Haimes, *Social and Ethical Issues in the Use of Familiar Searching in Forensic Investigations: Insights from Family and Kinship Studies*, 34 J.L. Med. & Ethics 262 (2006).

190

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

hoods can be used because, if anything, they understate the probative value of the DNA information.[166]

## 3. All-pairs matching within a database to verify estimated random-match probabilities

A third and final use of police intelligence databases has evidentiary implications. Section IV.E explained how population genetics models and reference samples for determining allele frequencies are used to estimate DNA genotype frequencies. Large databases can be used to check these theoretical computations. In New Zealand, for example, researchers compared every six-locus STR profile in the national database with every other profile.[167] At the time, there were 10,907 profiles. This means that there were about 59 million distinct pairs.[168] Because the theoretical random-match probability was about 1 in 50 million, if all the individuals represented in the database were unrelated, one would expect that an exhaustive comparison of the profiles for these 59 million pairs would produce only about one match. In fact, the 59 million comparisons revealed 10 matches. The excess number of matches is evidence that not all the individuals in the database were unrelated, that the true match probability was smaller than the theoretical calculation, or both. In fact, eight of the pairs were twins or brothers. The ninth was a duplicate (because one person gave a sample as himself and then again pretending to be someone else). The tenth was apparently a match between two unrelated people. This exercise thus confirmed the theoretical computation of the random-match probability. On average, the theoretical match probability was about 1/50,000,000, and the rate of matches in the unrelated pairs within the database was 1/59,000,000.

In the United States, defendants have sought discovery of the criminal-offender databases to determine whether the number of matching and partially matching pairs exceeds the predictions made with the population genetics model.[169] An early report about partial matches in a state database in Arizona was said to show extraordinarily large numbers of partial matches (without accounting for the combinatorial explosion in the number of comparisons in an all-pairs data-

---

166. *See* Kaye, *supra* note 3; *supra* Section V.D.1.

167. Walsh & Buckleton, *supra* note 159, at 463.

168. Altogether, nearly 11,000 people were represented in the New Zealand database. Hence, about 10,907 × 10,907 pairs such as (1,1), (1,2), (1,3), … , (1,10907), (2,1), (2,2), (2,3), . . . , (2,10907), . . . (10907,1), (10907,2), (10907,3), (10907,10907) can be formed. This amounts to almost 119 million possible pairs. Of course, there is no point in checking the pairs (1,1), (2,2), . . . (10907,10907). Thus, the number of ordered pairs with different individuals is 119 million minus a mere 10,907. The subtraction hardly changes anything. Finally, ordered pairs such as (1,5) and (5,1) involve the same two people. Therefore, the number of distinct pairs of people is about half of 119 million—the 59 million figure in the text.

169. Jason Felch & Maura Dolan, *How Reliable Is DNA in Identifying Suspects?* L.A. Times, July 20, 2008.

EXHIBIT C

base search).[170] However, some scientists question the utility of the investigative databases for population genetics research.[171] They observe that these databases contain an unknown number of relatives, that they might contain duplicates, and that the population in the offender databases is highly structured. These complicating factors would need to be considered in testing for an excess of matches or partial matches. Studies of offender databases in Australia and New Zealand that make adjustments for population structure and close relatives have shown substantial agreement between the expected and observed numbers of partial matches, at least up to the nine STR loci used in those databases.[172]

The existence of large databases also provides a means of estimating a random-match probability without making any modeling assumptions. For the New Zealand study, even ignoring the possibility of relatives and duplicates, there were only 10 matches out of 59 million comparisons. The empirical estimate of the random-match probability is therefore about 1 in 5.9 million. This is about 10 times larger than the theoretical estimate, but still quite small. As this example indicates, crude but simple empirical estimates from all-pairs comparisons in large databases may well produce random-match probabilities that are larger than the theoretical estimates (as expected when full siblings or other close relatives are in the databases), but the estimated probabilities are likely to remain impressively small.

170. *Id.*; Kaye, *supra* note 3. As illustrated *supra* note 168, an all-pairs search in a large database of size $N$ will involve $N(N-1)/2$, or about $N^2/2$ comparisons. For example, a database of 6 million samples gives rise to some 18,000,000,000,000 comparisons. Even with no population structure, relatives, and duplicates, and with random-match probabilities in the trillionths, one would expect to find a large number of matches or near-matches. An analogy can be made to the famous "birthday problem" mentioned in the 1996 NRC Report, *supra* note 9, at 165. In its simplest form, the birthday problem assumes that equal numbers of people are born every day of the year. The problem is to determine the minimum number of people in a room such that the odds favor there being at least two of them who were born on the same day of the same month. Focusing solely on the random-match probability of 1/365 for a specified birthday makes it appear that a huge number of people must be in the room for a match to be likely. After all, the chance of a match between two individuals having a given birthday (say, January 1) is (ignoring leap years) a miniscule $1/365 \times 1/365 = 1/133,225$. But because the matching birthday can be any one of the 365 days in the year and because there are $N(N-1)/2$ ways to have a match, it takes only $N = 23$ people before it is more likely than not that at least two people share a birthday. The birthday problem thus shows that surprising coincidences commonly occur even in relatively small databases. *See, e.g.,* Persi Diaconis & Frederick Mosteller, *Methods for Studying Coincidences*, 84 J. Am. Statistical Ass'n 853 (1989).

171. Bruce Budowle et al., *Partial Matches in Heterogeneous Offender Databases Do Not Call into Question the Validity of Random Match Probability Calculations*, 123 Int'l J. Legal Med. 59 (2009).

172. James M. Curran et al., *Empirical Support for the Reliability of DNA Evidence Interpretation in Australia and New Zealand*, 40 Australian J. Forensic Sci. 99, 102–06 (2008); Bruce S. Weir, *The Rarity of DNA Profiles*, 1 Annals Applied Stat. 358 (2007); B.S. Weir, *Matching and Partially-Matching DNA Profiles*, 49 J. Forensic Sci. 1009, 1013 (2004); *cf.* Laurence D. Mueller, *Can Simple Population Genetic Models Reconcile Partial Match Frequencies Observed in Large Forensic Databases?* 87 J. Genetics (India) 101 (2008) (maintaining that excess partial matches in an Arizona offender database are not easily reconciled with theoretical expectations). This literature is reviewed in David H. Kaye, *Trawling DNA Databases for Partial Matches: What Is the FBI Afraid of?* 19 Cornell J.L. & Pub. Pol'y 145 (2009).

EXHIBIT C

# VI. Nonhuman DNA Testing

Most routine applications of DNA technology in the forensic setting involve the identification of human beings—suspects in criminal cases, missing persons, or victims of mass disasters. However, inasmuch as DNA analysis might be informative in any kind of case involving biological material, DNA analysis has found application in such diverse situations as identification of individual plants and animals that link suspects to crime scenes, enforcement of endangered species and other wildlife regulations, investigation of patent issues involving specific animal breeds and plant cultivars, identification of fraudulently labeled foodstuffs, identification of sources of bacterial and viral epidemic outbreaks, and identification of agents of bioterrorism.[173] These applications are directed either at identifying the species origin of an item or at distinguishing among individuals (or subgroups) within a species. In deciding whether the evidence is scientifically sound, it can be important to consider the novelty of the application, the validity of the underlying scientific theory, the validity of any statistical interpretations, and the relevant scientific community to consult in assessing the application. This section considers these factors in the context of nonhuman DNA testing.

## A. Species and Subspecies

Evolution is a branching process. Over time, populations may split into distinct species. Ancestral species and some or all of their branches become extinct. Phylogenetics uses DNA sequences to elucidate these evolutionary "trees." This information can help determine the species of the organism from which material has been obtained. For example, the most desirable Russian black caviar originates from three species of wild sturgeon inhabiting the Volga River–Caspian Sea basin. But caviar from other sturgeon species is sometimes falsely labeled as originating from these three species—in violation of food labeling laws. Moreover, the three sturgeon species are listed as endangered, and trade in their caviar is restricted. A test of caviar species based on DNA sequence variation in a mitochondrial gene found that 23% of caviar products in the New York City area were mislabeled,[174] and in *United States v. Yazback*, caviar species testing was used to convict an

---

173. *See, e.g.,* R.G. Breeze et al., Microbial Forensics (2005); Laurel A. Neme, Animal Investigators: How the World's First Wildlife Forensics Lab Is Solving Crimes and Saving Endangered Species (2009). In still other situations, DNA testing has been used to establish the identity of a missing or stolen animal. *E.g.*, Augillard v. Madura, 257 S.W.3d 494 (Tex. App. 2008) (action for conversion to recover dog lost during Hurricane Katrina); Guillermo Giovambattista et al., *DNA Typing in a Cattle Stealing Case*, 46 J. Forensic Sci. 1484 (2001).

174. Rob DeSalle & Vadim J. Birstein, *PCR Identification of Black Caviar*, 381 Nature 197 (1996); Vadim J. Birstein et al., *Population Aggregation Analysis of Three Caviar-Producing Species of Sturgeons and Implications for the Species Identification of Black Caviar*, 12 Conservation Biology 766 (1998).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

importer of gourmet foods for falsely labeling fish eggs from the environmentally protected American paddlefish as the more prized Russian sevruga caviar.[175]

Phylogenetic analysis also is used to study changes in populations of organisms of the same species. In *State v. Schmidt*,[176] a physician was convicted of attempting to murder his former lover by injecting her with the HIV virus obtained from an infected patient. The virus evolves rapidly—its sequence can change by as much as 1% per year over the course of infection in a single individual. In time, an infected individual will harbor new strains, but these will be more closely related to the particular strain (or strains) that originally infected the individual than to the diverse strains of the virus in the geographic area. The victim in *Schmidt* had fewer strains of HIV than the patient—indicating a later infection—and all the victim's strains were closely related to a subset of the patient's strains—indicating that the victim's strains originated from that subset then in the patient. This technique of examining the genetic similarities and differences in two populations of viruses has been used in other cases across the world.[177]

The FBI employed similar reasoning to conclude that the anthrax spores in letters sent through the mail in 2001 came from the descendants of bacteria first cultured from an infected cow in Texas in 1981. This "Ames strain" was disseminated to various research laboratories over the years, and the FBI also attempted to associate the letter spores with particular collections of anthrax bacteria (all derived from the one Ames strain) now housed in different laboratories.[178]

Both the caviar and the HIV cases exemplify the translation of established scientific methods into a forensic application. The mitochondrial gene used for species identification in *Yazback* was the cytochrome b gene. Having accumulated mutations over time, this gene commonly is used for assessing species relationships among vertebrates, and the database of cytochrome b sequences is extensive. In particular, this gene sequence previously had been used to determine the evolutionary placement of sturgeons among other species of fish.[179] Likewise, the use of phylogenetic analysis for assessing relationships among HIV strains has provided critical insights into the biology of this deadly virus.

175. Dep't of Justice, Caviar Company and President Convicted in Smuggling Conspiracy, *available at* http://www.usdoj.gov/opa/pr/2002/January/02_enrd_052.htm. An earlier case is described in Andrew Cohen, *Sturgeon Poaching and Black Market Caviar: A Case Study*, 48 J. Env'l Biology Fishes 423 (1997).

176. 699 So. 2d 448 (La. Ct. App. 1997) (holding that the evidence satisfied *Daubert*).

177. Edwin J Bernard et al., *The Use of Phylogenetic Analysis as Evidence in Criminal Investigation of HIV Transmission*, Feb. 2007, *available at* http://www.nat.org.uk/Media%20library/Files/PDF%20 Documents/HIV-Forensics.pdf.

178. *See* National Research Council, Committee on the Review of the Scientific Approaches Used During the FBI's Investigation of the 2001 *Bacillus Anthracis* Mailings, Review of the Scientific Approaches Used During the FBI's Investigation of the 2001 Anthrax Letters (2011).

179. Sturgeon Biodiversity and Conservation (Vadim J. Birstein et al. eds., 1997).

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

That said, how the phylogenetic analysis is implemented and the genes used for the analysis may prompt questions in some cases.[180] Both the computer algorithm used to align DNA sequences prior to the construction of the phylogenetic tree and the computer algorithms used to build the tree contain assumptions that can influence the outcomes. Consequently, alignments generated by different software can result in different trees, and different tree-building algorithms can yield different trees from the same alignments. Thus, phylogenetic analysis should not be looked upon as a simple mechanical process. In *Schmidt*, the investigators anticipated and addressed potential problem areas in their choice of sequence data to collect and by using different algorithms for phylogenetic analysis. The results from the multiple analyses were the same, supporting the overall conclusion.[181]

## B. Individual Organisms

DNA analysis to determine that trace evidence originated from a particular individual within a species requires both a valid analytical procedure for forensic samples and at least a rough assessment of how rare the DNA types are in the population. In human DNA testing, suitable reference databases permit reasonable estimates of allele frequencies among groups of human beings (*see supra* Section IV), but adequate databases will not always be available for other organisms. Nonetheless, a match between the DNA at a crime scene and the organism that could be the source of that trace evidence still may be informative. In these cases, a court may consider admitting testimony about the matching features along with circumscribed, qualitative explanations of the significance of the similarities.[182]

Such cases began appearing in the 1990s. In *State v. Bogan*,[183] for example, a woman's body was found in the desert, near several Palo Verde trees. A detective noticed two Palo Verde seed pods in the bed of a truck that the suspect was driving before the murder. However, genetic variation in Palo Verde tree DNA had not been widely studied, and no one knew how much variation actually

---

180. One cannot assume that cytochrome b gene testing, for example, is automatically appropriate for all species identification. Mitochondria are maternally inherited, and one can ask whether cross-breeding between different species of sturgeon could make a sturgeon of one species appear to be another species because it carries mitochondrial DNA originating from the other species. Mitochondrial introgression has been detected in several vertebrate species. Coyote mtDNA in wolves and cattle mtDNA in bison are notable examples. Introgression in sturgeon has been reported—some individual sturgeon appearing to be of one of the prized Volga region caviar species were found to carry cytochrome b genes from a lesser regarded non-Volga species. These examples indicate the need for specialized knowledge of the basic biology and ecology of the species in question.

181. On the need for caution in the interpretation of HIV sequence similarities, see Bernard et al., *supra* note 177.

182. *See generally* Kaye et al., *supra* note 1 (discussing various ways to explain "matches" in forensic identification tests).

183. 905 P.2d 515 (Ariz. Ct. App. 1995) (holding that the admission of the DNA match was proper under *Frye*).

EXHIBIT C

*Reference Manual on Scientific Evidence*

existed within the species. Accordingly, a method for genetic analysis had to be developed, assessed for what it revealed about genetic variability, and evaluated for reliability. A university biologist chose random amplified polymorphic DNA (RAPD) analysis, a PCR-based method then commonly used for the detection of variation within species for which no genomic sequence information exists. This approach employs a single short piece of DNA with a random, arbitrary sequence as the PCR primer; the amplification products are DNA fragments of unknown sequence and variable length that can be separated by electrophoresis into a barcode-like "fingerprint" pattern. In a blind trial, the biologist was able to show that the DNA from nearly 30 Palo Verde trees yielded distinct RAPD patterns.[184] He testified that the two pods "were identical" and "matched completely with" a particular tree and "didn't match any of the [other] trees." In fact, he went so as to say that he felt "quite confident in concluding that" the tree's DNA would be distinguishable from that of "any tree that might be furnished" to him. Numerical estimates of the random-match probability were not introduced.[185]

The first example of an animal identification using STR typing involved linking evidence cat hairs to a particular cat. In *R. v. Beamish*, a woman disappeared from her home on Prince Edward Island, on Canada's eastern seaboard. Weeks later a man's brown leather jacket stained with blood was discovered in a plastic bag in the woods. In the jacket's lining were white cat hairs. After the missing woman's body was found in a shallow grave, her estranged common-law husband was arrested and charged with murder. He lived with his parents and a white cat named Snowball. A laboratory already engaged in the study of genetic diversity in cats showed that the DNA profile of the evidence cat hairs matched Snowball at 10 STR loci. Based on a survey of genetic variation in domestic cats generated for this case, the probability of a chance match was offered as evidence in support of the hypothesis that the hairs originated from Snowball.[186]

184. He analyzed samples from the nine trees near the body and another 19 trees from across the county. He "was not informed, until after his tests were completed and his report written, which samples came from" which trees. *Id*. at 521. Furthermore, unbeknownst to the experimenter, two apparently distinct samples were prepared from the tree at the crime scene that appeared to have been abraded by the defendant's truck. The biologist correctly identified the two samples from the one tree as matching, and he "distinguished the DNA from the seed pods in the truck bed from the DNA of all twenty-eight trees except" that one. *Id*.

185. RAPD analysis does not provide systematic information about sequence variation at defined loci. As a result, it is not possible to make a reliable estimate of allele or genotype frequencies at a locus, nor can one make the assumption of genetic independence required to legitimately multiply frequencies across multiple loci, as one can with STR markers. Furthermore, RAPD profile results are not generally portable between laboratories. Often, profiles generated by different laboratories will differ in their details. Therefore, RAPD profile data are not amenable to the generation of large databases. Nonetheless, the state's expert estimated a random match probability of 1 in 1,000,000, and the defense expert countered with 1 in 136,000. The trial court excluded both estimates because of the then-existing controversy (*see* Section IV) over analogous estimates for human RFLP genotypes.

186. *See* Marilyn A. Menott-Haymond et al., *Pet Cat Hair Implicates Murder Suspect*, 386 Nature 774 (1997).

196

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

In *Beamish*, there was no preexisting population database characterizing STR polymorphism in domestic cats, but the premise that cats exhibit substantial genetic variation at STR loci was in accord with knowledge of STR variation in other mammals. Moreover, testing done on two small cat populations provided evidence that the STR loci chosen for analysis were polymorphic and behaved as independent genetic characteristics, allowing allele frequency estimates to be used for the calculation of random-match probabilities as is done with human STR data. On this basis, the random-match probability for Snowball's STR profile was estimated to be one in many millions, and the trial court admitted this statistic.[187]

An animal-DNA random-match probability prompted a reversal, however, in a Washington case. In *State v. Leuluaialii*,[188] the prosecution offered testimony of an STR match with a dog's blood that linked the defendants to the victims' bodies. The defendants objected, seeking a *Frye* hearing, but the trial court denied this motion and admitted testimony that included the report that "the probability of finding another dog with Chief's DNA profile was 1 in 18 billion [or] 1 in 3 trillion."[189] The state court of appeals remanded the case for a hearing on general acceptance, cautioning that "[b]ecause PE Zoogen has not yet published sufficient data to show that its DNA markers and associated probability estimates are reliable, we would suggest that other courts tread lightly in these waters and closely examine canine DNA results before accepting them at trial."[190]

The scientific literature shows continued use of STR profiling[191] (as well as the use of SNP typing)[192] to characterize individuals in plant and animal populations. STR databases have been established for domestic and agriculturally significant animals such as dogs, cats, cattle, and horses as well as for a number of plant species.[193] Critical to the use of these databases is an understanding of the

---

187. David N. Leff, *Killer Convicted by a Hair: Unprecedented Forensic Evidence from Cat's DNA Convinced Canadian Jury*, Bioworld Today, Apr. 24, 1997, *available in* 1997 WL 7473675 ("the frequency of the match came out to be on the order of about one in 45 million," quoting Steven O'Brien); *All Things Considered: Cat DNA* (NPR broadcast, Apr. 23, 1997), *available in* 1997 WL 12832754 ("it was less than one in two hundred million," quoting Steven O'Brien).

188. 77 P.3d 1192 (Wash. Ct. App. 2003).

189. *Id.* at 1196.

190. *Id.* at 1201.

191. *E.g.*, Kathleen J. Craft et al., *Application of Plant DNA Markers in Forensic Botany: Genetic Comparison of* Quercus *Evidence Leaves to Crime Scene Trees Using Microsatellites*, 165 Forensic Sci. Int'l 64 (2007) (differentiation of oak tree leaves); Christine Kubik et al., *Genetic Diversity in Seven Perennial Ryegrass (*Lolium perenne *L.) Cultivars Based on SSR Markers*, 41 Crop Sci. 1565 (2001) (210 ryegrass samples correctly assigned to seven cultivars).

192. *E.g.*, Bridgett M. vonHoldt et al., *Genome-wide SNP and Haplotype Analyses Reveal a Rich History Underlying Dog Domestication*, 464 Nature 898 (2010) (48,000 SNPs in 912 dogs and 225 wolves).

193. Joy Halverson & Christopher J. Basten, *A PCR Multiplex and Database for Forensic DNA Identification of Dogs*, 50 J. Forensic Sci. 352 (2005); Marilyn A. Menotti-Raymond et al., *An STR Forensic Typing System for Genetic Individualization of Domestic Cat (*Felis catus*) Samples*, 50 J. Forensic Sci. 1061 (2005); L.H.P. van de Goor et al., *Population Studies of 16 Bovine STR Loci for Forensic*

EXHIBIT C

*Reference Manual on Scientific Evidence*

basic reproductive patterns of the species in question. The simple product rule (Section IV) assumes that the sexually reproducing species mates at random with regard to the STR loci used for typing. When that is the case, the usual STR alleles and loci can be regarded as independent. But if mating is nonrandom, as occurs when individuals within a species are selectively bred to obtain some property such as coat color, body type, or behavioral repertoire, or as occurs when a species exists in geographically distinct subpopulations, the inheritance of loci may no longer be independent. Because it cannot be assumed a priori that a crime scene sample originates from a mixed-breed animal, inbreeding normally must be accounted for.[194]

A different approach is called for if the species is not sexually reproducing. For example, many plants, some simple animals, and bacteria reproduce asexually. With asexual reproduction, most offspring are genetically identical to the parent. All the individuals that originate from a common parent constitute, collectively, a clone. The major source of genetic variation in asexually reproducing species is mutation. When a mutation occurs, a new clonal lineage is created. Individuals in the original clonal lineage continue to propagate, and two clonal lineages now exist where before there was one. Thus, in species that reproduce asexually, genetic testing distinguishes clones, not individuals; hence, the product rule cannot be applied to estimate genotype frequencies for individuals. Rather, the frequency of a particular clone in a population of clones must be determined by direct observation. For example, if a rose thorn found on a suspect's clothing were to be identified as originating from a particular cultivar of rose, the relevant question becomes how common that variety of rose bush is and where it is located in the community.

In short, the approach for estimating a genotype frequency depends on the reproductive pattern and population genetics of the species. In cases involving unusual organisms, a court will need to rely on experts with sufficient knowledge of the species to verify that the method for estimating genotype frequencies is appropriate.

---

*Purposes*, 125 Int'l J.L. Med. 111 (2009). *But see* People v. Sutherland, 860 N.E.2d 178 (Ill. 2006) (conflicting expert testimony on the representativeness of dog databases); Barbara van Asch & Filipe Pereira, *State-of-the-Art and Future Prospects of Canine STR-Based Genotyping*, 3 Open Forensic Sci. J. 45 (2010). (recommending collaborative efforts for standardization and additional development of population databases)..

194. This can be done either by using the affinal model for a structured population or by using the probability of a match to a littermate or other closely related animal in lieu of the general random-match probability. *See Sutherland*, 860 N.E.2d 178 (describing such testimony).

**EXHIBIT C**

*Reference Guide on DNA Identification Evidence*

# Glossary of Terms

**adenine (A).** One of the four bases, or nucleotides, that make up the DNA molecule. Adenine binds only to thymine. See nucleotide.

**affinal method.** A method for computing the single-locus profile probabilities for a theoretical subpopulation by adjusting the single-locus profile probability, calculated with the product rule from the mixed population database, by the amount of heterogeneity across subpopulations. The model is appropriate even if there is no database available for a particular subpopulation, and the formula always gives more conservative probabilities than the product rule applied to the same database.

**allele.** In classical genetics, an allele is one of several alternative forms of a gene. A biallelic gene has two variants; others have more. Alleles are inherited separately from each parent, and for a given gene, an individual may have two different alleles (heterozygosity) or the same allele (homozygosity). In DNA analysis, the term is applied to any DNA region (even if it is not a gene) used for analysis.

**allelic ladder.** A mixture of all the common alleles at a given locus. Periodically producing electropherograms of the allelic ladder aids in designating the alleles detected in an unknown sample. The positions of the peaks for the unknown can be compared to the positions in a ladder electropherogram produced near the time when the unknown was analyzed. Peaks that do not match up with the ladder require further analysis.

**Alu sequences.** A family of short interspersed elements (SINEs) distributed throughout the genomes of primates.

**amplification.** Increasing the number of copies of a DNA region, usually by PCR.

**amplified fragment length polymorphism (AMP-FLP).** A DNA identification technique that uses PCR-amplified DNA fragments of varying lengths. The DS180 locus is a VNTR whose alleles can be detected with this technique.

**antibody.** A protein (immunoglobulin) molecule, produced by the immune system, that recognizes a particular foreign antigen and binds to it; if the antigen is on the surface of a cell, this binding leads to cell aggregation and subsequent destruction.

**antigen.** A molecule (typically found in the surface of a cell) whose shape triggers the production of antibodies that will bind to the antigen.

**autoradiograph (autoradiogram, autorad).** In RFLP analysis, the X-ray film (or print) showing the positions of radioactively marked fragments (bands) of DNA, indicating how far these fragments have migrated, and hence their molecular weights.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**autosome.**  A chromosome other than the X and Y sex chromosomes.

**band.**  See autoradiograph.

**band shift.**  Movement of DNA fragments in one lane of a gel at a different rate than fragments of an identical length in another lane, resulting in the same pattern "shifted" up or down relative to the comparison lane. Band shift does not necessarily occur at the same rate in all portions of the gel.

**base pair (bp).**  Two complementary nucleotides bonded together at the matching bases (A and T or C and G) along the double helix "backbone" of the DNA molecule. The length of a DNA fragment often is measured in numbers of base pairs (1 kilobase (kb) = 1000 bp); base-pair numbers also are used to describe the location of an allele on the DNA strand.

**Bayes' theorem.**  A formula that relates certain conditional probabilities. It can be used to describe the impact of new data on the probability that a hypothesis is true. See the chapter on statistics in this manual.

**bin, fixed.**  In VNTR profiling, a bin is a range of base pairs (DNA fragment lengths). When a database is divided into fixed bins, the proportion of bands within each bin is determined and the relevant proportions are used in estimating the profile frequency.

**binning.**  Grouping VNTR alleles into sets of similar sizes because the alleles' lengths are too similar to differentiate.

**bins, floating.**  In VNTR profiling, a bin is a range of base pairs (DNA fragment lengths). In a floating bin method of estimating a profile frequency, the bin is centered on the base-pair length of the allele in question, and the width of the bin can be defined by the laboratory's matching rule (e.g., ±5% of band size).

**blind proficiency test.**  See proficiency test.

**capillary electrophoresis.**  A method for separating DNA fragments (including STRs) according to their lengths. A long, narrow tube is filled with an entangled polymer or comparable sieving medium, and an electric field is applied to pull DNA fragments placed at one end of the tube through the medium. The procedure is faster and uses smaller samples than gel electrophoresis, and it can be automated.

**ceiling principle.**  A procedure for setting a minimum DNA profile frequency proposed in 1992 by a committee of the National Academy of Sciences. One hundred persons from each of 15 to 20 genetically homogeneous populations spanning the range of racial groups in the United States are sampled. For each allele, the higher frequency among the groups sampled (or 5%, whichever is larger) is used in calculating the profile frequency. Compare interim ceiling principle.

**chip.**  A miniaturized system for genetic analysis. One such chip mimics capillary electrophoresis and related manipulations. DNA fragments, pulled by

200

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

small voltages, move through tiny channels etched into a small block of glass, silicon, quartz, or plastic. This system should be useful in analyzing STRs. Another technique mimics reverse dot blots by placing a large array of oligo-nucleotide probes on a solid surface. Such hybridization arrays are useful in identifying SNPs and in sequencing mitochondrial DNA.

**chromosome.** A rodlike structure composed of DNA, RNA, and proteins. Most normal human cells contain 46 chromosomes, 22 autosomes and a sex chromosome (X) inherited from the mother, and another 22 autosomes and one sex chromosome (either X or Y) inherited from the father. The genes are located along the chromosomes. See also homologous chromosomes.

**coding and noncoding DNA.** The sequence in which the building blocks (amino acids) of a protein are arranged corresponds to the sequence of base pairs within a gene. (A sequence of three base pairs specifies a particular one of the 20 possible amino acids in the protein. The mapping of a set of three nucleotide bases to a particular amino acid is the genetic code. The cell makes the protein through intermediate steps involving coding RNA transcripts.) About 1.5% of the human genome codes for the amino acid sequences. Another 23.5% of the genome is classified as genetic sequence but does not encode proteins. This portion of the noncoding DNA is involved in regulating the activity of genes. It includes promoters, enhancers, and repressors. Other gene–related DNA consists of introns (that interrupt the coding sequences, called exons, in genes and that are edited out of the RNA transcript for the protein), pseudogenes (evolutionary remnants of once-functional genes), and gene fragments. The remaining, extragenic DNA (about 75% of the genome) also is noncoding.

**CODIS (combined DNA index system).** A collection of databases on STR and other loci of convicted felons, maintained by the FBI.

**complementary sequence.** The sequence of nucleotides on one strand of DNA that corresponds to the sequence on the other strand. For example, if one sequence is CTGAA, the complementary bases are GACTT.

**control region.** See D–loop.

**cytoplasm.** A jelly–like material (80% water) that fills the cell.

**cytosine (C).** One of the four bases, or nucleotides, that make up the DNA double helix. Cytosine binds only to guanine. See nucleotide.

**database.** A collection of DNA profiles.

**degradation.** The breaking down of DNA by chemical or physical means.

**denature, denaturation.** The process of splitting, as by heating, two comple-mentary strands of the DNA double helix into single strands in preparation for hybridization with biological probes.

201

EXHIBIT C

*Reference Manual on Scientific Evidence*

**deoxyribonucleic acid (DNA).**  The molecule that contains genetic information. DNA is composed of nucleotide building blocks, each containing a base (A, C, G, or T), a phosphate, and a sugar. These nucleotides are linked together in a double helix—two strands of DNA molecules paired up at complementary bases (A with T, C with G). See adenine, cytosine, guanine, thymine.

**diploid number.**  See haploid number.

**D-loop.**  A portion of the mitochrondrial genome known as the "control region" or "displacement loop" instrumental in the regulation and initiation of mtDNA gene products. Two short "hypervariable" regions within the D-loop do not appear to be functional and are the sequences used in identity or kinship testing.

**DNA polymerase.**  The enzyme that catalyzes the synthesis of double-stranded DNA.

**DNA probe.**  See probe.

**DNA profile.**  The alleles at each locus. For example, a VNTR profile is the pattern of band lengths on an autorad. A multilocus profile represents the combined results of multiple probes. *See* genotype.

**DNA sequence.**  The ordered list of base pairs in a duplex DNA molecule or of bases in a single strand.

**DQ.**  The antigen that is the product of the DQA gene. See DQA, human leukocyte antigen.

**DQA.**  The gene that codes for a particular class of human leukocyte antigen (HLA). This gene has been sequenced completely and can be used for forensic typing. See human leukocyte antigen.

**EDTA.**  A preservative added to blood samples.

**electropherogram.**  The PCR products separated by capillary electrophoresis can be labeled with a dye that glows at a given wavelength in response to light shined on it. As the tagged fragments pass the light source, an electronic camera records the intensity of the fluorescence. Plotting the intensity as a function of time produces a series of peaks, with the shorter fragments producing peaks sooner. The intensity is measured in relative fluorescent units and is proportional to the number of glowing fragments passing by the detector. The graph of the intensity over time is an electropherogram.

**electrophoresis.**  See capillary electrophoresis, gel electrophoresis.

**endonuclease.**  An enzyme that cleaves the phosphodiester bond within a nucleotide chain.

**environmental insult.**  Exposure of DNA to external agents such as heat, moisture, and ultraviolet radiation, or chemical or bacterial agents. Such exposure

202

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

can interfere with the enzymes used in the testing process or otherwise make DNA difficult to analyze.

**enzyme.** A protein that catalyzes (speeds up or slows down) a reaction.

**epigenetic.** Heritable changes in phenotype (appearance) or gene expression caused by mechanisms other than changes in the underlying DNA sequence. Epigenetic marks are molecules attached to DNA that can determine whether genes are active and used by the cell.

**ethidium bromide.** A molecule that can intercalate into DNA double helices when the helix is under torsional stress. Used to identify the presence of DNA in a sample by its fluorescence under ultraviolet light.

**exon.** See coding and noncoding DNA.

**fallacy of the transposed conditional.** See transposition fallacy.

**false match.** Two samples of DNA that have different profiles could be declared to match if, instead of measuring the distinct DNA in each sample, there is an error in handling or preparing samples such that the DNA from a single sample is analyzed twice. The resulting match, which does not reflect the true profiles of the DNA from each sample, is a false match. Some people use "false match" more broadly, to include cases in which the true profiles of each sample are the same, but the samples come from different individuals. Compare true match. See also match, random match.

**gel, agarose.** A semisolid medium used to separate molecules by electrophoresis.

**gel electrophoresis.** In RFLP analysis, the process of sorting DNA fragments by size by applying an electric current to a gel. The different–size fragments move at different rates through the gel.

**gene.** A set of nucleotide base pairs on a chromosome that contains the "instruc-tions" for controlling some cellular function such as making an enzyme. The gene is the fundamental unit of heredity; each simple gene "codes" for a specific biological characteristic.

**gene frequency.** The relative frequency (proportion) of an allele in a population.

**genetic drift.** Random fluctuation in a population's allele frequencies from generation to generation.

**genetics.** The study of the patterns, processes, and mechanisms of inheritance of biological characteristics.

**genome.** The complete genetic makeup of an organism, including roughly 23,000 genes and many other DNA sequences in humans. Over three billion nucleotide base pairs comprise the haploid human genome.

**genotype.** The particular forms (alleles) of a set of genes possessed by an organ-ism (as distinguished from phenotype, which refers to how the genotype expresses itself, as in physical appearance). In DNA analysis, the term is

EXHIBIT C

*Reference Manual on Scientific Evidence*

applied to the variations within all DNA regions (whether or not they con-
stitute genes) that are analyzed.

**genotype, multilocus.** The alleles that an organism possesses at several sites in
its genome.

**genotype, single locus.** The alleles that an organism possesses at a particular
site in its genome.

**guanine (G).** One of the four bases, or nucleotides, that make up the DNA
double helix. Guanine binds only to cytosine. See nucleotide.

**haploid number.** Human sex cells (egg and sperm) contain 23 chromosomes
each. This is the haploid number. When a sperm cell fertilizes an egg cell, the
number of chromosomes doubles to 46. This is the diploid number.

**haplotype.** A specific combination of linked alleles at several loci.

**Hardy–Weinberg equilibrium.** A condition in which the allele frequencies
within a large, random, intrabreeding population are unrelated to patterns of
mating. In this condition, the occurrence of alleles from each parent will be
independent and have a joint frequency estimated by the product rule. See
independence, linkage disequilibrium.

**heteroplasmy, heteroplasty.** The condition in which some copies of mito-
chondrial DNA in the same individual have different base pairs at certain
points.

**heterozygous.** Having a different allele at a given locus on each of a pair of
homologous chromosomes. See allele. Compare homozygous.

**homologous chromosomes.** The 44 autosomes (nonsex chromosomes) in the
normal human genome are in homologous pairs (one from each parent) that
share an identical set of genes, but may have different alleles at the same loci.

**homozygous.** Having the same allele at a given locus on each of a pair of
homologous chromosomes. See allele. Compare heterozygous.

**human leukocyte antigen (HLA).** Antigen (foreign body that stimulates an
immune system response) located on the surface of most cells (excluding red
blood cells and sperm cells). HLAs differ among individuals and are associated
closely with transplant rejection. See DQA.

**hybridization.** Pairing up of complementary strands of DNA from differ-
ent sources at the matching base–pair sites. For example, a primer with
the sequence AGGTCT would bond with the complementary sequence
TCCAGA on a DNA fragment.

**independence.** Two events are said to be independent if one is neither more
nor less likely to occur when the other does.

**interim ceiling principle.** A procedure proposed in 1992 by a committee of
the National Academy of Sciences for setting a minimum DNA profile fre-
quency. For each allele, the highest frequency (adjusted upward for sampling

204

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

error) found in any major racial group (or 10%, whichever is higher), is used in product-rule calculations. Compare ceiling principle.

**intron.** See coding and noncoding DNA.

**kilobase (kb).** A measure of DNA length (1000 bases).

**likelihood ratio.** A measure of the support that an observation provides for one hypothesis as opposed to an alternative hypothesis. The likelihood ratio is computed by dividing the conditional probability of the observation given that one hypothesis is true by the conditional probability of the observation given the alternative hypothesis. For example, the likelihood ratio for the hypothesis that two DNA samples with the same STR profile originated from the same individual (as opposed to originating from two unrelated individuals) is the reciprocal of the random-match probability. Legal scholars have introduced the likelihood ratio as a measure of the probative value of evidence. Evidence that is 100 times more probable to be observed when one hypothesis is true as opposed to another has more probative value than evidence that is only twice as probable.

**linkage.** The inheritance together of two or more genes on the same chromosome.

**linkage equilibrium.** A condition in which the occurrence of alleles at different loci is independent.

**locus.** A location in the genome, that is, a position on a chromosome where a gene or other structure begins.

**mass spectroscopy.** The separation of elements or molecules according to their molecular weight. In the version being developed for DNA analysis, small quantities of PCR-amplified fragments are irradiated with a laser to form gaseous ions that traverse a fixed distance. Heavier ions have longer times of flight, and the process is known as matrix-assisted laser desorption-ionization time-of-flight mass spectroscopy. MALDI-TOF-MS, as it is abbreviated, may be useful in analyzing STRs.

**match.** The presence of the same allele or alleles in two samples. Two DNA profiles are declared to match when they are indistinguishable in genetic type. For loci with discrete alleles, two samples match when they display the same set of alleles. For RFLP testing of VNTRs, two samples match when the pattern of the bands is similar and the positions of the corresponding bands at each locus fall within a preset distance. See match window, false match, true match.

**match window.** If two RFLP bands lie within a preset distance, called the match window, that reflects normal measurement error, they can be declared to match.

**microsatellite.** Another term for an STR.

**minisatellite.** Another term for a VNTR.

205

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**mitochondria.** A structure (organelle) within nucleated (eukaryotic) cells that is the site of the energy–producing reactions within the cell. Mitochondria contain their own DNA (often abbreviated as mtDNA), which is inherited only from mother to child.

**molecular weight.** The weight in grams of 1 mole (approximately $6.02 \times 10^{23}$ molecules) of a pure, molecular substance.

**monomorphic.** A gene or DNA characteristic that is almost always found in only one form in a population. Compare polymorphism.

**multilocus probe.** A probe that marks multiple sites (loci). RFLP analysis using a multilocus probe will yield an autorad showing a striped pattern of 30 or more bands. Such probes are no longer used in forensic applications.

**multilocus profile.** See profile.

**multiplexing.** Typing several loci simultaneously.

**mutation.** The process that produces a gene or chromosome set differing from the type already in the population; the gene or chromosome set that results from such a process.

**nanogram (ng).** A billionth of a gram.

**nucleic acid.** RNA or DNA.

**nucleotide.** A unit of DNA consisting of a base (A, C, G, or T) and attached to a phosphate and a sugar group; the basic building block of nucleic acids. See deoxyribonucleic acid.

**nucleus.** The membrane-covered portion of a eukaryotic cell containing most of the DNA and found within the cytoplasm.

**oligonucleotide.** A synthetic polymer made up of fewer than 100 nucleotides; used as a primer or a probe in PCR. See primer.

**paternity index.** A number (technically, a likelihood ratio) that indicates the support that the paternity test results lend to the hypothesis that the alleged father is the biological father as opposed to the hypothesis that another man selected at random is the biological father. Assuming that the observed phenotypes correctly represent the phenotypes of the mother, child, and alleged father tested, the number can be computed as the ratio of the probability of the phenotypes under the first hypothesis to the probability under the second hypothesis. Large values indicate substantial support for the hypothesis of paternity; values near zero indicate substantial support for the hypothesis that someone other than the alleged father is the biological father; and values near unity indicate that the results do not help in determining which hypothesis is correct.

**pH.** A measure of the acidity of a solution.

**phenotype.** A trait, such as eye color or blood group, resulting from a genotype.

**point mutation.** See SNP.

206

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

**polymarker.** A commercially marketed set of PCR–based tests for protein polymorphisms.

**polymerase chain reaction (PCR).** A process that mimics DNA's own replication processes to make up to millions of copies of short strands of genetic material in a few hours.

**polymorphism.** The presence of several forms of a gene or DNA characteristic in a population.

**population genetics.** The study of the genetic composition of groups of individuals.

**population structure.** When a population is divided into subgroups that do not mix freely, that population is said to have structure. Significant structure can lead to allele frequencies being different in the subpopulations.

**primer.** An oligonucleotide that attaches to one end of a DNA fragment and provides a point for more complementary nucleotides to attach and replicate the DNA strand. See oligonucleotide.

**probe.** In forensics, a short segment of DNA used to detect certain alleles. The probe hybridizes, or matches up, to a specific complementary sequence. Probes allow visualization of the hybridized DNA, either by a radioactive tag (usually used for RFLP analysis) or a biochemical tag (usually used for PCR–based analyses).

**product rule.** When alleles occur independently at each locus (Hardy–Weinberg equilibrium) and across loci (linkage equilibrium), the proportion of the population with a given genotype is the product of the proportion of each allele at each locus, times factors of two for heterozygous loci.

**proficiency test.** A test administered at a laboratory to evaluate its performance. In a blind proficiency study, the laboratory personnel do not know that they are being tested.

**prosecutor's fallacy.** See transposition fallacy.

**protein.** A class of biologically important molecules made up of a linear string of building blocks called amino acids. The order in which these components are arranged is encoded in the DNA sequence of the gene that expresses the protein. See coding DNA.

**pseudogenes.** Genes that have been so disabled by mutations that they can no longer produce proteins. Some pseudogenes can still produce noncoding RNA.

**quality assurance.** A program conducted by a laboratory to ensure accuracy and reliability.

**quality audit.** A systematic and independent examination and evaluation of a laboratory's operations.

207

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**quality control.**  Activities used to monitor the ability of DNA typing to meet specified criteria.

**random match.**  A match in the DNA profiles of two samples of DNA, where one is drawn at random from the population. See also random-match probability.

**random-match probability.**  The chance of a random match. As it is usually used in court, the random-match probability refers to the probability of a true match when the DNA being compared to the evidence DNA comes from a person drawn at random from the population. This random true match probability reveals the probability of a true match when the samples of DNA come from different, unrelated people.

**random mating.**  The members of a population are said to mate randomly with respect to particular genes of DNA characteristics when the choice of mates is independent of the alleles.

**recombination.**  In general, any process in a diploid or partially diploid cell that generates new gene or chromosomal combinations not found in that cell or in its progenitors.

**reference population.**  The population to which the perpetrator of a crime is thought to belong.

**relative fluorescent unit (RFU).**  See electropherogram.

**replication.**  The synthesis of new DNA from existing DNA. See polymerase chain reaction.

**restriction enzyme.**  Protein that cuts double-stranded DNA at specific base-pair sequences (different enzymes recognize different sequences). See restriction site.

**restriction fragment length polymorphism (RFLP).**  Variation among people in the length of a segment of DNA cut at two restriction sites.

**restriction fragment length polymorphism (RFLP) analysis.**  Analysis of individual variations in the lengths of DNA fragments produced by digesting sample DNA with a restriction enzyme.

**restriction site.**  A sequence marking the location at which a restriction enzyme cuts DNA into fragments. See restriction enzyme.

**reverse dot blot.**  A detection method used to identify SNPs in which DNA probes are affixed to a membrane, and amplified DNA is passed over the probes to see if it contains the complementary sequence.

**ribonucleic acid (RNA).**  A single-stranded molecule "transcribed" from DNA. "Coding" RNA acts as a template for building proteins according the sequences in the coding DNA from which it is transcribed. Other RNA transcripts can be a sensor for detecting signals that affect gene expression, a switch for turning genes off or on, or they may be functionless.

EXHIBIT C

*Reference Guide on DNA Identification Evidence*

**sequence–specific oligonucleotide (SSO) probe.** Also, allele–specific oligonucleotide (ASO) probe. Oligonucleotide probes used in a PCR–associated detection technique to identify the presence or absence of certain base-pair sequences identifying different alleles. The probes are visualized by an array of dots rather than by the electrophoretograms associated with STR analysis.

**sequencing.** Determining the order of base pairs in a segment of DNA.

**short tandem repeat (STR).** See variable number tandem repeat.

**single–locus probe.** A probe that only marks a specific site (locus). RFLP analysis using a single–locus probe will yield an autorad showing one band if the individual is homozygous, two bands if heterozygous. Likewise, the probe will produce one or two peaks in an STR electrophoretogram.

**SNP (single nucleotide polymorphism).** A substitution, insertion, or deletion of a single base pair at a given point in the genome.

**SNP chip.** See chip.

**Southern blotting.** Named for its inventor, a technique by which processed DNA fragments, separated by gel electrophoresis, are transferred onto a nylon membrane in preparation for the application of biological probes.

**thymine (T).** One of the four bases, or nucleotides, that make up the DNA double helix. Thymine binds only to adenine. See nucleotide.

**transposition fallacy.** Also called the prosecutor's fallacy, the transposition fallacy confuses the conditional probability of A given B $[P(A|B)]$ with that of B given A $[P(B|A)]$. Few people think that the probability that a person speaks Spanish (A) given that he or she is a citizen of Chile (B) equals the probability that a person is a citizen of Chile (B) given that he or she speaks Spanish (A). Yet, many court opinions, newspaper articles, and even some expert witnesses speak of the probability of a matching DNA genotype (A) given that someone other than the defendant is the source of the crime scene DNA (B) as if it were the probability of someone else being the source (B) given the matching profile (A). Transposing conditional probabilities correctly requires Bayes' theorem.

**true match.** Two samples of DNA that have the same profile should match when tested. If there is no error in the labeling, handling, and analysis of the samples and in the reporting of the results, a match is a true match. A true match establishes that the two samples of DNA have the same profile. Unless the profile is unique, however, a true match does not conclusively prove that the two samples came from the same source. Some people use "true match" more narrowly, to mean only those matches among samples from the same source. Compare false match. See also match, random match.

**variable number tandem repeat (VNTR).** A class of RFLPs resulting from multiple copies of virtually identical base-pair sequences, arranged in succession at a specific locus on a chromosome. The number of repeats varies from

209

EXHIBIT C

*Reference Manual on Scientific Evidence*

individual to individual, thus providing a basis for individual recognition. VNTRs are longer than STRs.

**window.**  See match window.

**X chromosome.**  See chromosome.

**Y chromosome.**  See chromosome.

# References on DNA

Forensic DNA Interpretation (John Buckleton et al. eds., 2005).

John M. Butler, Fundamentals of Forensic DNA Typing (2010).

Ian W. Evett & Bruce S. Weir, Interpreting DNA Evidence: Statistical Genetics for Forensic Scientists (1998).

William Goodwin et al., An Introduction to Forensic Genetics (2d ed. 2011).

David H. Kaye, The Double Helix and the Law of Evidence (2010).

National Research Council Committee on DNA Forensic Science: An Update, The Evaluation of Forensic DNA Evidence (1996).

National Research Council Committee on DNA Technology in Forensic Science, DNA Technology in Forensic Science (1992).

The President's DNA Initiative, Forensic DNA Resources for Specific Audiences, *available at* www.dna.gov/audiences/.

**EXHIBIT C**

# Reference Guide on Statistics

### DAVID H. KAYE AND DAVID A. FREEDMAN

*David H. Kaye, M.A., J.D., is Distinguished Professor of Law and Weiss Family Scholar, The Pennsylvania State University, University Park, and Regents' Professor Emeritus, Arizona State University Sandra Day O'Connor College of Law and School of Life Sciences, Tempe.*

*David A. Freedman, Ph.D., was Professor of Statistics, University of California, Berkeley.*

[Editor's Note: Sadly, Professor Freedman passed away during the production of this manual.]

CONTENTS

I.  Introduction, 213
    A.  Admissibility and Weight of Statistical Studies, 214
    B.  Varieties and Limits of Statistical Expertise, 214
    C.  Procedures That Enhance Statistical Testimony, 215
        1.  Maintaining professional autonomy, 215
        2.  Disclosing other analyses, 216
        3.  Disclosing data and analytical methods before trial, 216
II.  How Have the Data Been Collected? 216
    A.  Is the Study Designed to Investigate Causation? 217
        1.  Types of studies, 217
        2.  Randomized controlled experiments, 220
        3.  Observational studies, 220
        4.  Can the results be generalized? 222
    B.  Descriptive Surveys and Censuses, 223
        1.  What method is used to select the units? 223
        2.  Of the units selected, which are measured? 226
    C.  Individual Measurements, 227
        1.  Is the measurement process reliable? 227
        2.  Is the measurement process valid? 228
        3.  Are the measurements recorded correctly? 229
    D.  What Is Random? 230
III.  How Have the Data Been Presented? 230
    A.  Are Rates or Percentages Properly Interpreted? 230
        1.  Have appropriate benchmarks been provided? 230
        2.  Have the data collection procedures changed? 231
        3.  Are the categories appropriate? 231
        4.  How big is the base of a percentage? 233
        5.  What comparisons are made? 233
    B.  Is an Appropriate Measure of Association Used? 233

EXHIBIT C

*Reference Manual on Scientific Evidence*

C.  Does a Graph Portray Data Fairly? 236
    1.  How are trends displayed? 236
    2.  How are distributions displayed? 236
D.  Is an Appropriate Measure Used for the Center of a Distribution? 238
E.  Is an Appropriate Measure of Variability Used? 239
IV.  What Inferences Can Be Drawn from the Data? 240
    A.  Estimation, 242
        1.  What estimator should be used? 242
        2.  What is the standard error? The confidence interval? 243
        3.  How big should the sample be? 246
        4.  What are the technical difficulties? 247
    B.  Significance Levels and Hypothesis Tests, 249
        1.  What is the *p*-value? 249
        2.  Is a difference statistically significant? 251
        3.  Tests or interval estimates? 252
        4.  Is the sample statistically significant? 253
    C.  Evaluating Hypothesis Tests, 253
        1.  What is the power of the test? 253
        2.  What about small samples? 254
        3.  One tail or two? 255
        4.  How many tests have been done? 256
        5.  What are the rival hypotheses? 257
    D.  Posterior Probabilities, 258
V.  Correlation and Regression, 260
    A.  Scatter Diagrams, 260
    B.  Correlation Coefficients, 261
        1.  Is the association linear? 262
        2.  Do outliers influence the correlation coefficient? 262
        3.  Does a confounding variable influence the coefficient? 262
    C.  Regression Lines, 264
        1.  What are the slope and intercept? 265
        2.  What is the unit of analysis? 266
    D.  Statistical Models, 268
Appendix, 273
    A.  Frequentists and Bayesians, 273
    B. The Spock Jury: Technical Details, 275
    C.  The Nixon Papers: Technical Details, 278
    D.  A Social Science Example of Regression: Gender Discrimination in
        Salaries, 279
        1.  The regression model, 279
        2.  Standard errors, *t*-statistics, and statistical significance, 281
Glossary of Terms, 283
References on Statistics, 302

**EXHIBIT C**

*Reference Guide on Statistics*

# I. Introduction

Statistical assessments are prominent in many kinds of legal cases, including antitrust, employment discrimination, toxic torts, and voting rights cases.[1] This reference guide describes the elements of statistical reasoning. We hope the explanations will help judges and lawyers to understand statistical terminology, to see the strengths and weaknesses of statistical arguments, and to apply relevant legal doctrine. The guide is organized as follows:

- Section I provides an overview of the field, discusses the admissibility of statistical studies, and offers some suggestions about procedures that encourage the best use of statistical evidence.
- Section II addresses data collection and explains why the design of a study is the most important determinant of its quality. This section compares experiments with observational studies and surveys with censuses, indicating when the various kinds of study are likely to provide useful results.
- Section III discusses the art of summarizing data. This section considers the mean, median, and standard deviation. These are basic descriptive statistics, and most statistical analyses use them as building blocks. This section also discusses patterns in data that are brought out by graphs, percentages, and tables.
- Section IV describes the logic of statistical inference, emphasizing foundations and disclosing limitations. This section covers estimation, standard errors and confidence intervals, $p$-values, and hypothesis tests.
- Section V shows how associations can be described by scatter diagrams, correlation coefficients, and regression lines. Regression is often used to infer causation from association. This section explains the technique, indicating the circumstances under which it and other statistical models are likely to succeed—or fail.
- An appendix provides some technical details.
- The glossary defines statistical terms that may be encountered in litigation.

---

1. *See generally* Statistical Science in the Courtroom (Joseph L. Gastwirth ed., 2000); Statistics and the Law (Morris H. DeGroot et al. eds., 1986); National Research Council, The Evolving Role of Statistical Assessments as Evidence in the Courts (Stephen E. Fienberg ed., 1989) [hereinafter The Evolving Role of Statistical Assessments as Evidence in the Courts]; Michael O. Finkelstein & Bruce Levin, Statistics for Lawyers (2d ed. 2001); 1 & 2 Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy (1988); Hans Zeisel & David Kaye, Prove It with Figures: Empirical Methods in Law and Litigation (1997).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## A. Admissibility and Weight of Statistical Studies

Statistical studies suitably designed to address a material issue generally will be admissible under the Federal Rules of Evidence. The hearsay rule rarely is a serious barrier to the presentation of statistical studies, because such studies may be offered to explain the basis for an expert's opinion or may be admissible under the learned treatise exception to the hearsay rule.[2] Because most statistical methods relied on in court are described in textbooks or journal articles and are capable of producing useful results when properly applied, these methods generally satisfy important aspects of the "scientific knowledge" requirement in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[3] Of course, a particular study may use a method that is entirely appropriate but that is so poorly executed that it should be inadmissible under Federal Rules of Evidence 403 and 702.[4] Or, the method may be inappropriate for the problem at hand and thus lack the "fit" spoken of in *Daubert*.[5] Or the study might rest on data of the type not reasonably relied on by statisticians or substantive experts and hence run afoul of Federal Rule of Evidence 703. Often, however, the battle over statistical evidence concerns weight or sufficiency rather than admissibility.

## B. Varieties and Limits of Statistical Expertise

For convenience, the field of statistics may be divided into three subfields: probability theory, theoretical statistics, and applied statistics. Probability theory is the mathematical study of outcomes that are governed, at least in part, by chance. Theoretical statistics is about the properties of statistical procedures, including error rates; probability theory plays a key role in this endeavor. Applied statistics draws on both of these fields to develop techniques for collecting or analyzing particular types of data.

2. *See generally* 2 McCormick on Evidence §§ 321, 324.3 (Kenneth S. Broun ed., 6th ed. 2006). Studies published by government agencies also may be admissible as public records. *Id*. § 296.

3. 509 U.S. 579, 589–90 (1993).

4. *See* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (suggesting that the trial court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 562–63 (S.D.N.Y. 2007) ("While errors in a survey's methodology usually go to the weight accorded to the conclusions rather than its admissibility, . . . 'there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact.'") (quoting AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 618 (7th Cir.1993)).

5. *Daubert*, 509 U.S. at 591; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248 (4th Cir. 2005) (motion to exclude statistical analysis that compared black and white employees without adequately taking into account differences in their job titles or positions was properly granted under *Daubert*); *Malletier*, 525 F. Supp. 2d at 569 (excluding a consumer survey for "a lack of fit between the survey's questions and the law of dilution" and errors in the execution of the survey).

214

EXHIBIT C

Statistical expertise is not confined to those with degrees in statistics. Because statistical reasoning underlies many kinds of empirical research, scholars in a variety of fields—including biology, economics, epidemiology, political science, and psychology—are exposed to statistical ideas, with an emphasis on the methods most important to the discipline.

Experts who specialize in using statistical methods, and whose professional careers demonstrate this orientation, are most likely to use appropriate procedures and correctly interpret the results. By contrast, forensic scientists often lack basic information about the studies underlying their testimony. *State v. Garrison*[6] illustrates the problem. In this murder prosecution involving bite mark evidence, a dentist was allowed to testify that "the probability factor of two sets of teeth being identical in a case similar to this is, approximately, eight in one million," even though "he was unaware of the formula utilized to arrive at that figure other than that it was 'computerized.'"[7]

At the same time, the choice of which data to examine, or how best to model a particular process, could require subject matter expertise that a statistician lacks. As a result, cases involving statistical evidence frequently are (or should be) "two expert" cases of interlocking testimony. A labor economist, for example, may supply a definition of the relevant labor market from which an employer draws its employees; the statistical expert may then compare the race of new hires to the racial composition of the labor market. Naturally, the value of the statistical analysis depends on the substantive knowledge that informs it.[8]

## C. Procedures That Enhance Statistical Testimony

### 1. Maintaining professional autonomy

Ideally, experts who conduct research in the context of litigation should proceed with the same objectivity that would be required in other contexts. Thus, experts who testify (or who supply results used in testimony) should conduct the analysis required to address in a professionally responsible fashion the issues posed by the litigation.[9] Questions about the freedom of inquiry accorded to testifying experts,

6. 585 P.2d 563 (Ariz. 1978).

7. *Id*. at 566, 568. For other examples, see David H. Kaye et al., The New Wigmore: A Treatise on Evidence: Expert Evidence § 12.2 (2d ed. 2011).

8. In *Vuyanich v. Republic National Bank*, 505 F. Supp. 224, 319 (N.D. Tex. 1980), *vacated*, 723 F.2d 1195 (5th Cir. 1984), defendant's statistical expert criticized the plaintiffs' statistical model for an implicit, but restrictive, assumption about male and female salaries. The district court trying the case accepted the model because the plaintiffs' expert had a "very strong guess" about the assumption, and her expertise included labor economics as well as statistics. *Id*. It is doubtful, however, that economic knowledge sheds much light on the assumption, and it would have been simple to perform a less restrictive analysis.

9. *See* The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, at 164 (recommending that the expert be free to consult with colleagues who have not been retained

EXHIBIT C

as well as the scope and depth of their investigations, may reveal some of the limitations to the testimony.

## 2. Disclosing other analyses

Statisticians analyze data using a variety of methods. There is much to be said for looking at the data in several ways. To permit a fair evaluation of the analysis that is eventually settled on, however, the testifying expert can be asked to explain how that approach was developed. According to some commentators, counsel who know of analyses that do not support the client's position should reveal them, rather than presenting only favorable results.[10]

## 3. Disclosing data and analytical methods before trial

The collection of data often is expensive and subject to errors and omissions. Moreover, careful exploration of the data can be time-consuming. To minimize debates at trial over the accuracy of data and the choice of analytical techniques, pretrial discovery procedures should be used, particularly with respect to the quality of the data and the method of analysis.[11]

# II. How Have the Data Been Collected?

The interpretation of data often depends on understanding "study design"—the plan for a statistical study and its implementation.[12] Different designs are suited to answering different questions. Also, flaws in the data can undermine any statistical analysis, and data quality is often determined by study design.

In many cases, statistical studies are used to show causation. Do food additives cause cancer? Does capital punishment deter crime? Would additional disclosures

by any party to the litigation and that the expert receive a letter of engagement providing for these and other safeguards).

10. *Id*. at 167; *cf*. William W. Schwarzer, *In Defense of "Automatic Disclosure in Discovery,"* 27 Ga. L. Rev. 655, 658–59 (1993) ("[T]he lawyer owes a duty to the court to make disclosure of core information."). The National Research Council also recommends that "if a party gives statistical data to different experts for competing analyses, that fact be disclosed to the testifying expert, if any." The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, at 167.

11. *See* The Special Comm. on Empirical Data in Legal Decision Making, Recommendations on Pretrial Proceedings in Cases with Voluminous Data, *reprinted in* The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, app. F; *see also* David H. Kaye, *Improving Legal Statistics*, 24 Law & Soc'y Rev. 1255 (1990).

12. For introductory treatments of data collection, see, for example, David Freedman et al., Statistics (4th ed. 2007); Darrell Huff, How to Lie with Statistics (1993); David S. Moore & William I. Notz, Statistics: Concepts and Controversies (6th ed. 2005); Hans Zeisel, Say It with Figures (6th ed. 1985); Zeisel & Kaye, *supra* note 1.

EXHIBIT C

*Reference Guide on Statistics*

in a securities prospectus cause investors to behave differently? The design of studies to investigate causation is the first topic of this section.[13]

Sample data can be used to describe a population. The population is the whole class of units that are of interest; the sample is the set of units chosen for detailed study. Inferences from the part to the whole are justified when the sample is representative. Sampling is the second topic of this section.

Finally, the accuracy of the data will be considered. Because making and recording measurements is an error-prone activity, error rates should be assessed and the likely impact of errors considered. Data quality is the third topic of this section.

## A. Is the Study Designed to Investigate Causation?

### 1. Types of studies

When causation is the issue, anecdotal evidence can be brought to bear. So can observational studies or controlled experiments. Anecdotal reports may be of value, but they are ordinarily more helpful in generating lines of inquiry than in proving causation.[14] Observational studies can establish that one factor is associ-

---

13. *See also* Michael D. Green et al., Reference Guide on Epidemiology, Section V, in this manual; Joseph Rodricks, Reference Guide on Exposure Science, Section E, in this manual.

14. In medicine, evidence from clinical practice can be the starting point for discovery of cause-and-effect relationships. For examples, see David A. Freedman, *On Types of Scientific Enquiry, in* The Oxford Handbook of Political Methodology 300 (Janet M. Box-Steffensmeier et al. eds., 2008). Anecdotal evidence is rarely definitive, and some courts have suggested that attempts to infer causation from anecdotal reports are inadmissible as unsound methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See, e.g.*, McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1244 (11th Cir. 2005) ("simply because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy."); *In re* Baycol Prods. Litig., 532 F. Supp. 2d 1029, 1039–40 (D. Minn. 2007) (excluding a meta-analysis based on reports to the Food and Drug Administration of adverse events); Leblanc v. Chevron USA Inc., 513 F. Supp. 2d 641, 650 (E.D. La. 2007) (excluding plaintiffs' experts' opinions that benzene causes myelofibrosis because the causal hypothesis "that has been generated by case reports . . . has not been confirmed by the vast majority of epidemiologic studies of workers being exposed to benzene and more generally, petroleum products."), *vacated*, 275 Fed. App'x. 319 (5th Cir. 2008) (remanding for consideration of newer government report on health effects of benzene); *cf.* Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011) (concluding that adverse event reports combined with other information could be of concern to a reasonable investor and therefore subject to a requirement of disclosure under SEC Rule 10b-5, but stating that "the mere existence of reports of adverse events . . . says nothing in and of itself about whether the drug is causing the adverse events"). Other courts are more open to "differential diagnoses" based primarily on timing. *E.g.*, Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171 (6th Cir. 2009) (reversing the exclusion of a physician's opinion that exposure to propenyl chloride caused a man to lose his sense of smell because of the timing in this one case and the physician's inability to attribute the change to anything else); Kaye et al., *supra* note 7, §§ 8.7.2 & 12.5.1. *See also Matrixx Initiatives*, *supra*, at 1322 (listing "a temporal relationship" in a single patient as one indication of "a reliable causal link").

217

EXHIBIT C

*Reference Manual on Scientific Evidence*

ated with another, but work is needed to bridge the gap between association and causation. Randomized controlled experiments are ideally suited for demonstrating causation.

Anecdotal evidence usually amounts to reports that events of one kind are followed by events of another kind. Typically, the reports are not even sufficient to show association, because there is no comparison group. For example, some children who live near power lines develop leukemia. Does exposure to electrical and magnetic fields cause this disease? The anecdotal evidence is not compelling because leukemia also occurs among children without exposure.[15] It is necessary to compare disease rates among those who are exposed and those who are not. If exposure causes the disease, the rate should be higher among the exposed and lower among the unexposed. That would be association.

The next issue is crucial: Exposed and unexposed people may differ in ways other than the exposure they have experienced. For example, children who live near power lines could come from poorer families and be more at risk from other environmental hazards. Such differences can create the appearance of a cause-and-effect relationship. Other differences can mask a real relationship. Cause-and-effect relationships often are quite subtle, and carefully designed studies are needed to draw valid conclusions.

An epidemiological classic makes the point. At one time, it was thought that lung cancer was caused by fumes from tarring the roads, because many lung cancer patients lived near roads that recently had been tarred. This is anecdotal evidence. But the argument is incomplete. For one thing, most people—whether exposed to asphalt fumes or unexposed—did not develop lung cancer. A comparison of rates was needed. The epidemiologists found that exposed persons and unexposed persons suffered from lung cancer at similar rates: Tar was probably not the causal agent. Exposure to cigarette smoke, however, turned out to be strongly associated with lung cancer. This study, in combination with later ones, made a compelling case that smoking cigarettes is the main cause of lung cancer.[16]

A good study design compares outcomes for subjects who are exposed to some factor (the treatment group) with outcomes for other subjects who are

---

15.  *See* National Research Council, Committee on the Possible Effects of Electromagnetic Fields on Biologic Systems (1997); Zeisel & Kaye, *supra* note 1, at 66–67. There are problems in measuring exposure to electromagnetic fields, and results are inconsistent from one study to another. For such reasons, the epidemiological evidence for an effect on health is inconclusive. National Research Council, *supra*; Zeisel & Kaye, *supra*; Edward W. Campion, *Power Lines, Cancer, and Fear*, 337 New Eng. J. Med. 44 (1997) (editorial); Martha S. Linet et al., *Residential Exposure to Magnetic Fields and Acute Lymphoblastic Leukemia in Children*, 337 New Eng. J. Med. 1 (1997); Gary Taubes, *Magnetic Field-Cancer Link: Will It Rest in Peace?*, 277 Science 29 (1997) (quoting various epidemiologists).

16.  Richard Doll & A. Bradford Hill, *A Study of the Aetiology of Carcinoma of the Lung*, 2 Brit. Med. J. 1271 (1952). This was a matched case-control study. Cohort studies soon followed. *See* Green et al., *supra* note 13. For a review of the evidence on causation, see 38 International Agency for Research on Cancer (IARC), World Health Org., IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans: Tobacco Smoking (1986).

EXHIBIT C

*Reference Guide on Statistics*

not exposed (the control group). Now there is another important distinction to be made—that between controlled experiments and observational studies. In a controlled experiment, the investigators decide which subjects will be exposed and which subjects will go into the control group. In observational studies, by contrast, the subjects themselves choose their exposures. Because of self-selection, the treatment and control groups are likely to differ with respect to influential factors other than the one of primary interest. (These other factors are called lurking variables or confounding variables.)[17] With the health effects of power lines, family background is a possible confounder; so is exposure to other hazards. Many confounders have been proposed to explain the association between smoking and lung cancer, but careful epidemiological studies have ruled them out, one after the other.

Confounding remains a problem to reckon with, even for the best observational research. For example, women with herpes are more likely to develop cervical cancer than other women. Some investigators concluded that herpes caused cancer: In other words, they thought the association was causal. Later research showed that the primary cause of cervical cancer was human papilloma virus (HPV). Herpes was a marker of sexual activity. Women who had multiple sexual partners were more likely to be exposed not only to herpes but also to HPV. The association between herpes and cervical cancer was due to other variables.[18]

What are "variables?" In statistics, a variable is a characteristic of units in a study. With a study of people, the unit of analysis is the person. Typical variables include income (dollars per year) and educational level (years of schooling completed): These variables describe people. With a study of school districts, the unit of analysis is the district. Typical variables include average family income of district residents and average test scores of students in the district: These variables describe school districts.

When investigating a cause-and-effect relationship, the variable that represents the effect is called the dependent variable, because it depends on the causes. The variables that represent the causes are called independent variables. With a study of smoking and lung cancer, the independent variable would be smoking (e.g., number of cigarettes per day), and the dependent variable would mark the presence or absence of lung cancer. Dependent variables also are called outcome variables or response variables. Synonyms for independent variables are risk factors, predictors, and explanatory variables.

17. For example, a confounding variable may be correlated with the independent variable and act causally on the dependent variable. If the units being studied differ on the independent variable, they are also likely to differ on the confounder. The confounder—not the independent variable—could therefore be responsible for differences seen on the dependent variable.

18. For additional examples and further discussion, see Freedman et al., *supra* note 12, at 12–28, 150–52; David A. Freedman, *From Association to Causation: Some Remarks on the History of Statistics,* 14 Stat. Sci. 243 (1999). Some studies find that herpes is a "cofactor," which increases risk among women who are also exposed to HPV. Only certain strains of HPV are carcinogenic.

**EXHIBIT C**

## 2. Randomized controlled experiments

In randomized controlled experiments, investigators assign subjects to treatment or control groups at random. The groups are therefore likely to be comparable, except for the treatment. This minimizes the role of confounding. Minor imbalances will remain, due to the play of random chance; the likely effect on study results can be assessed by statistical techniques.[19] The bottom line is that causal inferences based on well-executed randomized experiments are generally more secure than inferences based on well-executed observational studies.

The following example should help bring the discussion together. Today, we know that taking aspirin helps prevent heart attacks. But initially, there was some controversy. People who take aspirin rarely have heart attacks. This is anecdotal evidence for a protective effect, but it proves almost nothing. After all, few people have frequent heart attacks, whether or not they take aspirin regularly. A good study compares heart attack rates for two groups: people who take aspirin (the treatment group) and people who do not (the controls). An observational study would be easy to do, but in such a study the aspirin-takers are likely to be different from the controls. Indeed, they are likely to be sicker—that is why they are taking aspirin. The study would be biased against finding a protective effect. Randomized experiments are harder to do, but they provide better evidence. It is the experiments that demonstrate a protective effect.[20]

In summary, data from a treatment group without a control group generally reveal very little and can be misleading. Comparisons are essential. If subjects are assigned to treatment and control groups at random, a difference in the outcomes between the two groups can usually be accepted, within the limits of statistical error (*infra* Section IV), as a good measure of the treatment effect. However, if the groups are created in any other way, differences that existed before treatment may contribute to differences in the outcomes or mask differences that otherwise would become manifest. Observational studies succeed to the extent that the treatment and control groups are comparable—apart from the treatment.

## 3. Observational studies

The bulk of the statistical studies seen in court are observational, not experimental. Take the question of whether capital punishment deters murder. To conduct a randomized controlled experiment, people would need to be assigned randomly to a treatment group or a control group. People in the treatment group would know they were subject to the death penalty for murder; the

---

19. Randomization of subjects to treatment or control groups puts statistical tests of significance on a secure footing. Freedman et al., *supra* note 12, at 503–22, 545–63; *see infra* Section IV.

20. In other instances, experiments have banished strongly held beliefs. *E.g.*, Scott M. Lippman et al., Effect of Selenium and Vitamin E on Risk of Prostate Cancer and Other Cancers: The Selenium and Vitamin E Cancer Prevention Trial (SELECT), 301 JAMA 39 (2009).

**EXHIBIT C**

*Reference Guide on Statistics*

controls would know that they were exempt. Conducting such an experiment is not possible.

Many studies of the deterrent effect of the death penalty have been conducted, all observational, and some have attracted judicial attention. Researchers have catalogued differences in the incidence of murder in states with and without the death penalty and have analyzed changes in homicide rates and execution rates over the years. When reporting on such observational studies, investigators may speak of "control groups" (e.g., the states without capital punishment) or claim they are "controlling for" confounding variables by statistical methods.[21] However, association is not causation. The causal inferences that can be drawn from analysis of observational data—no matter how complex the statistical technique—usually rest on a foundation that is less secure than that provided by randomized controlled experiments.

That said, observational studies can be very useful. For example, there is strong observational evidence that smoking causes lung cancer (*supra* Section II.A.1). Generally, observational studies provide good evidence in the following circumstances:

- The association is seen in studies with different designs, on different kinds of subjects, and done by different research groups.[22] That reduces the chance that the association is due to a defect in one type of study, a peculiarity in one group of subjects, or the idiosyncrasies of one research group.
- The association holds when effects of confounding variables are taken into account by appropriate methods, for example, comparing smaller groups that are relatively homogeneous with respect to the confounders.[23]
- There is a plausible explanation for the effect of the independent variable; alternative explanations in terms of confounding should be less plausible than the proposed causal link.[24]

---

21. A procedure often used to control for confounding in observational studies is regression analysis. The underlying logic is described *infra* Section V.D and in Daniel L. Rubinfeld, Reference Guide on Multiple Regression, Section II, in this manual. *But see* Richard A. Berk, Regression Analysis: A Constructive Critique (2004); Rethinking Social Inquiry: Diverse Tools, Shared Standards (Henry E. Brady & David Collier eds., 2004); David A. Freedman, Statistical Models: Theory and Practice (2005); David A. Freedman, *Oasis or Mirage,* Chance, Spring 2008, at 59.

22. For example, case-control studies are designed one way and cohort studies another, with many variations. *See, e.g.,* Leon Gordis, Epidemiology (4th ed. 2008); *supra* note 16.

23. The idea is to control for the influence of a confounder by stratification—making comparisons separately within groups for which the confounding variable is nearly constant and therefore has little influence over the variables of primary interest. For example, smokers are more likely to get lung cancer than nonsmokers. Age, gender, social class, and region of residence are all confounders, but controlling for such variables does not materially change the relationship between smoking and cancer rates. Furthermore, many different studies—of different types and on different populations—confirm the causal link. That is why most experts believe that smoking causes lung cancer and many other diseases. For a review of the literature, see International Agency for Research on Cancer, *supra* note 16.

24. A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965); Alfred S. Evans, Causation and Disease: A Chronological Journey 187 (1993). Plausibility, however, is a function of time and circumstances.

221

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Thus, evidence for the causal link does not depend on observed associations alone.

Observational studies can produce legitimate disagreement among experts, and there is no mechanical procedure for resolving such differences of opinion. In the end, deciding whether associations are causal typically is not a matter of statistics alone, but also rests on scientific judgment. There are, however, some basic questions to ask when appraising causal inferences based on empirical studies:

- Was there a control group? Unless comparisons can be made, the study has little to say about causation.
- If there was a control group, how were subjects assigned to treatment or control: through a process under the control of the investigator (a controlled experiment) or through a process outside the control of the investigator (an observational study)?
- If the study was a controlled experiment, was the assignment made using a chance mechanism (randomization), or did it depend on the judgment of the investigator?

If the data came from an observational study or a nonrandomized controlled experiment,

- How did the subjects come to be in treatment or in control groups?
- Are the treatment and control groups comparable?
- If not, what adjustments were made to address confounding?
- Were the adjustments sensible and sufficient?[25]

## *4. Can the results be generalized?*

*Internal validity* is about the specifics of a particular study: Threats to internal validity include confounding and chance differences between treatment and control groups. *External validity* is about using a particular study or set of studies to reach more general conclusions. A careful randomized controlled experiment on a large but unrepresentative group of subjects will have high internal validity but low external validity.

Any study must be conducted on certain subjects, at certain times and places, and using certain treatments. To extrapolate from the conditions of a study to more general conditions raises questions of external validity. For example, studies suggest that definitions of insanity given to jurors influence decisions in cases of incest. Would the definitions have a similar effect in cases of murder? Other studies indicate that recidivism rates for ex-convicts are not affected by provid-

---

25. Many courts have noted the importance of confounding variables. *E.g.*, People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 537–38 (7th Cir. 1997) (educational achievement); Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193, 1213 (10th Cir. 2002) (stroke); *In re* Proportionality Review Project (II), 757 A.2d 168 (N.J. 2000) (capital sentences).

EXHIBIT C

ing them with temporary financial support after release. Would similar results be obtained if conditions in the labor market were different?

Confidence in the appropriateness of an extrapolation cannot come from the experiment itself. It comes from knowledge about outside factors that would or would not affect the outcome.[26] Sometimes, several studies, each having different limitations, all point in the same direction. This is the case, for example, with studies indicating that jurors who approve of the death penalty are more likely to convict in a capital case.[27] Convergent results support the validity of generalizations.

## B. Descriptive Surveys and Censuses

We now turn to a second topic—choosing units for study. A census tries to measure some characteristic of every unit in a population. This is often impractical. Then investigators use sample surveys, which measure characteristics for only part of a population. The accuracy of the information collected in a census or survey depends on how the units are selected for study and how the measurements are made.[28]

### 1. What method is used to select the units?

By definition, a census seeks to measure some characteristic of every unit in a whole population. It may fall short of this goal, in which case one must ask

26. Such judgments are easiest in the physical and life sciences, but even here, there are problems. For example, it may be difficult to infer human responses to substances that affect animals. First, there are often inconsistencies across test species: A chemical may be carcinogenic in mice but not in rats. Extrapolation from rodents to humans is even more problematic. Second, to get measurable effects in animal experiments, chemicals are administered at very high doses. Results are extrapolated—using mathematical models—to the very low doses of concern in humans. However, there are many dose–response models to use and few grounds for choosing among them. Generally, different models produce radically different estimates of the "virtually safe dose" in humans. David A. Freedman & Hans Zeisel, *From Mouse to Man: The Quantitative Assessment of Cancer Risks,* 3 Stat. Sci. 3 (1988). For these reasons, many experts—and some courts in toxic tort cases—have concluded that evidence from animal experiments is generally insufficient by itself to establish causation. *See, e.g.,* Bruce N. Ames et al., *The Causes and Prevention of Cancer*, 92 Proc. Nat'l Acad. Sci. USA 5258 (1995); National Research Council, Science and Judgment in Risk Assessment 59 (1994) ("There are reasons based on both biologic principles and empirical observations to support the hypothesis that many forms of biologic responses, including toxic responses, can be extrapolated across mammalian species, including *Homo sapiens*, but the scientific basis of such extrapolation is not established with sufficient rigor to allow broad and definitive generalizations to be made.").

27. Phoebe C. Ellsworth, *Some Steps Between Attitudes and Verdicts*, *in* Inside the Juror 42, 46 (Reid Hastie ed., 1993). Nonetheless, in *Lockhart v. McCree*, 476 U.S. 162 (1986), the Supreme Court held that the exclusion of opponents of the death penalty in the guilt phase of a capital trial does not violate the constitutional requirement of an impartial jury.

28. *See* Shari Seidman Diamond, Reference Guide on Survey Research, Sections III, IV, in this manual.

EXHIBIT C

*Reference Manual on Scientific Evidence*

whether the missing data are likely to differ in some systematic way from the data that are collected.[29] The methodological framework of a scientific survey is different. With probability methods, a sampling frame (i.e., an explicit list of units in the population) must be created. Individual units then are selected by an objective, well-defined chance procedure, and measurements are made on the sampled units.

To illustrate the idea of a sampling frame, suppose that a defendant in a criminal case seeks a change of venue: According to him, popular opinion is so adverse that it would be difficult to impanel an unbiased jury. To prove the state of popular opinion, the defendant commissions a survey. The relevant population consists of all persons in the jurisdiction who might be called for jury duty. The sampling frame is the list of all potential jurors, which is maintained by court officials and is made available to the defendant. In this hypothetical case, the fit between the sampling frame and the population would be excellent.

In other situations, the sampling frame is more problematic. In an obscenity case, for example, the defendant can offer a survey of community standards.[30] The population comprises all adults in the legally relevant district, but obtaining a full list of such people may not be possible. Suppose the survey is done by telephone, but cell phones are excluded from the sampling frame. (This is usual practice.) Suppose too that cell phone users, as a group, hold different opinions from landline users. In this second hypothetical, the poll is unlikely to reflect the opinions of the cell phone users, no matter how many individuals are sampled and no matter how carefully the interviewing is done.

Many surveys do not use probability methods. In commercial disputes involving trademarks or advertising, the population of all potential purchasers of a product is hard to identify. Pollsters may resort to an easily accessible subgroup of the population, for example, shoppers in a mall.[31] Such convenience samples may be biased by the interviewer's discretion in deciding whom to approach—a form of

---

29. The U.S. Decennial Census generally does not count everyone that it should, and it counts some people who should not be counted. There is evidence that net undercount is greater in some demographic groups than others. Supplemental studies may enable statisticians to adjust for errors and omissions, but the adjustments rest on uncertain assumptions. *See* Lawrence D. Brown et al., *Statistical Controversies in Census 2000*, 39 Jurimetrics J. 347 (2007); David A. Freedman & Kenneth W. Wachter, *Methods for Census 2000 and Statistical Adjustments, in* Social Science Methodology 232 (Steven Turner & William Outhwaite eds., 2007) (reviewing technical issues and litigation surrounding census adjustment in 1990 and 2000); 9 Stat. Sci. 458 (1994) (symposium presenting arguments for and against adjusting the 1990 census).

30. On the admissibility of such polls, see *State v. Midwest Pride IV, Inc.,* 721 N.E.2d 458 (Ohio Ct. App. 1998) (holding one such poll to have been properly excluded and collecting cases from other jurisdictions).

31. *E.g.*, Smith v. Wal-Mart Stores, Inc., 537 F. Supp. 2d 1302, 1333 (N.D. Ga. 2008) (treating a small mall-intercept survey as entitled to much less weight than a survey based on a probability sample); R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc., 511 F. Supp. 867, 876 (S.D.N.Y. 1980) (questioning the propriety of basing a "nationally projectable statistical percentage" on a suburban mall intercept study).

EXHIBIT C

*Reference Guide on Statistics*

selection bias—and the refusal of some of those approached to participate—non-response bias (*infra* Section II.B.2). Selection bias is acute when constituents write their representatives, listeners call into radio talk shows, interest groups collect information from their members, or attorneys choose cases for trial.[32]

There are procedures that attempt to correct for selection bias. In quota sampling, for example, the interviewer is instructed to interview so many women, so many older people, so many ethnic minorities, and the like. But quotas still leave discretion to the interviewers in selecting members of each demographic group and therefore do not solve the problem of selection bias.[33]

Probability methods are designed to avoid selection bias. Once the population is reduced to a sampling frame, the units to be measured are selected by a lottery that gives each unit in the sampling frame a known, nonzero probability of being chosen. Random numbers leave no room for selection bias.[34] Such procedures are used to select individuals for jury duty. They also have been used to choose "bellwether" cases for representative trials to resolve issues in a large group of similar cases.[35]

---

32. *E.g.*, Pittsburgh Press Club v. United States, 579 F.2d 751, 759 (3d Cir. 1978) (tax-exempt club's mail survey of its members to show little sponsorship of income-producing uses of facilities was held to be inadmissible hearsay because it "was neither objective, scientific, nor impartial"), *rev'd on other grounds*, 615 F.2d 600 (3d Cir. 1980). *Cf. In re* Chevron U.S.A., Inc., 109 F.3d 1016 (5th Cir. 1997). In that case, the district court decided to try 30 cases to resolve common issues or to ascertain damages in 3000 claims arising from Chevron's allegedly improper disposal of hazardous substances. The court asked the opposing parties to select 15 cases each. Selecting 30 extreme cases, however, is quite different from drawing a random sample of 30 cases. Thus, the court of appeals wrote that although random sampling would have been acceptable, the trial court could not use the results in the 30 extreme cases to resolve issues of fact or ascertain damages in the untried cases. *Id.* at 1020. Those cases, it warned, were "not cases calculated to represent the group of 3000 claimants." *Id. See infra* note 35.

A well-known example of selection bias is the 1936 *Literary Digest* poll. After successfully predicting the winner of every U.S. presidential election since 1916, the *Digest* used the replies from 2.4 million respondents to predict that Alf Landon would win the popular vote, 57% to 43%. In fact, Franklin Roosevelt won by a landslide vote of 62% to 38%. *See* Freedman et al., *supra* note 12, at 334–35. The *Digest* was so far off, in part, because it chose names from telephone books, rosters of clubs and associations, city directories, lists of registered voters, and mail order listings. *Id.* at 335, A-20 n.6. In 1936, when only one household in four had a telephone, the people whose names appeared on such lists tended to be more affluent. Lists that overrepresented the affluent had worked well in earlier elections, when rich and poor voted along similar lines, but the bias in the sampling frame proved fatal when the Great Depression made economics a salient consideration for voters.

33. *See* Freedman et al., *supra* note 12, at 337–39.

34. In simple random sampling, units are drawn at random without replacement. In particular, each unit has the same probability of being chosen for the sample. *Id.* at 339–41. More complicated methods, such as stratified sampling and cluster sampling, have advantages in certain applications. In systematic sampling, every fifth, tenth, or hundredth (in mathematical jargon, every *n*th) unit in the sampling frame is selected. If the units are not in any special order, then systematic sampling is often comparable to simple random sampling.

35. *E.g.*, *In re* Simon II Litig., 211 F.R.D. 86 (E.D.N.Y. 2002), *vacated*, 407 F.3d 125 (2d Cir. 2005), *dismissed*, 233 F.R.D. 123 (E.D.N.Y. 2006); *In re* Estate of Marcus Human Rights Litig., 910

225

EXHIBIT C

*Reference Manual on Scientific Evidence*

## *2. Of the units selected, which are measured?*

Probability sampling ensures that within the limits of chance (*infra* Section IV), the sample will be representative of the sampling frame. The question remains regarding which units actually get measured. When documents are sampled for audit, all the selected ones can be examined, at least in principle. Human beings are less easily managed, and some will refuse to cooperate. Surveys should therefore report nonresponse rates. A large nonresponse rate warns of bias, although supplemental studies may establish that nonrespondents are similar to respondents with respect to characteristics of interest.[36]

In short, a good survey defines an appropriate population, uses a probability method for selecting the sample, has a high response rate, and gathers accurate information on the sample units. When these goals are met, the sample tends to be representative of the population. Data from the sample can be extrapolated

F. Supp. 1460 (D. Haw. 1995), *aff'd sub nom*. Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996); Cimino v. Raymark Indus., Inc., 751 F. Supp. 649 (E.D. Tex. 1990), *rev'd*, 151 F.3d 297 (5th Cir. 1998); *cf. In re* Chevron U.S.A., Inc., 109 F.3d 1016 (5th Cir. 1997) (discussed *supra* note 32). Although trials in a suitable random sample of cases can produce reasonable estimates of average damages, the propriety of precluding individual trials raises questions of due process and the right to trial by jury. *See* Thomas E. Willging, Mass Torts Problems and Proposals: A Report to the Mass Torts Working Group (Fed. Judicial Ctr. 1999); cf. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2560–61 (2011). The cases and the views of commentators are described more fully in David H. Kaye & David A. Freedman, *Statistical Proof*, *in* 1 Modern Scientific Evidence: The Law and Science of Expert Testimony § 6:16 (David L. Faigman et al. eds., 2009–2010).

36. For discussions of nonresponse rates and admissibility of surveys conducted for litigation, see *Johnson v. Big Lots Stores, Inc.,* 561 F. Supp. 2d 567 (E.D. La. 2008) (fair labor standards); *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 437 (D. Del. 2003), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005) (antitrust).

The 1936 *Literary Digest* election poll (*supra* note 32) illustrates the dangers in nonresponse. Only 24% of the 10 million people who received questionnaires returned them. Most of the respondents probably had strong views on the candidates and objected to President Roosevelt's economic program. This self-selection is likely to have biased the poll. Maurice C. Bryson, *The* Literary Digest *Poll: Making of a Statistical Myth*, 30 Am. Statistician 184 (1976); Freedman et al., *supra* note 12, at 335–36. Even when demographic characteristics of the sample match those of the population, caution is indicated. *See* David Streitfeld, *Shere Hite and the Trouble with Numbers*, 1 Chance 26 (1988); Chamont Wang, Sense and Nonsense of Statistical Inference: Controversy, Misuse, and Subtlety 174–76 (1993).

In *United States v. Gometz*, 730 F.2d 475, 478 (7th Cir. 1984) (en banc), the Seventh Circuit recognized that "a low rate of response to juror questionnaires could lead to the underrepresentation of a group that is entitled to be represented on the qualified jury wheel." Nonetheless, the court held that under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1878 (1988), the clerk did not abuse his discretion by failing to take steps to increase a response rate of 30%. According to the court, "Congress wanted to make it possible for all qualified persons to serve on juries, which is different from forcing all qualified persons to be available for jury service." *Gometz*, 730 F.2d at 480. Although it might "be a good thing to follow up on persons who do not respond to a jury questionnaire," the court concluded that Congress "was not concerned with anything so esoteric as nonresponse bias." *Id.* at 479, 482; *cf. In re* United States, 426 F.3d 1 (1st Cir. 2005) (reaching the same result with respect to underrepresentation of African Americans resulting in part from nonresponse bias).

226

EXHIBIT C

*Reference Guide on Statistics*

to describe the characteristics of the population. Of course, surveys may be useful even if they fail to meet these criteria. But then, additional arguments are needed to justify the inferences.

## C. Individual Measurements

### 1. Is the measurement process reliable?

Reliability and validity are two aspects of accuracy in measurement. In statistics, reliability refers to reproducibility of results.[37] A reliable measuring instrument returns consistent measurements. A scale, for example, is perfectly reliable if it reports the same weight for the same object time and again. It may not be accurate—it may always report a weight that is too high or one that is too low— but the perfectly reliable scale always reports the same weight for the same object. Its errors, if any, are systematic: They always point in the same direction.

Reliability can be ascertained by measuring the same quantity several times; the measurements must be made independently to avoid bias. Given independence, the correlation coefficient (*infra* Section V.B) between repeated measurements can be used as a measure of reliability. This is sometimes called a test–retest correlation or a reliability coefficient.

A courtroom example is DNA identification. An early method of identification required laboratories to determine the lengths of fragments of DNA. By making independent replicate measurements of the fragments, laboratories determined the likelihood that two measurements differed by specified amounts.[38] Such results were needed to decide whether a discrepancy between a crime sample and a suspect sample was sufficient to exclude the suspect.[39]

Coding provides another example. In many studies, descriptive information is obtained on the subjects. For statistical purposes, the information usually has to be reduced to numbers. The process of reducing information to numbers is called "coding," and the reliability of the process should be evaluated. For example, in a study of death sentencing in Georgia, legally trained evaluators examined short summaries of cases and ranked them according to the defendant's culpability.[40]

---

37. Courts often use "reliable" to mean "that which can be relied on" for some purpose, such as establishing probable cause or crediting a hearsay statement when the declarant is not produced for confrontation. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.9 (1993), for example, distinguishes "evidentiary reliability" from reliability in the technical sense of giving consistent results. We use "reliability" to denote the latter.

38. *See* National Research Council, The Evaluation of Forensic DNA Evidence 139–41 (1996).

39. *Id*.; National Research Council, DNA Technology in Forensic Science 61–62 (1992). Current methods are discussed in David H. Kaye & George Sensabaugh, Reference Guide on DNA Identification Evidence, Section II, in this manual.

40. David C. Baldus et al., Equal Justice and the Death Penalty: A Legal and Empirical Analysis 49–50 (1990).

227

EXHIBIT C

*Reference Manual on Scientific Evidence*

Two different aspects of reliability should be considered. First, the "within–observer variability" of judgments should be small—the same evaluator should rate essentially identical cases in similar ways. Second, the "between–observer variability" should be small—different evaluators should rate the same cases in essentially the same way.

## 2. Is the measurement process valid?

Reliability is necessary but not sufficient to ensure accuracy. In addition to reliability, validity is needed. A valid measuring instrument measures what it is supposed to. Thus, a polygraph measures certain physiological responses to stimuli, for example, in pulse rate or blood pressure. The measurements may be reliable. Nonetheless, the polygraph is not valid as a lie detector unless the measurements it makes are well correlated with lying.[41]

When there is an established way of measuring a variable, a new measurement process can be validated by comparison with the established one. Breathalyzer readings can be validated against alcohol levels found in blood samples. LSAT scores used for law school admissions can be validated against grades earned in law school. A common measure of validity is the correlation coefficient between the predictor and the criterion (e.g., test scores and later performance).[42]

Employment discrimination cases illustrate some of the difficulties. Thus, plaintiffs suing under Title VII of the Civil Rights Act may challenge an employment test that has a disparate impact on a protected group, and defendants may try to justify the use of a test as valid, reliable, and a business necessity.[43] For validation, the most appropriate criterion variable is clear enough: job performance. However, plaintiffs may then turn around and challenge the validity of performance ratings. For reliability, administering the test twice to the same group of people may be impractical. Even if repeated testing is practical, it may be statistically inadvisable, because subjects may learn something from the first round of testing that affects their scores on the second round. Such "practice effects" are likely to compromise the independence of the two measurements, and independence is needed to estimate reliability. Statisticians therefore use internal evidence

41. *See* United States v. Henderson, 409 F.3d 1293, 1303 (11th Cir. 2005) ("while the physical responses recorded by a polygraph machine may be tested, 'there is no available data to prove that those specific responses are attributable to lying.'"); National Research Council, The Polygraph and Lie Detection (2003) (reviewing the scientific literature).

42. As the discussion of the correlation coefficient indicates, *infra* Section V.B, the closer the coefficient is to 1, the greater the validity. For a review of data on test reliability and validity, see Paul R. Sackett et al., *High-Stakes Testing in Higher Education and Employment: Appraising the Evidence for Validity and Fairness*, 63 Am. Psychologist 215 (2008).

43. *See, e.g.*, Washington v. Davis, 426 U.S. 229, 252 (1976); Albemarle Paper Co. v. Moody, 422 U.S. 405, 430–32 (1975); Griggs v. Duke Power Co., 401 U.S. 424 (1971); Lanning v. S.E. Penn. Transp. Auth., 308 F.3d 286 (3d Cir. 2002).

**EXHIBIT C**

*Reference Guide on Statistics*

from the test itself. For example, if scores on the first half of the test correlate well with scores from the second half, then that is evidence of reliability.

A further problem is that test-takers are likely to be a select group. The ones who get the jobs are even more highly selected. Generally, selection attenuates (weakens) the correlations. There are methods for using internal measures of reliability to estimate test-retest correlations; there are other methods that correct for attenuation. However, such methods depend on assumptions about the nature of the test and the procedures used to select the test-takers and are therefore open to challenge.[44]

### 3. Are the measurements recorded correctly?

Judging the adequacy of data collection involves an examination of the process by which measurements are taken. Are responses to interviews coded correctly? Do mistakes distort the results? How much data are missing? What was done to compensate for gaps in the data? These days, data are stored in computer files. Cross-checking the files against the original sources (e.g., paper records), at least on a sample basis, can be informative.

Data quality is a pervasive issue in litigation and in applied statistics more generally. A programmer moves a file from one computer to another, and half the data disappear. The definitions of crucial variables are lost in the sands of time. Values get corrupted: Social security numbers come to have eight digits instead of nine, and vehicle identification numbers fail the most elementary consistency checks. Everybody in the company, from the CEO to the rawest mailroom trainee, turns out to have been hired on the same day. Many of the residential customers have last names that indicate commercial activity ("Happy Valley Farriers"). These problems seem humdrum by comparison with those of reliability and validity, but—unless caught in time—they can be fatal to statistical arguments.[45]

---

44. *See* Thad Dunning & David A. Freedman, *Modeling Selection Effects, in* Social Science Methodology 225 (Steven Turner & William Outhwaite eds., 2007); Howard Wainer & David Thissen, *True Score Theory: The Traditional Method, in* Test Scoring 23 (David Thissen & Howard Wainer eds., 2001).

45. *See, e.g.,* Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 630 (S.D.N.Y. 2007) (coding errors contributed "to the cumulative effect of the methodological errors" that warranted exclusion of a consumer confusion survey); EEOC v. Sears, Roebuck & Co., 628 F. Supp. 1264, 1304, 1305 (N.D. Ill. 1986) ("[E]rrors in EEOC's mechanical coding of information from applications in its hired and nonhired samples also make EEOC's statistical analysis based on this data less reliable." The EEOC "consistently coded prior experience in such a way that less experienced women are considered to have the same experience as more experienced men" and "has made so many general coding errors that its data base does not fairly reflect the characteristics of applicants for commission sales positions at Sears."), *aff'd*, 839 F.2d 302 (7th Cir. 1988). *But see* Dalley v. Mich. Blue Cross–Blue Shield, Inc., 612 F. Supp. 1444, 1456 (E.D. Mich. 1985) ("although plaintiffs show that there were some mistakes in coding, plaintiffs still fail to demonstrate that these errors were so generalized and so pervasive that the entire study is invalid.").

EXHIBIT C

## D. *What Is Random?*

In the law, a selection process sometimes is called "random," provided that it does not exclude identifiable segments of the population. Statisticians use the term in a far more technical sense. For example, if we were to choose one person at random from a population, in the strict statistical sense, we would have to ensure that everybody in the population is chosen with exactly the same probability. With a randomized controlled experiment, subjects are assigned to treatment or control at random in the strict sense—by tossing coins, throwing dice, looking at tables of random numbers, or more commonly these days, by using a random number generator on a computer. The same rigorous definition applies to random sampling. It is randomness in the technical sense that provides assurance of unbiased estimates from a randomized controlled experiment or a probability sample. Randomness in the technical sense also justifies calculations of standard errors, confidence intervals, and *p*-values (*infra* Sections IV–V). Looser definitions of randomness are inadequate for statistical purposes.

# III. How Have the Data Been Presented?

After data have been collected, they should be presented in a way that makes them intelligible. Data can be summarized with a few numbers or with graphical displays. However, the wrong summary can mislead.[46] Section III.A discusses rates or percentages and provides some cautionary examples of misleading summaries, indicating the kinds of questions that might be considered when summaries are presented in court. Percentages are often used to demonstrate statistical association, which is the topic of Section III.B. Section III.C considers graphical summaries of data, while Sections III.D and III.E discuss some of the basic descriptive statistics that are likely to be encountered in litigation, including the mean, median, and standard deviation.

## A. *Are Rates or Percentages Properly Interpreted?*

### 1. *Have appropriate benchmarks been provided?*

The selective presentation of numerical information is like quoting someone out of context. Is a fact that "over the past three years," a particular index fund of large-cap stocks "gained a paltry 1.9% a year" indicative of poor management? Considering that "the average large-cap value fund has returned just 1.3% a year,"

---

46. *See generally* Freedman et al., *supra* note 12; Huff, *supra* note 12; Moore & Notz, *supra* note 12; Zeisel, *supra* note 12.

EXHIBIT C

*Reference Guide on Statistics*

a growth rate of 1.9% is hardly an indictment.[47] In this example and many others, it is helpful to find a benchmark that puts the figures into perspective.

## *2. Have the data collection procedures changed?*

Changes in the process of collecting data can create problems of interpretation. Statistics on crime provide many examples. The number of petty larcenies reported in Chicago more than doubled one year—not because of an abrupt crime wave, but because a new police commissioner introduced an improved reporting system.[48] For a time, police officials in Washington, D.C., "demonstrated" the success of a law-and-order campaign by valuing stolen goods at $49, just below the $50 threshold then used for inclusion in the Federal Bureau of Investigation's Uniform Crime Reports.[49] Allegations of manipulation in the reporting of crime from one time period to another are legion.[50]

Changes in data collection procedures are by no means limited to crime statistics. Indeed, almost all series of numbers that cover many years are affected by changes in definitions and collection methods. When a study includes such time-series data, it is useful to inquire about changes and to look for any sudden jumps, which may signal such changes.

## *3. Are the categories appropriate?*

Misleading summaries also can be produced by the choice of categories to be used for comparison. In *Philip Morris, Inc. v. Loew's Theatres, Inc.*,[51] and *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.*,[52] Philip Morris and R.J. Reynolds sought an injunction to stop the maker of Triumph low-tar cigarettes from running advertisements claiming that participants in a national taste test preferred Triumph to other brands. Plaintiffs alleged that claims that Triumph was a "national taste test winner" or Triumph "beats" other brands were false and misleading. An exhibit introduced by the defendant contained the data shown in Table 1.[53] Only 14% + 22% = 36% of the sample preferred Triumph to Merit, whereas

47. Paul J. Lim, *In a Downturn, Buy and Hold or Quit and Fold?*, N.Y. Times, July 27, 2008.

48. James P. Levine et al., Criminal Justice in America: Law in Action 99 (1986) (referring to a change from 1959 to 1960).

49. D. Seidman & M. Couzens, *Getting the Crime Rate Down: Political Pressure and Crime Reporting*, 8 Law & Soc'y Rev. 457 (1974).

50. Michael D. Maltz, *Missing UCR Data and Divergence of the NCVS and UCR Trends*, *in* Understanding Crime Statistics: Revisiting the Divergence of the NCVS and UCR 269, 280 (James P. Lynch & Lynn A. Addington eds., 2007) (citing newspaper reports in Boca Raton, Atlanta, New York, Philadelphia, Broward County (Florida), and Saint Louis); Michael Vasquez, *Miami Police: FBI: Crime Stats Accurate*, Miami Herald, May 1, 2008.

51. 511 F. Supp. 855 (S.D.N.Y. 1980).

52. 511 F. Supp. 867 (S.D.N.Y. 1980).

53. *Philip Morris*, 511 F. Supp. at 866.

EXHIBIT C

*Reference Manual on Scientific Evidence*

29% + 11% = 40% preferred Merit to Triumph. By selectively combining catego-
ries, however, the defendant attempted to create a different impression. Because
24% found the brands to be about the same, and 36% preferred Triumph, the
defendant claimed that a clear majority (36% + 24% = 60%) found Triumph "as
good [as] or better than Merit."[54] The court resisted this chicanery, finding that
defendant's test results did not support the advertising claims.[55]

Table 1. Data Used by a Defendant to Refute Plaintiffs' False Advertising Claim

|  | Triumph Much Better Than Merit | Triumph Somewhat Better Than Merit | Triumph About the Same as Merit | Triumph Somewhat Worse Than Merit | Triumph Much Worse Than Merit |
|---|---|---|---|---|---|
| Number | 45 | 73 | 77 | 93 | 36 |
| Percentage | 14 | 22 | 24 | 29 | 11 |

There was a similar distortion in claims for the accuracy of a home pregnancy
test. The manufacturer advertised the test as 99.5% accurate under laboratory con-
ditions. The data underlying this claim are summarized in Table 2.

Table 2. Home Pregnancy Test Results

|  | Actually Pregnant | Actually not Pregnant |
|---|---|---|
| Test says pregnant | 197 | 0 |
| Test says not pregnant | 1 | 2 |
| Total | 198 | 2 |

Table 2 does indicate that only one error occurred in 200 assessments, or
99.5% overall accuracy, but the table also shows that the test can make two types
of errors: It can tell a pregnant woman that she is not pregnant (a false negative),
and it can tell a woman who is not pregnant that she is (a false positive). The
reported 99.5% accuracy rate conceals a crucial fact—the company had virtually
no data with which to measure the rate of false positives.[56]

54. *Id.*
55. *Id.* at 856–57.
56. Only two women in the sample were not pregnant; the test gave correct results for both of
them. Although a false-positive rate of 0 is ideal, an estimate based on a sample of only two women
is not. These data are reported in Arnold Barnett, *How Numbers Can Trick You*, Tech. Rev., Oct.
1994, at 38, 44–45.

EXHIBIT C

*Reference Guide on Statistics*

### 4. How big is the base of a percentage?

Rates and percentages often provide effective summaries of data, but these statistics can be misinterpreted. A percentage makes a comparison between two numbers: One number is the base, and the other number is compared to that base. Putting them on the same base (100) makes it easy to compare them.

When the base is small, however, a small change in absolute terms can generate a large percentage gain or loss. This could lead to newspaper headlines such as "Increase in Thefts Alarming," even when the total number of thefts is small.[57] Conversely, a large base will make for small percentage increases. In these situations, actual numbers may be more revealing than percentages.

### 5. What comparisons are made?

Finally, there is the issue of which numbers to compare. Researchers sometimes choose among alternative comparisons. It may be worthwhile to ask why they chose the one they did. Would another comparison give a different view? A government agency, for example, may want to compare the amount of service now being given with that of earlier years—but what earlier year should be the baseline? If the first year of operation is used, a large percentage increase should be expected because of startup problems. If last year is used as the base, was it also part of the trend, or was it an unusually poor year? If the base year is not representative of other years, the percentage may not portray the trend fairly. No single question can be formulated to detect such distortions, but it may help to ask for the numbers from which the percentages were obtained; asking about the base can also be helpful.[58]

## B. Is an Appropriate Measure of Association Used?

Many cases involve statistical association. Does a test for employee promotion have an exclusionary effect that depends on race or gender? Does the incidence of murder vary with the rate of executions for convicted murderers? Do consumer purchases of a product depend on the presence or absence of a product warning? This section discusses tables and percentage-based statistics that are frequently presented to answer such questions.[59]

Percentages often are used to describe the association between two variables. Suppose that a university alleged to discriminate against women in admitting

---

57. Lyda Longa, *Increase in Thefts Alarming*, Daytona News-J. June 8, 2008 (reporting a 35% increase in armed robberies in Daytona Beach, Florida, in a 5-month period, but not indicating whether the number had gone up by 6 (from 17 to 23), by 300 (from 850 to 1150), or by some other amount).

58. For assistance in coping with percentages, see Zeisel, *supra* note 12, at 1–24.

59. Correlation and regression are discussed *infra* Section V.

233

EXHIBIT C

*Reference Manual on Scientific Evidence*

students consists of only two colleges—engineering and business. The university admits 350 out of 800 male applicants; by comparison, it admits only 200 out of 600 female applicants. Such data commonly are displayed as in Table 3.[60]

As Table 3 indicates, 350/800 = 44% of the males are admitted, compared with only 200/600 = 33% of the females. One way to express the disparity is to subtract the two percentages: 44% − 33% = 11 percentage points. Although such subtraction is commonly seen in jury discrimination cases,[61] the difference is inevitably small when the two percentages are both close to zero. If the selection rate for males is 5% and that for females is 1%, the difference is only 4 percentage points. Yet, females have only one-fifth the chance of males of being admitted, and that may be of real concern.

Table 3. Admissions by Gender

| Decision | Male | Female | Total |
|----------|------|--------|-------|
| Admit | 350 | 200 | 550 |
| Deny | 450 | 400 | 850 |
| Total | 800 | 600 | 1400 |

For Table 3, the selection ratio (used by the Equal Employment Opportunity Commission in its "80% rule") is 33/44 = 75%, meaning that, on average, women have 75% the chance of admission that men have.[62] However, the selection ratio has its own problems. In the last example, if the selection rates are 5% and 1%, then the exclusion rates are 95% and 99%. The ratio is 99/95 = 104%, meaning that females have, on average, 104% the risk of males of being rejected. The underlying facts are the same, of course, but this formulation sounds much less disturbing.

60. A table of this sort is called a "cross-tab" or a "contingency table." Table 3 is "two-by-two" because it has two rows and two columns, not counting rows or columns containing totals.

61. *See, e.g.*, State v. Gibbs, 758 A.2d 327, 337 (Conn. 2000); Primeaux v. Dooley, 747 N.W.2d 137, 141 (S.D. 2008); D.H. Kaye, *Statistical Evidence of Discrimination in Jury Selection*, *in* Statistical Methods in Discrimination Litigation 13 (David H. Kaye & Mikel Aickin eds., 1986).

62. A procedure that selects candidates from the least successful group at a rate less than 80% of the rate for the most successful group "will generally be regarded by the Federal enforcement agencies as evidence of adverse impact." EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D) (2008). The rule is designed to help spot instances of substantially discriminatory practices, and the commission usually asks employers to justify any procedures that produce selection ratios of 80% or less.

The analogous statistic used in epidemiology is called the relative risk. *See* Green et al., *supra* note 13, Section III.A. Relative risks are usually quoted as decimals; for example, a selection ratio of 75% corresponds to a relative risk of 0.75.

**EXHIBIT C**

*Reference Guide on Statistics*

The odds ratio is more symmetric. If 5% of male applicants are admitted, the odds on a man being admitted are 5/95 = 1/19; the odds on a woman being admitted are 1/99. The odds ratio is (1/99)/(1/19) = 19/99. The odds ratio for rejection instead of acceptance is the same, except that the order is reversed.[63] Although the odds ratio has desirable mathematical properties, its meaning may be less clear than that of the selection ratio or the simple difference.

Data showing disparate impact are generally obtained by aggregating—putting together—statistics from a variety of sources. Unless the source material is fairly homogeneous, aggregation can distort patterns in the data. We illustrate the problem with the hypothetical admission data in Table 3. Applicants can be classified not only by gender and admission but also by the college to which they applied, as in Table 4.

Table 4. Admissions by Gender and College

| Decision | Engineering | | Business | |
| | Male | Female | Male | Female |
| --- | --- | --- | --- | --- |
| Admit | 300 | 100 | 50 | 100 |
| Deny | 300 | 100 | 150 | 300 |

The entries in Table 4 add up to the entries in Table 3. Expressed in a more technical manner, Table 3 is obtained by aggregating the data in Table 4. Yet there is no association between gender and admission in either college; men and women are admitted at identical rates. Combining two colleges with no association produces a university in which gender is associated strongly with admission. The explanation for this paradox is that the business college, to which most of the women applied, admits relatively few applicants. It is easier to be accepted at the engineering college, the college to which most of the men applied. This example illustrates a common issue: Association can result from combining heterogeneous statistical material.[64]

63. For women, the odds on rejection are 99 to 1; for men, 19 to 1. The ratio of these odds is 99/19. Likewise, the odds ratio for an admitted applicant being a man as opposed to a denied applicant being a man is also 99/19.

64. Tables 3 and 4 are hypothetical, but closely patterned on a real example. *See* P.J. Bickel et al., *Sex Bias in Graduate Admissions: Data from Berkeley*, 187 Science 398 (1975). The tables are an instance of Simpson's Paradox.

EXHIBIT C

## C. Does a Graph Portray Data Fairly?

Graphs are useful for revealing key characteristics of a batch of numbers, trends over time, and the relationships among variables.

### 1. How are trends displayed?

Graphs that plot values over time are useful for seeing trends. However, the scales on the axes matter. In Figure 1, the rate of all crimes of domestic violence in Florida (per 100,000 people) appears to decline rapidly over the 10 years from 1998 through 2007; in Figure 2, the same rate appears to drop slowly.[65] The moral is simple: Pay attention to the markings on the axes to determine whether the scale is appropriate.

Figure 1                                                       Figure 2

 

### 2. How are distributions displayed?

A graph commonly used to display the distribution of data is the histogram. One axis denotes the numbers, and the other indicates how often those fall within

65. Florida Statistical Analysis Center, Florida Department of Law Enforcement, Florida's Crime Rate at a Glance, *available at* http://www.fdle.state.fl.us/FSAC/Crime_Trends/domestic_violence/index.asp. The data are from the Florida Uniform Crime Report statistics on crimes ranging from simple stalking and forcible fondling to murder and arson. The Web page with the numbers graphed in Figures 1 and 2 is no longer posted, but similar data for all violent crime is available at http://www.fdle.state.fl.us/FSAC/Crime_Trends/Violent-Crime.aspx.

EXHIBIT C

*Reference Guide on Statistics*

specified intervals (called "bins" or "class intervals"). For example, we flipped a quarter 10 times in a row and counted the number of heads in this "batch" of 10 tosses. With 50 batches, we obtained the following counts:[66]

7 7 5 6 8    4 2 3 6 5    4 3 4 7 4    6 8 4 7 4    7 4 5 4 3
4 4 2 5 3    5 4 2 4 4    5 7 2 3 5    4 6 4 9 10 5 5 6 6 4

The histogram is shown in Figure 3.[67] A histogram shows how the data are distributed over the range of possible values. The spread can be made to appear larger or smaller, however, by changing the scale of the horizontal axis. Likewise, the shape can be altered somewhat by changing the size of the bins.[68] It may be worth inquiring how the analyst chose the bin widths.

Figure 3. Histogram showing how frequently various numbers of heads appeared in 50 batches of 10 tosses of a quarter.



66. The coin landed heads 7 times in the first 10 tosses; by coincidence, there were also 7 heads in the next 10 tosses; there were 5 heads in the third batch of 10 tosses; and so forth.

67. In Figure 3, the bin width is 1. There were no 0s or 1s in the data, so the bars over 0 and 1 disappear. There is a bin from 1.5 to 2.5; the four 2s in the data fall into this bin, so the bar over the interval from 1.5 to 2.5 has height 4. There is another bin from 2.5 to 3.5, which catches five 3s; the height of the corresponding bar is 5. And so forth.

All the bins in Figure 3 have the same width, so this histogram is just like a bar graph. However, data are often published in tables with unequal intervals. The resulting histograms will have unequal bin widths; bar heights should be calculated so that the areas (height × width) are proportional to the frequencies. In general, a histogram differs from a bar graph in that it represents frequencies by area, not height. *See* Freedman et al., *supra* note 12, at 31–41.

68. As the width of the bins decreases, the graph becomes more detailed, but the appearance becomes more ragged until finally the graph is effectively a plot of each datum. The optimal bin width depends on the subject matter and the goal of the analysis.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## D. Is an Appropriate Measure Used for the Center of a Distribution?

Perhaps the most familiar descriptive statistic is the mean (or "arithmetic mean"). The mean can be found by adding all the numbers and dividing the total by how many numbers were added. By comparison, the median cuts the numbers into halves: half the numbers are larger than the median and half are smaller.[69] Yet a third statistic is the mode, which is the most common number in the dataset. These statistics are different, although they are not always clearly distinguished.[70] The mean takes account of all the data—it involves the total of all the numbers; however, particularly with small datasets, a few unusually large or small observations may have too much influence on the mean. The median is resistant to such outliers.

Thus, studies of damage awards in tort cases find that the mean is larger than the median.[71] This is because the mean takes into account (indeed, is heavily influenced by) the magnitudes of the relatively few very large awards, whereas the median merely counts their number. If one is seeking a single, representative number for the awards, the median may be more useful than the mean.[72] Still, if the issue is whether insurers were experiencing more costs from jury verdicts, the mean is the more appropriate statistic: The total of the awards is directly related to the mean, not to the median.[73]

---

69. Technically, at least half the numbers are at the median or larger; at least half are at the median or smaller. When the distribution is symmetric, the mean equals the median. The values diverge, however, when the distribution is asymmetric, or skewed.

70. In ordinary language, the arithmetic mean, the median, and the mode seem to be referred to interchangeably as "the average." In statistical parlance, however, the average is the arithmetic mean. The mode is rarely used by statisticians, because it is unstable: Small changes to the data often result in large changes to the mode.

71. In a study using a probability sample of cases, the median compensatory award in wrongful death cases was $961,000, whereas the mean award was around $3.75 million for the 162 cases in which the plaintiff prevailed. Thomas H. Cohen & Steven K. Smith, U.S. Dep't of Justice, Bureau of Justice Statistics Bulletin NCJ 202803, Civil Trial Cases and Verdicts in Large Counties 2001, 10 (2004). In *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993), briefs portraying the punitive damage system as out of control pointed to mean punitive awards. These were some 10 times larger than the median awards described in briefs defending the system of punitive damages. Michael Rustad & Thomas Koenig, *The Supreme Court and Junk Social Science: Selective Distortion in Amicus Briefs*, 72 N.C. L. Rev. 91, 145–47 (1993).

72. In passing on proposed settlements in class-action lawsuits, courts have been advised to look to the magnitude of the settlements negotiated by the parties. But the mean settlement will be large if a higher number of meritorious, high-cost cases are resolved early in the life cycle of the litigation. This possibility led the court in *In re Educational Testing Service Praxis Principles of Learning and Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 625 (E.D. La. 2006), to regard the smaller median settlement as "more representative of the value of a typical claim than the mean value" and to use this median in extrapolating to the entire class of pending claims.

73. To get the total award, just multiply the mean by the number of awards; by contrast, the total cannot be computed from the median. (The more pertinent figure for the insurance industry is

238

**EXHIBIT C**

*Reference Guide on Statistics*

Research also has shown that there is considerable stability in the ratio of punitive to compensatory damage awards, and the Supreme Court has placed great weight on this ratio in deciding whether punitive damages are excessive in a particular case. In *Exxon Shipping Co. v. Baker*,[74] Exxon contended that an award of $2.5 billion in punitive damages for a catastrophic oil spill in Alaska was unreasonable under federal maritime law. The Court looked to a "comprehensive study of punitive damages awarded by juries in state civil trials [that] found a median ratio of punitive to compensatory awards of just 0.62:1, but a mean ratio of 2.90:1."[75] The higher mean could reflect a relatively small but disturbing proportion of unjustifiably large punitive awards.[76] Looking to the median ratio as "the line near which cases like this one largely should be grouped," the majority concluded that "a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases [of reckless conduct]."[77]

## E. Is an Appropriate Measure of Variability Used?

The location of the center of a batch of numbers reveals nothing about the variations exhibited by these numbers.[78] Statistical measures of variability include the range, the interquartile range, and the standard deviation. The range is the difference between the largest number in the batch and the smallest. The range seems natural, and it indicates the maximum spread in the numbers, but the range is unstable because it depends entirely on the most extreme values.[79] The interquartile range is the difference between the 25th and 75th percentiles.[80] The interquartile range contains 50% of the numbers and is resistant to changes in extreme values. The standard deviation is a sort of mean deviation from the mean.[81]

---

not the total of jury awards, but actual claims experience including settlements; of course, even the risk of large punitive damage awards may have considerable impact.)

74. 128 S. Ct. 2605 (2008).

75. *Id*. at 2625.

76. According to the Court, "the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories," and the "stark unpredictability" of these rare awards is the "real problem." *Id*. This perceived unpredictability has been the subject of various statistical studies and much debate. *See* Anthony J. Sebok, *Punitive Damages: From Myth to Theory*, 92 Iowa L. Rev. 957 (2007).

77. 128 S. Ct. at 2633.

78. The numbers 1, 2, 5, 8, 9 have 5 as their mean and median. So do the numbers 5, 5, 5, 5, 5. In the first batch, the numbers vary considerably about their mean; in the second, the numbers do not vary at all.

79. Moreover, the range typically depends on the number of units in the sample.

80. By definition, 25% of the data fall below the 25th percentile, 90% fall below the 90th percentile, and so on. The median is the 50th percentile.

81. When the distribution follows the normal curve, about 68% of the data will be within 1 standard deviation of the mean, and about 95% will be within 2 standard deviations of the mean. For other distributions, the proportions will be different.

EXHIBIT C

*Reference Manual on Scientific Evidence*

There are no hard and fast rules about which statistic is the best. In general, the bigger the measures of spread are, the more the numbers are dispersed.[82] Particularly in small datasets, the standard deviation can be influenced heavily by a few outlying values. To assess the extent of this influence, the mean and the standard deviation can be recomputed with the outliers discarded. Beyond this, any of the statistics can (and often should) be supplemented with a figure that displays much of the data.

# IV. What Inferences Can Be Drawn from the Data?

The inferences that may be drawn from a study depend on the design of the study and the quality of the data (*supra* Section II). The data might not address the issue of interest, might be systematically in error, or might be difficult to interpret because of confounding. Statisticians would group these concerns together under the rubric of "bias." In this context, bias means systematic error, with no connotation of prejudice. We turn now to another concern, namely, the impact of random chance on study results ("random error").[83]

If a pattern in the data is the result of chance, it is likely to wash out when more data are collected. By applying the laws of probability, a statistician can assess the likelihood that random error will create spurious patterns of certain kinds. Such assessments are often viewed as essential when making inferences from data.

Technically, the standard deviation is the square root of the variance; the variance is the mean square deviation from the mean. For example, if the mean is 100, then 120 deviates from the mean by 20, and the square of 20 is $20^2 = 400$. If the variance (i.e., the mean of the squared deviations) is 900, then the standard deviation is the square root of 900, that is, $\sqrt{900} = 30$. Taking the square root gets back to the original scale of the measurements. For example, if the measurements are of length in inches, the variance is in square inches; taking the square root changes back to inches.

82. In *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), along with the mean and median ratios of punitive to compensatory awards of 0.62 and 2.90, the Court referred to a standard deviation of 13.81. *Id.* at 498. These numbers led the Court to remark that "[e]ven to those of us unsophisticated in statistics, the thrust of these figures is clear: the spread is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories." *Id.* at 499-500. The size of the standard deviation compared to the mean supports the observation that ratios in the cases of jury award studies are dispersed. A graph of each pair of punitive and compensatory damages offers more insight into how scattered these figures are. *See* Theodore Eisenberg et al., *The Predictability of Punitive Damages*, 26 J. Legal Stud. 623 (1997); *infra* Section V.A (explaining scatter diagrams).

83. Random error is also called sampling error, chance error, or statistical error. Econometricians use the parallel concept of random disturbance terms. *See* Rubinfeld, *supra* note 21. Randomness and cognate terms have precise technical meanings; it is randomness in the technical sense that justifies the probability calculations behind standard errors, confidence intervals, and *p*-values (*supra* Section II.D, *infra* Sections IV.A–B). For a discussion of samples and populations, see *supra* Section II.B.

**EXHIBIT C**

*Reference Guide on Statistics*

Thus, statistical inference typically involves tasks such as the following, which will be discussed in the rest of this guide.

- *Estimation*. A statistician draws a sample from a population (*supra* Section II.B) and estimates a parameter—that is, a numerical characteristic of the population. (The average value of a large group of claims is a parameter of perennial interest.) Random error will throw the estimate off the mark. The question is, by how much? The precision of an estimate is usually reported in terms of the standard error and a confidence interval.

- *Significance testing*. A "null hypothesis" is formulated—for example, that a parameter takes a particular value. Because of random error, an estimated value for the parameter is likely to differ from the value specified by the null—even if the null is right. ("Null hypothesis" is often shortened to "null.") How likely is it to get a difference as large as, or larger than, the one observed in the data? This chance is known as a *p*-value. Small *p*-values argue against the null hypothesis. Statistical significance is determined by reference to the *p*-value; significance testing (also called hypothesis testing) is the technique for computing *p*-values and determining statistical significance.

- *Developing a statistical model*. Statistical inferences often depend on the validity of statistical models for the data. If the data are collected on the basis of a probability sample or a randomized experiment, there will be statistical models that suit the occasion, and inferences based on these models will be secure. Otherwise, calculations are generally based on analogy: This group of people is like a random sample; that observational study is like a randomized experiment. The fit between the statistical model and the data collection process may then require examination—how good is the analogy? If the model breaks down, that will bias the analysis.

- *Computing posterior probabilities*. Given the sample data, what is the probability of the null hypothesis? The question might be of direct interest to the courts, especially when translated into English; for example, the null hypothesis might be the innocence of the defendant in a criminal case. Posterior probabilities can be computed using a formula called Bayes' rule. However, the computation often depends on prior beliefs about the statistical model and its parameters; such prior beliefs almost necessarily require subjective judgment. According to the frequentist theory of statistics,[84]

---

84. The frequentist theory is also called objectivist, by contrast with the subjectivist version of Bayesian theory. In brief, frequentist methods treat probabilities as objective properties of the system being studied. Subjectivist Bayesians view probabilities as measuring subjective degrees of belief. *See infra* Section IV.D and Appendix, Section A, for discussion of the two positions. The Bayesian position is named after the Reverend Thomas Bayes (England, c. 1701–1761). His essay on the subject was published after his death: *An Essay Toward Solving a Problem in the Doctrine of Chances*, 53 Phil. Trans. Royal Soc'y London 370 (1763–1764). For discussion of the foundations and varieties of Bayesian and

241

EXHIBIT C

*Reference Manual on Scientific Evidence*

prior probabilities rarely have meaning and neither do posterior probabilities.[85]

Key ideas of estimation and testing will be illustrated by courtroom examples, with some complications omitted for ease of presentation and some details postponed (*see infra* Section V.D on statistical models, and the Appendix on the calculations).

The first example, on estimation, concerns the Nixon papers. Under the Presidential Recordings and Materials Preservation Act of 1974, Congress impounded Nixon's presidential papers after he resigned. Nixon sued, seeking compensation on the theory that the materials belonged to him personally. Courts ruled in his favor: Nixon was entitled to the fair market value of the papers, with the amount to be proved at trial.[86]

The Nixon papers were stored in 20,000 boxes at the National Archives in Alexandria, Virginia. It was plainly impossible to value this entire population of material. Appraisers for the plaintiff therefore took a random sample of 500 boxes. (From this point on, details are simplified; thus, the example becomes somewhat hypothetical.) The appraisers determined the fair market value of each sample box. The average of the 500 sample values turned out to be $2000. The standard deviation (*supra* Section III.E) of the 500 sample values was $2200. Many boxes had low appraised values whereas some boxes were considered to be extremely valuable; this spread explains the large standard deviation.

## *A. Estimation*

### *1. What estimator should be used?*

With the Nixon papers, it is natural to use the average value of the 500 sample boxes to estimate the average value of all 20,000 boxes comprising the population.

---

other forms of statistical inference, see, e.g., Richard M. Royall, Statistical Inference: A Likelihood Paradigm (1997); James Berger, *The Case for Objective Bayesian Analysis*, 1 Bayesian Analysis 385 (2006), *available at* http://ba.stat.cmu.edu/journal/2006/vol01/issue03/berger.pdf; Stephen E. Fienberg, *Does It Make Sense to be an "Objective Bayesian"? (Comment on Articles by Berger and by Goldstein)*, 1 Bayesian Analysis 429 (2006); David Freedman, *Some Issues in the Foundation of Statistics*, 1 Found. Sci. 19 (1995), *reprinted in* Topics in the Foundation of Statistics 19 (Bas C. van Fraasen ed., 1997); see also D.H. Kaye, *What Is Bayesianism? in* Probability and Inference in the Law of Evidence: The Uses and Limits of Bayesianism (Peter Tillers & Eric Green eds., 1988), *reprinted in* 28 Jurimetrics J. 161 (1988) (distinguishing between "Bayesian probability," "Bayesian statistical inference," "Bayesian inference writ large," and "Bayesian decision theory").

85. Prior probabilities of repeatable events (but not hypotheses) can be defined within the frequentist framework. See *infra* note 122. When this happens, prior and posterior probabilities for these events are meaningful according to both schools of thought.

86. Nixon v. United States, 978 F.2d 1269 (D.C. Cir. 1992); Griffin v. United States, 935 F. Supp. 1 (D.D.C. 1995).

**EXHIBIT C**

*Reference Guide on Statistics*

With the average value for each box having been estimated as $2000, the plaintiff demanded compensation in the amount of

$$20{,}000 \times \$2{,}000 = \$40{,}000{,}000.$$

In more complex problems, statisticians may have to choose among several estimators. Generally, estimators that tend to make smaller errors are preferred; however, "error" might be quantified in more than one way. Moreover, the advantage of one estimator over another may depend on features of the population that are largely unknown, at least before the data are collected and analyzed. For complicated problems, professional skill and judgment may therefore be required when choosing a sample design and an estimator. In such cases, the choices and the rationale for them should be documented.

## 2. What is the standard error? The confidence interval?

An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates.[87] In our example of the Nixon papers, the standard error for the sample average can be computed from (1) the size of the sample—500 boxes—and (2) the standard deviation of the sample values; *see infra* Appendix. Bigger samples give estimates that are more precise. Accordingly, the standard error should go down as the sample size grows, although the rate of improvement slows as the sample gets bigger. ("Sample size" and "the size of the sample" just mean the number of items in the sample; the "sample average" is the average value of the items in the sample.) The standard deviation of the sample comes into play by measuring heterogeneity. The less heterogeneity in the values, the smaller the standard error. For example, if all the values were about the same, a tiny sample would give an accurate estimate. Conversely, if the values are quite different from one another, a larger sample would be needed.

With a random sample of 500 boxes and a standard deviation of $2200, the standard error for the sample average is about $100. The plaintiff's total demand was figured as the number of boxes (20,000) times the sample average ($2000). Therefore, the standard error for the total demand can be computed as 20,000 times the standard error for the sample average[88]:

---

87. We distinguish between (1) the standard deviation of the sample, which measures the spread in the sample data and (2) the standard error of the sample average, which measures the likely size of the random error in the sample average. The standard error is often called the standard deviation, and courts generally use the latter term. *See, e.g.*, Castaneda v. Partida, 430 U.S. 482 (1977).

88. We are assuming a simple random sample. Generally, the formula for the standard error must take into account the method used to draw the sample and the nature of the estimator. In fact, the Nixon appraisers used more elaborate statistical procedures. Moreover, they valued the material as of

243

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

$$20,000 \times \$100 = \$2,000,000.$$

How is the standard error to be interpreted? Just by the luck of the draw, a few too many high-value boxes may have come into the sample, in which case the estimate of $40,000,000 is too high. Or, a few too many low-value boxes may have been drawn, in which case the estimate is too low. This is random error. The net effect of random error is unknown, because data are available only on the sample, not on the full population. However, the net effect is likely to be something close to the standard error of $2,000,000. Random error throws the estimate off, one way or the other, by something close to the standard error. The role of the standard error is to gauge the likely size of the random error.

The plaintiff's argument may be open to a variety of objections, particularly regarding appraisal methods. However, the sampling plan is sound, as is the extrapolation from the sample to the population. And there is no need for a larger sample: The standard error is quite small relative to the total claim.

Random errors larger in magnitude than the standard error are commonplace. Random errors larger in magnitude than two or three times the standard error are unusual. Confidence intervals make these ideas more precise. Usually, a confidence interval for the population average is centered at the sample average; the desired confidence level is obtained by adding and subtracting a suitable multiple of the standard error. Statisticians who say that the population average falls within 1 standard error of the sample average will be correct about 68% of the time. Those who say "within 2 standard errors" will be correct about 95% of the time, and those who say "within 3 standard errors" will be correct about 99.7% of the time, and so forth. (We are assuming a large sample; the confidence levels correspond to areas under the normal curve and are approximations; the "population average" just means the average value of all the items in the population.[89]) In summary,

- To get a 68% confidence interval, start at the sample average, then add and subtract 1 standard error.
- To get a 95% confidence interval, start at the sample average, then add and subtract twice the standard error.

1995, extrapolated backward to the time of taking (1974), and then added interest. The text ignores these complications.

89. *See infra* Appendix. The area under the normal curve between −1 and +1 is close to 68.3%. Likewise, the area between −2 and +2 is close to 95.4%. Many academic statisticians would use ±1.96 SE for a 95% confidence interval. However, the normal curve only gives an approximation to the relevant chances, and the error in that approximation will often be larger than a few tenths of a percent. For simplicity, we use ±1 SE for the 68% confidence level, and ±2 SE for 95% confidence. The normal curve gives good approximations when the sample size is reasonably large; for small samples, other techniques should be used. *See infra* notes 106–07.

**EXHIBIT C**

*Reference Guide on Statistics*

- To get a 99.7% confidence interval, start at the sample average, then add and subtract three times the standard error.

With the Nixon papers, the 68% confidence interval for plaintiff's total demand runs

$$\text{from } \$40,000,000 - \$2,000,000 = \$38,000,000$$
$$\text{to } \$40,000,000 + \$2,000,000 = \$42,000,000.$$

The 95% confidence interval runs

$$\text{from } \$40,000,000 - (2 \times \$2,000,000) = \$36,000,000$$
$$\text{to } \$40,000,000 + (2 \times \$2,000,000) = \$44,000,000.$$

The 99.7% confidence interval runs

$$\text{from } \$40,000,000 - (3 \times \$2,000,000) = \$34,000,000$$
$$\text{to } \$40,000,000 + (3 \times \$2,000,000) = \$46,000,000.$$

To write this more compactly, we abbreviate standard error as SE. Thus, 1 SE is one standard error, 2 SE is twice the standard error, and so forth. With a large sample and an estimate like the sample average, a 68% confidence interval is the range

$$\text{estimate} - 1 \text{ SE to estimate} + 1 \text{ SE.}$$

A 95% confidence interval is the range

$$\text{estimate} - 2 \text{ SE to estimate} + 2 \text{ SE.}$$

The 99.7% confidence interval is the range

$$\text{estimate} - 3 \text{ SE to estimate} + 3 \text{ SE.}$$

For a given sample size, increased confidence can be attained only by widening the interval. The 95% confidence level is the most popular, but some authors use 99%, and 90% is seen on occasion. (The corresponding multipliers on the SE are about 2, 2.6, and 1.6, respectively; *see infra* Appendix.) The phrase "margin of error" generally means twice the standard error. In medical journals, "confidence interval" is often abbreviated as "CI."

**EXHIBIT C**

*Reference Manual on Scientific Evidence*



The main point is that an estimate based on a sample will differ from the exact population value, because of random error. The standard error gives the likely size of the random error. If the standard error is small, random error probably has little effect. If the standard error is large, the estimate may be seriously wrong. Confidence intervals are a technical refinement, and bias is a separate issue to consider (*infra* Section IV.A.4).

### 3. How big should the sample be?

There is no easy answer to this sensible question. Much depends on the level of error that is tolerable and the nature of the material being sampled. Generally, increasing the size of the sample will reduce the level of random error ("sampling error"). Bias ("nonsampling error") cannot be reduced that way. Indeed, beyond some point, large samples are harder to manage and more vulnerable to non-sampling error. To reduce bias, the researcher must improve the design of the study or use a statistical model more tightly linked to the data collection process.

If the material being sampled is heterogeneous, random error will be large; a larger sample will be needed to offset the heterogeneity (*supra* Section IV.A.1). A pilot sample may be useful to estimate heterogeneity and determine the final sample size. Probability samples require some effort in the design phase, and it will rarely be sensible to draw a sample with fewer than, say, two or three dozen items. Moreover, with such small samples, methods based on the normal curve (*supra* Section IV.A.2) will not apply.

Population size (i.e., the number of items in the population) usually has little bearing on the precision of estimates for the population average. This is surprising. On the other hand, population size has a direct bearing on estimated totals. Both points are illustrated by the Nixon papers (*see supra* Section IV.A.2 and *infra* Appendix). To be sure, drawing a probability sample from a large population may

246

**EXHIBIT C**

*Reference Guide on Statistics*

involve a lot of work. Samples presented in the courtroom have ranged from 5 (tiny) to 1.7 million (huge).[90]

## 4. What are the technical difficulties?

To begin with, "confidence" is a term of art. The confidence level indicates the percentage of the time that intervals from repeated samples would cover the true value. The confidence level does not express the chance that repeated estimates would fall into the confidence interval.[91] With the Nixon papers, the 95% confidence interval should not be interpreted as saying that 95% of all random samples will produce estimates in the range from $36 million to $44 million. Moreover, the confidence level does not give the probability that the unknown parameter lies within the confidence interval.[92] For example, the 95% confidence level should not be translated to a 95% probability that the total value of the papers is in the range from $36 million to $44 million. According to the frequentist theory of statistics, probability statements cannot be made about population characteristics: Probability statements apply to the behavior of samples. That is why the different term "confidence" is used.

The next point to make is that for a given confidence level, a narrower interval indicates a more precise estimate, whereas a broader interval indicates less

90. *See* Lebrilla v. Farmers Group, Inc., No. 00-CC-017185 (Cal. Super. Ct., Orange County, Dec. 5, 2006) (preliminary approval of settlement), a class action lawsuit on behalf of plaintiffs who were insured by Farmers and had automobile accidents. Plaintiffs alleged that replacement parts recommended by Farmers did not meet specifications: Small samples were used to evaluate these allegations. At the other extreme, it was proposed to adjust Census 2000 for undercount and overcount by reviewing a sample of 1.7 million persons. *See* Brown et al., *supra* note 29, at 353.

91. Opinions reflecting this misinterpretation include *In re* Silicone Gel Breast Implants Prods. Liab. Litig, 318 F. Supp. 2d 879, 897 (C.D. Cal. 2004) ("a margin of error between 0.5 and 8.0 at the 95% confidence level . . . means that 95 times out of 100 a study of that type would yield a relative risk value somewhere between 0.5 and 8.0."); United States *ex rel*. Free v. Peters, 806 F. Supp. 705, 713 n.6 (N.D. Ill. 1992) ("A 99% confidence interval, for instance, is an indication that if we repeated our measurement 100 times under identical conditions, 99 times out of 100 the point estimate derived from the repeated experimentation will fall within the initial interval estimate. . . ."), *rev'd in part*, 12 F.3d 700 (7th Cir. 1993). The more technically correct statement in the *Silicone Gel* case, for example, would be that "the confidence interval of 0.5 to 8.0 means that the relative risk in the population could fall within this wide range and that in roughly 95 times out of 100, random samples from the same population, the confidence intervals (however wide they might be) would include the population value (whatever it is)."

92. *See, e.g.*, Freedman et al., *supra* note 12, at 383–86; *infra* Section IV.B.1. Consequently, it is misleading to suggest that "[a] 95% confidence interval means that there is a 95% probability that the 'true' relative risk falls within the interval" or that "the probability that the true value was . . . within two standard deviations of the mean . . . would be 95 percent." DeLuca v. Merrell Dow Pharms., Inc., 791 F. Supp. 1042, 1046 (D.N.J. 1992), *aff'd*, 6 F.3d 778 (3d Cir. 1993); SmithKline Beecham Corp. v. Apotex Corp., 247 F. Supp. 2d 1011, 1037 (N.D. Ill. 2003), *aff'd on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005).

EXHIBIT C

*Reference Manual on Scientific Evidence*

precision.[93] A high confidence level with a broad interval means very little, but a high confidence level for a small interval is impressive, indicating that the random error in the sample estimate is low. For example, take a 95% confidence interval for a damage claim. An interval that runs from $34 million to $44 million is one thing, but –$10 million to $90 million is something else entirely. Statements about confidence without mention of an interval are practically meaningless.[94]

Standard errors and confidence intervals are often derived from statistical models for the process that generated the data. The model usually has parameters—numerical constants describing the population from which samples were drawn. When the values of the parameters are not known, the statistician must work backward, using the sample data to make estimates. That was the case here.[95] Generally, the chances needed for statistical inference are computed from a model and estimated parameter values.

If the data come from a probability sample or a randomized controlled experiment (*supra* Sections II.A–B), the statistical model may be connected tightly to the actual data collection process. In other situations, using the model may be tantamount to assuming that a sample of convenience is like a random sample, or that an observational study is like a randomized experiment. With the Nixon papers, the appraisers drew a random sample, and that justified the statistical

---

93. In *Cimino v. Raymark Industries, Inc.*, 751 F. Supp. 649 (E.D. Tex. 1990), *rev'd*, 151 F.3d 297 (5th Cir. 1998), the district court drew certain random samples from more than 6000 pending asbestos cases, tried these cases, and used the results to estimate the total award to be given to all plaintiffs in the pending cases. The court then held a hearing to determine whether the samples were large enough to provide accurate estimates. The court's expert, an educational psychologist, testified that the estimates were accurate because the samples matched the population on such characteristics as race and the percentage of plaintiffs still alive. *Id.* at 664. However, the matches occurred only in the sense that population characteristics fell within 99% confidence intervals computed from the samples. The court thought that matches within the 99% confidence intervals proved more than matches within 95% intervals. *Id.* This is backward. To be correct in a few instances with a 99% confidence interval is not very impressive—by definition, such intervals are broad enough to ensure coverage 99% of the time.

94. In *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996), for example, "an expert on statistics . . . testified that . . . a random sample of 137 claims would achieve 'a 95% statistical probability that the same percentage determined to be valid among the examined claims would be applicable to the totality of [9541 facially valid] claims filed.'" *Id.* at 782. There is no 95% "statistical probability" that a percentage computed from a sample will be "applicable" to a population. One can compute a confidence interval from a random sample and be 95% confident that the interval covers some parameter. The computation can be done for a sample of virtually any size, with larger samples giving smaller intervals. What is missing from the opinion is a discussion of the widths of the relevant intervals. For the same reason, it is meaningless to testify, as an expert did in *Ayyad v. Sprint Spectrum, L.P.*, No. RG03-121510 (Cal. Super. Ct., Alameda County) (transcript, May 28, 2008, at 730), that a simple regression equation is trustworthy because the coefficient of the explanatory variable has "an extremely high indication of reliability to more than 99% confidence level."

95. With the Nixon papers, one parameter is the average value of all 20,000 boxes, and another parameter is the standard deviation of the 20,000 values. These parameters can be used to approximate the distribution of the sample average. *See infra* Appendix. Regression models and their parameters are discussed *infra* Section V and in Rubinfeld, *supra* note 21.

248

**EXHIBIT C**

*Reference Guide on Statistics*

calculations—if not the appraised values themselves. In many contexts, the choice of an appropriate statistical model is less than obvious. When a model does not fit the data collection process, estimates and standard errors will not be probative.

Standard errors and confidence intervals generally ignore systematic errors such as selection bias or nonresponse bias (*supra* Sections II.B.1–2). For example, after reviewing studies to see whether a particular drug caused birth defects, a court observed that mothers of children with birth defects may be more likely to remember taking a drug during pregnancy than mothers with normal children. This selective recall would bias comparisons between samples from the two groups of women. The standard error for the estimated difference in drug usage between the groups would ignore this bias, as would the confidence interval.[96]

## B. Significance Levels and Hypothesis Tests

### 1. What Is the p-value?

In 1969, Dr. Benjamin Spock came to trial in the U.S. District Court for Massachusetts. The charge was conspiracy to violate the Military Service Act. The jury was drawn from a panel of 350 persons selected by the clerk of the court. The panel included only 102 women—substantially less than 50%—although a majority of the eligible jurors in the community were female. The shortfall in women was especially poignant in this case: "Of all defendants, Dr. Spock, who had given wise and welcome advice on child-rearing to millions of mothers, would have liked women on his jury."[97]

Can the shortfall in women be explained by the mere play of random chance? To approach the problem, a statistician would formulate and test a null hypothesis. Here, the null hypothesis says that the panel is like 350 persons drawn at random from a large population that is 50% female. The expected number of women drawn would then be 50% of 350, which is 175. The observed number of women is 102. The shortfall is $175 - 102 = 73$. How likely is it to find a disparity this large or larger, between observed and expected values? The probability is called $p$, or the $p$-value.

---

96. Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 311–12 (5th Cir.), *modified*, 884 F.2d 166 (5th Cir. 1989). In *Brock*, the court stated that the confidence interval took account of bias (in the form of selective recall) as well as random error. 874 F.2d at 311–12. This is wrong. Even if the sampling error were nonexistent—which would be the case if one could interview every woman who had a child during the period that the drug was available—selective recall would produce a difference in the percentages of reported drug exposure between mothers of children with birth defects and those with normal children. In this hypothetical situation, the standard error would vanish. Therefore, the standard error could disclose nothing about the impact of selective recall.

97. Hans Zeisel, *Dr. Spock and the Case of the Vanishing Women Jurors*, 37 U. Chi. L. Rev. 1 (1969). Zeisel's reasoning was different from that presented in this text. The conviction was reversed on appeal without reaching the issue of jury selection. United States v. Spock, 416 F.2d 165 (1st Cir. 1965).

249

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

The *p*-value is the probability of getting data as extreme as, or more extreme than, the actual data—given that the null hypothesis is true. In the example, *p* turns out to be essentially zero. The discrepancy between the observed and the expected is far too large to explain by random chance. Indeed, even if the panel had included 155 women, the *p*-value would only be around 0.02, or 2%.[98] (If the population is more than 50% female, *p* will be even smaller.) In short, the jury panel was nothing like a random sample from the community.

Large *p*-values indicate that a disparity can easily be explained by the play of chance: The data fall within the range likely to be produced by chance variation. On the other hand, if *p* is very small, something other than chance must be involved: The data are far away from the values expected under the null hypothesis. Significance testing often seems to involve multiple negatives. This is because a statistical test is an argument by contradiction.

With the Dr. Spock example, the null hypothesis asserts that the jury panel is like a random sample from a population that is 50% female. The data contradict this null hypothesis because the disparity between what is observed and what is expected (according to the null) is too large to be explained as the product of random chance. In a typical jury discrimination case, small *p*-values help a defendant appealing a conviction by showing that the jury panel is not like a random sample from the relevant population; large *p*-values hurt. In the usual employment context, small *p*-values help plaintiffs who complain of discrimination—for example, by showing that a disparity in promotion rates is too large to be explained by chance; conversely, large *p*-values would be consistent with the defense argument that the disparity is just due to chance.

Because *p* is calculated by assuming that the null hypothesis is correct, *p* does not give the chance that the null is true. The *p*-value merely gives the chance of getting evidence against the null hypothesis as strong as or stronger than the evidence at hand. Chance affects the data, not the hypothesis. According to the frequency theory of statistics, there is no meaningful way to assign a numerical probability to the null hypothesis. The correct interpretation of the *p*-value can therefore be summarized in two lines:

> *p* is the probability of extreme data given the null hypothesis.
> *p* is not the probability of the null hypothesis given extreme data.[99]

---

98. With 102 women out of 350, the *p*-value is about $2/10^{15}$, where $10^{15}$ is 1 followed by 15 zeros, that is, a quadrillion. See *infra* Appendix for the calculations.

99. Some opinions present a contrary view. *E.g.*, Vasquez v. Hillery, 474 U.S. 254, 259 n.3 (1986) ("the District Court . . . ultimately accepted . . . a probability of 2 in 1000 that the phenomenon was attributable to chance"); Nat'l Abortion Fed. v. Ashcroft, 330 F. Supp. 2d 436 (S.D.N.Y. 2004), *aff'd in part*, 437 F.3d 278 (2d Cir. 2006), *vacated*, 224 Fed. App'x. 88 (2d Cir. 2007) ("According to Dr. Howell, . . . a 'P value' of 0.30 . . . indicates that there is a thirty percent probability that the results of the . . . [s]tudy were merely due to chance alone."). Such statements confuse the probability of the

EXHIBIT C

*Reference Guide on Statistics*

To recapitulate the logic of significance testing: If $p$ is small, the observed data are far from what is expected under the null hypothesis—too far to be readily explained by the operations of chance. That discredits the null hypothesis.

Computing $p$-values requires statistical expertise. Many methods are available, but only some will fit the occasion. Sometimes standard errors will be part of the analysis; other times they will not be. Sometimes a difference of two standard errors will imply a $p$-value of about 5%; other times it will not. In general, the $p$-value depends on the model, the size of the sample, and the sample statistics.

## 2. Is a difference statistically significant?

If an observed difference is in the middle of the distribution that would be expected under the null hypothesis, there is no surprise. The sample data are of the type that often would be seen when the null hypothesis is true. The difference is not significant, as statisticians say, and the null hypothesis cannot be rejected. On the other hand, if the sample difference is far from the expected value—according to the null hypothesis—then the sample is unusual. The difference is significant, and the null hypothesis is rejected. Statistical significance is determined by comparing $p$ to a preset value, called the significance level.[100] The null hypothesis is rejected when $p$ falls below this level.

In practice, statistical analysts typically use levels of 5% and 1%.[101] The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure. An unexplained reference to highly significant results probably means that $p$ is less

kind of outcome observed, which is computed under some model of chance, with the probability that chance is the explanation for the outcome—the "transposition fallacy."

Instances of the transposition fallacy in criminal cases are collected in David H. Kaye et al., The New Wigmore: A Treatise on Evidence: Expert Evidence §§ 12.8.2(b) & 14.1.2 (2d ed. 2011). In *McDaniel v. Brown*, 130 S. Ct. 665 (2010), for example, a DNA analyst suggested that a random match probability of 1/3,000,000 implied a .000033 probability that the DNA was not the source of the DNA found on the victim's clothing. *See* David H. Kaye, *"False But Highly Persuasive": How Wrong Were the Probability Estimates in* McDaniel v. Brown? 108 Mich. L. Rev. First Impressions 1 (2009).

100. Statisticians use the Greek letter alpha ($\alpha$) to denote the significance level; $\alpha$ gives the chance of getting a significant result, assuming that the null hypothesis is true. Thus, $\alpha$ represents the chance of a false rejection of the null hypothesis (also called a false positive, a false alarm, or a Type I error). For example, suppose $\alpha = 5\%$. If investigators do many studies, and the null hypothesis happens to be true in each case, then about 5% of the time they would obtain significant results—and falsely reject the null hypothesis.

101. The Supreme Court implicitly referred to this practice in *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977), and *Hazelwood School District v. United States*, 433 U.S. 299, 311 n.17 (1977). In these footnotes, the Court described the null hypothesis as "suspect to a social scientist" when a statistic from "large samples" falls more than "two or three standard deviations" from its expected value under the null hypothesis. Although the Court did not say so, these differences produce $p$-values of about 5% and 0.3% when the statistic is normally distributed. The Court's standard deviation is our standard error.

251

EXHIBIT C

*Reference Manual on Scientific Evidence*

than 1%. These levels of 5% and 1% have become icons of science and the legal process. In truth, however, such levels are at best useful conventions.

Because the term "significant" is merely a label for a certain kind of *p*-value, significance is subject to the same limitations as the underlying *p*-value. Thus, significant differences may be evidence that something besides random error is at work. They are not evidence that this something is legally or practically important. Statisticians distinguish between statistical and practical significance to make the point. When practical significance is lacking—when the size of a disparity is negligible—there is no reason to worry about statistical significance.[102]

It is easy to mistake the *p*-value for the probability of the null hypothesis given the data (*supra* Section IV.B.1). Likewise, if results are significant at the 5% level, it is tempting to conclude that the null hypothesis has only a 5% chance of being correct.[103] This temptation should be resisted. From the frequentist perspective, statistical hypotheses are either true or false. Probabilities govern the samples, not the models and hypotheses. The significance level tells us what is likely to happen when the null hypothesis is correct; it does not tell us the probability that the hypothesis is true. Significance comes no closer to expressing the probability that the null hypothesis is true than does the underlying *p*-value.

### 3. Tests or interval estimates?

How can a highly significant difference be practically insignificant? The reason is simple: *p* depends not only on the magnitude of the effect, but also on the sample size (among other things). With a huge sample, even a tiny effect will be

---

102. *E.g.*, Waisome v. Port Auth., 948 F.2d 1370, 1376 (2d Cir. 1991) ("though the disparity was found to be statistically significant, it was of limited magnitude."); United States v. Henderson, 409 F.3d 1293, 1306 (11th Cir. 2005) (regardless of statistical significance, excluding law enforcement officers from jury service does not have a large enough impact on the composition of grand juries to violate the Jury Selection and Service Act); *cf.* Thornburg v. Gingles, 478 U.S. 30, 53–54 (1986) (repeating the district court's explanation of why "the correlation between the race of the voter and the voter's choice of certain candidates was [not only] statistically significant," but also "so marked as to be substantively significant, in the sense that the results of the individual election would have been different depending upon whether it had been held among only the white voters or only the black voters.").

103. *E.g.*, *Waisome*, 948 F.2d at 1376 ("Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for a deviation could be random . . . ."); Adams v. Ameritech Serv., Inc., 231 F.3d 414, 424 (7th Cir. 2000) ("Two standard deviations is normally enough to show that it is extremely unlikely (. . . less than a 5% probability) that the disparity is due to chance"); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 605 n.26 (D.N.J. 2002) (a "statistically significant . . . study shows that there is only 5% probability that an observed association is due to chance."); *cf.* Giles v. Wyeth, Inc., 500 F. Supp. 2d 1048, 1056 (S.D. Ill. 2007) ("While [plaintiff] admits that a *p*-value of .15 is three times higher than what scientists generally consider statistically significant—that is, a *p*-value of .05 or lower—she maintains that this "represents 85% certainty, which meets any conceivable concept of preponderance of the evidence.").

252

**EXHIBIT C**

*Reference Guide on Statistics*

highly significant.[104] For example, suppose that a company hires 52% of male job applicants and 49% of female applicants. With a large enough sample, a statistician could compute an impressively small *p*-value. This *p*-value would confirm that the difference does not result from chance, but it would not convert a trivial difference (52% versus 49% ) into a substantial one.[105] In short, the *p*-value does not measure the strength or importance of an association.

A "significant" effect can be small. Conversely, an effect that is "not significant" can be large. By inquiring into the magnitude of an effect, courts can avoid being misled by *p*-values. To focus attention on more substantive concerns—the size of the effect and the precision of the statistical analysis—interval estimates (e.g., confidence intervals) may be more valuable than tests. Seeing a plausible range of values for the quantity of interest helps describe the statistical uncertainty in the estimate.

### 4. Is the sample statistically significant?

Many a sample has been praised for its statistical significance or blamed for its lack thereof. Technically, this makes little sense. Statistical significance is about the difference between observations and expectations. Significance therefore applies to statistics computed from the sample, but not to the sample itself, and certainly not to the size of the sample. Findings can be statistically significant. Differences can be statistically significant (*supra* Section IV.B.2). Estimates can be statistically significant (*infra* Section V.D.2). By contrast, samples can be representative or unrepresentative. They can be chosen well or badly (*supra* Section II.B.1). They can be large enough to give reliable results or too small to bother with (*supra* Section IV.A.3). But samples cannot be "statistically significant," if this technical phrase is to be used as statisticians use it.

## C. Evaluating Hypothesis Tests

### 1. What is the power of the test?

When a *p*-value is high, findings are not significant, and the null hypothesis is not rejected. This could happen for at least two reasons:

---

104. *See supra* Section IV.B.2. Although some opinions seem to equate small *p*-values with "gross" or "substantial" disparities, most courts recognize the need to decide whether the underlying sample statistics reveal that a disparity is large. *E.g.*, Washington v. People, 186 P.3d 594 (Colo. 2008) (jury selection).

105. *Cf.* Frazier v. Garrison Indep. Sch. Dist., 980 F.2d 1514, 1526 (5th Cir. 1993) (rejecting claims of intentional discrimination in the use of a teacher competency examination that resulted in retention rates exceeding 95% for all groups); *Washington*, 186 P.2d 594 (although a jury selection practice that reduced the representation of "African–Americans [from] 7.7 percent of the population [to] 7.4 percent of the county's jury panels produced a highly statistically significant disparity, the small degree of exclusion was not constitutionally significant.").

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

1. The null hypothesis is true.
2. The null is false—but, by chance, the data happened to be of the kind expected under the null.

If the power of a statistical study is low, the second explanation may be plausible. Power is the chance that a statistical test will declare an effect when there is an effect to be declared.[106] This chance depends on the size of the effect and the size of the sample. Discerning subtle differences requires large samples; small samples may fail to detect substantial differences.

When a study with low power fails to show a significant effect, the results may therefore be more fairly described as inconclusive than negative. The proof is weak because power is low. On the other hand, when studies have a good chance of detecting a meaningful association, failure to obtain significance can be persuasive evidence that there is nothing much to be found.[107]

## 2. What about small samples?

For simplicity, the examples of statistical inference discussed here (*supra* Sections IV.A–B) were based on large samples. Small samples also can provide useful

---

106. More precisely, power is the probability of rejecting the null hypothesis when the alternative hypothesis (*infra* Section IV.C.5) is right. Typically, this probability will depend on the values of unknown parameters, as well as the preset significance level $\alpha$. The power can be computed for any value of $\alpha$ and any choice of parameters satisfying the alternative hypothesis. *See infra* Appendix for an example. Frequentist hypothesis testing keeps the risk of a false positive to a specified level (such as $\alpha = 5\%$) and then tries to maximize power.

Statisticians usually denote power by the Greek letter beta ($\beta$). However, some authors use $\beta$ to denote the probability of *accepting* the null hypothesis when the alternative hypothesis is true; this usage is fairly standard in epidemiology. Accepting the null hypothesis when the alternative holds true is a false negative (also called a Type II error, a missed signal, or a false acceptance of the null hypothesis).

The chance of a false negative may be computed from the power. Some commentators have claimed that the cutoff for significance should be chosen to equalize the chance of a false positive and a false negative, on the ground that this criterion corresponds to the more-probable-than-not burden of proof. The argument is fallacious, because $\alpha$ and $\beta$ do not give the probabilities of the null and alternative hypotheses; *see supra* Sections IV.B.1–2; *supra* note 34. *See also* D.H. Kaye, *Hypothesis Testing in the Courtroom*, *in* Contributions to the Theory and Application of Statistics: A Volume in Honor of Herbert Solomon 331, 341–43 (Alan E. Gelfand ed., 1987).

107. Some formal procedures (meta-analysis) are available to aggregate results across studies. *See, e.g., In re* Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1174, 1184 (N.D. Cal. 2007) (holding that "[a] meta-analysis of all available published and unpublished randomized clinical trials" of certain pain-relief medicine was admissible). In principle, the power of the collective results will be greater than the power of each study. However, these procedures have their own weakness. *See, e.g.*, Richard A. Berk & David A. Freedman, *Statistical Assumptions as Empirical Commitments, in* Punishment and Social Control: Essays in Honor of Sheldon Messinger 235, 244–48 (T.G. Blomberg & S. Cohen eds., 2d ed. 2003); Michael Oakes, Statistical Inference: A Commentary for the Social and Behavioral Sciences (1986); Diana B. Petitti, Meta-Analysis, Decision Analysis, and Cost-Effectiveness Analysis Methods for Quantitative Synthesis in Medicine (2d ed. 2000).

254

**EXHIBIT C**

*Reference Guide on Statistics*

information. Indeed, when confidence intervals and *p*-values can be computed, the interpretation is the same with small samples as with large ones.[108] The concern with small samples is not that they are beyond the ken of statistical theory, but that

1  The underlying assumptions are hard to validate.
2. Because approximations based on the normal curve generally cannot be used, confidence intervals may be difficult to compute for parameters of interest. Likewise, *p*-values may be difficult to compute for hypotheses of interest.[109]
3. Small samples may be unreliable, with large standard errors, broad confidence intervals, and tests having low power.

### 3. One tail or two?

In many cases, a statistical test can be done either one-tailed or two-tailed; the second method often produces a *p*-value twice as big as the first method. The methods are easily explained with a hypothetical example. Suppose we toss a coin 1000 times and get 532 heads. The null hypothesis to be tested asserts that the coin is fair. If the null is correct, the chance of getting 532 or more heads is 2.3%. That is a one-tailed test, whose *p*-value is 2.3%. To make a two-tailed test, the statistician computes the chance of getting 532 or more heads—or $500 - 32 = 468$ heads or fewer. This is 4.6%. In other words, the two-tailed *p*-value is 4.6%. Because small *p*-values are evidence against the null hypothesis, the one-tailed test seems to produce stronger evidence than its two-tailed counterpart. However, the advantage is largely illusory, as the example suggests. (The two-tailed test may seem artificial, but it offers some protection against possible artifacts resulting from multiple testing—the topic of the next section.)

Some courts and commentators have argued for one or the other type of test, but a rigid rule is not required if significance levels are used as guidelines rather than as mechanical rules for statistical proof.[110] One-tailed tests often make it

108. Advocates sometimes contend that samples are "too small to allow for meaningful statistical analysis," United States v. New York City Bd. of Educ., 487 F. Supp. 2d 220, 229 (E.D.N.Y. 2007), and courts often look to the size of samples from earlier cases to determine whether the sample data before them are admissible or convincing. *Id*. at 230; Timmerman v. U.S. Bank, 483 F.3d 1106, 1116 n.4 (10th Cir. 2007). However, a meaningful statistical analysis yielding a significant result can be based on a small sample, and reliability does not depend on sample size alone (*see supra* Section IV.A.3, *infra* Section V.C.1). Well-known small-sample techniques include the sign test and Fisher's exact test. *E.g.*, Michael O. Finkelstein & Bruce Levin, Statistics for Lawyers 154–56, 339–41 (2d ed. 2001); *see generally* E.L. Lehmann & H.J.M. d'Abrera, Nonparametrics (2d ed. 2006).

109. With large samples, approximate inferences (e.g., based on the central limit theorem, *see infra* Appendix) may be quite adequate. These approximations will not be satisfactory for small samples.

110. *See, e.g.*, United States v. State of Delaware, 93 Fair Empl. Prac. Cas. (BNA) 1248, 2004 WL 609331, ⋆10 n.4 (D. Del. 2004). According to formal statistical theory, the choice between one

255

EXHIBIT C

*Reference Manual on Scientific Evidence*

easier to reach a threshold such as 5%, at least in terms of appearance. However, if we recognize that 5% is not a magic line, then the choice between one tail and two is less important—as long as the choice and its effect on the *p*-value are made explicit.

## 4. How many tests have been done?

Repeated testing complicates the interpretation of significance levels. If enough comparisons are made, random error almost guarantees that some will yield "significant" findings, even when there is no real effect. To illustrate the point, consider the problem of deciding whether a coin is biased. The probability that a fair coin will produce 10 heads when tossed 10 times is $(1/2)^{10} = 1/1024$. Observing 10 heads in the first 10 tosses, therefore, would be strong evidence that the coin is biased. Nonetheless, if a fair coin is tossed a few thousand times, it is likely that at least one string of ten consecutive heads will appear. Ten heads in the first ten tosses means one thing; a run of ten heads somewhere along the way to a few thousand tosses of a coin means quite another. A test—looking for a run of ten heads—can be repeated too often.

Artifacts from multiple testing are commonplace. Because research that fails to uncover significance often is not published, reviews of the literature may produce an unduly large number of studies finding statistical significance.[111] Even a single researcher may examine so many different relationships that a few will achieve statistical significance by mere happenstance. Almost any large dataset—even pages from a table of random digits—will contain some unusual pattern that can be uncovered by diligent search. Having detected the pattern, the analyst can perform a statistical test for it, blandly ignoring the search effort. Statistical significance is bound to follow.

There are statistical methods for dealing with multiple looks at the data, which permit the calculation of meaningful *p*-values in certain cases.[112] However, no general solution is available, and the existing methods would be of little help in the typical case where analysts have tested and rejected a variety of models before arriving at the one considered the most satisfactory (*see infra* Section V on regression models). In these situations, courts should not be overly impressed with

tail or two can sometimes be made by considering the exact form of the alternative hypothesis (*infra* Section IV.C.5). *But see* Freedman et al., *supra* note 12, at 547–50. One-tailed tests at the 5% level are viewed as weak evidence—no weaker standard is commonly used in the technical literature. One-tailed tests are also called one-sided (with no pejorative intent); two-tailed tests are two-sided.

111. *E.g.*, Philippa J. Easterbrook et al., *Publication Bias in Clinical Research*, 337 Lancet 867 (1991); John P.A. Ioannidis, *Effect of the Statistical Significance of Results on the Time to Completion and Publication of Randomized Efficacy Trials*, 279 JAMA 281 (1998); Stuart J. Pocock et al., *Statistical Problems in the Reporting of Clinical Trials: A Survey of Three Medical Journals*, 317 New Eng. J. Med. 426 (1987).

112. *See, e.g.,* Sandrine Dudoit & Mark J. van der Laan, Multiple Testing Procedures with Applications to Genomics (2008).

EXHIBIT C

*Reference Guide on Statistics*

claims that estimates are significant. Instead, they should be asking how analysts developed their models.[113]

## 5. What are the rival hypotheses?

The *p*-value of a statistical test is computed on the basis of a model for the data: the null hypothesis. Usually, the test is made in order to argue for the alternative hypothesis: another model. However, on closer examination, both models may prove to be unreasonable. A small *p*-value means something is going on besides random error. The alternative hypothesis should be viewed as one possible explanation, out of many, for the data.

In *Mapes Casino, Inc. v. Maryland Casualty Co.*,[114] the court recognized the importance of explanations that the proponent of the statistical evidence had failed to consider. In this action to collect on an insurance policy, Mapes sought to quantify its loss from theft. It argued that employees were using an intermediary to cash in chips at other casinos. The casino established that over an 18-month period, the win percentage at its craps tables was 6%, compared to an expected value of 20%. The statistics proved that *something* was wrong at the craps tables—the discrepancy was too big to explain as the product of random chance. But the court was not convinced by plaintiff's alternative hypothesis. The court pointed to other possible explanations (Runyonesque activities such as skimming, scamming, and crossroading) that might have accounted for the discrepancy without implicating the suspect employees.[115] In short, rejection of the null hypothesis does not leave the proffered alternative hypothesis as the only viable explanation for the data.[116]

---

113. Intuition may suggest that the more variables included in the model, the better. However, this idea often turns out to be wrong. Complex models may reflect only accidental features of the data. Standard statistical tests offer little protection against this possibility when the analyst has tried a variety of models before settling on the final specification. *See* authorities cited, *supra* note 21.

114. 290 F. Supp. 186 (D. Nev. 1968).

115. *Id.* at 193. Skimming consists of "taking off the top before counting the drop," scamming is "cheating by collusion between dealer and player," and crossroading involves "professional cheaters among the players." *Id.* In plainer language, the court seems to have ruled that the casino itself might be cheating, or there could have been cheaters other than the particular employees identified in the case. At the least, plaintiff's statistical evidence did not rule out such possibilities. *Compare* EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 312 & n.9, 313 (7th Cir. 1988) (EEOC's regression studies showing significant differences did not establish liability because surveys and testimony supported the rival hypothesis that women generally had less interest in commission sales positions), *with* EEOC v. General Tel. Co., 885 F.2d 575 (9th Cir. 1989) (unsubstantiated rival hypothesis of "lack of interest" in "nontraditional" jobs insufficient to rebut prima facie case of gender discrimination); *cf. supra* Section II.A (problem of confounding).

116. *E.g.*, Coleman v. Quaker Oats Co., 232 F.3d 1271, 1283 (9th Cir. 2000) (a disparity with a *p*-value of "3 in 100 billion" did not demonstrate age discrimination because "Quaker never contends that the disparity occurred by chance, just that it did not occur for discriminatory reasons. When other pertinent variables were factored in, the statistical disparity diminished and finally disappeared.").

257

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## D. Posterior Probabilities

Standard errors, *p*-values, and significance tests are common techniques for assessing random error. These procedures rely on sample data and are justified in terms of the operating characteristics of statistical procedures.[117] However, frequentist statisticians generally will not compute the probability that a particular hypothesis is correct, given the data.[118] For example, a frequentist may postulate that a coin is fair: There is a 50–50 chance of landing heads, and successive tosses are independent. This is viewed as an empirical statement—potentially falsifiable—about the coin. It is easy to calculate the chance that a fair coin will turn up heads in the next 10 tosses: The answer (*see supra* Section IV.C.4) is 1/1024. Therefore, observing 10 heads in a row brings into serious doubt the initial hypothesis of fairness.

But what of the converse probability: If the coin does land heads 10 times, what is the chance that it is fair?[119] To compute such converse probabilities, it is necessary to postulate initial probabilities that the coin is fair, as well as probabilities of unfairness to various degrees. In the frequentist theory of inference, such postulates are untenable: Probabilities are objective features of the situation that specify the chances of events or effects, not hypotheses or causes.

By contrast, in the Bayesian approach, probabilities represent subjective degrees of belief about hypotheses or causes rather than objective facts about observations. The observer must quantify beliefs about the chance that the coin is unfair to various degrees—in advance of seeing the data.[120] These subjective probabilities, like the probabilities governing the tosses of the coin, are set up to obey the axioms of probability theory. The probabilities for the various hypotheses about the coin, specified before data collection, are called prior probabilities.

---

117. Operating characteristics include the expected value and standard error of estimators, probabilities of error for statistical tests, and the like.

118. In speaking of "frequentist statisticians" or "Bayesian statisticians," we do not mean to suggest that all statisticians fall on one side of the philosophical divide or the other. These are archetypes. Many practicing statisticians are pragmatists, using whatever procedure they think is appropriate for the occasion, and not concerning themselves greatly with what the numbers they obtain really mean.

119. We call this a converse probability because it is of the form $P(H_0|data)$ rather than $P(data|H_0)$; an equivalent phrase, "inverse probability," also is used. Treating $P(data|H_0)$ as if it were the converse probability $P(H_0|data)$ is the transposition fallacy. For example, most U.S. senators are men, but few men are senators. Consequently, there is a high probability that an individual who is a senator is a man, but the probability that an individual who is a man is a senator is practically zero. For examples of the transposition fallacy in court opinions, see cases cited *supra* notes 98, 102. The frequentist *p*-value, $P(data|H_0)$, is generally not a good approximation to the Bayesian $P(H_0|data)$; the latter includes considerations of power and base rates.

120. For example, let *p* be the unknown probability that the coin lands heads. What is the chance that *p* exceeds 0.1? 0.6? The Bayesian statistician must be prepared to answer such questions. Bayesian procedures are sometimes defended on the ground that the beliefs of any rational observer must conform to the Bayesian rules. However, the definition of "rational" is purely formal. *See* Peter C. Fishburn, *The Axioms of Subjective Probability*, 1 Stat. Sci. 335 (1986); Freedman, *supra* note 84; David Kaye, *The Laws of Probability and the Law of the Land*, 47 U. Chi. L. Rev. 34 (1979).

**EXHIBIT C**

*Reference Guide on Statistics*

Prior probabilities can be updated, using Bayes' rule, given data on how the coin actually falls. (The Appendix explains the rule.) In short, a Bayesian statistician can compute posterior probabilities for various hypotheses about the coin, given the data. These posterior probabilities quantify the statistician's confidence in the hypothesis that a coin is fair.[121] Although such posterior probabilities relate directly to hypotheses of legal interest, they are necessarily subjective, for they reflect not just the data but also the subjective prior probabilities—that is, degrees of belief about hypotheses formulated prior to obtaining data.

Such analyses have rarely been used in court, and the question of their forensic value has been aired primarily in the academic literature. Some statisticians favor Bayesian methods, and some commentators have proposed using these methods in some kinds of cases.[122] The frequentist view of statistics is more conventional; subjective Bayesians are a well-established minority.[123]

121. Here, confidence has the meaning ordinarily ascribed to it, rather than the technical interpretation applicable to a frequentist confidence interval. Consequently, it can be related to the burden of persuasion. *See* D.H. Kaye, *Apples and Oranges: Confidence Coefficients and the Burden of Persuasion*, 73 Cornell L. Rev. 54 (1987).

122. *See* David H. Kaye et al., The New Wigmore: A Treatise on Evidence: Expert Evidence §§ 12.8.5, 14.3.2 (2d ed. 2010); David H. Kaye, *Rounding Up the Usual Suspects: A Legal and Logical Analysis of DNA Database Trawls,* 87 N.C. L. Rev. 425 (2009). In addition, as indicated in the Appendix, Bayes' rule is crucial in solving certain problems involving conditional probabilities of related events. For example, if the proportion of women with breast cancer in a region is known, along with the probability that a mammogram of an affected woman will be positive for cancer and that the mammogram of an unaffected woman will be negative, then one can compute the numbers of false-positive and false-negative mammography results that would be expected to arise in a population-wide screening program. Using Bayes' rule to diagnose a specific patient, however, is more problematic, because the prior probability that the patient has breast cancer may not equal the population proportion. Nevertheless, to overcome the tendency to focus on a test result without considering the "base rate" at which a condition occurs, a diagnostician can apply Bayes' rule to plausible base rates before making a diagnosis. Finally, Bayes' rule also is valuable as a device to explicate the meaning of concepts such as error rates, probative value, and transposition. *See, e.g.,* David H. Kaye, The Double Helix and the Law of Evidence (2010); Wigmore, *supra*, § 7.3.2; David H. Kaye & Jonathan J. Koehler, *The Misquantification of Probative Value,* 27 Law & Hum. Behav. 645 (2003).

123. "Objective Bayesians" use Bayes' rule without eliciting prior probabilities from subjective beliefs. One strategy is to use preliminary data to estimate the prior probabilities and then apply Bayes' rule to that empirical distribution. This "empirical Bayes" procedure avoids the charge of subjectivism at the cost of departing from a fully Bayesian framework. With ample data, however, it can be effective and the estimates or inferences can be understood in frequentist terms. Another "objective" approach is to use "noninformative" priors that are supposed to be independent of all data and prior beliefs. However, the choice of such priors can be questioned, and the approach has been attacked by frequentists and subjective Bayesians. *E.g.,* Joseph B. Kadane, *Is "Objective Bayesian Analysis" Objective, Bayesian, or Wise?*, 1 Bayesian Analysis 433 (2006), *available at* http://ba.stat.cmu.edu/journal/2006/vol01/issue03/kadane.pdf; Jon Williamson, *Philosophies of Probability, in* Philosophy of Mathematics 493 (Andrew Irvine ed., 2009) (discussing the challenges to objective Bayesianism).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## *V. Correlation and Regression*

Regression models are used by many social scientists to infer causation from association. Such models have been offered in court to prove disparate impact in discrimination cases, to estimate damages in antitrust actions, and for many other purposes. Sections V.A, V.B, and V.C cover some preliminary material, showing how scatter diagrams, correlation coefficients, and regression lines can be used to summarize relationships between variables.[124] Section V.D explains the ideas and some of the pitfalls.

## *A. Scatter Diagrams*

The relationship between two variables can be graphed in a scatter diagram (also called a scatterplot or scattergram). We begin with data on income and education for a sample of 178 men, ages 25 to 34, residing in Kansas.[125] Each person in the sample corresponds to one dot in the diagram. As indicated in Figure 5, the horizontal axis shows education, and the vertical axis shows income. Person A completed 12 years of schooling (high school) and had an income of $20,000. Person B completed 16 years of schooling (college) and had an income of $40,000.

Figure 5. Plotting a scatter diagram. The horizontal axis shows educational level and the vertical axis shows income.



124. The focus is on simple linear regression. *See also* Rubinfeld, *supra* note 21, and the Appendix, *infra,* and Section II, *supra,* for further discussion of these ideas with an emphasis on econometrics.

125. These data are from a public–use CD, Bureau of the Census, U.S. Department of Commerce, for the March 2005 Current Population Survey. Income and education are self–reported. Income is censored at $100,000. For additional details, see Freedman et al., *supra* note 12, at A–11. Both variables in a scatter diagram have to be quantitative (with numerical values) rather than qualitative (nonnumerical).

**EXHIBIT C**

*Reference Guide on Statistics*

Figure 6 is the scatter diagram for the Kansas data. The diagram confirms an obvious point. There is a positive association between income and education. In general, persons with a higher educational level have higher incomes. However, there are many exceptions to this rule, and the association is not as strong as one might expect.

Figure 6. Scatter diagram for income and education: men ages 25 to 34 in Kansas.



## B. Correlation Coefficients

Two variables are positively correlated when their values tend to go up or down together, such as income and education in Figure 5. The correlation coefficient (usually denoted by the letter $r$) is a single number that reflects the sign of an association and its strength. Figure 7 shows $r$ for three scatter diagrams: In the first, there is no association; in the second, the association is positive and moderate; in the third, the association is positive and strong.

A correlation coefficient of 0 indicates no linear association between the variables. The maximum value for the coefficient is +1, indicating a perfect linear relationship: The dots in the scatter diagram fall on a straight line that slopes up. Sometimes, there is a negative association between two variables: Large values of one tend to go with small values of the other. The age of a car and its fuel economy in miles per gallon illustrate the idea. Negative association is indicated by negative values for $r$. The extreme case is an $r$ of −1, indicating that all the points in the scatter diagram lie on a straight line that slopes down.

Weak associations are the rule in the social sciences. In Figure 5, the correlation between income and education is about 0.4. The correlation between college grades and first-year law school grades is under 0.3 at most law schools, while the

261

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Figure 7. The correlation coefficient measures the sign of a linear association and its strength.



correlation between LSAT scores and first-year grades is generally about 0.4.[126] The correlation between heights of fraternal twins is about 0.5. By contrast, the correlation between heights of identical twins is about 0.95.

## 1. Is the association linear?

The correlation coefficient has a number of limitations, to be considered in turn. The correlation coefficient is designed to measure linear association. Figure 8 shows a strong nonlinear pattern with a correlation close to zero. The correlation coefficient is of limited use with nonlinear data.

## 2. Do outliers influence the correlation coefficient?

The correlation coefficient can be distorted by outliers—a few points that are far removed from the bulk of the data. The left-hand panel in Figure 9 shows that one outlier (lower right-hand corner) can reduce a perfect correlation to nearly nothing. Conversely, the right-hand panel shows that one outlier (upper right-hand corner) can raise a correlation of zero to nearly one. If there are extreme outliers in the data, the correlation coefficient is unlikely to be meaningful.

## 3. Does a confounding variable influence the coefficient?

The correlation coefficient measures the association between two variables. Researchers—and the courts—are usually more interested in causation. Causation is not the same as association. The association between two variables may be driven by a lurking variable that has been omitted from the analysis (*supra*

126. Lisa Anthony Stilwell et al., Predictive Validity of the LSAT: A National Summary of the 2001–2002 Correlation Studies 5, 8 (2003).

EXHIBIT C

*Reference Guide on Statistics*

Figure 8. The scatter diagram shows a strong nonlinear association with a cor‑
relation coefficient close to zero. The correlation coefficient only
measures the degree of linear association.



Figure 9. The correlation coefficient can be distorted by outliers.



Section II.A). For an easy example, there is an association between shoe size and vocabulary among schoolchildren. However, learning more words does not cause the feet to get bigger, and swollen feet do not make children more articulate. In this case, the lurking variable is easy to spot—age. In more realistic examples, the lurking variable is harder to identify.[127]

127.  Green et al., *supra* note 13, Section IV.C, provides one such example.

263

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

In statistics, lurking variables are called confounders or confounding variables. Association often does reflect causation, but a large correlation coefficient is not enough to warrant causal inference. A large value of *r* only means that the dependent variable marches in step with the independent one: Possible reasons include causation, confounding, and coincidence. Multiple regression is one method that attempts to deal with confounders (*infra* Section V.D).[128]

## C. Regression Lines

The regression line can be used to describe a linear trend in the data. The regression line for income on education in the Kansas sample is shown in Figure 10. The height of the line estimates the average income for a given educational level. For example, the average income for people with 8 years of education is estimated at $21,100, indicated by the height of the line at 8 years. The average income for people with 16 years of education is estimated at $34,700.

Figure 10. The regression line for income on education and its estimates.



Figure 11 combines the data in Figures 5 and 10: it shows the scatter diagram for income and education, with the regression line superimposed. The line shows the average trend of income as education increases. Thus, the regression line indicates the extent to which a change in one variable (income) is associated with a change in another variable (education).

---

128.  *See also* Rubinfeld, *supra* note 21. The difference between experiments and observational studies is discussed *supra* Section II.B.

**EXHIBIT C**

*Reference Guide on Statistics*

Figure 11. Scatter diagram for income and education, with the regression line indicating the trend.



## 1. What are the slope and intercept?

The regression line can be described in terms of its intercept and slope. Often, the slope is the more interesting statistic. In Figure 11, the slope is $1700 per year. On average, each additional year of education is associated with an additional $1700 of income. Next, the intercept is $7500. This is an estimate of the average income for (hypothetical) persons with zero years of education.[129] Figure 10 suggests this estimate may not be especially good. In general, estimates based on the regression line become less trustworthy as we move away from the bulk of the data.

The slope of the regression line has the same limitations as the correlation coefficient: (1) The slope may be misleading if the relationship is strongly non-linear and (2) the slope may be affected by confounders. With respect to (1), the slope of $1700 per year in Figure 10 presents each additional year of education as having the same value, but some years of schooling surely are worth more and

---

129. The regression line, like any straight line, has an equation of the form $y = a + bx$. Here, *a* is the intercept (the value of $y$ when $x = 0$), and *b* is the slope (the change in $y$ per unit change in $x$). In Figure 9, the intercept of the regression line is $7500 and the slope is $1700 per year. The line estimates an average income of $34,700 for people with 16 years of education. This may be computed from the intercept and slope as follows:

$7500 + ($1700 per year) × 16 years = $7500 + $22,200 = $34,700.

The slope *b* is the same anywhere along the line. Mathematically, that is what distinguishes straight lines from other curves. If the association is negative, the slope will be negative too. The slope is like the grade of a road, and it is negative if the road goes downhill. The intercept is like the starting elevation of a road, and it is computed from the data so that the line goes through the center of the scatter diagram, rather than being generally too high or too low.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

others less. With respect to (2), the association between education and income is no doubt causal, but there are other factors to consider, including family back-ground. Compared to individuals who did not graduate from high school, people with college degrees usually come from richer and better educated families. Thus, college graduates have advantages besides education. As statisticians might say, the effects of family background are confounded with the effects of education. Statisticians often use the guarded phrases "on average" and "associated with" when talking about the slope of the regression line. This is because the slope has limited utility when it comes to making causal inferences.

## 2. What is the unit of analysis?

If association between characteristics of individuals is of interest, these character-istics should be measured on individuals. Sometimes individual-level data are not to be had, but rates or averages for groups are available. "Ecological" correlations are computed from such rates or averages. These correlations generally overstate the strength of an association. For example, average income and average education can be determined for men living in each state and in Washington, D.C. The cor-relation coefficient for these 51 pairs of averages turns out to be 0.70. However, states do not go to school and do not earn incomes. People do. The correlation for income and education for men in the United States is only 0.42. The correlation for state averages overstates the correlation for individuals—a common tendency for ecological correlations.[130]

Ecological analysis is often seen in cases claiming dilution in voting strength of minorities. In this type of voting rights case, plaintiffs must prove three things: (1) the minority group constitutes a majority in at least one district of a proposed plan; (2) the minority group is politically cohesive, that is, votes fairly solidly for its preferred candidate; and (3) the majority group votes sufficiently as a bloc to defeat the minority-preferred candidate.[131] The first requirement is compactness; the second and third define polarized voting.

---

130. Correlations are computed from the March 2005 Current Population Survey for men ages 25–64. Freedman et al., *supra* note 12, at 149. The ecological correlation uses only the average figures, but within each state there is a lot of spread about the average. The ecological correlation smoothes away this individual variation. *Cf.* Green et al., *supra* note 13, Section II.B.4 (suggesting that ecological studies of exposure and disease are "far from conclusive" because of the lack of data on confounding variables (a much more general problem) as well as the possible aggregation bias described here); David A. Freedman, *Ecological Inference and the Ecological Fallacy, in* 6 Int'l Encyclopedia of the Social and Behavioral Sciences 4027 (Neil J. Smelser & Paul B. Baltes eds., 2001).

131. *See* Thornburg v. Gingles, 478 U.S. 30, 50–51 (1986) ("First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."). In subsequent cases, the Court has emphasized that these factors are not sufficient to make out a violation of section 2 of

EXHIBIT C

*Reference Guide on Statistics*

The secrecy of the ballot box means that polarized voting cannot be directly observed. Instead, plaintiffs in voting rights cases rely on ecological regression, with scatter diagrams, correlations, and regression lines to estimate voting behavior by groups and demonstrate polarization. The unit of analysis typically is the precinct. For each precinct, public records can be used to determine the percentage of registrants in each demographic group of interest, as well as the percentage of the total vote for each candidate—by voters from all demographic groups combined. Plaintiffs' burden is to determine the vote by each demographic group separately.

Figure 12 shows how the argument unfolds. Each point in the scatter diagram represents data for one precinct in the 1982 Democratic primary election for auditor in Lee County, South Carolina. The horizontal axis shows the percentage of registrants who are white. The vertical axis shows the turnout rate for the white candidate. The regression line is plotted too. The slope would be interpreted as the difference between the white turnout rate and the black turnout rate for the white candidate. Furthermore, the intercept would be interpreted as the black turnout rate for the white candidate.[132] The validity of such estimates is contested in the statistical literature.[133]

---

the Voting Rights Act. *E.g.*, Johnson v. De Grandy, 512 U.S. 997, 1011 (1994) ("*Gingles* . . . clearly declined to hold [these factors] sufficient in combination, either in the sense that a court's examination of relevant circumstances was complete once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution.").

132. By definition, the turnout rate equals the number of votes for the candidate, divided by the number of registrants; the rate is computed separately for each precinct. The intercept of the line in Figure 11 is 4%, and the slope is 0.52. Plaintiffs would conclude that only 4% of the black registrants voted for the white candidate, while 4% + 52% = 56% of the white registrants voted for the white candidate, which demonstrates polarization.

133. For further discussion of ecological regression in this context, see D. James Greiner, *Ecological Inference in Voting Rights Act Disputes: Where Are We Now, and Where Do We Want to Be?*, 47 Jurimetrics J. 115 (2007); Bernard Grofman & Chandler Davidson, Controversies in Minority Voting: The Voting Rights Act in Perspective (1992); Stephen P. Klein & David A. Freedman, *Ecological Regression in Voting Rights Cases*, 6 Chance 38 (Summer 1993). The use of ecological regression increased considerably after the Supreme Court noted in *Thornburg v. Gingles*, 478 U.S. 30, 53 n.20 (1986), that "[t]he District Court found both methods [extreme case analysis and bivariate ecological regression analysis] standard in the literature for the analysis of racially polarized voting." *See*, *e.g.*, Cottier v. City of Martin, 445 F.3d 1113, 1118 (8th Cir. 2006) (ecological regression is one of the "proven approaches to evaluating elections"); Bruce M. Clarke & Robert Timothy Reagan, Fed. Judicial Ctr., Redistricting Litigation: An Overview of Legal, Statistical, and Case-Management Issues (2002); Greiner, *supra*, at 117, 121. Nevertheless, courts have cautioned against "overreliance on bivariate ecological regression" in light of the inherent limitations of the technique. Lewis v. Alamance County, 99 F.3d 600, 604 n.3 (4th Cir. 1996); Johnson v. Hamrick, 296 F.3d 1065, 1080 n.4 (11th Cir. 2002) ("as a general rule, homogenous precinct analysis may be more reliable than ecological regression."). However, there are problems with both methods. *See, e.g.*, Greiner, *supra*, at 123–39 (arguing that homogeneous precinct analysis is fundamentally flawed and that courts need to be more discerning in dealing with ecological regression).

Redistricting plans based predominantly on racial considerations are unconstitutional unless narrowly tailored to meet a compelling state interest. Shaw v. Reno, 509 U.S. 630 (1993). Whether compliance with the Voting Rights Act can be considered a compelling interest is an open ques-

EXHIBIT C

Figure 12. Turnout rate for the white candidate plotted against the percentage of registrants who are white. Precinct-level data, 1982 Democratic Primary for Auditor, Lee County, South Carolina.



Source: Data from James W. Loewen & Bernard Grofman, *Recent Developments in Methods Used in Vote Dilution Litigation*, 21 Urb. Law. 589, 591 tbl.1 (1989).

## D. Statistical Models

Statistical models are widely used in the social sciences and in litigation. For example, the census suffers an undercount, more severe in certain places than others. If some statistical models are to be believed, the undercount can be corrected—moving seats in Congress and millions of dollars a year in tax funds.[134] Other models purport to lift the veil of secrecy from the ballot box, enabling the experts to determine how minority groups have voted—a crucial step in voting rights litigation (*supra* Section V.C). This section discusses the statistical logic of regression models.

A regression model attempts to combine the values of certain variables (the independent variables) to get expected values for another variable (the dependent variable). The model can be expressed in the form of a regression equation. A simple regression equation has only one independent variable; a multiple regression equation has several independent variables. Coefficients in the equation will be interpreted as showing the effects of changing the corresponding variables. This is justified in some situations, as the next example demonstrates.

tion, but efforts to sustain racially motivated redistricting on this basis have not fared well before the Supreme Court. *See* Abrams v. Johnson, 521 U.S. 74 (1997); Shaw v. Hunt, 517 U.S. 899 (1996); Bush v. Vera, 517 U.S. 952 (1996).

134. *See* Brown et al., *supra* note 29; *supra* note 89.

EXHIBIT C

*Reference Guide on Statistics*

Hooke's law (named after Robert Hooke, England, 1653–1703) describes how a spring stretches in response to a load: Strain is proportional to stress. To verify Hooke's law experimentally, a physicist will make a number of observations on a spring. For each observation, the physicist hangs a weight on the spring and measures its length. A statistician could develop a regression model for these data:

$$\text{length} = a + b \times \text{weight} + \varepsilon. \tag{1}$$

The error term, denoted by the Greek letter epsilon $\varepsilon$, is needed because measured length will not be exactly equal to $a + b \times$ weight. If nothing else, measurement error must be reckoned with. The model takes $\varepsilon$ as "random error"—behaving like draws made at random with replacement from a box of tickets. Each ticket shows a potential error, which will be realized if that ticket is drawn. The average of the potential errors in the box is assumed to be zero.

Equation (1) has two parameters, $a$ and $b$. These constants of nature characterize the behavior of the spring: $a$ is length under no load, and $b$ is elasticity (the increase in length per unit increase in weight). By way of numerical illustration, suppose $a$ is 400 and $b$ is 0.05. If the weight is 1, the length of the spring is expected to be

$$400 + 0.05 = 400.05.$$

If the weight is 3, the expected length is

$$400 + 3 \times 0.05 = 400 + 0.15 = 400.15.$$

In either case, the actual length will differ from expected, by a random error $\varepsilon$.

In standard statistical terminology, the $\varepsilon$'s for different observations on the spring are assumed to be independent and identically distributed, with a mean of zero. Take the $\varepsilon$'s for the first two observations. Independence means that the chances for the second $\varepsilon$ do not depend on outcomes for the first. If the errors are like draws made at random with replacement from a box of tickets, as we assumed earlier, that box will not change from one draw to the next—independence. "Identically distributed" means that the chance behavior of the two $\varepsilon$'s is the same: They are drawn at random from the same box. (*See infra* Appendix for additional discussion.)

The parameters $a$ and $b$ in equation (1) are not directly observable, but they can be estimated by the method of least squares.[135] Statisticians often denote esti-

---

135. It might seem that $a$ is observable; after all, we can measure the length of the spring with no load. However, the measurement is subject to error, so we observe not $a$, but $a + \varepsilon$. *See* equation (1). The parameters $a$ and $b$ can be estimated, even estimated very well, but they cannot be observed directly. The least squares estimates of $a$ and $b$ are the intercept and slope of the regression

**EXHIBIT C**

mates by hats. Thus, $\hat{a}$ is the estimate for $a$, and $\hat{b}$ is the estimate for $b$. The values of $\hat{a}$ and $\hat{b}$ are chosen to minimize the sum of the squared prediction errors. These errors are also called residuals. They measure the difference between the actual length of the spring and the predicted length, the latter being $\hat{a} + \hat{b} \times$ weight:

$$\text{actual length} = \hat{a} + \hat{b} \times \text{weight} + \text{residual}. \tag{2}$$

Of course, no one really imagines there to be a box of tickets hidden in the spring. However, the variability of physical measurements (under many but by no means all circumstances) does seem to be remarkably like the variability in draws from a box.[136] In short, the statistical model corresponds rather closely to the empirical phenomenon.

Equation (1) is a statistical model for the data, with unknown parameters $a$ and $b$. The error term $\varepsilon$ is not observable. The model is a theory—and a good one—about how the data are generated. By contrast, equation (2) is a regression equation that is fitted to the data: The intercept $\hat{a}$, the slope $\hat{b}$, and the residual can all be computed from the data. The results are useful because $\hat{a}$ is a good estimate for $a$, and $\hat{b}$ is a good estimate for $b$. (Similarly, the residual is a good approximation to $\varepsilon$.) Without the theory, these estimates would be less useful. Is there a theoretical model behind the data processing? Is the model justifiable? These questions can be critical when it comes to making statistical inferences from the data.

In social science applications, statistical models often are invoked without an independent theoretical basis. We give an example involving salary discrimination in the Appendix.[137] The main ideas of such regression modeling can be captured in a hypothetical exchange between a plaintiff seeking to prove salary discrimination and a company denying the allegation. Such a dialog might proceed as follows:

1. Plaintiff argues that the defendant company pays male employees more than females, which establishes a prima facie case of discrimination.
2. The company responds that the men are paid more because they are better educated and have more experience.
3. Plaintiff refutes the company's theory by fitting a regression equation that includes a particular, presupposed relationship between salary (the dependent variable) and some measures of education and experience. Plaintiff's expert reports that even after adjusting for differences in education and

line. *See supra* Section V.C.1; Freedman et al., *supra* note 12, at 208–10. The method of least squares was developed by Adrien-Marie Legendre (France, 1752–1833) and Carl Friedrich Gauss (Germany, 1777–1855) to fit astronomical orbits.

136. This is the Gauss model for measurement error. *See* Freedman et al., *supra* note 12, at 450–52.

137. The Reference Guide to Multiple Regression in this manual describes a comparable example.

EXHIBIT C

*Reference Guide on Statistics*

experience in this specific manner, men earn more than women. This remaining difference in pay shows discrimination.

4. The company argues that the difference could be the result of chance, not discrimination.
5. Plaintiff replies that because the coefficient for gender in the model is statistically significant, chance is not a good explanation for the data.[138]

In step 3, the three explanatory variables are education (years of schooling completed), experience (years with the firm), and a dummy variable for gender (1 for men and 0 for women). These are supposed to predict salaries (dollars per year). The equation is a formal analog of Hooke's law (equation 1). According to the model, an employee's salary is determined as if by computing

$$a + (b \times \text{education}) + (c \times \text{experience}) + (d \times \text{gender}), \qquad (3)$$

and then adding an error $\varepsilon$ drawn at random from a box of tickets.[139] The parameters $a$, $b$, $c$, and $d$, are estimated from the data by the method of least squares.

In step 5, the estimated coefficient $d$ for the dummy variable turns out to be positive and statistically significant and is offered as evidence of disparate impact. Men earn more than women, even after adjusting for differences in background factors that might affect productivity. This showing depends on many assumptions built into the model.[140] Hooke's law—equation (1)—is relatively easy to test experimentally. For the salary discrimination model, validation would be difficult. When expert testimony relies on statistical models, the court may well inquire, what are the assumptions behind the model, and why do they apply to the case at hand? It might then be important to distinguish between two situations:

- The nature of the relationship between the variables is known and regression is being used to make quantitative estimates of parameters in that relationship, or
- The nature of the relationship is largely unknown and regression is being used to determine the nature of the relationship—or indeed whether any relationship exists at all.

---

138. In some cases, the *p*-value has been interpreted as the probability that defendants are innocent of discrimination. However, as noted earlier, such an interpretation is wrong: *p* merely represents the probability of getting a large test statistic, given that the model is correct and the true coefficient for gender is zero (*see supra* Section IV.B, *infra* Appendix, Section D.2). Therefore, even if we grant the model, a *p*-value less than 50% does not demonstrate a preponderance of the evidence against the null hypothesis.

139. Expression (3) is the expected value for salary, given the explanatory variables (education, experience, gender). The error term is needed to account for deviations from expected: Salaries are not going to be predicted very well by linear combinations of variables such as education and experience.

140. *See infra* Appendix.

271

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Regression was developed to handle situations of the first type, with Hooke's law being an example. The basis for the second type of application is analogical, and the tightness of the analogy is an issue worth exploration.

In employment discrimination cases, and other contexts too, a wide variety of models can be used. This is only to be expected, because the science does not dictate specific equations. In a strongly contested case, each side will have its own model, presented by its own expert. The experts will reach opposite conclusions about discrimination. The dialog might continue with an exchange about which model is better. Although statistical assumptions are challenged in court from time to time, arguments more commonly revolve around the choice of variables. One model may be questioned because it omits variables that should be included—for example, skill levels or prior evaluations.[141] Another model may be challenged because it includes tainted variables reflecting past discriminatory behavior by the firm.[142] The court must decide which model—if either—fits the occasion.[143]

The frequency with which regression models are used is no guarantee that they are the best choice for any particular problem. Indeed, from one perspective, a regression or other statistical model may seem to be a marvel of mathematical rigor. From another perspective, the model is a set of assumptions, supported only by the say-so of the testifying expert. Intermediate judgments are also possible.[144]

141. *E.g.*, Bazemore v. Friday, 478 U.S. 385 (1986); *In re* Linerboard Antitrust Litig., 497 F. Supp. 2d 666 (E.D. Pa. 2007).

142. *E.g.*, McLaurin v. Nat'l R.R. Passenger Corp., 311 F. Supp. 2d 61, 65–66 (D.D.C. 2004) (holding that the inclusion of two allegedly tainted variables was reasonable in light of an earlier consent decree).

143. *E.g.*, Chang v. Univ. of R.I., 606 F. Supp. 1161, 1207 (D.R.I. 1985) ("it is plain to the court that [defendant's] model comprises a better, more useful, more reliable tool than [plaintiff's] counterpart."); Presseisen v. Swarthmore College, 442 F. Supp. 593, 619 (E.D. Pa. 1977) ("[E]ach side has done a superior job in challenging the other's regression analysis, but only a mediocre job in supporting their own . . . and the Court is . . . left with nothing."), *aff'd*, 582 F.2d 1275 (3d Cir. 1978).

144. *See*, *e.g.*, David W. Peterson, *Reference Guide on Multiple Regression*, 36 Jurimetrics J. 213, 214–15 (1996) (review essay); *see supra* note 21 for references to a range of academic opinion. More recently, some investigators have turned to graphical models. However, these models have serious weaknesses of their own. *See, e.g.,* David A. Freedman, *On Specifying Graphical Models for Causation, and the Identification Problem*, 26 Evaluation Rev. 267 (2004).

EXHIBIT C

*Reference Guide on Statistics*

# Appendix

## *A. Frequentists and Bayesians*

The mathematical theory of probability consists of theorems derived from axioms and definitions. Mathematical reasoning is seldom controversial, but there may be disagreement as to how the theory should be applied. For example, statisticians may differ on the interpretation of data in specific applications. Moreover, there are two main schools of thought about the foundations of statistics: frequentist and Bayesian (also called objectivist and subjectivist).[145]

Frequentists see probabilities as empirical facts. When a fair coin is tossed, the probability of heads is 1/2; if the experiment is repeated a large number of times, the coin will land heads about one-half the time. If a fair die is rolled, the probability of getting an ace (one spot) is 1/6. If the die is rolled many times, an ace will turn up about one-sixth of the time.[146] Generally, if a chance experiment can be repeated, the relative frequency of an event approaches (in the long run) its probability. By contrast, a Bayesian considers probabilities as representing not facts but degrees of belief: In whole or in part, probabilities are subjective.

Statisticians of both schools use conditional probability—that is, the probability of one event given that another has occurred. For example, suppose a coin is tossed twice. One event is that the coin will land HH. Another event is that at least one H will be seen. Before the coin is tossed, there are four possible, equally likely, outcomes: HH, HT, TH, TT. So the probability of HH is 1/4. However, if we know that at least one head has been obtained, then we can rule out two tails TT. In other words, given that at least one H has been obtained, the conditional probability of TT is 0, and the first three outcomes have conditional probability 1/3 each. In particular, the conditional probability of HH is 1/3. This is usually written as $P(HH|\text{at least one H}) = 1/3$. More generally, the probability of an event C is denoted $P(C)$; the conditional probability of D given C is written as $P(D|C)$.

Two events C and D are independent if the conditional probability of D given that C occurs is equal to the conditional probability of D given that C does not occur. Statisticians use "~C" to denote the event that C does not occur. Thus C and D are independent if $P(D|C) = P(D|{\sim}C)$. If C and D are independent, then the probability that both occur is equal to the product of the probabilities:

$$P(C \text{ and } D) = P(C) \times P(D). \tag{A1}$$

145. But see *supra* note 123 (on "objective Bayesianism").

146. Probabilities may be estimated from relative frequencies, but probability itself is a subtler idea. For example, suppose a computer prints out a sequence of 10 letters H and T (for heads and tails), which alternate between the two possibilities H and T as follows: H T H T H T H T H T. The relative frequency of heads is 5/10 or 50%, but it is not at all obvious that the chance of an H at the next position is 50%. There are difficulties in both the subjectivist and objectivist positions. *See* Freedman, *supra* note 84.

273

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

This is the multiplication rule (or product rule) for independent events. If events are dependent, then conditional probabilities must be used:

$$P(C \text{ and } D) = P(C) \times P(D \mid C). \tag{A2}$$

This is the multiplication rule for dependent events.

Bayesian statisticians assign probabilities to hypotheses as well as to events; indeed, for them, the distinction between hypotheses and events may not be a sharp one. We turn now to Bayes' rule. If $H_0$ and $H_1$ are two hypotheses[147] that govern the probability of an event A, a Bayesian can use the multiplication rule (A2) to find that

$$P(A \text{ and } H_0) = P(A \mid H_0)P(H_0) \tag{A3}$$

and

$$P(A \text{ and } H_1) = P(A \mid H_1)P(H_1). \tag{A4}$$

Moreover,

$$P(A) = P(A \text{ and } H_0) + P(A \text{ and } H_1). \tag{A5}$$

The multiplication rule (A2) also shows that

$$P(H_1 \mid A) = \frac{P(A \text{ and } H_1)}{P(A)}. \tag{A6}$$

We use (A4) to evaluate $P(A \text{ and } H_1)$ in the numerator of (A6), and (A3), (A4), and (A5) to evaluate $P(A)$ in the denominator:

$$P(H_1 \mid A) = \frac{P(A \mid H_1)P(H_1)}{P(A \mid H_0)P(H_0) + P(A \mid H_1)P(H_1)}. \tag{A7}$$

This is a special case of Bayes' rule. It yields the conditional probability of hypothesis $H_0$ given that event A has occurred.

For a stylized example in a criminal case, $H_0$ is the hypothesis that blood found at the scene of a crime came from a person other than the defendant; $H_1$ is the hypothesis that the blood came from the defendant; A is the event that blood from the crime scene and blood from the defendant are both type A. Then $P(H_0)$ is the prior probability of $H_0$, based on subjective judgment, while $P(H_0 \mid A)$ is the posterior probability—updated from the prior using the data.

147. $H_0$ is read "H–sub–zero," while $H_1$ is "H–sub–one."

**EXHIBIT C**

*Reference Guide on Statistics*

Type A blood occurs in 42% of the population. So $P(A|H_0) = 0.42$.[148] Because the defendant has type A blood, $P(A|H_1) = 1$. Suppose the prior probabilities are $P(H_0) = P(H_1) = 0.5$. According to (A7), the posterior probability that the blood is from the defendant is

$$P\left(H_1|A\right) = \frac{1 \times 0.5}{0.42 \times 0.5 + 1 \times 0.5} = 0.70. \tag{A8}$$

Thus, the data increase the likelihood that the blood is the defendant's. The probability went up from the prior value of $P(H_1) = 0.50$ to the posterior value of $P(H_1|A) = 0.70$.

More generally, $H_0$ and $H_1$ refer to parameters in a statistical model. For a stylized example in an employment discrimination case, $H_0$ asserts equal selection rates in a population of male and female applicants; $H_1$ asserts that the selection rates are not equal; A is the event that a test statistic exceeds 2 in absolute value. In such situations, the Bayesian proceeds much as before. However, the frequentist computes $P(A|H_0)$, and rejects $H_0$ if this probability falls below 5%. Frequentists have to stop there, because they view $P(H_0|A)$ as poorly defined at best. In their setup, $P(H_0)$ and $P(H_1)$ rarely make sense, and these prior probabilities are needed to compute $P(H_1|A)$: *See supra* equation (A7).

Assessing probabilities, conditional probabilities, and independence is not entirely straightforward, either for frequentists or Bayesians. Inquiry into the basis for expert judgment may be useful, and casual assumptions about independence should be questioned.[149]

## B. The Spock Jury: Technical Details

The rest of this Appendix provides some technical backup for the examples in Sections IV and V, *supra*. We begin with the *Spock* jury case. On the null hypothesis, a sample of 350 people was drawn at random from a large population that was 50% male and 50% female. The number of women in the sample follows the binomial distribution. For example, the chance of getting exactly 102 women in the sample is given by the binomial formula[150]

$$\frac{n!}{j! \times \left(n-j\right)!} f^{j}\left(1-f\right)^{n-j}. \tag{A9}$$

148. Not all statisticians would accept the identification of a population frequency with $P(A|H_0)$. Indeed, $H_0$ has been translated into a hypothesis that the true donor has been selected from the population at random (i.e., in a manner that is uncorrelated with blood type). This step needs justification. See *supra* note 123.

149. For problematic assumptions of independence in litigation, see, e.g., *Wilson v. State,* 803 A.2d 1034 (Md. 2002) (error to admit multiplied probabilities in a case involving two deaths of infants in same family); 1 McCormick, *supra* note 2, § 210; *see also supra* note 29 (on census litigation).

150. The binomial formula is discussed in, e.g., Freedman et al., *supra* note 12, at 255–61.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

In the formula, $n$ stands for the sample size, and so $n = 350$; and $j = 102$. The $f$ is the fraction of women in the population; thus, $f = 0.50$. The exclamation point denotes factorials: $1! = 1$, $2! = 2 \times 1 = 2$, $3! = 3 \times 2 \times 1 = 6$, and so forth. The chance of 102 women works out to $10^{-15}$. In the same way, we can compute the chance of getting 101 women, or 100, or any other particular number. The chance of getting 102 women or fewer is then computed by addition. The chance is $p = 2 \times 10^{-15}$, as reported *supra* note 98. This is very bad news for the null hypothesis.

With the binomial distribution given by (9), the expected the number of women in the sample is

$$n f = 350 \times 0.5 = 175. \tag{A10}$$

The standard error is

$$\sqrt{n} \times \sqrt{f \times (1 - f)} = \sqrt{350} \times \sqrt{0.5 \times 0.5} = 9.35. \tag{A11}$$

The observed value of 102 is nearly 8 SEs below the expected value, which is a lot of SEs.

Figure 13 shows the probability histogram for the number of women in the sample.[151] The graph is drawn so that the area between two values is proportional to the chance that the number of women will fall in that range. For example, take the rectangle over 175; its base covers the interval from 174.5 to 175.5. The area of this rectangle is 4.26% of the total area. So the chance of getting exactly 175 women is 4.26%. Next, take the range from 165 to 185 (inclusive): 73.84% of the area falls into this range. This means there is a 73.84% chance that the number of women in the sample will be in the range from 165 to 185 (inclusive).

According to a fundamental theorem in statistics (the central limit theorem), the histogram follows the normal curve.[152] Figure 13 shows the curve for comparison: The normal curve is almost indistinguishable from the top of the histogram. For a numerical example, suppose the jury panel had included 155 women. On the null hypothesis, there is about a 1.85% chance of getting 155 women or fewer. The normal curve gives 1.86%. The error is nil. Ordinarily, we would just report $p = 2\%$, as in the text (*supra* Section IV.B.1).

Finally, we consider power. Suppose we reject the null hypothesis when the number of women in the sample is 155 or less. Let us assume a particular alternative hypothesis that quantifies the degree of discrimination against women: The jury panel is selected at random from a population that is 40% female, rather than 50%. Figure 14 shows the probability histogram for the number of women, but now the histogram is computed according to the alternative hypothesis. Again,

---

151. Probability histograms are discussed in, e.g., *id.* at 310–13.
152. The central limit theorem is discussed in, e.g., *id.* at 315–27.

**EXHIBIT C**

*Reference Guide on Statistics*

Figure 13. Probability histogram for the number of women in a random sample
of 350 people drawn from a large population that is 50% female and
50% male. The normal curve is shown for comparison. About 2% of
the area under the histogram is to the left of 155 (marked by a heavy
vertical line).



*Note:* The vertical line is placed at 155.5, and so the area to the left of it includes the rectangles over
155, 154, . . . ; the area represents the chance of getting 155 women or fewer. *Cf.* Freedman et al.,
*supra* note 12, at 317. The units on the vertical axis are "percent per standard unit"; *cf. id.* at 80, 315.

Figure 14. Probability histogram for the number of women in a random sample
of 350 people drawn from a large population that is 40% female and
60% male. The normal curve is shown for comparison. The area to
the left of 155 (marked by a heavy vertical line) is about 95%.



277

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

the histogram follows the normal curve. About 95% of the area is to the left of 155, and so power is about 95%. The area can be computed exactly by using the binomial distribution, or to an excellent approximation using the normal curve.

Figures 13 and 14 have the same shape: The central limit theorem is at work. However, the histograms are centered differently. Figure 13 is centered at 175, according to requirements of the null hypothesis. Figure 14 is centered at 140, because the alternative hypothesis is used to determine the center, not the null hypothesis. Thus, 155 is well to the left of center in Figure 13, and well to the right in Figure 14: The figures have different centers. The main point of Figures 13 and 14 is that chances can often be approximated by areas under the normal curve, justifying the large–sample theory presented *supra* Sections IV.A–B.

## C. The Nixon Papers: Technical Details

With the Nixon papers, the population consists of 20,000 boxes. A random sample of 500 boxes is drawn and each sample box is appraised. Statistical theory enables us to make some precise statements about the behavior of the sample average.

- The expected value of the sample average equals the population average. Even more tersely, the sample average is an unbiased estimate of the population average.
- The standard error for the sample average equals

$$\sqrt{\frac{N-n}{N-1}} \times \frac{\sigma}{\sqrt{n}}. \tag{A12}$$

In (A12), the $N$ stands for the size of the population, which is 20,000; and $n$ stands for the size of the sample, which is 500. The first factor in (A12), with the square root, is the finite sample correction factor. Here, as in many other such examples, the correction factor is so close to 1 that it can safely be ignored. (This is why the size of population usually has no bearing on the precision of the sample average as an estimator for the population average.) Next, $\sigma$ is the population standard deviation. This is unknown, but it can be estimated by the sample standard deviation, which is $2200. The SE for the sample mean is therefore estimated from the data as $2200/$\sqrt{500}$ , which is nearly $100. Plaintiff's total claim is 20,000 times the sample average. The SE for the total claim is therefore 20,000 × $100 = $2,000,000. (Here, the size of the population comes into the formula.)

With a large sample, the probability histogram for the sample average follows the normal curve quite closely. That is a consequence of the central limit theorem. The center of the histogram is the population average. The SE is given by (A12), and is about $100.

278

EXHIBIT C

*Reference Guide on Statistics*

- What is the chance that the sample average differs from the population average by 1 SE or less? This chance is equal to the area under the probability histogram within 1 SE of average, which by the central limit theorem is almost equal to the area under the standard normal curve between −1 and 1; that normal area is about 68%.
- What is the chance that the sample average differs from the population average by 2 SE or less? By the same reasoning, this chance is about equal to the area under the standard normal curve between −2 and 2, which is about 95%.
- What is the chance that the sample average differs from the population average by 3 SE or less? This chance is about equal to the area under the standard normal curve between −3 and 3, which is about 99.7%.

To sum up, the probability histogram for the sample average is centered at the population average. The spread is given by the standard error. The histogram follows the normal curve. That is why confidence levels can be based on the standard error, with confidence levels read off the normal curve—for estimators that are essentially unbiased, and obey the central limit theorem (*supra* Section IV.A.2, Appendix Section B).[153] These large-sample methods generally work for sums, averages, and rates, although much depends on the design of the sample.

More technically, the normal curve is the density of a normal distribution. The standard normal density has mean equal to 0 and standard error equal to 1. Its equation is

$$y = e^{-x^2/2} / \sqrt{2\pi}$$

where $e$ = 2.71828... and $\pi$ = 3.14159... . This density can be rescaled to have any desired mean and standard error. The resulting densities are the famous "normal curves" or "bell-shaped curves" of statistical theory. In Figure 12, the density is scaled to match the probability histogram in terms of the mean and standard error; likewise in Figure 13.

## D. A Social Science Example of Regression: Gender Discrimination in Salaries

### 1. The regression model

To illustrate social science applications of the kind that might be seen in litigation, Section V referred to a stylized example on salary discrimination. A particular

---

153. *See, e.g.*, *id*. at 409–24. On the standard deviation, see *supra* Section III.E; Freedman et al., *supra* note 12, at 67–72. The finite sample correction factor is discussed in *id*. at 367–70.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

regression model was used to predict salaries (dollars per year) of employees in a firm. It had three explanatory variables: education (years of schooling completed), experience (years with the firm), and a dummy variable for gender (1 for men and 0 for women). The regression equation is

$$\text{salary} = a + b \times \text{education} + c \times \text{experience} + d \times \text{gender} + \varepsilon. \quad (A13)$$

Equation (A13) is a statistical model for the data, with unknown parameters *a, b, c,* and *d*. Here, *a* is the intercept and the other parameters are regression coefficients. The $\varepsilon$ at the end of the equation is an unobservable error term. In the right-hand side of (A3) and similar expressions, by convention, the multiplications are done before the additions.

As noted in Section V, the equation is a formal analog of Hooke's law (1). According to the model, an employee's salary is determined as if by computing

$$a + b \times \text{education} + c \times \text{experience} + d \times \text{gender} \quad (A14)$$

and then adding an error $\varepsilon$ drawn at random from a box of tickets. Expression (A14) is the expected value for salary, given the explanatory variables (education, experience, gender). The error term is needed to account for deviations from expected: Salaries are not going to be predicted very well by linear combinations of variables such as education and experience.

The parameters are estimated from the data using least squares. If the estimated coefficient for the dummy variable turns out to be positive and statistically significant, that would be evidence of disparate impact. Men earn more than women, even after adjusting for differences in background factors that might affect productivity. Suppose the estimated equation turns out as follows:

$$\text{predicted salary} = \$7100 + \$1300 \times \text{education} + \$2200 \times \text{experience} + \$700 \times \text{gender}. \quad (A15)$$

According to (A15), the estimated value for the intercept *a* in (A14) is $7100; the estimated value for the coefficient *b* is $1300, and so forth. According to equation (A15), every extra year of education is worth $1300. Similarly, every extra year of experience is worth $2200. And, most important, the company gives men a salary premium of $700 over women with the same education and experience.

A male employee with 12 years of education (high school) and 10 years of experience, for example, would have a predicted salary of

$$\$7100 + \$1300 \times 12 + \$2200 \times 10 + \$700 \times 1$$
$$= \$7100 + \$15{,}600 + \$22{,}000 + \$700 = \$45{,}400. \quad (A16)$$

A similarly situated female employee has a predicted salary of only

280

**EXHIBIT C**

*Reference Guide on Statistics*

$$\$7100 + \$1300 \times 12 + \$2200 \times 10 + \$700 \times 0$$
$$= \$7100 + \$15{,}600 + \$22{,}000 + \$0 = \$44{,}700. \tag{A17}$$

Notice the impact of the gender variable in the model: $700 is added to equation (A16), but not to equation (A17).

A major step in proving discrimination is showing that the estimated coefficient of the gender variable—$700 in the numerical illustration—is statistically significant. This showing depends on the assumptions built into the model. Thus, each extra year of education is assumed to be worth the same across all levels of experience. Similarly, each extra year of experience is worth the same across all levels of education. Furthermore, the premium paid to men does not depend systematically on education or experience. Omitted variables such as ability, quality of education, or quality of experience do not make any systematic difference to the predictions of the model.[154] These are all assumptions made going into the analysis, rather than conclusions coming out of the data.

Assumptions are also made about the error term—the mysterious $\varepsilon$ at the end of (A13). The errors are assumed to be independent and identically distributed from person to person in the dataset. Such assumptions are critical when computing *p*-values and demonstrating statistical significance. Regression modeling that does not produce statistically significant coefficients will not be good evidence of discrimination, and statistical significance cannot be established unless stylized assumptions are made about unobservable error terms.

The typical regression model, like the one sketched above, therefore involves a host of assumptions. As noted in Section V, Hooke's law—equation (1)—is relatively easy to test experimentally. For the salary discrimination model—equation (A13)—validation would be difficult. That is why we suggested that when expert testimony relies on statistical models, the court may well inquire about the assumptions behind the model and why they apply to the case at hand.

## 2. Standard errors, t-*statistics, and statistical significance*

Statistical proof of discrimination depends on the significance of the estimated coefficient for the gender variable. Significance is determined by the *t*-test, using the standard error. The standard error measures the likely difference between the estimated value for the coefficient and its true value. The estimated value is $700—the coefficient of the gender variable in equation (A5); the true value *d* in (A13), remains unknown. According to the model, the difference between the estimated value and the true value is due to the action of the error term $\varepsilon$ in (A3). Without $\varepsilon$, observed values would line up perfectly with expected values,

154. Technically, these omitted variables are assumed to be independent of the error term in the equation.

281

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

and estimated values for parameters would be exactly equal to true values. This does not happen.

The *t*-statistic is the estimated value divided by its standard error. For example, in (A15), the estimate for *d* is $700. If the standard error is $325, then *t* is $700/$325 = 2.15. This is significant—that is, hard to explain as the product of random error. Under the null hypothesis that *d* is zero, there is only about a 5% chance that the absolute value of *t* is greater than 2. (We are assuming the sample is large.) Thus, statistical significance is achieved (*supra* Section IV.B.2). Significance would be taken as evidence that *d*—the true parameter in the model (A13)—does not vanish. According to a viewpoint often presented in the social science journals and the courtroom, here is statistical proof that gender matters in determining salaries. On the other hand, if the standard error is $1400, then *t* is $700/$1400 = 0.5. The difference between the estimated value of *d* and zero could easily result from chance. So the true value of *d* could well be zero, in which case gender does not affect salaries.

Of course, the parameter *d* is only a construct in a model. If the model is wrong, the standard error, *t*-statistic, and significance level are rather difficult to interpret. Even if the model is granted, there is a further issue. The 5% is the chance that the absolute value of *t* exceeds 2, given the model and given the null hypothesis that *d* is zero. However, the 5% is often taken to be the chance of the null hypothesis given the data. This misinterpretation is commonplace in the social science literature, and it appears in some opinions describing expert testimony.[155] For a frequentist statistician, the chance that *d* is zero given the data makes no sense: Parameters do not exhibit chance variation. For a Bayesian statistician, the chance that *d* is zero given the data makes good sense, but the computation via the *t*-test could be seriously in error, because the prior probability that *d* is zero has not been taken into account.[156]

The mathematical terminology in the previous paragraph may need to be deciphered: The "absolute value" of *t* is the magnitude, ignoring sign. Thus, the absolute value of both +3 and −3 is 3.

---

155. *See supra* Section IV.B & notes 102 & 116.
156. *See supra* Section IV & *supra* Appendix.

EXHIBIT C

# Glossary of Terms

The following definitions are adapted from a variety of sources, including Michael O. Finkelstein & Bruce Levin, Statistics for Lawyers (2d ed. 2001), and David A. Freedman et al., Statistics (4th ed. 2007).

**absolute value.**  Size, neglecting sign. The absolute value of +2.7 is 2.7; so is the absolute value of −2.7.

**adjust for.**  See control for.

**alpha ($\alpha$).**  A symbol often used to denote the probability of a Type I error. See Type I error; size. Compare beta.

**alternative hypothesis.**  A statistical hypothesis that is contrasted with the null hypothesis in a significance test. See statistical hypothesis; significance test.

**area sample.**  A probability sample in which the sampling frame is a list of geographical areas. That is, the researchers make a list of areas, choose some at random, and interview people in the selected areas. This is a cost-effective way to draw a sample of people. See probability sample; sampling frame.

**arithmetic mean.**  See mean.

**average.**  See mean.

**Bayes' rule.**  In its simplest form, an equation involving conditional probabilities that relates a "prior probability" known or estimated before collecting certain data to a "posterior probability" that reflects the impact of the data on the prior probability. In Bayesian statistical inference, "the prior" expresses degrees of belief about various hypotheses. Data are collected according to some statistical model; at least, the model represents the investigator's beliefs. Bayes' rule combines the prior with the data to yield the posterior probability, which expresses the investigator's beliefs about the parameters, given the data. See Appendix A. Compare frequentist.

**beta ($\beta$).**  A symbol sometimes used to denote power, and sometimes to denote the probability of a Type II error. See Type II error; power. Compare alpha.

**between-observer variability.**  Differences that occur when two observers measure the same thing. Compare within-observer variability.

**bias.**  Also called systematic error. A systematic tendency for an estimate to be too high or too low. An estimate is unbiased if the bias is zero. (Bias does not mean prejudice, partiality, or discriminatory intent.) See nonsampling error. Compare sampling error.

**bin.**  A class interval in a histogram. See class interval; histogram.

**binary variable.**  A variable that has only two possible values (e.g., gender). Called a dummy variable when the two possible values are 0 and 1.

**binomial distribution.**  A distribution for the number of occurrences in repeated, independent "trials" where the probabilities are fixed. For example, the num-

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

ber of heads in 100 tosses of a coin follows a binomial distribution. When the probability is not too close to 0 or 1 and the number of trials is large, the binomial distribution has about the same shape as the normal distribution. See normal distribution; Poisson distribution.

**blind.** See double-blind experiment.

**bootstrap.** Also called resampling; Monte Carlo method. A procedure for estimating sampling error by constructing a simulated population on the basis of the sample, then repeatedly drawing samples from the simulated population.

**categorical data; categorical variable.** See qualitative variable. Compare quantitative variable.

**central limit theorem.** Shows that under suitable conditions, the probability histogram for a sum (or average or rate) will follow the normal curve. See histogram; normal curve.

**chance error.** See random error; sampling error.

**chi-squared ($\chi^2$).** The chi-squared statistic measures the distance between the data and expected values computed from a statistical model. If the chi-squared statistic is too large to explain by chance, the data contradict the model. The definition of "large" depends on the context. See statistical hypothesis; significance test.

**class interval.** Also, bin. The base of a rectangle in a histogram; the area of the rectangle shows the percentage of observations in the class interval. See histogram.

**cluster sample.** A type of random sample. For example, investigators might take households at random, then interview all people in the selected households. This is a cluster sample of people: A cluster consists of all the people in a selected household. Generally, clustering reduces the cost of interviewing. See multistage cluster sample.

**coefficient of determination.** A statistic (more commonly known as $R$-squared) that describes how well a regression equation fits the data. See $R$-squared.

**coefficient of variation.** A statistic that measures spread relative to the mean: SD/mean, or SE/expected value. See expected value; mean; standard deviation; standard error.

**collinearity.** See multicollinearity.

**conditional probability.** The probability that one event will occur given that another has occurred.

**confidence coefficient.** See confidence interval.

**confidence interval.** An estimate, expressed as a range, for a parameter. For estimates such as averages or rates computed from large samples, a 95% confidence interval is the range from about two standard errors below to two standard errors above the estimate. Intervals obtained this way cover the true

284

**EXHIBIT C**

*Reference Guide on Statistics*

value about 95% of the time, and 95% is the confidence level or the confidence coefficient. See central limit theorem; standard error.

**confidence level.**  See confidence interval.

**confounding variable; confounder.**  A confounder is correlated with the independent variable and the dependent variable. An association between the dependent and independent variables in an observational study may not be causal, but may instead be due to confounding. See controlled experiment; observational study.

**consistent estimator.**  An estimator that tends to become more and more accurate as the sample size grows. Inconsistent estimators, which do not become more accurate as the sample gets larger, are frowned upon by statisticians.

**content validity.**  The extent to which a skills test is appropriate to its intended purpose, as evidenced by a set of questions that adequately reflect the domain being tested. See validity. Compare reliability.

**continuous variable.**  A variable that has arbitrarily fine gradations, such as a person's height. Compare discrete variable.

**control for.**  Statisticians may control for the effects of confounding variables in nonexperimental data by making comparisons for smaller and more homogeneous groups of subjects, or by entering the confounders as explanatory variables in a regression model. To "adjust for" is perhaps a better phrase in the regression context, because in an observational study the confounding factors are not under experimental control; statistical adjustments are an imperfect substitute. See regression model.

**control group.**  See controlled experiment.

**controlled experiment.**  An experiment in which the investigators determine which subjects are put into the treatment group and which are put into the control group. Subjects in the treatment group are exposed by the investigators to some influence—the treatment; those in the control group are not so exposed. For example, in an experiment to evaluate a new drug, subjects in the treatment group are given the drug, and subjects in the control group are given some other therapy; the outcomes in the two groups are compared to see whether the new drug works.

Randomization—that is, randomly assigning subjects to each group—is usually the best way to ensure that any observed difference between the two groups comes from the treatment rather than from preexisting differences. Of course, in many situations, a randomized controlled experiment is impractical, and investigators must then rely on observational studies. Compare observational study.

**convenience sample.**  A nonrandom sample of units, also called a grab sample. Such samples are easy to take but may suffer from serious bias. Typically, mall samples are convenience samples.

285

EXHIBIT C

*Reference Manual on Scientific Evidence*

**correlation coefficient.** A number between −1 and 1 that indicates the extent of the linear association between two variables. Often, the correlation coefficient is abbreviated as *r*.

**covariance.** A quantity that describes the statistical interrelationship of two variables. Compare correlation coefficient; standard error; variance.

**covariate.** A variable that is related to other variables of primary interest in a study; a measured confounder; a statistical control in a regression equation.

**criterion.** The variable against which an examination or other selection procedure is validated. See validity.

**data.** Observations or measurements, usually of units in a sample taken from a larger population.

**degrees of freedom.** See *t*-test.

**dependence.** Two events are dependent when the probability of one is affected by the occurrence or non-occurrence of the other. Compare independence; dependent variable.

**dependent variable**. Also called outcome variable. Compare independent variable.

**descriptive statistics.** Like the mean or standard deviation, used to summarize data.

**differential validity.** Differences in validity across different groups of subjects. See validity.

**discrete variable.** A variable that has only a small number of possible values, such as the number of automobiles owned by a household. Compare continuous variable.

**distribution.** See frequency distribution; probability distribution; sampling distribution.

**disturbance term.** A synonym for error term.

**double-blind experiment.** An experiment with human subjects in which neither the diagnosticians nor the subjects know who is in the treatment group or the control group. This is accomplished by giving a placebo treatment to patients in the control group. In a single-blind experiment, the patients do not know whether they are in treatment or control; the diagnosticians have this information.

**dummy variable.** Generally, a dummy variable takes only the values 0 or 1, and distinguishes one group of interest from another. See binary variable; regression model.

**econometrics.** Statistical study of economic issues.

**epidemiology.** Statistical study of disease or injury in human populations.

286

EXHIBIT C

*Reference Guide on Statistics*

**error term.**  The part of a statistical model that describes random error, i.e., the impact of chance factors unrelated to variables in the model. In econometrics, the error term is called a disturbance term.

**estimator.**  A sample statistic used to estimate the value of a population parameter. For example, the sample average commonly is used to estimate the population average. The term "estimator" connotes a statistical procedure, whereas an "estimate" connotes a particular numerical result.

**expected value.**  See random variable.

**experiment.**  See controlled experiment; randomized controlled experiment. Compare observational study.

**explanatory variable.**  See independent variable; regression model.

**external validity.**  See validity.

**factors.**  See independent variable.

**Fisher's exact test.**  A statistical test for comparing two sample proportions. For example, take the proportions of white and black employees getting a promotion. An investigator may wish to test the null hypothesis that promotion does not depend on race. Fisher's exact test is one way to arrive at a $p$-value. The calculation is based on the hypergeometric distribution. For details, see Michael O. Finkelstein and Bruce Levin, Statistics for Lawyers 154–56 (2d ed. 2001). See hypergeometric distribution; $p$-value; significance test; statistical hypothesis.

**fitted value.**  See residual.

**fixed significance level.**  Also alpha; size. A preset level, such as 5% or 1%; if the $p$-value of a test falls below this level, the result is deemed statistically significant. See significance test. Compare observed significance level; $p$-value.

**frequency; relative frequency.**  Frequency is the number of times that something occurs; relative frequency is the number of occurrences, relative to a total. For example, if a coin is tossed 1000 times and lands heads 517 times, the frequency of heads is 517; the relative frequency is 0.517, or 51.7%.

**frequency distribution.**  Shows how often specified values occur in a dataset.

**frequentist.**  Also called objectivist. Describes statisticians who view probabilities as objective properties of a system that can be measured or estimated. Compare Bayesian. *See* Appendix.

**Gaussian distribution.**  A synonym for the normal distribution. See normal distribution.

**general linear model.**  Expresses the dependent variable as a linear combination of the independent variables plus an error term whose components may be dependent and have differing variances. See error term; linear combination; variance. Compare regression model.

**grab sample.**  See convenience sample.

287

EXHIBIT C

*Reference Manual on Scientific Evidence*

**heteroscedastic.**  See scatter diagram.

**highly significant.**  See *p*-value; practical significance; significance test.

**histogram.**  A plot showing how observed values fall within specified intervals, called bins or class intervals. Generally, matters are arranged so that the area under the histogram, but over a class interval, gives the frequency or relative frequency of data in that interval. With a probability histogram, the area gives the chance of observing a value that falls in the corresponding interval.

**homoscedastic.**  See scatter diagram.

**hypergeometric distribution.**  Suppose a sample is drawn at random, without replacement, from a finite population. How many times will items of a certain type come into the sample? The hypergeometric distribution gives the probabilities. For more details, see 1 William Feller, An Introduction to Probability Theory and Its Applications 41–42 (2d ed. 1957). Compare Fisher's exact test.

**hypothesis.**  See alternative hypothesis; null hypothesis; one-sided hypothesis; significance test; statistical hypothesis; two-sided hypothesis.

**hypothesis test.**  See significance test.

**identically distributed.**  Random variables are identically distributed when they have the same probability distribution. For example, consider a box of numbered tickets. Draw tickets at random with replacement from the box. The draws will be independent and identically distributed.

**independence.**  Also, statistical independence. Events are independent when the probability of one is unaffected by the occurrence or non-occurrence of the other. Compare conditional probability; dependence; independent variable; dependent variable.

**independent variable.**  Independent variables (also called explanatory variables, predictors, or risk factors) represent the causes and potential confounders in a statistical study of causation; the dependent variable represents the effect. In an observational study, independent variables may be used to divide the population up into smaller and more homogenous groups ("stratification"). In a regression model, the independent variables are used to predict the dependent variable. For example, the unemployment rate has been used as the independent variable in a model for predicting the crime rate; the unemployment rate is the independent variable in this model, and the crime rate is the dependent variable. The distinction between independent and dependent variables is unrelated to statistical independence. See regression model. Compare dependent variable; dependence; independence.

**indicator variable.**  See dummy variable.

**internal validity.**  See validity.

**interquartile range.**  Difference between 25th and 75th percentile. See percentile.

288

EXHIBIT C

*Reference Guide on Statistics*

**interval estimate.**  A confidence interval, or an estimate coupled with a standard error. See confidence interval; standard error. Compare point estimate.

**least squares.**  See least squares estimator; regression model.

**least squares estimator.**  An estimator that is computed by minimizing the sum of the squared residuals. See residual.

**level.**  The level of a significance test is denoted alpha ($\alpha$). See alpha; fixed significance level; observed significance level; *p*-value; significance test.

**linear combination.**  To obtain a linear combination of two variables, multiply the first variable by some constant, multiply the second variable by another constant, and add the two products. For example, $2u + 3v$ is a linear combination of $u$ and $v$.

**list sample.**  See systematic sample.

**loss function.**  Statisticians may evaluate estimators according to a mathematical formula involving the errors—that is, differences between actual values and estimated values. The "loss" may be the total of the squared errors, or the total of the absolute errors, etc. Loss functions seldom quantify real losses, but may be useful summary statistics and may prompt the construction of useful statistical procedures. Compare risk.

**lurking variable.**  See confounding variable.

**mean.**  Also, the average; the expected value of a random variable. The mean gives a way to find the center of a batch of numbers: Add the numbers and divide by how many there are. Weights may be employed, as in "weighted mean" or "weighted average." See random variable. Compare median; mode.

**measurement validity.**  See validity. Compare reliability.

**median.**  The median, like the mean, is a way to find the center of a batch of numbers. The median is the 50th percentile. Half the numbers are larger, and half are smaller. (To be very precise: at least half the numbers are greater than or equal to the median; At least half the numbers are less than or equal to the median; for small datasets, the median may not be uniquely defined.) Compare mean; mode; percentile.

**meta–analysis.**  Attempts to combine information from all studies on a certain topic. For example, in the epidemiological context, a meta–analysis may attempt to provide a summary odds ratio and confidence interval for the effect of a certain exposure on a certain disease.

**mode.**  The most common value. Compare mean; median.

**model.**  See probability model; regression model; statistical model.

**multicollinearity.**  Also, collinearity. The existence of correlations among the independent variables in a regression model. See independent variable; regression model.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**multiple comparison**. Making several statistical tests on the same dataset. Multiple comparisons complicate the interpretation of a *p*-value. For example, if 20 divisions of a company are examined, and one division is found to have a disparity significant at the 5% level, the result is not surprising; indeed, it would be expected under the null hypothesis. Compare *p*-value; significance test; statistical hypothesis.

**multiple correlation coefficient.** A number that indicates the extent to which one variable can be predicted as a linear combination of other variables. Its magnitude is the square root of *R*-squared. See linear combination; *R*-squared; regression model. Compare correlation coefficient.

**multiple regression.** A regression equation that includes two or more independent variables. See regression model. Compare simple regression.

**multistage cluster sample.** A probability sample drawn in stages, usually after stratification; the last stage will involve drawing a cluster. See cluster sample; probability sample; stratified random sample.

**multivariate methods.** Methods for fitting models with multiple variables; in statistics, multiple response variables; in other fields, multiple explanatory variables. See regression model.

**natural experiment.** An observational study in which treatment and control groups have been formed by some natural development; the assignment of subjects to groups is akin to randomization. See observational study. Compare controlled experiment.

**nonresponse bias.** Systematic error created by differences between respondents and nonrespondents. If the nonresponse rate is high, this bias may be severe.

**nonsampling error.** A catch-all term for sources of error in a survey, other than sampling error. Nonsampling errors cause bias. One example is selection bias: The sample is drawn in a way that tends to exclude certain subgroups in the population. A second example is nonresponse bias: People who do not respond to a survey are usually different from respondents. A final example: Response bias arises, for example, if the interviewer uses a loaded question.

**normal distribution.** Also, Gaussian distribution. When the normal distribution has mean equal to 0 and standard error equal to 1, it is said to be "standard normal." The equation for the density is then

$$y = e^{-x^2/2}/\sqrt{2\pi}$$

where $e$ = 2.71828... and $\pi$ = 3.14159.... The density can be rescaled to have any desired mean and standard error, resulting in the famous "bell-shaped curves" of statistical theory. Terminology notwithstanding, there need be nothing wrong with a distribution that differs from normal.

290

**EXHIBIT C**

*Reference Guide on Statistics*

**null hypothesis.** For example, a hypothesis that there is no difference between two groups from which samples are drawn. See significance test; statistical hypothesis. Compare alternative hypothesis.

**objectivist.** See frequentist.

**observational study.** A study in which subjects select themselves into groups; investigators then compare the outcomes for the different groups. For example, studies of smoking are generally observational. Subjects decide whether or not to smoke; the investigators compare the death rate for smokers to the death rate for nonsmokers. In an observational study, the groups may differ in important ways that the investigators do not notice; controlled experiments minimize this problem. The critical distinction is that in a controlled experiment, the investigators intervene to manipulate the circumstances of the subjects; in an observational study, the investigators are passive observers. (Of course, running a good observational study is hard work, and may be quite useful.) Compare confounding variable; controlled experiment.

**observed significance level.** A synonym for $p$-value. See significance test. Compare fixed significance level.

**odds.** The probability that an event will occur divided by the probability that it will not. For example, if the chance of rain tomorrow is 2/3, then the odds on rain are $(2/3)/(1/3) = 2/1$, or 2 to 1; the odds against rain are 1 to 2.

**odds ratio.** A measure of association, often used in epidemiology. For example, if 10% of all people exposed to a chemical develop a disease, compared with 5% of people who are not exposed, then the odds of the disease in the exposed group are $10/90 = 1/9$, compared with $5/95 = 1/19$ in the unexposed group. The odds ratio is $(1/9)/(1/19) = 19/9 = 2.1$. An odds ratio of 1 indicates no association. Compare relative risk.

**one–sided hypothesis; one–tailed hypothesis.** Excludes the possibility that a parameter could be, for example, less than the value asserted in the null hypothesis. A one–sided hypothesis leads to a one–sided (or one–tailed) test. See significance test; statistical hypothesis; compare two–sided hypothesis.

**one–sided test; one–tailed test.** See one–sided hypothesis.

**outcome variable.** See dependent variable.

**outlier.** An observation that is far removed from the bulk of the data. Outliers may indicate faulty measurements and they may exert undue influence on summary statistics, such as the mean or the correlation coefficient.

**$p$–value.** Result from a statistical test. The probability of getting, just by chance, a test statistic as large as or larger than the observed value. Large $p$-values are consistent with the null hypothesis; small $p$-values undermine the null hypothesis. However, $p$ does not give the probability that the null hypothesis is true. If $p$ is smaller than 5%, the result is statistically significant. If $p$ is smaller

291

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

than 1%, the result is highly significant. The *p*-value is also called the observed significance level. See significance test; statistical hypothesis.

**parameter.** A numerical characteristic of a population or a model. See probability model.

**percentile.** To get the percentiles of a dataset, array the data from the smallest value to the largest. Take the 90th percentile by way of example: 90% of the values fall below the 90th percentile, and 10% are above. (To be very precise: At least 90% of the data are at the 90th percentile or below; at least 10% of the data are at the 90th percentile or above.) The 50th percentile is the median: 50% of the values fall below the median, and 50% are above. On the LSAT, a score of 152 places a test taker at the 50th percentile; a score of 164 is at the 90th percentile; a score of 172 is at the 99th percentile. Compare mean; median; quartile.

**placebo.** See double-blind experiment.

**point estimate.** An estimate of the value of a quantity expressed as a single number. See estimator. Compare confidence interval; interval estimate.

**Poisson distribution.** A limiting case of the binomial distribution, when the number of trials is large and the common probability is small. The parameter of the approximating Poisson distribution is the number of trials times the common probability, which is the expected number of events. When this number is large, the Poisson distribution may be approximated by a normal distribution.

**population.** Also, universe. All the units of interest to the researcher. Compare sample; sampling frame.

**population size.** Also, size of population. Number of units in the population.

**posterior probability.** See Bayes' rule.

**power.** The probability that a statistical test will reject the null hypothesis. To compute power, one has to fix the size of the test and specify parameter values outside the range given by the null hypothesis. A powerful test has a good chance of detecting an effect when there is an effect to be detected. See beta; significance test. Compare alpha; size; *p*-value.

**practical significance.** Substantive importance. Statistical significance does not necessarily establish practical significance. With large samples, small differences can be statistically significant. See significance test.

**practice effects.** Changes in test scores that result from taking the same test twice in succession, or taking two similar tests one after the other.

**predicted value.** See residual.

**predictive validity.** A skills test has predictive validity to the extent that test scores are well correlated with later performance, or more generally with outcomes that the test is intended to predict. See validity. Compare reliability.

EXHIBIT C

*Reference Guide on Statistics*

**predictor.**  See independent variable.

**prior probability.**  See Bayes' rule.

**probability.**  Chance, on a scale from 0 to 1. Impossibility is represented by 0, certainty by 1. Equivalently, chances may be quoted in percent; 100% corresponds to 1, 5% corresponds to .05, and so forth.

**probability density.**  Describes the probability distribution of a random variable. The chance that the random variable falls in an interval equals the area below the density and above the interval. (However, not all random variables have densities.) See probability distribution; random variable.

**probability distribution.**  Gives probabilities for possible values or ranges of values of a random variable. Often, the distribution is described in terms of a density. See probability density.

**probability histogram.**  See histogram.

**probability model.**  Relates probabilities of outcomes to parameters; also, statistical model. The latter connotes unknown parameters.

**probability sample.**  A sample drawn from a sampling frame by some objective chance mechanism; each unit has a known probability of being sampled. Such samples minimize selection bias, but can be expensive to draw.

**psychometrics.**  The study of psychological measurement and testing.

**qualitative variable; quantitative variable.**  Describes qualitative features of subjects in a study (e.g., marital status—never-married, married, widowed, divorced, separated). A quantitative variable describes numerical features of the subjects (e.g., height, weight, income). This is not a hard-and-fast distinction, because qualitative features may be given numerical codes, as with a dummy variable. Quantitative variables may be classified as discrete or continuous. Concepts such as the mean and the standard deviation apply only to quantitative variables. Compare continuous variable; discrete variable; dummy variable. See variable.

**quartile.**  The 25th or 75th percentile. See percentile. Compare median.

**$R$-squared ($R^2$).**  Measures how well a regression equation fits the data. $R$-squared varies between 0 (no fit) and 1 (perfect fit). $R$-squared does not measure the extent to which underlying assumptions are justified. See regression model. Compare multiple correlation coefficient; standard error of regression.

**random error.**  Sources of error that are random in their effect, like draws made at random from a box. These are reflected in the error term of a statistical model. Some authors refer to random error as chance error or sampling error. See regression model.

**random variable.**  A variable whose possible values occur according to some probability mechanism. For example, if a pair of dice are thrown, the total number of spots is a random variable. The chance of two spots is 1/36, the

293

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

chance of three spots is 2/36, and so forth; the most likely number is 7, with chance 6/36.

The expected value of a random variable is the weighted average of the possible values; the weights are the probabilities. In our example, the expected value is

$$\frac{1}{36}\times2+\frac{2}{36}\times3+\frac{3}{36}\times4+\frac{5}{36}\times6+\frac{6}{36}\times7$$
$$+\frac{5}{36}\times8+\frac{4}{36}\times9+\frac{3}{36}\times10+\frac{2}{36}\times11+\frac{1}{36}\times12$$

In many problems, the weighted average is computed with respect to the density; then sums must be replaced by integrals. The expected value need not be a possible value for the random variable.

Generally, a random variable will be somewhere around its expected value, but will be off (in either direction) by something like a standard error (SE) or so. If the random variable has a more or less normal distribution, there is about a 68% chance for it to fall in the range expected value − SE to expected value + SE. See normal curve; standard error.

**randomization.**  See controlled experiment; randomized controlled experiment.

**randomized controlled experiment.**  A controlled experiment in which sub-jects are placed into the treatment and control groups at random—as if by a lottery. See controlled experiment. Compare observational study.

**range.**  The difference between the biggest and the smallest values in a batch of numbers.

**rate.**  In an epidemiological study, the number of events, divided by the size of the population; often cross-classified by age and gender. For example, the death rate from heart disease among American men ages 55–64 in 2004 was about three per thousand. Among men ages 65–74, the rate was about seven per thousand. Among women, the rate was about half that for men. Rates adjust for differences in sizes of populations or subpopulations. Often, rates are computed per unit of time, e.g., per thousand persons per year. Data source: Statistical Abstract of the United States tbl. 115 (2008).

**regression coefficient.**  The coefficient of a variable in a regression equation. See regression model.

**regression diagnostics.**  Procedures intended to check whether the assumptions of a regression model are appropriate.

**regression equation.**  See regression model.

**regression line.**  The graph of a (simple) regression equation.

**regression model.**  A regression model attempts to combine the values of certain variables (the independent or explanatory variables) in order to get expected values for another variable (the dependent variable). Sometimes, the phrase

294

**EXHIBIT C**

*Reference Guide on Statistics*

"regression model" refers to a probability model for the data; if no qualifications are made, the model will generally be linear, and errors will be assumed independent across observations, with common variance, The coefficients in the linear combination are called regression coefficients; these are parameters. At times, "regression model" refers to an equation ("the regression equation") estimated from data, typically by least squares.

For example, in a regression study of salary differences between men and women in a firm, the analyst may include a dummy variable for gender, as well as statistical controls such as education and experience to adjust for productivity differences between men and women. The dummy variable would be defined as 1 for the men and 0 for the women. Salary would be the dependent variable; education, experience, and the dummy would be the independent variables. See least squares; multiple regression; random error; variance. Compare general linear model.

**relative frequency.**  See frequency.

**relative risk.**  A measure of association used in epidemiology. For example, if 10% of all people exposed to a chemical develop a disease, compared to 5% of people who are not exposed, then the disease occurs twice as frequently among the exposed people: The relative risk is 10%/5% = 2. A relative risk of 1 indicates no association. For more details, see Leon Gordis, Epidemiology (4th ed. 2008). Compare odds ratio.

**reliability.**  The extent to which a measurement process gives the same results on repeated measurement of the same thing. Compare validity.

**representative sample.**  Not a well-defined technical term. A sample judged to fairly represent the population, or a sample drawn by a process likely to give samples that fairly represent the population, for example, a large probability sample.

**resampling.**  See bootstrap.

**residual.**  The difference between an actual and a predicted value. The predicted value comes typically from a regression equation, and is better called the fitted value, because there is no real prediction going on. See regression model; independent variable.

**response variable.**  See independent variable.

**risk.**  Expected loss. "Expected" means on average, over the various datasets that could be generated by the statistical model under examination. Usually, risk cannot be computed exactly but has to be estimated, because the parameters in the statistical model are unknown and must be estimated. See loss function; random variable.

**risk factor.**  See independent variable.

**robust.**  A statistic or procedure that does not change much when data or assumptions are modified slightly.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**sample.**  A set of units collected for study. Compare population.

**sample size.**  Also, size of sample. The number of units in a sample.

**sample weights.**  See stratified random sample.

**sampling distribution.**  The distribution of the values of a statistic, over all possible samples from a population. For example, suppose a random sample is drawn. Some values of the sample mean are more likely; others are less likely. The sampling distribution specifies the chance that the sample mean will fall in one interval rather than another.

**sampling error.**  A sample is part of a population. When a sample is used to estimate a numerical characteristic of the population, the estimate is likely to differ from the population value because the sample is not a perfect microcosm of the whole. If the estimate is unbiased, the difference between the estimate and the exact value is sampling error. More generally,

$$\text{estimate} = \text{true value} + \text{bias} + \text{sampling error}$$

Sampling error is also called chance error or random error. See standard error. Compare bias; nonsampling error.

**sampling frame.**  A list of units designed to represent the entire population as completely as possible. The sample is drawn from the frame.

**sampling interval.**  See systematic sample.

**scatter diagram.**  Also, scatterplot; scattergram. A graph showing the relationship between two variables in a study. Each dot represents one subject. One variable is plotted along the horizontal axis, the other variable is plotted along the vertical axis. A scatter diagram is homoscedastic when the spread is more or less the same inside any vertical strip. If the spread changes from one strip to another, the diagram is heteroscedastic.

**selection bias.**  Systematic error due to nonrandom selection of subjects for study.

**sensitivity.**  In clinical medicine, the probability that a test for a disease will give a positive result given that the patient has the disease. Sensitivity is analogous to the power of a statistical test. Compare specificity.

**sensitivity analysis.**  Analyzing data in different ways to see how results depend on methods or assumptions.

**sign test.**  A statistical test based on counting and the binomial distribution. For example, a Finnish study of twins found 22 monozygotic twin pairs where 1 twin smoked, 1 did not, and at least 1 of the twins had died. That sets up a race to death. In 17 cases, the smoker died first; in 5 cases, the nonsmoker died first. The null hypothesis is that smoking does not affect time to death, so the chances are 50-50 for the smoker to die first. On the null hypothesis, the chance that the smoker will win the race 17 or more times out of 22 is

296

**EXHIBIT C**

*Reference Guide on Statistics*

8/1000. That is the *p*-value. The *p*-value can be computed from the binomial distribution. For additional detail, see Michael O. Finkelstein & Bruce Levin, Statistics for Lawyers 339–41 (2d ed. 2001); David A. Freedman et al., Statistics 262–63 (4th ed. 2007).

**significance level.** See fixed significance level; *p*-value.

**significance test.** Also, statistical test; hypothesis test; test of significance. A significance test involves formulating a statistical hypothesis and a test statistic, computing a *p*-value, and comparing *p* to some preestablished value ($\alpha$) to decide if the test statistic is significant. The idea is to see whether the data conform to the predictions of the null hypothesis. Generally, a large test statistic goes with a small *p*-value; and small *p*-values would undermine the null hypothesis.

For example, suppose that a random sample of male and female employees were given a skills test and the mean scores of the men and women were different—in the sample. To judge whether the difference is due to sampling error, a statistician might consider the implications of competing hypotheses about the difference in the population. The null hypothesis would say that on average, in the population, men and women have the same scores: The difference observed in the data is then just due to sampling error. A one-sided alternative hypothesis would be that on average, in the population, men score higher than women. The one-sided test would reject the null hypothesis if the sample men score substantially higher than the women—so much so that the difference is hard to explain on the basis of sampling error.

In contrast, the null hypothesis could be tested against the two-sided alternative that on average, in the population, men score differently than women—higher or lower. The corresponding two-sided test would reject the null hypothesis if the sample men score substantially higher or substantially lower than the women.

The one-sided and two-sided tests would both be based on the same data, and use the same *t*-statistic. However, if the men in the sample score higher than the women, the one-sided test would give a *p*-value only half as large as the two-sided test; that is, the one-sided test would appear to give stronger evidence against the null hypothesis. ("One-sided" and "one-tailed" are synonymous; so are "two-sided and "two-tailed.") See *p*-value; statistical hypothesis; *t*-statistic.

**significant.** See *p*-value; practical significance; significance test.

**simple random sample.** A random sample in which each unit in the sampling frame has the same chance of being sampled. The investigators take a unit at random (as if by lottery), set it aside, take another at random from what is left, and so forth.

**simple regression.** A regression equation that includes only one independent variable. Compare multiple regression.

**size.** A synonym for alpha ($\alpha$).

297

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**skip factor.**  See systematic sample.

**specificity.**  In clinical medicine, the probability that a test for a disease will give a negative result given that the patient does not have the disease. Specificity is analogous to $1 - \alpha$, where $\alpha$ is the significance level of a statistical test. Compare sensitivity.

**spurious correlation.**  When two variables are correlated, one is not necessarily the cause of the other. The vocabulary and shoe size of children in elementary school, for example, are correlated—but learning more words will not make the feet grow. Such noncausal correlations are said to be spurious. (Originally, the term seems to have been applied to the correlation between two rates with the same denominator: Even if the numerators are unrelated, the common denominator will create some association.) Compare confounding variable.

**standard deviation (SD).**  Indicates how far a typical element deviates from the average. For example, in round numbers, the average height of women age 18 and over in the United States is 5 feet 4 inches. However, few women are exactly average; most will deviate from average, at least by a little. The SD is sort of an average deviation from average. For the height distribution, the SD is 3 inches. The height of a typical woman is around 5 feet 4 inches, but is off that average value by something like 3 inches.

For distributions that follow the normal curve, about 68% of the elements are in the range from 1 SD below the average to 1 SD above the average. Thus, about 68% of women have heights in the range 5 feet 1 inch to 5 feet 7 inches. Deviations from the average that exceed 3 or 4 SDs are extremely unusual. Many authors use standard deviation to also mean standard error. See standard error.

**standard error (SE).**  Indicates the likely size of the sampling error in an esti-mate. Many authors use the term standard deviation instead of standard error. Compare expected value; standard deviation.

**standard error of regression.**  Indicates how actual values differ (in some aver-age sense) from the fitted values in a regression model. See regression model; residual. Compare *R*-squared.

**standard normal.**  See normal distribution.

**standardization.**  See standardized variable.

**standardized variable.**  Transformed to have mean zero and variance one. This involves two steps: (1) subtract the mean; (2) divide by the standard deviation.

**statistic.**  A number that summarizes data. A statistic refers to a sample; a parameter or a true value refers to a population or a probability model.

**statistical controls.**  Procedures that try to filter out the effects of confounding variables on non-experimental data, for example, by adjusting through statisti-cal procedures such as multiple regression. Variables in a multiple regression

298

**EXHIBIT C**

*Reference Guide on Statistics*

equation. See multiple regression; confounding variable; observational study. Compare controlled experiment.

**statistical dependence.**  See dependence.

**statistical hypothesis.**  Generally, a statement about parameters in a probability model for the data. The null hypothesis may assert that certain parameters have specified values or fall in specified ranges; the alternative hypothesis would specify other values or ranges. The null hypothesis is tested against the data with a test statistic; the null hypothesis may be rejected if there is a statistically significant difference between the data and the predictions of the null hypothesis.

Typically, the investigator seeks to demonstrate the alternative hypothesis; the null hypothesis would explain the findings as a result of mere chance, and the investigator uses a significance test to rule out that possibility. See significance test.

**statistical independence.**  See independence.

**statistical model.**  See probability model.

**statistical test.**  See significance test.

**statistical significance.**  See *p*-value.

**stratified random sample.**  A type of probability sample. The researcher divides the population into relatively homogeneous groups called "strata," and draws a random sample separately from each stratum. Dividing the population into strata is called "stratification." Often the sampling fraction will vary from stratum to stratum. Then sampling weights should be used to extrapolate from the sample to the population. For example, if 1 unit in 10 is sampled from stratum A while 1 unit in 100 is sampled from stratum B, then each unit drawn from A counts as 10, and each unit drawn from B counts as 100. The first kind of unit has weight 10; the second has weight 100. See Freedman et al., Statistics 401 (4th ed. 2007).

**stratification.**  See independent variable; stratified random sample.

**study validity.**  See validity.

**subjectivist.**  See Bayesian.

**systematic error.**  See bias.

**systematic sample.**  Also, list sample. The elements of the population are numbered consecutively as 1, 2, 3, . . . . The investigators choose a starting point and a "sampling interval" or "skip factor" $k$. Then, every $k$th element is selected into the sample. If the starting point is 1 and $k = 10$, for example, the sample would consist of items 1, 11, 21, . . . . Sometimes the starting point is chosen at random from 1 to $k$: this is a random-start systematic sample.

***t*-statistic.**  A test statistic, used to make the *t*-test. The *t*-statistic indicates how far away an estimate is from its expected value, relative to the standard error. The expected value is computed using the null hypothesis that is being tested.

EXHIBIT C

*Reference Manual on Scientific Evidence*

Some authors refer to the *t*-statistic, others to the *z*-statistic, especially when the sample is large. With a large sample, a *t*-statistic larger than 2 or 3 in absolute value makes the null hypothesis rather implausible—the estimate is too many standard errors away from its expected value. See statistical hypothesis; significance test; *t*-test.

**t-test.**  A statistical test based on the *t*-statistic. Large *t*-statistics are beyond the usual range of sampling error. For example, if *t* is bigger than 2, or smaller than −2, then the estimate is statistically significant at the 5% level; such values of *t* are hard to explain on the basis of sampling error. The scale for *t*-statistics is tied to areas under the normal curve. For example, a *t*-statistic of 1.5 is not very striking, because 13% = 13/100 of the area under the normal curve is outside the range from −1.5 to 1.5. On the other hand, *t* = 3 is remarkable: Only 3/1000 of the area lies outside the range from −3 to 3. This discussion is predicated on having a reasonably large sample; in that context, many authors refer to the *z*-test rather than the *t*-test.

Consider testing the null hypothesis that the average of a population equals a given value; the population is known to be normal. For small samples, the *t*-statistic follows Student's *t*-distribution (when the null hypothesis holds) rather than the normal curve; larger values of *t* are required to achieve significance. The relevant *t*-distribution depends on the number of degrees of freedom, which in this context equals the sample size minus one. A *t*-test is not appropriate for small samples drawn from a population that is not normal. See *p*-value; significance test; statistical hypothesis.

**test statistic.**  A statistic used to judge whether data conform to the null hypothesis. The parameters of a probability model determine expected values for the data; differences between expected values and observed values are measured by a test statistic. Such test statistics include the chi-squared statistic ($\chi^2$) and the *t*-statistic. Generally, small values of the test statistic are consistent with the null hypothesis; large values lead to rejection. See *p*-value; statistical hypothesis; *t*-statistic.

**time series.**  A series of data collected over time, for example, the Gross National Product of the United States from 1945 to 2005.

**treatment group.**  See controlled experiment.

**two-sided hypothesis; two-tailed hypothesis.**  An alternative hypothesis asserting that the values of a parameter are different from—either greater than or less than—the value asserted in the null hypothesis. A two-sided alternative hypothesis suggests a two-sided (or two-tailed) test. See significance test; statistical hypothesis. Compare one-sided hypothesis.

**two-sided test; two-tailed test.**  See two-sided hypothesis.

**Type I error.**  A statistical test makes a Type I error when (1) the null hypothesis is true and (2) the test rejects the null hypothesis, i.e., there is a false posi-

**EXHIBIT C**

*Reference Guide on Statistics*

tive. For example, a study of two groups may show some difference between samples from each group, even when there is no difference in the population. When a statistical test deems the difference to be significant in this situation, it makes a Type I error. See significance test; statistical hypothesis. Compare alpha; Type II error.

**Type II error.** A statistical test makes a Type II error when (1) the null hypothesis is false and (2) the test fails to reject the null hypothesis, i.e., there is a false negative. For example, there may not be a significant difference between samples from two groups when, in fact, the groups are different. See significance test; statistical hypothesis. Compare beta; Type I error.

**unbiased estimator.** An estimator that is correct on average, over the possible datasets. The estimates have no systematic tendency to be high or low. Compare bias.

**uniform distribution.** For example, a whole number picked at random from 1 to 100 has the uniform distribution: All values are equally likely. Similarly, a uniform distribution is obtained by picking a real number at random between 0.75 and 3.25: The chance of landing in an interval is proportional to the length of the interval.

**validity.** Measurement validity is the extent to which an instrument measures what it is supposed to, rather than something else. The validity of a standardized test is often indicated by the correlation coefficient between the test scores and some outcome measure (the criterion variable). See content validity; differential validity; predictive validity. Compare reliability.

Study validity is the extent to which results from a study can be relied upon. Study validity has two aspects, internal and external. A study has high internal validity when its conclusions hold under the particular circumstances of the study. A study has high external validity when its results are generalizable. For example, a well-executed randomized controlled double-blind experiment performed on an unusual study population will have high internal validity because the design is good; but its external validity will be debatable because the study population is unusual.

Validity is used also in its ordinary sense: assumptions are valid when they hold true for the situation at hand.

**variable.** A property of units in a study, which varies from one unit to another, for example, in a study of households, household income; in a study of people, employment status (employed, unemployed, not in labor force).

**variance.** The square of the standard deviation. Compare standard error; covariance.

**weights.** See stratified random sample.

**within-observer variability.** Differences that occur when an observer measures the same thing twice, or measures two things that are virtually the same. Compare between-observer variability.

301

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**z–statistic.**  See *t*-statistic.

**z–test.**  See *t*-test.

# References on Statistics

## General Surveys

David Freedman et al., Statistics (4th ed. 2007).
Darrell Huff, How to Lie with Statistics (1993).
Gregory A. Kimble, How to Use (and Misuse) Statistics (1978).
David S. Moore & William I. Notz, Statistics: Concepts and Controversies (2005).
Michael Oakes, Statistical Inference: A Commentary for the Social and Behavioral Sciences (1986).
Statistics: A Guide to the Unknown (Roxy Peck et al. eds., 4th ed. 2005).
Hans Zeisel, Say It with Figures (6th ed. 1985).

## Reference Works for Lawyers and Judges

David C. Baldus & James W.L. Cole, Statistical Proof of Discrimination (1980 & Supp. 1987) (continued as Ramona L. Paetzold & Steven L. Willborn, The Statistics of Discrimination: Using Statistical Evidence in Discrimination Cases (1994) (updated annually).
David W. Barnes & John M. Conley, Statistical Evidence in Litigation: Methodology, Procedure, and Practice (1986 & Supp. 1989).
James Brooks, A Lawyer's Guide to Probability and Statistics (1990).
Michael O. Finkelstein & Bruce Levin, Statistics for Lawyers (2d ed. 2001).
Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman et al. eds., Volumes 1 and 2, 2d ed. 2002) (updated annually).
David H. Kaye et al., The New Wigmore: A Treatise on Evidence: Expert Evidence § 12 (2d ed. 2011) (updated annually).
National Research Council, The Evolving Role of Statistical Assessments as Evidence in the Courts (Stephen E. Fienberg ed., 1989).
Statistical Methods in Discrimination Litigation (David H. Kaye & Mikel Aickin eds., 1986).
Hans Zeisel & David Kaye, Prove It with Figures: Empirical Methods in Law and Litigation (1997).

## General Reference

Encyclopedia of Statistical Sciences (Samuel Kotz et al. eds., 2d ed. 2005).

**EXHIBIT C**

# Reference Guide on Multiple Regression

DANIEL L. RUBINFELD

*Daniel L. Rubinfeld, Ph.D., is Robert L. Bridges Professor of Law and Professor of Economics Emeritus, University of California, Berkeley, and Visiting Professor of Law at New York University Law School.*

CONTENTS

I. Introduction and Overview, 305

II. Research Design: Model Specification, 311
    A. What Is the Specific Question That Is Under Investigation by the Expert? 311
    B. What Model Should Be Used to Evaluate the Question at Issue? 311
        1. Choosing the dependent variable, 312
        2. Choosing the explanatory variable that is relevant to the question at issue, 313
        3. Choosing the additional explanatory variables, 313
        4. Choosing the functional form of the multiple regression model, 316
        5. Choosing multiple regression as a method of analysis, 317

III. Interpreting Multiple Regression Results, 318
    A. What Is the Practical, as Opposed to the Statistical, Significance of Regression Results? 318
        1. When should statistical tests be used? 319
        2. What is the appropriate level of statistical significance? 320
        3. Should statistical tests be one-tailed or two-tailed? 321
    B. Are the Regression Results Robust? 322
        1. What evidence exists that the explanatory variable causes changes in the dependent variable? 322
        2. To what extent are the explanatory variables correlated with each other? 324
        3. To what extent are individual errors in the regression model independent? 325
        4. To what extent are the regression results sensitive to individual data points? 326
        5. To what extent are the data subject to measurement error? 327

EXHIBIT C

*Reference Manual on Scientific Evidence*

IV.  The Expert, 328
    A.  Who Should Be Qualified as an Expert? 328
    B.  Should the Court Appoint a Neutral Expert? 329
V.  Presentation of Statistical Evidence, 330
    A.  What Disagreements Exist Regarding Data on Which the Analysis Is Based? 330
    B.  Which Database Information and Analytical Procedures Will Aid in Resolving Disputes over Statistical Studies? 331
Appendix: The Basics of Multiple Regression, 333
    A.  Introduction, 333
    B.  Linear Regression Model, 336
        1.  Specifying the regression model, 337
        2.  Regression line, 337
    C.  Interpreting Regression Results, 339
    D. Determining the Precision of the Regression Results, 340
        1.  Standard errors of the coefficients and $t$-statistics, 340
        2.  Goodness-of-fit, 344
        3.  Sensitivity of least squares regression results, 345
    E.  Reading Multiple Regression Computer Output, 346
    F . Forecasting, 348
    G.  A Hypothetical Example, 350
Glossary of Terms, 352
References on Multiple Regression, 357

**EXHIBIT C**

*Reference Guide on Multiple Regression*

# I. Introduction and Overview

Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables.[1] Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable.[2] For example, a multiple regression analysis might estimate the effect of the number of years of work on salary. Salary would be the dependent variable to be explained; the years of experience would be the explanatory variable.

Multiple regression analysis is sometimes well suited to the analysis of data about competing theories for which there are several possible explanations for the relationships among a number of explanatory variables.[3] Multiple regression typically uses a single dependent variable and several explanatory variables to assess the statistical data pertinent to these theories. In a case alleging sex discrimination in salaries, for example, a multiple regression analysis would examine not only sex, but also other explanatory variables of interest, such as education and experience.[4] The employer-defendant might use multiple regression to argue that salary is a function of the employee's education and experience, and the employee-plaintiff might argue that salary is also a function of the individual's sex. Alternatively, in an antitrust cartel damages case, the plaintiff's expert might utilize multiple regression to evaluate the extent to which the price of a product increased during the period in which the cartel was effective, after accounting for costs and other variables unrelated to the cartel. The defendant's expert might use multiple

---

1. A variable is anything that can take on two or more values (e.g., the daily temperature in Chicago or the salaries of workers at a factory).

2. Explanatory variables in the context of a statistical study are sometimes called independent variables. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section II.A.1, in this manual. The guide also offers a brief discussion of multiple regression analysis. *Id.*, Section V.

3. Multiple regression is one type of statistical analysis involving several variables. Other types include matching analysis, stratification, analysis of variance, probit analysis, logit analysis, discriminant analysis, and factor analysis.

4. Thus, in *Ottaviani v. State University of New York,* 875 F.2d 365, 367 (2d Cir. 1989) (citations omitted), *cert. denied*, 493 U.S. 1021 (1990), the court stated:

> In disparate treatment cases involving claims of gender discrimination, plaintiffs typically use multiple regression analysis to isolate the influence of gender on employment decisions relating to a particular job or job benefit, such as salary.

The first step in such a regression analysis is to specify all of the possible "legitimate" (i.e., non-discriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees. By identifying those legitimate criteria that affect the decisionmaking process, individual plaintiffs can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees. If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net "residual" difference represents the unlawful effect of discriminatory animus on the allocation of jobs or job benefits.

305

**EXHIBIT C**

regression to suggest that the plaintiff's expert had omitted a number of price-determining variables.

More generally, multiple regression may be useful (1) in determining whether a particular effect is present; (2) in measuring the magnitude of a particular effect; and (3) in forecasting what a particular effect would be, but for an intervening event. In a patent infringement case, for example, a multiple regression analysis could be used to determine (1) whether the behavior of the alleged infringer affected the price of the patented product, (2) the size of the effect, and (3) what the price of the product would have been had the alleged infringement not occurred.

Over the past several decades, the use of multiple regression analysis in court has grown widely. Regression analysis has been used most frequently in cases of sex and race discrimination[5] antitrust violations,[6] and cases involving class cer-

---

5. Discrimination cases using multiple regression analysis are legion. *See, e.g.,* Bazemore v. Friday, 478 U.S. 385 (1986), *on remand,* 848 F.2d 476 (4th Cir. 1988); Csicseri v. Bowsher, 862 F. Supp. 547 (D.D.C. 1994) (age discrimination), *aff'd,* 67 F.3d 972 (D.C. Cir. 1995); EEOC v. General Tel. Co., 885 F.2d 575 (9th Cir. 1989), *cert. denied,* 498 U.S. 950 (1990); Bridgeport Guardians, Inc. v. City of Bridgeport, 735 F. Supp. 1126 (D. Conn. 1990), *aff'd,* 933 F.2d 1140 (2d Cir.), *cert. denied,* 502 U.S. 924 (1991); Bickerstaff v. Vassar College, 196 F.3d 435, 448–49 (2d Cir. 1999) (sex discrimination); McReynolds v. Sodexho Marriott, 349 F. Supp. 2d 1 (D.C. Cir. 2004) (race discrimination); Hnot v. Willis Group Holdings Ltd., 228 F.R.D. 476 (S.D.N.Y. 2005) (gender discrimination); Carpenter v. Boeing Co., 456 F.3d 1183 (10th Cir. 2006) (sex discrimination); Coward v. ADT Security Systems, Inc., 140 F.3d 271, 274–75 (D.C. Cir. 1998); Smith v. Virginia Commonwealth Univ., 84 F.3d 672 (4th Cir. 1996) (en banc); Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1184–86 (9th Cir. 2000); Mehus v. Emporia State University, 222 F.R.D. 455 (D. Kan. 2004) (sex discrimination); Guiterrez v. Johnson & Johnson, 2006 WL 3246605 (D.N.J. Nov. 6, 2006 (race discrimination); Morgan v. United Parcel Service, 380 F.3d 459 (8th Cir. 2004) (racial discrimination). *See also* Keith N. Hylton & Vincent D. Rougeau, *Lending Discrimination: Economic Theory, Econometric Evidence, and the Community Reinvestment Act,* 85 Geo. L.J. 237, 238 (1996) ("regression analysis is probably the best empirical tool for uncovering discrimination").

6. *E.g.,* United States v. Brown Univ., 805 F. Supp. 288 (E.D. Pa. 1992) (price fixing of college scholarships), *rev'd,* 5 F.3d 658 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224 (3d Cir.), *cert. denied,* 510 U.S. 994 (1993); Ohio v. Louis Trauth Dairy, Inc., 925 F. Supp. 1247 (S.D. Ohio 1996); *In re* Chicken Antitrust Litig., 560 F. Supp. 963, 993 (N.D. Ga. 1980); New York v. Kraft Gen. Foods, Inc., 926 F. Supp. 321 (S.D.N.Y. 1995); Freeland v. AT&T, 238 F.R.D. 130 (S.D.N.Y. 2006); *In re* Pressure Sensitive Labelstock Antitrust Litig., 2007 U.S. Dist. LEXIS 85466 (M.D. Pa. Nov. 19, 2007); *In re* Linerboard Antitrust Litig., 497 F. Supp. 2d 666 (E.D. Pa. 2007) (price fixing by manufacturers of corrugated boards and boxes); *In re* Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348 (N.D. Ga. 2000); *In re* OSB Antitrust Litig., 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) (price fixing of Oriented Strand Board, also known as "waferboard"); *In re* TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583 (N.D. Cal. 2010).

For a broad overview of the use of regression methods in antitrust, see ABA Antitrust Section, Econometrics: Legal, Practical and Technical Issues (John Harkrider & Daniel Rubinfeld, eds. 2005). *See also* Jerry Hausman et al., *Competitive Analysis with Differentiated Products,* 34 Annales D'Économie et de Statistique 159 (1994); Gregory J. Werden, *Simulating the Effects of Differentiated Products Mergers: A Practical Alternative to Structural Merger Policy,* 5 Geo. Mason L. Rev. 363 (1997).

EXHIBIT C

tification (under Rule 23).[7] However, there are a range of other applications, including census undercounts,[8] voting rights,[9] the study of the deterrent effect of the death penalty,[10] rate regulation,[11] and intellectual property.[12]

7. In antitrust, the circuits are currently split as to the extent to which plaintiffs must prove that common elements predominate over individual elements. *E.g., compare In Re* Hydrogen Peroxide Litig., 522 F.2d 305 (3d Cir. 2008) *with In Re* Cardizem CD Antitrust Litig., 391 F.3d 812 (6th Cir. 2004). For a discussion of use of multiple regression in evaluating class certification, see Bret M. Dickey & Daniel L. Rubinfeld, *Antitrust Class Certification: Towards an Economic Framework,* 66 N.Y.U. Ann. Surv. Am. L. 459 (2010) and John H. Johnson & Gregory K. Leonard, *Economics and the Rigorous Analysis of Class Certification in Antitrust Cases,* 3 J. Competition L. & Econ. 341 (2007).

8. *See, e.g.,* City of New York v. U.S. Dep't of Commerce, 822 F. Supp. 906 (E.D.N.Y. 1993) (decision of Secretary of Commerce not to adjust the 1990 census was not arbitrary and capricious), *vacated,* 34 F.3d 1114 (2d Cir. 1994) (applying heightened scrutiny), *rev'd sub nom.* Wisconsin v. City of New York, 517 U.S. 565 (1996); Carey v. Klutznick, 508 F. Supp. 420, 432–33 (S.D.N.Y. 1980) (use of reasonable and scientifically valid statistical survey or sampling procedures to adjust census figures for the differential undercount is constitutionally permissible), *stay granted,* 449 U.S. 1068 (1980), *rev'd on other grounds,* 653 F.2d 732 (2d Cir. 1981), *cert. denied,* 455 U.S. 999 (1982); Young v. Klutznick, 497 F. Supp. 1318, 1331 (E.D. Mich. 1980), r*ev'd on other grounds,* 652 F.2d 617 (6th Cir. 1981), *cert. denied,* 455 U.S. 939 (1982).

9. Multiple regression analysis was used in suits charging that at-large areawide voting was instituted to neutralize black voting strength, in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1988). Multiple regression demonstrated that the race of the candidates and that of the electorate were determinants of voting. *See* Williams v. Brown, 446 U.S. 236 (1980); Rodriguez v. Pataki, 308 F. Supp. 2d 346, 414 (S.D.N.Y. 2004); United States v. Vill. of Port Chester, 2008 U.S. Dist. LEXIS 4914 (S.D.N.Y. Jan. 17, 2008); Meza v. Galvin, 322 F. Supp. 2d 52 (D. Mass. 2004) (violation of VRA with regard to Hispanic voters in Boston); Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976 (D.S.D. 2004) (violations of VRA with regard to Native American voters in South Dakota); Georgia v. Ashcroft, 195 F. Supp. 2d 25 (D.D.C. 2002) (redistricting of Georgia's state and federal legislative districts); Benavidez v. City of Irving, 638 F. Supp. 2d 709 (N.D. Tex. 2009) (challenge of city's at-large voting scheme). For commentary on statistical issues in voting rights cases, see, e.g., *Statistical and Demographic Issues Underlying Voting Rights Cases,* 15 Evaluation Rev. 659 (1991); Stephen P. Klein et al., *Ecological Regression Versus the Secret Ballot,* 31 Jurimetrics J. 393 (1991); James W. Loewen & Bernard Grofman, *Recent Developments in Methods Used in Vote Dilution Litigation,* 21 Urb. Law. 589 (1989); Arthur Lupia & Kenneth McCue, *Why the 1980s Measures of Racially Polarized Voting Are Inadequate for the 1990s,* 12 Law & Pol'y 353 (1990).

10. *See, e.g.,* Gregg v. Georgia, 428 U.S. 153, 184–86 (1976). For critiques of the validity of the deterrence analysis, see National Research Council, Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates (Alfred Blumstein et al. eds., 1978); Richard O. Lempert, *Desert and Deterrence: An Assessment of the Moral Bases of the Case for Capital Punishment,* 79 Mich. L. Rev. 1177 (1981); Hans Zeisel, *The Deterrent Effect of the Death Penalty: Facts v. Faith,* 1976 Sup. Ct. Rev. 317; and John Donohue & Justin Wolfers, *Uses and Abuses of Statistical Evidence in the Death Penalty Debate,* 58 Stan. L. Rev. 787 (2005).

11. *See, e.g.,* Time Warner Entertainment Co. v. FCC, 56 F.3d 151 (D.C. Cir. 1995) (challenge to FCC's application of multiple regression analysis to set cable rates), *cert. denied,* 516 U.S. 1112 (1996); Appalachian Power Co. v. EPA, 135 F.3d 791 (D.C. Cir. 1998) (challenging the EPA's application of regression analysis to set nitrous oxide emission limits); Consumers Util. Rate Advocacy Div. v. Ark. PSC, 99 Ark. App. 228 (Ark. Ct. App. 2007) (challenging an increase in nongas rates).

12. *See* Polaroid Corp. v. Eastman Kodak Co., No. 76-1634-MA, 1990 WL 324105, at ★29, ★62–63 (D. Mass. Oct. 12, 1990) (damages awarded because of patent infringement), *amended by* No.

307

EXHIBIT C

*Reference Manual on Scientific Evidence*

Multiple regression analysis can be a source of valuable scientific testimony in litigation. However, when inappropriately used, regression analysis can confuse important issues while having little, if any, probative value. In *EEOC v. Sears, Roebuck & Co.*,[13] in which Sears was charged with discrimination against women in hiring practices, the Seventh Circuit acknowledged that "[m]ultiple regression analyses, designed to determine the effect of several independent variables on a dependent variable, which in this case is hiring, are an accepted and common method of proving disparate treatment claims."[14] However, the court affirmed the district court's findings that the "E.E.O.C.'s regression analyses did not 'accurately reflect Sears' complex, nondiscriminatory decision-making processes'" and that the "'E.E.O.C.'s statistical analyses [were] so flawed that they lack[ed] any persuasive value.'"[15] Serious questions also have been raised about the use of multiple regression analysis in census undercount cases and in death penalty cases.[16]

The Supreme Court's rulings in *Daubert* and *Kumho Tire* have encouraged parties to raise questions about the admissibility of multiple regression analyses.[17] Because multiple regression is a well-accepted scientific methodology, courts have frequently admitted testimony based on multiple regression studies, in some cases over the strong objection of one of the parties.[18] However, on some occasions courts have excluded expert testimony because of a failure to utilize a multiple regression methodology.[19] On other occasions, courts have rejected regression

76-1634-MA, 1991 WL 4087 (D. Mass. Jan. 11, 1991); Estate of Vane v. The Fair, Inc., 849 F.2d 186, 188 (5th Cir. 1988) (lost profits were the result of copyright infringement), *cert. denied,* 488 U.S. 1008 (1989); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 576, 664 (S.D.N.Y. 2007) (trademark infringement and unfair competition suit). The use of multiple regression analysis to estimate damages has been contemplated in a wide variety of contexts. *See, e.g.,* David Baldus et al., *Improving Judicial Oversight of Jury Damages Assessments: A Proposal for the Comparative Additur/Remittitur Review of Awards for Nonpecuniary Harms and Punitive Damages,* 80 Iowa L. Rev. 1109 (1995); Talcott J. Franklin, *Calculating Damages for Loss of Parental Nurture Through Multiple Regression Analysis,* 52 Wash. & Lee L. Rev. 271 (1997); Roger D. Blair & Amanda Kay Esquibel, *Yardstick Damages in Lost Profit Cases: An Econometric Approach,* 72 Denv. U. L. Rev. 113 (1994). Daniel Rubinfeld, *Quantitative Methods in Antitrust, in* 1 Issues in Competition Law and Policy 723 (2008).

13. 839 F.2d 302 (7th Cir. 1988).

14. *Id.* at 324 n.22.

15. *Id.* at 348, 351 (quoting EEOC v. Sears, Roebuck & Co., 628 F. Supp. 1264, 1342, 1352 (N.D. Ill. 1986)). The district court commented specifically on the "severe limits of regression analysis in evaluating complex decision-making processes." 628 F. Supp. at 1350.

16. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Sections II.A.3, B.1, in this manual.

17. Daubert v. Merrill Dow Pharms., Inc. 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (expanding the *Daubert's* application to nonscientific expert testimony).

18. *See* Newport Ltd. v. Sears, Roebuck & Co., 1995 U.S. Dist. LEXIS 7652 (E.D. La. May 26, 1995). *See also* Petruzzi's IGA Supermarkets, *supra* note 6, 998 F.2d at 1240, 1247 (finding that the district court abused its discretion in excluding multiple regression–based testimony and reversing the grant of summary judgment to two defendants).

19. *See, e.g., In re* Executive Telecard Ltd. Sec. Litig., 979 F. Supp. 1021 (S.D.N.Y. 1997).

EXHIBIT C

*Reference Guide on Multiple Regression*

studies that did not have an adequate foundation or research design with respect to the issues at hand.[20]

In interpreting the results of a multiple regression analysis, it is important to distinguish between correlation and causality. Two variables are correlated—that is, associated with each other—when the events associated with the variables occur more frequently together than one would expect by chance. For example, if higher salaries are associated with a greater number of years of work experience, and lower salaries are associated with fewer years of experience, there is a positive correlation between salary and number of years of work experience. However, if higher salaries are associated with less experience, and lower salaries are associated with more experience, there is a negative correlation between the two variables.

A correlation between two variables does not imply that one event causes the second. Therefore, in making causal inferences, it is important to avoid *spurious correlation*.[21] Spurious correlation arises when two variables are closely related but bear no causal relationship because they are both caused by a third, unexamined variable. For example, there might be a negative correlation between the age of certain skilled employees of a computer company and their salaries. One should not conclude from this correlation that the employer has necessarily discriminated against the employees on the basis of their age. A third, unexamined variable, such as the level of the employees' technological skills, could explain differences in productivity and, consequently, differences in salary.[22] Or, consider a patent infringement case in which increased sales of an allegedly infringing product are associated with a lower price of the patented product.[23] This correlation would be spurious if the two products have their own noncompetitive market niches and the lower price is the result of a decline in the production costs of the patented product.

Pointing to the possibility of a spurious correlation will typically not be enough to dispose of a statistical argument. It may be appropriate to give little weight to such an argument absent a showing that the correlation is relevant. For example, a statistical showing of a relationship between technological skills

20. *See* City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.2d 548 (11th Cir. 1998), in which the court ruled plaintiffs' regression-based expert testimony inadmissible and granted summary judgment to the defendants. *See also* American Booksellers Ass'n v. Barnes & Noble, Inc., 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), in which a model was said to contain "too many assumptions and simplifications that are not supported by real-world evidence," *and* Obrey v. Johnson, 400 F.3d 691 (9th Cir. 2005).

21. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section V.B.3, in this manual.

22. *See, e.g.,* Sheehan v. Daily Racing Form Inc., 104 F.3d 940, 942 (7th Cir.) (rejecting plaintiff's age discrimination claim because statistical study showing correlation between age and retention ignored the "more than remote possibility that age was correlated with a legitimate job-related qualification"), *cert. denied,* 521 U.S. 1104 (1997).

23. In some particular cases, there are statistical tests that allow one to reject claims of causality. For a brief description of these tests, which were developed by Jerry Hausman, see Robert S. Pindyck & Daniel L. Rubinfeld, Econometric Models and Economic Forecasts § 7.5 (4th ed. 1997).

309

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

and worker productivity might be required in the age discrimination example, above.[24]

Causality cannot be inferred by data analysis alone; rather, one must infer that a causal relationship exists on the basis of an underlying causal theory that explains the relationship between the two variables. Even when an appropriate theory has been identified, causality can never be inferred directly. One must also look for empirical evidence that there is a causal relationship. Conversely, the fact that two variables are correlated does not guarantee the existence of a relationship; it could be that the model—a characterization of the underlying causal theory—does not reflect the correct interplay among the explanatory variables. In fact, the absence of correlation does not guarantee that a causal relationship does not exist. Lack of correlation could occur if (1) there are insufficient data, (2) the data are measured inaccurately, (3) the data do not allow multiple causal relationships to be sorted out, or (4) the model is specified wrongly because of the omission of a variable or variables that are related to the variable of interest.

There is a tension between any attempt to reach conclusions with near certainty and the inherently uncertain nature of multiple regression analysis. In general, the statistical analysis associated with multiple regression allows for the expression of uncertainty in terms of probabilities. The reality that statistical analysis generates probabilities concerning relationships rather than certainty should not be seen in itself as an argument against the use of statistical evidence, or worse, as a reason to not admit that there is uncertainty at all. The only alternative might be to use less reliable anecdotal evidence.

This reference guide addresses a number of procedural and methodological issues that are relevant in considering the admissibility of, and weight to be accorded to, the findings of multiple regression analyses. It also suggests some standards of reporting and analysis that an expert presenting multiple regression analyses might be expected to meet. Section II discusses research design—how the multiple regression framework can be used to sort out alternative theories about a case. The guide discusses the importance of choosing the appropriate specification of the multiple regression model and raises the issue of whether multiple regression is appropriate for the case at issue. Section III accepts the regression framework and concentrates on the interpretation of the multiple regression results from both a statistical and a practical point of view. It emphasizes the distinction between regression results that are statistically significant and results that are meaningful to the trier of fact. It also points to the importance of evaluating the robustness

---

24. *See, e.g.,* Allen v. Seidman, 881 F.2d 375 (7th Cir. 1989) (judicial skepticism was raised when the defendant did not submit a logistic regression incorporating an omitted variable—the possession of a higher degree or special education; defendant's attack on statistical comparisons must also include an analysis that demonstrates that comparisons are flawed). The appropriate requirements for the defendant's showing of spurious correlation could, in general, depend on the discovery process. *See, e.g.,* Boykin v. Georgia Pac. Co., 706 F.2d 1384 (1983) (criticism of a plaintiff's analysis for not including omitted factors, when plaintiff considered all information on an application form, was inadequate).

EXHIBIT C

*Reference Guide on Multiple Regression*

of regression analyses, i.e., seeing the extent to which the results are sensitive to changes in the underlying assumptions of the regression model. Section IV briefly discusses the qualifications of experts and suggests a potentially useful role for court-appointed neutral experts. Section V emphasizes procedural aspects associated with use of the data underlying regression analyses. It encourages greater pretrial efforts by the parties to attempt to resolve disputes over statistical studies.

Throughout the main body of this guide, hypothetical examples are used as illustrations. Moreover, the basic "mathematics" of multiple regression has been kept to a bare minimum. To achieve that goal, the more formal description of the multiple regression framework has been placed in the Appendix. The Appendix is self-contained and can be read before or after the text. The Appendix also includes further details with respect to the examples used in the body of this guide.

# II. Research Design: Model Specification

Multiple regression allows the testifying economist or other expert to choose among alternative theories or hypotheses and assists the expert in distinguishing correlations between variables that are plainly spurious from those that may reflect valid relationships.

## A. What Is the Specific Question That Is Under Investigation by the Expert?

Research begins with a clear formulation of a research question. The data to be collected and analyzed must relate directly to this question; otherwise, appropriate inferences cannot be drawn from the statistical analysis. For example, if the question at issue in a patent infringement case is what price the plaintiff's product would have been but for the sale of the defendant's infringing product, sufficient data must be available to allow the expert to account statistically for the important factors that determine the price of the product.

## B. What Model Should Be Used to Evaluate the Question at Issue?

Model specification involves several steps, each of which is fundamental to the success of the research effort. Ideally, a multiple regression analysis builds on a theory that describes the variables to be included in the study. A typical regression model will include one or more dependent variables, each of which is believed to be causally related to a series of explanatory variables. Because we cannot be certain that the explanatory variables are themselves unaffected or independent of the influence of the dependent variable (at least at the point of initial study), the explanatory

311

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

variables are often termed *covariates*. Covariates are known to have an association with the dependent or outcome variable, but causality remains an open question.

For example, the theory of labor markets might lead one to expect salaries in an industry to be related to workers' experience and the productivity of workers' jobs. A belief that there is job discrimination would lead one to create a model in which the dependent variable was a measure of workers' salaries and the list of covariates included a variable reflecting discrimination in addition to measures of job training and experience.

In a perfect world, the analysis of the job discrimination (or any other) issue might be accomplished through a controlled "natural experiment," in which employees would be randomly assigned to a variety of employers in an industry under study and asked to fill positions requiring identical experience and skills. In this observational study, where the only difference in salaries could be a result of discrimination, it would be possible to draw clear and direct inferences from an analysis of salary data. Unfortunately, the opportunity to conduct observational studies of this kind is rarely available to experts in the context of legal proceedings. In the real world, experts must do their best to interpret the results of real-world *"quasi-experiments,"* in which it is impossible to control all factors that might affect worker salaries or other variables of interest.[25]

Models are often characterized in terms of parameters—numerical characteristics of the model. In the labor market discrimination example, one parameter might reflect the increase in salary associated with each additional year of prior job experience. Another parameter might reflect the reduction in salary associated with a lack of current on-the-job experience. Multiple regression uses a sample, or a selection of data, from the population (all the units of interest) to obtain estimates of the values of the parameters of the model. An estimate associated with a particular explanatory variable is an estimated regression coefficient.

Failure to develop the proper theory, failure to choose the appropriate variables, or failure to choose the correct form of the model can substantially bias the statistical results—that is, create a systematic tendency for an estimate of a model parameter to be too high or too low.

## 1. Choosing the dependent variable

The variable to be explained, the dependent variable, should be the appropriate variable for analyzing the question at issue.[26] Suppose, for example, that pay dis-

---

25. In the literature on natural and quasi-experiments, the explanatory variables are characterized as "treatments" and the dependent variable as the "outcome." For a review of natural experiments in the criminal justice arena, see David P. Farrington, *A Short History of Randomized Experiments in Criminology*, 27 Evaluation Rev. 218–27 (2003).

26. In multiple regression analysis, the dependent variable is usually a continuous variable that takes on a range of numerical values. When the dependent variable is categorical, taking on only two or three values, modified forms of multiple regression, such as probit analysis or logit analysis, are

312

**EXHIBIT C**

*Reference Guide on Multiple Regression*

crimination among hourly workers is a concern. One choice for the dependent variable is the hourly wage rate of the employees; another choice is the annual salary. The distinction is important, because annual salary differences may in part result from differences in hours worked. If the number of hours worked is the product of worker preferences and not discrimination, the hourly wage is a good choice. If the number of hours worked is related to the alleged discrimination, annual salary is the more appropriate dependent variable to choose.[27]

## 2. Choosing the explanatory variable that is relevant to the question at issue

The explanatory variable that allows the evaluation of alternative hypotheses must be chosen appropriately. Thus, in a discrimination case, the variable of interest may be the race or sex of the individual. In an antitrust case, it may be a variable that takes on the value 1 to reflect the presence of the alleged anticompetitive behavior and the value 0 otherwise.[28]

## 3. Choosing the additional explanatory variables

An attempt should be made to identify additional known or hypothesized explanatory variables, some of which are measurable and may support alternative substantive hypotheses that can be accounted for by the regression analysis. Thus, in a discrimination case, a measure of the skills of the workers may provide an alternative explanation—lower salaries may have been the result of inadequate skills.[29]

appropriate. For an example of the use of the latter, see EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 325 (7th Cir. 1988) (EEOC used logit analysis to measure the impact of variables, such as age, education, job-type experience, and product-line experience, on the female percentage of commission hires).

27. In job systems in which annual salaries are tied to grade or step levels, the annual salary corresponding to the job position could be more appropriate.

28. Explanatory variables may vary by type, which will affect the interpretation of the regression results. Thus, some variables may be continuous and others may be categorical.

29. In *James v. Stockham Valves,* 559 F. 2d 310 (5th Cir. 1977), the Court of Appeals rejected the employer's claim that skill level rather than race determined assignment and wage levels, noting the circularity of defendant's argument. In *Ottaviani v. State University of New York,* 679 F. Supp. 288, 306–08 (S.D.N.Y. 1988), *aff'd,* 875 F.2d 365 (2d Cir. 1989), *cert. denied,* 493 U.S. 1021 (1990), the court ruled (in the liability phase of the trial) that the university showed that there was no discrimination in either placement into initial rank or promotions between ranks, and so rank was a proper variable in multiple regression analysis to determine whether women faculty members were treated differently than men.

However, in *Trout v. Garrett,* 780 F. Supp. 1396, 1414 (D.D.C. 1991), the court ruled (in the damage phase of the trial) that the extent of civilian employees' prehire work experience was not an appropriate variable in a regression analysis to compute back pay in employment discrimination. According to the court, including the prehire level would have resulted in a finding of no sex discrimination, despite a contrary conclusion in the liability phase of the action. *Id. See also* Stuart v. Roache, 951 F.2d 446 (1st Cir. 1991) (allowing only 3 years of seniority to be considered as the result of prior

313

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Not all possible variables that might influence the dependent variable can be included if the analysis is to be successful; some cannot be measured, and others may make little difference.[30] If a preliminary analysis shows the unexplained portion of the multiple regression to be unacceptably high, the expert may seek to discover whether some previously undetected variable is missing from the analysis.[31]

Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable.[32] In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis. The importance of omitting a relevant variable depends on the strength of the relationship between the omitted variable and the dependent variable and the strength of the correlation between the omitted variable and the explanatory variables of interest. Other things being equal, the greater the correlation between the omitted variable and the variable of interest, the greater the bias caused by the omission. As a result, the omission of an important variable may lead to inferences made from regression analyses that do not assist the trier of fact.[33]

---

discrimination), *cert. denied*, 504 U.S. 913 (1992). Whether a particular variable reflects "legitimate" considerations or itself reflects or incorporates illegitimate biases is a recurring theme in discrimination cases. *See, e.g.,* Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 677 (4th Cir. 1996) (en banc) (suggesting that whether "performance factors" should have been included in a regression analysis was a question of material fact); *id.* at 681–82 (Luttig, J., concurring in part) (suggesting that the failure of the regression analysis to include "performance factors" rendered it so incomplete as to be inadmissible); *id.* at 690–91 (Michael, J., dissenting) (suggesting that the regression analysis properly excluded "performance factors"); *see also* Diehl v. Xerox Corp., 933 F. Supp. 1157, 1168 (W.D.N.Y. 1996).

30. The summary effect of the excluded variables shows up as a random error term in the regression model, as does any modeling error. *See* Appendix, *infra,* for details. *But see* David W. Peterson, *Reference Guide on Multiple Regression*, 36 Jurimetrics J. 213, 214 n.2 (1996) (review essay) (asserting that "the presumption that the combined effect of the explanatory variables omitted from the model are uncorrelated with the included explanatory variables" is "a knife-edge condition . . . not likely to occur").

31. A very low $R$-squared ($R^2$) is one indication of an unexplained portion of the multiple regression model that is unacceptably high. However, the inference that one makes from a particular value of $R^2$ will depend, of necessity, on the context of the particular issues under study and the particular dataset that is being analyzed. For reasons discussed in the Appendix, a low $R^2$ does not necessarily imply a poor model (and vice versa).

32. Technically, the omission of explanatory variables that are correlated with the variable of interest can cause biased estimates of regression parameters.

33. *See* Bazemore v. Friday, 751 F.2d 662, 671–72 (4th Cir. 1984) (upholding the district court's refusal to accept a multiple regression analysis as proof of discrimination by a preponderance of the evidence, the court of appeals stated that, although the regression used four variable factors (race, education, tenure, and job title), the failure to use other factors, including pay increases that varied by county, precluded their introduction into evidence), *aff'd in part*, *vacated in part*, 478 U.S. 385 (1986).

Note, however, that in *Sobel v. Yeshiva University,* 839 F.2d 18, 33, 34 (2d Cir. 1988), *cert. denied*, 490 U.S. 1105 (1989), the court made clear that "a [Title VII] defendant challenging the validity of

EXHIBIT C

*Reference Guide on Multiple Regression*

Omitting variables that are not correlated with the variable of interest is, in general, less of a concern, because the parameter that measures the effect of the variable of interest on the dependent variable is estimated without bias. Suppose, for example, that the effect of a policy introduced by the courts to encourage husbands to pay child support has been tested by randomly choosing some cases to be handled according to current court policies and other cases to be handled according to a new, more stringent policy. The effect of the new policy might be measured by a multiple regression using payment success as the dependent variable and a 0 or 1 explanatory variable (1 if the new program was applied; 0 if it was not). Failure to include an explanatory variable that reflected the age of the husbands involved in the program would not affect the court's evaluation of the new policy, because men of any given age are as likely to be affected by the old policy as they are the new policy. Randomly choosing the court's policy to be applied to each case has ensured that the omitted age variable is not correlated with the policy variable.

Bias caused by the omission of an important variable that is related to the included variables of interest can be a serious problem.[34] Nonetheless, it is possible for the expert to account for bias qualitatively if the expert has knowledge (even if not quantifiable) about the relationship between the omitted variable and the explanatory variable. Suppose, for example, that the plaintiff's expert in a sex discrimination pay case is unable to obtain quantifiable data that reflect the skills necessary for a job, and that, on average, women are more skillful than men. Suppose also that a regression analysis of the wage rate of employees (the dependent variable) on years of experience and a variable reflecting the sex of each employee (the explanatory variable) suggests that men are paid substantially more than women with the same experience. Because differences in skill levels have not been taken into account, the expert may conclude reasonably that the

---

a multiple regression analysis [has] to make a showing that the factors it contends ought to have been included would weaken the showing of salary disparity made by the analysis," by making a specific attack and "a showing of relevance for each particular variable it contends . . . ought to [be] includ[ed]" in the analysis, rather than by simply attacking the results of the plaintiffs' proof as inadequate for lack of a given variable. *See also* Smith v. Virginia Commonwealth Univ., 84 F.3d 672 (4th Cir. 1996) (en banc) (finding that whether certain variables should have been included in a regression analysis is a question of fact that precludes summary judgment); Freeland v. AT&T, 238 F.R.D. 130, 145 (S.D.N.Y. 2006) ("Ordinarily, the failure to include a variable in a regression analysis will affect the probative value of the analysis and not its admissibility").

Also, in *Bazemore v. Friday*, the Court, declaring that the Fourth Circuit's view of the evidentiary value of the regression analyses was plainly incorrect, stated that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility. Importantly, it is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case." 478 U.S. 385, 400 (1986) (footnote omitted).

34. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section V.B.3, in this manual.

EXHIBIT C

wage difference measured by the regression is a conservative estimate of the true discriminatory wage difference.

The precision of the measure of the effect of a variable of interest on the dependent variable is also important.[35] In general, the more complete the explained relationship between the included explanatory variables and the dependent variable, the more precise the results. Note, however, that the inclusion of explanatory variables that are irrelevant (i.e., not correlated with the dependent variable) reduces the precision of the regression results. This can be a source of concern when the sample size is small, but it is not likely to be of great consequence when the sample size is large.

## 4. Choosing the functional form of the multiple regression model

Choosing the proper set of variables to be included in the multiple regression model does not complete the modeling exercise. The expert must also choose the proper form of the regression model. The most frequently selected form is the linear regression model (described in the Appendix). In this model, the magnitude of the change in the dependent variable associated with the change in any of the explanatory variables is the same no matter what the level of the explanatory variables. For example, one additional year of experience might add $5000 to salary, regardless of the previous experience of the employee.

In some instances, however, there may be reason to believe that changes in explanatory variables will have differential effects on the dependent variable as the values of the explanatory variables change. In these instances, the expert should consider the use of a nonlinear model. Failure to account for nonlinearities can lead to either overstatement or understatement of the effect of a change in the value of an explanatory variable on the dependent variable.

One particular type of nonlinearity involves the interaction among several variables. An interaction variable is the product of two other variables that are included in the multiple regression model. The interaction variable allows the expert to take into account the possibility that the effect of a change in one variable on the dependent variable may change as the level of another explanatory variable changes. For example, in a salary discrimination case, the inclusion of a term that interacts a variable measuring experience with a variable representing the sex of the employee (1 if a female employee; 0 if a male employee) allows the expert to test whether the sex differential varies with the level of experience. A significant negative estimate of the parameter associated with the sex variable suggests that inexperienced women are discriminated against, whereas a significant

---

35. A more precise estimate of a parameter is an estimate with a smaller standard error. *See* Appendix, *infra,* for details.

EXHIBIT C

*Reference Guide on Multiple Regression*

negative estimate of the interaction parameter suggests that the extent of discrimination increases with experience.[36]

Note that insignificant coefficients in a model with interactions may suggest a lack of discrimination, whereas a model without interactions may suggest the contrary. It is especially important to account for interaction terms that could affect the determination of discrimination; failure to do so may lead to false conclusions concerning discrimination.

## 5. *Choosing multiple regression as a method of analysis*

There are many multivariate statistical techniques other than multiple regression that are useful in legal proceedings. Some statistical methods are appropriate when nonlinearities are important;[37] others apply to models in which the dependent variable is discrete, rather than continuous.[38] Still others have been applied predominantly to respond to methodological concerns arising in the context of discrimination litigation.[39]

It is essential that a valid statistical method be applied to assist with the analysis in each legal proceeding. Therefore, the expert should be prepared to explain why any chosen method, including multiple regression, was more suitable than the alternatives.

---

36. For further details concerning interactions, see the Appendix, *infra*. Note that in *Ottaviani v. State University of New York,* 875 F.2d 365, 367 (2d Cir. 1989), *cert. denied*, 493 U.S. 1021 (1990), the defendant relied on a regression model in which a dummy variable reflecting gender appeared as an explanatory variable. The female plaintiff, however, used an alternative approach in which a regression model was developed for men only (the alleged protected group). The salaries of women predicted by this equation were then compared with the actual salaries; a positive difference would, according to the plaintiff, provide evidence of discrimination. For an evaluation of the methodological advantages and disadvantages of this approach, see Joseph L. Gastwirth, *A Clarification of Some Statistical Issues in* Watson v. Fort Worth Bank and Trust, 29 Jurimetrics J. 267 (1989).

37. These techniques include, but are not limited to, piecewise linear regression, polynomial regression, maximum likelihood estimation of models with nonlinear functional relationships, and autoregressive and moving-average time-series models. *See*, *e.g.*, Pindyck & Rubinfeld, *supra* note 23, at 117–21, 136–37, 273–84, 463–601.

38. For a discussion of probit analysis and logit analysis, techniques that are useful in the analysis of qualitative choice, see *id*. at 248–81.

39. The correct model for use in salary discrimination suits is a subject of debate among labor economists. As a result, some have begun to evaluate alternative approaches, including urn models (Bruce Levin & Herbert Robbins, *Urn Models for Regression Analysis, with Applications to Employment Discrimination Studies*, Law & Contemp. Probs., Autumn 1983, at 247) and, as a means of correcting for measurement errors, reverse regression (Delores A. Conway & Harry V. Roberts, *Reverse Regression, Fairness, and Employment Discrimination*, 1 J. Bus. & Econ. Stat. 75 (1983)). *But see* Arthur S. Goldberger, *Redirecting Reverse Regressions*, 2 J. Bus. & Econ. Stat. 114 (1984); Arlene S. Ash, *The Perverse Logic of Reverse Regression*, *in* Statistical Methods in Discrimination Litigation 85 (D.H. Kaye & Mikel Aickin eds., 1986).

EXHIBIT C

*Reference Manual on Scientific Evidence*

# III. Interpreting Multiple Regression Results

Multiple regression results can be interpreted in purely statistical terms, through the use of significance tests, or they can be interpreted in a more practical, nonstatistical manner. Although an evaluation of the practical significance of regression results is almost always relevant in the courtroom, tests of statistical significance are appropriate only in particular circumstances.

## A. What Is the Practical, as Opposed to the Statistical, Significance of Regression Results?

Practical significance means that the magnitude of the effect being studied is not de minimis—it is sufficiently important substantively for the court to be concerned. For example, if the average wage rate is $10.00 per hour, a wage differential between men and women of $0.10 per hour is likely to be deemed practically insignificant because the differential represents only 1% ($0.10/$10.00) of the average wage rate.[40] That same difference could be statistically significant, however, if a sufficiently large sample of men and women was studied.[41] The reason is that statistical significance is determined, in part, by the number of observations in the dataset.

As a general rule, the statistical significance of the magnitude of a regression coefficient increases as the sample size increases. Thus, a $1.00 per hour wage differential between men and women that was determined to be insignificantly different from zero with a sample of 20 men and women could be highly significant if the sample size were increased to 200.

Often, results that are practically significant are also statistically significant.[42] However, it is possible with a large dataset to find statistically significant coeffi-

---

40. There is no specific percentage threshold above which a result is practically significant. Practical significance must be evaluated in the context of a particular legal issue. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.B.2, in this manual.

41. Practical significance also can apply to the overall credibility of the regression results. Thus, in *McCleskey v. Kemp,* 481 U.S. 279 (1987), coefficients on race variables were statistically significant, but the Court declined to find them legally or constitutionally significant.

42. In *Melani v. Board of Higher Education,* 561 F. Supp. 769, 774 (S.D.N.Y. 1983), a Title VII suit was brought against the City University of New York (CUNY) for allegedly discriminating against female instructional staff in the payment of salaries. One approach of the plaintiff's expert was to use multiple regression analysis. The coefficient on the variable that reflected the sex of the employee was approximately $1800 when all years of data were included. Practically (in terms of average wages at the time) and statistically (in terms of a 5% significance test), this result was significant. Thus, the court stated that "[p]laintiffs have produced statistically *significant* evidence that women hired as CUNY instructional staff since 1972 received *substantially* lower salaries than similarly qualified men." *Id.* at 781 (emphasis added). For a related analysis involving multiple comparison, see Csicseri v. Bowsher,

318

EXHIBIT C

cients that are practically insignificant. Similarly, it is also possible (especially when the sample size is small) to obtain results that are practically significant but fail to achieve statistical significance. Suppose, for example, that an expert undertakes a damages study in a patent infringement case and predicts "but-for sales"—what sales would have been had the infringement not occurred—using data that predate the period of alleged infringement. If data limitations are such that only 3 or 4 years of preinfringement sales are known, the difference between but-for sales and actual sales during the period of alleged infringement could be practically significant but statistically insignificant. Alternatively, with only 3 or 4 data points, the expert would be unable to detect an effect, even if one existed.

## 1. When should statistical tests be used?

A test of a specific contention, a hypothesis test, often assists the court in determining whether a violation of the law has occurred in areas in which direct evidence is inaccessible or inconclusive. For example, an expert might use hypothesis tests in race and sex discrimination cases to determine the presence of a discriminatory effect.

Statistical evidence alone never can prove with absolute certainty the worth of any substantive theory. However, by providing evidence contrary to the view that a particular form of discrimination has not occurred, for example, the multiple regression approach can aid the trier of fact in assessing the likelihood that discrimination has occurred.[43]

Tests of hypotheses are appropriate in a cross-sectional analysis, in which the data underlying the regression study have been chosen as a sample of a population at a particular point in time, and in a time-series analysis, in which the data being evaluated cover a number of time periods. In either analysis, the expert may want to evaluate a specific hypothesis, usually relating to a question of liability or to the determination of whether there is measurable impact of an alleged violation. Thus, in a sex discrimination case, an expert may want to evaluate a null hypothesis of no discrimination against the alternative hypothesis that discrimination takes a par-

862 F. Supp. 547, 572 (D.D.C. 1994) (noting that plaintiff's expert found "statistically significant instances of discrimination" in 2 of 37 statistical comparisons, but suggesting that "2 of 37 amounts to roughly 5% and is hardly indicative of a pattern of discrimination"), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995).

43. *See* International Brotherhood. of Teamsters v. United States, 431 U.S. 324 (1977) (the Court inferred discrimination from overwhelming statistical evidence by a preponderance of the evidence); Ryther v. KARE 11, 108 F.3d 832, 844 (8th Cir. 1997) ("The plaintiff produced overwhelming evidence as to the elements of a prima facie case, and strong evidence of pretext, which, when considered with indications of age-based animus in [plaintiff's] work environment, clearly provide sufficient evidence as a matter of law to allow the trier of fact to find intentional discrimination."); Paige v. California, 291 F.3d 1141 (9th Cir. 2002) (allowing plaintiffs to rely on aggregated data to show employment discrimination).

EXHIBIT C

ticular form.[44] Alternatively, in an antitrust damages proceeding, the expert may want to test a null hypothesis of no legal impact against the alternative hypothesis that there was an impact. In either type of case, it is important to realize that rejection of the null hypothesis does not in itself prove legal liability. It is possible to reject the null hypothesis and believe that an alternative explanation other than one involving legal liability accounts for the results.[45]

Often, the null hypothesis is stated in terms of a particular regression coefficient being equal to 0. For example, in a wage discrimination case, the null hypothesis would be that there is no wage difference between sexes. If a negative difference is observed (meaning that women are found to earn less than men, after the expert has controlled statistically for legitimate alternative explanations), the difference is evaluated as to its statistical significance using the *t*-test.[46] The *t*-test uses the *t*-statistic to evaluate the hypothesis that a model parameter takes on a particular value, usually 0.

## *2. What is the appropriate level of statistical significance?*

In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.[47] The significance level measures the probability that the null hypothesis will be rejected incorrectly. In general, the lower the percentage required for statistical significance, the more difficult it is to reject the null hypothesis; therefore, the lower the probability that one will err in doing so. Although the 5% criterion is typical, reporting of more stringent 1% significance tests or less stringent 10% tests can also provide useful information.

In doing a statistical test, it is useful to compute an observed significance level, or *p*-value. The *p*-value associated with the null hypothesis that a regression coefficient is 0 is the probability that a coefficient of this magnitude or larger could have occurred by chance if the null hypothesis were true. If the *p*-value were less than or equal to 5%, the expert would reject the null hypothesis in favor of the

44. Tests are also appropriate when comparing the outcomes of a set of employer decisions with those that would have been obtained had the employer chosen differently from among the available options.

45. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.C.5, in this manual.

46. The *t*-test is strictly valid only if a number of important assumptions hold. However, for many regression models, the test is approximately valid if the sample size is sufficiently large. See Appendix, *infra,* for a more complete discussion of the assumptions underlying multiple regression..

47. *See*, *e.g.*, Palmer v. Shultz, 815 F.2d 84, 92 (D.C. Cir. 1987) ("'the .05 level of significance . . . [is] certainly sufficient to support an inference of discrimination'" (quoting Segar v. Smith, 738 F.2d 1249, 1283 (D.C. Cir. 1984), *cert. denied,* 471 U.S. 1115 (1985))); United States v. Delaware, 2004 U.S. Dist. LEXIS 4560 (D. Del. Mar. 22, 2004) (stating that .05 is the normal standard chosen).

EXHIBIT C

*Reference Guide on Multiple Regression*

alternative hypothesis; if the *p*-value were greater than 5%, the expert would fail to reject the null hypothesis.[48]

### 3. Should statistical tests be one-tailed or two-tailed?

When the expert evaluates the null hypothesis that a variable of interest has no linear association with a dependent variable against the alternative hypothesis that there is an association, a two-tailed test, which allows for the effect to be either positive or negative, is usually appropriate. A one-tailed test would usually be applied when the expert believes, perhaps on the basis of other direct evidence presented at trial, that the alternative hypothesis is either positive or negative, but not both. For example, an expert might use a one-tailed test in a patent infringe-ment case if he or she strongly believes that the effect of the alleged infringement on the price of the infringed product was either zero or negative. (The sales of the infringing product competed with the sales of the infringed product, thereby lowering the price.) By using a one-tailed test, the expert is in effect stating that prior to looking at the data it would be very surprising if the data pointed in the direct opposite to the one posited by the expert.

Because using a one-tailed test produces *p*-values that are one-half the size of *p*-values using a two-tailed test, the choice of a one-tailed test makes it easier for the expert to reject a null hypothesis. Correspondingly, the choice of a two-tailed test makes null hypothesis rejection less likely. Because there is some arbitrariness involved in the choice of an alternative hypothesis, courts should avoid relying solely on sharply defined statistical tests.[49] Reporting the *p*-value or a confidence interval should be encouraged because it conveys useful information to the court, whether or not a null hypothesis is rejected.

48. The use of 1%, 5%, and, sometimes, 10% levels for determining statistical significance remains a subject of debate. One might argue, for example, that when regression analysis is used in a price-fixing antitrust case to test a relatively specific alternative to the null hypothesis (e.g., price fixing), a somewhat lower level of confidence (a higher level of significance, such as 10% ) might be appropriate. Otherwise, when the alternative to the null hypothesis is less specific, such as the rather vague alternative of "effect" (e.g., the price increase is caused by the increased cost of production, increased demand, a sharp increase in advertising, or price fixing), a high level of confidence (associated with a low significance level, such as 1%) may be appropriate. *See, e.g.,* Vuyanich v. Republic Nat'l Bank, 505 F. Supp. 224, 272 (N.D. Tex. 1980) (noting the "arbitrary nature of the adoption of the 5% level of [statistical] significance" to be required in a legal context); Cook v. Rockwell Int'l Corp., 2006 U.S. Dist. LEXIS 89121 (D. Colo. Dec. 7, 2006).

49. Courts have shown a preference for two-tailed tests. *See, e.g.,* Palmer v. Shultz, 815 F.2d 84, 95–96 (D.C. Cir. 1987) (rejecting the use of one-tailed tests, the court found that because some appellants were claiming overselection for certain jobs, a two-tailed test was more appropriate in Title VII cases); Moore v. Summers, 113 F. Supp. 2d 5, 20 (D.D.C. 2000) (reiterating the preference for a two-tailed test). *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Sec-tion IV.C.2, in this manual; Csicseri v. Bowsher, 862 F. Supp. 547, 565 (D.D.C. 1994) (finding that although a one-tailed test is "not without merit," a two-tailed test is preferable).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## B. Are the Regression Results Robust?

The issue of robustness—whether regression results are sensitive to slight modifications in assumptions (e.g., that the data are measured accurately)—is of vital importance. If the assumptions of the regression model are valid, standard statistical tests can be applied. However, when the assumptions of the model are violated, standard tests can overstate or understate the significance of the results.

The violation of an assumption does not necessarily invalidate a regression analysis, however. In some instances in which the assumptions of multiple regression analysis fail, there are other statistical methods that are appropriate. Consequently, experts should be encouraged to provide additional information that relates to the issue of whether regression assumptions are valid, and if they are not valid, the extent to which the regression results are robust. The following questions highlight some of the more important assumptions of regression analysis.

### 1. What evidence exists that the explanatory variable causes changes in the dependent variable?

In the multiple regression framework, the expert often assumes that changes in explanatory variables affect the dependent variable, but changes in the dependent variable do not affect the explanatory variables—that is, there is no feedback.[50] In making this assumption, the expert draws the conclusion that a correlation between a covariate and the dependent outcome variable results from the effect of the former on the latter and not vice versa. Were it the case that the causality was reversed so that the outcome variable affected the covariate, and not vice versa, spurious correlation is likely to cause the expert and the trier of fact to reach the wrong conclusion. Finally, it is possible in some cases that both the outcome variable and the covariate each affect the other; if the expert does not take this more complex relationship into account, the regression coefficient on the variable of interest could be either too high or too low.[51]

Figure 1 illustrates this point. In Figure 1(a), the dependent variable, price, is explained through a multiple regression framework by three covariate explanatory variables—demand, cost, and advertising—with no feedback. Each of the three covariates is assumed to affect price causally, while price is assumed to have no effect on the three covariates. However, in Figure 1(b), there is feedback, because price affects demand, and demand, cost, and advertising affect price. Cost and advertising, however, are not affected by price. In this case both price and demand are jointly determined; each has a causal effect on the other.

---

50. The assumption of no feedback is especially important in litigation, because it is possible for the defendant (if responsible, for example, for price fixing or discrimination) to affect the values of the explanatory variables and thus to bias the usual statistical tests that are used in multiple regression.

51. When both effects occur at the same time, this is described as "simultaneity."

**EXHIBIT C**

*Reference Guide on Multiple Regression*

Figure 1. Feedback.



### 1(a). No Feedback

### 1(b). Feedback

As a general rule, there are no basic direct statistical tests for determining the direction of causality; rather, the expert, when asked, should be prepared to defend his or her assumption based on an understanding of the underlying behavior evidence relating to the businesses or individuals involved.[52]

Although there is no single approach that is entirely suitable for estimating models when the dependent variable affects one or more explanatory variables, one possibility is for the expert to drop the questionable variable from the regression to determine whether the variable's exclusion makes a difference. If it does not, the issue becomes moot. Another approach is for the expert to expand the multiple regression model by adding one or more equations that explain the relationship between the explanatory variable in question and the dependent variable.

Suppose, for example, that in a salary-based sex discrimination suit the defendant's expert considers employer-evaluated test scores to be an appropriate explanatory variable for the dependent variable, salary. If the plaintiff were to provide information that the employer adjusted the test scores in a manner that penalized women, the assumption that salaries were determined by test scores and not that test scores were affected by salaries might be invalid. If it is clearly inappropriate,

---

52. There are statistical time-series tests for particular formulations of causality; see Pindyck & Rubinfeld, *supra* note 23, § 9.2.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

the test–score variable should be removed from consideration. Alternatively, the information about the employer's use of the test scores could be translated into a second equation in which a new dependent variable—test score—is related to workers' salary and sex. A test of the hypothesis that salary and sex affect test scores would provide a suitable test of the absence of feedback.

## *2. To what extent are the explanatory variables correlated with each other?*

It is essential in multiple regression analysis that the explanatory variable of interest not be correlated perfectly with one or more of the other explanatory variables. If there were perfect correlation between two variables, the expert could not separate out the effect of the variable of interest on the dependent variable from the effect of the other variable. In essence, there are two explanations for the same pattern in the data. Suppose, for example, that in a sex discrimination suit, a particular form of job experience is determined to be a valid source of high wages. If all men had the requisite job experience and all women did not, it would be impossible to tell whether wage differentials between men and women were the result of sex discrimination or differences in experience.

When two or more explanatory variables are correlated perfectly—that is, when there is *perfect collinearity*—one cannot estimate the regression parameters. The existing dataset does not allow one to distinguish between alternative competing explanations of the movement in the dependent variable. However, when two or more variables are highly, but not perfectly, correlated—that is, when there is *multicollinearity*—the regression can be estimated, but some concerns remain. The greater the multicollinearity between two variables, the less precise are the estimates of individual regression parameters, and an expert is less able to distinguish among competing explanations for the movement in the outcome variable (even though there is no problem in estimating the joint influence of the two variables and all other regression parameters).[53]

Fortunately, the reported regression statistics take into account any multicollinearity that might be present.[54] It is important to note as a corollary, however, that a failure to find a strong relationship between a variable of interest and

53. *See* Griggs v. Duke Power Co., 401 U.S. 424 (1971) (The court argued that an education requirement was one rationalization of the data, but racial discrimination was another. If you had put both race and education in the regression, it would have been asking too much of the data to tell which variable was doing the real work, because education and race were so highly correlated in the market at that time.).

54. *See* Denny v. Westfield State College, 669 F. Supp. 1146, 1149 (D. Mass. 1987) (The court accepted the testimony of one expert that "the presence of multicollinearity would merely tend to *overestimate* the amount of error associated with the estimate. . . . In other words, *p*-values will be artificially higher than they would be if there were no multicollinearity present.") (emphasis added); *In re* High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 659 (7th Cir. Ill. 2002) (refusing to second-guess district court's admission of regression analyses that addressed multicollinearity in different ways).

324

EXHIBIT C

*Reference Guide on Multiple Regression*

a dependent variable need not imply that there is no relationship.[55] A relatively small sample, or even a large sample with substantial multicollinearity, may not provide sufficient information for the expert to determine whether there is a relationship.

### 3. To what extent are individual errors in the regression model independent?

If the expert calculated the parameters of a multiple regression model using as data the entire population, the estimates might still measure the model's population parameters with error. Errors can arise for a number of reasons, including (1) the failure of the model to include the appropriate explanatory variables, (2) the failure of the model to reflect any nonlinearities that might be present, and (3) the inclusion of inappropriate variables in the model. (Of course, further sources of error will arise if a sample, or subset, of the population is used to estimate the regression parameters.)

It is useful to view the cumulative effect of all of these sources of modeling error as being represented by an additional variable, the error term, in the multiple regression model. An important assumption in multiple regression analysis is that the error term and each of the explanatory variables are independent of each other. (If the error term and an explanatory variable are independent, they are not correlated with each other.) To the extent this is true, the expert can estimate the parameters of the model without bias; the magnitude of the error term will affect the precision with which a model parameter is estimated, but will not cause that estimate to be consistently too high or too low.

The assumption of independence may be inappropriate in a number of circumstances. In some instances, failure of the assumption makes multiple regression analysis an unsuitable statistical technique; in other instances, modifications or adjustments within the regression framework can be made to accommodate the failure.

The independence assumption may fail, for example, in a study of individual behavior over time, in which an unusually high error value in one time period is likely to lead to an unusually high value in the next time period. For example, if an economic forecaster underpredicted this year's Gross Domestic Product, he or she is likely to underpredict next year's as well; the factor that caused the prediction error (e.g., an incorrect assumption about Federal Reserve policy) is likely to be a source of error in the future.

---

55. If an explanatory variable of concern and another explanatory variable are highly correlated, dropping the second variable from the regression can be instructive. If the coefficient on the explanatory variable of concern becomes significant, a relationship between the dependent variable and the explanatory variable of concern is suggested.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Alternatively, the assumption of independence may fail in a study of a group of firms at a particular point in time, in which error terms for large firms are systematically higher than error terms for small firms. For example, an analysis of the profitability of firms may not accurately account for the importance of advertising as a source of increased sales and profits. To the extent that large firms advertise more than small firms, the regression errors would be large for the large firms and small for the small firms. A third possibility is that the dependent variable varies at the individual level, but the explanatory variable of interest varies only at the level of a group. For example, an expert might be viewing the price of a product in an antitrust case as a function of a variable or variables that measure the marketing channel through which the product is sold (e.g., wholesale or retail). In this case, errors within each of the marketing groups are likely not to be independent. Failure to account for this could cause the expert to overstate the statistical significance of the regression parameters.

In some instances, there are statistical tests that are appropriate for evaluating the independence assumption.[56] If the assumption has failed, the expert should ask first whether the source of the lack of independence is the omission of an important explanatory variable from the regression. If so, that variable should be included when possible, or the potential effect of its omission should be estimated when inclusion is not possible. If there is no important missing explanatory variable, the expert should apply one or more procedures that modify the standard multiple regression technique to allow for more accurate estimates of the regression parameters.[57]

## 4. *To what extent are the regression results sensitive to individual data points?*

Estimated regression coefficients can be highly sensitive to particular data points. Suppose, for example, that one data point deviates greatly from its expected value, as indicated by the regression equation, while the remaining data points show

---

56. In a time-series analysis, the correlation of error values over time, the "serial correlation," can be tested (in most instances) using a number of tests, including the Durbin-Watson test. The possibility that some error terms are consistently high in magnitude and others are systematically low, heteroscedasticity can also be tested in a number of ways. *See, e.g.*, Pindyck & Rubinfeld, *supra* note 23, at 146–59. When serial correlation and/or heteroscedasticity are present, the standard errors associated with the estimated coefficients must be modified. For a discussion of the use of such "robust" standard errors, see Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach, ch. 8 (4th ed. 2009).

57. When serial correlation is present, a number of closely related statistical methods are appropriate, including generalized differencing (a type of generalized least squares) and maximum likelihood estimation. When heteroscedasticity is the problem, weighted least squares and maximum likelihood estimation are appropriate. *See, e.g.*, *id.* All these techniques are readily available in a number of statistical computer packages. They also allow one to perform the appropriate statistical tests of the significance of the regression coefficients.

**EXHIBIT C**

*Reference Guide on Multiple Regression*

little deviation. It would not be unusual in this situation for the coefficients in a multiple regression to change substantially if the data point in question were removed from the sample.

Evaluating the robustness of multiple regression results is a complex endeavor. Consequently, there is no agreed set of tests for robustness that analysts should apply. In general, it is important to explore the reasons for unusual data points. If the source is an error in recording data, the appropriate corrections can be made. If all the unusual data points have certain characteristics in common (e.g., they all are associated with a supervisor who consistently gives high ratings in an equal pay case), the regression model should be modified appropriately.

One generally useful diagnostic technique is to determine to what extent the estimated parameter changes as each data point in the regression analysis is dropped from the sample. An *influential* data point—a point that causes the estimated parameter to change substantially—should be studied further to determine whether mistakes were made in the use of the data or whether important explanatory variables were omitted.[58]

## 5. To what extent are the data subject to measurement error?

In multiple regression analysis it is assumed that variables are measured accurately.[59] If there are measurement errors in the dependent variable, estimates of regression parameters will be less accurate, although they will not necessarily be biased. However, if one or more independent variables are measured with error, the corresponding parameter estimates are likely to be biased, typically toward zero (and other coefficient estimates are likely to be biased as well).

To understand why, suppose that the dependent variable, salary, is measured without error, and the explanatory variable, experience, is subject to measurement error. (Seniority or years of experience should be accurate, but the type of experience is subject to error, because applicants may overstate previous job responsibilities.) As the measurement error increases, the estimated parameter associated with the experience variable will tend toward zero, that is, eventually, there will be no relationship between salary and experience.

It is important for any source of measurement error to be carefully evaluated. In some circumstances, little can be done to correct the measurement-error prob-

58. A more complete and formal treatment of the robustness issue appears in David A. Belsley et al., Regression Diagnostics: Identifying Influential Data and Sources of Collinearity 229–44 (1980). For a useful discussion of the detection of outliers and the evaluation of influential data points, see R.D. Cook & S. Weisberg, Residuals and Influence in Regression (Monographs on Statistics and Applied Probability No. 18, 1982). For a broad discussion of robust regression methods, see Peer J. Rouseeuw & Annick M. Leroy, Robust Regression and Outlier Detection (2004).

59. Inaccuracy can occur not only in the precision with which a particular variable is measured, but also in the precision with which the variable to be measured corresponds to the appropriate theoretical construct specified by the regression model.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

lem; the regression results must be interpreted in that light. In other circumstances, however, the expert can correct measurement error by finding a new, more reliable data source. Finally, alternative estimation techniques (using related variables that are measured without error) can be applied to remedy the measurement-error problem in some situations.[60]

# IV. The Expert

Multiple regression analysis is taught to students in extremely diverse fields, including statistics, economics, political science, sociology, psychology, anthropology, public health, and history. Nonetheless, the methodology is difficult to master, necessitating a combination of technical skills (the science) and experience (the art). This naturally raises two questions:

1. Who should be qualified as an expert?
2. When and how should the court appoint an expert to assist in the evaluation of statistical issues, including those relating to multiple regression?

## A. Who Should Be Qualified as an Expert?

Any individual with substantial training in and experience with multiple regression and other statistical methods may be qualified as an expert.[61] A doctoral degree in a discipline that teaches theoretical or applied statistics, such as economics, history, and psychology, usually signifies to other scientists that the proposed expert meets this preliminary test of the qualification process.

The decision to qualify an expert in regression analysis rests with the court. Clearly, the proposed expert should be able to demonstrate an understanding of the discipline. Publications relating to regression analysis in peer-reviewed journals, active memberships in related professional organizations, courses taught on regression methods, and practical experience with regression analysis can indicate a professional's expertise. However, the expert's background and experience with the specific issues and tools that are applicable to a particular case should also be considered during the qualification process. Thus, if the regression methods are being utilized to evaluate damages in an antitrust case, the qualified expert should have sufficient qualifications in economic analysis as well as statistics. An individual whose expertise lies solely with statistics will be limited in his or her ability to evaluate the usefulness of alternative economic models. Similarly, if a case involves

---

60. *See, e.g.*, Pindyck & Rubinfeld, *supra* note 23, at 178–98 (discussion of instrumental variables estimation).

61. A proposed expert whose only statistical tool is regression analysis may not be able to judge when a statistical analysis should be based on an approach other than regression analysis.

328

**EXHIBIT C**

*Reference Guide on Multiple Regression*

eyewitness identification, a background in psychology as well as statistics may provide essential qualifying elements.

## *B. Should the Court Appoint a Neutral Expert?*

There are conflicting views on the issue of whether court-appointed experts should be used. In complex cases in which two experts are presenting conflicting statistical evidence, the use of a "neutral" court-appointed expert can be advantageous. There are those who believe, however, that there is no such thing as a truly "neutral" expert. In any event, if an expert is chosen, that individual should have substantial expertise and experience—ideally, someone who is respected by both plaintiffs and defendants.[62]

The appointment of such an expert is likely to influence the presentation of the statistical evidence by the experts for the parties in the litigation. The neutral expert will have an incentive to present a balanced position that relies on broad principles for which there is consensus in the community of experts. As a result, the parties' experts can be expected to present testimony that confronts core issues that are likely to be of concern to the court and that is sufficiently balanced to be persuasive to the court-appointed expert.[63]

Rule 706 of the Federal Rules of Evidence governs the selection and instruction of court-appointed experts. In particular:

1. The expert should be notified of his or her duties through a written court order or at a conference with the parties.
2. The expert should inform the parties of his or her findings orally or in writing.
3. If deemed appropriate by the court, the expert should be available to testify and may be deposed or cross-examined by any party.
4. The court must determine the expert's compensation.[64]
5. The parties should be free to utilize their own experts.

Although not required by Rule 706, it will usually be advantageous for the court to opt for the appointment of a neutral expert as early in the litigation process as possible. It will also be advantageous to minimize any ex parte contact with

62. Judge Posner notes in *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.2d 651, 665 (7th Cir., 2002), "the judge and jury can repose a degree of confidence in his testimony that it could not repose in that of a party's witness. The judge and the jury may not understand the neutral expert perfectly but at least they will know that he has no axe to grind, and so, to a degree anyway, they will be able to take his testimony on faith."

63. For a discussion of the presentation of expert evidence generally, including the use of court-appointed experts, see Samuel R. Gross, *Expert Evidence*, 1991 Wis. L. Rev. 1113 (1991).

64. Although Rule 706 states that the compensation must come from public funds, complex litigation may be sufficiently costly as to require that the parties share the costs of the neutral expert.

329

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

the neutral expert; this will diminish the possibility that one or both parties will come to the view that the court's ultimate opinion was unreasonably influenced by the neutral expert.

Rule 706 does not offer specifics as to the process of appointment of a court-appointed expert. One possibility is to have the parties offer a short list of possible appointees. If there was no common choice, the court could select from the combined list, perhaps after allowing each party to exercise one or more peremptory challenges. Another possibility is to obtain a list of recommended experts from a selection of individuals known to be experts in the field.

# V. Presentation of Statistical Evidence

The costs of evaluating statistical evidence can be reduced and the precision of that evidence increased if the discovery process is used effectively. In evaluating the admissibility of statistical evidence, courts should consider the following issues:

1. Has the expert provided sufficient information to replicate the multiple regression analysis?
2. Are the expert's methodological choices reasonable, or are they arbitrary and unjustified?

## A. What Disagreements Exist Regarding Data on Which the Analysis Is Based?

In general, a clear and comprehensive statement of the underlying research methodology is a requisite part of the discovery process. The expert should be encouraged to reveal both the nature of the experimentation carried out and the sensitivity of the results to the data and to the methodology.

The following suggestions are useful requirements that can substantially improve the discovery process:

1. To the extent possible, the parties should be encouraged to agree to use a common database. Even if disagreement about the significance of the data remains, early agreement on a common database can help focus the discovery process on the important issues in the case.
2. A party that offers data to be used in statistical work, including multiple regression analysis, should be encouraged to provide the following to the other parties: (a) a hard copy of the data when available and manageable in size, along with the underlying sources; (b) computer disks or tapes on which the data are recorded; (c) complete documentation of the disks or tapes; (d) computer programs that were used to generate the data (in hard

330

EXHIBIT C

copy if necessary, but preferably on a computer disk or tape, or both); and (e) documentation of such computer programs. The documentation should be sufficiently complete and clear so that the opposing expert can reproduce all of the statistical work.

3. A party offering data should make available the personnel involved in the compilation of such data to answer the other parties' technical questions concerning the data and the methods of collection or compilation.

4. A party proposing to offer an expert's regression analysis at trial should ask the expert to fully disclose (a) the database and its sources,[65] (b) the method of collecting the data, and (c) the methods of analysis. When possible, this disclosure should be made sufficiently in advance of trial so that the opposing party can consult its experts and prepare cross-examination. The court must decide on a case-by-case basis where to draw the disclosure line.

5. An opposing party should be given the opportunity to object to a database or to a proposed method of analysis of the database to be offered at trial. Objections may be to simple clerical errors or to more complex issues relating to the selection of data, the construction of variables, and, on occasion, the particular form of statistical analysis to be used. Whenever possible, these objections should be resolved before trial.

6. The parties should be encouraged to resolve differences as to the appropriateness and precision of the data to the extent possible by informal conference. The court should make an effort to resolve differences before trial.

These suggestions are motivated by the objective of improving the discovery process to make it more informative. The fact that these questions may raise some doubts or concerns about a particular regression model should not be taken to mean that the model does not provide useful information. It does, however, take considerable skill for an expert to determine the extent to which information is useful when the model being utilized has some shortcomings.

## B. Which Database Information and Analytical Procedures Will Aid in Resolving Disputes over Statistical Studies?[66]

To help resolve disputes over statistical studies, experts should follow the guidelines below when presenting database information and analytical procedures:

65. These sources would include all variables used in the statistical analyses conducted by the expert, not simply those variables used in a final analysis on which the expert expects to rely.

66. For a more complete discussion of these requirements, see *The Evolving Role of Statistical Assessments as Evidence in the Courts,* app. F at 256 (Stephen E. Fienberg ed., 1989) (Recommended

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

1. The expert should state clearly the objectives of the study, as well as the time frame to which it applies and the statistical population to which the results are being projected.
2. The expert should report the units of observation (e.g., consumers, businesses, or employees).
3. The expert should clearly define each variable.
4. The expert should clearly identify the sample for which data are being studied,[67] as well as the method by which the sample was obtained.
5. The expert should reveal if there are missing data, whether caused by a lack of availability (e.g., in business data) or nonresponse (e.g., in survey data), and the method used to handle the missing data (e.g., deletion of observations).
6. The expert should report investigations into errors associated with the choice of variables and assumptions underlying the regression model.
7. If samples were chosen randomly from a population (i.e., probability sampling procedures were used),[68] the expert should make a good-faith effort to provide an estimate of a sampling error, the measure of the difference between the sample estimate of a parameter (such as the mean of a dependent variable under study), and the (unknown) population parameter (the population mean of the variable).[69]
8. If probability sampling procedures were not used, the expert should report the set of procedures that was used to minimize sampling errors.

Standards on Disclosure of Procedures Used for Statistical Studies to Collect Data Submitted in Evidence in Legal Cases).

67. The sample information is important because it allows the expert to make inferences about the underlying population.

68. In probability sampling, each representative of the population has a known probability of being in the sample. Probability sampling is ideal because it is highly structured, and in principle, it can be replicated by others. Nonprobability sampling is less desirable because it is often subjective, relying to a large extent on the judgment of the expert.

69. Sampling error is often reported in terms of standard errors or confidence intervals. *See* Appendix, *infra,* for details.

332

**EXHIBIT C**

# Appendix: The Basics of Multiple Regression

## *A. Introduction*

This appendix illustrates, through examples, the basics of multiple regression analysis in legal proceedings. Often, visual displays are used to describe the relationship between variables that are used in multiple regression analysis. Figure 2 is a scatterplot that relates scores on a job aptitude test (shown on the *x*-axis) and job performance ratings (shown on the *y*-axis). Each point on the scatterplot shows where a particular individual scored on the job aptitude test and how his or her job performance was rated. For example, the individual represented by Point A in Figure 2 scored 49 on the job aptitude test and had a job performance rating of 62.

Figure 2. Scatterplot of scores on a job aptitude test relative to job performance rating.



The relationship between two variables can be summarized by a correlation coefficient, which ranges in value from −1 (a perfect negative relationship) to +1 (a perfect positive relationship). Figure 3 depicts three possible relationships between the job aptitude variable and the job performance variable. In Figure 3(a), there is a positive correlation: In general, higher job performance ratings are associated with higher aptitude test scores, and lower job performance ratings are associated with lower aptitude test scores. In Figure 3(b), the correlation is

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

negative: Higher job performance ratings are associated with lower aptitude test scores, and lower job performance ratings are associated with higher aptitude test scores. Positive and negative correlations can be relatively strong or relatively weak. If the relationship is sufficiently weak, there is effectively no correlation, as is illustrated in Figure 3(c).

Figure 3. Correlation between the job aptitude variable and the job performance variable: (a) positive correlation, (b) negative correlation, (c) weak relationship with no correlation.



Multiple regression analysis goes beyond the calculation of correlations; it is a method in which a regression line is used to relate the average of one variable—the dependent variable—to the values of other explanatory variables. As a result, regression analysis can be used to predict the values of one variable using the values of others. For example, if average job performance ratings depend on aptitude test scores, regression analysis can use information about test scores to predict job performance.

334

EXHIBIT C

*Reference Guide on Multiple Regression*

A regression line is the best-fitting straight line through a set of points in a scatterplot. If there is only one explanatory variable, the straight line is defined by the equation

$$Y = a + bX. \tag{1}$$

In equation (1), $a$ is the intercept of the line with the $y$-axis when $X$ equals 0, and $b$ is the slope—the change in the dependent variable associated with a 1-unit change in the explanatory variable. In Figure 4, for example, when the aptitude test score is 0, the predicted (average) value of the job performance rating is the intercept, 18.4. Also, for each additional point on the test score, the job performance rating increases .73 units, which is given by the slope .73. Thus, the estimated regression line is

$$Y = 18.4 + .73X. \tag{2}$$

The regression line typically is estimated using the standard method of least squares, where the values of $a$ and $b$ are calculated so that the sum of the squared deviations of the points from the line are minimized. In this way, positive deviations and negative deviations of equal size are counted equally, and large deviations are counted more than small deviations. In Figure 4 the deviation lines are verti-

Figure 4. Regression line.



Job Performance Rating

Job Aptitude Test Score

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

cal because the equation is predicting job performance ratings from aptitude test scores, not aptitude test scores from job performance ratings.

The important variables that systematically might influence the dependent variable, and for which data can be obtained, typically should be included explicitly in a statistical model. All remaining influences, which should be small individually, but can be substantial in the aggregate, are included in an additional random error term.[70] Multiple regression is a procedure that separates the systematic effects (associated with the explanatory variables) from the random effects (associated with the error term) and also offers a method of assessing the success of the process.

## B. Linear Regression Model

When there are an arbitrary number of explanatory variables, the linear regression model takes the following form:

$$Y = \beta_0 + \beta_1 X_1 + \beta_2 X_2 + \ldots + \beta_k X_k + \varepsilon \tag{3}$$

where $Y$ represents the dependent variable, such as the salary of an employee, and $X_1 \ldots X_k$ represent the explanatory variables (e.g., the experience of each employee and his or her sex, coded as a 1 or 0, respectively). The error term, $\varepsilon$, represents the collective unobservable influence of any omitted variables. In a linear regression, each of the terms being added involves unknown parameters, $\beta_0$, $\beta_1$, $\ldots$ $\beta_k$,[71] which are estimated by "fitting" the equation to the data using least squares.

Each estimated coefficient $\beta_k$ measures how the dependent variable $Y$ responds, on average, to a change in the corresponding covariate $X_k$, after "controlling for" all the other covariates. The informal phrase "controlling for" has a specific statistical meaning. Consider the following three-step procedure. First, we calculate the residuals from a regression of $Y$ on all covariates other than $X_k$. Second, we calculate the residuals of a regression of $X_k$ on all the other covariates. Third, and finally, we regress the first residual variable on the second residual variable. The resulting coefficient will be identically equal to $\beta_k$. Thus, the coeffi-

70. It is clearly advantageous for the random component of the regression relationship to be small relative to the variation in the dependent variable.

71. The variables themselves can appear in many different forms. For example, $Y$ might represent the logarithm of an employee's salary, and $X_1$ might represent the logarithm of the employee's years of experience. The logarithmic representation is appropriate when $Y$ increases exponentially as $X$ increases—for each unit increase in $X$, the corresponding increase in $Y$ becomes larger and larger. For example, if an expert were to graph the growth of the U.S. population ($Y$) over time ($t$), the following equation might be appropriate:

$$\log(Y) = \beta_0 + \beta_1 \log(t).$$

336

**EXHIBIT C**

*Reference Guide on Multiple Regression*

cient in a multiple regression represents the slope of the line "*Y*, adjusted for all covariates other than $X_k$ versus $X_k$ adjusted for all the other covariates."[72]

Most statisticians use the least squares regression technique because of its simplicity and its desirable statistical properties. As a result, it also is used frequently in legal proceedings.

## 1. Specifying the regression model

Suppose an expert wants to analyze the salaries of women and men at a large publishing house to discover whether a difference in salaries between employees with similar years of work experience provides evidence of discrimination.[73] To begin with the simplest case, *Y*, the salary in dollars per year, represents the dependent variable to be explained, and $X_1$ represents the explanatory variable—the number of years of experience of the employee. The regression model would be written

$$Y = \beta_0 + \beta_1 X_1 + \varepsilon. \tag{4}$$

In equation (4), $\beta_0$ and $\beta_1$ are the parameters to be estimated from the data, and $\varepsilon$ is the random error term. The parameter $\beta_0$ is the average salary of all employees with no experience. The parameter $\beta_1$ measures the average effect of an additional year of experience on the average salary of employees.

## 2. Regression line

Once the parameters in a regression equation, such as equation (3), have been estimated, the fitted values for the dependent variable can be calculated. If we denote the estimated regression parameters, or regression coefficients, for the model in equation (3) by $\beta_0, \beta_1, \ldots \beta_k$, the fitted values for *Y*, denoted $\hat{Y}$, are given by

$$\hat{Y} = \beta_0 + \beta_1 X_1 + \beta_2 X_2 + \ldots \beta_k X_k. \tag{5}$$

Figure 5 illustrates this for the example involving a single explanatory variable. The data are shown as a scatter of points; salary is on the vertical axis, and years of experience is on the horizontal axis. The estimated regression line is drawn through the data points. It is given by

$$\hat{Y} = \$15,000 + \$2000 X_1. \tag{6}$$

---

72. In econometrics, this is known as **the Frisch–Waugh–Lovell theorem**.

73. The regression results used in this example are based on data for 1715 men and women, which were used by the defense in a sex discrimination case against the *New York Times* that was settled in 1978. Professor Orley Ashenfelter, Department of Economics, Princeton University, provided the data.

337

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Figure 5. Goodness of fit.



Thus, the fitted value for the salary associated with an individual's years of experi-ence $X_{1i}$ is given by

$$\hat{Y}_i = \beta_0 + \beta_1 X_{1i} \text{ (at Point B).} \tag{7}$$

The intercept of the straight line is the average value of the dependent variable when the explanatory variable or variables are equal to 0; the intercept $\beta_0$ is shown on the vertical axis in Figure 5. Similarly, the slope of the line measures the (average) change in the dependent variable associated with a unit increase in an explanatory variable; the slope $\beta_1$ also is shown. In equation (6), the intercept $15,000 indicates that employees with no experience earn $15,000 per year. The slope parameter implies that each year of experience adds $2000 to an "average" employee's salary.

Now, suppose that the salary variable is related simply to the sex of the employee. The relevant indicator variable, often called a dummy variable, is $X_2$, which is equal to 1 if the employee is male, and 0 if the employee is female. Suppose the regression of salary $Y$ on $X_2$ yields the following result: $Y = \$30,449 + \$10,979 X_2$. The coefficient $10,979 measures the difference between the average salary of men and the average salary of women.[74]

74. To understand why, note that when $X_2$ equals 0, the average salary for women is $30,449 + $10,979★0 = $30,449. Correspondingly, when $X_2$ = 1, the average salary for men is $30,449 + $10,979★1 = $41,428. The difference, $41,428 − $30,449, is $10,979.

338

**EXHIBIT C**

*Reference Guide on Multiple Regression*

a. Regression residuals

For each data point, the regression residual is the difference between the actual values and fitted values of the dependent variable. Suppose, for example, that we are studying an individual with 3 years of experience and a salary of $27,000. According to the regression line in Figure 5, the average salary of an individual with 3 years of experience is $21,000. Because the individual's salary is $6000 higher than the average salary, the residual (the individual's salary minus the average salary) is $6000. In general, the residual $e$ associated with a data point, such as Point A in Figure 5, is given by $e_i = Y_i - \hat{Y}_i$. Each data point in the figure has a residual, which is the error made by the least squares regression method for that individual.

b. Nonlinearities

Nonlinear models account for the possibility that the effect of an explanatory variable on the dependent variable may vary in magnitude as the level of the explanatory variable changes. One useful nonlinear model uses interactions among variables to produce this effect. For example, suppose that

$$S = \beta_1 + \beta_2 SEX + \beta_3 EXP + \beta_4(EXP)(SEX) + \varepsilon \qquad (8)$$

where $S$ is annual salary, SEX is equal to 1 for women and 0 for men, EXP represents years of job experience, and $\varepsilon$ is a random error term. The coefficient $\beta_2$ measures the difference in average salary (across all experience levels) between men and women for employees with no experience. The coefficient $\beta_3$ measures the effect of experience on salary for men (when SEX = 0), and the coefficient $\beta_4$ measures the difference in the effect of experience on salary between men and women. It follows, for example, that the effect of 1 year of experience on salary for men is $\beta_3$, whereas the comparable effect for women is $\beta_3 + \beta_4$.[75]

## C. Interpreting Regression Results

To explain how regression results are interpreted, we can expand the earlier example associated with Figure 5 to consider the possibility of an additional explanatory variable—the square of the number of years of experience, $X_3$. The $X_3$ variable is designed to capture the fact that for most individuals, salaries increase with experience, but eventually salaries tend to level off. The estimated regression line using the third additional explanatory variable, as well as the first explanatory variable for years of experience ($X_1$) and the dummy variable for sex ($X_2$), is

75. Estimating a regression in which there are interaction terms for all explanatory variables, as in equation (8), is essentially the same as estimating two separate regressions, one for men and one for women.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

$$\hat{Y} = \$14{,}085 + \$2323X_1 + \$1675X_2 - \$36X_3. \tag{9}$$

The importance of including relevant explanatory variables in a regression model is illustrated by the change in the regression results after the $X_3$ and $X_1$ variables are added. The coefficient on the variable $X_2$ measures the difference in the salaries of men and women while controlling for the effect of experience. The differential of $1675 is substantially lower than the previously measured differential of $10,979. Clearly, failure to control for job experience in this example leads to an overstatement of the difference in salaries between men and women.

Now consider the interpretation of the explanatory variables for experience, $X_1$ and $X_3$. The positive sign on the $X_1$ coefficient shows that salary increases with experience. The negative sign on the $X_3$ coefficient indicates that the rate of salary increase decreases with experience. To determine the combined effect of the variables $X_1$ and $X_3$, some simple calculations can be made. For example, consider how the average salary of women ($X_2 = 0$) changes with the level of experience. As experience increases from 0 to 1 year, the average salary increases by $2251, from $14,085 to $16,336. However, women with 2 years of experience earn only $2179 more than women with 1 year of experience, and women with 1 year of experience earn only $2127 more than women with 2 years. Furthermore, women with 7 years of experience earn $28,582 per year, which is only $1855 more than the $26,727 earned by women with 6 years of experience.[76] Figure 6 illustrates the results: The regression line shown is for women's salaries; the corresponding line for men's salaries would be parallel and $1675 higher.

## D. Determining the Precision of the Regression Results

Least squares regression provides not only parameter estimates that indicate the direction and magnitude of the effect of a change in the explanatory variable on the dependent variable, but also an estimate of the reliability of the parameter estimates and a measure of the overall goodness of fit of the regression model. Each of these factors is considered in turn.

### 1. Standard errors of the coefficients and t-statistics

Estimates of the true but unknown parameters of a regression model are numbers that depend on the particular sample of observations under study. If a different sample were used, a different estimate would be calculated.[77] If the expert continued to collect more and more samples and generated additional estimates, as might happen when new data became available over time, the estimates of each

---

76. These numbers can be calculated by substituting different values of $X_1$ and $X_3$ in equation (9).

77. The least squares formula that generates the estimates is called the least squares estimator, and its values vary from sample to sample.

**EXHIBIT C**

*Reference Guide on Multiple Regression*

Figure 6. Regression slope for women's salaries and men's salaries.



parameter would follow a probability distribution (i.e., the expert could determine the percentage or frequency of the time that each estimate occurs). This probability distribution can be summarized by a mean and a measure of dispersion around the mean, a standard deviation, which usually is referred to as the standard error of the coefficient, or the standard error (SE).[78]

Suppose, for example, that an expert is interested in estimating the average price paid for a gallon of unleaded gasoline by consumers in a particular geographic area of the United States at a particular point in time. The mean price for a sample of 10 gas stations might be $1.25, while the mean for another sample might be $1.29, and the mean for a third, $1.21. On this basis, the expert also could calculate the overall mean price of gasoline to be $1.25 and the standard deviation to be $0.04.

Least squares regression generalizes this result, by calculating means whose values depend on one or more explanatory variables. The standard error of a regression coefficient tells the expert how much parameter estimates are likely to vary from sample to sample. The greater the variation in parameter estimates from sample to sample, the larger the standard error and consequently the less reliable the regression results. Small standard errors imply results that are likely to

78. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.A, in this manual.

341

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

be similar from sample to sample, whereas results with large standard errors show more variability.

Under appropriate assumptions, the least squares estimators provide "best" determinations of the true underlying parameters.[79] In fact, least squares has several desirable properties. First, least squares estimators are unbiased. Intuitively, this means that if the regression were calculated repeatedly with different samples, the average of the many estimates obtained for each coefficient would be the true parameter. Second, least squares estimators are consistent; if the sample were very large, the estimates obtained would come close to the true parameters. Third, least squares is efficient, in that its estimators have the smallest variance among all (linear) unbiased estimators.

If the further assumption is made that the probability distribution of each of the error terms is known, statistical statements can be made about the precision of the coefficient estimates. For relatively large samples (often, thirty or more data points will be sufficient for regressions with a small number of explanatory variables), the probability that the estimate of a parameter lies within an interval of 2 standard errors around the true parameter is approximately .95, or 95%. A frequent, although not always appropriate, assumption in statistical work is that the error term follows a normal distribution, from which it follows that the estimated parameters are normally distributed. The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area. Note that the normality assumption is not necessary for least squares to be used, because most of the properties of least squares apply regardless of normality.

In general, for any parameter estimate $b$, the expert can construct an interval around $b$ such that there is a 95% probability that the interval covers the true parameter. This 95% confidence interval[80] is given by[81]

$$b \pm 1.96 \ (\text{SE of } b). \tag{10}$$

The expert can test the hypothesis that a parameter is actually equal to 0 (often stated as testing the null hypothesis) by looking at its $t$-statistic, which is defined as

$$t = \frac{b}{\text{SE}(b)}. \tag{11}$$

79. The necessary assumptions of the regression model include (a) the model is specified correctly, (b) errors associated with each observation are drawn randomly from the same probability distribution and are independent of each other, (c) errors associated with each observation are independent of the corresponding observations for each of the explanatory variables in the model, and (d) no explanatory variable is correlated perfectly with a combination of other variables.

80. Confidence intervals are used commonly in statistical analyses because the expert can never be certain that a parameter estimate is equal to the true population parameter.

81. If the number of data points in the sample is small, the standard error must be multiplied by a number larger than 1.96.

342

**EXHIBIT C**

*Reference Guide on Multiple Regression*

If the *t*-statistic is less than 1.96 in magnitude, the 95% confidence interval around *b* must include 0.[82] Because this means that the expert cannot reject the hypothesis that β equals 0, the estimate, whatever it may be, is said to be not statistically significant. Conversely, if the *t*-statistic is greater than 1.96 in absolute value, the expert concludes that the true value of β is unlikely to be 0 (intuitively, *b* is "too far" from 0 to be consistent with the true value of β being 0). In this case, the expert rejects the hypothesis that β equals 0 and calls the estimate statistically significant. If the null hypothesis β equals 0 is true, using a 95% confidence level will cause the expert to falsely reject the null hypothesis 5% of the time. Consequently, results often are said to be significant at the 5% level.[83]

As an example, consider a more complete set of regression results associated with the salary regression described in equation (9):

$$\hat{Y} = \$14{,}085 + \$2323X_1 + \$1675X_2 - \$36X_3$$
$$(1577) \quad (140) \quad (1435) \quad (3.4)$$
$$t = \quad 8.9 \quad 16.5 \quad 1.2 \quad -10.8. \tag{12}$$

The standard error of each estimated parameter is given in parentheses directly below the parameter, and the corresponding *t*-statistics appear below the standard error values.

Consider the coefficient on the dummy variable $X_2$. It indicates that $1675 is the best estimate of the mean salary difference between men and women. However, the standard error of $1435 is large in relation to its coefficient $1675. Because the standard error is relatively large, the range of possible values for measuring the true salary difference, the true parameter, is great. In fact, a 95% confidence interval is given by

$$\$1675 \pm \$1435 \cdot 1.96 = \$1675 \pm \$2813. \tag{13}$$

In other words, the expert can have 95% confidence that the true value of the coefficient lies between −$1138 and $4488. Because this range includes 0, the effect of sex on salary is said to be insignificantly different from 0 at the 5% level. The *t* value of 1.2 is equal to $1675 divided by $1435. Because this *t*-statistic is less than 1.96 in magnitude (a condition equivalent to the inclusion of a 0 in the above confidence interval), the sex variable again is said to be an insignificant determinant of salary at the 5% level of significance.

---

82. The *t*-statistic applies to any sample size. As the sample gets large, the underlying distribution, which is the source of the *t*-statistic (Student's *t*-distribution), approximates the normal distribution.

83. A *t*-statistic of 2.57 in magnitude or greater is associated with a 99% confidence level, or a 1% level of significance, that includes a band of 2.57 standard deviations on either side of the estimated coefficient.

**EXHIBIT C**

Note also that experience is a highly significant determinant of salary, because both the $X_1$ and the $X_3$ variables have *t*-statistics substantially greater than 1.96 in magnitude. More experience has a significant positive effect on salary, but the size of this effect diminishes significantly with experience.

## 2. Goodness of fit

Reported regression results usually contain not only the point estimates of the parameters and their standard errors or *t*-statistics, but also other information that tells how closely the regression line fits the data. One statistic, the standard error of the regression (SER), is an estimate of the overall size of the regression residuals.[84] An SER of 0 would occur only when all data points lie exactly on the regression line—an extremely unlikely possibility. Other things being equal, the larger the SER, the poorer the fit of the data to the model.

For a normally distributed error term, the expert would expect approximately 95% of the data points to lie within 2 SERs of the estimated regression line, as shown in Figure 7 (in Figure 7, the SER is approximately $5000).

Figure 7. Standard error of the regression.



---

84. More specifically, it is a measure of the standard deviation of the regression error $\varepsilon$. It sometimes is called the root mean squared error of the regression line.

EXHIBIT C

*Reference Guide on Multiple Regression*

$R$-squared ($R^2$) is a statistic that measures the percentage of variation in the dependent variable that is accounted for by all the explanatory variables.[85] Thus, $R^2$ provides a measure of the overall goodness of fit of the multiple regression equation. Its value ranges from 0 to 1. An $R^2$ of 0 means that the explanatory variables explain none of the variation of the dependent variable; an $R^2$ of 1 means that the explanatory variables explain all of the variation. The $R^2$ associated with equation (12) is .56. This implies that the three explanatory variables explain 56% of the variation in salaries.

What level of $R^2$, if any, should lead to a conclusion that the model is satisfactory? Unfortunately, there is no clear-cut answer to this question, because the magnitude of $R^2$ depends on the characteristics of the data being studied and, in particular, whether the data vary over time or over individuals. Typically, an $R^2$ is low in cross-sectional studies in which differences in individual behavior are explained. It is likely that these individual differences are caused by many factors that cannot be measured. As a result, the expert cannot hope to explain most of the variation. In time-series studies, in contrast, the expert is explaining the movement of aggregates over time. Because most aggregate time series have substantial growth, or trend, in common, it will not be difficult to "explain" one time series using another time series, simply because both are moving together. It follows as a corollary that a high $R^2$ does not by itself mean that the variables included in the model are the appropriate ones.

As a general rule, courts should be reluctant to rely solely on a statistic such as $R^2$ to choose one model over another. Alternative procedures and tests are available.[86]

### 3. Sensitivity of least squares regression results

The least squares regression line can be sensitive to extreme data points. This sensitivity can be seen most easily in Figure 8. Assume initially that there are only three data points, A, B, and C, relating information about $X_1$ to the variable $Y$. The least squares line describing the best-fitting relationship between Points A, B, and C is represented by Line 1. Point D is called an *outlier* because it lies far from the regression line that fits the remaining points. When a new, best-fitting least squares line is reestimated to include Point D, Line 2 is obtained. Figure 8 shows that the outlier Point D is an *influential* data point, because it has a dominant effect on the slope and intercept of the least squares line. Because least squares attempts to minimize the sum of squared deviations, the sensitivity of the line to individual points sometimes can be substantial.[87]

---

85. The variation is the square of the difference between each $Y$ value and the average $Y$ value, summed over all the $Y$ values.

86. These include $F$-tests and specification error tests. *See* Pindyck & Rubinfeld, *supra* note 23, at 88–95, 128–36, 194–98.

87. This sensitivity is not always undesirable. In some instances it may be much more important to predict Point D when a big change occurs than to measure the effects of small changes accurately.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Figure 8. Least squares regression.



What makes the influential data problem even more difficult is that the effect of an outlier may not be seen readily if deviations are measured from the final regression line. The reason is that the influence of Point D on Line 2 is so substantial that its deviation from the regression line is not necessarily larger than the deviation of any of the remaining points from the regression line.[88] Although they are not as popular as least squares, alternative estimation techniques that are less sensitive to outliers, such as robust estimation, are available.

## E. Reading Multiple Regression Computer Output

Statistical computer packages that report multiple regression analyses vary to some extent in the information they provide and the form that the information takes. Table 1 contains a sample of the basic computer output that is associated with equation (9).

---

88. The importance of an outlier also depends on its location in the dataset. Outliers associated with relatively extreme values of explanatory variables are likely to be especially influential. *See, e.g.*, Fisher v. Vassar College, 70 F.3d 1420, 1436 (2d Cir. 1995) (court required to include assessment of "service in academic community," because concept was too amorphous and not a significant factor in tenure review), *rev'd on other grounds*, 114 F.3d 1332 (2d Cir. 1997) (en banc).

**EXHIBIT C**

*Reference Guide on Multiple Regression*

Table 1. Regression Output

| Dependent variable: $Y$ | | SSE | 62346266124 | $F$-test | 174.71 |
|---|---|---|---|---|---|
| | | DFE | 561 | Prob > $F$ | 0.0001 |
| | | MSE | 111134164 | $R^2$ | 0.556 |
| Variable | DF | Parameter Estimate | Standard Error | $t$-Statistic | Prob >$\lvert t \rvert$ |
| Intercept | 1 | 14,084.89 | 1577.484 | 8.9287 | .0001 |
| $X_1$ | 1 | 2323.17 | 140.70 | 16.5115 | .0001 |
| $X_2$ | 1 | 1675.11 | 1435.422 | 1.1670 | .2437 |
| $X_3$ | 1 | −36.71 | 3.41 | −10.7573 | .0001 |

*Note*: SSE = sum of squared errors; DFE = degrees of freedom associated with the error term; MSE = mean squared error; DF = degrees of freedom; Prob = probability.

In the lower portion of Table 1, note that the parameter estimates, the standard errors, and the *t*-statistics match the values given in equation (12).[89] The variable "Intercept" refers to the constant term $b_0$ in the regression. The column "DF" represents degrees of freedom. The "1" signifies that when the computer calculates the parameter estimates, each variable that is added to the linear regression adds an additional constraint that must be satisfied. The column labeled "Prob > $\lvert t \rvert$" lists the two-tailed *p*-values associated with each estimated parameter; the *p*-value measures the observed significance level—the probability of getting a test statistic as extreme or more extreme than the observed number if the model parameter is in fact 0. The very low *p*-values on the variables $X_1$ and $X_3$ imply that each variable is statistically significant at less than the 1% level—both highly significant results. In contrast, the $X_2$ coefficient is only significant at the 24% level, implying that it is insignificant at the traditional 5% level. Thus, the expert cannot reject with confidence the null hypothesis that salaries do not differ by sex after the expert has accounted for the effect of experience.

The top portion of Table 1 provides data that relate to the goodness of fit of the regression equation. The sum of squared errors (SSE) measures the sum of the squares of the regression residuals—the sum that is minimized by the least squares procedure. The degrees of freedom associated with the error term (DFE) are given by the number of observations minus the number of parameters that were estimated. The mean squared error (MSE) measures the variance of the error term (the square of the standard error of the regression). MSE is equal to SSE divided by DFE.

89. Computer programs give results to more decimal places than are meaningful. This added detail should not be seen as evidence that the regression results are exact.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

The $R^2$ of 0.556 indicates that 55.6% of the variation in salaries is explained by the regression variables, $X_1$, $X_2$, and $X_3$. Finally, the $F$-test is a test of the null hypothesis that all regression coefficients (except the intercept) are jointly equal to 0—that there is no linear association between the dependent variable and any of the explanatory variables. This is equivalent to the null hypothesis that $R^2$ is equal to 0. In this case, the $F$-ratio of 174.71 is sufficiently high that the expert can reject the null hypothesis with a very high degree of confidence (i.e., with a 1% level of significance).

## *F. Forecasting*

In general, a forecast is a prediction made about the values of the dependent variable using information about the explanatory variables. Often, ex ante forecasts are performed; in this situation, values of the dependent variable are predicted beyond the sample (e.g., beyond the time period in which the model has been estimated). However, ex post forecasts are frequently used in damage analyses.[90] An ex post forecast has a forecast period such that all values of the dependent and explanatory variables are known; ex post forecasts can be checked against existing data and provide a direct means of evaluation.

For example, to calculate the forecast for the salary regression discussed above, the expert uses the estimated salary equation

$$\hat{Y} = \$14{,}085 + \$2323X_1 + \$1675X_2 - \$36X_3. \tag{14}$$

To predict the salary of a man with 2 years' experience, the expert calculates

$$\hat{Y}(2) = \$14{,}085 + (\$2323 \cdot 2) + \$1675 - (\$36 \cdot 2) = \$20{,}262. \tag{15}$$

The degree of accuracy of both ex ante and ex post forecasts can be calculated provided that the model specification is correct and the errors are normally distributed and independent. The statistic is known as the standard error of forecast (SEF). The SEF measures the standard deviation of the forecast error that is made within a sample in which the explanatory variables are known with certainty.[91] The

90. Frequently, in cases involving damages, the question arises, what the world would have been like had a certain event not taken place. For example, in a price-fixing antitrust case, the expert can ask what the price of a product would have been had a certain event associated with the price-fixing agreement not occurred. If prices would have been lower, the evidence suggests impact. If the expert can predict how much lower they would have been, the data can help the expert develop a numerical estimate of the amount of damages.

91. There are actually two sources of error implicit in the SEF. The first source arises because the estimated parameters of the regression model may not be exactly equal to the true regression parameters. The second source is the error term itself; when forecasting, the expert typically sets the error equal to 0 when a turn of events not taken into account in the regression model may make it appropriate to make the error positive or negative.

EXHIBIT C

*Reference Guide on Multiple Regression*

SEF can be used to determine how accurate a given forecast is. In equation (15), the SEF associated with the forecast of $20,262 is approximately $5000. If a large sample size is used, the probability is roughly 95% that the predicted salary will be within 1.96 standard errors of the forecasted value. In this case, the appropriate 95% interval for the prediction is $10,822 to $30,422. Because the estimated model does not explain salaries effectively, the SEF is large, as is the 95% interval. A more complete model with additional explanatory variables would result in a lower SEF and a smaller 95% interval for the prediction.

A danger exists when using the SEF, which applies to the standard errors of the estimated coefficients as well. The SEF is calculated on the assumption that the model includes the correct set of explanatory variables and the correct functional form. If the choice of variables or the functional form is wrong, the estimated forecast error may be misleading. In some instances, it may be smaller, perhaps substantially smaller, than the true SEF; in other instances, it may be larger, for example, if the wrong variables happen to capture the effects of the correct variables.

The difference between the SEF and the SER is shown in Figure 9. The SER measures deviations within the sample. The SEF is more general, because it calculates deviations within or without the sample period. In general, the difference between the SEF and the SER increases as the values of the explanatory variables increase in distance from the mean values. Figure 9 shows the 95% prediction interval created by the measurement of two SEFs about the regression line.

Figure 9. Standard error of forecast.



EXHIBIT C

*Reference Manual on Scientific Evidence*

## G. A Hypothetical Example

Jane Thompson filed suit in federal court alleging that officials in the police department discriminated against her and a class of other female police officers in violation of Title VII of the Civil Rights Act of 1964, as amended. On behalf of the class, Ms. Thompson alleged that she was paid less than male police officers with equivalent skills and experience. Both plaintiff and defendant used expert economists with econometric expertise to present statistical evidence to the court in support of their positions.

Plaintiff's expert pointed out that the mean salary of the 40 female officers was $30,604, whereas the mean salary of the 60 male officers was $43,077. To show that this difference was statistically significant, the expert put forward a regression of salary (SALARY) on a constant term and a dummy indicator variable (FEM) equal to 1 for each female and 0 for each male. The results were as follows:

$$SALARY = \$43,077 - \$12,373 \star FEM$$

| | | |
|---|---|---|
| Standard Error | ($1528) | ($2416) |
| $p$-value | <.01 | <.01 |
| $R^2 = .22$ | | |

The −$12,373 coefficient on the FEM variable measures the mean difference between male and female salaries. Because the standard error is approximately one-fifth of the value of the coefficient, this difference is statistically significant at the 5% (and indeed at the 1%) level. If this is an appropriate regression model (in terms of its implicit characterization of salary determination), one can conclude that it is highly unlikely that the difference in salaries between men and women is due to chance.

The defendant's expert testified that the regression model put forward was the wrong model because it failed to account for the fact that males (on average) had substantially more experience than females. The relatively low $R^2$ was an indication that there was substantial unexplained variation in the salaries of male and female officers. An examination of data relating to years spent on the job showed that the average male experience was 8.2 years, whereas the average for females was only 3.5 years. The defense expert then presented a regression analysis that added an additional explanatory variable (i.e., a covariate), the years of experience of each police officer (EXP). The new regression results were as follows:

$$SALARY = \$28,049 - \$3860 \star FEM + \$1833 \star EXP$$

| | | | |
|---|---|---|---|
| Standard Error | (2513) | ($2347) | ($265) |
| $p$-value | <.01 | <.11 | <.01 |
| $R^2 = .47$ | | | |

Experience is itself a statistically significant explanatory variable, with a $p$-value of less than .01. Moreover, the difference between male and female

350

**EXHIBIT C**

*Reference Guide on Multiple Regression*

salaries, holding experience constant, is only $3860, and this difference is not statistically significant at the 5% level. The defense expert was able to testify on this basis that the court could not rule out alternative explanations for the difference in salaries other than the plaintiff's claim of discrimination.

The debate did not end here. On rebuttal, the plaintiff's expert made three distinct points. First, whether $3860 was statistically significant or not, it was practically significant, representing a salary difference of more than 10% of the mean female officers' salaries. Second, although the result was not statistically significant at the 5% level, it was significant at the 11% level. If the regression model were valid, there would be approximately an 11% probability that one would err by concluding that the mean salary difference between men and women was a result of chance.

Third, and most importantly, the expert testified that the regression model was not correctly specified. Further analysis by the expert showed that the value of an additional year of experience was $2333 for males on average, but only $1521 for females. Based on supporting testimonial experience, the expert testified that one could not rule out the possibility that the mechanism by which the police department discriminated against females was by rewarding males more for their experience than females. The expert made this point clear by running an additional regression in which a further covariate was added to the model. The new variable was an interaction variable, INT, measured as the product of the FEM and EXP variables. The regression results were as follows:

SALARY = $35,122 − $5250★FEM + $2333★EXP − $812★FEM★EXP
St. Error    ($2825)    ($347)        ($265)            ($185)
$p$-value    <.01    <.11        <.01            <.04
$R^2$ = .65

The plaintiff's expert noted that for all males in the sample, FEM = 0, in which case the regression results are given by the equation

$$SALARY = \$35,122 + \$2333 \star EXP$$

However, for females, FEM = 1, in which the corresponding equation is

$$SALARY = \$29,872 + \$1521 \star EXP$$

It appears, therefore, that females are discriminated against not only when hired (i.e., when EXP = 0), but also in the reward they get as they accumulate more and more experience.

The debate between the experts continued, focusing less on the statistical interpretation of any one particular regression model, but more on the model choice itself, and not simply on statistical significance, but also with regard to practical significance.

351

EXHIBIT C

*Reference Manual on Scientific Evidence*

# Glossary

The following terms and definitions are adapted from a variety of sources, including A Dictionary of Epidemiology (John M. Last et al., eds., 4th ed. 2000) and Robert S. Pindyck & Daniel L. Rubinfeld, Econometric Models and Economic Forecasts (4th ed. 1998).

**alternative hypothesis.** See hypothesis test.

**association.** The degree of statistical dependence between two or more events or variables. Events are said to be associated when they occur more frequently together than one would expect by chance.

**bias.** Any effect at any stage of investigation or inference tending to produce results that depart systematically from the true values (i.e., the results are either too high or too low). A biased estimator of a parameter differs on average from the true parameter.

**coefficient.** An estimated regression parameter.

**confidence interval.** An interval that contains a true regression parameter with a given degree of confidence.

**consistent estimator.** An estimator that tends to become more and more accurate as the sample size grows.

**correlation.** A statistical means of measuring the linear association between variables. Two variables are correlated positively if, on average, they move in the same direction; two variables are correlated negatively if, on average, they move in opposite directions.

**covariate.** A variable that is possibly predictive of an outcome under study; an explanatory variable.

**cross–sectional analysis.** A type of multiple regression analysis in which each data point is associated with a different unit of observation (e.g., an individual or a firm) measured at a particular point in time.

**degrees of freedom (DF).** The number of observations in a sample minus the number of estimated parameters in a regression model. A useful statistic in hypothesis testing.

**dependent variable.** The variable to be explained or predicted in a multiple regression model.

**dummy variable.** A variable that takes on only two values, usually 0 and 1, with one value indicating the presence of a characteristic, attribute, or effect (1), and the other value indicating its absence (0).

**efficient estimator.** An estimator of a parameter that produces the greatest precision possible.

**error term.** A variable in a multiple regression model that represents the cumulative effect of a number of sources of modeling error.

352

**EXHIBIT C**

*Reference Guide on Multiple Regression*

**estimate.** The calculated value of a parameter based on the use of a particular sample.

**estimator.** The sample statistic that estimates the value of a population parameter (e.g., a regression parameter); its values vary from sample to sample.

**ex ante forecast.** A prediction about the values of the dependent variable that go beyond the sample; consequently, the forecast must be based on predictions for the values of the explanatory variables in the regression model.

**explanatory variable.** A variable that is associated with changes in a dependent variable.

**ex post forecast.** A prediction about the values of the dependent variable made during a period in which all values of the explanatory and dependent variables are known. Ex post forecasts provide a useful means of evaluating the fit of a regression model.

**F-test.** A statistical test (based on an *F*-ratio) of the null hypothesis that a group of explanatory variables are jointly equal to 0. When applied to all the explanatory variables in a multiple regression model, the *F*-test becomes a test of the null hypothesis that $R^2$ equals 0.

**feedback.** When changes in an explanatory variable affect the values of the dependent variable, and changes in the dependent variable also affect the explanatory variable. When both effects occur at the same time, the two variables are described as being determined simultaneously.

**fitted value.** The estimated value for the dependent variable; in a linear regression, this value is calculated as the intercept plus a weighted average of the values of the explanatory variables, with the estimated parameters used as weights.

**heteroscedasticity.** When the error associated with a multiple regression model has a nonconstant variance; that is, the error values associated with some observations are typically high, while the values associated with other observations are typically low.

**hypothesis test.** A statement about the parameters in a multiple regression model. The null hypothesis may assert that certain parameters have specified values or ranges; the alternative hypothesis would specify other values or ranges.

**independence.** When two variables are not correlated with each other (in the population).

**independent variable.** An explanatory variable that affects the dependent variable but that is not affected by the dependent variable.

**influential data point.** A data point whose deletion from a regression sample causes one or more estimated regression parameters to change substantially.

**interaction variable.** The product of two explanatory variables in a regression model. Used in a particular form of nonlinear model.

353

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**intercept.** The value of the dependent variable when each of the explanatory variables takes on the value of 0 in a regression equation.

**least squares.** A common method for estimating regression parameters. Least squares minimizes the sum of the squared differences between the actual values of the dependent variable and the values predicted by the regression equation.

**linear regression model.** A regression model in which the effect of a change in each of the explanatory variables on the dependent variable is the same, no matter what the values of those explanatory variables.

**mean (sample).** An average of the outcomes associated with a probability distribution, where the outcomes are weighted by the probability that each will occur.

**mean squared error (MSE).** The estimated variance of the regression error, calculated as the average of the sum of the squares of the regression residuals.

**model.** A representation of an actual situation.

**multicollinearity.** When two or more variables are highly correlated in a multiple regression analysis. Substantial multicollinearity can cause regression parameters to be estimated imprecisely, as reflected in relatively high standard errors.

**multiple regression analysis.** A statistical tool for understanding the relationship between two or more variables.

**nonlinear regression model.** A model having the property that changes in explanatory variables will have differential effects on the dependent variable as the values of the explanatory variables change.

**normal distribution.** A bell–shaped probability distribution having the property that about 95% of the distribution lies within 2 standard deviations of the mean.

**null hypothesis.** In regression analysis the null hypothesis states that the results observed in a study with respect to a particular variable are no different from what might have occurred by chance, independent of the effect of that variable. See *hypothesis test*.

**one–tailed test.** A hypothesis test in which the alternative to the null hypothesis that a parameter is equal to 0 is for the parameter to be either positive or negative, but not both.

**outlier.** A data point that is more than some appropriate distance from a regression line that is estimated using all the other data points in the sample.

***p*–value.** The significance level in a statistical test; the probability of getting a test statistic as extreme or more extreme than the observed value. The larger the *p*-value, the more likely that the null hypothesis is valid.

**parameter.** A numerical characteristic of a population or a model.

354

**EXHIBIT C**

*Reference Guide on Multiple Regression*

**perfect collinearity.** When two or more explanatory variables are correlated perfectly.

**population.** All the units of interest to the researcher; also, universe.

**practical significance.** Substantive importance. Statistical significance does not ensure practical significance, because, with large samples, small differences can be statistically significant.

**probability distribution.** The process that generates the values of a random variable. A probability distribution lists all possible outcomes and the probability that each will occur.

**probability sampling.** A process by which a sample of a population is chosen so that each unit of observation has a known probability of being selected.

**quasi–experiment (or natural experiment).** A naturally occurring instance of observable phenomena that yield data that approximate a controlled experiment.

**$R$–squared ($R^2$).** A statistic that measures the percentage of the variation in the dependent variable that is accounted for by all of the explanatory variables in a regression model. $R$–squared is the most commonly used measure of goodness of fit of a regression model.

**random error term.** A term in a regression model that reflects random error (sampling error) that is the result of chance. As a consequence, the result obtained in the sample differs from the result that would be obtained if the entire population were studied.

**regression coefficient.** Also, regression parameter. The estimate of a population parameter obtained from a regression equation that is based on a particular sample.

**regression residual.** The difference between the actual value of a dependent variable and the value predicted by the regression equation.

**robust estimation.** An alternative to least squares estimation that is less sensitive to outliers.

**robustness.** A statistic or procedure that does not change much when data or assumptions are slightly modified is robust.

**sample.** A selection of data chosen for a study; a subset of a population.

**sampling error.** A measure of the difference between the sample estimate of a parameter and the population parameter.

**scatterplot.** A graph showing the relationship between two variables in a study; each dot represents one subject. One variable is plotted along the horizontal axis; the other variable is plotted along the vertical axis.

**serial correlation.** The correlation of the values of regression errors over time.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**slope.** The change in the dependent variable associated with a one–unit change in an explanatory variable.

**spurious correlation.** When two variables are correlated, but one is not the cause of the other.

**standard deviation.** The square root of the variance of a random variable. The variance is a measure of the spread of a probability distribution about its mean; it is calculated as a weighted average of the squares of the deviations of the outcomes of a random variable from its mean.

**standard error of forecast (SEF).** An estimate of the standard deviation of the forecast error; it is based on forecasts made within a sample in which the values of the explanatory variables are known with certainty.

**standard error of the coefficient; standard error (SE).** A measure of the variation of a parameter estimate or coefficient about the true parameter. The standard error is a standard deviation that is calculated from the probability distribution of estimated parameters.

**standard error of the regression (SER).** An estimate of the standard deviation of the regression error; it is calculated as the square root of the average of the squares of the residuals associated with a particular multiple regression analysis.

**statistical significance.** A test used to evaluate the degree of association between a dependent variable and one or more explanatory variables. If the calculated *p*-value is smaller than 5%, the result is said to be statistically significant (at the 5% level). If *p* is greater than 5%, the result is statistically insignificant (at the 5% level).

***t*-statistic.** A test statistic that describes how far an estimate of a parameter is from its hypothesized value (i.e., given a null hypothesis). If a *t*-statistic is suffi-ciently large (in absolute magnitude), an expert can reject the null hypothesis.

***t*-test.** A test of the null hypothesis that a regression parameter takes on a particu-lar value, usually 0. The test is based on the *t*-statistic.

**time–series analysis.** A type of multiple regression analysis in which each data point is associated with a particular unit of observation (e.g., an individual or a firm) measured at different points in time.

**two–tailed test.** A hypothesis test in which the alternative to the null hypothesis that a parameter is equal to 0 is for the parameter to be either positive or negative, or both.

**variable.** Any attribute, phenomenon, condition, or event that can have two or more values.

**variable of interest.** The explanatory variable that is the focal point of a par-ticular study or legal issue.

356

**EXHIBIT C**

# References on Multiple Regression

Jonathan A. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust: Review and Critique,* 1 Am. L. & Econ. Rev. 386 (1999).

Gerald V. Barrett & Donna M. Sansonetti, *Issues Concerning the Use of Regression Analysis in Salary Discrimination Cases,* 41 Personnel Psychol. 503 (2006).

Thomas J. Campbell, *Regression Analysis in Title VII Cases: Minimum Standards, Comparable Worth, and Other Issues Where Law and Statistics Meet,* 36 Stan. L. Rev. 1299 (1984).

Catherine Connolly, *The Use of Multiple Regression Analysis in Employment Discrimination Cases,* 10 Population Res. & Pol'y Rev. 117 (1991).

Arthur P. Dempster, *Employment Discrimination and Statistical Science,* 3 Stat. Sci. 149 (1988).

Michael O. Finkelstein, *The Judicial Reception of Multiple Regression Studies in Race and Sex Discrimination Cases,* 80 Colum. L. Rev. 737 (1980).

Michael O. Finkelstein & Hans Levenbach, *Regression Estimates of Damages in Price-Fixing Cases,* Law & Contemp. Probs., Autumn 1983, at 145.

Franklin M. Fisher, *Multiple Regression in Legal Proceedings,* 80 Colum. L. Rev. 702 (1980).

Franklin M. Fisher, *Statisticians, Econometricians, and Adversary Proceedings,* 81 J. Am. Stat. Ass'n 277 (1986).

Joseph L. Gastwirth, *Methods for Assessing the Sensitivity of Statistical Comparisons Used in Title VII Cases to Omitted Variables,* 33 Jurimetrics J. 19 (1992).

Note, *Beyond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal,* 89 Harv. L. Rev. 387 (1975).

Daniel L. Rubinfeld, *Econometrics in the Courtroom,* 85 Colum. L. Rev. 1048 (1985).

Daniel L. Rubinfeld & Peter O. Steiner, *Quantitative Methods in Antitrust Litigation,* Law & Contemp. Probs., Autumn 1983, at 69.

Daniel L. Rubinfeld, *Statistical and Demographic Issues Underlying Voting Rights Cases,* 15 Evaluation Rev. 659 (1991).

The Evolving Role of Statistical Assessments as Evidence in the Courts (Stephen E. Fienberg ed., 1989).

EXHIBIT C

EXHIBIT C

# Reference Guide on Survey Research

## SHARI SEIDMAN DIAMOND

*Shari Seidman Diamond, J.D., Ph.D., is the Howard J. Trienens Professor of Law and Professor of Psychology, Northwestern University, and a Research Professor, American Bar Foundation, Chicago, Illinois.*

CONTENTS

I.  Introduction, 361
  A.  Use of Surveys in Court, 363
  B.  Surveys Used to Help Assess Expert Acceptance in the Wake of *Daubert*, 367
  C.  Surveys Used to Help Assess Community Standards: *Atkins v. Virginia*, 369
  D.  A Comparison of Survey Evidence and Individual Testimony, 372
II.  Purpose and Design of the Survey, 373
  A.  Was the Survey Designed to Address Relevant Questions? 373
  B.  Was Participation in the Design, Administration, and Interpretation of the Survey Appropriately Controlled to Ensure the Objectivity of the Survey? 374
  C.  Are the Experts Who Designed, Conducted, or Analyzed the Survey Appropriately Skilled and Experienced? 375
  D.  Are the Experts Who Will Testify About Surveys Conducted by Others Appropriately Skilled and Experienced? 375
III.  Population Definition and Sampling, 376
  A.  Was an Appropriate Universe or Population Identified? 376
  B.  Did the Sampling Frame Approximate the Population? 377
  C.  Does the Sample Approximate the Relevant Characteristics of the Population? 380
  D.  What Is the Evidence That Nonresponse Did Not Bias the Results of the Survey? 383
  E.  What Procedures Were Used to Reduce the Likelihood of a Biased Sample? 385
  F.  What Precautions Were Taken to Ensure That Only Qualified Respondents Were Included in the Survey? 386

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

IV.  Survey Questions and Structure, 387
   A.  Were Questions on the Survey Framed to Be Clear, Precise, and
       Unbiased? 387
   B.  Were Some Respondents Likely to Have No Opinion? If So, What
       Steps Were Taken to Reduce Guessing? 389
   C.  Did the Survey Use Open-Ended or Closed-Ended Questions? How
       Was the Choice in Each Instance Justified? 391
   D.  If Probes Were Used to Clarify Ambiguous or Incomplete Answers,
       What Steps Were Taken to Ensure That the Probes Were Not
       Leading and Were Administered in a Consistent Fashion? 394
   E.  What Approach Was Used to Avoid or Measure Potential Order or
       Context Effects? 395
   F.  If the Survey Was Designed to Test a Causal Proposition, Did the
       Survey Include an Appropriate Control Group or Question? 397
   G.  What Limitations Are Associated with the Mode of Data Collection
       Used in the Survey? 401
       1.  In-person interviews, 402
       2.  Telephone interviews, 403
       3.  Mail questionnaires, 405
       4.  Internet surveys, 406
 V.  Surveys Involving Interviewers, 409
   A.  Were the Interviewers Appropriately Selected and Trained? 409
   B.  What Did the Interviewers Know About the Survey and Its
       Sponsorship? 410
   C.  What Procedures Were Used to Ensure and Determine That the
       Survey Was Administered to Minimize Error and Bias? 411
 VI.  Data Entry and Grouping of Responses, 412
   A.  What Was Done to Ensure That the Data Were Recorded
       Accurately? 412
   B.  What Was Done to Ensure That the Grouped Data Were Classified
       Consistently and Accurately? 413
VII.  Disclosure and Reporting, 413
   A.  When Was Information About the Survey Methodology and Results
       Disclosed? 413
   B.  Does the Survey Report Include Complete and Detailed
       Information on All Relevant Characteristics? 415
   C.  In Surveys of Individuals, What Measures Were Taken to Protect the
       Identities of Individual Respondents? 417
VIII. Acknowledgment, 418
Glossary of Terms, 419
References on Survey Research, 423

**EXHIBIT C**

*Reference Guide on Survey Research*

# I.    Introduction

*Sample surveys* are used to describe or enumerate the beliefs, attitudes, or behavior of persons or other social units.[1] Surveys typically are offered in legal proceedings to establish or refute claims about the characteristics of those individuals or social units (e.g., whether consumers are likely to be misled by the claims contained in an allegedly deceptive advertisement;[2] which qualities purchasers focus on in making decisions about buying new computer systems).[3] In a broader sense, a *survey* can describe or enumerate the attributes of any units, including animals and objects.[4] We focus here primarily on sample surveys, which must deal not only with issues of population definition, sampling, and measurement common to all surveys, but also with the specialized issues that arise in obtaining information from human respondents.

In principle, surveys may count or measure every member of the relevant population (e.g., all plaintiffs eligible to join in a suit, all employees currently working for a corporation, all trees in a forest). In practice, surveys typically count or measure only a portion of the individuals or other units that the survey is intended to describe (e.g., a sample of jury-eligible citizens, a sample of potential job applicants). In either case, the goal is to provide information on the relevant population from which the sample was drawn. Sample surveys can be carried out using probability or nonprobability sampling techniques. Although probability sampling offers important advantages over nonprobability sampling,[5] experts in some fields (e.g., marketing) regularly rely on various forms of nonprobability sampling when conducting surveys. Consistent with Federal Rule of Evidence 703, courts generally have accepted such evidence.[6] Thus, in this reference guide, both the probability sample and the nonprobability sample are discussed. The strengths of probability sampling and the weaknesses of various types of non-probability sampling are described.

---

1. Sample surveys conducted by social scientists "consist of (relatively) systematic, (mostly) standardized approaches to collecting information on individuals, households, organizations, or larger organized entities through questioning systematically identified samples." James D. Wright & Peter V. Marsden, *Survey Research and Social Science: History, Current Practice, and Future Prospects*, *in* Handbook of Survey Research 1, 3 (James D. Wright & Peter V. Marsden eds., 2d ed. 2010).

2. *See* Sanderson Farms v. Tyson Foods, 547 F. Supp. 2d 491 (D. Md. 2008).

3. *See* SMS Sys. Maint. Servs. v. Digital Equip. Corp., 118 F.3d 11, 30 (1st Cir. 1999). For other examples, see notes 19–32 and accompanying text.

4. In *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138 (E.D. Va. 1995), clam processors and fishing vessel owners sued the Secretary of Commerce for failing to use the unexpectedly high results from 1994 survey data on the size of the clam population to determine clam fishing quotas for 1995. The estimate of clam abundance is obtained from surveys of the amount of fishing time the research survey vessels require to collect a specified yield of clams in major fishing areas over a period of several weeks. *Id.* at 1144–45.

5. *See infra* Section III.C.

6. Fed. R. Evid. 703 recognizes facts or data "of a type reasonably relied upon by experts in the particular field. . . ."

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

As a method of data collection, surveys have several crucial potential advantages over less systematic approaches.[7] When properly designed, executed, and described, surveys (1) economically present the characteristics of a large group of respondents or other units and (2) permit an assessment of the extent to which the measured respondents or other units are likely to adequately represent a relevant group of individuals or other units.[8] All questions asked of respondents and all other measuring devices used (e.g., criteria for selecting eligible respondents) can be examined by the court and the opposing party for objectivity, clarity, and relevance, and all answers or other measures obtained can be analyzed for completeness and consistency. The survey questions should not be the only focus of attention. To make it possible for the court and the opposing party to closely scrutinize the survey so that its relevance, objectivity, and representativeness can be evaluated, the party proposing to offer the survey as evidence should also describe in detail the design, execution, and analysis of the survey. This should include (1) a description of the population from which the sample was selected, demonstrating that it was the relevant population for the question at hand; (2) a description of how the sample was drawn and an explanation for why that sample design was appropriate; (3) a report on response rate and the ability of the sample to represent the target population; and (4) an evaluation of any sources of potential bias in respondents' answers.

The questions listed in this reference guide are intended to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information.[9] These questions can be (1) raised from the bench during a pretrial proceeding to determine the admissibility of the survey evidence; (2) presented to the contending experts before trial for their joint identification of disputed and undisputed issues; (3) presented to counsel with the expectation that the issues will be addressed during the examination of the experts at trial; or (4) raised in bench trials when a motion for a preliminary injunction is made to help the judge evaluate

---

7. This does not mean that surveys can be relied on to address all questions. For example, if survey respondents had been asked in the days before the attacks of 9/11 to predict whether they would volunteer for military service if Washington, D.C., were to be bombed, their answers may not have provided accurate predictions. Although respondents might have willingly answered the question, their assessment of what they would actually do in response to an attack simply may have been inaccurate. Even the option of a "do not know" choice would not have prevented an error in prediction if they believed they could accurately predict what they would do. Thus, although such a survey would have been suitable for assessing the *predictions* of respondents, it might have provided a very inaccurate estimate of what an actual response to the attack would be.

8. The ability to quantitatively assess the limits of the likely margin of error is unique to probability sample surveys, but an expert testifying about any survey should provide enough information to allow the judge to evaluate how potential error, including coverage, measurement, nonresponse, and sampling error, may have affected the obtained pattern of responses.

9. *See infra* text accompanying note 31.

362

**EXHIBIT C**

*Reference Guide on Survey Research*

what weight, if any, the survey should be given.[10] These questions are intended to improve the utility of cross-examination by counsel, where appropriate, not to replace it.

All sample surveys, whether they measure individuals or other units, should address the issues concerning purpose and design (Section II), population definition and sampling (Section III), accuracy of data entry (Section VI), and disclosure and reporting (Section VII). Questionnaire and interview surveys, whether conducted in-person, on the telephone, or online, raise methodological issues involving survey questions and structure (Section IV) and confidentiality (Section VII.C). Interview surveys introduce additional issues (e.g., interviewer training and qualifications) (Section V), and online surveys raise some new issues and questions that are currently under study (Section VI). The sections of this reference guide are labeled to direct the reader to those topics that are relevant to the type of survey being considered. The scope of this reference guide is necessarily limited, and additional issues might arise in particular cases.

## *A. Use of Surveys in Court*

Fifty years ago the question of whether surveys constituted acceptable evidence still was unsettled.[11] Early doubts about the admissibility of surveys centered on their use of sampling[12] and their status as hearsay evidence.[13] Federal Rule of Evidence

---

10. Lanham Act cases involving trademark infringement or deceptive advertising frequently require expedited hearings that request injunctive relief, so judges may need to be more familiar with survey methodology when considering the weight to accord a survey in these cases than when presiding over cases being submitted to a jury. Even in a case being decided by a jury, however, the court must be prepared to evaluate the methodology of the survey evidence in order to rule on admissibility. *See* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).

11. Hans Zeisel, *The Uniqueness of Survey Evidence*, 45 Cornell L.Q. 322, 345 (1960).

12. In an early use of sampling, Sears, Roebuck & Co. claimed a tax refund based on sales made to individuals living outside city limits. Sears randomly sampled 33 of the 826 working days in the relevant working period, computed the proportion of sales to out-of-city individuals during those days, and projected the sample result to the entire period. The court refused to accept the estimate based on the sample. When a complete audit was made, the result was almost identical to that obtained from the sample. *Sears, Roebuck & Co. v. City of Inglewood,* tried in Los Angeles Superior Court in 1955, is described in R. Clay Sprowls, *The Admissibility of Sample Data into a Court of Law: A Case History*, 4 UCLA L. Rev. 222, 226–29 (1956–1957).

13. Judge Wilfred Feinberg's thoughtful analysis in *Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F. Supp. 670, 682–83 (S.D.N.Y. 1963), provides two alternative grounds for admitting opinion surveys: (1) Surveys are not hearsay because they are not offered in evidence to prove the truth of the matter asserted; and (2) even if they are hearsay, they fall under one of the exceptions as a "present sense impression." In *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218 (2d Cir. 1999), the Second Circuit distinguished between perception surveys designed to reflect the present sense impressions of respondents and "memory" surveys designed to collect information about a past occurrence based on the recollections of the survey respondents. The court in *Schering* suggested that if a survey is offered to prove the existence of a specific idea in the public mind, then the survey does constitute hearsay

EXHIBIT C

*Reference Manual on Scientific Evidence*

703 settled both matters for surveys by redirecting attention to the "validity of the techniques employed."[14] The inquiry under Rule 703 focuses on whether facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[15] For a survey, the question becomes, "Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?"[16] This focus on the adequacy of the methodology used in conducting and analyzing results from a survey is also consistent with the Supreme Court's discussion of admissible scientific evidence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[17]

Because the survey method provides an economical and systematic way to gather information and draw inferences about a large number of individuals or other units, surveys are used widely in business, government, and, increasingly,

---

evidence. As the court observed, Federal Rule of Evidence 803(3), creating "an exception to the hearsay rule for such statements [i.e., state-of-mind expressions] rather than excluding the statements from the definition of hearsay, makes sense only in this light." *Id.* at 230 n.3. *See also* Playtex Prods. v. Procter & Gamble Co., 2003 U.S. Dist. LEXIS 8913 (S.D.N.Y. May 28, 2003), *aff'd*, 126 Fed. Appx. 32 (2d Cir. 2005). Note, however, that when survey respondents are shown a stimulus (e.g., a commercial) and then respond to a series of questions about their impressions of what they viewed, those impressions reflect both respondents' initial perceptions and their memory for what they saw and heard. Concerns about the impact of memory on the trustworthiness of survey responses appropriately depend on the passage of time between exposure and testing and on the likelihood that distorting events occurred during that interval.

Two additional exceptions to the hearsay exclusion can be applied to surveys. First, surveys may constitute a hearsay exception if the survey data were collected in the normal course of a regularly conducted business activity, unless "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6); *see also* Ortho Pharm. Corp. v. Cosprophar, Inc., 828 F. Supp. 1114, 1119–20 (S.D.N.Y. 1993) (marketing surveys prepared in the course of business were properly excluded because they lacked foundation from a person who saw the original data or knew what steps were taken in preparing the report), *aff'd*, 32 F.3d 690 (2d Cir. 1994). In addition, if a survey shows guarantees of trustworthiness equivalent to those in other hearsay exceptions, it can be admitted if the court determines that the statement is offered as evidence of a material fact, it is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and admissibility serves the interests of justice. Fed. R. Evid. 807; *e.g.*, *Schering*, 189 F.3d at 232. Admissibility as an exception to the hearsay exclusion thus depends on the trustworthiness of the survey. New Colt Holding v. RJG Holdings of Fla., 312 F. Supp. 2d 195, 223 (D. Conn. 2004).

14. Fed. R. Evid. 703 Advisory Committee Note.

15. Fed. R. Evid. 703.

16. Manual for Complex Litigation § 2.712 (1982). Survey research also is addressed in the Manual for Complex Litigation, Second § 21.484 (1985) [hereinafter MCL 2d]; the Manual for Complex Litigation, Third § 21.493 (1995) [hereinafter MCL 3d]; and the Manual for Complex Litigation, Fourth §11.493 (2004) [hereinafter MCL 4th]. Note, however, that experts who collect survey data, along with the professions that rely on those surveys, may differ in some of their methodological standards and principles. An assessment of the precision of sample estimates and an evaluation of the sources and magnitude of likely bias are required to distinguish methods that are acceptable from methods that are not.

17. 509 U.S. 579 (1993); *see also* General Elec. Co. v. Joiner, 522 U.S. 136, 147 (1997).

EXHIBIT C

*Reference Guide on Survey Research*

administrative settings and judicial proceedings.[18] Both federal and state courts have accepted survey evidence on a variety of issues. In a case involving allegations of discrimination in jury panel composition, the defense team surveyed prospective jurors to obtain their age, race, education, ethnicity, and income distribution.[19] Surveys of employees or prospective employees are used to support or refute claims of employment discrimination.[20] Surveys provide information on the nature and similarity of claims to support motions for or against class certification.[21] In ruling on the admissibility of scientific claims, courts have examined surveys of scientific experts to assess the extent to which the theory or technique has received widespread acceptance.[22] Some courts have admitted surveys in obscenity cases to provide evidence about community standards.[23] Requests for a change of venue on grounds of jury pool bias often are backed by evidence from a survey of jury-eligible respondents in the area of the original venue.[24] The plaintiff in an antitrust suit conducted a survey to assess what characteristics, including price, affected consumers' preferences. The survey was offered as one way to estimate damages.[25] In a Title IX suit based on allegedly discriminatory scheduling of girls'

18. Some sample surveys are so well accepted that they even may not be recognized as surveys. For example, some U.S. Census Bureau data are based on sample surveys. Similarly, the Standard Table of Mortality, which is accepted as proof of the average life expectancy of an individual of a particular age and gender, is based on survey data.

19. United States v. Green, 389 F. Supp. 2d 29 (D. Mass. 2005), *rev'd on other grounds,* 426 F.3d 1 (1st Cir. 2005) (evaluating minority underrepresentation in the jury pool by comparing racial composition of the voting-age population in the district with the racial breakdown indicated in juror questionnaires returned to court); *see also* People v. Harris, 36 Cal. 3d 36, 679 P.2d 433 (Cal. 1984).

20. John Johnson v. Big Lots Stores, Inc*.,* No. 04-321, 2008 U.S. Dist. LEXIS 35316, at ⋆20 (E.D. La. Apr. 29, 2008); Stender v. Lucky Stores, Inc., 803 F. Supp. 259, 326 (N.D. Cal. 1992); EEOC v. Sears, Roebuck & Co., 628 F. Supp. 1264, 1308 (N.D. Ill. 1986), *aff'd*, 839 F.2d 302 (7th Cir. 1988).

21. John Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567 (E.D. La. 2008); Marlo v. United Parcel Service, Inc., 251 F.R.D. 476 (C.D. Cal. 2008).

22. United States v. Scheffer, 523 U.S. 303, 309 (1998); United States v. Bishop, 64 F. Supp. 2d 1149 (D. Utah 1999); United States v. Varoudakis, No. 97-10158, 1998 WL 151238 (D. Mass. Mar. 27, 1998); State v. Shively, 268 Kan. 573 (2000), *aff'd*, 268 Kan. 589 (2000) (all cases in which courts determined, based on the inconsistent reactions revealed in several surveys, that the polygraph test has failed to achieve general acceptance in the scientific community). *Contra, see* Lee v. Martinez, 136 N.M. 166, 179–81, 96 P.3d 291, 304–06 (N.M. 2004). People v. Williams, 830 N.Y.S.2d 452 (2006) (expert permitted to testify regarding scientific studies of factors affecting the perceptual ability and memory of eyewitnesses to make identifications based in part on general acceptance demonstrated in survey of experts who study eyewitness identification).

23. *E.g.*, People v. Page Books, Inc., 601 N.E.2d 273, 279–80 (Ill. App. Ct. 1992); State v. Williams, 598 N.E.2d 1250, 1256–58 (Ohio Ct. App. 1991).

24. *E.g.*, United States v. Eagle, 586 F.2d 1193, 1195 (8th Cir. 1978); United States v. Tokars, 839 F. Supp. 1578, 1583 (D. Ga. 1993), *aff'd*, 95 F.3d 1520 (11th Cir. 1996); State v. Baumruk, 85 S.W.3d 644 (Mo. 2002); People v. Boss, 701 N.Y.S.2d 342 (App. Div. 1999).

25. Dolphin Tours, Inc. v. Pacifico Creative Servs., Inc., 773 F.2d 1506, 1508 (9th Cir. 1985). *See also* SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp., 188 F.3d 11 (1st Cir. 1999); Benjamin F. King, *Statistics in Antitrust Litigation*, *in* Statistics and the Law 49 (Morris H. DeGroot et al. eds.,

EXHIBIT C

*Reference Manual on Scientific Evidence*

sports, a survey was offered for the purpose of establishing how girls felt about the scheduling of girls' and boys' sports.[26] A routine use of surveys in federal courts occurs in Lanham Act[27] cases, when the plaintiff alleges trademark infringement[28] or claims that false advertising[29] has confused or deceived consumers. The pivotal legal question in such cases virtually demands survey research because it centers on consumer perception and memory (i.e., is the consumer likely to be confused about the source of a product, or does the advertisement imply a false or misleading message?).[30] In addition, survey methodology has been used creatively to assist federal courts in managing mass torts litigation. Faced with the prospect of conducting discovery concerning 10,000 plaintiffs, the plaintiffs and defendants in *Wilhoite v. Olin Corp.*[31] jointly drafted a discovery survey that was administered

1986). Surveys have long been used in antitrust litigation to help define relevant markets. In *United States v. E.I. du Pont de Nemours & Co.,* 118 F. Supp. 41, 60 (D. Del. 1953), *aff'd,* 351 U.S. 377 (1956), a survey was used to develop the "market setting" for the sale of cellophane. In *Mukand, Ltd. v. United States,* 937 F. Supp. 910 (Ct. Int'l Trade 1996), a survey of purchasers of stainless steel wire rods was conducted to support a determination of competition and fungibility between domestic and Indian wire rod.

26. Alston v. Virginia High Sch. League, Inc., 144 F. Supp. 2d 526, 539–40 (W.D. Va. 1999).

27. Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1946) (amended 2006).

28. *E.g.,* Herman Miller v. Palazzetti Imports & Exports, 270 F.3d 298, 312 (6th Cir. 2001) ("Because the determination of whether a mark has acquired secondary meaning is primarily an empirical inquiry, survey evidence is the most direct and persuasive evidence."); Simon Property Group v. MySimon, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000) ("Consumer surveys are generally accepted by courts as one means of showing the likelihood of consumer confusion."). *See also* Qualitex Co. v. Jacobson Prods. Co., No. CIV-90-1183HLH, 1991 U.S. Dist. LEXIS 21172 (C.D. Cal. Sept. 3, 1991), *aff'd in part & rev'd in part on other grounds*, 13 F.3d 1297 (9th Cir. 1994), *rev'd on other grounds*, 514 U.S. 159 (1995); Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830 (1976). According to Neal Miller, *Facts, Expert Facts, and Statistics: Descriptive and Experimental Research Methods in Litigation*, 40 Rutgers L. Rev. 101, 137 (1987), trademark law has relied on the institutionalized use of statistical evidence more than any other area of the law.

29. *E.g.,* Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1142–43 (9th Cir. 1997); American Home Prods. Corp. v. Johnson & Johnson, 577 F.2d 160 (2d Cir. 1978); Rexall Sundown, Inc. v. Perrigo Co., 651 F. Supp. 2d 9 (E.D.N.Y. 2009); Mutual Pharm. Co. v. Ivax Pharms. Inc., 459 F. Supp. 2d 925 (C.D. Cal. 2006); Novartis Consumer Health v. Johnson & Johnson–Merck Consumer Pharms., 129 F. Supp. 2d 351 (D.N.J. 2000).

30. Courts have observed that "the court's reaction is at best not determinative and at worst irrelevant. The question in such cases is, what does the person to whom the advertisement is addressed find to be the message?" American Brands, Inc. v. R.J. Reynolds Tobacco Co., 413 F. Supp. 1352, 1357 (S.D.N.Y. 1976). The wide use of surveys in recent years was foreshadowed in *Triangle Publications, Inc. v. Rohrlich,* 167 F.2d 969, 974 (2d Cir. 1948) (Frank, J., dissenting). Called on to determine whether a manufacturer of girdles labeled "Miss Seventeen" infringed the trademark of the magazine *Seventeen*, Judge Frank suggested that, in the absence of a test of the reactions of "numerous girls and women," the trial court judge's finding as to what was likely to confuse was "nothing but a surmise, a conjecture, a guess," noting that "neither the trial judge nor any member of this court is (or resembles) a teen-age girl or the mother or sister of such a girl." *Id.* at 976–77.

31. No. CV-83-C-5021-NE (N.D. Ala. filed Jan. 11, 1983). The case ultimately settled before trial. *See* Francis E. McGovern & E. Allan Lind, *The Discovery Survey*, Law & Contemp. Probs., Autumn 1988, at 41.

EXHIBIT C

in person by neutral third parties, thus replacing interrogatories and depositions. It resulted in substantial savings in both time and cost.

## B. *Surveys Used to Help Assess Expert Acceptance in the Wake of* Daubert

Scientists who offer expert testimony at trial typically present their own opinions. These opinions may or may not be representative of the opinions of the scientific community at large. In deciding whether to admit such testimony, courts applying the *Frye* test must determine whether the science being offered is generally accepted by the relevant scientific community. Under *Daubert* as well, a relevant factor used to decide admissibility is the extent to which the theory or technique has received widespread acceptance. Properly conducted surveys can provide a useful way to gauge acceptance, and courts recently have been offered assistance from surveys that allegedly gauge relevant scientific opinion. As with any scientific research, the usefulness of the information obtained from a survey depends on the quality of research design. Several critical factors have emerged that have limited the value of some of these surveys: problems in defining the relevant target population and identifying an appropriate sampling frame, response rates that raise questions about the representativeness of the results, and a failure to ask questions that assess opinions on the relevant issue.

Courts deciding on the admissibility of polygraph tests have considered results from several surveys of purported experts. Surveys offered as providing evidence of relevant scientific opinion have tested respondents from several populations: (1) professional polygraph examiners,[32] (2) psychophysiologists (members of the Society for Psychophysiological Research),[33] and (3) distinguished psychologists (Fellows of the Division of General Psychology of the American Psychological Association).[34] Respondents in the first group expressed substantial confidence in the scientific accuracy of polygraph testing, and those in the third group expressed substantial doubts about it. Respondents in the second group were asked the same question across three surveys that differed in other aspects of their methodology (e.g., when testing occurred and what the response rate was). Although over 60% of those questioned in two of the three surveys characterized the polygraph as a useful diagnostic tool, one of the surveys was conducted in 1982 and the more recent survey, published in 1984, achieved only a 30% response rate. The third

32. See plaintiff's survey described in Meyers v. Arcudi, 947 F. Supp. 581, 588 (D. Conn. 1996).

33. Susan L. Amato & Charles R. Honts, *What Do Psychophysiologists Think About Polygraph Tests? A Survey of the Membership of SPR,* 31 Psychophysiology S22 [abstract]; Gallup Organization, *Survey of Members of the Society for Psychological Research Concerning Their Opinions of Polygraph Test Interpretation,* 13 Polygraph 153 (1984); William G. Iacono & David T. Lykken, *The Validity of the Lie Detector: Two Surveys of Scientific Opinion,* 82 J. Applied Psychol. 426 (1997).

34. Iacono & Lykken, *supra* note 33.

EXHIBIT C

survey, also conducted in 1984, achieved a response rate of 90% and found that only 44% of respondents viewed the polygraph as a useful diagnostic tool. On the basis of these inconsistent reactions from the several surveys, courts have determined that the polygraph has failed to achieve general acceptance in the scientific community.[35] In addition, however, courts have criticized the relevance of the population surveyed by proponents of the polygraph. For example, in *Meyers v. Arcudi* the court noted that the survey offered by proponents of the polygraph was a survey of "practitioners who estimated the accuracy of the control question technique [of polygraph testing] to be between 86% and 100%."[36] The court rejected the conclusions from this survey on the basis of a determination that the population surveyed was not the relevant scientific community, noting that "many of them . . . do not even possess advanced degrees and are not trained in the scientific method."[37]

The link between specialized expertise and self-interest poses a dilemma in defining the relevant scientific population. As the court in *United States v. Orians* recognized, "The acceptance in the scientific community depends in large part on how the relevant scientific community is defined."[38] In rejecting the defendants' urging that the court consider as relevant only psychophysiologists whose work is dedicated in large part to polygraph research, the court noted that *Daubert* "does not require the court to limit its inquiry to those individuals that base their livelihood on the acceptance of the relevant scientific theory. These individuals are often too close to the science and have a stake in its acceptance; i.e., their livelihood depends in part on the acceptance of the method."[39]

To be relevant to a *Frye* or *Daubert* inquiry on general acceptance, the questions asked in a survey of experts should assess opinions on the quality of the scientific theory and methodology, rather than asking whether or not the instrument should be used in a legal setting. Thus, a survey in which 60% of respondents agreed that the polygraph is "a useful diagnostic tool when considered with other available information," 1% viewed it as sufficiently reliable to be the sole determinant, and the remainder thought it entitled to little or no weight, failed to assess the relevant issue. As the court in *United States v. Cordoba* noted, because "useful" and "other available information" could have many meanings, "there is little wonder why [the response chosen by the majority of respondents] was most frequently selected."[40]

35. United States v. Scheffer, 523 U.S. 303, 309 (1998); United States v. Bishop, 64 F. Supp. 2d 1149 (D. Utah 1999); Meyers v. Arcudi, 947 F. Supp. 581, 588 (D. Conn. 1996); United States v. Varoudakis, 48 Fed. R. Evid. Serv. 1187 (D. Mass. 1998).

36. *Meyers v. Arcudi,* 947 F. Supp. at 588.

37. *Id.*

38. 9 F. Supp. 2d 1168, 1173 (D. Ariz. 1998).

39. *Id.*

40. 991 F. Supp. 1199 (C.D. Cal. 1998), *aff'd*, 194 F.3d 1053 (9th Cir. 1999).

**EXHIBIT C**

*Reference Guide on Survey Research*

A similar flaw occurred in a survey conducted by experts opposed to the use of the polygraph in trial proceedings. Survey respondents were asked whether they would advocate that courts admit into evidence the outcome of a polygraph test.[41] That question calls for more than an assessment of the accuracy of the polygraph, and thus does not appropriately limit expert opinion to issues within the expert's competence, that is, to the accuracy of the information provided by the test results. The survey also asked whether respondents agreed that the control question technique, the most common form of polygraph test, is accurate at least 85% of the time in real-life applications for guilty and innocent subjects.[42] Although polygraph proponents frequently claim an accuracy level of 85%, it is up to the courts to decide what accuracy level would be required to justify admissibility. A better approach would be to ask survey respondents to estimate the level of accuracy they believe the test is likely to produce.[43]

Surveys of experts are no substitute for an evaluation of whether the testimony an expert witness is offering will assist the trier of fact. Nonetheless, courts can use an assessment of opinion in the relevant scientific community to aid in determining whether a particular expert is proposing to use methods that would be rejected by a representative group of experts to arrive at the opinion the expert will offer. Properly conducted surveys can provide an economical way to collect and present information on scientific consensus and dissensus.

## C. Surveys Used to Help Assess Community Standards: Atkins v. Virginia

In *Atkins v. Virginia*,[44] the U.S. Supreme Court determined that the Eighth Amendment's prohibition of "cruel and unusual punishment" forbids the execution of mentally retarded persons.[45] Following the interpretation advanced in *Trop v. Dulles*[46] that "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society,"[47] the Court examined a variety of sources, including legislative judgments and public opinion polls, to find that a national consensus had developed barring such executions.[48]

41. *See* Iacono & Lykken, *supra* note 33, at 430, tbl. 2 (1997).

42. *Id.*

43. At least two assessments should be made: an estimate of the accuracy for guilty subjects and an estimate of the accuracy for innocent subjects.

44. 536 U.S. 304, 322 (2002).

45. Although some groups have recently moved away from the term "mental retardation" in response to concerns that the term may have pejorative connotations, mental retardation was the name used for the condition at issue in *Atkins* and it continues to be employed in federal laws, in cases determining eligibility for the death penalty, and as a diagnosis by the medical profession.

46. 356 U.S. 86 (1958).

47. *Id.* at 101.

48. *Atkins,* 536 U.S. at 313–16.

369

EXHIBIT C

In a vigorous dissent, Chief Justice Rehnquist objected to the use of the polls, arguing that legislative judgments and jury decisions should be the sole indicators of national opinion. He also objected to the particular polls cited in the majority opinion, identifying what he viewed as serious methodological weaknesses.

The Court has struggled since *Furman v. Georgia*[49] to develop an adequate way to measure public standards regarding the application of the death penalty to specific categories of cases. In relying primarily on surveys of state legislative actions, the Court has ignored the forces that influence whether an issue emerges on a legislative agenda, and the strong influence of powerful minorities on legislative actions.[50] Moreover, the various members of the Court have disagreed about whether states without any death penalty should be included in the count of states that bar the execution of a particular category of defendant.

The Court has sometimes considered jury verdicts in assessing public standards. In *Coker v. Georgia*,[51] the Court forbade the imposition of the death penalty for rape. Citing *Gregg v. Georgia*[52] for the proposition that "[t]he jury . . . is a significant and reliable objective index of contemporary values because it is so directly involved," the Court noted that "in the vast majority of cases [of rape in Georgia], at least 9 out of 10, juries have not imposed the death sentence."[53] In *Atkins*, Chief Justice Rehnquist complained about the absence of jury verdict data.[54] Had such data been available, however, they would have been irrelevant because a "survey" of the jurors who have served in such cases would constitute a biased sample of the public. A potential juror unwilling to impose the death penalty on a mentally retarded person would have been ineligible to serve in a capital case involving a mentally retarded defendant because the juror would not have been able to promise during voir dire that he or she would be willing to listen to the evidence and impose the death penalty if the evidence warranted it. Thus, the death-qualified jury in such a case would be composed only of representatives from that subset of citizens willing to execute a mentally retarded defendant, an unrepresentative and systematically biased sample.

Public opinion surveys can provide an important supplementary source of information about contemporary values.[55] The Court in *Atkins* was presented with data from 27 different polls and surveys,[56] 8 of them national and 19 statewide.

49. 408 U.S. 238 (1972).

50. *See* Stanford v. Kentucky, 492 U.S. 361 (1989), *abrogated by* Roper v. Simmons, 543 U.S. 551 (2005).

51. 433 U.S. 584, 596 (1977).

52. 428 U.S. 153, 181 (1976).

53. *Coker v. Georgia*, 433 U.S. at 596.

54. *See Atkins,* 536 U.S. at 323 (Rehnquist, C.J., dissenting).

55. *See id.* at 316 n.21 ("[T]heir consistency with the legislative evidence lends further support to our conclusion that there is a consensus").

56. The quality of any poll or survey depends on the methodology used, which should be fully visible to the court and the opposing party. *See* Section VII, *infra*.

**EXHIBIT C**

*Reference Guide on Survey Research*

The information on the polling data appeared in an amicus brief filed by the American Association on Mental Retardation.[57] Respondents were asked in various ways how they felt about imposing the death penalty on a mentally retarded defendant. In each poll, a majority of respondents expressed opposition to executing the mentally retarded. Chief Justice Rehnquist noted two weaknesses reflected in the data presented to the Court. First, almost no information was provided about the target populations from which the samples were drawn or the methodology of sample selection and data collection. Although further information was available on at least some of the surveys (e.g., the nationwide telephone survey of 1000 voters conducted in 1993 by the Tarrance Group used a sample based on voter turnout in the last three presidential elections), that information apparently was not part of the court record. This omission violates accepted reporting standards in survey research, and the information is needed if the decisionmaker is to intelligently evaluate the quality of the survey. Its absence in this instance occurred because the survey information was obtained from secondary sources.

A second objection raised by Chief Justice Rehnquist was that the wording of some of the questions required respondents to say merely whether they favored or were opposed to the use of the death penalty when the defendant is mentally retarded. It is unclear how a respondent who favors execution of a mentally retarded defendant only in a rare case would respond to that question. Some of the questions, however, did ask whether the respondent felt that it was never appropriate to execute the mentally retarded or whether it was appropriate in some circumstances.[58] In responses to these questions as well, a majority of respondents said that they found the execution of mentally retarded persons unacceptable under any circumstances. The critical point is that despite variations in wording of questions, the year in which the poll was conducted, who conducted it, where it was conducted, and how it was carried out, a majority of respondents (between 56% and 83%) expressed opposition to executing mentally retarded defendants. The Court thus was presented with a consistent set of findings, providing striking reinforcement for the *Atkins* majority's legislative analysis. Opinion poll data and legislative decisions have different strengths and weaknesses as indicators of contemporary values. The value of a multiple-measure approach is that it avoids a potentially misleading reliance on a single source or measure.

---

57. The data appear as an appendix to the Opinion of Chief Justice Rehnquist in *Atkins*.

58. Appendix to the Opinion of Chief Justice Rehnquist in *Atkins*. "Some people feel that there is nothing wrong with imposing the death penalty on persons who are mentally retarded, depending on the circumstances. Others feel that the death penalty should never be imposed on persons who are mentally retarded under any circumstances. Which of these views comes closest to your own?" The Tarrance Group, Death Penalty Poll, Q. 9 (Mar. 1993), citing Samuel R. Gross, *Update: American Public Opinion on the Death Penalty—It's Getting Personal*, 83 Cornell L. Rev. 1448, 1467 (1998).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## D. A Comparison of Survey Evidence and Individual Testimony

To illustrate the value of a survey, it is useful to compare the information that can be obtained from a competently done survey with the information obtained by other means. A survey is presented by a survey expert who testifies about the responses of a substantial number of individuals who have been selected according to an explicit sampling plan and asked the same set of questions by interviewers who were not told who sponsored the survey or what answers were predicted or preferred. Although parties presumably are not obliged to present a survey conducted in anticipation of litigation by a nontestifying expert if it produced unfavorable results,[59] the court can and should scrutinize the method of respondent selection for any survey that is presented.

A party using a nonsurvey method generally identifies several witnesses who testify about their own characteristics, experiences, or impressions. Although the party has no obligation to select these witnesses in any particular way or to report on how they were chosen, the party is not likely to select witnesses whose attributes conflict with the party's interests. The witnesses who testify are aware of the parties involved in the case and have discussed the case before testifying.

Although surveys are not the only means of demonstrating particular facts, presenting the results of a well-done survey through the testimony of an expert is an efficient way to inform the trier of fact about a large and representative group of potential witnesses. In some cases, courts have described surveys as the most direct form of evidence that can be offered.[60] Indeed, several courts have drawn negative inferences from the absence of a survey, taking the position that failure to undertake a survey may strongly suggest that a properly done survey would not support the plaintiff's position.[61]

59. *In re* FedEx Ground Package System, 2007 U.S. Dist. LEXIS 27086 (N.D. Ind. April 10, 2007); Loctite Corp. v. National Starch & Chem. Corp., 516 F. Supp. 190, 205 (S.D.N.Y. 1981) (distinguishing between surveys conducted in anticipation of litigation and surveys conducted for non-litigation purposes which cannot be reproduced because of the passage of time, concluding that parties should not be compelled to introduce the former at trial, but may be required to provide the latter).

60. *See, e.g.*, Morrison Entm't Group v. Nintendo of Am., 56 Fed. App'x. 782, 785 (9th Cir. Cal. 2003).

61. Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 695 (2d Cir. 1994); Henri's Food Prods. Co. v. Kraft, Inc., 717 F.2d 352, 357 (7th Cir. 1983); Medici Classics Productions LLC v. Medici Group LLC, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008); Citigroup v. City Holding Co., 2003 U.S. Dist. LEXIS 1845 (S.D.N.Y. Feb. 10, 2003); Chum Ltd. v. Lisowski, 198 F. Supp. 2d 530 (S.D.N.Y. 2002).

**EXHIBIT C**

# II. Purpose and Design of the Survey

## A. Was the Survey Designed to Address Relevant Questions?

The report describing the results of a survey should include a statement describing the purpose or purposes of the survey. One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy (e.g., to estimate damages in an antitrust suit or to assess consumer confusion in a trademark case). Surveys not conducted specifically in preparation for, or in response to, litigation may provide important information,[62] but they frequently ask irrelevant questions[63] or select inappropriate samples of respondents for study.[64] Nonetheless, surveys do not always achieve their stated goals. Thus, the content and execution of a survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court.[65] Moreover, if a survey was not designed for purposes of litigation, one source of bias is less likely: The party presenting the survey is less likely to have designed and constructed the survey to provide evidence supporting its side of the issue in controversy.

---

62. *See, e.g.,* Wright v. Jeep Corp., 547 F. Supp. 871, 874 (E.D. Mich. 1982). Indeed, as courts increasingly have been faced with scientific issues, parties have requested in a number of recent cases that the courts compel production of research data and testimony by unretained experts. The circumstances under which an unretained expert can be compelled to testify or to disclose research data and opinions, as well as the extent of disclosure that can be required when the research conducted by the expert has a bearing on the issues in the case, are the subject of considerable current debate. *See, e.g.,* Joe S. Cecil, *Judicially Compelled Disclosure of Research Data,* 1 Cts. Health Sci. & L. 434 (1991); Richard L. Marcus, *Discovery Along the Litigation/Science Interface,* 57 Brook. L. Rev. 381, 393–428 (1991); *see also Court-Ordered Disclosure of Academic Research: A Clash of Values of Science and Law,* Law & Contemp. Probs., Summer 1996, at 1.

63. *See* Loctite Corp. v. National Starch & Chem. Corp., 516 F. Supp. 190, 206 (S.D.N.Y. 1981) (marketing surveys conducted before litigation were designed to test for brand awareness, while the "single issue at hand . . . [was] whether consumers understood the term 'Super Glue' to designate glue from a single source").

64. In *Craig v. Boren,* 429 U.S. 190 (1976), the state unsuccessfully attempted to use its annual roadside survey of the blood alcohol level, drinking habits, and preferences of drivers to justify prohibiting the sale of 3.2% beer to males under the age of 21 and to females under the age of 18. The data were biased because it was likely that the male would be driving if both the male and female occupants of the car had been drinking. As pointed out in 2 Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy: Tort Law, Evidence, and Health 527 (1988), the roadside survey would have provided more relevant data if all occupants of the cars had been included in the survey (and if the type and amount of alcohol most recently consumed had been requested so that the consumption of 3.2% beer could have been isolated).

65. *See* Merisant Co. v. McNeil Nutritionals, LLC, 242 F.R.D. 315 (E.D. Pa. 2007).

**EXHIBIT C**

## B. Was Participation in the Design, Administration, and Interpretation of the Survey Appropriately Controlled to Ensure the Objectivity of the Survey?

An early handbook for judges recommended that survey interviews be "conducted independently of the attorneys in the case."[66] Some courts interpreted this to mean that any evidence of attorney participation is objectionable.[67] A better interpretation is that the attorney should have no part in carrying out the survey.[68] However, some attorney involvement in the survey design is necessary to ensure that relevant questions are directed to a relevant population.[69] The 2009 amendments to Federal Rule of Civil Procedure 26(a)(2)[70] no longer allow an inquiry into the nature of communications between attorneys and experts, and so the role of attorneys in constructing surveys may become less apparent. The key issues for the trier of fact concerning the design of the survey are the objectivity and relevance of the questions on the survey and the appropriateness of the definition of the population used to guide sample selection. These aspects of the survey are visible to the trier of fact and can be judged on their quality, irrespective of who suggested them. In contrast, the interviews themselves are not directly visible, and any potential bias is minimized by having interviewers and respondents blind to the purpose and sponsorship of the survey and by excluding attorneys from any part in conducting interviews and tabulating results.[71]

---

66. Judicial Conference of the United States, Handbook of Recommended Procedures for the Trial of Protracted Cases 75 (1960).

67. *See, e.g.*, Boehringer Ingelheim G.m.b.H. v. Pharmadyne Lab., 532 F. Supp. 1040, 1058 (D.N.J. 1980).

68. Upjohn Co. v. American Home Prods. Corp., No. 1-95-CV-237, 1996 U.S. Dist. LEXIS 8049, at *42 (W.D. Mich. Apr. 5, 1996) (objection that "counsel reviewed the design of the survey carries little force with this Court because [opposing party] has not identified any flaw in the survey that might be attributed to counsel's assistance"). For cases in which attorney participation was linked to significant flaws in the survey design, see Johnson v. Big Lots Stores, Inc.*,* No. 04-321, 2008 U.S. Dist. LEXIS 35316, at *20 (E.D. La. April 29, 2008); United States v. Southern Indiana Gas & Elec. Co., 258 F. Supp. 2d 884, 894 (S.D. Ind. 2003); Gibson v. County of Riverside, 181 F. Supp. 2d 1057, 1069 (C.D. Cal. 2002).

69. *See* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:166 (4th ed. 2003).

70. www.uscourts.gov/News/TheThirdBranch/10-11-01/Rules_Recommendations_Take_Effect_December_1_2010.aspx.

71. *Gibson,* 181 F. Supp. 2d at 1068.

**EXHIBIT C**

*Reference Guide on Survey Research*

## C. Are the Experts Who Designed, Conducted, or Analyzed the Survey Appropriately Skilled and Experienced?

Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, political science, marketing, communication sciences, statistics, or a related discipline; that training should include courses in survey research methods, sampling, measurement, interviewing, and statistics. In some cases, professional experience in teaching or conducting and publishing survey research may provide the requisite background. In all cases, the expert must demonstrate an understanding of foundational, current, and best practices in survey methodology, including sampling,[72] instrument design (questionnaire and interview construction), and statistical analysis.[73] Publication in peer-reviewed journals, authored books, fellowship status in professional organizations, faculty appointments, consulting experience, research grants, and membership on scientific advisory panels for government agencies or private foundations are indications of a professional's area and level of expertise. In addition, some surveys involving highly technical subject matter (e.g., the particular preferences of electrical engineers for various pieces of electrical equipment and the bases for those preferences) or special populations (e.g., developmentally disabled adults with limited cognitive skills) may require experts to have some further specialized knowledge. Under these conditions, the survey expert also should be able to demonstrate sufficient familiarity with the topic or population (or assistance from an individual on the research team with suitable expertise) to design a survey instrument that will communicate clearly with relevant respondents.

## D. Are the Experts Who Will Testify About Surveys Conducted by Others Appropriately Skilled and Experienced?

Parties often call on an expert to testify about a survey conducted by someone else. The secondary expert's role is to offer support for a survey commissioned by the party who calls the expert, to critique a survey presented by the opposing party, or to introduce findings or conclusions from a survey not conducted in preparation for litigation or by any of the parties to the litigation. The trial court should take into account the exact issue that the expert seeks to testify about and the nature of the expert's field of expertise.[74] The secondary expert who gives an opinion

---

72. The one exception is that sampling expertise would be unnecessary if the survey were administered to all members of the relevant population. *See, e.g.*, McGovern & Lind, *supra* note 31.

73. If survey expertise is being provided by several experts, a single expert may have general familiarity but not special expertise in all these areas.

74. *See* Margaret A. Berger, The Admissibility of Expert Testimony, Section III.A, in this manual.

**EXHIBIT C**

about the adequacy and interpretation of a survey not only should have general skills and experience with surveys and be familiar with all of the issues addressed in this reference guide, but also should demonstrate familiarity with the following properties of the survey being discussed:

1. Purpose of the survey;
2. Survey methodology,[75] including
    a. the target population,
    b. the sampling design used in conducting the survey,
    c. the survey instrument (questionnaire or interview schedule), and
    d. (for interview surveys) interviewer training and instruction;
3. Results, including rates and patterns of missing data; and
4. Statistical analyses used to interpret the results.

# III. Population Definition and Sampling

## A. Was an Appropriate Universe or Population Identified?

One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe).[76] The target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent. Thus, in trademark litigation, the relevant population in some disputes may include all prospective and past purchasers of the plaintiff's goods or services and all prospective and past purchasers of the defendant's goods or services. Similarly, the population for a discovery survey may include all potential plaintiffs or all employees who worked for Company A between two specific dates. In a community survey designed to provide evidence for a motion for a change of venue, the relevant population consists of all jury-eligible citizens in the community in which the trial is to take place.[77]

---

75. *See* A & M Records, Inc. v. Napster, Inc., 2000 U.S. Dist. LEXIS 20668 (N.D. Cal. Aug. 10, 2000) (holding that expert could not attest credibly that the surveys upon which he relied conformed to accepted survey principles because of his minimal role in overseeing the administration of the survey and limited expert report).

76. Identification of the proper target population or universe is recognized uniformly as a key element in the development of a survey. *See, e.g.*, Judicial Conference of the U.S., *supra* note 66; MCL 4th, *supra* note 16, § 11.493; *see also* 3 McCarthy, *supra* note 69, § 32:166; Council of Am. Survey Res. Orgs., Code of Standards and Ethics for Survey Research § III.A.3 (2010).

77. A second relevant population may consist of jury-eligible citizens in the community where the party would like to see the trial moved. By questioning citizens in both communities, the survey can test whether moving the trial is likely to reduce the level of animosity toward the party requesting the change of venue. *See* United States v. Haldeman, 559 F.2d 31, 140, 151, app. A at 176–79 (D.C. Cir. 1976) (court denied change of venue over the strong objection of Judge MacKinnon, who cited survey evidence that Washington, D.C., residents were substantially more likely to conclude, before

EXHIBIT C

*Reference Guide on Survey Research*

The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers. For example, consumers who are prospective purchasers may know more about the product category than consumers who are not considering making a purchase.

The universe must be defined carefully. For example, a commercial for a toy or breakfast cereal may be aimed at children, who in turn influence their parents' purchases. If a survey assessing the commercial's tendency to mislead were conducted based on a sample from the target population of prospective and actual adult purchasers, it would exclude a crucial relevant population. The appropriate population in this instance would include children as well as parents.[78]

## B. Did the Sampling Frame Approximate the Population?

The target population consists of all the individuals or units that the researcher would like to study. The sampling frame is the source (or sources) from which the sample actually is drawn. The surveyor's job generally is easier if a complete list of every eligible member of the population is available (e.g., all plaintiffs in a discovery survey), so that the sampling frame lists the identity of all members of the target population. Frequently, however, the target population includes members who are inaccessible or who cannot be identified in advance. As a result, reasonable compromises are sometimes required in developing the sampling frame. The survey report should contain (1) a description of the target population, (2) a description of the sampling frame from which the sample is to be drawn, (3) a discussion of the difference between the target population and the sampling frame, and, importantly, (4) an evaluation of the likely consequences of that difference.

A survey that provides information about a wholly irrelevant population is itself irrelevant.[79] Courts are likely to exclude the survey or accord it little

trial, that the defendants were guilty); *see also* People v. Venegas, 31 Cal. Rptr. 2d 114, 117 (Cal. Ct. App. 1994) (change of venue denied because defendant failed to show that the defendant would face a less hostile jury in a different court).

78. *See, e.g.*, Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76 (2d Cir. 1981) (surveying children users of the product rather than parent purchasers). Children and some other populations create special challenges for researchers. For example, very young children should not be asked about sponsorship or licensing, concepts that are foreign to them. Concepts, as well as wording, should be age appropriate.

79. A survey aimed at assessing how persons in the trade respond to an advertisement should be conducted on a sample of persons in the trade and not on a sample of consumers. *See* Home Box Office v. Showtime/The Movie Channel, 665 F. Supp. 1079, 1083 (S.D.N.Y.), *aff'd in part and vacated in part*, 832 F.2d 1311 (2d Cir. 1987); J & J Snack Food Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 371–72 (N.J. 2002). *But see* Lon Tai Shing Co. v. Koch + Lowy, No. 90-C4464, 1990 U.S. Dist. LEXIS 19123, at ⋆50 (S.D.N.Y. Dec. 14, 1990), in which the judge was willing to find likelihood of consumer confusion from a survey of lighting store salespersons questioned by a survey researcher posing as a customer. The court was persuaded that the salespersons who were misstating the source

EXHIBIT C

*Reference Manual on Scientific Evidence*

weight.[80] Thus, when the plaintiff submitted the results of a survey to prove that the green color of its fishing rod had acquired a secondary meaning, the court gave the survey little weight in part because the survey solicited the views of fishing rod dealers rather than consumers.[81] More commonly, however, the sampling frame and the target population have some overlap, but the overlap is imperfect: The sampling frame excludes part of the target population, that is, it is under-inclusive, or the sampling frame includes individuals who are not members of the target population, that is, it is overinclusive relative to the target population. Coverage error is the term used to describe inconsistencies between a sampling frame and a target population. If the coverage is underinclusive, the survey's value depends on the proportion of the target population that has been excluded from the sampling frame and the extent to which the excluded population is likely to respond differently from the included population. Thus, a survey of spectators and participants at running events would be sampling a sophisticated subset of those likely to purchase running shoes. Because this subset probably would consist of the consumers most knowledgeable about the trade dress used by companies that sell running shoes, a survey based on this sampling frame would be likely to substantially overrepresent the strength of a particular design as a trademark, and the extent of that overrepresentation would be unknown and not susceptible to any reasonable estimation.[82]

Similarly, in a survey designed to project demand for cellular phones, the assumption that businesses would be the primary users of cellular service led surveyors to exclude potential nonbusiness users from the survey. The Federal Communications Commission (FCC) found the assumption unwarranted and concluded that the research was flawed, in part because of this underinclusive coverage.[83] With the growth in individual cell phone use over time, noncoverage error would be an even greater problem for this survey today.

of the lamp, whether consciously or not, must have believed reasonably that the consuming public would be likely to rely on the salespersons' inaccurate statements about the name of the company that manufactured the lamp they were selling.

80. *See* Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734 (E.D. Mich. 2003).

81. *See* R.L. Winston Rod Co. v. Sage Mfg. Co., 838 F. Supp. 1396, 1401–02 (D. Mont. 1993).

82. *See* Brooks Shoe Mfg. Co. v. Suave Shoe Corp., 533 F. Supp. 75, 80 (S.D. Fla. 1981), *aff'd*, 716 F.2d 854 (11th Cir. 1983); *see also* Hodgdon Power Co. v. Alliant Techsystems, Inc., 512 F. Supp. 2d 1178 (D. Kan. 2007) (excluding survey on gunpowder brands distributed at plaintiff's promotional booth at a shooting tournament); Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454, 1467 (D. Kan. 1996) (survey flawed in failing to include sporting goods customers who constituted a major portion of customers). *But see* Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 294–95 (7th Cir. 1998) (survey of store personnel admissible because relevant market included both distributors and ultimate purchasers).

83. *See* Gencom, Inc., 56 Rad. Reg. 2d (P&F) 1597, 1604 (1984). This position was affirmed on appeal. *See* Gencom, Inc. v. FCC, 832 F.2d 171, 186 (D.C. Cir. 1987); *see also* Beacon Mut. Ins. Co. v. Onebeacon Ins. Corp, 376 F. Supp. 2d 251, 261 (D.R.I. 2005) (sample included only defendant's insurance agents and lack of confusion among those agents was "nonstartling").

378

EXHIBIT C

*Reference Guide on Survey Research*

In some cases, it is difficult to determine whether a sampling frame that omits some members of the population distorts the results of the survey and, if so, the extent and likely direction of the bias. For example, a trademark survey was designed to test the likelihood of confusing an analgesic currently on the market with a new product that was similar in appearance.[84] The plaintiff's survey included only respondents who had used the plaintiff's analgesic, and the court found that the target population should have included users of other analgesics, "so that the full range of potential customers for whom plaintiff and defendants would compete could be studied."[85] In this instance, it is unclear whether users of the plaintiff's product would be more or less likely to be confused than users of the defendants' product or users of a third analgesic.[86]

An overinclusive sampling frame generally presents less of a problem for inter-pretation than does an underinclusive sampling frame.[87] If the survey expert can demonstrate that a sufficiently large (and representative) subset of respondents in the survey was drawn from the appropriate sampling frame, the responses obtained from that subset can be examined, and inferences about the relevant population can be drawn based on that subset.[88] If the relevant subset cannot be identified, however, an overbroad sampling frame will reduce the value of the survey.[89] If the sampling frame does not include important groups in the target population, there is generally no way to know how the unrepresented members of the target population would have responded.[90]

84. *See* American Home Prods. Corp. v. Barr Lab., Inc., 656 F. Supp. 1058 (D.N.J.), *aff'd*, 834 F.2d 368 (3d Cir. 1987).

85. *Id.* at 1070.

86. *See also* Craig v. Boren, 429 U.S. 190 (1976).

87. *See* Schwab v. Philip Morris USA, Inc. 449 F. Supp. 2d 992, 1134–35 (E.D.N.Y. 2006) ("Studies evaluating broadly the beliefs of low tar smokers generally are relevant to the beliefs of "light" smokers more specifically.").

88. *See* National Football League Props. Inc. v. Wichita Falls Sportswear, Inc. 532 F. Supp. 651, 657–58 (W.D. Wash. 1982).

89. *See* Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 502 F.3d 504, 518 (6th Cir. 2007) (lower court was correct in giving little weight to survey with overbroad universe); Big Dog Motor-cycles, L.L.C. v. Big Dog Holdings, Inc., 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) (universe com-posed of prospective purchasers of all t–shirts and caps overinclusive for evaluating reactions of buyers likely to purchase merchandise at motorcycle dealerships). *See also* Schieffelin & Co. v. Jack Co. of Boca, 850 F. Supp. 232, 246 (S.D.N.Y. 1994).

90. *See, e.g.*, Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263–64 (5th Cir. 1980) (court found both plaintiff's and defendant's surveys substantially defective for a systematic failure to include parts of the relevant population); Scott Fetzer Co. v. House of Vacuums, Inc., 381 F.3d 477 (5th Cir. 2004) (universe drawn from plaintiff's customer list underinclusive and likely to differ in their familiar-ity with plaintiff's marketing and distribution techniques).

EXHIBIT C

*Reference Manual on Scientific Evidence*

## C. Does the Sample Approximate the Relevant Characteristics of the Population?

Identification of a survey population must be followed by selection of a sample that accurately represents that population.[91] The use of probability sampling techniques maximizes both the representativeness of the survey results and the ability to assess the accuracy of estimates obtained from the survey.

Probability samples range from simple random samples to complex multistage sampling designs that use stratification, clustering of population elements into various groupings, or both. In all forms of probability sampling, each element in the relevant population has a known, nonzero probability of being included in the sample.[92] In simple random sampling, the most basic type of probability sampling, every element in the population has a known, equal probability of being included in the sample, and all possible samples of a given size are equally likely to be selected.[93] Other probability sampling techniques include (1) stratified random sampling, in which the researcher subdivides the population into mutually exclusive and exhaustive subpopulations, or strata, and then randomly selects samples from within these strata; and (2) cluster sampling, in which elements are sampled in groups or clusters, rather than on an individual basis.[94] Note that selection probabilities do not need to be the same for all population elements; however, if the probabilities are unequal, compensatory adjustments should be made in the analysis.

Probability sampling offers two important advantages over other types of sampling. First, the sample can provide an unbiased estimate that summarizes the responses of all persons in the population from which the sample was drawn; that is, the expected value of the sample estimate is the population value being estimated. Second, the researcher can calculate a confidence interval that describes explicitly how reliable the sample estimate of the population is likely to be. If the sample is unbiased, the difference between the estimate and the exact value is called the sampling error.[95] Thus, suppose a survey collected responses from a simple random sample of 400 dentists selected from the population of all dentists

---

91. MCL 4th, *supra* note 16, § 11.493. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section II.B, in this manual.

92. The exception is that population elements omitted from the sampling frame have a zero probability of being sampled.

93. Systematic sampling, in which every *n*th unit in the population is sampled and the starting point is selected randomly, fulfills the first of these conditions. It does not fulfill the second, because no systematic sample can include elements adjacent to one another on the list of population members from which the sample is drawn. Except in unusual situations when periodicities occur, systematic samples and simple random samples generally produce the same results. Thomas Plazza, *Fundamentals of Applied Sampling*, *in* Handbook of Survey Research, *supra* note 1, at 139, 145.

94. *Id.* at 139, 150–63.

95. *See* David H. Kaye & David A. Freedman, *supra* note 91, Glossary, for a definition of sampling error.

**EXHIBIT C**

*Reference Guide on Survey Research*

licensed to practice in the United States and found that 80, or 20%, of them mistakenly believed that a new toothpaste, Goldgate, was manufactured by the makers of Colgate. A survey expert could properly compute a confidence interval around the 20% estimate obtained from this sample. If the survey were repeated a large number of times, and a 95% confidence interval was computed each time, 95% of the confidence intervals would include the actual percentage of dentists in the entire population who would believe that Goldgate was manufactured by the makers of Colgate.[96] In this example, the margin of error is ±4%, and so the confidence interval is the range between 16% and 24%, that is, the estimate (20%) plus or minus 4%.

All sample surveys produce estimates of population values, not exact measures of those values. Strictly speaking, the margin of error associated with the sample estimate assumes probability sampling. Assuming a probability sample, a confidence interval describes how stable the mean response in the sample is likely to be. The width of the confidence interval depends on three primary characteristics:

1. Size of the sample (the larger the sample, the narrower the interval);
2. Variability of the response being measured; and
3. Confidence level the researcher wants to have.[97]

Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value.[98]

Stratified probability sampling can be used to obtain more precise response estimates by using what is known about characteristics of the population that are likely to be associated with the response being measured. Suppose, for example, we anticipated that more-experienced and less-experienced dentists might respond differently to Goldgate toothpaste, and we had information on the year in which each dentist in the population began practicing. By dividing the population of dentists into more- and less-experienced strata (e.g., in practice 15 years or more versus in practice less than 15 years) and then randomly sampling within experience stratum, we would be able to ensure that the sample contained precisely

96. Actually, because survey interviewers would be unable to locate some dentists and some dentists would be unwilling to participate in the survey, technically the population to which this sample would be projectable would be all dentists with current addresses who would be willing to participate in the survey if they were asked. The expert should be prepared to discuss possible sources of bias due to, for example, an address list that is not current.

97. When the sample design does not use a simple random sample, the confidence interval will be affected.

98. To increase the likelihood that the confidence interval contains the actual population value (e.g., from 95% to 99%) without increasing the sample size, the width of the confidence interval can be expanded. An increase in the confidence interval brings an increase in the confidence level. For further discussion of confidence intervals, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.A, in this manual.

EXHIBIT C

proportionate representation from each stratum, in this case, more- and less-experienced dentists. That is, if 60% of dentists were in practice 15 years or more, we could select 60% of the sample from the more-experienced stratum and 40% from the less-experienced stratum and be sure that the sample would have proportionate representation from each stratum, reducing the likely sampling error.[99]

In proportionate stratified probability sampling, as in simple random sampling, each individual member of the population has an equal chance of being selected. Stratified probability sampling can also disproportionately sample from different strata, a procedure that will produce more precise estimates if some strata are more heterogeneous than others on the measure of interest.[100] Disproportionate sampling may also used to enable the survey to provide separate estimates for particular subgroups. With disproportionate sampling, sampling weights must be used in the analysis to accurately describe the characteristics of the population as a whole.

Although probability sample surveys often are conducted in organizational settings and are the recommended sampling approach in academic and government publications on surveys, probability sample surveys can be expensive when in-person interviews are required, the target population is dispersed widely, or members of the target population are rare. A majority of the consumer surveys conducted for Lanham Act litigation present results from nonprobability convenience samples.[101] They are admitted into evidence based on the argument that nonprobability sampling is used widely in marketing research and that "results of these studies are used by major American companies in making decisions of considerable consequence."[102] Nonetheless, when respondents are not selected randomly from the relevant population, the expert should be prepared to justify the method used to select respondents. Special precautions are required to reduce the likelihood of biased samples.[103] In addition, quantitative values computed from such samples (e.g., percentage of respondents indicating confusion) should be viewed as rough

99. *See* Pharmacia Corp. v. Alcon Lab., 201 F. Supp. 2d 335, 365 (D.N.J. 2002).

100. Robert M. Groves et al., Survey Methodology, Stratification and Stratified Sampling, 106–18 (2004).

101. Jacob Jacoby & Amy H. Handlin, *Non-Probability Sampling Designs for Litigation Surveys*, 81 Trademark Rep. 169, 173 (1991). For probability surveys conducted in trademark cases, see James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266 (7th Cir. 1976); Nightlight Systems, Inc., v. Nite Lights Franchise Sys., 2007 U.S. Dist. LEXIS 95565 (N.C. Ga. July 17, 2007); National Football League Props., Inc. v. Wichita Falls Sportswear, Inc*.,* 532 F. Supp. 651 (W.D. Wash. 1982).

102. National Football League Props., Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 515 (D.N.J. 1986). A survey of members of the Council of American Survey Research Organizations, the national trade association for commercial survey research firms in the United States, revealed that 95% of the in-person independent contacts in studies done in 1985 took place in malls or shopping centers. Jacoby & Handlin, *supra* note 101, at 172–73, 176. More recently, surveys conducted over the Internet have been administered to samples of respondents drawn from panels of volunteers; *see infra* Section IV.G.4 for a discussion of online surveys. Although panel members may be randomly selected from the panel population to complete the survey, the panel population itself is not usually the product of a random selection process.

103. *See infra* Sections III.D–E.

EXHIBIT C

*Reference Guide on Survey Research*

indicators rather than as precise quantitative estimates.[104] Confidence intervals technically should not be computed, although if the calculation shows a wide interval, that may be a useful indication of the limited value of the estimate.

## D. *What Is the Evidence That Nonresponse Did Not Bias the Results of the Survey?*

Even when a sample is drawn randomly from a complete list of elements in the target population, responses or measures may be obtained on only part of the selected sample. If this lack of response is distributed randomly, valid inferences about the population can be drawn with assurance using the measures obtained from the available elements in the sample. The difficulty is that nonresponse often is not random, so that, for example, persons who are single typically have three times the "not at home" rate in U.S. Census Bureau surveys as do family members.[105] Efforts to increase response rates include making several attempts to contact potential respondents, sending advance letters,[106] and providing financial or nonmonetary incentives for participating in the survey.[107]

The key to evaluating the effect of nonresponse in a survey is to determine as much as possible the extent to which nonrespondents differ from the respondents in the nature of the responses they would provide if they were present in the sample. That is, the difficult question to address is the extent to which nonresponse has biased the pattern of responses by undermining the representativeness of the sample and, if it has, the direction of that bias. It is incumbent on the expert presenting the survey results to analyze the level and sources of nonresponse, and to assess how that nonresponse is likely to have affected the results. On some occasions, it may be possible to anticipate systematic patterns of nonresponse. For example, a survey that targets a population of professionals may encounter difficulty in obtaining the same level of participation from individuals with high-volume practices that can be obtained from those with lower-volume practices. To enable the researcher to assess whether response rate varies with the volume of practice, it may be possible to identify in advance potential respondents

104. The court in Kinetic Concept, Inc. v. Bluesky Medical Corp., 2006 U.S. Dist. LEXIS 60187, *14 (W.D. Tex. Aug. 11, 2006), found the plaintiff's survey using a nonprobability sample to be admissible and permitted the plaintiff's expert to present results from a survey using a convenience sample. The court then assisted the jury by providing an instruction on the differences between probability and convenience samples and the estimates obtained from each.

105. 2 Gastwirth, *supra* note 64, at 501. This volume contains a useful discussion of sampling, along with a set of examples. *Id*. at 467.

106. Edith De Leeuw et al., *The Influence of Advance Letters on Response in Telephone Surveys: A Meta-analysis*, 71 Pub. Op. Q. 413 (2007) (advance letters effective in increasing response rates in telephone as well as mail and face-to-face surveys).

107. Erica Ryu et al., *Survey Incentives: Cash vs. In-kind; Face-to-Face vs. Mail; Response Rate vs. Nonresponse Error*, 18 Int'l J. Pub. Op. Res. 89 (2005).

383

EXHIBIT C

*Reference Manual on Scientific Evidence*

with varying years of experience. Even if it is not possible to know in advance the level of experience of each potential member in the target population and to design a sampling plan that will produce representative samples at each level of experience, the survey itself can include questions about volume of practice that will permit the expert to assess how experience level may have affected the pattern of results.[108]

Although high response rates (i.e., 80% or higher)[109] are desirable because they generally eliminate the need to address the issue of potential bias from nonresponse,[110] such high response rates are increasingly difficult to achieve. Survey nonresponse rates have risen substantially in recent years, along with the costs of obtaining responses, and so the issue of nonresponse has attracted substantial attention from survey researchers.[111] Researchers have developed a variety of approaches to adjust for nonresponse, including weighting obtained responses in proportion to known demographic characteristics of the target population, comparing the pattern of responses from early and late responders to mail surveys, or the pattern of responses from easy-to-reach and hard-to-reach responders in telephone surveys, and imputing estimated responses to nonrespondents based on known characteristics of those who have responded. All of these techniques can only approximate the response patterns that would have been obtained if non-respondents had responded. Nonetheless, they are useful for testing the robustness of the findings based on estimates obtained from the simple aggregation of answers to questions given by responders.

To assess the general impact of the lower response rates, researchers have conducted comparison studies evaluating the results obtained from surveys with

---

108. In *People v. Williams, supra* note 22, a published survey of experts in eyewitness research was used to show general acceptance of various eyewitness phenomena. *See* Saul Kassin et al., *On the "General Acceptance" of Eyewitness Testimony Research: A New Survey of the Experts,* 56 Am. Psychologist 405 (2001). The survey included questions on the publication activity of respondents and compared the responses of those with high and low research productivity. Productivity levels in the respondent sample suggested that respondents constituted a blue ribbon group of leading researchers. *Williams,* 830 N.Y.S.2d at 457 n.16. *See also* Pharmacia Corp. v. Alcon Lab., Inc., 201 F. Supp. 2d 335 (D.N.J. 2002).

109. Note that methods of computing response rates vary. For example, although response rate can be generally defined as the number of complete interviews with reporting units divided by the number of eligible reporting units in the sample, decisions on how to treat partial completions and how to estimate the eligibility of nonrespondents can produce differences in measures of response rate. *E.g.,* American Association of Public Opinion Research, Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys (rev. 2008), *available at* www. Aapor.org/uploads/Standard_Definitions_07-08_Final.pdf.

110. Office of Management and Budget, Standards and Guidelines for Statistical Surveys (Sept. 2006), Guideline 1.3.4: Plan for a nonresponse bias analysis if the expected unit response rate is below 80%. *See* Albert v. Zabin, 2009 Mass. App. Unpub. LEXIS 572 (July 14, 2009) reversing summary judgment that had excluded surveys with response rates of 27% and 31% based on a thoughtful analysis of measures taken to assess potential nonresponse bias.

111. *E.g.,* Richard Curtin et al., *Changes in Telephone Survey Nonresponse Over the Past Quarter Century,* 69 Pub. Op. Q. 87 (2005); Survey Nonresponse (Robert M. Groves et al. eds., 2002).

EXHIBIT C

*Reference Guide on Survey Research*

varying response rates.[112] Contrary to earlier assumptions, surprisingly comparable results have been obtained in many surveys with varying response rates, suggesting that surveys may achieve reasonable estimates even with relatively low response rates. The key is whether nonresponse is associated with systematic differences in response that cannot be adequately modeled or assessed.

Determining whether the level of nonresponse in a survey seriously impairs inferences drawn from the results of a survey generally requires an analysis of the determinants of nonresponse. For example, even a survey with a high response rate may seriously underrepresent some portions of the population, such as the unemployed or the poor. If a general population sample is used to chart changes in the proportion of the population that knows someone with HIV, the survey would underestimate the population value if some groups more likely to know someone with HIV (e.g., intravenous drug users) are underrepresented in the sample. The survey expert should be prepared to provide evidence on the potential impact of nonresponse on the survey results.

In surveys that include sensitive or difficult questions, particularly surveys that are self-administered, some respondents may refuse to provide answers or may provide incomplete answers (i.e., item rather than unit nonresponse).[113] To assess the impact of nonresponse to a particular question, the survey expert should analyze the differences between those who answered and those who did not answer. Procedures to address the problem of missing data include recontacting respondents to obtain the missing answers and using the respondent's other answers to predict the missing response (i.e., imputation).[114]

## E. What Procedures Were Used to Reduce the Likelihood of a Biased Sample?

If it is impractical for a survey researcher to sample randomly from the entire target population, the researcher still can apply probability sampling to some aspects of respondent selection to reduce the likelihood of biased selection. For example, in many studies the target population consists of all consumers or purchasers of a product. Because it is impractical to randomly sample from that population, research is often conducted in shopping malls where some members of the target population may not shop. Mall locations, however, can be sampled randomly from a list of possible mall sites. By administering the survey at several different

---

112. *E.g.*, Daniel M. Merkle & Murray Edelman, *Nonresponse in Exit Polls: A Comprehensive Analysis*, *in* Survey Nonresponse, *supra* note 111, at 243–57 (finding minimal nonresponse error associated with refusals to participate in in-person exit polls); *see also* Jon A. Krosnick, *Survey Research*, 50 Ann. Rev. Psychol. 537 (1999).

113. *See* Roger Tourangeau et al., The Psychology of Survey Response (2000).

114. *See* Paul D. Allison, *Missing Data*, *in* Handbook of Survey Research, *supra* note 1, at 630; *see also* Survey Nonresponse, *supra* note 111.

**EXHIBIT C**

malls, the expert can test for and report on any differences observed across sites. To the extent that similar results are obtained in different locations using different onsite interview operations, it is less likely that idiosyncrasies of sample selection or administration can account for the results.[115] Similarly, because the characteristics of persons visiting a shopping center vary by day of the week and time of day, bias in sampling can be reduced if the survey design calls for sampling time segments as well as mall locations.[116]

In mall intercept surveys, the organization that manages the onsite interview facility generally employs recruiters who approach potential survey respondents in the mall and ascertain if they are qualified and willing to participate in the survey. If a potential respondent agrees to answer the questions and meets the specified criteria, he or she is escorted to the facility where the survey interview takes place. If recruiters are free to approach potential respondents without controls on how an individual is to be selected for screening, shoppers who spend more time in the mall are more likely to be approached than shoppers who visit the mall only briefly. Moreover, recruiters naturally prefer to approach friendly looking potential respondents, so that it is more likely that certain types of individuals will be selected. These potential biases in selection can be reduced by providing appropriate selection instructions and training recruiters effectively. Training that reduces the interviewer's discretion in selecting a potential respondent is likely to reduce bias in selection, as are instructions to approach every *n*th person entering the facility through a particular door.[117]

## F. What Precautions Were Taken to Ensure That Only Qualified Respondents Were Included in the Survey?

In a carefully executed survey, each potential respondent is questioned or measured on the attributes that determine his or her eligibility to participate in the survey. Thus, the initial questions screen potential respondents to determine if they are members of the target population of the survey (e.g., Is she at least 14 years old? Does she own a dog? Does she live within 10 miles?). The screening questions must be drafted so that they do not appeal to or deter specific groups within the target population, or convey information that will influence the respondent's

---

115. Note, however, that differences in results across sites may arise from genuine differences in respondents across geographic locations or from a failure to administer the survey consistently across sites.

116. Seymour Sudman, *Improving the Quality of Shopping Center Sampling*, 17 J. Marketing Res. 423 (1980).

117. In the end, even if malls are randomly sampled and shoppers are randomly selected within malls, results from mall surveys technically can be used to generalize only to the population of mall shoppers. The ability of the mall sample to describe the likely response pattern of the broader relevant population will depend on the extent to which a substantial segment of the relevant population (1) is not found in malls and (2) would respond differently to the interview.

EXHIBIT C

*Reference Guide on Survey Research*

answers on the main survey. For example, if respondents must be prospective and recent purchasers of Sunshine orange juice in a trademark survey designed to assess consumer confusion with Sun Time orange juice, potential respondents might be asked to name the brands of orange juice they have purchased recently or expect to purchase in the next 6 months. They should not be asked specifically if they recently have purchased, or expect to purchase, Sunshine orange juice, because this may affect their responses on the survey either by implying who is conducting the survey or by supplying them with a brand name that otherwise would not occur to them.

The content of a screening questionnaire (or screener) can also set the context for the questions that follow. In *Pfizer, Inc. v. Astra Pharmaceutical Products, Inc.*,[118] physicians were asked a screening question to determine whether they prescribed particular drugs. The survey question that followed the screener asked "Thinking of the practice of cardiovascular medicine, what first comes to mind when you hear the letters XL?" The court found that the screener conditioned the physicians to respond with the name of a drug rather than a condition (long-acting).[119]

The criteria for determining whether to include a potential respondent in the survey should be objective and clearly conveyed, preferably using written instructions addressed to those who administer the screening questions. These instructions and the completed screening questionnaire should be made available to the court and the opposing party along with the interview form for each respondent.

# IV. Survey Questions and Structure

## A. Were Questions on the Survey Framed to Be Clear, Precise, and Unbiased?

Although it seems obvious that questions on a survey should be clear and precise, phrasing questions to reach that goal is often difficult. Even questions that appear clear can convey unexpected meanings and ambiguities to potential respondents. For example, the question "What is the average number of days each week you have butter?" appears to be straightforward. Yet some respondents wondered whether margarine counted as butter, and when the question was revised to include the introductory phrase "not including margarine," the reported frequency of butter use dropped dramatically.[120]

---

118. 858 F. Supp. 1305, 1321 & n.13 (S.D.N.Y. 1994).

119. *Id.* at 1321.

120. Floyd J. Fowler, Jr., *How Unclear Terms Affect Survey Data*, 56 Pub. Op. Q. 218, 225–26 (1992).

EXHIBIT C

When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question.[121] If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey. For example, a survey was designed to assess community sentiment that would warrant a change of venue in trying a case for damages sustained when a hotel skywalk collapsed.[122] The court found that the question "Based on what you have heard, read or seen, do you believe that in the current compensatory damage trials, the defendants, such as the contractors, designers, owners, and operators of the Hyatt Hotel, should be punished?" could neither be correctly understood nor easily answered.[123] The court noted that the phrase "compensatory damages," although well-defined for attorneys, was unlikely to be meaningful for laypersons.[124]

A variety of pretest activities may be used to improve the clarity of communication with respondents. Focus groups can be used to find out how the survey population thinks about an issue, facilitating the construction of clear and understandable questions. Cognitive interviewing, which includes a combination of think-aloud and verbal probing techniques, may be used for questionnaire evaluation.[125] Pilot studies involving a dress rehearsal for the main survey can also detect potential problems.

Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous,[126] and some courts have recognized the value of pretests.[127] In many pretests or pilot tests,[128] the proposed survey is administered to a small sample (usually between 25 and 75)[129] of the

---

121. *See id.* at 219.

122. Firestone v. Crown Ctr. Redevelopment Corp., 693 S.W.2d 99 (Mo. 1985) (en banc).

123. *See id.* at 102, 103.

124. *See id.* at 103. When there is any question about whether some respondents will understand a particular term or phrase, the term or phrase should be defined explicitly.

125. Gordon B. Willis et al., *Is the Bandwagon Headed to the Methodological Promised Land? Evaluating the Validity of Cognitive Interviewing Techniques*, *in* Cognitive and Survey Research 136 (Monroe G. Sirken et al. eds., 1999). *See also* Tourangeau et al., *supra* note 113, at 326–27.

126. *See* Jon A. Krosnick & Stanley Presser, *Questions and Questionnaire Design*, *in* Handbook of Survey Research, *supra* note 1, at 294 ("No matter how closely a questionnaire follows recommendations based on best practices, it is likely to benefit from pretesting. . ."). *See also* Jean M. Converse & Stanley Presser, Survey Questions: Handcrafting the Standardized Questionnaire 51 (1986); Fred W. Morgan, *Judicial Standards for Survey Research: An Update and Guidelines*, 54 J. Marketing 59, 64 (1990).

127. *See e.g.*, Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670 (S.D.N.Y. 1963); Scott v. City of New York, 591 F. Supp. 2d 554, 560 (S.D.N.Y. 2008) ("[s]urvey went through multiple pretests in order to insure its usefulness and statistical validity.").

128. The terms *pretest* and *pilot test* are sometimes used interchangeably to describe pilot work done in the planning stages of research. When they are distinguished, the difference is that a pretest tests the questionnaire, whereas a pilot test generally tests proposed collection procedures as well.

129. Converse & Presser, *supra* note 126, at 69. Converse and Presser suggest that a pretest with 25 respondents is appropriate when the survey uses professional interviewers.

EXHIBIT C

*Reference Guide on Survey Research*

same type of respondents who would be eligible to participate in the full–scale survey. The interviewers observe the respondents for any difficulties they may have with the questions and probe for the source of any such difficulties so that the questions can be rephrased if confusion or other difficulties arise.[130] Attorneys who commission surveys for litigation sometimes are reluctant to approve pilot work or to reveal that pilot work has taken place because they are concerned that if a pretest leads to revised wording of the questions, the trier of fact may believe that the survey has been manipulated and is biased or unfair. A more appropriate reaction is to recognize that pilot work is a standard and valuable way to improve the quality of a survey[131] and to anticipate that it often results in word changes that increase clarity and correct misunderstandings. Thus, changes may indicate informed survey construction rather than flawed survey design.[132]

## B. Were Some Respondents Likely to Have No Opinion? If So, What Steps Were Taken to Reduce Guessing?

Some survey respondents may have no opinion on an issue under investigation, either because they have never thought about it before or because the question mistakenly assumes a familiarity with the issue. For example, survey respondents may not have noticed that the commercial they are being questioned about guaranteed the quality of the product being advertised and thus they may have no opinion on the kind of guarantee it indicated. Likewise, in an employee survey, respondents may not be familiar with the parental leave policy at their company and thus may have no opinion on whether they would consider taking advantage of the parental leave policy if they became parents. The following three alternative question structures will affect how those respondents answer and how their responses are counted.

First, the survey can ask all respondents to answer the question (e.g., "Did you understand the guarantee offered by Clover to be a 1–year guarantee, a 60–day guarantee, or a 30–day guarantee?"). Faced with a direct question, particularly one that provides response alternatives, the respondent obligingly may supply an

130. Methods for testing respondent understanding include concurrent and retrospective think-alouds, in which respondents describe their thinking as they arrive at, or after they have arrived at, an answer, and paraphrasing (asking respondents to restate the question in their own words). Tourangeau et al., *supra* note 113, at 326–27; *see also* Methods for Testing and Evaluating Survey Questionnaires (Stanley Presser et al. eds., 2004).

131. *See* OMB Standards and Guidelines for Statistical Survey, *supra* note 110, Standard 1.4, Pre-testing Survey Systems (specifying that to ensure that all components of a survey function as intended, pretests of survey components should be conducted unless those components have previously been successfully fielded); American Association for Public Opinion Research, Best Practices (2011) ("Because it is rarely possible to foresee all the potential misunderstandings or biasing effects of different questions or procedures, it is vital for a well-designed survey operation to include provision for a pretest.").

132. *See infra* Section VII.B for a discussion of obligations to disclose pilot work.

389

EXHIBIT C

answer even if (in this example) the respondent did not notice the guarantee (or is unfamiliar with the parental leave policy). Such answers will reflect only what the respondent can glean from the question, or they may reflect pure guessing. The imprecision introduced by this approach will increase with the proportion of respondents who are unfamiliar with the topic at issue.

Second, the survey can use a quasi-filter question to reduce guessing by providing "don't know" or "no opinion" options as part of the question (e.g., "Did you understand the guarantee offered by Clover to be for more than a year, a year, or less than a year, or don't you have an opinion?").[133] By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply. Respondents are more likely to choose a "no opinion" option if it is mentioned explicitly by the interviewer than if it is merely accepted when the respondent spontaneously offers it as a response. The consequence of this change in format is substantial. Studies indicate that, although the relative distribution of the respondents selecting the *listed* choices is unlikely to change dramatically, presentation of an explicit "don't know" or "no opinion" alternative commonly leads to a 20% to 25% increase in the proportion of respondents selecting that response.[134]

Finally, the survey can include full-filter questions, that is, questions that lay the groundwork for the substantive question by first asking the respondent if he or she has an opinion about the issue or happened to notice the feature that the interviewer is preparing to ask about (e.g., "Based on the commercial you just saw, do you have an opinion about how long Clover stated or implied that its guarantee lasts?").[135] The interviewer then asks the substantive question only of those respondents who have indicated that they have an opinion on the issue.

Which of these three approaches is used and the way it is used can affect the rate of "no opinion" responses that the substantive question will evoke.[136] Respondents are more likely to say that they do not have an opinion on an issue if a full filter is used than if a quasi-filter is used.[137] However, in maximizing respondent expressions of "no opinion," full filters may produce an underreporting of opinions. There is some evidence that full-filter questions discourage respondents who actually have opinions from offering them by conveying the implicit suggestion that respondents can avoid difficult followup questions by saying that they have no opinion.[138]

---

133. Norbert Schwarz & Hans-Jürgen Hippler, *Response Alternatives: The Impact of Their Choice and Presentation Order*, *in* Measurement Errors in Surveys 41, 45–46 (Paul P. Biemer et al. eds., 1991).

134. Howard Schuman & Stanley Presser, Questions and Answers in Attitude Surveys: Experiments on Question Form, Wording and Context 113–46 (1981).

135. *See, e.g.*, Johnson & Johnson–Merck Consumer Pharmas. Co. v. SmithKline Beecham Corp., 960 F.2d 294, 299 (2d Cir. 1992).

136. Considerable research has been conducted on the effects of filters. For a review, see George F. Bishop et al., *Effects of Filter Questions in Public Opinion Surveys*, 47 Pub. Op. Q. 528 (1983).

137. Schwarz & Hippler, *supra* note 133, at 45–46.

138. *Id*. at 46.

EXHIBIT C

*Reference Guide on Survey Research*

In general, then, a survey that uses full filters provides a conservative esti-mate of the number of respondents holding an opinion, while a survey that uses neither full filters nor quasi–filters may overestimate the number of respondents with opinions, if some respondents offering opinions are guessing. The strategy of including a "no opinion" or "don't know" response as a quasi–filter avoids both of these extremes. Thus, rather than asking, "Based on the commercial, do you believe that the two products are made in the same way, or are they made differently?"[139] or prefacing the question with a preliminary, "Do you have an opinion, based on the commercial, concerning the way that the two products are made?" the question could be phrased, "Based on the commercial, do you believe that the two products are made in the same way, or that they are made differently, or don't you have an opinion about the way they are made?"

Recent research on the effects of including a "don't know" option shows that quasi–filters as well as full filters may discourage a respondent who would be able to provide a meaningful answer from expressing it.[140] The "don't know" option provides a cue that it is acceptable to avoid the work of trying to provide a more substantive response. Respondents are particularly likely to be attracted to a "don't know" option when the question is difficult to understand or the respondent is not strongly motivated to carefully report an opinion.[141] One solution that some survey researchers use is to provide respondents with a general instruction not to guess at the beginning of an interview, rather than supplying a "don't know" or "no opinion" option as part of the options attached to each question.[142] Another approach is to eliminate the "don't know" option and to add followup questions that measure the strength of the respondent's opinion.[143]

## C. Did the Survey Use Open-Ended or Closed-Ended Questions? How Was the Choice in Each Instance Justified?

The questions that make up a survey instrument may be open–ended, closed–ended, or a combination of both. Open-ended questions require the respondent to formulate and express an answer in his or her own words (e.g., "What was the main point of the commercial?" "Where did you catch the fish you caught

---

139. The question in the example without the "no opinion" alternative was based on a ques-tion rejected by the court in Coors Brewing Co. v. Anheuser-Busch Cos., 802 F. Supp. 965, 972–73 (S.D.N.Y. 1992). *See also* Procter & Gamble Pharms., Inc. v. Hoffmann-La Roche, Inc., 2006 U.S. Dist. LEXIS 64363 (S.D.N.Y. Sept. 6, 2006).

140. Jon A. Krosnick et al., *The Impact of "No Opinion" Response Options on Data Quality: Non-Attitude Reduction or Invitation to Satisfice*? 66 Pub. Op. Q. 371 (2002).

141. Krosnick & Presser, *supra* note 126, at 284.

142. Anheuser-Busch, Inc. v. VIP Prods, LLC, No. 4:08cv0358, 2008 U.S. Dist. LEXIS 82258, at ⋆6 (E.D. Mo. Oct. 16, 2008).

143. Krosnick & Presser, *supra* note 126, at 285.

EXHIBIT C

*Reference Manual on Scientific Evidence*

in these waters?"[144]). Closed-ended questions provide the respondent with an explicit set of responses from which to choose; the choices may be as simple as *yes* or *no* (e.g., "Is Colby College coeducational?"[145]) or as complex as a range of alternatives (e.g., "The two pain relievers have (1) the same likelihood of causing gastric ulcers; (2) about the same likelihood of causing gastric ulcers; (3) a somewhat different likelihood of causing gastric ulcers; (4) a very different likelihood of causing gastric ulcers; or (5) none of the above."[146]). When a survey involves in-person interviews, the interviewer may show the respondent these choices on a showcard that lists them.

Open-ended and closed-ended questions may elicit very different responses.[147] Most responses are less likely to be volunteered by respondents who are asked an open-ended question than they are to be chosen by respondents who are presented with a closed-ended question. The response alternatives in a closed-ended question may remind respondents of options that they would not otherwise consider or which simply do not come to mind as easily.[148]

The advantage of open-ended questions is that they give the respondent fewer hints about expected or preferred answers. Precoded responses on a closed-ended question, in addition to reminding respondents of options that they might not otherwise consider,[149] may direct the respondent away from or toward a particular response. For example, a commercial reported that in shampoo tests with more than 900 women, the sponsor's product received higher ratings than

144. A relevant example from *Wilhoite v. Olin Corp.* is described in McGovern & Lind, *supra* note 31, at 76.

145. Presidents & Trustees of Colby College v. Colby College–N.H., 508 F.2d 804, 809 (1st Cir. 1975).

146. This question is based on one asked in American Home Products Corp. v. Johnson & Johnson, 654 F. Supp. 568, 581 (S.D.N.Y. 1987), that was found to be a leading question by the court, primarily because the choices suggested that the respondent had learned about aspirin's and ibuprofen's relative likelihood of causing gastric ulcers. In contrast, in McNeilab, Inc. v. American Home Products Corp., 501 F. Supp. 517, 525 (S.D.N.Y. 1980), the court accepted as nonleading the question, "Based only on what the commercial said, would Maximum Strength Anacin contain more pain reliever, the same amount of pain reliever, or less pain reliever than the brand you, yourself, currently use most often?"

147. Howard Schuman & Stanley Presser, *Question Wording as an Independent Variable in Survey Analysis*, 6 Soc. Methods & Res. 151 (1977); Schuman & Presser, *supra* note 134, at 79–112; Converse & Presser, *supra* note 126, at 33.

148. For example, when respondents in one survey were asked, "What is the most important thing for children to learn to prepare them for life?", 62% picked "to think for themselves" from a list of five options, but only 5% spontaneously offered that answer when the question was open-ended. Schuman & Presser, *supra* note 134, at 104–07. An open-ended question presents the respondent with a free-recall task, whereas a closed-ended question is a recognition task. Recognition tasks in general reveal higher performance levels than recall tasks. Mary M. Smyth et al., Cognition in Action 25 (1987). In addition, there is evidence that respondents answering open-ended questions may be less likely to report some information that they would reveal in response to a closed-ended question when that information seems self-evident or irrelevant.

149. Schwarz & Hippler, *supra* note 133, at 43.

392

EXHIBIT C

*Reference Guide on Survey Research*

other brands.[150] According to a competitor, the commercial deceptively implied that each woman in the test rated more than one shampoo, when in fact each woman rated only one. To test consumer impressions, a survey might have shown the commercial and asked an open-ended question: "How many different brands mentioned in the commercial did each of the 900 women try?"[151] Instead, the survey asked a closed-ended question; respondents were given the choice of "one," "two," "three," "four," or "five or more." The fact that four of the five choices in the closed-ended question provided a response that was greater than one implied that the correct answer was probably more than one.[152] Note, however, that the open-ended question also may suggest that the answer is more than one.

By asking "how many different brands," the question suggests (1) that the viewer should have received some message from the commercial about the number of brands each woman tried and (2) that different brands were tried. Similarly, an open-ended question that asks, "[W]hich company or store do you think puts out this shirt?" indicates to the respondent that the appropriate answer is the name of a company or store. The question would be leading if the respondent would have considered other possibilities (e.g., an individual or Webstore) if the question had not provided the frame of a company or store.[153] Thus, the wording of a question, open-ended or closed-ended, can be leading or non-leading, and the degree of suggestiveness of each question must be considered in evaluating the objectivity of a survey.

Closed-ended questions have some additional potential weaknesses that arise if the choices are not constructed properly. If the respondent is asked to choose one response from among several choices, the response chosen will be meaningful only if the list of choices is exhaustive—that is, if the choices cover all possible answers a respondent might give to the question. If the list of possible choices is incomplete, a respondent may be forced to choose one that does not express his or her opinion.[154] Moreover, if respondents are told explicitly that they are

150.  *See* Vidal Sassoon, Inc. v. Bristol-Myers Co., 661 F.2d 272, 273 (2d Cir. 1981).

151.  This was the wording of the closed-ended question in the survey discussed in *Vidal Sassoon*, 661 F.2d at 275–76, without the closed-ended options that were supplied in that survey.

152.  Ninety-five percent of the respondents who answered the closed-ended question in the plaintiff's survey said that each woman had tried two or more brands. The open-ended question was never asked. *Vidal Sassoon*, 661 F.2d at 276. Norbert Schwarz, *Assessing Frequency Reports of Mundane Behaviors: Contributions of Cognitive Psychology to Questionnaire Construction*, *in* Research Methods in Personality and Social Psychology 98 (Clyde Hendrick & Margaret S. Clark eds., 1990), suggests that respondents often rely on the range of response alternatives as a frame of reference when they are asked for frequency judgments. *See, e.g.*, Roger Tourangeau & Tom W. Smith, *Asking Sensitive Questions: The Impact of Data Collection Mode, Question Format, and Question Context*, 60 Pub. Op. Q. 275, 292 (1996).

153.  Smith v. Wal-Mart Stores, Inc, 537 F. Supp. 2d 1302, 1331–32 (N.D. Ga. 2008).

154.  *See, e.g.*, American Home Prods. Corp. v. Johnson & Johnson, 654 F. Supp. 568, 581 (S.D.N.Y. 1987).

EXHIBIT C

*Reference Manual on Scientific Evidence*

not limited to the choices presented, most respondents nevertheless will select an answer from among the listed ones.[155]

One form of closed-ended question format that typically produces some distortion is the popular agree/disagree, true/false, or yes/no question. Although this format is appealing because it is easy to write and score these questions and their responses, the format is also seriously problematic. With its simplicity comes acquiescence, "[T]he tendency to endorse any assertion made in a question, regardless of its content," is a systematic source of bias that has produced an inflation effect of 10% across a number of studies.[156] Only when control groups or control questions are added to the survey design can this question format provide reasonable response estimates.[157]

Although many courts prefer open-ended questions on the ground that they tend to be less leading, the value of any open-ended or closed-ended question depends on the information it conveys in the question and, in the case of closed-ended questions, in the choices provided. Open-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondent's mind, but closed-ended questions are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives.

## D. If Probes Were Used to Clarify Ambiguous or Incomplete Answers, What Steps Were Taken to Ensure That the Probes Were Not Leading and Were Administered in a Consistent Fashion?

When questions allow respondents to express their opinions in their own words, some of the respondents may give ambiguous or incomplete answers, or may ask for clarification. In such instances, interviewers may be instructed to record any answer that the respondent gives and move on to the next question, or they may be instructed to probe to obtain a more complete response or clarify the meaning of the ambiguous response. They may also be instructed what clarification they can provide. In all of these situations, interviewers should record verbatim both what the respondent says and what the interviewer says in the attempt to get or provide clarification. Failure to record every part of the exchange in the order in which it occurs raises questions about the reliability of the survey, because neither the court nor the opposing party can evaluate whether the probe affected the views expressed by the respondent.

---

155. *See* Howard Schuman, *Ordinary Questions, Survey Questions, and Policy Questions*, 50 Pub. Opinion Q. 432, 435–36 (1986).

156. Jon A. Krosnick, *Survey Research*, 50 Ann. Rev. Psychol. 537, 552 (1999).

157. *See infra* Section IV.F.

EXHIBIT C

*Reference Guide on Survey Research*

If the survey is designed to allow for probes, interviewers must be given explicit instructions on when they should probe and what they should say in probing.[158] Standard probes used to draw out all that the respondent has to say (e.g., "Any further thoughts?" "Anything else?" "Can you explain that a little more?" Or "Could you say that another way?") are relatively innocuous and non-controversial in content, but persistent continued requests for further responses to the same or nearly identical questions may convey the idea to the respondent that he or she has not yet produced the "right" answer.[159] Interviewers should be trained in delivering probes to maintain a professional and neutral relation-ship with the respondent (as they should during the rest of the interview), which minimizes any sense of passing judgment on the content of the answers offered. Moreover, interviewers should be given explicit instructions on when to probe, so that probes are administered consistently.

A more difficult type of probe to construct and deliver reliably is one that requires a substantive question tailored to the answer given by the respondent. The survey designer must provide sufficient instruction to interviewers so that they avoid giving directive probes that suggest one answer over another. Those instructions, along with all other aspects of interviewer training, should be made available for evaluation by the court and the opposing party.

## E. What Approach Was Used to Avoid or Measure Potential Order or Context Effects?

The order in which questions are asked on a survey and the order in which response alternatives are provided in a closed-ended question can influence the answers.[160] For example, although asking a general question before a more specific question on the same topic is unlikely to affect the response to the specific ques-tion, reversing the order of the questions may influence responses to the general question. As a rule, then, surveys are less likely to be subject to order effects if the questions move from the general (e.g., "What do you recall being discussed

158. Floyd J. Fowler, Jr. & Thomas W. Mangione, Standardized Survey Interviewing: Minimiz-ing Interviewer-Related Error 41–42 (1990).

159. *See, e.g.*, Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc., 19 F.3d 125, 135 (3d Cir. 1994); American Home Prods. Corp. v. Procter & Gamble Co., 871 F. Supp. 739, 748 (D.N.J. 1994).

160. *See* Schuman & Presser, *supra* note 134, at 23, 56–74. Krosnick & Presser, *supra* note 126, at 278–81. In *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.,* 511 F. Supp. 867, 875 (S.D.N.Y. 1980), the court recognized the biased structure of a survey that disclosed the tar content of the ciga-rettes being compared before questioning respondents about their cigarette preferences. Not surpris-ingly, respondents expressed a preference for the lower tar product. *See also* E. & J. Gallo Winery v. Pasatiempos Gallo, S.A., 905 F. Supp. 1403, 1409–10 (E.D. Cal. 1994) (court recognized that earlier questions referring to playing cards, board or table games, or party supplies, such as confetti, increased the likelihood that respondents would include these items in answers to the questions that followed).

EXHIBIT C

*Reference Manual on Scientific Evidence*

in the advertisement?") to the specific (e.g., "Based on your reading of the advertisement, what companies do you think the ad is referring to when it talks about rental trucks that average five miles per gallon?").[161]

The mode of questioning can influence the form that an order effect takes. When respondents are shown response alternatives visually, as in mail surveys and other self-administered questionnaires or in face-to-face interviews when respondents are shown a card containing response alternatives, they are more likely to select the first choice offered (a primacy effect).[162] In contrast, when response alternatives are presented orally, as in telephone surveys, respondents are more likely to choose the last choice offered (a recency effect).[163] Although these effects are typically small, no general formula is available that can adjust values to correct for order effects, because the size and even the direction of the order effects may depend on the nature of the question being asked and the choices being offered. Moreover, it may be unclear which order is most appropriate. For example, if the respondent is asked to choose between two different products, and there is a tendency for respondents to choose the first product mentioned,[164] which order of presentation will produce the more accurate response?[165] To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated,[166] so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product B listed first, and one-third of the respondents have Product C listed first. If the three different orders[167] are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the three will provide a reasonable estimate of response level.[168]

161. This question was accepted by the court in *U-Haul Int'l, Inc. v. Jartran, Inc.,* 522 F. Supp. 1238, 1249 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982).

162. Krosnick & Presser, *supra* note 126, at 280.

163. *Id.*

164. Similarly, candidates in the first position on the ballot tend to attract extra votes. J.M. Miller & Jon A. Krosnick, *The Impact of Candidate Name Order on Election Outcomes*, 62 Pub. Op. Q. 291 (1998).

165. *See* Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1218 (7th Cir. 1997) (survey did not pass muster in part because of failure to incorporate random rotation of corporate names that were the subject of a trademark dispute).

166. *See, e.g.* Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454, 1465–67 (D. Kan. 1996) (failure to rotate the order in which the jackets were shown to the consumers led to reduced weight for the survey); Procter & Gamble Pharms., Inc. v. Hoffmann–La Roche, Inc., 2006 U.S. Dist. LEXIS 64363, 2006-2 Trade Cas. (CCH) P75465 (S.D.N.Y. Sept. 6, 2006).

167. Actually, there are six possible orders of the three alternatives: ABC, ACB, BAC, BCA, CAB, and CBA. Thus, the optimal survey design would allocate equal numbers of respondents to each of the six possible orders.

168. Although rotation is desirable, many surveys are conducted with no attention to this potential bias. Because it is impossible to know in the abstract whether a particular question suffers much, little, or not at all from an order bias, lack of rotation should not preclude reliance on the answer to the question, but it should reduce the weight given to that answer.

EXHIBIT C

## F. If the Survey Was Designed to Test a Causal Proposition, Did the Survey Include an Appropriate Control Group or Question?

Many surveys are designed not simply to describe attitudes or beliefs or reported behaviors, but to determine the source of those attitudes or beliefs or behaviors. That is, the purpose of the survey is to test a causal proposition. For example, how does a trademark or the content of a commercial affect respondents' perceptions or understanding of a product or commercial? Thus, the question is not merely whether consumers hold inaccurate beliefs about Product A, but whether exposure to the commercial misleads the consumer into thinking that Product A is a superior pain reliever. Yet if consumers already believe, before viewing the commercial, that Product A is a superior pain reliever, a survey that simply records consumers' impressions after they view the commercial may reflect those preexisting beliefs rather than impressions produced by the commercial.

Surveys that merely record consumer impressions have a limited ability to answer questions about the origins of those impressions. The difficulty is that the consumer's response to any question on the survey may be the result of information or misinformation from sources other than the trademark the respondent is being shown or the commercial he or she has just watched.[169] In a trademark survey attempting to show secondary meaning, for example, respondents were shown a picture of the stripes used on Mennen stick deodorant and asked, "[W]hich [brand] would you say uses these stripes on their package?"[170] The court recognized that the high percentage of respondents selecting "Mennen" from an array of brand names may have represented "merely a playback of brand share";[171] that is, respondents asked to give a brand name may guess the one that is most familiar, generally the brand with the largest market share.[172]

Some surveys attempt to reduce the impact of preexisting impressions on respondents' answers by instructing respondents to focus solely on the stimulus as a basis for their answers. Thus, the survey includes a preface (e.g., "based on the commercial you just saw") or directs the respondent's attention to the mark at issue (e.g., "these stripes on the package"). Such efforts are likely to be only partially successful. It is often difficult for respondents to identify accurately the

169. *See, e.g.,* Procter & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d. 339, 351–52 (S.D.N.Y. 2008) (survey was unreliable because it failed to control for the effect of preexisting beliefs).

170. Mennen Co. v. Gillette Co., 565 F. Supp. 648, 652 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir. 1984). To demonstrate secondary meaning, "the [c]ourt must determine whether the mark has been so associated in the mind of consumers with the entity that it identifies that the goods sold by that entity are distinguished by the mark or symbol from goods sold by others." *Id*.

171. *Id*.

172. *See also* Upjohn Co. v. American Home Prods. Corp., No. 1-95-CV-237, 1996 U.S. Dist. LEXIS 8049, at ⋆42–44 (W.D. Mich. Apr. 5, 1996).

EXHIBIT C

*Reference Manual on Scientific Evidence*

source of their impressions.[173] The more routine the idea being examined in the survey (e.g., that the advertised pain reliever is more effective than others on the market; that the mark belongs to the brand with the largest market share), the more likely it is that the respondent's answer is influenced by (1) preexisting impressions; (2) general expectations about what commercials typically say (e.g., the product being advertised is better than its competitors); or (3) guessing, rather than by the actual content of the commercial message or trademark being evaluated.

It is possible to adjust many survey designs so that causal inferences about the effect of a trademark or an allegedly deceptive commercial become clear and unambiguous. By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus.[174] In the simplest version of such a survey experiment, respondents are assigned randomly to one of two conditions.[175] For example, respondents assigned to the experimental condition view an allegedly deceptive commercial, and respondents assigned to the control condition either view a commercial that does not contain the allegedly deceptive material or do not view any commercial.[176] Respondents in both the experimental and control groups answer the same set of questions about the allegedly deceptive message. The effect of the commercial's allegedly deceptive message is evaluated by comparing the responses made by the experimental group members with those of the control group members. If 40% of the respondents in the experimental group responded indicating that they received the deceptive message (e.g., the advertised product has fewer calories than its competitor), whereas only 8% of the respondents in the control group gave that response, the difference between 40% and 8% (within the limits of sampling error[177]) can be attributed only to the allegedly deceptive message. Without the control group, it is not possible to determine how much of the 40% is attributable to respondents' preexisting beliefs

173. *See* Richard E. Nisbett & Timothy D. Wilson, *Telling More Than We Can Know: Verbal Reports on Mental Processes*, 84 Psychol. Rev. 231 (1977).

174. *See* Shari S. Diamond, *Using Psychology to Control Law: From Deceptive Advertising to Criminal Sentencing*, 13 Law & Hum. Behav. 239, 244–46 (1989); Jacob Jacoby & Constance Small, *Applied Marketing: The FDA Approach to Defining Misleading Advertising*, 39 J. Marketing 65, 68 (1975). *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section II.A, in this manual.

175. Random assignment should not be confused with random selection. When respondents are assigned randomly to different treatment groups (e.g., respondents in each group watch a different commercial), the procedure ensures that within the limits of sampling error the two groups of respondents will be equivalent except for the different treatments they receive. Respondents selected for a mall intercept study, and not from a probability sample, may be assigned randomly to different treatment groups. Random selection, in contrast, describes the method of selecting a sample of respondents in a probability sample. *See supra* Section III.C.

176. This alternative commercial could be a "tombstone" advertisement that includes only the name of the product or a more elaborate commercial that does not include the claim at issue.

177. For a discussion of sampling error, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV.A, in this manual.

EXHIBIT C

*Reference Guide on Survey Research*

or other background noise (e.g., respondents who misunderstand the question or misstate their responses). Both preexisting beliefs and other background noise should have produced similar response levels in the experimental and control groups. In addition, if respondents who viewed the allegedly deceptive commercial respond differently than respondents who viewed the control commercial, the difference cannot be merely the result of a leading question, because both groups answered the same question. The ability to evaluate the effect of the wording of a particular question makes the control group design particularly useful in assessing responses to closed-ended questions,[178] which may encourage guessing or particular responses. Thus, the focus on the response level in a control group design is not on the absolute response level, but on the difference between the response level of the experimental group and that of the control group.[179]

In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.[180] Although a survey with an imperfect control group may provide better information than a survey with no control group at all, the choice of an appropriate control group requires some care and should influence the weight that the survey receives. For example, a control stimulus should not be less attractive than the experimental stimulus if the survey is designed to measure how familiar the experimental stimulus is to respondents, because attractiveness may affect perceived familiarity.[181] Nor should the control stimulus share with the experimental stimulus the feature whose impact is being assessed. If, for example, the control stimulus in a case of alleged trademark infringement is itself a likely source of consumer confusion, reactions to the experimental and control stimuli may not

---

178. The Federal Trade Commission has long recognized the need for some kind of control for closed-ended questions, although it has not specified the type of control that is necessary. *See* Stouffer Foods Corp., 118 F.T.C. 746, No. 9250, 1994 FTC LEXIS 196, at ⋆31 (Sept. 26, 1994).

179. *See, e.g.*, Cytosport, Inc. v. Vital Pharms., Inc., 617 F. Supp. 2d 1051, 1075–76 (E.D. Cal. 2009) (net confusion level of 25.4% obtained by subtracting 26.5% in the control group from 51.9% in the test group).

180. *See, e.g.,* Skechers USA, Inc. v. Vans, Inc., No. CV-07-01703, 2007 WL 4181677, at ⋆8–9 (C.D. Cal. Nov. 20, 2007) (in trade dress infringement case, control stimulus should have retained design elements not at issue); Procter & Gamble Pharms., Inc. v. Hoffman-LaRoche, Inc., No. 06-Civ-0034, 2006 U.S. Dist. LEXIS 64363, at ⋆87 (S.D.N.Y. Sept. 6, 2006) (in false advertising action, disclaimer was inadequate substitute for appropriate control group).

181. *See, e.g.*, Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club L.P., 34 F.3d 410, 415–16 (7th Cir. 1994) (court recognized that the name "Baltimore Horses" was less attractive for a sports team than the name "Baltimore Colts."); *see also* Reed-Union Corp. v. Turtle Wax, Inc., 77 F.3d 909, 912 (7th Cir. 1996) (court noted that one expert's choice of a control brand with a well-known corporate source was less appropriate than the opposing expert's choice of a control brand whose name did not indicate a specific corporate source); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 576, 595 (S.D.N.Y. 2007) (underreporting of background "noise" likely occurred because handbag used as control was quite dissimilar in shape and pattern to both plaintiff and defendant's bags).

399

EXHIBIT C

*Reference Manual on Scientific Evidence*

differ because both cause respondents to express the same level of confusion.[182] In an extreme case, an inappropriate control may do nothing more than control for the effect of the nature or wording of the survey questions (e.g., acquiescence).[183] That may not be enough to rule out other explanations for different or similar responses to the experimental and control stimuli. Finally, it may sometimes be appropriate to have more than one control group to assess precisely what is causing the response to the experimental stimulus (e.g., in the case of an allegedly deceptive ad, whether it is a misleading graph or a misleading claim by the announcer; or in the case of allegedly infringing trade dress, whether it is the style of the font used or the coloring of the packaging).

Explicit attention to the value of control groups in trademark and deceptive-advertising litigation is a relatively recent phenomenon, but courts have increasingly come to recognize the central role the control group can play in evaluating claims.[184] A LEXIS search using *Lanham Act* and *control group* revealed only 4 federal district court cases before 1991 in which surveys with control groups were discussed, 16 in the 9 years from 1991 to 1999, and 46 in the 9 years between 2000 and 2008, a rate of growth that far exceeds the growth in Lanham Act litigation. In addition, courts in other cases have described or considered surveys using control group designs without labeling the comparison group a control group.[185] Indeed, one reason why cases involving surveys with control groups may be underrepresented in reported cases is that a survey with a control group produces

182.  *See, e.g.*, Western Publ'g Co. v. Publications Int'l, Ltd., No. 94-C-6803, 1995 U.S. Dist. LEXIS 5917, at ⋆45 (N.D. Ill. May 2, 1995) (court noted that the control product was "arguably more infringing than" the defendant's product) (emphasis omitted). *See also* Classic Foods Int'l Corp. v. Kettle Foods, Inc., 2006 U.S. Dist. LEXIS 97200 (C.D. Cal. Mar. 2, 2006); McNeil-PPC, Inc. v. Merisant Co., 2004 U.S. Dist. LEXIS 27733 (D.P.R. July 29, 2004).

183.  *See* text accompanying note 156, *supra.*

184.  *See, e.g.*, SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson–Merck, 2001 U.S. Dist. LEXIS 7061, at ⋆37 (S.D.N.Y. June 1, 2001) (survey to assess implied falsity of a commercial not probative in the absence of a control group); Consumer American Home Prods. Corp. v. Procter & Gamble Co., 871 F. Supp. 739, 749 (D.N.J. 1994) (discounting survey results based on failure to control for participants' preconceived notions); ConAgra, Inc. v. Geo. A. Hormel & Co., 784 F. Supp. 700, 728 (D. Neb. 1992) ("Since no control was used, the . . . study, standing alone, must be significantly discounted."), *aff'd*, 990 F.2d 368 (8th Cir. 1993).

185.  Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club L.P., No. 94727-C, 1994 U.S. Dist. LEXIS 19277, at ⋆10–11 (S.D. Ind. June 27, 1994), *aff'd*, 34 F.3d 410 (7th Cir. 1994). In *Indianapolis Colts*, the district court described a survey conducted by the plaintiff's expert in which half of the interviewees were shown a shirt with the name "Baltimore CFL Colts" on it and half were shown a shirt on which the word "Horses" had been substituted for the word "Colts." *Id.* The court noted that the comparison of reactions to the horse and colt versions of the shirt made it possible "to determine the impact from the use of the word 'Colts.'" *Id.* at ⋆11. *See also* Quality Inns Int'l, Inc. v. McDonald's Corp., 695 F. Supp. 198, 218 (D. Md. 1988) (survey revealed confusion between McDonald's and McSleep, but control survey revealed no confusion between McDonald's and McTavish). *See also* Simon Prop. Group L.P. v. MySimon, Inc., 104 F. Supp. 2d 1033 (S.D. Ind. 2000) (court criticized the survey design based on the absence of a control that could show that results were produced by legally relevant confusion).

EXHIBIT C

*Reference Guide on Survey Research*

less ambiguous findings, which may lead to a resolution before a preliminary injunction hearing or trial occurs.

A less common use of control methodology is a control question. Rather than administering a control stimulus to a separate group of respondents, the survey asks all respondents one or more control questions along with the question about the product or service at issue. In a trademark dispute, for example, a survey indicated that 7.2% of respondents believed that "The Mart" and "K-Mart" were owned by the same individuals. The court found no likelihood of confusion based on survey evidence that 5.7% of the respondents also thought that "The Mart" and "King's Department Store" were owned by the same source.[186]

Similarly, a standard technique used to evaluate whether a brand name is generic is to present survey respondents with a series of product or service names and ask them to indicate in each instance whether they believe the name is a brand name or a common name. By showing that 68% of respondents considered Teflon a brand name (a proportion similar to the 75% of respondents who recognized the acknowledged trademark Jell-O as a brand name, and markedly different from the 13% who thought aspirin was a brand name), the makers of Teflon retained their trademark.[187]

Every measure of opinion or belief in a survey reflects some degree of error. Control groups and, as a second choice, control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question.

## G. *What Limitations Are Associated with the Mode of Data Collection Used in the Survey?*

Three primary methods have traditionally been used to collect survey data: (1) in-person interviews, (2) telephone interviews, and (3) mail questionnaires.[188] Recently, in the wake of increasing use of the Internet, researchers have added Web-based surveys to their arsenal of tools. Surveys using in-person and telephone interviews, too, now regularly rely on computerized data collection.[189]

---

186. S.S. Kresge Co. v. United Factory Outlet, Inc., 598 F.2d 694, 697 (1st Cir. 1979). Note that the aggregate percentages reported here do not reveal how many of the same respondents were confused by both names, an issue that may be relevant in some situations. *See* Joseph L. Gastwirth, *Reference Guide on Survey Research*, 36 Jurimetrics J. 181, 187–88 (1996) (review essay).

187. E.I. du Pont de Nemours & Co. v. Yoshida Int'l, Inc., 393 F. Supp. 502, 526–27 & n.54 (E.D.N.Y. 1975); *see also* Donchez v. Coors Brewing Co., 392 F.3d 1211, 1218 (10th Cir. 2004) (respondents evaluated eight brand and generic names in addition to the disputed name). A similar approach is used in assessing secondary meaning.

188. Methods also may be combined, as when the telephone is used to "screen" for eligible respondents, who then are invited to participate in an in-person interview.

189. Wright & Marsden, *supra* note 1, at 13–14.

EXHIBIT C

*Reference Manual on Scientific Evidence*

The interviewer conducting a computer-assisted interview (CAI), whether by telephone (CATI) or face-to-face (CAPI), follows the computer-generated script for the interview and enters the respondent's answers as the interview proceeds. A primary advantage of CATI and other CAI procedures is that skip patterns can be built into the program. If, for example, the respondent answers *yes* when asked whether she has ever been the victim of a burglary, the computer will generate further questions about the burglary; if she answers *no*, the program will automatically skip the followup burglary questions. Interviewer errors in following the skip patterns are therefore avoided, making CAI procedures particularly valuable when the survey involves complex branching and skip patterns.[190] CAI procedures also can be used to control for order effects by having the program rotate the order in which the questions or choices are presented.[191]

Recent innovations in CAI procedures include audio computer-assisted self-interviewing (ACASI) in which the respondent listens to recorded questions over the telephone or reads questions from a computer screen while listening to recorded versions of them through headphones. The respondent then answers verbally or on a keypad. ACASI procedures are particularly useful for collecting sensitive information (e.g., illegal drug use and other HIV risk behavior).[192]

All CAI procedures require additional planning to take advantage of the potential for improvements in data quality. When a CAI protocol is used in a survey presented in litigation, the party offering the survey should supply for inspection the computer program that was used to generate the interviews. Moreover, CAI procedures do not eliminate the need for close monitoring of interviews to ensure that interviewers are accurately reading the questions in the interview protocol and accurately entering the respondent's answers.

The choice of any data collection method for a survey should be justified by its strengths and weaknesses.

## 1. In-person interviews

Although costly, in-person interviews generally are the preferred method of data collection, especially when visual materials must be shown to the respondent under controlled conditions.[193] When the questions are complex and the interviewers are skilled, in-person interviewing provides the maximum opportunity to

190. Willem E. Saris, Computer-Assisted Interviewing 20, 27 (1991).

191. *See, e.g.*, Intel Corp. v. Advanced Micro Devices, Inc., 756 F. Supp. 1292, 1296–97 (N.D. Cal. 1991) (survey designed to test whether the term *386* as applied to a microprocessor was generic used a CATI protocol that tested reactions to five terms presented in rotated order).

192. *See, e.g.*, N. Galai et al., *ACASI Versus Interviewer-Administered Questionnaires for Sensitive Risk Behaviors: Results of a Cross-Over Randomized Trial Among Injection Drug Users* (abstract, 2004), *available at* http://gateway.nlm.nih.gov/MeetingAbstracts/ma?f=102280272.html.

193. A mail survey also can include limited visual materials but cannot exercise control over when and how the respondent views them.

402

EXHIBIT C

*Reference Guide on Survey Research*

clarify or probe. Unlike a mail survey, both in–person and telephone interviews have the capability to implement complex skip sequences (in which the respondent's answer determines which question will be asked next) and the power to control the order in which the respondent answers the questions. Interviewers also can directly verify who is completing the survey, a check that is unavailable in mail and Web-based surveys. As described *infra* Section V.A, appropriate interviewer training, as well as monitoring of the implementation of interviewing, is necessary if these potential benefits are to be realized. Objections to the use of in–person interviews arise primarily from their high cost or, on occasion, from evidence of inept or biased interviewers. In-person interview quality in recent years has been assisted by technology. Using computer-assisted personal interviewing (CAPI), the interviewer reads the questions off the screen of a laptop computer and then enters responses directly.[194] This support makes it easier to follow complex skip patterns and to promptly submit results via the Internet to the survey center.

## 2. Telephone interviews

Telephone surveys offer a comparatively fast and lower–cost alternative to in–person surveys and are particularly useful when the population is large and geographically dispersed. Telephone interviews (unless supplemented with mailed or e-mailed materials) can be used only when it is unnecessary to show the respondent any visual materials. Thus, an attorney may present the results of a telephone survey of jury-eligible citizens in a motion for a change of venue in order to provide evidence that community prejudice raises a reasonable suspicion of potential jury bias.[195] Similarly, potential confusion between a restaurant called McBagel's and the McDonald's fast-food chain was established in a telephone survey. Over objections from defendant McBagel's that the survey did not show respondents the defendant's print advertisements, the court found likelihood of confusion based on the survey, noting that "by soliciting audio responses[, the telephone survey] was closely related to the radio advertising involved in the case."[196] In contrast, when words are not sufficient because, for example, the survey is assessing reactions to the trade

194. Wright & Marsden, *supra* note 1, at 13.

195. *See, e.g.,* State v. Baumruk, 85 S.W.3d 644 (Mo. 2002). (overturning the trial court's decision to ignore a survey that found about 70% of county residents remembered the shooting that led to the trial and that of those who had heard about the shooting, 98% believed that the defendant was either definitely guilty or probably guilty); State v. Erickstad, 620 N.W.2d 136, 140 (N.D. 2000) (denying change of venue motion based on media coverage, concluding that "defendants [need to] submit qualified public opinion surveys, other opinion testimony, or any other evidence demonstrating community bias caused by the media coverage"). For a discussion of surveys used in motions for change of venue, see Neal Miller, *Facts, Expert Facts, and Statistics: Descriptive and Experimental Research Methods in Litigation, Part II*, 40 Rutgers L. Rev. 467, 470–74 (1988); National Jury Project, Jurywork: Systematic Techniques (2d ed. 2008).

196. McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268, 1278 (S.D.N.Y. 1986).

EXHIBIT C

dress or packaging of a product that is alleged to promote confusion, a telephone survey alone does not offer a suitable vehicle for questioning respondents.[197]

In evaluating the sampling used in a telephone survey, the trier of fact should consider:

1. Whether (when prospective respondents are not business personnel) some form of random-digit dialing[198] was used instead of or to supplement telephone numbers obtained from telephone directories, because a high percentage of all residential telephone numbers in some areas may be unlisted;[199]

2. Whether any attempt was made to include cell phone users, particularly the growing subpopulation of individuals who rely solely on cell phones for telephone services;[200]

3. Whether the sampling procedures required the interviewer to sample within the household or business, instead of allowing the interviewer to administer the survey to any qualified individual who answered the telephone;[201] and

4. Whether interviewers were required to call back multiple times at several different times of the day and on different days to increase the likelihood of contacting individuals or businesses with different schedules.[202]

---

197. *See* Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208 (2d Cir. 1985); Incorporated Publ'g Corp. v. Manhattan Magazine, Inc., 616 F. Supp. 370 (S.D.N.Y. 1985), *aff'd without op.*, 788 F.2d 3 (2d Cir. 1986).

198. Random-digit dialing provides coverage of households with both listed and unlisted telephone numbers by generating numbers at random from the sampling frame of all possible telephone numbers. James M. Lepkowski, *Telephone Sampling Methods in the United States*, *in* Telephone Survey Methodology 81–91 (Robert M. Groves et al. eds., 1988).

199. Studies comparing listed and unlisted household characteristics show some important differences. *Id*. at 76.

200. According to a 2009 study, an estimated 26.5% of households cannot be reached by landline surveys, because 2.0% have no phone service and 24.5% have only a cell phone. Stephen J. Blumberg & Julian V. Luke, Wireless Substitution: Early Release of Estimates Based on the National Health Interview Survey, July–December 2009 (2010), *available at* http://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201005.pdf. People who can be reached only by cell phone tend to be younger and are more likely to be African American or Hispanic and less likely to be married or to own their home than individuals reachable on a landline. Although at this point, the effect on estimates from landline-only telephone surveys appears to be minimal on most topics, on some issues (e.g., voter registration) and within the population of young adults, the gap may warrant consideration. Scott Keeter et al., *What's Missing from National RDD Surveys? The Impact of the Growing Cell-Only Population*, Paper presented at the 2007 Conference of AAPOR, May 2007.

201. This is a consideration only if the survey is sampling individuals. If the survey is seeking information on the household, more than one individual may be able to answer questions on behalf of the household.

202. This applied equally to in-person interviews.

EXHIBIT C

*Reference Guide on Survey Research*

Telephone surveys that do not include these procedures may not provide precise measures of the characteristics of a representative sample of respondents, but may be adequate for providing rough approximations. The vulnerability of the survey depends on the information being gathered. More elaborate procedures are advisable for achieving a representative sample of respondents if the survey instrument requests information that is likely to differ for individuals with listed telephone numbers versus individuals with unlisted telephone numbers, individuals rarely at home versus those usually at home, or groups who are more versus less likely to rely exclusively on cell phones.

The report submitted by a survey expert who conducts a telephone survey should specify:

1. The procedures that were used to identify potential respondents, including both the procedures used to select the telephone numbers that were called and the procedures used to identify the qualified individual to question),
2. The number of telephone numbers for which no contact was made; and
3. The number of contacted potential respondents who refused to participate in the survey.[203]

Like CAPI interviewing,[204] computer–assisted telephone interviewing (CATI) facilitates the administration and data entry of large–scale surveys.[205] A computer protocol may be used to generate and dial telephone numbers as well as to guide the interviewer.

### 3. Mail questionnaires

In general, mail surveys tend to be substantially less costly than both in–person and telephone surveys.[206] Response rates tend to be lower for self–administered mail surveys than for telephone or face–to–face surveys, but higher than for their Web–based equivalents.[207] Procedures that raise response rates include multiple mailings, highly personalized communications, prepaid return envelopes, incentives or gratuities, assurances of confidentiality, first–class outgoing postage, and followup reminders.[208]

---

203. Additional disclosure and reporting features applicable to surveys in general are described in Section VII.B, *infra*.

204. See text accompanying note 194, *supra*.

205. *See* Roger Tourangeau et al., The Psychology of Survey Response 289 (2000); Saris, *supra* note 190.

206. *See* Chase H. Harrison, *Mail Surveys and Paper Questionnaires*, *in* Handbook of Survey Research, *supra* note 1, at 498, 499.

207. *See* Mick Couper et al., *A Comparison of Mail and E-Mail for a Survey of Employees in Federal Statistical Agencies*, 15 J. Official Stat. 39 (1999); Mick Couper, Web Surveys: A Review of Issues and Approaches 464, 473 (2001).

208. *See, e.g.*, Richard J. Fox et al., *Mail Survey Response Rate: A Meta-Analysis of Selected Techniques for Inducing Response*, 52 Pub. Op. Q. 467, 482 (1988); Kenneth D. Hopkins & Arlen R.

EXHIBIT C

*Reference Manual on Scientific Evidence*

A mail survey will not produce a high rate of return unless it begins with an accurate and up-to-date list of names and addresses for the target population. Even if the sampling frame is adequate, the sample may be unrepresentative if some individuals are more likely to respond than others. For example, if a survey targets a population that includes individuals with literacy problems, these individuals will tend to be underrepresented. Open-ended questions are generally of limited value on a mail survey because they depend entirely on the respondent to answer fully and do not provide the opportunity to probe or clarify unclear answers. Similarly, if eligibility to answer some questions depends on the respondent's answers to previous questions, such skip sequences may be difficult for some respondents to follow. Finally, because respondents complete mail surveys without supervision, survey personnel are unable to prevent respondents from discussing the questions and answers with others before completing the survey and to control the order in which respondents answer the questions. Although skilled design of questionnaire format, question order, and the appearance of the individual pages of a survey can minimize these problems,[209] if it is crucial to have respondents answer questions in a particular order, a mail survey cannot be depended on to provide adequate data.

## 4. Internet surveys

A more recent innovation in survey technology is the Internet survey in which potential respondents are contacted and their responses are collected over the Internet. Internet surveys in principle can reduce substantially the cost of reaching potential respondents. Moreover, they offer some of the advantages of in-person interviews by enabling the respondent to view pictures, videos, and lists of response choices on the computer screen during the survey. A further advantage is that whenever a respondent answers questions presented on a computer screen, whether over the Internet or in a dedicated facility, the survey can build in a variety of controls. In contrast to a mail survey in which the respondent can examine and/or answer questions out of order and may mistakenly skip questions, a computer-administered survey can control the order in which the questions are displayed so that the respondent does not see a later question before answering an earlier one and so that the respondent cannot go back to change an answer previously given to an earlier question in light of the questions that follow it. The order of the questions or response options can be rotated easily to control for order effects. In addition, the structure permits the survey to remind, or even require, the respondent to answer a question before the next question is presented. One advantage of computer-administered surveys over interviewer-administered

Gullickson, *Response Rates in Survey Research: A Meta-Analysis of the Effects of Monetary Gratuities*, 61 J. Experimental Educ. 52, 54–57, 59 (1992); Eleanor Singer et al., *Confidentiality Assurances and Response: A Quantitative Review of the Experimental Literature*, 59 Pub. Op. Q. 66, 71 (1995); *see generally* Don A. Dillman, Internet Mail and Mixed-Mode Surveys: The Tailored Design Method (3d ed. 2009).

209.  Dilman, *supra* note 208, at 151–94.

EXHIBIT C

*Reference Guide on Survey Research*

surveys is that they eliminate interviewer error because the computer presents the questions and the respondent records her own answers.

Internet surveys do have limitations, and many questions remain about the extent to which those limitations impair the quality of the data they provide. A key potential limitation is that respondents accessible over the Internet may not fairly represent the relevant population whose responses the survey was designed to measure. Although Internet access has not approached the 95% penetration achieved by the telephone, the proportion of individuals with Internet access has grown at a remarkable rate, as has the proportion of individuals who regularly use a computer. For example, according to one estimate, use of the Internet among adults jumped from 22% in 1997 to 60% in 2003.[210] Despite this rapid expansion, a digital divide still exists, so that the "have–nots" are less likely to be represented in surveys that depend on Internet access. The effect of this divide on survey results will depend on the population the survey is attempting to capture. For example, if the target population consists of computer users, any bias from systematic underrepresentation is likely to be minimal. In contrast, if the target population consists of owners of television sets, a proportion of whom may not have Internet access, significant bias is more likely. The trend toward greater access to the Internet is likely to continue, and the issue of underrepresentation may disappear in time. At this point, a party presenting the results of a Web–based survey should be prepared to provide evidence on how coverage limitations may have affected the pattern of survey results.

Even if noncoverage error is not a significant concern, courts evaluating a Web–based survey must still determine whether the sampling approach is adequate. That evaluation will depend on the type of Internet survey involved, because Web-based surveys vary in fundamental ways.

At one extreme is the list–based Web survey. This Web survey is sent to a closed set of potential respondents drawn from a list that consists of the e–mail addresses of the target individuals (e.g., all students at a university or employees at a company where each student or employee has a known e–mail address).

At the other extreme is the self–selected Web survey in which Web users in general, or those who happen to visit a particular Web site, are invited to express their views on a topic and they participate simply by volunteering. Whereas the list–based survey enables the researcher to evaluate response rates and often to assess the representativeness of respondents on a variety of characteristics, the self–selected Web survey provides no information on who actually participates or how representative the participants are. Thus, it is impossible to evaluate nonresponse error or even participation rates. Moreover, participants are very likely to self–select on the basis of the nature of the topic. These self–selected pseudosurveys resemble reader polls published in magazines and do not meet standard criteria for legitimate surveys

---

210. Jennifer C. Day et al., Computer and Internet Use in the United States: 2003, 8–9 (U.S. Census Bureau 2005).

EXHIBIT C

admissible in court.[211] Occasionally, proponents of such polls tout the large number of respondents as evidence of the weight the results should be given, but the size of the sample cannot cure the likely participation bias in such voluntary polls.[212]

Between these two extremes is a large category of Web-based survey approaches that researchers have developed to address concerns about sampling bias and nonresponse error. For example, some approaches create a large database of potential participants by soliciting volunteers through appeals on well-traveled sites.[213] Based on the demographic data collected from those who respond to the appeals, a sample of these panel members are asked to participate in a particular survey by invitation only. Responses are weighted to reduce selection bias.[214] An expert presenting the results from such a survey should be prepared to explain why the particular weighting approach can be relied upon to achieve that purpose.[215]

Another approach that is more costly uses probability sampling from the initial contact with a potential respondent. Potential participants are initially contacted by telephone using random-digit dialing procedures. Those who lack Internet access are provided with the technology to participate. Members from the panel are then invited to participate in a particular survey, and the researchers know the characteristics of participants and nonparticipants from the initial telephone contact.[216] For all surveys that rely on preselected panels, whether nonrandomly or randomly selected, questions have been raised about panel conditioning (i.e., the effect of having participants in earlier surveys respond to later surveys) and the relatively low rate of response to survey invitations. An expert presenting results from a Web-based survey should be prepared to address these issues and to discuss how they may have affected the results.

Finally, the recent proliferation of Internet surveys has stimulated a growing body of research on the influence of formatting choices in Web surveys. Evidence from this research indicates that formatting decisions can significantly affect the quality of survey responses.[217]

---

211. *See, e.g.,* Merisant Co. v. McNeil Nutritionals, LLC, 242 F.R.D. 315 (E.D. Pa. 2007) (report on results from AOL "instant poll" excluded).

212. *See, e.g.*, Couper (2001), *supra* note 207, at 480–81 (a self-selected Web survey conducted by the National Geographic Society through its Web site attracted 50,000 responses; a comparison of the Canadian respondents with data from the Canadian General Social Survey telephone survey conducted using random-digit dialing showed marked differences on a variety of response measures).

213. *See, e.g.,* Ecce Panis, Inc. v. Maple Leaf Bakery, Inc. 2007 U.S. Dist. LEXIS 85780 (D. Ariz. Nov. 7, 2007).

214. *See, e.g.,* Philip Morris USA, Inc. v. Otamedia Limited, 2005 U.S. Dist. LEXIS 1259 (S.D.N.Y. Jan. 28, 2005).

215. *See, e.g.,* A&M Records, Inc. v. Napster, Inc. 2000 WL 1170106 (N.D. Cal. Aug. 10, 2000) (court refused to rely on results from Internet panel survey when expert presenting the results showed lack of familiarity with panel construction and weighting methods).

216. *See, e.g.,* Price v. Philip Morris, Inc., 219 Ill. 2d 182, 848 N.E.2d 1 (2005).

217. *See, e.g.,* Mick P. Couper et al., *What They See Is What We Get: Response Options for Web Surveys*, 22 Soc. Sci. Computer Rev. 111 (2004) (comparing order effects with radio button and

EXHIBIT C

*Reference Guide on Survey Research*

A final approach to data collection does not depend on a single mode, but instead involves a mixed-mode approach. By combining modes, the survey design may increase the likelihood that all sampling members of the target population will be contacted. For example, a person without a landline may be reached by mail or e-mail. Similarly, response rates may be increased if members of the target population are more likely to respond to one mode of contact versus another. For example, a person unwilling to be interviewed by phone may respond to a written or e-mail contact. If a mixed-mode approach is used, the questions and structure of the questionnaires are likely to differ across modes, and the expert should be prepared to address the potential impact of mode on the answers obtained.[218]

# V. Surveys Involving Interviewers

## A. Were the Interviewers Appropriately Selected and Trained?

A properly defined population or universe, a representative sample, and clear and precise questions can be depended on to produce trustworthy survey results only if "sound interview procedures were followed by competent interviewers."[219] Properly trained interviewers receive detailed written instructions on everything they are to say to respondents, any stimulus materials they are to use in the survey, and how they are to complete the interview form. These instructions should be made available to the opposing party and to the trier of fact. Thus, interviewers should be told, and the interview form on which answers are recorded should indicate, which responses, if any, are to be read to the respondent. Moreover, interviewers should be instructed to record verbatim the respondent's answers, to indicate explicitly whenever they repeat a question to the respondent, and to record any statements they make to or supplementary questions they ask the respondent.

Interviewers require training to ensure that they are able to follow directions in administering the survey questions. Some training in general interviewing techniques is required for most interviews (e.g., practice in pausing to give the respondent enough time to answer and practice in resisting invitations to express the interviewer's beliefs or opinions). Although procedures vary, there is evidence that interviewer performance suffers with less than a day of training in general interviewing skills and techniques for new interviewers.[220]

drop-box formats); Andy Peytchev et al., *Web Survey Design: Paging Versus Scrolling*, 70 Pub. Op. Q. 212 (2006) (comparing the effects of presenting survey questions in a multitude of short pages or in long scrollable pages).

218. Don A. Dillman & Benjamin L. Messer, *Mixed-Mode Surveys, in* Wright & Marsden, *supra* note 1, at 550, 553.

219. Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983).

220. Fowler & Mangione, *supra* note 158, at 117; Nora Cate Schaeffer et al., *Interviewers and Interviewing, in* Handbook of Survey Research, *supra* note 1, at 437, 460.

**EXHIBIT C**

The more complicated the survey instrument is, the more training and experience the interviewers require. Thus, if the interview includes a skip pattern (where, e.g., Questions 4–6 are asked only if the respondent says *yes* to Question 3, and Questions 8–10 are asked only if the respondent says *no* to Question 3), interviewers must be trained to follow the pattern. Note, however, that in surveys conducted using CAPI or CATI procedures, the interviewer will be guided by the computer used to administer the questionnaire.

If the questions require specific probes to clarify ambiguous responses, interviewers must receive instruction on when to use the probes and what to say. In some surveys, the interviewer is responsible for last-stage sampling (i.e., selecting the particular respondents to be interviewed), and training is especially crucial to avoid interviewer bias in selecting respondents who are easiest to approach or easiest to find.

Training and instruction of interviewers should include directions on the circumstances under which interviews are to take place (e.g., question only one respondent at a time outside the hearing of any other respondent). The trustworthiness of a survey is questionable if there is evidence that some interviews were conducted in a setting in which respondents were likely to have been distracted or in which others could overhear. Such evidence of careless administration of the survey was one ground used by a court to reject as inadmissible a survey that purported to demonstrate consumer confusion.[221]

Some compromises may be accepted when surveys must be conducted swiftly. In trademark and deceptive advertising cases, the plaintiff's usual request is for a preliminary injunction, because a delay means irreparable harm. Nonetheless, careful instruction and training of interviewers who administer the survey, as well as monitoring and validation to ensure quality control,[222] and complete disclosure of the methods used for all of the procedures followed are crucial elements that, if compromised, seriously undermine the trustworthiness of any survey.

## B. *What Did the Interviewers Know About the Survey and Its Sponsorship?*

One way to protect the objectivity of survey administration is to avoid telling interviewers who is sponsoring the survey. Interviewers who know the identity of the survey's sponsor may affect results inadvertently by communicating to respondents their expectations or what they believe are the preferred responses of the survey's sponsor. To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind

221. *Toys "R" Us*, 559 F. Supp. at 1204 (some interviews apparently were conducted in a bowling alley; some interviewees waiting to be interviewed overheard the substance of the interview while they were waiting).
222. *See* Section V.C, *infra*.

**EXHIBIT C**

*Reference Guide on Survey Research*

research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose. Thus, the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses. Explicit clues could include a sponsor's letterhead appearing on the survey; implicit clues could include reversing the usual order of the *yes* and *no* response boxes on the interviewer's form next to a crucial question, thereby potentially increasing the likelihood that *no* will be checked.[223]

Nonetheless, in some surveys (e.g., some government surveys), disclosure of the survey's sponsor to respondents (and thus to interviewers) is required. Such surveys call for an evaluation of the likely biases introduced by interviewer or respondent awareness of the survey's sponsorship. In evaluating the consequences of sponsorship awareness, it is important to consider (1) whether the sponsor has views and expectations that are apparent and (2) whether awareness is confined to the interviewers or involves the respondents. For example, if a survey concerning attitudes toward gun control is sponsored by the National Rifle Association, it is clear that responses opposing gun control are likely to be preferred. In contrast, if the survey on gun control attitudes is sponsored by the Department of Justice, the identity of the sponsor may not suggest the kinds of responses the sponsor expects or would find acceptable.[224] When interviewers are well trained, their awareness of sponsorship may be a less serious threat than respondents' awareness. The empirical evidence for the effects of interviewers' prior expectations on respondents' answers generally reveals modest effects when the interviewers are well trained.[225]

## C. What Procedures Were Used to Ensure and Determine That the Survey Was Administered to Minimize Error and Bias?

Three methods are used to ensure that the survey instrument was implemented in an unbiased fashion and according to instructions. The first, monitoring the interviews as they occur, is done most easily when telephone surveys are used. A supervisor listens to a sample of interviews for each interviewer. Field settings make monitoring more difficult, but evidence that monitoring has occurred provides an additional indication that the survey has been reliably implemented. Some

223. *See* Centaur Communications, Ltd. v. A/S/M Communications, Inc., 652 F. Supp. 1105, 1111 n.3 (S.D.N.Y. 1987) (pointing out that reversing the usual order of response choices, yes or no, to no or yes may confuse interviewers as well as introduce bias), *aff'd*, 830 F.2d 1217 (2d Cir. 1987).

224. *See, e.g.*, Stanley Presser et al., *Survey Sponsorship, Response Rates, and Response Effects*, 73 Soc. Sci. Q. 699, 701 (1992) (different responses to a university-sponsored telephone survey and a newspaper-sponsored survey for questions concerning attitudes toward the mayoral primary, an issue on which the newspaper had taken a position).

225. *See, e.g.*, Seymour Sudman et al., *Modest Expectations: The Effects of Interviewers' Prior Expectations on Responses*, 6 Soc. Methods & Res. 171, 181 (1977).

EXHIBIT C

monitoring systems, both telephone and field, now use recordings, procedures that may require permission from respondents.

Second, validation of interviews occurs when respondents in a sample are recontacted to ask whether the initial interviews took place and to determine whether the respondents were qualified to participate in the survey. Validation callbacks may also collect data on a few key variables to confirm that the correct respondent has been interviewed. The standard procedure for validation of in-person interviews is to telephone a random sample of about 10% to 15% of the respondents.[226] Some attempts to reach the respondent will be unsuccessful, and occasionally a respondent will deny that the interview took place even though it did. Because the information checked is typically limited to whether the interview took place and whether the respondent was qualified, this validation procedure does not determine whether the initial interview as a whole was conducted properly. Nonetheless, this standard validation technique warns interviewers that their work is being checked and can detect gross failures in the administration of the survey. In computer-assisted interviews, further validation information can be obtained from the timings that can be automatically recorded when an interview occurs.

A third way to verify that the interviews were conducted properly is to examine the work done by each individual interviewer. By reviewing the interviews and individual responses recorded by each interviewer and comparing patterns of response across interviewers, researchers can identify any response patterns or inconsistencies that warrant further investigation.

When a survey is conducted at the request of a party for litigation rather than in the normal course of business, a heightened standard for validation checks may be appropriate. Thus, independent validation of a random sample of interviews by a third party rather than by the field service that conducted the interviews increases the trustworthiness of the survey results.[227]

# VI. Data Entry and Grouping of Responses

## A. *What Was Done to Ensure That the Data Were Recorded Accurately?*

Analyzing the results of a survey requires that the data obtained on each sampled element be recorded, edited, and often coded before the results can be tabulated

---

226. *See, e.g.*, Davis v. Southern Bell Tel. & Tel. Co., No. 89-2839, 1994 U.S. Dist. LEXIS 13257, at *16 (S.D. Fla. Feb. 1, 1994); National Football League Properties, Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 515 (D.N.J. 1986).

227. In *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1218 (7th Cir. 1997), the court criticized a survey in part because it "did not comport with accepted practice for independent validation of the results."

EXHIBIT C

*Reference Guide on Survey Research*

and processed. Procedures for data entry should include checks for completeness, checks for reliability and accuracy, and rules for resolving inconsistencies. Accurate data entry is maximized when responses are verified by duplicate entry and comparison, and when data-entry personnel are unaware of the purposes of the survey.

## B. *What Was Done to Ensure That the Grouped Data Were Classified Consistently and Accurately?*

Coding of answers to open-ended questions requires a detailed set of instructions so that decision standards are clear and responses can be scored consistently and accurately. Two trained coders should independently score the same responses to check for the level of consistency in classifying responses. When the criteria used to categorize verbatim responses are controversial or allegedly inappropriate, those criteria should be sufficiently clear to reveal the source of disagreements. In all cases, the verbatim responses should be available so that they can be recoded using alternative criteria.[228]

# VII. Disclosure and Reporting

## A. *When Was Information About the Survey Methodology and Results Disclosed?*

Objections to the definition of the relevant population, the method of selecting the sample, and the wording of questions generally are raised for the first time when the results of the survey are presented. By that time it is often too late to correct methodological deficiencies that could have been addressed in the planning stages of the survey. The plaintiff in a trademark case[229] submitted a set of proposed survey questions to the trial judge, who ruled that the survey results

---

228. *See, e.g.*, Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc., 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (inconsistent scoring and subjective coding led court to find survey so unreliable that it was entitled to no weight), *aff'd*, 57 F.3d 1062 (2d Cir. 1995); Rock v. Zimmerman, 959 F.2d 1237, 1253 n.9 (3d Cir. 1992) (court found that responses on a change-of-venue survey incorrectly categorized respondents who believed the defendant was insane as believing he was guilty); Coca-Cola Co. v. Tropicana Prods., Inc., 538 F. Supp. 1091, 1094–96 (S.D.N.Y.) (plaintiff's expert stated that respondents' answers to the open-ended questions revealed that 43% of respondents thought Tropicana was portrayed as fresh squeezed; the court's own tabulation found no more than 15% believed this was true), *rev'd on other grounds*, 690 F.2d 312 (2d Cir. 1982); *see also* Cumberland Packing Corp. v. Monsanto Co., 140 F. Supp. 2d 241 (E.D.N.Y. 2001) (court examined verbatim responses that respondents gave to arrive at a confusion level substantially lower than the level reported by the survey expert).

229. Union Carbide Corp. v. Ever-Ready, Inc., 392 F. Supp. 280 (N.D. Ill. 1975), *rev'd*, 531 F.2d 366 (7th Cir. 1976).

EXHIBIT C

*Reference Manual on Scientific Evidence*

would be admissible at trial while reserving the question of the weight the evidence would be given.[230] The Seventh Circuit called this approach a commendable procedure and suggested that it would have been even more desirable if the parties had "attempt[ed] in good faith to agree upon the questions to be in such a survey."[231]

The *Manual for Complex Litigation, Second,* recommended that parties be required, "before conducting any poll, to provide other parties with an outline of the proposed form and methodology, including the particular questions that will be asked, the introductory statements or instructions that will be given, and other controls to be used in the interrogation process."[232] The parties then were encouraged to attempt to resolve any methodological disagreements before the survey was conducted.[233] Although this passage in the second edition of the Manual has been cited with apparent approval,[234] the prior agreement that the Manual recommends has occurred rarely, and the *Manual for Complex Litigation, Fourth*, recommends, but does not advocate requiring, prior disclosure and discussion of survey plans.[235] As the Manual suggests, however, early disclosure can enable the parties to raise prompt objections that may permit corrective measures to be taken before a survey is completed.[236]

Rule 26 of the Federal Rules of Civil Procedure requires extensive disclosure of the basis of opinions offered by testifying experts. However, Rule 26 does not produce disclosure of all survey materials, because parties are not obligated to disclose information about nontestifying experts. Parties considering whether to commission or use a survey for litigation are not obligated to present a survey that produces unfavorable results. Prior disclosure of a proposed survey instrument places the party that ultimately would prefer not to present the survey in the position of presenting damaging results or leaving the impression that the results are not being presented because they were unfavorable. Anticipating such a situation,

---

230. Before trial, the presiding judge was appointed to the court of appeals, and so the case was tried by another district court judge

231. *Union Carbide*, 531 F.2d at 386. More recently, the Seventh Circuit recommended filing a motion in limine*,* asking the district court to determine the admissibility of a survey based on an examination of the survey questions and the results of a preliminary survey before the party undertakes the expense of conducting the actual survey. Piper Aircraft Corp. v. Wag–Aero, Inc., 741 F.2d 925, 929 (7th Cir. 1984). On one recent occasion, the parties jointly developed a survey administered by a neutral third–party survey firm. Scott v. City of New York, 591 F. Supp. 2d 554, 560 (S.D.N.Y. 2008) (survey design, including multiple pretests, negotiated with the help of the magistrate judge).

232. MCL 2d, *supra* note 16, § 21.484.

233. *See id.*

234. *See, e.g.*, National Football League Props., Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 514 n.3 (D.N.J. 1986).

235. MCL 4th, *supra* note 16, § 11.493 ("including the specific questions that will be asked, the introductory statements or instructions that will be given, and other controls to be used in the interrogation process.").

236. *See id.*

414

EXHIBIT C

*Reference Guide on Survey Research*

parties do not decide whether an expert will testify until after the results of the survey are available.

Nonetheless, courts are in a position to encourage early disclosure and dis-cussion even if they do not lead to agreement between the parties. In *McNeilab, Inc. v. American Home Products Corp.*,[237] Judge William C. Conner encouraged the parties to submit their survey plans for court approval to ensure their evidentiary value; the plaintiff did so and altered its research plan based on Judge Conner's recommendations. Parties can anticipate that changes consistent with a judicial suggestion are likely to increase the weight given to, or at least the prospects of admissibility of, the survey.[238]

## B. Does the Survey Report Include Complete and Detailed Information on All Relevant Characteristics?

The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey. A survey report generally should provide in detail:

1. The purpose of the survey;
2. A definition of the target population and a description of the sampling frame;
3. A description of the sample design, including the method of selecting respondents, the method of interview, the number of callbacks, respondent eligibility or screening criteria and method, and other pertinent information;
4. A description of the results of sample implementation, including the number of
   a. potential respondents contacted,
   b. potential respondents not reached,
   c. noneligibles,
   d. refusals,
   e. incomplete interviews or terminations, and
   f. completed interviews;
5. The exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits;[239]

---

237. 848 F.2d 34, 36 (2d Cir. 1988) (discussing with approval the actions of the district court). *See also* Hubbard v. Midland Credit Mgmt, 2009 U.S. Dist. LEXIS 13938 (S.D. Ind. Feb. 23, 2009) (court responded to plaintiff's motions to approve survey methodology with a critique of the proposed methodology).

238. Larry C. Jones, *Developing and Using Survey Evidence in Trademark Litigation*, 19 Memphis St. U. L. Rev. 471, 481 (1989).

239. The questionnaire itself can often reveal important sources of bias. *See* Marria v. Broaddus, 200 F. Supp. 2d 280, 289 (S.D.N.Y. 2002) (court excluded survey sent to prison administrators based

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

6. A description of any special scoring (e.g., grouping of verbatim responses into broader categories);
7. A description of any weighting or estimating procedures used;
8. Estimates of the sampling error, where appropriate (i.e., in probability samples);
9. Statistical tables clearly labeled and identified regarding the source of the data, including the number of raw cases forming the base for each table, row, or column; and
10. Copies of interviewer instructions, validation results, and code books.[240]

Additional information to include in the survey report may depend on the nature of sampling design. For example, reported response rates along with the time each interview occurred may assist in evaluating the likelihood that nonresponse biased the results. In a survey designed to assess the duration of employee preshift activities, workers were approached as they entered the workplace; records were not kept on refusal rates or the timing of participation in the study. Thus, it was impossible to rule out the plausible hypothesis that individuals who arrived early for their shift with more time to spend on preshift activities were more likely to participate in the study.[241]

Survey professionals generally do not describe pilot testing in their survey reports. They would be more likely to do so if courts recognized that surveys are improved by pilot work that maximizes the likelihood that respondents understand the questions they are being asked. Moreover, the Federal Rules of Civil Procedure may require that a testifying expert disclose pilot work that serves as a basis for the expert's opinion. The situation is more complicated when a nontestifying expert conducts the pilot work and the testifying expert learns about the pilot testing only indirectly through the attorney's advice about the relevant issues

on questionnaire that began, "We need your help. We are helping to defend the NYS Department of Correctional Service in a case that involves their policy on intercepting Five-Percenter literature. Your answers to the following questions will be helpful in preparing a defense.").

240. These criteria were adapted from the Council of American Survey Research Organizations, *supra* note 76, § III.B. Failure to supply this information substantially impairs a court's ability to evaluate a survey. *In re* Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 532 (D.N.J. 1997) (citing the first edition of this manual). *But see* Florida Bar v. Went for It, Inc., 515 U.S. 618, 626–28 (1995), in which a majority of the Supreme Court relied on a summary of results prepared by the Florida Bar from a consumer survey purporting to show consumer objections to attorney solicitation by mail. In a strong dissent, Justice Kennedy, joined by three other Justices, found the survey inadequate based on the document available to the court, pointing out that the summary included "no actual surveys, few indications of sample size or selection procedures, no explanations of methodology, and no discussion of excluded results . . . no description of the statistical universe or scientific framework that permits any productive use of the information the so-called Summary of Record contains." *Id.* at 640.

241. *See* Chavez v. IBP, Inc., 2004 U.S. Dist. LEXIS 28838 (E.D. Wash. Aug. 18, 2004).

416

**EXHIBIT C**

*Reference Guide on Survey Research*

in the case. Some commentators suggest that attorneys are obligated to disclose such pilot work.[242]

## C. In Surveys of Individuals, What Measures Were Taken to Protect the Identities of Individual Respondents?

The respondents questioned in a survey generally do not testify in legal proceedings and are unavailable for cross-examination. Indeed, one of the advantages of a survey is that it avoids a repetitious and unrepresentative parade of witnesses. To verify that interviews occurred with qualified respondents, standard survey practice includes validation procedures,[243] the results of which should be included in the survey report.

Conflicts may arise when an opposing party asks for survey respondents' names and addresses so that they can re-interview some respondents. The party introducing the survey or the survey organization that conducted the research generally resists supplying such information.[244] Professional surveyors as a rule promise confidentiality in an effort to increase participation rates and to encourage candid responses, although to the extent that identifying information is collected, such promises may not effectively prevent a lawful inquiry. Because failure to extend confidentiality may bias both the willingness of potential respondents to participate in a survey and their responses, the professional standards for survey researchers generally prohibit disclosure of respondents' identities. "The use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-identifiable information or lessen the importance of Respondent anonymity."[245] Although no surveyor–respondent privilege currently is recognized, the need for surveys and the availability of other means to examine and ensure their trustworthiness argue for deference to legitimate claims for confidentiality in order to avoid seriously compromising the ability of surveys to produce accurate information.[246]

---

242. *See* Yvonne C. Schroeder, *Pretesting Survey Questions*, 11 Am. J. Trial Advoc. 195, 197–201 (1987).

243. *See supra* Section V.C.

244. *See, e.g.*, Alpo Petfoods, Inc. v. Ralston Purina Co., 720 F. Supp. 194 (D.D.C. 1989), *aff'd in part and vacated in part*, 913 F.2d 958 (D.C. Cir. 1990).

245. Council of Am. Survey Res. Orgs., *supra* note 76, § I.A.3.f. Similar provisions are contained in the By-Laws of the American Association for Public Opinion Research.

246. United States v . Dentsply Int'l, Inc., 2000 U.S. Dist. LEXIS 6994, at ★23 (D. Del. May 10, 2000) (Fed. R. Civ. P. 26(a)(1) does not require party to produce the identities of individual survey respondents); Litton Indus., Inc., No. 9123, 1979 FTC LEXIS 311, at ★13 & n.12 (June 19, 1979) (Order Concerning the Identification of Individual Survey-Respondents with Their Questionnaires) (citing Frederick H. Boness & John F. Cordes, *The Researcher–Subject Relationship: The Need for Protection and a Model Statute*, 62 Geo. L.J. 243, 253 (1973)); *see also* Applera Corp. v. MJ Research, Inc., 389 F. Supp. 2d 344, 350 (D. Conn. 2005) (denying access to names of survey respondents); Lampshire

EXHIBIT C

Copies of all questionnaires should be made available upon request so that the opposing party has an opportunity to evaluate the raw data. All identifying information, such as the respondent's name, address, and telephone number, should be removed to ensure respondent confidentiality.

# VIII. Acknowledgment

Thanks are due to Jon Krosnick for his research on surveys and his always sage advice.

---

v. Procter & Gamble Co., 94 F.R.D. 58, 60 (N.D. Ga. 1982) (defendant denied access to personal identifying information about women involved in studies by the Centers for Disease Control based on Fed. R. Civ. P. 26(c) giving court the authority to enter "any order which justice requires to protect a party or persons from annoyance, embarrassment, oppression, or undue burden or expense.") (citation omitted).

**EXHIBIT C**

*Reference Guide on Survey Research*

# Glossary of Terms

The following terms and definitions were adapted from a variety of sources, including Handbook of Survey Research (Peter H. Rossi et al. eds., 1st ed. 1983; Peter V. Marsden & James D. Wright eds., 2d ed. 2010); Measurement Errors in Surveys (Paul P. Biemer et al. eds., 1991); Willem E. Saris, Computer-Assisted Interviewing (1991); Seymour Sudman, Applied Sampling (1976).

**branching.** A questionnaire structure that uses the answers to earlier questions to determine which set of additional questions should be asked (e.g., citizens who report having served as jurors on a criminal case are asked different questions about their experiences than citizens who report having served as jurors on a civil case).

**CAI (computer–assisted interviewing).** A method of conducting interviews in which an interviewer asks questions and records the respondent's answers by following a computer–generated protocol.

**CAPI (computer–assisted personal interviewing).** A method of conducting face–to–face interviews in which an interviewer asks questions and records the respondent's answers by following a computer–generated protocol.

**CATI (computer–assisted telephone interviewing).** A method of conducting telephone interviews in which an interviewer asks questions and records the respondent's answers by following a computer–generated protocol.

**closed–ended question.** A question that provides the respondent with a list of choices and asks the respondent to choose from among them.

**cluster sampling.** A sampling technique allowing for the selection of sample elements in groups or clusters, rather than on an individual basis; it may significantly reduce field costs and may increase sampling error if elements in the same cluster are more similar to one another than are elements in different clusters.

**confidence interval.** An indication of the probable range of error associated with a sample value obtained from a probability sample.

**context effect.** A previous question influences the way the respondent perceives and answers a later question.

**convenience sample.** A sample of elements selected because they were readily available.

**coverage error.** Any inconsistencies between the sampling frame and the target population.

**double–blind research.** Research in which the respondent and the interviewer are not given information that will alert them to the anticipated or preferred pattern of response.

419

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**error score.** The degree of measurement error in an observed score (see true score).

**full–filter question.** A question asked of respondents to screen out those who do not have an opinion on the issue under investigation before asking them the question proper.

**mall intercept survey.** A survey conducted in a mall or shopping center in which potential respondents are approached by a recruiter (intercepted) and invited to participate in the survey.

**multistage sampling design.** A sampling design in which sampling takes place in several stages, beginning with larger units (e.g., cities) and then proceeding with smaller units (e.g., households or individuals within these units).

**noncoverage error.** The omission of eligible population units from the sampling frame.

**nonprobability sample.** Any sample that does not qualify as a probability sample.

**open–ended question.** A question that requires the respondent to formulate his or her own response.

**order effect.** A tendency of respondents to choose an item based in part on the order of response alternatives on the questionnaire (see primacy effect and recency effect).

**parameter.** A summary measure of a characteristic of a population (e.g., average age, proportion of households in an area owning a computer). Statistics are estimates of parameters.

**pilot test.** A small field test replicating the field procedures planned for the full–scale survey; although the terms *pilot test* and *pretest* are sometimes used interchangeably, a pretest tests the questionnaire, whereas a pilot test generally tests proposed collection procedures as well.

**population.** The totality of elements (individuals or other units) that have some common property of interest; the target population is the collection of elements that the researcher would like to study. Also, universe.

**population value, population parameter.** The actual value of some characteristic in the population (e.g., the average age); the population value is estimated by taking a random sample from the population and computing the corresponding sample value.

**pretest.** A small preliminary test of a survey questionnaire. See pilot test.

**primacy effect.** A tendency of respondents to choose early items from a list of choices; the opposite of a recency effect.

**probability sample.** A type of sample selected so that every element in the population has a known nonzero probability of being included in the sample; a simple random sample is a probability sample.

420

EXHIBIT C

*Reference Guide on Survey Research*

**probe.** A followup question that an interviewer asks to obtain a more complete answer from a respondent (e.g., "Anything else?" "What kind of medical problem do you mean?").

**quasi–filter question.** A question that offers a "don't know" or "no opinion" option to respondents as part of a set of response alternatives; used to screen out respondents who may not have an opinion on the issue under investigation.

**random sample.** See probability sample.

**recency effect.** A tendency of respondents to choose later items from a list of choices; the opposite of a primacy effect.

**sample.** A subset of a population or universe selected so as to yield information about the population as a whole.

**sampling error.** The estimated size of the difference between the result obtained from a sample study and the result that would be obtained by attempting a complete study of all units in the sampling frame from which the sample was selected in the same manner and with the same care.

**sampling frame.** The source or sources from which the individuals or other units in a sample are drawn.

**secondary meaning.** A descriptive term that becomes protectable as a trademark if it signifies to the purchasing public that the product comes from a single producer or source.

**simple random sample.** The most basic type of probability sample; each unit in the population has an equal probability of being in the sample, and all possible samples of a given size are equally likely to be selected.

**skip pattern, skip sequence.** A sequence of questions in which some should not be asked (should be skipped) based on the respondent's answer to a previous question (e.g., if the respondent indicates that he does not own a car, he should not be asked what brand of car he owns).

**stratified sampling.** A sampling technique in which the researcher subdivides the population into mutually exclusive and exhaustive subpopulations, or strata; within these strata, separate samples are selected. Results can be combined to form overall population estimates or used to report separate within-stratum estimates.

**survey–experiment.** A survey with one or more control groups, enabling the researcher to test a causal proposition.

**survey population.** See population.

**systematic sampling.** A sampling technique that consists of a random starting point and the selection of every $n$th member of the population; it is generally analyzed as if it were a simple random sample and generally produces the same results..

**target population.** See population.

EXHIBIT C

*Reference Manual on Scientific Evidence*

**trade dress.** A distinctive and nonfunctional design of a package or product pro–tected under state unfair competition law and the federal Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1946) (amended 1992).

**true score.** The underlying true value, which is unobservable because there is always some error in measurement; the observed score = true score + error score.

**universe.** See population.

422

EXHIBIT C

*Reference Guide on Survey Research*

# References on Survey Research

Paul P. Biemer, Robert M. Groves, Lars E. Lyberg, Nancy A. Mathiowetz, & Seymour Sudman (eds.), Measurement Errors in Surveys (2004).

Jean M. Converse & Stanley Presser, Survey Questions: Handcrafting the Standardized Questionnaire (1986).

Mick P. Couper, Designing Effective Web Surveys (2008).

Don A. Dillman, Jolene Smyth, & Leah M. Christian, Internet, Mail and Mixed-Mode Surveys: The Tailored Design Method (3d ed. 2009).

Robert M. Groves, Floyd J. Fowler, Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, & Roger Tourangeau, Survey Methodology (2004).

Sharon Lohr, Sampling: Design and Analysis (2d ed. 2010).

Questions About Questions: Inquiries into the Cognitive Bases of Surveys (Judith M. Tanur ed., 1992).

Howard Schuman & Stanley Presser, Questions and Answers in Attitude Surveys: Experiments on Question Form, Wording and Context (1981).

Monroe G. Sirken, Douglas J. Herrmann, Susan Schechter, Norbert Schwarz, Judith M. Tanur, & Roger Tourangeau, Cognition and Survey Research (1999).

Seymour Sudman, Applied Sampling (1976).

Survey Nonresponse (Robert M. Groves, Don A. Dillman, John L. Eltinge, & Roderick J. A. Little eds., 2002).

Telephone Survey Methodology (Robert M. Groves, Paul P. Biemer, Lars E. Lyberg, James T. Massey, & William L. Nicholls eds., 1988).

Roger Tourangeau, Lance J. Rips, & Kenneth Rasinski, The Psychology of Survey Response (2000).

EXHIBIT C

EXHIBIT C

# Reference Guide on Estimation of Economic Damages

MARK A. ALLEN, ROBERT E. HALL, AND
VICTORIA A. LAZEAR

*Mark Allen, J.D., is Senior Consultant at Cornerstone Research, Menlo Park, California.*

*Robert Hall, Ph.D., is Robert and Carole McNeil Hoover Senior Fellow and Professor of Economics, Stanford University, Stanford, California.*

*Victoria Lazear, M.S., is Vice President at Cornerstone Research, Menlo Park, California.*

CONTENTS

I. Introduction, 429
II. Damages Experts' Qualifications, 431
III. The Standard General Approach to Quantification of Damages, 432
    A. Isolating the Effect of the Harmful Act, 432
    B. The Damages Quantum Prescribed by Law, 433
    C. Is There Disagreement About What Legitimate Conduct of the Defendant Should Be Hypothesized in Projecting the Plaintiff's Earnings but for the Harmful Event? 439
    D. Does the Damages Analysis Consider All the Differences in the Plaintiff's Situation in the But–For Scenario, or Does It Assume That Many Aspects Would Be the Same as in Actuality? 440
IV. Valuation and Damages, 443
V. Quantifying Damages Using a Market Approach Based on Prices or Values, 444
    A. Is One of the Parties Using an Appraisal Approach to the Measurement of Damages? 445
    B. Are the Parties Disputing an Adjustment of an Appraisal for Partial Loss? 445
    C. Is One of the Parties Using the Assets and Liabilities Approach? 446
    D. Are the Parties Disputing an Adjustment for Market Frictions? 446
    E. Is One of the Parties Relying on Hypothetical Property in Its Damages Analysis? 447
    F. What Complications Arise When Anticipation of Damages Affects Market Values? 448

EXHIBIT C

*Reference Manual on Scientific Evidence*

   VI.  Quantifying Damages as the Sum of Discounted Lost Cash Flows, 448
         A.  Is There Disagreement About But–For Revenues in the Past? 449
         B.  Is There Disagreement About the Costs That the Plaintiff Would Have Incurred but for the Harmful Event? 449
         C.  Is There Disagreement About the Plaintiff's Actual Revenue After the Harmful Event? 450
         D.  What Is the Role of Inflation? 451
             1.  Do the parties use constant dollars for future losses, or are such losses stated in future dollars whose values will be diminished by inflation? 451
             2.  Are the parties using a discount rate properly matched to the projection? 452
             3.  Is one of the parties assuming that discounting and earnings growth offset each other? 453
         E.  Are Losses Measured Before or After the Plaintiff's Income Taxes? 454
         F.  Is There a Dispute About the Costs of Stock Options? 456
         G.  Is There a Dispute About Prejudgment Interest? 457
         H.  Is There Disagreement About the Interest Rate Used to Discount Future Lost Value? 459
         I.  Is One of the Parties Using a Capitalization Factor? 459
  VII.  Limitations on Damages, 461
         A.  Is the Defendant Arguing That Plaintiff's Damages Estimate Is Too Uncertain and Speculative? 461
         B.  Are the Parties Disputing the Remoteness of Damages? 463
         C.  Are the Parties Disputing the Plaintiff's Efforts to Mitigate Its Losses? 464
         D.  Are the Parties Disputing Damages That May Exceed the Cost of Avoidance? 466
         E.  Are the Parties Disputing a Liquidated Damages Clause? 467
 VIII. Other Issues Arising in General in Damages Measurement, 468
         A.  Damages for a Startup Business, 458
              1.  Is the defendant challenging the fact of economic loss? 468
             2.  Is the defendant challenging the use of the expected value approach? 468
             3.  Are the parties disputing the relevance and validity of the data on the value of a startup? 469
         B.  Issues Specific to Damages from Loss of Personal Income, 470
              1.  Calculating losses over a person's lifetime, 470
             2.  Calculation of fringe benefits, 471
             3.  Wrongful death, 473
             4.  Shortened life expectancy, 474
             5.  Damages other than lost income, 474
         C.  Damages with Multiple Challenged Acts: Disaggregation, 475

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

D. Is There a Dispute About Whether the Plaintiff Is Entitled to All the Damages? 477

E. Are the Defendants Disputing the Apportionment of Damages Among Themselves? 479
    1. Are the defendants disputing apportionment among themselves despite full information about their roles in the harmful event? 479
    2. Are the defendants disputing the apportionment because the wrongdoer is unknown? 480

F. Is There Disagreement About the Role of Subsequent Unexpected Events? 480

IX. Data Used to Measure Damages, 482
  A. Types of Data, 482
    1. Electronic data, 482
    2. Paper data, 482
    3. Sampling data, 482
    4. Survey data, 483
  B. Are the Parties Disputing the Validity of the Data? 483
    1. Criteria for determining validity of data, 484
    2. Quantitative methods for validation, 485
  C. Are the Parties Disputing the Handling of Missing Data? 485

X. Standards for Disclosing Data to Opposing Parties, 486
  A. Use of Formats, 487
  B. Data Dictionaries, 487
  C. Resolution of Problems, 488
  D. Special Masters and Neutral Experts, 489

XI. Damages in Class Actions, 489
  A. Class Certification, 489
  B. Classwide Damages, 489
  C. Damages of Individual Class Members, 490
  D. Have the Defendant and the Class's Counsel Proposed a Fair Settlement? 490

XII. Illustrations of General Principles, 491
  A. Claim for Lost Personal Income, 491
    1. Is there a dispute about projected earnings but for the harmful event? 492
    2. Are the parties disputing the valuation of benefits? 492
    3. Is there disagreement about how earnings should be discounted to present value? 495
    4. Is there disagreement about subsequent unexpected events? 495
    5. Is there disagreement about retirement and mortality? 495
    6. Is there a dispute about mitigation? 496
    7. Is there disagreement about how the plaintiff's career path should be projected? 496

EXHIBIT C

*Reference Manual on Scientific Evidence*

B.  Lost Profits for a Business, 497

1.  Is there a dispute about projected revenues? 498
2.  Are the parties disputing the calculation of marginal costs? 499
3.  Is there a dispute about mitigation? 499
4.  Is there disagreement about how profits should be discounted to present value? 500
5.  Is there disagreement about subsequent unexpected events? 500

Glossary of Terms, 501

**EXHIBIT C**

# I.    Introduction

This reference guide identifies areas of dispute that arise when economic losses are at issue in a legal proceeding. Our focus is on explaining the issues in these disputes rather than taking positions on their proper resolutions. We discuss the application of economic analysis within established legal frameworks for damages. We cover topics in economics that arise in measuring damages and provide citations to cases to illustrate the principles and techniques discussed in the text.

We begin by discussing the qualifications required of experts who quantify damages. We then set forth the standard general approach to damages quantification, with particular focus on defining the harmful event and the alternative, often called the but-for scenario. In principle, the difference between the plaintiff's economic value in the but-for scenario and in actuality measures the loss caused by the harmful act of the defendant. We then consider damages estimation for two cases: (1) a discrete loss of market value and (2) the loss of a flow of income over time, where damages are the discounted value of the lost cash flow. Other topics include the role of inflation, issues relating to income taxes and stock options, adjustments for the time value of money, legal limitations on damages, damages for a new business, disaggregation of damages when there are multiple challenged acts, the role of random events occurring between the harmful act and trial, data for damages measurement, standards for disclosing data to opposing parties, special masters and neutral experts, liquidated damages, damages in class actions, and lost earnings.[1]

Our discussion follows the structure of the standard damages study, as shown in Figure 1. Damages quantification operates on the premise that the defendant is liable for damages from the defendant's harmful act. The plaintiff is entitled to recover monetary damages for losses occurring before and possibly after the time of the trial. The top line of Figure 1 measures the losses before trial; the bottom line measures the losses after trial.[2]

The goal of damages measurement is to find the plaintiff's loss of economic value from the defendant's harmful act. The loss of value may have a one-time character, such as the diminished market value of a business or property, or it may take the form of a reduced stream of profit or earnings. The losses are net of any costs avoided because of the harmful act.

The essential elements of a study of losses are the quantification of the reduction in economic value, the calculation of interest on past losses, and the appli-

---

1. For a discussion of specific issues relating to estimating damages in antitrust, intellectual property, and securities litigation, see Mark A. Allen et al., *Estimation of Economic Damages in Antitrust, Intellectual Property, and Securities Litigation* (June 2011), *available at* http://www.stanford.edu/~rehall/DamagesEstimation.pdf.

2. Our scope here is limited to losses of actual dollar income. However, economists sometimes have a role in the measurement of nondollar damages, including pain and suffering and the hedonic value of life. *See generally* W. Kip Viscusi, Reforming Products Liability (1991).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Figure 1. Standard format for a damages study.



cation of financial discounting to future losses. The losses are the difference between the value the plaintiff would have received if the harmful event had not occurred and the value the plaintiff has or will receive, given the harmful event. The plaintiff may be entitled to interest for losses occurring before trial. Losses occurring after trial are usually discounted to the time of trial. The plaintiff may be due interest on the judgment from the time of trial to the time the defendant actually pays. The majority of damages studies fit this format; thus, we have used such a format as the basic model for this reference guide.

We use numerous brief examples to explain the disputes that can arise. These examples are not full case descriptions; they are deliberately stylized. They attempt to capture the types of disagreements about damages that arise in practical experience, although they are purely hypothetical. In many examples, the dispute involves factual as well as legal issues. We do not try to resolve the disputes in these examples and hope that the examples will help clarify the legal and factual disputes that need to be resolved before or at trial. We introduce many areas of potential dispute with a question, because asking the parties these questions can identify and clarify the majority of disputes over economic damages.

The reader with limited experience in the economic analysis of damages may find it most helpful to begin with Sections II and III and then read Section XII.A, which provides a straightforward application of the principles. Sections IV, V, and VI may be particularly helpful for readers knowledgeable in accounting and valuation. The other sections discuss specific issues relating to damages, and some readers may find it useful to review only those specific to their needs. Section XII.B

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

discusses an application of some of these more specific issues in the context of a damages analysis for a business.

# II. Damages Experts' Qualifications

Experts who quantify damages come from a variety of backgrounds. The expert should be trained and experienced in quantitative analysis. For economists, the common qualification is the Ph.D. Damages experts with business or accounting backgrounds often have M.B.A. degrees or other advanced degrees, or C.P.A. credentials. Both the method used and the substance of the damages claim dictate the specific areas of specialization the expert needs. In some cases, participation in original research and authorship of professional publications may add to the qualifications of an expert. However, relevant research and publications are not likely to be on the topic of damages measurement per se but rather on topics and methods encountered in damages analysis. For example, a damages expert may need to restate prices and quantities for a but-for market with more sellers than are present in the actual market. For an expert undertaking this task, direct participation in research on the relation between market structure and performance would be helpful.

Many damages studies use statistical regression analysis.[3] Specific training is required to apply regression analysis. Damages studies sometimes use field surveys.[4] In this case, the damages expert should be trained in survey methods or should work in collaboration with a qualified survey statistician. Because damages estimation often makes use of accounting records, most damages experts need to be able to interpret materials prepared by professional accountants. Some damages issues may require assistance from a professional accountant.

Experts also benefit from professional training and experience in areas relevant to the substance of the damages claim. For example, in antitrust, a background in industrial organization may be helpful; in securities damages, a background in finance may assist the expert; and in the case of lost earnings, an expert may benefit from training in labor economics.

An analysis by even the most qualified expert may face a challenge under the criteria associated with the *Daubert* and *Kumho* cases.[5] These criteria are intended to exclude testimony based on untested and unreliable theories. Relatively few economists serving as damages experts succumb to *Daubert* challenges, because

---

3. For a discussion of regression analysis, *see generally* Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in this manual.

4. For a discussion of survey methods, *see generally* Shari Seidman Diamond, Reference Guide on Survey Research, in this manual.

5. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). For a discussion of emerging standards of scientific evidence, see Margaret A. Berger, The Admissibility of Expert Testimony, Section IV, in this manual.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

most damages analyses operate in the familiar territory of measuring economic values using a combination of professional judgment and standard tools. But the circumstances of each damages analysis are unique, and a party may raise a *Daubert* challenge based on the proposition that the tools have never before been applied to these circumstances. Even if a *Daubert* challenge fails, it can be an effective way for the opposing party to probe the damages analysis prior to trial.

# III. The Standard General Approach to Quantification of Damages

In this section, we review the elements of the standard loss measurement in the format of Figure 1. For each element, there are several areas of potential dispute. The sequence of issues discussed here should identify most of the areas of disagreement between the damages analyses of opposing parties.

## A. Isolating the Effect of the Harmful Act

The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position.

In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful. Accordingly, throughout this discussion, we assume that the plaintiff is entitled to compensation for losses sustained from a harmful act of the defendant. The characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved.

Because the but-for scenario differs from what actually happened only with respect to the harmful act, damages measured in this way isolate the loss of value caused by the harmful act and exclude any change in the plaintiff's value arising from other sources. Thus, a proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only the loss *caused* by the harmful act. The damages expert using the but-for approach does not usually testify separately about the causal relation between damages and the harmful act, although variations may occur where there are issues about the directness of the causal link.

432

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

## B. The Damages Quantum Prescribed by Law

In most cases, the law prescribes a damages measure that falls into one of the following five categories:

- *Expectation:* Plaintiff restored to the same financial position as if the defendant had performed as promised.
- *Reliance:* Plaintiff restored to the same position as if the relationship with the defendant or the defendant's misrepresentation (and resulting harm) had not existed in the first place.
- *Restitution:* Plaintiff compensated by the amount of the defendant's gain from the unlawful conduct, also called compensation for unjust enrichment, disgorgement of ill-gotten gains, or compensation for unbargained-for benefits.[6]
- *Statutory:* Plaintiff's compensation is a set amount per occurrence of wrongdoing. This occurs in cases involving violations of state labor codes and in copyright infringement.
- *Punitive:* Compensation rewards the plaintiff for detecting and prosecuting wrongdoing to deter similar future wrongdoing.

Expectation damages[7] often apply to breach of contract claims, where the wrongdoing is the failure to perform as promised, and the but-for scenario hypothesizes the absence of that wrongdoing, that is, proper performance by the defendant. Expectation damages are an amount sufficient to give the plaintiff the same economic value the plaintiff would have received if the defendant had fulfilled the promise or bargain.[8]

---

6. Courts and commentators often subsume unjust enrichment in defining restitution. Professor Farnsworth, for example, states: "[T]he object of restitution is not the enforcement of a promise, but rather the prevention of unjust enrichment. . . . The party in breach is required to disgorge what he has received in money or services. . . ." *See, e.g.,* E. Allen Farnsworth, Contracts § 12.1, at 814 (1982). However, others have argued that restitution and unjust enrichment are different concepts. *See, e.g.,* James J. Edelman, *Unjust Enrichment, Restitution, and Wrongs,* 79 Tex. L. Rev. 1869 (2001); Peter Birks, *Unjust Enrichment and Wrongful Enrichment,* 79 Tex. L. Rev. 1767 (2001); and Emily Sherwin, *Restitution and Equity: An Analysis of the Principle of Unjust Enrichment,* 79 Tex. L. Rev. 2083 (2001). Judge Posner discusses restitution (defined as returning the breaching party's profits from the breach) in relation to contract damages and unjust enrichment (defined as compensation for unbargained-for benefits) in connection with implied contracts. *See* Richard A. Posner, *Economic Analysis of Law* 130, 151 (1998). *See also* Restatement (Third) of Restitution and Unjust Enrichment (2011).

7. *See* John R. Trentacosta, *Damages in Breach of Contract Cases*, 76 Mich. Bus. J. 1068, 1068 (1997) (describing expectation damages as damages that place the injured party in the same position as if the breaching party completely performed the contract); Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 728–29 (2d Cir. 1992) (defining expectation damages as damages that put the injured party in the same economic position the party would have enjoyed if the contract had been performed).

8. *See* Restatement (Second) of Contracts § 344 cmt. a (1981). Expectation has been called "a queer kind of 'compensation,'" because it gives the promisee something it never had, i.e., the benefit

433

EXHIBIT C

Reliance damages generally apply to torts and to some contract breaches. Such damages restore the plaintiff to the same financial position it would have enjoyed absent the defendant's conduct as well as, in the case of torts, compensation for nonpecuniary losses such as pain and suffering.[9] Reliance most often includes out-of-pocket costs, but may also include compensation for lost opportunities, when appropriate. In such cases, reliance damages may approach expectation damages. For a tort, reliance damages place the plaintiff in a position economically equivalent to the position absent the harmful act.[10] For a breach of contract, measuring damages as the amount of compensation needed to place the plaintiff in the same position as if the contract had not been made in the first place will result in refunding the part of the plaintiff's reliance investment that cannot be recovered in other ways.[11] Thus, reliance damages may be appropriate when the plaintiff made an investment relying on the defendant's performance.

of its bargain. L.L. Fuller & William R. Perdue, Jr., *The Reliance Interest in Contract Damages: 1*, 46 Yale L.J. 52, 53 (1936). The policy underlying expectation damages is that they promote and facilitate reliance on business agreements. *Id*. at 61–62.

9. Generally, the objective of reliance damages is to put the *promisee* or nonbreaching party back to the position in which it would have been had the promise not been made. *See* E. Allan Farnsworth, *Legal Remedies for Breach of Contract*, 70 Colum. L. Rev. 1145, 1148 (1979). *See also* Restatement (Second) of Contracts § 344(b). Reliance damages include expenditures made in preparation for performance and performance itself. Restatement (Second) of Contracts § 349.

10. *See, e.g.,* East River Steamship Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 873 n.9 (1986) ("tort damages generally compensate the plaintiff for loss and return him to the position he occupied before the injury"). The compensatory goal of tort damages is to make the plaintiff whole as nearly as possible through an award of money damages. *See* Randall R. Bovbjerg et al., *Valuing Life and Limb in Tort: Scheduling "Pain and Suffering,"* 83 Nw. U. L. Rev. 908, 910 (1989); John C.P. Goldberg, *Two Conceptions of Tort Damages: Fair v. Full Compensation,* 5 DePaul L. Rev. 435 (2006). Often, the damages expert is not asked to provide guidance relating to estimating damages for nonpecuniary losses such as pain and suffering. However, hedonic analysis may sometimes be used.

11. Economists and legal scholars have debated contract damages and the concepts of expectation and reliance for decades. Fuller and Perdue's definition of reliance included the plaintiff's foregone lost opportunities in addition to his expenditures. But courts that award reliance damages typically award only out-of-pocket expenditures. *See, e.g.,* Michael B. Kelly, *The Phantom Reliance Interest in Contract Damages,* 1992 Wis. L. Rev. 1755, 1771 (1992). Farnsworth has suggested that this is most likely explained by difficulties in damages proof rather than any rule excluding lost opportunities from reliance damages—that is, that the reason for barring the expectation measure (most often lack of proof of damages with reasonable certainty) will apply equally to bar lost opportunities. E Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum. L. Rev. 217, 225 (1987). Reliance damages including lost opportunities may be awarded in cases where the expectation is unavailable because the agreement is illusory or too indefinite to be enforceable. *See, e.g.,* Grouse v. Group Health Plan, Inc., 306 N.W.2d 114 (Minn. 1981), where the plaintiff employee resigned one job and turned down the offer of another in reliance on defendant's promise of employment, but the promised employment would have been at will. The court stated that the proper measure of damages was not what the plaintiff would have earned in his employment with the defendant, but what he lost in quitting his job and turning down an additional offer of employment. *Id*. at 116. Finally, we note that in a competitive market, reliance damages including lost opportunities

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

*Example:*    Agent contracts with Owner for Agent to sell Owner's farm. The asking price is $1,000,000, and the agreed fee is 6%. Agent incurs costs of $1,000 in listing the property. A potential buyer offers the asking price, but Owner withdraws the listing. Agent calculates damages as $60,000, the agreed fee for selling the property. Owner calculates damages as $1,000, the amount that Agent spent to advertise the property.

*Comment:*    Under the expectation remedy, Agent is entitled to $60,000, the fee for selling the property. However, the Agent has only partly performed under the contract, and thus it may be appropriate to limit damages to $1,000. Some states limit recovery in this situation by law to the $1,000, the reliance measure of damages, unless the property is actually sold.[12]

Restitution damages[13] are often the same, from the perspective of quantification, as reliance damages. If the only loss to the plaintiff from the defendant's harmful act arises from an expenditure that the plaintiff made that cannot otherwise be recovered, the plaintiff receives compensation equal to the amount of that expenditure.[14]

Interesting and often difficult issues arise in cases that involve elements of both contract and tort. Consider a contract for a product that turns out to be defective. Generally, under what has become known as the economic loss rule, if the defective product only causes economic or commercial loss, the dispute is a private matter between the parties, and the contract will likely control their dispute. But if the product causes personal injury or property damage (other than to the product itself), then tort law and tort damages will likely control.[15]

are generally equivalent to expectation damages. *See, e.g.,* Robert Cooter & Melvin Aron Eisenberg, *Damages for Breach of Contract,* 73 Cal. L. Rev. 1432, 1445 (1985).

12.  *Compare* Hollinger v. McMichael, 177 Mont. 144, 580 P.2d 927, 929 (1978) (broker earned his commission when he "procured a purchaser able, ready and willing to purchase the seller's property") *with* Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 236 A.2d 843, 855 (1967) (broker earns commission only when the transaction is completed by closing the title in accordance with the provisions of the contract). *See generally* Steven K. Mulliken, *When Does the Seller Owe the Broker a Commission? A Discussion of the Law and What It Teaches About Listing Agreements*, 132 Mil. L. Rev. 265 (1991).

13.  The objective of restitution damages is to put the *promisor* or breaching party back in the position in which it would have been had the promise not been made. Note the traditional legal distinction between restitution and reliance damages: Reliance damages seek to put the *promisee* or nonbreaching party back in the position in which it would have been if the promise had not been made. *See* E. Allan Farnsworth, *Legal Remedies for Breach of Contract*, 70 Colum. L. Rev. 1145, 1148 (1979). Both measures seek to restore the status quo ante. *See also* Restatement (Third) of Restitution and Unjust Enrichment (2011).

14.  *See* Restatement (Second) of Contracts § 344(c).

15.  Judge Posner has advocated using the term "commercial" rather than "economic" loss because, since personal injuries and property losses destroy values that can be monetized, they are economic losses also. *See* Miller v. United States Steel Corp., 902 F.2d 573, 574 (7th Cir. 1990). *See generally* Dan B. Dobbs, *An Introduction to Non-Statutory Economic Loss Claims*, 48 Ariz. L. Rev. 713

435

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Fraud actions can present particularly difficult problems. For example, if the claim is that the defendant fraudulently induced the plaintiff to enter into an agreement that caused purely commercial losses, the economic loss rule may apply to limit the plaintiff's recovery to only commercial losses for breach of contract, and thus not allow recovery of additional damages recoverable under fraud, such as punitive damages. Generally, courts have taken three approaches to this problem. Some courts have found that the economic loss rule applies to bar the tort claim completely, so that the plaintiff can proceed only under a breach of contract theory. Other courts have found that fraud is an exception to the economic loss doctrine, allowing fraud actions to proceed. A third approach allows a separate fraud action, but only if the fraud is "independent of" or "extraneous to" the contract promises.[16]

A plaintiff asserting fraud can generally recover either out-of-pocket costs or expectation damages,[17] but courts today more commonly award expectation damages to place the plaintiff in the position it would have occupied had the fraudulent statement been true.[18] In cases where the court interprets the fraudulent statement as an actual warranty, then the appropriate remedy is expectation damages. Courts, though, have awarded expectation damages even when the fraudulent statement is not interpreted as an actual warranty. Some of these cases may be situations where a contract exists but is legally unenforceable for technical reasons.

As an alternative, the but-for analysis may consider the value the plaintiff would have received in the absence of the economically detrimental relationship created by the fraud. In this case, the but-for analysis for fraud may adopt the premise that the plaintiff would have entered into a valuable relationship with an entity other than the defendant. For example, if the defendant's misrepresentations have caused the plaintiff to purchase property unsuited to the plaintiff's planned use, then the but-for analysis might consider the value that the plaintiff would have received by purchasing a suitable property from another seller.[19]

---

(2006); Richard A. Posner, *Common-Law Economic Torts: An Economic and Legal Analysis*, 48 Ariz. L. Rev. 735 (2006).

16. *See, e.g.,* Dan B. Dobbs, *An Introduction to Non-Statutory Economic Loss Claims,* 48 Ariz. L. Rev. 713, 728–30 (2006); Ralph C. Anzivino, *The Fraud in the Inducement Exception to the Economic Loss Doctrine,* 90 Marq. L. Rev. 921, 931–36 (2007); Richard A. Posner, *Common-Law Economic Torts: An Economic and Legal Analysis,* 48 Ariz. L. Rev. 735 (2006); R. Joseph Barton, *Note: Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims,* 41 Wm. & Mary L. Rev. 1789 (2000). *See also* Marvin Lumber and Cedar Co. v. PPG Industries, 34 F. Supp. 2d 738 (D.C. Minn. 1999) *aff'd,* 223 F.3d 873 (7th Cir. 2000) (economic loss doctrine barred fraud claim of merchant against manufacturer where facts supporting such claim were not independent of those supporting its UCC contract claims).

17. *See* Restatement (Second) of Torts § 549 (1974). Under the Restatement, expectation damages are available only to "the recipient of a fraudulent misrepresentation in a business transaction," and only for intentional, not negligent, misrepresentation. *Id*. §§ 549(2), 552.

18. *See, e.g.,* Richard Craswell, *Against Fuller and Perdue,* 67 U. Chi. L. Rev. 99, 148 (2000).

19. This measure is equivalent to the reliance interest with recovery for lost opportunities, which can approach expectation damages. *See supra* note 11.

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

Plaintiffs cannot normally seek punitive damages in a claim for breach of contract,[20] but may seek them in addition to compensatory damages in connection with a tort claim. Although punitive damages are rarely the subject of expert testimony, economists have advanced the concept that punitive damages compensate a plaintiff who brings a case for a wrongdoing that is hard to detect or hard to prosecute. Thus under this concept, punitive damages should be calculated so that the expected recovery for a randomly chosen victim is equal to the victim's loss. To do this, actual damages are multiplied by a factor that is equal to the reciprocal of the probability of both detecting the harmful act and prosecuting the wrongdoer. This adjustment to the damages estimate ensures that the expected recovery from a randomly chosen victim is equal to the victim's loss.[21]

In some situations, the plaintiff may have a choice of remedies under different legal theories. For example, in determining damages for fraud in connection with a contract, damages may be awarded under tort law for deceit or under contract law for breach.[22]

*Example:*　Buyer purchases a condominium from Owner for $900,000. However, the condominium is known by the Owner to be worth only $800,000 at the time of sale because of defects. Buyer chooses to compute damages under the expectation measure of damages as $100,000 and to retain the condominium. Owner computes damages under the reliance measure owed to Buyer as $900,000 and also seeks the return of the condominium to Owner, despite the fact that the condominium is now worth $1,200,000.

*Comment:*　Owner's application of the reliance remedy is incomplete. Absent the fraud, Buyer would have purchased another condominium and enjoyed the general appreciation in the market. Thus, correctly applied, the two measures are likely to be similar.

---

20. Posner explains that most breaches are either involuntary, where performance is impossible at a reasonable cost, or voluntary but efficient. The policy of contract law is not to compel adherence to contracts, but only to require each party either to perform under the contract or compensate the other party for any resulting injuries. *See* Richard A. Posner, *Economic Analysis of Law, supra* note 6, at 131. For an argument in favor of punitive damages in contracts, see William S. Dodge, *The Case for Punitive Damages in Contracts*, 48 Duke L. J. 629 (1999).

21. *See* A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 879 (1998).

22. This assumes that the economic loss rule does not apply. Generally, plaintiffs will prefer tort remedies to contract remedies because such remedies are broader, affording the possibility of recovery for nonpecuniary losses and punitive damages. For fraud actions, most jurisdictions do not allow recovery for nonpecuniary loses such as emotional distress, although some do if the distress is severe. *See, e.g.,* Nelson v. Progressive Corp., 976 P.2d 859, 868 (Alaska 1999). The Restatement advocates restricting fraud recovery to pecuniary losses. *See* Restatement (Second) of Torts § 549.

437

EXHIBIT C

*Reference Manual on Scientific Evidence*

A plaintiff may argue that a harmful act has caused significant losses for many years. The defendant may reply that most of the losses that occurred from the injury are the result of causes other than the harmful act. Thus, the defendant may argue that the injury was caused by multiple factors only one of which was the result of the harmful act, or the defendant may argue that the observed injury over time was caused by subsequent events.

*Example:*    Worker is the victim of a disease caused either by exposure to xerxium or by smoking. Worker makes leather jackets tanned with xerxium. Worker sues the producer of the xerxium, Xerxium Mine, and calculates damages as all lost wages. Defendant Xerxium Mine, in contrast, attributes most of the losses to smoking and calculates damages as only a fraction of lost wages.

*Comment:*    The resolution of this dispute will turn on the legal question of comparative or contributory fault. If the law permits the division of damages into parts attributable to exposure to xerxium and smoking, then medical evidence on the likelihood of cause may be needed to make that division. We discuss this topic further in Section VIII.B. on disaggregation of damages.

*Example:*    Real Estate Agent is wrongfully denied affiliation with Broker. Agent's damages study projects past earnings into the future at the rate of growth of the previous 3 years. Broker's study projects that earnings would have declined even without the breach because the real estate market has turned downward.

*Comment:*    The difference between a damages study based on extrapolation from the past, here used by Agent, and a study based on actual data after the harmful act, here used by Broker, is one of the most common sources of disagreement in damages. This is a factual dispute that hinges on the broker demonstrating that there is a relationship between real estate market conditions and the earnings of agents. The example also illustrates how subsequent unexplained events can affect damages calculations, discussed in Section VIII.E.

Frequently, the defendant will calculate damages on the premise that the harmful act had no causal relationship to the plaintiff's losses—that is, that the plaintiff's losses would have occurred without the harmful act. The defendant's but-for scenario will thus describe a situation in which the losses happen anyway. This is equivalent to arguing that the harmful act occurred but the plaintiff suffered no losses.

*Example:*    Contractors conspired to rig bids in a construction deal. State seeks damages for subsequent higher prices. Contractors' damages estimate is

438

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

zero because they assert that the only effect of the bid rigging was to determine the winner of the contract and that prices were not affected.

*Comment:*  This is a factual dispute about how much effect bid rigging has on the ultimate price. The analysis should go beyond the mechanics of the bid-rigging system to consider how the bids would be different had there been no collaboration among the bidders.

The defendant may also argue that the plaintiff has overstated the scope of the harmful act. Here, the legal character of the harmful act may be critical; the law may limit the scope to proximate effects if the harmful act was negligence, but may require a broader scope if the harmful act was intentional.[23]

*Example:*  Plaintiff Drugstore Network experiences losses because defendant Superstore priced its products predatorily. Drugstore Network reduced prices in all its stores because it has a policy of uniform national pricing. Drugstore Network's damages study considers the entire effect of national price cuts on profits. Defendant Superstore argues that Network should have lowered prices only on the West Coast and its price reductions elsewhere should not be included in damages.

*Comment:*  Whether adherence to a policy of national pricing is the reasonable response to predatory pricing in only part of the market is a question of fact.

## C. Is There Disagreement About What Legitimate Conduct of the Defendant Should Be Hypothesized in Projecting the Plaintiff's Earnings but for the Harmful Event?

One party's damages analysis may hypothesize the absence of any act of the defendant that influenced the plaintiff, whereas the other's damages analysis may hypothesize an alternative, legal act. This type of disagreement is particularly common in antitrust and intellectual property disputes. Although disagreement over the alternative scenario in a damages study is generally a legal question, opposing experts may have been given different legal guidance and therefore made different economic assumptions, resulting in major differences in their damages estimates.

*Example:*  Defendant Copier Service's long-term contracts with customers are found to be unlawful because they create a barrier to entry that maintains Copier Service's monopoly power. Rival's damages study hypothesizes

---

23. *See generally* Prosser and Keeton on the Law of Torts § 65, at 462 (Prosser et al. 5th ed., 1984). Dean Prosser states that simple negligence and intentional wrongdoing differ "not merely in degree but in the kind of fault . . . and in the social condemnation attached to it." *Id.*

EXHIBIT C

*Reference Manual on Scientific Evidence*

no contracts between Copier Service and its customers, so Rival would face no contractual barrier to bidding those customers away from Copier Service. Copier Service's damages study hypothesizes medium-term contracts with its customers and argues that these would not have been found to be unlawful. Under Copier Service's assumption, Rival would have been much less successful in bidding away Copier Service's customers, and damages are correspondingly lower.

*Comment:*    Assessment of damages will depend greatly on the substantive law governing the injury. The proper characterization of Copier Service's permissible conduct usually is an economic issue. However, the expert must also have legal guidance as to the proper legal framework for damages. Counsel for plaintiff may instruct plaintiff's damages expert to use a different legal framework from that of counsel for the defendant.

## D. Does the Damages Analysis Consider All the Differences in the Plaintiff's Situation in the But-For Scenario, or Does It Assume That Many Aspects Would Be the Same as in Actuality?

The analysis of some types of harmful events requires consideration of effects, such as price erosion,[24] that involve changes in the economic environment caused by the harmful event. For a business, the main elements of the economic environment that may be affected by the harmful event are the prices charged by rivals, the demand facing the seller, and the prices of inputs. For example, misappropriation of intellectual property can cause lower prices because products produced with the misappropriated intellectual property compete with products sold by the owner of the intellectual property. In contrast, some harmful events do not change the plaintiff's economic environment. The theft of some of the plaintiff's products would not change the market price of those products, nor would an injury to a worker change the general level of wages in the labor market. A damages study need not analyze changes in broader markets when the harmful act plainly has minuscule effects in those markets. The plaintiff may assert that, absent the defendant's wrongdoing, a higher price could have been charged and therefore that the defendant's harmful act has eroded the market price. The defendant may reply that the higher price would lower the quantity sold. The parties may then dispute how much the quantity would fall as a result of higher prices.

---

24. *See, e.g.,* General Am. Transp. Corp. v. Cryo-Trans, Inc., 897 F. Supp. 1121, 1123–24 (N.D. Ill. 1995), *modified,* 93 F.3d 766 (Fed. Cir. 1996); Rawlplug Co., Inc. v. Illinois Tool Works Inc., No. 91 Civ. 1781, 1994 WL 202600, at *2 (S.D.N.Y. May 23, 1994); Micro Motion, Inc. v. Exac Corp., 761 F. Supp. 1420, 1430–31 (N.D. Cal. 1991) (holding in all three cases that the patentee is entitled to recover lost profits due to past price erosion caused by the wrongdoer's infringement).

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

*Example:*   Valve Maker infringes patent of Rival. Rival calculates lost profits as the profits Rival would have made plus a price-erosion effect. The amount of price erosion is the difference between the higher price that Rival would have been able to charge absent Valve Maker's presence in the market and the actual price. The price-erosion effect is that price difference multiplied by the combined sales volume of Valve Maker and Rival. Defendant Valve Maker counters that the volume would have been lower had the price been higher and measures damages using the lower volume.

*Comment:*   Wrongful competition is likely to cause some price erosion[25] and, correspondingly, some enlargement of the total market because of the lower price. The more elastic the demand, the lower the volume would have been with a higher price. The actual magnitude of the price-erosion effect could be determined by economic analysis.

Price erosion is a common issue in quantifying intellectual property damages. However, price erosion may be an issue in many other commercial disputes. For example, a plaintiff may argue that the disparagement of its product due to false advertising has eroded the product's price.[26]

In more complicated situations, the damages analysis may need to focus on how an entire industry would be affected by the defendant's wrongdoing. For example, one federal appeals court held that a damages analysis for exclusionary conduct must consider that other firms beside the plaintiff would have enjoyed the benefits of the absence of that conduct. Thus, prices would have been lower, and the plaintiff's profits correspondingly less than those posited in the plaintiff's damages analysis.[27]

*Example:*   Computer Printer Maker has used unlawful means to exclude rival suppliers of ink cartridges. Rival calculates damages on the assumption that it would have been the only additional seller in the market absent the exclusionary conduct, and that Rival would have been able to sell its cartridges at the same price actually charged by Printer Maker. Printer Maker counters that other sellers would have entered the market and driven the price down, and so Rival has overstated its damages.

25.  *See, e.g., Micro Motion,* 761 F. Supp. at 1430 (citing Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536, 553 (1886), in which the *Micro Motion* court stated that "[i]n most price erosion cases, a patent owner has reduced the actual price of its patented product in response to an infringer's competition").

26.  *See, e.g.,* BASF Corp. v. Old World Trading Co., Inc., 41 F.3d 1081 (7th Cir. 1994) (finding that the plaintiff's damages only consisted of lost profits before consideration of price erosion, prejudgment interest, and costs due to the presence of other competitors who would keep prices low).

27.  *See* Dolphin Tours, Inc. v. Pacifico Creative Servs., Inc., 773 F.2d 1506, 1512 (9th Cir. 1985).

441

EXHIBIT C

*Reference Manual on Scientific Evidence*

*Comment:*  Increased competition lowers price in all but the most unusual situations. Again, determination of the number of entrants attracted by the elimination of exclusionary conduct and their effect on the price probably requires a full economic analysis.

A comparison of the parties' statements about the harmful event and the likely impact of its absence will likely reveal differences in legal theories that can result in large differences in damages claims.

*Example:*  Client is the victim of unsuitable investment advice by Broker (all of Client's investments made by Broker are the result of Broker's negligence). Client's damages study measures the sum of the losses of the investments made by Broker, including only the investments that incurred losses. Broker's damages study measures the net loss by including an offset for those investments that achieved gains.

*Comment:*  Client is considering the harmful event to be the recommendation of investments that resulted in losses, whereas Broker is considering the harmful event to be the entire body of investment advice. Under Client's theory, Client would not have made the unsuccessful investments but would have made the successful ones, absent the unsuitable advice. Under Broker's theory, Client would not have made any investments based on Broker's advice.

A clear statement about the plaintiff's situation but for the harmful event is also helpful in avoiding double counting that can arise if a damages study confuses or combines reliance[28] and expectation damages.

*Example:*  Marketer is the victim of defective products made by Manufacturer; Marketer's business fails as a result. Marketer's damages study adds together the out-of-pocket costs of creating the business in the first place and the projected profits of the business had there been no defects. Manufacturer's damages study measures the difference between the profit margin Marketer would have made absent the defects and the profit margin Marketer actually made.

---

28. *See* Section III.B. Reliance damages are distinguished from expectation damages. Reliance damages are defined as damages that do not place the injured party in as good a position as if the contract had been fully performed (expectation damages) but in the same position as if promises were never made. Reliance damages reimburse the injured party for expenses incurred in reliance of promises made. *See, e.g.*, Satellite Broad. Cable, Inc. v. Telefonica de Espana, S.A., 807 F. Supp. 218 (D.P.R. 1992) (holding that under Puerto Rican law an injured party is entitled to reliance but not expectation damages due to the wrongdoer's willful and malicious termination or withdrawal from precontractual negotiations).

442

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

*Comment:*  Marketer has mistakenly added together damages from the reliance principle and the expectation principle.[29] Under the reliance principle, Marketer is entitled to be put back to where it would have been had it not started the business in the first place. Damages are total outlays less the revenue actually received. Under the expectation principle, as applied in Manufacturer's damages study, Marketer is entitled to the profit on the extra sales it would have received had there been no product defects. Out-of-pocket expenses of starting the business would have no effect on expectation damages because they would be present in both the actual and the but-for cases and would offset each other in the comparison of actual and but-for value.

# IV. Valuation and Damages

Most damages measurements deal, one way or another, with the question of the economic value of streams of profit or income. In this section, we introduce some of the basic concepts of valuation. In the following two sections, we first address market approaches that use current data on prices and values to estimate value directly. Second, we address income approaches that start by estimating future flows and then discounting them back to a reference date (often referred to as discounting cash flows). The income approaches apply to losses of personal earnings as well as to business losses from lost streams of profits or income, where damages are calculated as the present value of a lost stream of earnings. Although commonly called income approaches, the methods include discounting any form of cash flow, such as revenues and costs as well as income, to arrive at an estimate of damages.

The choice between the two types of approaches is a matter of expert judgment. In some cases, an expert will use both types of approaches. Much of our discussion is stated in terms of business valuation, but the discussion also applies to real estate and other assets.

Some of the ways experts implement a market approach, based on market prices or values, to determine damages include

- Relying on comparables such as a similar business or property,
- Using balance sheet information such as assets and liabilities,

---

29. The injured party cannot recover both reliance and expectation damages if such recovery would result in double counting. *See, e.g.,* West Haven Sound Development Corp. v. City of West Haven, 514 A.2d 734, 746–47 (Conn. 1986) (plaintiff could seek recovery of reliance expenditures instead of lost profits, but not in addition to lost profits, because reliance expenditures were part of the value of the business as a going concern). *See also* George M. Cohen, *The Fault Lines in Contract Damages,* 80 Va. L. Rev. 1225, 1262 (1994).

EXHIBIT C

*Reference Manual on Scientific Evidence*

- Using known ratios from valuing comparables to measure losses, and
- Multiplying existing valuations by changes in market values from publicly available information.

Different methods that experts use to implement an income approach, based on discounting cash flows, to determine damages include

- Projecting revenues and costs with and without the alleged bad act,
- Adjusting profit streams to present value using measures of inflation and the real rate of interest, and
- Projecting profit streams to present value implicitly using capitalization rates.

Each approach presents challenges. The expert must identify the most appropriate method and implement it properly.

Although these methods may seem different and may rely on different information about the firm, each should generate similar numbers. If not, then there is usually an underlying difference in assumptions. Section V discusses the issues and pitfalls frequently encountered when damages are computed from prices or values, while Section VI discusses the issues and pitfalls frequently encountered when damages are computed relying on discounted cash flows.

# V. Quantifying Damages Using a Market Approach Based on Prices or Values

An expert can sometimes measure damages as of the time of the wrongdoing directly from market prices or values. For example, if the defendant's negligence causes the total destruction of the plaintiff's cargo of wheat, worth $17 million at the current market price, damages are simply that amount. The only task for the expert is to restate the damages as the economic equivalent at time of trial, through the calculation of prejudgment interest, a topic we consider in Section VI.G.

In many cases, the expert does not take a market price and apply it directly. The price of the product or object at issue may not itself be known from a market, but the expert can approximate the market value from the prices of similar products or objects. Appraisers are experts whose task is to estimate the fair market value of real estate, equipment, and works of art. Experts who assess the value of businesses—some of whom specialize as business valuation experts—often perform similar functions based on the known market values of comparable businesses.

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

## A. Is One of the Parties Using an Appraisal Approach to the Measurement of Damages?

Damages analyses based on appraisals usually have two parts. The first is an appraisal of the property, and the second is an application of that appraisal to quantify the loss from the harmful act. The starting point for an appraisal is the choice of comparable properties or businesses. For real estate, the comparables are nearby similar properties. For businesses, the comparables are businesses similar in as many ways as possible to the business at issue, based on characteristics such as type of business, type of customers, size, type of location, and so forth. Only in the case of publicly traded companies is there a known market value at virtually all times. For real estate and private businesses, the comparables must have traded hands at a known transaction price fairly recently. Numerous firms sell databases of transaction prices and other data for the use of business valuation experts.

The second step in an appraisal is the adjustment of the comparables to account for differences between each comparable business or property and the one at issue. Business values are often restated as valuation ratios, such as the ratio of price to revenue or to earnings. Real estate is restated as value per square foot of land or interior space. Such ratios usually need to be specific to the type of business or real estate. In particular, rapidly growing businesses and real estate in growing areas have higher valuation ratios than those with zero or negative growth outlooks.

*Example:*   Oil Company deprives Gas Station Operator of the benefits of Operator's business. Oil Company's damages study starts by calculating the ratio of sales value to gasoline sales for five nearby gas station businesses that have sold recently. The ratio is $0.26 per gallon of sales per year. The Operator sells 1.6 million gallons per year, so the business was worth $0.26 × 1,600,000 = $416,000, according to the Oil Company's expert. The Gas Station Expert argues that the sales used by the Oil Company occurred before a major business relocated nearby. Thus, the sales value to gasoline sales should be increased to $0.30 to reflect the new growth rate as a result of the expected increase in business. He calculates his business to be worth $0.30 × 1,600,000 = $480,000.

## B. Are the Parties Disputing an Adjustment of an Appraisal for Partial Loss?

In most cases where the appraisal approach is appropriate, the plaintiff has not suffered a total loss of property or business, but rather some impairment of its value. In that case, the damages expert will adapt the appraisal to measure the loss from the impairment. Here, again, the use of valuation ratios is common.

445

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

*Example:*    Oil Company breaches an earlier agreement with Gas Station Operator and opens another station near Operator's station. Operator's gasoline sales fall by 700,000 gallons per year. Oil Company's damages study applies the ratio of $0.26 per gallon of sales per year to the loss: $0.26 × 700,000 = $182,000. Operator's damages study uses a regression analysis of the valuation of recently sold businesses and finds that each gallon of *added* sales raises value by $0.47 and so calculates damages as $0.47 × 700,000 = $329,000.

*Comment*:    Because of fixed costs, the average valuation of gasoline sales will be less than the marginal valuation, and the latter is the conceptually correct approach.

## C. Is One of the Parties Using the Assets and Liabilities Approach?

The assets and liabilities approach starts with the accounting balance sheet of a company and adjusts assets and liabilities to approximate current market values. It then nets the assets and the liabilities to compute the net asset value of the firm. The asset values include the value of intangibles. Because these values are hard to determine, the assets and liabilities method is not generally suited to the valuation of businesses with substantial intangible assets.

## D. Are the Parties Disputing an Adjustment for Market Frictions?

Purely competitive markets have what economists term a "frictionless" market structure. These markets have (1) a large number of buyers and sellers of a single, homogeneous product; (2) fully informed participants; and (3) the feature that sellers can easily enter or exit from the market. A "friction" is anything that prevents the market from being purely competitive. The markets for businesses and properties have frictions that may make transaction values depart from the usual concept of the price negotiated by a willing seller and a willing buyer. In the case of a forced sale and thus a less willing seller, the transaction price may understate the value. Adverse selection, which occurs when one party knows more about a property or business than the other, may cause severe understatements in some markets.[30] Because equipment with hidden defects is more likely to be offered for sale than equipment in unusually good condition, and sales prices are lower as a result, owners of the good equipment tend not to offer it on the market.

---

30. *See, e.g.,* George A. Akerlof, *The Market for "Lemons": Quality Uncertainty and the Market Mechanism,* 84 Q. J. Econ. 488 (1970).

446

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

*Example*:    Negligence of Tire Maker causes the total loss of a 747 aircraft. Tire Maker's damages analysis uses the prices of 747s of similar age in the used airplane market to set a value of $23 million on the ruined airplane. However, Airline offers the testimony of an economist expert who explains that only a small fraction of 747s are ever put up for sale in the used airplane market. Rather, airlines choose to sell only defective planes because they continue to fly nondefective 747s. He then adjusts for the adverse selection of inferior airplanes in the used market and places a value of $42 million on the plane.

*Comment:*    Although merited in principle, the airline's adjustment is challenging to carry out and is likely to be the subject of expert disagreement.

A major source of friction in property and business markets is the capital gains tax. Because capital gains are taxed only at realization, after-tax sales prices will generally understate the value of a business or property to the existing owners if they have no plans to sell except in the more distant future. The forced sale implicit in any act that harms a business or property imposes a loss on the owners in excess of their after-tax loss. We discuss this topic later in Section VI.E on taxes.

## E. Is One of the Parties Relying on Hypothetical Property in Its Damages Analysis?

Plaintiffs may argue that undeveloped land or a business opportunity yet to be pursued was taken from them by the defendant's harmful act and that the value lost should include the value of the still hypothetical improvements. We consider this topic in more detail in Section VIII.A in its most important form, damages for harm to a startup business.

*Example*:    Property Owner sues County for the value of undeveloped property condemned for a rapid transit extension. Owner's damages claim is $18 million, the appraisal value of a hypothetical condominium development on the property less the anticipated cost of building the development. The County's expert, an appraiser, argues that the market value of the property is $2 million, based on comparable undeveloped land nearby.

*Comment*:    In principle, the current market value of undeveloped land and the market value of the same land with proper development, less the cost of that development, should be the same, because buyers would bid based on the value of the undeveloped land. Property Owner probably understated the development costs. But the value of the nearby property may understate the value of the condemned property—it is for sale because it lacks certain features that make it less desirable to

447

EXHIBIT C

*Reference Manual on Scientific Evidence*

develop, such as a view. On the other hand, the Property Owner's valuation does not reflect the probability that the Property Owner may not succeed in building the condominium.

## F. What Complications Arise When Anticipation of Damages Affects Market Values?

For publicly traded companies, the harmful act may depress the market value of the company itself. For example, suppose that a manufacturer of wood windows treats its windows with a preservative that is defective, causing the windows to rot. The window manufacturer sues the manufacturer of the preservative for damages from lost sales in addition to the cost of replacing the defective windows. The window manufacturer's expert may be tempted to use the decline following the harm as a measure of damages. In cases when the news of the harm reaches the public discretely, say in a single day, the technique of an event study, commonly used in securities fraud cases, can be used to isolate the special component of the decline in market value.

The problem with using the plaintiff's market value is that the market will anticipate recovery in the form of damages, and this will offset at least some of the decline in market value. In the extreme, if stock traders expect that the plaintiff will receive exactly full compensation, the plaintiff's market value will not change at all when knowledge of the wrongdoing—including the fact that a damages award will be made—hits the stock market. Thus, the use of the observed decline in the value of the plaintiff company at the time of the injury understates the actual amount of harm by an unknown amount, so the expert should consider using other valuation techniques. Note that this understatement arises when the publicly traded company itself stands to recover damages.

Changes in market values have a different role in situations, such as fraud on the market, where the public company is the defendant. If the release of previously fraudulently concealed adverse information causes both a reduction in the value of the company because of the information and a further reduction because the market anticipates that the company will pay damages to investors who overpaid for their shares during the period when the information was concealed, damages may be overstated by an unknown amount.

# VI. Quantifying Damages as the Sum of Discounted Lost Cash Flows

The fundamental principle of economics governing the second approach to valuation is that the value of a business is the present value of its expected future cash

EXHIBIT C

flows.[31] In forming a present value, the expert multiplies each future year's cash flows by the value today for a dollar received in that future year. This price is the discount factor. Thus, the discount factor reflects the decreased value for a dollar received in the future compared to the value of a dollar received today.

In broad summary, the damages expert using the discounted cash flow approach projects historical and future but-for revenue and cost, actual historical revenue and cost, and projected actual revenue and cost. The difference between revenue and cost is cash flow, and the difference between but-for and actual cash flow is the loss of cash flow attributable to the harmful act. The expert then applies discount rates to each year's lost cash flow to determine damages.

## A. Is There Disagreement About But-For Revenues in the Past?

A common source of disagreement about the likely profitability of a business is the absence of a track record of earlier profitability. Whenever the plaintiff is a startup business, the issue will arise of reconstructing the value of a business with no historical benchmark.

*Example:* Plaintiff Xterm is a failed startup. Defendant VenFund has breached a venture capital financing agreement. Xterm's damages study projects the profits it would have made under its business plan. VenFund's damages estimate, which is much lower, is based on the value of the startup as revealed by sales of Xterm equity made just before the breach.

*Comment:* Both sides confront factual issues to validate their damages estimates. Xterm needs to show that its business plan was still a reasonable forecast as of the time of the breach. VenFund needs to show that the sale of equity places a reasonable value on the firm, that is, that the equity sale was at arm's length and was not subject to discounts. This dispute can also be characterized as whether the plaintiff is entitled to expectation damages or reliance damages. The jurisdiction may limit damages for firms with no track record.

## B. Is There Disagreement About the Costs That the Plaintiff Would Have Incurred but for the Harmful Event?

Where the injury takes the form of lost sales volume, the plaintiff usually has avoided the cost of production for the lost sales. Calculation of these avoided costs is a common area of disagreement about damages. Conceptually, avoided cost is the difference between the cost that would have been incurred at the higher volume of

---

31. This discussion follows that in Shannon Pratt, Business Valuation Body of Knowledge 85–95 (2d ed. 2003).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

sales but for the harmful event and the cost actually incurred at the lower volume of sales achieved. In the format of Figure 1, the avoided–cost calculation is done each year. The following are some of the issues that arise in calculating avoided cost:

- For a firm operating at capacity, expansion of sales is cheaper in the long run than in the short run, whereas, if there is unused capacity, expansion may be cheaper in the short run.
- The costs that can be avoided if sales fall abruptly are smaller in the short run than in the long run.
- Avoided costs may include marketing, selling, and administrative costs as well as the cost of manufacturing.
- Some costs are fixed, at least in the short run, and are not avoided as a result of the reduced volume of sales caused by the harmful act.

Sometimes putting costs into just two categories is useful: those that vary with sales (variable costs) and those that do not vary with sales (fixed costs). This breakdown is approximate, however, and does not do justice to important aspects of avoided costs. In particular, costs that are fixed in the short run may be variable in the longer run. Disputes frequently arise over whether particular costs are fixed or variable. One side may argue that most costs are fixed and were not avoided by losing sales volume, whereas the other side may argue that many costs are variable.

Certain accounting concepts relate to the calculation of avoided cost. Profit-and–loss statements frequently report the "cost of goods sold."[32] Costs in this category are frequently, but not uniformly, avoided when sales volume is lower. But costs in other categories, called "operating costs" or "overhead costs," also may be avoided, especially in the long run. One approach to the measurement of avoided cost is based on an examination of all of a firm's cost categories. The expert determines how much of each category of cost was avoided.

An alternative approach uses regression analysis or some other statistical method to determine how costs vary with sales as a general matter within the firm or across similar firms. The results of such an analysis can be used to measure the costs avoided by the decline in sales volume caused by the harmful act.

## C. Is There Disagreement About the Plaintiff's Actual Revenue After the Harmful Event?

When the plaintiff has mitigated the adverse effects of the harmful act by making an investment that has not yet paid off at the time of trial, disagreement may arise about the value that the plaintiff has actually achieved.

---

32. *See, e.g.,* United States v. Arnous, 122 F.3d 321, 323 (6th Cir. 1997) (finding that the district court erred when it relied on government's theory of loss because the theory ignored the cost of goods sold).

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

*Example:*  Manufacturer breaches agreement with Distributor. Distributor starts a new business that shows no accounting profit as of the time of trial. Distributor's damages study makes no deduction for actual earnings during the period from breach to trial. Manufacturer's damages study places a value on the new business as of the time of trial and deducts that value from damages.

*Comment:*  Some offset for economic value created by Distributor's mitigation efforts may be appropriate. Note that if Distributor made a good–faith effort to create a new business, but was unsuccessful because of adverse events outside its control, the issue of the treatment of unexpected subsequent events will arise.[33]

## D. What Is the Role of Inflation?

### 1. Do the parties use constant dollars for future losses, or are such losses stated in future dollars whose values will be diminished by inflation?

Persistent inflation in the U.S. economy complicates projections of future losses. Although inflation rates in the United States since 1987 have been only in the range of 1% to 3% per year, the cumulative effect of inflation has a pronounced effect on future dollar quantities. At 3% annual inflation, a dollar today buys what $4.38 will buy 50 years from now. Under inflation, the unit of measurement of economic values becomes smaller each year, and this shrinkage must be considered if future losses are measured in the smaller dollars of the future. Calculations of this type are often termed "escalation." Dollar losses grow in the future because of the use of the shrinking unit of measurement. For example, an expert might project that revenues for a firm will rise at approximately 5% per year for the next 10 years—3% because of general inflation and 2% more because of the growth of the firm.[34]

Alternatively, the expert may project future losses in constant dollars without explicitly accounting for escalation for future inflation.[35] The use of constant dollars avoids the problems of dealing with a shrinking unit of measurement. In the example just given, the expert might project that revenues will rise at 2% per year in constant dollars. Constant dollars must be stated with respect to a base year. Thus, a calculation in constant 2009 dollars means that the unit for future measurement is the purchasing power of the dollar in 2009.

---

33. *See* Section VIII.F.

34. *See* Section VI.D.2.

35. *See, e.g.,* Willamette Indus., Inc. v. Commissioner, 64 T.C.M. (CCH) 202 (1992) (holding expert witness erred in failing to take inflation escalation into account).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## 2. Are the parties using a discount rate properly matched to the projection?

For future losses, a damages study calculates the amount of compensation needed at the time of trial to replace expected future lost income. The result is discounted future losses;[36] it is also sometimes referred to as the present value of future losses.[37] Discounting is conceptually separate from the adjustment for inflation considered in the preceding section. Discounting is typically carried out in the format shown in Table 1.

Table 1. Calculation of Discounted Loss at 5% Interest

| Years in Future | Loss | Discount Factor | Discounted Loss[a] |
|---|---|---|---|
| 0 | $100 | 1.000 | $100 |
| 1 | 125 | 0.952 | 119 |
| 2 | 130 | 0.907 | 118 |
| Total | | | $337 |

[a]Discounted Loss = Loss × Discount Factor.

"Loss" is the estimated future loss, in either escalated or constant–dollar form. "Discount factor" is a factor that calculates the number of dollars needed at the time of trial to compensate for a lost dollar in the future year. The discount factor is the ratio of the value at a future date of a cash flow received today to its value today. It is calculated from the discount rate, which is the interest rate that values a cash flow at a future date. If the current 1-year interest rate is 5%, then the discount rate is 1.05—the value of $1 will be $1.05 a year from now. The discount factor will therefore be $1/$1.05. The 2-year discount rate is the square of 1.05, and the discount factor will be $1/(1.05 \times 1.05)$ Thus, the discount factor is computed by compounding the discount rate forward from the base year to the future year and then taking the reciprocal.

For example, in Table 1, the interest rate is 5%. As discussed, the discount factor for the next year is calculated as the reciprocal of 1.05, and the discount factor for 2 years in the future is calculated as the reciprocal of 1.05 squared. Future discounts would be obtained by multiplying by 1.05 a suitably larger number of times and then taking the reciprocal. The discounted loss is the loss multiplied by the discount factor for that year. The number of dollars at time of trial that compensates for the loss is the sum of the discounted losses, $337 in this example.

36. *See generally* Michael A. Rosenhouse, Annotation, *Effect of Anticipated Inflation on Damages for Future Losses—Modern Cases*, 21 A.L.R. 4th 21 (1981) (discussing discounted future losses extensively).

37. *See generally* George A. Schieren, *Is There an Advantage in Using Time-Series to Forecast Lost Earnings?* 4 J. Legal Econ. 43 (1994) (discussing effects of different forecasting methods on present discounted value of future losses). *See, e.g.*, Wingad v. John Deere & Co., 523 N.W.2d 274, 277–79 (Wis. Ct. App. 1994) (calculating present discounted value of future losses).

452

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

To discount a future loss projected in escalated terms, one should use an ordinary interest rate. For example, in Table 1, if the losses of $125 and $130 are in dollars of those years, and not in constant dollars of the initial year, then the use of a 5% discount rate is appropriate if 5% represents an accurate measure of the current interest rate, also known as the time value of money. The ordinary interest rate is often called the nominal interest rate to distinguish it from the real interest rate.

To discount a future loss projected in constant dollars, one should use a real interest rate as the discount rate. A real interest rate is an ordinary interest rate less an assumed rate of future inflation.[38] In Table 1, the use of a 5% discount rate for discounting constant–dollar losses would be appropriate if the ordinary interest rate was 8% and the rate of inflation was 3%.[39] Then the real interest rate would be 8% minus 3%, or 5%. The deduction of the inflation rate from the discount rate is the counterpart of the omission of escalation for inflation from the projection of future losses.

## 3. Is one of the parties assuming that discounting and earnings growth offset each other?

An expert might make the assumption that future growth of losses will occur at the same rate as the discount rate. Table 2 illustrates the standard format for this method of calculating discounted loss.

Table 2. Calculation of Discounted Loss When Growth and Discounting Offset Each Other

| Years in Future | Loss | Discount Factor | Discounted Loss[a] |
|---|---|---|---|
| 0 | $100 | 1.000 | $100 |
| 1 | 105 | 0.952 | 100 |
| 2 | 110 | 0.907 | 100 |
| Total | | | $300 |

[a]Discounted Loss = Loss × Discount Factor.

When growth and discounting exactly offset each other, the present dis–counted value is the number of years of lost future earnings multiplied by the

38. Some experts rely on the real interest rate inferred from the price of TIPS (Treasury Inflation Protected Securities).

39. Technically, the formula is: $(1 + \text{real rate of interest}) = (1 + \text{ordinary rate of interest})/(1 + \text{inflation})$. However, the difference is diminimus unless the ordinary rate of interest is high. Thus, using this formula, the real interest rate is 4.85%.

453

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

current amount of lost earnings.[40] In Table 2, the loss of $300 is exactly three times the base year's loss of $100. Thus the discounted value of future losses can be calculated by a shortcut in this special case. The explicit projection of future losses and the discounting back to the time of trial are unnecessary. However, the parties may dispute whether the assumption that growth and discounting are exactly offsetting is realistic in view of projected rates of growth of losses and market interest rates at the time of trial.

In *Jones & Laughlin Steel Corp. v. Pfeifer*,[41] the Supreme Court considered the issue of escalated dollars with nominal discounting against constant dollars with real discounting. It found both acceptable, although the Court seemed to express a preference for the second format.

## E. Are Losses Measured Before or After the Plaintiff's Income Taxes?

A damages award compensates the plaintiff for lost economic value. In principle, the calculation of compensation should measure the plaintiff's loss after taxes and then calculate the magnitude of the pretax award needed to compensate the plaintiff fully, once taxation of the award is considered. In practice, the tax rates applied to the original loss and to the compensation are frequently the same. When the rates are the same, the two tax adjustments are a wash. In that case, the appropriate pretax compensation is simply the pretax loss, and the damages calculation may be simplified by the omission of tax considerations.[42]

In some damages analyses, explicit consideration of taxes is essential, and disagreements between the parties may arise about these tax issues. If the plaintiff's lost income would have been taxed as a capital gain (at a preferential rate), but the damages award will be taxed as ordinary income, the plaintiff can be expected to include an explicit calculation of the extra compensation needed to make up for the loss of the tax advantage. Sometimes tax considerations are paramount in damages calculations.[43]

---

40. Certain state courts have, in the past, required that the offset rule be used so as to avoid speculation about future earnings growth. In *Beaulieu v. Elliott,* 434 P.2d 665, 671–72 (Alaska 1967), the court ruled that discounting was exactly offset by wage growth. In *Kaczkowki v. Bolubasz,* 421 A.2d 1027, 1036–38 (Pa. 1980), the Pennsylvania Supreme Court ruled that no evidence on price inflation was to be introduced and deemed that inflation was exactly offset by discounting.

41. 462 U.S. 523 (1983).

42. There is a separate issue about the effect of taxes on the interest rate for prejudgment interest and discounting. *See* discussion *infra* Sections VI.G, VI.H.

43 *See generally* John H. Derrick, Annotation, *Damages for Breach of Contract as Affected by Income Tax Considerations*, 50 A.L.R. 4th 452 (1987) (discussing a variety of state and federal cases in which courts ruled on the propriety of tax considerations in damage calculations; courts have often been reluctant to award difference in taxes as damages because it is calling for too much speculation).

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

*Example:*   Trustee wrongfully sells Beneficiary's property at full market value. Beneficiary would have owned the property until death and deferred the capital gains tax.

*Comment:*  Damages are the difference between the actual capital gains tax and the present value of the future capital gains tax that would have been paid but for the wrongful sale, even though the property sold at its full value.

In some cases, the law requires different tax treatment of loss and compensatory awards. Again, the tax adjustments do not offset each other, and consideration of taxes may be a source of dispute.

*Example:*   Driver injures Victim in a truck accident. A state law provides that awards for personal injury are not taxable, even though the income lost as a result of the injury would have been taxable. Victim calculates damages as lost pretax earnings, but Driver calculates damages as lost earnings after tax.[44] Driver argues that the nontaxable award would exceed actual economic loss if it were not adjusted for the taxation of the lost income.

*Comment:*  Under the principle that damages are to restore the plaintiff to the economic equivalent of the plaintiff's position absent the harmful act, it may be recognized that the income to be replaced by the award would have been taxed. However, the law in a particular jurisdiction may not allow a jury instruction on the taxability of an award.[45]

*Example:*   Worker is wrongfully deprived of tax-free fringe benefits by Employer. Under applicable law, the award is taxable. Worker's damages estimate includes a factor so that the amount of the award, after tax, is sufficient to replace the lost tax-free value.

*Comment:*  Again, to achieve the goal of restoring plaintiff to a position economically equivalent absent the harmful act, an adjustment of this type is

44. *See generally* Brian C. Brush & Charles H. Breedon, *A Taxonomy for the Treatment of Taxes in Cases Involving Lost Earnings*, 6 J. Legal Econ. 1 (1996) (discussing four general approaches for treating tax consequences in cases involving lost future earnings or earning capacity based on the economic objective and the tax treatment of the lump sum award). *See, e.g.,* Myers v. Griffin–Alexander Drilling Co., 910 F.2d 1252 (5th Cir. 1990) (holding loss of past earnings between the time of the accident and the trial could not be based on pretax earnings).

45. *See generally* John E. Theuman, Annotation, *Propriety of Taking Income Tax into Consideration in Fixing Damages in Personal Injury or Death Action*, 16 A.L.R. 4th 589 (1981) (discussing a variety of state and federal cases in which the propriety of jury instructions regarding tax consequences is at issue). *See, e.g.,* Bussell v. DeWalt Prods. Corp., 519 A.2d 1379 (N.J. 1987) (holding that trial court hearing a personal injury case must instruct jury, upon request, that personal injury damages are not subject to state and federal income taxes); Gorham v. Farmington Motor Inn, Inc., 271 A.2d 94 (Conn. 1970) (holding court did not err in refusing to instruct jury that personal injury damages were tax-free).

EXHIBIT C

*Reference Manual on Scientific Evidence*

appropriate. The adjustment is often called "grossing up" damages.[46] To accomplish grossing up, divide the lost tax-free value by one minus the tax rate. For example, if the loss is $100,000 of tax-free income, and the income tax rate is 25%, the award should be $100,000 divided by 0.75, or $133,333.

## F. Is There a Dispute About the Costs of Stock Options?

In some firms, employee stock options are a significant part of total compensation. Stock options are often used by startup businesses because the options do not require the business to pay out any cash. However, at a future date, the options may be exercised and the option holder will pay only the price per share at the time the options are received as opposed to the price per share at the time the options are exercised. In this way, the firm transfers part of the compensation costs incurred today to the firm's shareholders.

The parties may dispute whether the value of options should be included in the costs avoided by the plaintiff as a result of lost sales volume. The defendant might argue that stock options should be included, because their issuance is costly to the shareholders. The defendant might place a value on newly issued options and amortize this value over the period from issuance to vesting. The plaintiff, in contrast, might exclude options costs because the options cost the firm no cash payout, even though they impose costs on the firm's shareholders.

*Example:*    Firm A pays its sales manager $2000 for every machine sold at $100,000 as well as options to purchase 1600 shares in a year at the existing price of $10 per share. As a result of B's disparagement of A, A asserts that it lost $10,000,000 in sales (100 machines). In its damages analysis, A states that the lost sales represent lost profits of $5,800,000: $10,000,000 less $4,000,000 in avoided production costs and $200,000 in avoided sales commissions. Defendant B calculates that each stock option is worth $5 today based on an analysis using accepted financial models to value the options. Thus, B asserts that damages are $5,000,000: $10,000,000 less $4,000,000 in avoided production costs and $1,000,000 in sales commissions ($200,000 plus $5 × 100 × 1600).

*Comment*:    The costs of the options will never show up on the profit-and-loss statements for Firm A, even if exercised. However, Firm A will receive a lower value for each share it sells either to an investor or through an IPO to reflect the potential future dilution in its shares outstanding.

---

46. *See* Cecil D. Quillen, Jr., *Income, Cash, and Lost Profits Damages Awards in Patent Infringement Cases*, 2 Fed. Circuit B.J. 201, 207 (1992) (discussing the importance of taking tax consequences and cash flows into account when estimating damages).

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

## G. Is There a Dispute About Prejudgment Interest?[47]

The law may specify how to calculate interest for losses prior to a verdict on liability, generally termed "prejudgment interest." The law may exclude prejudgment interest, specify prejudgment interest to be a statutory rate, or exclude compounded interest. Table 3 illustrates these alternatives. With simple uncompounded interest, losses from 5 years before trial earn five times the specified interest, and so compensation for a $100 loss from 5 years ago is $135 at 7% interest. With compound interest, the plaintiff earns interest on past interest. Compensation at 7% interest compounded is about $140 for a loss of $100 five years before trial. The difference between simple and compound interest becomes much larger if the time from loss to trial is greater or if the interest rate is higher. Because interest receipts in practice do earn further interest, economic analysis generally supports the use of compound interest.

Table 3. Calculation of Prejudgment Interest (in Dollars)

| Years Before Trial | Loss Without Interest | Loss with Compound Interest at 7% | Loss with Simple Uncompounded Interest at 7% |
|---|---|---|---|
| 10 | 100 | 197 | 170 |
| 9 | 100 | 184 | 163 |
| 8 | 100 | 172 | 156 |
| 7 | 100 | 161 | 149 |
| 6 | 100 | 150 | 142 |
| 5 | 100 | 140 | 135 |
| 4 | 100 | 131 | 128 |
| 3 | 100 | 123 | 121 |
| 2 | 100 | 114 | 114 |
| 1 | 100 | 107 | 107 |
| 0 | 100 | 100 | 100 |
| Total | 1100 | 1579 | 1485 |

47. *See generally* Michael S. Knoll, *A Primer on Prejudgment Interest,* 75 Tex. L. Rev. 293 (1996) (discussing prejudgment interest extensively). *See, e.g.,* Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386, 391–92 (D. Md. 1997) (specifying a method of calculating prejudgment interest in an employment discrimination case to ensure plaintiff is fairly compensated rather than given a windfall); Acron/Pacific Ltd. v. Coit, No. C-81-4264-VRW, 1997 WL 578673, at ⋆2 (N.D. Cal. Sept. 8, 1997) (reviewing supplemental interest calculations and applying California state law to determine the appropriate amount of prejudgment interest to be awarded); Prestige Cas. Co. v. Michigan Mut. Ins. Co., 969 F. Supp. 1029 (E.D. Mich. 1997) (analyzing Michigan state law to determine the appropriate prejudgment interest award).

EXHIBIT C

*Reference Manual on Scientific Evidence*

Where the law does not prescribe the form of interest for past losses, the experts will normally apply a reasonable interest rate to bring those losses forward. The parties may disagree on whether the interest rate should be measured before or after tax. The before-tax interest rate is the normally quoted rate. To calculate the corresponding after-tax rate, one subtracts the amount of income tax the recipient would have to pay on the interest. Thus, the after-tax rate depends on the tax situation of the plaintiff. The format for calculation of the after-tax interest rate is shown in the following example:

1. Interest rate before tax: 9%
2. Tax rate: 30%
3. Tax on interest (line 1 times line 2): 2.7%
4. After-tax interest rate (line 1 less line 3): 6.3%

Even where damages are calculated on a pretax basis, economic considerations suggest that the prejudgment interest rate should be on an after-tax basis: Had a taxpaying plaintiff actually received the lost earnings in the past and invested the earnings at the assumed rate, income tax would have been due on the interest. The plaintiff's accumulated value would be the amount calculated by compounding past losses at the after-tax interest rate.

Where there is economic disparity between the parties, there may be a disagreement about whose interest rate should be used—the borrowing rate of the defendant or the lending rate of the plaintiff, or some other rate. There may also be disagreements about adjustment for risk.[48]

*Example:*    Crop Insurance Company disputes payment of insurance to Farmer. Farmer calculates damages as the payment due plus the large amount of interest charged by a personal finance company; no bank was willing to lend to her, given her precarious financial condition. Crop Insurer calculates damages as a lower payment plus the interest on the late payment at the normal bank loan rate.

*Comment:*    The law may limit claims for prejudgment interest to a specified interest rate, and a court may hold that this situation falls within the limit. Economic analysis does support the idea that delays in payments are more costly to people with higher borrowing rates and that the actual rate incurred may be considered damages.

---

48. *See generally* James M. Patell et al., *Accumulating Damages in Litigation: The Roles of Uncertainty and Interest Rates*, 11 J. Legal Stud. 341 (1982) (extensive discussion of interest rates in damages calculations).

**EXHIBIT C**

## H. Is There Disagreement About the Interest Rate Used to Discount Future Lost Value?

Discount calculations should use a reasonable interest rate drawn from current data at the time of trial for losses projected to occur after trial. The interest rate might be obtained from the rates that could be earned in the bond market from a bond of maturity comparable to the lost stream of receipts. As in the case of prejudgment interest, there is an issue as to whether the interest rate should be on a before- or after-tax basis. The parties may also disagree about adjusting the interest rate for risk. A common approach for determining the interest on lost business profit is to use the Capital Asset Pricing Model (CAPM)[49] to calculate the risk-adjusted discount rate. The CAPM is the standard method in financial economics to analyze the relation between risk and discounting. In the CAPM method, the expert first measures the firm's "beta"—the ratio of the percent variation in one firm's value to the percent variation in the value of all businesses. That is, if the index of value for a representative set of firms[50] increases by 10% over a year and the firm has a beta of 1.5, then its value is expected to increase by 15% over a year. Then the risk-adjusted discount rate is the risk-free rate from a U.S. Treasury security plus the beta multiplied by the historical average risk premium for the stock market.[51] The calculation may be presented in the following format:

1. Risk-free interest rate: 4.0%
2. Beta for this firm: 1.2
3. Market equity premium: 6.0%
4. Equity premium for this firm (line 2 times line 3): 7.2%
5. Discount rate for this firm (line 1 plus line 4): 11.2%

## I. Is One of the Parties Using a Capitalization Factor?

Another approach to discounting a stream of losses uses a market capitalization factor. A capitalization factor is the ratio of the value of a future stream of income to the current amount of the stream; for example, if a firm is worth $1 million and its current earnings are $100,000, its capitalization factor is ten.

The capitalization factor generally is obtained from the market values of comparable assets or businesses. For example, the expert might locate a comparable business traded in the stock market and compute the capitalization factor as

---

49. *See, e.g.,* Cede & Co. v. Technicolor, Inc., No. Civ.A.7129, 1990 WL 161084 (Del. Ch. Oct. 19, 1990) (Mem.) (assessing the propriety of using CAPM to determine the discount rate); Gilbert v. MPM Enters., Inc., No. 14416, 1997 WL 633298, at *8 (Del. Ch. Oct. 9, 1997) (finding that petitioner's expert witnesses' use of CAPM is appropriate).

50. For example, the S&P 500.

51. Richard A. Brealey et al., Principles of Corporate Finance 213–22 (9th ed. 2008).

EXHIBIT C

the ratio of stock market value to operating income. In addition to capitalization factors derived from markets, experts sometimes use rule-of-thumb capitalization factors. For example, the value of a dental practice might be taken as 2 year's gross revenue (the capitalization factor for revenue is 2). Often the parties dispute whether there is reliable evidence that the capitalization factor accurately measures value for the specific asset or business.

Once the capitalization factor is determined, the calculation of the discounted value of the loss is straightforward: It is the current annual loss in operating profit multiplied by the capitalization factor. A capitalization factor approach to valuing future losses may be formatted in the following way:

1. Ratio of market value to current annual earnings in comparable publicly traded firms: 13
2. Plaintiff's lost earnings over past year: $200,000
3. Value of future lost earnings (line 1 times line 2): $2,600,000

The capitalization factor approach might also be applied to revenue, cash flow, accounting profit, or other measures. The expert might adjust market values for any differences between the valuation principles relevant for damages and those that the market applies. For example, the value in the stock market may be considered the value placed on a business for a minority interest, whereas the plaintiff's loss relates to a controlling interest. In this case, the expert would adjust the capitalization factor upward to account for the value of the control rights. The parties may dispute almost every element of the capitalization calculation.

*Example:* Lender is responsible for failure of Auto Dealer. Plaintiff Auto Dealer's damages study projects rapid growth of future profits based on the current year's profit but for Lender's misconduct. The study uses a discount rate calculated as the after-tax interest rate on Treasury bills. As a result, the application of the discount rate to the future stream of earnings implies a capitalization rate of 12 times the current pretax profit. The resulting estimate of lost value is $10 million. Defendant Lender's damages study uses data on the actual sale prices of similar dealerships in various parts of the country. The data show that the typical sales price of a dealership is six times its 5-year average annual pretax profit. Lender's damages study multiplies the capitalization factor of six by the 5-year average annual pretax profit of Auto Dealer of $500,000 to estimate lost value as $3 million.

*Comment:* Part of the difference between the two damages studies comes from the higher implied capitalization factor used by Auto Dealer. Another reason for the differences may be that the 5-year average pretax profit is less than the current-year profit.

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

# VII. Limitations on Damages

The law imposes four important limitations on a plaintiff's ability to recover losses as damages: (1) a plaintiff must prove its damages with reasonable certainty, (2) a plaintiff may not recover damages that are too remote, (3) a plaintiff has a duty to mitigate its damages, and (4) a liquidated damages clause may limit the amount of damages by prior agreement.

## A. Is the Defendant Arguing That Plaintiff's Damages Estimate Is Too Uncertain and Speculative?

In general, damages law holds that a plaintiff may not recover damages beyond an amount proven with reasonable certainty.[52] This rule permits damages estimates that are not mathematically certain but excludes those that are speculative.[53] Failure to prove damages to a reasonable certainty is a common defense. The determination of what constitutes speculation is increasingly a matter of law to be determined prior to trial in a *Daubert* proceeding.[54]

Courts and commentators have long recognized the difficulties in defining what constitutes reasonable certainty or speculation in a damages analysis. The exclusion of damages on grounds of excessive uncertainty regarding the amount of damages may result in an award of zero damages when it is likely that the plaintiff suffered significant damages, even though the actual amount is quite uncertain.

There are three contexts in which reasonable certainty or speculation can arise: (1) where the outcome is uncertain, (2) where it is argued that the expert has not used the best method or data, or (3) where the damages suffered by a specific plaintiff are uncertain.

Traditionally, damages are calculated without reference to uncertainty about outcomes in the but-for scenario. Outcomes are taken as actually occurring if they are the expected outcome and as not occurring if they are not expected to occur. This approach may overcompensate some plaintiffs and undercompensate others. For example, suppose that a drug company was deprived of the opportunity to bring to market a drug that had a 90% chance of receiving Food and Drug

---

52. *See, e.g.,* Restatement (Second) of Contracts § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty").

53. Comment a to Restatement (Second) of Contracts § 352 states, in pertinent part: "Damages need not be calculable with mathematical accuracy and are often at best approximate."

54. *See, e.g.,* Cole v. Homier Distributing Co., Inc., 599 F.3d 856, 866 (8th Cir. 2010) (expert testimony on lost profits excluded under *Daubert* standard because it "failed to rise above the level of speculation"). *See also* Webb v. Braswell, 930 So. 2d 387 (Miss. 2006). In *Webb,* the plaintiff's expert sought to testify as to future damages resulting from unplanted crops, without establishing that the crops would have been profitable. The court excluded the testimony based on Mississippi's adoption of the *Daubert* standard, stating that "damages for breach of contract must be proven with reasonable certainty and not based merely on speculation and conjecture." *Id*. at 398.

461

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

Administration (FDA) approval, at a profit of $2 billion, and a 10% chance of not receiving FDA approval, with losses of $1 billion. The court may treat 90% as near enough to certainty and ignore the 10% risk of failure and award damages of $2 billion.

By contrast, economists quantify losses of uncertain outcomes in terms of expected values, where the value in each outcome is weighted by its probability. Under that approach, economic losses in our example should be calculated as the $2 billion economic loss assuming FDA approval times 90% plus the $1 billion economic loss times 10%, or $(0.9) \times (\$2 \text{ billion}) + (0.1) \times (-\$1 \text{ billion}) = \$1.7$ billion. The plaintiff would be overcompensated by $300 million under the approach that ignored the small probability of failure.

Now suppose the drug has only a 40% chance of FDA approval with the same economic payoffs. The plaintiff may recover no damages on grounds of uncertainty and speculation even though the economic loss is $(0.4) \times (\$2 \text{ billion}) + (0.6) \times (-\$1 \text{ billion}) = \$200$ million. This issue also arises with respect to new businesses and is discussed further in Section VIII.A.

The second context where speculation arises when a damages expert fails to conduct his analysis in accordance with the principles discussed in *Daubert*.[55]

In general, the expert should provide all available information about the degree of uncertainty in an estimate of damages particularly when the claim is that inadequate data are available.

*Example*:  A fire destroyed Broker's business including its business records. Defendant Smoke Detector Manufacturer argues that determining the profitability of the Broker's business is impossible without the business records. Therefore, damages are speculative and damages should not be awarded. Broker argues that the information would have been available absent the failure of Smoke Detector Manufacturer's product, and so Broker should be permitted wide latitude to measure damages from fragmentary records.

This issue also arises in labor cases where the defendant has failed to maintain the records as required by law.

*Example*:  A class of workers was denied lunch breaks as required by state law. The class estimates damages assuming that no lunch breaks were ever taken. Defendant Can Maker argues that lunch breaks were often taken and provides testimony by a few employees as proof. The class argues that it is entitled to damages on the hypothesis that no lunch breaks were ever taken because Can Maker failed to keep proper records.

55. *See* Margaret A. Berger, The Admissibility of Expert Testimony, in this manual.

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

Disputes about what constitutes a reasonable damages analysis can range from the plaintiff's assertion that lack of records entitles it to damages under the worst-case scenario to defendant's assertion that damages are zero because any calculation is speculative. Furthermore, the latitude afforded the plaintiffs sometimes appears to depend on the egregiousness of the defendants' improper actions. The difficulties in finding a middle ground are greater when the defendant fails to make an affirmative estimate of damages but only attacks the plaintiff's quantification as speculative. Defendants frequently avoid offering a jury an affirmative damages analysis for fear that the jury will take the affirmative analysis as a concession of fault.

The question of speculative damages also arises in a third context when the certainty of damages for a specific plaintiff is not knowable at the time of trial.

*Example*:  Vaccine Maker's duck flu vaccine given to children has been proven to harm one-quarter of the children who receive it, but determining which children will be affected is impossible. The harm is the onset of dementia at age 50, with economic losses of $1 million per person. Trial occurs well before any of the vaccinated children has reached this age. The expert for the class measures damages as $250,000 per recipient of the vaccine. The expert for Vaccine Maker argues that damages are zero because it is more likely than not that any given child was not harmed.

*Comment*:  The class might not recover damages even though the average class member's economic loss is the expected value of $250,000. The case might be resolved at an early stage by denial of class certification because it is not possible to define a class in which all members were proven to be harmed.[56] Note that a possible solution would be to create a trust with $250,000 per class member, let it earn market returns, and pay out that amount plus the returns to each class member who develops dementia.

This difficulty in determining the probability of damages may be part of a challenge to class certification and is discussed further in Section XI.

## B. Are the Parties Disputing the Remoteness of Damages?

A second legal limitation on damages is that a plaintiff may not recover damages that are too remote. In tort cases, this restriction is expressed in terms of proximate cause,[57] which often is equivalent to reasonable foreseeability. In contract

56. *See, e.g., In Re* New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6 (1st Cir. 2008).

57. *See* William L. Prosser, *Palsgraf Revisited,* 52 U. Mich. L. Rev. 1 (1953); Osborne M. Reynolds, Jr., *Limits on Negligence Liability: Palsgraf at 50*, 32 Okla. L. Rev. 63 (1979).

EXHIBIT C

*Reference Manual on Scientific Evidence*

cases, the limitation is similarly embodied in the idea of foreseeability—a party may not recover damages that were not reasonably foreseeable by the parties at the time of the agreement.[58] The foreseeability rule has two parts. First, a party is liable for what are known as direct or general damages—those damages that arise naturally from the breach itself. Second, a defendant may also be liable for consequential or special damages—damages apart from those arising naturally from the breach—if such damages were reasonably foreseeable at the time of the agreement.[59] Although sometimes there are differences between proximate cause in torts and foreseeability in contracts, the general concept is the same: The law imposes a limit on damages that are too remote.[60]

The rule is often at issue in cases in which the injured party's loss greatly exceeds the benefit the breaching party received in return.

*Example*:  Manufacturer hires Repairman to replace a part in a machine in its plant. Repairman negligently performs the service, causing Manufacturer's plant to cease production for two weeks. Manufacturer's damages demand includes a claim for two weeks of lost profits. Repairman counters that, although he may be liable for the cost of proper repairs, the foreseeability rule bars a claim for lost profits because such damages were not a probable consequence reasonably foreseeable at the time of the agreement.

Similar examples involve cases in which a package delivery firm or courier service is sued for remote consequential damages resulting from its failure to deliver a package.[61]

These limitations on damages are closely related to mitigation and the proper protection from losses resulting from the failure of agents or counterparties. A responsible company would not risk large losses from the failings of a repairman or delivery service. Rather, the company would use redundancy or other standard measures to limit the chances that such a failure would cause huge losses.

## C. Are the Parties Disputing the Plaintiff's Efforts to Mitigate Its Losses?

A third limitation on damages is that a party may not recover for losses it could have avoided, and is often expressed by stating that the injured party has a duty to mitigate, or lessen, its damages. The economic justification for the mitigation rule

---

58. *See* E. Allan Farnsworth, *Legal Remedies for Breach of Contract,* 70 Colum. L. Rev. 1145, 1199–1210.

59. *Id.*

60. *See, e.g.* Richard A. Posner, Economic Analysis of Law 203–04 (1998).

61. *See* Hampton by Hampton v. Fed. Express Corp., 917 F. 2d 1124 (8th Cir. 1990).

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

is that the injured party should not cause economic waste by needlessly increasing its losses.[62]

In a dispute about mitigation, the law places the burden of proof on the defendant to show that the plaintiff failed to take reasonable steps to mitigate.[63] The defendant will propose that the proper offset is the earnings the plaintiff should have achieved, under proper mitigation, rather than actual earnings. In some cases, the defendant may presume the ability of the plaintiff to mitigate in certain ways unless the defendant has specific knowledge to the contrary at the time of a breach. For example, the defendant might presume that the plaintiff could mitigate by locating another source of supply in the event of a breach of a supply agreement. Damages are limited to the difference between the contract price and the current market price in that situation.

For personal injuries, the issue of mitigation often arises because the defendant believes that the plaintiff's failure to work after the injury is a withdrawal from the labor force or retirement rather than the result of the injury.[64] For commercial torts, mitigation issues can be more subtle. Where the plaintiff believes that the harmful act destroyed a company, the defendant may argue that the company could have been put back together and earned profit, possibly in a different line of business.[65] The defendant will then treat the hypothetical profits as an offset to damages.[66]

Alternatively, where the plaintiff continues to operate the business after the harmful act and includes subsequent losses in damages, the defendant may argue that the proper mitigation was to shut down after the harmful act.[67]

*Example:* Franchisee Soil Tester starts up a business based on Franchiser's proprietary technology, which Franchiser represents as meeting government standards. During the startup phase, Franchiser notifies Soil Tester that the technology has failed. Soil Tester continues to develop the business but sues Franchiser for profits it would have made from successful technology. Franchiser calculates much lower damages on the theory that Soil Tester should have mitigated by terminating the startup.

62. *See* E. Allan Farnsworth, *Legal Remedies for Breach of Contract,* 70 Colum. L. Rev. 1145, 1183–84.

63. *See, e.g.,* Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005) (defendant employer seeking to avoid a claim of lost wages bears the burden of proving that the plaintiff failed to mitigate his damages by, among other things, taking reasonable steps to obtain alternate employment).

64. *See* William T. Paulk, Commentary, *Mitigation Through Employment in Personal Injury Cases: The Application of the "Reasonable" Standard and the Wealth Effects of Remedies*, 58 Ala. L. Rev. 647–64 (2007).

65. *See* Seahorse Marine Supplies v. Puerto Rico Sun Oil, 295 F.3d 68, 84–85 (1st Cir. 2002).

66. *Id.* at 84.

67. *Id.* at 85. *Also see In re* First New England Dental Ctrs., Inc.*,* 291 B.R. 240 (D. Mass. 2003).

465

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

*Comment:*  This is primarily a factual dispute about mitigation. If the failure of the technology was unambiguous, it would appear that Soil Tester was deliberately trying to increase damages by continuing its business. On the other hand, Soil Tester might argue that the notification overstated the defects of the technology and was an attempt by Franchiser to avoid its obligations under the contract.

Disagreements about mitigation may be hidden within the frameworks of the plaintiff's and the defendant's damages studies.

*Example:*  Defendant Board Maker has breached an agreement to supply circuit boards. Plaintiff Computer Maker's damages study is based on the loss of profits on the computers to be made from the circuit boards. Board Maker's damages study is based on the difference between the contract price for the boards and the market price at the time of the breach.

*Comment:*  There is an implicit disagreement about Computer Maker's duty to mitigate by locating alternative sources for the boards not supplied by the defendant. The Uniform Commercial Code spells out the principles for resolving these legal issues under the contracts it governs.[68]

## D. Are the Parties Disputing Damages That May Exceed the Cost of Avoidance?

An important consideration in capping damages may be the costs of steps that the plaintiff could have taken that would have eliminated damages. This argument is closely related to mitigation, but has an important difference: The defendant may argue that the plaintiff's failure to undertake a costly step that would have avoided losses was reasonable, but that the failure to take that step shows that the plaintiff knew that damages were much smaller than its later damages claim.

*Example:*  Insurance Company suffered a business interruption because a fire made its offices unusable for a period of time. Insurance Company's damages claim for $10 million includes not only the lost business until the offices were usable but also damages for permanent loss of business from customers who found other sources during the period the

68. *See, e.g.,* Aircraft Guaranty Corp. v. Strato-Lift, Inc., 991 F. Supp. 735, 738–39 (E.D. Pa. 1998) (Mem.) (finding that according to the Uniform Commercial Code, plaintiff-buyer had a duty to mitigate if the duty was reasonable in light of all the facts and circumstances, but that failure to mitigate does not preclude recovery); S.J. Groves & Sons Co. v. Warner Co.*,* 576 F.2d 524 (3d Cir. 1978) (holding that the duty to mitigate is a tool to lessen plaintiff's recovery and is a question of fact); Thomas Creek Lumber & Log Co. v. United States, 36 Fed. Cl. 220 (1996) (finding that under federal common law the U.S. government had a duty to mitigate in breach-of-contract cases).

466

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

offices were unusable. Defendant argues that the plaintiff's failure to relocate to temporary quarters shows that their losses were less than the $350,000 cost of that relocation.

*Comment*:    Defendant's argument has the unstated premise that Insurance Company could have carried on its business and avoided any of its later losses by relocating. Insurance Company will likely argue that a decision not to relocate was commercially appropriate because relocation would not have avoided much of the lost business.

## *E. Are the Parties Disputing a Liquidated Damages Clause?*

In addition to legally imposed limitations on damages, the parties themselves may have agreed to impose limits on damages should a dispute arise. Such clauses are common in many types of agreements. Once litigation has begun, the parties may dispute whether these provisions are legally enforceable. The law may limit enforcement of liquidated damages provisions to those that bear a reasonable relation to the actual damages. In particular, the defendant may attack the amount of liquidated damages as an unenforceable penalty. The parties may disagree on whether the harmful event falls within the class intended by the contract provision.

Changes in economic conditions may be an important source of disagreement about the reasonableness of a liquidated damages provision. One party may seek to overturn a liquidated damages provision on the grounds that new conditions make it unreasonable.

*Example:*    Scrap Iron Supplier breaches supply agreement and pays only the specified liquidated damages. Buyer seeks to set aside the liquidated damages provision because the price of scrap iron has risen, and the liquidated damages are a small fraction of actual damages under the expectation principle.

*Comment:*    There may be conflict between the date for judging the reasonableness of a liquidated damages provision and the date for measuring expectation damages, as in this example. Generally, the date for evaluating the reasonableness of liquidated damages is the date the contract is made. In contrast, the date for measuring expectation damages is the date of the breach. The conflict may be resolved by the substantive law of the jurisdiction. Enforcement of the liquidated damages provision in this example will induce inefficient breach.

467

EXHIBIT C

# VIII. Other Issues Arising in General in Damages Measurement

## A. Damages for a Startup Business

Failure rates for startups are high even without any actionable harm. More than two-thirds of venture-funded startups return nothing to their founding entrepreneurs, although the expected value of venture outcomes is several million dollars per entrepreneur.[69] Thus, a damages calculation for harm to a startup puts particular stress on the treatment of uncertainty in damages, as we discussed earlier in Section VII.A. At one time, legal principles barred recovery because damages were too speculative, but today most courts will allow a new business to recover damages for lost profits if such damages can be proven with reasonable certainty.[70] Whether a court will award damages for an injured startup if the plaintiff's damages expert testifies that the likelihood was less than 50% that the company would have become profitable is still unresolved.

### 1. Is the defendant challenging the fact of economic loss?

Expert testimony on damages does not usually include separate consideration of the fact of damages, because an opinion that damages are positive amounts to an opinion about the fact, and a zero-damages opinion amounts to an opinion against the fact. Damages for startups may be an exception. Analysis by the plaintiff's expert may conclude that there is a significant probability that the startup would not have been profitable and, in that contingency, damages would have turned out to be zero (or even negative, in the sense that the defendant's action prevented the plaintiff from incurring a loss). Thus, a defendant may argue that the plaintiff has not proven the fact of damages. In most cases involving an existing business, the fact of economic loss is often self-evident, but in a case involving a new business, the fact of economic loss may be at issue.

### 2. Is the defendant challenging the use of the expected value approach?

The expected value approach to uncertain damages weights each outcome by its probability of occurring. The expected value can be positive, indicating damages, even if the odds favor a company making a loss. Application of the expected value approach involves studying the various outcomes of the new business in relation to risk factors. Risks can be categorized as idiosyncratic (i.e., risks specific to the

---

69. *See* Robert E. Hall & Susan E. Woodward, *The Burden of the Nondiversifiable Risk of Entrepreneurship*, 100 Am. Econ. Rev. 1163 (2010).

70. *See* Mark A. Allen & Victoria A. Lazear, *Valuing Losses in New Businesses, in* Litigation Services Handbook: The Role of the Financial Expert §§ 11.1–.26 (Roman L. Weil et al. eds., 4th ed. 2007).

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

venture) or systematic (i.e., risks that affect the venture in the same way as other businesses). Idiosyncratic risks include whether the venture will succeed, the firm's ability to obtain financing, whether a competitor will develop a similar product, and risks related to the pricing of the product or competitive products, such as the price of inputs. Examples of systematic risks are financial crisis, inflation, collapse of the stock market, and recession.

The expert proceeds first by identifying the idiosyncratic risks associated with the venture and creating an appropriate model. Analyses usually model these types of risk as different scenarios, each with a specific probability of occurring. The expert computes the lost profits for each scenario, multiplies the lost profits by the probability of the event occurring, and then sums the weighted profits to arrive at expected lost profits. The result is a stream of future lost profits before adjustment for general economic variables such as inflation, stock market fluctuations, or wage growth. Because the expert has adjusted for idiosyncratic factors, the remaining risks of lost profits for a new business are the same as those for a similar, existing business. Then experts usually adjust lost profits for systematic risks using the CAPM (*see* Section VI.H) to estimate the cost of capital.

The actual calculation of expected damages is usually straightforward. Damages are the stream of expected lost profits discounted to present value. However, sometimes the alternatives and interactions between the possible outcomes become so complex that other methods are required. In such cases, experts often generate hundreds or thousands of possible outcomes using techniques such as Monte Carlo or bootstrap simulation. These techniques generate random values for the variables that change with different outcomes.[71] Expected damages are then the average of lost profits across all outcomes.

An alternative to calculating new business damages based on lost profits uses market valuations of the firm. For a publicly traded business, the valuation is implicit in the stock price—it is the market capitalization of the firm. For a new venture, the valuation is implicit in financing decisions. Startup firms are often financed by venture capitalists who invest funds in exchange for ownership in the venture. The valuation at the time of financing is the amount of financing divided by the ownership transferred. For example, if venture investors pay $4 million for 10% of the firm, the total value of the firm is $4 divided by 0.10, or $40 million.

## 3. Are the parties disputing the relevance and validity of the data on the value of a startup?

The expert seeking to establish economic loss on behalf of a new business will often face a lack of data and therefore will need to use additional resources for the

---

71. Monte Carlo relies on random draws from the hyposized distributions for the variables. Bootstrap takes the observed variables as the population of outcomes and relies on repeated random draws from this population.

469

**EXHIBIT C**

analysis. Although the expert may have access to third-party data on factors such as overall success rates for comparable ventures, the expert will often need to rely on the plaintiff and other experts to refine the probability of success. If success reflects consumer preferences, then the expert may use market research techniques such as surveys. For example, a survey could evaluate the desirability of a new feature for a product and the premium that consumers will pay for it. Other sources of information include studies of success rates on behalf of venture capitalists. Such studies typically show the success rates for new businesses at different stages of investment and the actual returns that the venture capitalists have realized.

## B. Issues Specific to Damages from Loss of Personal Income

As with all cases, many of the disputes that arise in estimating damages for lost personal income can be resolved by carefully applying the basic damages framework. Damages are the difference between the but-for and actual worlds, where the actual world reflects any mitigating factors. Estimating such damages also involves issues that are unique, such as calculating losses over a person's lifetime, valuing fringe benefits, estimating lost income in wrongful death cases, and calculating damages for economic losses other than lost wages. We discuss these issues below.

### 1. Calculating losses over a person's lifetime

In nearly all cases involving lost income, the effects continue past trial and sometimes until the plaintiff's death. Therefore, quantifying damages for loss of personal income necessarily involves projecting the plaintiff's work history and retirement. Conceptually, the estimate of income for each year, either but-for or actual, is the expected income multiplied by the probability that the person will be working for that year. The probability that the person will be working for that year is the product of the probability that the person will survive the year, the probability that the person will be in the labor force, the probability that the person will be employed, given that the person worked in the prior year.[72] We refer to this as the standard framework for calculating personal losses.

In many cases, such as those involving wrongful termination, the projection that the plaintiff was working is the same for both the but-for world and the actual world. However, in wrongful death cases and some personal injury cases, these projections may differ,[73] and the expert will need to compute separate projections for the but-for and actual worlds before taking the difference between the two.

---

72. Except for wrongful death cases, the probability that the persons will be working is usually 1 for both the but-for and actual cases. In wrongful death cases the probability is still usually 1 in the but-for case, but 0 in the actual.

73. This situation may arise in a personal injury case if, as a result of the accident, the injured person is less likely to be able to work. If so, then the person may have an increased likelihood of

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

These projections usually rely on data from the Bureau of Labor Statistics (BLS) and include tables on survival, labor force participation, and employment. The expert usually needs to manipulate this information in order to generate the conditional probabilities needed.

To simplify the calculations, sometimes the expert uses the person's expected lifespan and retirement age based on his or her age at trial using standard tables from the BLS. Then the expert need only sum the discounted losses for each year until the expected age at death. This method, often referred to as the life expectancy method, will considerably simplify the calculations associated with determining lost retirement benefits. However, the standard and the life expectancy methods will usually generate the same estimate of losses only if the expert is assuming that the expected discounted income in each year is the same—that is, that the expected increase in income is offset by the discount rate (*see* Section VI.D.3).

BLS data are generally only available by age and sex. Other data specify these statistics by race, location, or broad occupation categories but only by groups of ages. More specific tables are commercially available, but the reliability of these data may be disputed because of questions about the methodology used to generate the tables.

## 2. Calculation of fringe benefits

Fringe benefits are often a component of lost pay and may include medical insurance and retirement benefits such as social security. Although sick days and vacation are also fringe benefits, they are included already in lost-pay calculations. An exception occurs if these days are accrued but not taken, where, for example, the employee lost the cash payout that would have occurred at a normal termination or lost the benefit of future days off with pay.

a. Medical insurance benefits

In the following discussion, we assume that the plaintiff no longer has the benefit of the employer-provided insurance as a result of the actions of the defendant. Such situations typically arise in wrongful termination or wrongful death cases.

Calculating damages for lost medical insurance is straightforward if the plaintiff can purchase insurance under COBRA, or from his current employer, or on the open market. Then the value of the lost medical insurance is the employee's portion of the premium. If insurance coverage available to the plaintiff differs significantly between the but-for and the actual worlds, then the expert will need to project the impact of the difference in policy coverage.

leaving the labor force for each age compared with the likelihood prior to the incident. Similarly, the injured person may be more likely to retire at an earlier age.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

If the plaintiff chooses not to purchase insurance even though the option is vailable, or the plaintiff is unable to purchase insurance,[74] then the plaintiff may argue that the value of insurance is the sum of his actual expenses less the premium in the but–for world. The defendant will likely respond that the plaintiff assumed the risk that the incurred medical expenses could exceed the plaintiff's portion of the premium, and therefore that the defendant's responsibility should be limited to the plaintiff's portion of the premium foregone. The plaintiff may counter that his pay was insufficient to afford the insurance.

b. Retirement benefits

For lost retirement benefits, the issues are similar to those involving lost medical benefits, but the calculations are more complex. There are basically two types of retirement plans: defined benefit plans and defined contribution plans. Defined benefit plans are those where the benefits paid out after retirement are guaranteed to be a definite amount upon retirement. In contrast, defined contribution plans are those where the employer makes a predefined contribution for the employee but the benefits paid out depend on the return earned on the money invested.

The expert can calculate both types of retirement plans on the basis of either the amounts paid in or the amounts paid out by the employer. If the expert uses the amount the employer paid for the benefits, which may be a function of the amount the plaintiff earned, then the calculation is analogous to computing the loss in plaintiff's earnings. The disadvantage of this approach is that the amounts paid in may not adequately predict the benefits paid out, particularly when the plan is a defined benefit plan. We discuss this topic below in connection with social security benefits, where the problem is particularly acute.

*(1) Defined benefit plan*

To determine the present value of the benefits received under a defined benefit plan, the calculation is simplified if the expert uses the life expectancy method to calculate the plaintiff's losses. In this situation, the expert must determine the number of years that the plaintiff would have worked at the firm upon retirement, his retirement age, his expected lifespan, and his salary at the firm over time. These factors must be consistent with the expert's belief about the projected trajectory of plaintiff's employment in both the but–for and actual worlds.

However, if the expert instead uses probability tables for each year, then the calculation is more complex. For each year in which the plaintiff may cease to be in the labor force for reasons other than death, the expert must determine the likelihood that the plaintiff would be receiving benefits from the plan because of

---

74. For example, a preexisting condition may make it impossible to purchase insurance on the open market or may limit the plaintiff's coverage to exclude a preexisting condition either permanently or for a period of time.

472

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

disability (if the plan permits) or retirement. Complicating this determination is that the payout from the plan may depend on the age of retirement. Thus, the calculation must incorporate the probability for each possible payout. Depending on the plan, defining possible outcomes can be extremely complex.

A special and common example of a defined benefit plan is Social Security.[75] Determining benefits from Social Security can be forbiddingly complex because the number of potential outcomes is so large. For example, a person can retire at almost any age, and disability payments are made if he is unable to work. In addition, calculating the benefit at any age depends on the person's average salary over the most recent 35 years. If social security benefits are critical to the magnitude of damages, the expert may choose to simplify the calculation by relying on the life expectancy method.

### *(2) Defined contribution plan*

For a defined contribution plan, the expert's task is to project the employer's contribution, the number of years that the employee would have worked at the firm, as well as the employee's age at retirement. Generally, this determination is straightforward because it is based on the same factors the expert uses to project the employee's salary in the but-for and actual worlds. The present value of the employer's contributions will be the expected payouts from the plan.

## *3. Wrongful death*

Traditionally, under common law, the right of recovery ended with a person's death and thus damages for wrongful death were not recoverable. Today, states have remedied this situation through the passage of wrongful death and survival statutes. A wrongful death action focuses on the impact of the decedent's death on persons other than the decedent. In contrast, a survival action continues the action the decedent could have maintained had he lived and compensates the decedent's estate for damages the decedent sustained. Some states have separate wrongful death and survival statutes; others have hybrid statutes that combine elements of both actions. Rules for recovery vary widely by state.

Generally, calculation of economic damages for wrongful death depends on whether the claimant is a relative of the decedent or is the estate. If the claimant is a relative of the decedent, economic damages are limited to the economic value that the relative would have received had the decedent lived. If the relative is a dependent, the recovery may be substantial, whereas if the decedent is a child or unmarried and childless and the only relatives are parents, the recovery may be small, because most parents receive little economic value from their children. In

---

75. Social Security is generally regarded as a defined benefit plan although it has some elements of a defined contribution plan.

EXHIBIT C

*Reference Manual on Scientific Evidence*

contrast, if the beneficiary is the estate, the recovery may include all of the lost economic value.

Where the claimant is a relative, damages from lost wages may be reduced to reflect the decedent's own consumption spending had he continued living. Such expenses may be relatively small if the claimant is a spouse with children under the theory that much of the decedent's income would have been spent to support the dependents. If the decedent had no children or if there is another earner in the family, the offset for the spending of the decedent on himself may be higher.

## 4. Shortened life expectancy

An important issue is whether a plaintiff may recover compensation for shortened life expectancy caused by an injury. This issue may arise, for example, in medical malpractice cases in which a doctor fails to diagnose and treat a condition or where a surgeon fails to remove a medical device used during surgery. Some states allow such a recovery; others do not.[76]

A related issue is whether dependents in a wrongful death action may recover economic damages for support the decedent would have provided had the decedent lived—that is, whether such damages can be recovered over the remainder of the decedent's expected lifetime, had he lived. Again, rules regarding such recovery vary widely by state, but quantifying such damages requires a projection of the decedent's life expectancy using the methods discussed above.

## 5. Damages other than lost income

### a. Loss of services

Economic damages may include loss of services in addition to lost wages. For example, in a case involving the death or disability of a housewife, the husband may seek recovery for money necessary to hire someone to take care of the children and the home.

### b. Medical expenses

Damages for wrongful death or injury may also include past and future medical expenses. Recoverable medical expenses may include compensation for someone to provide medical assistance to the plaintiff, such as nursing care, or expenses for special equipment necessary for living. These expenses are usually calculated by an expert in this area. The role of the economic damages expert is usually confined to computing the present value of these expenses.

---

76. *See, e.g.,* Dillon v. Evanston Hospital, 771 N.E.2d 357 (Ill. 2002); Swain v. Curry, 595 So. 2d 168 (Fla. Dist. Ct. App. 1992).

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

#### c. Expenses not incurred

If the plaintiff is not employed, she may not be incurring certain expenses that she otherwise would have incurred had the wrongful termination or personal injury never taken place. Applying the but–for world analysis, the defendant may argue that these expenses should be an offset in the calculation of plaintiff's economic damages.[77] Examples of such expenses are union dues or transportation costs. *See* Section VIII.D for a general discussion. Legal standards vary by jurisdiction.

#### d. Other damages

Sometimes an expert may be asked to opine on damages for pain and suffering and other diminution in the quality of life. There has been some development in using hedonic models to estimate such losses, but the research is still preliminary. In general, the expert relies upon whoever is best positioned to place an economic value on the diminution of life suffered by the plaintiff. The expert may then be asked to calculate the present value of the estimate.

## C. Damages with Multiple Challenged Acts: Disaggregation

Plaintiffs sometimes challenge a number of a defendant's acts and offer an estimate of the combined effect of those acts. If the court determines that only some of the challenged acts are illegal, the damages analysis needs to be adjusted to consider only those acts. This issue seems to arise most often in antitrust cases, but can arise in any type of case. Ideally the damages testimony would equip the factfinder to determine damages for any combination of the challenged acts, but that may be tedious. If there are, say, 10 challenged acts, it would take more than 1000 separate studies to determine damages for every possible combination of findings about the unlawfulness of the acts.

There have been several cases where the jury has found partially for the plaintiff, but the jury lacked assistance from the damages experts on how the damages should be calculated for the combination of acts the jury found to be unlawful. Although the jury has attempted to resolve the issue, appeals courts have sometimes rejected damages found by juries without supporting expert testimony.[78]

---

77. In wrongful death actions, these expenses may be included in the deduction for the amount the decedent would have spent on himself. *See supra* Section VIII.B.3.

78. *See e.g.,* Litton Sys., Inc. v. Honeywell, Inc., 1996 U.S. Dist. LEXIS 14662 (C.D. Cal. July 26, 1996) (granting new trial on damages only "[b]ecause there is no rational basis on which the jury could have reduced Litton's 'lump sum' damage estimate to account for Litton's losses attributable to conduct excluded from the jury's consideration, . . ."); Image Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1224 (9th Cir. 1997), *cert. denied,* 118 S. Ct. 1560 (1998) (plaintiffs "must segregate damages attributable to lawful competition from damages attributable to Kodak's monopolizing conduct").

475

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

One solution to this problem is to make the determination of the illegal acts before damages testimony is heard, termed "bifurcation" of liability and damages. The damages experts can adjust their testimony to consider only the acts found to be illegal.

In some situations, damages are the sum of separate damages for the various illegal acts. For example, there may be one injury in New York and another in Oregon. Then, the damages testimony may consider the acts separately, and disaggregation is not challenging.

When the challenged acts have effects that interact, it is not possible to consider damages separately and add up damages for each individual act. This is an area of great confusion. When the harmful acts substitute for each other, the sum of damages attributable to each separately is *less* than their combined effect. As an example, suppose that the defendant has used exclusionary contracts and anticompetitive acquisitions to ruin the plaintiff's business. However, the plaintiff's business could not survive if either the contracts or the acquisitions were found to be legal. Damages for the combination of acts are the value of the business, which would have thrived absent both the contracts and the acquisitions. Now consider damages if only the contracts but not the acquisitions are illegal. In the but-for analysis, the acquisitions are hypothesized to occur because they are not illegal, but not the contracts. But plaintiff's business cannot function in that but-for situation because the acquisitions alone were sufficient to ruin the business. Hence damages—the difference in value of the plaintiff's business in the but-for and actual situations—are zero. The same would be true for a separate damages measurement for the acquisitions, with the contracts taken to be legal but not the acquisitions. Thus, the sum of damages for the individual acts is zero, but the damages if both acts are illegal are the value of the business.

When the effects of the challenged conduct are complementary, the sum of damages for each type of conduct by itself will be *more* than damages for all types of conduct together. For example, suppose a party claims that a contract is exclusionary based on the combined effect of the contract's duration and its liquidated damages clause that includes an improper penalty provision. The actual amount of the penalty would cause little exclusion if the duration were brief, but substantial exclusion if the duration were long. Similarly, the actual duration of the contract would cause little exclusion if the penalty were small but substantial exclusion if the penalty were large. A damages analysis for the penalty provision in isolation compares but-for—without the penalty provision but with long duration—to actual, where both provisions are in effect. Damages are large. Similarly, a damages estimate for the duration in isolation gives large damages. The sum of the two estimates is nearly double the damages from the combined use of both provisions.

Thus, a request that the damages expert disaggregate damages for different combinations of challenged acts is far more than a request that the total damages estimate be broken down into components that add up to the damages attributable to the combination of all the challenged acts. In principle, a separate damages

476

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

analysis—with its own carefully specified but-for scenario and analysis—needs to be done for every possible combination of illegal acts.

*Example:*   Hospital challenges Glove Maker for illegally obtaining market power through the use of long-term contracts and the use of a discount program that gives discounts to consortiums of hospitals if they purchase exclusively from Glove Maker. The jury finds that Glove Maker has attempted to monopolize the market with its discount programs, but that the long-term contracts were legal because of efficiencies. Hospital states that its damages are the same as in the case in which both acts were unlawful because either act was sufficient to achieve the observed level of market power. Glove Maker argues that damages are zero because the lawful long-term contracts would have been enough to allow it to dominate the market.

*Comment:*   The appropriate damages analysis is based on a careful new comparison of the market with and without the discount program. The but-for analysis should include the presence of the long-term contracts because they were found to be legal.

Apportionment, sometimes referred to as disaggregation, can arise in a different setting. A damages measure may be challenged as encompassing more than the harm caused by the defendant's harmful act. The expert may be asked to apportion his estimate of damages between the harm caused by the defendant and the harm caused by factors other than the defendant's misconduct. In this case, the expert is being asked to restate the improper actions, not to disaggregate the damages estimate for the improperly inclusive damages estimate. If the expert uses the standard format and thus properly isolates the effects of only the defendant's wrongful actions, no modification of the expert's estimate of damages is needed. In the standard format, the but-for analysis differs from the actual world only by hypothesizing the absence of the harmful act committed by the defendant. The comparison of the but-for world with the actual world automatically isolates the causal effects of the harmful act. No disaggregation of damages caused by the harmful act is needed once the standard format is applied.

## D. Is There a Dispute About Whether the Plaintiff Is Entitled to All the Damages?

When the plaintiff is in some sense a conduit to other parties, the defendant may argue that the plaintiff is entitled to only those damages that it would have retained in the but-for scenario. In the following example, a regulated utility is arguably a conduit to the ratepayers:

477

EXHIBIT C

*Reference Manual on Scientific Evidence*

*Example:* Generator Maker overcharges Utility. Generator Maker argues that the overcharge would have been part of Utility's rate base, and so Utility's regulator had set higher prices because of the overcharge. Utility, therefore, did not lose anything from the overcharge. Instead, the ratepayers paid the overcharge. Utility argues that it stands in for all the ratepayers and that the damages award will accrue to the ratepayers by the same principle—the regulator will set lower rates because the award will count as revenue for rate-making purposes.

*Comment:* In addition to the legal issue of whether Utility does stand in for ratepayers, there are two factual issues: Was the overcharge actually passed on to ratepayers? Will the award be passed on to ratepayers?

Similar issues can arise in the context of employment law.

*Example:* Plaintiff Sales Representative sues for wrongful denial of a commission. Sales Representative has subcontracted with another individual to do the actual selling and pays a portion of any commission to that individual as compensation. The subcontractor is not a party to the suit. Defendant Manufacturer argues that damages should be Sales Representative's lost profit measured as the commission less costs, including the payout to the subcontractor. Sales Representative argues that she is entitled to the entire commission.

*Comment*: Given that the subcontractor is not a plaintiff, and Sales Representative avoided the subcontractor's commission, the literal application of standard principles for damages measurement would appear to call for the lost-profit measure. The subcontractor, however, may be able to claim his share of the damages award. In that case, damages would equal the entire lost commission, so that, after paying off the subcontractor, Sales Representative receives exactly what she would have received absent the breach. Note that the second approach would place the subcontractor in exactly the same position as the Internal Revenue Service in our discussion of adjustments for taxes in Section VI.E.

The issue also arises acutely in the calculation of damages on behalf of a non-profit corporation. When the corporation is entitled to damages for lost profits, the defendant may argue that the corporation intentionally operates its business without profit. The actual losers in such a case are the people who would have enjoyed the benefits from the nonprofit that would have been financed from the profits at issue.

478

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

## E. Are the Defendants Disputing the Apportionment of Damages Among Themselves?

When the defendants are not jointly liable for the harmful acts, but rather each is responsible for its own harmful act, the damages expert needs to quantify damages separately for each defendant. The issues in apportionment among defendants are similar to those discussed above for disaggregation among the harmful acts.

### 1. Are the defendants disputing apportionment among themselves despite full information about their roles in the harmful event?

In the simplest case, there are no interactions among the harmful acts of different defendants, and the expert can proceed as if there were separate trials with separate damages analyses.

However if there are interactions among the harmful acts, then apportionment among defendants involves puzzles that cannot be resolved by economic principles. If either of the harmful acts of two defendants would have caused all the harm that occurred, then either defendant can argue for zero damages on the ground that the harm would have occurred anyway, because of the other defendant's act.

*Example*:    Tire Maker supplies faulty tire and Landing Gear Maker supplies faulty landing gear. Either one would have resulted in the loss of the airplane upon landing. Airline measures damages as the value of the airplane and proposes that the two defendants split the amount equally. But Tire Maker asserts that the damages it owes the plaintiff are zero because the crash would have occurred anyway because of the Landing Gear Maker's faulty landing gear. Similarly, the Landing Gear Maker asserts the damages it owes the plaintiff to be zero because the crash would have occurred anyway because of the Tire Maker's faulty tire.

The issue also arises when the interaction is more complicated.

*Example*:    Teenager drives through a red light and injures Driver. The injury is more serious than it would have been otherwise because Driver's airbag failed to deploy. Airbag Maker argues that it should pay nothing because there would have been no harm if Teenager had obeyed the red light. Teenager argues that Airbag Maker should pay the difference between the actual harm to Driver and the harm if the airbag had worked properly.

479

EXHIBIT C

*Reference Manual on Scientific Evidence*

## *2. Are the defendants disputing the apportionment because the wrongdoer is unknown?*

A second issue in apportioning damages arises when the harmful product is known, but more than one defendant made the product, and it is not known which made the product that caused the injury. One approach is to determine the probability that each defendant made the product that caused the plaintiff's loss. In some cases, a reasonable assumption may be that the probability that the defendant caused the plaintiff's losses may be determined from its market share. Thus, for example, a drug manufacturer's responsibility would be proportional to the likelihood that a plaintiff consumed one of its pills.

## *F. Is There Disagreement About the Role of Subsequent Unexpected Events?*

Random events occurring after the harmful event can affect the plaintiff's actual loss. The effect might be either to amplify the economic loss from what might have been expected at the time of the harmful event or to reduce the loss.

*Example:*    Housepainter uses faulty paint, which begins to peel a month after the paint job. Owner measures damages as the cost of repainting. Painter disputes on the ground that a hurricane that actually occurred 3 months after the paint job would have ruined a proper paint job anyway.

*Comment:*    This dispute will need to be resolved on legal rather than economic grounds. Both sides can argue that their approach to damages will, on average over many applications, result in the right incentives for proper house painting.

The issue of subsequent random events should be distinguished from the legal principle of supervening events.[79] The subsequent events occur after the harmful act; there is no ambiguity about who caused the damage, only an issue of quantification of damages. Under the theory of a supervening event, there is precisely a dispute about who caused an injury. In the example above, there would be an

---

79. *See, e.g.,* Derdiarian v. Felix Contracting Corp., 414 N.E.2d 666 (N.Y. 1980) (interpreting state law to hold that a jury could find that the defendant is ultimately liable to plaintiff for negligence, even though a third person's negligence was a supervening event); Lavin v. Emery Air Freight Corp., 980 F. Supp. 93 (D. Conn. 1997) (holding that under Connecticut law, a party seeking to be excused from a promised performance as a result of a supervening event must show the performance was made impracticable, non-occurrence was an assumption at the time the contract was made, impracticability did not arise from the party's actions, and the party seeking to be excused did not assume a greater liability than the law imposed).

480

EXHIBIT C

*Reference Guide on Estimation of Economic Damages*

issue of the role of a supervening event if the paint had not begun to peel until after the hurricane.

Disagreements about the role of subsequent random events are particularly likely when the harmful event is fraud.

*Example:* Seller of property misstates condition of property. Buyer shows that he would not have purchased the property absent the misstatement. Property values in general decline sharply between the fraud and the trial. Buyer measures damages as the difference between the purchase price and the market value of the property at the time of trial. Seller measures damages as the difference between the purchase price and the market value at the time of purchase, assuming full disclosure.

*Comment:* Buyer may be able to argue that retaining the property was the reasonable course of action after uncovering the fraud; in other words, there may be no issue of mitigation here. In that sense, Seller's fraud caused not only an immediate loss, as measured by Seller's damages analysis, but also a subsequent loss. Seller, however, did not cause the decline in property values. The dispute needs to be resolved as a matter of law.

As a general matter, it is preferable to exclude the effects of random subsequent effects, especially if the effects are large in relation to the original loss.[80] The reason is that plaintiffs choose which cases to bring, which may influence the approach to damages. If random subsequent events are always included in damages, then plaintiffs will bring the cases that happen to have amplified damages and will not pursue those where the random later event makes damages negative. Such selection of cases will overcompensate plaintiffs. Similarly, if plaintiffs can choose whether to include the effects of random subsequent events, plaintiffs will choose to include those effects when they are positive and exclude them when they are negative. Again, the result will be to overcompensate plaintiffs.[81] If random subsequent events are always excluded, then the plaintiff is compensated for his loss, however temporary, and the defendant pays for the damages he actually caused.

80. *See* Franklin M. Fisher & R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, *in* Industrial Organization, Economics, and the Law 392, 399–402 (John Monz ed., 1991); Fishman v. Estate of Wirtz, 807 F.2d 520, 563 (7th Cir. 1986) (Easterbrook, J., dissenting in part).

81. *See* William B. Tye et al., *How to Value a Lost Opportunity: Defining and Measuring Damages from Market Foreclosure*, 17 Res. L. & Econ. 83 (1995). For a discussion of disclosure of expert reports under Federal Rule of Civil Procedure 26(a)(2), see Margaret A. Berger, The Admissibility of Expert Testimony, Section V.B.1, in this manual. For a discussion of disclosure of data supporting expert testimony, see Daniel L. Rubinfeld, Reference Guide on Multiple Regression, Section V, in this manual.

EXHIBIT C

*Reference Manual on Scientific Evidence*

# IX. Data Used to Measure Damages

## A. Types of Data

### 1. Electronic data

Electronic data have four general formats: (1) proprietary, (2) electronic character, (3) scanned, and (4) survey.

Examples of proprietary formats are those used by the SAS statistical software, the Oracle database system, and Microsoft's Access and Excel. Although these formats are proprietary, the ones we have listed are de facto industry standards and are the most convenient ways to transmit data among experts and from parties to experts. All of these software systems can create data files in Excel format, which is the effective universal standard for sharing smaller bodies of data.

Electronic character representations are almost always in Adobe's Portable Document Format (PDF), a public domain standard. Essentially any computer software can produce a PDF document. The PDF format is convenient for the electronic sharing of documents formatted for visual presentation (as opposed to files formatted to be read by computers), but is not a useful way to move data, especially in large volumes. Reading data from a PDF document into analytical software requires endless human intervention.

Scanned documents are represented internally as pixels, not as characters. The automatic reading of scanned numerical documents into analytical software is close to impossible, because optical character recognition software is unreliable with numerical material and requires large amounts of human intervention, character by character.

Much confusion exists between electronic character documents and scanned documents, because both are part of the PDF standard. It is easy to tell them apart. With any amount of magnification, an electronic character document shows perfectly crisp characters, while a scanned document shows its granular pixels.

### 2. Paper data

Although the overwhelming majority of business records are kept in computer form today, historical data may be available only in paper form. The data usually reach the expert as scanned document images. Then, the expert needs to deal with the problems of accurately reading scanned data.

### 3. Sampling data

In some instances, the expert is faced with more information than is possible to process. This situation is most likely to arise if human review of each data record is part of the processing. Even if processing all of the data may be ultimately necessary, processing a sample of the data for preliminary analyses may be appropriate.

**EXHIBIT C**

If the expert elects to study a sample of the data, the expert needs to have carefully considered how the information will be used to ensure that the data sample is large enough and contains sufficient information. Usually, this requires that the expert has constructed a model of damages and a related sampling plan that includes an estimate of the sampling error. Unless the expert is a trained statistician, the expert should seek outside help in designing the sampling plan.

### 4. Survey data

Another situation arises when the data can only be obtained by interviewing individuals. This often arises because damages hinge on consumer preference. For example, the issue may be how many bicycles of a certain brand would have been sold absent a misappropriated braking system. Another example might be the number of people who would have ordered their prescription contact lenses over the Internet if the wholesalers had not conspired to restrict sales to the Internet retailers.

A need for a survey can also arise when the plaintiffs comprise a class. In this situation, it may be prohibitive to interview every class member, and the damages expert will need to construct both a sampling plan and a survey instrument so that the results can be reliably used to estimate damages.

The principles in constructing a sampling to collect data for analysis from a dataset apply to constructing a sample of individuals to be surveyed: The expert needs to have carefully considered how the information will be used to ensure that the data sample is large enough and contains sufficient information. In addition, complexities arise because some respondents selected to be surveyed will not be reachable or will be unwilling to complete a survey. The expert must devise a plan to deal with such contingencies and be confident that such problems do not bias the results.

Care must also be taken in developing the survey instrument. Generally, it is advantageous to work with experts in survey to ensure that the responses can be reliably interpreted and are not biased.[82]

## B. Are the Parties Disputing the Validity of the Data?

Validation of any dataset is critical. The expert needs to have a firm basis for relying on the chosen data. Opposing parties frequently try to impeach damages estimates by challenging the reliability of the data or an expert's validation of the data.

---

82. For a discussion of the issues in designing sample plans and survey instruments particularly for use in litigation, see Shari Diamond, Reference Guide on Survey Research, in this manual.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## 1. Criteria for determining validity of data

The validity of data is ultimately a matter of judgment. Experts often need to use data that are not mathematically precise, because the only relevant data may be known to contain some errors. Experts generally have an obligation to use data that are as accurate as possible, meaning that the expert has used every practical means to eliminate erroneous information. Experts should also perform cross checks with other data, to the extent possible, to demonstrate completeness and reliability. When data are inherently inaccurate because of random influences, validity requires absence of bias or adjustment for bias. Validation of data turns in part on commonsense indicators of accuracy and bias. The following is a list, in rough order of presumptive validity, of data sources often used in damages measurement:

- Official government publications and databases, such as from the Census Bureau, the BLS, and the Bureau of Economic Analysis;
- A company's audited financial statements and filings with the Securities and Exchange Commission;
- A company's accounting records maintained in the normal course of business;
- A company's operating reports prepared for management in the normal course of business;
- A survey designed by the damages expert with assistance from survey professionals, conforming to established standards of survey design and execution;
- A marketing research study conforming to established standards for these studies;
- Industry reports and other materials prepared by unaffiliated organizations and consultants;
- Newspaper articles;
- A company's study of damages from the harmful event, prepared in the normal course of business; and
- A company's study of damages, prepared for litigation.

Other factors can alter this presumptive order of validity. When audited financial statements are accused of being fraudulent, they lose their presumption of validity. The most fully researched articles in the best newspapers have a higher presumption of validity. Some private industry reports are highly reliable. Rules of evidence may also affect when and how these various data sources can be used in expert reports and at trial. However, when internal data are unavailable through no fault of the plaintiff, then courts often will make allowances for the lack availability if the expert has made every effort to demonstrate that the data relied upon are reasonable.

484

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

## 2. Quantitative methods for validation

One important aspect of validation is to verify that the data are complete. If a separate summary document is available that shows the number of records in the database together with summary statistics such as total amounts paid, completeness is easy to establish. Other methods for establishing completeness include examining serial numbers for records and finding other sources of information about transactions that should be in the data and verifying the presence of all or a sample of them.

Another validation method is to examine specific observations. For example, if the dataset consists of purchasing records, then the expert may examine all of the records for sampled customers, or the expert may examine the information for selected transactions. This type of validation is particularly useful if damages depend on certain types of transactions that are identified by additional data on the purchasing records but are not summarized in other records.

Another approach is to test the internal integrity of the data. For example, a company may keep separate records of sales of products at its stores and shipments to the stores. The expert can compare sales to shipments to establish data integrity.

Not surprisingly, validation of data usually reveals some inconsistent or missing data. Some ways to handle these issues are discussed in the next section.

## C. Are the Parties Disputing the Handling of Missing Data?

In dealing with missing data, it is critical to ascertain why the data are missing and to attempt to isolate the extent of the missing data. If only a small fraction of data is missing and the pattern appears to be random, then potentially the issue of the missing data can be disregarded and inferences can be drawn using only the available data.

However, missing data are seldom random. For example, suppose that only 1% of transactions are missing, but the transactions that are missing are large ones accounting for a third of all volume. Validation by summarizing across different characteristics will usually identify missing data that are not random. Such errors might occur if all of the missing transactions were submitted in a different format that the program for reading the data does not handle. For example, a manufacturer might record sales to Wal-Mart separately from all other customers.

Identifying and adding the missing data to the database is the best correction for missing data, but this is often not possible. In this case, the expert needs to address the problem in another way. The simplest method is to "gross up" damages to reflect the missing data. For example, if 10% of the transactions are randomly missing, then the expert may correct for the missing transactions by dividing calculated damages by 0.9. This method implicitly assumes that the percent missing is known and that the missing and nonmissing transactions reflect the same damages.

485

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

A related approach is to rely on partial, detailed data to measure damages as a fraction of another variable, such as sales. With this approach, other reliable and complete company records such as audited financials may be used to identify the company's total revenues, and damages are then calculated as the fraction of total sales as calculated above. The expert may choose to patch together incomplete data from one source and infer complete, reliable data in other ways. Such ways can include using a survey of customers or workers to measure damages per dollar of sales or per dollar of earnings and then applying those ratios to reliable data on total sales or total earnings.

*Example*:    Credit Card Issuer sells cardholders fraudulent overcharges for insurance against theft for computer purchases. But the insurance does not cover theft of additional purchases such as a printer. The overcharge is found to be 1% of the price of the computer. The transactions reflected in the only available data include computers bundled with printers. Defendant uses the assumption that all transactions over $800 include the purchase of a printer and deducts $150 as the average amount spent for the printer. Credit Card Issuer's damages estimate is 1% × (total purchases less $150 times the number of purchases for more than $800). The expert for the class of insurance purchasers surveys a sample of purchasers and finds that fewer printers were actually purchased in the sample than implied by Issuer's damages formula and thus calculates a higher total overcharge for the class.

*Comment:*  The parties have competing approximations to solve the same problem in the data. The resolution depends on which one is more accurate. A proper survey would probably be the better answer unless the expert for the Issuer can offer additional evidence about the reliability of the approach used.

# X. Standards for Disclosing Data to Opposing Parties

The usual procedure for disclosure of work performed by the damages expert in federal cases is to provide electronic data at the same time or soon after the delivery of the expert's Rule 26(a)(2) report.[83] The data enable the opposing expert to replicate and investigate the damages expert's work in preparation for the expert's deposition and the opposing expert's rebuttal analysis. Even the most complete Rule 26(a)(2) report falls far short of enabling replication of damages calculations

---

83. For a discussion of disclosure of expert reports under Federal Rule of Civil Procedure 26(a)(2), see Margaret A. Berger, The Admissibility of Expert Testimony, Section V.B.1, in this manual.

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

in all but the simplest damages case. The fundamental standard for data disclosure pursuant to Rule 26(a)(2) should be all the materials, starting from original data sources through all intermediate calculations up to the final computer output reflecting the results shown in the Rule 26(a)(2) report. This disclosure should also include all scripts (including programs or any instructions to any program used) as well as all data involved in any step of the computations in the format used by the corresponding software. In particular, Excel or other such programs should include the cell instructions in the worksheet. In addition to the backup for the calculations described in the expert's report, the disclosure should include the materials relating to any other opinion the expert has reached. If confidential data are involved, appropriate protective orders can be sought.

## A. Use of Formats

Disclosure of data should be in standard formats. In general, the formats used by damages experts include Access, Oracle, and other relational databases; Excel, SAS, and Stata datasets; and flat files containing uniformly formatted data in character form. It is critical that the data be provided as actual data files on computer media such as DVDs or data disks, not paper or electronic printouts or reports formatted for visual presentation. As noted earlier, materials formatted for visual presentation are generally difficult to convert back to formats suitable for computer analysis.

## B. Data Dictionaries

The disclosure should include data dictionaries when variable formats and descriptions are not obvious. Data dictionaries should state the format for each variable, the range of appropriate values, and how to interpret the data. This information is particularly important for historic data because specific data formatting may have been used to convey information. For example, positive income values might be used to indicate total household income but negative values might indicate the income of individuals in the household. This specific formatting may have evolved because the underlying data came from multiple sources or data storage was at a premium. Problems of this nature occur less often in more current data because the price of data storage has declined dramatically.

Often, the expert will receive multiple databases from an opposing party. In this situation, the expert needs the requisite information for linking the datasets together. Also, the expert needs to know how the data were compiled in order to understand how to interpret inconsistent information. For example, if the database consists of events corresponding to subscriptions to a newspaper, the expert may encounter overlapping dates for subscriptions to weekday-only service and subscriptions to both weekday and weekend service. Such issues become acute when the data have not been reviewed for errors or difficulties in interpretation.

**EXHIBIT C**

In the example presented, the expert may be advised that the most reliable data are the starting dates and that the end dates should be ignored unless the entire subscription is terminated.

## C. Resolution of Problems

Friction between parties over disclosure of electronic backup is unfortunately common. Some common accusations are

- Failing to disclose the intermediate steps that were performed to generate the data used in the final calculations from the source data;
- Disclosing data and other materials only on paper or as scanned images, not in electronically readable form;
- Disclosing data as reports formatted as tables (although the expert may have originally received the data in this format);
- Concealing the logic of an Excel spreadsheet by revealing only the cell values and not the formulas used to generate the values;
- Failing to provide data dictionaries explaining the meaning of the underlying data; and
- Omitting calculations related to opinions other than the actual damages calculation.

A judge, magistrate, or special master overseeing discovery should become familiar with these issues to resolve the disputes fairly and to ensure full disclosure of each expert's numerical work to the opposition.

A tool that may be effective, but that is rarely used in the United States, is to have the experts meet without attorneys and identify where they agree and where they disagree.[84] Such an arrangement would generally require the consent of the parties.

---

84. New Zealand allows such expert conferences in certain circumstances. For example, High Court Rule 9.44 provides:

> (1) The court may, on its own initiative or on the application of a party to a proceeding, direct expert witnesses to—(a) confer on specified matters; (b) confer in the absence of the legal advisers of the parties; (c) try to reach agreement on matters in issue in the proceeding; (d) prepare and sign a joint witness statement stating the matters on which the expert witnesses agree and the matters on which they do not agree, including the reasons for their disagreement; (e) prepare the joint witness statement without the assistance of the legal advisers of the parties. (2) The court must not give a direction under subclause (1)(b) or (e) unless the parties agree.

Judicature Act 1908 No. 89 (as at 24 May 2010), Schedule 2 High Court Rules, Part 9 Evidence, Subpart 5—Experts, Rule 9.44.

**EXHIBIT C**

## D. Special Masters and Neutral Experts

Court-appointed individuals with the appropriate backgrounds can be useful in cases with complex damages calculations. If such an individual is assisting the court, the parties are unlikely to fail to cooperate speedily in disclosing their underlying computer work, knowing that any failure of cooperation would be recognized immediately.

# XI. Damages in Class Actions

## A. Class Certification

Damages play a large and increasing role in the certification of a class. Courts are exhibiting an increasing tendency to deny certification unless the class has a well-developed method for measuring damages for individual class members. One aspect of this tightening of standards is the use of a damages model to limit the membership of the class to individuals who are known to have incurred losses from the harmful conduct. Whereas earlier standards for damages were mainly the assurance of a qualified expert that damages could be measured later in the proceeding, some courts now require the expert to present a more fully developed method for quantifying damages.[85] Disputes about the practicality of damages measurement are more and more likely in proposed class actions.[86]

A court operating under the rule that class certification requires a fully developed damages quantification will need to grant discovery prior to class certification to support the class's damages analysis and the defendant's opposition.

## B. Classwide Damages

The class's damages expert normally measures and testifies to classwide damages using methods discussed elsewhere in this chapter. In many class actions, damages ultimately will be paid to class members who file claims in a phase that occurs after settlement or trial. In principle, the damages experts will need to forecast the number of claimants as well as the average amount of damages per claimant. The propensity of class members to file claims depends critically on the amount of their likely recovery. Asbestos victims have high claim rates, whereas individuals who overpaid their cell phone bills by a few dollars have low rates.

---

85. *See* David S. Evans, *The New Consensus on Class Certification: What It Means for the Use of Economic and Statistical Evidence in Meeting the Requirements of Rule 23* (Jan. 2009), *available at* http://ssrn.com/abstract=1330594.

86. *See, e.g., In Re* New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6 (1st Cir. 2008).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## C. Damages of Individual Class Members

Damages experts may also have a role in the process of disbursing funds from verdict or settlement to individual class members. An expert can develop software that measures individual damages based on evidence supplied by individuals through a claims–processing facility. For example, in *Millsap v. McDonnell-Douglas,*[87] more than 1000 class members, victims of the defendant's challenged layoffs, completed sworn questionnaires describing their post-layoff experiences. McDonnell-Douglas supplied additional information from its employee records. The class's damages expert used standard methods for valuing claims for lost earnings to calculate estimates for each class member. Because the settlement compromised a number of disputes about the law and about the facts underlying the layoffs, the total cash from the settlement was less than the sum of these estimates, and class members received a fraction of the amount indicated by the damages model.

## D. Have the Defendant and the Class's Counsel Proposed a Fair Settlement?

The classwide damages measure has a key role in resolving class–action cases, because courts refer to it in determining the fairness of proposed settlements. The court's careful review of the benefits proposed for the class is essential because the interests of the class's counsel are not aligned with those of the class members with respect to settlement.

*Example:*   Lender required excessive escrow deposits for property taxes from a class of mortgage borrowers, although the excess was repaid at the end of each year. Under the terms of the proposed settlement negotiated between Lender's lawyers and those for the class, the excess is to be refunded to the class members immediately, with 30% of that amount paid to class counsel as fees.

*Comment:*   This settlement is unreasonable and leaves the class worse off than they were under the excessive escrows. The loss to the class from placing funds in an escrow is the foregone interest on the amount in the escrow, which would likely be no more than 10% of the excess amount of the escrow. By granting 30% of the refund as fees to class counsel, the class members are at least 20% worse off than they would be if the excess were repaid with a delay.

87.  No. 94-CV-633-H(M), 2003 WL 21277124 (N.D. Okla. May 28, 2003).

490

**EXHIBIT C**

At one time, settlements granted coupons to class members rather than cash compensation, but this practice is now discouraged. The valuation of the coupons is controversial.[88]

*Example:*    In a case brought by the Department of Justice, airlines were found culpable for price fixing. The settlement of the derivative consumer class action granted class members coupons for discounts on air travel. Alaska Airlines, not a defendant in the government case or earlier in the class action, petitioned the court to be added as a defendant so that it too could gain the marketing advantage of the coupons.[89]

*Comment:*    Alaska's petition made it clear that the coupons were beneficial to the airlines, not costly, and so the corresponding value to the class was presumptively small.

# XII. Illustrations of General Principles

In the sections below, we provide concrete examples of how damages may be calculated in two common situations: (1) lost personal earnings and (2) lost profits for a business. The discussions are intended to illustrate how to apply the general ideas presented in the previous sections.

## A. Claim for Lost Personal Income

Claims for lost personal earnings generally arise from wrongful termination, discrimination, injury, or death. The earnings usually come from employment in a firm, but essentially the same issues arise if self-employment or partnership earnings are lost. Most damages studies for personal lost earnings closely fit the model of Figure 1. The but-for world is usually based on the projected employment trajectory absent the harmful act. Here we present an example of a moderately realistic lost personal income damages quantification.

A construction worker sues for lost personal income after he is severely injured when the defendant runs through a red light and hits him. He asserts that he is disabled and unable to work for the rest of his life. Moreover, his injuries

---

88. *See* Figueroa v. Sharper Image Corp., 519 F. Supp. 2d 1302–29 (S.D. Fla. 2007).

89. *In Re* Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297 (N.D. Ga. 1993). According to a spokesman for Alaska Air, "The airlines using those coupons are going to see substantial additional ticket sales because of them. . . . We asked to be named in the case because, once we saw the settlement, we realized it was to our competitive disadvantage not to do so." Anthony Faiola, *In Settling with Airlines, There's No Free Ride; Coupons for Travelers, $16 Million for Lawyers*, Washington Post, Mar. 20, 1995, at A1. For a general discussion of coupon settlements, see Christopher R. Leslie, *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation*, 49 UCLA L. Rev. 91 (2002).

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

are so severe that his lifespan has been shortened by 3.5 years. Although he was a construction worker at the time of the accident, he had been going to school to become a CPA. The plaintiff's damages study presumes that he will not be able to work at all in the future. The defendant argues that the plaintiff should have continued his education after the accident and worked as a CPA. The defendant also disputes the reliability of the reduced life expectancy calculation. The judge has ruled that a jury should decide if there is a sufficient basis to conclude that the calculation of lost personal earnings should reflect the plaintiff's reduced life expectancy.

*1. Is there a dispute about projected earnings but for the harmful event?*

A plaintiff who seeks compensation for lost earnings will normally estimate damages based on wages or salary; other cash compensation, such as commissions, overtime, and bonuses; and the value of fringe benefits. Employees in similar jobs whose earnings were not interrupted form a natural benchmark for earning growth between the harmful event and trial. The plaintiff may make the case that a promotion or job change would have occurred during that period. Disputes involving the more variable elements of cash compensation are likely to arise. The plaintiff may measure bonuses and overtime during a period when these parts of compensation were unusually high, while the defendant may choose a longer period, during which the average is lower.

In our example, the construction worker claims that he would have made $75,000 working for one more year in construction while completing his degree. After that, he would have worked as a CPA earning $100,000 a year until retirement at age 70 based on the average salary for all CPAs. As a result of his injury, he only receives $22,000 a year from disability payments. Table 4 shows these projections.

The defendant's damages study presumes that the plaintiff could have continued his education after the injury and begun working as a CPA a year later. However, he argues the plaintiff would have earned only $75,000 as a CPA because of the plaintiff's lackluster record as an undergraduate and his career as a construction worker, where his work resulted in a depreciation of the skills that a CPA needs. This salary is based on the median salary for all CPAs. Table 5 shows the defendant's projections.

*2. Are the parties disputing the valuation of benefits?*

Lost benefits are an important part of lost personal earnings damages. As discussed in Section VIII.B, strict adherence to the format of Figure 1 can help resolve these disputes.

In the example, plaintiff includes only disability payments because of the injury. Absent his injury, he would have received higher benefits than the disability payments after retirement at age 70. The defendant projects higher social

492

**EXHIBIT C**

## Table 4. Plaintiff's Estimate of Lost Personal Income

| Age | Actual Earnings | Actual Social Sec Benefits | Total Actual Income | Probability of Surviving | Probability of Working | Expected Income | But-for Earnings | But-for Social Sec Benefits | But-for Total But-for Income | But-for Probability of Surviving | But-for Probability of Working | But-for Expected Income | Total Lost Income | Discount Rate | Discount Rate Index | Discounted Lost Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 56-57 | 0 | 22,008 | 22,008 | 1.00 | 0.00 | 22,008 | 75,000 | | 75,000 | 1.00 | 0.90 | 67,500 | 45,492 | 0.01 | 1.00 | 45,492 |
| 57-58 | 0 | 22,008 | 21,727 | 0.99 | 0.00 | 21,727 | 87,083 | | 87,083 | 0.99 | 1.00 | 86,341 | 64,615 | 0.01 | 0.99 | 63,975 |
| 58-59 | 0 | 22,008 | 21,428 | 0.97 | 0.00 | 21,428 | 100,000 | | 100,000 | 0.98 | 1.00 | 98,238 | 76,810 | 0.01 | 0.98 | 75,297 |
| 59-60 | 0 | 22,008 | 21,107 | 0.96 | 0.00 | 21,107 | 100,000 | | 100,000 | 0.97 | 1.00 | 97,258 | 76,151 | 0.01 | 0.97 | 73,911 |
| 60-61 | 0 | 22,008 | 20,761 | 0.94 | 0.00 | 20,761 | 100,000 | | 100,000 | 0.96 | 1.00 | 96,195 | 75,434 | 0.01 | 0.96 | 72,491 |
| 61-62 | 0 | 22,008 | 20,387 | 0.93 | 0.00 | 20,387 | 100,000 | | 100,000 | 0.95 | 1.00 | 95,039 | 74,653 | 0.01 | 0.95 | 71,029 |
| 62-63 | 0 | 22,008 | 19,984 | 0.91 | 0.00 | 19,984 | 100,000 | | 100,000 | 0.94 | 1.00 | 93,788 | 73,804 | 0.01 | 0.94 | 69,527 |
| 63-64 | 0 | 22,008 | 19,556 | 0.89 | 0.00 | 19,556 | 100,000 | | 100,000 | 0.92 | 1.00 | 92,448 | 72,892 | 0.01 | 0.93 | 67,988 |
| 64-65 | 0 | 22,008 | 19,104 | 0.87 | 0.00 | 19,104 | 100,000 | | 100,000 | 0.91 | 1.00 | 91,024 | 71,920 | 0.01 | 0.92 | 66,417 |
| 65-66 | 0 | 22,008 | 18,629 | 0.85 | 0.00 | 18,629 | 100,000 | | 100,000 | 0.90 | 1.00 | 89,514 | 70,885 | 0.01 | 0.91 | 64,813 |
| 66-67 | 0 | 22,008 | 18,130 | 0.82 | 0.00 | 18,130 | 100,000 | | 100,000 | 0.88 | 1.00 | 87,916 | 69,786 | 0.01 | 0.91 | 63,177 |
| 67-68 | 0 | 22,008 | 17,605 | 0.80 | 0.00 | 17,605 | 100,000 | | 100,000 | 0.86 | 1.00 | 86,220 | 68,615 | 0.01 | 0.90 | 61,501 |
| 68-69 | 0 | 22,008 | 17,052 | 0.77 | 0.00 | 17,052 | 100,000 | | 100,000 | 0.84 | 1.00 | 84,414 | 67,362 | 0.01 | 0.89 | 59,780 |
| 69-70 | 0 | 22,008 | 16,467 | 0.75 | 0.00 | 16,467 | 100,000 | | 100,000 | 0.82 | 1.00 | 82,483 | 66,016 | 0.01 | 0.88 | 58,006 |
| 70-71 | 0 | 22,008 | 15,849 | 0.72 | 0.00 | 15,849 | | 31,152 | 31,152 | 0.80 | 0.00 | 25,053 | 9,203 | 0.01 | 0.87 | 8,007 |
| 71-72 | 0 | 22,008 | 15,197 | 0.69 | 0.00 | 15,197 | | 31,152 | 31,152 | 0.78 | 0.00 | 24,365 | 9,168 | 0.01 | 0.86 | 7,897 |
| 72-73 | 0 | 22,008 | 14,506 | 0.66 | 0.00 | 14,506 | | 31,152 | 31,152 | 0.76 | 0.00 | 23,626 | 9,121 | 0.01 | 0.85 | 7,778 |
| 73-74 | 0 | 22,008 | 13,775 | 0.63 | 0.00 | 13,775 | | 31,152 | 31,152 | 0.73 | 0.00 | 22,832 | 9,058 | 0.01 | 0.84 | 7,648 |
| 74-75 | 0 | 22,008 | 13,005 | 0.59 | 0.00 | 13,005 | | 31,152 | 31,152 | 0.71 | 0.00 | 21,982 | 8,977 | 0.01 | 0.84 | 7,505 |
| 75-76 | 0 | 22,008 | 12,200 | 0.55 | 0.00 | 12,200 | | 31,152 | 31,152 | 0.68 | 0.00 | 21,074 | 8,875 | 0.01 | 0.83 | 7,346 |
| 76-77 | 0 | 22,008 | 11,364 | 0.52 | 0.00 | 11,364 | | 31,152 | 31,152 | 0.65 | 0.00 | 20,113 | 8,748 | 0.01 | 0.82 | 7,170 |
| 77-78 | 0 | 22,008 | 10,505 | 0.48 | 0.00 | 10,505 | | 31,152 | 31,152 | 0.61 | 0.00 | 19,098 | 8,594 | 0.01 | 0.81 | 6,973 |
| 78-79 | 0 | 22,008 | 9,628 | 0.44 | 0.00 | 9,628 | | 31,152 | 31,152 | 0.58 | 0.00 | 18,035 | 8,408 | 0.01 | 0.80 | 6,755 |
| 79-80 | 0 | 22,008 | 8,740 | 0.40 | 0.00 | 8,740 | | 31,152 | 31,152 | 0.54 | 0.00 | 16,927 | 8,187 | 0.01 | 0.80 | 6,512 |
| 80-81 | 0 | 22,008 | 7,852 | 0.36 | 0.00 | 7,852 | | 31,152 | 31,152 | 0.51 | 0.00 | 15,780 | 7,928 | 0.01 | 0.79 | 6,244 |
| 81-82 | 0 | 22,008 | 6,973 | 0.32 | 0.00 | 6,973 | | 31,152 | 31,152 | 0.47 | 0.00 | 14,602 | 7,629 | 0.01 | 0.78 | 5,949 |
| 82-83 | 0 | 22,008 | 6,112 | 0.28 | 0.00 | 6,112 | | 31,152 | 31,152 | 0.43 | 0.00 | 13,401 | 7,289 | 0.01 | 0.77 | 5,627 |
| 83-84 | 0 | 22,008 | 5,283 | 0.24 | 0.00 | 5,283 | | 31,152 | 31,152 | 0.39 | 0.00 | 12,188 | 6,906 | 0.01 | 0.76 | 5,279 |
| 84-85 | 0 | 22,008 | 4,494 | 0.20 | 0.00 | 4,494 | | 31,152 | 31,152 | 0.35 | 0.00 | 10,976 | 6,481 | 0.01 | 0.76 | 4,905 |
| 85-86 | 0 | 22,008 | 3,758 | 0.17 | 0.00 | 3,758 | | 31,152 | 31,152 | 0.31 | 0.00 | 9,777 | 6,019 | 0.01 | 0.75 | 4,510 |
| 86-87 | 0 | 22,008 | 3,082 | 0.14 | 0.00 | 3,082 | | 31,152 | 31,152 | 0.28 | 0.00 | 8,605 | 5,523 | 0.01 | 0.74 | 4,097 |
| 87-88 | 0 | 22,008 | 2,475 | 0.11 | 0.00 | 2,475 | | 31,152 | 31,152 | 0.24 | 0.00 | 7,474 | 5,000 | 0.01 | 0.73 | 3,673 |
| 88-89 | 0 | 22,008 | 1,941 | 0.09 | 0.00 | 1,941 | | 31,152 | 31,152 | 0.21 | 0.00 | 6,400 | 4,459 | 0.01 | 0.73 | 3,243 |
| 89-90 | 0 | 22,008 | 1,484 | 0.07 | 0.00 | 1,484 | | 31,152 | 31,152 | 0.17 | 0.00 | 5,394 | 3,911 | 0.01 | 0.72 | 2,816 |
| 90-91 | 0 | 22,008 | 1,102 | 0.05 | 0.00 | 1,102 | | 31,152 | 31,152 | 0.14 | 0.00 | 4,469 | 3,367 | 0.01 | 0.71 | 2,401 |
| 91-92 | 0 | 22,008 | 793 | 0.04 | 0.00 | 793 | | 31,152 | 31,152 | 0.12 | 0.00 | 3,634 | 2,841 | 0.01 | 0.71 | 2,005 |
| 92-93 | 0 | 22,008 | 551 | 0.03 | 0.00 | 551 | | 31,152 | 31,152 | 0.09 | 0.00 | 2,895 | 2,344 | 0.01 | 0.70 | 1,638 |
| 93-94 | 0 | 22,008 | 369 | 0.02 | 0.00 | 369 | | 31,152 | 31,152 | 0.07 | 0.00 | 2,256 | 1,887 | 0.01 | 0.69 | 1,306 |
| 94-95 | 0 | 22,008 | 236 | 0.01 | 0.00 | 236 | | 31,152 | 31,152 | 0.06 | 0.00 | 1,716 | 1,480 | 0.01 | 0.69 | 1,014 |
| 95-96 | 0 | 22,008 | 145 | 0.01 | 0.00 | 145 | | 31,152 | 31,152 | 0.04 | 0.00 | 1,272 | 1,127 | 0.01 | 0.68 | 765 |
| 96-97 | 0 | 22,008 | 84 | 0.00 | 0.00 | 84 | | 31,152 | 31,152 | 0.03 | 0.00 | 916 | 832 | 0.01 | 0.67 | 559 |
| 97-98 | 0 | 22,008 | 46 | 0.00 | 0.00 | 46 | | 31,152 | 31,152 | 0.02 | 0.00 | 640 | 594 | 0.01 | 0.67 | 395 |
| 98-99 | 0 | 22,008 | 24 | 0.00 | 0.00 | 24 | | 31,152 | 31,152 | 0.01 | 0.00 | 433 | 410 | 0.01 | 0.66 | 270 |
| 99-100 | 0 | 22,008 | 11 | 0.00 | 0.00 | 11 | | 31,152 | 31,152 | 0.01 | 0.00 | 283 | 272 | 0.01 | 0.65 | 177 |
| 100 and over | 0 | 22,008 | 0 | 0.00 | 0.00 | 0 | | 31,152 | 31,152 | 0.00 | 0.00 | 0 | 0 | 0.01 | 0.65 | 0 |

Total Lost Personal Income    1,043,866

493

EXHIBIT C

## Table 5. Defendant's Estimate of Lost Personal Income

| Age | Actual Earnings | Actual Social Sec Benefits | Total Actual Income | Probability of Surviving | Probability of Working | Expected Income | But-for Earnings | But-for Social Sec Benefits | But-for Total But-for Income | But-for Probability of Surviving | But-for Probability of Working | But-for Expected Income | Total Lost Income | Discount Rate | Discount Rate Index | Discounted Lost Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 56-57 | 0 | 0 | 0 | 1.00 | 0.00 | 0 | 75,000 | | 75,000 | 1.00 | 0.80 | 60,000 | 60,000 | 0.05 | 1.00 | 60,000 |
| 57-58 | 75,000 | 0 | 74,361 | 0.99 | 1.00 | 74,361 | 75,000 | | 75,000 | 0.99 | 1.00 | 74,361 | 0 | 0.05 | 0.95 | 0 |
| 58-59 | 75,000 | 0 | 73,678 | 0.98 | 1.00 | 73,678 | 75,000 | | 75,000 | 0.98 | 1.00 | 73,678 | 0 | 0.05 | 0.91 | 0 |
| 59-60 | 75,000 | 0 | 72,944 | 0.97 | 1.00 | 72,944 | 75,000 | | 75,000 | 0.97 | 1.00 | 72,944 | 0 | 0.05 | 0.86 | 0 |
| 60-61 | 75,000 | 0 | 72,146 | 0.96 | 1.00 | 72,146 | 75,000 | | 75,000 | 0.96 | 1.00 | 72,146 | 0 | 0.05 | 0.82 | 0 |
| 61-62 | 75,000 | 0 | 71,280 | 0.95 | 1.00 | 71,280 | 75,000 | | 75,000 | 0.95 | 1.00 | 71,280 | 0 | 0.05 | 0.78 | 0 |
| 62-63 | 75,000 | 0 | 70,341 | 0.94 | 1.00 | 70,341 | 75,000 | | 75,000 | 0.94 | 1.00 | 70,341 | 0 | 0.05 | 0.75 | 0 |
| 63-64 | 75,000 | 0 | 69,336 | 0.92 | 1.00 | 69,336 | 75,000 | | 75,000 | 0.92 | 1.00 | 69,336 | 0 | 0.05 | 0.71 | 0 |
| 64-65 | 75,000 | 0 | 68,268 | 0.91 | 1.00 | 68,268 | 75,000 | | 75,000 | 0.91 | 1.00 | 68,268 | 0 | 0.05 | 0.68 | 0 |
| 65-66 | 75,000 | 0 | 67,135 | 0.90 | 1.00 | 67,135 | 75,000 | | 75,000 | 0.90 | 1.00 | 67,135 | 0 | 0.05 | 0.64 | 0 |
| 66-67 | 75,000 | 0 | 65,937 | 0.88 | 1.00 | 65,937 | 75,000 | | 75,000 | 0.88 | 1.00 | 65,937 | 0 | 0.05 | 0.61 | 0 |
| 67-68 | 75,000 | 0 | 64,665 | 0.86 | 1.00 | 64,665 | 75,000 | | 75,000 | 0.86 | 1.00 | 64,665 | 0 | 0.05 | 0.58 | 0 |
| 68-69 | 75,000 | 0 | 63,310 | 0.84 | 1.00 | 63,310 | 75,000 | | 75,000 | 0.84 | 1.00 | 63,310 | 0 | 0.05 | 0.56 | 0 |
| 69-70 | 75,000 | 0 | 61,863 | 0.82 | 1.00 | 61,863 | 75,000 | | 75,000 | 0.82 | 1.00 | 61,863 | 0 | 0.05 | 0.53 | 0 |
| 70-71 | 0 | 30,864 | 24,821 | 0.80 | 0.00 | 24,821 | | 31,152 | 31,152 | 0.80 | 0.00 | 25,053 | 232 | 0.05 | 0.51 | 117 |
| 71-72 | 0 | 30,864 | 24,140 | 0.78 | 0.00 | 24,140 | | 31,152 | 31,152 | 0.78 | 0.00 | 24,365 | 225 | 0.05 | 0.48 | 108 |
| 72-73 | 0 | 30,864 | 23,408 | 0.76 | 0.00 | 23,408 | | 31,152 | 31,152 | 0.76 | 0.00 | 23,626 | 218 | 0.05 | 0.46 | 100 |
| 73-74 | 0 | 30,864 | 22,621 | 0.73 | 0.00 | 22,621 | | 31,152 | 31,152 | 0.73 | 0.00 | 22,832 | 211 | 0.05 | 0.44 | 92 |
| 74-75 | 0 | 30,864 | 21,779 | 0.71 | 0.00 | 21,779 | | 31,152 | 31,152 | 0.71 | 0.00 | 21,982 | 203 | 0.05 | 0.42 | 84 |
| 75-76 | 0 | 30,864 | 20,879 | 0.68 | 0.00 | 20,879 | | 31,152 | 31,152 | 0.68 | 0.00 | 21,074 | 195 | 0.05 | 0.40 | 77 |
| 76-77 | 0 | 30,864 | 19,927 | 0.65 | 0.00 | 19,927 | | 31,152 | 31,152 | 0.65 | 0.00 | 20,113 | 186 | 0.05 | 0.38 | 70 |
| 77-78 | 0 | 30,864 | 18,922 | 0.61 | 0.00 | 18,922 | | 31,152 | 31,152 | 0.61 | 0.00 | 19,098 | 177 | 0.05 | 0.36 | 63 |
| 78-79 | 0 | 30,864 | 17,868 | 0.58 | 0.00 | 17,868 | | 31,152 | 31,152 | 0.58 | 0.00 | 18,035 | 167 | 0.05 | 0.34 | 57 |
| 79-80 | 0 | 30,864 | 16,771 | 0.54 | 0.00 | 16,771 | | 31,152 | 31,152 | 0.54 | 0.00 | 16,927 | 156 | 0.05 | 0.33 | 51 |
| 80-81 | 0 | 30,864 | 15,634 | 0.51 | 0.00 | 15,634 | | 31,152 | 31,152 | 0.51 | 0.00 | 15,780 | 146 | 0.05 | 0.31 | 45 |
| 81-82 | 0 | 30,864 | 14,467 | 0.47 | 0.00 | 14,467 | | 31,152 | 31,152 | 0.47 | 0.00 | 14,602 | 135 | 0.05 | 0.30 | 40 |
| 82-83 | 0 | 30,864 | 13,277 | 0.43 | 0.00 | 13,277 | | 31,152 | 31,152 | 0.43 | 0.00 | 13,401 | 124 | 0.05 | 0.28 | 35 |
| 83-84 | 0 | 30,864 | 12,076 | 0.39 | 0.00 | 12,076 | | 31,152 | 31,152 | 0.39 | 0.00 | 12,188 | 113 | 0.05 | 0.27 | 30 |
| 84-85 | 0 | 30,864 | 10,874 | 0.35 | 0.00 | 10,874 | | 31,152 | 31,152 | 0.35 | 0.00 | 10,976 | 101 | 0.05 | 0.26 | 26 |
| 85-86 | 0 | 30,864 | 9,686 | 0.31 | 0.00 | 9,686 | | 31,152 | 31,152 | 0.31 | 0.00 | 9,777 | 90 | 0.05 | 0.24 | 22 |
| 86-87 | 0 | 30,864 | 8,525 | 0.28 | 0.00 | 8,525 | | 31,152 | 31,152 | 0.28 | 0.00 | 8,605 | 80 | 0.05 | 0.23 | 18 |
| 87-88 | 0 | 30,864 | 7,405 | 0.24 | 0.00 | 7,405 | | 31,152 | 31,152 | 0.24 | 0.00 | 7,474 | 69 | 0.05 | 0.22 | 15 |
| 88-89 | 0 | 30,864 | 6,341 | 0.21 | 0.00 | 6,341 | | 31,152 | 31,152 | 0.21 | 0.00 | 6,400 | 59 | 0.05 | 0.21 | 12 |
| 89-90 | 0 | 30,864 | 5,344 | 0.17 | 0.00 | 5,344 | | 31,152 | 31,152 | 0.17 | 0.00 | 5,394 | 50 | 0.05 | 0.20 | 10 |
| 90-91 | 0 | 30,864 | 4,428 | 0.14 | 0.00 | 4,428 | | 31,152 | 31,152 | 0.14 | 0.00 | 4,469 | 41 | 0.05 | 0.19 | 8 |
| 91-92 | 0 | 30,864 | 3,600 | 0.12 | 0.00 | 3,600 | | 31,152 | 31,152 | 0.12 | 0.00 | 3,634 | 34 | 0.05 | 0.18 | 6 |
| 92-93 | 0 | 30,864 | 2,868 | 0.09 | 0.00 | 2,868 | | 31,152 | 31,152 | 0.09 | 0.00 | 2,895 | 27 | 0.05 | 0.17 | 5 |
| 93-94 | 0 | 30,864 | 2,235 | 0.07 | 0.00 | 2,235 | | 31,152 | 31,152 | 0.07 | 0.00 | 2,256 | 21 | 0.05 | 0.16 | 3 |
| 94-95 | 0 | 30,864 | 1,700 | 0.06 | 0.00 | 1,700 | | 31,152 | 31,152 | 0.06 | 0.00 | 1,716 | 16 | 0.05 | 0.16 | 2 |
| 95-96 | 0 | 30,864 | 1,260 | 0.04 | 0.00 | 1,260 | | 31,152 | 31,152 | 0.04 | 0.00 | 1,272 | 12 | 0.05 | 0.15 | 2 |
| 96-97 | 0 | 30,864 | 908 | 0.03 | 0.00 | 908 | | 31,152 | 31,152 | 0.03 | 0.00 | 916 | 8 | 0.05 | 0.14 | 1 |
| 97-98 | 0 | 30,864 | 634 | 0.02 | 0.00 | 634 | | 31,152 | 31,152 | 0.02 | 0.00 | 640 | 6 | 0.05 | 0.14 | 1 |
| 98-99 | 0 | 30,864 | 429 | 0.01 | 0.00 | 429 | | 31,152 | 31,152 | 0.01 | 0.00 | 433 | 4 | 0.05 | 0.13 | 1 |
| 99-100 | 0 | 30,864 | 280 | 0.01 | 0.00 | 280 | | 31,152 | 31,152 | 0.01 | 0.00 | 283 | 3 | 0.05 | 0.12 | 0 |
| 100 + | 0 | 30,864 | 0 | 0.00 | 0.00 | 0 | | 31,152 | 31,152 | 0.00 | 0.00 | 0 | 0 | 0.05 | 0.12 | 0 |

Total Lost Personal Income   61,104

EXHIBIT C

494

*Reference Guide on Estimation of Economic Damages*

security benefits based on a longer period and higher level of contributions to social security. The parties agree that the plaintiff would have retired at age 70 absent the accident.

### 3. Is there disagreement about how earnings should be discounted to present value?

Because personal lost earnings damages may accrue over the remainder of a plaintiff's working life, the issues of predicting future inflation and discounting earnings to present value are likely to generate quantitatively important disagreements. As we noted in Section VI.D, projections of future compensation can be calculated in constant dollars or escalated terms. In the first case, the interest rate used to discount future constant–dollar losses should be a real interest rate—the difference between the ordinary interest rate and the projected future rate of inflation. All else being the same, the two approaches will give identical calculations of damages.

In our example, both the plaintiff and defendant use constant dollars and use a real rate of interest for discounting. However, the plaintiff calculates the real rate of interest as 1%, relying on the implied rate from inflation–adjusted Treasury bonds. In contrast, the defendant uses a discount rate of 5% based on the historic real rate of return to investments in general.

### 4. Is there disagreement about subsequent unexpected events?

Disagreements about subsequent unexpected events are likely in cases involving personal earnings, as discussed in general in Section VIII.E. For example, the plaintiff may have suffered a debilitating illness that would have caused him to quit his job a year later even if the wrongful act had not occurred. Alternatively, the plaintiff may have been laid off as a result of employer hardship a year later notwithstanding the wrongful act. In these examples, the defendant may argue that damages should be limited to one year. The plaintiff might respond that subsequent events were unexpected at the time of the termination and therefore should be excluded from consideration in the calculation of damages. Thus, the plaintiff would argue that damages should be calculated without consideration of these events.

In our example, the defendant points out that the unemployment rate for construction workers was 50% beginning six months after the accident. The plaintiff argues that the unemployment rate for construction workers at the time of the accident was only 19% and therefore the revised unemployment rate after the accident is irrelevant.

### 5. Is there disagreement about retirement and mortality?

Closely related to the issue of unexpected events is how future damages should reflect the probability that the plaintiff will die or decide to retire. Sometimes an

EXHIBIT C

*Reference Manual on Scientific Evidence*

expert will assume a work–life expectancy and terminate damages at the end of that period. Tables of work–life expectancy incorporate the probability of both retirement and death. Another approach is to multiply each year's lost earnings by the probability that the plaintiff will be alive and working in that year. That probability declines gradually with age and can be inferred from data on labor force participation and mortality by age.

In our example, the plaintiff projects that his life expectancy was reduced by 3.5 years and uses revised survival rates as a result. The defendant disagrees, arguing that the survival tables relied upon by the plaintiff are unreliable. However, both agree that the plaintiff would have worked until age 70 absent the accident because the unemployment rate for CPAs is essentially zero in the area where the plaintiff lives.

## 6. *Is there a dispute about mitigation?*

Actual earnings before trial, although known, may be subject to dispute if the defendant argues that the plaintiff took too long to find a job or the job taken was not sufficiently remunerative. Even more problematic may be the situation in which the plaintiff continues to be unemployed. Parties disputing the length of job search frequently offer testimony from job placement experts. Testimony from a psychologist also may be offered if the plaintiff has suffered emotional trauma as a result of the defendant's actions. Recovery from temporarily disabling injuries may be the subject of testimony by experts in vocational rehabilitation.

In our example, the plaintiff argues that he is disabled and unable to work for the remainder of his life. The defendant argues that the plaintiff could have finished his education and could then have worked as a CPA. Both provide the testimony from experts in vocational rehabilitation to support their conclusions.

## 7. *Is there disagreement about how the plaintiff's career path should be projected?*

The issues that arise in projecting but–for and actual earnings after trial are similar to the issues that arise in measuring damages before trial. In addition, the parties are likely to disagree about the plaintiff's future increases in compensation. A damages analysis should be internally consistent. For example, the compensation paths for both but–for and actual earnings should be based on consistent assumptions about general economic conditions, about conditions in the local labor market for the plaintiff's type of work, the age-earnings profile for the career path, and particularly about the plaintiff's likely increased skills and earning capacity. The analysis probably should project a less successful career for mitigation if it is projecting a slow earnings growth absent the harm.

In our example, the plaintiff argues that he would have worked as a CPA but for the accident but that he is too injured to complete his education and work as a CPA. The defendant argues that working as a CPA is a viable option for the

496

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

plaintiff. Although there is a disagreement about how much the plaintiff would have earned as a CPA, the plaintiff's argument that he is too disabled to work accounts for most of the damages. As shown in Tables 4 and 5, the plaintiff is seeking just over $1 million while the defendant calculates that damages are only $61,000. Differences of this magnitude between quantifications of lost personal earnings by plaintiffs and defendants are common. Our example illustrates some of the main reasons for the large differences.

## B. Lost Profits for a Business

Claims for lost profits for a business generally arise from a lost stream of revenue. However, lost profits can also arise from increased costs. As an example, a breach of a supply contract may increase the victim firm's costs. Generally, an expert will likely be most involved in cases in which the plaintiff is seeking recovery for expectation, reliance, or restitution damages. Most damages studies will follow Figure 1 where earnings are the lost profits. For explication, the following is an example of a business lost profits case:

Plaintiff HSM makes cell phone handsets. Defendant TPC is a cell phone carrier. By denying HSM technical information and by informing HSM's potential customers that HSM's handsets are incompatible with TPC's network, TPC has imposed economic losses on HSM. TPC asserts that HSM has failed to mitigate its losses and overstates its lost revenues. Trial is set for the end of 2010. The respective damages analyses are shown in Tables 6 and Table 7 and discussed below.

Table 6. HSM's Damages Analysis (Dollars in Millions)

| Year | (2) But–For Revenue | (3) But–For Costs | (4) But–For Earnings | (5) Actual Earnings | (6) Lost Earnings | (7) Discount Factor | (8) Damages |
|------|---------|-------|----------|----------|----------|--------|---------|
| 2008 | $561 | $374 | $187 | $34 | $153 | 1.21 | $185 |
| 2009 | 600 | 400 | 200 | 56 | 144 | 1.14 | 164 |
| 2010 | 639 | 426 | 213 | 45 | 168 | 1.07 | 180 |
| 2011 | 681 | 454 | 227 | 87 | 140 | 1.00 | 140 |
| 2012 | 726 | 484 | 242 | 96 | 147 | 0.96 | 141 |
| 2013 | 777 | 518 | 259 | 105 | 153 | 0.92 | 142 |
| 2014 | 828 | 552 | 276 | 116 | 160 | 0.89 | 142 |
| 2015 | 882 | 588 | 294 | 127 | 167 | 0.85 | 143 |
| Total | | | | | | | $1236 |

497

EXHIBIT C

*Reference Manual on Scientific Evidence*

Table 7. TPC's Damages Analysis (Dollars in Millions)

| Year | (2) But–For Revenue | (3) But–For Costs | (4) But–For Earnings | (5) Mitigated Earnings | (6) Lost Earnings | (7) Discount Factor | (8) Damages |
|---|---|---|---|---|---|---|---|
| 2008 | $404 | $303 | $101 | $79 | $22 | 1.21 | $27 |
| 2009 | 432 | 324 | 108 | 85 | 23 | 1.14 | 26 |
| 2010 | 460 | 345 | 115 | 81 | 34 | 1.07 | 36 |
| 2011 | 492 | 369 | 123 | 98 | 25 | 1.00 | 25 |
| 2012 | 524 | 393 | 131 | 108 | 23 | 0.87 | 20 |
| 2013 | 560 | 420 | 140 | 119 | 21 | 0.76 | 16 |
| 2014 | 596 | 447 | 149 | 130 | 19 | 0.66 | 12 |
| 2015 | 636 | 477 | 159 | 143 | 16 | 0.57 | 9 |
| Total | | | | | | | $171 |

## 1. Is there a dispute about projected revenues?

Projecting lost revenues can be straightforward if the disrupted revenue stream occurs immediately following the bad act and the firm recovers relatively quickly. More complex cases can arise if the effect is delayed or the recovery is slow, intermittent, or nonexistent.

In the example above, the plaintiff's expert would argue that revenues would have been higher absent TPC's conduct and thus projects revenues based on the revenue growth prior to the bad act, which reflects increasing sales and increasing prices. The projected revenue for the plaintiff is shown in Table 6, column 2. The defendant's expert would argue that HSM's projections use a growth factor that improperly includes the period when HSM initially entered the market and, therefore, projects HSM's sales using the growth rate for the previous 2 years and assumes that prices would have remained unchanged. TPC's projection of HSM's revenue is shown in Table 7, column 2.

Some additional examples of complexities can found in antitrust cases. For example, assume a company is disadvantaged because a rival has constructed barriers to entry by entering into contracts that require customers to use its add-on products such as ink for a printer. In such cases, the plaintiff's expert may assert that the only suppliers in the but-for market for printer ink would consist of the defendant and the plaintiff, and that the profit would reflect pricing for a duopoly. The defendant may respond that there would be five firms in addition to the plaintiff who would have entered the market as suppliers, and that therefore the pricing would be close to that of a highly competitive market.

Other complexities may arise in intellectual property cases where the revenue stream is reduced because the intellectual property for a product has been misappropriated. In these cases, the expert may need to identify how much of the

498

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

plaintiff's revenue stream should be attributed to the misappropriated intellectual property and how much should be attributed to other aspects of the product. For example, our printer manufacturer may believe that its printers are popular because of its proprietary method to increase the printing speed. However, the defendant may argue that the increase in printing speed has little to do with the popularity of the plaintiff's printer but rather the sharpness of the printing. Or the defendant may argue that at the time of the bad act the plaintiff's product was the fastest printer, but 2 years later, a noninfringing printer is faster and the plaintiff's sales therefore would have dropped to zero.

The projection of the revenue stream is likely to be the most controversial part of any damages estimate in a business case because it requires so many assumptions on the part of both experts with respect to the other players in the market and customer demand.

### 2. Are the parties disputing the calculation of marginal costs?

Another area of dispute that can arise is the measurement of marginal costs. Generally, if the business is an ongoing concern, then the costs can be determined from existing data. Often this is done either by directly modeling the costs needed for the additional revenues or using regression analysis that captures how costs have varied with revenues. The relevant concept is the measure of costs that would have been expended to generate the lost revenues.

In our example, plaintiff's expert would project that the additional costs would reflect the marginal cost ratio that was derived from a regression model of costs against revenues. The defendant's expert might use the average ratio of costs to revenues, arguing that this would be more appropriate because additional workers and equipment would have been needed to generate the increased revenues. The projected costs for both parties are shown in column 3 of Tables 6 and 7.

Costs are often expressed as a percentage of revenues, which simplifies the projection of costs. However, this approach can be problematic if there is reason to believe that the profit rate will change over time. The rate may change because the change in revenues will be so large as to require that an increasing percentage of fixed costs will need to be included, the mix of costs will change over time, or the components of cost will grow at disparate rates. If computing costs as a percentage of revenues is not viable, then the projected costs should reflect the same assumptions about growth and inflation that were used in the revenue projection.

### 3. Is there a dispute about mitigation?

Defendant's expert may argue that the plaintiff's *actual* profits are understated because the plaintiff failed to mitigate its losses. For example, the plaintiff's losses may have been minimized by closure of its business. Or the plaintiff perhaps should have invested in alternative facilities while its business was interrupted because it could not use its existing facilities.

**EXHIBIT C**

In our example, the defendant's expert would argue that HSM could have mitigated its losses by obtaining the technical information it needed from other sources and could have counteracted TPC's disparagement with vigorous marketing. HSM's actual earnings are shown in column 5 of Table 6, and TPC's calculation of HSM's earnings with mitigation are shown in column 5 of Table 7.

## 4. Is there disagreement about how profits should be discounted to present value?

Generally, interest for lost earnings prior to trial is computed at a statutory rate, often not compounded. In our example, trial is at the end of year 2010 and the statutory rate is assumed to be 7% simple (i.e., without compounding). If the prejudgment rate is not set by law, economists favor the use of the cost of borrowing for the defendant, because damages are a forced loan to the defendant by the plaintiff.[90]

The rate used to discount future losses back to the time of the trial is not set by law and substantial disputes will arise about the discount rate. Generally, economists believe that the discount rate should equal the after-tax cost of capital for the plaintiff.

In our example, HSM argues that the proper discount rate should be based on a 4%, after-tax interest rate, obtained by applying HSM's corporate tax rate to TPC's medium-term borrowing rate. TPC, however, believes that the proper discount rate should be HSM's cost of capital, reflecting HSM's cost of equity and cost of debt. Column 7 of Tables 4 and 5 shows the respective discount rates after trial. The resulting damages are shown in column 8 of Tables 6 and 7.

## 5. Is there disagreement about subsequent unexpected events?

Disagreements about subsequent unexpected events are likely in cases involving lost profits. For example, the market for the plaintiff's goods may have suffered a substantial contraction a year after the bad act, with plaintiff likely to be forced into bankruptcy even if the wrongful act had not occurred. Or the costs of the plaintiff may have increased dramatically a year later because of shortages that would have necessitated that the plaintiff retool its business even if the wrongful act had not occurred. The plaintiff might respond that subsequent events were unexpected at the time of the bad act and so should be excluded from consideration in the calculation of damages. Plaintiff, therefore, would argue that damages should be calculated without consideration of these events. The defendant would respond that damages should be limited to 1 year because the unexpected events would have forced the closure of the plaintiff's business. This topic is discussed more fully in Section VIII.E.

---

90. *See* James M. Patell et al., *Accumulating Damages in Litigation: The Roles of Uncertainty and Interest Rates,* 11 J. Legal Stud. 341–64 (1982).

**EXHIBIT C**

*Reference Guide on Estimation of Economic Damages*

# Glossary of Terms

**appraisal.** A method of determining the value of the plaintiff's claim on an earnings stream by reference to the market values of comparable earnings streams. For example, if the plaintiff has been deprived of the use of a piece of property, the appraised value of the property might be used to determine damages.

**avoided cost.** Cost that the plaintiff did not incur as a result of the harmful act. Usually it is the cost that a business would have incurred in order to make the higher level of sales the business would have enjoyed but for the harmful act.

**but–for analysis.** Restatement of the plaintiff's economic situation but for the defendant's harmful act. Damages are generally measured as but–for value less actual value received by the plaintiff.

**capitalization factor.** Factor used to convert a stream of revenue or profit into its capital or property value. A capitalization factor of 10 for profit means that a firm with $1 million in annual profit is worth $10 million.

**compound interest.** Interest calculation giving effect to interest earned on past interest. As a result of compound interest at rate $r$, it takes $(1 + r)(1 + r) = 1 + 2r + r^2$ dollars to make up for a lost dollar of earnings 2 years earlier.

**constant dollars.** Dollars adjusted for inflation. When calculations are done in constant 1999 dollars, it means that future dollar amounts are reduced in proportion to increases in the cost of living expected to occur after 1999.

**discount rate.** Rate of interest used to discount future losses.

**discounting.** Calculation of today's equivalent to a future dollar to reflect the time value of money. If the interest rate is $r$, the discount applicable to 1 year in the future is:

$$\text{discount rate} = 1/(1 + r).$$

The discount for 2 years is this amount squared; for 3 years, it is this amount to the third power, and so on for longer periods. The result of the calculation is to give effect to compound interest.

**earnings.** Economic value received by the plaintiff. Earnings could be salary and benefits from a job, profit from a business, royalties from licensing intellectual property, or the proceeds from a one–time or recurring sale of property. Earnings are measured net of costs. Thus, lost earnings are lost receipts less costs avoided.

**escalation.** Consideration of future inflation in projecting earnings or other dollar flows. The alternative is to make projections in constant dollars.

**expectation damages.** Damages measured on the principle that the plaintiff is entitled to the benefit of the bargain originally made with the defendant.

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

**fixed cost.** Cost that does not change with a change in the amount of products or services sold.

**mitigation.** Action taken by the plaintiff to minimize the economic effect of the harmful act. Also often refers to the actual level of earnings achieved by the plaintiff after the harmful act.

**nominal interest rate.** Interest rate quoted in ordinary dollars, without adjustment for inflation. Interest rates quoted in markets and reported in the financial press are always nominal interest rates.

**prejudgment interest.** Interest on losses occurring before trial.

**present value.** Value today of money due in the past (with interest) or in the future (with discounting).

**price erosion.** Effect of the harmful act on the price charged by the plaintiff. When the harmful act is wrongful competition, as in intellectual property infringement, price erosion is one of the ways that the plaintiff's earnings have been harmed.

**real interest rate.** Interest rate adjusted for inflation. The real interest rate is the nominal interest rate less the annual rate of inflation.

**regression analysis.** Statistical technique for inferring stable relationships among quantities. For example, regression analysis may be used to determine how costs typically vary when sales rise or fall.

**reliance damages.** Damages designed to reimburse a party for expenses incurred from reliance upon the promises of the other party.

**restitution damages.** Damages measured on the principle of restoring the economic equivalent of lost property or value.

**variable cost.** Component of a business's cost that would have been higher if the business had enjoyed higher sales. See also avoided cost.

EXHIBIT C

# Reference Guide on Exposure Science

JOSEPH V. RODRICKS

*Joseph V. Rodricks, Ph.D., is Principal at Environ, Arlington, Virginia.*

CONTENTS

   I.  Introduction, 505
  II.  Exposure Science, 506
      A.  What Do Exposure Scientists Do? 507
      B.  Who Qualifies as an Expert in Exposure Assessment? 508
      C.  Organization of the Reference Guide, 508
 III.  Contexts for the Application of Exposure Science, 509
      A.  Consumer Products, 509
      B.  Environmental and Product Contaminants, 510
      C.  Chemicals in Workplace Environments, 511
      D.  Claims of Disease Causation, 511
 IV.  Chemicals, 513
      A.  Organic and Inorganic Chemicals, 513
      B.  Industrial Chemistry, 514
  V.  Human Exposures to Chemicals, 516
      A.  Exposure Sources—An Overview, 516
      B.  The Goal of Exposure Assessment, 518
      C.  Pathways, 519
      D.  Exposure Routes, 522
      E.  Summary of the Descriptive Process, 524
 VI.  Quantification of Exposure, 525
      A.  Dose, 525
      B.  Doses from Indirect Exposure Pathways, 527
      C.  Direct Measurement: Analytical Science, 528
      D.  Environmental Models, 530
      E.  Integrated Exposure/Dose Assessment, 533
VII.  Into the Body, 534
      A.  Body Burdens, 534
      B.  Monitoring the Body (Biomonitoring), 535
VIII. Evaluating the Scientific Quality of an Exposure Assessment, 537
 IX.  Qualifications of Exposure Scientists, 539

EXHIBIT C

*Reference Manual on Scientific Evidence*

Appendix A: Presentation of Data—Concentration Units, 541
Appendix B: Hazardous Waste Site Exposure Assessment, 543
Glossary of Terms, 545
References on Exposure, 548

**EXHIBIT C**

# I. Introduction

The sciences of epidemiology[1] and toxicology[2] are devoted to understanding the hazardous properties (the toxicity) of chemical substances. Moreover, epidemiological and toxicological studies provide information on how the seriousness and rate of occurrence of the hazard in a population (its risk) change as exposure to a particular chemical changes. To evaluate whether individuals or populations exposed to a chemical are at risk of harm,[3] or have actually been harmed, the information that arises from epidemiological and toxicological studies is needed, as is the information on the exposures incurred by those individuals or populations.

Epidemiologists and toxicologists can tell us, for example, how the magnitude of risk of benzene-induced leukemia changes as exposure to benzene changes. Thus, if there is a need to understand the magnitude of the leukemia risk in populations residing near a petroleum refinery, it becomes necessary to understand the magnitude of the exposure of those populations to benzene. Likewise, if an individual with leukemia claims that benzene exposure was the cause, it becomes necessary to evaluate the history of that individual's exposure to benzene.[4]

Understanding exposure is essential to understanding whether the toxic properties of chemicals have been or will be expressed. Thus, claims of toxic tort or product liability generally require expert testimony not only in medicine and in the sciences of epidemiology and toxicology, but also testimony concerning the nature and magnitude of the exposures incurred by those alleging harm. Similarly, litigation involving the regulation of chemicals said to pose excessive risks to health also requires litigants to present evidence regarding exposure. The need to understand exposure is a central topic in the reference guides in this publication on epidemiology and toxicology. This reference guide provides a view of how the magnitude of exposure comes to be understood.[5]

1. *See* Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

2. *See* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, in this manual.

3. *See, e.g.,* Rhodes v. E.I. du Pont de Nemours & Co., 253 F.R.D. 365 (S.D. W. Va. 2008) (suit for medical monitoring costs because exposure to perfluoroctanoic acid in drinking water allegedly caused an increased risk of developing certain diseases in the future); *In re* Welding Fume Prods. Liab. Litig., 245 F.R.D. 279 (N.D. Ohio 2007) (exposure to manganese fumes allegedly increased the risk of later developing brain damage).

4. *See, e.g.,* Lambert v. B.P. Products North America, Inc., 2006 WL 924988 (S.D. Ill. 2006), 2006 U.S. Dist. LEXIS 16756 (plaintiff diagnosed with chronic lymphocytic leukemia was exposed to jet fuel allegedly containing excessive levels of benzene).

5. This chapter focuses on measuring exposure to toxic substances as a specific developing area of scientific investigation. This topic is distinct from the legal concept of "exposure," which is an element of a claim in toxic tort litigation. The legal concept of exposure relies on the evolving scientific understanding of the manner and extent to which individuals come into contact with toxic substances. However, the legal concept also reflects substantive legal principles and interpretations that vary across jurisdictions. *Compare* Parker v. Mobil Oil Corp., 793 N.Y.S.2d 434 (2005) (requiring findings of specific levels of exposure to benzene by plaintiff who claimed that his leukemia was the result of his

**EXHIBIT C**

Not all questions concerning human exposures to potentially harmful substances require expert testimony. In those circumstances in which the magnitude of exposure is not relevant, or is clearly evident (e.g., because a plaintiff was observed to take the prescribed amount of a prescription medicine), expert testimony is not indicated. But if the magnitude of exposure is an important component of the needed evidence, and if that magnitude is not a simple question of fact, then expert testimony will be important.

# II. Exposure Science

Exposure science is not yet a distinct academic discipline. Although some schools of public health may offer courses in exposure assessment, there are no academic degrees offered in exposure science. When regulatory and public health agencies began in the 1970s to examine toxicological risks in a quantitative way, it became apparent that quantitative exposure assessments would become necessary. Initially, exposure assessment was typically practiced by toxicologists and epidemiologists. As the breadth and complexity of the subject began to be recognized, it became apparent that scientists and engineers with a better grasp of the properties of chemicals (which affect how they behave and undergo change in different environments), and of the methods available to identify and measure chemicals in products and in the environment, would be necessary to provide scientifically defensible assessments. As the importance of exposure assessment grew and began to present significant scientific challenges, its practice drew increasing numbers of scientists and engineers, and some began to refer to their work as exposure science. Not surprisingly, most of the early expositions of exposure assessment came from government agencies that recognized the need to develop and refine the practice to meet their risk assessment needs. Indeed, various documents and reports used by the U.S. Environmental Protection Agency (EPA) remain essential sources for the practice of exposure assessment.[6] Academics and practitioners have written chapters on exposure science for major multiauthor reference works

17-year occupational exposure to gasoline containing benzene) *with* Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999) (evidence of specific exposure level not required where evidence of talc in the workplace indicated that the worker was covered in talc and left footprints on the floor) *and* Allen v. Martin Surfacing, 263 F.R.D. 47 (D. Mass. 2009) (admissible expert testimony may be based on symptom accounts by those exposed rather than direct measurements of solvent concentrations). This chapter takes no position regarding exposure as a substantive legal concept.

6. U.S. Environmental Protection Agency, Exposure Assessment Tools and Models (2009), *available at* http://www.epa.gov/oppt/exposure/ (last visited June 6, 2011); National Exposure Research Laboratory, U.S. Environmental Protection Agency, Scientific and Ethical Approaches for Observational Exposure Studies, Doc. No. EPA 600/R-08/062 (2008), *available at* http://www.epa.gov/nerl/sots/index.html (last visited July 14, 2010); U.S. Environmental Protection Agency. Exposure Factors Handbook (1997).

EXHIBIT C

on toxicology,[7] but most of the work in this area is still found in the primary reference works.

Although exposure science is not yet a distinct academic discipline, in this reference guide the phrase is retained and used to refer to the work of scientists and engineers ("exposure scientists") working in one or more aspects of exposure assessment.

## A. What Do Exposure Scientists Do?

Human beings are exposed to natural and industrial chemicals from conception to death, and because almost all chemicals can become harmful if exposures exceed certain levels, understanding the magnitude and duration of exposures to chemicals is critical to understanding their health impacts. Exposure science is the study of how people can come into contact with (are exposed to)[8] chemicals that may be present in various environmental media (air, water, food, soil, consumer products of all types) and of the amounts of those chemicals that enter the body as a result of these contacts.[9] Exposure scientists also study whether and how those amounts change over time. The goal of exposure science is to quantify those amounts and time periods. The quantitative expression of those amounts is referred to as dose. Ultimately the dose incurred by populations or individuals is the measure needed by health experts to quantify risk of toxicity. Exposure science does not typically deal with the health consequences of those exposures.

The dose entering the body (through inhalation or ingestion, through the skin, and through other routes) is often referred to as the "exposure dose," to distinguish it from the dose that enters the bloodstream and reaches various organs of the body. The latter is typically only a fraction of the exposure dose and is identified through studies that can trace the fate of a chemical after it enters the body. The term "dose" as used in this reference guide is synonymous with "exposure dose," and doses reaching blood or various organs within the body are referred to as "target site doses" or "systemic doses,"

Exposure assessments can be directed at past, present, or even future exposures and can be narrowly focused (one chemical, one environmental medium, one population group) or very broad in scope (many chemicals, several environ-

---

7. P.J. Lioy, *Exposure Analysis and Its Assessment, in* Comprehensive Toxicology (I.G. Sipes et al. eds., 1997); D.J. Paustenbach & A. Madl, *The Practice of Exposure Assessment, in* Principles and Methods of Toxicology (Wallace Hayes ed., 5th ed. 2008).

8. *See, e.g.,* Kitzmiller v. Jefferson, 2006 WL 2473399, 2006 U.S. Dist. LEXIS 61109 (N.D. W. Va. 2006) (defendants offered expert's testimony that plaintiff's use of liquid cleaning agents containing benzalkonium chloride failed to show that she was exposed to benzalkonium chloride in the air); Hawkins v. Nicholson, 2006 WL 954654, 2006 U.S. App. Vet. Claims LEXIS 197, 21 Vet. App. 64 (Vet. App. 2006) (noting that "a veteran who served on active duty in Vietnam between January 9, 1962, and May 7, 1975, is entitled to a rebuttable presumption of exposure to Agent Orange").

9. The term "enter the body" also includes entering the external surface of the body.

EXHIBIT C

mental media, several different population groups). This reference guide explores the various contexts in which exposure assessments are conducted and how their scope is determined.

## B. Who Qualifies as an Expert in Exposure Assessment?

As noted, it is unlikely that any expert can present evidence of having an academic degree in exposure science. An expert's qualifications thus have to be tested by examining the expert's experience,[10] including his or her knowledge of and reliance on authoritative reference works.[11] Experts generally will have strong academic credentials in environmental science and engineering, chemistry, chemical engineering, statistics and mathematical model building, industrial hygiene, or other hard sciences related to the behavior of chemicals in the environment.

To the extent exposure assessments deal with the amounts and behaviors of chemicals in the body, individuals can qualify as experts if they can offer academic credentials or substantial experience in toxicology and in the measurement of chemicals in blood or in biological tissues. Certainly, toxicology, epidemiology, or medical credentials are needed if experts are to offer testimony on the health consequences associated with particular exposures.

Not all exposure assessments are complex; indeed, some, as will be seen, are relatively simple. Most toxicologists and epidemiologists have considerable training and experience assessing dose from medicines and other consumer products—and even from food. But if exposures result from chemicals moving from sources through one or more environmental media, it is unlikely that toxicologists or epidemiologists will be able to offer appropriate qualifications, because modeling or other forms of indirect measurement are needed to assess exposures. Further details on the qualifications of experts are offered in the closing sections of the reference guide.

## C. Organization of the Reference Guide

The reference guide begins with a discussion of the various contexts in which exposure science is applied (Section III). Following that discussion is a section on chemicals and their various sources. Three broad categories of chemicals are discussed: (1) those that are produced for specific uses; (2) those that are byproducts of chemical production, use, and disposal and that enter the environment as contaminants; and (3) those that are created and released by the combustion of all types of organic substances (including tobacco) and of fuels used for energy

---

10. *See, e.g.,* Best v. Lowe's Home Ctrs, 2009 WL 3488367, 2009 U.S. Dist. LEXIS 97700 (E.D. Tenn. 2009) (a medical doctor with extensive industrial toxicology and product safety experience opined that the plaintiff could not have been exposed to the chemical at issue as alleged).

11. Most of the EPA's guidance documents on exposure assessment have been issued after extensive peer review and thus are considered authoritative.

**EXHIBIT C**

production. Each of these categories can be thought of as a source for chemical exposure. Next, there is a discussion of the pathways chemicals follow from their sources to the environmental media to which humans are or could be in contact. Such contact is said to create an exposure. Chemicals can then move from these media of human contact and enter the body by different routes of exposure—by ingestion (in food or water, for example), by inhalation, or by direct skin contact (the dermal route). The section on exposure routes includes a discussion of how chemicals contact and enter the body and of how they behave within it. This last topic comprises the interface between exposure science and the sciences of epidemiology and toxicology. Traditionally, exposure scientists have described their work as ending with the description of dose to the body (exposure dose). As will be seen, some practitioners are focusing on the amounts of chemicals present in blood or various tissues of the body as a result of exposure. Unlike the toxicologist, the exposure scientist is not qualified to evaluate the health consequences of these so-called biomarkers of exposure.

This reference guide first presents all of the above material in nonquantitative terms—to describe and illustrate the various processes through which human exposures to chemicals are created (Sections III–V). The guide then focuses on the quantitative aspects (Sections VI and VII). Without some quantitative understanding of the magnitude of exposure, and of the duration of time over which exposure occurs, it becomes difficult to reach meaningful conclusions about health risks. Thus, the remaining sections are devoted to a critical quantitative concept in exposure science—that of dose—and are intended to integrate all of the earlier descriptive material. The reference guide ends with a review of the qualifications of exposure science experts and how they can be assessed.

# III. Contexts for the Application of Exposure Science

There are perhaps four major contexts in which exposure science is applied: (1) consumer products, (2) contaminants in the environment and in consumer products, (3) chemicals in the workplace, and (4) disease causation.

## A. Consumer Products

Many intentional uses of chemical substances lead to human exposures, and the health risks that are associated with those exposures need to be understood.[12] In some cases, laws and regulations require that health risks be understood in

---

12. *See, e.g., In re* Stand 'n Seal, 623 F. Supp. 2d 1355 (N.D. Ga. 2009) (consumer use of spray-on product allegedly resulted in inhalation exposure to toxic substances, causing respiratory injuries).

EXHIBIT C

advance of the marketing of such chemicals or products containing them. Thus, intentionally introduced food additives, pesticides, and certain industrial chemicals must have regulatory approvals before they are marketed, and manufacturers of such substances are required to demonstrate the absence of significant health risks (i.e., their safety) based on toxicology studies and careful assessments of expected exposures. Pharmaceuticals and other medical products must undergo similar pre-market evaluations. The safety and efficacy of such products must be demonstrated through clinical studies (which are undertaken after animal toxicology studies have been done and have demonstrated the safety of such products for individuals who are involved in clinical trials). Human exposure assessments are central to the regulatory approval of these products.[13]

Many other consumer products require risk assessments, but premarket approvals are not generally required under our current laws. The list of such products is very long, and not all substances included in these products have been subjected to exposure and risk assessments, but regulatory initiatives in the United States and abroad are creating new requirements for more complete assessments of consumer safety.

## B. Environmental and Product Contaminants

Byproducts of many industrial processes, including those created by combustion, have led to much environmental contamination (*see* Section IV for a discussion of the sources of such contamination).[14] Technically speaking, contamination refers to the presence of chemical substances in environmental media (including consumer products) in which such substances would not ordinarily be found. The term also may be used to refer to their presence in greater amounts than is usual.[15] The assessment of health risks from such contaminants depends upon an understanding of the magnitude and duration of exposure to them. Exposures may occur through the presence of contaminants in air, drinking water, foods, consumer products, or soils and dusts; in many cases, exposures may occur simul-taneously through more than one of these media.

The results from exposure and risk assessments (which incorporate informa-tion regarding the toxic properties of the contaminants) are typically used by regulators and public health officials to determine whether exposed populations are at significant risk of harm. If regulators decide that the risks are excessive, they

13. B.D. Beck et al., *The Use of Toxicology in the Regulatory Process, in* Principles and Methods of Toxicology (A. Wallace Hayes ed., 5th ed. 2008).

14. *See, e.g.,* Orchard View Farms, Inc. v. Martin Marietta Aluminum, Inc., 500 F. Supp. 984, 1008 (D. Or. 1980) (failure to monitor fluoride emissions that harmed nearby orchards supported award of punitive damages).

15. For example, lead is naturally present in soils. It could be said that a sample of soil is con-taminated with lead only if it were clear that the amounts present exceeded natural levels. The issue is complicated by the fact that natural levels are highly variable.

EXHIBIT C

will take steps to reduce them, typically by using interventions that will reduce exposures (because the inherent toxic properties of the chemicals involved cannot be altered). Exposure scientists are called upon to assess the magnitude of exposure reduction (and therefore risk reduction) achieved through a given intervention.[16]

## C. Chemicals in Workplace Environments

Workers in almost all industrial sectors are exposed to chemicals.[17] Exposures are created in industries involved in the extraction of the many raw materials used to manufacture chemical products (the mining, agricultural,[18] and petroleum industries). Raw materials are refined and otherwise processed in thousands of different ways and are eventually turned into manufactured chemical products that number in the tens of thousands. These products enter many channels of distribution and are incorporated into many other products (so-called downstream uses). Occupational exposures can occur at all of these various steps of manufacturing and use. Exposure also can occur from disposal of wastes. Exposure assessments in all of these various occupational settings are important to understand whether health risks are excessive and therefore require reduction.[19]

## D. Claims of Disease Causation

In the above three situations, the exposures of interest are those that are currently occurring or that are likely to occur in the future. In those situations the exposure assessments are used to ascertain whether risks of harm are excessive (and thus require reduction) or to document safety (when risks are negligible). There are, however, many circumstances in which individuals claim they actually have been harmed by chemicals. Specifically, they allege that some existing medical condition has been caused by exposures occurring in the past, whether in the workplace, the environment, or through the use of various consumer products.[20]

16. National Research Council, Air Quality Management in the United States (2004).

17. *See, e.g.,* Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin., 476 F.3d 946 (D.C. Cir. 2007) (suit over regulations addressing miners' exposure to diesel particulate matter).

18. The term "agriculture" is applied here very broadly and includes the production of a wide variety of raw materials that have industrial and consumer product uses (including flavors, fragrances, fibers of many types, and some medicinal products). *See, e.g.,* Association of Irritated Residents v. Fred Schakel Dairy, 634 F. Supp. 2d 1081, 1083 (E.D. Cal. 2008) (methanol emissions from dairy allegedly resulted in exposure sufficient to create human health risks).

19. Office of Pesticide Programs, U.S. Environmental Protection Agency, General Principles for Performing Aggregate Exposure and Risk Assessments, *available at* http://www.epa.gov/pesticides/ trac/science/aggregate.pdf (last visited July 14, 2010).

20. *See* Michael D. Green et al., *supra* note 1, in this manual, for a discussion on disease causation. Regulations and public health actions are usually driven by findings of excessive risk of harm (although sometimes evidence of actual harm).

EXHIBIT C

*Reference Manual on Scientific Evidence*

Exposure science comes into play in these cases because the likelihood that any given disease or injury was induced because of exposure to one or more chemicals depends in large part on the size of that exposure.[21] Thus, with the advent of large numbers of so-called toxic tort claims has come the need to assess past exposures. Exposure scientists have responded to this need by adapting the methods of exposure assessment to reconstruct the past—that is, to produce a profile of individuals' past exposures.[22]

A plaintiff with a medical condition known from epidemiological studies to be caused by a specific chemical may not be able to substantiate his or her claim without evidence of exposure to that chemical of a sufficient magnitude.[23] Exposure experts are needed to quantify the exposures incurred; causation experts are then called upon to offer testimony on whether those exposures are of a magnitude sufficient to cause the plaintiff's condition. Chemicals known to cause diseases under certain exposure conditions will not do so under all exposure conditions.

Exposure reconstruction has a history of use by epidemiologists who are studying disease rates in populations that may be associated with past exposures.[24] Epidemiologists have paved the way for the use of exposure assessment methods to reconstruct the past. Although the methods for evaluating current and past exposures are essentially identical, the data needed to quantify past exposures are often more limited and yield less certain results than the data needed to evaluate current exposures. Assessment of past exposures is especially difficult when considering diseases with very long latency periods.[25] By the time disease occurs, documentary proof of exposure and magnitude may have disappeared. But courts regularly deal with evidence reconstructing the past, and assessment of toxic exposure is another application of this common practice.[26]

---

21. *See supra* notes 1 & 2. Causation may sometimes be established even if quantification of the exposure is not possible. *See, e.g.,* Best v. Lowe's Home Ctrs, Inc., 563 F.3d 171 (6th Cir. 2009) (doctor permitted to testify as to causation based on differential diagnosis).

22. Confounding factors must be carefully addressed. *See, e.g.,* Allgood v. General Motors Corp., 2006 WL 2669337, at *11 (S.D. Ind. 2006) (selection bias rendered expert testimony inadmissible); American Farm Bureau Fed'n v. EPA, 559 F.3d 512 (2009) (in setting particulate matter standards addressing visibility, the data relied on should avoid the confounding effects of humidity); Avila v. Willits Envtl. Remediation Trust, 2009 WL 1813125, 2009 U.S. Dist. LEXIS 67981 (N.D. Cal. 2009) (failure to rule out confounding factors of other sources of exposure or other causes of disease rendered expert's opinion inadmissible); Adams v. Cooper Indus. Inc., 2007 WL 2219212, 2007 U.S. Dist. LEXIS 55131 (E.D. Ky. 2007) (differential diagnosis includes ruling out confounding causes of plaintiffs' disease).

23. *See* Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

24. *Id*.

25. W.T. Sanderson et al., *Estimating Historical Exposures of Workers in a Beryllium Manufacturing Plant,* 39 Am. J. Indus. Med. 145–57 (2001).

26. Courts have accepted indirect evidence of exposure. For example, differential diagnosis may support an expert's opinion that the exposure caused the harm. Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171 (6th Cir. 2009). On occasion, qualitative evidence of exposure is admitted as evidence

EXHIBIT C

# IV. Chemicals

Before embarking on a description of the elements of exposure science, it is useful to provide a brief primer on some of the characteristics of chemicals that influence their behavior and that therefore affect the ways in which humans can be exposed to them. The primer also introduces some technical terms that frequently arise in exposure science.

## A. Organic and Inorganic Chemicals

For both historical and scientific reasons, chemists divide the universe of chemicals into organic and inorganic compounds. The original basis for classifying chemicals as organic was the hypothesis, known since the mid-nineteenth century to be false, that organic chemicals could be produced only by living organisms. Modern scientists classify chemicals as organic if they contain the element carbon.[27] Carbon has the remarkable and nearly unique property that its atoms can combine with each other in many different ways, and, together with a few other elements—including hydrogen, oxygen, nitrogen, sulfur, chlorine, bromine—can create a huge number of different molecular arrangements. Each such arrangement is a unique chemical. Several million distinct organic chemicals are already known to chemists, and there are many more that will no doubt be found to occur naturally or that will be created by laboratory synthesis. All of life—at least on Earth—depends on carbon compounds and probably could not have evolved if carbon did not have its unique and extraordinary bonding properties.

All other chemicals are called inorganic. There are 90 elements in addition to carbon in nature (and several more that have been created in laboratories), and because these elements do not have the special properties of carbon, the number of different possible combinations of them is smaller than can occur with carbon.

Living organisms contain or produce organic chemicals by the millions. One of the most abundant organic chemicals on Earth is cellulose—a giant molecule containing thousands of atoms of carbon, hydrogen, and oxygen. Cellulose is produced by all plants and is their essential structural component. Chemically, cel-

---

that the magnitude was great enough to cause harm. *See, e.g.,* Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999) (no quantitative measurement required where evidence showed plaintiff was covered in talc and left footprints; Allen v. Martin Surfacing, 263 F.R.D. 47 (D. Mass. 2009) (symptom accounts at the time of exposure formed the basis for expert's opinion that exposure was high enough to cause harm). And courts have accepted the government's reconstruction of exposure to radiation. Hayward v. U.S. Dep't of Labor, 536 F.3d 376 (5th Cir. 2008); Hannis v. Shinseki, 2009 WL 3157546 (Vet. App. 2009) (no direct measure of veteran's exposure to radiation was possible but VA's dose estimate was not clearly erroneous).

27. There are a few compounds of carbon that chemists still consider inorganic: These are typically simple molecules such as carbon monoxide (CO) and carbon dioxide ($CO_2$) and the mineral limestone, which is calcium carbonate ($CaCO_3$).

EXHIBIT C

*Reference Manual on Scientific Evidence*

lulose is a carbohydrate (one that is not digested by humans), a group that together with proteins, fats, and nucleic acids are the primary components of life. But living organisms also produce huge numbers of other types of organic molecules. The colors of plants and animals and their odors and tastes are a result of the presence of organic chemicals. The numbers and structural varieties of naturally occurring chemicals are enormous.

Other important natural sources of organic chemicals are the so-called fossil fuels—natural gas, petroleum, and coal—all deposited in the Earth from the decay of plant and animal remains and containing thousands of degradation products. Most of these are simple compounds containing only carbon and hydrogen (technically known as hydrocarbons). The organic chemical industry depends upon these and just a few other natural products for everything it manufactures; the fraction of fossil fuels not used directly for energy generation is used as feedstock for the chemical industry. There are also inorganic chemicals—the minerals— present in living organisms, many essential to life. But the principal natural source of inorganic chemicals is the nonliving part of the Earth that humans have learned how to mine.

## B. Industrial Chemistry

The modern chemical industry had its origins in the late nineteenth century when chemists, mostly European, discovered that it was possible to create in the laboratory chemicals that had previously been found only in nature. Most remarkably, scientists also discovered they could synthesize compounds not found in nature— substances never previously present on Earth. In other words, they found ways to alter through chemical reactions the bonds present in one compound so that a new compound was formed. The first compound synthesized in this way was a dye called aniline purple by the British chemist, William Henry Perkin, who discovered it.[28] The work of chemical synthesis grew out of the development of so-called structural theory in the nineteenth century and remains central to the science today. This theory explains that the number and type of chemical elements present, and the ways in which those elements are bonded to each other, are unique for each chemical compound and therefore distinguish one chemical from another.

In the late nineteenth century and up to World War II, coal was the major starting material for the organic chemical industry. When coal is heated in the absence of oxygen, coke and volatile byproducts called coal tars are created. All sorts of organic chemicals can be isolated from coal tar—benzene, toluene, xylenes, ethylbenzene, naphthalene, creosotes, and many others. The organic

---

28. This compound and others related to it became the bases for the first chemical industry, that devoted to dye production. Perkins' dye was later called "mauve" and its wide use led to what came to be called the Mauve Decade (1890s).

514

EXHIBIT C

*Reference Guide on Exposure Science*

chemical industry also uses other natural products, such as animal fats, vegetable oils, and wood byproducts.

The move to petroleum as a raw materials source for the organic chemical industry began during the 1940s. Petrochemicals, as they are called, are now used to create thousands of useful industrial chemicals. The rate of commercial introduction of new chemicals shot up rapidly after World War II.

Among the thousands of products produced by the organic chemical industry and by related industries are medicines (most of which are organic chemicals of considerable complexity), dyes, agricultural chemicals, including substances used to eliminate pests (insecticides, fungicides, herbicides, rodenticides, and other "cides"), soaps and detergents, synthetic fibers and rubbers, paper chemicals, plastics and resins of great variety, adhesives, food additives, additives for drinking water, refrigerants, explosives, cleaning and polishing materials, cosmetics, and textile chemicals. Because of past disposal practices, chemicals primarily used as solvents (for many purposes) are among the most widespread environmental contaminants.

The history of human efforts to tap the inorganic earth for useful materials is complex and involves a blend of chemical, mining, and materials technologies. Included here is everything from the various silicaceous materials derived from stone (glasses, ceramics, clays, asbestos) to the vast number of metals derived from ores that have been mined and processed (iron, copper, nickel, cadmium, molybdenum, mercury, lead, silver, gold, platinum, tin, aluminum, uranium, cobalt, chromium, germanium, iridium, cerium, palladium, manganese, zinc, and many more). Other nonmetallic materials, such as chlorine and bromine, salt (sodium chloride), limestone (calcium carbonate), sulfuric acid, and phosphates, and various compounds of the metals, have hundreds of different uses, as strictly industrial chemicals and as consumer products. These inorganic substances reach, enter, and move about our environment, and we come into contact with them, sometimes intentionally, sometimes inadvertently. The number of organic and inorganic chemicals in commercial production exceeds 70,000, and the number of uses and products created from them far exceeds this number.

There are important health questions related to what is generally referred to as particulate matter (PM). Small particulates in the air usually arise from combustion of almost any organic material. The chemical composition of such particulates can vary depending upon source, but it is possible that their health effects depend more upon their physical size than their chemical composition. This issue is currently unresolved, but it is important to include PMs of all types as a class of chemical contaminants.

Finally, it is important to note that, in addition to PM, many chemicals are produced when fuels or other organic materials are burned. Organic chemicals take on oxygen atoms during combustion and yield large numbers of substances not present in the materials that are burned. Combustion also produces simple inorganic oxides of carbon, nitrogen, and sulfur, which are major air pollutants.

515

EXHIBIT C

*Reference Manual on Scientific Evidence*

Burning tobacco introduces 4000 to 5000 chemicals into the lungs. Combustion products are another important source of environmental contamination.[29]

# V. Human Exposures to Chemicals

As noted earlier, this section is entirely descriptive, rather than quantitative. It describes all the various physical processes that lead to human exposures to chemicals and introduces the terms that exposure scientists apply to those processes. Section VI illustrates how these various processes can be quantified and the types of data that are required to do so.

## A. Exposure Sources—An Overview

Figure 1 provides a broad overview of most of the major sources of exposure. As shown, sources can be intended or unintended. Thus, many chemicals are intentionally used in ways that will lead to human exposures. Substances added to food and indeed food itself,[30] cosmetics, personal care products, fibers and the colorants added to them, and medical products of many types are included in this broad category. Direct ingestion of, or other types of direct contact with (on the skin or through inhalation), such products obviously creates exposures. Nicotine and tobacco combustion products might also be classified as intended exposures. Generally, these exposures are more readily quantifiable than those associated with unintended exposures.

Although the term is somewhat ambiguous, unintended exposures may be said to fall into two broad categories. There are deliberate uses of certain chemicals that, although not intended to lead to human exposures, will inevitably do so. Pesticides applied to food crops, some components of food packaging materials that may migrate into food, and many types of household products are not intended for direct human ingestion or contact, but exposures will nonetheless occur indirectly. Occupational exposures, although unintended, are similarly unavoidable. Also, many exposures to a very broad range of environmental contaminants are unintended (see Figure 1).

In all of these cases, such exposures are not described as intentional, in the sense that the term is applied to a pharmaceutical ingredient or a cosmetic, but most are not completely avoidable. Unintended exposures are generally more

---

29. National Research Council, Human Exposure Assessment for Airborne Pollutants: Advances and Opportunities (1991); J. Samet & S. Wang, *Environmental Tobacco Smoke, in* Environmental Toxicants (M. Lippmann ed., 2d ed. 2000).

30. The natural constituents of food include not only substances that have nutritional value, but also hundreds of thousands of other natural chemicals.

516

EXHIBIT C

*Reference Guide on Exposure Science*

Figure 1. Opportunities for exposure: Sources of chemical releases.



difficult to identify and quantify than are intended exposures.[31] In the case of
the intended exposures, the pathway from source to humans is direct; in the case
of unintended exposures, the pathway is indirect, sometimes highly so. Thus,
the most important distinction for purposes of exposure assessment concerns the
directness of the pathway from source to people.

31. There are significant differences in the laws regarding the regulation of substances that have
been grouped as creating intended or unintended exposures.

517

**EXHIBIT C**

*Reference Manual on Scientific Evidence*

## B. The Goal of Exposure Assessment

Exposure assessment is generally intended to answer the following questions:

- Who has been, or could become exposed to a specific chemical(s) arising from one or more specific sources? Is it the entire general population, or is it a specific subpopulation (e.g., those residing near a certain manufacturing or hazardous waste facility, or infants and children), or is it workers?[32]
- What specific chemicals comprise the exposures?
- What are the pathways from the source of the chemical to the exposed population? Pathways include direct product use, or those (so-called indirect pathways) in which the chemical moves through one or more environmental media to reach the media to which people are exposed (air, water, foods, soils, and dusts). Understanding pathways is necessary to understanding exposure routes (below) and quantifying exposures.
- By what routes are people exposed? Routes include ingestion, inhalation, and dermal contact.[33] Identifying exposure routes is important because those routes affect the magnitude of ultimate exposures and because they often affect health outcomes.
- What is the magnitude and duration of exposure incurred by the population of interest? Dose is the technical term used for magnitude, and it is the amount of chemical entering the body or contacting the surface of the body, usually over some specified period of time (often over 1 day[34]). Duration refers to the number of days over which exposure occurs. Note that exposures can be intermittent or continuous and can be highly variable, especially for some air contaminants.

The ultimate goal of exposure assessment is to identify dose and duration. The concept of dose is further developed in Section VI. After a chemical enters or contacts the body, it can be absorbed (into the bloodstream), distributed to many organs of the body, metabolized (chemically altered by certain enzymes in cells of the liver and other organs), and then excreted. Understanding these processes is important to determining whether and how a chemical may cause adverse health effects. These processes mark the interface between exposure science and toxicology, epidemiology, and medicine. Understanding the dose is the necessary first step in understanding these processes; for purposes of this reference guide, the boundary of exposure science is set at understanding dose. However, some

---

32. *See, e.g.,* Hackensack Riverkeeper, Inc. v. Del. Ostego, 450 F. Supp. 2d 467 (D.N.J. 2006) (river and bay users alleged that hazardous waste runoff and emissions polluted the water).

33. Additional routes of exposure are relevant for some pharmaceuticals, diagnostics, and medical devices.

34. Shorter periods of time are used when the concern is very short-term exposures to chemicals that have extremely high toxicity—so-called acutely poisonous materials.

EXHIBIT C

*Reference Guide on Exposure Science*

discussion of how it is possible to gain more direct measures of exposure (target site doses) by examining human blood and urine is included.

The completion of an exposure assessment provides the information needed (the dose and duration of exposure) by epidemiologists and toxicologists, who will have information on the adverse health effects of the chemicals involved and on the relationships between those effects and the dose and duration of exposure.[35] Recall that exposure assessments can be directed at exposures that occurred in the past, those that are currently occurring, or those that will occur in the future should certain actions be taken (e.g., the entry of a new product into the consumer market or the installation of new air pollution controls).

The discussion of each of these elements of exposure assessment is expanded in the following section, beginning with pathways.

## C. Pathways

Assuming that the chemical of interest and its sources have been identified, exposure assessment focuses on the pathway the chemical follows to reach the population of interest.[36]

To ensure thoroughness in the assessment, all conceivable pathways should be explicitly identified, with the understanding that ultimately some pathways will be found to contribute negligibly to the overall exposure. Identifying pathways is also important to understanding exposure routes.

As noted earlier, the simplest pathways are those described as direct. Thus, a substance, such as a noncaloric sweetener or an emulsifier, once added to food, follows a simple and direct pathway to the people who ingest the food. The same can be said for pharmaceuticals, cosmetics, and other personal care products. Cal-

---

35. *See* reference guides on epidemiology and toxicology in this manual. *See also, e.g.,* White v. Dow Chem. Co., 321 Fed. App'x. 266, 2009 WL 931703 (4th Cir. 2009) (plaintiff must show more than possible exposure; must show concentration and duration); Anderson v. Dow Chem. Co., 255 Fed. Appx. 1, 2007 WL 1879170 (5th Cir. 2007) (lawsuit dismissed because uncontested data showed that magnitude and duration of exposure was insufficient to cause adverse health effects); Finestone v. Florida Power & Light Co., 272 Fed. App'x. 761, 2008 WL 931703 (4th Cir. 2009) (experts' testimony was properly excluded where their conclusions relied on unsupported assumptions).

36. SPPI-Somersville, Inc. v. TRC Cos., 2009 WL 2612227, at ★16 (N.D. Cal. 2009) (groundwater contamination claim was dismissed because there was no current pathway to exposure); United States v. W.R. Grace Co., 504 F.3d 745 (9th Cir. 2007) (affirming exclusion of report, but not expert testimony based on the report, identifying which pathways of asbestos exposure were most associated with lung abnormalities); Grace Christian Fellowship v. KJG Investments Inc., 2009 WL 2460990, at ★12 (E.D. Wis. 2009) (preliminary injunction was denied because the plaintiff did not establish that a complete pathway currently existed for toxins to enter the building); National Exposure Research Laboratory, U.S. Environmental Protection Agency, Scientific and Ethical Approaches for Observational Exposure Studies, Doc. No. EPA 600/R–08/062 (2008), *available at* http://www.epa.gov/nerl/sots/index.html (last visited July 14, 2010); U.S. Environmental Protection Agency. Exposure Factors Handbook (1997).

EXHIBIT C

*Reference Manual on Scientific Evidence*

culating doses for such substances, as shown in Section VI, is generally a straight-forward process. Even in such cases, however, complexities can arise. Thus, in the case of certain personal care products that are applied to the skin, there is a possibility of inhalation exposures to any substance in those products that can readily volatilize at room temperatures. One physical characteristic of chemicals that exposure scientists need to understand is their capacity to move from a liquid to a gaseous state (to volatilize). Not all chemicals are readily volatile (and almost all inorganic, metal-based substances are close to nonvolatile), but inhalation routes can be significant for those that are volatile, regardless of their sources.[37]

Indirect pathways of exposure can range from the relatively simple to the highly complex. Many packaging materials are polymeric chemicals—very large molecules synthesized by causing very small molecules to chemically bind to each other (or to other small molecules) to make very long chemical chains. These polymers (polyethylene, polyvinyl chloride, polycarbonates, and others) tend to be physically very stable and chemically quite inert (meaning they have very low toxicity potential). But it is generally not possible to synthesize polymers without very small amounts of the starting chemicals (those small molecules, usually called monomers) remaining in the polymers. The small molecules can often migrate from the polymer into materials with which the polymer comes into contact. If those materials are foods or consumer products, people consuming those foods or otherwise using those products will be exposed.

Some amount of the pesticides applied to food crops may remain behind in treated foods and be consumed by people.[38] This last pathway can become more complicated when treated crops are used as feed for animals that humans consume (meat and poultry and farm-raised fish) or from which humans obtain food (milk and eggs). Exposure scientists who study these subjects thus need to understand what paths pesticides follow when they are ingested by farm animals used as food. The same complex indirect pathways arise for some veterinary drugs used in animals from which humans obtain food.[39]

In the realm of environmental contamination, pathways can multiply and the problem of exposure assessment can become even more complex. Sources of environmental contamination include air emissions from manufacturing facilities and from numerous sources associated with the combustion of fuels and other

37. Inhalation exposures to nonvolatile chemicals can occur if they are caused to move into the air as dusts. *See* National Research Council, Human Exposure Assessment for Airborne Pollutants: Advances and Opportunities (1991).

38. Other pathways for pesticide exposure include spraying homes or fields. Kerner v. Terminix Int'l Co., 2008 WL 341363 (S.D. Ohio 2008) (pesticides allegedly misapplied inside home); Brittingham v. Collins, 2008 WL 678013 (D. Md. Feb. 26, 2008) (crop-dusting plane sprayed plaintiff's decedent); Haas v. Peake, 525 F.3d 1168 (Fed. Cir. 2008) (veteran claimed exposure to Agent Orange).

39. P. Frank & J.H. Schafer, *Animal Health Products, in* Regulatory Toxicology (S.C. Gad, ed., 2d ed. 2001).

520

EXHIBIT C

*Reference Guide on Exposure Science*

organic materials.[40] Similar emissions to water supplies, including ground water used for drinking or for raising plants and animals, can result in human exposures through drinking water and food.[41] Contaminants of drinking water that are volatile can enter the air when water is used for bathing, showering, and cooking. A recent problem of much concern is the contamination of air in homes and other buildings because of the presence of volatile chemical contaminants in the water beneath those structures.[42]

Wastes from industrial processes and many kinds of consumer wastes can similarly result in releases to air and water.[43] In some cases, emissions to air can lead to the deposition of contaminants in soils and household dusts; this type of contamination is usually associated with nonvolatile substances. Some such substances may remain in soils for very long periods; others may migrate from their sites of deposition and contaminate ground water; whereas others may degrade relatively quickly.

All of these issues regarding the movement of chemicals from their sources and through the environment to reach human populations come under the heading of chemical fate and transport.[44] Transport concerns the processes that cause chemicals to follow certain pathways from their sources through the environment, and fate concerns their ultimate disposition—that is, the medium in which they finally reside and the length of time that they might reside there. Fate-and-transport scientists have models available to estimate the amount of chemical that will be present in that final environmental medium.[45] Some discussion of the nature of these models is offered in Section VI.

One final feature of pathways analysis that should be noted concerns the fact that some chemicals degrade rapidly when they enter the environment, others slowly, and some not at all or only exceedingly slowly. The study of environmental persistence of different chemicals is a significant feature of exposure science; its goal is to understand the chemical nature of the degradation products and the duration of time the chemical and its degradation products persist in any

---

40. *See, e.g.,* Natural Resources Defense Council, Inc. v. EPA, 489 F.3d 1250 (D.C. Cir. 2007) (vacating EPA rule for solid waste incinerators); Kurth v. ArcelorMittal USA, Inc., 2009 WL 3346588 (N.D. Ind. 2009) (defendant manufacturers allegedly emitted toxic chemicals, endangering school-children); American Industrial Hygiene Association, Guideline on Occupational Exposure Reconstruction (S.M. Viet et al. eds., 2008).

41. United States v. Sensient Colors, Inc., 580 F. Supp. 2d 369, 373 (D.N.J. 2008) (leaching lead threatened to contaminate ground water used for drinking).

42. Interstate Technology & Regulatory Council (ITRC), Vapor Intrusion Pathway: A Practical Guideline. (Jan. 2007), *available at* http://www.itrcweb.org/Documents/VI-1.pdf.

43. American Farm Bureau Fed'n. v. EPA, 559 F.3d 512 (D.C. Cir. 2009) (EPA outdoor air pollution standards).

44. The common phrase used by exposure scientists is "fate and transport." In fact, transport takes place and has to be understood before fate is known.

45. In the context of exposure science, the term "final" refers to the medium through which people become exposed. A chemical may in fact continue to move to other media after that human exposure has occurred.

521

EXHIBIT C

*Reference Manual on Scientific Evidence*

given environmental medium. Most inorganic chemicals are highly persistent; metals that become contaminants may change their chemical forms in small ways (lead sulfide may convert to lead oxide), but the metal persists forever (although it may migrate from one medium to another). Most organic chemicals degrade in the environment as a result of their exposure to light, to microorganisms present in soils and sediments, and to other environmental substances. But a few organic substances (e.g., polychlorinated biphenyls (PCBs) and the chlorinated dioxins, certain chlorinated pesticides such as DDT that were once widely used) are quite resistant to degradation and may persist for unexpectedly long periods (although even these ultimately degrade).[46]

Exposure scientists also need to be aware of the possibility that the degradation products of certain chemicals may be as or more toxic than the chemicals themselves. The once widely used solvents trichloroethylene and perchloroethylene (tetrachloroethylene) are commonly found in ground water. Under certain conditions, these compounds degrade by processes that lead to the replacement of some chlorine atoms by hydrogen atoms; one product of their degradation is the more dangerous chemical called vinyl chloride (monochloroethylene). The presence of such a degradation product in drinking water should not be ignored.

A description of pathways is the critical first step in exposure assessment and, especially for environmental contaminants, must be done with thoroughness. Are all conceivable pathways accounted for? Have some pathways been eliminated from consideration, and if so, why? Are any environmental degradation products of concern? Only with adequate description can adequate quantification (Section VI) be accomplished.

A graphical description of pathways is offered in Figure 2.

## D. Exposure Routes

Pathways analysis leads to the identification of the environmental media in which the chemical of interest comes to be present and with which human contact can occur—the media of human exposure.

The inhalation of air containing the chemical of interest is one route of exposure.[47] The physical form of the chemical in air, which should be known from the pathways analysis, will influence what happens to the chemical during inhalation. Chemicals that are in the vapor phase will remain in that physical

---

46. K.W. Fried & K.K. Rozman, *Persistent Polyhalogenated Aromatic Hydrocarbons*. *in* Toxicology and Risk Assessment: A Comprehensive Introduction H. Greim & R. Snyder eds., 2009).

47. *See, e.g.,* Byers v. Lincoln Elec. Co., 607 F. Supp. 2d 840 (N.D. Ohio 2009) (welder inhaled toxic manganese fumes); O'Connor v. Boeing North American, Inc., 2005 WL 6035256 (C.D. Cal. 2005) (alleged failure to monitor ambient air emissions of radioactive particles); *In re* FEMA Trailer Formaldehyde Prod. Liab. Litig., 2009 WL 2382773 (E.D. La. 2009) (trailer residents exposed to formaldehyde).

EXHIBIT C

*Reference Guide on Exposure Science*

Figure 2. Description of the many possible environmental pathways that chemi-
cals may follow after releases from different sources.



Source: Graphic created by Jason Miller.

state and will move to the lungs, where a certain fraction will pass through the lungs and enter the bloodstream. The extent to which different chemical substances pass through the lungs is dependent in large part upon their physical properties, particularly solubilities in both fatlike materials and water. Passage through cell membranes (of the cells lining the lungs) requires that substances have a degree of both fat solubility and water solubility. Predicting the extent of absorption through the lungs (or the gastrointestinal tract or skin, discussed below) cannot be accomplished with accuracy; knowledge in this area can be gathered only through measurement.

Certain fibrous materials (including but not limited to asbestos) and particu-late matter and dusts may move through the airways and may reach the lungs, but some of these kinds of materials may be trapped in the nose and excreted. Gen-erally, only very fine particles reach the lower lung area. Some particles may be deposited in the upper regions of the respiratory tract and then carried by certain physical processes to the pharynx and then be coughed up or swallowed. Thus, inhaled chemicals and particulates can enter the body through the gastrointestinal

EXHIBIT C

(GI) tract or the respiratory tract.[48] Understanding risk requires information about these characteristics of the chemicals involved.

Ingestion is the second major route of exposure to substances in environmental media.[49] Chemicals that comprise or come to be present in foods, in drinking water, in soils and dusts,[50] and many of those that serve as medicines are all ingested. They are swallowed, enter the GI tract, and to greater or lesser degrees are absorbed into the bloodstream at various locations along that tract. This is often referred to as the oral route of exposure.

The largest organ of the body, the skin, is the third route of exposure for chemicals in products and the environment.[51] As with the GI tract and the lungs, chemicals are absorbed through the skin to greater or lesser degrees, depending on their physical and chemical characteristics. In some cases, toxic harm can occur directly within the respiratory or GI tracts or on the skin before absorption occurs.[52]

The pathways analysis allows the identification of all the routes by which chemicals from a given source may enter the body, because it identifies the media of human contact into which the chemicals migrate from their sources. Once the media of human contact are identified, the possible exposure routes are known.

## E. Summary of the Descriptive Process

Once the exposure question to be examined has been defined, the exposure scientist sets out to identify all the relevant sources of exposure to the chemicals of interest. All the pathways the chemicals can follow from those sources to reach the population of interest are then described, with careful attention to the possibility that chemical degradation (to more or less toxic substances) can occur. The pathways analysis concludes with a description of what chemicals will be present in the various environmental media with which the exposed populations were, are, or could become exposed (air, water, foods, soils and dusts, consumer products). At this point, it becomes possible to identify the routes by which the chemicals can enter the body.

48. J.V. Rodricks, *From Exposure to Dose, in* Calculated Risks: The Toxicity and Human Health Risks of Chemicals in Our Environment (2d ed. 2007).

49. *See, e.g.,* Foster v. Legal Sea Foods, Inc., 2008 WL 2945561 (D. Md. 2008) (hepatitis A allegedly contracted from eating undercooked mussels); Winnicki v. Bennigan's, 2006 WL 319298 (D.N.J. 2006) (alleged foodborne illness contracted from defendant's restaurant led to renal failure and death); Palmer v. Asarco Inc., 2007 WL 2298422 (N.D. Okla. 2007) (children allegedly ingested dust and soil contaminated with lead).

50. Inadvertent exposures to these and other nonfood items are known to occur and can be especially common in children.

51. *See, e.g.,* United States v. Chamness, 435 F.3d 724 (7th Cir. 2006) (evidence that methamphetamine and the ingredients used in its manufacture are toxic to the eyes, mucous membranes, and skin supported sentencing enhancement for danger to human life).

52. J.V. Rodricks, *From Exposure to Dose, in* Calculated Risks: The Toxicity and Human Health Risks of Chemicals in Our Environment (2d ed. 2007).

EXHIBIT C

Description by itself, however, often is inadequate. Attempts have to be made to quantify exposure, to arrive at estimates of the dose received by the exposed population, and to determine the duration of time over which that dose is received.

# VI. Quantification of Exposure

## A. Dose

The simplest dose calculations relate to situations in which direct exposures occur.[53] Thus, for example, consider the case of a substance directly added to food (and approved by the U.S. Food and Drug Administration (FDA) for such addition). Suppose the chemical is of well-established identity and is approved for use in nonalcoholic beverages at a concentration of 10 milligrams of additive for each liter of beverage (10 mg/L).[54] To understand the amount (weight) of the additive ingested each day, it is necessary to know how much of the beverage people consume each day. Data are available on rates of food consumption in the general population. Typically, those data reflect average consumption rates and also rates at the high end of consumption. To make sure that the additive is safe for use, FDA seeks to ensure the absence of risk for individuals who may consume at the high end, perhaps at the 95th percentile of consumption rates.[55] Surveys of intake levels for the beverage in our example reveal that the 95th percentile intake is 1.2 L per day for adults.

The weight of additive ingested by individuals at the 95th percentile of beverage consumption rate is thus obtained as follows:

$$10 \text{ mg/L} \times 1.2 \text{ L/day} = 12 \text{ mg/day}.$$

For a number of reasons, toxicologists express dose as weight of chemical per unit of body weight. For adults having a body weight (bw) of, on average, 70 kilograms (kg), the dose of additive is

$$12 \text{ mg/day} \div 70 \text{ kg bw} = 0.17 \text{ mg/kg bw per day.}[56]$$

---

53. *See, e.g.,* McLaughlin v. Sec'y of Dep't of Health & Human Servs., 2008 WL 4444142 (Fed. Cl. 2008) (plaintiff exposed to known dose of thimerosol in vaccine; study using four times that dose was not reliable evidence that exposure caused his autistic symptoms).

54. See Appendix A for a discussion of units used in exposure science.

55. J.V. Rodricks & V. Frankos, *Food Additives and Nutrition Supplements, in* Regulatory Toxicology 51–82 (C.P. Chengeliss et al. eds., 2d ed. 2001).

56. To gain approval for such an additive, FDA would require that no toxic effects are observable in long-term animal studies at doses of at least 17 mg/kg bw per day (100 times the high-end human intake).

EXHIBIT C

*Reference Manual on Scientific Evidence*

Doses from other ingested products containing specified amounts of chemicals are calculated in much the same way. It generally would be assumed that the duration of exposure for a substance added to a food or beverage would be continuous and would cover a large fraction of a lifetime. For other products, particularly pharmaceuticals, exposure durations will vary widely; dose calculations would be the same, regardless of duration, but the potential for harm requires consideration of exposure duration.

It will be useful, before proceeding further, to illustrate dose calculations for exposures occurring by the inhalation and dermal routes.[57] Consider a hypothetical workplace setting in which a solvent is present in the air. Measurement by an industrial hygienist reveals its presence at a weight of 2 mg in each cubic meter ($m^3$) of air. Data on breathing rates reveal that a typical worker breathes in 10 $m^3$ of air each 8-hour workday.[58] Thus, the worker dose will be

$$2 \text{ mg/m}^3 \times 10 \text{ m}^3/\text{day} = 20 \text{ mg/day}$$
$$20 \text{ mg/day} \div 70 \text{ kg} = 0.28 \text{ mg/kg bw per day.}$$

As noted earlier, it is likely that only a fraction of this dose will reach and pass through the lungs and enter the bloodstream. As also noted earlier, if the chemical is a fiber or other particle, its dynamics in the respiratory tract will be different than that of a vapor, with a portion of the inhaled dose entering the GI tract.

Dose from skin exposure often is expressed as the weight of chemical per some unit of skin surface area (e.g., per $m^2$ of skin). The body surface area of an average (70 kg) adult is 1.8 $m^2$. Thus, consider a body lotion containing a chemical of interest. If the lotion is applied over the entire body, then it is necessary to know the total amount of lotion applied and then the total amount of chemical present in that amount of lotion. That last amount will then be divided by 1.8 to yield the skin dose in units of milligrams per square meter. If the chemical causes toxicity directly to the skin, that toxicity dose information also will be expressed in milligrams per square meter. Then risk is evaluated by examining the quantitative relationship between the toxic dose (milligrams per square meter) and the (presumably much lower) human dose expressed in the same units. If the chemical can penetrate the skin and produce toxicity within the body, then the dose determination must include an examination of the amount absorbed into the human body.[59]

57. *See, e.g.,* Henricksen v. ConocoPhillips Co., 605 F. Supp. 2d 1142, 1164 (E.D. Wash. 2009) (benzene exposure on skin and by inhalation); Bland v. Verizon Wireless (VAW) LLC, 2007 WL 5681791, at ★9 (S.D. Iowa 2007) (inhalation exposure to Freon in "canned air" sprayed into water bottle). For a discussion of the importance of assessment of dose as a measure of exposure, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, Section I.A.1.c, in this manual.

58. The 24-hour inhalation rate outside the workplace setting is ca. 20 $m^3$. The lack of direct proportion to time reflects the fact that breathing rates increase under exertion.

59. Rates of absorption of chemicals into the body, through the GI tract, the lungs, or the skin, usually must be obtained by measurement; they are not readily predicted.

**EXHIBIT C**

*Reference Guide on Exposure Science*

One final matter concerning dose estimation concerns the importance of body size, in particular that of the infant and the growing child. In matters such as food and water intake, and breathing rates, small children are known to take in these media at higher rates per unit of their body weights than do adults.[60] Thus, when a small child is exposed to a food contaminant, that child will often receive a greater dose of the contaminant than will an adult consuming food with the same level of contaminant. Children also tend to ingest greater amounts of nonfood items, such as soils and dusts, than do adults. In some cases, nursing mothers excrete chemicals in their milk. The exposure scientist generally conducts separate assessments for children that take into account the possibility of periods of increased exposure during the developmental period.[61]

## B. *Doses from Indirect Exposure Pathways*

Recall that the goal of exposure assessment is to identify the media through which people will be exposed to chemicals of interest that are emitted from sources of interest. As will be seen, the assessment, when completed, will reveal the amount of the chemical of interest in a certain weight or volume of each of the media with which people come into contact. Once this is known, dose calculations can proceed in the manner described in the preceding section.

In the preceding section, firm and readily available knowledge was available about the amount of chemical present in a given weight of food or consumer product (the body lotion example) or in a given volume (cubic meters) of air. These measures are called concentrations of the chemicals in the media of expo-sure (*see* Appendix A). When a chemical must move from one or more sources, and then through one or more environmental media, before it comes to be present in the media with which people have contact (the media of exposure), determin-ing the concentrations of the chemical in the media of exposure becomes dif-ficult.[62] Such a situation is clearly different from that in which a specific amount of an additive is directly added to a specific amount of food. The challenge faced by exposure scientists when the chemical comes to be present in the medium of human exposure not by direct and intentional addition, but by indirect means, through movement from source through the environment, is to find a reliable

60. *See, e.g.,* Northwest Coalition for Alternatives to Pesticides (NCAP) v. EPA, 544 F.3d 1043 (9th Cir. 2008) (dispute over how much lower allowable pesticide levels should be to account for children's greater susceptibility).

61. For some substances, susceptibility to toxicity is also enhanced during the same periods. See Section VII.B.

62. *See, e.g.,* Hannis v. Shinseki, 2009 WL 3157546 (Vet. App. 2009) (no direct measure of veteran's exposure to radiation was possible but VA's dose estimate was not clearly erroneous); Fisher v. Ciba Specialty Chem. Corp., 2007 WL 2302470 (S.D. Ala. 2007) (allowing expert's qualitative account of DDT and its metabolites spreading from defendant's plant to plaintiffs' property, because quantification would necessarily rely on speculative data).

EXHIBIT C

way to estimate concentrations in the medium of human exposure.[63] Once concentrations are known, dose is readily calculated (as in Section VI.A), but reliably estimating concentrations can be difficult.

Two methods typically are used to estimate those concentrations. One involves direct measurement using the tools of analytical chemistry. The second involves the use of models that are intended to quantify the concentrations resulting from the movement of chemicals from the source to the media of human exposure.

## C. Direct Measurement: Analytical Science

Once the media that could be subject to contamination have been identified through pathways analysis (Section V.C), one available choice for determining the concentrations of contaminants involves sampling those media and subjecting the samples taken to chemical analysis. The analysis will not only reveal the concentrations of chemicals in the media of concern, but should also confirm their identities. Environmental sampling and analysis is under way all over the world, at and near contaminated waste sites, in the vicinity of facilities emitting chemicals to air and water, and in many other circumstances.[64]

One purpose of such sampling and analysis is to determine whether products and environmental media contain substances at concentrations that meet existing regulatory requirements. In many circumstances, regulators have established limits on the concentrations of certain chemicals in foods, other products, water, air, and even soils. These limits generally are based on assessments of health risk and calculations of concentrations that are associated with what the regulators believe to be negligibly small risks. The calculations are made after first identifying the total dose of a chemical that is safe (poses a negligible risk) and then determining the concentration of that chemical in the medium of concern that should not be exceeded if exposed individuals (typically those at the high end of media contact) are not to incur a dose greater than the safe one. The most common concentration limits are regulatory tolerances for pesticide residues in food, Maximum Con-

---

63. *See, e.g.,* Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 352–53 (5th Cir. 2007) (study of people with much longer exposure to organic solvents could not support conclusion that plaintiff's injuries were caused by such solvents); Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin., 476 F.3d 946, 950 (D.C. Cir. 2007) (because diesel particulate matter was difficult to monitor, MSHA's surrogate limits on total carbon and elemental carbon were reasonable).

64. *See, e.g.,* Genereux v. American Beryllia Corp., 577 F.3d 350, 366–67 (1st Cir. 2009) ("*all* beryllium operations should be periodically air-sampled, and a workspace may be dangerous to human health even though no dust is visible"); Allen v. Martin Surfacing, 2009 WL 3461145 (D. Mass. 2009) (where air sampling was not done, expert resorted to modeling plaintiff's decedent's exposure); Jowers v. BOC Group, Inc., 608 F. Supp. 2d 724, 738 (S.D. Miss. 2009) (OSHA measurements showed that 30% of welders experienced manganese fumes at higher than allowable concentrations); *In re* FEMA Trailer Formaldehyde Prod. Liab. Litig., 583 F. Supp. 2d at 776 (air sampling revealed formaldehyde levels higher than allowable).

EXHIBIT C

*Reference Guide on Exposure Science*

taminant Levels (MCLs) for drinking water contaminants, National Ambient Air Quality Standards (NAAQS), and, for workplace exposure, Permissible Exposure Limits (PELs) or Threshold Limit Values (TLVs).[65] Much environmental sampling and analysis is done, by both government agencies and private organizations, for the purpose of ascertaining compliance with existing concentration limits (sometimes referred to as standards).

But sampling and analysis also are undertaken to investigate newly identified contamination or to ascertain exposures (and risks) in situations involving noncompliance with existing standards. As described earlier, information on concentrations in the media through which people are exposed is the necessary first step in estimating doses.

Although at first glance it might seem that direct measurements of concentrations would provide the most reliable data, there are limits to what can be gained through this approach.

- How can we be sure that the samples taken are actually representative of the media sampled?

  Standard methods are available to design sampling plans that have specified probabilities of being representative, but they can never provide complete assurance. Generally, when contamination is likely to be highly homogeneous, there is a greater chance of achieving a reasonably representative sample than is the case when it is highly heterogeneous. In the latter circumstance, obtaining a representative sample, even when very large numbers of samples are taken, may be unachievable.
- How can we be sure that the samples taken represent contamination over long periods?

  Sampling events may provide a good snapshot of current conditions, but in circumstances in which concentrations could be changing over time, and where the health concerns involve long-term exposures, snapshots could be highly misleading. This type of problem may be especially severe when attempts are being made to reconstruct past exposures, based on snapshots taken in the present.
- How can we be sure that the analytical work was done properly?

  Most major laboratories that routinely engage in this type of analysis have developed standard operating procedures and quality control proce-

65. PELs are official standards promulgated by the Occupational Safety and Health Administration. TLVs are guidance values offered by an organization called the American Conference of Governmental Industrial Hygienists. *See, e.g., In re* Howard, 570 F.3d 752, 754 (6th Cir. 2009) (challenging PELs for coal mine dust); Jowers v. BOC Group, Inc., 608 F. Supp. 2d 724, 735–36 (S.D. Miss. 2009) (PELs and TLVs for welders' manganese fume exposure); International Brominated Solvents Ass'n v. American Conf. of Gov. Indus. Hygienists, Inc., 625 F. Supp. 2d 1310 (M.D. Ga. 2008) (challenging TLVs for several chemicals); Miami–Dade County v. EPA, 529 F.3d 1049 (11th Cir. 2008) (MCLs for public drinking water).

EXHIBIT C

*Reference Manual on Scientific Evidence*

dures. Laboratory certification programs of many types also exist to document performance. When analytical work is performed in certified, highly experienced laboratories, there is a reasonably high likelihood that the analytical results are reliable. But it is very difficult to confirm reliability when analytical work is done in laboratories or by individuals who cannot provide evidence of certification or of longstanding quality control procedures.

• How are data showing the absence of contamination to be interpreted?

In most circumstances involving possible contamination of environmental media, the analysis of some (and sometimes many) of the samples will fail to find the contaminant. The analytical chemist will often report "ND" (for nondetect) for such samples. But an ND should never be considered evidence that the concentration of the contaminant is zero. In fact, most chemists will (and should) report that the contaminant is "BDL" (below detection limit). Every analytical method has a nonzero detection limit; the method is not sensitive to and cannot measure concentrations below that limit. Thus, for each sample reported as BDL, all that can be known is that the concentration of contaminant is somewhere below that limit. If there is clear evidence that the contaminant is present in some of the samples (its concentration exceeds the method's BDL), then it is usually assumed that all the samples of the same medium reported as BDL will actually contain some level of contaminant, often and for reliable reasons assumed to be one-half the BDL. Practices for dealing with BDL findings vary, but assuming that the BDL is actually zero is not one of the acceptable practices.

Sampling and measurement are no doubt useful, but are nonetheless limited in important ways. The alternative involves modeling. In fact, a combination of both approaches—one acting as a check on the other—is often the most useful and reliable.

## D. *Environmental Models*

A model is an attempt to provide a mathematical description of how some feature of the physical world operates. In the matters at hand, a model refers to a mathematical description of the quantitative relationship between the amount of a chemical emitted from some source, usually over a specified period of time, to the concentrations of that chemical in the media of human exposure, again over some specified time period.[66]

---

66. *See, e.g.,* NCAP v. EPA, 544 F.3d 1043 (9th Cir. 2008) (EPA was permitted to rely on modeling in developing allowable pesticide residual levels); O'Neill v. Sherwin-Williams Co., 2009 WL 2297026, at ⋆5 (C.D. Cal. 2009) (exposure model was inappropriate because it was based on a different type of paint than plaintiff was exposed to); Hayward v. U.S. Dep't of Labor, 536 F.3d 376

EXHIBIT C

*Reference Guide on Exposure Science*

Models are idealized mathematical expressions of the relationship between two or more variables. They are usually derived from basic physical and chemical principles that are well established under idealized circumstances, but may not be validated under actual field conditions. Models thus cannot generate completely accurate predictions of chemical concentrations in the environment. In some cases, however, they are the only method available for estimating exposure—for example, in assessing the impacts of a facility before it is built or after it has ceased to operate. In such circumstances, they are necessary elements of exposure assessments and have been used extensively. Models are necessary if projections are to be made backward or forward in time or to other locations where no measurements have been made.

Typically, a model is developed by first constructing a flow diagram to illustrate the theoretical pathways of environmental contamination, as shown in Figure 2 and for a hazardous waste site in Appendix B. These models can be used to estimate concentrations in the relevant media based on several factors related to the nature of the site and the chemicals of interest. Model variables include the following:

1. The total amount of chemical present in or emitted from the media that are its sources;
2. The solubility of the chemical in water;
3. The chemical's vapor pressure (a measure of volatility);
4. The degree to which a chemical accumulates in fish, livestock, or crops (bioconcentration or bioaccumulation factor);
5. The nature of the soil present at the site; and
6. The volumes and movement of water around and beneath the site.

Some of this information derives from laboratory studies on the chemical (the first four points) and some from an investigation at the site (the remaining two points). The development of the data and modeling of the site often require the combined skills of chemists, environmental engineers, and hydrogeologists. In addition to the information listed above, time projection models also require information on the stability of the chemical of interest. As noted earlier, some chemicals degrade in the environment very quickly (in a matter of minutes), whereas others are exceedingly resistant to degradation. Quantitative information on rates of degradation is often available from laboratory and field studies.

Models that assess the exposures associated with air emissions consider the fact that the opportunity for people to be exposed to chemicals depends upon their activities and locations.[67] These models account for the activity patterns of

(5th Cir. 2008) (a model was used to reconstruct the dose of radiation that the employee was exposed to); Rodricks & Frankos, *supra* note 55.

67. *See, e.g.,* Palmer v. Asarco Inc., 2007 WL 2298422 (N.D. Okla. 2007) (children allegedly were exposed to lead by "hand-to-mouth activity ingestion of soil/house dust"); Henricksen

EXHIBIT C

*Reference Manual on Scientific Evidence*

potentially exposed populations and provide estimates of the cumulative exposure over specified periods.

Perhaps the most widely used models are those that track the fate and transport pathways followed by substances emitted into the air. Knowledge of the amounts emitted per unit of time (usually obtainable by measurement) from a given location (a stack of a certain height, for example) provides the basic model input. Information on wind directions and velocities, the nature of the physical terrain surrounding the source, and other factors needs to be incorporated into the modeling. Some substances will remain in the vapor phase after emission, but chemical degradation (e.g., because of the action of sunlight) could affect media concentrations. Some models provide for estimating the distributions of soil concentrations for those substances (particulates of a certain size) that may fall during dispersion. Much effort has been put into developing and validating air dispersion models.[68] Similar models are available to track the movement of contaminants in both surface and ground waters.

The fate and transport modeling issue becomes more complex when attempts are made to follow a chemical's movement from air, water, and soils into the food chain and to estimate concentrations in the edible portions of plants and animals.[69] Most of the effort in this area involves the use of empirical data (e.g., What does the scientific literature tell us about the quantitative relationships between the concentration of cadmium in soil and its concentration in the edible portions of plants grown in that soil?). This type of empirical information, together with general data on chemical absorption into, distribution in, and excretion from living systems, is the usual approach to ascertain concentrations in these food media.[70]

Many models for environmental fate and transport analysis are available. It is not possible to specify easily which models have established validity and which have not; rather, some are preferred for some purposes and others are preferred for different purposes.

Perhaps the best that can be done to scrutinize the work of an expert in this area is to

- Require that the expert describe in full the basis for model selection;
- Ask the expert to describe the standing of the model with authoritative bodies such as EPA;
- Require the expert to state why other possible models are not suitable;

v. ConocoPhillips Co., 605 F. Supp. 2d 1142, 1164 (E.D. Wash. 2009) (expert calculated plaintiff's benzene exposure by adjusting study results to account for plaintiff's activities); Junk v. Terminix Int'l Co., 2008 WL 6808423 (S.D. Iowa 2008) (study measured chlorpyrifos exposure of inhabitants of houses sprayed indoors); *In re* W.R. Grace & Co., 355 B.R. 462 (Bankr. D. Del. 2006) (asbestos in attic insulation released by normal activity).

68. National Research Council, Models in Environmental Regulatory Decision Making (2007).

69. Ecologists also use modeling results to evaluate risks to wildlife, plants, and ecosystems.

70. National Research Council, *supra* note 68.

EXHIBIT C